UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| Robert Simpson Ricci, et al., | | |
| Plaintiffs, | Civil Action Nos. | 72-0469-T |
| | | 74-2768-T |
| | | 75-3010-T |
| | | 75-5023-T |
| v. | | 75-5210-T |
| Robert L. Okin et al. | | |
| Defendants | | |

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
TO REOPEN AND RESTORE CASE TO ACTIVE DOCKET
AND TO ENFORCE THE FINAL ORDER OF MAY 12, 1993

The state defendants hereby oppose the July 14, 2004, Motion to Reopen and Restore Case to Active Docket and to Enforce the Final Order of May 12, 1993, brought on behalf of one segment of the original Ricci class ("Motion"). As this Court is aware, the period between the filing of the class-action lawsuit and the entry of the Final Order saw unprecedented improvement of the state intermediate care facilities for the mentally retarded ("ICFs/MR"), transforming not simply the physical condition of the buildings, but--more importantly--the quality of care for individuals in these facilities and in the community. After decades of neglect and deplorable treatment for residents, the "state schools," as they were then called, have been transformed into facilities where individual rights are respected and the quality of medical, nursing, habilitative, physical therapy, speech therapy, social, recreation and other services in the facilities and in the community is excellent. Supports provided to Ricci class members in the community also improved as a result. Since the entry of the Final Order in 1993, the Department has recognized its special responsibility to Ricci class members, specifically ensuring that their

1

service needs are met. The Department's Commissioner, Gerald J. Morrissey, Jr., has repeatedly and publicly acknowledged and emphasized this longstanding commitment to these individuals throughout his thirty-year tenure with the Department, and has consistently instructed his managers to respect the terms of the Order. In addition, the Department has established a <u>Ricci</u> Class Project, staffed by two skilled social workers to act as liaisons to the class members, their families, and class representatives, and the Commissioner has met with class representatives on a quarterly basis for many years. Affidavit of John E. Riley ("Riley Aff."), submitted herewith as Exhibit 5, at ¶¶ 4, 5. Any suggestion that Fernald, or any other facility run by the Department, has returned to pre-<u>Ricci</u> status is wholly unsupported and should be firmly rejected. This memorandum and the materials submitted in support thereof establish the Commonwealth's ongoing commitment to its citizens with mental retardation and the continued vitality of the 1993 Final Order.

The Motion submitted by the Plaintiffs' Counsel for the Fernald, Monson, and Belchertown Classes, rather than making legitimate allegations of systemic failure to provide services mandated by the Final Order, represents the efforts of some plaintiffs to hamper the planned reconfiguration of the campus of the Fernald Developmental Center campus and resulting transfer of current Fernald residents to the community and other placements that will provide them with equal or better services in the least restrictive settings. The planned closure of Fernald is consistent with the long-standing policy commitment of the Department of Mental Retardation ("DMR") to favor community-based settings for individuals who can handle and benefit from them and to reduce its reliance upon traditional institutions for adults with mental retardation. This policy commitment, in addition to furthering the goals of the May 25, 1993, Final Order that Department's clients receive services in the least restrictive environment

2

possible, is also consistent with national trends and the 1999 decision of the U.S. Supreme Court in Olmstead v. Zimring.

As discussed below, the Motion--the vehicle for attempting to draw the Court into this dispute over the Fernald closure--makes allegations that on their face would not demonstrate systemic failure to provide an ISP process; systemic failure to provide the services required under ISPs; or systemic failure to adequately staff, fund, or maintain the Fernald Developmental Center, or any other facilities affected by the Final Order. The allegations are anecdotal and isolated rather than systemic; were not raised in quarterly meetings held with class representatives over the last three years; in many instances are stale and have since been resolved; and in almost every instance, even assuming they were true, should be resolved through the ISP process rather than a petition to reopen this matter. Because the motion is a misplaced effort to drive state policy choices—not an authentic attempt to secure enforcement of the Final Order—it should be denied.

## RELEVANT FACTS

A.  DMR's Facilities--Including Fernald--Have Consistently
    Been in Compliance with Title XIX.

As required by federal law as well as by the terms of the Final Order, the Department has consistently maintained compliance with the requirements of Title XIX. From 1993 to the present, the Department has been found to be in compliance with federal requirements for all of its facilities and its community-based residential system. Affidavit of Diane Enochs ("Enochs Aff."), submitted herewith as Exhibit 1, at ¶12. Federal requirements mandate annual surveys of its ICF/MR facilities conducted by the Massachusetts Department of Public Health ("DPH") as the delegee of the Center for Medicare and Medicaid ("CMS"). Enochs Aff. ¶ 9. DPH surveys Fernald and the other

ICFs/MR to evaluate compliance with federal Title XIX regulations and to determine whether the facility will maintain its certification and federal financial participation ("FFP"). Enochs Aff. ¶ 9.[1]

Since the entry of the Ricci Final Order in May of 1993, Fernald, like all ICFs/MR operated by the Department, has maintained its Title XIX certification. Enochs Aff. ¶ 12. During the eleven years since the Ricci Final Order, any deficiencies noted in Fernald's surveys have not risen to "Condition Level" deficiencies, which would threaten the facility's certification status. Enochs Aff. ¶ 12. Although some deficiencies have been noted in survey reports, the surveyors have been satisfied in their follow-up surveys that the noted deficiencies have been corrected by the facility. Enochs Aff. ¶ 12.[2]

In addition to state and federal quality reviews, the Department has put in place a comprehensive quality assurance system designed to ensure excellence in the quality of services delivered to Ricci class members at the ICFs/MR and in the community.

---

[1] Re-certification is based on facilities' compliance with eight "Conditions of Participation," set forth in the regulations that govern the Title XIX program. These are: Governing Body and Management, Client Protections, Facility Staffing, Active Treatment, Client Behavior and Facility Practices, Health Care Services, Physical Environment, and Dietetic Services. Enochs Aff. ¶ 10. Each Condition is broken down into detailed Standards, which the facility must meet in order to be judged compliant with the Condition. Id. In total, there are over 380 standards the facility must meet as a condition of continued FFP. Id. If deficiencies are noted during a survey, the facility must submit a detailed Plan of Correction ("POC") describing specific actions to be taken to correct the deficiencies and the dates by which corrections will be made. Enochs Aff. ¶ 11. The DPH survey team returns to the facility some time after the last correction date to determine whether the POC has been implemented and the deficiencies corrected. Enochs Aff. ¶ 11.

[2] Each of DMR's facilities has an internal Quality Enhancement office. These internal offices are the on-site mechanism for monitoring the facility's compliance with both Title XIX and DMR regulations. Enochs Aff. ¶ 20. In addition, each facility is required by Title XIX to have Qualified Mental Retardation Professionals ("QMRPs") to integrate, coordinate, and monitor the active treatment program for each individual. Enochs Aff. ¶ 20.

4

Affidavit of Gail Grossman ("Grossman Aff."), submitted herewith as Exhibit 2, at ¶ 4. DMR's Office of Quality Management has primary responsibility for overseeing this system to assure that individuals are healthy, safe, and their rights are protected; that providers are offering quality services; and that information regarding the overall quality of the statewide service system is analyzed, reviewed, and used to improve service quality. Grossman Aff. ¶ 4. Specific programs include licensure and certification processes for 190 service providers, oversight of the Medication Administration program, the risk management and critical incident reporting system, the development of initiatives to enhance and strengthen access and quality of health care services, and the mortality review and reporting system. Id.

    B.    <u>DMR's Systemic Compliance With the ISP Process.</u>

The moving plaintiffs' arguments that the Department has not properly complied with the individual-service plan process set forth in the Final Order should be rejected. In the 1980s, DMR adopted regulations establishing a service plan process. Called the "individual service plan" or "ISP," the plan identifies individual needs and appropriate services to meet those needs. Under the terms of the Final Order, all <u>Ricci</u> class members, whether residing in the facilities or in the community, must have an ISP and the Department is required "to substantially provide" the services identified in the ISP on a lifetime basis. Final Order at ¶ 2 (copy attached as Exhibit 3).

Today, the ISP team process is the process by which decisions about the individual are made. Enochs Aff. ¶ 42. Notwithstanding any other information-gathering process that the Department may utilize, decisions about placement are made in the ISP team meeting process, Enochs Aff. ¶¶ 28, 38, and the ISP remains the cornerstone of

individualized treatment for all <u>Ricci</u> class members. Most ISPs for both <u>Ricci</u> and non-<u>Ricci</u> class members are now electronically recorded. Enochs Aff. ¶ 44. DMR tracks compliance with ISPs monthly through its electronic consumer database: in May of 2004 (looking at data from the month ending February 29, 2004), of 4,166 Ricci class members, only 24 had "overdue" ISPs.[3] Enochs Aff. ¶ 40. All individuals who have been transferred from Fernald in the past two years have had the full benefit of the ISP process including notice and rights of appeal. Affidavit of Gale Conley ("Conley Aff."), submitted herewith Exhibit 4, at ¶ 10.

The placement profile has not replaced the ISP process, but was developed as a tool to assist the Department in planning residential options for over 200 residents at Fernald in communities of their choice. Enochs Aff. ¶ 27. A similar tool was used to plan placement opportunities during the closure of Belchertown State School and the Dever Developmental Center. Enochs Aff. ¶ 27; Riley Aff. ¶¶ 8, 10; Affidavit of Teresa O'Hare ("O'Hare Aff."), submitted herewith as Exhibit 6, ¶¶ 8, 11. The placement profile is neither an assessment nor a part of--or replacement for--the ISP. Rather, it is a tool for compiling information from individuals (families or consumers), or from other existing documents (ISPs, assessments, and other related documents) to provide the information necessary to begin placement planning. Enochs Aff. ¶ 28. DMR staff use the placement profile to gather information on the desires and the interests of an individual's family or guardians as they relate to planning a home and day services. Enochs Aff. ¶ 28. The information so gathered is preliminary placement information that

---

[3] The data does not indicate whether there is a legitimate reason for delay of the ISP, such as hospitalization of the class member. Follow-up is conducted by the Regional Director of the Facility Director to assure compliance with the Final Order.

guides placement planners in their search for homes and day programs by focusing their attention to certain geographical locations and by alerting them to individual needs (e.g., knowing that an individual uses a very large electric wheelchair is critical when looking for an accessible home) and other important considerations such as specific preferences regarding housemates. Enochs Aff. ¶ 28.

While much of the information necessary to develop placement options is available in individual ISPs, a document specific to placement planning allows for the aggregation of data for use in program development and other management activities. Enochs Aff. ¶ 29. For example, this information is being used to plan the location of the new state-operated homes that are being developed in order to provide 80 opportunities for Fernald individuals to move to the community. Enochs Aff. ¶ 29. Information is also used in selecting compatible housemates and maintaining long-standing relationships. Enochs Aff. ¶ 29. During the Belchertown and Dever closings, this tool was important to the success of the placement planning profile. When the placement profile is complete, the Individual Transition Planning team ("ITP")[4] returns the information to the ISP team, which develops a placement objective to be added to the individual's ISP. Enochs Aff. ¶ 30. Thus, placement objectives may be appealed through the ISP process. Enochs Aff. ¶ 30. Profiles for Fernald residents were completed by the individual, family and guardian, and in part by the ISP team. Enochs Aff. ¶ 32. Because most families of individuals living at Fernald refused to offer input into their relatives' placement profiles, the section

---

[4] The Individual Transition Planning Team was developed to dedicate a group of staff to the time-consuming work of seeking and planning individual placements. This work involves extensive clerical work; frequent travel; communication with other staff, individuals, families, guardians, and potential service providers; and a variety of management tasks.

7

intended for individual, family, and guardian response was completed by the ISP teams where necessary. Enochs Aff. ¶ 33.

### C. Adequate Staffing in the Facilities and in the Community

A Title XIX survey is an outcome-based survey process, as are most survey processes now used in the field of mental retardation. Enochs Aff. ¶ 13. Federal regulations provide this guidance to surveyors in determining whether or not a facility has an adequate number of clinicians: "determine if the facility's delivery of professional services is adequate by the extent to which individuals' needs are aggressively and competently addressed." Id. If individual needs are being met, then the standard for professional program services is met. Id. Since the entry of the Final Order, Fernald has not received any citations regarding staffing standards. Enochs Aff. ¶ 14.

The overall staffing ratios at the ICF/MR facilities have not changed significantly over the past ten years. Enochs Aff. ¶ 16. While there have been reductions in force, at the same time there has been census reduction at each of the facilities as well. Enochs Aff. ¶ 16. Positions identified for reduction at ICF/MR facilities have always been those that could be reduced without affecting Title XIX services and the continuation of active treatment. Enochs Aff. ¶ 16. Necessary staffing levels for clinical, nursing, vocational, and habilitative supports are determined by needs identified in ISPs, rather than by arbitrary staffing ratios. Enochs Aff. ¶ 16. The direct care staffing ratio at Fernald--the only facility where staffing was cited as a problem in the Motion--is 3:1.2. Ratios within each discipline (e.g., psychology, nursing habilitation, speech) have been maintained in order to provide all supports identified in ISPs. Enochs Aff. ¶16.

During the past two years there has been a 17.5% census reduction at Fernald and a 13% staff reduction. Enochs Aff. ¶ 17. Since FY02, Fernald has hired a total of 106.9 FTE's. Enochs Aff. ¶ 17. These figures do not include the 20 positions hired for Marquardt, the skilled nursing facility. Enochs Aff. ¶ 17. All new hires were based on the active treatment needs of the people living at Fernald as determined by their ISP as well as by the operational needs of the facility. Positions filled since FY02 have included direct care, supervisors, clinical, nursing, and support staff. Enochs Aff. ¶ 17. Plaintiffs' assertion that the census at Fernald during the past year has been reduced by approximately 10% and during the same time there was a staff reduction of 50% is wildly inaccurate. Enochs Aff. ¶ 17.

At the start of fiscal year 2003, DMR's total ICF/MR census was 1175 individuals and the per-person cost was $135,000.[5] Enochs Aff. ¶ 18. At the start of fiscal year 2004, the census was 1131 and the per-person cost was $137,000. Enochs Aff. ¶ 18. At the start of Fiscal Year 2005 (July 1, 2004), the census was 1084 and the per-person cost $146,000. Enochs Aff. ¶ 18. Funding for the facilities is more than adequate to meet all rights and protections afforded to the Ricci class members under the Final Order. Enochs ¶ 18.

        D.    Lack of Class Member Complaints About Services or ISPs

As part of the Final Order, the Governor's Commission on Mental Retardation was created as an oversight body to monitor services to individuals served by DMR, to receive and resolve complaints regarding services with DMR, and to make recommendations to the Governor regarding the delivery of services to individuals with

---

[5] There are various methodologies that may be used to determine per-person cost. The figures cited above are based exclusively on the yearly appropriation figure.

9

mental retardation, including Ricci class members. Final Order at ¶ 8. For over ten years, the Governor's Commission has served in this capacity and has been re-established by Executive Order every three years since its creation. See Executive Order Re-establishing Governor's Commission on Mental Retardation attached hereto as Exhibit 7. Commissioner Morrissey has attended these public meetings of the Governor's Commission on a monthly basis for many years, providing information to the Commission as requested and receiving advice and feedback from the Commission and attendees.

The Governor's Commission may receive complaints and request information regarding any individual issue or problem identified in order to facilitate a resolution. There are now more than 3,372 Ricci class members receiving services in the community, and 904 class members in the facilities, but in the past three years, only 15 individual service issues have been presented to the Governor's Commission, see Report of Governor's Commission on Mental Retardation, attached as Exhibit 8, and, to the DMR's senior management's knowledge, no service issues involving a Ricci class member or any other DMR client that has been raised with the Governor's Commission has gone unresolved.

    E.  DMR's Certification of "Equal Or Better" Services

DMR has consolidated and closed several facilities in the last decade. These include Belchertown State School, closed December, 1992; The Dexter Building of the Wrentham Developmental Center, closed May, 1993; The J.T. Berry Rehabilitation Center, closed June, 1995; The Paul A. Dever Developmental Center, December 2002. See "Department of Mental Retardation Twelve-Year Report" (published July 1, 2002,

updated with current data for FY03 and FY04).   In closing these facilities, DMR has transferred hundreds of individuals from facilities to community-based programs or to other facilities.  Enochs Aff. ¶ 25; O'Hare Aff. ¶ 7; Riley Aff. ¶ 8 .  Under the Final Order, all transfers of <u>Ricci</u> class members from one residential setting to another must be reviewed by DMR's Regional Director or the Facility Director to ensure compliance with the Final Order's requirement that transferred individuals receive services equal to, or better able to meet their needs in the new location than, the services they were receiving in the old location.  Final Order at ¶ 4.

Certification that the "equal-or-better" requirement has been met has been made in different forms, including the transfer form and the ISP.  Riley Aff. ¶ 5; Enochs Aff. ¶¶ 20, 22.  However, DMR's practice for <u>Ricci</u> class members has consistently been that the Facility Director or the Regional Director (or the Area Director for the Regional Director) certifies when signing the ISP that a transferred <u>Ricci</u> class member's services meet the "equal or better" standard.  Enochs Aff. ¶¶ 22-23.

    F. <u>Allegations Regarding Increased Death or Injuries at Fernald</u>

In 1999, in conjunction with the University of Massachusetts Medical School's Center for Developmental Disabilities Evaluation and Research ("CDDER"), the Department instituted a state-wide mortality-review process with independent participants, including physicians and other clinicians.  Grossman Aff. ¶ 11. Working with the CDDER, the Department developed an electronic death-reporting database, and standardized electronic death-reporting forms that include information regarding the individual, time and location of death, preliminary cause of death, primary care physician and notifications to appropriate entities.  Grossman Aff. ¶ 7.

A clinical review process is conducted by a Mortality Review Committee that is comprised of nurse and/or physician, a representative of the statewide mortality review committee and a regional risk manager. The Committee reviews all deaths according to a prescribed format. Information regarding health problems, medications and dosages, hospitalizations, physicians visits, health status in the previous three months, details on the day of death and cause of death are reviewed and analyzed. Grossman Aff. ¶ 11.

Information from all deaths reported is aggregated by the University of Massachusetts Medical School/Center for Development Disabilities Evaluation and Research (CDDER), with which DMR has a contract. CDDER generates an independent annual Mortality Report. The annual report details patterns and trends with respect to death rates, age of death, cause of death and location of death. Grossman Aff. ¶ 12.[6]

As expected, mortality rates vary by age, with the oldest age group exhibiting the highest mortality rate. The lowest rate of death occurred in individuals living in their own or family home, the highest rate occurred in nursing homes. This is predictable given the higher average age and acuity of individuals residing in nursing facilities. Similarly, individuals in the developmental centers have a higher rate of death than individuals living at home or in community-based residences, which is attributable to age and medical conditions. The three-year trend in DMR facilities reveals a decrease in the death rate per 1000 individuals and an increase in the average age at death. Grossman Aff. ¶¶ 14-15.

Given the relatively small number of deaths in the developmental centers, and the number of variables that impact on the rate of mortality--most importantly age and

---

[6] The Mortality Report is shared with the Governor's Commission on Mental Retardation and the Class Representatives.

medical condition--it is not possible to draw conclusions about the cause of death or trends without examining the individual circumstances of each death through a medical review or the mortality review process. Looking only at the statistics available, the numbers of deaths and average age of death fluctuate from year to year at the Department's developmental centers. Grossman Aff. ¶15.

A review of the allegations made by Kay Schodek relative to her "hypothesis" regarding increased mortality at Fernald reveals the following. First, the annual number of deaths reported by Ms. Schodek is not consistent with DMR data, in all likelihood because the period of time Ms. Schodek selected – annual periods tied to the date of the announcement of the Fernald closure – is not consistent with the standard convention used by the CDDER and DMR, the calendar year. Second, both CDDER and DMR use the "average age of death," not the "median" age, as used by Ms. Schodek. Finally, because the number of deaths is small, the underlying circumstances in each case must be examined before drawing any conclusions regarding cause of death. Grossman Aff. ¶¶ 16-17.

A medical review of the deaths of the Fernald residents during the last year was conducted by a physician under contract with the Department and the medical director of Fernald. Affidavit of Randall Powers, M.D., submitted hereto as Exhibit 9 ("Powers Aff.") ¶ 10.[7] Based upon his review, Dr. Powers determined that there were ten deaths in the ICF/MR population at the Fernald Center in calendar year 2003. Powers Aff. ¶ 10. Eight of these 10 decedents had a Do Not Resuscitate (DNR) order; the remaining two decedents died during resuscitative efforts in the ER or within the initial day of

---

[7] Individual Mortality Reviews are not being provided due to their confidential nature, but the Department will supply them upon the entry of an appropriate confidentiality order.

hospitalization. Powers Aff. ¶ 10. All ten of these deaths were natural deaths, meaning that they resulted from an identifiable underlying medical condition. Powers Aff. ¶ 10. None of the ten deaths was suspicious. Powers Aff. ¶ 10.

### G. DMR Has Adequately Maintained its Facilities

Independent Title XIX surveyors have consistently found that Department meets environmental standards. Enochs Aff. ¶¶ 10, 12. The Fernald Center is located on 183 acres. Affidavit of Joseph Breen, submitted herewith as Exhibit 10 ("Breen Aff.") ¶ 9. There are 70 buildings on site, many of which were closed during the 1960s and 1970s and are not currently in use. Breen Aff. ¶ 9. The buildings that are occupied and in use, such as the Administration Building, residential buildings, clinical services buildings are all in good condition and are well maintained. Breen Aff. ¶ 9. Individuals' rooms and common areas are regularly cleaned and maintained by the Department's housekeeping services contractor. Breen Aff. at ¶ 9.

The Department has hired contractors over the past 20 years to assist in managing both maintenance issues and scheduling of repairs and replacements. Breen Aff. at ¶ 12. In addition to the 18 full-time employees on campus to maintain general upkeep, the Department also contracts with UNICCO Services for housekeeping and other general cleaning services. Breen Aff. ¶ 13. While the character of the campus is old and sprawling, a good state of cleanliness is maintained. Breen Aff. ¶ 13.

In the past several years, the Department has spent over $1.2 million on facility maintenance and equipment repair at the Fernald Developmental Center alone. Breen Aff. ¶ 41. In the last three years, the Department has made substantial repairs and upgrades, including but not limited to roof repairs, renovations of bathrooms, and

purchase of furniture and equipment. Breen Aff. ¶ 41. Some of these expenditures have been to paint, renovate, and repair client areas, to replace furniture and equipment, and to replace floors, roofing and address other structural issues. Breen Aff. ¶ 41.

### H. Communications Under Paragraph 7 of the Final Order

The Final Order requires DMR and plaintiffs to engage in a cooperative process and to meet at least twice in an attempt to resolve allegations of systemic non-compliance with the Final Order. DMR has adhered to this requirement, meeting with class representatives and counsel on three occasions and making detailed written response to concerns raised by the plaintiffs. Affidavit of Marianne Meacham, submitted July 21, 2004 ("Meacham Aff."), Ex. B. In the June 8th meeting, DMR's Commissioner presented a 13-point plan for the closure of the Fernald Developmental Center. Id. DMR's written response also included several proposals to address matters raised by the plaintiffs, see id., which the class counsel for the Fernald, Belchertown, and Monson plaintiffs categorically rejected on June 21. Meacham Aff. Ex. A. In contrast, class counsel for Wrentham and Dever plaintiffs have chosen to continue the ¶ 7 ( c ) process. See Statement of the Wrentham and Dever Plaintiffs Regarding Certain Issues Raised by Motion to Reopen and Restore Case to Active Docket and Enforce the Final Order, July 29, 2004.

### ARGUMENT

I. THIS MOTION IS AN ATTEMPT BY ONE SEGMENT OF THE RICCI CLASS TO SLOW THE COMMONWEALTH'S PLANNED RECONFIGURATION OF FERNALD DEVELOPMENTAL CENTER.

The focus of the presentations by Class Counsel for Fernald and Monson during the required ¶7 ( c ) meetings, was the decision of the Department to close the Fernald

15

Developmental Center as an intermediate care facility for the mentally retarded (ICF/MR). As Attorney Beryl Cohen stated, the allegations made were part of one "continuous issue," namely the policy decision to close Fernald, the planning process utilized by the Department to implement the closure (ISP team, ITP team and placement planning profile interplay), and the belief that deferred maintenance and reduced staffing at Fernald are part of an overall effort to move the closure forward more quickly. Attorney Cohen's letter of June 21, 2004, rejecting the Commissioner's Proposed Plan for the Fernald Closure, confirms the central nature of the Fernald closure to these ¶7 ( c ) proceedings. Thus, the primary issue of concern to the Fernald Class Representatives, and the reason for filing this Motion elevating these isolated issues into an overarching allegation of "systemic" failure to provide services or an ISP process--and even asserting that conditions at Fernald today resemble those of the pre-Ricci reform, when such is clearly not the case--is, simply stated, to keep Fernald open as an ICF/MR.

    The Fernald plaintiffs have explicitly challenged the Department's decision to close Fernald as an "abuse of discretion" violative of the Final Order. For the following reasons, the Fernald Plaintiffs' efforts to thwart all plans to consolidate and close the Fernald as an ICF/MR, in favor of an array of choices of state and privately operated community-based settings for DMR services, should not be allowed. The Court's Final Order, the Department's regulations and, most recently, the Supreme Court's decision in Olmstead v. Zimring, 527 U.S. 581 (1999), support the transforming of the current services paradigm that is dependent upon institutional care, towards community-based programs that will meet the ISP needs of all Fernald class members.

A.  The Decision to Close the Fernald Developmental Center

In the Final Order, the Court left to the Department considerable discretion in "developing and improving programs, managing and determining the personnel and budget of the Department of Mental Retardation and other state agencies, implementing innovative services, improving quality enhancement and dispute-resolution mechanisms, or allocating its resources to ensure equitable treatment of its citizens."

The Department has the authority under the Order to reconfigure its residential services to provide them to individuals in a more integrated setting. During the last 10 years, there has been a national trend away from institutional services and towards more integrated, less restrictive community-based services. See Olmstead, 527 U.S. 581. Consistent with this trend, and as described above, the Department has taken steps beginning before the Final Order entered to reduce its ICF/MR capacity in favor of community-based programs. Since FY92, the facility population has declined from 2,643 to 1,088 (904 of whom are Ricci class members) in FY04. More than 1,200 people have moved out of the large facilities during this time period with the vast majority opting for community placement. The care and attention accorded these transfers was very high as was evidenced in independent satisfaction surveys and the comments from parents and loved ones once the moves were completed. See Exhibits 11, 12.

In closing Fernald as an ICF/MR, the Department is thus implementing its long-established policy of preferring integrated community settings to facilities.[8] The

---

[8] The Court, in describing the ISP regulations that govern the delivery of services, noted that "[t]hese regulations shall guarantee that each class member be provided with the least restrictive, most normal, appropriate residential environment together with the most appropriate treatment, training and support services suited to the person's individual

Department is committed to creating placement and transfer options for DMR consumers that protect health and safety while providing individuals an opportunity for services in, as this Court has stated, the "most normal" setting possible.

In accordance with this standard, and consistent with the national trends towards community-based residential and non-residential services for individuals with mental retardation, the Department has, in the decade since the Final Order, reduced its ICF/MR capacity while concurrently creating a community-based residential system to serve adults with mental retardation. The capacity of the community-based residential service system has grown to accommodate the needs of Ricci class members and others. At the same time, there has been substantial growth in community-based day services and supports to families caring for their family members with mental retardation at home.

The Administration announced the decision to close the Fernald Developmental Center ("Fernald") in February of 2003. The Legislature, in the Acts and Resolves of Fiscal Year 2004, and again for Fiscal Year 2005, appropriated funds for the Department's ICFs/MR subject to the proviso that the Department take appropriate steps to consolidate or close its ICFs/MR.[9] Thus, both the Administration and the Legislature

---

needs." Order, fn. 2. The "least restrictive" standard is also the applicable regulatory standard for the Department's services. 115 C.M.R. 6.20(3).

[9] The language directing the Department to take these steps is as follows: "Provided, that in order to comply with the provisions of the Olmstead decision and to enhance care within available resources to clients served by the department, the department shall take steps to consolidate or close intermittent [sic] care facilities for the mentally retarded, called ICF/MRs managed by the department and shall endeavor within available resources to discharge clients residing in the ICF/MRs to residential services in the community when the following criteria are met: 1) the client is deemed clinically suited for a more integrated setting; 2) community residential service capacity and resources available to provide each client with an equal or improved level of service; and 3) the cost to the commonwealth of serving the client in the community is less than or equal to

have directed the Department to take steps to consolidate or close its ICFs/MR and the Department has taken steps to do so.

The Department's approach to the closure of Fernald, in offering individuals and families the choice between another facility and community-operated programs, is being implemented with full attention to meeting the individual service planning needs of Fernald class members. Although the Department does not agree that all the residents at Fernald are so profoundly retarded or medically complex that they would not be appropriate for community-based residential programs, the plan to close Fernald contains options for those who need, or desire, continued ICF/MR care, or meet the level of need for skilled nursing care at Marquadt on the Fernald campus. Meacham Aff. Ex. B.

B.  Department's Proposed Plan for Fernald Closure

At the meeting on June 8th, the Commissioner presented a plan to close the Fernald Developmental Center. The Plan provides the individuals living at Fernald and their families with an array of residential options to choose from that will constitute the "least restrictive" setting in which to receive supports appropriate for that individual. The process and time frame for closure will be measured, and will allow individuals and their families time to participate fully in planning and choosing from these options. As the Commissioner indicated, there will be a continuing DMR presence on the Fernald campus with the Department maintaining an approximately 65-bed skilled nursing facility on the site for individuals who are determined to be appropriate for nursing

---

the cost of serving the client in ICF/MRs, so called; provided further that any client transferred to another ICF/MR as the result of facility closure shall receive a level of care that is equal to or better than the care that had been received at the closed ICF/MR..."

facility level of care. The Malone Park facility on the Fernald campus will also be converted and the conversion to state-operated community beds. The details of the plan are set forth with specificity in Exhibit B to the Meacham Affidavit.

The Department's 1992 closure of the Belchertown facility was universally successful, as acknowledged by the moving plaintiffs. See Motion at 19. The plaintiffs go on to assert that the planned Fernald closure will not be the same. Id. However, the affidavits of John E. Riley and Teresa O'Hare, both intimately involved with the Belchertown closing and familiar with the plans for the closure of Fernald as an ICF/MR, establish the similarity between the plans and DMR's expertise and experience in implementing closure and transfer plans successfully.

In the Department's professional judgment, the range of 259-271 state-operated beds, in addition to provider-directed programs, provides an array of choices for individuals now residing at Fernald and their families. The time frame for closure is not hurried, and all Fernald residents' services, as well as the physical facilities, will be maintained during the transition period at a level of excellence.[10]

The Department has successfully implemented plans to consolidate or close its facilities before. As noted above, Belchertown Developmental Center, the John T. Barry Regional Center, and the Dever Developmental Centers were closed in 1992, 1995 and 2002, respectively. Each of these closures was accomplished over a period of years; in the case of Dever, ten years. The success of the placements from these facilities was tied

---

[10] Contrary to Class Counsel's assertion that shifting residential capacity from facility-based care to the community will have an adverse affect on non-Ricci class members seeking community residential supports, the opposite is true, insofar as shifting resources away from the Fernald campus into the community-based program will, in some instances, prove more cost effective and allow resources currently used to maintain the campus to fund services.