to the thoughtful, measured, person-centered approach taken with all individuals. Riley Aff. ¶¶ 9, 10 ; O'Hare Aff. ¶¶14, 15. Post-placement consumer satisfaction surveys showed a high level of satisfaction in community placements. See Exhibits 11 and 12. Family cooperation and inclusion in all of the planning processes was considered by those involved to be the critical factor for successful transitions. Riley Aff. ¶¶ 6, 12 ; O'Hare Aff. ¶¶ 8, 17. The Department's implementation strategy is very similar to that employed at Belchertown, Berry and Dever. Id. At no time has the Department acted precipitously or without full regard for the ISP process.

II.    ALLEGATIONS OF DEFICIENCIES IN SERVICE ARE NOT "SYSTEMIC" AND, IN ANY EVENT, HAVE BEEN ADDRESSED OR ARE BEING ADDRESSED BY THE DEPARTMENT THROUGH THE COOPERATIVE PROCESS SET FORTH IN THE FINAL ORDER.

A.    The Department Has Certified Compliance with the "Equal Or Better" Standard.

Since the entry of the Final Order, DMR has reduced its facility census significantly. As stated above, DMR has consolidated and closed several facilities in the last decade. In closing these facilities, DMR has transferred hundreds of individuals from facilities to community-based programs or to other facilities. Under the Final Order, "defendants shall not approve a transfer of any class member out of a state school into the community, or from one community residence to another such residence, until and unless the Superintendent of the transferring school (or the Regional Director of the pertinent community region) certifies that the individual to be transferred will receive equal or better services to meet their needs in the new location, and that all ISP-recommended services for the individual's current needs as identified in the ISP are available at the new location." Order at ¶ 4.

Contrary to the plaintiffs' assertions, DMR has consistently met this standard over the last eleven years as it has moved individuals from facilities into the community, and from one community residence to another and it continues to do so today. See Riley Aff. ¶¶ 5, 8 ; Enochs Aff. ¶¶ 23, 25; Breen Aff. ¶ 40. Certification of this requirement has occurred in different forms used by the Department, including the transfer form (for the first three years following the entry of Final Order), and more recently, the ISP form and Ricci ISP Response Form. Id.

Plaintiffs' assertion that the certification has not been made is based upon the faulty premise that the "transfer forms" that were used to notify class counsel of a change of address are meant to constitute the certification. The transfer forms attached to the Motion as Exhibit 5 were developed in response to class counsel's request that DMR provide them with a mechanism for *tracking* these individuals per the requirements of the Final Order. Riley Aff. ¶ 5. In response, the Change of Address Form was developed.[11] At no time was this form intended as the certification of the Regional Director or Facility Director that services in the new setting would equal or exceed those of the previous location. It was understood at that time, as it is today, that that certification is contained in the ISP document and in the ISP Response Sheet. Id.

> B. The Department Continues to Employ an Individual Service Planning
> Process That is Consistent With the Final Order.

Paragraph 2 (b) of the Final Order provides:

---

[11]The Change of Address form contained straightforward demographic information to assist class representatives in keeping in contact with class clients. Riley Aff. ¶ 5. At the class representatives' request, a section entitled 'Reason for Transfer' was added just before final promulgation of the form in July of 2000. This section was intended to be a brief summary to indicate whether the class member's move was caused by something that would trigger a review. Riley Aff. ¶ 5.

> Defendants shall not seek to amend, revise, or otherwise modify the ISP regulations as they affect class members except upon 60 days written notice to plaintiffs' counsel, with an opportunity for plaintiffs to comment upon the proposed changes. Any amendments must leave in place a process that is at least the substantial equivalent of the regulations currently set forth in 104 C.M.R 20, et seq., with regard to the definition of the ISP, the individualized nature of the ISP, the existence of the appeal process, and the principles contained in footnotes 2 and 3 hereof. [12]

Paragraph 6 (a) of the final Order requires the Department to "[c]ontinue to seek to improve, and [ ] not undermine, the progress achieved during this litigation by: [ ] maintaining and implementing the basic principles of the ISP."

Finally, and most important, the Order allows the plaintiffs to seek to re-open the case, after complying with the provisions of ¶ 7 (c), if "the defendants substantially fail to provide a state ISP process in compliance with this Order . . ." Order, ¶ 7 (a)(emphasis supplied), and explicitly states that "[i]ndividual ISP disputes shall be enforced solely through the state ISP process." Id. (emphasis supplied).

Under the terms of the Final Order, all Ricci class members, whether residing in the facilities or in the community, must have an ISP, and the Department must substantially provide the ISP-identified services to each class member on a lifetime basis. Further, and important to this case, individual ISP issues should be addressed through the ISP appeal process. Only "systemic" failure to provide an ISP process consistent with the Final Order constitutes grounds to re-open the case.

No "systemic" violation has been, or could be, alleged here. The ISP regulations and process established through this litigation continue in full force and effect. The Department has consistently affirmed to Plaintiffs that the ISP team process is the process by which decisions about the individual are made. Notwithstanding any other

---

[12] Plaintiffs do not assert that any regulatory modifications have occurred.

information-gathering process that the Department may utilize, decisions about placement are made in the ISP team meeting process.  Enochs Aff. ¶ 30.

Nonetheless, and presumably in an effort to paint a picture of non-compliance and disregard for the ISP regulations, Plaintiffs mistakenly state that the Defendants have not conducted ISP modification meetings, with full attendant rights of appeal, for every individual whom it has transferred from Fernald to either a community placement or another ICF/MR.  See Plaintiffs' Motion at 9 ("Notwithstanding the announced intention by Governor Romney in February 2003 to close Fernald and all existing ICF/MRs at Glavin, Hogan, Monson, Templeton, Wrentham and to transfer, beginning in 2004, all current residents at Fernald to other facilities, not one modification or transfer ISP required by regulation (115 C.M.R. 6.25 and 6.63) has been scheduled or held, which effectively denies families and guardians the opportunity to timely participate in an administrative and judicial appeal of the relocation of the affected resident.").

This statement is utterly false: of the 28 individuals who have elected to transfer to community placements or other facilities from Fernald, *all* have received a transfer notice, guardians or families have in *all* cases consented to the transfer, and ISP modification meetings have been held for *all* individuals.  Conley Aff. ¶¶ 10,11, and exhibits thereto.[13]  Plaintiffs further assert in their Motion that the Department has failed to comply with Paragraph 2 (b) of the Final Order by 1) implementing a "Placement Planning Profile" that supplants the ISP process; and 2) using the ITP Team, and not the

---

[13] These exhibits consist of individual transfer notices and associated documentation for the 28 DMR clients.  Due to their confidential nature, these exhibits are not being submitted at this time, but will be submitted consistent with an appropriate protective order.

individual's ISP Team, to develop a "Placement Planning Profile" for each individual. For the following reasons, each of these claims is without merit.

Neither the placement profile nor the individual transition planning teams are intended to circumvent the ISP processes, nor are they new devices: both mechanisms were successfully utilized in the Belchertown and Dever closures. Riley Aff., ¶¶ 6, 8, 11; O'Hare Aff. ¶¶8, 11. At Fernald, as at Belchertown and Dever, these administrative structures and tools will not be used to supplant or subvert the individual planning process. Indeed, experience in prior closures has shown that, only by engaging families in extensive planning regarding a future placement, down to the details of the home and in many cases the re-assembly of familiar staff and friends in the individual's home, will families' and guardians' satisfaction be obtained. Riley Aff. ¶¶ 6-10.

C.    The Placement Profile and ITP Teams

Other misstatements about the placement profiles and the ITP teams contribute to the false suggestion that they are an effort to supplant or avoid the ISP process. See Motion at 4-5 ("Notwithstanding the strict requirements of both the ISP Regulations and the Final Order of the Court, the Defendants have, in the absence of specific regulatory authority, created a Placement Planning Process . . . which includes a Placement Profile, in which the entire ISP 'team' authorized by Regulation (115 C.M.R. 6.21 et seq.) does not fully participate, but instead the program, support needs, and alternative future residential site are determined by an Individual Transition Planning Team comprised of Fernald Administrators only.") Contrary to the statement quoted above, placement profiles were completed in part by the individual, family and guardian, and in part by the ISP team. Enochs Aff. ¶ 33. Since most families of individuals living at Fernald refused

to offer input into their relatives' placement profiles, the section intended for individual, family and guardian response was completed by the ISP teams when this input was withheld. Id.

Further, the ISP and the placement profile serve two entirely different purposes. The ISP establishes the supports that are needed by the individual, and through the ISP Team process, assures that active treatment will be delivered to the individual in the facility. Enochs Aff. ¶ 30. The placement profile gathers preliminary information for purposes of informing the planning efforts for an individual. The profile document does *not* provide for any specific supports or services. While much of the information necessary to develop placement options is available in these individuals' ISPs, it is necessary to use a document specific to placement planning to allow the aggregation of data for use in program development and other management activities such as the siting of new state-operated homes that will be developed in order to provide 80 placement opportunities for Fernald individuals to move to the community. Information contained in the profile, and not in the ISP, is also used in selecting compatible housemates and maintaining long-standing relationships. Enochs Aff. ¶ 30.

Plaintiffs' assertion that there is no statutory or regulatory authority authorizing - - in this case requiring - - the creation of the placement profile is also inaccurate. Federal regulations require the Department to prepare a family or guardian and the individual for transfer or discharge. 42 C.F.R. 483.440(b)(4)(5). Both mechanisms assist the department in preparing individuals for discharge by helping to create or identify placement options.

26

Finally, Plaintiffs complain that "[t]he entire Placement Profile form is not filled out with families and guardians at a pre-Individual Support Plan meeting authorized in accordance with 115 C.M.R. 6.21 and, therefore denies families and guardians [sic] to exercise critical input in the Profile." Plaintiffs' Memo at 5. To the contrary, DMR contacted all families and guardians by mail and then by telephone to solicit input into the placement profile, only to find that families and guardians were instructed by counsel not to speak to any staff from the Department regarding the profile. Enochs Aff. ¶ 34. Receiving little input from any families or guardians, the ISP Teams were left in many cases to complete the placement profile without family or guardian input; however, upon completion of the profiles, the Department attempted again to solicit input by mailing all the profiles to families and guardians in June of 2004. Id.

At individual ISP meetings, which occurred in June, 2004, Class Counsel suggested for the first time that the placement profile should be discussed with families and guardians in a pre-ISP meeting. (Id.) The Department has complied with this request, in order to engage families in family using this process. (Id.)[14]

The Individual Transition Planning Team was developed in order to dedicate a group of staff to the significant work of supporting individuals, families and ISP teams in the placement planning, development, and transition process. Organizing the work in this

---

[14] With regard to Plaintiffs' assertion that, in order to complete a placement profile, families must be informed about the home and community based waiver (the federal Medicaid program that funds community-based supports), Motion at 5, *Ricci* class members are entitled to services that meet their needs established through their ISP for life, regardless of where they live. Final Order, ¶2. Whether services are funded through Title XIX or through the home and community-based waiver, 42 USC §§ 1396 et seq., does not determine the availability of services to meet their needs. Further, the Department has stated in writing that anyone who is unsatisfied with community-based services and wishes to return to an ICF/MR setting may do so. The only alternative that will not be available is an ICF/MR bed at Fernald.

way also creates important support and assistance for the ISP team in planning for individuals, in particular, completing the tasks of identifying areas such as groupings, staffing needs, the numbers and types of residential supports needed and their locations. Most importantly, this structure allows the ISP team to continue their important day-to-day work with individuals.

        D.    Individual ISP Issues

Eleven Affidavits submitted by the Plaintiffs assert that ISP's were altered or modified after the ISP meeting without conferring with family members; that certain language that was agreed in the ISP meeting was omitted or "administratively edited" by the Department; and that certain supports that should appear in the ISP simply do not. There are several responses to this. First, for almost every individual referenced in the affidavits, the guardian or family members signed the ISP response sheet after the ISP meeting date, formally accepting the ISP as written. Two other individuals appealed, as discussed below.

Second, even assuming that these individuals had objected to the ISP, appealed and found no redress, which is not the case, in the context of over 4,166 Ricci class members' ISPs, the allegations of a small number of individual family members at Fernald should not be deemed to rise to the level of a "systemic" violation of the state's obligation to "provide a state ISP process in compliance with [the] Order," or a 'systemic failure to provide services to class members as described in this Order." Order at ¶ 7 (a.). During the very same period in which Plaintiffs assert that services were not being provided in accordance with individual ISPs, in January through March of 2004, the Department of Public Health conducted a survey of Fernald, examining compliance with the ISP

regulations and with the provision of active treatment, see Enochs Aff. ¶¶ 9-12, and found the facility to be in compliance with Title XIX requirements.

Third, to the extent that the individual affiants have raised issues of either the appropriateness of the content of their ISP or the provision of services in accordance with their ISP, their individual claims should be addressed through the state ISP process which is an ISP appeal pursuant to 115 C.M.R. 6.32 (check cite). See Order, ¶7 ( a ) "Individual ISP disputes shall be enforced solely through the state ISP process." (emphasis supplied). Indeed, two of the eleven affiants who assert that the content of the ISP has been edited or changed without assent, or that services that should be part of the ISP are not being provided, have filed an appeal. Affidavit of Ann Smith ("Smith Aff."), submitted herewith as Exhibit 13, ¶ 18. Nine others could have appealed their ISPs under the state process available, but did not, and, in fact, signed ISP Response Sheets accepting the ISPs as written.  Smith Aff. ¶ 18, Exs. 1-16.

Fourth, the Department has reviewed the specific allegations made in each of these affidavits and offers specific responses to each. See Smith Aff. ¶¶ 19-28 . Broadly, however, it is evident from a review of the ISPs themselves, and the allegations contained in plaintiffs' affidavits, see Plaintiffs' Exhibit 8, that ISPs were not "administratively edited," as the Motion suggests. See Motion, at 7. In most instances, the language allegedly removed or not included in the ISP either *was* in the ISP, in another location, or, to the recollection of the Qualified Mental Retardation Profession (QMRP), the person responsible for conducting the ISP meeting or drafting the ISP, had never been discussed in the ISP meeting. Smith Aff. ¶¶ 17-28 .  In either case, the inclusion or failure to

include language in the ISP would be an appropriate subject for an appeal, but not for this Motion.

In several instances, the Supervisor for the QMRPs did direct that language discussed at the meeting be removed from the ISP. Department regulations mandate "the ISP shall be reviewed by the Area of Facility Director or his or her designees, [and] approved or disapproved in part or in whole." 115 CMR 6.23(5)(a) (emphasis added). This administrative review is to ensure compliance with regulations and that they are adequately "client-focused." In these few instances, supervisors directed the QMRP to remove language that was not sufficiently individualized, and which was determined to be appropriate for inclusion in the ISP Response Sheet, but not in the ISP. These include statements that express disagreement with the policy decision to close Fernald, statements that merely recite the staffing requirements for an ICF/MR, without any particularized assessment indicating that specific services are needed, and, in one instances, a recitation of certain legislative language concerning the closure of Fernald. See Smith Aff. ¶¶ 19-28. While individuals may express their desires or concerns in an attached addendum to the ISP, the ISP is a service planning document, and thus statements unrelated to the individual's needs are inappropriate for inclusion.

Finally, several of the allegations of failure to include particular services in the ISP, or to provide those services, should be addressed in an individual ISP appeal because the ISP Team may not be in agreement that the requested items serve appropriate objectives. Examples from the affidavits attached to the Motion as Exhibit 8 include the alleged failure to include swimming in the ISP when swimming was not an established objective for the individual; the alleged failure to provide regular ophthalmology

appointments for two residents, both of whom are legally blind and, according to the ISP team, require visits to an ophthalmologist only on an as-needed basis; and the alleged failure to give notice to a guardian regarding the termination of a sign-language communication program in 1986, after 10 years of active treatment with no result. Smith Aff. ¶¶ 19-28. These disputes should have been raised in a timely manner through the individual ISP process.

      E.     Adequate Staff at Fernald and Monson[15]

Overall staffing ratios at the Department's ICF/MR facilities, including Fernald, have not changed significantly over the past ten years. While there have been reductions in force, at the same time there has been a census reduction at each of the facilities. Further, in those years in which it has been necessary to make reductions in force, the positions identified for reduction at ICF/MR facilities have always been those that could be reduced without affecting Title XIX services and the continuation of active treatment. Stated differently, the Department has shielded from reductions those positions necessary to provide active treatment and meet Title XIX requirements. Necessary staffing levels for clinical, nursing, vocational, and habilitative supports, as determined by needs identified in ISPs, rather than by arbitrary staffing ratios, have been maintained. While individuals at the facilities have exercised their right to accept early retirement - - where applicable - - and thus staff has left, the Department has assured an adequate level of staffing through hiring new staff.[16] This is evidenced by the recent completion and

---

[15] No allegations of specific staffing inadequacy were made in plaintiffs' affidavits by class representatives other than from Fernald and, although not specifically tied to any services, Monson.

[16] The Department has made efforts to hire nursing staff at Fernald; however, vacancies persist as they do at all health care institutions. The Department covers vacancies

certification by the Center for Medicare and Medicaid, through the DPH survey conducted at Fernald between January and March of 2004. As an outcome-based survey process, the Title XIX survey determines whether or not a facility has an adequate number of clinicians "by the extent to which individuals' needs are aggressively and competently addressed." If individual needs are being met, then the standard for professional program services is met. Since the entry of the Final Order, Fernald has not received any citations regarding staffing standards. The direct care staffing ratio at Fernald--the only facility where staffing was cited as a problem in the Motion--is 3:1.2, and ratios within each discipline (e.g., psychology, nursing habilitation, speech) have been maintained in order to provide all supports identified in ISPs.

In the last two years significant budget shortfalls and budget reductions, including an offer of early retirement to state employees, have resulted in staffing reductions within the Department. However, the Motion misstates the magnitude of the reduction, the impact (early retirement, for example, did not apply to direct care staff or most clinical staff), and completely ignores the significant re-hiring the Department made at its facilities in general, and Fernald in particular, to maintain its Title XIX compliance.[17]

One of many inaccuracies in the Motion is the statement that, during the past two years, there has been census reduction at Fernald of 10%, whereas the staffing reduction during the same period was 50%, resulting decreased access to services, and the decreased availability of therapeutic programs conducted at the swimming pool. Motion

---

through overtime and other mechanisms. Notwithstanding any vacancies, the Department has been in full compliance with Title XIX requirements, as discussed above.
[17] Plaintiffs also allege that the "savings" figure advanced by the Administration for the closure of Fernald of $4.5 million, was, in essence, disingenuous. The savings figure for fiscal year 2004 was later reduced to $2.5 million, and has been realized.

at 14. In fact, during the past two years there has been a 17.5% census reduction at Fernald and a 13% staff reduction. Enochs Aff. ¶ 17. Moreover, since FY02, DMR has hired a total of 105.3 full time employees (FTEs) for Fernald: 41.7 in FY02, 30.4 in FY03, and 33.2 in FY04. In addition, DMR filled 20 positions at Marquardt, the skilled nursing facility at Fernald. All new hires were based on the active treatment needs of the people living at Fernald as determined by their ISP as well as by the operational needs of the facility. Positions included direct care, supervisors, clinical, nursing, and support staff.

Another exaggeration of the staffing situation is found in plaintiffs' assertion that "[t]he magnitude of and impact of the current proposed budget reductions can only be considered in the context of 543 personnel reductions *made at ICF/MRs* in recent prior years, which together with the proposed budget for FY2005 clearly establish a systemic violation of the order." Motion at 10 (emphasis supplied). The figure of 543 is the total number of employees that left *the Department* through early retirement, attrition and layoffs, not the number that left the ICF/MR facilities. Further, many of these employees left administrative positions as the result of a re-organization of state government that consolidated administrative positions, such as payroll.

With regard to the caseload issues raised, for a Qualified Mental Retardation Professional ("QMRP") to have a caseload of 25 individuals is not unusual and is, in fact, consistent with what QMRPs at other facilities are responsible for managing. Further, the "caseload" for members of the Psychology Department will vary greatly depending upon the number of objectives they must consult on or manage.

Plaintiffs complain that it is "both irrelevant and misleading" to compare the 1993 level of legislative appropriation with the current level to determine compliance with the requirements of the order that the Commonwealth exert fiscal efforts to support individuals with mental retardation, even though that is exactly what the Order requires. (Plaintiffs' Motion at 11). Paragraph 6 (b) requires that the Commonwealth "exert [its] best efforts to maintain and secure sufficient funds to meet the needs of class members under this Order." Further, "[t]he defendants shall be determined to have met their obligation under this subparagraph if the defendants have secured and maintained an annual appropriation for the Department of Mental Retardation at least equal to the total gross amount of actual appropriations for Fiscal Year 1993." Id.

The Commonwealth's fiscal efforts with regard to services for individuals with mental retardation, including Ricci class members, far exceeds the 1993 levels.



Source: "Department of Mental Retardation Twelve-Year Report" (published July 1, 2002, updated with current data for FY03 and FY04).

As illustrated above, DMR's budget has expanded from $601.4 million in FY92 to $1.016 billion in FY04, and $1.063 billion in FY05. This expansion has also brought a

34

significant increase in federal dollars coming to the state, rising from $219 million in FY92 to, thus far, $365 million in FY04. In addition, we note that the funding dedicated to Ricci class members alone during the relevant period has been substantial and, indeed, captures the greatest portion of this funding stream. Funding for the facilities is more than adequate to meet all rights and protections afforded to the Ricci class members under the Final Order.

F.    The Department's Plan to Address Allegations Relating To Maintenance of Equipment and Grounds at Fernald.

The plaintiffs' suggestion that the physical condition of the Fernald Developmental Center harkens back to pre-Ricci conditions is completely baseless. The Department has expended and continues to expend significant amounts to maintain the campus, including contracts with a housekeeping vendor to maintain cleanliness and with another entity for preventive maintenance. DMR employs 18 full-time employees to address facility issues, maintains a contract with an external maintenance company to schedule and track needed maintenance and repairs, and employs a pest-control contractor to address complaints of vermin and insects.[18]  See Breen Aff., generally.  The complaints articulated, which were confined to Fernald, do not constitute a "systemic" failure, and in fact Fernald has been found to be in compliance with the environmental aspects of Title XIX requirements.

With regard to the allegations that there were insufficient working vans at Fernald to ensure that individuals were transported to programs or appointments, the Department has confirmed that there is at least one (1) van available for each cottage or building, as

_____

[18] These can  occur in any congregate residential setting, but particularly in one such as Fernald where, due to client safety concerns, pesticides that are potentially harmful to humans cannot be used.

well as additional back-up vans in the event of a mechanical problem with a van. The Department has addressed the issue with Division Directors to ensure that good communication about transportation needs eliminates any interruption in services due to a mechanical failure. Meacham Aff. Ex. B.

Pursuant to the Final Order, paragraph 7 ( c ), the Department has proposed and is implementing a "Plan of Correction" to address the buildings issues raised. See Meacham Aff. Ex. B. These steps should be sufficient to address issues raised by the plaintiffs and to maintain the Fernald campus in excellent condition for normal use by residents. In addition, some immediate steps have been taken to address the overall appearance of portions of the campus, such as general clean-up of outside areas. Id.

CONCLUSION

For all the reasons detailed herein and in the attached affidavits, this Court should

(1) conclude that there is no violation of the Final Order--systemic or otherwise; (2) reject

this attempt by one portion of the <u>Ricci</u> class to stop the planned closure of Fernald as an

ICF/MR; and (3) decline to reopen this matter.

Respectfully submitted,

DEPARTMENT OF MENTAL
RETARDATION,

By its attorneys,

THOMAS F. REILLY
ATTORNEY GENERAL

Robert L. Quinan. Jr., BBO 553010
Juliana deHaan Rice, BBO 564918
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
(617) 727-2200, ext. 2554, 2062

Marianne Meacham, BBO 550468
Special Assistant Attorney General
General Counsel
Department of Mental Retardation
500 Harrison Avenue
Boston, MA 02118
(617) 727-5608

Dated: August 16, 2004

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above
document was served upon the attorney of
record for each other party by mail (by hand)

on ___8/16/04___.

37