UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| Robert Simpson Ricci, et al., ) | | |
| Plaintiffs, ) | | |
| ) | CA Nos. | 72-0469-T (Belchertown) |
| ) | | 74-2768-T (Fernald) |
| v. ) | | 75-3910-T (Monson) |
| ) | | 75-5023-T (Wrentham) |
| ) | | 75-5210-T (Dever) |
| Robert L. Okin, et al., ) | | |
| Defendants ) | | |

## PLAINTIFFS' REPLY TO DEFENDANT'S RESPONSE TO NOTICE OF UNRESOLVED OUTSTANDING ISSUES

### Background/Procedural History

In response to the suggestion of the Court at the hearing held on November 10, 2004, the parties, in addition to telephone conferences, met on November 11, on December 15 and December 22, December 23, 2004, for the purpose of preparing a Stipulation regarding the conduct of Individual Support/Service Plan meetings, which would thereafter exclude any discussion between the parties of alternative placements for Fernald residents until such time as a specific alternative site was identified where the Department will propose to provide an equal or better service plan that meets the currents needs of the individual and their family and guardian. Only then is a separate Modification or Transfer ISP held to discuss the specific proposed site with the guardians.

The Stipulation signed by the parties was filed with the Court on December 29, 2004. Prior to the agreed Stipulation, the Department ex parte issued a Memorandum to all Fernald staff on December 16, 2004 regarding placement discussions at annual ISP meetings, which Memorandum had neither been discussed or proved by the Plaintiffs' counsel.

The Defendants limited the time available for discussion by arriving late to meetings, by failing to have key members present, and by failing to be prepared even though the meetings were held in their conference rooms. Most of the negotiations began 30 minutes later than the time scheduled, although Plaintiffs' representatives were in attendance. On December 15, 2004, the Defendants requested a 5-minute break and returned 49 minutes later while plaintiffs were available in the conference room. Commissioner Morrissey joined the meeting on December 15, 2004 at 1:10P.M., although the meeting was scheduled to begin at 9:00A.M. and had actually begun at 9:30A.M. after DMR chief counsel arrived.

Prior to the conclusion of the ISP-related discussions, the Plaintiffs' counsel, in the presence of Plaintiffs Representatives Diane Booher and George Mavridis, Commissioner Morrissey, Assistant Attorney General Quinan, and DMR Attorney Marianne Meacham, requested an

opportunity to continue discussions in accordance with the Court suggestions at the hearing on November 10, 2004: "I think it would do everybody a lot of good if you people could sit down with a view toward resolving some of these... all of these issues that you present to me." (Transcript, p.67, l.17-20)

In brief discussions between the parties, both on December 15 and December 22, 2004, Plaintiffs' counsel reviewed the issues set forth in the 21-page Motion to Reopen and Restore Case to Active Docket and stated that staffing, budget, and capital improvement issues were among the first matters that required resolution. In addition, the Plaintiffs' counsel requested current information regarding staff vacancies, comparable staffing at alternative facilities proposed for transfer of Fernald residents, budget requests for Fernald for FY2006, current plans to reduce Fernald professional and direct care staff based on the five million dollar budget reduction for FY2005, a copy of the DMR Self Plus survey regarding Capital Outlay Projection at Fernald as set forth in Report on Anticipated Capital Needs of DMR Facilities, Appendix 3, Table IV of the Report of the DMR Facility Planning Working Group (May 2002).

In addition, the Plaintiffs' counsel suggested additional day-long meetings to be held on December 24, 27, 28, 29, 30, and 31, 2004.

Neither Assistant Attorney General Robert L. Quinan, Jr., or Marianne Meacham, General Counsel, DMR, responded that they would be available for such discussions. Nor did they provide or offer to provide a response to the document requests.

At the conference held on December 23, 2004 at the DMR administrative offices, it was explained that Commissioner Gerald Morrissey's absence from the meeting was due to his attendance at an emergency matter outside the Department's administrative offices. However, during a recess at approximately 11:00A.M., the Plaintiffs' counsel observed Commissioner Morrissey seated in a room adjacent to the conference room. When the Commissioner's presence next door to the meeting was noted to Assistant Attorney General Quinan and Attorney Meacham, it was stated that Commissioner Morrissey had no intention to further participate in the discussions regarding the Stipulation or the additional issues raised in the Motion to Reopen and Restore Case to Active Docket.

The Defendant's assertion in their Response that "The parties have not yet held exhaustive or meaningful settlement discussions on a number of issues raised in the Plaintiffs' Motion and now cited in the Plaintiff's Notice of Unresolved Outstanding Issues." is challenged on the basis that the Defendant's counsel alone has claimed their unavailability to attend such discussions between December 24 and December 31, 2004 or thereafter.

**1. Request Court to take View of Fernald Developmental Center**

At the hearing held on November 10, 2004, the Court stated:

> "I mean, as I hear Mr. Cohen's recitation of conditions, I mean, are there conditions deteriorating from the time that I last went there? I mean, are we living in a situation where we have got mice and rats and things like that, the way it was

2

when I first visited Belchertown twenty something years ago that caused this whole case to become very, very active and a front burner item?

I mean, is that – because I can find out by going to see. I can take a view. And I can invite the Governor to come with me and so we could both see, you know, because other Governors have come.

Dukakis came with me. King came with me. Bill Weld, Speaker McGee, all kinds of people. They wanted to see for themselves. That is all I ever said to anybody, come and take a look and see what I see. If you don't see it, you don't see it the same way, you vote the way you want." (Transcript, p.55, l.1-17)

On December 14, 2004, without notice to the Court or to the Plaintiffs' attorney, Governor Romney and Commissioner Morrissey made an unannounced visit to the Fernald Developmental Center for approximately 30 minutes beginning at 7:30A.M. The Governor only visited three of fourteen residential buildings on the Fernald campus.

According to the staff that were present, the Governor and the Commissioner, in the presence of four state police officers, visited the building known as ICF21 for approximately two to three minutes, during which time the Governor looked into one resident bedroom, shook hands with one staff person, and left the building without having met any resident. The Governor then visited the building known as ICF22, did not meet any residents, remained for less than two minutes, and did not visit any of the residential living areas.

Thereafter, Governor Romney visited the Greene Building, at which time he shook hands with two security people and one staff member. On the first floor of Greene, the Governor entered Apartment 1 where he was greeted by a staff person who advised him that residents were either taking showers or dressing, that this was not a good time for him to visit. He then walked past Apartment 2 on the first floor, making no entry or inquiry, entered the Clinical Unit, where there were approximately four nurses present. Thereafter, the Governor with Commissioner Morrissey walked to the basement of the Green Building and viewed the swimming pool, which was not in use at the time. From the pool area, the Governor went to the second floor, entered Apartment 4, looked into the dining area, and observed approximately five female residents at breakfast. The Governor did not communicate in any way with the residents or the staff. After leaving Apartment 4, the Governor walked past Apartment 5 and entered Apartment 6, at which time after a brief view, left the building and exited the Fernald campus.

In order to take the route on campus that was required to visit ICF21, ICF22, and the Greene building, the Governor was required to drive by Cottage 8 (housing 13 residents), Cottage 7 (housing 16 residents), Cottage 6 (housing 12 residents), and Cottage 5 (housing 7 residents). Notwithstanding Commissioner Morrissey's full knowledge of the service needs of the Fernald residents and the deficiencies in the housing accommodations caused by the lack of capital improvements, Governor Romney's half-hour tour denied him the opportunity to interact with over 250 residents or with the professional and direct care staff. In addition, the Governor failed to visit the Marquardt building in which approximately 28 residents live and receive skilled nursing care from excellent professional and direct care staff.

Governor Romney and Commissioner Morrissey did not visit any of the Cottages (where almost 40% of the residents live), Marquardt (housing 28 mentally retarded adults with major medical, nursing and rehabilitation needs), Farrell Hall or Program areas. The Governor did not take the opportunity to see or meet the residents in their Day Programs. He visited 3 of approximately 30 buildings in active use on the Fernald Center campus. Staffing makes up about 85% of the budget, yet the Governor did not take the opportunity to converse with staff about the active treatment they provide in this ICF/MR. No families were notified, invited, or involved in the Governor's tour of Fernald Center on December 14, 2004.

During his brief visit to the Fernald campus, Governor Romney had an insufficient opportunity to view the disrepair, continuing unsanitary conditions, roach, mice and flea infestations, safety hazards, toilet deficiencies, shortage of supplies, unrepaired appliances, all of which have been repeatedly identified to the Fernald administration since the Motion to Reopen was filed on July 14, 2004.

2. **List of Class Members at Fernald/exact date of each annual ISP for next calendar year/ name of current QMRP assigned to oversee the ISP for each identified resident/name, phone number and address of each current guardian for every resident at Fernald Center**

On December 10, 2004, Plaintiffs' counsel wrote the following letter to Marianne Meacham, General Counsel, which, to date, has never been answered:

> "On November 11, 2004, you provided me with a list of the due dates and times of the ISP meetings to be held at Fernald from September 2004 through June 2005, which only included the identity, the telephone extension and the assigned location of a QMRP.
>
> In the form provided, in failing to identify the individual resident by name, the current, accurate assignment of the QMRP, or the assignments for the months of July and August, the information is of no use in allowing the Fernald League to be in contact with family members and guardians for the purpose of providing representation as a designated representative.
>
> In order to comply with Judge Tauro's stated intention at the November 10th Hearing that the Plaintiffs be provided with such information, it is necessary that you immediately provide me with the following, which shall be contemporaneously updated:
>
> 1. A current list of all Fernald Center residents;
> 2. The exact ISP date for each Fernald resident for the next calendar year;
> 3. The name of the current QMRP assigned to oversee the ISP for each identified resident;
> 4. The name, address, and phone number of each of the current guardians for every resident at Fernald Center.
>
> Insofar as the League does not have a current list of residents or guardians, the process that you have recently implemented, by which the Department is directly contacting guardians relative to the Fernald League being named as a

4

designated representative, is unclear, will result in confusion, and is ineffective in that it does not allow the League to communicate directly with all guardians.

Please provide requested information upon receipt of this letter."

At the hearing held by the Court on November 10, 2004, the following colloquy occurred between the Plaintiffs' counsel and the Court:

"I have asked the Commissioner personally on a number of occasions what are the dates of the ISP meetings for each family member…

The Court: They will provide it to you." (Transcript p. 82, 1.18-21)

As a direct result of the failure to provide Plaintiffs' counsel with a current list of all Fernald residents or the exact ISP date for each Fernald resident for the next calendar year, there has been a reduction in the census at Fernald from 252 individual residents at Fernald on November 10, 2004, the date of the Court hearing, to 246 residents now present.

### 3. Prohibition of DMR employees discussing status of Federal Court case with family members or guardians

Following the Court hearings held on November 10, 2004 and November 15, 2004, administrative and supervisory staff at Fernald provided inaccurate and improper information to family members of residents at Fernald regarding the action taken by the Court. Specifically, it was reported that the Court had made decisions against the Plaintiffs and rejected the Motion to Reopen. The effect of such remarks upon parents and guardians has been devastating. The specific identities of those individuals who falsely reported the status of the Court case were given to the Commissioner. No cautionary instructions to the Fernald staff has been issued by the Commissioner.

### 4. Prohibition against the transfer on more than one occasion of any current resident of Fernald to an alternative placement site at an existing ICF/MR

On February 26, 2003, Governor Romney announced a policy to close all existing ICFs/MR at Fernald, Glavin, Hogan, Monson, Templeton, and Wrentham during his administration. The implementation of such a policy will potentially cause hundreds of severely retarded individuals to be relocated on several occasions, which will severely impact and disrupt their treatment plans as well as their continuing relationships with familiar staff and family members. Such policy-driven transfers cannot, by definition or common sense, be based on individual needs.

At the Court hearing held on November 10, 2004, the Court stated:

"Well, why send them to yet another institution that you are going to close anyway?" (Transcript, p.64, 1.1-2)

Since the Governor's policy was announced, of the 43 individual who have been transferred from Fernald, 37 have been relocated to another ICF/MR, and only 6 individuals have chosen to be relocated to other alternative sites.

5. **The Department will allow any individual who chooses an alternative placement and later decides that the alternative program is not successful for that individual to return to an ICF/MR bed within DMR**

Based upon the Defendant's Response, the parties are now in agreement that this issue has been resolved.

6. **Applicability of Stipulation by the parties dated December 28, 2004 to include the current residents at Marquardt Nursing Center located on Fernald grounds**

While Marquardt Nursing Center and Fernald ICF/MR each have their own licenses and staff, the Defendants have linked them together in the Commissioner's "13-point plan." Many current residents of the Greene building will have to be moved if DMR carries out the proposal to convert the Greene building to a Skilled Nursing Facility for mentally retarded adults because they do not meet the eligibility criteria for this level of care. Other Greene residents may choose to be relocated to an ICF/MR bed at Fernald, rather than live in a nursing home. All Marquardt residents would have to be moved to Greene Building once renovations are complete. Most of these residents are Ricci class members and moving them in this manner can result in serious loss of skills and an increase in health-related problems.

7. **Opposition to the Department's intention to mail referral materials relating to representatives from any other advocacy group or entity that wishes to offer its services to act as a "designated representative" for an individual's ISP at Fernald**

Reference to advocacy groups other than the Fernald League acting as representatives of class members was added by Commissioner Morrissey on December 29, 2004 as a footnote to the Stipulations, and discussed by Defendants' counsel with Plaintiffs' counsel by telephone that morning. The Court has not allowed any other parties to represent the Ricci class members at Fernald besides the Fernald League. DMR never called any other advocacy group to be involved in the negotiations. The Defendant added this at the last minute in an attempt to draw into the case other advocacy groups that are inclined to support the Defendants' positions to close Fernald. The advocacy groups that the Department favor include those organizations that have contracts with DMR, and groups that do not support the right of individuals and their guardians to choose where they live, including an institution or facility such as Fernald Center.

8. **Failure to comply with Final Order, May 25, 1993, paragraph 4**
   "Defendants shall not approve a transfer of any class member of a state school into the community, or from one community residence to another such residence, until and unless the Superintendent of the transferring school (or the Regional Director of the pertinent community region) certifies that the individual to be transferred will receive equal or better services to meet their needs in the new location and that all ISP-recommended services for the individual's current needs as identified in the ISP are available at the new location."

The Response of the Defendants of December 29, 2004 to the Plaintiff's Notice of Unresolved Issues (as stated in paragraph 8) is to rely upon the same position the Department "fully set forth on pages 10-11 and 21-22 of its Opposition to Plaintiff's Motion to Reopen and Restore Case to Active Docket, which was filed with this Court on August 16, 2004. In brief, the Department's position has not changed since it filed its Answer five months ago.

9. **Failure to comply with Final Order, May 25, 1993, paragraph 2a**
   "Defendants shall substantially provide services to each class member on a lifetime basis. The specific services to be provided to each class member to meet this obligation, and defining this obligation, shall be set forth in an Individual Service Plan ("ISP") that details each class member's capabilities and needs for services, pursuant to the regulations governing the preparation of ISP's as currently set forth in 103 CMR 20, et seq. (the "ISP Regulations").[2] Such services shall include, as appropriate for the person, residential programs; day programs; recreational and leisure time activities; medical psychological, dental and health-related professional services; respite care and crisis intervention services; support and generic services, such as guardianship and adaptive equipment services; and transportation services."

The Response of the Defendants of December 29, 2004 to the Plaintiff's Notice of Unresolved Issues (as stated in paragraph 9) is to rely upon the same position the Department "fully set forth on pages 5-7 of its Opposition to Plaintiff's Motion to Reopen and Restore Case to Active Docket, which was filed with this Court on August 16, 2004. In brief, the Department's position has not changed since it filed its Answer five months ago.

10. **Failure to comply with Final Order, May 25, 1993, paragraph 2b**

> "Defendants shall not seek to amend, revise, or otherwise modify the ISP Regulations as they affect class members except upon 60 days written notice to the plaintiffs' counsel, with an opportunity for plaintiffs to comment upon the proposed changes. Any amendments must leave in place a process that is at least the substantial equivalent of the regulations currently set forth in 104 CMR 20 et seq., with regard to the definition of the ISP, the individualized nature of the ISP, the existence of an appeal process, and the principles contained in footnotes 2 and 3 herein."

The Response of the Defendants of December 29, 2004 to the Plaintiff's Notice of Unresolved Issues (as stated in paragraph 10) is to rely upon the same position the Department "fully set forth on pages 22-28 of its Opposition to Plaintiff's Motion to Reopen and Restore Case to Active Docket, which was filed with this Court on August 16, 2004. In brief, the Department's position has not changed since it filed its Answer five months ago.

11. **Failure to comply with Final Order, May 25, 1993, paragraph 6a**
    "Defendants shall continue to seek to improve, and shall not undermine, the progress achieved during the period of this litigation by:

    a. Maintaining and implementing the basic principles of the ISP.[3]"

The Response of the Defendants of December 29, 2004 to the Plaintiff's Notice of Unresolved Issues (as stated in paragraph 11) is to rely upon the same position the Department "fully set forth on pages 22-28 of its Opposition to Plaintiff's Motion to Reopen and Restore Case to Active Docket, which was filed with this Court on August 16, 2004. In brief, the Department's position has not changed since it filed its Answer five months ago.

12. **The Defendants have, in the absence of specific regulatory authority, created a Placement Planning Process for the displacement of all current residents at the Fernald Developmental Center, which process includes a Placement Profile, in which the entire ISP "team" authorized by Regulation (115 CMR 6.21 et seq.) does not fully participate, but instead the program, support needs, and alternative future residential site of the individual are determined by an Individual Transition Planning Team comprised of Fernald administrators only.**

The Response of the Defendants of December 29, 2004 to the Plaintiff's Notice of Unresolved Issues (as stated in paragraph 12) is to rely upon the same position the Department "fully set forth on pages 22-28 of its Opposition to Plaintiff's Motion to Reopen and Restore Case to Active Docket, which was filed with this Court on August 16, 2004. In brief, the Department's position has not changed since it filed its Answer five months ago.

13. **The Defendants, without specific regulatory authority and in the absence of a reconvened ISP team, have conducted reviews of ISPs previously completed by family, guardians, and team members and have edited and otherwise re-written ISPs, in the absence of family members, guardians, and team member professionals, with the purpose of intentionally reducing costs, services and supports to residents, which clearly constitutes a systemic violation of the specific mandates of the Order.**

The Response of the Defendants of December 29, 2004 to the Plaintiff's Notice of Unresolved Issues (as stated in paragraph 13) is to rely upon the same position the Department "fully set forth on pages 28-31 of its Opposition to Plaintiff's Motion to Reopen and Restore Case to Active Docket, which was filed with this Court on August 16, 2004. In brief, the Department's position has not changed since it filed its Answer five months ago.

14. **Failure to comply with Final Order, May 25, 1993, paragraph 6b**
    **"Defendants shall continue to seek to improve, and shall not undermine, the progress achieved during the period of this litigation by:**

    **b. Exerting their best efforts to maintain and secure sufficient funds to meet the needs of class members under this Order."**

    **The Defendants have failed to provide appropriations to meet the large scale present need for capital improvements and repairs.**

    **The policy decision announced by Governor Romney to close or consolidate existing DMR facilities which are subject to the Final Order together with the unprecedented reduction in personnel and available budget in the past several years totally undermines and erodes the progress achieved by the Federal Court during the period of litigation 1972 - 1993 and accordingly, represents a systemic violation.**

The Response of the Defendants of December 29, 2004 to the Plaintiff's Notice of Unresolved Issues (as stated in paragraph 14) is to rely upon the same position the Department "fully set forth on pages 8-9 and 31-35 of its Opposition to Plaintiff's Motion to Reopen and Restore Case to Active Docket, which was filed with this Court on August 16, 2004. In brief, the Department's position has not changed since it filed its Answer five months ago.

15. **The impact of the FY2005 and FY2006 budgets, which place Fernald class members at risk and severely affect the Defendant's ability to meet its Court-mandated obligations to provide active treatment for Ricci class members**

    **In addition, the staff reductions and early retirements in FY2002 and FY2003 have had a direct effect upon the number of professional, clinical, and support staff required to meet the ISP-documented needs of class members.**

    **Further, the failure to fill long-term staff vacancies has resulted in inappropriate short-term use of floating personnel, unnecessary overtime, increased caseloads for remaining**

9

**staff, an attendant lack of supervision, and a direct affect upon resident participation in active treatment programs and recreational activities.**

The Response of the Defendants of December 29, 2004 to the Plaintiff's Notice of Unresolved Issues (as stated in paragraph 15) is to rely upon the same position the Department "fully set forth on pages 8-9 and 31-35 of its Opposition to Plaintiff's Motion to Reopen and Restore Case to Active Docket, which was filed with this Court on August 16, 2004. In brief, the Department's position has not changed since it filed its Answer five months ago.

16. **Failure to comply with Final Order, May 25, 1993, paragraph 2c**
    "**Sufficient adequately trained and experienced personnel, as reasonably determined by the Department of Mental Retardation based on professional judgment, shall be available to substantially meet the needs set forth in each class member's ISP.**"

    **Due to staff shortages, lack of supervision, and lack of preventative maintenance programs, there has been a progressive and alarming physical deterioration and loss of timely maintenance at Fernald, which has resulted in an increase in safety issues, lack of medical attention, inconsistent transportation services, elimination of recreation programs, unattended health issues, and a visible increase in vermin and insects in residential areas.**

The Response of the Defendants of December 29, 2004 to the Plaintiff's Notice of Unresolved Issues (as stated in paragraph 16) is to rely upon the same position the Department "fully set forth on pages 8-9, 14-15, 31-35 and 36-of its Opposition to Plaintiff's Motion to Reopen and Restore Case to Active Docket, which was filed with this Court on August 16, 2004. In brief, the Department's position has not changed since it filed its Answer five months ago.

17. **Failure to comply with Final Order, May 25, 1993, paragraph 5**
    "**Except as set forth in other paragraphs of this Order, nothing in this Order is intended to detract from or limit the discretion of the defendants in developing and improving programs, managing and determining the personnel and budget of the Department of Mental Retardation and other state agencies, implementing innovative services, improving quality enhancement and dispute-resolution mechanisms, or allocating its resources to ensure equitable treatment of its citizens.**"

Since the Final Order was entered by the Court on May 25, 1993, the Defendants have systematically abused the discretion authorized by the Court by publicly alleging that there would be budget savings accomplished by closing of Fernald Developmental Center and all other ICF-MRs; ignoring the concerns of the family advocacy organization at Fernald; limiting the subject matter proposed for discussion by the Family Advisory Committee; inappropriately establishing a process for the sale to private developers of the 163 acre site at Fernald prior to the development of a humane plan to provide alternative housing for the current residents; fully funding the Boulet and Rolland federally-mandated lawsuits while substantially reducing the available budget for the Ricci class action; politicizing the admission policy at the Developmental Centers to accommodate the factors of influence and favoritism; the development

of a Placement Profile process, which circumvents and denigrates the established ISP process; and publicly criticizing the Court's role in the Consent-Decree process.

>Respectfully submitted,
>Belchertown, Monson and Fernald Plaintiffs
>By Their Attorney
>
>*/s/ Beryl W. Cohen*
>Beryl W. Cohen
>11 Beacon Street
>Boston, MA 02108
>(617) 742-3322
>BBO# 088620

DATED: January 10, 2005

## CERTIFICATE OF SERVICE

I, Beryl W. Cohen, hereby certify that a true copy of the within Plaintiffs' Reply To Defendant's Response To Notice Of Unresolved Outstanding Issues has been served this day January 10, 2005, by first-class mail upon the Defendants' attorneys, Robert L. Quinan, Jr., Assistant Attorney General, Government Bureau, Office of the Attorney General, Commonwealth of Massachusetts, at his office at One Ashburton Place, Room 2019, Boston, MA 02108-1698 and Marianne Meacham, General Counsel, Department of Mental Retardation, 500 Harrison Avenue, Boston, MA 02118.

*/s/ Beryl W. Cohen*
Beryl W. Cohen