# PYLE, ROME, LICHTEN, EHRENBERG & LISS-RIORDAN, P.C.
Attorneys at Law
18 Tremont Street, Suite 500
Boston, MA 02108

Telephone (617) 367-7200
Fax (617) 367-4820

Warren H. Pyle
David B. Rome
Harold L. Lichten*
Betsy Ehrenberg
Shannon Liss-Riordan**
Terence E. Coles
Kathrine D. Shea

M. Amy Carlin
Nicole Horberg Decter**
Rebecca G. Pontikes
Alfred Gordon
Leah M. Barrault

*Also admitted in Maine
**Also admitted in New York

Tod A. Cochran
OF COUNSEL

February 14, 2005

By Hand Delivery
The Honorable Judge Joseph Tauro
United States District Court
District of Massachusetts
One Courthouse Way, Suite 2300
Boston, MA 02110

Re: Ricci, et al. v. Okin, et al.,
Civil Action Nos. 72-0469-T, 74-2768-T, 75-3910-T, 75-5023-T and 75-5210-T

Dear Judge Tauro:

This firm represents the Service Employees International Union, Local 509 ("Union or Local 509"). Local 509 is the collective bargaining representative of approximately 10,000 public and private sector human service and education professionals, including approximately 900 employees of the Department of Mental Retardation ("DMR") of the Commonwealth of Massachusetts. Among these 900 DMR employees, approximately half are in the Human Service Coordinator job series titles. See Affidavit of Colleen Doherty ("Doherty Aff."), Exhibit A, ¶ 5, attached as Exhibit 1.[1] It is the Human Service Coordinators ("Service Coordinators") assigned to the DMR area offices who have the primary responsibility to assess clients' needs for services and to develop, coordinate, review, evaluate and monitor clients' ISPs. Id., Exhibit B. These responsibilities are essential to ensuring that Ricci v. Okin class members who reside or will reside in the community receive services according to their ISPs and that the ISP process functions properly.

---

[1] In 2001, DMR combined the titles of Service Coordinator and QMRP under one title, Human Service Coordinator. Id.

1

**PYLE, ROME, LICHTEN, EHRENBERG & LISS-RIORDAN, P.C.**

The Union writes to you now because it has recently gathered information that Service Coordinator caseloads have grown to an unprecedented level. While the Union is aware of the Plaintiffs' recent motion to reopen this case and also to enforce the May 25, 1993 Order, the Union did not seek to take a position in that litigation nor is the Union seeking at this time to become a party. Rather, the Union submits this letter as an Amicus on the narrow but paramount issue of Service Coordinator staffing and caseloads, which were not, as far as the Union is aware, addressed by that motion or related proceedings.

The average Service Coordinator caseload in fourteen of the twenty-one area offices[2] about which Local 509 representatives were able to obtain information stands at fifty or above, with seven of the offices having an average of fifty-three or above. Numerous individual Service Coordinators are carrying intolerable caseloads of 58 – 60 clients. See Affidavit of Ernest Tarquinio ("Tarquinio Aff."), ¶ 6, attached as Exhibit 2; Affidavit of Bud Whalon ("Whalon Aff."), ¶ 6, attached as Exhibit 3; Affidavit of Gerry Villani ("Villani Aff."), ¶ 5, attached as Exhibit 4. Unless Service Coordinators are able to do their jobs in a thorough and timely manner, the integrity of the ISP process is threatened.

By way of contrast, in 1990, when this Court intervened to prevent the layoffs of Service Coordinators, the average caseload was 42. See Affidavit of Stu Dickson ("Dickson Aff."), ¶ 6, attached as Exhibit 5. By 2000, the average caseload ballooned to 48 which by DMR's own estimate required an additional 72.42 Service Coordinator positions to achieve a caseload average of 40 clients for Service Coordinators serving the DMR Adult population. See DMR 2000 Report to Senate, attached hereto as Exhibit 6. With averages now in the 50s, current caseload levels are continuing to move in an alarming direction, with no reasonable expectation that the Commonwealth, of its own initiative, will provide relief in the form of increased staffing. On February 3, 2005, the Union was informed that the Governor's Fiscal Year 2006 budget submission to the Legislature, House 1, did not contain any request for funding for additional Service Coordinator positions. Doherty Aff., ¶10. It is not possible to accurately calculate how many additional Service Coordinator positions would currently be required to bring Service Coordinator caseloads down to the 1:40 ratio referenced in DMR's 2000 submission to the Legislature but the information necessary to do so is certainly within DMR's possession. DMR has not been required to submit such information to the Legislature since Governor Romney vetoed the language requiring such submissions in Fiscal Years 2004 and 2005. Affidavit of Katherine D. Shea, General Counsel to Local 509 ("Shea Aff."), ¶5, attached as Exhibit 7.

The Union bases its estimate of the current average caseload on a recent survey of its membership conducted by the Local 509 DMR Chapter Regional and Joint Executive Board Representatives. In some regions and/or offices, all caseload numbers of individual Service Coordinators were available and in some, the information available was more limited. The Union recognizes that its estimate of the current average caseload may not be as accurate as would be ideal. However, its efforts to obtain caseload related

---

[2] In total, there are twenty-four area offices. Doherty Aff., ¶9.

**PYLE, ROME, LICHTEN, EHRENBERG & LISS-RIORDAN, P.C.**

information and records from DMR have been resisted by the DMR administration, as set forth in the affidavits of Katherine D. Shea, General Counsel to Local 509, and Colleen Doherty, SEIU Local 509 DMR Chapter President. Specifically, the Union has pursued two paths to obtain complete and accurate caseload data, an information request pursuant to M.G.L. c. 150E, and a public records request pursuant to M.G.L. c. 66, §10. Both efforts have been met with roadblocks by DMR.

On November 22, 2004, Ms. Doherty sent an email to DMR Labor-Management Representative Larry Tummino requesting statewide Service Coordinator caseload averages. Doherty Aff., ¶6 and Exhibit C. On or about December 10, 2004, Mr. Tummino informed Ms. Doherty that she should receive the caseload averages by fax or e-mail the following week. Id., ¶ 7. However, on December 15, 2004, Mr. Tummino sent Ms. Doherty an e-mail stating that he had been advised not to send this information separate from the Union's Public Records Request. Id., ¶ 8 and Exhibit D.

On November 29, 2004, the Union's attorney, Katherine Shea, had made a public records request of DMR seeking Human Service Coordinator caseload data as well as other documents relevant to assessing caseload and workload levels. See Shea Aff., ¶2, Exhibit A. As seen forth in detail in the Shea affidavit, until December 23, 2004, DMR Attorney James Bergeron indicated to Shea that she would soon receive the documents he had already gathered, including the Human Service Coordinator caseload data, and that DMR would continue to gather the remainder and forward them at a future date. However, on December 23, 2004, according to Attorney Bergeron, DMR General Counsel Marianne Meacham, while agreeing the documents were "disclosable," told Bergeron she wanted to first obtain the authorization of the DMR Commissioner to forward the documents. Although the Commissioner was that very day in meetings with Ms. Meacham, Mr. Bergeron told Ms. Shea that he was not optimistic that she would receive a response on the documents as soon as previously indicated. Since December 23, 2004, Mr. Bergeron has not responded to telephone messages from Ms. Shea. Shea Aff., ¶¶ 9, 10. Thus, the Union, through its elected DMR Chapter officers, proceeded to gather the most accurate caseload information it could.[3]

DMR may attempt to dispute the proposition that the size of caseloads necessarily corresponds with the ability to monitor and/or provide services. There is at least one measure, however, which would belie such an assertion - the ability of DMR to timely complete the annual ISP review. In 1987, an earlier year for which the Union has some evidence, 100% of reviews were completed on time. See 1988 ISP Status Report attached as Exhibit 8. In contrast, in 2002, according to the DMR Management Report, there were already 310 ISPs overdue by more than 30 days as of May 1, 2002. See DMR Monthly Management Report for March 2003, attached as Exhibit 9. The most recent data, for August 2004, is among the records that DMR has in its possession but refuses to provide. Shea Aff., ¶ 5. As stated by former DMR Deputy Commissioner Frederick M. Misilo, Jr., "the ISP date is an important service milestone . . . this date . . .

---

[3] The Union is also seeking the intervention of the Secretary of State, pursuant to G.L. c. 66, §10(b). See Shea Aff., ¶11. If necessary, the Union will also file a Charge of Prohibited Practice, pursuant to G.L. c. 150E.

3

**PYLE, ROME, LICHTEN, EHRENBERG & LISS-RIORDAN, P.C.**

demonstrate[s] that we are meeting our service obligations to consumers and particularly to class members." See June 8, 1993 Memorandum, attached as Exhibit 10. This refusal to provide the August, 2004 data certainly creates an inference that the records do not reflect favorably on the ability of DMR staff to comply with ISP timelines.

Nor can it be said that the work involved in each case on a Service Coordinator's caseload has become any less involved. On the contrary, as demonstrated by the Union's 2004 Workload Survey, the actual workload demands of Service Coordinators have increased far more than caseload averages alone suggest. Dickson Aff. ¶ 7 and Exhibit C. As revealed by the Union's workload survey, enormous computer, paperwork and administrative demands placed on Service Coordinators, as well as the service demands of challenging new groups of clients, have created substantial burdens and obstacles to performing services on a behalf of DMR clients.

Without the complete data in the possession of DMR, it is difficult to accurately assess the full magnitude of the Service Coordinator staffing problems faced by the Ricci class members or the precise scope of relief required. However, based on the survey information proffered here, combined with DMR's refusal to provide the requested documents, the Union submits that there is sufficient basis to warrant further inquiry by this Court. The Union therefore requests that this honorable Court require the Defendants to demonstrate that it has retained sufficient numbers of Service Coordinators whose services are essential and integral to ensuring that the needs set forth in each class member's ISP are substantially met and that the state ISP process is in compliance with the Court's Order.[4] If, as the Union's survey evidence suggests, DMR cannot so demonstrate, the Union will consider seeking to become a party in this matter so that it may file appropriate motions.

Respectfully submitted,
SEIU, Local 509,
By its attorney,

*Katherine D. Shea*
Katherine D. Shea, BBO# 549771
Pyle, Rome, Lichten, Ehrenberg &
    Liss-Riordan, P.C.
18 Tremont Street, Suite 500
Boston, MA 02108
(617) 367-7200

---

[4] The May 25, 1993 Order, ¶2, provides the following: "Defendants shall continue to provide services to the members of the plaintiff class as set forth in this paragraph…(c) Sufficient adequately trained and experienced personnel, as reasonably determined by the Department of Mental Retardation based on professional judgment, shall be available to substantially meet the needs set forth in each class member's ISP." Paragraph 7(a) provides that the Plaintiffs may seek enforcement of the Order "[i]f the defendants substantially fail to provide a state ISP process in compliance with this order . . ." A copy of the Order is attached as Exhibit 11.

**PYLE, ROME, LICHTEN, EHRENBERG & LISS-RIORDAN, P.C.**

cc: Marianne Meacham, Esq.
     Beryl W. Cohen, Esq.
     Margaret M. Pinkham, Esq.
     Juliana deHaan Rice, Esq.
     Michael Grunko
     Cliff Cohn
     Colleen Doherty
     Stu Dickson
     Bud Whalon
     Gerry Villani
     Ernest Tarquinio