UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| Robert Simpson Ricci, et al. | ) | |
| Plaintiffs, | ) ) ) | CIVIL ACTION |
| | ) | NO.   72-0469-T |
| v. | ) | 74-2768-T |
| | ) | 75-3910-T |
| Robert L. Okin, et al. | ) | 75-5023-T |
| | ) | 75-5210-T |
| Defendants. | ) ) | |

THE DEPARTMENT OF MENTAL RETARDATION'S RESPONSE THE
SUBMISSION OF THE SERVICE EMPLOYEES INTERNATIONAL UNION

Introduction

The Department submits this memorandum in response to the submission of the Service Employees International Union, Local 509 ("SEIU" or "the Union") and in accordance with this Court's Order of February 22, 2005. The Union seeks an order requiring the Department of Mental Retardation ("DMR" or "the Department") to demonstrate "that it has retained sufficient numbers of Service Coordinators whose services are essential and integral to ensuring that the needs set forth in each [*Ricci*] class member's ISP are substantially met and that the state ISP process is in compliance with the Court's Order."[1]   Letter from Katherine Shea dated February 14, 2005 ("the Union's Letter") at 4.[2]   The Union has submitted various affidavits to support its

---

[1] The Union is not a party to the *Ricci* litigation and therefore has no standing to object to the Department's compliance with the Final Order.[1]

[2] The Department recently responded to this Court in some detail to a motion filed by class representatives alleging that noncompliance with this Court's Final Order of May 25, 1993 ("the Final Order"), see Defendants' Opposition to Plaintiff's Motion to Reopen and Restore Case to Active Docket, including issues related to the compliance with

1

position that "Service Coordinator Caseloads have grown to an unprecedented level[,]" based upon the Union's own survey information, caseloads "stand[ ] at fifty or above[,]." and suggesting that as a result of the caseload, *Ricci* class members individuals service plans (ISPs) are not being completed in accordance with the regulatory guidelines.  Union's Letter at 4.

The Union's attempt to advance its collective bargaining agenda and its members' interests by inserting themselves in this closed matter must be rejected.  The issues raised in the Union's letter, namely the appropriate "caseload' or "workload" of DMR service coordinators, has been the subject of significant and ongoing labor-management discussions between the Department and the Union over the last several years. Those discussions, which have resulted in both an understanding on case assignment policy and DMR's restoration of (20) service coordinator vacancies, are the appropriate forum in which to negotiate these matters.   To the extent that these issues continue to present a labor-management area of dispute, the Union is required to exhaust its administrative remedies through the administrative process before it may seek resort to Court, which it has not done.  The Union should not be permitted to raise these issues under the guise of Court monitoring of the *Ricci* Final Order.  Nor should the retained jurisdiction of this Court following the closure of this case be an invitation to nonparties to bring new issues, and new parties, under the Court's supervision. Cotter v. City of Boston, 323 F3d 160, 172 (1st Cir 2003).

With regard to the merits of the Union's claims, the Union's depiction of the workload growth as "unprecedented" and, by inference, negatively affecting the quality of services to *Ricci* class members, is factually incorrect.  In an effort to create a sense of crisis where there is none, the Union has exaggerated the facts and then drawn faulty conclusions therefrom.  In fact, the

---

ISP regulations and in particular the timely completion of ISPs for *Ricci* class member in the facilities and in the community. See Defts'. Opp. at 5-6, 23-25.

2

average service coordinator workload--once current posted positions are filled--stands at 48.5 and has been at or around this level for over five years.  Looking only at service coordinators to *Ricci* class members, as this Court did in 1990, the workload ratio is far less, because the number of *Ricci* class members has declined (through natural mortality) over the same period of time that the number of service coordinators has increased.  Today, with 375 service coordinators to provide services to 3,354 *Ricci* class members in the community (exclusive of *Ricci* class members in ICF/MRs), the average *Ricci* class member workload is 8.65.  While in practice service coordinators (SCIs) have both *Ricci* class members and non-*Ricci* class members as part of their workload, meeting the service needs of *Ricci* class members is prioritized based upon the requirements of the Final Order.  Every Area Director understands that *Ricci* class members are in the first position when it comes to services and service coordination, and service coordinator supervisors (SCIIs) are required to assume responsibility for Ricci class members in the case of a service coordinator vacancy or absence.

     Further, the inference that the Union encourages the Court to draw from the Department's appropriate withholding of ISP data in response to the Union's public records request, is incorrect.  The Department correctly determined that a portion of a "management report" which was raw data collected but not yet subject to data validation, was not a "public record," and thus was not required to be disclosed in response to the Union's public records request.  In response to the Union's claim that this data been withheld because it sheds unfavorable light on the Department's compliance with the Final Order, the Department voluntarily produces this information.  And, in fact, the data, which overstates noncompliance, clearly indicates that the rate of ISP compliance for Ricci class members is in excess of ninety-nine percent (99.7%).  The

Department's fundamental commitment to Ricci class members, and to ensuring that the ISP process is maintained, is amply supported by this data.

    I.    <u>The Caseload Issue Is A Proper Subject For Labor Negotiations, And the Union Has Failed To Exhaust Its Administrative Remedies On This Topic</u>.

The issue of service coordinator workloads – how they are measured, how assignments are made, what constitutes an acceptable workload for the individual service coordinator within the confines of available resources - has been a subject of discussion with the Union for some time. Tummino Aff., ¶22 . In 2001, Local 509, SEIU, requested the Department begin discussions on the issue of case assignment practices, a topic closely related to the issue of appropriate service coordinator workloads. In December of 2001, a Joint Labor/Management Committee, convened pursuant to Supplemental Agreement O of the SEIU Contract, was charged with exploring the current case assignment practices for service coordinators and developing written recommendations. This Committee held five Regional meetings to investigate this practice. Surveys were performed and there were many discussions over many months to determine the best way cases should be assigned. Ultimately, a majority of the service coordinators indicated their preference for their offices' current practices outlined above over a more standardized rating or ranking proposal. Affidavit of Larry Tummino, ¶ 23.

    On September 15, 2003, an agreement, entitled "Supplemental O Summary" was presented to the Department's Commissioner, Gerald J. Morrissey, Jr. As a result of this Joint Labor/Management Committee, certain recommendations were made concerning case assignment practices. These recommendations included reissuing the Area of Service Policy and drafting a policy and procedure for the closing of cases. Both of these recommendations have been carried out. Affidavit of Larry Tummino, ¶ 24. The recommendations of this Joint

Labor/Management Committee, as set forth in the Supplemental O Summary, should favorably impact management of service coordinator workloads. Id.

The Union's workload issues present a labor-management area of dispute, and the Union is required to exhaust its administrative remedies through the collective bargaining process before it may seek resort to Court. Leahy v. Local 1526, AFSCME, 399 Mass. 341, 504 N.E.2d 602 (1987)(issues which constitute prohibited labor practice should normally be decided in the first instance by the Massachusetts Labor Relations Commission); see also Johnston v. School Committee of Watertown, 404 Mass. 23, 533 N.E.2d 1310 (1989); Ash v. Police Commissioner of Boston, 11 Mass.App. Ct. 650, 418 N.E.2d 622 (1981). The parties have made significant progress in establishing case assignment protocols and restoring 20 positions that had remained vacant in an effort to manage a deficiency in the DMR budget in the prior fiscal year. Affidavit of Lawrence Tummino (hereafter "Tummino Aff.") ¶ 26. This is the appropriate forum to address these issues, not this Court.

    II    <u>The Department is Employing An Adequate Number of Service Coordinators to Meet Ricci Class Members' Needs.</u>

Effective service coordination is the foundation of the DMR community system. Affidavit of Larry Tummino ("Tummino Aff. at 7). The service coordinator is "the person designated by the Department to arrange, coordinator, or monitor, or to remain informed about, services or supports provided, purchased, or arranged by the Department for a particular individual and to be responsible for the development of an ISP for the individual." 115 CMR. 2.00 et seq. The first priority for every DMR service coordinator is the *Ricci* class members who are assigned to them. Tummino Aff., ¶ 19. The service coordinator is responsible for monitoring the class members' objectives in the ISPs continuously to ensure all needs are substantially met. Id. The critical function of the service coordinator is to have a thorough

understanding of the person for whom they are assigned. Tummino Aff., Id. They do this through periodic check-ins with the individual, the providers of services, and guardians. Id

The number of service coordinators employed by the Commonwealth has consistently increased since 1990. Tummino Aff., ¶ 13, In 1991, the Department employed a total of 324.14 Human Service Coordinators ('SC "). This number has increased over the years; today, the Department employs a total of 539.16 SCs, of which approximately 68 are Service Coordinator Supervisors (" SC IIs"), and 50.65 are Service Coordinators for children and for those between 18-22. Id.

As of November 2004, there were 375.29 adult service coordinator positions available among 23 Area Offices who handle a total of 18,892 adults. Tummino Aff., ¶ 16, leaving an average workload for each service coordinator of 48.5 across the state with all funded positions filled. This figure has been fairly consistent for the past five years.[3] See Reports to House Ways & Means for 2000, 2001, 2002, attached as Exhibit A to Tummino Affidavit.

Looking only at service coordinators to Ricci class members, as this Court did in 1990,[4] the ratio is, naturally, far lower because the number of *Ricci* class members declined over the same period of time that the number of SCs has increased. Today, for the 375 SCIs, there are 3,354 *Ricci* class members, for a workload ratio of 8.65. While, in practice, SCIs have both *Ricci* class members and non-*Ricci* class members as part of their workload, meeting the service needs of *Ricci* class members is prioritized based upon the requirements of the Final Order.

---

[3] The Union attached the Department's Report to the Senate Ways & Means Committee for 2000, see Exhibit 6, but erroneously included two documents that were not submitted to the Committee as part of this Report. These documents, which the Union suggests support DMR's "own estimate" of a need for an additional 72 service coordinators, were documents evidently prepared for budget and/or policy discussion, and were not submitted to the House or Senate Ways & Means Committees as part of this Report. Further, following this budget cycle, the Department hired 25 additional service coordinators to address the needs of a new group receiving DMR services, Rolland class members.

[4] The Union letter's Exhibit 5, and its Attachment B purport to indicate that the average *Ricci* caseload was 1:14., but this information appears to come from the handwritten notes of a Union member, and the department has not data available to confirm this figure.

6

Every Area Director understands that *Ricci* class members are in the first position when it comes to services and service coordination.

The Union mistakenly equates the current dispute about service coordinator "caseloads" with the circumstances that gave rise to this Court's unique intervention in 1990. (See Union Letter Exhibit 5, Attachment A). In 1990, the Commonwealth proposed laying off 126 service coordinators, or 38% of the service coordinator workforce to address an $11.4 million budget reduction in the residential account alone. Today, the Department's budget, including the community residential account which funds most, if not all the service coordinator positions, has increased steadily over the past five years and there are no proposed layoffs of service coordinators; in fact, in the most recent fiscal years, despite some staff reductions and early retirements experienced across other accounts, there were no reductions in force taken in service coordinator positions with the exception that in fiscal year 2005, 20 vacancies went unfilled to manage a $1 million deficit in the regional administrative account. Affidavit of Larry Tummino, ¶ 15. After discussion with the Union, a decision was made that those vacancies would be filled.

Finally, other developments since 1990 – enhanced technology, including electronic ISPs, additional and separate quality monitoring functions such as the staff from the DMR Office of Quality Enhancement, Investigations, human rights committees, and Area office program Monitors, to name a few, provide an additional set of eyes on the system and make the comparison of service coordination caseloads to 1990 levels not a true "apples to apples" comparison. Some of the functions listed as service coordination role in 1990 are actually performed today by others. Tummino Aff., ¶ 12; Cf. Exhibit 5, Attachment A p. 2. Thus the comparison by the Union to 1990 workloads of 40, and the suggestion that this is the appropriate workload today, fails to take into account these significant changes.

III.   The Department's ISP Compliance Data Establishes That the Number of Service Coordinators is Adequate to Meet the needs of *Ricci* Class Members.

In its submission, the Union asserts that ISP compliance data compiled by the Department suggests that ISPs for *Ricci* class members are not being completed in timely fashion, pointing to excerpted data from an internal DMR document dated March 2003, entitled "DMR Monthly Management Report- March 2003 " see Union Exhibit 9, which reflects a total 310 "'late ISPs"[5] for the entire DMR adult population as of March 31, 2002.   Contrary to this suggestion, the Department is substantially meeting the needs of *Ricci* class members with its current service coordinator complement.  As discussed in greater detail below, data compiled by the Department shows a negligible number of ISPs not completed in a timely manner, and these figures are even smaller upon data validation.

A.   The Requested Data Does Not Constitute a "Public Record"

The Union's charge that the Department refused to provide the Union with documents they requested relating to ISPs in a public records request is an attempt to muddy the water here. The Union requested, among other documents, "management reports" similar to the March 2003 "Monthly Management Report" attached as Exhibit 9 to their submission.  In general, the monthly management reports which are generated by the Department's Systems Integration Management Division are  "data runs" generated from the Department's main client-based electronic data reporting system, the Consumer Registry System (CRS) at a particular point in time.  Affidavit of Margaret Chow-Menzer ("Chow-Menzer Aff."), ¶ 3. Since data entry by

---

[5] For purposes of this report, "overdue ISPs" were those that appeared on the Department's electronic Consumer Registry System ("CRS") to not have occurred within 30 days of the date entered on the system as the date by which the individual's ISP should have been completed.  Affidavit of Margaret Chow Menzer, ¶5.

service coordinators and others is continual into the CRS system, these data runs create a "data snapshot" for that point in time.  Id.

These data runs are used internally by the Department's senior managers to ensure, among other things, the accuracy and timeliness of ISP data entered into the agency's information management systems, to track the Department's performance in completing ISPs, and to aid the Department in policy development on a wide array of issues by providing data trends and information.  Chow-Menzer Aff, ¶ 4.  The data contained in these reports, which reports are distributed only to senior managers, must be further validated by field staff.  Chow-Menzer Aff., ¶ 5.  For example, there are instances where an ISP reported as "overdue" ("overdue" means more than 30 days past the date which is indicated on CRS for the ISP to be completed)  may have in fact occurred but was not captured by the system because there was a technical error in the information system.  Chow-Menzer Aff, ¶ 5.  Additionally, there are instances where an ISP is reported correctly as being past due, but for which there are a number of appropriate reasons why the ISP may be late.  Chow-Menzer Aff, ¶ 5.  Data is validated through referral to field staff, and follow-through occurs; data corrections are reflected in the next month's report. Chow-Menzer Aff, ¶ 5.  To generate a report for purposes of external reporting, it is necessary to pick a particular point in time, and conduct thorough data validation.  Chow-Menzer Aff, ¶ 5.  For these reasons, the August 2004 data run referenced in the Union's submission was not a report that has undergone data validation.

The Department's position was and is that these "reports" fall within exemption (d) to the Public Records Law, G.L. c. 6, as factually incomplete, and were properly withheld. See Response to Union's public records request, attached hereto.(A denial to provide the requested materials can be made if the requested items are not presently in the possession of the custodian,

9

or if the requested items fall into one of the fifteen (15) statutory exemptions included in G.L. c. 4 § 7 Twenty-Sixth (a)-(p).

The Union has appealed the Department's denial to the Supervisor of Public Records within the Secretary of State's Office, which is the appropriate forum to do so. The Department has responded to the Union's request, with a copy sent to the Supervisor. Notwithstanding that the data compiled in these data runs does not constitute, in the Department's view, a "public record" subject to disclosure, the Department is voluntarily disclosing this data in order to prevent the unjustified conclusion that the data is unfavorable to the Department or suggests noncompliance.

### B. The Department Is in Compliance with ISP Requirements

*Ricci* class members' ISPs are being developed in a timely manner in accordance with DMR regulations. Based upon data collected by the Department on a monthly basis, as of August 31, 2004, out of a total of 4164 Ricci class members throughout the entire state, only 12 ISPs were overdue. Affidavit of Margaret Chow-Menzer, ¶7. This represents an approximately 99.7% on time completion rate. Id. In the community, with a total number of 14,066 individuals, as of August 31, 2004, 97 ISPs were overdue, representing approximately 99.3% on time completion rate. Id. at ¶8. These figures, which likely overstate the number of "overdue" ISPs, demonstrate that the Department is in substantial compliance with the Final Order's requirement that *Ricci* class members receive a timely ISP and services thereunder.

### IV. DMR's Efforts To Promote Service Coordinator Performance and Job Satisfaction

The Department values the role of service coordinators and has made consistent efforts towards addressing service coordination concerns. Although the service coordination position may be stressful, the long tenure of many of these employees evidence job satisfaction. Affidavit of Larry Tummino, ¶34.

The Department realizes and understands the stress experienced by service coordinators as they perform their important work for *Ricci* class members and non-*Ricci* class members every day, and has developed a programs of activities designed to promote professional development and upward job mobility; to assist service coordinators in developing and utilizing "best practices" in their job performance; and even working collaboratively with the Union by sponsoring and funding a personal well-being day for service coordinators of adult individuals, and another for service coordinators of children. Tummino Aff., ¶¶37, 38. These latter sessions were developed to address service coordinator stress and morale issues, were aimed at providing the service coordinators with coping mechanisms and stress management techniques. Tummino Aff., ¶¶38.

The Department continues to recognize and be sensitive to the needs of the service coordinator position and will continue its commitment to offer classes and training seminars aimed at addressing the stress and morale issues experienced by service coordinators. A Professional In-Service Program has benefited service coordinators financially. Under this program, negotiated with Local 509, Human Service Coordinators have been receiving a "Professional In-Service payment equal to 5% of their pay if they attend a given amount of training. This 5% payment is given on a weekly basis. Id.

In sum, the Department has worked well with the Union and funded employee training across a spectrum of areas; these efforts are designed to increase job satisfaction as well as promote best practice.

Conclusion

The issues raised in the Union's Letter are more properly addressed in the appropriate forum, the labor-management committees established for this purpose and, wanting resolution, to

the Labor Relations Commission. This Court should reject the Union's attempt to further the agenda of its members under the guise of a *Ricci* compliance action, particularly since the Union has no standing in this closed lawsuit.  Finally, the Department is in full compliance with its obligation to *Ricci* class members in the community, as set forth in the Department's August 16, 2004, Opposition to Plaintiffs' Motion to Reopen and Restore Case to Active Docket and to Enforce the Final Order of May 12, 1993.

Respectfully submitted,
DEPARTMENT OF MENTAL RETARDATION,

By its attorneys,
THOMAS F. REILLY
ATTORNEY GENERAL


s/Juliana deHaan Rice
Robert L. Quinan, Jr., BBO 553010
Juliana deHaan Rice, BBO 564918
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place
Boston, MA  02108
(617) 727-2200, ext. 2554, 2062


 s/Marianne Meacham
Marianne Meacham, BBO 550468
Special Assistant Attorney General
General Counsel
Department of Mental Retardation
500 Harrison Avenue
Boston, MA  02118
(617) 727-5608