UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT SIMPSON RICCI, et al., <br>     Plaintiffs, <br><br> vs. <br><br> ROBERT L. OKIN, <br> et al., <br>     Defendants. | CIVIL ACTION <br> No.   72-0469-T <br>         74-2768-T <br>         75-3910-T <br>         75-5023-T <br>         75-5210-T |

AFFIDAVIT OF LAWRENCE TUMMINO

1. I, Lawrence Tummino, do depose and say as follows:

2. I am the Assistant Commissioner for Field Operations for the Department of Mental Retardation. I have worked for the Commonwealth in the field of mental retardation for 32 years. In my current position, my responsibilities include the general supervision, coordination and management of the provision of services by or through the DMR field office to persons with disabilities who are eligible for services from the Department; the DMR field offices are located throughout Massachusetts. There are four regional offices headed by regional directors. There are twenty-three area offices headed by area directors.

3. The services delivered through four regions, and area offices include residential supports, day and work programs, family supports and transportation.

1

4. In my position, I oversee the managers who supervise service coordinators, and as such, I am fully familiar with the issues surrounding service coordinator workload, and the issues raised in the letter filed with this Court by the Service Employees International Union ("SEIU" or "the Union").

5. I am also familiar with the events described in the letter attached to Stu Dickson's Affidavit, SEIU Exhibit 5, Attachment A, the budget reductions and service coordinator layoffs which were proposed in 1990. As a Deputy Assistant Commissioner at that time, I was intimately involved in managing the budget reductions and the impact that those reductions had on individuals served by the Department. In my opinion, the current circumstances and the current service coordinator workload issues do not approach in any way the crisis that the Department and individuals with mental retardation faced in 1990.

6. Further, the work responsibilities of service coordinators have changed since 1990 and while workloads have increased slightly in the last five years, the comparison of workloads between 1990 and the present must, in my opinion, take that into account.

The Role of Service Coordinators

7. Effective service coordination is the foundation of the community system. The responsibilities of a service coordinator are outlined in the regulations of the Department, specifically 115 CMR 2.01. "Service coordinator means the person designated by the Department to arrange, coordinate, or monitor, or to remain informed about, services or supports provided, purchased, or arranged by the Department for a particular individual and to be responsible for the

development of an ISP for the individual." The service coordinator is the principle organizer and architect of the individual service plan ("ISP") for the individual. The service coordinator also performs at least periodic check-ins with individuals to ensure that services are in place and the individual is safe, and may be much more involved with individuals in times of crisis or transition.

8. Each individual served by the Department has different needs. Therefore, there is a variation of work in each workload. For example, there are cases where the service coordinator would have to make contact with the individual just once per year if that individual was eligible for but refusing services. There are others who need at least monthly or more involvement due to the individual's needs and situations. There are others who are at times in crisis and demand a high degree of time and involvement. All of these factors are taken into account when supervisors work with service coordinators to prioritize how to use their time most effectively given the dynamic nature of the people assigned to them.

9. Each area office uses similar case assignment practices. Area offices take into consideration the interests of the service coordinator, travel time, specialization, language and cultural issues when assigning cases. New cases are presented at staff meetings in order to solicit input and requests for the case. New service coordinators are assigned cases on an incremental basis. Other cases are assigned for short-term specific needs. Therefore, although these cases would be part of a service coordinator's workload, the number can be deceiving.

10. A team concept is utilized to ensure that service coordinators work on cases in areas in which they have an interest or particular skills and experience, which are most relevant to the people to whom they are assigned.

11. Most service coordinators are experienced and there is great tenure within the job title. Service Coordinators who work for the Department have, in many instances, worked for the Department for 10, 20 and even 30 years.

12. The role of the service coordinator has changed significantly since 1990. At that time, the Department had very limited staff resources to monitor quality in the provider system on a regularized basis, to investigate complaints of abuse, neglect or mistreatment or to investigate and monitor human rights issues. Therefore, the service coordinator performed these functions, though not with the same degree of intensity as they are performed today. The development of separate quality monitoring functions such as the DMR Office of Quality Enhancement, Investigations Division, human rights committees and area office program monitors, to name a few, provide an additional set of eyes on the system and make the comparison of service coordination workloads to 1990 levels not a true "apples to apples" comparison.

Service Coordinators' Ricci Class Member Workloads

13. The number of service coordinators has consistently increased over the years since 1990. Today, the Department has 539.16 service coordinators. Of this total, 68 are Service Coordinator Supervisors ("SC II's") who have the responsibility to oversee service coordinators who have Ricci class members on their workloads and who cover all Ricci class members when there is a service coordinator

vacancy. In addition, 50.65 are Service Coordinators for Children and for those between 18-22.

14. The average service coordinator workload has been fairly consistent, hovering around 48 for the past five years. A true and accurate copy of the Service Coordination Caseloads Reports filed with the Legislature in 2000, 2001, 2002 and 2003 are attached Exhibit A.

15. In November, 2004, I compiled service coordinator workload data in connection with discussions with SEIU regarding the appropriate level of service coordinator workloads, the Department's decision to manage a deficiency in its budget through allowing 20 service coordinator positions to go unfilled in FY 2005. The purpose of this data was to evaluate certain policy matters including upcoming budget decisions and appropriate staffing. This data was for policy development, and was not submitted as a final data compilation to the Legislature.

16. As of November 2004, 375.29 adult service coordinator positions were the total available positions distributed among 23 Area Offices who handle a total of 18,892 adults. (This number does not include service coordinator supervisors or those service coordinators dedicated to children and those between 18-22.) Of this number, 3354 are Ricci class members. A true and accurate copy of the Service Coordinator Study for the time period November 2004 which I prepared is attached as Exhibit B. The average Ricci service coordinator workload as of this time was 8.65. The average workload for each adult service coordinator is thus 48.5 across the state with all funded positions filled.

17. In addition to these staff, service coordinators operate within a management structure of Regional Directors (4) , Area Directors (23), Assistant Area Directors ( 23), and Service Coordinator Supervisors (68) that support and assist them. This structure ensures that there is active supervision, accountability, oversight and adequate coverage at all times. Service coordinator supervisors are prepared to assist service coordinators with their duties. Area Directors and Assistant Area Directors assist when necessary, and offer support and direct supervision to the service coordinators and the service coordinator supervisors as they deal with their workload, and especially as they address their responsibilities with regard to Ricci class members.

18. All Regional Directors, Area Directors, Service Coordinator Supervisors and Service Coordinators understand that Ricci class members' needs must be addressed under the Final Order and are therefore the Department's first priority in terms of resource allocation.

19. The first priority for every service coordinator is the Ricci class members who are assigned to them. The objectives in their ISPs are continuously monitored to ensure all needs are substantially met. For all individuals, the critical function of the service coordinator is to have a thorough understanding of the person for whom they are assigned. They do this through periodic check-ins with the individual, the providers of services and guardians.

20. Service coordinator supervisors offer critical support to the service coordinators they supervise. They are able to handle difficult cases, to cover absences and to

offer advice. Importantly, they are expected to cover service coordinators Ricci class member workload when vacancies or absences occur.

Labor Management Discussions Regarding Service Coordinator Workloads

21. As part of my duties as Assistant Commissioner, I attend Statewide Labor Resource Meetings where DMR management and the various unions we work with discuss labor issues and attempt to resolve them.

22. In 2001, Local 509, SEIU requested the Department begin discussions on the issue of case assignment practices, a topic closely related to the issue of appropriate service coordinator workloads.

23. In December of 2001, A Joint Labor/Management Committee was convened with the charge of exploring the current case assignment practices for service coordinators and developing written recommendations. This Committee held five Regional meetings to investigate this practice. Surveys were performed and there were many discussions over many months to determine the best way cases should be assigned. A majority of the service coordinators preferred their offices' current practices outlined above to a more standardized rating or ranking proposal.

24. On September 15, 2003, an agreement, entitled "Supplemental O Summary" was presented to the Department's Commissioner, Gerald J. Morrissey, Jr. A true and accurate copy of this document is attached hereto as Exhibit C. As a result of this Joint Labor/Management Committee, certain recommendations were made concerning case assignment practices. These recommendations included reissuing the Area of Service Policy and drafting a policy and procedure for the

closing of cases. Both of these recommendations have been carried out and should have a positive impact on workload management.

25. In general, when labor issues or disputes arise outside of labor contract negotiations, the Union and the Department's management, including, if necessary the Commissioner, will meet to attempt to resolve the issues administratively prior to resorting to legal proceedings. If issues have been discussed, and cannot be resolved, this may result in an unfair labor practice being filed with the Labor Relations Commission. It is extremely unusual for a union to file a grievance or complaint about a matter which is the subject of labor negotiations or discussions in the Federal Court.

The Union's Public Records Request

26. I have reviewed the affidavit of Colleen Doherty. During a series of meetings starting in the summer after the Fiscal Year 2005 budget was passed, I had discussions with Colleen Doherty and others about restoring the loss of 20 positions reflected in that budget. In December, I informed Ms. Doherty that we would be filling these 20 positions in a staggered fashion.

27. Simultaneously with the above, Colleen Doherty asked in October or November if I had any information regarding the workloads of service coordinators. I responded that the Department did have some information on workloads that may be helpful and I would attempt to determine what we have and then respond. Colleen Doherty then followed this request with an e-mail requesting the same information.

28. Shortly thereafter, a request for workload information came to the Department's Legal Office in the form of a public records request from the Union's Counsel, Katherine Shea. As the request was received by the Legal Department, and the Department was engaged in active litigation, I deferred to their response to it.

Differences Between 1990 Circumstances

29. I am familiar with the letter written to Judge Tauro in September of 1990 by SEIU in response to a potential layoff of 126 of 360 service coordinators. As noted in the letter, this would have been a 38% reduction. At this time in 1990, the fiscal budget crisis had severely impacted the Department's budget by $11.4 million in the residential budget alone. I remember the circumstances surrounding this filing by SEIU, as described above.

30. Today, the Department's budget including the community residential account which funds most, if not all of the service coordinator positions, has increased at an average rate of 5% over the past five years.

31. The circumstances surrounding that potential layoff and the circumstances today are completely different. We are not proposing to lay off any service coordinators. In November, as the attached Exhibit A notes, there were 8.50 posted positions while vacancies to be filled stood at 14.10. These vacancies are now in various stages of being completed.

32. In the most recent fiscal years, despite administrative staff reductions and early retirements experienced across other accounts, there were no reductions in force of service coordinator positions with the exception that in Fiscal Year 2005, 20

9

vacancies went unfilled to manage a $1 million deficit in the Department's regional administration account.

33. The current workloads of service coordinators are more than adequate to fulfill the requirements of the Ricci Final Order.

Department's Efforts to Address Service Coordinator Issues

34. The Department values the role of service coordinators and has made consistent efforts towards addressing service coordination concerns. Although the service coordination position may be stressful, many of these employees evidence job satisfaction.

35. Nevertheless, the Department realizes and understands the stress experienced by service coordinators as they perform their important work for Ricci class members and non-Ricci class members every day, and has taken the following steps to mitigate that stress.

36. The Department of Mental Retardation, in concert with the Union, operates a Service Coordinator Institute for Service Coordinator I (SC I's) and Service Coordinator II (SC II's) where classes and trainings are offered to service coordinators to assist in their job performance and satisfaction. Through the University of Massachusetts Donahue Institute, service coordinators are offered classes that focus on developing skills that will directly benefit them throughout the development of their careers. The classes and trainings offered by the Department are an excellent way for service coordinators to enhance their professional development and enjoy upward job mobility.

37. The Department offers classes that seek to address the needs of the service coordinators and to assist them in developing and utilizing "best practices" in their job performance. By offering classes that seek to improve a service coordinator's job skills, the Department is confident that through the development of improved job skills, a service coordinator will be better prepared to manage the important work that the job entails.

38. In the spring of 2004 the Department of Mental Retardation held a personal well-being day for service coordinators of adult individuals, and another for service coordinators of children. The sessions, developed to address service coordinator stress and morale issues, were aimed at providing the service coordinators with coping mechanisms and stress management techniques.

39. In consultation with the Union, the Department has assisted in amassing six libraries throughout the Department, one at Central Office and one for each Region. These libraries contain a wealth of information and can be used by the service coordinators as resources in the performance of their jobs.

40. The Department of Mental Retardation has worked closely with the Union to maximize union training money that is geared towards improving the job satisfaction of the service coordinator position. Expenditures on training have been significant and the two parties have worked closely with each other in developing appropriate measures in a cooperative, non-contentious manner.

41. The Department continues to recognize and be sensitive to the needs of the service coordinator position and will continue its commitment to offer classes and

training seminars aimed at addressing the stress and morale issues experienced by service coordinators.

42. A Professional In-Service Program has benefited service coordinators financially. Under this program, negotiated with Local 509, Human Service Coordinators have been receiving a Professional In-Service payment equal to 5% of their pay if they attend a given amount of training. This 5% payment is given on a weekly basis.

43. Classes are also offered to maximize their potential and help them advance in their service coordinator careers. They are taught the latest in best practices and industry trends to facilitate advancement to the supervisory level.

44. The Department funds these programs to demonstrate our depth of understanding and commitment regarding the issues that are facing our service coordinators. The Department aggressively targeted SEIU Training money when it was available in Fiscal Year 2004 so that were able to implement these actions as demonstrative of our seriousness in realizing the importance of the service coordinator position. All additional offerings of the Service Coordinator Institute are funded directly from the Department's own budget.

45. In sum, the Department has worked well with the Union and funded employee training across a spectrum of areas; these efforts are designed to increase job satisfaction as well as promote best practices.

Signed under the pains and penalties of perjury this 8th day of March, 2005.

                                                    __s/Lawrence Tummino____
                                                    Lawrence Tummino