UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT SIMPSON *RICCI*, et al. ) | Civil Action Nos. 72-0469-T (Belchertown) |
| ) | 74-2768-T (Fernald) |
| Plaintiffs, ) | 75-3910-T (Monson) |
| ) | 75-5023-T (Wrentham) |
| ROBERT L. OKIN, *et al.* ) | 75-5210-T (Dever) |
| Defendants. ) | |

**RESPONSE OF WRENTHAM CLASS TO SUBMISSION OF SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 509**

In accordance with the Court's February 22, 2005 Order, the Wrentham Association submits its comments on the submission of the Service Employees International Union, Local 509 ("SEIU").

1. There is no dispute that service coordinators remain, as they were described by the DMR in the 1990 hearings on the Ricci Class Members' request to enjoin service coordinator layoffs, the "first line of quality assurance" and the means by which the DMR provides oversight and accountability for the care provided to class members.

2. It is also undisputed that service coordinators are required to prepare Individual Service Plans for class members. It is a matter of public record that the average service coordinator caseload in 1990 was 42, increasing to an average of 48 in 2000, and further increasing to an average as far as SEIU has been able to determine, in the 50s in 2005, with some service coordinators having a caseload in the upper 50s or even 60.

3    Service coordinators who responded to 2004 SEIU's survey, which was made necessary in part by DMR's failure to respond in a timely manner to SEIU's public records request, almost uniformly noted an increase in the responsibilities of the position over the past

1

years, combined with an increasing caseload comprised of more individuals who are spread out over greater distance. As a result, service coordinators noted that the they cannot complete ISPs on a timely basis because they are consumed with "crisis management", "putting out fires" and "crisis intervention" since emergency matters are prioritized over routine tasks, even as they recognize that ISPs are very important and a high priority. One service coordinator said it best:

> It is not feasible to expect SCs to get all ISPs out on time, do 120+ home visits a year, and pay attention to detail with caseloads over 50.

4. The foreseeable and actual result of the convergence of factors listed in paragraph 3, above, is a decrease in quality of work done, and quality of care provided by service coordinators. As one noted, "The only thing [I] can do is relax the quality/effort that goes into the actual writing and review of the ISPs, decrease effort to maintain high quality of work." As another confessed, "I find I am doing more work with less quality than when I began the job . . . I am so happy to complete an ISP . . . In my desire to hurry and complete that task so that I can more on to more important things, I find that I am sloppy."

5. The natural and foreseeable result of having a team of service coordinators who are overwhelmed by the multitude of heavy responsibilities they bear is that certain tasks are not done (or not done well), and things get missed or overlooked. In many meetings with DMR over past two years, when Class representatives pointed out serious problems being experienced by certain class members, DMR consistently took the position that those problems were simply isolated experiences and did not represent systemic problems in DMR's care delivery system. When pushed on this position, DMR said that if there was a systemic problem, they would know about it, because it is the job of service coordinators to make sure that nothing and no one falls

through the cracks, and since the service coordinators have not reported rampant problems, DMR's service delivery system must be fine.

6. As the SEIU submission shows, DMR's first line of defense -- its means of providing quality assurance, is overwhelmed and unable to fulfill its function. This demonstrates a systemic violation of the Court's 1993 Disengagement Order: Paragraph 2a) DMR shall substantially provide services to each class member on an annual basis . . . [to be] set forth in an Individual Service Plan ("ISP") that details each class member's capabilities and needs for services [which] shall include, as appropriate for the person, residential programs; day programs; recreational and leisure time activities; medical, psychological, dental and health-related professional services; support and generic services . . . ; and transportation services; and Paragraph 2c) Sufficient adequately trained and experienced personnel, as reasonably determined by [DMR] based on professional judgment, shall be available to substantially meet the needs set forth in each class member's ISP.

7. In light of the information contained in the SEIU submission, it appears that DMR's ability to use service coordinators as an internal quality assurance mechanism to assure that DMR in fulfilling its obligations to Ricci Class Members is hopelessly compromised. DMR's internal oversight system is broken, and Class Members have been, and continue to be, placed at risk and without services to which they are entitled.

8. The Wrentham Class shares the SEIU's frustration with DMR's responses to public records requests. The fact that DMR refused to provide class counsel with its most recent list of Wrentham class members, which is maintained in an electronic database, until ordered to do so by the Court, speaks volumes about DMR's intransigence. In fact, the Massachusetts House Post Audit and Oversight Bureau ("Bureau") shared this same frustration when it

conducted a multi-year review of DMR in 1997. The Bureau noted in its findings and recommendations that:

> DMR protects itself from public scrutiny and accountability through delay tactics producing records, not producing all records as requested, and by asserting confidentiality of DMR clients and client records to prevent oversight of its actions.

Unfortunately, it appears that DMR continues to view requests for public records as bothersome, and continues to delay in producing responsive records, which makes it exceedingly difficult for the parties to gather evidence on issues regarding DMR's compliance with the Disengagement Order. Absent an independent monitor or auditor, and apart from the very focused inquiries made by the Bureau and more recently, the Inspector General, there is not a single mechanism by which the Ricci Class members can establish DMR's compliance or noncompliance with the Court's Disengagement Order. The Court presumably had this in mind when it mandated independent review of DMR's community programs on a periodic basis in <u>Paragraph 2e</u> of the Order.

WHEREFORE, the Wrentham Class respectfully requests that the Court

a) restore the case to its active docket and allow the parties to conduct formal discovery to determine whether DMR is, in fact, complying in all respects with the Disengagement Order; and/or

b) appoint a special master to 1) conduct an inquiry into the means by which DMR has a system in place to assure compliance with the Disengagement Order and evaluate such compliance efforts; 2) make findings of fact; and, 3) make recommendations to the Court regarding processes and procedures for the DMR to adopt, if necessary, to assist in complying with the Disengagement Order. In particular, the Wrentham Class suggests the appointment of

4

Linda Glenn, a former DMR Assistant Commissioner from 1976-1980, who has served as a master and monitor in a number of cases. Ms. Glenn's curriculum vitae is attached hereto as Exhibit A. The Wrentham Association would be willing to submit the names of other qualified individuals if so requested.

|  |  |
|---|---|
|  | WRENTHAM ASSOCIATION,<br>By its attorneys, |
|  |      /s/ Margaret M. Pinkham<br>Margaret M. Pinkham (BBO #561920)<br>Daniel J. Brown (BBO #654459)<br>BROWN RUDNICK BERLACK ISRAELS LLP<br>One Financial Center<br>Boston, MA  02111<br>Telephone:  (617) 856-8200<br>Fax:  (617) 856-8201 |
| DATED:  March 8, 2005 | E-mail: mpinkham@brownrudnick.com |

5

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties below by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

**Fernald/Monson/Belchertown Classes**
Beryl Cohen, Esq.
11 Beacon St.
Boston, MA  02108

**Dever Class**
Neil Moynihan, Esq.
Nixon Peabody
101 Federal Street
Boston, MA  02110

**ARC**
Cathy E. Costanzo
Center for Public Representation (CPR)
22 Green Street
Northampton, MA  01060

**Disability Law Center**
Christine M. Griffin, Esq. (564420)
Disability Law Center, Inc.
11 Beacon Street, Suite 925
Boston, MA  02108

**Office of the Attorney General**
Juliana deHaan Rice, Esq.
Assistant Attorney General
Office of the Attorney General
Government Bureau
One Ashburton Place
Boston, Massachusetts  02108

**Department of Mental Retardation**
Marianne Meacham, General Counsel
Commonwealth of Massachusetts
Executive Office of Health & Human Services
Department of Mental Retardation
500 Harrison Avenue
Boston, Massachusetts  02118

DATED: March 8, 2005

　　　　　　/s/ Margaret M. Pinkham
Margaret M. Pinkham

# 1348078 v1 - pinkhamm - 000004/0784