FILED
IN CLERK'S OFFICE

2005 MAR -8 P 3: 56

U.S. DISTRICT COURT
DISTRICT OF MASS

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT SIMPSON RICCI, et al )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>ROBERT L. ORKIN, et al., )<br>)<br>Defendants. )<br>_____) | Civil Action Nos:  72-0469-T (Belchertown)<br>74-2768-T (Fernald)<br>75-3910-T (Monson)<br>75-5023-T (Wrentham)<br>75-5210-T (Dever) |

**COMMENTS OF DEVER PLAINTIFFS PURSUANT
TO THE COURT'S ORDER OF FEBRUARY 22, 2005**

The Dever Plaintiffs, through their current representative Daryl Cameron Every, Esq., and their undersigned pro bono counsel, comment as follows concerning the February 14, 2005 letter submitted on behalf of the Service Employees' International Union, Local 509 ("SEIU" or "Union") by its counsel.

1. This letter dramatizes the critical need for better quality, timely information from DMR about the care and treatment of Ricci Class Members in community-based settings.

2. Adequate protective orders by the Court should dispel DMR's vocal concerns about disclosure of sensitive information concerning Ricci Class Members.

3. The need to allay the concerns of guardians and relatives of Class Members, as well as of the general public, is extremely acute given the Defendants' announcement of Fernald's imminent closure and shutdown of DMR's large facilities.

4.  In light of the serious problems that the plaintiffs' counsels are experiencing with repeated DMR refusals to release information about Class Members' services and DMR compliance with the Final Order, the Court should consider the appointment of a special discovery master to supervise an extensive disclosure process.

**DEVER PLAINTIFFS' SUGGESTIONS AS TO SEIU'S LETTER TO THE COURT**

I.  Introduction.

It is the Dever Plaintiffs' position that SEIU has produced to the Court prima facie evidence that the Department of Mental Retardation ("DMR") is not providing sufficient community service coordination to community-based Ricci class members that is "equal or better," in violation of this Court's 1993 Final Order. Moreover, DMR's obdurate refusals to provide SEIU with updated information regarding community-based Human Service Coordinators' ("service coordinators") caseloads is indicative of DMR's clear pattern of obstructionism which it has imposed upon requests for information made by plaintiffs' counsels for the Dever, Fernald and Wrentham classes.

II. The Increase in Community Service Coordinators' Caseloads Significantly Impacts upon Dever Class Members and Consequently, the Defendants Should Be Required to Produce Caseload Information.

As a result of the 11-year phasedown and ultimate 2002 closure of the Paul A. Dever Developmental Center, essentially all of the Dever Class Members are living currently in community-based settings. According to DMR's March 5, 2005 Ricci Class Member List of former Dever residents, there are 918 remaining Dever Class Members. While DMR has resisted all attempts by the Dever Plaintiffs to update Dever Class Member information, the Dever Plaintiffs know that, just prior to DMR's 1991 announced shutdown of the Dever facility, the Dever Developmental Center served the highest percentage of profoundly retarded individuals

- 2 -

BOS1471884.1

when compared to the other large DMR facilities. See: Letter from Steven Rothstein, DMR Assistant Commissioner, to Louise Johnson, circa 1989.

By virtue of their residential locale, Dever Class Members must now rely heavily on their community-based human service coordinators to provide a variety of vital services. In terms of the Ricci Final Order, one of the most critical roles that community service coordinators deliver is that of clinical team leader for developing, coordinating, evaluating and monitoring the competent implementation of the Dever Class Members' Individual Support Plans ("ISPs"). Final Order, para. 2(a), 2(c), 4, 5, 6, 7; Affidavit of Colleen Doherty, Exhibit "B," Job Description of Human Services Coordinator; 115 CMR 6.21(5)(a)-(j).

Through affidavits and exhibits, the labor organization which represents the human service coordinators, SEIU, has detailed its painstaking efforts to ascertain the current case loads for community-based human service coordinators. DMR has refused to comply with SEIU's legitimate requests for such information under the state's labor relations act, M.G.L. c. 150E. Affidavit of Colleen Doherty, para 6-8. Further, DMR has refused to release the service coordinators' caseload information, as required under the state's Public Records Law, M.G.L. c. 66. Affidavit of Katherine E. Shea, para. 8-10.

As a result of DMR's stonewalling, SEIU conducted an informal survey of its members. The Union learned that the average service coordinator caseload is presently 50 or above, with some service coordinators carrying caseloads of 58 to 60 retarded individuals. See Shea letter dated February 15, 2005, Exh 2 Tarquinio, Exh 3 Aff Whalon; Exh 4, Aff Villani. Notably, these caseloads differ dramatically from 1990, when the average service coordinator caseload in the community was 42. Exh. 5, Aff. Of Stu Dickson, para 6. If these figures are, indeed, accurate, DMR is violating the Final Order's para 2(c) which requires, inter alia, that DMR

provide to Ricci Class Members with ". . . [s]ufficient adequately trained and experienced personnel . . ."

The information that SEIU seeks also needs to be analyzed within the context of the Final Order's Paragraph 4 requirement of an "equal or better" servicing package, when a Ricci Class Member transfers either between a facility to a community residence or between one community residence to another community residence. Final Order, para 4. In the Defendants' Opposition to the Plaintiffs' Motion to Reopen, DMR plainly represented to the Court that it has scrupulously complied with the Final Order's "equal or better" certification requirement. Defendants' Opposition, p. 11. Yet DMR later stated that the typical caseloads for facility-based service coordinators (also, known as "Qualified Mental Retardation Professionals" or "QMRPs") is 25. Defendants' Opposition, p. 33. Again, if these facts prove accurate, DMR's transfer of Ricci Class Members from a facility where the service coordination caseload is 25 to a community setting where DMR provides service coordination on a 1 to 42 ratio or 1 to 58 ratio is a prima facie showing that DMR is violating the Final Order's "equal or better" requirement.

In sum, SEIU's efforts to obtain accurate data about community service coordinators' caseload have flagged a serious and crucial quality assurance issue. The Dever Plaintiffs are obligated to monitor the Defendants' compliance with this Court's Final Order to ensure that their Class Members' constitutional rights are not again violated. Therefore, the Dever Plaintiffs ask the Court to order the Defendants to:

- Identify the number of DMR consumers on each community-based DMR service coordinator's caseload for the years 1993 through 2004;

- Identify the number and types of Ricci Class Members on each community-based service coordinator's caseload for the years 1993 through 2004;

- Identify the number and type of <u>Ricci</u> Class Members who were not assigned a community service coordinator for the years 1993 through 2004;

- Identify the number of <u>Ricci</u> Class Members on each Dever Developmental Center's QMRPs caseload for the years 1993 to 2002;

- Produce all quarterly and/or semi-annual reports that DMR submitted to the House and Senate Committees on Ways and Means, pursuant to account #5920-1000, as contained in the FY 2000 through FY 2005 budgets; and

- Produce all DMR Management Reports relative to compliance with ISP timelines by area since January 1, 1987 to present.

III. DMR's Repeated Refusals to Provide the Dever Plaintiffs with Relevant, Material Information Concerning Dever Class Members' Service Needs and DMR Compliance with the Final Order Improperly Interferes with Dever Plaintiffs' Enjoyment of Their Final Order Remedies.

It cannot go unnoticed that, while DMR has vigorously fought all the Plaintiffs' requests for information—such as ISPs, and names and addresses of guardians—DMR has disclosed eventually these documents to other Plaintiffs' counsels. On February 9, 2005, DMR and the Wrentham Class Counsel entered into a court approved confidentiality agreement that resulted in counsel obtaining a list of the names of all Wrentham Class Members and, in addition, the names and addresses of their guardians. Moreover, on February 15, 2005, DMR and the Fernald Class Counsel entered into a court approved confidentiality agreement that guaranteed counsel a list of all Fernald Class Members at the facility; their ISP team meeting dates, names and addresses of current Fernald Class Members' guardians. The Dever Class Counsel has offered to enter into an appropriate confidentiality agreement, however, DMR has chosen to ignore this invitation.

BOS1471884.1

Under the totality of these circumstances, the DMR's professed concern for Class Members' privacy lacks credibility.

>Respectfully submitted,
>
>On Behalf of the Dever Class
>and Its Representative
>
>*Cornelius J. Moynihan*
>Cornelius J. Moynihan, Jr.
>BBO No: 358840
>Nixon Peabody LLP
>100 Summer Street
>Boston, MA 02110
>Tel: 617-345-1315

Dated: March 8, 2005

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail (by hand) on March 8, 2005.

*Cornelius J. Moynihan*

- 6 -