April 1, 2005

William F. Gear
109 Neponset Avenue
Roslindale, MA. 02131



Ms. Gail Gillespie, Regional Director
Metro-Boston Region
Department of Mental Retardation
200 Trapelo Road
Waltham, MA   02452

Dear Ms. Gillespie,

I have recently received three communications from you. I will address them in order of their receipt.

In a letter dated March 22, 2005, you offered a response, on behalf Commissioner Morrissey, to my letter to him dated February 8, 2005. Regarding the 2002 ISP modification, which has previously been inappropriately referred to as the 2004 ISP, you state my right to appeal the document under DMR regulations 115 CMR 6.25(7). If indeed this document is a 2002 ISP modification and is not, as was previously asserted, a 2004 ISP, then the regulations do not provide for a return to the appeal mechanisms. I was told that to disagree I must appeal, but the regulations do not provide DMR with the option of retreating into another elliptical appeal process when disagreements have not yet been resolved about a modification.

Modifications to ISP's are to be developed by the DMR service coordinator of appropriate jurisdiction, in concert with the client and/or the client's guardian. Last fall, Mr. Sanderson referred to the draft modification developed by him and by representatives of Nonotuck, as the 2004 ISP. In his cover letter, he named Ms. Cindy Miller as the Area Director and referred to a service coordinator from the Plymouth Area Office, as the representatives of Gena's new Area office. However, when I did not approve of his modification document, he referred Gena back to you, in Region VI, granting inappropriate ISP status to the modification document. Now that we have cleared up the difference between a draft modification and a new ISP, I can find no regulatory basis for DMR's insistence that the modification process be replaced by yet another appeal. As Jack Reilly stated, I cooperated with the appeal procedure on a pro forma basis to preserve Gena's rights. If the 2004 ISP has been re-classified as a modification document, the regulations you cite do not call for appeal. We are supposed to continue the modification process until consensus is achieved.

In my letter of February 8, I proposed the following **"framework within which we could negotiate good services for Gena and closure for DMR and for Gena's guardians:**

1

1. DMR should withdraw the so-called 2004 ISP and complete the modification process of the 2002 ISP.

2. Commissioner Morrissey and I should meet for an informal private discussion of this matter. At such a meeting, I will provide a concise summary of Gena's treatment by DMR since she left Fernald. If any of my assertions do not seem accurate or credible, I will document their accuracy and the truth of my statements.

3. DMR and Gena's guardian(s) should strictly follow the DMR ISP regulations and the both the letter and the spirit of the Ricci Final Order from the Court. As I represent Gena's wishes and we have expressed the wish to live in the Southeast Region, the DMR Service Coordinator previously identified by Mr. Sanderson in the Plymouth Area Office would appropriately complete a line by line modification of Gena's 2002 ISP, consistent with the instructions of the hearing officer with respect to clinical matters contained in Dr. Julian's report. Gena does not wish to live in Region VI and our relationship with the Director of Region VI is beyond repair. Neither you, Ms. Gillespie, nor your subordinates, should play any part in the modification of the 2002 ISP, nor in its subsequent implementation.

4. DMR should agree that Gena is entitled to prompt implementation of those items in the 2002 ISP that were not contested by DMR in the 2002 appeal process, including the original ombudsperson's meeting and including the appeal hearing. These items include transportation resources and a primary care physician, as well as many other items.

5. DMR, when the ISP is complete, should assist me in developing the means to implement the ISP, including our preferred vendor, our preferred manner of living and our preferred location.

It is truly unfortunate that the 2002 ISP modification process was derailed by the introduction of an imputed 2004 ISP that was not legitimate and that lacked any such standing under DMR regulations. This error has caused many months of preventable delay in the development and implementation of Gena's service.

Regarding Dr. Julian's report, I must ask you to either use the report in its entirety, or to desist from efforts to misuse the report through out-of-context quotations or creative extrapolations. Dr. Julian is a gifted and dedicated professional, and we value his clinical suggestions. We will however not tolerate the misuse of this report to trump the wishes and preference of Gena as communicated by her guardian. As I object to the manner in which this report has been used, including during the January 20, 2005 session in the Court of the Honorable Judge Joseph Tauro, I will copy this letter to Dr. Julian. I object to the public discussion and misstatements about Gena's psychiatric status that DMR has

2

carried out. Once again, please desist, and please consider the right of patient confidentiality that you are perilously close to or well within the realm of violating. Dr. Julian did state that the use of physical restraint was potentially harmful to Gena and that it should only be used as a last ditch effort in an emergency. Placing Gena, with her well-characterized behavioral and impulse control problems, as well as her probable post traumatic stress disorder in a day program or any other group program would artificially and preventably create such emergencies, due to our obligation to protect other clients. I hope you will accept the simplicity and the clarity of this point. I have not deprived Gena of programmatic opportunities, I have merely protected her from being in situations that would pose moral dilemmas regarding the use of potentially harmful physical restraint. I would also note, that DPPC does not define physical restraint as the use of hands on force and guidance until such use of force has exceeded five minutes. These five minutes would be terrifying for Gena, and we must avoid situations that breed the necessity for their use.

Regarding Nonotuck, I believe they were introduced as a possible provider by Conrad O'Donnell in order to resist the suggestion of a group residence by Mr. Sanderson and others. I have never given permission for information about Gena to be given to Nonotuck, as I believe that the ISP should be completed before vendors are selected. I believe that Judge Tauro voiced this same principle on January 20, 2005. This is not a criticism of Nonotuck. My one conversation with them was cordial. I am very glad that everyone involved has now endorsed the reasonableness of Gena living in an individualized supportive home, with a combination of resident care givers and paid hourly workers. I am distressed that DMR continues to illegitimately seek to proscribe the free and self-determined relationship between myself and Gena. This is inappropriate, but I believe that the huge expense in time, delay and conflict expended by DMR in this matter over a nine year period is less puzzling when one realizes that it is a goal of the DMR to separate Gena from her family. DMR should desist from attempting to require Gena to be separated from her father in order to receive mandated services and supports. I can document DMR's efforts to accomplish this separation and I would remind you that Gena has received excellent personal care during the eight years she has lived with me. DMR can not make the same assertion about her years in DMR licensed and sponsored programs.

DMR resisted my request for a consumer driven RFR process, citing possible delays as their reason. I must point out that it took you seven weeks just to answer my last letter and you have failed to implement an ISP signed by Joan Katz in 2002. When I request legitimate empowerment and involvement, I am accused of fostering delay. When DMR accomplishes nothing for years at a time, it is good process. Please stop resisting my appropriate involvement as Gena's guardian. When Gena was represented by Mr. Tichner, he stated repeatedly and in writing that if I did not agree to DMR's terms, DMR intended to challenge my status as legal guardian. I can document this and I have additional evidence of this repeated assertion by DMR. DMR must release some of its need to control Gena and permit her right to self-determination to the fullest extent possible. Currently, Gena's family is the only provider of safe, dignified and non-abusive

service and support that she has known since she entered out of home services at the age of eight. I say all of this to express outrage and to appeal to the best part of each of you.

Thank you for agreeing to continue funding Gena's current staff supports during our vacation. This is a welcome gesture of good will and will be a very restorative and enjoyable time for Gena. I will research the cost of transportation and I hope you will consider simply implementing the transportation services and resources that were described in the 2002 ISP and that were not disputed during the appeal. I will write a separate letter to you regarding transportation and approximate dates of our time away when I have gathered more information.

Regarding Jack Riley's report as ombudsperson, I must admit that I am confused. If there is no 2004 ISP, why am I required to exercise appeal rights to signal my lack of agreement with the modification drafts prepared by DMR? Please advise. Still and all, it was a pleasure to meet with Mr. Riley and I appreciate the time, effort and respect he offered to Gena and to her family. I agree with Mr. Riley's hope that we can rapidly resolve our areas of disagreement. I also appreciate Mr. Riley's conclusion that, " The centrality of Mr. Gear's role as father, guardian and crucial support for Gena was not questioned at any point during my review."

You also corresponded to me regarding the matter of Gena's health care and her need of a primary care physician. You are incorrect in stating that Dr. Clark is Gena's primary care physician. She refused to accept this role after her one encounter with Gena in 2002. I wish to consult with Dr. Blanchet and others from Shriver Clinical and I will respond further to your letter regarding Gena's primary care needs and current supports in the near future.

Thank you for your continued attention and support. I hope that you understand that all of my statements are based upon my desire to obtain necessary supports for Gena, while all of my assertions, however unwelcome, can be documented.

Sincerely,

William F. Gear, Co-Guardian

Cc:Barbara Santella, Co-Guardian
   Dr. John Julian
   Commissioner Gerald Morrissey
   The Honorable Judge Joseph Tauro

# The Commonwealth of Massachusetts
## Executive Office of Health & Human Services
## Department of Mental Retardation

**Metro Region**
200 Trapelo Road
Waltham, Massachusetts 02452

Mitt Romney
*Governor*

Kerry Healey
*Lieutenant Governor*

Tel. (781) 894-3600   Fax  (781) 314 - 7579

Ronald Preston
*Secretary*

Gerald J. Morrissey, Jr.
*Commissioner*

Gail Gillespie
*Regional Director*

March 22, 2005

William Gear
109 Neponset Avenue
Roslindale, MA  02131

Barbara Santella
519 Ferry Street
Everett, MA  02149

Dear Mr. Gear and Ms. Santella:

I am writing to you on behalf of the Commissioner in response to your letter of February 8, 2005. I will address your concerns in the order they were addressed to the Commissioner. I will also respond to your request to me for resources for Gena while you are on vacation in Canada.

I would like to first address your questions regarding the 2002 ISP modification. You have the right to appeal the proposed modification of the 2002 ISP under the Department's regulations at 115 CMR 6.25(7). This was not a 2004 ISP but the 2002 ISP modification. We arranged for the appointment of an ombudsperson, Jack Riley, and pursuant to this process you met with Mr. Riley, and are awaiting its outcome from Mr. Riley.

In regards to your comments regarding Dr. Julian's report, the report does speak to the interventions that will be necessary in order for Gena to be successful in a new setting. Dr. Julian does reference the fact that for seven years, Gena has had not day treatment program or vocational program. Dr. Julian made many recommendations that have not yet been carried out. Gena is still not involved in a meaningful day program of any kind where she may interact with peers. Contrary to the statement in your letter, Dr. Julian never asserted that it would be dangerous for Gena or her peers if she attended a day program.

In February 2004, Mark Sanderson was asked to become involved in this case to facilitate implementation of the 2002 ISP. Mark is the Community Systems Director of

1

the Southeast DMR Region. I asked that he work with us to transition Gena from Roslindale to an appropriate placement in the Plymouth Area – the area you requested

At the beginning of this most recent planning process, the Department did state that a group home setting could be an appropriate setting. We also left open consideration of shared living as a viable alternative. Ultimately, we moved forward with your request for shared living even though at first we did not consider that to be the most appropriate alternative. In fact, it was you and Gena's attorney, Jerome Tichner, who provided the Department with the name of a shared living provider, Nonotuck Resources Associates. You and Mr. Tichner asked that Nonotuck evaluate Gena and determine whether she would be an appropriate candidate for shared living and whether they had the capacity to serve her.

On March 11, Mark Sanderson and Roberta Lewonis, Community Systems Director from the Metro Region, visited Gena in your home in Roslindale. They had the opportunity to speak with Conrad O'Donnell from Shriver Clinical Services and a staff person working with Gena to get their perspectives on Gena's needs and what supports would be necessary.

The first meeting between all parties was to determine how to move forward with the implementation of the 2002 ISP. This was held on March 16, 2004. Gena's attorney at that time, Jerome Tichner, was at this meeting as well as Conrad O'Donnell and Andre Blanchet from Shriver Clinical Services, Kim LaDue from DMR Legal, and Roberta Lewonis and Deb Butkiewicz from the Metro Region. You chose not to attend. There was agreement that in her current residence with you, with DMR-funded supports provided by Shriver in your home, Gena has little interaction with people besides you and staff, and she rarely leaves the house. It was also agreed that in her current residence, Gena's behavioral concerns are not addressed through a consistent, structured approach as recommended in Dr. Julian's report. Gena's cooperation in routine medical care has been an issue although she has been seen regularly at Franciscan's Hospital with medication and much support. Issues discussed at this meeting were whether a shared living arrangement or a more structured residential service model is in Gena's best interests. It was agreed that examples of both service approaches should be explored, and that you and Attorney Tichner would be offered the opportunity to visit both types of programs to help you make an informed choice in the matter.

Shortly after this meeting Attorney Tichner indicated that you had inquired about Nonotuck, Resources Associates, an agency based in Western Massachusetts. This agency is skilled at providing shared living. Mr. Tichner inquired about the possibility of Nonotuck evaluating Gena's appropriateness for a shared living approach. Mr. Tichner also indicated that you had no interest in visiting other traditional residential programs at this time. Mark Sanderson agreed to work with Conrad O'Donnell to invite staff from Nonotuck to evaluate Gena and to assess whether, in their clinical judgment, shared living was an appropriate model for Gena. Even though Nonotuck is primarily an agency in the western part of the state, Mark worked with their administrative staff to consider development in the Southeast Region. Mark Sanderson also explained that depending on

2

where Gena eventually lived and in which support model, it would make the most sense to defer a final decision on area of tie.

Shortly after this first meeting, George Fleischner and John Struth from Nonotuck visited Gena in her home in Roslindale where they had an opportunity to interact with you and Gena as well as staff who provide supports to her.

On April 7, 2004, John Struth met with you and Gena's attorney at the Carver Regional Office in order to report back to the group on Nonotuck's impression of Gena relative to shared living. Mr. Struth indicated that in Nonotuck's view, Gena would indeed be a good candidate despite some of her developmental challenges and lack of current meaningful activity that has likely led to increased inappropriate behaviors. Mark Sanderson expressed some concerns that Nonotuck's base of operation was quite distant from Southeastern Massachusetts and this could be problematic, especially given Gena's significant needs and the need for strong clinical and emergency supports, planned respite providers, etc. as well as the length of time needed to recruit potential providers so far from Nonotuck's base of operation. John Struth acknowledged that these issues could be surmounted but that it would take time to put all the pieces in place.

During the course of that meeting, the Department, Attorney Tichner and yourself asked Nonotuck if they would be willing to provide supports to Gena under certain conditions:

1) Recruitment for a long-term placement would focus on the Southeast Region although the possibility of recruitment would not exclude providers in the Central Massachusetts Region as well. A key consideration would be that you would be able to easily visit Gena so she would have to be in relatively close proximity to Boston.

2) Potential providers would be female although again, under acceptable circumstances a married couple might be considered

3) You would remain actively involved in your daughter's life and participate in the screening of potential shared living providers

Nonotuck made it clear that it would not be acceptable for you to live in the home of any shared living providers and you expressed agreement. At the conclusion of the meeting, Nonotuck was asked to prepare a support plan for Gena. that would be reviewed at a subsequent team meeting.

On May 17, 2004, Gena's team met to review and respond to the support plan presented to you by staff from Nonotuck. You were in attendance along with Gena's attorney. George Fleischner, John Struth, Suzanne Robichaud, all of Nonotuck, as well as other members of Gena's team.

3

Mark Sanderson opened the meeting by reviewing the chronology of events relative to service planning for Gena and his understanding of the purpose of the meeting. The basic elements of Nonotuck's plan included:

1) An interim plan where Gena would be placed with an existing, acceptable shared living provider, potentially from a pool of providers already recruited and screened by Nonotuck in the Greater Worcester area. There were several potential providers who might be good matches, but work would need to be done by Nonotuck's recruiter, Suzanne Robichaud, to meet Gena, you, and her current staff to better understand her support needs. This is necessary to help identify the optimal living arrangement and provider "matches" for Gena. You questioned whether you would be allowed to participate in meeting potential providers and you were reassured that you would indeed be encouraged to participate.

2) While developing an interim placement for Gena, Nonotuck would simultaneously begin recruitment efforts in Southeastern Massachusetts with an eye towards developing a permanent shared living arrangement in that part of the state. Nonotuck stated that it could take as long as six months or more to complete the recruitment of the shared living providers, the day staff and respite workers before a placement in Southeastern Massachusetts could be accomplished.

The advantages to Gena of the interim plan were discussed. First, it would more quickly move her into a much better living environment where she would begin to develop skills, begin addressing her inappropriate behaviors, get involved in the community and have the kind of enrichment activities identified in her last ISP. Second, the interim plan would give all of us an opportunity to get a sense of how Gena would respond to living in a shared living environment. This will be a new experience for her and some of the lessons learned may be invaluable to planning a permanent shared living arrangement.

John Struth and George Fleischner presented an overview of the services proposed by Nonotuck which included: two, preferably female providers; a "built-in" day program to be provided by separate Nonotuck staff; scheduled respite (in Gena's home) for the shared living providers; and clinical training and support from Nonatuck's professional staff. Nonotuck would coordinate Gena's medical concerns but Conrad O'Donnell stated Shriver Clinical would provide medical supports if necessary.

In response to a question from Mark Sanderson about your interest in Southeastern Massachusetts, you responded that you wanted to remain involved in your daughter's life and live close enough to easily visit and that Gena. had friends in Rockland that were important to retain. Mark suggested that if Gena. lived in the Worcester area where Nonotuck was already established, it would be just as close to visit. It was also reiterated that an important aspect of the Nonotuck proposal was to support your continued involvement in your daughter's life. In fact, that was one reason a half-time Program

4

Director was budgeted to dedicate a resource for this purpose, i.e., to serve as liaison with Gena's family members and friends.

During this meeting, you asked how this plan could interfere with your wish to take Gena to Nova Scotia for a vacation to his home in Canada. You were told Nonotuck staff felt it might be desirable for Gena to take extended vacations as it might make provider recruitment easier. Suzanne Robichaud asked you for some dates when she could make several house visits to better acquaint herself with Gena. You and she exchanged e-mail addresses and you stated that you would get back to her with acceptable dates.

You were asked at this time where Nonotuck should focus its recruitment efforts in Southeastern Massachusetts. Your initial response was the Plymouth area but you were also open to more communities, including Cape Cod.

At the close of the meeting, Attorney Tichner stated he would speak with both guardians about the proposed plan and contact Mark Sanderson with responses. In the meantime, you responded to an e-mail request from Suzanne Robichaud for dates to visit Gena. Your response indicated that you were awaiting the Department's position through a written summary of the May 17 meeting. [The writing of a summary was not discussed at the meeting but in any event, the Department forwarded a summary of the meeting to Attorney Tichner and yourself.]

On May 27, 2004, Attorney Tichner phoned Mark Sanderson after speaking with you about the May 17th proposal. Mr. Tichner stated that you now wanted to pursue a "consumer-driven RFR" and have more involvement in the design of the program and selection of the provider despite the fact that you had originally recommended Nonotuck to the Department and had been a full participant in designing the proposed shared living plan for Gena.

Mark Sanderson responded to Mr. Tichner that this was not part of the agreement reached subsequent to the May 17th meeting, and that it would further delay Gena obtaining the services she deserves and needs. Attorney Tichner asked if the Department would commit to meet certain terms or stipulations in order to avoid the consumer-driven RFR and keep Nonotuck in the picture. Most of the terms he suggested had been agreed upon in previous meetings, e.g., shared living, female providers, along with your involvement in aspects of program planning, etc. Mark Sanderson asked Mr. Tichner to work with you to develop a list of stipulations that the Department could respond to in order to keep the progress made going in a positive direction. It was agreed that once all parties agreed to the stipulations, we would do two things:

1) Ask Nonotuck to draft a service plan addressing the stipulation items and submitting it to Attorney Tichner, yourself and the Department for review and consensus by all parties.

2) Incorporate the stipulation items into a modified ISP that would be signed off by all parties. This new document would form the legal basis for Gena's service plan.

On June 15, 2004, the Department received a carbon copy of an email from you sent to Attorney Tichner identifying your stipulation conditions as well as a draft ISP modification document. The Department contacted Attorney Tichner who stated that this did not represent the official letter to be sent to DMR containing the final stipulations. These stipulations in your e-mail were unacceptable to the Department and differed from points previously agreed upon in prior meetings (e.g. your "presence" in Gena's new home, final approval of Nonotuck staff, etc.).

On June 18, 2004, the Department received via FedEx a four-CD package from you containing a recording of the 11/10/03 ISP Appeals Hearing as well as your written testimony. For the balance of June and July 2004 and despite many messages to Attorney Tichner, the Department received no response.

On August 10, 2004, Conrad O'Donnell of Shriver informed the Department that you and Gena left for a vacation to your home in Canada the previous week with no definite return date. The last communication the Department had with either you or Attorney Tichner was June 22, 2004.

On August 12, 2004, Attorney Tichner confirmed you and Gena were in Canada. He advised the Department he would contact you in Canada and try to get a draft stipulation letter to Mr. Sanderson in a few days.

Despite the lack of contact from you or Mr. Tichner regarding the draft stipulation letter for several weeks, the Department asked Nonotuck to refine and submit a plan to serve Gena. We beleived that if you and Gena's co-guardian had a specific plan in which to respond, it might give all parties the opportunity to highlight and resolve differences. In October, a modified ISP outlining Nonotuck's plan is developed and mailed to you.

On October 5, 2004, Shriver forwarded to the Department an email from you indicating you and Gena would be returning to Roslindale in time for Gena to make a dental appointment on October 15th. You indicated your car was inoperable and Shriver should contact DMR to arrange transportation for the return to Boston.

On October 15, 2004, Shriver arranged a one-way rental for you and Gena to return to Roslindale. On October 22, 2004, Gena's new ISP and cover letter were mailed to you and Barbara Santella for approval.

On October 25, 2004, the Department received an e-mail request from you that we lease a vehicle for Gena's use. The Department responded that Conrad and Shriver will provide regular shopping services and if Gena needed transportation it would be provided. The modified ISP, if adopted, would resolve future transportation issues.

On November 4, 2004, the Department received a telephone call from Attorney Tichner advising that he and his firm would no longer be representing Gena, effective immediately.

6

On November 7th and 10th the Department received e-mails from you questioning various aspects of the modified ISP. The Department offered to modify some but not all of the language of concern to you. You indicated concerns about the ISP related to your authority, the transportation vehicle, and the identification of Nonotuck as the shared living provider without having benefit of a consumer-driven RFR. Mark Sanderson responded to your concerns and asked that you submit modified language for consideration. You chose not to respond.

On November 24, 2004, Mark Sanderson received a certified letter from you rejecting Gena's modified ISP. Shriver continues to support Gena in her home in Roslindale.

On December 8, 2004, I confirmed your request for appeal and offered to set up an Informal Conference. You requested a hearing with an ombudsperson in lieu of the Informal Conference with me. A meeting was held with the ombudsperson, Jack Riley, on February 18, 2005. I expect his report shortly and will issue it as an outcome to the informal phase of the ISP process.

Finally, in a letter dated March 4, 2005, you requested that the Department fund supports for Gena while on vacation with you in Canada. While the Department often supports individuals and their families to have vacations, it is not typical to pay staff who are residents of another country to provide 1:1 services (24) hours day.

In order to support Gena on her vacation, the Department will agree to continue to pay the Shriver Center at the current rate of payment. You reference the need for transportation to and from Canada for yourself and Gena as an added expense. That cost must be assumed within the current level of funding. I have informed Conrad O'Donnell and he will work with you around a plan.

Prior to this approval, I am requesting that you provide me with the exact dates of your vacation and phone and email information to reach you in Canada.

It is my continued hope that you will work with Department staff around services for Gena. It is in her best interest to move from her current setting and receive more appropriate services.

Sincerely,

Gail Gillespie

Regional Director

Metro Region


Cc: Gerald J. Morrissey Jr., Commissioner

7