June 23, 2005

The Honorable Judge Joseph L. Tauro
U.S. District Court
John Joseph Moakley Courthouse
One Courthouse Way
Boston, MA 02210

Subject: June 15th Hearing

Dear Judge Tauro:

I know that you are concerned about the welfare of the residents of Fernald and the other ICF-MR facilities, your past actions on the bench have demonstrated that concern and resulted in a dramatic increase in the quality of life for my brother, John, and for each and every Ricci class member. I and my family will always be grateful for your involvement in the case. Last week however, I left the courthouse feeling sad and frustrated. Perhaps it is because of the time constraints of these last few court hearings but I feel that you are hearing only bits and pieces of information and not getting the full picture.

I have construed from your remarks that you believe that a finalized ISP is all that is needed to ensure that a mentally retarded resident is well cared for by the DMR. I would argue that the ISP, although extremely important, is only a part of the overall picture. **The resident's surroundings and staff providing the ISP services are *as important* to the resident as the "contract" that is the ISP.** I am not a mental health professional but there are several studies that document the negative effect change has on the severely mentally retarded. I can also point to the experience of my brother and that of his peers to illustrate how devastating a change in caregivers and setting can be to these very fragile individuals.

My brother, John, has been at Fernald for nearly 50 years. He is severely retarded, and has never spoken but does respond to verbal cues from staff to eat, wash his hands, etc. He currently lives in a one story unit in Malone Park with seven peers. They have a living room, dining room, kitchen, two bathrooms and six bedrooms. John shares a bedroom with another man who is also non-verbal. When John moved to Malone Park several years ago from another building on the Fernald campus, he was so upset that in the first year he lost 20 pounds from his already thin frame. It didn't matter to him that his ISP was the same or that his new surroundings were much more pleasant and homey or that his roommates were more compatible. John was so distressed that the people closest to him (his caregivers) and his home were suddenly gone that he stopped eating and his behavior problems increased.

Last fall, Andy, one of John's roommates (also nonverbal), contracted pneumonia and had to be hospitalized at Mount Auburn Hospital for several days. During his hospitalization, the Fernald Center had to provide a staff person from his building from each of the various shifts, to stay with Andy in the hospital because he refused to take nourishment from hospital staff. When I first joined the Building Committee in October, I heard a similar story about the effect of change from a parent about his son, Brian. The elderly father was trying to explain to the Facility Director why the coke machine outside of Brian's building needed attention. According to his dad, Brian needs to have a "red" can, a "blue" can and a "silver" can at specific times during the day. If he doesn't get the exact color can of cola at the precise time, he acts out and starts hurting himself or others. The father drove from Quincy to Waltham every day to get the three kinds of cola until the machine was re-stocked.

There are many other stories I have heard from family members about moves that have resulted in a whole host of problems including the decline of the resident's health, behavior problems, and in some cases, even death. These mentally retarded folks cannot understand why they are being moved or why the people who have fed, bathed and clothed them every day are no longer there. They cannot communicate their confusion, sadness, anger or frustration in the way that we can, instead they take it out on themselves by not eating, or harming themselves or others.

The average person doesn't know the devastating effect of moving a mentally retarded person from one setting to another but the Commissioner knows, but apparently he doesn't care. DMR staff will tell you that they plan for transitions very carefully and according to Attorney Marianne Meacham, "We know how to do this." When they moved residents from one building to another on the Fernald campus this past winter, they did it with little preparation or thought. After bringing the residents to their new building only once for a short visit, DMR administration threw a party for them at the Activity Center at noon and brought them to their new home right after lunch. Familiar staff were supposed to remain with the residents for a period of one month but instead they were all reassigned to other buildings the following week - so much for careful planning and preparation. Months later a resident who has the ability to speak still asks staff, "When am I going home?" This is just one typical example of so many ill prepared on-campus moves DMR has made yet they have the audacity to tell you that transfers take place only after careful planning. It would be laughable if it were not so tragic.

In the courtroom, you treat DMR attorneys and the Commissioner with respect and call them fair-minded people. Unfortunately, the DMR has not treated the residents and guardians with the same sense of fairness or respect you have shown. In the Commissioner's rush to close Fernald, he and his staff have targeted the weakest residents first i.e., those whose guardians are physically or psychologically unable to advocate for their ward or guardians who work for the Greater Boston Association for Retarded Citizens (GBARC), an organization whose goal is the closure of facilities such as Fernald. It is small wonder why none of those guardians contacted Attorney Beryl Cohen to represent them. Their wards are essentially unrepresented. Who is protecting their rights?

You saw with your own eyes the woman who was approached by DMR about placement of her son shortly after her husband died. The Fernald League found out about this woman only because a DMR staff person was so distraught about what she witnessed and described the tactics used by DMR to get the woman to agree to the transfer as "coercive." She told a colleague to contact the Fernald League and made her colleague promise not to reveal her name for fear that it would jeopardize her job. Please do not assume that all guardians who do not want their ward transferred have the wherewithal to call the Fernald League. How many other guardians are being subjected to these tactics and who do not have the ability to ask for help? Again, who is protecting their family members?

Most of our loved ones cannot speak for themselves so we have to speak for them. As we sit before you in your courtroom (although I must admit I am so disheartened that I don't know if I can bear another session) or as you read about our struggle in the newspaper, please understand that we are not fighting this hard or this long because we are "fearful of change" as ARC alleges or because we are attached to a piece of land, especially one with such a checkered past. We are fighting to protect our fragile family members from undergoing a totally unnecessary and devastating disruption to their lives. Is money sufficient justification for the State of Massachusetts to cause these innocent human beings months and years of emotional and physical distress?

I am asking you to please put a stop to this inhumane treatment of our most vulnerable citizens. Please help us protect our family members – a completed ISP is only part of the equation. I understand that after spending so many years overseeing this case that you may not have the time or energy to invest in this case again. If that is the situation, would you please consider appointing someone who can make that investment?

Respectfully yours,

Diane M. Walsh

Diane M. Walsh