UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| Robert Simpson Ricci, et al., ) | | |
| Plaintiffs, ) | | |
| ) | CA Nos. | 72-0469-T (Belchertown) |
| ) | | 74-2768-T (Fernald) |
| v. ) | | 75-3910-T (Monson) |
| ) | | 75-5023-T (Wrentham) |
| ) | | 75-5210-T (Dever) |
| Robert L. Okin, et al., ) | | |
| Defendants ) | | |

## REPORT TO THE COURT IN ACCORDANCE WITH ORDER OF JANUARY 20, 2005 RELATIVE TO THE TRANSFER BETWEEN FEBRUARY 26, 2003 AND JUNE 22, 2005 OF 43 RESIDENTS FROM THE FERNALD DEVELOPMENTAL CENTER TO AN ALTERNATIVE PLACEMENT

Pursuant to the Order of the Court on January 20, 2005 that the Plaintiffs were to be provided with an opportunity to review the documentation relative to the transfer of residents from Fernald Developmental Center since February 26, 2003 in order to determine compliance with the Final Orders of the Court entered on May 15, 1993 that an "individual to be transferred will receive equal or better services to meet their needs in the new location, and that all ISP-recommended services for the individual's current needs as identified in the ISP are available at the new location.," on June 16, 2005, the Court further entered an Order for the Protection of Confidential Material. (See attached Exhibit 1.) Thereafter, on June 28, 2005, the Department of Mental Retardation provided to the Plaintiffs a list of individuals who had been transferred since February 26, 2003, together with the date of transfer and identification of the alternative location.

On July 12, 13, 20, 21, August 24, September 1, and November 18, 2005, Plaintiffs' authorized representatives, Class Counsel Beryl W. Cohen, and Fernald *Ricci* Class Representatives, Diane Booher and George Mavridis, in compliance with the Order for the Protection of Confidential Material, reviewed the limited documentation made available by the Department of Mental Retardation relating to the transferees.

Due to the constraints of the document inspection imposed, which prevented the reviewers from obtaining copies of any of the records subject to review, it became necessary for the reviewers to take extensive notes by long hand, which in itself required over 200 hours to complete the evaluation and inspection of documents. In addition, although it was assumed that extensive documentation existed, as required by state Regulations, regarding both the residents who were transferred to other facilities and information regarding the availability of specific services at their new location, the materials provided the reviewers for their determination that the transferees were receiving "equal or better services in the new location, and that all ISP-

recommended services for the individuals' current needs as identified in the ISP are available at the new location" were extremely limited.

At an early point in our evaluation, when it became evident that the DMR had not fully complied with either the transfer Regulations or the Orders of the Court, for the purpose of obtaining additional relevant information and documentation in the individual client files that had not been initially made available, a request was made by Attorney Beryl W. Cohen to DMR General Counsel for additional documents, including:

- Two ISP Attendance sheets for each of the 43 individuals (one documenting attendance at the last ISP meeting held at Fernald, and the other documenting attendance at the first ISP meeting by DMR at the receiving location)

- Certification of "Equal or Better": certifications by the Fernald Facility Director that the 43 individuals transferred are receiving equal or better services to meet their needs in the new location, and that all ISP-recommended services for the individual's current needs as identified in the ISP are available at the new location.

- "Notice and Request for Proposed Facility Transfer"

- Template of letter entitled "Notice of Request for Proposed Facility Transfer," also referred to as the "45-day letter."

a) Within the body of the 45-day notice, statements of how the proposed move will result in improved services and supports and quality of life for the individual (115 CMR 6.63(2)(c)1);

b) Within the body of the 45-day notice, statements that the parties may visit and examine the proposed home at a time and in a manner not disruptive to individuals who may be living in the home (115 CMR 6.63(2)(c)3);

c) Within the body of the 45-day notice, correspondence inviting the individual, guardian and other parties to consult with the service coordinator or other designated staff regarding the advantages and disadvantages of transfer (115 CMR 6.63(2)(c)4);

- Documentation by Guardians to DMR in which guardians request placement for their wards, as referenced in the "Notice of Request for Proposed Facility Transfer" letter of each individual transferred.

- The green USPS registered mail cards sent with the "Notice of Requests for Proposed Facility Transfer" letter and returned to DMR with guardian signature.

- Documentation that 45-day letter was sent to "individual's family, guardian, and designated representative, if any and providers of supports to the individual" per 115 CMR 6.24 (4)(a).

- Right of Return letters for all individuals transferred since April 7, 2005.

- Information about Home and Community-Based Program: documentation that was provided to guardians whose wards were transferring to community placements about the Home and Community-Based Program, how it compares to the Intermediate Care Facility model of care and documentation demonstrating that this written material was explained to guardians as it was provided to them.

- Advantages and Disadvantages of Proposed Transfer: documentation of the consultation between guardians and Fernald staff regarding the advantages and disadvantages of the proposed transfer, including a written record of the explanation of the intended outcome of transfer, the risks and alternatives.

- Birth date

- If applicable, date of death and last address of residence

- Year each individual arrived and departed each DMR residence, including Fernald.

(See attached Exhibit 2, letter of August 18, 2005 from Attorney Beryl W. Cohen to DMR General Counsel Marianne Meacham.)

Each of the specific requests for additional documentation cited above was denied by the Department of Mental Retardation. (See attached Exhibit 3, letter of September 26, 2005 from General Counsel Marianne Meacham)

In accordance with the direction of the Court, following the completion of the document review, Attorney Cohen and Class Representatives, met with DMR Commissioner Morrissey and his counsel and staff on January 18, 2006 for the purpose of reviewing their findings.

Of the 43 individuals who were transferred from Fernald Developmental Center between February 26, 2003 and June 22, 2005, only 9 individuals were transferred to group homes in the community, whereas 34 individuals were transferred to Intermediate Care Facilities for the Mentally Retarded (ICF/MRs), all of which facilities themselves have been also designated by Governor Romney and the Department of Mental Retardation to be closed.

For the purpose of monitoring the transfer process which was employed by the Department of Mental Retardation and further to guarantee a uniform oversight methodology, a checklist was developed by the reviewers which was applied to each of the 43 transfers, which occurred following the announcement by Governor Romney of his intention to close the Fernald Developmental Center. (See attached Exhibit 4.)

3

**Notwithstanding the limitations upon the document review, by clear and convincing evidence, the following findings have been substantiated:**

### No Certification of "Equal or Better":

**In violation of the Final Order of the Court (paragraph 4) entered on May 25, 1993, there is no certification by the Superintendent (now referred to as the Facility Director) of the transferring facility that individuals to be transferred will receive equal or better services to meet their needs in the new location, and that all ISP-recommended services for the individual's current needs as identified in the ISP are available at the new location.**

Included in the correspondence dated August 18, 2005 (See Exhibit 2), the following specific request was made to the Department of Mental Retardation General Counsel Marianne Meacham by Attorney Beryl Cohen in a letter dated August 18, 2005:

"I am requesting that the following documents be provided to me within the next week: certifications by the Fernald Facility Director that the 43 individuals transferred are receiving equal or better services to meet their needs in the new location, and that all ISP-recommended services for the individual's current needs as identified in the ISP are available at the new location."

In response, the General Counsel by letter dated September 26, 2005, with no reference to compliance with the equal or better standard imposed by the Court, stated in part:

"As was stated at the Court's status conference on January 20, 2005 the completed Individual Service Plan, in conjunction with the ISP Process represents the certification by the facility director that the individual's needs are being met in the new location." (See Exhibit 3.)

For nearly 13 years, there has been widespread reliance by family members and guardians upon the lifetime guarantee of protection by the Federal Court against reduced, inappropriate and unequal services to retarded citizens who are Class Members.

At the hearing held on January 20, 2005, the Court stated:

"Equal or better –we put that in the Final Report and everybody understands English. That is an easy phrase. If there is anyone who doesn't understand that, then we can work on providing some guidance. But equal or better means equal or better." [Transcript p.5 lines 20-25]

### Despite specific directions from the Court, the "Right of Return" letter did not exist in the records reviewed for any of the 43 individuals transferred out of Fernald after February 26, 2003.

The following dialogue between the Court and General Counsel for the Department of Mental Retardation occurred at a hearing on April 7, 2005:

**The Court:** Not just told but, I mean it should be in part of the papers that they get on their way out the door: You can always come back. [Transcript p.34, lines 10-12]

**The Court:** No recriminations. We all agree that it is going to be done. [Transcript p.34, lines 17-18]

**Ms. Meacham**: For anyone who requests that, it will be done and there will be a letter in their file. [Transcript p.34, lines 19-20]

**The Court**: No, no, nobody should request it. It should be for everybody who gets transferred, there should be a notice that you can come back. [p.34, lines 17-23]

**The Court**: Everybody who gets transferred ought to have some piece of paper in the file, the transfer file saying you can always come back. We will leave the light on and the window open. [Transcript p.35, lines 5-8]

**Ms. Meacham**: You can always have an alternative placement in the facility. That's the… [Transcript p.35, lines 9-10]

**The Court**: Whatever it is, make sure it is not ad hoc. It goes to everybody. And it looks like an official statement of policy of the Department. [Transcript p.35, lines 11-13]

In addition, at the hearing held on June 15, 2005, the Court stated:

"There is another factor here that you haven't mentioned yet and it runs through my mind. And that is that I have also said—I don't know whether in a document or just orally—that these transfers always carry with them the proviso that if they want to come back, they can come back. I have got that right, haven't I?" [Transcript p.7, lines 19-25]

**Transfers were based upon the policy to close Fernald which was established by Governor Romney, and were not based upon the individual active treatment needs of the residents as described in their Treatment Plans:**

Transfers were based upon Governor Romney's policy established in February 2003 to close all ICF/MRs in Massachusetts, beginning with the Fernald Developmental Center. There was no evidence that DMR employees initiated these transfers in response to documented needs of individual Fernald residents.

The policy established by Governor Romney is in violation of the Final Order of the Court regarding the individuals nature of the ISP [paragraph 2(a)-(b)]; the Code of Federal Regulations that defines six criteria for transfer and discharge, none of which were met by the intent of the Department to close Fernald [42 CFR 483.12]; Commonwealth of Massachusetts regulations requiring that transfers be initiated to provide "improved services and supports and quality of life for the individual." [115 CMR 6.63(2)(c)(1)]

**In addition, the execution of the Romney policy by the DMR contradicts remarks by Judge Tauro at the hearing held on November 10, 2004:**

**"But basically you can't have, it seems to me, a wholesale abandonment of any place until you have satisfied the ISP for each of the individuals. There is nothing that trumps the ISP."** [Transcript p.61, lines 12-15]

The Department itself in its publication (*Quick Guide for Families: Individual Support Planning Process*) states that:

The ISP process is based on:
1. The Department's Mission and Guiding Principles
2. The most current ways that services are provided to people with mental retardation
3. The 1992 definition of mental retardation of the American Association on Mental Retardation that focuses on the person's strengths and the supports in the environment
4. New ways of thinking about service delivery that look at the whole range of supports, including family, friends, non-paid people, services that everyone uses and specialized services from which people with mental retardation choose
5. The six Quality of Life Areas which are important in all parts of DMR service delivery and which reflect those outcomes that bring meaning to all people's lives. (See attached ISP Form utilized by the Department as Exhibit 5)

**Notwithstanding the ISP-recorded notes relating to Medical History, Measurable Objectives, and Challenging Issues, there were no unmet needs documented in the ISPs written immediately prior to the transfer of any of the 43 individuals.**

Each of the final ISP's prior to transfer contains a section entitled "Unmet Needs"; all of these sections were either blank or contained the word: "none."

The DMR itself defines an unmet need as:

"An unmet support need is something the individual needs to overcome a limitation and is not currently provided. This may be a limitation in adaptive skills; lack of accommodations; and assistive technology needed within the context of home, work and community environments. The Team should identify how to address unmet needs." [Department of Mental Retardation "Quick Guide for Families: Individual Support Planning Process."]

**There was no evidence that guardians/families requested alternative placements outside the Fernald Developmental Center.**

In a letter to Marianne Meacham, DMR General Counsel, dated August 18, 2005, Attorney Beryl Cohen requested "Documentation by Guardians to DMR in which guardians

requested placement for their wards, as referenced in the 'Notice of Request for Proposed Facility Transfer' letter of each individual transferred." Attorney Meacham denied the request as follows in a response to Attorney Cohen dated September 26, 2005:

> "Requests for placement are made in a variety of forms, including statements by guardians to staff in person, and not necessarily 'documented' by a formal or written request. To the extent that they are reflected in individual client files, the documents you requested are beyond the scope of the Protective Order, and contain 'personal identifying information' protected by statute. See Fair Information Practices Act, G.L. c. 66A, sections 1-3; the Health Insurance Portability and Accountability Act, 45 CFR 164.502, as well as under the Department's statue and regulations, G.L. c. 123B, section 17 and 115 CMR 4.06."

In requiring individuals to seek a transfer from Fernald, the Department has violated their transfer and discharge rights established by applicable regulations. The Fernald Developmental Center continues to operate, while the Department required guardians to agree to alternative placements.

Federal regulations allow discharge from an ICF/MR for one of the following reasons:

> "The facility must permit each resident to remain in the facility, and not transfer or discharge the resident from the facility unless (i) the resident's needs cannot be met at the facility, (ii) the resident's health has improved, (iii) safety is endangered, (iv) health is endangered, (v) the resident has failed to pay for care, or (vi) the facility ceases to operate." [42 CFR §483.12 (2)(vi)]

The policy to close Fernald and all remaining DMR facilities places at least the 34 individuals who have been admitted to any of the five other ICF/MRs at risk for trauma caused by multiple transfers. The Department has failed to inform guardians of the sequence of closure of all DMR facilities. There is no evidence that the risks of multiple transfers were reviewed with guardians as part of the process of informed consent for discharge from, and admission to, an alternative ICF/MR facility.

At a hearing held on November 10, 2004, the Court stated:

> "Well, why send them to yet another institution that you are going to close anyway?" [Transcript p.64, lines 1-2]

## "45-day Letter" does not meet all regulatory requirements.

### The written notice ("45-day letter") fails to conform to DMR Regulations regarding special requirements for transfer and informed consent.

The written notice is hereinafter referred to as the "45-day letter" as referenced in the following regulation:

"All parties eligible to participate in the modification meeting pursuant to the Department's regulations on the modification of individual service plans shall be given written notice of the proposed transfer at least 45 days prior to the date of the proposed transfer."  [115 CMR 6.63 (2)]

This notice is critical for full disclosure and informed consent. The regulatory process is designed to provide all due process rights available to the individual regarding transfer out of a DMR facility and admission to another DMR facility or community program. The letters that we reviewed failed to provide critical information to guardians: both as to information common to all individuals as defined by statute and information that is unique to the individual for whom transfer is proposed.

**There is no evidence that the "45-day letter" was delivered to the individual Fernald resident.** [115 CMR 6.63 (2)(a)]

**There is no evidence that the "45-day letter" was delivered to the guardian(s).** [115 CMR 6.63 (2)(a)]

**There is no evidence that the "45-day letter" was delivered to other parties, as specifically described in the Regulations.** [115 CMR 6.63 (2)(a)]

**There is no documentation that guardians requested, in accordance with the Regulations, the shortening of the 45-day timeline for transfer out of Fernald.** [115 CMR 6.63 (d)]

**In violation of the DMR Regulations** [115 CMR 6.63 (2)(c) 1], **the '45-day letter" does not include a statement of how the proposed move will result in improved services and supports and quality of life for the individual.**

Instead of providing information explaining how the proposed move of a specific individual would result in improved services, supports, and quality of life, the DMR sent a form letter to guardians.

As to proposed transfers to another DMR facility, the form letter stated:

"This new home will offer _____ a residential setting within a Title XIX facility like the Fernald Developmental Center. _____ 's day services will also be provided by staff at the __place__ through _program name_ ."

As to proposed transfers to a community residence, the form letter stated:

"This new home will offer _____ a smaller and more community-integrated setting while providing him/her with staff supervision and supports he/she needs. _____ 's day program will also allow him/her the opportunity to transition into community-based day supports from her current Fernald setting."

**Not all "45-day letters" included a statement as required by the Regulations that the parties may visit and examine the proposed home at a time and in a manner not disruptive to individuals who may be living in the home.** [115 CMR 6.63 (2)(c) 3]

**The "45-day letter" does not explain in accordance with the Regulations that no punitive action will be taken against the individual's guardian if consent is withheld or withdrawn.** [115 CMR 5.08 (3)(e) 4]

**There is no documentation that the advantages and disadvantages of the proposed move were explained as required by the Informed Consent regulations.** [115 CMR 5.08 (1)-(3)]

Informed Consent regulations in part require:

- A written record shall be made which summarizes the information provided to the individual from whom consent is secured in accordance with 115 CMR 5.08 (3)(d) and (e).
- The person securing consent shall:
  - explain the risks of the proposed activity, as well as the risks of not proceeding. [115 CMR 5.08 (3)(e) 2]
  - explain the alternatives to the proposed activity. [115 CMR 5.08 (3)(e) 3]
  - explain that consent may be withheld or withdrawn at any time, with no punitive action taken against the individual. [115 CMR 5.08 (3)(e) 4]

Instead of complying with the Regulations, the Department utilized a blanket consent form, which states:

"I (guardian) have received timely notice of the proposed transfer pertaining to (individual) from (place) to (place) on or about (date) pursuant to 115 CMR 6.63(2) of the regulations of the Department of Mental Retardation. I have also received notice of my rights under these regulations. I understand my right to deny consent to the proposed transfer and my right to a hearing. After considering the information I have received about the proposed transfer, I am satisfied that this transfer is in (individual's) best interest. All my questions have been answered to my full satisfaction. I, therefore, choose not to object and hereby consent to the proposed transfer.

I understand that the transfer may now take place as scheduled and that I have waived the 45-day waiting period.

I understand that I retain the right to appeal issues related to the provisions of services to me pursuant to 115 CMR 6.63(4)."

At the hearing held by the Court on November 10, 2004, the Court stated:

9

"You can't have a consent to an ISP unless all the information is available. Where are they going to go, what is at the end of the ride. I mean that is very, very important. You are entitled to know what is at the end of that ride. But the ISP is going to be followed. It has got to be a decision that is made by the individual or their representative with full knowledge of the consequences, full disclosure, and if you do that, then we won't have any trouble." [Transcript p.79, lines 21-25]

## There is no evidence that the guardians of any of the nine individuals transferred to group homes in the community were informed about the requirements of the "Home and Community-Based Program."

The funding of this program differs from that of ICF/MR facilities. Individuals within a Home and Community-Based Program can be eligible for services but not receive them because of insufficient funds. In an ICF/MR setting, if one individual receives a service, all others who need the same service must also receive that service.

The Home and Community-Based Services (HCBS) Waiver is a program of community-based supports operated by the Department of Mental Retardation and funded through a combination of state funds and federal Medicaid funds. It is called the "Waiver" program because it is a Medicaid program that is exempt from meeting certain traditional Medicaid program requirements. Historically Medicaid funds were only available for services provided in institutions such as hospitals, nursing homes, or ICF/MRs (state schools or developmental centers). As the community service system grew and developed, Congress recognized that people could benefit from home and community-based services to a fixed number of individuals as an alternative to institutional services. Therefore, one of the qualifications for waiver services is that a person must meet the level of care (LOC) required in an institutional setting. In Massachusetts, these community-based services known as waiver services, are provided to individuals:

"pursuant to a written plan of care to individuals for whom there has been a determination that, but for the provision of such services, the individual would require the level of care provided in an intermediate care facility for the mentally retarded."

## No corporate guardians attended the modification ISP meeting prior to consenting to transfer their wards from Fernald. The record review also clearly established that a majority of out-of-state guardians representing individuals who were transferred from Fernald did not attend any modification ISP meetings prior to consenting to transfer their wards.

The decision to move aging, profoundly retarded and disabled adults from their homes of many decades represents one of the most important decisions that guardians will ever make for their wards. It requires consultation with primary caregivers to determine the "best interests" of the ward. Guardians who consent to transfer without discussing the risks and benefits of the proposed transfer together with the interdisciplinary team forego informed consent.

**The record review indicated many instances of resident transfers accomplished with out-of-state guardians who by necessity relied primarily upon Fernald administrative staff to approve a voluntary transfer.**

For example, one resident's co-guardian lives in Alaska and the other co-guardian lives in California. Fernald staff worked with the resident's cousin from a third state to achieve a transfer.

Another resident's father was her guardian until 2003. Thereafter, the Fernald administration sought out a former Fernald nurse now living in North Carolina who assumed guardianship. The resident was transferred to Monson and her guardian "maintains contact… through her social worker."

Another transferee's mother died in 2003. Her family now lives in Virginia and records report that the family was uncomfortable making decisions about where the ward should live. The Department arranged the appointment of a former Fernald nurse now living in North Caroline as guardian.

**The record review clearly established that there were documented instances when a resident's services at Fernald were reduced prior to a transfer as well following a transfer from Fernald, including failures to provide wheelchairs, recreational services, 24-hour nursing care, speech and occupational therapy.**

**In addition, the frequency and duration of active treatment objectives either decreased after transfer or were otherwise defined in non-specific terms. Further, it was clearly established that active treatment objectives were individualized before transfer and generic after transfer.**

For example, prior to transfer, a resident who had two treatment objectives at Fernald identified as "operating a musical toy" and "learning to flush the toilet" were changed after transfer to the community so as to replace those earlier objectives so as to provide "access the community to develop relationships with people" and the other to "participate in sensory activities."

Another resident, prior to transfer, had three individualized learning objectives to increase travel with her adaptive cane, sign more independently to use "toilet", and increase her walking on a treadmill. After transfer, the three individualized learning objectives were replaced by the following objective: "will participate in sensory motor activity which maximizes her independence. Duration: as determined. Frequency: as determined."

A third resident, prior to transfer from Fernald, had individualized learning objectives to increase his consistency in flushing the toilet and brushing his teeth more completely. Twenty-eight (28) days after transferring from Fernald, his objectives were changed to "actively engage in offered activities" and "become familiar with and use his residence independently or with staff's verbal prompt."

**Community Placement was Discussed Post-Transfer in 30-day ISP.**

"Within 30 days after admission, the interdisciplinary team must prepare for each client an individual program plan that states the specific objectives necessary to meet the client's needs, as identified by the comprehensive assessment required by paragraph (c)(3) of this section, and the planned sequence for dealing with those objectives." [42 CFR §§ 483, 440(c)(4)]

**DMR employees at receiving facilities documented that they discussed community placement with guardians as early as three weeks after their wards were transferred from Fernald.**

The following entry appeared in the 30-day ISP following a transfer in November 2003:

"The co-guardians have viewed some sample community homes in the past, and did not feel that they would meet …'s needs. After much discussion, and given that … is still new at the [alternative location] it was decided that community placement will be discussed again at next year's ISP meeting."

On November 15, 2004, at the hearing held by the Court, the Court stated:

"Equal or better. And, also, that we have to–in order to determine that, we have to know where–where the bus trip is going to end up." [Transcript p. 15, lines 1-3]

**Deaths Among Transferees**: Upon information and belief, Plaintiffs have been informed at least six (6) of the 43 residents transferred from Fernald Center have already died (Five of 34 who relocated to ICF/MRs and one of nine who relocated to community residences). Two died within two months of their transfer to Monson and Wrentham respectively. One died seven months after transfer to Monson. The fourth and fifth died in less than two years after transfer to Wrentham and Hogan, respectively. The sixth individual died within 14 months of transfer into the community.

In the letter to General Counsel Marianne Meacham on August 18, 2005, Attorney Beryl Cohen specifically requested "the date of death and last address of residence…regarding the 43 transferees." (See Exhibit 2.)

In response, Attorney Meacham, on September 26, 2005, replied (See Exhibit 3):

"The information you have requested regarding the age and prior residences of Fernald transferees is beyond the scope of the Protective Order and is 'personal identifying information' which the Department cannot disclose to you under the Fair Information Practices Act, G.L. c. 66A, sections 1-3, the Health Insurance Portability and Accountability Act, 45 CFR 164.502, as well as under the Department's statutes and regulations, G.L. c. 123B, section 17 and 115 CMR 4.06. Further responding, the Department asserts that such confidential personal data is not relevant to its determination of "equal or better services.""

**The record review clearly established that a number of transferees experienced medical, emotional and behavioral changes shortly before and after transfer, including loss of skin integrity, assaultive behavior, anxiety and depression for which medication was prescribed or increased, self-inflicted injuries, significant increase in seizures, mood changes, sleep disorder.**

**The record review clearly established that there were numerous failures to comply with the transfer Regulations, including: not completing the 30-day ISP when due; failure to notify a Designated Representative of notice to transfer; failure of a guardian to indicate approval or appeal of Modification ISP; Modification ISP approval by one guardian only; and consent to transfer signed by one guardian only.**

**The record review clearly established that there was no evidence that familiar staff were moved with the transferees.**

**The importance of familiar staff was emphasized in the ISPs of many individuals, who upon transfer lost contact with significant caregivers important to their safety and well-being. Notes included in the ISPs by Fernald staff prior to transfer included the following commentaries:**

"_____ is blind. She would not understand the alarm or need to evacuate. Her self-injurious behaviors and reliance on preferred/familiar staff may slow her egress."

"Familiar staff understand her signs, gestures, and behaviors."

"Being in an unfamiliar environment or routine may cause anxiety."

"_____'s family would like him to remain at Fernald...as long as possible to have minimum changes in his life with familiar staff and environment."

"_____'s family have expressed their desire to have _____ remain living at Fernald. They feel she receives excellent care here with familiar staff and peers."

"_____ responds best to familiar voices and will accept brief physical interactions from very familiar people."

**The record review clearly established that there was insufficient documentation of continuity of involvement of Fernald ISP team members throughout the transfer process.**

At each ISP team meeting, the various participants representing both professional and direct care staff sign a Record of Attendance in order to establish responsibility for the team's active treatment plan.

In the absence of providing the reviewers with the requested attendance sheets of ISP team members, it cannot be verified whether the individual's full ISP team developed the modification ISP at the time of transfer, whether that team was involved in all transition planning

meetings, and whether members of the team attended the 30-day ISP at the receiving location. Clearly, the individual's adjustment to the new facility and programs needs to be evaluated, and problems addressed, in consultation with the familiar ISP team members from Fernald.

## SELECTED VERBATIM EXCERPTS FROM THE ISP RECORDS OF TRANSFEREES

### Case Study No. 1

Challenging Issues: (        ) is not able to attend to activities as she has frequent daily seizures which remain uncontrolled, despite being on medication.

Due to medication, she sleeps most of the day and does not want to be disturbed.

(        ) used to receive ADL training specifically assisting in eating and drinking. However, she no longer tolerates physical touch or assistance. For this reason, she no longer receives training in this area and is fed by staff.

Safety/Risk: (        ) has no self-preservation skills. No safety awareness and depends upon staff for all her needs.

The ISP Team is not in full consensus on the issue of community living. (        )'s guardian is not in support of community placement. She feels that (        ) has lived at a facility for many years and receives good care and support. She does not want to consider moving her at this point in time. Over the coming year, the Team will assess (        ) for community living. Refer to the Community Placement Profile Form included in this package. Community placement is not a priority for this coming year. (        ) is not able to express her feelings on community living and is represented by her guardian.

(        ) is non-ambulatory and depends on staff for position changes, transfers and evacuation. (        ) is not able to complete self-care tasks without assistance of direct care providers. She is totally dependent on staff to complete all activities of daily living. She is able to communicate her preference by facial expressions, vocalizations, and body movements. (        ) especially enjoys air on her face, music massage, and van rides.

(        ) receives medical monitoring for epilepsy, orthopedic problems, scoliosis, blindness, gastroesophageal reflux, dependent edema of lower extremities. Lost 100% of familiar staff. (        ) requires 24-hour nursing support services due to refractory seizure disorder. Pureed Diet.

(        )'s health related supports include adapted wheelchair, padded siderails, Arjolift, Jobst stockings, coated teaspoon, nose cup, padded foot and head boards.

Transferred November 18, 2003. Died June 1, 2004.

**Case Study No. 2**

Personal Growth and Accomplishment:

Relationships: to have familiar staff assist with routines, problem solving and decisions on personal issues. To have staff understand my wants and needs. To continue to develop relationships with preferred staff and peers. To continue to have my supports around me, QMRP, SW, Habco, Recreational Therapist, Psychologist, OTR, PT, Speech Therapist, Direct Care Staff, NP, MD, Nurses, and the administrators at Fernald state school.

Personal Growth and Accomplishment: To continue to have staff offer me jewelry, makeup, and pretty outfits so that I can look my best.

Personal Well-Being: To take a few changes in my programming so that I have a fun and exciting life.

Master Medical Problems: Spastic Quadriplegia—Clubbed feet and contractors of knees and hips. Glaucoma.

Rights and Dignity: Staff assists me with my sponge bath at least two times a day and when needed in my bed. Staff follows my toileting schedule of changing my diaper a minimum of five times a day.

She does not utilize toilet and is changed with staff assistance in her room. (          ) will assist with turning her body and shifting her weight in bed.

Staff utilizes the Hoyer Lift with her. (          ) sits on a sling throughout the day. There are always two staff there during the lifts.

Relationships: Special with some of my peers, (          ) and some staff (          ), (          ), and (          ). These staff have worked with her for many years and are caregivers who deal with her basic needs on a daily basis.

Direct care provides her the support, assistance, and comfort level so she has a well-rounded day. The direct care provide her assistance in the areas of bathing, handwashing, swabbing her gums, dressing and other personal tasks.

(          ) is assisted by staff in having jewelry, make-up and matching outfits worn at the beginning of each shift. (          ) enjoys looking pretty and having extra frilly stuff on. Familiar staff in (          )'s life is important, especially around personal care and lifting issues. She does express a sense of insecurity around float staff and new staff. (          ) is a spastic quadriplegic

Objective: (          ) will wipe her mouth with a napkin when given a que after each meal. 80% of recorded trials for three consecutive months.

(        ) enjoys the time she is alone with staff. She appears to exhibit a sense of comfort when it is just she and staff. She becomes more verbal and will express short but clear words to staff when she feels this sense of comfort.

(        ) loves to look pretty and be told how pretty she is. The staff in her cottage always takes time to dress her in nice clothes, comb her hair, and to put minimal make-up on. The staff provides her with jewelry and hair ribbons when appropriate.

(        ) is non-verbal. However, she does respond to familiar people by smiling, vocalizing sounds... She spends most of the day smiling and responding to interactions.

## Case Study No. 3

Medication: Risperidone – Depakote – Protonix – Allegra – Folic Acid – Calcium – Levothyroxine – Thiamine – Pro-MOD

(        ) receives medications for treatment of Bipolar Disorder, Hypothyroidism, Rhinitis, Allergies, and Arthritis. He takes multiple medications which may predispose him to increased interactions or side effects.

The psychological services provider also implemented and monitored a Personal Well-Being objective which attempted to reduce disruptive outbursts to no more than 10 incidents per month in 5 of 7 months. He met this goal and this will no longer be a formal objective, though Behavior Guidelines will remain in place and will be addressed as a Support Protocol.

Safety Risk: (        ) would require physical assistance of one staff to push his wheelchair to evacuate a first floor setting and 2-3 staff to lift his wheelchair down the stairs if he had to evacuate in 2nd floor setting in the event of an emergency.

Over past year, (        ) had four Accident and Injury reports filed on his behalf.

His ambulation has diminished over time and requires a wheelchair to most of his mobility.

Community placement was not recommended by the previous ISP team from Fernald. Since (        ) has only been at (        ) for a few weeks and the new Team was still getting to know him, a community placement recommendation would be tabled until next year's ISP Meeting.

**Case Study No. 4**

47 years old. At Fernald since 3 year old.
Uses sign language.

Requires close monitoring by staff at all times for inappropriate behavior.

Currently supported by a Primary Care Physician, Nurse Practitioner, Pharmacist, as well as access to 16 hours of nursing daily and on call.

**Case Study No. 5**

Requires 24-hour nursing.

G-Tube in September 2003. Wheelchair. Uses several modes of expressive communication, including eye gaze, facial expression, vocalization, non-ritualized gestures, body movement, pointing objects, conventional gestures and speech. Right foot deformity is progressive—at some time in the future, he may not be able to ambulate any more.

Displays no awareness of his personal safety. He cannot evacuate a building independently during a fire drill.

History of GI bleed, gastritis, urinary tract infection, GERD (gastroesophogal reflex disease), duodenal ulcer and hypercholesterolemia. He is also osteoporotic.

Medical and nursing will continue to follow for optimal health with concerns for Dysphasia, Risk of Aspiration, Asthma, Osteoporosis, GERD and Peptic Ulcers, Hypercholesterolemia, Urinary Tract Infections, Orthopedic issues, Allergies, Constipation, Hemorrhoids, and G-tube.

**Case Study No. 6**

Relationships: To continue to have close relationships with staff, like (          ),
(          ) and (          ). To continue to have opportunities to interact with familiar peers.

Profound retardation. Spastic Diplegia, Hyperlipidemia, History of Hematemesis Secondary to Gastric Outlet Narrowing with Duodenitis, Esphagitis and Gastritis.

Episodes of screaming, tantrums.

Wheelchair

(          ) continues to reside in (          ). This continues to be an appropriate placement for him. Requires a barrier free wheelchair accessible residence due to

17

his orthopedic limitations. (        ) is dependent on staff for assistance and/or supervision for all aspects of his daily living activities, including feeding, bathing, dressing, toothbrushing, etc. He has a close relationship with a staff member, (        ).

Primarily (        ) enjoys solitary activities and he is a passive participant in group activities. For example, he is likely to sit and observe. When his needs are not met, or he is physically uncomfortable, (        ) will scream and thrash about his wheelchair.

(        ) can use his right hand to reach for, grasp and release objects. He uses a variety of grasps including palmer, three jaw chuck, and a crude pincer.

Vision is impaired by Esotropia and far-sightedness.

Relationships: To develop close relationships with familiar staff. To make new friends and acquaintance at (        ). He prefers familiar staff and responds particularly well to male staff.

18

## CONCLUSIONS

1. The Department of Mental Retardation has failed to document that those 43 individuals who have been transferred to alternative facilities between February 26, 2003 and June 22, 2005 will receive equal or better services to meet their needs in the new location, and that all ISP-recommended services for the individual's current needs as identified in the ISP are available at the new location.

2. The Department of Mental Retardation has failed to comply with the specific stated purpose and language of Federal Court Orders regarding the process to be followed before and after a transfer to an alternative placement site is approved.

3. The Department of Mental Retardation has placed profoundly retarded and severely handicapped residents in its care, at risk in its failure to provide proof that required records of transfer to alternative sites are in compliance with Federal and State Regulations.

4. The Department has failed to conform with the direction of the Court on April 7, 2005 and thereafter to provide a "Right of Return" to Fernald letter in the record of each individual transferred from Fernald after February 26, 2003.

5. The Department has initiated transfers from Fernald to satisfy the administration's policy to close ICF/MRs, rather than meet the individual support needs of the Ricci Class Members as defined by Regulations.

6. The Department reduced services to Class Members for whom transfer was considered in order to induce guardian and family member consent to transfer.

7. In the absence of any documented explanation of the "Home and Community-Based Services" waiver for guardians of nine individuals transferred from Fernald into community settings, guardians may have forfeited the intermediate care facility model of service delivery without full knowledge of what they were accepting in its place.

8. The Department of Mental Retardation has selectively targeted less active corporate and out-of-state guardians to participate in a transfer process employed by the Department, which did not fully utilize a modification proceeding available to guardians by State Regulations.

9. Less active guardians, and their wards, were made especially vulnerable by the failure of the Department to provide individualized, specific, written information, including the advantages, disadvantages and risks of transfer, necessary to them to allow them to give informed consent.

10. The Department's failure to timely declare the complete policy and timetable for closure of all ICF/MRs at Wrentham, Monson, Hogan, Templeton, and Glavin has denied family members and guardians at Fernald the benefits of full disclosure and informed consent and placed individuals at risk for trauma caused by multiple transfers.

11. In failing to comply with informed consent regulations, the Department has undermined the fundamental relationship between the Department and guardians on which all treatment and service delivery decisions depend.

12. There is no evidence that familiar staff were moved to an alternative site with the transferees, although the records of many indicated that familiar staff were important to their safety and well-being.

13. Fragile, dependent individuals suffered additional medical complications, emotional disorders, and behavior problems shortly before and after discharge from Fernald.

14. The lack of continuity of care to transferees by their ISP team was demonstrated by the failure of the Department to include the attendance sheet for ISP meetings as part of each ISP.

## RECOMMENDATIONS

1. All transfers of residents from Fernald to alternative facilities should now be reviewed by independent professionals under the authority of the United States Department of Justice for the purpose of determining whether federal law has been violated in the transfer process employed by the Department of Mental Retardation and whether the 43 transferees should be returned to Fernald to meet their active treatment needs and receive all ISP-recommended services identified in their most recent ISP approved by a Fernald team.

2. The records of all 43 individuals transferred from Fernald after February 26, 2003, together with all future transferees, shall be amended to include a "Right of Return" notice in conformity with the direction of the Court at the hearing held on April 7, 2005 and thereafter.

3. No individual shall be transferred from Fernald to an alternative location until and unless the Commissioner of the Department of Mental Retardation certifies in writing that the individual to be transferred will receive equal or better services to meet their needs in the new location, and that all ISP-recommended services for the individual's current needs as identified in the ISP are available at the new location.

4. A hearing shall be held by the Court to determine whether DMR Commissioner Gerald Morrissey shall be held in Contempt of Court for his intentional failure to comply with mandated State and Federal Regulations, failure to comply with Court Orders, failure to have certified that a transferee will receive equal or better services and that all ISP-recommended services for the individual's current needs as identified in the ISP are available at the alternative location, and failure to provide a letter informing guardians that transferees have a right to return to Fernald from alternative placements.

5. All transfers from Fernald to other ICF/MRs and community residences shall be discontinued until the Department of Mental Retardation has established that its transfer procedures are in strict compliance with State and Federal Regulations.

6. The Department of Mental Retardation shall immediately publish its previously declared policy and timetable for the closure of ICF/MRs at Wrentham, Monson, Hogan, Templeton, and Glavin.

7. No individual resident of the Fernald Developmental Center shall be transferred by the Department to more than one alternative facility during his/her lifetime.

8. No individual shall be transferred to a community residence, unless, and until, the Department, by certification to the Court, affirms that it has reviewed written information explaining the Home and Community Based Program waiver, in a manner understandable to the guardians, and the guardian has signed and dated the waiver agreement which indicates consent that the guardian has chosen community care instead of facility-based care.

9. All staff participating in the development of annual or modification ISPs shall sign and date the plan which they agree to implement regarding the needs of the individual for whom the plan is written.

Respectfully submitted,

Beryl W. Cohen, Attorney
11 Beacon Street
Boston, MA 02108
(617) 742-3322
BBO# 088620

DATED: February 2, 2006

CERTIFICATE OF SERVICE

I, Beryl W. Cohen, hereby certify that a true copy of the within *Report to the Court In Accordance with Order of January 20, 2005 relative to the Transfer Between February 26, 2003 and June 22, 2005 of 43 Residents from the Fernald Developmental Center to an Alternative Placement* has been served this day, in hand at the office of the Defendants' attorneys, Juliana deHaan Rice, Assistant Attorney General, Government Bureau, Office of the Attorney General, Commonwealth of Massachusetts, One Ashburton Place, Room 2019, Boston, MA 02108-1698 and Marianne Meacham, General Counsel, Department of Mental Retardation, 500 Harrison Avenue, Boston, MA 02118.

DATED: February 2, 2006

Beryl W. Cohen