UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Robert Simpson Ricci, *et al*., | CIVIL ACTION Nos. |
| | 72-0469-T |
| | 74-2768-T |
| Plaintiffs | 75-3910-T |
| | 75-5023-T |
| v. | 75-5210-T |
| Robert L. Okin, *et al*., | |
| Defendants | |

**THE DEPARTMENT OF MENTAL RETARDATION'S STATUS REPORT
TO THE COURT AND PRELIMINARY RESPONSE TO THE REPORT
OF THE FERNALD PLAINTIFFS FILED ON FEBRUARY 2, 2006**

Introduction

The Department of Mental Retardation ("the Department") submits this status report

regarding the Department's implementation of its plan to close the Fernald Developmental Center

("Fernald") and the status of the individuals who have been transferred from Fernald to community

settings or other Intermediate Care Facilities for the Mentally Retarded ("ICFs/MR"). Further, the

Department hereby responds preliminarily to the Plaintiffs' *Report to the Court in Accordance with

Order of January 20, 2005 Relative to the Transfer Between February 26, 2003 and June 22, 2005

of 43 Residents from the Fernald Developmental Center to an Alternative Placement* (hereinafter,

"the Plaintiffs' Report").[1]

The planned closure of Fernald is consistent with the long-standing policy commitment of

the Department of Mental Retardation ("DMR") to favor community-based settings for individuals

who can handle and benefit from them and to reduce its reliance upon traditional institutions for

---

[1] As the Department received the Plaintiffs' report on February 2, 2006, a mere four business days
prior to the court's scheduled status conference, it specifically reserves the right to supplement this
Response.

adults with mental retardation. This policy commitment, in addition to furthering the goals of the May 25, 1993 Final Order specifying that the Department's clients receive services in the least restrictive environment possible, is also consistent with national trends and the decision of the U.S. Supreme Court in *Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581 (1999).

<u>Placements from Fernald</u>

The Department has fully complied with this Court's Final Order of May 1993, ensuring that all individuals transferred from Fernald into community residential settings are receiving "equal or better" care in the new settings. <u>See</u> Affidavit Of Diane Enochs, ¶10. The Department has placed 49 individuals from Fernald into either community settings or alternative ICF/MR settings.[2] <u>Id</u>. at ¶ 6. All placements were voluntary, and were consented to by the individual's legally authorized guardian. For those 9 individuals whose families have chosen community placements, the transition processes have been thoughtful and caring. Those individuals have adjusted well to their new settings, and are being provided an array of opportunities and experiences which would not have been available to them at Fernald and have resulted in an improved quality of life. Enochs Aff., ¶ 12.

For those 34 individuals reviewed by Plaintiffs whose families have chosen to transfer to the Wrentham or Monson Developmental Centers, or to the Hogan Regional Center, the full array of ICF/MR services supplied there by knowledgeable and caring staff are equal to services provided at Fernald, and in most cases have resulted in improved opportunities for community outings and more spacious living quarters for individuals. Enochs Aff., ¶ 13. These factors have

---

[2]  In February 2003, at the time of the announced closure of Fernald, the ICF/MR facility census was 280 residents.  As of February 1, 2006, the census is 198 residents.  Several of the transferred Fernald Class Members have gone to skilled nursing facilities or are now deceased.

resulted in a high level of satisfaction expressed by individuals and their families and guardians.[3] Enochs Aff., ¶ 14.

Several individuals have indicated that community placement allows individuals to experience new activities such as outings into the community to stores, the bank, etc.   Enochs Aff., ¶¶ 15-16.  For many individuals, the transition process itself proved uneventful, and the availability of familiar staff to assist with the transition has ameliorated the adjustment period for individuals where needed.  Id., ¶¶ 17, 84.

For some individuals in the community or at another ICF/MR, the moves have placed them in much closer proximity to their families, allowing more time for visiting siblings and elderly parents.  In particular for some aging parents with transportation challenges, this has proven very beneficial.  Enochs Aff., ¶ 18.  Without minimizing in any way the potential for transfers to be disrupting, many of the individuals transferred and their families have expressed a clear view that the moves, while requiring adjustments, have been extremely positive for the class members and their families.   Id. at ¶ 15.   Most families and guardians have articulated a high degree of satisfaction with the new services.  Id. at ¶¶ 19, 23.

There have been six deaths among those transferred over the last three years.  Given the ages of the individuals involved and the serious underlying medical conditions which were identified in each mortality review report, the deaths were not unusual or surprising.   Enochs Aff., ¶ 27.  They were not related in any way to the move from Fernald.  Id.

---

[3]  Services at all the Department's ICFs/MR, including Wrentham, Hogan and Monson, continue to comply with the requirements of Title XIX of the Social Security Act.  Title XIX surveys were recently completed at Hogan and Wrentham; the federal reviewers did not assess either facility as being deficient in any aspect of client care.  Enochs Aff., ¶¶ 8-9.

<u>Placement Planning for Fernald Class Members</u>

On January 20, 2005, this Court approved a Stipulation between the parties, requiring the bifurcation of the individual service planning ("ISP") process into two steps:  (1) discussion of all of the elements of the individual's service plan, but excluding any discussion of placement in a less restrictive setting; and (2) a separate meeting to discuss placement planning.  <u>See</u> Stipulation dated January 20, 2005.  The Court further directed, in the hearing, that the Department notify class counsel of the dates of all ISPs for Fernald residents and of the dates of placement planning meetings for those individuals represented by class counsel.  Representation by class counsel was indicated by the guardian's execution of a release allowing the Fernald League to participate in the ISP meeting.  The Department has scrupulously complied with these requirements, refraining from any discussion of placement at the ISP meeting, and notifying class counsel of ISP dates and placement planning meetings dates, even though class counsel has not chosen to appear at any such meeting.  Enochs Aff., ¶ 48.

As this Court is well aware, the importance of the ISP to the effective delivery of services to individuals cannot be overstated.  Effective service planning and communication by all team members on all the issues required in the Department's ISP regulations is essential to the well-being and quality of life for the individual.  The bifurcation of the ISP, while intended to address the Fernald plaintiffs' October 2004 allegations concerning the ISP process,[4] has had two major unintended consequences.  Enochs Aff., ¶¶ 49-57.

First, ISPs at Fernald, developed by the ISP team, including the family, are not being finalized because the advice of class counsel and the Fernald League is to *avoid finalizing the ISP*

---

[4]  The Department addressed those concerns in its brief filed with the Court on August 16, 2004.  A recent hearing appeal decision confirms that many of the plaintiffs' arguments regarding the editing of appeals or decrease in services were specious.  <u>See</u> Enochs Aff., ¶ 66.

*by filing an appeal, thus delaying any placement planning meeting.*   This advice is clearly stated

in a May 2, 2005, flyer from the Fernald League:

**DMR is not to discuss placement until the ISP is "finalized,"
according to Judge Joseph Tauro on April 7, 2005.**

**"Finalized" means your ward's 2005 ISP is <u>not</u> under appeal
<u>not</u> in the process of being written
and <u>not</u> due between now and January 2006**.

See Exhibit A, attached hereto.  This strategy of avoiding placement planning meetings by appealing

the ISP is clearly reflected in the dramatic increase in the number of ISP appeals filed at Fernald in

the past year.  The number of appeals for the past five years is as follows:

| <u>Year</u> | <u>No. of ISP Appeals Filed</u> |
|------|------|
| 2001 | 1 |
| 2002 | 0 |
| 2003 | 3 |
| 2004 | 15 |
| 2005 | 46 |

Enochs Aff., ¶ 64.  Further, the strategy of appealing the ISP, even where no substantive issues are

identified for the appeal, is reflected in the appeals themselves.  Guardians, advised by the League

to do so, appeal the ISP without indicating any specific issues until the day of the appeal, and even

then appear unsure what they are appealing.[5]   <u>Id</u>. at ¶¶ 59, 65, 69-70.  The substance of these

appeals, when they are brought to hearing, is frequently trivial and could easily have been remedied

through communication.  <u>Id</u>. at ¶ 66.  In one recent appeal, the sole issue was whether a particular

brand of soft drink should be included in the ISP Vision Statement.  <u>Id</u>.

Moreover, scheduling conflicts and cancellation of informal conferences and hearing dates

---

[5]   Appellants instead indicate all nine (9) bases for appeal, including "eligibility" and
"prioritization," which clearly are not issues for any class member at Fernald.

means that months potentially go by before the appeal is heard. Enochs Aff., ¶ 60. Although the Department can move to expeditiously schedule hearings, its usual practice is to allow reasonable extensions for good cause. Id., ¶ 61. In the past year, however, there have been numerous requests to re-scheduled both informal conferences and hearing dates. Additionally, the hearings are frequently unfocused due to the appellant's failure to identify the issues appealed, and may go on for several days.[6] Id., ¶ 62.

The Department does not dispute the right of any appellant to use the administrative process to resolve issues presented in the ISP, nor would it suggest that this Court alter those due process rights. However, the second major unintended consequence of the bifurcation of the ISP process, linked to the Fernald League's strategy of avoiding finalization of the ISP through baseless appeals, is a broad, systemic inability to satisfy (1) the Department's regulations requiring consideration through the ISP process of service delivery in the least restrictive service setting (see 115 CMR §§ 6.00, et seq.), and (2) the Supreme Court's mandate in Olmstead that States provide services for individuals with disabilities in the least restrictive setting available. The result is that families are not being included in the placement planning process and are not becoming aware of community or facility placement options that are available for their family members. The Fernald League has effectively stifled the Fernald staff's communication with families about this important matter, in violation of existing law and contrary to clearly expressed public policy.[7]

---

[6] A recent decision by Hearing Officer John Riley illustrates this pattern. See Enochs Aff., ¶ 62.

[7] The Fernald League does not acknowledge that discussion about community placement at ISPs is consistent with the law and DMR practice. The Fernald League complains that "DMR employees at receiving facilities documented that they discussed community placement with guardians as early as three weeks after their wards were transferred from Fernald." Plaintiffs' Report at 12. This is correct because it is the standard practice at all ICFs/MR, except Fernald, to have discussions about less restrictive alternatives in the ISP meeting. This does not mean that individuals are being pushed

(continued...)

The Department respectfully submits that whatever curative aspects the Stipulation may have had with regard to the ISP process at Fernald has now been achieved, and it is presently operating mainly to thwart communication between the Department and families. The Stipulation should be vacated, and the normal ISP process allowed to operate for all Fernald residents.

Continued  Improvements in Programming<br>and the Environment at Fernald Development Center

The Department has continued, and expanded, the efforts outlined in its Response to Plaintiffs' Motion to Re-Open Case (notwithstanding the motion having been denied by this Court on January 20, 2005), to improve the physical environment and programming at Fernald during this winding-down period. Enochs Aff., ¶¶ 35, 42-44.  Under the supervision of Facility Director Linda Montminy, the physical environment of Fernald continues to improve.  With the re-organization of the facility's administrative divisions, Division Directors have taken direct responsibility for all physical environment concerns.  Id., ¶ 37.  Major renovations to Malone Park, an area of Fernald which will be converted from an ICF/MR to community-based residences (with 24 residents) are now underway.  Id., ¶ 44.

Development of Housing Opportunities for Fernald Residents

When it comes to providing housing services in the community for Fernald class members who might choose to transfer from Fernald in the next two years, there is significant available residential capacity in the Department's state-operated system, as well as in its provider-operated programs.  In addition, the Department is actively involved in a housing development process, in partnership with the state Division of Capital Asset Management ("DCAM"), the Department of

---

(...continued)

into community placements, but it assures that they are aware of opportunities for community placement.

Housing and Community Development ("DHCD"), and local housing authorities, that will meet the present and future needs of individuals served by the Department. Residential housing capacity that is developed through this initiative (known as the Chapter 689 or *Housing for People with Special Needs* program) will further add to the inventory of adaptable and fully accessible housing available in the DMR system.

The most significant challenge in developing housing to meet Class Members' needs at this time is the bifurcation of the ISP and placement planning processes, resulting in families and guardians having no contact with the Department about their ward/family member's housing needs or preferences. Only with reasonably full input from families can the Department develop community-based housing that meets the geographic needs or preferences of families. Furthermore, involvement by families offers the opportunity for substantial input in the development of a home-like environment for their family member.

The Department's Preliminary Response to the Fernald Plaintiffs'<br>
<u>"Report to the Court in Accordance With the Order of January 20, 2005"</u>

At the outset, it should be noted that Plaintiffs' styling of their "Report" erroneously implies that the Court's Order of January 20, 2005, called for or authorized the Fernald League Plaintiffs to conduct a review of the 43 transferees from Fernald on behalf of the Court. The January 20th Order simply *allowed* the Fernald Plaintiffs' counsel and class representatives to review certain records of the transferees; it did not *direct* the Fernald plaintiffs to conduct this review.

This "Report" was distributed to many media outlets on the day of its filing with the Court, and one may infer that the Plaintiffs' characterization of the "Report" was deliberately intended to imbue it with the imprimatur of Court authorization and so to lend credibility to the Plaintiffs' review. In fact, it is not the report of an independent entity authorized by the Court to investigate

-8-

the transfers; rather, it is the filing of a party with a highly publicized goal of keeping the Fernald Developmental Center open indefinitely.

Each issue identified in the "Report" will be addressed in detail below.  As an overview, the Department offers the following responses to the Fernald League's key points:

- Plaintiffs were provided with *all* the documentation required to be disclosed under the Stipulation and Order for the Protection of Confidential Information.  Plaintiffs subsequently requested access to broad categories of confidential documents outside the terms of the Protective Order, and the Department's counsel appropriately denied those requests.  The Department, however, invited Plaintiffs to resubmit more individualized information requests directed toward an individual-specific determination of whether services were "equal or better," but they declined to do so.  Plaintiffs' counsel also chose not to seek in this Court to modify the Stipulation and should not now be heard to complain about the Department's faithful adherence to the terms of the Stipulation.

- Plaintiffs have not complied with this Court's order of January 20, 2005, to bring specific issues relating to the ISPs of the 43 transferred individual to the Department for potential resolution.  Plaintiffs' counsel's perfunctory presentation of unspecified complaints to the Department on January 18, 2006, and his statement that he desired no further review or discussion with the Department, demonstrates bad faith in complying with this Court's directive.

- To the extent that the "Report" addresses the issue of whether the 43 transferees have received "equal or better" services in their new location (Report at 11) – and there is little concrete data in this "Report" that addresses this most fundamental issue –

-9-

it fails to establish any reduction in services either before or after transfer.

- Allegations that individuals have suffered "medical, emotional or behavioral changes shortly before or after transfer" (Report at 13) are factually unsupported. Plaintiffs' "case studies" (Report at 14-18) contain recitations of individual diagnoses and conditions, and of challenges and objectives which exist for many Fernald residents, both those who have been transferred and those who have not. The existence of physical and behavioral challenges does not establish that individuals who have transferred from Fernald have suffered any "trauma" as a result.[8]

- On several topics, Plaintiffs' Report consists of nothing more than a rehash of legal arguments that they advanced in their July 2004 Motion to Re-Open the Case, which was subsequently denied by this Court. See, e.g., Report at page 4 (the section entitled "No Certification of Equal or Better").

- The Fernald League's "recommendation" that the individuals transferred from Fernald – individuals who voluntarily transferred with the consent of their legally authorized guardian and who have not requested a return to Fernald – should be ordered returned to Fernald is contrary to black-letter law that clearly vests the authority to consent to an individual's services in a particular setting with the individual's guardian – and not with Class Counsel or the Fernald League. It is furthermore contrary to the interests of the individuals themselves to suggest a transfer from their current settings where, as the Department's affidavit amply demonstrates, they are thriving and benefiting from newly available services.

---

[8] Plaintiffs stated in their brief meeting with the Department on January 18, 2006, that they had not undertaken any "clinical review" of the transferees. Yet plaintiffs would have this Court believe that the existence of the diagnoses in the transferees is causally related to the transfer.

■ The Plaintiffs' Report also contains mischaracterizations and selective quotations from the transcripts of this Court's prior hearings, in an effort to imply that the Department failed to comply with a court order requiring the documentation of any Fernald resident's right to return to an ICF/MR. See Plaintiffs' Report at 4-5 (the "Right to Return letter" section). Plaintiffs then urge that the Department's Commissioner be held in contempt of court. The Department, however, is in full compliance with the orders of this Court, as will be further demonstrated below.

■ Plaintiffs' allegations that the Department has not complied with federal regulations (Report at 5-6) are based upon their misreading of regulations that do not apply to ICF/MR facilities such as Fernald. In effect, Plaintiffs assert that the Department has failed to comply with nursing home discharge regulations, which are plainly inapplicable to the transfer discharges from Fernald.

■ Plaintiffs' allegations of non-compliance with regulations, such as the alleged procedural deficiencies in the 45-day transfer notice process (Report at 7-10), and the alleged failure to document "informed consent" to transfer (Report at 9-10), are based upon plaintiffs' incorrect interpretation of the Department's regulations.

## DMR's MORE DETAILED RESPONSE TO PLAINTIFFS' ALLEGATIONS

A.    The Department Complied with the Court's Orders and Provided the Documentation Described in the Protective Order.

As noted in earlier court filings, following this Court's Status Conference on January 20, 2005, Fernald Class Counsel and Department attorneys met on at least five occasions to discuss which materials should be part of Class Counsel's review of the Department's provision of "equal or better services" and should therefore fall within the parameters of the Proposed Protective Order.

-11-

Following agreement of the parties regarding the parameters of the Proposed Protective Order, this Court entered an Order on June 15, 2005, precisely identifying the materials to be made available for Class Counsel's review of the Department's provision of "equal or better services" to transferring Fernald residents. Class Counsel and two representatives from the Fernald League reviewed the confidential material specified in the Protective Order on July 12th, July 13th, July 20th, July 21st, August 24th, September 1st, and November 18th.

On August 18th, Class Counsel requested by letter a broad range of additional confidential information, indisputably outside the parameters of the Protective Order, concerning each Class Member who had transferred from the Fernald Developmental Center. This extensive request for confidential data protected from disclosure by law was not authorized by the Court, or the Class Members themselves, and the request did not specify any particular Class Member for whom the additional information was necessary to complete the "equal or better care" review. The Department responded to this request on September 26th and October 5th and informed Class Counsel that most of the information he requested was beyond the scope of the Protective Order and contained personal identifying information that the Department was not able to divulge.[9] The Department acknowledged, however, that the Court instructed the parties to confer in certain limited instances to determine if additional documentation would assist Class Counsel in assessing whether a particular Class Member is receiving equal or better care elsewhere. Accordingly, Department counsel specifically invited Class Counsel to call her to discuss these or other pertinent issues. On November 9th, the Department again invited Class Counsel to discuss the issues related to the

---

[9]  On June 15, 2005, this Court acknowledged that the parties had worked hard in coming to an agreement, and that further efforts to expand the scope of disclosure of confidential information would be looked at "very, very closely," and the Stipulation would be "interpret[ed] in a strict manner." Transcript of June 15, 2005, hearing at pp. 9-10.

provision of equal or better care to Fernald Class Members who have pursued an alternative placement. Class Counsel did not respond to the Department's invitations to discuss these issues.

B.     **The Fernald League Has Not Complied With The Final Order's Dispute Resolution Requirements.**

On January 20, 2005, this Court indicated to the Fernald League that upon its completion of its record review of the 43 transferees, it was to comply with the dispute resolution requirements of the 1993 Final Order, paragraph 7 (c), and thus bring any concerns it identified first to the Department for potential resolution. Transcript of Court hearing of January 20, 2005, at pages 44-45. On January 18, 2006, Class Counsel briefly articulated the issues identified in the Plaintiffs' Report in a one-hour oral presentation to the Commissioner and other staff. When Department officials indicated that they would like the opportunity to address Class Counsel's concerns, and to engage in further discussion of identified issues, Class Counsel promptly declined the offer, stating that he was "done" and was uninterested in any further communication. This perfunctory and blatant attempt to avoid the processes required under Paragraph 7 (c) of the 1993 Final Order was in clear violation of the Final Order, and this Court's directive of January 20, 2005, and should not be countenanced. Further, as the examples below illustrate, a meaningful discussion regarding particular individuals and their current needs could have dispelled the notion that services were being reduced, or at least afforded the Department an opportunity for a more informed understanding of certain individuals' needs and, if corrections were necessary, a chance to implement improvements. Clearly, however, Plaintiffs' Counsel had a different agenda in mind.

C.     **Services Provided to the 43 Transferees in Their New Settings Were "Equal to or Better" Than the Services Provided Before the Transfer.**

Services provided to the 43 individuals transferred from Fernald and reviewed by Class

Counsel were certified by Fernald's Director, Linda Montminy, to be "equal or better" through her signing of the individual's ISP.  Enochs Aff., ¶ 10.  The process of comparing the services that will be provided in the new setting with those services in the Fernald ISP is well established and is applied to every transfer.  Id.  If there are active treatment objectives that exist at the time of transfer, they must be addressed in the new setting, and the Facility Director is responsible for ensuring that this occurs.  Id.  In each case, the Department engaged in a thorough review of service needs and ultimately issued a certification that "equal or better" services could be offered in a different setting.  Id.  Tellingly, not a single Fernald Class Member now in a community setting (personally or via his or her guardian or relatives) has requested a return to an ICF/MR.  Id., ¶ 11.

> The Plaintiffs' Report asserts that:
>
> The record review clearly established that there were documented instances when a resident's services at Fernald were reduced prior to a transfer as well as following a transfer from Fernald, including failures to provide wheelchairs, recreational services, 24-hour nursing care, speech and occupational therapy.
>
> In addition, the frequency and duration of active treatment objectives either decreased after transfer or were otherwise defined in non-specific terms.  Further, it was established that treatment objectives were individualized before transfer and generic after transfer.

Id. at 11.  The Fernald League supports these broad assertions with three examples.  See id.  First, it should be noted that the examples chosen address only one issue – the difference in the language used in the objectives for three individuals.  *There is no evidence whatsoever of a failure to provide wheelchairs, recreational services, 24-hour nursing care, speech or occupational therapy.*  Indeed, the summary reviews provided by the Department demonstrate that in several instances (most notably, one resident's move to the Wrentham Developmental Center), staff at the new facility acquired new equipment for a transferring Fernald Class Member (e.g., a new electric wheelchair

-14-

for the resident who moved to Wrentham).

Second, Plaintiffs' examples do not support the allegation that services have been reduced. The third example was presented to the Department at the parties' January 18th meeting. As the Department explained in that meeting, the individual objectives of 'increasing [ . . . ] consistency in flushing the toilet" and "brushing teeth more completely" were changed in the ISP developed for this individual after the transfer because the individual was consistently meeting the original objective. New objectives to "actively engage in offered activities" and "become familiar with and use his residence independently or with staff's verbal prompt" were appropriate new objectives not found in the prior ISP. Enochs Aff., ¶ 32. The other two examples of "reducing services" cited in Plaintiffs' Report also reflect appropriate developmental changes. Id., ¶ 33. It would be inappropriate to do as the Fernald League suggests, to retain objectives that have been achieved as part of the ISP. ISP objectives should not remain static over time if an individual progresses. Id.

Finally, the Fernald League attaches "Case Stud[ies] 1-6," presumably to support their allegations that services have been reduced or that individuals have suffered as a result of the transfer. However, each "Case Study" is simply a recitation of language presumably found in an individual's ISP, with no reference to when it applies – prior to or after transfer – or of the relevant context. See Plaintiffs' Report at 14-19. The case studies do not prove a violation of anything.

D.    There Is No Factual Support For Plaintiffs' Allegations That Individuals Have Suffered As A Result Of Transfer And A Review Of The Transfers By The U.S. Department Of Justice Would Be Duplicative Of Other Existing Review Mechanisms.

Plaintiffs offer no competent evidentiary support for their serious allegation that individuals suffered medical, emotional, or behavioral changes before or after transfer. See Plaintiffs' Report at 14. Again, the Fernald League's "Case Studies" (Report at 14-18) contain recitations of

individual diagnoses and conditions, of challenges and objectives, *which exist for many Fernald residents, both those who have been transferred and those who have not.* These descriptions of conditions are not unusual for any Fernald resident, and the existence of physical and behavioral challenges does not establish that individuals who have been transferred have suffered any of these conditions as a result of their transfer.

In its "Recommendations" section, the Fernald League calls for an external review by the United States Department of Justice into the transfer process and services provided to Ricci Class Members who have been transferred from Fernald. (Plaintiffs' Report at 20). Such a review would be unnecessary and over-reaching since federal law already provides oversight and review of both community-based services and Title XIX facility services, as well as of transfer and discharge processes, by the federal Center for Medicare and Medicaid ("CMS"). Furthermore, the provisions of the Final Order already require external review of community-based services.

        1.    The Center for Medicare and Medicaid Already Conducts External Review of Class Members' Services.

Title XIX surveys are regularly conducted on behalf of the federal Center for Medicare and Medicaid Services, through the Massachusetts Department of Public Health, at each of the Department's Intermediate Care Facilities for the Mentally Retarded (ICFs/MR). These surveys involve a comprehensive on-site review of all services provided to individuals, the physical environment, and all aspects of compliance with federal requirements to operate an ICF/MR. Each of the Department's ICFs/MR have been the subject of recent surveys and have been determined to be in full compliance with requirements of the Title XIX program. Enochs Aff., ¶¶ 45-46.

Subsequent to the Final Order, CMS also developed and implemented a quality review process for the Department's home and community-based services. CMS's review of the

Department's Home and Community-Based Waiver Program was last completed in 2002, and provided a comprehensive analysis of community services. In December of 2005, CMS contacted the Department to inform it that CMS would be conducting another review of all home and community-based services in February of 2006. The Department is currently engaged in that review and expects that the final report will be wholly positive.

2. The "Periodic Review" of Community-Based Services Required Under the Final Order Provides For An Additional External Review of the Quality of Services for Those Individuals Transferred from Fernald to the Community.

Paragraph 2 (e) of the 1993 Final Order requires that "[w]ithin nine months of the date of this Order, defendants shall enter into an agreement with contracted consultant retardation professionals or with a nationally recognized evaluation group to review community programs on a periodic basis." In addition to the internal quality assurance activities that the Department routinely conducts, and which are summarized in the Annual Quality Assurance Report published by the Office of Quality Enhancement (and available on the DMR website), the Department has collaborated with many independent professionals and organizations to evaluate its community service system.

From approximately 1987 to 1995, the Department contracted with Seaside Associates to conduct "Independent Professional Reviews" of services delivered in the community. From 1997 through the present, the Department has participated in the "National Core Indicators Project,"[10] a collaboration among member state agencies of the National Association of Directors of Developmental Disability Services (working through the Human Services Research Institute or "HSRI"), to develop a systematic approach to performance and outcome measurement. Through

_____

[10] Currently, CMS is also considering the National Core Indicators model for future reviews of the Department's community-based services.

their collaboration with HSRI, participating states develop consensus around the quality outcomes most important to measure. Participating states take part in consumer and family surveys across an array of settings. Results are tabulated by state and averaged nationally, allowing for states to benchmark their performance against nationally recognized quality indicators.

From 1997 through 2003, as part of this project with HSRI, the Department has periodically contracted with Boston University (as a subcontractor to HSRI) to conduct telephone and mail consumer surveys to evaluate the quality of both facility-based and community-based residential services using the NCI tool. The Department has also contracted with professionals to conduct in-person interviews with family and guardians and, where possible, individuals receiving services. Analysis of the consumer and family surveys and interview data is performed by HSRI using the NCI data.

In addition, the Department has conducted consumer surveys, using NCI, as administered by the Office of Quality Management ("OQM"),[11] for analysis by HSRI. The Department has specifically contracted with HSRI to sample *Ricci* class members residing in the community and in the Department's ICF/MR facilities. Published results of HSRI studies are publicly available on-line at the HSRI website.

In addition to these reviews of community services, the Department has contracted with various consultant experts to review particular aspects of its community services for quality assurance purposes. Additional oversight and evaluative studies of various aspects of the services delivery system have been conducted by:

---

[11] All DMR Quality Management surveyors are mandated reporters and are required to report any suspected allegations of abuse or neglect to the DPPC. Further, the results of the NCI surveys, as well as multiple other sources of quality assurance data, are integrated into the DMR Annual Quality Assurance Report for review by management.

- The Governor's Commission on Mental Retardation – Pursuant to Executive Order, the Commission is authorized to receive information on systems issues and policies; it also receives and investigates complaints, and makes recommendations to the Department about service delivery. The Governor's Commission has published reports on the availability of durable medical equipment and assistive technology to individuals in the community; and the

- Disabled Persons Protection Commission – Publishes quarterly statistical evaluations on complaints, investigations and outcomes of complaints, which it investigates.

Additionally, the Department participates in a national policy study regarding financing and programming trends in the United States. An annual AAMR publication entitled "The State of the States in Developmental Disabilities," contains data regarding these trends. Data are collected from each state's principal mental retardation / developmental disabilities agency to assess trends in the structure and financing of developmental disabilities services.

Although this list is not exhaustive, the Department submits that there are already in place adequate independent, external reviews of the Department's community programs, including those programs to which the Fernald class members have transferred. The plaintiffs' recommendation for yet another layer of review should be rejected.

E.    The Department Has Complied With the Final Order's Requirement of Certification of "Equal Or Better" Services in the New Setting.

The Fernald League's contention that the Department is not complying with the equal or better certification requirement was made in its July 2004 Motion to Reopen and Restore Case to Active Docket, and the Department replied to this allegation in both the *Defendant's Opposition to Plaintiff's Motion to Re-open and Restore Case to Active Docket and to Enforce the Final Order of May 12, 1993* (hereinafter "Opposition"), and the affidavits of John Riley and Diane Enochs submitted therewith. In response to this filing, the Department expressly incorporates herein the Opposition and its supporting affidavits. See Opposition at 10. In sum, DMR understands and is

-19-

discharging its obligations under the Final Order to certify "equal or better" services.  Under the Final Order, all transfers of <u>Ricci</u> class members from one residential setting to another must be reviewed by DMR's Regional Director or the Facility Director to ensure compliance with the Final Order's requirement that transferred individuals receive services equal to, or better able to meet their needs in the new location than, the services they were receiving in the old location.  Final Order at ¶ 4.  Certification that the "equal-or-better" requirement has been met has been made in different forms, including the transfer form and the ISP.  However, DMR's practice for *Ricci* class members has consistently been that the Facility Director or the Regional Director (or the Area Director for the Regional Director) certifies when signing the ISP that a transferred *Ricci* class member's services meet the "equal or better" standard.  In its most recent filing, the Fernald League quotes the Court as stating that the phrase "equal or better" is well-understood.  The Department agrees with the Court, and affirms that it is currently certifying such services as equal or better.

  F. The Department Has Provided Guardians and Families Leaving Fernald With A "Right-to-Return" Letter.

   Prior to the recent litigation in this matter, the Department, in a letter sent to Class Counsel, voluntarily agreed that the Department would honor any request by an individual placed from Fernald into a community setting, if dissatisfied with the community placement, to return to an ICF/MR setting other than the Fernald Developmental Center.  <u>See</u> Attachment B.  This voluntary commitment was discussed at the April 7, 2005, hearing, and more recently at the June 15, 2005, hearing.  <u>See</u> Transcript excerpt attached as Exhibit C, at pp. 12-16.  The Department has provided letters to individual transferees consistent with its commitment and placed them within the individual's client file.[12]  The Department did not understand its obligation to be to provide a right-

---

[12]  Individuals who had already been transferred from Fernald prior to June 15, 2005, and who had

(continued...)

to-return letter to someone who had transferred prior to these hearing dates; prior to the Spring of 2005, the Department understood that this practice was voluntary and not court-ordered. See Exhibit C (transcript) at 14. However, it has provided every individual who has left Fernald since June 15, 2005, with such a letter. The process is consistent and not "ad hoc," as the Court warned against on June 15, 2005. The Department therefore believes that it is in full compliance with this Court's direction with regard to these letters.

G.    Plaintiffs Incorrectly Interpret Federal and State Regulations Concerning "Unmet Needs."

In their Report, the Plaintiffs incorrectly assert that the Department's policy decision to close Fernald is in violation of federal regulations because the 43 transfers did not satisfy the criteria contained within 42 Code of Federal Regulations part 483.12. In the first instance, plaintiffs are incorrect because the cited regulations do not apply to intermediate care facilities for the mentally retarded ("ICFs/MR"); rather they pertain to admission, discharge and transfer standards for skilled nursing facilities ("SNFs") or nursing facilities ("NFs"). The standards for admission, discharge and transfer of residents of ICFs/MR are not found within this regulation.

The Department operates the Commonwealth's ICFs/MR in accordance with the provisions of federal Title XIX, state law, and DMR regulations. Neither Title XIX, nor state law or regulations, require that an individual's transfer from an ICF/MR be based solely upon an individual's "unmet active treatment needs."

More importantly, Plaintiffs note that in none of the 43 individual ISPs reviewed were there

_____

(...continued)
not requested a 'right-to-return letter" would likely not have such a letter in their file as it was not understood prior to then to be a court-ordered requirement. Any individual from Fernald who requests a return to an ICF/MR, however, would see that request honored. But none have made such a request to date. Enochs Aff., ¶ 7.

-21-

any identified "unmet needs." Report at 6. This is not surprising because the Department is required under law to meet all the needs of *Ricci* class members, and *Ricci* class members should never have "unmet needs." Under the terms of the Final Order, the Department is required to meet all support needs of individuals residing in the ICFs/MR, regardless of the availability of resources. While individuals reside at Fernald, the Department provides appropriate services to meet their support needs. This practice continues when an individual leaves Fernald to reside in another setting.

> H.   Plaintiffs' Allegations of Non-compliance with Regulations, Such as Alleged Procedural Deficiencies in the 45-day Transfer, and the Alleged Failure to Document "Informed Consent" to Transfer, Are Based Upon Plaintiffs' Incorrect Interpretation of the Department's Regulations.

> 1.   The transfers of all Fernald Class Members followed thorough planning procedures and consultation with individuals, guardians and family members.

Family members, guardians, and Class Members communicate with the Department in a variety of ways and, as such, placement wishes and desires are addressed in many different ways. In many instances, communications between guardians and Department staff are, for the most part, oral in nature. A guardian's consent to a proposed residential transfer is evidenced by the individual's signature upon the consent forms that were subject to review by Class Counsel. Since family members and guardians have been aware for some time that the Fernald Center is closing, many have proceeded with planning for alternative placements for their wards.

> 2.   All transfers were consented to by legal guardians.

All transfers of Fernald Class members were made pursuant to a signed consent form from the individual, and/or the individual's guardian(s). During the meeting of January 18, 2006, Class Counsel did not provide any information concerning specific guardians or family members of Fernald Class Members that he contends did not receive proper notice of the transfer meetings or

did not consent to the residential transfer.  Plaintiffs' report is also devoid of such information.

> 3.    The notice and request for proposed facility transfer letter utilized by the Department meets all regulatory requirements concerning notice and consent.

State law and DMR regulations provide guidance regarding the inclusion of certain provisions within the letter notifying an individual of a proposed transfer and requesting consent to the transfer.  A copy of the DMR regulations concerning the transfer and the consent letter is mailed along with the request for consent.  All individual rights are therefore spelled out clearly in the transfer letter and attached regulations.  Plaintiffs' assertion that these rights are not conveyed adequately in the letter is therefore unfounded.

> a.    The 45-day letters include statements addressing how the proposed move will result in improved services and supports and quality of life for the individual, as required by 115 CMR § 6.63(2)(c)(1).

The letters that Plaintiffs' representatives reviewed (see Report at 8) include a variety of language that conveys that the proposed move will result in improved services and quality of life. For example, statements such as:  "This new home will offer [Class Member] a smaller, more community integrated setting while providing the staff supervision and supports needed  . . . and allow [Class Member] the opportunity to transition into community based day supports" are used in many of the letters the Department has issued.  These statements convey information to the individual or the individual's guardian that the proposed transfer will result in improved services and as such they meet the requirements of 115 CMR § 6.63.

> b.    The 45-day letters were mailed to Class Members or guardians and return letters were signed by them signifying receipt and consent  to the proposed transfer.

All of the letters that were mailed to interested persons and the signed consent forms were included among the materials that were reviewed by Class Counsel.  Letters are not typically sent

by certified mail, and therefore proof of receipt is based upon (1) the presumption that a mailed letter will be delivered, and (2) a signed, returned consent form unequivocally establishing that the letter was received.  Plaintiffs' complaints about this, Report at 8, are purely specious.

> c.      Guardians consulted with Department staff regarding the transfer of their wards and voluntarily consented to a proposed transfer.

All transfers of Fernald Class Members were made pursuant to signed consent forms from the involved individual and/or the individual's guardian(s).  The Department urges and actively encourages meaningful guardian participation in the placement planning activities of their wards regardless of whether the guardians are elderly, live out of state, or are corporate guardians. Although the Department encourages guardian participation, the particular level of participation is not mandated.  Information concerning placement is provided to elderly, out-of-state, and corporate guardians in the same manner it is provided to other individual guardians.  It is then up to the individual guardians to determine the appropriate level of involvement in planning for their ward. Evidence of their planning considerations would not necessarily be included among the information reviewed by Class Counsel.  Again, thus far every transfer has occurred with the consent of the Class Member and/or his or her guardian(s).  Since the announced closure of the Fernald Developmental Center in February 2003, many families and guardians have discussed alternative placement with the Department and have proceeded with planning for their wards.

Allegations that some of the transferees had out-of-state guardians or paid guardians (due to the lack of an available family guardian) are true.  A small number of the transferees have out-of-state guardians, as do some of the individuals still residing at Fernald.  While it is optimal for individuals to have nearby, involved family members serving as guardians, that is not always possible.  That some guardians are either paid guardians or out-of-state family members or friends

does not obviate the voluntariness of the transfer.

> d.    The letters that were signed by the guardians and returned to the Department constitute ample evidence of the guardian's voluntary consent to the proposed transfer.

The Department's *Notice of and Request for Consent to Proposed Facility Transfer* letter complies with all applicable requirements for guardian consent to a ward's transfer to a new setting. The consent form and letter is a written record that explains the transfer process and requests consent to the transfer in a detailed manner.   The letter specifically invites the guardian to contact the Department to discuss any questions or concerns regarding any aspect of the transfer and explains in detail the rights of the parties if the guardian chooses not to consent to the proposed transfer. A copy of the transfer regulations is mailed with the letter so that the guardian can refer to a complete statement of the ward's rights.

In an attempt to muddy the water, Plaintiffs cite DMR regulations requiring "informed consent" that only apply prior to admission to a facility or prior to medical or other treatment that requires an explication of the "risks and benefits" of admission or medical treatment.[13]   Notably, Class Member transfers are not listed among the limited situations in 115 CMR § 5.08 for which informed consent must be secured, and it would not be appropriate to discuss the "risks" of community placement in the way that the risks of a medical procedure must be discussed. Plaintiff's insistence upon this inapplicable standard is yet another effort to malign the popular choice of

---

[13]   The Fernald Plaintiffs erroneously contend that the voluntary transfer of an individual from a Department facility requires the "informed consent" of the individual or guardian. "Informed consent" is a term of art defined in the Department's regulations, and is required only in limited instances and is generally reserved for medical procedures, research activities, facility admissions or related activities. See 115 CMR § 5.08. Transfer from one setting to another requires consent, not "informed consent" as defined in 115 CMR § 5.08; nevertheless, the 45-day letter and consent form the Department provides during the transfer process clearly meets this standard as well as the standard set forth in 115 CMR § 2.01's definition of "consent."

-25-

community placement by inferring that such placements entail "risk."

> e.    The 45-day letters Class Counsel reviewed in most instances include a statement that the parties may visit and examine the proposed home at a time and in a manner not disruptive to individuals who may be living in the home, as required by 115 CMR § 6.63(2)(c)(3).

As all of the transfers from the Fernald Developmental Center have been voluntary transfers, in most instances visits by Class Members, families, or guardians to a proposed living environment occurred at the beginning of the placement process. For that reason, and in accordance with the regulatory requirements, many of the letters reviewed included statements such as: "Please note that you may visit [Class Member] at any time you would like at his new home." As these individuals may have already visited the home, the inclusion of a statement informing them that they may view and inspect the proposed home would not be appropriate. The statements that were included in the letters, although not an exact recitation of the regulatory requirements, convey the intention that the parties may visit a Class Member at any time in the new living environment and are in accordance with the facts of the situations presented.

> I.    Class Counsel's Allegations Regarding the Home and Community-Based Waiver Program Are Factually and Legally Incorrect.

Plaintiffs' statements about the home and community-based waiver program are both immaterial and legally and factually incorrect. First, as all Fernald transferees are *Ricci* class members for whom the Department has an obligation to meet their service needs, regardless of the availability of funding, the implication that receiving services through the home and community-based waiver program is risky in terms of future funding is misleading and false.[14] Second, plaintiffs' statements about the legal requirements of the home and community-based waiver

---

[14]  Plaintiffs have made no argument that the Commonwealth is failing to adequately fund services for *Ricci* class members, as required by the 1993 Final Order.

programs are inaccurate. The home and community-based waiver program is a Medicaid program with a myriad of rules and requirements, the discussion of which is beyond the scope of this Response. However, plaintiffs' contention that individuals can be eligible for services within a home and community-based waiver program but not receive them due to inadequate resources is inaccurate. See generally 42 U.S.C. § 1915(c). Finally, the Department has made a presentation to the Fernald League on the subject of the home and community-based waiver, at their request, and is always available to answer questions about it. In sum, there is no requirement in the transfer statute or regulations, or elsewhere in the DMR regulations, that individuals be informed of the Home and Community Based Waiver Program ("HCBW") prior to their residential transfer, but such information, though not relevant to the delivery of services to *Ricci* class members, is available.

> J.    Following An Individual's Alternative Placement From The Fernald Developmental Center, The Class Member And The New Team Complete An ISP Within 30 or 60 Days That Complies With All Applicable Federal, State, and Department Requirements.

Class Counsel's allegation that DMR regulations are being routinely violated because ISPs are not completed within 30 days following transfer is incorrect and not based upon established fact, law, or regulations. When an individual is moved to another ICF/MR, a new ISP must be developed within 30 days following the transfer. See 42 CFR 483.440(a)(3). For a move to the community, a new ISP must be developed within 60 days following the transfer. See 115 CMR 6.23. In some instances, ISP meeting dates are adjusted or postponed to accommodate unforeseen circumstances, including instances in which a necessary guardian or family member is unable to attend. In all instances, the Department seeks to ensure that these regulatory requirements are met.

> K.    The Number of Individuals Who Have Transferred From Fernald That Have Since Died Is Not Unexpected.

A significant number of the individuals served by the Department have a multitude of serious

health and medical issues that they live with every day. The individuals who transferred from the Fernald Developmental Center are no different in that respect. The age span of individuals who have transferred from Fernald and died following their placement elsewhere ranges from 41 to 92 years of age, with the average age being 57 years old. The earliest death occurred just over two months following the transfer, with the latest occurring over a year and a half following the alternative placement. As stated above, all of the individuals concerned had a multitude of serious, long-standing health problems, and in most instances the individual's death was related to these issues.

Mortality reviews conducted by a physician, nursing staff, and other mortality review team members in each case have concluded that the deaths were all the result of natural causes -- i.e., underlying medical conditions such as cardiac arrhythmia (the cause of death for two Class Members), cardiac arrest (which also killed two Class Members), or acute myelogenous leukemia, in which death is not an unexpected outcome.[15]

### L.    Familiar Staff Are Used To Help Transition Individuals.

The Department has, where appropriate and possible, used staff familiar to the transferee to ease the transition process. Enochs Aff., ¶ 84. While the Department considers services provided by familiar staff to be an important and beneficial objective for individuals receiving services from the Department, it is not a specific requirement of the regulations governing provision of services,

---

[15]  The mortality review documents were not included with the materials that were given to Class Counsel to review as they were not a part of the materials subject to the Protective Order signed by the Court of June 15, 2005. The Order that was drafted governed the disclosure of materials necessary for Class Counsel to review and assess whether services provided to individual Class Members satisfied the requirement they receive equal or better care. These materials were largely comprised of individual support plans and other materials directly associated with the individual's transfer. Any notations of death were not a component of the documents that were provided to demonstrate equal or better services and were additionally not covered by the provisions of the Protective Order. As such, they were not included among the material reviewed by Class Counsel.

nor is it a requirement that individual transfers are contingent upon.  As the populations of larger ICFs/MR get smaller, it is hoped that staff from these facilities will continue to serve individuals as they transition to alternative locations.  While the involvement of familiar staff in the lives of all individuals served is an aspiration for the provision of services, the Department recognizes that individual staff members are free to pursue employment in environments of their own choosing and it cannot simply mandate that services be provided only by staff familiar to the transferee.

        M.        **Fernald ISP Team Members Regularly Meet With and Communicate With ISP Team Members In the New Living Environment.**

During the transition of an individual from one living environment to another there is a significant amount of communication between staff at the present and proposed locations.  This communication is coordinated through the individual's Individual Transition Team and evidence of this communication would not necessarily be included among the materials that were provided to Class Counsel for his review.  Through the use of the individual transition plan and visits to the new living environment, the individual is prepared for the smoothest possible transition to their new residence.  Staff at the individual's former home are always available for consultation if there are additional questions concerning a particular individual's transition.

        N.        **Contrary To Class Counsel's Assertion That Services Have Been Reduced To Accommodate Transfers, The Department Has Continued To Offer Care And Services At The Fernald Center That Comply With Title XIX Standards And The Requirements Of DMR Regulations.**

Although service reductions were alleged at the Department's meeting with Class Counsel on January 18, 2006, no specific identifying information was provided regarding the individuals being referred to, so it was difficult for the Department to effectively respond to this allegation.  The Department is aware, however, that there have been very limited complaints regarding Class Members not adjusting well to their new living environment.  When these issues have arisen, they

-29-

are dealt with quickly and efficiently by Department and provider staff in cooperation with guardians and family members on an individualized basis.

### CONCLUSION

For all of the reasons detailed herein and in the attached affidavit, this Court should (1) conclude that the Department continues to abide by its obligations under the 1993 Final Order and governing law; (2) reject the "recommendations" recently issued by the Fernald Class Counsel; and (3) decline to take further action in this closed case.

Respectfully submitted,

DEPARTMENT OF MENTAL RETARDATION,

By its attorneys:

_____
Marianne Meacham, BBO No. 550468
Special Assistant Attorney General
General Counsel
Department of Mental Retardation
500 Harrison Avenue
Boston, MA  02118
(617) 727-5608


/s/ Robert L. Quinan, Jr.
_____
Robert L. Quinan, Jr.  BBO No. 553010
Assistant Attorney General
Office of the Attorney General
One Ashburton Place, 20th floor
Boston, MA  02108
(617) 727-2200, ext. 2554

Dated:  February 7, 2006

-30-