UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

Robert Simpson Ricci, *et al*.,

                         Plaintiffs

                         v.

Robert L. Okin, *et al*.,

                         Defendants

_____

CIVIL ACTION Nos.
72-0469-T
74-2768-T
75-3910-T
75-5023-T
75-5210-T

## SECOND AFFIDAVIT OF DIANE ENOCHS

I, Diane Enochs, on oath hereby depose and state as follows:

1.      I have been employed by the Department of Mental Retardation (the "Department" or
"DMR") since 1986. My position is Assistant Commissioner for Facility Management. This is
my second affidavit to the court in this matter. Unless otherwise indicated, the facts contained in
this Affidavit are based on personal knowledge, information provided by DMR staff who report
to me, and/or DMR records.

2.      As Assistant Commissioner for Facility Management, it is my responsibility to ensure
compliance with regulations promulgated under Title XIX of the Social Security Act, 42 U.S.C
§§ 1396, et seq. (found at 42 C.F.R. Part 430 to end), throughout the Department's ICF/MR
facilities, and to ensure that licensure and certification of the state-operated programs is
maintained.

3.      As the Assistant Commissioner for Facility Management, I have primary responsibility
for the implementation of the Department's policy decision to close the Fernald Developmental
Center. To support this work, I have established a leadership team comprised of senior staff,

including individuals with many years of experience in maintaining Title XIX compliance, quality assurance, active treatment, individual service planning, building and capital issues, and community programming, placement and systems. These staff are directly involved in all aspects of the closure process and report regularly to me on their activities.

Placements from Fernald

4.      I have read the "Report to the Court" filed by Attorney Beryl Cohen on February 2, 2006. I understand it was based upon a limited record review of 43 records, and without any contact with the individual Ricci Class Members involved, their family members or guardian, or DMR staff.

5.      The Department has a history of community placement for those with severe needs. Belchertown, Dever, and Berry all had fragile, medically needy individuals who moved to the community. These placements have been very successful and speak to the ability of the Department to ensure that placements are made with the utmost care.

6.      Since the announced closure of Fernald by Governor Romney on February 26, 2003, fifty-five (55) people have moved from Fernald to another home. Fourteen (14) individuals have chosen placement in the community and thirty-five (35) have chosen placement in an alternative ICF/MR. The remaining six (6) went to skilled nursing facilities.

7.      Of these 55 people, no Ricci Class Member or guardian has asked that the Class Member be returned to Fernald.

8.      The transfer process that the Department followed for each of the 55 people who have been placed outside of Fernald will continue as we move forward. The process, from the very first discussion concerning an individual's placement, attempts to engage the guardian to the fullest extent possible. Guardian involvement in the placement process to date has ranged from

-2-

intricate involvement, with some even initiating the alternate placements, to nominal involvement, letting the ITP team direct the process. The individual's ISP team and guardians are asked to identify the needs of the individual, what residential model for the individual would be best, a facility or a community home, what geographic area the guardian wants the individual to live in, etc. Many times the moves have resulted in much shorter commutes for the guardian and increased visiting times. Tours and visits of possible future homes for an individual are an extremely important part of the placement process. Members of the individual's ISP team and the guardian are afforded the opportunity to see if a particular home or facility will meet the needs of the individual; provided an opportunity to meet staff and individuals who may already live in the home; or, in the case of new program development, given the chance to become involved in the creation of a new home. New day program opportunities are also sought out and toured.

9.     After a home is decided upon, an Individual Transition Plan is written. This plan provides very detailed information on the person's preparation for moving, special information for personal routines, social life, relationships and communication, physical considerations and equipment needs, safety considerations and health/medical/psychological issues. The ISP is also reviewed carefully, which is also documented in this plan. There is another section that covers only transition issues. This section includes information about the new support provider, important contact persons, the type of day supports, community medical providers, a schedule of visits, an in-service training schedule, financial issues and, finally, follow-up support services.

<u>Certification of Equal or Better</u>

10.     The Fernald Facility Director, Linda Montminy, must certify that each and every individual who moves from Fernald will be receiving equal or better services in the new

placement.  In order to do this, Ms. Montminy reviews the objectives in the individual's current ISP and then reviews the objectives that were developed to be carried over through the transition to the next ISP.  The carryover objectives are set prior to the move.  This review not only ensures that the objectives are similar but also includes the confirmation of who will be the objective manager at the new placement.   Using this system, the Facility Director confirms and then certifies that each individual will receive "equal to or better" services in the new facility.  Under my supervision, this task has been completed for every individual who has transferred from Fernald.

11.     There have been no requests from any guardian of an individual who has moved to a community setting to return to an ICF/MR.

12.     For those 14 individuals whose families have chosen community placement, the transition processes have been thoughtful and caring.  Those individuals have adjusted well to new settings, and are being provided an array of opportunities and experiences which would not have been available to them at Fernald and have resulted in an improved quality of life.

13.     For those 34 individuals reviewed by Plaintiffs whose families have chosen transfer to the Templeton, Wrentham or Monson Developmental Centers, or to the Hogan or Glavin Regional Center, a full array of ICF/MR services supplied by knowledgeable and caring staff are equal to services provided at Fernald, and in most cases have resulted in improved opportunities for community outings and more spacious living quarters for individuals.

14.     Based upon my personal contact with these family members and guardians, I can state that these factors have resulted in a high level of satisfaction expressed by individuals and their families and guardians.

15.     Without minimizing in any way the potential for transfers to be disrupting, it is clear that

many of the individuals transferred and their families have expressed their views that the moves, while requiring adjustments, have been extremely positive for the class members and their families. One service coordinator for an individual ("A") who moved to a community-based vendor-operated program in May of 2003 summarized A's transition this way:

> id's transition was extremely successful and without incident or issue. He immediately became oriented and comfortable in his new surroundings. Behavioral, psychiatric, nursing support was all available to David as was ongoing support from staff at Fernald in case David didn't transition well into his new surroundings . . . .
>
> The most important and obvious changes for David is the increase in community membership: David frequently goes for walks to the local store and makes purchases, he has enjoyed day trips to New Hampshire and Maine, he is a member of the local Yacht club, he has participated in countless community activities which have included picnics, concerts, dances hosting seasonal parties as well as some involvement with the local church. David has also reached a point where he is able to communicate when he wants to spend time outside in the yard, which he does safely . . . .

16.    Several individuals have echoed the view that the new placement allowed them a new lifestyle that includes access to, and participation in, a variety of activities.

17.    For many individuals, the transition process itself proved uneventful. The availability of familiar staff to assist with the transition has eased the adjustment period for other individuals.

18.    For some individuals in the community or at an ICF/MR, the moves have placed some individuals in much closer proximity to families, allowing more time for visiting siblings and elderly parents. In particular for some aging parents with transportation challenges, this has proven very beneficial.

19.    Most families and guardians have expressed a high degree of satisfaction with the new services. For example, A's family member commented in A's ISP in 2003:

> "I find this I.S.P. report to be excellent and comprehensive. I am very pleased with David's new home and workshop environment. I am always available to help with David's needs and plan on a continuing communication with the people that are

assisting him in his growth.  It was a 'long one' but I was privileged to walk with my son to find his present destination."

<u>Guardian and Consumer Satisfaction Surveys</u>

20.    The Department routinely sends a "Satisfaction Survey" to any guardian whose ward has moved from Fernald at least one year previously.  Questions are posed in the form of statements regarding the level of satisfaction with planning for placement, the transition process, and post-placement services and supports.  Responses are offered in the form of ratings from 1 to 5.  A copy of the survey form is attached hereto as Exhibit A.

21.    A rating of 1 indicates that the guardian strongly agrees with the statement, and a rating of 5 indicates strong disagreement.  On all questions except one, a rating of 1 is the most favorable response and 5 is the least favorable.

22.    On one question, the ratings do not evaluate services but seek information about guardian's preferences before the move.  There are 17 questions on the survey that request the guardian's rating on this scale of 1-5.  All questions offer the opportunity for comment.

23.    To date, about half the eligible guardians have completed and returned the satisfaction surveys, yielding 17 sets of responses in all.  Responses to all questions have been overwhelmingly favorable.  Of 272 possible ratings (of 1, 2, 3, 4 or 5) on as many survey items:

- 211 or 78% were 1

- 38 or 14% were 2

- 5 or 2% were 3

- 1 or less than 1% was 4

- 3 or 1% were 5

- 14 or 5% were not rated

-6-

Collectively, 249 or 92% of the responses were favorable (1s or 2s), five or 2% were neutral, four or 2% were unfavorable, and 14 or 5% were not given a rating.

24.    After receiving the Satisfaction Survey, one guardian telephoned the Department. She was very happy with the move and her ward's response to it. The reason for the call was her worry over news reports about the Plaintiffs going back to court. She asked the staff person: "Is the lawyer going to make me move my son back to Fernald?"

25.    Another example of an individual being very happy with the move occurred when a staff person from Fernald went to visit an individual who had moved. When the individual heard the voice of the staff person, he left the couch he was sitting on and ran. This staff person believed this response was due to his fear he would have to go back to Fernald.

26.    Another example of guardians being happy with their ward's move occurred with an individual who moved from Fernald to another facility. This individual was terminally ill when she left Fernald but the guardians wanted their sister to be nearer to their homes. This individual has since passed away but the guardians told the Deputy Facility Director they believed that their ward's life was extended because of the wonderful care their sister received.

<u>Deaths of Transferees</u>

27.    There have been 6 deaths among those transferred over the last three years. Given the age of the individuals and the serious underlying medical conditions which were identified in the mortality review process, the deaths were not unusual.

Plaintiffs' Complaints about ISP Objective
<u>Modifications to Reflect New Conditions or Progress</u>

28.    Individual support planning is an on-going process of establishing goals for individuals consistent with the outcomes described in the quality of life areas set forth in the Department's

-7-

regulations, along with identifying supports and strategies that will promote achievement of those goals.  The Department's regulations establish the framework for individual support planning, which can be tailored to and by the individual and which is responsive to changing circumstances in the individual's life.

29.     All services and objectives are determined according to an individual's need.  An ISP is a "fluid" document and may require changes and updates prior to the yearly ISP meeting.  In the "Report" written by Plaintiffs' counsel, Attorney Cohen states that objectives were no longer individualized.  However, a person's environment necessarily impacts what a person needs.  Changes in an individual's objectives are always based on that individual and what their needs are at that time.  If an objective is no longer necessary, it is modified to reflect what the individual truly requires.

30.     In the Plaintiffs' Report, the examples given of an "individualized objective" included one stating "operating a musical toy" and "learning to flush the toilet."  However, that individual is now in a home-like environment where operating a musical toy is too specific.  If this sensory objective was in place for cause and effect training, this could be met by any number of things that occur in the community.  A trip to a concert would result in hearing music play or helping to cook in the kitchen would result in a meal to be eaten.

31.     Another factor that must be considered is that each individual has the ability to learn through objectives across settings.  That is, the learning involved in flushing the toilet and operating a musical toy can be facilitated through any number of strategies.

32.     One of the examples employed by Plaintiffs indicates that 28 days after transfer, objectives changed from "consistently flushing the toilet" and "brushing his teeth more completely" to more general objectives.  This individual was recognizable to us and we learned

-8-

from the Area Office that this person was so successful in his new home that he no longer needed prompts to either flush the toilet or brush his teeth.  These objectives were met and were therefore no longer necessary.  The new objectives to "actively engage in offered activities" and "become familiar with and use his residence independently or with staff's verbal prompts" were appropriate new objectives not found in the prior ISP.

33.    The other examples of "reducing services" also reflect appropriate developmental changes.  It would be inappropriate to retain objectives that have been achieved as part of the ISP as objectives should not remain static when individuals progress.

Plaintiffs' "Case Stud[ies]"

34.    I reviewed the "Case Study" materials submitted with Plaintiffs' Report.  These appeared to be extracts from the ISPs, with no information as to which ISP (before transfer or after transfer) these sentences were quoted from or what the purpose of the inclusion of these excerpts are to the issue of the provision of "equal to or better" services.  Many of the individuals living at Fernald are medically fragile individuals.  However, these and all individuals who move from Fernald are placed in a facility or home that can provide the necessary services.  Wrentham, Monson and Hogan Developmental Centers all have intensive medical supports for medically fragile individuals.  Community-based programs may also support medically fragile persons.

Improvements at Fernald

35.    There have been many improvements to the physical plant as well as changes in the programs attended by individuals served at Fernald.  Staffing changes have been made as well to maximize supports on a consolidated campus for individuals who remain at Fernald as we move towards closure.

36.    The Department launched a "Full Compliance" initiative in August of 2004.  It has been

very successful, resulting in a high level of compliance. This initiative involves setting a minimal standard for all discipline and supervisory staff to formally monitor active treatment programs, activity schedules, and the environment. All monitoring information is submitted to the Office of Quality Enhancement where compliance issues are identified and then followed up through resolution with management staff.

37.     There are now two administrative divisions at Fernald rather than four. Division Directors John Hill and Suzanne Kingston each work with Assistant Division Directors to oversee the delivery of active treatment to all residents. The Division Directors report directly to the Facility Director, Linda Montminy.

38.     Fernald has created two new Assistant Division Director positions along with adding 2.5 MRW IV employees who assist the Division Directors with administrative and operational support.

39.     The management team at Fernald now includes a new Deputy Facility Director and an Executive Assistant for Core Services.

40.     Three new Ford F350 Wheelchair vans were obtained along two additional 12-passenger vans for use by the residential divisions. Two new Ford F250 4x4 pickup trucks were also purchased for use by core services for plowing. A new Ford 350 one-ton pickup truck with a dump body and plow was purchased in November and is in use now by the Farm and Grounds staff. This will be used to plow snow and disperse sand. We also expect four new wheelchair vans to be delivered in February.

41.     There is a new preventive maintenance system in place. A condition report is made weekly to the Division Directors. There is also a monthly preventive maintenance schedule, which provides a monthly quick check of each residential vehicle.

42.     There is a new Intensive Day Program on grounds at Brookside.  This day program promotes engagement to individuals with successful activities, an exposure to a variety of classes each day, along with a new philosophy of having individual goals worked on.  This new program was a result of the team meeting to work on specific groupings of individuals and staffing and specific activities for each room.  The individuals who attend Brookside have sessions in music, gardening, gross motor activities, obstacle course sessions, fine motor activities, computer sessions, sensory exploration and daily living activities.

43.     These same changes have begun and will continue to be made to the curriculums of the other day programs on grounds for the ongoing benefit of other individuals attending day programs.

44.     There have been many improvements to the Fernald grounds, work-sites and residences in the past year.  They include:

- • Greene Building
    - Renovated new thrift shop classroom and coffee shop with paint, new flooring and new shelving.
    - All exterior stairs/ramps had their concrete repaired and sealed against future deterioration of the concrete.
    - Repaired the retaining wall against future deterioration of the concrete.
    - Repaired and painted the Greene Building stairwells.
    - Replaced all screens for the outside Screen House.
- • Malone Park (ICFs)
    - Resurfaced sidewalks.

-11-

- Replaced radiator covers at #21 and #22.

- Installed sidewalk and safety rails at #24

- Replaced entry canopy at #23

- Replaced all of the sliding screen doors.

- Remodeled kitchen at ICF 24.

- Farrell Hall

    - Replaced screens

    - Replaced all glass at Farrell Hall front entrance

    - Repaired and sealed front stairs

    - Renovated four pantries

    - Renovated 2 tub rooms

    - Replaced all vanities in Apartment #2

- Cottage Complex

    - Concrete repairs to Cottage 7 and Cottage 11 in their horseshoes

    - Renovated the laundry rooms in Cottage 11, including new washers and dryers

    - Renovated one laundry room in Cottage 9

    - Replaced tub room floor in Cottage 3B

    - Renovated bath and shower room in Cottage 3B

- Marquardt/Thom Buildings

    - Installed new visitor's parking lot

    - Installed new walkway to front door

    - Repainted nursing home area

- Activity Center

  - Repaired water damage and repainted Activity Center

  - New Wiring

- Site 7/FLOW Workshop

  - Installed electrical handicap access doors

  - Painted safety bollards in front entrance.

- Woodside

  - Painted the entire inside of the building

  - Painted the safety bollards in front of the building

- Brookside

  - Installed sidewalk & safety rails at front entrance

  - Renovated the entire inside of the building which included painting of entire building; electrical work; trailing rails on the interior; installed new walkway and rails from the fire exit to the street; installed/repaired all doors and cabinets.

  - Installed new outdoor carpet at the front entrance and leveled cement beneath.

  - Carpenters built adaptive equipment to assist in the sensory room.

<u>Title XIX Survey Results at Fernald</u>

45.    Fernald underwent a very successful annual Department of Public Health survey in March of 2005. The Department of Public Health gave the facility a very favorable report with no active treatment citations and a finding of all conditions of participation being met.

46.    The Department of Public Health has recently finished its annual survey at the Hogan

Regional Center in Danvers and the Wrentham Developmental Center in Wrentham, both Title

XIX facilities of the Department of Mental Retardation.  Both facility directors were told during

the exit interview that there were no failures to meet required conditions and no deficiencies in

the provision of care.

47.    The current ratio of staff to individuals here at Fernald is 3.6 to 1.  At the time of the

announcement of the closure of Fernald in 2003 the ratio of staff to individuals was 2.8 to 1.

<u>Issues with the Current Placement Planning Process</u>

48.    As a result of the Court's order of January 20, 2005, the Department has bifurcated the

placement planning process from the Individual Support Planning ("ISP") process into two

steps:  (1) discussion of all of the elements of the individual's service plan, but excluding any

discussion of placement in a less restrictive setting; and (2) a separate meeting to discuss

placement planning.  The Department has also notified class counsel of the dates of all ISPs for

Fernald residents and of the dates of placement planning meetings for those individuals

represented by class counsel.  Representation by class counsel was indicated by the guardian's

execution of a release allowing the Fernald League to participate in the ISP meeting.  The

Department has scrupulously complied with these requirements, refraining from any discussion

of placement at the ISP meeting, and notifying class counsel of all ISP dates and placement

planning meetings dates, even though class counsel has not chosen to appear at any such

meetings.

49.    This bifurcation has resulted in the unintended consequence of families/guardians

participating in most areas of their ward's life but not in planning for his/her future home.

50.    The bifurcated process now in place does not allow the Department to be responsive to

the change each individual will necessarily go through when dealing with the placement planning process.

51.    An example of the problem of bifurcation can be seen in the case of an individual's guardian who attended an ISP meeting for the year 2006.  The placement planning meeting had been held in 2005 after the finalization of the 2005 ISP.  This guardian did not attend the placement planning meeting.  At this ISP meeting, the guardian said that though the team had recommended community placement for his ward, he thought a facility would be the best place for him to go.  The guardian was advised that the Department could not discuss placement issues during the ISP meeting and therefore another meeting for placement would have to be scheduled. Though this meeting was the ideal place for the Department and the family to discuss future planning for the individual, we could not do so.

52.    The inability to discuss placement planning along with the ISP impacts the team's ability to discuss change with the guardians and to offer their support in the decision making process.

53.    The ISP meeting is the natural place to discuss issues pertaining to the individual, like moving and the related considerations, decision making, planning and preparation.

54.    Although we continue to strongly encourage family/guardian participation in placement planning meetings, placement is not being discussed with the families since the majority of the families are choosing not to attend placement planning meetings.

55.    Though the majority of families who have not participated in placement planning have stated that they do not desire placement for their family member outside of Fernald, even though they have been assured that Fernald is closing and have seen evidence of this through facility consolidations, placements, staff re-deployment, and direct and clear statements from the Department that Fernald is closing, follow up letters and or telephone calls are made to inform

-15-

families of all placement activities undertaken on behalf of their family member.  It is the Department's obligation to keep guardians informed of all placement planning activity, even when guardians express the sentiment that they do not desire any contact or communication concerning placement.  In all of the Department's communications to families concerning placement planning, family participation is strongly encouraged.

56.    An additional consideration is that for many families and guardians, making arrangements to attend a second meeting to plan placement following the completion of the ISP can be difficult.  Many family members are aged and traveling to the facility for another meeting is not always convenient.  Others work during business hours and taking another day from their schedules may not be possible.

57.    The guardians' responsibility to make informed decisions based on all available information on behalf of their wards is thus not being met when families refuse to participate in any discussion pertaining to the closing of Fernald.

Increased Number of Appeals

58.    A further consequence of the bifurcation of the ISP is that families are being advised by class counsel and the Fernald League that in order to delay placement planning, the ISP should be appealed so it will not be "finalized."

59.    These appeals then proceed to Informal Conference with the guardians themselves unaware of the issues.  At a recent Informal Conference, the guardian, reading from a letter she signed, could not explain what one of the issues were because she said she did not write it.

60.    The large number of appeals being handled by the Fernald League, in some cases without the guardian, has resulted in scheduling issues, cancellation of informal conferences and fair hearings.

61.    The Department's practice has been to allow reasonable extensions of time for good cause.

62.    One recent hearing lasted four full days due to the necessity of going through all nine grounds of appeal without one real regulatory issue being identified beforehand.

63.    In the past two years, there has been a significant increase in the number of ISP appeals at Fernald.

64.    Prior to the announced closure, there was one ISP appeal in 2001 and zero ISP appeals for the year 2002.  In 2003, there were three ISP appeals, 15 appeals in 2004, and 46 appeals in 2005.

65.    The majority of the ISP Appeal Notification forms that are used to file an appeal indicate the reason for appeal as "1-9" – meaning that *all* of the ISP-related options on the form are selected,  even though some of these options clearly do not apply.  Eligibility for DMR services, one of the nine options, has never been in question for these <u>Ricci</u> Class Members (who enjoy special eligibility for services pursuant to court order and DMR regulations).

66.    Some examples of reasons for appeal given at Informal Conferences include requests for the following additions to the ISP:

- **"a safe campus-style environment with limited traffic"**  This is a standard request from the League, regardless of whether or not an individual walks independently around campus, or is **totally** dependent on staff to push his/her wheelchair.

- **"a barrier free environment on the first floor"**   This request has been made for those who currently live on the second floor.

- **"Staff do 30-minute bed checks"**  This is also routinely being requested as an addition to "Current Supports."  The bed checks are a Fernald procedure and staff expectation.  The ISP should reflect the needs of the individual, and should document the actual supports needed at night, such as re-positioning, assistance

-17-

to the bathroom, changes, etc.

- **"on grounds"**  This is being requested as a description for every clinic/health care appointment that is held at Fernald or Tufts Dental Clinic.  For some individuals this is need based, and a real support.  It might be a strong preference, or important for health based or behaviorally based reasons.  For others, it is not relevant or even a real support; their appointments could be held elsewhere.

- **The ISP template introduces the "Individual Vision" section as follows: Vision for the future of the individual that focuses on increasing the opportunities for the individual to have more positive experiences which are linked with the preferences of the individual and with opportunities available in the community."**   Informal Conferences are being used to attempt to start a debate about the appropriateness of these words.  Demands are made to have them removed, with the justification that they represent a political agenda, connected to the closure of Fernald.

- **Complete description of nursing shift coverage and where the nurses are located (i.e., in-building _x_ hours per day).**  Again this is a routine request for everyone who has League representation, rather than a particularized inclusion of an individual's medical/nursing support needs.  On a number of occasions, we have been asked to insert a statement that a person "requires" the number of hours of nursing care that correspond to the hours that a nurse is present in a building, without regard for the person's specific needs.

- **Requests for statements to be included in the "Individual Vision" section have included:**
    (A) "To have ISP team, guardians' and family assistance to protect due process rights with respect to state and federal regulations and Ricci class entitlement."
    (B) "To receive a lifetime of services from the state of Massachusetts under the consent decree."

- **"Current Supports"**  In one case, the ISP contained a statement that a person "has the support of a psychologist…."  The Department was requested to change the language to "'close' support."

- Another recent appeal involved a request for two additional items in the ISP.  The guardian did not participate in the Informal Conference.  The two items were (1) the addition of the words "on grounds" for clinics, and (2) the addition of the line "a pharmacist conducts quarterly medication reviews."  A pharmacist conducting medication reviews is a routine practice as opposed to being a unique need of this individual.  This appeal resulted in nothing more than eight

words being added to the original ISP.

- "**Licensed Nurses, Licensed Pharmacists, Licensed Therapists**"   The League representatives are insisting that all clinicians be identified with the word "licensed."  The fact that nurses and pharmacists have licenses in order to perform their duties is not something that belongs in an individual's ISP.

- In one recent Informal Conference, one of the issues was replacing the word "soda" with "decaffeinated coke and/or coffee."

- Another ISP was appealed because the name of the individual was missing an upper case letter.

67.    Having the families and guardians together at the ISP with the entire ISP team present would better meet the mandates of the Department's regulations and Title XIX regarding guardian involvement in the major life events of individuals.

68.    It is imperative that individuals with mental retardation served by the Department are always offered the least restrictive alternatives available and appropriate in all aspects of their life.  These discussions would typically occur at the ISP meeting.  However, what was meant as a helpful strategy (bifurcation) is resulting in minimal or total lack of any discussion with guardians of the future of the individuals residing at Fernald.

69.    Several families have told Department staff that they really liked the ISP but that the League wanted them to appeal.

70.    Families have attended Informal Hearings and demonstrated no understanding at all of what they were there to do.  Often, the family says nothing and the League does all of the talking.  One elderly parent and guardian recently asked "what is an ISP?" at the Informal Conference for her son, sat patiently while the League representative presented her concerns, then asked her, "Are you finished?"

71.    The Fernald League has effectively put a damper on the communication process and

-19-

interdisciplinary approach the ISP is supposed to encourage.  If a clinician presents an option to consider that is not mentioned in the final ISP, the League, through the guardian, will then appeal the ISP, stating that the team made a decision which is not in the ISP.  Clinicians are reluctant to discuss ideas with other team members at the ISP meeting as a result since they are afraid to be held to providing services that may not be appropriate.

72.    The Fernald League is interfering with the ISP process.  What should be a gathering of clinicians and others who know the individual well discussing the individual's needs and services has become a discussion of rote language such as the insertion of "J lives in a campus environment with limited traffic."  A Fernald League representative has demanded that this sentence be added at the ISP meetings of Class Members who are wholly dependent on others for mobility and do not venture outside on their own.

73.    League members have indicated during Informal Hearings that they have a complaint about "staff conduct" when in fact the complaint is that each and every word they said at the ISP meeting was not agreed to by the staff person being accused of conduct issues.

74.    Because of an increase in the length of ISP meetings, the focus on general language and not the individual, and the difficulty clinicians have sometimes encountered when presenting valid clinical opinions that do not produce the outcomes desired by the League (for example, Physical Therapy staff stating that the pool will not help the person therapeutically), managers have been attending these meetings in an attempt to keep the meeting focused on the individual and not on the administrative issues the League is continually bringing up at an individual's ISP meeting.

75.    Recently, a representative from the Fernald League chastised a Department employee (a QMRP) for giving a competent individual residing at Fernald a copy of his own ISP and for

reviewing it with him. This is a regulatory requirement and it is each individual's right to accept or reject the ISP and the exercise of this right requires an understanding of its contents. Subsequently, the League, without any evidence of having obtained the individual's assent, submitted an appeal of this ISP. The League also filed an appeal of another ISP without any showing of having obtained the guardian's assent to the appeal.

76.    As described below, most families and guardians of individuals still living at Fernald have been advised to refuse all communication with the Individual Transition Planning ("ITP") team, despite numerous efforts to engage them. They have expressed an unwillingness to listen to the options available to their wards or to participate in any activities designed to provide information to them. This has posed a significant problem for DMR staff attempting to ensure that the families' interests are considered in placement planning and that their concerns and fears are answered, ameliorated, or at least addressed.

77.    Letters from guardians to the supervisors of the ITP team indicating their refusal to participate in the placement planning process often contain very similar wording, reflecting the fact that this is wording they have been advised to use.

78.    Placement planning has been effectively slowed by the number of appeals that are being filed in order to prevent individuals' ISPs from being finalized.

79.    In some cases, Fernald League representatives attend ISP meetings without the guardian but with a written authorization.

80.    In others, the League representative does all of the talking without any input from the guardian.

81.    Extreme pressure is exerted by the Fernald League to have every word in a current ISP match the language of the prior year's ISP. This does not take into account that ISPs are fluid

documents which must change along with the individual. ISPs are not meant to be the same as the previous year.

82.    Additionally, presumably upon advice of counsel, some families for the first time demanded that the ISP reflect a greater level of need than actually exists in an attempt to paint Fernald as the only suitable setting for services. One such demand is that the ISP state that the individual has or has access to 24-hour nursing services even if the individual has no significant health issues and no need for this high level of nursing intervention. In addition, some services available at Fernald are available solely by virtue of Title XIX requirements for an ICF/MR and are not appropriate for inclusion in the ISPs of individuals who do not need them.

83.    Every individual who has moved outside of Fernald and every individual who presently remains at Fernald is a class member and is entitled to receive services and supports necessary to meet their needs regardless of where they reside now and in the future. The Department acknowledges the rights of class members and will provide services as identified in their Individual Support Plans for the Class Members' lifetime in accordance with the 1993 federal court order. The Department's expectation and policy is that the ISP is the document that identifies supports and services for an individual. This document is a reflection of the individual's *current* abilities, support needs, objectives, and vision for the future. This document by design and intent cannot remain stagnant and unchanged from year to year. The ISP document certainly takes into account an individual's history and the importance of continuity. However, in actuality, it is a plan for the future of an individual; one that reflects growth, life changes, and new goals and visions.

84.    Transition planning involves both Fernald staff and the staff from the new placement. Transition visits occur for as long as necessary to make the individual comfortable. After the

move to the new home, Fernald staff are available at all times to ensure the individual acclimates to his or her new home.  Familiar staffing is a concern for many families.  Families have expressed fear that when their family member moves outside of Fernald familiar staff will not be available to assist their family member.  When an individual moves, naturally the expectation is that staff in the receiving home or facility will become the primary familiar staff as quickly as possible.  The transition needs of each individual are considered and planned individually, and when consultation and support has been needed from Fernald staff to assist with any difficulties an individual might experience, this has been provided.  Mostly, this has been in the form of consultation.  The majority of individuals who have moved from Fernald have had excellent transitions and they and their guardians have developed good relationships with the new staff.

Signed under the pains and penalties of perjury this 7th day of February, 2006.


/s/ Diane Enochs

_____

Diane Enochs
Assistant Commissioner for Facilities
Commonwealth of Massachusetts
Department of Mental Retardation