

# The Commonwealth of Massachusetts
## Executive Office of Health & Human Services
## Department of Mental Retardation
### 500 Harrison Avenue
### Boston, MA 02118

**Mitt Romney**
Governor

**Kerry Healey**
Lieutenant Governor

July 1, 2004

**Ronald Preston**
Secretary

**Gerald J. Morrissey, Jr.**
Commissioner

Area Code (617) 727-5608
TTY: (617) 624-7590

BY FAX AND BY REGULAR MAIL
Lisa Goodheart, Esq.
Piper Rudnick
One International Place, 21st Floor
Boston, MA 02110-2613
Fax 617.406.6100

Beryl Cohen, Esq.
11 Beacon Street
Boston, MA 02108

Re: Ricci, et al v. Okin, et al – Order May 25, 1993

Dear Lisa and Beryl:

This letter is a follow-up to our meetings on May 28, June 7, and June 8, 2004, regarding compliance with the May 25, 1993 Final Order ("the Order"). During the meetings, the Department made several proposals to resolve the issues you raised in your letters of April 6th and April 12, 2004. In accordance with ¶7 (c) (3) of the Order, the Department memorializes those proposals to resolve the issues raised. At the outset, we continue to believe that the Department is in compliance with the Order, and the information presented in our meetings confirmed that no "systemic" noncompliance with the Order, including the ISP processes or services required under the Order exists. We are willing to meet again to discuss these proposals at your convenience.

### The Department's Proposed Plan for Fernald Closure

The focus of the ¶7 (c) meetings, as presented by Class Counsel for Fernald and Monson, was the decision of the Department to close the Fernald Developmental Center as an intermediate care facility for the mentally retarded (ICF/MR). As Attorney Beryl Cohen stated, the allegations made were part of one "continuous issue," namely the policy decision to close Fernald, the planning process utilized by the Department to implement the closure (ISP team, ITP team and placement planning profile interplay), and the belief that deferred maintenance and reduced staffing at Fernald are part of an overall effort to move the closure forward more quickly. Attorney Cohen's letter of June 21, 2004, rejecting the Commissioner's Proposed Plan for the Fernald Closure, confirms

1

the centrality of the Fernald closure to these 7 ( c ) proceedings. We reiterate that there is no validity to the contention that the staffing issues or maintenance issues you raised are part of an effort to close Fernald. However, we have carefully considered the concerns you raised related to these issues, and have either addressed, or will address the "deferred maintenance" and staffing issues as they relate to Fernald in proposals set forth below.

As to the fundamental issue, the Department's authority to make the policy decision to close Fernald, the Final Order gives to the Department considerable discretion in "developing and improving programs, managing and determining the personnel and budget of the Department of Mental Retardation and other state agencies, implementing innovative services, improving quality enhancement and dispute-resolution mechanisms, or allocating its resources to ensure equitable treatment of its citizens." We understand your clients' concerns about change and about meeting their individual family member's needs, and will work closely with every family to ensure that individual needs are being met, and put first, in this process. However, the Department not only has the authority under the Order to reconfigure its residential services to provide them to individuals in a more integrated setting, but to the extent that an individual's ISP needs can be met in a less restrictive setting, the Department has an obligation under its own regulations and the Final Order to offer supports to all Ricci class members in the least restrictive setting.

At the meeting on June 8th, the Commissioner presented a plan to close the Fernald Developmental Center.[1] The Plan provides the individuals living at Fernald and their families with an array of residential options to choose from that will constitute the "least restrictive" setting to receive supports appropriate for that individual. The process and time frame for closure will be measured, and will allow individuals and their families time to participate fully in planning and choosing from these options. As the Commissioner indicated, there will be a continuing DMR presence on the Fernald campus with the Department maintaining an approximately 65-bed skilled nursing facility on the site for individuals who are determined to be appropriate for nursing facility level of care and the development of state-operated community beds at Malone Park.

The thirteen points of the Plan are set forth in greater detail below.

First, the Department is committed to creating various residential options amongst which individuals or their families may choose, in locations that permit maximum family participation in individual's lives. These options will include:

1. A community residence in a provider directed program funded by DMR in the Greater Waltham area or elsewhere, according to individual and family preference.

---

[1] In your letter of June 21, 2004, rejecting the Department's proposed Plan for the closure of Fernald, you stated that this Plan lacked the Governor's or the Legislature's approval. The Commissioner presented the Plan with the authority of the Governor, as we stated in the meeting.

2

2. A state-operated residential residence in the Greater Waltham area and in the Department's Northeast Region. The Department will develop approximately 80 new beds, 40 in the Greater Waltham area and 40 in the Department's Northeast Region. "State-operated" means a community residential home staffed and managed by state employees. The Department will work with the labor unions representing staff at Fernald on a plan to allow certain Fernald staff to transition with individual residents to these settings.

3. The Department will designate up to 25 existing "state-operated" beds for Fernald residents, contributing to a total of 105 state-operated homes for families to choose from.

4. The Department will make available up to 65 beds within the Department's ICF/MR system for current Fernald residents (at Wrentham Developmental Center, Hogan Developmental Center, Glavin Developmental Center, Templeton Developmental Center or Monson Developmental Center).

5. At Fernald, the Department will maintain and expand its current skilled nursing facility capacity by consolidating the Marquadt Skilled Nursing Facility and the Greene Building which will become a skilled nursing facility to create a total of 65 beds at the site. The Department will determine which Fernald residents meets the level of care for skilled nursing and offer those individuals the option of residing in the Greene Building. In order to maintain this capacity at Greene, the Department will install a separate boiler system for Greene, thus allowing the Department to close down the power plant.

6. The Department will maintain a program of research and outpatient services, including dental services, adaptive equipment and other appropriate activities) in collaboration with the Shriver Center at the Fernald site.

7. At the Fernald site, the Department will maintain its bed capacity at "Malone Park" at approximately 24 beds. These beds will be converted from ICF/MR beds to state-operated community-based program beds.

8. The Department will allow any individual who chooses community placement and later decides that the program is not successful for that individual to move back to an ICF/MR bed within DMR.

9. DMR will continue to actively participate in planning for the campus to ensure that its future use is compatible with the Department's on-campus uses.

10. The Individual Service Planning (ISP) process will continue to be the process by which service needs are defined.

3

11. All ISP processes and management planning activities will ensure full compliance with the Final Order, the Department's regulations, federal regulations, the state budget and legislative directives.[2]

12. The anticipated final closure date for Fernald will be sometime between FY06 and FY07 allowing additional time, and indeed, enlarging the timeframe contemplated by the Legislature for maximum participation in planning and implementing choices.

13. The Department will implement a process by which the Department and families can communicate about these issues that will be open to all families and not restricted in its membership. Stakeholder meetings will continue to be held quarterly, and there shall be regular meetings of senior DMR staff (Asst. Commissioner for Facilities, Facility Director, and Division Managers) at Fernald to address all issues raised by the Fernald League, the Buildings Representatives, or other individuals or families relating to any issues at Fernald, including those raised in our ¶ 7 ( c ) meetings.

In the Department's professional judgment, the range of 259-271 state-operated beds, in addition to provider directed programs, provides an array of choices for individuals now residing at Fernald and their families. The time frame for closure is not hurried, and all Fernald residents' services, as well as the physical facilities, will be maintained during the transition period at a level of excellence.[3]

**The Department's Response to Class Counsel's Allegations of Noncompliance**
Although we do not believe that the information you provided in our meetings suggests, much less establishes, that the Department is in noncompliance with any portion of the Final Order, or that the information presented in our meetings suggests a "systemic" failure to provide services to Ricci class members, we have proposed specific actions be undertaken to address the specific concerns that you raised. We address these issues, as well as supplementing our responses to others based upon our discussions, in the following order: 1) the impact of Fiscal Year FY05 Budget on Ricci Class Members and the Order's requirement that the Department maintain funding at least equal to the 1993 appropriation; 2) the allegation that there are "inadequate" trained staff at Fernald and in the community; 3) "deferred maintenance" issues at Fernald; 4) ISP issues at Fernald and

---

[2] The Legislature, in the Acts and Resolves of Fiscal Year 2004, and again for Fiscal Year 2005, appropriated funds for the Department's Intermediate Care Facilities for the Mentally Retarded (hereinafter ICF/MRs) subject to the proviso that the Department take appropriate steps to consolidate or close its ICF/MRs.

[3] Contrary to your assertion in your letter of June 21, 2004, shifting residential capacity from facility-based care to the community will not have an adverse affect on non-Ricci class members seeking community residential supports. In fact, the opposite is true insofar as shifting resources away from the Fernald campus into the community-based program will, in some instances, prove more cost effective and allow resources currently used to maintain the campus to fund services.

4

use of the placement profile as part of the Fernald closure process; 5) the Order's requirement of certification that services be of "equal or better" upon transfers; and 6) the Order's requirement of "periodic" review of community programs.

1. **Impact of Fiscal Year 2005 Budget Reductions- Level of Fiscal Effort for Services to Ricci Class Members**

The Department incorporates by reference its previous response regarding reductions to DMR accounts that fund day services, transportation services, or clinical services noting that as of today, the House and Senate Conference Committee issued its Report on June 15, 2004, and the Conference Report recommends full restoration of each of the proposed cuts, and are now part of the GAA for Fiscal Year 2005. Although the cuts as proposed would not have affected Ricci class members, the restoration of these budget line items addresses the class counsel's concerns about these reductions.

2. **Numbers of Trained Staff at Fernald and in the Community**

In our meetings, Attorney Cohen and the Class Representative from Fernald raised the issue of lack of adequate staffing at Fernald due to budget reductions over the last three years. The Department disagrees that the staff reductions over the past three years have resulted in a "systemic" failure to provide services.[4] As we stated in our previous correspondence, the staffing ratio as a whole at Fernald is three (3) staff for every one (1) resident, which meets the Title XIX requirements and is by national standards a very generous staffing ratio. The direct care staffing ratios are in excess of Title XIX regulations, and although there are technically unfilled "vacancies" or positions such as MRW IIs posted upon the website, the declining census at Fernald, as at other DMR facilities, obviates the need to fill positions at levels that were maintained three or four years ago.

However, in our meeting with you and class representatives we heard families' views that there was an inadequate number of supervisory staff in particular cottages or areas.[5] The Department is transferring supervisory staff from the consolidated Hillside residence to address the supervision needs identified in the particular cottages.

With regard to the caseload issues raised, for a Qualified Mental Retardation Professional ("QMRP") to have 25 individuals assigned to him is not unusual and is, in fact, consistent with what QMRPs' at other facilities are responsible for managing. Further, the "caseload" for members of the Psychology Department will vary greatly depending upon

---

[4] When Class Counsel was asked in the meetings about the adequacy of staffing at any of the Department's other facilities, no issues were raised. The issue raised appears to be confined to specific instances at Fernald and cannot, therefore, be considered "systemic."

[5] Class representatives reported that one (1) MR III and one (1) MR IV position was left vacant with a reported impact that although services were being delivered, they were not being documented properly. Class Representatives also complained that the QMRP no longer maintained an office in Cottage 8 and had a caseload of 25, and that one Psychology staff has a caseload of 65 individuals.

5

the number of objectives they must consult on or manage. The Psychology Department at Fernald currently has 7.5 staff, which it believes are adequate to meet the needs of Fernald residents.

We note that although it was mentioned that there are nursing "vacancies" posted for Fernald, there was no evidence that nursing care was not adequate or that individual's needs were not being met.

### Adequate Staffing in the Community

In our meetings, Class Counsel raised the issue of the inadequacy of salary and benefits in the purchase of services (POS) system to attract a sufficient number of adequately trained personnel. Class Counsel stated that she had difficulty in getting specifics on this issue due to privacy concerns. She postulated, however, that given the OSD Report conclusions regarding staff turnover within human services providers (then at a rate of 25%-28%), and the salary range, it is not possible to provide adequate staffing.

The Department agrees that there is a pressing need to recruit, train, hire and retain qualified staff in the POS system, although it does not believe that the turnover rate in staffing in the DMR POS system is as high as it was reported to be in 2000, a time of record low unemployment. The Department has made and continues to make efforts to increase the training available to direct care staff through its human services certification program at eight (8) community colleges, and has undertaken initiatives with providers to recruit staff through advertising and other means.

While appreciating the difficulty *to the plaintiffs* in assessing adequacy of qualified trained and professional staff on a system-wide basis, the Department believes, based upon the periodic reviews that have been conducted, and the internal monitoring systems in place, that there *are* adequate numbers of trained staff to meet the ISP needs of Ricci class members in the community. The Department does not believe that you have demonstrated that there is inadequate staffing in community programs to meet the needs of Ricci class members.

### 3. The Department's Plan to Address Allegations Relating To Maintenance of Equipment and Grounds at Fernald

In our meetings, you asserted that the Department has failed to maintain the Fernald Developmental Center in the condition that DMR facilities had achieved during the period of the Consent Decrees. In support of this, you cited the reports of the Building Representatives at Fernald in January, February and March of 2004 as evidence of conditions in several of the buildings and cottages, reading these aloud in the meetings. You further asserted that reductions in maintenance staff such as electricians, handymen, etc had resulted in a failure to promptly and adequately address all building issues.

Although we do not agree that the complaints you articulated, which were confined to Fernald, constitute a "systemic" failure, and in fact Fernald has been found to be in

compliance with the Title XIX requirements *as required by the Final Order*, in response to your complaints we reviewed the physical conditions at Fernald and found that while meeting Title XIX requirements, certain aspects of the cleaning and maintenance of the campus were not at the level the Department wishes to maintain for Fernald residents.

To address these problem areas, and to resolve the issues you raised relative to physical plant maintenance and equipment/transportation at Fernald, we propose the following plan:

1. The Department will add 5 FTEs to its current Fernald maintenance staff of 18 FTEs. These will include one (1) plumber, three (3) trades people and one (1) machinist.
2. The Assistant Facility Director for Plant Management will meet regularly with the Division Directors to address physical plant concerns raised either by the Division Directors or the Building Representatives.
3. The Facility Director will meet regularly with the Building Representatives to address maintenance issues.
4. A log of all reported maintenance issues by date with response date and response action will be maintained.
5. Building representatives, working with the Asst. Facility Director for Plant Management, will develop a list of needed furniture and equipment repairs.

These steps should be sufficient to maintain the Fernald campus in excellent condition for full use by residents. In addition, some immediate steps have been taken to address the overall appearance of portions of the campus, such as painting the exterior of the cottages and general spring clean up of outside areas.

With regard to the allegations that there were insufficient working vans at Fernald to ensure that individuals were transported to programs or appointments, and that the snow removal equipment was inadequate, we have confirmed that there is at least one (1) van available for each cottage or building, as well as additional back-up vans in the event of a mechanical problem with a van. We have addressed the issue with Division Directors to ensure that good communication about transportation needs eliminates any interruption in services due to a mechanical failure.

We agree that there were problems with snow removal during one particularly heavy snowfall this past winter, and the system for snow removal is being addressed.
In response to the particular items you raised in the meeting – a persistent problem with mice in two cottages, requests for upgrading of bathrooms denied, trash in certain areas, and the lack of an available electrician on the grounds and so forth, we believe that these additional maintenance staff should address these issues. However, we will provide you with a more detailed response to each issue, should you so require.

7

### 4. ISPs, Placement Profiles Issues

In our meeting, you raised specific complaints about the content of Individual Service Plans ("ISP"), or their implementation with specific individual. Most, if not all, of the ISP issues that were raised at the ¶ 7 ( c ) meetings with Class Counsel and Class representatives are under appeal. The Final Order provides that individual ISP disputes "shall be enforced solely through the state process." See ¶5 of the Final Order. In addition, we cannot address those issues in this letter without violating the confidentiality and privacy rights of those individuals.

Further, after considering the information presented at the meeting, we do not believe that there has been a "systemic" failure to implement the ISP process at Fernald. However, we agree that in particular instances, ISPs have been mailed late, and in some cases the content of the ISPs was not in accordance with the regulations. In response, the Department has taken immediate steps to address these issues, and is confident that additional supervision by DMR staff, as well as re-training in some instances, will correct these problems. All ISPs are currently up-to-date, and we will continue to closely monitor this activity to ensure compliance with the Final Order and the Department's regulations.

With regard to compliance with the ISP process for individual already transferred from Fernald, thus far 27 people have been transferred to homes in the community and other facilities. Every transfer met the regulatory requirements of transfer, including the modification of their ISP. Individual transitions were done according to individuals' needs. Every guardian signed the necessary consent to facilitate the transfer.

On June 1, 2004, the Department began adding placement objectives to each Fernald resident's ISP. Some guardians have complained that they were not given an opportunity to discuss the placement objective during the pre-ISP consultation mandated to occur 6 weeks prior to the ISP meeting. To address this concern, the Department has postponed the placement discussion when families request a delay and will re-convene these ISP meetings to discuss the placement objective. The Department's planning tool, the placement planning profile, has now been sent to all families or guardians as requested by Class Counsel. For the families who did not participate in the profile's completion, they can review the ISP team's recommendation regarding the potential placement for the resident. The Individual Transition Planning ("ITP") team will work with the families to address any issues or concerns the family has around this issue.

We have considered your request to stop all planning with families regarding transfers from Fernald, and cannot accede to it. Individuals have and continue to come forward to plan a transfer. We will continue to work with them. We have instituted a very measured process of initiating discussions with families through the addition of a "placement objective" to the ISP. Your request that we not do this would interfere with the flow of information between families and the Department concerning this process and bring the closure process to a standstill.

### 5. Certification of Equal or Better for Transfers

It is a requirement of the Final Order that transfers or placements of individual *Ricci* class members must meet the "equal or better" standard. All transfers are therefore reviewed by the Regional Director or the Facility Director to ensure compliance with this aspect of the Order. Certification of this requirement has occurred in different forms used by the Department, including the transfer form and the ISP itself.

As we discussed in our meetings, the Final Order required that Class Counsel be notified of any change of address of a Ricci class member for a period of three years. When the requirement ended, the Department stopped the process of notifying Class Counsel of transfers; at or about the same time, the Department stopped using the transfer notice which had been used and which recited the "equal or better" language contained in the Order.

In 1997 and 1998, in response to issues raised about class members whose address was unknown, Class Counsel and the Department's counsel had discussions around resuming notification of transfers. The parties negotiated a "new" transfer form that did not include the certification language.

Apart from the change in the language of the transfer form, the Department's practice has consistently been that for Ricci class members the Facility Director or the Regional Director (or the Area Director for the Regional Director) certifies when signing the ISP that a transferred Ricci class member' services meet the "equal or better" standard. Indeed, Ricci class members' ISPs have a special form that indicates that all of the individual's needs are being met. This form was also negotiated with Class Counsel. Given this history, the Department is in compliance with the Order for the individuals transferred.[6] However, in an effort to resolve this issue, the Department proposes that prospectively, the Department will adopt and implement a transfer certification form similar to the one used prior to 1997, which contains an explicit "equal or better" certification.

### 6. Periodic Review

In our meeting, Class Counsel indicated that in a review of community systems must have the following elements: qualified reviewers; an independent review, not an agency self-assessment; regular or consistent periods when the review takes place; community-focused reviews with Ricci-class members included; and with appropriate follow-up of

---

[6] The Department produced the transfer forms that contain a brief "Reason for move" section, and during our meetings, Class Counsel indicated that the very brief statements included as the "reason for move" were grossly inadequate. Again, following the expiration of the three-year period, the transfer notices were an agreed to notice of an address change; the ISP, not the transfer notice, would contain a full statement concerning the individual and the move to a new location. Disclosure of the content of an individual's ISP is precluded by federal and state statutes and regulations governing the confidentiality of DMR records, medical records and protected health information.

issues raised. Class Counsel also raised the issue of the quality of the review in terms of a survey versus an in-person review. We supplement our prior responses with the following information regarding each of these categories.

We believe that we addressed the issues of the qualifications of our external reviewers, Human Services Research Institute (HSRI)) by providing you with the documents you requested regarding our contracts with these entities, as well as the researchers' qualifications and resumes. Again, additional information about HSRI is on their website. As we stated on May 28th, HSRI is an organization that is nationally recognized in the field of human services evaluation, and the primary entity that conducts, through its subcontractor Boston University, periodic reviews of our community system. We believe that not only is HSRI qualified to perform the review, they are perhaps the national experts in quality assurance in this area.

With regard to the "independence" factor, in prior years, the Department has engaged Boston University to conduct interviews with clients, families or guardians. You raised the issue that in our most recent periodic review with HSRI, staff of the Department's Office Quality Management Survey and Certification is performing the data-gathering function by administering the National Core Indicators (NCI) tool, performing in-person interviews with individuals and their families. As Assistant Commissioner Janet George explained, the Department believes that the NCI survey instrument is so carefully prescribed that it permits little, if any, discretion to the reviewer in the data-gathering process. Most importantly, the results of the 600+ interviews conducted in 2004 will be sent to HSRI for independent analysis by HSRI and comparison with other participating states' data. Given this construct, we believe that this survey process provides for an "independent" review of community services. However, as described below, we are prepared to offer a compromise on this issue.

In terms of the "periodic" or "regularity" element, you raised the issue that the time period between the review cycles has at times been too long. In terms of what constitutes an appropriate "cycle" for periodic review, we have stated our belief that every other year should suffice to meet this requirement. We believe that a more frequent cycle should not be undertaken for the following reasons. First, the two-year cycle is challenging given the large sample size. Each cycle requires time devoted to sample selection, the conduct of interviews to several hundred people, the data entry in format to send to HSRI for review; and analysis and review by HSRI. It is difficult to imagine that a quality review of this number of individuals could be accomplished in less time. We also discussed the issue of "survey fatigue," which is a problem that researchers face in doing in-depth reviews with large sample size. With a random sample selection, it is possible to select some individuals who have been previously interviewed, and those individuals or their families may become reluctant to participate.

With regard to your concern that the HSRI review was inadequately focused on community services for Ricci class members, we supplement our prior response as follows. In 2004, the Department participated in a Consumer Survey of National Core Indicators. As part of that survey, the Department's Office of Quality Management staff

10

contacted 1,396 individuals; of these, 249 were Ricci class members. Of these, 170 Ricci class members were interviewed; 79 declined to be interviewed. The representation of participants in the survey very closely mirrored the percentage of class members in the DMR system. That is, 18% of the survey sample was Ricci class members whereas 18% of total DMR consumers are Ricci class members. Thus, from an extremely large sample size, an appropriate and significant sample of Ricci class members participated in the review.

We have not ascertained what the Ricci class member participation was in prior survey. However, since all surveys utilized random samples, and distribution across regions were consistent with population distribution of persons served by DMR, the same result is likely. [7]

You raised an issue in our meeting on June 7th about whether the HSRI review was a review of "community programs" as required by the Order. We suggested then that in the field of quality assurance for services and supports for individuals with mental retardation, experts in the field of quality assurance and monitoring have concluded that it is preferable to measure "outcomes for individuals" in various domains (health and safety, human rights, community integration).

With regard to your suggestion that class representatives participate in designing the review or in defining the scope of review, we hope that that the parties have come to consensus that the NCI tool and the HSRI review process are valid, reliable indicators of the quality of our community programs and services provided to Ricci class members, as well as other individuals that the Department serves. Working under the assumption that NCI will continue to be the process by which we conduct periodic external reviews of the community system, the "scope" of the review, in essence the NCI tool and the structure

---

[7] A summary of the HSRI survey activity for the last three years and the participation rate is as follows:

    2002 – 2003 - Adult/Family Survey, (where individual is over 18, lives at home with family, has service coordination, and at least one service that is not transportation). Survey mailed to family members or guardians. 2,000 surveys mailed - 495 returned, 25% response rate.

    2002-2003 - Family/Guardian Survey (where individual is over 18, does NOT live at home, has service coordination, and at least one service that is not transportation). Survey sent b mail to family members or guardians. 2,000 surveys mailed -779 returned, 39% response rate.

    2003- Children/Family Survey (where individual is under 18 years of age). Survey mailed t family members or guardians.1,500 surveys mailed---375 returned, 25% response rate.

of the protocol is established. It is necessary to the integrity of the protocol, and to allow an "apples to apples," state-to-state, review of systems in yearly cycles for the scope of the review to remain constant. Thus, as stated above, in our view the scope of the review should stay the same.

With regard to "follow-up" to the HSRI results, specific concerns that arise during the course of interviews are referred directly to the individual's service coordinator through a Central Office manager. In addition, all surveyors are mandated reporters and are required to report any suspected allegations of abuse or neglect to the DPPC. Further, the results of the NCI surveys, as well as multiple other sources of quality assurance data, are integrated into the DMR Annual Quality Assurance Report for review by management. The issues identified serve as the basis for review by Regional and Area staff and are used to inform both local service improvement efforts as well as statewide strategic planning processes and service improvement targets. An example of the latter is the Department's use of NCI data to inform the work of Strategic Plan Goal 3. The Goal developed was to improve access to and delivery of health care to all DMR clients. The Workgroup focused on issues such as improving the quality of consumer's annual physical exam, and developing strategies to improve access to and utilization of gynecological services, issues identified through the NCI survey.

That being said, to address your concerns and in a good faith effort to resolve the issues you have raised, we propose the following with respect to periodic review of community programs:

1. To address your request for more input into the review process, we propose that we meet with class counsel on a regular basis (at the beginning of the review cycle) to discuss the HSRI protocol and implementation for that cycle, as well as the results of the review for the preceding cycle, in order to receive feedback on how to use the data to develop policy initiatives in the upcoming year. We further propose that in anticipation of that meeting, the Department send class counsel the final HSRI report as soon as it is available.
2. Prospectively, the Department will engage Boston University, or another subcontractor that it selects through an appropriate Request For Responses bid process, for the data-gathering portion of the review.
3. The Department will participate with HSRI on a regular, two-year cycle. If this proves problematic, the Department will advise class counsel on its reasons for not participating, and consult with class counsel on alternatives.

With regard to the review of the 26 individuals by Ricci class representatives in 2000, we believe that we provided your office with the summaries of follow-up by Mary Akoury regarding individual class members, and we are not aware of any outstanding requests for information with respect to these individuals.

## The Department's Response To the "Abuse Of Discretion" Allegations

In your letter of April 6, 2004, you charged that the decision to close Fernald constituted an "abuse of discretion" granted under the Final Order. This allegation bear further response.

You stated that the Department overstated the amount of cost savings achieved by closing Fernald was represented for FY04 at $5 million. In your letter of June 21, 2004, you state that the decision to close Fernald is a "false solution to saving taxpayers dollars." As we have consistently stated, the decision to close Fernald was not based simply on projected cost savings for any given year, but rather on several factors, including the Department's commitment to serving individuals with mental retardation in the "least restrictive setting." As to the amount of savings projected, the $4.5 million savings that was originally projected to be associated with the closing of Fernald was reduced to $2.3 million for Fiscal Year 2004. In fact, the consolidation and transfers from Fernald have resulted in FY04 savings.

The long-term savings achieved through the Fernald closure will assure that an appropriate level of resources is available in community settings, as well as in the facilities. Currently, the Department spends approximately $43 million to support 260 individuals at Fernald at an average annual per person cost of approximately $165,384. Further, as plaintiffs' counsel points out, the Department faces future capital and maintenance costs. The Department believes funding appropriated can and should be used to provide excellent services to individuals with mental retardation in the community, not to renovate buildings on the Fernald campus.

Class Counsel charges that the Department has not met the Legislature's mandated reporting requirements with respect to the Fernald closure. The Department has submitted the required reports. With regard to your assertion that the Department has not conducted an adequate study of the cost of facility care versus community placement, there is significant national and state data supporting the Department's position, which we will be happy to discuss with you.

Class Counsel alleges that the Department has ignored concerns of the Fernald Family Advisory Group. As you know, the Commissioner created the Fernald Family Advisory Committee (FAC) to foster communication, feedback, give feedback regarding the closing and offer opportunities to give feedback. The Commissioner himself held regular meetings with Class Counsel and representatives for the past two years. The Commissioner assigned senior staff to attend the FAC meetings to facilitate discussion and gain feedback from families. Several things occurred over the past year of meetings in this process. First, the Fernald Family Advisory Committee warned families away from Information Fairs and other opportunities to gain information about potential placements. Second, the meetings proved very divisive in tone, and instead of fostering communication with families about the closure, created an atmosphere of hostility towards DMR staff. Third, members were directed by counsel *not* to communicate with

13

DMR staff on any subject touching upon closure. Under these circumstances, there was little productive feedback to be gained from the meetings. [8]

At the June 8th meeting, the Commissioner announced that the Committee was not functioning as a useful communication mechanism for families, and that he would create a family forum open to all families in order to disseminate information and receive feedback on the Plan.

In your letter of April 6, 2004, you also charge that the Department has abused its discretion by developing a plan to sell the 163-acre Fernald property. The Legislature directed the creation of the Fernald Reuse Committee, and that the owners of the property, the Commonwealth, through its agencies, the Division of Capital Asset Management and the Department, are participants in this public process, along with state and local legislators and council persons. These public processes will inform the final disposition.

You have suggested that it constitutes an "abuse of discretion" to fully fund the *Boulet* and *Rolland* settlement agreements while cutting the facilities budget. Compliance with federal court orders in *Rolland* and *Boulet* scarcely constitutes an abuse of discretion. The facilities' budget proposed by the Governor, and approved by the House and Senate, reflects the declining census in the facilities and the reduction in expenditures resulting therefrom.

There is no merit to your allegation that the Department has "politicized" admission policies for facilities. As we reported to you in our meetings, there have been 128 admissions to the facilities in the past 4 years, and those admissions have been made consistent with the Department's policy.

Contrary to your allegation, the Department and the Commonwealth have acted in good faith to implement the plan to close Fernald, advising counsel at each step of the way of its implementation plan, advising the Legislature of its efforts as required by statute, creating a process to include families in meaningful discussions.

In sum, the rebalancing of services in favor of services provided in a less restrictive environment for those who can benefit from community-based services, while maintaining adequate capacity for those who require the ICF/MR level of care, is entirely consistent with the Final Order.

---

[8] You have indicated that requests made by the Fernald Advisory Committee for clinical ratios/staffing ratios/injury data have not been responded to. This is not true. During the past year, the Committee and class representatives made numerous requests for information including one for "staffing ratios" and data about reported injuries. The Department responded to these many requests, and provided numbers of staff in various categories at each of the facilities, along with census information. We will continue to be responsive to public records requests for information, as we have been in the past.

14

Conclusion

We hope that by providing you with this information, and making these concrete proposals, we will have resolved any outstanding complaint that you have. We are willing to meet with you to further discuss these matters. Please respond either in writing or by calling me at your earliest convenience.

Very truly yours,

Marianne Meacham
General Counsel

Cc: Gerald J. Morrissey, Jr., Commissioner
    Kristen Reasoner-Apgar, General Counsel
    Beryl Cohen, Esq.
    Robert Quinan, AAG
    Asst. Commissioner Janet George
    Asst. Commissioner Gail Grossman