ATTACHMENT A

# Piper Rudnick

One International Place, 21st Floor
Boston, Massachusetts 02110-2613
main 617.406.6000 fax 617.406.6100

LISA C. GOODHEART
lisa.goodheart@piperrudnick.com
Direct Dial: 617-406-6023
Direct Fax: 617-406-6123

April 12, 2004

<u>By FAX and First Class Mail</u>

Commissioner Gerald J. Morrissey, Jr.
Massachusetts Department of Mental Retardation
500 Harrison Avenue
Boston, MA  02118

Re: *Ricci, et al. v. Okin, et al.*, Civil Action Nos. 72-0469 (Belchertown); 74-2768-T (Fernald); 75-3920 (Monson); 75-5023-T (Wrentham); 75-5210-T (Dever) (D. Mass.)

Dear Commissioner Morrissey:

I write on behalf of the plaintiffs in the above-referenced Wrentham and Dever class actions, Civil Action Nos. 75-5023-T and 75-5210-T (including, among others, the Wrentham Association for Retarded Citizens, Inc., the Paul A. Dever Association for Retarded Citizens, Inc., and the Association for Retarded Citizens ("ARC") of Massachusetts, Inc.). In accordance with paragraphs 7a and 7c(1) of the Order of the United States District Court (Tauro, J.), dated May 25, 1993, and reported at 823 F. Supp. 984, the above-described plaintiffs hereby give notice that they believe that the defendants are not in substantial compliance with the Order with regard to systemic issues.

You have already received the letter of April 6, 2004 from attorney Beryl Cohen on behalf of the Belchertown, Monson and Fernald plaintiffs, which outlines many areas of alleged substantial noncompliance with the Order by the defendants. Among other concerns, Mr. Cohen identifies **paragraph 2c of the Order**, which calls for "[s]ufficient adequately trained and experienced personnel." Mr. Cohen's letter highlights inadequacies in the provision of personnel at the Fernald Developmental Center, in particular. The plaintiffs in the Wrentham and Dever actions assert further that the defendants are not in substantial compliance with paragraph 2e of the Order because of the failure to provide adequate salaries and benefits to the staff who serve *Ricci* class members in community settings.

Notably, the majority of *Ricci* class members currently reside in the community, rather than in one of the state developmental centers, as was the case when this litigation commenced

~BOST1:298636.v1
125-847

*Piper Rudnick LLP*

**Piper Rudnick**

Commissioner Gerald J. Morrissey, Jr.
April 12, 2004
Page 2

some 30 years ago. In the community, most of the *Ricci* class members who receive services from the Department of Mental Retardation ("DMR") are served by non-governmental-agency staff, commonly described as "Purchase of Service" contractors. Defendants have made insufficient provision for the salary and benefits needs of the direct support, supervisory and professional staff who work with *Ricci* class members pursuant to the Purchase of Service contract system. As a result, there are systemic deficiencies including increased and unacceptable levels of staff turnover, lengthy and problematic vacancies in staff positions, a decrease in the quality of services and the number of clients receiving adequate services, and ultimately, real concerns about safety issues.

This is a problem that has been long in the making. After fiscal year 1989, for a period of seven years (from fiscal year 1990 through fiscal year 1996) there were *no* salary reserve increases for Purchase of Service contractors funded by DMR. Starting in fiscal year 1997, salary reserves were provided for several years, but at levels and with caps that were insufficient to prevent low wages from becoming an increasing problem, with growing adverse consequences for the *Ricci* class members (and others). This problem was documented in January 2001 by a report issued by the Operational Services Division of the Executive Office for Administration and Finance, entitled "Outside Section 445, Study of the Impact of Salary Reserve, FY 1997 to FY 2000" (the "Salary Reserve Impact Report"). That report reflects a legislatively mandated examination of the impact of salary reserves on the salaries of human services staff employed through contracts with state departments, including DMR, within the Executive Office for Health and Human Services and the Executive Office of Elder Affairs. The Salary Reserve Impact Report documented a higher turnover rate for Purchase of Services contractors in FY 2000 (25.75%) than in FY 1997 (17.94%). Significantly, the majority of contractors surveyed for the study reported that wage levels had the biggest impact on turnover.

Since the Salary Reserve Impact Report was released in 2001, we believe that the situation has further deteriorated. The last budgeted salary reserve, which was directed to staff earning less than $20,000 per year, was provided in fiscal year 2002. In addition, the Commonwealth has not allocated any cost of living dollars through a reserve to address increases in fixed costs, such as utilities, insurance and rent, since the 1980s. Most significantly, there has been no reserve to address the spiraling cost of health benefit premiums during the 1990s and the past few years. The absence of salary reserves for recent years, combined with the absence of cost of living allocations during a much longer period, has resulted in systemic problems.

The inadequacy of the salaries for staff serving individuals with mental retardation who reside in the community is particularly problematic in light of Governor Romney's intention of closing down the state's developmental centers, starting with the Fernald Developmental Center, as announced in February of 2003. The Administration has made clear that the decision to close Fernald is not justified by cost considerations, but is rather based on policy considerations. A policy of favoring the placement of persons with mental retardation in community settings

~BOST1:298636.v1
125-847

**Piper Rudnick**

instead of institutions suggests that a substantial increase of resources to the community care system will be required and should be expected. *See Olmstead v. L.C. by Zimring*, 527 U.S. 581 (1999) (reinforcing the need to develop the capacity to provide services to individuals with mental retardation in their communities). Yet, Governor Romney's FY05 House 1 Budget contains no increases for the salaries of the Purchase of Service contractors, and proposes substantial budget *cuts* for day services, transportation services, and residential services, including clinical team supports for individuals living in community settings (all as detailed in Mr. Cohen's April 6, 2004 letter). These aspects of the proposed budget would be extremely problematic even without the plan to close Fernald and other facilities, and the closure plan makes them even more serious in consequence.

We also believe that DMR is failing to provide sufficient adequately trained and experienced professional staff, such as psychologists, counselors, and speech and other allied health therapists, to meet the need of *Ricci* class members on a systemic basis. Notably, the percentage of professional staff such as counselors and speech and other allied health therapists is relatively small, given the more than 10,000 individuals receiving residential services in the community, of which a substantial percentage are *Ricci* class members. A 2004 listing of staff/budget codes for the DMR reflects that fewer than 50 full-time equivalent psychologists are available as consultants or staff to support that entire population. Of these psychologists, only approximately 18 (18.2 FTE) are Ph.D. level professionals. There are fewer than 23 (22.84 FTE) full-time equivalent allied health therapists reported, and most of these are occupational therapists. At the same time, as the population of *Ricci* class members continues to age, the therapeutic needs of that group continue to increase, and the need for adequately trained and experienced professional staff to serve that group likewise continues to grow. Quite simply, the provision of a very small number of trained professionals to serve the needs of a very large population with growing needs is an arrangement that we believe is fundamentally inadequate to meet the needs of the *Ricci* class members on a systemic basis.

**Paragraph 2e of the Order** calls for contracted consultant retardation professionals or a nationally recognized evaluation group to review community programs on a periodic basis. As stated in Mr. Cohen's letter of April 6, 2004, the defendants are not in substantial compliance with this requirement. The surveys and reports that have been made available to us to date simply do not constitute the kind of regular, comprehensive and independent reviews that we believe the Final Order requires. Again, the Administration's announced plan to close Fernald and other facilities makes the need for such reviews of community programs all the more urgent and important.

Finally, the plaintiffs in the Wrentham and Dever actions believe that the impacts of the proposed FY05 budget, together with the cumulative impacts of prior budget cuts over the past several years, will seriously interfere not only with DMR's ability to provide sufficient adequately trained and experienced personnel as required by paragraph 2c of the Order, but also

**Piper Rudnick**

Commissioner Gerald J. Morrissey, Jr.<br>
April 12, 2004<br>
Page 4

with DMR's ability to substantially provide required services to each class member on a lifetime basis, and to maintain and implement the basic principles of the ISP and otherwise to satisfy its obligations to the *Ricci* class members pursuant to **paragraphs 2a and 6a of the Order**. Ultimately, the DMR's determined efforts to do more with less, and to organize itself and manage its operations for increased efficiencies, simply cannot compensate for budget cuts of the depth and breath that have been incurred in recent years and are threatened for the next fiscal year. Despite securing annual appropriations that exceed the total gross amounts of the actual appropriations for FY03, more than a decade later that benchmark is no longer a fair measure of adequate funding, and the fact is that the defendants are no longer maintaining and securing sufficient funds to meet the needs of *Ricci* class members under the Order, as is contemplated by **paragraph 6b of the Order**. Accordingly, the plaintiffs in the Wrentham and Dever actions join their co-plaintiffs in the Belchertown, Monson and Fernald actions in seeking enforcement of the Order.

Sincerely,

*Lisa C. Goodheart*

Lisa C. Goodheart

LCG:btj

cc: Beryl W. Cohen, Esq. (By FAX and First Class Mail)
Marianne Meacham, Esq. (By FAX and First Class Mail)
Mrs. Florence S. Finkel (By First Class Mail)
Ms. Colleen Lutkevich (By E-Mail)
Mr. Leo V. Sarkissian (By E-Mail)

~BOST1:298636.v1
125-847