ATTACHMENT B



# The Commonwealth of Massachusetts
### Executive Office of Health & Human Services
### Department of Mental Retardation
### 500 Harrison Avenue
### Boston, MA 02118

Mitt Romney  
Governor

Kerry Healey  
Lieutenant Governor

Ronald Preston  
Secretary

Gerald J. Morrissey, Jr.  
Commissioner

May 17, 2004

Area Code (617) 727-5608  
TTY: (617) 624-7590

BY FAX AND BY REGULAR MAIL  
Lisa Goodheart, Esq.  
Piper Rudnick  
One International Place, 21st Floor  
Boston, MA 02110-2613  
Fax 617.406.6100

Re: Ricci, et al v. Okin, et al – Order May 25, 1993

Dear Attorney Goodheart:

Introduction

This letter is in response to your letter of April 12, 2004, in which you invoke Paragraphs 7a and 7c(1) of the May 25, 1993 Final Order ("the Order") in the above-referenced case. In your letter, you state that the Department of Mental Retardation ("the Department") is not in substantial compliance with the Order.

Preliminarily, we note that you reference Attorney Beryl Cohen's letter of April 6, 2004, and to the extent that you assert noncompliance with the Order based upon the allegations set forth in Attorney Cohen's letter on behalf of the Wrentham and Dever class members, we incorporate by reference our response to Attorney Cohen dated May 11, 2004.

Second, we request that you provide the Department with specific facts supporting these allegations as they pertain to the Dever and Wrentham class members. The Department believes that it is in full compliance with the Order, that Dever and Wrentham class members both in facilities and in the community are receiving ISPs and the services identified in their ISPs.

Further, as set forth below, we believe that we are in full compliance with all other aspects of the Order. As we have stated in our prior response, the budget process for the upcoming year is not complete, and the concerns you raise about potential non-compliance resulting from proposed budget reductions are, therefore, premature.

1

Background

On May 25, 1993, Judge Tauro issued the Final Order in the consolidated cases involving the Department's five state developmental centers, ending nearly two decades of court involvement with these institutions and with services to *Ricci* class members in the community. The period of time between the filing of the class action lawsuit and the entry of the Final Order saw unprecedented improvement of the state intermediate care facilities for the mentally retarded ("ICFs/MR"), transforming not simply the physical condition of the facilities, but more importantly, the quality of care for individuals in these facilities. After decades of neglect and deplorable treatment for residents, the "state schools," as they were referred to then, had been transformed to facilities where individual's rights were respected. The quality of services (medical, nursing, habilitative, physical therapy, speech therapy, social, recreation services) was similarly transformed and improved. From 1993 to the present the Department has been found to be in compliance with federal requirements for all of its facilities and its community-based residential system.

An important element of the Final Order was the creation of the Governor's Commission on Mental Retardation as an oversight body to monitor services to individuals that the Department serves, to receive and resolve complaints regarding services with the Department and to make recommendations to the Governor regarding the delivery of services to *Ricci* class members and all individuals the Department serves. The Commission has been re-established by Executive Order every three years since its creation. For over ten years the Governor's Commission has served in this capacity. Commissioner Morrissey has attended these public meetings of the Governor's Commission on a monthly basis for many years, providing information to the Commission as requested and receiving advice and feedback from the Commission and attendees.

As stated above, among the powers of the Governor's Commission is the authority to receive complaints and to request information from the Department regarding any individual issue or problem identified in order to facilitate a resolution. Tellingly, in the past three years, with more than 3,372 *Ricci* class members receiving services in the community only a handful, fifteen (15), individual service issues have been presented to the Governor's Commission, and no service issues involving a *Ricci* class member or other individual served by the Department raised to the Governor's Commission in that period has gone unresolved.

Commissioner Morrissey and senior level staff have met with you, as well as with the class representatives and class counsel Beryl Cohen, Esq. on at least a quarterly basis for the past three years and shared information about services to class members when requested. While in any service delivery system, quality issues will emerge and occasionally sentinel events will occur, when they have involved *Ricci* class members we have shared the information with you and have informed you of corrective action taken. Moreover, aside from these events, and aside from concerns regarding the budget as a whole, we are unaware of any "systemic" service or ISP issues raised by you or Attorney

2

Cohen. We therefore find it difficult to understand how you can assert that there are "systemic" issues related to the quality of services or the Department's ability to meet class members' needs without identifying any instances or examples of individual's needs not being met.

The Decision to Close the Fernald Developmental Center

In the Final Order, the Court left to the Department considerable discretion in "developing and improving programs, managing and determining the personnel and budget of the Department of Mental Retardation and other state agencies, implementing innovative services, improving quality enhancement and dispute-resolution mechanisms, or allocating its resources to ensure equitable treatment of its citizens."

The Department has the authority under the Order to reconfigure its residential services to provide them to individuals in a more integrated setting. During the last 10 years, there has been a national trend away from institutional services and towards more integrated, less restrictive community-based services. See Olmstead v. L.C. by Zimring, 527 U.S. 581 (1999). Consistent with this trend, DMR has consolidated and closed a number of facilities in the last decade.

These include:
- Belchertown State School, closed 12/1992.
- The Dexter Building of the Wrentham Developmental Center, closed 5/93.
- The J.T. Berry Rehabilitation Center, closed 6/95.
- The Paul A Dever Developmental Center, closed 2/02

Since FY92, the facility population has declined from **2,643** to **1,088** (904 of whom are *Ricci* class members) in FY04. More than 1,200 people have moved out of the large facilities in this time period with the vast majority opting for community placement. The care and attention accorded these transfers was very high as was evidenced in independent satisfaction surveys and the comments from parents and loved ones once the moves were completed.

At present, DMR operates six facilities: the Monson Developmental Center in Palmer, the Templeton Developmental Center in Baldwinville, the Glavin Regional Center in Shrewsbury, the Hogan Regional Center in Danvers, the Fernald Developmental Center in Waltham, and the Wrentham Developmental Center in Wrentham. DMR management and staff maintain high levels of care and treatment at these facilities. For several consecutive years, all of these six centers have maintained high standards on the federal Title XIX review programs that measure the appropriateness and effectiveness of the services these facilities provide.



The Department is implementing its long-established policy preferring integrated community settings to facilities.[2] The Department is committed to creating placement and transfer options for DMR consumers that protect health and safety while providing individuals an opportunity for services in, as Judge Tauro stated, the "most normal" setting possible.

In accordance with this standard, and consistent with the national trends towards community-based residential and non-residential services for individuals with mental retardation, the Department has, in the decade since the Final Order, reduced its ICF/MR capacity while concurrently creating a community-based residential system to serve adults with mental retardation. The capacity of the community-based residential service system has grown to accommodate the demands of *Ricci* class members and others. At the same time, there has been substantial growth in community-based day services and supports to families caring for their family members with mental retardation at home.

The Administration announced the decision to close the Fernald Developmental Center ("Fernald") in February of 2003. The Legislature, in the Acts and Resolves of Fiscal Year 2004, and again for Fiscal Year 2005, appropriated funds for the Department's Intermediate Care Facilities for the Mentally Retarded (hereinafter ICFs/MR) subject to

---

[1] Numbers of Individuals in Developmental Centers derived from the "Department of Mental Retardation Twelve-Year Report" (Published July 1, 2002), updated with current data to date for FY03 and FY04.
[2] Judge Tauro, in describing the ISP regulations that govern the delivery of services, noted that "[t]hose regulations shall guarantee that each class member be provided with the least restrictive, most normal, appropriate residential environment together with the most appropriate treatment, training and support services suited to the person's individual needs." Order, fn. 2. The "least restrictive" standard is also the applicable regulatory standard for the Department's services. 115 C.M.R. 6.20(3).

the proviso that the Department take appropriate steps to consolidate or close its ICFs/MR.[3] Thus, both the Governor and the Legislature have directed the Department to take steps to consolidate or close its ICF/MRs and the Department has taken steps to do so. It is in this context that you have raised certain allegations regarding the Department's compliance with the Order in the above-referenced case.

Salaries and Benefits for Staff Who Serve Ricci Class members in the Community

You allege that because most Ricci class members receive services through non-profit agencies under contract with the Department, and because the Commonwealth has made insufficient provision for the "salary and benefit needs of direct support, supervisory and professional staff who work with Ricci class members pursuant to the Purchase of Service contract system," there are "systemic deficiencies including increased and unacceptable levels of staff turnover, lengthy and problematic vacancies in staff positions, a decrease in the quality of services and the number of clients receiving adequate services, and ultimately, real concerns about safety."

First, the Department disagrees with your characterization of the quality of the services provided and the system as a whole. Services provided to Ricci class members, including residential supports, day supports, transportation, clinical services and dental services, have been found in all periodic reviews of the community system to be of high quality despite the challenges presented to the Department's non-profit providers and state-operated homes by staff turnover and vacancies.

Second, we disagree that the salaries paid to supervisory or professional staff by providers has been found to be inadequate. In particular, the Salary Reserve Impact Report of January 2001, which you discuss, focused on the salaries of direct care workers, not supervisors or professional staff.

With regard to professional staff such as registered nurses or licensed practical nurses (LPNs), the broader, statewide concern is a nursing shortage that affects all health care providers. In this, the Department faces the same challenge in its state-operated facilities and residences as non-profit community providers do, or as hospitals and other health providers do. That is, we have vacancies in nursing positions in our facilities, as well as

---

[3] The language directing the Department to take these steps is as follows: "Provided, that in order to comply with the provisions of the Olmstead decision and to enhance care within available resources to clients served by the department, shall take steps to consolidate or close intermittent [sic] care facilities for the mentally retarded, called ICF/MRs managed by the department and shall endeavor within available resources to discharge clients residing in the ICF/MRs to residential services in the community when the following criteria are met: 1) the client is deemed clinically suited for a more integrated setting; 2) community residential service capacity and resources available to provide each client with an equal or improved level of service; and 3) the cost to the commonwealth of serving the client in the community is less than or equal to the cost of serving the client in ICF/MRs, so called; provided further that any client transferred to another ICF/MR as the result of facility closure shall receive a level of care that is equal to or better than the care that had been received at the closed ICF/MR..."

in state-operated community residences, despite vigorous and creative recruiting efforts, and despite state salary and benefit packages. The issue, therefore, is not as simple as increasing salary reserves at least for this section of the workforce. The challenges of demographics – an aging population and a workforce that has not kept pace – will prove to be problematic regardless of salary increases.

However, the issue of increasing salaries and health benefits for direct care workers in the POS system and, in other ways, increasing the interest in human services work, is one to which the Department has devoted considerable effort. As a Department, we have encouraged efforts to strengthen recruitment and retention of direct care staff in the community through developing a certification program in the community college system that allows direct care workers to increase their knowledge base and earn salary bonuses. Between 400 and 500 employees working in the field of mental retardation have participated in the community college certification program.

Recently, and perhaps most directly responsive to your concerns, both the House Ways and Means and the Senate Ways & Means appropriated $20 million in the FY05 budget for adjustment of salaries of private human services providers. This represents an important step in recognizing the value and importance of the work that direct care staff do. Of this amount, a portion is allocated towards those workers with salaries under $25,000 and the other portion is dedicated towards those whose salaries fall between $25,001 and $40,000. Although the budget process is not complete, this is an important step for direct care workers.

With regard to the cost of benefits for direct care workers, the Department supported the Senate Ways & Means Outside Section 321 which establishes a commission to study the feasibility of developing and implementing a voluntary health care plan for employees of private health and human services providers who contract with agencies under the Executive office of Health and Human Services.[4] Amendments to the Senate Ways & Means budget filed today proposed amending M.G.L. c. 32A to provide a mechanism for vendor-employer of human service agencies, including the Department's vendors, to participate in group insurance purchasing through the Massachusetts Group Insurance Commission. See Clerk Amendment No. 83, "Health Insurance for Human Services Employees."

The Department believes that these mechanisms, i.e. a Legislative initiative creating a $20 million salary reserve for direct care staff, and health insurance for direct care workers funded through the Group Insurance Commission, funding community college certification programs to increase the competency and quality of the workforce, and reforming the purchase of services contracting system through the development of service rates will produce improvements in the income and benefit levels for direct care staff more effectively than litigation.

---

[1] The other issues which you address, that of increases in rent, utilities and other "fixed costs," are somewhat more complex. The Department is in the process of working with provider agencies to reform the method of funding of the provider system through the purchase of services contract system to be more equitable and reflect the level of need of the individual served.

6

Finally, the federal government is working towards finding solutions for these problems as well. The President signed Executive Order 13217 on Monday, June 18, 2001, promoting community-based alternatives rather than institutions for individuals with disabilities. This Executive Order directs key federal agencies to work closely with states to ensure full compliance with the Supreme Court's ruling in the Olmstead case and the Americans with Disabilities Act (ADA).[5]

Ricci Class Members' Access to Clinical Staff

Individual Ricci class members living in the community have the ability to access a wide array of Medicaid state-plan and privately-funded medical or therapeutic services from the area in which they live to meet their needs. It is the Department's responsibility to ensure that Ricci class members are able to access medically necessary services including services provided by psychologists, physical therapists, occupational therapists, recreational therapists, etc. In some instances the Department may provide services that *supplement* these community services. For example, there are circumstances when Department psychologists monitor or oversee an individual's treatment on a consultative basis, but this would occur on an as-needed basis. It is not, however, expected that the psychologists who are employed by the Department would provide all the services necessary to meet the needs of individuals living in the community because class

---

[5] The "New Freedom Initiative" is the result of the President's Executive Order. A preliminary report entitled "Delivering on the Promise – Federal Agency Actions to Eliminate Barriers and Promote Community Integration – Personal Assistance, Direct Care Services and Community Workers" addresses the reality that as more people with significant disabilities live in home and community-based settings and enter the workforce, the critical need for personal care assistants and other direct care staff and community service workers will become even more pronounced. The report acknowledges there is a chronic inability to attract and retain dedicated people in these fields. This can be traced to the fact that traditionally, across the country, these workers earn very low pay, work long hours, and often receive no benefits. The report recognizes there is an urgent need to address the areas of recruiting, training, retaining, promoting, and improving the earnings/benefits of personal assistants and other community service workers. The following activities by the Health and Human Services are planned to address these barriers.

- HHS will, together with a limited number of volunteer states, initiate a national demonstration designed to address workforce shortages of community service direct care workers. The demonstration will test the extent to which workforce shortages and instabilities might be addressed through (a) better coordination with the Temporary Assistance for Needy Families (TANF) program; and (b) the availability of vouchers for worker health insurance or for tuition or day care credits. Participating states would be expected to develop options for workers to purchase affordable group health coverage through the state health insurance system or similar organized insurance group.
- HHS components will collaborate on a joint initiative to: (a) mobilize and make available to states a coherent body of information about methods to address worker shortage issues; (b) research significant issues; and (c) partner with foundations, other private sector organizations, the Department of Labor, and other agencies to formulate a comprehensive approach to the worker issue.
- HHS will work with other federal agencies to devise and implement additional strategies on workforce issues as part of the activities of the Interagency Council on Community Living.

members, like other citizens, have access to generic and specialized services from an array of community providers.

Because looking at the Department's listing of staff or budget codes for a particular category of service does not give a complete picture of the clinical services available to the individual, your assertion that the Department's provision of 50 full-time psychologists to serve the needs of 10,000 individuals in the community grossly understates the services which are available, and being accessed by Ricci class members. Similarly, the number of "allied health therapists," reported in your letter does not represent the number of professional, clinical staff providing services to Ricci class members.

Based upon information that we have, we believe that Ricci class members' needs for clinical or therapeutic services are being met. *If you have information suggesting that an individual class member's ISP-identified needs are not being met, please identify the individual so that the problem can be addressed.*

### Periodic Review of Community Programs

You have joined in Attorney Cohen's letter insofar as you allege that the Department has failed to meet the requirement of "periodic reviews" of the community system. We strongly disagree that the Department's efforts in this regard to do meet the requirements of the Order, and again note that of the many reviews that the Department has had conducted, the National Core Indicator Project, and subsequent iterations, is probably to date the largest nationally-recognized quality review of a community system in the nation, and the HSRI has reviewed and analyzed data of thousands of individuals within the department's services system over a period of years.

### Fiscal Effort: Obligation to Use Best Efforts to Secure Sufficient Funding to Meet the Needs of Class Members

Paragraph 6 (b) requires that the Department "exert their best efforts to maintain and secure sufficient funds to meet the needs of class members under this Order." Further, "[t]he defendants shall be determined to have met their obligation under this subparagraph if the defendants have secured and maintained an annual appropriation for the Department of Mental Retardation at least equal to the total gross amount of actual appropriations for Fiscal Year 1993." Id.



DMR's budget has expanded from $601.4 million in FY92 to $ 1.016 billion in FY04, and a proposed House One budget of $1.044 billion in FY05. This expansion has also brought a significant increase in increased federal dollars coming to the state, rising from $219 million in FY92 to over $ $365 million thus far in FY04. In addition, we note that the funding dedicated to *Ricci* class members alone during the relevant period has been substantial and, indeed, captures the greatest portion of this funding stream.

### Day, Transportation and Clinical Services Cuts

On page three of your letter, you correctly note that the Governor's House 1 Budget contained service reductions for clients of DMR; importantly, however, no service reductions were or are planned for *Ricci* class members as a result of these cuts. With regard to your claims that the Fiscal Year 2005 House-1 Budget process will result in substantial services cuts to non-*Ricci* class members, it is premature to speculate as to what service reductions will result from the final budget. Indeed, the House Ways & Means Budget, and the Senate Ways & Means, as amended, fully restored funding the day and transportation services to those accounts.

With regard to the clinical services cut of $1.2 million, the House and the Senate have mitigated this cut by two-thirds, leaving a budget reduction of approximately $330,000. With this level of funding, the Department will assure adequate clinical supports, including accessing Medicaid state-plan medically necessary services for implementation of ISPs for *Ricci* class members.

In the past several years, the Department, through its Office of Quality Management, has developed a health initiative to ensure that all individuals with mental retardation within our service system receive appropriate access to health care of all kinds. While current data suggests that while there is more to do, the Department's consumers have regular access to health care through annual physicals and referrals to appropriate specialists and

9

hospital care. The Department's staff is working to continually improve services in such areas as behavioral interventions and medication review. In the best professional view of the Department, these efforts will not be substantially impacted by these budget reductions.

In addition, both the House Ways & Means and the Senate Ways & Means budgets contain a proposal to impose a health assessment on public and private ICF/MR and community providers that is expected to yield more than $18 million in revenue for FY05, which revenues may be applied to improve the quality of both ICF/MR and community-based services for *Ricci* class members, as well as others.

The Commissioner has shared with you information regarding the budget process on numerous occasions. The budget process today is incomplete, with the Conference Committee process, the veto process and veto overrides yet to come. We look forward to meeting with you on progress in the budget process. At this point, however, it is premature to base any action for non-compliance on any perceived shortfalls in funding that would not, in any event, impact *Ricci* class members.

<u>Conclusion</u>

The Department is providing supports to meet the needs of all *Ricci* class members as required by the Final Order. The Department has adequate resources and staff to continue to provide the supports that individuals at each of the developmental centers, and in community placements, need. The Department is complying with its ISP guidelines for *Ricci* class members.

The Final Order *requires* the parties to attempt to resolve any issues of alleged non-compliance with the Order before invoking the authority of the federal court in this matter. *We request that you provide us, in advance of our first meeting on May 28th, with any information you have indicating that any individual Ricci class member's ISP needs are not being me, or any evidence you have of "systemic" noncompliance with the terms of the Final Order.* If we receive such information, the Department will investigate the allegation and take corrective action, if necessary.

We hope that by providing you with this information, and by meeting with you on May 28th and June 7th and 8th, we can resolve any outstanding issues you have. In light of our continued commitment, fiscal and otherwise, to *Ricci* class members, a prompt resolution should be achieved.

Very truly yours,

Marianne Meacham
General Counsel

Cc: Gerald J. Morrissey, Jr., Commissioner
Kristen Reasoner-Apgar, General Counsel
Beryl Cohen, Esq.
Diane Enochs, Asst. Commissioner for Facilities
Regional Directors
Nicholas D'Alusio, Facility Director