# HILL & BARLOW
*A Professional Corporation*



DANA M. TULLY
DIRECT LINE: 617-428-3576
DTULLY@HILLBARLOW.COM

June 15, 2001

**By First Class Mail**

Commissioner Gerald J. Morrissey, Jr.
Department of Mental Retardation
Executive Office of Health and
  Human Services
160 North Washington Street, 3d Floor
Boston, MA 02114

Marianne Meacham, Esq.
General Counsel
Department of Mental Retardation
Executive Office of Health and
  Human Services
160 North Washington Street, 3d Floor
Boston, MA 02114

Mr. John E. Riley
Class Member Project Director
Department of Mental Retardation
Executive Office of Health and
  Human Services
160 North Washington Street, 3d Floor
Boston, MA 02114

Re:   *Ricci v. Okin* Final Order

Dear Gerry, Marianne, and Jack:

I have enclosed our agenda for the class member-DMR meeting. We look forward to seeing you here on June 27, 2001 at 9:30 a.m. You should all come to the 20th floor at Hill & Barlow, One International Place. Let the receptionist know that you are here to see me.

Sincerely,

*Dana*

Dana M. Tully

DMT:btj
Enclosure
cc:   Lisa C. Goodheart, Esq. (By Hand -- With Enclosure)

Representatives of Ricci Class/ Department of Mental Retardation
Hill & Barlow
Meeting Agenda

I. Purpose and Intent

The Ricci class representatives seek to resolve all outstanding disputes between the class and the DMR concerning systemic issues affecting class members. Should the parties be unable to resolve the disputes, the class representatives will take action to enforce the rights of the class.

Paragraph 1 of the May 1993 Final Order in Ricci et al. v. Okin, et al. ("Final Order) provides: "Any action to enforce the rights of the plaintiff classes may be brought before the court only pursuant to ¶ 7 below." Paragraph 7, in turn, states:

> (c) Should the plaintiff class believe that the defendants are not in substantial compliance with this Order with regard to systemic issues, plaintiffs may seek to reopen this case and to restore this case to the active docket and to move for enforcement of this Order only after the following steps have occurred:
>
> (1) plaintiffs have given written notice to defendants of the alleged non-compliance, including the facts alleged and the provision of the Order involved;
>
> (2) defendants have been provided with 30 days to review and respond to plaintiffs' notice and to inform plaintiffs of any proposed plan of correction;
>
> (3) plaintiffs and defendants (or their respective counsel) have met personally at least twice to discuss and seek to resolve any remaining dispute under the notice.

This agenda is intended to comply with Paragraph 7(c)(1), above. This meeting is intended as the first of the two meetings required by Paragraph 7(c)(3), above.

II. Class Members Classified as "Refusing Services" and/or "Inactive"

Beginning with the death of Karen Mutanen in May of 2000, the class representatives have attempted to understand and correct any problems with regard to class members classified as "Refusing Services" and/or "Inactive."

A. Relevant Provisions of the Final Order

- Paragraph 2(a) provides - Defendants shall substantially provide services to each class member on a lifetime basis... Such services shall include, as appropriate for the person, residential programs; day programs; recreational

and leisure time activities; medical, psychological, dental and health-related professional services; respite care and crisis intervention services . . .

- Paragraph 4 provides - Defendants shall not approve a transfer of any class member out of a state school into the community, or from one community residence to another such residence, until and unless the Superintendent of the transferring school . . . certifies that the individual to be transferred will receive equal or better services to meet their needs in the new location, and that all ISP-recommended services for the individual's current needs as identified in the ISP are available at the new location.

- Footnote 1 of the Final Order provides that the DMR shall "maintain a mechanism for keeping track of the occurrence and history of transfers, which information shall be available to plaintiffs' counsel."

- DMR regulations, 115 CMR 4.06 provide that "the "legally authorized representative shall be permitted to inspect and copy the individual's records upon request."

A. **Issue Chronology**

- May 23, 2000 - Ms. Mutanen and her mother were found dead in their home.

- June 2000 - Jack Riley mentioned to Colleen Lutkevich that Ms. Mutanen had "refused services," but he could not provide written documentation because of "confidentiality."

- July 19, 2000 - Hill & Barlow wrote to the DMR requesting documentation as to Ms. Mutanen's status and referring to provisions in the final order permitting the DMR to provide class counsel with documentation.

- October 13, 2000 - DMR refused to provide documentation, but included a letter from Ms. Mutanen's mother. The letter states "I need help."

- November 27, 2000 – Hill & Barlow wrote to the DMR stating that the October 13 letter demonstrated that there may be a "systemic failure" to provide services. Requested a complete review of all files of class members classified as "Refusing Services."

- December 13, 2000 – DMR refuses to provide the requested materials and suggests a meeting.

B. **Questions and Action Items**

What specifically has the DMR done to prevent another catastrophe with regard to class members who have allegedly "refused services?"

When can the class representatives review the files of these individuals?

2

Who at the DMR will be responsible for coordinating file review and corrective action?

III. **Results of Class Member Surveys**

This spring, the DMR and the class representatives conducted a survey of the placement and services provided to 26 class members, selected randomly from members of the Class (except Belchertown). The survey results revealed several areas that require intervention and response from the DMR.

A. **Relevant Provisions of the Final Order**

- Paragraph 2(a) provides that the DMR "shall substantially provide services to each class member on a lifetime basis ... Such services shall include, as appropriate for the person, residential programs; day programs; recreational and leisure time activities; medical, psychological, dental and health-related professional services; respite care and crisis intervention services; support and generic services, such as guardianship and adaptive equipment services; and transportation services."

B. **Survey Results**

1) Statistical Results – The class representatives analyzed the survey data with the following results. A total of 26 class members were surveyed, so percentages are based on this number. If the statistics here are indicative of the class as a whole, however, the number of affected individuals could be very high. All the numbers below may be verified from the actual survey reporting forms.

   **Class members needing clinical services but not currently receiving them:** 38%

   **Class members living in housing that is in need of modification, cleaning or is otherwise inappropriate:** 35%

   **Class members in need of better day programming:** 35%

   **Class members with financial issues:** 31%

   **Class members with transportation problems:** 23%

   **Class members with staffing issues:** 31%

2) Report Received from DMR

   The class representatives have reviewed a draft of Mr. Riley's report of the survey results. Although this report concludes that the survey results were "generally very positive," it also acknowledges the following

3

- "There was some evidence of social isolation in approximately half of the cases."
- "There appeared to be an issue of quality of day programs."
- "There was an indication that some clinical services were not as available as they should be."
- "In a few cases where such things as clinical services, housing or other supports were of concern, there appeared to be a problem with the service coordinator's identification of the problem or recognition of the changing needs of the individual."
- "Staff turnover, supervision and training also emerged as issues."
- Some individuals' surveys suggested "the need for a competency review and a need for potential guardianship."

C. **Questions and Action Items**

1) Leo Sarkissian also analyzed the survey data and provided a report to the DMR. All the reports, the class representatives' statistical summary, Mr. Sarkissian's report and Mr. Riley's draft report reveal a need for action in the following categories:

   Clinical Services/Quality of Day Programs

   Housing

   Financial

   Staffing

   Social isolation

   Competency/Guardianship

   Who at the DMR will take responsibility for addressing each of these issues? The class representatives request a report of remediation plans and results for each issue no later than July 30, 2001.

2) Both the class representatives' reports and Mr. Riley emphasize a need for a further surveys (although more study is NOT necessary to demonstrate a need for action in the categories above). Who at the DMR will take responsibility for designing and implementing a larger survey? How can the class representatives assist in this effort? The class representatives request a draft new survey plan no later than July 30, 2001.

3) The class representatives understand that 210 class members were included in a survey DMR conducted with the Boston University School of Social Work. The class representatives request an opportunity to review the results of that survey no later than July 30, 2001.

4

IV.  **Communications with Class Members Concerning the Final Order**

At some point, the DMR circulated a booklet entitled "A New Beginning: The 1993 Order in the Mental Retardation Cases, Questions, Answers and Resources." The class representatives recommend revisions and updates to the booklet – for example, the booklet should explain that Hill & Barlow is plaintiffs' counsel and monitors compliance with the final order. The class representatives also recommend that the booklet be reissued every two years. The booklet should be sent to both the class member AND the guardian, if applicable.

The booklet update not only makes good common sense, but will ensure compliance with the last sentence of the Final Order, which provides that rights pursuant to the Final Order "shall be reviewed with each class member at that individual's next scheduled ISP meeting."

V.  **Report on Class Members in Nursing Homes**

A.  **The Situation**

The class representatives request information, in specific terms, about steps the DMR has taken and plans to take to ensure that class members in nursing homes are receiving the services and supports outlined in their ISPs. It should be noted that the Rolland class included members of the Ricci class who had been inappropriately placed in nursing homes. Generally, it is unclear that class members in nursing homes are receiving proper services and supports, even where the placements are appropriate.

The class representatives are concerned that the DMR's list of Ricci class members currently residing in nursing homes is incomplete, which may be hindering progress on this point. It should also be noted that the class members brought the issue to Mr. Morrissey's attention in February 2000 (see letter from Viggiani to Morrisey, February 29, 2000). Apparently, however, we have not made progress on this issue.

B.  **Relevant Provisions of the Final Order**

Because class members inappropriately placed in nursing homes are part of the Ricci class, they are also beneficiaries of Paragraph 2(a) of the Final Order.

C.  **Questions and Action Items**

What specific steps has the DMR taken to identify all class members residing in nursing homes and to monitor the services being provided to them? What specific steps will the Department take to ensure that required services and supports are provided in a timely and appropriate manner and to remedy those placements that

5

are inappropriate? Who is responsible for this effort? The Class Representatives request a report on this issue no later than August 15, 2001.

VI.   **Guardianship Issues**

VII.  **Scheduling Next Meeting**