**Piper Rudnick**

One International Place, 21st Floor
Boston, Massachusetts 02110-2613
main 617.406.6000  fax 617.406.6100

LISA C. GOODHEART
lisa.goodheart@piperrudnick.com
Direct Dial: 617-406-6023
Direct Fax: 617-406-6123

July 28, 2004

**By FAX (617-624-7573) and First Class Mail**

Marianne Meacham, Esq.
General Counsel
Massachusetts Department of Mental Retardation
500 Harrison Avenue
Boston, MA 02118

Re: *Ricci, et al. v. Okin, et al.*, Civil Action Nos. 72-0469 (Belchertown); 74-2768-T (Fernald); 75-3920 (Monson); 75-5023-T (Wrentham); 75-5210-T (Dever)
(D. Mass.)

Dear Ms. Meacham:

This letter is a follow-up to our meetings on May 28, June 7 and June 8, 2004, and your letter of July 1, 2004. Consistent with our approach in prior correspondence and at the related meetings, I will not respond to the issues involving the proposed closure of the Fernald Developmental Center. I will, however, address (1) the periodic review of community programs; (2) the transfer certifications of equal or better services and the availability of all ISP-recommended services; and (3) the salary and benefits issues that impact the provision of sufficient adequately trained and experienced personnel in the community.

1. **Periodic Independent Review of Community Programs.**

We have spent considerable time considering the additional information that you have provided regarding the work performed by Human Services Research Institute ("HSRI") and the National Core Indicators consumer survey tool. We have also given thought to the proposed compromise of the parties' dispute on the subject of periodic reviews of community programs, as outlined on page 12 of your July 1st letter. Speaking for the Wrentham and Dever class members, and ARC of Massachusetts, your compromise proposal is acceptable as far as it goes, but it is not sufficient to meet all of our concerns, and we believe that the Department should take additional actions in order to comply fully with the letter and spirit of paragraph 2e of the Final Order.

--BOST1:305349.v1
125-847

*Piper Rudnick LLP*

**Piper Rudnick**

Marianne Meacham, Esq.
July 28, 2004
Page 2

Specifically, we welcome the Department's invitation to meet with class counsel on a regular basis, at the beginning of each review cycle, to discuss the HSRI protocol and its implementation for that cycle, so that class counsel can provide input to the Department. You have also proposed to provide us with the final HSRI report as soon as it is available. However, because the final HSRI report for each review cycle is typically not completed and made available until long after the data has been collected (and perhaps, in some cases, even after a new review cycle is already underway), we would like to receive the data itself in real time, as it is collected. Please let us know whether the Department will agree to that request. Also, we would appreciate knowing when the next HSRI review cycle is currently scheduled to begin, so that we can prepare to meet with the Department with regard to the upcoming cycle.

Second, we appreciate the Department's willingness to engage Boston University or other subcontractors for the data-gathering portion of the review. We continue to believe that a completely independent review, conducted entirely by reviewers outside the Department, is necessary to satisfy the Final Order's requirements.

Third, we understand that the Department intends to continue to participate with HSRI on a regular, two-year cycle, going forward, and appreciate the Department's agreement to advise class counsel if there should be any change in this plan in the future, and to consult with us regarding alternatives. We would hope and expect that any such consultation would take place at an early enough point in time to enable us to offer meaningful input to the Department regarding such alternatives, should the need arise.

The foregoing actions, while appreciated, do not fully respond to our concerns about the adequacy of the periodic reviews of community programs, as noted above. We remain concerned that the HSRI studies and the NCI survey tool, which aggregate data for the purpose of identifying systemic issues and trends and shaping Departmental policies and priorities, do not lend themselves to an individualized review of the quality and adequacy of the programs, services and living conditions provided to those class members in the community, nor to the identification and prompt correction of specific problems identified. We believe there is a need for periodic, individualized checks on the status of *Ricci* class members (and others) in the community, which should include personal visits by qualified, independent professionals to all surveyed individuals at their homes and day programs. This effort should include, but not be limited to, a review of the ISP-recommended services for each surveyed individual, and a determination as to whether all of those recommended services are actually in place for each such individual. This is increasingly important as the population ages and increasing numbers of people are served through the community system.

We understand that the Department has a number of internal monitoring mechanisms in place, besides the external reviews performed by HSRI and others, that the Department believes provide ample safeguards of the adequacy of services provided to those in the community. We do not believe that these existing monitoring mechanisms are fully sufficient to safeguard the rights of the *Ricci* class members, however. More is needed. The importance of such individualized reviews was highlighted for us by the results of the informal survey of 26 *Ricci*

~BOST1:305349.v1
125-847

**Piper Rudnick**

Marianne Meacham, Esq.
July 28, 2004
Page 3

class members that was jointly conducted by Department staff and designated class representatives in 2000. Although that survey produced a number of positive results, there were also a number of situations that required active intervention and follow-up by the Department. These included problems of social isolation for many of the surveyed individuals, issues with the quality of day programs and the availability of transportation services, issues with the availability of clinical services, issues with staff turnover, supervision and training, and issues suggesting the need, in some cases, for competency reviews and consideration of guardianships. Indeed, the Department recognized that follow-up actions were needed in response to those survey results, and proceeded to take such actions, as to many issues.

In your letter, you indicated that the Department provided us with summaries of the follow-up actions taken with respect to the issues identified through the 26-person survey, and that the Department is not aware of any outstanding requests for information with respect to these individuals. My records indicate, however, that on May 16, 2002, we sent you a letter and attached memorandum that detailed numerous areas in which the Department had, as of that date, apparently not taken follow-up actions with respect to specific individuals (or at least not confirmed any such actions to us). To the best of my knowledge, we never received a response to that letter. At our meeting, you suggested that we should direct any remaining issues concerning the 26-person survey to Jack Riley, and I will do so by separate correspondence. I did want to make clear to you in this letter, however, that from our perspective, we previously raised a number of issues arising from that survey that, to our knowledge, have never been resolved by the Department.

Our small survey of 26 persons identified areas where specific corrective action was needed, and facilitated Departmental follow-up for the surveyed persons on an *individualized* basis. This is something that the NCI tool is clearly not designed to do. At our recent meetings and in your July 1st letter, you explained that any specific concerns that may arise during the course of interviews conducted for the HSRI/NCI surveys are referred directly to the individual's service coordinator through a Central Office manager. However, the reliance on service coordinators to resolve problems identified through the review process is complicated by the increasing caseloads of the service coordinators over the years, and the anticipated reduction of approximately 18 service coordinators pursuant to the final FY05 budget. In addition, that system does not appear to involve any centralized, comprehensive reporting and documentation of the follow-up actions taken in response to the specific problems identified through the survey, much less any sharing of such information with class counsel. Finally, the results of the 26-person survey prove to us that active Departmental efforts, above and beyond those taken by individual service coordinators, is sometimes needed to identify, call attention to, and resolve serious problems. Again, we think more is needed, in terms of prompt, individualized follow-up on survey results.

Please let us know whether the Department is prepared to negotiate and implement an additional method of performing periodic reviews of community programs to address the foregoing concerns, beyond the HSRI/NCI surveys and other existing monitoring programs that are currently in place. If so, we would propose to arrange some joint meetings between

~BOST1:305349.v1
125-847

**Piper Rudnick**

Marianne Meacham, Esq.
July 28, 2004
Page 4

designated class representatives, perhaps assisted by outside experts, and the appropriate Department staff, in order to develop the outline for such a method.

2. **Transfer Certifications of Equal or Better Services and the Availability of All ISP-Recommended Services.**

In response to Beryl Cohen's public records request of April 27, 2004, which sought copies of the certifications mandated by paragraph 4 of the Final Order, the Department produced copies of "Ricci Class Member Change of Home Address Forms" for the past three years. Attorney Cohen has shared with me the forms for the Wrentham and Dever class members, and I have reviewed them. As I stated at our meetings, I do not believe they satisfy the requirements of the Final Order, which are that "the Superintendent of the transferring school (or the Regional Director of the pertinent community region) certif[y] that the individual to be transferred will receive equal or better services to meet their needs in the new location, and that all ISP-recommended services for the individual's current needs as identified in the ISP are available at the new location." (Final Order, ¶ 4.)

In your July 1, 2004 letter, you state that a new transfer form, which did not include the "equal or better" certification language, was "negotiated" between class counsel and the Department's counsel in 1997 and 1998. The suggestion that class counsel in any way agreed to the elimination of the court-mandated certification requirement is not accurate. Obviously, class counsel does not have any authority to alter in any way the requirements of the Final Order. Further, neither my correspondence file nor my memory is consistent with your suggestion that, as a result of negotiations in 1997 and 1998, class counsel agreed to the elimination of the equal or better certification from the transfer forms. To the contrary, in 1997, class counsel requested that the Department return to the use of the transfer forms that were used during the *Ricci* litigation for several years thereafter. The Department refused to do so. Later, in 1998, class counsel reviewed the Department's proposed new transfer form and *objected* to the absence of a certification of equal or better services, as well as to the fact that the new form did not specify whether anticipated services were in place, and called for only very limited information about the new home and the relevant support and day services.

In any event, in order to resolve the parties' dispute on this point, the Department has proposed, as stated in your July 1st letter, to adopt and implement, on a prospective basis, a transfer certification form similar to the one used prior to 1997, which contains an explicit "equal or better" certification. Speaking for the Wrentham and Dever class members, and ARC of Massachusetts, we would like to see that happen as soon as possible, and we ask that you give us an opportunity to review and comment on the actual form that you intend to use, before you make this change.

This proposed change, however, will not address the absence of such certifications from 1997 to date. Indeed, the proposal in your letter appears to be a step back from the offer made at our last meeting, which, as I understood it, was to have the appropriate Facility Director or Regional Director go back and certify the provision of equal or better services for each transfer

~BOST1:305349.v1
125-847

made within the three-year period represented by the transfer forms recently provided to us (and, presumably, to take any actions that might prove to be necessary in order to enable such certifications to be made). At our meeting, class counsel expressed concern that performing such certifications for those transfers made in the past three years would not ensure the protection of the rights of *Ricci* class members who were transferred at other times since the Department discontinued the use of its pre-1997 transfer forms. We asked that the Department agree to perform and document the requisite certifications for all transfers of *Ricci* class members since that 1997 date, or, at a minimum, to certify that each *Ricci* class member currently receives services that are equal to or better than what he or she received at the time of the last transfer for which the Department has a transfer form with an appropriate "equal or better" certification. Each such certification should be made by the Superintendent of the transferring facility or the Regional Director of the pertinent community region (as specified in paragraph 4 of the Final Order), and should be based upon a review of the transferred person's ISP and an express determination that all ISP-recommended services for the individual's current needs as identified in the ISP are available at the new location. We continue to believe that the Department is obligated to take this additional step, in order to comply with paragraph 4 of the Final Order.

3. **Sufficient Adequately Trained and Experienced Personnel in the Community.**

We appreciate the Department's acknowledgement, confirmed by your letter, that there is a pressing need to recruit, train, hire and retrain qualified staff in the purchase of services ("POS") system, through which most of the *Ricci* class members now living in the community receive services. At the same time, however, you assert that we have not demonstrated that there is a lack of sufficient adequately trained and experienced personnel to meet the needs of *Ricci* class members in the community. We find this puzzling. It is precisely that lack that has produced the pressing need -- which you acknowledge -- to recruit, train, hire and retrain qualified staff. If there was not such a serious insufficiency of adequately trained and experienced personnel to serve *Ricci* class members in the community, then there would be no pressing need to recruit, train, hire and retrain such personnel.

Further, your letter notes the limitations of the information that class counsel has been able to gather to date on this point, and asserts that the Department's own information, including the results of periodic reviews and internal monitoring systems, shows that the Department is providing adequate staffing in the community. Yet the Department has not offered any meaningful specifics to support its contention in this regard. For example, in response to the statistics about the staff turnover rate in the POS system that I presented at our recent meetings, based on information contained in the OSD's Salary Reserve Impact Report, you state that the Department does not believe that the turnover rate is as high as it was reported to be in 2000, but you do not offer any data to support this assertion, or state what the Department believes the current turnover rate to be.

We acknowledge and appreciate the $20 million human services salary reserve included in the FY05 budget, which will help in part to ameliorate some of strains created by the relatively

**Piper Rudnick**

Marianne Meacham, Esq.
July 28, 2004
Page 6

low salaries and benefits afforded to personnel in the community. In our view, this is a good start, but it is not by any means sufficient to address the problem. In light of the substantial differential between the salaries paid to state workers and POS contractors, and the number of affected workers, the scope of the shortfall that impacts community workers has been estimated by some to be a $120 million problem.

We continue to be concerned about the sufficiency and adequacy of trained, experienced personnel, as required by paragraph 2c of the Final Order, to serve the needs of *Ricci* class members in community settings, and we believe that this is a systemic problem. Again, particularly in view of the Department's stated plan to close Fernald and other facilities, it is imperative for the Department to obtain resources necessary to meet the pressing need to address personnel issues in the community. We recognize the challenges faced by the Department in this regard. For example, although the Department previously pointed to the $20 million salary reserve as "an important step in recognizing the value and importance of the work that direct care staff do," Governor Romney vetoed this reserve, and it was only restored to the final budget through an override by the House and Senate.

In sum, we continue to believe that there are systemic failures to meet the requirements of the *Ricci* Final Order, which the Department has neither acknowledged nor remedied to date, in the areas of periodic review of community programs, the transfer certifications of equal or better services, and the provision of sufficient adequately trained and experienced personnel to *Ricci* class members in the community. We are prepared to continue to negotiate these issues with the Department, at this point. However, as Beryl Cohen has recently filed a motion to re-open the *Ricci* case, based on at least some of the issues addressed in this letter, we recognize the possibility that these may soon become litigation issues, and we are prepared to address them in that context if and as may be necessary.

I look forward to hearing from you further on these issues at your earliest convenience.

Sincerely,

*Lisa C. Goodheart (by)*

Lisa C. Goodheart

LCG:btj

cc: Robert L. Quinan, Jr., Esq. (By FAX -- 617-727-5785 -- and First Class Mail)
    Beryl W. Cohen, Esq. (By FAX -- 617-720-5652 -- and First Class Mail)
    Mrs. Florence S. Finkel (By First Class Mail)
    Ms. Colleen Lutkevich (By E-Mail -- colleen.lutkevich@verizon.net)
    Mr. Leo V. Sarkissian (By E-Mail -- sarkissian@arcmass.org)