

**THE MASSACHUSETTS COALITION OF FAMILIES
AND ADVOCATES FOR THE RETARDED, INC.**

3 Hodges Street, Mansfield, MA 02048
Telephone: (508) 339-3379  Fax: (508) 339-5034
www.cofar-mass.org

# The Procurement of Community-Based Housing for Fernald Developmental Center Residents

**April 2006**

1

# Table of Contents

I)    Executive Summary ................................................................................................... 3

II)   Introduction: 8

III)  Findings:    10

      Finding 1: DMR has not publicly issued an overall plan for the development of community-
              based housing for Fernald residents: ............................................................... 11

      Finding 2: DCAM selected TILL without knowing whether TILL's proposed group homes
              were still available to the vendor to purchase ................................................. 13

      Finding 3: TILL submitted proposals in response to the DCAM RFP for rehabilitating homes
              in different towns that were incomplete and identical to each other in several
              key respects: ................................................................................................. 15

      Finding 4: TILL did not appear to possess adequate experience in constructing group homes
              ........................................................................................................................ 25

      Finding 5: DCAM's RFP for this housing failed to include requirements necessary for
              selecting the most qualified developers and contractors: ............................... 26

      Finding 6: DCAM diluted and misinterpreted site identification requirements in its RFP ..... 27

      Finding 7: Neither CIL Realty nor TILL's proposals appeared to show any differentiation
              between "special-needs" and non-special-needs homes ................................... 28

      Finding 8: DMR's plan to lease housing for Fernald residents with an option to purchase is
              unnecessarily expensive: ................................................................................. 30

      Finding 9: TILL has been criticized by the State Auditor for financial mismanagement: ...... 31

      Finding 10: TILL has had a record of substantiated cases of abuse and neglect in group
              homes it has managed. .................................................................................... 32

      Finding 11: Both DMR and DCAM have not provided documentation sought by COFAR in
              seeking to examine the community housing procurement process. .................. 34

IV)   Recommendations: ................................................................................................... 36

V)    Conclusion:   37

VI)   Attachments  38

# I)  *Executive Summary*

The procurement process undertaken by the state Division of Capital Asset Management and the Department of Mental Retardation to develop community-based housing for former Fernald Developmental Center residents has been seriously flawed, according to a review by The Massachusetts Coalition of Families and Advocates for the Retarded, Inc. (COFAR).

The procurement process resulted in the selection of two private vendors—Toward Independent Living and Learning, Inc. (TILL) and CIL Realty of Massachusetts (CIL Realty) to develop the housing.  Both vendors were selected despite having submitted proposals to DCAM in response to a Request for Proposals that were deficient in several key respects.  COFAR has referred its preliminary findings to the State Inspector General's Office and is now submitting this report to U.S. District Court Judge Joseph Tauro and to U.S. Attorney Michael Sullivan, who has been appointed Court Monitor in the ongoing Ricci v. Okin civil litigation over care in the DMR system.

Our findings are as follows:

- **The DCAM/DMR procurement process and other DMR housing initiatives appear to fall far short of the potential need.**

Although DMR announced in 2003 that it intended to close the six remaining large state facilities for persons with mental retardation, starting with the Fernald Center, the Department has never publicly issued a plan showing how it would accommodate the resulting influx of more than 1,100 facility residents into community-based care.  Thus far, COFAR has been able to identify agreements to develop a total of 57 new community-based beds, which would appear to fall far short of the potential need.

- **DCAM selected TILL without knowing whether TILL's proposed group homes were still available to the vendor to purchase.**

None of the TILL proposals in response to DCAM's Request for Proposals included signed Purchase and Sale agreements for the properties TILL intended to rehabilitate or construct.  Thus, there is a question as to whether the houses proposed for rehabilitation and the property on which construction was proposed were still even available to TILL to purchase at the time DCAM selected TILL to develop the homes.

- **TILL submitted proposals for rehabilitating homes in different towns that were incomplete and identical to each other in several key respects.**

Even though the TILL proposals were for differently sized houses located in different towns, they all included the same statement describing the locations of the proposed residences: "Very safe neighborhood—listed as one of the safest in the state."  In

addition, none of the proposals included required information about the condition of the structure of the houses proposed for rehabilitation, and none specified the types of improvements to the building enclosures and systems that TILL intended to make.

Further, three of the four TILL rehabilitation proposals listed identical project development costs, even though the proposed homes were located in different towns or were of different sizes and types of construction. Also, none of the TILL proposals identified a contractor who would undertake the construction, as required by the RFP, and none included required floor plans or drawings that were specific to the houses proposed for rehabilitation or construction. Further, TILL did not demonstrate clear evidence of its ability to finance the rehabilitation or construction of the proposed properties.

- **TILL did not appear to possess adequate experience in constructing group homes.**

From the information provided in the TILL proposals, it appears that TILL is primarily a vendor of direct-care related services for persons with mental retardation, not a firm that specializes in developing or constructing residential facilities.

- **DCAM's RFP failed to include requirements necessary for selecting the most qualified developers and contractors.**

The RFP did not require the proposers to list specific projects they had constructed or to provide references for those projects. Proposers were required to list the names, addresses and telephone numbers of current tenants of buildings *owned* by the proposers However, proposers could well own those buildings without having built them. The RFP should have required a listing of tenants and owners of buildings *constructed* by the proposers.

Further, while the RFP stated that the financial strength of the proposed landlord, design team, contractor, and property management company would be considered, as well as the "demonstrated capacity of the proposed landlord to finance the required improvements, the RFP did not require proposers to submit audited financial statements along with their proposals.

- **DCAM diluted and misinterpreted site identification requirements in its RFP.**

DCAM does not appear to have met its own 55-day schedule (later extended to 75 days) for identification and approval of sites for the homes proposed by its selected proposers. DCAM selected CIL Realty even though the vendor did not identify any sites for its proposed new homes. Moreover, DCAM appears to have misinterpreted the RFP to allow CIL Realty to ultimately identify a site for just one of four group homes, which it was conditionally selected to build. The RFP actually required sites to be ultimately identified for *all* of a selected proposer's proposed group homes.

4

- **Neither CIL Realty nor TILL's proposals appeared to show any differentiation between "special-needs" and non-special-needs homes.**

The DCAM RFP  stated that DCAM was seeking separate proposals for homes in the Boston Metro region containing 13 beds for consumers with "special needs," including eight beds in one four-bedroom duplex for persons with impaired vision, and five beds in one five-bedroom group home for persons with "certain behavioral needs."

The RFP contained a number of specifications for vision-impaired homes, but did not appear to list any separate specifications for homes for persons with behavioral challenges.  However, the proposals that DCAM received from CIL Realty and TILL did not appear to reflect any differences among those types of homes.

- **DMR's plan to lease housing for Fernald residents with an option to purchase is unnecessarily expensive.**

The total proposed Base Rent to the state over a 20-year period from all firms responding to the DCAM RFP ranged from a low of $741,000 for a five-bedroom group home, proposed by a bidder that was not selected, to a high of $3.1 million for a four-bedroom duplex, proposed by CIL Realty.  TILL proposed a Total Base Rent of $1.9 million for its proposed duplex, and a Total Base Rent of $1.2 million for each of its proposed four-and-five-bedroom group homes.

COFAR believes that were the state to pay up-front for this housing, it would be much less expensive over the long run than the current plans for long-term lease agreements, which are projected to cost taxpayers as much as $3 million per house over the 20-year period.

- **TILL has been criticized by the State Auditor for financial mismanagement:**

A January 2002 report by the Massachusetts Office of the State Auditor stated that TILL had spent more than $4 million in state funds in "unallowable, undocumented, and questionable business activities."

The report, dated January 7, 2002, covered TILL financial activities from July 1, 1997 through December 31, 2000.  The audit identified several undisclosed related-party relationships; $934,557 in unallowable and questionable related-party transactions; at least $3,203,587 in undocumented payroll costs; at least $273,274 in questionable salary and vehicle expenses for TILL's president; $50,836 in undocumented and questionable costs charged against a cost reimbursement contract; and inadequate administrative and internal controls over various aspects of TILL's operations.  The total of these "unallowable," "questionable" and "undocumented" costs was $4,462,254.

- **TILL has had a record of substantiated cases of abuse and neglect in group homes it has managed.**

Since 2002, the Disabled Persons Protection Commission has substantiated at least eight allegations of abuse and neglect in group homes operated by TILL. The cases involve a range of violations, including physical, emotional, and sexual abuse, and neglect. In one case involving alleged sexual abuse, the DPPC referred the case for criminal investigation.

- **Both DMR and DCAM have not provided documentation sought by COFAR in seeking to examine the community housing procurement process.**

In undertaking a review of the housing procurement process and related issues, COFAR has been unable to obtain several key documents, which both DCAM and DMR have withheld, citing exemptions to the Massachusetts Public Records law.

**Recommendations and Conclusion**

This report recommends that as part of its overall review of care in the DMR system, the U.S. Attorney's Office monitor DCAM's and DMR's efforts to procure community-based housing for former state facility residents.

 The report further recommends that the U.S. Attorney's Office review the TILL and CIL proposals in this procurement process, any contracts, when and if signed, and any internal evaluations of these proposals done by DCAM and DMR. Finally, the U.S. Attorney's Office should review any contracts or agreements when and if signed with housing authorities in various towns to develop housing for Fernald residents.

This report is meant to supplement evidence already submitted to Judge Tauro in the Ricci v. Okin case by the Fernald and Wrentham Association plaintiffs. Those plaintiffs have both presented evidence of flaws in the process of transferring Fernald Center residents to other locations and have shown that care and conditions in the community-based system are not equal or better than in the facilities.

The current residents of the Fernald Center and the other state facilities have the most severe and profound levels of mental retardation of any DMR clients in the Commonwealth, and a large number are aging and have serious medical needs. If these residents are transferred inappropriately from the facilities to a community system that provides substandard care and services in addition to providing poorly constructed housing, the consequences could be catastrophic.

We hope this report will advance the "postage-stamp" proposal for the Fernald campus as a first step in developing a comprehensive plan to upgrade the entire DMR system. Under the proposal, an ICF/MR-level facility would remain on a portion of the Fernald grounds, serving all of the existing residents who wish to remain there, while the remainder of the campus was developed for appropriate use. New housing needed for

Fernald residents would be built on the campus and paid for up front by the state. If the existing buildings at Fernald are considered outmoded or inefficient to maintain and heat, then they can be rehabilitated or torn down. The proposal, we believe, would be a start toward improved care, conditions, and accountability within the DMR system.

# *II) Introduction:*

The Massachusetts Coalition of Families and Advocates for the Retarded, Inc. (COFAR) has examined a procurement process resulting in the conditional selection in July 2005 by the Division of Capital Asset Management (DCAM) of two private vendors to develop housing for former Fernald Developmental Center residents. Our examination has been based on a review of DCAM procurement records obtained under the state Public Records law, and on interviews with state and other officials. The review has revealed what appear to be flaws in the procurement process, and we have referred our preliminary findings to the State Inspector General's Office (see Attachment 1, letter to OIG).

We hope this report, which represents a more in-depth analysis of the procurement process, will be of assistance to the U.S. Attorney's Office in its investigation of care under the Department of Mental Retardation, as part of the Ricci v. Okin civil action before U.S. District Court Judge Joseph Tauro.

In February 2006, the Fernald plaintiffs in Ricci v. Okin presented evidence to Judge Tauro of flaws in DMR's process of transferring residents from Fernald Center to other locations. The Wrentham Association plaintiffs similarly presented evidence that care and conditions in the community system are not equal to or better than the care and conditions in the facilities, as required by Judge Tauro's 1993 disengagement order.

The evidence in this report concerning the community housing procurement process is intended to supplement the evidence developed so far by the Fernald and Wrentham plaintiffs. This procurement process appears to be illustrative of the difficulty the Department of Mental Retardation and DCAM are having in finding, siting, constructing, and rehabilitating suitable residences in the community for Fernald residents. We think all of this evidence points to the need for DMR to reconsider its decision announced in 2003 to close the Fernald Center and the other Intermediate Care Facilities in Massachusetts. We think the evidence further points to the need to build new any new housing that may be needed on the existing campuses of those facilities.

## Background on the DCAM/DMR community housing procurement process:

The procurement process examined by COFAR appears specifically to be a part of the DMR's effort to carry out a 13-point plan announced in June 2004 for consolidating and closing the Fernald Center. As part of that plan, DMR stated that it intended to operate group homes containing up to 80 new residential beds in the Boston Metro and Northeast regions of the state (July 2004 *COFAR Voice,* Vol. 6, No. 4). In January 2005, DCAM issued a Request for Proposals on behalf of DMR, seeking to lease group homes with up to 40 beds in each of the two regions.

The DCAM RFP stated (Section A-1, Project Summary) that selected proposers would sign 20-year lease-purchase agreements with DCAM and with DMR, which would operate the homes.  Proposers were asked to propose the renovation or construction of either A) duplex homes with four bedrooms in each unit, B) single-family five-bedroom homes, or C) a four-bedroom group home if at least 16 beds had been proposed in either of the five-bedroom or duplex styles.

In addition, in the Boston Metro region, the RFP required that 13 beds be provided for consumers with special needs, including eight beds in one four-bedroom duplex for persons with impaired vision, and five beds in one five-bedroom group home for persons with "certain behavioral needs."  Each four-bedroom group home was required to have 2,350 square feet of usable space; each five-bedroom group home 2,550 square feet of space; and each duplex home was required to have 4,700 usable square feet of space. Desired occupancy was specified as "no later than Spring 2006."

In April 2005, DCAM received proposals for group homes from five proposers.  In July 2005, DCAM conditionally selected two of those proposers—Toward Independent Living and Learning, Inc. (TILL), a Dedham-based vendor; and CIL Realty of Massachusetts, Inc. (CIL Realty), a Massachusetts affiliate of a Connecticut-based firm— to undertake the housing development project.  TILL appears to have proposed to develop at least five group home projects—four existing four-and-five bedroom homes, which it proposed to rehabilitate, and one new duplex construction project.  CIL Realty appears to have proposed to construct up to nine duplexes and one five-bedroom group home.

According to a September 23, 2005 letter from Martha Goldsmith, Director of the DCAM Office of Leasing, to Dafna Krouk-Gordon, TILL president, TILL was conditionally selected on July 22, 2005 to renovate two five-bedroom homes in the Northeast Region (containing a total of 10 beds).  A letter, also dated September 23, 2005 from Goldsmith to Peter Venvie of CIL Realty, stated that CIL Realty was conditionally selected on July 22, 2005 to construct four homes containing a total of 29 beds: two four-bedroom duplex homes in the Northeast Region, one four-bedroom duplex home in the Metro Boston region, and one five-bedroom home for "behaviorally challenged" persons, in the Metro Boston region.  Thus, both vendors were selected to develop a total of 39 beds.[1]

As of February 2006, DMR had still not signed lease-purchase contracts with these firms. In an interview on February 14, 2006, Peter Wilson, DCAM's deputy general counsel, said no lease-purchase agreements with any of the proposers had yet been executed."

In the wake of concerns raised by COFAR about the procurement process, DCAM reportedly put a hold on negotiations with TILL over lease-purchase contracts, according to the January 26, 2006 *Waltham Daily Tribune*.

---

[1] DCAM  has declined to provide COFAR with the actual notices to TILL and CIL Realty of their conditional selections, stating that these records are exempt from public disclosure because lease-purchase contracts had not yet been signed with either firm.

# *III)    Findings:*

The findings in this report center around apparent flaws in the procurement process for community-based housing for Fernald residents, which led to the selection of vendors whose qualifications and/or development proposals appeared to be deficient in several respects.

The procurement process appears to be flawed, in part, because DMR has not placed the process within the context of an overall plan for the closure of all of the state facilities. DMR announced in 2003 that it intended to close all six remaining Intermediate Care facilities, starting with the Fernald Center; but the Department has never publicly issued a plan showing how it would deal with the resulting influx of more than 1,100 facility residents into community-based care.

Based on statements of various DMR officials, it appears that the Department is currently pursing at least two separate community housing initiatives—the DCAM procurement process in which TILL and CIL Realty have been selected as housing developers, and separate arrangements with local housing authorities to construct special-needs-based housing for former facility residents. DMR, however, has never publicly disclosed the number of beds it ultimately plans to develop through these two, or possibly other, approaches. Thus far, COFAR has been able to identify agreements to develop a total of 57 beds, 49 of which would be earmarked for Fernald Center residents (see Finding 1). That total number of beds would appear to fall far short of the potential need.

The DCAM procurement process itself appears to be additionally flawed for several reasons:

- **TILL proposed sites for homes it intended to rehabilitate, but did not provide any signed purchase and sale agreements for those properties with its proposals. Thus, there is a question whether the homes TILL proposed were still even available to the vendor to purchase at the time DCAM selected TILL to rehabilitate the residences. (See Finding 2)**

- **DCAM selected TILL to develop housing despite the fact that TILL's proposals were incomplete and nearly identical (Finding 3).**

- **TILL did not appear to possess adequate experience in constructing group homes (Finding 4).**

- **DCAM's RFP for this housing failed to include requirements necessary for selecting the most qualified developers and contractors (Finding 5).**

- **DCAM diluted and misinterpreted site identification requirements in its RFP (Finding 6).**

- **Neither CIL Realty nor TILL's proposals appeared to show any differentiation between "special-needs" and non-special-needs homes (Finding 7).**

- **DMR's plan to lease housing for Fernald residents with an option to purchase is unnecessarily expensive (Finding 8).**

- **TILL has had a record of substantiated cases of abuse and neglect in group homes it has managed (Finding 9).**

The following are our findings and information on the status of this procurement process:

### Finding 1: DMR has not publicly issued an overall plan for the development of community-based housing for Fernald residents:

DMR has issued differing and sometimes contradictory statements about its community housing development initiatives as it carries out its plans to close the Fernald Center and other remaining ICF/MR facilities. No public plan has been issued as to how the Department intends to develop housing for all of the more than 1,100 facility residents who would ultimately have to be relocated once all the facilities were closed.

In a January 23, 2006 interview, Diane Enochs, assistant DMR commissioner of facilities management, stated that in addition to the DCAM housing procurement process, DMR had begun working with local housing authorities to provide housing for Fernald residents. However, in a January 25, 2006 interview, Margaret Chow-Menzer, assistant DMR commissioner for systems integration management, appeared to downplay that contention, saying some of the housing authority residences may be targeted for former Fernald residents and some may not.

On January 25, 2006, COFAR sent a list of written questions about the issue to DMR Commissioner Gerald Morrissey. The questions were as follows:

1. Is DMR working with local housing authorities both to construct new housing and rehabilitate existing housing for former Fernald Center residents?
2. What types of homes are being developed?
3. Are DMR's requirements for the homes similar to those in the Division of Capital Asset Management's Request for Proposals for single-family and duplex homes in the Metro Boston and northeast regions?
4. Is DMR considering placing any former Fernald Center residents in congregate housing, along with persons who are elderly and/or low income or mentally ill?
5. What agreements have been signed so far?

11

COFAR also requested from DMR copies of all contracts, memoranda of understanding, and/or other agreements entered into with local housing authorities for the development of the community-based housing, and all written requirements, plans, and specifications developed by DMR for this housing.

A response received on March 16, 2006 from James Bergeron, DMR assistant general counsel, stated that housing for Fernald Center residents and other persons served by DMR was being developed in partnership with the Department of Housing and Community Development (DHCD) under a Housing for Special Needs program (known as Chapter 689).

DMR also provided two letters written by DMR Commissioner Gerald Morrissey in August and September 2005 to Jane Wallis Gumble at DHCD. The letters concerned Chapter 689 applications submitted by DMR in partnership with the Chelmsford and Billerica housing authorities respectively to develop special needs housing for up to 18 persons with mental retardation, who "will be moving into the community from institutional settings." In the letter concerning the Billerica Housing Authority, Morrissey's letter stated that housing would be created for up to 10 residents of the Fernald Center "who are seeking community placements."

A third letter to Wallis Gumble, provided by DMR, was written by Robert Gittens, then Secretary of Health and Human Services, and dated July 2, 2002. The letter stated that the Executive Office of Health and Human Services supported a Chapter 689 special needs housing proposal submitted the previous year by the Shrewsbury Housing Authority in partnership with DMR Glavin Regional Center.

In his March 16, 2006 response to COFAR, Bergeron stated that no contracts, memoranda of understanding, or other agreements had yet been executed by DMR and any housing authorities to construct housing for Fernald Center residents.

As noted in the introduction to this report, DCAM selected TILL and CIL Realty to develop a total of 39 beds for Fernald Center residents. Adding this total to the 18 beds apparently proposed for construction by the Billerica and Chelmsford housing authorities would bring the total number of new community-based beds specified for former facility residents to 57. The number of beds earmarked for Fernald Center residents includes the 10 beds projected to be created by the Billerica Housing Authority and the 39 beds awarded to TILL and CIL Realty. That total of 49 community-based beds earmarked for Fernald residents is still well short of the 80 beds specified in the DMR 13-point plan.

It is not clear, moreover, whether the 10 beds developed by the Billerica Housing Authority would be state-operated, and thus even part of the 80 state-operated beds proposed in DMR's 13-point plan for the closure of the Fernald Center. DMR has yet to publicly issue a plan specifying how it intends to develop the total of 80 beds specified for the Metro Boston and Northeast regions in the 13-point plan, let alone how it will ultimately accommodate the total remaining population at Fernald or the other remaining ICFs/MR.

In a February 1, 2006, interview, Fernald plantiffs' Attorney Beryl Cohen maintained that DMR needed to provide more information about its use of housing authorities. He added: "I'm not sure how much the use of housing authorities is appropriate for people with special needs. You can't put someone (with mental retardation) right on the second floor of each house with other people."

In response to COFAR's question about whether the housing authority construction would lead to the placement of persons with mental retardation in congregate housing, Bergeron's March 16 response to COFAR stated that regulatory guidelines governing DMR housing "place limitations upon the number of individuals receiving residential supports at a particular program location and are subject to waiver only in certain limited circumstances." Thus, the housing "does not meet the definition of 'congregate' housing as indicated in (COFAR's) inquiry," the letter stated. Nevertheless, a separate special needs design document provided by DMR for housing authority projects stated that: "Group residents (for persons with mental retardation) may also be combined with other types of housing such as elderly or family units." (Design Guideline for Special Needs Housing, Developed for the Department of Mental Retardation by the Department of Housing and Community Development, p. 3).

Bergeron's March 16 letter to COFAR stated that DMR would not provide COFAR with any plans, specifications or written requirements pertaining to housing development projects being undertaken by specific housing authorities. This information, according to the letter, was exempt from disclosure under the state's Public Records law because the housing authority projects were "still in the policy development process."

### Finding 2: DCAM selected TILL without knowing whether TILL's proposed group homes were still available to the vendor to purchase

COFAR examined five TILL proposals that were submitted in response to the Request for Proposals issued by DCAM in January 2005 to develop community-based housing for former Fernald residents. The proposals were numbered 18 through 22, and were among a total of 23 proposals submitted by a total of five firms, according to a DCAM summary document.

The TILL proposals were provided by DCAM in response to a Public Records request for all of the vendor's proposals in response to the RFP. The proposals were labeled as follows:

> **#18 (7 Marilyn Road, Andover):** This was described in the proposal as an existing house, which would be rehabilitated and converted into either a four-bedroom group home (2,350 sq. ft.) or five-bedroom group home (2,550 sq. ft.).[2]

---

[2] The addresses of the residences in the actual proposals were redacted. However, a separate DCAM document, which summarized proposed rental costs of each proposal, did list the addresses of each

13

**#19 (39 Forest Road and Cedar Street, lots 1-5, Millis):** This was described as a project to construct a new four-bedroom duplex (4,700 sq. ft.) on one of five available plots of land.

**#20 (2 Carey Lane, Dedham):** This was described as an existing house, which would be rehabilitated and converted into either a five-bedroom group home or a five-bedroom group home for persons who were "behaviorally challenged" (both 2,550 sq. ft.).

**#21 (6 East Street, North Reading):** This was described as an existing house, which would be rehabilitated and converted into either a four-bedroom group home (2,350 sq. ft.), a five-bedroom home (2,550 sq. ft.), or a five-bedroom group home for persons who were behaviorally challenged (2,550 sq. ft.).

**#22 (6 East Street, North Reading):** This was described as an alternative to Proposal #21, under which the same house would be converted into a five-bedroom group home for persons who were behaviorally challenged (2,550 sq. ft.)[3]

None of the TILL proposals included signed Purchase and Sale agreements for the properties TILL intended to rehabilitate or construct. Thus, there is a question as to whether the houses proposed for rehabilitation and the Millis property on which construction was proposed were still even available to TILL to purchase at the time DCAM selected TILL to develop the homes.

In Sub-Section 6.2 (Availability of Group Home) of the RFP, all of TILL's rehabilitation proposals stated: "Based on completed P&S," in response to question when the building would be vacant. Thus, in TILL's case, DCAM selected TILL without even knowing whether the houses were still available, since Purchase and Sale agreements had apparently not yet been signed and no other evidence of control of the properties had been submitted.

The DCAM RFP, in fact, was amended on March 25, 2005, to eliminate a requirement [A-4.3: "Eligible Proposers"] that the proposers must propose at least one group home for which they demonstrated that they were the "record owner or prospective purchaser of the property." In order to be considered a prospective purchaser, the eliminated

---

proposed house. This document was a memorandum, dated July 27, 2005, to the proposers from Roy Klein, DCAM Project Manager Office of Leasing and State Office Planning.

[3] In Section 4.1 of the Lease-Purchase Proposal Form (Building Statistics), Proposal #21 described the house proposed for rehabilitation as having been constructed in 1989 and having 1,744 square feet of usable space. Proposal #22 described the house, apparently at the same address, as having been constructed in 1957 and having 2,896 square feet of usable space. Although the address of the house was redacted in each proposal, a separate DCAM summary document listed the address of each house as 6 East Street, North Reading. It wasn't clear why each proposal described a different house at that same address or why separate proposals were submitted, since Proposal #21 also listed a five-bedroom group home as an alternative for persons who were behaviorally challenged.

requirement had stated that the proposer must attach a copy of a signed Purchase and Sale agreement "or other evidence of control of the property" to the proposal.

### Finding 3: TILL submitted proposals in response to the DCAM RFP for rehabilitating homes in different towns that were incomplete and identical to each other in several key respects:

An examination by COFAR of the five TILL proposals showed that:

- **Even though the proposals were for differently sized houses located in different towns, they all included the same statement describing the locations of the proposed residences: "Very safe neighborhood—listed as one of the safest in the state."**

- **None of the proposals included required information about the condition of the structure of the houses proposed for rehabilitation, and none specified the types of improvements to the building enclosures and systems that TILL intended to make.**

- **Three of the four TILL rehabilitation proposals listed identical project development costs, even though the proposed homes were located in different towns or were of different sizes and types of construction.**

- **None of the proposals identified a contractor who would undertake the construction, as required by the RFP, and none included required floor plans or drawings that were specific to the houses proposed for rehabilitation or construction.**

- **TILL did not demonstrate clear evidence of its ability to finance the rehabilitation or construction of the proposed properties**

The following is a listing of specific requirements as written in the DCAM RFP. Those requirements are followed by the responses to those requirements in the TILL proposals.

### 1. Location description requirement, RFP/Lease-Purchase Proposal form (Section 3.4):

This section of the RFP/Lease Purchase Proposal form had three requirements:

1) Neighborhood Characteristics: [Proposers were asked to:] Check below the uses of all buildings or land adjacent to and across the street from the proposed group home: commercial, residential, industrial, vacant land, other (specify).

2) List amenities (banks, restaurants, shops, etc.) within a ten-minute walk of the group home.

3) Describe neighborhood characteristics relating to safety and security.

**TILL Responses:**

All five of the TILL proposals checked "Residential" in response to the first item in the section. Nothing was listed in response to the requirement that amenities be listed. In response to the third item, the following statement was inserted in each proposal: "Very safe neighborhood—listed as one of the safest in the state."

## 2. **Building description requirement, RFP/Lease-Purchase Proposal form (Section 4.2):**

This provision appeared to apply only to rehabilitation proposals. Proposers were directed to place a checkmark beside the applicable description below and fill in applicable information:

1) Building Enclosure: Type of Construction: Brick, Concrete, Steel, Wood, Modular Construction, Other (specify);

2) Type of Exterior Walls: Brick, Stone, Stucco, Wood, Vinyl/Aluminum Siding, Other (specify);

3) Type and Age of Windows: Type, Date Installed, Operable;

4) Type of Roof; Year of Installation;

5) Describe any proposed improvements to building enclosure.

**Response: TILL proposal #18 (7 Marilyn Road, Andover):**

"Brick" and "Wood" were checked under Type of Construction.

"Brick' and "Wood" were checked under Type of Exterior Walls.

No further information was provided in this section.[4]

---

[4] Proposal #18 included an attachment titled "Overview of Proposal Offerings," which stated on the first page that TILL was proposing to convert existing garages in one of the homes (location redacted) into bedrooms. No further details were provided for that home or for other homes, for which similar very general statements were made about the possibility of converting space into bedrooms. This attachment was also included, apparently without the first page, in proposals # 20, 21, and 22.

**Response: TILL proposal #20 (2 Carey Lane, Dedham):**

The response in this section appeared to be identical to Proposal #18 above.

**Response: TILL proposal #21 (6 East Street, North Reading):**

"Wood" was checked under Type of Construction.

No further information was provided in this section.

**Response: TILL proposal #22 (6 East Street, North Reading):**

"Wood" was checked under Type of Construction.

"Wood" was checked under Type of exterior walls.

No further information was provided in this section.

None of the proposals included required information about the condition of the structure of the houses proposed for rehabilitation, and none specified the types of improvements to the building enclosures and systems that TILL intended to make.

## 3. Building systems description requirement, RFP/Lease-Purchase Proposal form (Section 4.3):

This provision appeared to apply only to rehabilitation proposals. The provision was divided into five sections:

1) Life Safety Systems: [Proposers were asked to:] Write E for those [items] that exist and meet current code requirements, and P for those that do not exist but that will be provided as required by current codes prior to occupancy. [Items listed were:] emergency egress, sprinkler systems, fire extinguishers, exit signs, emergency lighting, interconnected smoke detectors, fire alarm, fire escapes, and exit route diagrams.

2) Heating System: [Proposers were asked to provide information about:] Type of system, fuel source, date of installation, and date and scope of latest renovations.

3) Air Conditioning: [Proposers were asked:] Is this a central air conditioning system or window units? If window units, give number, age, and BTU rating for each unit. [List:] [d]ate and scope of latest renovations.

4) Electrical System: [Proposers were asked to provide information about:] Electrical panel capacity/date of installation; Available capacity for the proposed space; and Date and scope of latest renovations.

5) [Proposers were asked to:] Describe any proposed improvements to building systems.

**Response: TILL proposal #18 (7 Marilyn Road, Andover):**

Under (1) Life Safety Systems, this proposal listed "E" for emergency egress, "NA" for fire escapes, and "P" for all other items.

Under (2) Heating System, the proposal listed natural gas and "to be completed" for date and scope of latest renovations. No other information was provided.

Under (3) Air Conditioning, the proposal stated: "will be installed-central."

Under (4) Electrical System, the proposal stated: "150 amp—upgrade if needed." No other information was provided.

Under (5) Proposed improvements to building systems, no information was provided.

**Response: TILL proposal #20 (2 Carey Lane, Dedham):**

All responses to this section were identical to TILL Proposal #18 above.

**Response: TILL proposal #21 (6 East Street, North Reading):**

Under (1) Life Safety Systems, this proposal listed "E" for emergency egress, and "P" for all other items.

Under (2) Heating System, the proposal listed "hot water baseboard/oil." The proposal stated "1992 addition" for date and scope of latest renovations.

Under (3) Air Conditioning, the proposal stated: "will be added."

Under (4) Electrical System, the proposal stated: "200 amp." No other information was provided.

Under (5) Proposed improvements to building systems, no information was provided.

**Response:  TILL proposal #22 (6 East Street, North Reading):**

Under (1) Life Safety Systems, this proposal listed "E" for emergency egress, and "P" for all other items.

Under (2) Heating System, the proposal listed "forced air."  No other information was provided.[5]

Under (3) Air Conditioning, the proposal stated: "central."  No other information was provided.

Under (4) Electrical System, the proposal stated: "200 amp."  No other information was provided.

Under (5) Proposed improvements to building systems, no information was provided.

None of the proposals included required information about the condition of the structure of the houses proposed for rehabilitation, and none specified the types of improvements to the building enclosures and systems that TILL intended to make.

## 4.  Landlord capacity description requirements in RFP (Section A-7.6) and Lease-Purchase Proposal form (Section 6.6):

The TILL proposals did not respond adequately to this section of the RFP in several key respects.  Three of the four TILL rehabilitation proposals listed identical project development costs and timelines for construction, even though the proposed homes were located in different towns or were of different sizes and types of construction.  None of the proposals identified a contractor who would undertake the construction and none included floor plans or drawings that were specific to the houses proposed for rehabilitation or construction.

Also, TILL did not demonstrate clear evidence of its ability to finance the rehabilitation or construction of the proposed properties.

The RFP contained several provisions concerning "Landlord Capacity":

---

[5] As was the case with differences listed in the age of the house at this address in Proposals #21 and 22, it was unclear why these two separate proposals concerning a house with the same address differed in their descriptions of the heating and other systems of the residence.

[Section A-7.6 of the RFP defined "Landlord Capacity" as:] The demonstrated capacity of the proposed landlord to develop the proposed group homes for occupancy by the Commonwealth and to provide the property management services required by the RFP and lease. The qualifications, experience, and financial strength of the proposed landlord, the design team and contractor, and the property management company are considered.

[Section A-7.6 of the RFP also contained subsections concerning the proposers' Timely Completion of Work, Technical and Financial Capacity to Complete the Project, and Building Management Capacity to Operate and Maintain the Property. For example, Sub-sub-section 7.6.2 Technical and Financial Capacity to Complete the Project stated that DCAM would consider:] The demonstrated capacity of the proposed landlord to finance the required improvements... [This sub-sub-section further stated that:] Evaluation of this criterion shall take into account the experience of the landlord in completing projects of similar cost and complexity and the experience of the proposed designer(s) and contractor(s) in designing and constructing projects of a similar complexity, type and size.

[Section 6 of the RFP's Lease-Purchase Proposal form (Landlord Capacity) contained several subsections, which asked proposers to:]

6.1 Confirm that the Proposal complies with the Landlord's Services specifications in Section B of the RFP: Yes, No. If you answered No above, please identify and describe the items that do not comply and for which you are proposing an alternative.

6.2 Availability of Group Home. If the group home is an existing home and is to be renovated to meet the User Agency needs, confirm when the building will be vacant.

6.3 Design and Construction: Identify the estimated time 1) to prepare the Design-Development Drawings, 2) to prepare Working Drawings, and 3) to complete Landlord's Improvements and any required building improvements following approval of Working Drawings. Attach a project timeline (see 6.6.3 below and 9.3, page 11 of Proposal). [This subsection also asked proposers to list:] Name of persons or entities (e.g., architect and engineer) expected to prepare Working Drawings [and] Name of person or entity (e.g. general contractor) expected to complete Landlord's Improvements.

[Sub-sub-section 6.6.3 Project Timeline asked proposers to:] Please provide project timeline from proposal selection to completion of tenant improvements, highlighting critical milestones including, but not limited to, permitting, financing, lease execution, start of construction, and substantial completion.

[Section 9 Plans and Photographs asked proposers to include the following documents:] Floor Plans to scale for each floor in each proposed group home, identifying all exterior walls, windows, and doorways; interior partitions walls, windows, and doorways; all rooms labeled as to function; a plot plan showing metes and bounds and tax map indicating the location of the proposed home; a project timeline; copies of all permits/approvals and proof of compliance with all federal, state, and local ordinances and regulations; a map indicating the location of the proposed group home, parking, public transit stops serving the home, and major roadways; a copy of the executed purchase and sale agreement or other evidence of control of the property [See Finding 2 of this report]; and color photos showing the front, back, and sides of the proposed group home.

6.4 Financial Information. [Proposers were asked to:] Please complete the following schedules regarding total development costs and financing, and attach commitment letters or letters of interest with a plan and schedule for obtaining commitments. Please attach documentation stating that the provision of adequate funding will not be conditioned on any material modifications to the lease, or documentation identifying the necessary modifications to the lease.

[Sub-Section 6.4 contained three sub-sub-sections:]

6.4.1 Total Development Budget. [This sub-sub-section asked proposers to list the following costs:] Acquisition Cost, Direct Construction Cost, Construction Contingency, Total Construction Cost, Architectural and Engineering Fees, Permits, Legal, Construction Lon Interest, Construction Period Expenses, Finance Fees and Closing Costs, Other Costs, Develop's Fee, and Total Development Costs.

6.4.2 Sources of Construction and Permanent Financing. [Proposers were asked to list the following, under the heading Construction Financing:] Lender's Name, Address, City/State/Zip Code, Contact, Telephone, Fax, Term of Loan, Interest Rate, and Amount of Loan. [Proposers were asked to list the following under the heading Equity:] Proposer's Equity and Other Equity, including Source and Amount. [Proposers were then asked to list a figure for Total Construction Financing.]

6.4.3 Permanent Financing. [Proposers were asked to list the same information as required in Sub-sub-Section 6.4.2 above, with the exception that the headings in this sub-sub-section were Debt, Equity, and Total Permanent Financing.]

6.5 Building Management. [Proposers were asked to:] Identify entity expected to provide property management services.

6.6 Landlord Capacity/for new construction. [Proposers were asked to:] Please complete the information requested below if the proposed space is for new construction.

[Subsection 6.6 contained three sub-subsections:]

6.6.1 Status of Project. [Proposers were asked to indicate whether Schematic
Design, Working Drawings, and Construction Underway had been completed or
were to be completed. Proposers were also asked whether zoning, conservation,
environmental, and building permits had been obtained or were to be obtained.]

6.6.2 Project Team. [Proposers were asked to fill in the names of the Developer,
Architect, Engineers, Contractors, and Others, and to submit resumes and
qualifications of all Project Team members.]

6.6.3 Project Timeline. [Proposers were asked to:] Please provide project
timeline from proposal selection to completion of tenant improvements,
highlighting critical milestones including, but not limited to, permitting,
financing, lease execution, start of construction, and substantial completion.

**Responses:**

Under Sub-Section 6.1 of the Lease-Purchase Proposal Form, all of the TILL
proposals checked the Yes box to confirm that the Proposal "complies precisely
with Landlord's Services specifications..."

Under Sub-Section 6.2 Availability of Group Home, all of the proposals stated:
"Based on completed P&S," in response to question when the building would be
vacant [See Finding 2 on availability of TILL residences].

Under Sub-Section 6.3 Design and Construction, Proposals # 18, 20, 21, and 22
referred to an attachment, which stated that Design-Development drawings and
Working Drawings would each take an estimated two weeks per house to
complete, and that completing the landlord's improvements would take an
estimated three months. Those improvements were described as:

    for building of a ramp and or for the conversion of additional
    bedrooms from garage space or new construction of additional
    bedrooms and for the conversion of bathroom and kitchen space
    for handicap accessibility as needed.

Thus, the design and construction timelines and all other information listed in the
attachment were identical in each of the four rehabilitation proposals for houses
proposed for Andover, Dedham and North Reading.

In response to the requirement in Sub-section 6.3 that the proposer list the name
of architect or engineer expected to prepare Working Drawings, the attachment to
Proposals #18, 20, 21, and 22 listed the architectural firm of Mostue &

Associates. However, the attachment did not state that the firm would necessarily be involved in the design of the proposed group home(s), but stated only that it was among "groups with which we have formed a good team in other construction and renovation projects." The proposal attachment also included the following statement:

> If surveys are needed and depending on the extent of the work needed, we would engage Beals and Thomas for engineering and or survey work. In the Northeast area, we may use Atlantic Engineering for proximity. We have worked with both firms.

In response to the requirement in Sub-section 6.3 that proposers list the name of the general contractor expected to complete the Landlord's Improvements, the attachment to the four rehabilitation proposals stated that a contractor had not yet been selected, and that the selection would "depend upon the scope of the work of the final proposals which are selected." The proposal attachment added that TILL would provide DCAM with a list of "potential contractors" and would arrange visits to "any of our 15 renovation or four new construction homes" if the firm was awarded the project.

Under Sub-sub-section 6.6.2 Project Team, which relates to proposed new construction, Proposal #19 listed Mostue & Associates as the Architect and "To Be Determined" for both the Engineers and Contractors. This proposal included a statement that TILL was estimating a five-month construction period for the proposed house. No further information was provided about the project timeline. All drawings were listed as "To Be Completed," and all permits as "To Be Obtained."

Each TILL proposal also included a resume of Robert J. Buckley, Principal of Beals and Thomas, Inc., and an informational brochure for Beals and Thomas, which described the firm as engaging in civil engineering, environmental services, land surveying, landscape architecture, and planning.

In response to the requirements of Section 9 for Plans and Photographs, Proposals # 18, 19, and 20 included identical copies of four unstamped floor plans done by Mostue & Associates, all labeled "DCAM Proposal." Two of the plans were for the first and second floors of a four-bedroom duplex, and the remaining two plans were for a four and five-bedroom group home. It was not apparent why these plans, which appeared to be for construction of new houses, were included in proposals for the rehabilitation of existing houses. Proposal #21 appeared to include the same first-floor plan for a four-bedroom duplex only; and Proposal #22 did not appear to include any floor plans.

Proposals # 18, 19, 20, and 22 all stated in their cover letter that plot plans for the proposed homes were not available. Proposal #21 contained what appeared to be a location map for properties North Reading, where the proposed group home was located.

None of the proposals contained any copies of permits or approvals as required by Section 9.

Also, none of the proposals included maps, as required by Section 9, indicating the location of the proposed group homes, parking, public transit stops, or major roadways.

With regard to photographs required by Section 9, none of the proposals appeared to contain any photographs of the actual houses proposed for rehabilitation. All of the proposals, including the proposal for new construction, contained the same photos of two unspecified houses. Proposal #22 also contained additional photos of a second unspecified house and a swimming pool.

In response to Sub-section 6.4 (Financial Information), none of the proposal provided any commitment letters or letters of interest in the project, as required. All of the proposals, with the exception of Proposal #19, instead referred to an attached letter "from one of our primary commercial mortgage lenders regarding our financial relationship with Sovereign Bank."

The attached letter, dated April 20, 2005, was from Daniel W. Bennett, Vice President of Sovereign Bank, and addressed to DCAM. The letter stated that: "T.I.L.L. is an excellent account of Sovereign Bank. The Bank currently has mortgages on eight group homes. Sovereign Bank looks forward to working with T.I.L.L. to provide future financing." The letter, however, did not indicate a commitment to finance the proposed group home projects.

All of the proposals, again with the exception of Proposal #19, included a second letter, also dated April 20, 2005, from Susan K. Kelly, Vice President, Lending, at Braintree Cooperative Bank. This letter similarly stated that the bank had an excellent relationship with TILL and that the firm's credit history had been "exemplary." However, this letter also did not express a commitment to finance the proposed projects. It stated that: "We would entertain new credit extensions should TILL, Inc. bring loan requests that meet our loan policy guidelines."

In response to Sub-sub-section 6.4.1 (Total Development Budget), Proposals # 18, 21, and 22 each listed an Acquisition Cost of $465,000 for their proposed houses. Each of the three proposals further listed a Direct Construction Cost of $110,000, a Construction Contingency of $5,000, Architectural and Engineering Fees of $10,000, Permit fees of $1,000, Legal fees of $1,800, Finance Fees and Closing Costs of $2,200, and a Developer's Fee of $5,000. Total Development Costs were listed in each of the three proposals as $600,000.

It does not appear possible that proposals for rehabilitating different homes in Andover and North Reading, including two differently sized homes in North Reading,

would have identical development budgets, including identical acquisition and construction costs.

In response to Sub-sub-sections 6.4.2 and 6.4.3 (Sources of Construction and Permanent Financing), none of the proposals indicated that TILL had obtained any means of financing the proposed renovations or construction projects. Proposals # 18, 20, 21, and 22 each referred to the same attachment, which stated that TILL held three individual home mortgages with Sovereign Bank "as well as a jumbo mortgage for five additional properties." In addition, the attachment stated, TILL held mortgages with Braintree Cooperative, Central Cooperative, "and a roll up mortgage for seven of our properties through HEFA." The attachment added that TILL had also "pursued CEDAC, affordable housing tax credits, historic preservation tax credits, DHCD, and FCF funding." However, as previously noted, Sub-sub-sections 6.4.2 and 6.4.3 required that each proposal specify details of the actual financing of each group home project, including terms and amounts of loans and equity in each property. Each of the TILL proposals left that information blank.

TILL's attachment for Proposals # 18, 20, 21, and 22 added:

> The combination of funding which we would put together for this project would depend upon the extent and location of the houses and whether the final award is for new construction or renovation. We hope that our proven track record over the past twenty-five years as well as our references from three regions in DMR can attest to our ability to finance any and all commitments with which we get involved.

The attachment also stated that TILL had obtained a commitment "of a private investor who is interested in financing this project, however, at this early stage of development, he is not in a position to state his interest publicly."

As noted, the RFP stated that DCAM would take into account the demonstrated capacity of the proposed landlord to develop the proposed group homes for occupancy by the Commonwealth and to provide the property management services required by the RFP and lease. With respect to this section of the RFP, TILL did not demonstrate clear evidence of its ability to finance the proposed properties.

## Finding 4: TILL did not appear to possess adequate experience in constructing group homes

TILL's proposals provided no specific examples of construction or rehabilitation activity that it had done. In a letter accompanying each proposal, TILL stated that it was currently operating 40 "residential settings throughout eastern Massachusetts with an additional four homes scheduled to open before the end of fiscal year 2005."

The letter further stated that TILL had "built four houses from initial construction to meet the needs of particular individuals," and that "[w]e have added numerous additions, ramps, and renovations of baths and kitchens to accommodate wheelchairs, people with medical equipment needed for daily living and the like." The letter also stated that TILL was working to rehabilitate an unspecified commercial building in Chelsea into 23 affordable housing units.

TILL, however, did not specify the addresses of the residences it claimed to have constructed. Proposers, in fact, were not required by the RFP to list references for buildings they had constructed—a serious shortcoming in the RFP requirements (See Finding 5 below).

From the information provided in the proposals, it appeared that TILL is primarily a vendor of direct-care related services for persons with mental retardation, not a firm that specializes in developing or constructing residential facilities.

### Finding 5: DCAM's RFP for this housing failed to include requirements necessary for selecting the most qualified developers and contractors:

The RFP stated in Sub-section A-7.6 (Landlord Capacity) that DCAM would consider the qualifications, experience, and financial strength of the proposed landlord, the design team, contractor, and the property management company in making its selection of the project developer. Sub-sub-section 7.6.2 further stated that evaluation "would take into account the experience of the landlord in completing projects of similar cost and complexity..."

The RFP, however, did not require the proposers to list specific projects they had constructed or to provide references for those projects. The listing of completed construction projects and references is a requirement for public construction under the state's public construction bidding law (M.G.L. c. 149, s. 44 A-M), which was not used in this procurement process.[6] Proposers in this case were required to list the names, addresses and telephone numbers of current tenants of buildings *owned* by the proposers (Section 7.1 of the Lease-Purchase Proposal Form), and to list addresses and telephone numbers of all agencies of the Commonwealth with rental agreements with the proposers (Section 7.2). However, proposers could well own those buildings without having built them. The RFP should have required a listing of tenants and owners of buildings *constructed* by the proposers.

---

[6] Each bidder on a public building construction project in Massachusetts, governed by M.G.L. c. 149, must submit with its bid a Certificate of Eligibility issued by DCAM. This certificate is issued after DCAM evaluates the contractor's past performance, based on evaluations provided by owners of public and private projects completed by the contractor within the past five years. (Massachusetts Office of the Inspector General, Designing and Constructing Public Facilities manual, 2000 edition, p. 55).

Further, while the RFP stated that the financial strength of the proposed landlord, design team, contractor, and property management company would be considered, as well as the "demonstrated capacity of the proposed landlord to finance the required improvements (Sub-sub-section 7.6.2), the RFP did not require proposers to submit audited financial statements along with their proposals. Submission of audited financial statements is also part of the prequalification process for contractors under the state's public construction bid law noted above.

The RFP also did not require proposers to identify specific sites for their proposed group homes until after they were selected by DCAM for the contract(s) [See discussion of group home siting in Findings 2 and 6].

In addition, the RFP stated in Section A-5 (Procedures for Evaluation, Conditional Selection, and Lease Execution) that DCAM "reserves the right to waive portions of the RFP for all proposers..." COFAR believes this provision, if invoked, could have undermined the fairness of the RFP process.

### Finding 6: DCAM diluted and misinterpreted site identification requirements in its RFP

DCAM does not appear to have met its own 55-day schedule (later extended to 75 days) for identification and approval of sites for the homes proposed by its selected proposers. The site identification and approval schedule was specified in Section A-5.4 of the RFP ("Notification to Proposers of Conditional Selection of Proposal(s)).

Moreover, DCAM appears to have misinterpreted this section of the RFP to allow CIL Realty to identify a site for just one of four group homes, which it was conditionally selected to build. The RFP actually required sites to be ultimately identified for *all* of a selected proposer's proposed group homes.

CIL Realty was conditionally selected by DCAM in July 2005 without having identified any sites for homes it had proposed. A DCAM summary list of information provided by each proposer, dated July 27, 2005, stated "site to be determined" beside the proposed address for all 10 proposals listed for CIL Realty. None of the CIL proposals examined by COFAR identified any sites for the proposed homes.

Section A-5.4 of the RFP stated that if DCAM conditionally selected a proposal for a group home for which the proposer did not "demonstrate site control," the notification would include a schedule for identifying an acceptable site; and within 45 days of receipt of the conditional selection letter for **each** proposed group home, the proposer must present in writing **at least one** potential site. The section further stated that DCAM, DMR and the proposer must visit the proposed site and, within 10 business days, DCAM must notify the proposer whether the site was acceptable.

Thus, the RFP allowed up to 55 days **after** notification of the conditional selection of each proposer for approval of a potential site for each group home. (Section A-5.4 was amended on March 25, 2005 to increase the timeframe for identifying potential sites from 45 days to 60 days of receipt of the conditional selection letter, and for DCAM approval from 10 to 15 days. Thus, the total timeframe from conditional selection to site approval was extended to 75 days).

According to a September 23, 2005 letter from Martha Goldsmith, Director of the DCAM Office of Leasing, to Peter Venvie of CIL Realty, CIL was conditionally selected on July 22, 2005 to construct four homes: two four-bedroom duplex homes in the northeast region, one four-bedroom duplex home in the metro Boston region, and one five-bedroom home for "behaviorally challenged" persons, in the metro Boston region. Despite the already extended RFP requirement, the letter stated that the initial 60-day period for identifying at least one site for a group home was about to expire on September 24, and that the deadline for satisfying the condition was being extended by an additional 45 days until November 8, 2005. Thus, in a letter to one of its conditionally selected vendors, DCAM was now extending the timeframe for identification of a site from 60 to 105 days, and consequently extending the total timeframe from selection to approval from 75 to 120 days.

Moreover, the September 23 DCAM letter stated that the conditional selection letter had required that within the 60 days (now extended to 105 days), CIL must "present at least one potential site for consideration **as sites for group homes**..." (emphasis added). This does not appear to be consistent with Section A-5.4 of the RFP, which stated that the proposer had 45 (later 60) days to identify at least one potential site "for **each** such proposed group home," (emphasis added). Thus, it appears that in its conditional selection letter, DCAM decided to interpret the RFP as requiring a proposer only to identify a site for one of its proposed homes, even if the proposer had submitted proposals for more than one home, as was the case with CIL Realty. This interpretation, in effect, diluted the already loosened site identification requirement in the RFP still further.

As of December 21, 2005, when COFAR reviewed records of the procurement process at DCAM, COFAR was provided with two purchase and sale agreements signed by CIL for two properties located in Millis and Bedford, Massachusetts. The purchase and sale agreements were dated October 5 and November 15, 2005. As of December 21, 2005, approximately 150 days after the conditional selection notification, it was unclear whether CIL had identified sites for more than two of the four houses which it was selected to build.

### Finding 7: Neither CIL Realty nor TILL's proposals appeared to show any differentiation between "special-needs" and non-special-needs homes

Section A-1 of the RFP (Project Summary) stated in Sub-section 1.3 (Summary of Space Needs, Type of Group Home) that DCAM was seeking separate proposals for homes in the Boston Metro region containing 13 beds for consumers with "special needs," including eight beds in one four-bedroom duplex for persons with impaired vision, and five beds in one five-bedroom group home for persons with "certain behavioral needs."

The RFP contained a number of specifications for vision-impaired homes, but did not appear to list any separate specifications for homes for persons with behavioral challenges. However, the proposals that DCAM received from CIL Realty and TILL did not appear to reflect any differences among those types of homes.

The RFP required in Section B-2 (Landlord's Improvements), Sub-sub-section 2.2.4 (Access for Individuals with Disabilities) that:

> The group home must be free of barriers preventing access to the proposed space by individuals with disabilities in accordance with applicable state and federal regulations.
>
> DCAM and DMR prefer single-level group homes and it is preferred that all homes have front and rear ground-level extrance/exit areas.
>
> Additional requirements for special need home:
> Impaired Vision
> If a ramp is constructed, landlord must provide and install contrasting color strips at the top and bottom of the ramp. The landlord is to provide samples of color and material to DMR for approval during the design phase.

Sub-sub-section 2.8.2 of the RFP included additional requirements for the bathroom for a special need home for persons with impaired vision, including the installation of a whirlpool tub, non-slip floor material and a floor drain, and sinks and toilet seats with contrasting colors. In order to accommodate the whirlpool tub, the landlord was required to install a ceramic tiled enclosure with built-in access panel for a motor, pump, and plumbing.

In Sub-sub-section 2.9.5 (Lighting and Switches), the RFP required that in impaired-vision homes, the landlord install a fluorescent light fixture in each bedroom closet activated by a button on the door so that the light goes on automatically when the door is opened. Additionally, Sub-sub-section 2.11.1 of the the RFP (Kitchen Area and Fixtures) required that countertops in the kitchen of the home for visually impaired persons have countertops with a matte finish.

COFAR examined three of CIL's proposals in this regard:

1. Proposal #4: 4-bedroom duplex, Northeast Region, **which was not designated as a special needs home** (4,700 sq. ft).

 **2.** Proposal#11: 4-bedroom duplex, Metro Region, designated as a home for persons who were visually impaired (4,700 sq. ft.).

3.  Proposal #12: 5-bedroom group home, Metro Region, designated for persons who were behaviorally challenged (2,550 sq. ft.).

The only difference between the three CIL proposals concerned the different square-footage requirement of the duplex versus five-bedroom group home designs. CIL, in fact, included the same total development budget of $1,368,019, including a direct construction cost of $820,050, in its proposals for both the duplex for the visually impaired and the non-special needs duplex. Both duplex proposals included an identical four-bedroom duplex floor plan and proposed elevations plan. Both of these plans were labeled "preliminary," and "not intended for permitting or bidding." No other drawings or plans were included in the two CIL proposals.

The CIL proposal for the five-bedroom group home for persons with behavioral challenges included a floor plan and proposed elevation plan for a 2,550 sq-foot, five–bedroom group home. These plans were also labeled preliminary and not intended for permitting or bidding. The proposal listed a Total Development Budget of $936,162 for the house, including and a direct construction cost of $453,750.

## Finding 8: DMR's plan to lease housing for Fernald residents with an option to purchase is unnecessarily expensive:

Section 2 (Cost) of the Lease-Purchase Proposal form required proposers to fill in a table containing the proposed components of the proposed Total Annual Occupancy Cost (the total leasing cost to DMR) for each year of the 20-year lease term. The components listed included Total Base Rent (which included net rent, maintenance and repair, and a replacement reserve), Estimated Additional Rent (which included water/sewer charges, real estate taxes, and insurance), and Other Occupancy Costs (which included utilities and trash removal).

COFAR added together the yearly figures listed in each proposal for the Total Base Rent for the 20-year lease period  (See Attachment 2).  The total proposed Base Rent to the state over a 20-year period ranged from a low of $741,000 for a five-bedroom group home, proposed by a bidder that was not selected, to a high of $3,100,704 for a four-bedroom duplex, proposed by CIL Realty.  TILL proposed a Total Base Rent of $1,953,600 for its proposed duplex, and a Total Base Rent of $1,201,620 for each of its proposed four-and-five-bedroom group homes.

COFAR believes that were the state to pay up-front for this housing, it would be much less expensive over the long run than the current plans for long-term lease agreements,

which are projected to cost taxpayers as much as $3 million per house over the 20-year period. Moreover, were the state to construct this housing on the Fernald grounds, it would be subject to the state's public construction bidding law (M.G.L. c. 149, s. 44A-M), which would require not only that complete designs and specifications be developed prior to selection of a contractor, but that the contract award go to the lowest "responsible and eligible" bidder.

COFAR's analysis of the proposals did not take into account the Additional Rental charges for water/sewer, utilities, and trash removal, which would presumably be the same were the housing to be built either in the community or on the facility campus. The analysis also did not take into account real estate taxes, a pass-through charge under Estimated Additional Rent, which would represent a further savings to the state if the housing was constructed on the facility campus.

### Finding 9: TILL has been criticized by the State Auditor for financial mismanagement:

A January 2002 report by the Massachusetts Office of the State Auditor stated that TILL had spent more than $4 million in state funds in "unallowable, undocumented, and questionable business activities."

The report, dated January 7, 2002, covered TILL financial activities from July 1, 1997 through December 31, 2000. The audit identified several undisclosed related-party relationships; $934,557 in unallowable and questionable related-party transactions; at least $3,203,587 in undocumented payroll costs; at least $273,274 in questionable salary and vehicle expenses for TILL's president; $50,836 in undocumented and questionable costs charged against a cost reimbursement contract; and inadequate administrative and internal controls over various aspects of TILL's operations. The total of these "unallowable," "questionable" and "undocumented" costs was $4,462,254.

During audit fieldwork, TILL did not make some requested records available to audit staff, thus impairing the ability of the state auditor to perform sufficient audit testing, according to the report.

Findings of the audit report included:

1. TILL did not have payroll records to substantiate the number of hours TILL's administrative staff performed administrative tasks for related-party organizations owned by the president.

2. Undisclosed relationships existed between TILL and Training, Research and Implementation, Inc. (TRI), which purchased and managed residential homes; Specialty Management Services, Inc. (SMS), which did consulting and business development; and SMS LP, which invested and managed real and personal property.

3.  TILL did not disclose that it was using funds under state contracts to pay monthly payroll expenses for all of the staff of LEAD, Inc., a related organization that generated revenues from food service catering contractors in school and municipal cafeterias.

4.  In Fiscal Year 1999, TILL used $25,000 in state funds to make a down payment on property in Hyde Park that was being purchased by LEAD, Inc. TILL also used $726,811 in state funds to pay for LEAD's payroll costs. The auditor determined that these transactions were not directly benefiting TILL's Massachusetts state-funded programs.

5.  During Fiscal Years 1998 and 1999, SMS LP billed TILL New Hampshire, another related company, a total of $165,000 for administrative management fees despite the fact that TILL New Hampshire was using Massachusetts state-funded staff to provide administrative support. TILL's president further used funds generated from state contracts for the benefit of herself and other related party organizations owned by president.

6.  TILL did not require salaried employees to complete weekly records documented hours worked and functions benefited.

7.  During the audit period, the TILL president billed $267,334 in salary and expenses from the state. During the same time, she received $120,347 in full time salary from TILL New Hampshire. There were no payroll records to document her days and hours worked. The president also charged $11,880 to the State of Massachusetts to lease a vehicle used to commute to TILL New Hampshire. According to president, each working day lasted 20 hours and after working all day at TILL, the president claimed that she would drive to New Hampshire to work at TILL New Hampshire. The auditor questioned this and recommended that TILL's payroll records be brought into compliance and that DMR review billings for the president and her vehicle.

8.  In Fiscal Year 199, TILL billed $90,000 to operate its Project Engage Program. The auditor found $14,279 of those expenses had no supporting documentation, and an additional $36,557 were questionable, such as the purchase of two clothes dryers and three air conditioners, an $804 extension table, and $24,187.50 to an unidentified individual.

## Finding 10: TILL has had a record of substantiated cases of abuse and neglect in group homes it has managed.

The following are eight allegations of abuse and neglect since 2002 in group homes operated by TILL that were found by the Disabled Persons Protection Commission to be substantiated. The cases involve a range of violations, including physical, emotional, and

sexual abuse, and neglect. In one case involving alleged sexual abuse, the DPPC referred the case for criminal investigation:

- April 23, 2002: Physical injury: abrasions, lacerations. The Alleged Victim (ALV) was coming off the van and was injured because he fell and cut his head. The ALV was not wearing his helmet at the time and should have been.

- October 21, 2002: Physical injury: abrasions, lacerations. When the reporter went to visit the ALV, the ALV could not be located. The ALV was found in a closet. He had his left orthotic (arm support) off his arm and his arm was bleeding. The ALV was known to bite himself, which was why he had to wear the orthotic. The ALV was supposed to be supervised.

- November 20, 2002: Physical injury: bruises, welts, abrasions, lacerations, emotional injury C) irritability. Reporter stated that the Alleged Abuser (ALAB) brought the ALV to the day program. The ALAB was rough with the women she was transporting. She was rushing them and manhandling them. A staff person from the program noticed that seats in the van were not strapped or buckled.

- March 13, 2003: Changes in B) anxiety level. ALAB yelled at ALV for talking to another client's mother. The ALV was visibly upset when she reported this to the staff at the day program.

- March 10, 2003: Emotional Injury Changes in B) anxiety level and E) functioning level/decompensation. The ALV went out to dinner with her parents yesterday and was pulling on her lip, saying she had a big mouth. The ALV was questioned and disclosed that the ALAB had told her she had a big mouth and should mind her own business. The ALV is frightened of the ALAB.

- December 19, 2002: Physical injury sores, other skin breakdown, emotional injury B) anxiety level, C) irritability. On or about August 9, 2002, when changing the ALV for hygiene care, "several open red areas" were observed "on the right side of his groin." The ALV's father had reported that the ALV had complained that night staff were leaving him wet. This information was noted in the agency nursing log.

- February 11, 2003: Physical injury abrasions, lacerations, emotional injury B) anxiety level. The driver left the van to go to the house and witnessed the residential staff force the ALV to put his jacket on. The ALAB was forcing one arm through the jacket and the ALV was kicking and crying on the floor. The ALAB pulled the ALV into a seated position and the ALV was still struggling with the ALAB. Once the jacket was on, the ALV lay back down on the floor and the ALAB yanked the ALV back up and pushed him toward the front door. The ALV was examined at the day program and has numerous scratches on his cheek and neck.

- October 31, 2002: Physical injury b) physical force used sexual, d) fondling/unconsented (sic) sexual touching emotional injury. The ALAB came into the group home between 8 a.m. and 9 a.m. on October 30, 2002. He went up to her room and sexually molested her with his hand. The reporter states that the ALV said he put his hand down her pants and then inserted his fingers into her vagina, and also touched her breasts. Case referred for criminal investigation.

### Finding 11: Both DMR and DCAM have not provided documentation sought by COFAR in seeking to examine the community housing procurement process.

In undertaking a review of the housing procurement process and related issues, COFAR has been unable to obtain several key documents, which both DCAM and DMR have withheld, citing exemptions to the Massachusetts Public Records law.

For example, since September 2005, COFAR has sought all internal DCAM reports, memoranda, and correspondence pertaining to internal departmental comparisons, ratings, and selection of the TILL and CIL Realty proposals. DCAM has declined to provide that documentation, citing an exemption to the Public Records law for inter-agency communications in connection with the evaluation process for bids or proposals prior to a decision to award a contract (M.G.L. c., 4, s. 7(26) (h)). The slow pace of the negotiations with TILL and CIL, which has prevented the timely signing of lease-purchase agreements with them, has also prevented the disclosure of information about the procurement process.

DMR has also declined to provide COFAR with any plans, specifications or written requirements pertaining to housing development projects being undertaken by specific housing authorities. DMR stated in a March 16, 2005 letter to COFAR that these projects are "still in the policy development process" and thus are exempt from disclosure under the state's Public Records Law.

COFAR has also been unable to obtain documentation sought from DMR since November 2005 concerning a new system being implemented by the Department for determining eligibility for supports and services. COFAR appealed this case, and on February 13, 2006, the Supervisor of Public Records upheld DMR's contention that most of that documentation was exempt from public disclosure. However, the Supervisor ordered DMR to produce a report by the Center for Developmental Disabilities Evaluation and Research (CDDER) on the clinical capacity of the mental health and behavioral supports available in the community system.

COFAR believes the CDDER report may be of importance in gauging the capacity of the provider system to provide equal or better care and housing to former residents of the Fernald Center. In an undated letter, DMR requested that the Public Records Supervisor

reconsider his decision that the CDDER report be produced.  A final decision on the matter is pending.

# *IV) Recommendations:*

We would recommend that as part of its overall review of care in the DMR system, the U.S. Attorney's Office monitor DCAM's and DMR's efforts to procure community-based housing for former state facility residents.

We would also recommend that the U.S. Attorney's Office review the TILL and CIL proposals in this procurement process, any contracts, when and if signed, and any internal evaluations of these proposals done by DCAM and DMR. These internal reviews have not been released to COFAR by DCAM, which has argued that they are exempt under the state Public Records law from disclosure because contracts have not yet been signed with the vendors.

We would further recommend that the U.S. Attorney's Office review any contracts or agreements when and if signed with housing authorities in various towns to develop housing for Fernald residents.

# V) Conclusion:

We believe the three strains of evidence developed most recently in the Ricci v. Okin litigation—1) flaws in the transfer process of residents from Fernald; 2) deficiencies in the community-based system of care; and, in this report, 3) flaws in the procurement process for community-based housing—all point to the conclusion that DMR and DCAM should reconsider the decision to close Fernald and the other state facilities and should build new housing needed on the existing campuses.

We believe that an agreement to build needed new housing on the existing facility campuses would be a first step in the development of a comprehensive plan to revamp and upgrade the entire DMR system of care for persons with mental retardation.

We hope this report will advance the "postage-stamp" proposal for the Fernald campus as a first step in that comprehensive plan. Under the proposal, an ICF/MR-level facility would remain on a portion of the Fernald grounds, serving all of the existing residents who wish to remain there, while the remainder of the campus was developed for appropriate use. If the existing buildings at Fernald are considered outmoded or inefficient to maintain and heat, then they can be rehabilitated or torn down, and new, efficient housing built. This new or rehabilitated housing can be integrated with other uses on these campuses. The problem of finding suitable sites for the residences would thus be solved.

Moreover, were the new housing built on the state facility campuses, the procurement of rehabilitation and construction contracts could be bid under Massachusetts General Laws Chapter 149, Sections 44A-M, the state's public construction bid law, which requires that pre-qualified contractors bid on projects based on a complete design developed by a qualified designer and awarded to the lowest responsible and eligible bidders. Thus, potential developers and contractors would have a clear idea of what DMR wanted them to build, and could submit their bids with some assurance that they would be judged fairly. In addition, the state would be assured that it was paying a competitive cost for the housing.

The current residents of the Fernald Center and the other state facilities have the most severe and profound levels of mental retardation of any DMR clients in the Commonwealth, and a large number are aging and have serious medical needs. If these residents are transferred inappropriately from the facilities to a community system that provides substandard care and services in addition to providing poorly constructed housing, the consequences could be catastrophic.

We hope the "postage-stamp" proposal for the Fernald campus will lead to improved care, conditions, and accountability within the DMR system.



# THE MASSACHUSETTS COALITION OF FAMILIES
# AND ADVOCATES FOR THE RETARDED, Inc.

3 Hodges Street,  Mansfield, MA 02048
Telephone: (508) 339-3379  Fax: (508) 339-5034
www.cofar-mass.org

Gregory Sullivan
Inspector General
Massachusetts Office of the Inspector General
One Ashburton Place
Boston, MA 02133                                    January 27, 2006

Dear Mr. Sullivan:

We are writing to request that your agency undertake a review of a public procurement process involving the "conditional" selection last year by the Division of Capital Asset Management of two human services vendors to develop state-run, community-based housing in Massachusetts.

This Request for Proposals procurement process has been undertaken on behalf of the Department of Mental Retardation, which is seeking to close the Fernald Developmental Center and to develop at least 80 beds in group homes in the Metro Boston and northeast regions of the state. DMR has indicated that it intends to sign 20-year lease-purchase agreements with the two selected vendors—Toward Independent Living and Learning, Inc. (TILL) and CIL Realty of Massachusetts, Inc. (CIL).

Under the proposed arrangement, TILL and CIL will construct new homes and/or rehabilitate existing ones and then lease them to DMR, which will staff them with state personnel. According to DMR, the selections are conditional upon the selection of suitable sites for the homes. As of this date, DMR and DCAM had not signed any actual agreements with TILL, but may have signed two lease-purchase agreements with CIL.

As an advocacy organization for persons with Mental Retardation, we have reviewed the RFP for this procurement as well as five proposals submitted by TILL under a Public Records Law request. We are currently seeking to obtain all of the proposals submitted by CIL. Our review thus far has uncovered what we believe are significant flaws in the procurement process. In particular, we question the validity of the selection of TILL, given that required information in each of its proposals in response to the RFP was missing.

Among the specific findings of our review of the documents are the following:

Letter to Inspector General Gregory Sullivan

- TILL appears to have proposed the same total development budget of $600,000 for three of the four group homes it was proposing to rehabilitate. Further, the same rehabilitation construction cost of $110,000 was projected for each of the three houses. Yet, the homes were identified as being located in different towns or as being of different ages, sizes and types of construction.
- The only rehabilitation improvement specified in any of the proposals was a statement that TILL was proposing to convert a garage in one house into bedrooms. None of the proposals specified the type and age of the windows and roof of each house, as required in DCAM's Request for Proposals.
- Photographs of the same two unidentified houses were included in each proposal, including a proposal for new construction. With one possible exception, no photographs of houses actually specified in the proposals appear to have been included in the documents made public by DCAM.
- The same timeline for completing the rehabilitation improvements was provided in each proposal.
- Each rehabilitation proposal and the new construction proposal identified the neighborhood surrounding each proposed house with an identically worded description: "Very safe neighborhood--listed as one of the safest in the state."
- In only one case were required plot plans included with the proposals, and no floor plans or drawings were provided that were specific to the houses for which renovations were proposed.
- In none of the proposals did TILL provide the required information about financing the rehabilitation improvements or construction of the one new home it proposed.
- None of the proposals identified the contractor expected to complete the rehabilitation improvements or new construction, as the RFP required.

Beryl Cohen, an attorney for the Fernald plaintiffs in ongoing litigation before U.S. District Court Judge Joseph Tauro, maintained that the process appears to have been geared toward "favored developers...The proposals by TILL and CIL are obviously the pilot process that the Romney administration is using to jumpstart the sale of over 160 acres of prime real estate presently occupied by Fernald," Cohen said.

In recent days, DMR and DCAM have indicated in news reports that contracts with TILL are on hold, due to questions raised about the process by our newsletter (see our attached newsletter article and attached article in the January 26, 2006 *Waltham Daily News Tribune*). However, one DMR official told us that the TILL proposals remain under review and that their status is unchanged.

We strongly believe that DMR should cancel this entire procurement and consider building the new housing it needs on the existing Fernald Center grounds. The procurement of rehabilitation and construction contracts could then be done under Chapter 149, which requires the production of complete plans and specifications for public construction prior to the selection of contractors. Thus, potential developers and contractors would have a clear idea of what DMR wanted them to build, and could submit their bids with some assurance that they would be judged fairly. Moreover, were the state to pay up-front for this construction, it would be much less expensive

2

Letter to Inspector General Gregory Sullivan

over the long run than the current plans for long-term lease agreements, which are projected to cost taxpayers as much as $3 million per house over a 20-year period.

Thank you for your consideration of our request.

Sincerely,

Thomas J. Frain, Esq.
President

Colleen M. Lutkevich
Executive Director

