

**THE MASSACHUSETTS COALITION OF FAMILIES
AND ADVOCATES FOR THE RETARDED, Inc.**

3 Hodges Street, Mansfield, MA 02048
Telephone: (508) 339-3379 Fax: (508) 339-5034
New website address: www.cofar.org



JudyAnn Bigby
Secretary of Health and Human Services
One Ashburton Place, 11th Floor
Boston, MA 02108

January 5, 2007

Dear Dr. Bigby:

We are writing to you to state our position in favor of the provision of a full continuum of care
for persons with mental retardation in Massachusetts and to set the record straight regarding the
critical role of facility-care in this continuum.

First, we would like to note for you that we are a statewide, nonprofit organization that has
advocated since 1983 on behalf of persons with mental retardation and their families. COFAR is
comprised entirely of persons with mental retardation and their family members and guardians,
who live throughout the commonwealth. We have long supported the full availability of choice
in care and services, and our members live in home, community, and facility-based settings.
More information about us can be found on our website at www.cofar.org.

It has come to our attention that some advocates for the disabled have approached the incoming
Patrick-Murray administration with a renewed call for the closure of all of the remaining state-
run facilities, starting with the Fernald Developmental Center in Waltham. This had been the
position of the Romney-Healey administration as well, and it is one that we believe is misguided.

Continued efforts to close these critical facilities will result in the evictions of hundreds of
residents with serious medical conditions and the most severe and profound levels of mental
retardation in the commonwealth. We would note that even Department of Mental Retardation
Commissioner Gerald Morrissey has often said that he does not favor the closure of all facilities
in Massachusetts and that there is a need for some capacity of care provided at the facility-based
level.

Closures of the remaining facilities will only exacerbate the already strained community-based
system of care in Massachusetts and lead to longer waiting lists for those seeking that care. For
reasons we enumerate below, these closures will not save money, but instead will pit people in
need against one another and will benefit only those who stand to gain financially from the
increased privatization of these services.

We would like to respond specifically to the following points that have been made in the
renewed call for the closure of all the facilities:

**1) An open facility bed could be filled by an individual who is placed there against his or
her will.**

This is a falsehood that we believe has been intentionally spread in order to discredit the facilities. It is virtually impossible for such placements of persons against their will to occur. In his 1993 disengagement order in the landmark Ricci v. Okin litigation, which resulted in the improvement in the quality of care throughout the system overseen by the Department of Mental Retardation, U.S. District Court Judge Joseph Tauro left it to the DMR's discretion as to whether to admit additional persons to the state facilities. Since 1993, DMR has adopted a de facto no-admissions policy to the facilities; and in the few cases in which admissions have been allowed, virtually all have been of persons both whose guardians and DMR agreed had not received adequate care in the community system. In some instances, in fact, guardians have had to take legal action and seek help from legislators in order to *gain* admission to facilities for their wards. We see no indication that this DMR admissions policy will change in the foreseeable future.

**2) In the post-Olmstead era, facilities are seen as outdated service models and no longer appropriate placements, given their restrictive institutional settings.**

This is both untrue and a misreading of the U.S. Supreme Court's 1999 decision in Olmstead v. L.C. In 2004, COFAR joined the national Voice of the Retarded, Inc. in filing an amicus brief with Judge Tauro, which argued that the Olmstead decision is consistent with efforts to keep Fernald and other state-run facilities open. The brief noted that the Olmstead decision held that institutional placements are justified when they are medically required, sought by the individual or his or her guardian, and places are available. The brief went on to quote the high court directly in this regard: "We emphasize," the Olmstead decision stated, "that nothing in the ADA (the Americans with Disabilities Act) or in its implementing regulations condones termination of institutional settings for persons unable to handle or benefit from community settings."

The COFAR/VOR brief concluded that: "As long as there are Massachusetts citizens with profound mental retardation, there will be a need for institutional care. If Governor Romney's promise to close all institutions is taken literally, it cannot pass muster under Olmstead. Some form of in-state institutional placement is required to comply with Olmstead."

In a November 2004 hearing in his chambers, Judge Tauro explicitly backed the COFAR/VOR position on Olmstead, saying he thought the brief "accurately cites the Olmstead case. It's nothing I haven't said for the last 20 years," he stated.

It is moreover simply not true that institutional care is an outdated service model or is necessarily restrictive. The six Massachusetts facilities are the only sites in the commonwealth that provide the comprehensive intermediate-care (ICF/MR) level of supports and services specified under Title XIX of the Social Security Act. This level of care has to date not been duplicated in the community-based system.

We would agree that the community-based model of care is preferable for those whose mental retardation is mild or moderate enough that they are able to function in the community. But the majority of the residents in the state facilities in Massachusetts have levels of mental retardation that are so severe or profound that they cannot function in any other settings, and need the ICF/MR care provided in the facilities. Their conditions are often further complicated by medical, psychiatric, and other clinical issues as well as their advanced age. The average age of

Letter to JudyAnn Bigby

current facility residents in Massachusetts is over 55, and many are in their seventies, eighties and nineties.

It is moreover a myth that the facilities are restrictive or are isolated or segregated from the communities that surround them. As we pointed out in the January 2005 edition of our newsletter, *The COFAR Voice* (available online on our website), the Massachusetts facilities are closely integrated with their communities and provide a myriad of clinical, medical, recreational and other services to community-based clients of DMR as well. As the article noted, there are many caring staff in these facilities who go well beyond their job descriptions in providing a normal, homelike existence for their clients, frequently taking them on visits to the surrounding communities and even on vacations with them.

A substantial number of facility residents have lived there for most of their lives, and the facilities are their homes. The staff have in many cases become like family to them. This is in contrast to the community system where staff turnover is far higher and residents are often cared for by workers who do not know them. Most of these residents have poor if any communication skills, which makes the longevity and stability of staff vital to them.

**3) Equal or better services to the medically fragile and persons with mental retardation are proven to work in settings other than the present facilities.**

This is simply not true. As Judge Tauro wrote in his remarks on his 1993 disengagement order in Ricci v. Okin, the improvements in the facilities enacted in response to the 20-year litigation had "taken people with mental retardation from the snake pit, human warehouse environment of two decades ago to the point where Massachusetts now has a system of care and habilitation that is probably second to none anywhere in the world." Today, the facility system provides world-class care that is unduplicated in the community system.

The unfortunate reality is that since 1993, there has been a decline in the quality of care in Massachusetts; but this decline has occurred primarily in the community system and to a much lesser extent in the facilities themselves. In a brief filed in February 2006 in support of reopening Ricci v. Okin, the Wrentham Association stated that abuse, neglect, medication errors and other problems had become so prevalent in the community system in recent years that the system was approaching "the breaking point." The brief added that DMR's facility closure policy "will move hundreds more (Ricci v. Okin) Class members to vendor-operated homes that are already under-staffed and are providing a sub-standard level of care…"

A major reason for the lack of staffing and sub-standard care found in the community system has to do with the low wages and benefits that are offered to by private service providers to direct-care workers. The relatively higher wages and benefits earned by direct-care staff in the state-run facilities have resulted in much greater longevity of facility-based staff, who are in turn better trained.

The standard of equal or better care is determined on an individual basis, according to the resident's Individual Service Plan; and as the Wrentham Association brief notes, care and services in the community system are often less than is available in the facilities. A recent

Letter to JudyAnn Bigby

survey done for DMR by the Center for Developmental Disabilities Evaluation and Research (CDDER) noted, for instance, that less than half the community-based provider agencies in five surveyed regions across the state employed nurses for the care of residents in community-based group homes. In the Metro Boston region, only 28 percent of surveyed providers had a registered nurse on staff; only 11 percent had a licensed practical nurse; and only 1 percent had any advanced nursing services. In contrast, all of the facilities employ registered nurses and licensed practical nurses on a 24-hour basis, as well as medical and clinical staff, who are on site during the day and on call at night. For those reasons, many residents of group homes receive medical and dental care available only through the facilities.

**4) Closing the state facilities will save the state money. Cost savings from facility closures can be directed to strengthening the community system.**

This is not true. The Romney-Healey administration backed away from initial projections of a cost savings in closing the Fernald Center and the other facilities, and then admitted there would be no such savings. Moreover, the journal *Mental Retardation* reported in its April 2003 edition that a review of 250 cost studies did not support a conclusion that community-based care was less expensive than institutional care when similar services were compared.

In fact, the transfers of the hundreds of residents who remain in the facilities to community-based care in Massachusetts will result in a need for the construction of new housing and in new medical and other costs that have never been publicly quantified by DMR. One of our main objections to the Romney-Healey administration's effort to close the facilities has been the lack of apparent planning and cost analyses that have gone into it.

We are currently attempting to analyze estimates of the cost of operating the Fernald Center, which have been released by DMR to the media and elsewhere. These high cost estimates do not appear to take into account the many functions and services provided at the Fernald campus that involve community-based clients and others in addition to the facility residents. We would be happy to provide this analysis to you when it is completed.

In conclusion, we believe that a comprehensive plan is needed for the future of the care provided to persons with mental retardation in Massachusetts. We believe this plan should reflect the ongoing need for a full continuum of care, from home-based to community-based to institutional-based care for those who require it.

We believe that a model can and should be developed that allows for the continuation of the high level of facility-based care, while at the same time ensuring the continued integration of facilities with their surrounding communities in a cost-effective way. If the current physical plant and buildings at the Fernald Center and the other facilities are not found to be cost-effective, then they can and should be replaced by more cost-effective housing on the campuses for the facility residents.

We have proposed a start in that direction with our "postage stamp" proposal for the Fernald Center, under which the current residents would continue to occupy a portion of the campus, leaving the remainder of the grounds available for appropriate development. We think this approach can serve as a blueprint for the other remaining facilities as well.

4

Letter to JudyAnn Bigby


We would be happy to meet with you to discuss this matter further and to provide you with any materials or information we can.

Thank you for your consideration.

Sincerely,

David J. Hart
President

Colleen M. Lutkevich
Executive Director


Cc: Governor Deval Patrick
DMR Commissioner Gerald Morrissey
U.S. District Court Judge Joseph Tauro
U.S. Attorney Michael Sullivan
Beryl Cohen, Esq.
Thomas Frain, Esq.
Margaret Pinkham, Esq.
Mary Lou Sudders
The Rev. Richard Richardson
William Stefaniak
•Martin Corry