

**U.S. Department of Justice**

*Michael J. Sullivan*
United States Attorney
District of Massachusetts

---

Main Reception: (617) 748-3100

John Joseph Moakley United States Courthouse
1 Courthouse Way
Suite 9200
Boston, Massachusetts 02210

The Honorable Judge Joseph L. Tauro
United States District Court
John Joseph Moakley U.S. Courthouse
1 Courthouse Way - Suite 2300
Boston, MA 02210

Re:  The Request of ▮▮▮▮ by and through his Parents and Guardians, ▮▮▮▮ and ▮▮▮▮, to Voluntary Move from Fernald to a Community Residence in ▮▮▮▮

Dear Judge Tauro:

I am writing you in my capacity as Court appointed Monitor in the Fernald matter. Since the appointment in February, 2006, my office has conducted extensive visits to all of the Intermediate Care Facilities for the Mentally Retarded (ICF/MR) within Massachusetts, including four visits to Fernald, and visits to Hogan, Munson, Templeton, Wrentham and Glavine. We have visited over 30 community residences and numerous day centers. We have met with over 75 guardians, parents and siblings at Fernald and other ICF/MRs, and have seen most of the residents of these facilities during their day programs and in their residences. Since my appointment as Monitor, approximately nine individuals currently residing at Fernald have come forward seeking to voluntarily leave Fernald. Some of these individuals, including ▮▮▮▮, have expressed a desire to voluntarily move to a community residence. Another five have expressed a desire to move from Fernald to another ICF/MR. The following discussion pertains particularly to the request of ▮▮▮▮, through his parents, to have ▮▮▮▮ move to a community residence in ▮▮▮▮, Massachusetts.

Medical History (brief overview)

In an attempt to independently glean a full understanding of the medical status and requirements of individuals seeking to transfer from Fernald, my office hired independent medical doctors with a history of caring for individuals afflicted with mental retardation. I asked both counsel for the plaintiffs and the defendants to provide a list of qualified medical professionals that had

The Honorable Joseph L. Tauro
Page 2

experience in treating and servicing individuals with mental retardation. Once the list was finalized, it was distributed to both counsel for the plaintiffs and the defendants. A period of time was allowed for my office to receive comments, suggestions and concerns regarding the list of medical professionals. Three medical doctors were chosen by my office and we have asked these doctors to review the medical history of individuals seeking to voluntarily leave Fernald for community residences, or to transfer from Fernald to another ICF/MR. Robert Baldor, M.D. was asked to review the medical history and future medical needs of ▇▇▇▇▇ (full report attached). Dr. Baldor is a Board-certified family Physician and has a practice at the University of Massachusetts Medical School in Worcester. His current practice includes caring for individuals with intellectual disabilities, and he makes house calls to group homes where 4-8 individuals with mental retardation reside. He also worked at Belchertown Development Center when it was operational.

Dr. Baldor has provided my office with the following medical overview. ▇▇▇▇▇ was born on ▇▇▇▇▇, and has lived at Fernald since ▇▇▇▇▇ He suffers from mild mental retardation, epilepsy and some behavioral issues due to a febrile illness at the age of 2. On average he suffers from 2 - 6 seizures monthly. He is treated with an application of the VNS magnet and sublingual Ativan, and rarely requires such intervention (only once this past year). He also needs to be transported to his neurologist at the Beth Israel Hospital for regularly scheduled visits. His dental services will continue to be provided by Tufts Dental facility, and his primary care physician will be located in ▇▇▇▇▇.

▇▇▇▇▇ behavioral issues are intermittent and include verbal abuse (2 - 3 per month) and physical aggression including hitting, kicking and pushing. His care givers should be aware of appropriate behavioral modification techniques to address any behavioral issue.

▇▇▇▇▇ also suffers from some minor chronic medical conditions including GERD, constipation, seborrhea, dyplastic nevi, tachycardia and a requirement for SBE prophylaxis. He requires medication for these medical issues, and these medical issues are stable, common conditions that are well within the abilities of a local primary care physician to monitor. Overall, ▇▇▇▇▇ requires minimal assistance with his activities of daily living (ADL's) for hygiene and completion. He currently attends a day program part-time and goes to restaurants regularly.

The Community Residence

My office visited the proposed community residence for ▇▇▇▇▇. The Provider that operates the home is Southern Residential Services (SRS). SRS is a Department of Mental Retardation Sponsored provider. Since 1993 SRS has become one of the largest providers of residential services in the Commonwealth of Massachusetts. SRS provides 24 hour residential supports to 277 individuals in 60 community homes throughout Southeastern Massachusetts. SRS currently supports 203 RICCI Class Members, and employs approximately 800 employees including direct support staff, LPN staff, RN staff, and nurse practitioners. Many of the homes support individuals with complex medical needs. Five of the homes provide 24 hour nursing

The Honorable Joseph L. Tauro
Page 3

supports for medically fragile people. These needs include, but are not limited to the following: medication administered through a feeding tube; changing or replacing a feeding tube; urinary cauterizations; naso-tacheal or tracheal suctioning; tracheotomy care; mechanical ventilation; intramuscular or subcutaneous injections; soap suds enemas; cardio-respiratory assessment; and assessment of individuals with recent hospitalizations and/or surgery.

The specific house that ▇▇▇ will reside is located in a quiet neighborhood. The home is well maintained and extremely attractive. The home will employ staff that are fully trained in detecting and responding to epileptic seizures. The home also has 24 hour nursing care and will be home to four other men and two ladies. The home has an eight person capacity. The activities in the home are varied and include a number of activities to keep the residents active and involved in their community. ▇▇▇ will have a myriad of activities available to him and some of these activities will include the following: visiting the mall; going to restaurants; miniature golf; going to the movies; outdoor activities; and the YMCA.

The Day Program

▇▇▇ will be attending his day program at the Town Line Redemption Center in North Dighton, Massachusetts (program description attached). The day program is located ▇▇▇ from his residence. Staff at the day program will be trained by SRS nursing staff to monitor and respond to any seizures that ▇▇▇ may experience. While at the day program, ▇▇▇ will be responsible for sorting cans in a can processing area where he will be trained to distinguish between approximately 7 different distributors. Each distributor's containers will be introduced to ▇▇▇ one at a time. For example, he may start with Coca Cola products and then move on to other high-volume distributors when he is comfortable. He may move into the plastic container sorting area at a later date and learn the sorting process on that side if he so chooses. There will be a reclining chair in ▇▇▇ work location if he feels he needs to sit down periodically to rest.

Final Assessment

Upon meeting ▇▇▇ having numerous conversations with his mother and guardian ▇▇▇, visiting the proposed new residence in ▇▇▇ and his day program in Dighton, and having Dr. Baldor conduct a medical assessment of ▇▇▇ ongoing health needs, it is the opinion of the Monitor that ▇▇▇ can receive equal to or better treatment at this particular community residence. My opinion is based on a number of factors, but certainly does not overlook the fact that he has resided at Fernald for a significant time. Ultimately, although ▇▇▇ has frequent seizures, the proposed residence in ▇▇▇ will have staff fully trained to monitor and respond to his seizures. Also, Dr. Baldor concludes that an intercom system within his room would allow for unobtrusive monitoring of any nighttime seizure activity. Lastly, Dr. Baldor suggests that a customized chair with back supports be available to prevent ▇▇▇ from tumbling backwards during a seizure.

The Honorable Joseph L. Tauro
Page 4

    Lastly, both ▇▇▇▇ mother and father are weekly visitors to Fernald. Both parents have moved ▇▇▇▇ and the distance between them and their son has resulted in a one hour drive in each direction. Both parents would prefer to have their son living closer to them in the community so that they are visit him more often and have him visit their respective homes more frequently. Given that the services and safeguards will be in place for ▇▇▇▇ to move to the community, I believe his move can be accommodated successfully and the services received will equate to the services he is currently receiving.

    I am available to provide any further information regarding ▇▇▇▇ proposed move from Fernald to a community residence in ▇▇▇▇.

Very truly yours,

Michael J. Sullivan / M.K.C.

Michael J. Sullivan
United States Attorney

Enclosures    (Dr. Baldor's medical report)
                  (Town Line Redemption Center Program Description)