UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ROBERT SIMPSON RICCI, *et al.* | ) | Civil Action Nos. 72-0469-T (Belchertown) |
|  | ) | 74-2768-T (Fernald) |
| Plaintiffs, | ) | 75-3910-T (Monson) |
|  | ) | 75-5023-T (Wrentham) |
| ROBERT L. OKIN, *et al.* | ) | 75-5210-T (Dever) |
|  | ) |  |
| Defendants. | ) |  |

PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR CLARIFICATION OF ORDER APPOINTING COURT MONITOR

The Dever, Fernald, and Wrentham Classes (collectively, the "Plaintiffs") hereby move for clarification of this Court's Order dated February 8, 2006, appointing a Court Monitor ("Appointment Order"). The clarification is requested with respect to the breadth of the Monitor's role in determining whether past and prospective transfer processes employed by the Department of Mental Retardation ("DMR") are in compliance with the Court's 1993 Disengagement Order ("Disengagement Order"), particularly where the transfers involved are to community-based group homes.

In a recent bi-weekly conference call between the Plaintiffs and the Monitor, the US Attorney's Office indicated that while it seeks to provide a very complete report to the Court, it does not wish to overstep the limits of its authority. Accordingly, the Plaintiffs believe it is in the best interests of the parties and the Monitor for the Court to clarify whether the Appointment Order authorizes the Monitor to examine and report on whether Class Members who have been or will be transferred into community-based homes are provided with care and services that are "equal or better" to care provided in their prior residence, regardless of whether the Class member ever resided at Fernald.

1

### A. The Appointment Order Authorizes the Monitor to Address the "Equal or Better" Requirement.

The Appointment Order provides that the Monitor is to "advise the court as to whether the past and prospective transfer processes employed by the Department of Mental Retardation comply with federal law, state regulations, *as well as the orders of this court*" (emphasis supplied). Therefore, the Appointment Order requires the Monitor to consider the Court's 1993 Disengagement Order in its investigation. The Plaintiffs believe it is essential for the Monitor to examine the care and services provided by DMR providers in community-based homes in order to determine whether Class members who reside in those homes receive care that meets the "equal or better" requirement set forth in the Disengagement Order.

Following his appointment as a Monitor in this case, US Attorney Michael Sullivan and his staff pledged an open investigation, and the Monitor has fulfilled that pledge. The Monitor has kept the Plaintiffs apprised of his efforts and sought the Plaintiffs' input into appropriate areas of inquiry, including identifying community-based homes and providers with the highest numbers of substantiated claims of abuse, the provision of services at group homes and day programs, and staffing levels at community-based homes. Based on the Monitor's openness and inclusiveness, the Plaintiffs have understood that the Monitor's investigation and report would address not only the transfer procedures employed by DMR, but also the more substantive question of whether, once transferred out of a facility, Class members continue to receive the level of care required by federal law, the Disengagement Order, and as set forth in Individual Service Plans prepared in accordance with the Disengagement Order. These are important questions for all Class members, not only Fernald Class members.

1. <u>The Failure to Certify "Equal or Better" Services in the Community Setting Should Be Examined.</u>

The Disengagement Order forbids DMR from transferring a class member unless "the Superintendent of the transferring school (or the Regional Director of the pertinent community region) certifies that the individual to be transferred will receive equal or better services . . . [and] all ISP-recommended services for the individual's current needs as identified in the ISP are available at the new location." This "equal or better" certification is an essential element of the transfer process, but DMR erroneously claims that certification of "equal or better" is <u>implicit</u> in the approval of a Class member's transfer.

In response to a DMR presentation to the Monitor on how clinical needs are met in the community, also attended by the various Plaintiffs' representatives, the Dever and Wrentham Associations submitted follow-up questions (attached as <u>Exhibits A-B</u>) regarding the certification, including who makes it and how it can be made when providers admittedly do not have the same quality of staff or services available. DMR has not responded to these questions, which the Monitor provided to DMR. As such, DMR's non-compliance with the Disengagement Order's "equal or better" certification requirement is an appropriate issue for the Court Monitor to investigate, and address in his report.

2. <u>The Court Monitor Should Examine and Report on Conditions at Community-Based Facilities to Ensure DMR's Compliance With the Disengagement Order.</u>

Without concrete evidence that a certification process is taking place, which has been lacking since 1997, the Monitor cannot be assured of DMR compliance with the Disengagement Order unless he investigates the conditions in group homes, especially those operated by providers under contract with DMR. While there are no certifications that DMR has found the transfer locations, such as the provider-operated homes, to meet the "equal or better" standard

required by the Disengagement Order, there is significant evidence that vendor-operated homes do not comply with that Order's requirement that DMR provide a sufficient number of adequately trained staff. Far from allowing Class members the opportunity to be integrated into society, Class members in a number of community-based homes are isolated from mainstream society due to lack of staff and funding. At the very least, the conditions in many community-based homes are far inferior to facilities and DMR operated group homes, which have more experienced staff and lower rates of medical errors, and sexual and physical abuse. The Monitor should, by virtue of his obligation to ensure compliance with the Disengagement Order, examine the conditions in DMR and provider-operated homes as the Monitor's examination and recommendations may obviate the need for additional motion practice or further litigation on the part of the Plaintiffs.

      3.      <u>Conditions in the Provider-Operated Facilities Do Not Uniformly Meet the "Equal or Better" Standard.</u>

The Disengagement Order requires DMR to provide services to each class member based on the Individual Service Plan ("ISP"), which outlines the class member's capabilities and needs for services, pursuant to the regulations governing the preparation of ISPs. The services are to be tailored to the individual and include, as appropriate, "residential programs; day programs; recreational and leisure time activities; medical, psychological, dental and health-related professional services; respite care and crisis intervention services; support and generic services, such as guardianship and adaptive equipment services; and transportation services." In some instances, Class members do not even receive an ISP, in direct violation of applicable law and this Court's Order.[1]

---

[1] In further support of this conclusion, the Plaintiffs rely on the *Wrentham Association's Memorandum in Support of Its Motion to Re-Open the Case*, February 7, 2006, at 39–47.

4

a. *ISPs have become decreasingly specific to each class member's needs.*

While ISP meetings in the community are conducted in a similar manner, the critical difference is that most community-based families are unaware of the resources available to their loved ones. The quality and implementation of the ISP still rises and falls with the intensity level of family advocacy, and there is a wide disparity of "off the shelf" services offered to the Class Members, depending on whether they reside in the community or a facility. The lack of information, understanding and education are the most critical issues facing families of mentally retarded persons in provider-run group homes. As many advocates believe, most community-based families struggle achieving an appropriate and well-funded ISP. Most have no idea, for example, that there are state-operated group homes in the community managed by DMR. Few have any idea about the depth of services and experience that exist at ICFs/MR. ISP meetings at ICFs/MR, on the other hand, are routinely attended by clinical, nursing, administrative and direct care staff.

The ISP is the standard by which DMR's performance is to be measured. In the past ten years, however, the manner in which ISPs are prepared in community-based homes has degraded to such a degree that the ISPs are now generic form documents completed under the direction of a single service coordinator unless the guardian is very forceful and proactive in demanding and obtaining clinical input. Moreover, DMR's own regulations, 115 CMR 6.21(c), provide that it is up to the service coordinator to determine "what, if any, assessments or professional consultations are necessary for the development, modification, or review of the ISP, and, <u>subject to the availability of resources</u>, to arrange for assessments and consultations which are not the responsibility of any current provider." (emphasis supplied). Service coordinators in the community carry twice the case load of service coordinators at facilities, and are in many

instances, surprised to learn that Ricci class members are entitled to receive services regardless of funding. One service coordinator, employed by DMR for more than 20 years, was unaware that Ricci class members receive services according to their ISPs <u>without</u> regard to funding. The same service coordinator had never seen DMR's "Ricci Rights" brochure that outlines the specific services that must be provided to Class members.

The geographic distance between patients also makes adequate monitoring of all Class members by service coordinators impossible. One service coordinator had not visited or conducted an ISP for a Class member for more than two years, because he did not think it was "necessary" since the Class member was in a nursing home. *Wrentham Association's Memorandum in Support of Its Motion to Reopen*, p. 46-47. Service coordinators are supposed to visit each Class member every 30 days, but they apparently are not trained or reviewed on this requirement, and DMR has not responded to the Plaintiffs' requests for more information about the processes and substantive requirements for the monthly visits.

### i. <u>Staffing Shortfalls</u>

The Disengagement Order also requires that "sufficient adequately trained and experienced personnel" be "available to substantially meet the needs set forth in each class member's ISP." DMR and its vendors have failed to provide adequate salaries and benefits to the staff who care for Class members. There is no escaping the effect of inadequate resources. There are systemic deficiencies in the provision of care, including escalating turnover among providers, continuous vacancies in staff positions, decreasing levels of service, and significant risk of personal harm and injury to Class members. High turnover directly impacts the level of experience of direct-care workers because fewer stay on the job long enough to gain the requisite experience, which in turn directly affects Class members by failing to provide them with direct-

care workers with whom they are familiar. This is important because a number of Class members fare much better when dealing with care workers with whom they have developed a personal relationship, commonly referred to as "preferred staff." This issue, while rooted in common sense, is also explicitly addressed in many ISPs. The lack of experienced, qualified direct-care staff jeopardizes Class members' physical and emotional well-being.

Medical care in the community presents DMR with another challenge with respect to equal or better services. Direct care staff must make all the arrangements and appointments for Class members. DMR has not responded to a number of substantive questions on this topic, despite the fact that the Monitor provided Plaintiffs' inquiries to DMR and understood that DMR would respond. The Monitor's assistance in identifying the shortfalls with respect to staff training and education, as well as the level of care and services being provided to Class members in the community is essential to successfully establishing whether care provided by DMR contractors meets the "equal or better" standard.

ii. <u>Staffing inadequacy causes harm to Class members.</u>[2]

One of the most critical areas requiring trained staff involves the administration of medication. Class members have died as the result of medication errors and DMR's intransigence on this issue is a prime example of a systemic failure. Specifically, in 2003, David Malcolm, a resident of a community program on the South Shore, died after the manager of his community home failed to fill his prescription for medication to control his seizures. David's new prescription from December 11, 2002 was never filled by the home manager.[3] By late December, his other prescription ran out and he missed three doses. On December 29, 2002,

---

[2] Additional examples of abuse are set forth in *Wrentham Association's Memorandum in Support of its Motion to Reopen* at 5-17.

[3] *Patriot Ledger*, David Malcolm Timeline, March 20, 2004.

David collapsed at 4 a.m. The house manager decided to wait until more staff arrived to bring him to the emergency room, although a doctor recommended that he be seen immediately. David had another seizure at 6 a.m. The manager did not respond to a page, and there was apparently only one staffer on duty. Shortly after 8 a.m., the staffer heard another crash and found David lying in the bathroom, bleeding from the nose and forehead, shaking and biting his tongue.[4] The staffer called 911 and David was taken to South Shore Hospital, where he had more seizures and suffered cardiac arrest. He died on January 4, 2003 at age 39.[5]

Rachel Deline, a Wrentham Class Member, also suffered and died because of medication errors. On April 13, 2002, a pharmacist who filled her prescription accidentally gave her double the dose of lithium that was prescribed to control her mood swings. She developed diarrhea, a symptom of lithium poisoning that went unnoticed. The group home manager told staff to limit her fluids, which increased the risk of dehydration. The diarrhea continued and Rachel soon became weak and unsteady. Noticing a bruise on her back, staffers brought her to the doctor for x-rays on May 10, 2002. There was nothing wrong with her back, though she had to be carried into the office. The next day, her parents came from New Hampshire for their monthly visit. When they arrived, the staff were all watching television. Rachel's father found her moaning and crying, with half her body on a couch and the other half on the floor. The DPPC investigator subsequently determined that she had been in that condition for 90 minutes. She died, on May 13, 2002 at age 51, of dehydration and kidney damage.[6] Her family subsequently received a $1 million settlement in a civil lawsuit filed after her death.

---

[4] Id.

[5] *Patriot Ledger*, David Malcolm Timeline, March 20, 2004.

[6] Sue Reinert, *No One Punished for Woman's Death, and Her Family Asks, "Why Not?"* The Patriot Ledger, March 22, 2004.

Most foster care providers and direct care staff have no professional or clinical expertise and DMR admittedly does not require providers to mandate that direct care staff attend quarterly training programs on such topics as dealing with seizures, nutrition and Medicare information. DMR does provide brochures, pamphlets, and signs and symptoms sheets to providers, <u>all of which are written at a fifth grade reading level</u>. This speaks volumes as to the qualifications of direct care staff. Of concern is the ability of these staff members to recognize dangerous and sometimes lethal medical symptoms, particularly when training is not required, they may only read at a fifth grade level and/or speak English as a second language.

###   iii.   Increased levels of abuse in community-based homes.

Additionally, an examination of DPPC-substantiated claims of abuse demonstrates that rates of abuse in provider-operated, community-based homes are higher than in settings where DMR staff provide direct care services. In FY 2002, there were 114 substantiated claims of abuse in residential, non-facility settings, and 121 substantiated Reports in FY 2003. Thirteen percent of substantiated complaints against providers involved sexual abuse, as compared to only 4% of the substantiated complaints in settings where DMR employees provide direct care. Additionally, medication errors represent 7% of the substantiated complaints against providers, but only 2% of the complaints in settings where DMR employees provide direct care (including DMR-operated group homes).[7]

The overwhelming majority of substantiated claims of abuse at ICFs/MR are the result of falls, usually from wheelchairs, or out of bed, or because the Class member was not closely

---

[7] DMR objects to analyzing the DPPC data in community-based homes by segregating substantiated claims of abuse by whether care is provided by a vendor's employees, rather than DMR employees. When the data is analyzed by grouping the abuse on the basis of whether care is provided in a facility, versus in the community, the higher quality care provided in DMR-operated group homes, where employees are much more experienced and better paid, masks the higher rate of abuse and medication errors in provider-run group homes. DMR also contends that these statistics are not accurate, but it has never disclosed any results of its own analysis, though at a presentation to the Monitor, it took the position that in some years rates of abuse at facilities were higher than in the community, and in other years, it was the reverse.

9

supervised. One Class member went "awol" from a facility for one hour – a far cry from confirmed reports from community homes where DMR clients were gone for hours, including overnight, with caregivers who apparently did not notice or care.[8] The abuse against DMR clients in community homes is more often the result of malfeasance – it is conduct that is intended to cause harm, or represents gross recklessness in the care of individuals who need to be constantly monitored in order to be safe from themselves, other clients, or abusive staff. A class member's placement in a setting that exposes him or her to a substantially higher risk of harm does not meet the "equal or better" standard.

Recently, a nine year-old severely handicapped child, a DMR client, died of pneumonia at privately-operated Sunshine Haven due to alleged inadequate training of caregivers, and the failure of that provider to have nursing supervision while the provider's regular nurse was on vacation. The caregivers did not recognize that the child had pneumonia and therefore failed to take him to receive medical care.[9] Sunshine Haven is a DMR provider.

Inadequate supervision by staff also resulted in severe injuries to the plaintiff in *Bobick v. United States Fid. & Guar. Co.*, when he fell trying to cross the street by himself, despite the fact that the van driver who was transporting him was supposed to ensure that he was met by someone at the day program.[10] Poor supervision, coupled with the failure to comply with DMR regulations and DMR's failure to recognize or act on non-compliance, also leads to injury. One heartbreaking example of a DMR client being harmed by the failure of a community home to

---

[8] Three such cases are summarized in the *Wrentham Association's Memorandum in Support of Its Motion to Re-Open the Case*, at 10–17.

[9] *Massachusetts Lawyers Weekly*, "Child Dies of Pneumonia At Facility for Handicapped," May 30, 2005.

[10] *Massachusetts Lawyers Weekly*, "Plaintiff Can't Sue over a 'Low' Offer to Settle Case," July 7, 2003.

meet the basic requirements of handicap-accessibility is that of Thomas Frost, Jr.[11] As a result of a stroke as an infant, Thomas was partially paralyzed on his left side and used a foot brace for walking assistance. Despite these physical handicaps, he could walk, talk, dance, play softball and feed himself. He lived at a home operated by Human Service Options, Inc., a DMR provider, when he was going back upstairs after staff told him to put a dirty towel in a hamper on the first floor. The stairs were too high and the single railing was on the left side, so it was useless to Thomas. He fell down the stairs and sustained serious injuries, including a fractured skull, fractured bones, a concussion, sinus injuries, internal bleeding and multiple bruising, a permanent brain injury, and marked worsening of his health and disability. He is confined to a wheelchair and no longer talks or feeds himself. He is now permanently and totally disabled and will need constant care for the rest of his life. DMR had improperly certified the home as compliant a few months before Thomas fell.[12]

DMR's failure to critically evaluate the services at provider-operated community homes has contributed to its willful ignorance of the deficiencies in the system. DMR faces staffing shortages and training concerns, high turnover rates, and salary deficiencies. Absent an investigation and overhaul of the community care system, DMR is incapable of providing sufficient, adequately trained personnel. In Suffolk County alone, there have been close to 50 lawsuits filed against DMR vendors since the Court's Disengagement Order based on negligence, personal injury and wrongful death; the majority of these actions were filed within the past five years. Moreover, DMR's plan to close the ICFs/MR and transfer Class members to

---

[11] DMR's regulations require group homes to provide a "barrier free environment" to persons with "substantial mobility impairment." 115 CMR 7.07(4). In order to comply, premises must comply with the Architectural Access Board requirements. Specifically, 521 CMR 27.4.1 requires that "stairways shall have continuous handrails at both sides of all stairs." Additionally, stair risers are to be a maximum of 8.25 inches high.

[12] *Frost et al. v. Human Service Options, Inc.*, Norfolk Superior Court, CV2005-00063.

provider-operated community-based homes will only add more individuals to an already overwhelmed and short-staffed system, resulting in services that are not "equal or better" thereby violating this Court's Order. As the Monitor is examining DMR's compliance with the Disengagement Order, it is appropriate for the Monitor to investigate and report on unacceptable conditions in the community-based facilities.

**B.     This Court Has Authority to Order the Expenditure of State Resources in Order to Ensure Compliance With the Disengagement Order Because It is Ancillary to Proper Prospective Relief In Light of DMR's Constitutional Violations.**

In addition to clarifying the Monitor's role, this Court has the authority to order the expenditure of state funds to support the Monitor in determining whether or not DMR is in compliance with the Court's Order requiring "equal or better" services and to secure future compliance. "[C]onstitutional requirements are not…to be measured or limited by dollar considerations." Rozecki v. Gaughan, 459 F.2d 6, 8 (1st Cir. 1972). Where state institutions have been operating under unconstitutional conditions and practices, they may not cite lack of funds and claim the district court's inability to order appropriations by the state legislature as defenses. See id. (citing Holt v. Sarver, 309 F.Supp. 362, (E.D. Ark.1970), aff'd, 442 F.2d 304 (8th Cir. 1971)); see also Hamilton v. Love, 328 F.Supp. 1182, 1194 (E.D. Ark.1971) ("Inadequate resources can never be an adequate justification for the State's depriving any person of his constitutional rights.").

When constitutional violations are found, the court has the duty and obligation to fashion effective relief, and the district court is allowed wide discretion in doing so. See Swann v. Bd. of Educ., 402 U.S. 1, 15, (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."). Enforcing prospective relief allows a federal court to grant a

remedy which results in the payment of funds from a state treasury if ancillary to the proper prospective relief.  Milliken v. Bradley, 433 U.S. 267, 289 (1977) (the exception "permits federal courts to enjoin state officials to conform their conduct to requirements of federal law, notwithstanding a direct and substantial impact on the state treasury").

The 1993 Disengagement Order required DMR to create an Individual Service Plan (ISP) detailing each Class member's capabilities and need for services, and to substantially provide the services laid out in the ISP.  This prospective relief was designed to remedy the conditions resulting in the deprivation of the Plaintiffs' Fourteenth Amendment liberty interests, and was properly ordered.  See Milliken, 433 U.S. at 287-89, (requiring remedial educational programs as part of desegregation plan sufficiently tailored to remedy past violation and requiring state to pay for half of the programs did not violate the 11th Amendment).  The Appointment Order requiring the Court Monitor to evaluate DMR's compliance with the Disengagement Order, "notwithstanding the direct and substantial impact" on the allocation of state and DMR resources, falls under the prospective compliance and continuing violation exceptions and does not run afoul of the Eleventh Amendment.  Therefore, it is appropriate for the Court to order the Monitor to examine conditions in vendor-operated homes to which DMR is transferring Class members, and, if necessary, to use state funds in order to conduct this investigation.

## CONCLUSION

For the above stated reasons and the reasons set forth in *Wrentham Association's Memorandum in Support of Its Motion to Re-Open the Case*, Plaintiffs respectfully request that this Court clarify that its February 8, 2006 Order requires the Court Monitor to examine the conditions in the community-based homes to determine whether past and present transfer processes comply with the Disengagement Order's requirement that DMR provide an adequate

number of sufficiently trained staff, conduct ISPs in the manner required by federal regulations, and that the care and services provided by DMR, especially in those group homes in which DMR contracts with a vendor, meets the "equal or better" standard.

Respectfully submitted,

DEVER ASSOCIATION

By its attorneys:

   /s/ Cornelius J. Moynihan
Cornelius J. Moynihan, Jr. (BBO # 358840)
Nixon Peabody, LLP
100 Summer Street
Boston, MA 02110.
(617) 345-1000
cmoynihan@nixonpeabody.com

WRENTHAM ASSOCIATION

  /s/ Margaret M. Pinkham
Margaret M. Pinkham (BBO#561920)
Daniel J. Brown (BBO#654459)
BROWN RUDNICK BERLACK ISRAELS LLP
One Financial Center
Boston, MA  02111
(617) 856-8200
mpinkham@brownrudnick.com
dbrown@brownrudnick.com

FERNALD ASSOCIATION

By its attorney:

   /s/ Beryl Cohen
Beryl Cohen (BBO #088620)
11 Beacon Street
Boston, MA 02108
berylwcohen@verizon.net

Dated:  January 25, 2007

## **CERTIFICATE OF SERVICE**

      I hereby certify that a copy of the foregoing document was filed electronically. Notice of this filing will be sent by e-mail to all parties below by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

**Fernald/Monson/Belchertown Classes**
Beryl Cohen, Esq.
11 Beacon St., Rm. 900
Boston, MA  02108

**Dever Class**
Cornelius J. Moynihan, Jr., Esq.
Nixon Peabody, LLP
100 Summer Street
Boston, MA  02110

**ARC**
Steven J. Schwartz, Esq.
Cathy E. Costanzo, Esq.
Center for Public Representation (CPR)
22 Green Street
Northampton, MA  01060

**Disability Law Center**
Stanley J. Eichner, Esq.
Disability Law Center, Inc.
11 Beacon Street, Suite 925
Boston, MA  02108

**Office of the Attorney General**
Robert Quinan, Esq.
Assistant Attorney General
Office of the Attorney General
Government Bureau
One Ashburton Place
Boston, Massachusetts  02108

**Department of Mental Retardation**
Marianne Meacham, General Counsel
Commonwealth of Massachusetts
Executive Office of Health & Human Services
Department of Mental Retardation
500 Harrison Avenue
Boston, Massachusetts  02118


Dated:  January 25, 2007          /s/ Margaret M. Pinkham