**BROWN RUDNICK**

MARGARET M. PINKHAM, Esq.
direct dial: 617-856-8265
mpinkham@brbilaw.com

One
Financial
Center
Boston
Massachusetts
02111
tel 617.856.8200
fax 617.856.8201

July 28, 2006

Rayford A. Farquhar, Esq.
  Chief-Defensive Litigation
United States Attorney's Office
John Joseph Moakely Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210

RE: **Ricci, et al v. Okin, et al**
*Civil Action Nos. 72-0469(Belchertown); 74-2768-T(Fernald);
75-3920(Monson); 75-5023-T(Wrentham); 75-5210-T(Dever)*

Dear Ray:

Thank you for the opportunity to attend the DMR presentation on how clinical needs are met in the community. The Wrentham Class has a number of follow-up questions/comments:

A. **Equal or Better Certification**

Under Judge Tauro's Order, prior to transfer, DMR must certify that the Class Member will receive equal or better treatment at the new location. This raises two questions:

- Who actually makes the certification on behalf of DMR?

- How can such a certification be made when providers admittedly do not have the same quality of staff, or services available?

DMR said that Class Members in the community access medical care in the same way as other citizens who receive public assistance. This position discounts the fact that direct care staff must make all arrangements and appointments, and glosses over the very real problem that only a small group of physicians accept MassHealth. One of the most telling answers to the Monitor's questions was in response to the inquiry "What is the most challenging aspect of a transfer out of a facility from DMR's point of view?" Ms. Brown responded "The challenge is how to meet their needs in the community in a creative way." The need to be "creative" in meeting a class member's needs implies that it is much more challenging to meet the needs in a community setting. This makes sense as we are dealing with a population that tends to present complex medical needs, with perhaps a mental health component as well.

DMR must depend on the voluntary cooperation of medical and other professionals in the community system, while in the facilities, the professionals either work directly for or

contract with DMR. In trying to secure such cooperation, approximately 7000 primary care physicians received a mailing about DMR clients. However, as Sharon Oxx stated, "who knows if they read it?" Furthermore, 7000 physicians is a number that is not easy to manage. There must be all levels of good, bad and indifferent for this fragile population. A single RN employed in DMR's area office cannot provide oversight to the hundreds of individuals within the area, nor effectively assist in coordinating medical care that "anybody else in the community" would get with MassHealth. Families on MassHealth can hardly get a visiting nurse to help provide care following hospitalization or injuries, so it is difficult to believe DMR's assurances that direct care staff know how to work the tangled bureaucracy, and are forceful health care advocates for group home residents.

- How can DMR certify that access to medical care in the community is equal or better to having immediate access to on-site medical care?

- Is the "equal or better certification" made when class members are moved from one group home to another?

DMR admits that the only dental care this population can get is at a Tufts Dental Clinic. A service coordinator who was employed by DMR for more than 20 years was unaware that Ricci class members could be seen at the clinic. When she called the clinic and was told there were no openings, she informed the guardian to try to find, and pay for, a private provider. DMR's "Ricci Rights" brochure for service coordinators apparently needs to be updated and redistributed since it was prepared approximately ten years ago. The service coordinator referenced above had never seen it – she asked Colleen Lutkevich to give her a copy. She was also not aware that under DMR's regulations, Ricci class members receive services according to their ISP's *without regard to funding*.

- Does DMR have a contract with Tufts that requires it to provide dental care to class members and other DMR clients or are the clinics the result of Tufts' good will?

B.   **Oversight and Monitoring**

The DMR representatives explained the involvement of a number of care providers in the early stages of transfers to help make the transition as smooth as possible.

- After the transfer is made, how long does facility staff monitor the transfer to make sure it is a good fit?

- Afterward, who takes over monitoring the Class Member's care – a service coordinator?

- What are the case loads of service coordinators in the community compared to those in facilities?

At the presentation on July 20, 2006, Gail Grossman stated that DMR uses 22 quality assurance systems. The meeting was not the proper place to provide detail about all of them, but we would like information on each of these systems. One of the Wrentham Association's primary concerns is that Judge Tauro's Order requires community programs to be reviewed on a periodic basis ("periodic monitoring"). DMR's QA monitoring appears to be almost completely internal. While investigators are separated from administrators/operations, monitoring should be done by a source that is independent from DMR.

The Annual Quality Assurance Reports conducted by DMR are system-wide reviews – there is no periodic monitoring focused on Ricci class members as a subset of the DMR population, therefore, it is difficult to determine whether DMR is complying with its obligations to the Class. The National Core Indicators Project that DMR participates in tracks trends and makes suggestions over the long term. For example, there were insufficient OB/GYN exams being done for DMR clients. This project did not track individuals, and the individuals whose stories were used in the aggregate report will have to wait years for new DMR systems (such as an increase in exams) to be implemented. Additionally, much of what is included in the Report is dependent upon self-reporting of such things as medical occurrences, use of restraints, etc., and as the Monitor recognizes, it is not in the financial interests of providers to report their own failures.

There is also evidence of dangerous gaps in DMR's certification process for community homes. The Monitor asked if all group homes must be handicap-accessible, and DMR said no. However, 115 CMR 7.07(4) requires that group homes provide a "barrier free environment" to persons with a "substantial mobility impairment". In order to comply with this requirement, the premises must comply with the Architectural Access Board requirements set forth in 521 CMR 1.00 *et seq*. A large percentage of Ricci class members have impaired mobility.

- How many Ricci class members have a "substantial mobility impairment" and do all of the group homes in which they reside comply with the Architectural Access Board regulations?

One of DMR's providers, Human Service Options Inc., which runs 35-40 group homes, has certified that its premises comply with the DMR's regulations. 521 CMR 27.4.1 provides that "Stairways shall have continuous handrails at both sides of all stairs." In addition, the stair risers are to be a maximum of 8.25 inches high. As a result of a stroke as an infant, Thomas Frost Jr. was partially paralyzed on his left side and used a foot brace for walking assistance. He could walk, talk, dance, play softball and feed himself. He lived at a Human Service Options home. In December 2002, Thomas was going up the stairs when he fell; the stairs were too high and the single railing was on his left side. Since Thomas could not grasp with his left hand, the handrail was useless to him.

As a result of his fall, Thomas sustained serious injuries, including a fractured skull, fractured bones, concussion, sinus injuries, internal bleeding and multiple bruising, a

permanent brain injury, and marked worsening of his health and disability. He is confined to a wheelchair and no longer talks or feeds himself. To date, Thomas' medical expenses exceed $140,000. Thomas is permanently and totally disabled and will need constant care for the rest of his life. DMR had certified the home as compliant a few months before Thomas fell.[1]

Colleen Lutkevich received a recent telephone call regarding two Ricci class members (Monson) who live in a provider run group home with only one overnight staff person. Both class members are in wheelchairs and are unable to evacuate in 2.5 minutes as required by DMR's Regulations. According to DMR, this situation should result in an "immediate jeopardy" notice to be corrected within 24-48 hours. Given these examples, it seems clear that DMR is unaware of its own regulations, or unwilling or unable to find providers and group homes that comply with them.

- What steps does DMR take to ensure its own regulations are followed?

- What type of training does it provide regarding regulations?

- How frequently are inspections of premises conducted? At the July 20 conference, DMR stated that every 24 hour facility is inspected every 30 days, but Human Service Options is relying upon a certification by DMR, from months before Thomas' fall.

Ms. Lutkevich received a call from a family in New Hampshire regarding TILL, a provider in New Hampshire and Massachusetts. A care provider for a shared living arrangement, which used to be referred to as "foster care," had left the resident alone overnight for several nights to spend time with his sick mother in the hospital. Ms. Lutkevich reported this to the NH Department of Health and Human Services, which found reason to investigate. The chief investigator told Ms. Lutkevich that she had been worried about this situation with the shared living provider for some time but did not have enough evidence to move forward. The shared living provider had been fired from another agency and had a history of drug abuse, but was hired by TILL NH. Without independent monitoring, it is impossible to know if this is also happening in Massachusetts, though the MA Inspector General has criticized DMR and DMH's use of CORI checks in a single state before hiring direct care staff, as a check of the record in Massachusetts will not reflect RI, NH, CT, VT or NY records and direct care staff do not always reside in Massachusetts.

- Can DMR identify which of its providers, and which locations, have been the subject of a DPPC investigation that substantiated a complaint of abuse?

- What steps does DMR take to inform itself of these events and what action does it take in response?

---

[1] *Frost et. al, v. Human Service Options, Inc.*, Norfolk Superior Court, CV2005-00063, had a pre-trial conference on July 13, 2006.

Contract negotiation for providers with DMR does not provide an incentive for compliance– it was suggested by Attorney Meacham that following the rules and regulations is "implied" by the signing of the contract. Financial improprieties would be particularly noted due to auditing. Several years ago, TILL was investigated by the State Auditor's office and its Executive Director was found to have double billed her salary. DMR did not sanction TILL – to the contrary, that Executive Director was appointed by Commissioner Morrissey to serve on the Governor's Commission for Mental Retardation. Even more disturbing was the recent award of a conditional contract to TILL to build housing for Fernald residents. After a great deal of complaining by COFAR to DMR, DCAM, the Inspector General's office and the Attorney General's office, DMR rejected TILL's response to DMR's request for proposals and the contract was re-bid.

C.      **Training**

The Medication Administration Program (MAP), which has one of the lowest minimum training requirements (16 hours) in the United States for such programs, also relies upon self-reporting to track problems. The MAP certification is not mandatory, and there are no requirements regarding MAP personnel in connection with a provider's licensure.

- What type of training is required by DMR for providers and direct care staff in community homes?

DMR admittedly does not require providers to mandate that direct care staff attend quarterly training programs on such topics as dealing with seizures, nutrition and Medicare information. However, DMR does provide brochures, pamphlets and signs and symptoms sheets to providers – which are prepared at a 5th grade reading level. This speaks volumes as to the qualifications of direct care staff. Most foster care providers and direct care staff have no professional or clinical expertise. Direct care staff should not be expected to recognize symptoms of such things as lithium toxicity[2] when they are provided with a sheet listing a number of conditions and symptoms, particularly those reading at a "fifth grade level" with "English as a second language".

- How are direct care staff trained or made aware that they can/should make calls to doctors after hours when they have a health concern for one of their clients?

---

[2] The case of Rachel Deline, referenced in Wrentham's Motion to Reopen, is a striking example of the consequences of lithium toxicity and the consequences of having a staff unable to recognize the symptoms. The wrongful death claim resulting from the Rachel Deline tragedy recently settled for $1 million. The summary provided in Mass. Lawyers' Weekly is enclosed.

- If they are instructed to call doctors after hours, is this procedure for calling doctors under contract with DMR or for calling a pager for the client's primary care physician? How do direct care staff know who to call?

### D. Ability to Return to Facilities

Diane Enochs stated that in her twenty years of experience, no one has ever asked to return to a facility. One concern is that a number of families are not informed of the right to return. Additionally, the Wrentham Association provided as part of its Motion to Reopen, written evidence of a letter of a mother asking for her son to return, and the subsequent refusal by the Wrentham Facility Director stating that it was not allowed. Other families have had family members return to a facility, including the Harlow's (Dever), the Doherty's (Fernald), and the Rooney's (Wrentham), all after particularly bad community placements. These families had to fight with DMR to get their child back into the facility.

Given that many families feel uninformed and with the inaccuracy of Ms. Enoch's statement, a few questions might be asked:

- How does DMR inform families and guardians of the right to return to a facility?

- What records are there regarding requests to return, or for any particular placement for that matter?

- What is the procedure for transferring an individual back to a facility?

### E. Staffing Issues

The service coordinators are expected to be the "frontline" people and are expected to do a more comprehensive job than QMRPs at the facilities, yet are responsible for many more clients. Additionally, there is concern that the service coordinators are not performing their duties. One story, mentioned in Wrentham's Motion to reopen, involves a service coordinator who had not visited, nor conducted an ISP, for a class member for over two years. He stated that he did not believe it was necessary because the client was living in a nursing home, and likely would not need services from DMR.

- How many service coordinators have been hired in the past 5 years, and what efforts have been made to recruit and retain service coordinators?

- The Service Coordinators are required to visit every Ricci Class member every 30 days. What do they do during these visits and how long are they?

- If service coordinators are visiting Ricci class members monthly, and Boulet and Rolland class members regularly as well, who monitors non-class members?

BR
July 28, 2006
Page 7

We thank you for your attention to this matter. As always, please feel free to call me or Dan Brown at anytime if you have any questions.

Very truly yours,

**BROWN RUDNICK BERLACK ISRAELS LLP**

By: _____
Margaret M. Pinkham

Enclosure

MMP/rsg
cc:   Colleen Lutkevich
      Daniel J. Brown, Esq.

# 1443884 v4 - pinkhamm - 000004/0784

# Verdicts & Settlements

Contact Alyssa Cutler at alyssa.cutler@lawyersweekly.com

EDITOR'S NOTE: Barring unusual circumstances, Lawyers Weekly publishes all verdict and settlement reports submitted to the newspaper by both plaintiffs' lawyers and defense counsel. The information published here is taken directly from the submitting lawyer's summary.

## Mentally retarded woman dies of lithium toxicity

**Type of action:** Medical malpractice

**Injuries alleged:** Medication error and failure to notice signs and symptoms of lithium toxicity leading to death

**Name of case:** Withheld

**Court/case #:** Worcester Superior Court (no. withheld)

**Tried before judge or jury:** N/A (settled)

**Amount of settlement:** $1 million

**Date:** January 2006

**Attorneys:** Andrew C. Meyer Jr. and Krysia J. Syska, Lubin & Meyer, Boston (for the plaintiff)

### Prescription filled incorrectly; overdose wasn't noticed

### $1 million settlement

The plaintiff's decedent was a 51-year-old mentally retarded woman who died from lithium toxicity on May 13, 2002. She had been a resident at the defendant residential home from 1992 until her death. Her past medical history was significant for profound mental retardation, rapid cyclic bipolar disorder, hypothyroidism and early onset idiopathic Parkinsonism.

On April 13, 2002, the defendant pharmacy and pharmacist incorrectly filled the decedent's lithium prescription, dispensing lithium carbonate 300-mg capsules instead of the prescribed lithium carbonate 150-mg capsules. The mistake resulted in decedent consuming 1800-mg of lithium carbonate daily, instead of the prescribed 900-mg daily dosage.

On April 25, 2002, the decedent's primary care physician examined her for complaints of a three-day history of diarrhea, a classic symptom of lithium toxicity. The defendant PCP noted that the decedent had no evidence of clinical dehydration and recommended an increase in her fluid intake and regular diet. The PCP also instructed the caregivers at the defendant residential home to follow-up with him if the decedent exhibited signs of decreased oral intake, lethargy or worsening symptoms. The decedent continued to experience diarrhea and was not eating well, however, those facts were apparently not communicated to the PCP.

On April 30, 2002, the decedent was again examined by the defendant PCP. There was no notation regarding the complaints of diarrhea for which he saw the decedent five days earlier, nor did he note that her symptoms had improved or resolved. The PCP noted a slight increase in tone upon examining the decedent, which was a symptom of lithium toxicity. The PCP neglected to order a lithium level.

It was clear that the residential staff had indicated and noted that the decedent was demonstrating unsteadiness, gait disturbances, lethargy and weakness approximately one month before she died.

On May 2, 2002, the decedent was still experiencing diarrhea. The residential home was informed by the decedent's day program that she was not allowed to return until she was medically cleared to do so. Also on May 2, a nurse at the residential home called the decedent's psychiatrist to report the symptoms. The defendant psychiatrist gave orders to discontinue the morning dose of Zyprexa 2.5-mg due to "unsteadiness and lethargy," both symptoms of lithium toxicity, however, the psychiatrist failed to recognize those symptoms and order a stat lithium level. She also failed to give orders to bring the decedent to a physician for an immediate physical exam.

On May 8, 2002, a residential home employee documented that the decedent was unstable, could hardly move and was very weak and helpless.

On May 10, 2002, the decedent again visited her PCP's office for the purpose of an X-ray. Subsequent treating physicians from the hospital where the decedent was taken and eventually died indicated that the decedent was obtunded for one week before her admission, had generalized weakness and lethargy for one month before her admission and that a history of five to seven days of dehydration would be compatible with her condition on admission to the hospital.

On May 11, 2002, the decedent's parents visited her at the residential home and insisted that she be taken to the hospital for evaluation. She was sent to the hospital and was noted as having been obtunded for one week and suffering from general weakness. She was admitted with severe hyponatremia, hyperkalemia and volume depletion. Her lithium level was noted to be 6.8 mEq/L, a critically high value. The next day the decedent was noted to have severe dehydration with metabolic derangement and hypotension, as well as acute renal failure, a known consequence and sign of lithium toxicity. The decedent died on May 13, 2002.

Litigation is ongoing in the matter with the defendant PCP and psychiatrist stating that the symptoms were not relayed to them by the residential staff. The PCP contended that the decedent's symptoms on the dates he saw her were not suggestive of lithium toxicity and it was not his responsibility to monitor that medication as he was not the individual who prescribed it. The psychiatrist who prescribed the medication contended that she was not told of the weakness and lethargy despite her signed telephone communication stating those as the symptoms and reason for altering other medications.

The case settled for $1 million during litigation with the pharmacy, pharmacist and residential home defendants.

**The Personal Injury Law Firm with a Difference**

**Commitment**

Dedicated to plaintiff representation in medical malpractice and other serious injury cases