

# NIXON PEABODY LLP
ATTORNEYS AT LAW

100 Summer Street
Boston, MA 02110-1832
(617) 345-1000
Fax: (617) 345-1300

Cornelius J. Moynihan, Jr.
Direct Dial: (617) 345-1315
E-Mail: cmoynihan@nixonpeabody.com

August 9, 2006

Rayford A. Farquhar
Chief Defensive Litigation
US Department of Justice
Moakley Courthouse
1 Courthouse Way
Suite 9200
Boston, MA 02210

    RE:    Ricci v. Okin - Dever Plaintiffs' Response to DMR Medical Services Presentation

Dear Ray:

    I am enclosing a redacted version of the Dever Plaintiffs' Response to DMR's presentation about Medical Services to Ricci Class Members in the Community.

    Thank you.

Very truly yours,

Cornelius J. Moynihan, Jr.

cc:    Daryl Every, Esq.
    Beryl Cohen, Esq.
    Margaret Pinkham, Esq.
    Daniel Brown, Esq.

RECEIVED: 8/11/06

10077333.1

## DEVER PLAINTIFFS' RESPONSE TO DMR PRESENTATION ABOUT MEDICAL SERVICES TO RICCI CLASS MEMBERS IN THE COMMUNITY

On July 20, 2006, the Department of Mental Retardation ("DMR") gave a presentation to the Court Monitor regarding how DMR plans and delivers medical services to community-based individuals with mental retardation, including Ricci Class Members. Predominately, the DMR officials described their experiences with providing community-based medical services in western Massachusetts following the 1992 closure of the Belchertown State School and transfers from the Monson Development Center.

The Dever Plaintiffs have enormous concerns about a number of inaccuracies and misrepresentations made by DMR to the Court Monitor about medical services in community settings. While DMR coordination of community-based medical services appears comprehensive on paper, Ricci Class Members do not actually receive qualitatively "equal or better" medical services in the community, when compared to an intermediate care facility for the mentally retarded ("ICF/MR"). We support our critique with specific examples of Dever Class Members who did not receive "equal or better" medical services in the community.[1]

The Dever Plaintiffs believe that DMR has violated the Ricci Final Order's "equal or better" certification provisions under paragraph 4. As a result, there are Dever Class Members who are not receiving clinically appropriate services as required under paragraph 2(a). Unless DMR is forced to address these problems, DMR will continue to deny that they exist, the problems will only be repeated, and more harm will be inflicted on Class Members.

- ISSUE: Primary Physicians Visiting Individuals in their Community Home

Terry O'Hare stated that she was aware of one situation where a physician visited a DMR consumer in his home. Based upon our experience with Dever Class Members, who have been transferred from Dever[2] to community-based settings in eastern Massachusetts, we are unaware of any instance where a primary physician has gone to a community residence to provide medical care to a Dever Class Member. The overwhelming majority of primary physicians in the

---

[1] In responding, the Dever Plaintiffs rely on our experiences with DMR transfers of Dever Class Members from the Dever Developmental Center into community settings in eastern and southeastern Massachusetts. Between 1975 and 1991, approximately 1,000 Dever Class Members were transferred out of the facility largely to vendor-operated community sites. Between 1991 to 2002, the 300 person Dever Developmental Center was phased down. Two-thirds of the Dever population transferred to DMR operated community residences in southeastern Massachusetts. The remaining one-third transferred to vendor-operated community residences with a few transferring to other DMR facilities.

[2] In 2002, DMR closed the Dever Developmental Center in Taunton. There remain 11 DMR-operated group residences on the Dever campus, plus two DMR-vendor operated group homes.

community see Dever Class Members in their offices or in hospitals (e.g., emergency rooms). The situation that O'Hare described was an aberration.

The point that the Dever Plaintiffs ask that the Court Monitor keep in mind is the services offered through the medical model at the intermediate care facilities for the mentally retarded ("ICF/MR") versus the community model. At an ICF/MR, primary medical services, related medical sub-specialties (e.g., psychiatry, psychology, neurology, orthopedics, podiatry), nursing (e.g., nurse practitioners, registered nurses, licensed practical nurses) and related clinicians (e.g., speech therapy, physical therapy, occupational therapy, etc.) are centrally located and accessible on essentially a "medical concierge" basis. In the community, medical and their affiliated services are fragmented. Community-based medical care is accessed if the MR consumer has a highly assertive advocate, who knows how to maximize MassHealth (Medicaid) benefits.

- ISSUE: DMR consumers have an array of specialists.

On its face, Terry O'Hare's statement that DMR consumers have an array of specialists is correct. The question is whether accurate clinical evaluations are occurring so that Dever Class Members' clinical needs are fully and accurately identified and, in turn, whether the Dever Class Members are receiving all the services to which they are entitled under Judge Tauro's 1993 Final Order.

The Dever Plaintiffs do not believe that Dever Class Members are receiving their respective full array of medical specialists.

First, in 1986, Paula Minihan, M.S.W. chronicled DMR's habit of eliminating medical servicing needs when accessing them in a community setting was too difficult. See: Minihan, P.M..: Planning for community physician services prior to deinstitutionalization of mentally retarded persons. American Journal of Public Health, 1986; 76:1202-1206.

Second, in the community, no licensed clinicians are required to attend Individual Support Plan ("ISP") meetings, in contrast to ISPs that are developed at ICF/MRs.

Third, in the case of Dever Class Member *Andrew Harney*, his guardians were promised by DMR in writing that Andrew would receive 24/7 licensed nurse practitioner ("LPN") services in his Berkley group home, with a registered nurse ('RN") monitoring, an RN on-call and a nurse practitioner ("NP") available. Heightened nursing coverage was necessitated due to Andrew's gastro-intestinal tube ("G-tube") through which he received all his medications and food. However, when he was transferred in 2000, DMR provided Andrew only with float staff LPN coverage for handling his medication administrations. Andrew died in 2004 reportedly from cancer.

Fourth, in the case of Dever Class Member *Margaret ("Maggie") Shea*, her guardian requested that DMR obtain a second opinion from a Boston hospital to assess the cause(s) for Maggie's chronic urinary tract infections ("UTIs") which had lasted eight consecutive months. Maggie lives in a group residence at 111 Sherwood Lane, Raynham. DMR's assigned RN and LPN had no lists of referring Boston hospitals to recommend. Instead, the guardian had to

perform an internet research to identify Massachusetts General Hospital's Urology Department as a location for a second opinion. ▮

- ISSUE: In the community, the key person in the ISP process is the RN.

The Court Monitor asked DMR about who participates in the ISP process and how does DMR get leverage for ensuring that DMR consumers are properly serviced. Terry O'Hare's response to the question was that the RN is the key person in the ISP process.

The impact of inadequate nursing in community settings for individuals with complex medical needs is poignantly seen in the transfer of *Dever Class Member Joan Angelo*. DMR is currently pressuring Joan's legal guardians/parents to consent to Joan's transfer from a Bridgewell, Inc. operated 4-person duplex at Baker St., Saugus to a residence that Bridgewell will operate 17 Wedgemere Road, Beverly.

Joan Angelo is a 57-year old woman with Downs Syndrome, Alzheimer's Disease and other disabilities. DMR and Bridgewell have been unable to articulate how the new location will be clinically "equal or better" to the services that Joan currently receives, given the progressive nature of Joan's Alzheimer's. At a June 26, 2006 meeting, DMR and Bridgewell were unable to provide the guardians' RN consultants with a breakdown of the particular clinical services that Joan would receive at the new location and how specifically Joan's end of life care would be managed. It seems no nursing staff was present at either the June 26th meeting or Joan's November 2, 2005 annual ISP meeting. Joan's projected transfer date is sometime after August 15, 2006. ▮

Overall, it is the Dever Plaintiffs' in experience in eastern Massachusetts that RNs normally do not attend ISP meetings of consumers in the community. While on paper there may be an RN or NP who is available to provide oversight and "trouble shooting" assistance through the vendor agency or the local DMR area office, RN and NP are not regular participants at ISP meetings, unless a crisis has arisen and a guardian is demanding their participation. There is no DMR regulation that requires their attendance.

- ISSUE: DMR has leverage over providers because DMR signs contracts.

DMR signs contracts with providers of residential services and certain day programs. But, DMR does not sign contracts with medical providers.[3] Physicians and hospitals contract

---

[3] DMR's excessive reliance on third party payors determining medical care cannot be overstated. In the area of prescription medications, DMR relies on consumers' individual entitlements to medications from Medicare Part D, Medicaid (MassHealth), and private insurance, if available. Particular prescription drug plans under Medicare Part D and Medicaid (MassHealth) have rules regarding whether the plan will approve payment for certain prescribed medications. When problems develop concerning prescription drug plans' refusals to pay for clinically necessary drugs, DMR insists that the consumer pursue an appeal rather than DMR stepping in and assuming the costs of the medications. Under the Ricci Final Order requires DMR to provide Ricci Class Members with clinically necessary medical care, including medications. A case in which DMR failed to assume timely responsibility involves *Dever Class*

10065321.1                                          3

individually with Medicaid (Mass/Health)[4] or Medicare on a more limited basis. Therefore, DMR has no contractual leverage with medical providers other than to change providers. It should be noted that DMR does have some limited clinical service providers under contract (e.g., EDCO for speech, physical, and occupational therapy). However, DMR's overwhelming preference is to obtain those clinical services on a short-term basis through hospital out-patient clinics or through Title 19 covered day habilitation sites.

Dever Plaintiffs have observed that certain day programs (e.g., day habilitation, adult day health, etc.) funded by the federal government's Title 19 program will not provide written information of the consumers' status to ISP teams and they will not attend ISP meetings, unless unusual circumstances arise. These day programs typically service Class Members 30 hours a week. The excuse given by DMR service coordinators for non-participation of the day program in the ISP process is that the day program gets its funding from a non-DMR source and, therefore, DMR cannot require its presence. This situation is in marked contrast to ICF/MRs where representative(s) of the day program must attend the interdisciplinary ISP team meeting.

- ISSUE:  An agency has a nurse on its staff or alternatively, contracts for nursing.

Some residential providers do have one registered nurse on staff or alternatively, contract with a RN to provide nursing care for an entire agency that services 200 to 300 mentally retarded people in community settings. The problem with this approach is that the RN coverage is limited to one RN providing oversight to direct care people who are servicing hundreds of consumers in multiple locations over large geographic distances. Qualitatively, there is a major difference between a single RN troubleshooter and an ICF/MR interdisciplinary team of coordinated nursing on a single campus, who regularly see and touch the patient.

One strong indicator of how well the "troubleshooting RN on a beeper/cell phone" model works is the agency's reliance on emergency room ("ER") utilization. Generally, the worst place for a mentally retarded person is an ER setting. The Boston Globe recently published an article regarding the criticality of eliminating ER visits for elders in nursing homes. In contrast, at an ICF/MR, a RN will see a resident and the on-campus physician before an ER transport will occur for hospital admission.

- ISSUE:  At Belchertown, physicians did not attend ISP meetings.

Marianne Meacham pointed out that, at the Belchertown State School, physicians did not attend ISP meetings. The Belchertown State School closed in the early 1990s. The Title 19 ICF/MR regulations required the attendance of physicians at ISPs. Therefore, the lack of

---

*Members Kevin Coogan* and *Paula Odie*, who require brand name prescribed medications or otherwise suffer harm when a generic substitute is imposed.

4    DMR insists that DMR consumers utilize their individual health care benefits (e.g., Medicaid, Medicare, family health insurance, etc.) before DMR will actually pay for medical services. If consumers are not MassHealth eligible (i.e., meaning the individual has less than $2,000 in total assets), DMR either bills them for charges for care or applies to become the individual's representative payee of his social security benefit check in order to make the individual eligible).

10065321.1                                4

physician at Belchertown ISP meetings indicates that DMR was more likely in violation of applicable federal law than an indicator of clinically appropriate care.

In contrast, at the Dever Developmental Center, physicians were required to attend ISP meetings and discuss medical issues with the entire team. Oftentimes, when the physician appeared, the ISP interdisciplinary meeting would focus on medical, nursing and other clinical issues. When that discussion ended, the physician would leave and note on the ISP Attendance Sheet the times of his participation. RN nursing was present throughout the meeting and, if necessary, the physician would be recalled. At various times, medical services at Dever were provided under contract by the Shriver Medical group or Tufts Medical.

- **ISSUE: DMR description of dental care in the community.**

Terry O'Hare's broad description of dental services in community settings was superficially accurate. Yet, it omitted some important issues that negatively impact on the "equal or better" quality of dental service delivery.

First, there are excessive wait times for dental services in operating room settings. Presently the wait for an OR is about 12 months. The clinical standard for waiting is 1 to 2 months. Wait times lead to further tooth decay. While DMR will insist that no great harm occurs as the result of dental delays since emergency cases are moved to the top of the treatment list, the MR population includes people with neurological damage that can impair their ability to feel and inform others of their pain. Again, delaying the treatment of decay does not improve the condition of teeth.

Second, in eastern Massachusetts, guardians have limited choice for the location of OR cleanings and restorative work. Presently, Tufts Dental utilizes Shattuck Hospital in Jamaica Plain and Franciscan Children's Hospital in Brighton. Some families object to the Shattuck Hospital because of its utilization by the Department of Corrections for performing dental work on prisoners (e.g., regularly, Corrections officers are escorting prisoners through the corridors with the prisoners in chains while other patients and their families are in the halls; Corrections officers manacle prisoners to the hospital beds while in the recovery room next to mentally retarded people, who are also in recovery). In addition, Franciscan Children's Hospital cuts off access to Tufts Dental when its dental patients are 60 years old or older. Since the <u>Ricci</u> population is only getting older, it is anticipated that the OR wait periods for the Shattuck Hospital will only increase.

Third, DMR does not inform Tufts Dental of which patients are Ricci Class Members. As a result, Tufts Dental is unaware of which patients belong to the Ricci class and, therefore, entitled from DMR to receive clinically appropriate services. This designation becomes important to dental treatment. DMR insists that Tufts Dental exhaust the consumers' MassHealth and/or private health insurance benefits. If third party sources deny payment, Tufts Dental (with DMR's tacit approval) informs the guardian or family of the denial in an effort to learn if they will shoulder the cost. The standard Tufts Dental response for patients who are Ricci Class Members should be that DMR needs to be informed of the required cost for treatment. Under the Final Order, DMR has the obligation to provide dental services.

An example of where DMR has not shouldered the cost is with Dever Class Member *Richard Johnson*. Richard requires a Maryland Bridge, which at $1,100 MassHealth on appeal has refused to approve for payment. Tufts Dental informed Richard's guardian, who arranged for private payment. The question is: how many Ricci class members has MassHealth denied for dental payments, and why hasn't DMR given Tufts Dental sufficient information and computer support to trace these consumers?

Fourth, Tufts Dental lacks sufficient hygienists to provide community-based training and support to direct care staff so that DMR consumers are properly cleaning their teeth and avoid tooth decay.

Fifth, residential direct care staff are not sufficiently trained and monitored to ensure that DMR consumers are actually appearing for scheduled appointments. The "missed appointment" rate contributes to the long wait times.

Sixth, Tufts Dental cleanings in the community for Ricci class members is now 3 times a year instead of 4 times a year when Dever was operational.

In sum, Ricci Class Members receive the dental services that other low income people on MassHealth receive. The Ricci Final Order requires DMR to deliver clinically necessary dental care to Ricci Class Members, regardless of DMR's ability to obtain third party payment.

- ISSUE: Adequate planning for a transfer from a facility must start with the ISP and an evaluation of what the individual needs rather than what the individual has that day.

DMR's claims that the disabled individual's needs are paramount to the transfer planning process. The reality is that, when DMR plans the transfers of Dever Class Members, the opinion of a DMR administrator is paramount to deciding what the individual's needs are and, therefore, the services that shall be made available for meeting those needs. The ISP clinical document is not the determining factor, as required by the Final Order.[5]

First, DMR did not certify to "equal or better" services when transferring residents out of the Dever Developmental Center between 1991 and 2002. During the Dever facility phase down, then-Facility Director Jack Riley did not certify that the Dever Class Member would receive "equal or better" services at the new facility. The "equal or better" certification by the transferring facility director is a fundamental requirement of the Final Order for ensuring Ricci Class Members' hard won entitlement to adequate clinical services continued indefinitely.

Contrary to DMR's opposition papers to the 2004 Fernald re-opener motion, the DMR transfer sheets between 1993 to 1996 do not contain an "equal or better" certification and none of the post-1996 ISPs of Dever transferees contain an implied certification of "equal or better." The

---

[5] The description supra concerning DMR's planned transfer of *Joan Angelo* underscores the functional uselessness of the ISP for planning, despite DMR's contention to the contrary. To the best of the guardians' knowledge, the regional director has not certified that Joan Angelo's proposed transfer is "equal or better," as required by the Final Order.

10065321.1                                6

Dever Association has spoken with some guardians of Dever placements and the guardians have stated uniformly that they do not believe that the ISPs issued prior to the transfer implicitly contain an "equal or better" certification.

Second, for managing the Dever closure, DMR did maintain confidential service comparison sheets regarding each person's transfer and how comparable services or no services would be provided in the new location.[6] The service comparisons were not provided to guardians as part of the guardians' informed consent process. These "cheat sheets" were developed and maintained by then-Dever Facility Director Jack Riley. At a 1998 meeting with Jack Riley, DMR Regional Director Rick O'Meara, and Dever Association members Allyson Every and Daryl Every, Facility Director Riley stated that the Final Order's "equal or better" requirement does not mean "equal or better." Instead, this phrase means that Dever residents will get from DMR the services that the facility director viewed as necessary in their new location. The Dever Plaintiffs believe that DMR's failure to provide "equal or better certifications" to the transfers of Dever Class Members resulted also in Dever guardians not giving informed consent to the transfers of their wards.

Third, the Individual Transition Plan ("ITP") and the ITP team were utilized during the phase down of the Dever Developmental Center to supercede the ISP as the primary placement tool for planning a transfer. Notably, the Dever ITP team was led typically by a unlicensed social worker in conjunction with the Dever Facility Director. The ITP was not formulated by the ISP team and did not contain clinical recommendations, but rather suggestions for improving a transfer (i.e., the new location should have a back-up wheelchair). DMR utilized the ISP at the very end of the ITP process, when the placement was located and the guardian had acceded to incessant DMR demands for consent. The ITP process was a helpful means for administration to circumvent the ISP clinical teams, who were overwhelmingly opposed to the transfer out of Dever residents.

Finally, following the 1991 announcement of the Dever facility's closure, it was standard practice at Dever to conduct the ISP meeting and forward the draft ISP document then-Assistant Facility Director Kevin McCullough and others for review and edit. It was not unusual for the "Ad Building" (meaning Administration Building) to return the ISP draft with edits that caused the elimination of specific servicing requirements from the ISP and the loss of clinical recommendations regarding necessary services and personnel that must be in place for the retarded person at a future servicing location. An example of administrative editing occurred with the ISP of Dever Class Member ***Ann Harney***. In its 2004 motion to re-open, the Fernald Plaintiffs complained of this same type of administrative interference with the clinical team process to "dumb down" the ISP.

- ISSUE: Actual care delivery is handled by direct care staff, who manage medical care in the community.

---

[6] The Dever Nursing Department also produced nursing care plans, which were very detailed documents for identifying each Dever residents' clinical and, in some instances, psychiatric needs prior to transfer. These nursing care plans were generally not shared with guardians.

10065321.1                                          7

One of the riskiest aspects of the DMR community service delivery approach is the inappropriate reliance of direct care workers in the delivery of medical care. This situation is especially problematic when the consumer is non-verbal, has high medical needs or emerging medical needs and the residential provider has either no nursing in the homes or limited nursing in a monitoring role.

DMR was inaccurate when it asserted to the Court Monitor that a community direct care worker–even on a hunch that "something" is amiss with the MR consumer's health--can simply contact the consumer's primary care physician. Within DMR's Southeastern Residential Services ("SRS") division, direct care staff cannot simply telephone the consumer's primary physician. Rather, the direct care person must contact the program director or, in the evening, the Administrator on Duty ("AOD"). It is the day administrator's or on-call administrator's decision to authorize contact with the SRS on-call nurse.[7]

Furthermore, DMR inaccurately implied, that when the direct care staff utilizes the community physicians on-call system, the ensuing medicare care is adequate. Often it is not. Most physician's off-hours contact systems rely on a telephone consultation between a back-up physician (not necessarily the consumer's regular physician) who must rely on an intelligent, articulate staff person to describe the patient's symptoms. Most direct care persons–even the well intentioned–have difficulty performing in such situations. If the responding physician has concerns or doubts, he will direct the staff person to take the consumer to the local emergency room ("ER"). ER's are not desirable settings for persons with intellectual disabilities. In an ICF/MR setting, the RN would exam the consumer and, if warranted, the on-campus physician would personally exam the consumer before determining if an ER transport or hospital admission were warranted.

In the community, DMR does not utilize is its nursing staff for regular medical appointments. Ironically in the community, the preferred staff for bringing a DMR consumer to the doctor is a direct care person. At an ICF/MR, the assigned RN is typically the person who works closely with the campus physician in describing the clinical needs and symptoms. The lack of nursing personnel to communicate with community physicians is a major weakness in DMR community services, and it is not "equal or better."

In DMR's 2005 Five Year Strategic Plan,[8] DMR recognizes the challenge of adequately addressing the needs of community-based consumers, who may already have or will present

---

[7]  Exceptions exist for 911-type medical emergencies.

[8]  DMR's July 20, 2006 presentation about medical services in community settings was notable for its lack of focus on the current and future-medical needs of the Ricci Class Members. For example, in 1989, the Dever Developmental Center had the highest percentage of profoundly retarded persons of the five state developmental centers. Additionally, from a service perspective, there are troubling clinical trends that DMR must quickly address. For example, 90% of all persons with Down Syndrome will develop Alzheimer's disease and die within an average of 8 years. DMR offered no specific information as to how it intends to address these types of major problems.

Dever Class Counsel has made repeated requests to DMR for clinical information (e.g., date of birth, diagnoses, etc.) about the Dever Class Members. DMR has rebuffed all such requests. DMR also

medically complex clinical needs and are aging. Rather, however, than initiate an intensive plan to attract more nurses and develop specialized medical centers for this unique population, DMR has decided to target direct care for more detailed usage of symptom checklists and computerization.

- ISSUE: One of the biggest community transfer problems occurs with compatibility of <u>sudden placements into a group living situation.</u>

Compatibility issues are, indeed, a major challenge that DMR has not adequately addressed in terms of the rights of existing residents to be free from harm. DMR has not worked with guardians and families in developing a means for sharing information regarding emergency and non-emergency transferees. A typical response by DMR to guardian objections to the compatibility of a placement is to deny that a problem exists.[9] While all individuals in group living situations have rights to privacy, they and their wards have the equal rights to be forewarned of threatening or dangerous behaviors by individuals who are living in the homes.

DMR gave the Court Monitor the false impression that incompatible consumer mixes are rare and eventually worked out with cooperation between the DMR service coordinator and the provider. In February 2006, DMR transferred *Dever Class Member* ▇▇▇▇ to a DMR/SRS-operated group residence at 1370 Bay Street, Taunton. On the evening of the transfer, the DMR administrator telephoned the other guardians of the wards in the home and informed them of the transfer. The DMR administrator denied that the transfer was occurring in an emergency, even though ▇▇▇ had <u>not</u> been provided with a transitional visitation schedule and the disabled person was provided a 1:1 staff person.[10]

On or about February 20, 2006, the guardian of another resident in the home observed Bruce grab the head of her female ward and kiss the ward. When the guardian objected to this behavior and questioned ▇▇▇ compatibility with a home comprised of largely profoundly retarded women, the DMR official dismissed the incident and suggested that not only did the incident not happen as the guardian described, but the guardian's ward had previously engaged in inappropriate behavior that might warrant the ward's removal. Contrary to DMR's assertion incompatible placements do not get "worked out" eventually.

On a related issue, there are some individuals with mental retardation who will not adapt to transfers regardless of the length of transition periods or the good intentions of staff. During the phasedown of Dever, the Dever Plaintiffs are aware of Dever Class Members, who within a short period of time of their transfers died. Despite several requests by Dever Class Counsel, DMR has refused to provide counsel with the names of those Dever Class Members who have died, the date of their departure from Dever and their date of death. *Dever Class Member*

---

refuses to give Dever Class Counsel monthly updates about the names and addresses of Dever Class Members and the names of those who have died.

[9] The new electronic DMR Incident Reporting System has made the identification of questionable behavior even more difficult. DMR re-defined the standards that necessitate the reporting of incidents so that many former incidents now do not meet the reporting criteria for documentation.

[10] The transfer occurred so quickly that DMR did not even consult with the DMR service coordinator for the seven other residents of the home.

10065321.1                                    9

███████ died within three months of his Dever transfer due to a seizure. Another Dever Class Member (whose name we are confirming) died from choking on a diaper shortly after his transfer from Dever to the Greenery.

In terms of Diane Enochs' comments about the great success that DMR has witnessed with uneventful transfers, the Dever Plaintiffs are unaware of any returns to the Dever facility of placements once the state announced its 1991 decision to shutdown Dever. In contrast, prior to 1991, there was an established track record of DMR albeit reluctantly accepting back Dever Class Members if their community placement did not work out.

- ISSUE: The DMR Quality Assurance System provides adequate monitoring of the <u>community service system.</u>

There are numerous problems with the DMR quality assurance system for monitoring community-based care. See: Lisa Goodheart, Esq.'s 2004 Statement of Dever and Wrentham Plaintiffs' Position, which is filed in this case.

First, DMR is certifying its own programs, either operated with DMR employees or by DMR-contracted vendors. It is not in DMR's self-interest to de-certify itself. With DMR's high reliance on vendor contracts, DMR does not have the operational capacity to rapidly and easily terminate a contract and assume control over the consumers' care.

Second, DMR's quality assurance teams do not have any licensed clinicians as members. These teams do not even begin to resemble the former federal Title 19 "look-behind" clinical teams which had a licensed physician, licensed psychologist, registered nurse, licensed social worker and a qualified mental retardation professional ("QMRP"). Therefore, there is no credible independent evaluation as to whether the clinical needs of DMR consumers are being recognized and serviced.

Third, the overarching function of DMR's quality assurance monitors is directed inward for the benefit of the DMR bureaucracy. If a medication error occurs, it is not included in the Class Members' clinical binder or annual ISP. The same lack of information occurs with human rights investigations.

Fourth, the Final Order requires that DMR have a quality assurance system in place for monitoring DMR's compliance with the Final Order's terms. Instead, of having a separate audit of compliance for Ricci Class Members, DMR contracts for a random sample of DMR consumers system-wide. With 20,000 persons receiving DMR services and about 4,300 Ricci Class Members, the likelihood of Ricci Class Members' actually being surveyed becomes remote amidst the sea of non-Ricci consumers.

Fifth, the new electronic health record is a wonderful idea. However, DMR does not inform guardians of its existence or its utility for managing the ward's services. Again, the electronic health record is designed for benefitting the DMR bureaucracy. It becomes the source for more information to be hidden, with the danger of inaccurate information remaining uncorrected.

- ISSUE: Not all DMR consumers in the community have medical needs and not all <u>houses in the community have nurses.</u>

    Sharon Oxx, R.N. correctly stated that not all DMR consumers in the community have medical needs and not all community residences have nurses. The implication, however, of this statement is that medical needs in the community are low and, therefore, the need for nurses in group houses is low. Importantly, DMR failed to provide the Court Monitor with an analysis of the clinical needs of both community-based and facility-based DMR consumers and, in particular, the clinical needs of Ricci Class Members across both settings. <u>The Court Monitor needs to obtain the current and projected clinical needs of the Ricci Class on an individual, per class grouping basis.</u>

    The Dever Plaintiffs know the severity of clinical needs of the 300 residents who resided at the Dever Developmental Center at the start of the 1990s. Of the five developmental centers, Dever had the highest percentage of profoundly retarded people. See: Steve Rothstein's 1989 letter to Louise Johnson. Aside from their cognitive impairment, the vast majority of Dever residents had other severe multiple handicaps (e.g., ambulation problems, swallowing disabilities, behavioral, vision impairment, pica, etc.). See: Dever Superintendent Ajit Mukherjee's 1989 answers to the Dever Association's questionnaire about the clinical profiles of Dever residents, who also included 14 Dever operated community-based ICF/MR group residences in southeastern Massachusetts. Approximately two-thirds of the Dever population between 1991 and 2002 was transferred into state-operated group residences in southeastern Massachusetts in order to address the intense nursing needs that private vendors were unable to serve.

    With respect to the 1,000 Dever Class Members who were transferred out of the Dever facility prior to 1991, the Dever Plaintiffs do not have a strong sense as to what their current or projected clinical needs are. Dever Class Counsel has requested information from DMR regarding the clinical needs of the entire Dever Class, but DMR has refused to provide this information because allegedly the Final Order does not require it and consumer privacy prevents the release of this information. We are aware of Paula Minihan's 1986 study in which she found that DMR eliminates from the ISP difficult to service need areas. We also aware of Minihan's recommendation that, in order to service mentally persons with complex medical and clinical needs, DMR should establish regional one-stop medical centers to provide out-patient care. DMR never instituted this practical recommendation, instead opting for the fragmented medical services that are provided to low income people within the general population.

- ISSUE: DMR consumers can utilize VNA transitory nursing services as well as DMR <u>Area Office RN or NP nursing staff.</u>

    Relegating Ricci Class Members to VNA transitory nursing services is not "equal or better" than the nursing provided at ICF/MRs.

10065321.1                                                            11

DMR Area Office RN or NP services are typically used for troubleshooting or crisis management <u>after</u> harm has been inflicted on the consumer. Area Office nursing is not an integrated part of the consumer's daily, preventive services.

Overall, once a Ricci Class Member transfers into the community, DMR relies on the regular nursing care that is accessible to low income people through MassHealth and Medicare. Ricci Class Members are entitled to more than the Medicaid or Medicare legal entitlement.

- ISSUE: As part of the overall quality assurance for nursing delivery, DMR has Mortality Analysis provided by UMass Medical/Worcester.

Sharon Oxx, R.N. mentioned that DMR analyzes the circumstances surrounding all causes of consumer death to determine if those deaths were appropriate or avoidable. DMR believes that, when compared to other states, its death rates are favorable.

The major problem with the UMass Medical mortality reports is that age is the primary factor that the mortality analysts consider (i.e., the older you are, the more likely you are to die). The medical center cautions that it does not factor into its analysis the level of disability to determine if certain clinical conditions impact on the increased risk of death. Dr. Strauss considers the clinical needs of consumers in his studies of de-institutionalization and finding that, in California, there was a 72% likelihood of mortality as the result of de-institutionalization.

- ISSUE: DMR's Medication Administration Program ("MAP") is a unique program to Massachusetts in that MAP permits certain non-licensed direct care staff to administer medications.

The Dever Plaintiffs and families have enormous concerns with the administration of prescription medications by non-licensed direct care staff. At times, the intellectual and language demands of MAP administration put Dever Class Members at risk and contribute to the overall lack of nursing care in community settings where consumer medical needs are only increasing.

- ISSUE: DMR made no mention of the need for dietary and recreational services in community settings.

Dever Class Members with weight and dietary problems are not able to access dietary and recreational services in the community on an "equal or better" basis to the services provided at ICF/MR. If a Dever Class Member had a weight problem while at the facility, a licensed dietitian would go to the person's residence and day program (if necessary), see how and what meals were prepared, assess the disabled person's food intake, and prepare a food plan for implementation that the dietitian would monitor. That system of dietary services does not exist in community settings. Instead, DMR will obtain a referral for the disabled person to be seen by a licensed dietitian either at a local hospital or, within DMR's Southeastern Residential Services, DMR will assign a RN with dietary training to perform this task. The effectiveness of the community services approach is deficient and does not result in weight loss.

Lack of recreation in the community is severe. At an ICF/MR, there is dedicated recreational therapist whose job is to provide recreational opportunities to the class members. Recreational opportunities include: swimming, a host of adaptive physical activities, games, movies, and therapeutic horseback riding. In the community, direct care staff is expected to provide recreational services in additional to their direct care, transportation and housekeeping duties. The result is that for some Dever Class Members the key recreational activity is sitting in the residence's living room, walking and riding in cars to restaurants. Dever Class Members in the community do not receive "equal or better" recreational services.