UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| _____ ) | | |
| Robert Simpson Ricci, *et al.* ) | | |
| ) | | |
| Plaintiffs, ) | | CIVIL ACTION |
| ) | | Nos.  72-0469-T |
| v. ) | | 74-2768-T |
| ) | | 75-3910-T |
| Robert L. Okin, *et al.* ) | | 75-5023-T |
| ) | | 75-5210-T |
| Defendants. ) | | |
| _____) | | |

**THE DEPARTMENT OF MENTAL RETARDATION'S RESPONSE TO
THE DISABILITY LAW CENTER *et al.*'s MOTION TO MODIFY, AND THE FERNALD
PLAINTIFFS' MOTION TO EXTEND, THE COURT'S ORDER OF FEBRUARY 8, 2006**

      The Department of Mental Retardation supports the recent motion filed by the Disability Law Center, *et al.* ("DLC") requesting modification of the Court's February 8, 2006 Order that froze transfers from the Fernald Developmental Center so as to permit the transfer of those current Fernald residents who, according to United States Attorney Michael J. Sullivan ("the Court Monitor"), have *voluntarily* expressed a desire to transfer from Fernald to either a community-based residential setting or another intermediate care facility for the mentally retarded (ICF/MR) and whose proposed transfer enjoys the support of the Court Monitor.  The objections raised by counsel for the Fernald class to the Court Monitor's endorsement of these residents' transfer requests are meritless and the Fernald plaintiffs' motion to extend the life of the February 8th Order should be denied.  In multiple communications to Department staff over the past year or more, the guardians and family members of the Fernald residents identified in letters to the Court from the Court Monitor (see Docket documents nos. 132 and 133) have voluntarily indicated a desire to pursue prompt placement for their wards from the Fernald Center to community residential programs.  In order to comply with settled federal and state law, as well as the Olmstead v. Zimring decision of the United States Supreme Court, the Department respectfully requests that the Court modify the February 8th Order to allow these placements from the Fernald Developmental Center to take place without further delay.

**The Factual Backdrop and Prior Proceedings**

Pursuant to the terms of the Order entered on May 25, 1993 in the case <u>Ricci, et al. v.</u> <u>Okin, et al</u>. ("the Final Order"), the Department of Mental Retardation is accorded great leeway in "developing and improving programs, managing and determining the personnel and budget of the Department of Mental Retardation and . . . allocating its resources to ensure equitable treatment of its citizens."   Actions taken by the Department to accommodate the voluntary requests of individuals and/or guardians to proceed with alternative placements from the Fernald Center to other ICFs/MR or community-based programs are consistent with this discretion, as well as consistent with directives from the Massachusetts Legislature to "consolidate or close" the intermediate care facilities operated or managed by the Department.   Measures taken by the Department to facilitate the placement of current Fernald residents into community-based programs additionally further the Final Order's objective that Department clients receive services in the "least restrictive" setting possible and are consistent with Title XIX, state law and regulations, prevailing national trends, and the 1999 decision of the U.S. Supreme Court in <u>Olmstead v. Zimring</u>.

As referenced above, the Massachusetts Legislature has directed the Department to take steps to consolidate or close the ICFs/MR managed by the Department.   In the Acts and Resolves of each Fiscal Year since 2004, the Legislature has appropriated funds for the operation of the Department's ICFs/MR subject to the proviso that the Department take appropriate steps to consolidate or close its ICFs/MR.   Thus, both the Legislature of the Commonwealth and state and federal laws and regulations favor the provision of services to individuals in the least restrictive setting appropriate for the individual and the consolidation or eventual closure of the Commonwealth's ICFs/MR.   In accordance with these directives, and the discretion left to the Department in the *Ricci* Final Order, the Department has implemented measures to appropriately do so.

Clearly opposed to the guidance of the Legislature and the Department's efforts to comply with such and the directives concerning service provision in the least restrictive setting, in July of 2004 Counsel for the Fernald, Monson, and Belchertown classes filed a "Motion to Reopen and Restore the *Ricci* Case to the Active Docket and Enforce the Final Order of 1993." In the motion, the Fernald Plaintiffs alleged a "systemic" failure on the Department's part to provide services to *Ricci* Class Members.   In response, the Department fully rebutted the

Plaintiffs' assertions and thoroughly detailed the Department's past and current practices of effectively serving *Ricci* class members.

In January 2005, this Court dismissed, without prejudice, the Fernald Plaintiffs' Motion to Reopen the Case. In January of 2006, Fernald Class Counsel filed a "Report" alleging violations of federal and state law, and the Final Order, in connection with the voluntary transfer of some 49 individuals transferred from Fernald between February of 2003 and June of 2005. At a February 8, 2006, status conference the Court determined there were "fundamental factual and legal disputes" that needed to be resolved and appointed United States Attorney Michael Sullivan to serve as Court Monitor. As Court Monitor, the United States Attorney was charged with "advis[ing] the court as to whether the past and prospective transfer processes employed by the Department of Mental Retardation comply with federal law, state regulations, as well as the orders of this court." Pending completion of the Court Monitor's final report, the Court issued a preliminary injunction prohibiting "all transfers from Fernald to other ICF/MRs and community residences." See Order of February 8, 2006 (the "February 8th Order").

Since that date the Department has worked cooperatively with the United States Attorney's Office to provide documented evidence of its compliance with Title XIX, state and federal laws, Department regulations, and the *Ricci* Final Order, both on a systemic and on an individual Class Member basis.[1] On January 12, 2007, the Court Monitor submitted, and the Court published, the first two of what are anticipated to be several letters or reports to the Court, confirming that, at least with respect to certain specified individuals (whose names have been redacted for confidentiality reasons), the Department has undertaken all appropriate transfer planning actions and the specific transfers the Department and individual guardians are proposing are in the best interests of the subject Fernald wards and meet the "equal or better" standard set forth in the Final Order. Despite this endorsement of the Department's compliance with all relevant laws, the Department is currently constrained from proceeding with the placement of these individuals by this Court's February 8th Order prohibiting transfers from the Fernald Center. This preliminary injunction prohibiting transfers pending the issuance of the

---

[1] As part of his review, the United States Attorney and his staff, Department staff, and representatives of the Plaintiff classes visited all six of the Department's ICFs/MR, visited multiple community-based residential programs across the Commonwealth, and attended several presentations concerning Department practices and procedures. Additionally, the U.S. Attorney's Office thoroughly examined the client files of potential Fernald transferees and consulted with the guardians of these transferees to discuss their possible transition from the Fernald Center.

Court Monitor's final report poses an unwarranted hardship upon the Department, an infringement on the rights of these and other Fernald Class Members, and is in contravention of the public interest. The Court's order should be modified to allow for the normal placement process to resume at Fernald, at least with respect to those individuals about whom the Court Monitor has opined that the proposed transfers meet all applicable legal requirements.

**ARGUMENT**

A.    **The Court Should Modify the Order Prohibiting Transfers From the Fernald Developmental Center As No Evidence Has Emerged to Warrant Continued Injunctive Relief.**

"A preliminary injunction is an extraordinary remedy, which is not issued lightly or as a matter of course." Neighborhood Ass'n of the Back Bay, Inc. v. Federal Transit, 407 F. Supp. 2d 323, 331 (D.Mass. 2005). The determination of whether to modify or dissolve a preliminary injunction should depend on the same considerations that guided the Court in deciding whether to grant or deny an interlocutory injunction initially. Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp., 15 F.3d 1222, 1225 (1st Cir. 1994). In this case, the Court did not enter its February 8th Order (which certainly has all the characteristics of a preliminary injunction) upon any motion explicitly requesting a preliminary injunction. Nor did the Court publicly undertake the familiar preliminary injunction analysis prior to issuing its Order. Cf. F.R.Civ.P. 52(a) (requiring judges, upon issuing interlocutory injunctions, to "set forth the findings of fact and conclusions of law which constitute the grounds of its action"). In fact, this case officially remains a closed case. Nonetheless, the standards for issuing a preliminary injunction are familiar. A plaintiff requesting a preliminary injunction bears the burden of establishing to the Court (1) a substantial likelihood of success on the merits of the case, (2) a threat of irreparable harm if the injunction is not granted, (3) a favorable balance of the hardship to the plaintiff in the absence of an injunction against the hardship to the defendant if the injunction is granted, and (4) a lack of conflict between the proposed injunction and the public interest. See Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003); Ocean Spray Cranberries, Inc. v. Pepsico, Inc., 160 F.3d 58, 60 (1st Cir. 1998). The factor of primary importance in examining the appropriateness of a preliminary injunction is whether the plaintiff can demonstrate a likelihood of success on the merits. Id.

1. **The Fernald Plaintiffs Have No Likelihood of Prevailing on the Merits of their Argument for a Continued Injunction Blocking Transfers from the Fernald Developmental Center.**

For the reasons addressed in detail below, the Fernald Plaintiffs have no likelihood of success on the merits as to any further injunction prohibiting transfers from (or even preventing the consolidation or closure of) the Fernald Developmental Center. The Massachusetts Legislature, the Department's governing statute and regulations, the Americans with Disabilities Act ("ADA"), Title XIX, and the *Ricci* Final Order all support the provision of services to individuals in the least restrictive environment and either favor or do not bar the consolidation and/or closure of the Commonwealth's ICFs/MR. The careful process the Department has implemented to accommodate transfers from Fernald is consistent with the court-mandated Individual Service Plan ("ISP") process, the transfer statute, and implementing regulations and ensures compliance with Final Order requirements that necessitate that each individual receive equal or better care in the new setting. The Supreme Court's decision in <u>Olmstead v. Zimring</u> and federal law initiatives such as the ADA's "integration regulation," 28 CFR § 35.130(d), also support the Department's long-standing policy commitment to prefer community residential options over ICFs/MR for individuals who are able to handle and benefit from them. Finally, throughout pertinent decisions, appellate courts have consistently articulated the need for judges to respect the sound medical decisions of a State's treatment professionals in determining the most appropriate setting for service delivery. <u>See</u>, <u>e.g.</u>, <u>Olmstead v. L.C. ex rel. Zimring</u>, 527 U.S. 581, 602 (1999); <u>see</u> <u>also</u> <u>School Bd. of Nassau Cty. v. Arline</u>, 480 U.S. 273, 288 (1987) ("[C]ourts normally should defer to the reasonable medical judgment of public health officials.").

At a minimum, the proposed transfers from Fernald that have been initiated because of the Department's receipt of voluntary requests for transfer made by certain individuals' guardians or family members must be permitted to proceed. Contrary to the Fernald Plaintiffs' suggestion, the proposed transfers are voluntary and reflect the desires of the guardians for the individuals.[2] Reasons for requesting community placement vary; in the case of one individual,

---

[2] According to the Court Monitor, and based upon his interviews with specific family members and guardians, "[s]ince my appointment as Monitor, approximately nine individuals currently residing at Fernald have come forward seeking to voluntarily leave Fernald. Some of these individuals, including [name redacted], have expressed a desire to voluntarily move to a community residence. Another five have expressed a desire to move to another ICF/MR." <u>See</u> Court Docket, Document No. 132, at p.1.

both family members wish to have their son living closer to them to facilitate weekly visits. Docket Doc. No. 132 at p. 4. These requests have followed the Department's efforts, in compliance with applicable regulations, to engage guardians in a discussion of the provision of services to Fernald residents in the least restrictive environment possible. In the individual cases reviewed, the Court Monitor has exhaustively studied the proposed transfers and concluded that these individuals can receive "equal to or better" treatment in the new, less restrictive, setting. The Court Monitor's conclusions follow a review of each individual's complete file, including review of their individual support plans ("ISPs") for the last five years; visits with class members at Fernald and visits to the proposed settings, both residential and day programming; visits and interviews with guardians and family members; and a medical review by independently selected medical experts. The Fernald Plaintiffs' suggestion that the Court Monitor's or the medical expert's review was inadequate, concededly made without any review of the Dr. Baldor's more detailed report, is simply misinformed.

2. **The Fernald Plaintiffs' Objections to the Court Monitor's Review of the Individuals Requesting Transfer Have No Legal Basis and Are Without Merit**.

Although counsel for the Fernald Class has registered general objections to the Court Monitor's recommendations regarding individual transfers, to date the Fernald Plaintiffs have offered no specific evidence to undermine the Court Monitor's recommendations or that would tend to prove any violations by the Department of any statutory or regulatory laws or Final Order provisions concerning the voluntary transfers of individuals from the Fernald Center.[3]

The contentions set forth in the Fernald Plaintiffs' "Objection to Recommendation of Court Monitor for Individual Transfer[s] from Fernald . . . ," filed on January 31, 2007 (Document Nos. 139 and 140), lack substance and are without merit. Furthermore, there are serious questions as to the standing of the Fernald Plaintiffs to object to the independent decisions of families and guardians of particular Fernald residents to elect to pursue voluntary transfer from the Fernald Center facility. Indeed, the thwarting of these individuals' right to

---

[3] The Department has repeatedly requested from Class Counsel concrete information regarding alleged lapses in proper transfer protocols and has received no response. Additionally, throughout the course of the Court Monitor's review, the Department has inquired whether specific allegations of transfer irregularities had been made to the Court Monitor so that the Department might respond. At no time have the Fernald Plaintiffs ever supplied detailed, never mind client-specific, information to support such allegations to the Department or to the Office of the United States Attorney.

pursue treatment in the least restrictive setting for over a year during the pendency of the Court Monitor's review may be viewed as an ongoing infringement of individual rights and creates a legal conflict between the Fernald Class Counsel's representation of the Fernald League against the stated interests of other Fernald Class members. The Fernald Plaintiffs' principal "Objections" to the proposed lifting of the injunction to allow the named individuals to move to community-based settings are addressed below.

> A. *"The Court Monitor does not indicate compliance with DMR Regulations relating to the 45-day letter required to be provided to guardians prior to a proposed transfer. [115 CMR 6.63(2)] . . . There is no evidence that the "45-day letter" was delivered to the guardian(s) . . . ."* <u>See</u> Document Nos. 139 and 140 at pp. 2-3.

The Fernald Class Counsel cites to requirements regarding the so-called "45 day letter" required by 115 CMR 6.63 and G.L. c. 123B, § 3. As the Court has not yet indicated that any transfer may occur, it would be premature for the Department to send a notice of intention to transfer to the guardians of these individuals. Upon receipt of authorization from the Court to proceed with the proposed transfer(s), or alternatively the Court's modification of the Order, the Department would then of course appropriately comply with the applicable statute and regulations requiring the 45-day letter. As Fernald Class Counsel is well aware, having reviewed the prior transferees' files, all have received a 45-day transfer letter prior to any transfer taking place.

> B. *"There is no representation by the Court Monitor that the Facility /Regional Director has certified in accordance with the Final Court Order of 1993 that 'the individual to be transferred will receive equal or better services to meet their needs in the new location, and that all ISP recommended services for the individual's current needs as identified in the ISP are available at the new location.'"* <u>See</u> Document Nos. 139 and 140 at p. 2.

Class Counsel takes this same approach with regard to the Final Order's requirement of the facility director's certification of "equal or better," and this Court's guidance regarding the provision of a "Right to Return" for individuals participating in a transition from the Fernald Center. Again, because these transfers remain pending, the Department, as well as the Court Monitor, have not yet undertaken or reviewed these final steps but have clearly completed substantial work in preparation for these transfers, and remain available to complete such requirements upon receipt of this Court's approval. As Fernald Class Counsel is aware, all prior transferees from Fernald have had a completed certification by the Facility Director that all ISP-

recommended services were in place. Fernald Class Counsel's allegations concerning lack of compliance with these final steps in the transfer process are disingenuous and misleading; indeed, <u>had</u> the Department sent the 45-day letters to these individuals' guardians in the absence of specific authorization from the Court, Fernald Class Counsel would certainly have alleged that the Department violated the February 8, 2006 Order by initiating unauthorized transfers.

> C.    *"There is no documentation that the Court Monitor reviewed the adequacy of the Department's explanation of the "Home and Community-Based Services" waiver programs to the guardians in order that the guardians could give informed, written consent to the proposed community placement for this individual."*  <u>See</u> Documents Nos. 139 and 140 at p. 3.

Fernald Class Counsel again rehashes erroneous allegations concerning the Home and Community-Based Waiver Program ("HCBW") and "Informed Consent" requirement that were previously addressed and discredited by the Department.  <u>See</u> DMR Status Report to the Court of February 7, 2006 at pp. 25 and 27.  This is misleading in multiple respects as neither the DMR transfer statute, the DMR transfer regulation, Title XIX or the *Ricci* Final Order require an explanation of the HCBW waiver program or an individual's "informed consent" as specified in 115 CMR 5.08 as prerequisites to residential transfer.  Class Counsel essentially invents artificial standards necessary for compliance, and then cites the Department and the Court Monitor for failing to have documentation of such compliance.  There is no requirement in the transfer statute [G.L. c. 123B, § 3], the transfer regulation [115 CMR 6.63], or elsewhere in DMR regulations, that individuals be informed of the HCBW program prior to their residential transfer.  Though such information is not relevant to the provision of services to <u>Ricci</u> Class Members, the information is nonetheless be available to them.[4]  Indeed, Department staff have stated in meetings with Class representatives, and stated in writing to Class Counsel, that the requirements relating to the provision of lifetime services set forth in the Final Order supersede any perceived restriction relating to any particular DMR program, including the HCBW waiver, and the issue is therefore irrelevant.

---

[4]  Additional information concerning the Home and Community-Based Waiver program, or any other subject requested by an individual or guardian considering an alternative placement, is available and would be provided to them during the transfer planning process.  Given that all Fernald transferees are *Ricci* class members for whom the Department has an obligation to meet their service needs, regardless of the availability of funding, the Plaintiffs' implication that receiving services through the home and community-based waiver program is risky in terms of future funding as compared to ICF/MR services is incorrect and misleading.

> D. *"The Court Monitor does not describe how he determined whether DMR complied with the regulatory requirements to obtain knowing consent, voluntarily given by an individual's guardians who understood the risks and benefits involved in the proposed transfer."* <u>See</u> Documents Nos. 139 and 140 at p. 3.

Fernald Counsel incorrectly cites to the Department's "informed consent" regulations as specified in 115 CMR 5.08 as a prerequisite for a residential transfer. A cursory analysis of the Department's transfer statute and transfer regulation reveals that the detailed procedures necessary for compliance with 115 CMR 5.08's "informed consent" provisions <u>are not required</u> prior to residential transfers.[5] Section 115 CMR 5.08 requires specific and detailed procedures for obtaining "informed consent," and mandates that the informed consent of the individual or guardian <u>must be in writing</u>. See 115 CMR 5.08(3)(a). The DMR transfer statute [G.L. c. 123B, § 3] and the transfer regulation [115 CMR 6.63] require the Department to obtain the "consent" of the individual or guardian, as defined in 115 CMR 2.01, prior to a residential transfer. <u>Neither authority requires that consent to a residential transfer be in writing</u>. Both the transfer statute and transfer regulation mandate that an objection to a residential transfer must be made in writing and both authorities clearly state that a failure to object to the proposed residential transfer [in writing] within the allotted time <u>shall be deemed to be a consent to the residential transfer</u>. <u>See</u> G.L. c. 123B, § 3, and 115 CMR § 6.63(3)(a) and (b).

This is not to say that the Department does not discuss in great detail with families and guardians the nature of the services to be provided in the new location, the process for providing medical and nursing services in the new location, the transition process, and many other issues relevant to placement in the community. Guardians are well informed of the services to be provided and how those services will meet their family member's needs. However, Plaintiffs' insistence, in every filing they have made to date, that there must be documentation of the weighing of the "risks and benefits" of continued ICF/MR placement versus community placement (<u>e.g.</u>, Docket Nos. 139 and 140 at p. 3) and that this "informed consent" (applicable to

---

[5] "Informed consent" is a term of art defined in the Department's regulations, and is required only in limited instances and is generally reserved for medical procedures, research activities, facility admissions or related activities. <u>See</u> 115 CMR § 5.08. Tellingly, transfer from one residential setting to another is not listed in this regulation as requiring "informed consent." Residential transfers require consent, not "informed consent" as defined in 115 CMR § 5.08; nevertheless, the 45-day letter and consent form the Department provides during the transfer process clearly meets this standard as well as the standard set forth in 115 CMR § 2.01's definition of "consent." <u>See</u> <u>also</u> DMR Status Report to the Court dated February 7, 2006, at p. 25.

admission for treatment in an ICF/MR, not to consent to placement in a community-based program) must be present is simply wrong and contrary to the clear language of the applicable regulations. The Department has complied with all relevant and appropriate standards for obtaining guardian and/or individual consent and Plaintiffs' allegations regarding the necessity of compliance with the "informed consent" regulation are without merit.

Finally, Fernald Counsel makes unsupported and factually incorrect allegations concerning the sufficiency of the Court Monitor's review. (Docket Nos. 139 and 140, p. 4) During the course of their review of these particular Class Members, the Court Monitor, and the medical experts retained by him, conducted a thorough review of the medical files, including Individual Support Plans, of each individual who has requested placement from the Fernald Center. Substantial communications occurred between the Court Monitor and the guardians and/or family members of these individuals affording the guardians with an opportunity to ask questions or voice concerns regarding the proposed transfer. In most instances, the Court Monitor and the experts visited with and/or observed the particular Fernald residents for a greater understanding of the individuals' particular needs. In summary, the review of these individuals undertaken by the United States Attorney's Office, and the medical experts retained by the Court Monitor, was thorough and comprehensive, yet entirely supplemental to the Department's own procedures required by statute, regulation, and the Final Order. Although supplemental, the Court Monitor's review has nonetheless led him to state that "it is the opinion of the Monitor that [the Class Members in question] can receive equal to or better treatment" elsewhere, in comparison to what is available to them at the Fernald Developmental Center. While Fernald Counsel raises many questions in his recent filing, no admissible evidence is offered to suggest that a more detailed report by the Court Monitor, with respect to the individuals who were the subjects of the Court Monitor's recent letters, is necessary.

### 3. A Further Injunction Prohibiting Transfers from Fernald Would Violate Fernald Residents' Right to Receive Services in Less Restrictive Community-Based Settings and Override the Competent Judgments of the Government's Treatment Professionals.

At the time the February 8th Order was entered, placement discussions, including visits to proposed community residential programs, were well underway between Department staff and families and guardians of a number of Fernald class members. Department staff, families, and

guardians were voluntarily and cooperatively working to identify community-based residential opportunities in a manner consistent with the requirements of state and federal statutes, Departmental regulations, the 1993 Final Order, the parties' stipulation of January 20, 2005, and the directives of this Court.    Pursuant to the requests for community or alternative ICF/MR placement, Department staff thoroughly reviewed and assessed each individual in order to determine whether the individual's support needs could be appropriately met, and whether the individual would benefit from a community placement.    Of the individuals who requested community placements, the Department's treatment professionals determined that all needs identified in the individual's Individual Support Plan ("ISP") could be met, and that all could benefit from an appropriate community-based residential placement.

Having requested placements in available settings supported by the Department, these clients are legally entitled to a transfer out of Fernald.  Title II of the Americans With Disabilities Act of 1990 (ADA) provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  The ADA was enacted in large part "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  Id. at § 12101.[6]

In Olmstead, the United States Supreme Court determined that, in order to avoid discrimination against individuals with mental retardation, Title II of the ADA requires States "to place persons with mental disabilities in community settings rather than in institutions when the State's treatment professionals [have] determined that community placement is appropriate, the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and the placement can be reasonably accommodated, taking into account the

---

[6]   To implement the provisions of Title II of the ADA, Congress directed that regulations be promulgated to accomplish the ADA's mandate of eliminating discrimination against individuals with disabilities. One of the regulations so promulgated is commonly referred to as the "integration regulation."  28 CFR § 35.130(d).  The integration regulation states that a "public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  Id.

resources available to the State and the needs of others with mental disabilities."[7]  527 U.S. at 582.  The Court highlighted the crucial decisional authority of treatment professionals:

> A State generally may rely on the reasonable assessments of its own professionals in determining whether an individual "meets the essential eligibility requirements" for habilitation in a community-based program.  Absent such qualification, it would be inappropriate to remove a patient from the more restrictive setting.  See 28 CFR § 35130(d) (1998) (public entity shall administer services and programs in "the most integrated setting *appropriate* to the needs of qualified individuals with disabilities" (emphasis added)); cf. *School Bd. of Nassau Cty v. Arline*, 480 U.S. 273, 288 (1987) ("[C]ourts normally should defer to the reasonable medical judgments of public health officials.")

Olmstead, 527 U.S. at 602.[8]  Here, not only have the Department's treatment professionals assessed the subject individuals' suitability for community-based programs and affirmatively determined that all their needs as identified in their ISPs could be met (and indeed these clients would flourish) outside of Fernald, but independent medical experts retained by the United States Attorney have come to the same conclusions.

Under the holding of Olmstead, the continued segregation of these individuals in more restrictive institutional settings, when they have requested and have been determined to be suitable for community placement, is discrimination on the basis of their disability in violation of the Americans with Disabilities Act.  The Court's February 8th Order discontinuing transfers from Fernald has inadvertently become a barrier to these individuals exercising their right to receive services in the least restrictive setting available.   As such, the Department supports the DLC's motion that the Court modify or vacate the February 8th Order to allow for appropriate placements from the Fernald Center.

---

[7] In perceiving unlawful discrimination in continued institutional residency when a less restrictive setting is more appropriate, the Olmstead Court noted that the "unjustified institutional isolation of persons with disabilities is a form of discrimination [that] reflects two evident judgments.  First, institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life . . . .  Second, confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, education advancement, and cultural enrichment."  527 U.S. at 600.

[8]  In his concurring opinion, Justice Kennedy stated:  "It is of central importance, then, that courts apply today's decision with great deference to the medical decisions of the responsible, treating physicians and, as the Court makes clear, with appropriate deference to the program funding decisions of state policymakers."  Olmstead, 527 U.S. at 610.

4.  **A Permanent Injunction Prohibiting Transfers from Fernald Would Conflict with Federal and State Laws Requiring Unfettered Discharge and Placement Planning Discussions.**

In addition to the regulatory mandates of the ADA, Title XIX of the Social Security Act (42 U.S.C. §§ 1396, et seq.), which regulates compliance with the conditions of participation for certification of the Department's ICFs/MR, requires that an individual's ability and potential for independent and/or community living be assessed and discussed as part of the individual's Individual Program Plan ("IPP").  See 42 C.F.R. § 483.440.[9]  These regulatory provisions provide the basis for the mandatory placement discussions in the ISP and ensure that individuals be provided with applicable information concerning integration to community-based habilitation.

Consistent with the Olmstead decision, the ADA's integration regulation, and the Title XIX active treatment regulations, the Commonwealth's statutes and regulations provide for the development of a comprehensive program of community mental retardation services (see M.G.L. c. 19B, § 12), and consideration through the ISP process of service delivery in the least restrictive service setting (see 115 CMR §§ 6.00, et seq.).[10]  Throughout the development of the ISP and during the ISP meeting, Department regulations require that substantial efforts be dedicated to effecting the delivery of services in the least restrictive setting possible; membership and involvement in community activities must also be considered a primary component of the individual's quality of life objectives.  See 115 CMR §§ 6.20, 6.23.

Finally, as alluded to above, the Massachusetts Legislature has also directed the Department to engage facility residents in planning for placement in less restrictive community-based residences.  Beginning in Fiscal Year 2004, the Massachusetts Legislature has

---

[9]  The ISPs developed by the Department satisfy the Title XIX regulatory requirements for Individual Program Plans ("IPP"), which are a necessary component of active treatment compliance.  As part of the development of every IPP, the regulations require that the individual's interdisciplinary team assess or reassess the individual's "physical development and health, nutritional status, sensorimotor development, affective development, speech and language development and auditory functioning, cognitive development, social development, adaptive behaviors or *independent living skills necessary for the client to be able to function in the community*, and as applicable, vocational skills."  See 42 C.F.R. §483.440(c)(3)(v) [emphasis added].

[10]  As one of the General Principles contained in 115 CMR § 5.00's Standards to Promote Dignity states: "Services and supports are to be provided in a manner that promotes[ t]he opportunity to live and receive services or supports in the least restrictive and most typical setting possible."  115 CMR § 5.03(2)(d).  This provision is also included within the "Principles Governing Individual Support Planning."  See 115 CMR § 6.20(3).

appropriated funds for the operation of the Department's ICFs/MR in the General Appropriations Act subject to the proviso "that[,] in order to comply with the provisions of the Olmstead decision and to enhance care within available resources to clients served by the department, the department shall take steps to consolidate or close intermittent [sic] care facilities for the mentally retarded . . . managed by the department and shall endeavor within available resources to discharge clients residing in the ICF/MRs to residential services in the community."[11]  As a necessary consequence of the Legislature's mandate to "endeavor  . . . to discharge clients" to appropriate community residential services, the Department <u>must</u> engage facility residents and their families and guardians in order to discuss discharge to a less restrictive setting.  The most appropriate forum for these discussions and, in fact, the setting required by both Title XIX and Departmental regulations, is the annual ISP meeting.  However, Orders issued by this Court have hampered the Department's ability to discharge its legal obligations.

     5.   **Continued Application of the February 8th Order Blocking Transfers from Fernald Would Undermine the Department's Voluntary Service System and Inappropriately Supersede the Voluntary Decisions of Many Guardians and Families of Fernald Class Members.**

     Pursuant to explicit statutory and regulatory provisions, the Department provides all services, including residential services in an ICF/MR or community-based residence, on a voluntary basis.  Massachusetts law governing the voluntary admission and discharge from Department facilities states:  "Any person retained in a facility . . . ***shall be free to leave such facility at any time***, and any parent or guardian who requested the admission may withdraw such person at any time."  <u>See</u> M.G.L. c. 123B, § 7 [emphasis added].[12]  These provisions provide the basis for the Department's voluntary service system and cannot be reconciled with continued implementation of the Court's February 8th Order.  The February 8th Order enjoining transfers should be modified so that the legal authority of the guardians of Fernald residents to make

---

[11]  <u>See</u> Line Item 5930-1000 contained in Chapter 26 of the Acts of 2003 (Fiscal Year 2004); Chapter 149 of the Acts of 2004 (Fiscal Year 2005); Chapter 45 of the Acts of 2005 (Fiscal Year 2006); and Chapter 139 of the Acts of 2006 (Fiscal Year 2007).

[12]  <u>See</u> <u>also</u> M.G.L. c. 123B, § 6:  "Pursuant to departmental regulations on admission procedures, the superintendent may receive and retain on a voluntary basis any mentally retarded person providing the person is in need of care and treatment and providing the admitting facility is suitable for such care and treatment."

unfettered decisions may be restored.

**B.    The Defendants, Many Fernald Residents, and Other Ricci Class Members Face the Risk of Irreparable Harm if the Injunction Remains in Place.**

To establish a justification for continued operation of the February 8, 2006, injunction prohibiting transfers from the Fernald Developmental Center, the Plaintiffs must demonstrate that someone will suffer irreparable harm if the Court dissolves or modifies the injunction. In general, irreparable injury may be established if imminently threatened harm cannot be adequately repaired or compensated for at some later time. See generally Brown v. Chote, 411 U.S. 452 (1972); National Tank Truck Carriers v. Burke, 608 F.2d 819, 824 (1st Cir. 1979). Here, the Fernald Plaintiffs have not demonstrated that anyone will suffer any harm if the Order prohibiting transfers from the Fernald Center is dissolved or modified and the pre-existing statutory and regulatory scheme is permitted to spring back to life.

**1.    No *Ricci* Class Member Will Suffer Any Harm if the Prohibition Against Transfers from the Fernald Center is Lifted or Modified.**

Title XIX provisions, plus Departmental law and regulations, require substantial procedures prior to any individual's discharge or transfer from an ICF/MR. Additionally, the Final Order requires the additional protection that the Department certify equal or better care whenever a *Ricci* class member transfers "out of a state school into the community, or from one community residence to another such residence." These mandated procedures and Final Order requirements are specific to the individual and remain in effect regardless of whether any recent restrictions on transfers from Fernald remain in place. As such, if the injunction is modified or dissolved, Class Members will suffer no harm as the procedural protections applicable to all ICF/MR residents remain in place and fully applicable to them.

Prior to a discharge or transfer from an ICF/MR, Title XIX requires that the facility: (1) document that the individual is being transferred or discharged for good cause; (2) provide a reasonable time to prepare the individual for the transfer or discharge; (3) develop a summary of the client's developmental, behavioral, social, health and nutritional status; and (4) develop a post-discharge plan of care that will assist the individual to adjust to the new living environment. See 42 CFR § 483.440(a). These necessary procedures ensure that an individual's transfer or discharge from an ICF/MR to another living environment occurs in a thoughtful and measured

manner.  As stated in earlier briefings to the Court, Fernald and the Department have been found to be in compliance with Title XIX standards in recent Title XIX surveys conducted by the federal Centers for Medicaid and Medicare Services.   If the injunction prohibiting transfers from the Fernald Center is lifted, the Fernald Plaintiffs will suffer no harm as the procedures mandated by the federal government as part of Title XIX will remain in effect.

Certain Massachusetts laws (G.L. c. 123B, § 3, and 115 C.M.R. § 6.63) dictate additional procedures that must be adhered to prior to the transfer of an individual from the Fernald Developmental Center.[13]   Upon receipt of the Department's "Notice of and Request for Consent to Proposed Facility Transfer" letter (the so-called "45 Day Letter"), if an individual, guardian or family member objects to a proposed transfer, the Department's statute and regulations provide that the individual may file a request for an adjudicatory hearing with the Division of Administrative Law Appeals ("DALA") to determine whether the transfer should proceed.  See G.L. c. 123B, § 3, and 115 C.M.R. § 6.63.  Following the hearing officer's decision, an aggrieved party may appeal an adverse decision to Superior Court.   The Department's statute and regulations specify that no transfer shall occur during the pendency of the adjudicatory process. If the injunction prohibiting transfers from the Fernald Center is dissolved, Fernald residents will retain their individual rights to utilize the adjudicatory process to contest their proposed transfers. As such, they will suffer no harm if the prohibition against transfers from the Fernald Center is lifted.

Lastly, the Final Order contains comprehensive protection from the inappropriate transfers of *Ricci* Class Members from the Fernald Center.  The Final Order requires that the Department "not approve of a transfer of any class member out of a state school into the community, or from one community residence to another such residence, until and unless the Superintendent of the transferring school (or the Regional Director of the pertinent community region) certifies that the individual to be transferred will receive equal or better services to meet their needs in the new location, and that all ISP-recommended services for the individual's current needs as identified in the ISP are available at the new location."   Consistent with the requirements of Title XIX, and the Department's statute and regulations, a Class Member's

---

[13]  The specific requirements of these provisions and the Department's compliance with them were addressed in detail in *The Department of Mental Retardation's Status Report to the Court and Preliminary Response to the Report of the Fernald Plaintiffs*, filed on February 8, 2006.  See id. at pages 22 – 26.

entitlement to "equal or better" care exists independently of the injunction prohibiting transfers from Fernald, and this standard may be argued before the DALA and the Superior Court.  As such, because they individually possess these procedural and regulatory protections, the *Ricci* Class Members residing at Fernald will suffer no harm if the injunction prohibiting transfers from the Fernald Center is dissolved.  For the foregoing reasons, the Plaintiffs have failed to establish that anyone will suffer irreparable harm if the ordinary course of placement planning and alternative placement, as specified in federal and state laws, is allowed to unfold, unfettered by any recent injunctions issued by this Court.

       **2.**       **As the Fernald Plaintiffs Have Made No Legitimate Showing of Injury in the Absence of an Injunction, the Balance of the Hardships Clearly Tips Against Them.**

At present, and as a direct result of the February 8th Order, the Department of Mental Retardation is confronting grave difficulties in effectively allocating Department resources and planning for adequate residential opportunities for all clients of the Department, including *Ricci* Class Members transferring from Fernald.  Individual Fernald residents who (through guardians or family members) are presently requesting transfer from Fernald but are presently stymied by the Court's February 8th Order face the prospect of irreparable injury if the Court's Order forecloses presently available placements.  Suitable community-based residential opportunities, in which these individuals' needs may appropriately be met, cannot remain vacant much longer, and thus the creation of this capacity for these individuals may be irreparably harmed if the status quo persists.

       **3.**       **The Injunction Prohibiting Transfer from the Fernald Center Has Undermined the Department's Ability to Effectively Allocate Resources and Plan for Appropriate Residential Opportunities.**

As summarized in previous pleadings, the Department has devised a process with many safeguards to accommodate Fernald class members who choose to transfer from Fernald within the next two years.[14]  In addition to available residential capacity in the Department's state-operated or provider-operated programs, and in the other ICFs/MR operated by the

---

[14]  See, e.g., "The Department of Mental Retardation's Status Report to The Court and Preliminary Response to the Report of the Fernald Plaintiffs Filed on February 2, 2006," at p. 7.

Commonwealth, the Department is additionally actively involved in a housing development process in partnership with the Division of Capital Asset Management ("DCAM"), the Department of Housing and Community Development ("DHCD"), and local housing authorities ("LHA") that will meet the present and future needs of individuals served by the Department. Contrary to the Plaintiffs' assertions of a careless and hurried effort to hastily transfer Fernald residents, the Department has planned to ensure that the needs of Fernald residents continue to be met at Fernald, while concurrently developing residential opportunities to meet their needs when they proceed with an alternative placement. Although the Department has been successful so far in this housing development process, the bifurcation of the ISP and placement planning process, and more recently the February 8th Order, have significantly constrained the Department's efforts to plan for appropriate and accessible housing for Fernald residents.[15]

Continuation of the February 8th Order threatens irreparable harm to the Department's ability to adequately allocate appropriated resources for the housing needs of Fernald class members. Since the announced closure of the Fernald Center, the Department has consistently planned for the development of additional housing capacity, as well as the use of presently existing housing assets to meet the needs of transferring Fernald residents. A significant percentage of the Department's residential capacity, both community and ICF/MR, has been identified for potential occupancy by transferring Fernald class members. The February 8th Order has placed the development of new housing capacity in jeopardy, as already-developed housing must necessarily remain vacant pursuant to the terms of the Court Order, and existing vacancies in state-operated and vendor-operated programs earmarked for these Ricci class members cannot be held open indefinitely. See Affidavit of Paul Antonellis, attached hereto as Exhibit A, at ¶¶ 11, 15-17.

Prior to the occupancy of the residence by Department clients, valuable time is needed to hire and train staff to the new residence and its future occupants. Id. at ¶¶ 10, 13. Further court-ordered impediments to the housing development process will continue to have an effect until the

---

[15]  At the time of the status conference held on February 8, 2006, the most significant challenge to developing housing to meet class members' needs was the bifurcation of the ISP and placement planning process that was agreed to by the parties in a Stipulation entered into in January of 2005. As was predicted at that time, the unintended consequence of the Stipulation has been that many families and guardians have had little or no contact with the Department about their ward/family member's housing needs or preferences. In the past year, there has been a continuation of the Fernald League's interference with the planning process to the detriment of families who lack adequate knowledge of opportunities for appropriate placement planning.

freeze on placements is lifted and the Department can initiate the essential processes of staffing these residences and preparing for future occupancy. Difficult decisions regarding the optimal use of Department assets during the pendency of the February 8th Order have led to the Commonwealth's taxpayers sustaining significantly detrimental costs and have severely impacted the Department's ability to fairly and equitably allocate funding to Department clients in the most efficient manner. Id. at 14.

Any further implementation of the Order discontinuing transfers from Fernald may additionally make it infeasible for developers and local housing authorities to continue to partner with the Department on planned housing development projects. Id. Although the development of special needs housing projects has been largely successful to date, developers and LHAs face unsustainable uncertainty regarding future housing partnerships in the light of the Order discontinuing transfers from the Fernald Center. Id. Although the Department has developed adequate community residential options to demonstrate that housing opportunities are sufficient to accommodate the needs of Fernald class members, the February 8th Order is now constraining the Department's housing development and resource allocation efforts to the detriment of the entire Department population. Id. In consideration of this potentially irreparable harm, the Court should modify or vacate the February 8th Order, and vacate the Stipulation, in order to permit effective placement planning for individuals at Fernald as part of the normal ISP process.

### 4. The Injunction Prohibiting Transfers from the Fernald Developmental Center Now Disserves the Public Interest.

With the work of the United States Attorney drawing to a close, and no evidence that the transfers the Department presently is proposing will harm anyone, the citizens of Massachusetts possess a burgeoning interest in the lifting of the injunction prohibiting transfers from Fernald and the reinstatement of the Department's normal transfer and placement planning processes. As described above, if the injunction is allowed to continue, the Commonwealth will very likely incur substantial costs as community-based residences specifically developed for transferring Fernald residents remain vacant and un-staffed pending resolution of this matter. The injunction additionally interferes with the public's interest in promoting community integration of mentally retarded citizens as directed by the Americans with Disabilities Act, Title XIX, Departmental laws and regulations, as well as the specific directives of the Massachusetts Legislature to consolidate or close the Department's ICF/MRs. Lastly, the citizens of the Commonwealth have

a strong interest in seeing that long-standing principles of federalism are observed and that the Commonwealth's lawful discretion to provide treatment and services to individuals with mental retardation absent federal court interference is honored.

<u>**Conclusion**</u>

Whereas the Court Monitor's review to date has revealed no compelling reason why the efforts of those individuals who seek voluntary placement from the Fernald Developmental Center should be further hindered, the Department respectfully requests that the Court vacate, or at least modify, the February 8, 2006 Order, thus permitting the Department to reinstate the normal placement process so that these and like-minded individuals may proceed with their intention to pursue transfers from the Fernald Center.

Respectfully submitted,

DEPARTMENT OF MENTAL RETARDATION

By its attorneys:

MARTHA COAKLEY
ATTORNEY GENERAL

/s/ Marianne Meacham
_____
Marianne Meacham, BBO #550468
Special Assistant Attorney General
General Counsel
Department of Mental Retardation
500 Harrison Avenue
Boston, MA  02118
(617) 624-7701

and

/s/ Robert L. Quinan, Jr.
_____
Robert L. Quinan, Jr.  BBO No. 553010
Assistant Attorney General
Office of the Attorney General
One Ashburton Place, 20th floor
Boston, MA  02108
(617) 727-2200, ext. 2554

20

## <u>CERTIFICATE OF SERVICE</u>

I, Marianne Meacham, General Counsel for the Department of Mental Retardation and Special Assistant Attorney General, do hereby certify that a copy of the above *Response to the DLC's Motion to Modify, and the Fernald Plaintiffs' Motion to Extend, the Court's Order of February 8, 2006*, is being mailed via first class to all counsel of record who are not registered with the Court's Electronic Case Filing system.

Date:  February 28, 2007          _/s/ Marianne Meacham_____
                                          Marianne Meacham
                                          General Counsel

## <u>Certification of Compliance with Local Rule 7.1 (A)(2)</u>

By my signature below, I hereby certify that counsel for the Department and the Court Monitor have communicated extensively regarding the circumstances of the individuals whose efforts to pursue outplacements from the Fernald Center were curtailed by this Court's Order of February 8, 2006.  The Plaintiffs and the Court Monitor have discussed this matter as well, and have conferred regarding the Department's position and, notwithstanding these discussions, the Department has deemed it necessary to file this motion.

Date:  February 28, 2007          _/s/ Marianne Meacham_____
                                          Marianne Meacham
                                          General Counsel