UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| Robert Simpson Ricci, et al., | | |
| Plaintiffs, | Civil Action Nos. | 72-0469-T |
| | | 74-2768-T |
| | | 75-3010-T |
| | | 75-5023-T |
| v. | | 75-5210-T |
| Robert L. Okin, et al., | | |
| Defendants, | | |

**AFFIDAVIT OF PAUL ANTONELLIS**

I, Paul Antonellis, do depose and say as follows:

1. I am employed by the Department of Mental Retardation ("the Department" or "DMR") as a Program Manager IX in the Department's Systems Integration Management Office ("SIM"). In this capacity a component of my responsibilities include the planning, development, and procurement of community-based housing for individuals receiving services and supports from the Department. Unless otherwise indicated, the facts contained in this Affidavit are based on personal knowledge and information provided by DMR staff or records.

2. I received my Bachelor's of Science degree in Special Education from Boston University in 1968 and my Master's degree in Special Education from Boston University in 1971. I have participated in post Master's degree work at Fitchburg State College and the University of Connecticut.

3. I have been employed by the Department of Mental Retardation since 1985 when I served as the Assistant Superintendent of the Wrentham State School. I served as Assistant Superintendent at Wrentham from 1985 to 1996, and then served as the Department's Director of Consolidation until 2000. From September 2000 to October 2003, I served as the Facility Director at Fernald, and then Deputy Assistant Commissioner. I have been in my present position of Director of Housing within the office of Systems Integration Management since October 2003.

4. The Department's Systems Integration Management Office manages the information management and reporting systems for the Department of Mental Retardation and is responsible for ensuring that Department planning and development is in compliance with agency standards, practices and policies. A component of the SIM Office's duties is the coordination and planning for the development of new state-operated community-based housing opportunities to meet the needs of individuals receiving services from the Department.

5. The actual development of community-based housing projects is accomplished through the Department's collaboration with partnering agencies such as the Department of Capital Asset Management ("DCAM"), the Department of Housing and Community Development ("DHCD"), and the Community Economic Development Assistance Corporation ("CEDAC"). The Department's advancement of housing projects is completed through close consultation with DCAM and the issuance of Requests for Proposals ("RFPs") for the construction and development of new community-based housing. The SIM office also coordinates with DHCD and various Local Housing Authorities ("LHAs") through the Chapter 689 Housing for Individuals with Special Needs program for the development of housing for individuals with disabilities. All of these efforts take place following the Department's assessment of need for new community-based housing for Department clients.

6. Assessing the need for new community-based housing is conducted principally by the Regional, Facility and Area Offices within the Department and reviewed by a DMR Central Office Committee overseeing the development of community housing needs for facility residents. Planning related to housing needs, not geared toward facility residents, is reviewed by the Assistant Commissioner for Field Operations, who is also a member of the Steering Committee, to ensure overall coordination of the DMR planning efforts for community-based housing. Decisions of the Steering Committee guide the Department's procurement efforts regarding the need and location of new homes as well as the appropriate partnering agency to consult with.

7. As part of my duties I serve as the DMR agency contact with DCAM on the development and release of RFPs for the construction or development of new community-based housing, and also for RFPs for the renewal of leases for existing community housing programs. Following the announced closure of the Fernald Developmental Center ("Fernald"), the Department began working with DCAM to develop community housing capacity to provide Fernald residents with the opportunity to transition to programs located in the Department's Metro Boston and Northeast Regions. The work with DCAM represents one component of the housing development process and, as stated above, the Department also partnered with DHCD and the LHAs to develop additional housing through the Chapter 689 – Housing for People with Special Needs program.

8. Through these initiatives to develop new community housing, new homes are in active development by the Department and the respective partnering agencies. The Department and partnering agencies such as DCAM and DHCD have worked to develop a number of new housing opportunities located in the DMR Metro Boston and DMR Northeast Regions. Some of these homes are in the very final stages of development prior to coming "on-line" and accepting individuals for occupancy. Other homes are scheduled to be completed and

come "on-line" early in the next fiscal year, which begins July 1, 2007. Furthermore, the Department has detailed plans in place for the development of additional new community-based homes in subsequent fiscal years.

9. DCAM, in consultation with DMR, has recently issued another RFP for the development of new community-based housing in the DMR Northeast and Metro Boston Regions. This RFP provides for the development of up to 12 new homes suitable for residents of the Fernald Developmental Center. These additional homes will be developed following the Department's assessment of need for the housing, and the needs of individuals who would live in the homes.

10. Generally, the DCAM development process takes about 14 to 16 months, starting from release of an RFP until the home is ready for occupancy, barring unforeseen obstacles during the construction and development processes. This allows sufficient time for receipt and evaluation of proposals, site selection and approval, design modifications, purchase and sales agreements, financing, permitting, site work, construction, landscaping, lease preparation, and occupancy permits. This time-frame does not include the time required to furnish and equip the home, provide and train necessary staff, finalize funding, and conduct transitional activities for the proposed residents.

11. Certain procedures required by the *Ricci* litigation have constrained the Department's placement planning ability to develop housing options for specific individuals. Current planning activities, which include input from Facility, Regional and Area staff involving individualized services planning, help to ensure that any new community-based housing that is developed is suitable and appropriate for the individuals with a wide range of disabilities who will reside therein. Placement planning is generally conducted between the individual or guardians and the Regional, Facility or Area Offices who have a specialized knowledge of the individuals proposed for the new home.

In the case of potential Fernald placements, the Department is developing housing that will be suitable for persons with a wide range of disabilities and specialized housing needs.

12. The new homes being developed include such features as: fully sprinkled fire suppression systems, landscaped accessed entries where possible [thereby eliminating the need for ramps], fully accessible bathrooms that include roll-in showers designed without thresholds, bathtubs that allow access from three sides [to allow staff to better assist individuals with bathing needs], bathtubs built on platforms that allow for use of floor-based lifting devices, floor drains in bathrooms and laundry rooms with sloped floors to mitigate damage caused by water and moisture, 48"-width corridors, and reinforced ceilings to accommodate the installation of ceiling-based lift systems.

13. Throughout the housing development process there is a great need to ensure proper coordination and timing between all parties involved, both internal and external to the Department, so that the home and the services to be provided at the home are in place and available to come "on-line" at as close to the same time as possible. Uncertainty regarding the future occupancy of the home will lead to significant carrying costs if homes remain vacant because community placements cannot go forward for Fernald residents.

14. The uncertainty with respect to when people will be able to move from Fernald and transition to new community homes creates problems for the housing development process, and the Department's ability to fairly and equitably allocate funding to DMR clients in the most efficient manner. As the new homes are being developed with Fernald residents in mind, the resources to support these homes must follow these individuals as they transition from the facility; yet these resources to support the new homes are not readily available unless the individuals are able to transition to the homes that were developed for them.

15. When homes are completed and there are delays or obstacles preventing the occupancy of the home, the Department's housing partners grow concerned regarding the impact of the delays on the cost to the Commonwealth for such things as additional interest charges for construction loans, security for unoccupied homes, and operational costs without specific individuals receiving any benefit. There are also issues with respect to timing and accuracy of funding allocations and commitments for public subsidies used in the project. The discontinuance of transfers from Fernald since February 8, 2006 has greatly contributed to the uncertainty surrounding these issues.

16. Additionally, the discontinuance has had a negative impact on operations related to the sequencing and progression of the housing development and the RFP process, the development and construction processes, as well as the individual service planning and transitional process for individuals that is done by the Regional and Area Offices prior to an individual transfer. There are also detrimental impacts to lease costs related to additional carrying costs for construction financing associated with delays in the lease executions, executing permanent financing arrangements, and identifying and accessing resources for supporting the homes.

17. Lastly, such unpredictable delays in the development process resulting from the ongoing discontinuance of transfers from Fernald are likely to result in additional carrying costs to future proposals that may be submitted, as there is uncertainty whether the Commonwealth will be able to execute leases at the time of the projected completion and occupancy dates of the newly developed homes. As these homes are developed principally for Fernald residents and occupancy in the new homes has been reserved for them, the impact, costs, and detrimental effects of the suspension of placements from Fernald has the potential to continue well past the time when transfers from the facility are again permissible.

Signed under the pains and penalties of perjury this 28th day of February 2007.

/s/ Paul Antonellis_____
Paul Antonellis