

**U.S. Department of Justice**

*Michael J. Sullivan*
*United States Attorney*
*District of Massachusetts*

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

March 6, 2007

The Honorable Judge Joseph L. Tauro
United States District Court
John Joseph Moakley U.S. Courthouse
1 Courthouse Way - Suite 2300
Boston, MA 02210

Re:  The Monitor's Report on Whether the "Past and Prospective
     transfer processes employed by the Department of Mental
     Retardation were in compliance with Federal Law, State
     Regulations, as well as Orders of the Court."

Dear Judge Tauro:

I am writing you in my capacity as Court appointed Monitor in the
Fernald matter.  Since the appointment in February, 2006, our
office has conducted extensive visits to all of the
Commonwealth's Intermediate Care Facilities for the Mentally
Retarded (ICF/MR) within Massachusetts, including four visits to
Fernald, and visits to Hogan, Monson, Templeton, Wrentham and
Glavin.  We have met with well over 250 guardians,  parents and
siblings at Fernald and other ICF/MRs, and have visited with and
met with most of the residents of these facilities during their
day programs and in their residences.  In addition , we visited
over 30 community residences and numerous day centers.  We have
also reviewed all of the pleadings in the <u>Ricci v. Okin, et. al</u>.
filings,and ascertained that there are approximately 3,959 Ricci
class members.  Overall, 49 individuals were transferred from
Fernald since February 26, 2003 with 35 transferring to ICF/MRs
and 14 transferring to community residences.

While our review touched on a number of issues raised by
plaintiffs and guardians, two areas of significant concern were
delivery of medical services and the potential for greater abuse

The Monitor's Report
March 6, 2007
Page 2

and neglect in the community.

To best understand how medical services are provided for
individuals residing in community residences, and how
investigations of alleged neglect and abuse are conducted, our
office received two presentations from the Department of Mental
Retardation (DMR) on Medical Services to Ricci Class Members in
the community, and how Allegations of Abuse and Neglect are
Investigated by DMR.  Our office invited all of the plaintiffs'
counsel to attend the presentations, and thereafter, solicited
written comments and questions from plaintiffs' counsel.  Upon
receipt of the plaintiffs' comments and questions, our office
asked DMR to respond in writing.  These presentations, and the
follow-up questions and answers, gave our office tremendous
insight into how medical services are accessed by mentally
retarded individuals in community residences.  The presentation
on how Allegations of Abuse and Neglect are Investigated was
extremely informative.  We also independently reviewed the
Disabled Persons Protection Commissions Vendor Survey Reports for
all ICF/MRs and for community residences since January, 1996.  We
met on a number of occasions with counsel for the parties and
conducted bi-weekly conference calls.  We requested and were
provided assistance from counsel and the parties to better
appreciate the issues, challenges and successes as it related to
the services provided to our most vulnerable citizens.  Overall,
the review by the Monitor attempted to meet the scope of review
defined by the Court.  Our approach was to achieve a full
understanding of the various arguments and allegations being
raised by the plaintiffs, in order to provide the Court with a
more comprehensive report.

1.    **Overview of the Intermediate Care Facilities for the
      Mentally Retarded (ICF/MRs)**

      A.    The Hogan Regional Center

Our office visited the Hogan Regional Center at 450 Maple Street,
Hathorne, Massachusetts.  Our office was extremely impressed with
the facility and the level of comprehensive medical care that is
provided to each individual.  The facility has an extremely
functional design and is situated on 54 acres.  The facility was
opened in 1967 and is presently home to approximately 151
individuals and has a capacity for 166 individuals.  The physical
layout consists of several discrete residential units and
vocational work sites with a central gymnasium, pool, cafeteria,
auditorium and motor training area.  The facility is Title XIX

The Monitor's Report
March 6, 2007
Page 3

qualified and is capable of providing service coordination
dependent upon an individuals assessed needs.  These needs could
include the following: Assistive Technology, Audiology, Dental,
Medicine, Neurology, Nursing, Nutrition, Occupational Therapy,
Orthotics, Orthopedics, Peripatology, Physical Therapy,
Psychology, Social Services, Speech Therapy, Therapeutic
Recreation and Vocational Services.

The Day Program at the Hogan Regional Center is directed by North
Shore Enterprises.  The program is conducted in two buildings and
over half of the individuals at Hogan attend the program.  The
remaining individuals at Hogan attend day programs in the
community between 9:00 a.m. and 3:00 p.m.  The day programs range
from very basic skill building to pre-vocational skills.

The Hogan Regional Center is well maintained and exhibited bright
cheerful artwork throughout the facility.  We noted that the
staff takes great pleasure in making each living area as
comfortable and well decorated as possible.  This feeling of home
was a recurrent theme throughout all of the ICF/MRs that we
visited.

       B.    The Wrentham Development Center

Our office visited the Wrentham Development Center at 131 Emerald
Street, Wrentham, Massachusetts.  We were extremely impressed
with the facility and the level of comprehensive medical care
that is provided to each individual.  The facility services
approximately 325 adults with mental retardation and has a
capacity for 343 individuals.  It opened in 1907 and is situated
on 400 acres of open and wooded land.  The configuration of the
facility includes 5 large buildings and 13 houses.  The facility
also has a state-of-the-art 12 bed acute care medical center.
The medical center is also used for diagnostic evaluations,
reassessment of chronic illness, and/or close medical or nursing
observation.  Overall, the facility offers a full range of
clinical services in the area of medicine, nursing, psychology,
recreation, social work, occupational  and physical therapy,
communication, adult education and vocational services.

The Wrentham Development Center also houses the Quinn Program
Center for workshops and day activities.  Such activities include
vocational, recreational and other learning and interactive
programs.  The complex has an Olympic size indoor pool with one-
third of the pool having a floor that is adjustable from depths
of zero to four feet of water.  The building also has a full size

The Monitor's Report
March 6, 2007
Page 4

gymnasium with all the modern exercise equipment and is overseen
by adaptive physical education instructors.

The Wrentham residences are very nicely decorated and it is
obvious that the staff takes great pride in making each residence
very warm and inviting.

    C.    The Monson Development Center

Our office visited the Monson Development Center at 175 State
Avenue, Palmer, Massachusetts.  The facility was originally
opened in 1898 as a hospital for people with epilepsy.  Until
1970, epilepsy was the common and primary diagnosis for everyone
admitted to the facility.  Epilepsy and its treatment often
result in the development of many other health conditions, and
consequently, Monson has developed sophisticated medical services
and supports to address the complex medical needs of its
residents.  The facility is situated on 588 acres and is located
one mile from the Massachusetts Turnpike.  Monson is a Title XIX
consent degree facility that currently supports 186 people with a
capacity for 385 people.

The age range for residents at Monson is between 35 to 87.  The
functioning ranges for the residents are between profoundly
mentally retarded to mild, with 79% of the population functioning
in the severe to profound range.  The facility has around the
clock nursing including 4 nurse practitioners and 2 physicians on
duty between Monday through Friday.  There is an on call
physician coverage for nights and weekends.  Other clinical
services provided include Occupational Therapy, Physical Therapy,
Adapted Equipment, Psychology, Speech Therapy, Habilitation
Coordination, Recreation, Nursing, Respiratory Therapy,
Neurology, Podiatry, Optometry, Psychiatry and Gynecology.
Monson uses The University of Massachusetts Medical Center and
The Wing Memorial Hospital for acute care hospitalizations.
Monson also has an on-campus hospital, which often shortens stays
in acute hospitals, and provides extensive health services for
people experiencing acute problems.  Monson has an array of day
programs including competitive employment, employment workshops,
retirement services and sensory motor programs.

Although Monson was opened in 1898, the facility has undergone
continuous renovation since 1975.  Some of the improvements
included upgrading electrical and water systems, renovating 15
living areas and permitting decorations and furnishings to
reflect the personal preferences of the residents and their

The Monitor's Report
March 6, 2007
Page 5

families.  There is a strong sense of pride within the facility
and it is evident in the longevity of the work force as the
average years of employment at the facility is 20 years, and the
average age of the employees is 45 years (we noted similar
employment trends at the other ICF/MRs).

    D.   <u>The Glavin Regional Center</u>

The Glavin Regional Center in Shrewsbury was opened in May, 1974
and is situated 123 acres on Lake Street, Shrewsbury,
Massachusetts.  Each of the approximate 63 resident receives
residential and day programs.  Glavin has a capacity of 63
residents.  The programs are certified yearly by the Department
of Public Health under Federal Title XIX Regulations.  Although
Glavin Regional Center did not come under the consent decree,
approximately 18 residents who presently reside at the center are
class members.  The age for people living at Glavin ranges from
31 to 83.  Glavin has the capacity to provide a variety of
professional services including nursing, physical therapy,
occupational therapy, psychology, psychiatry, speech and language
pathology, vocational and recreation therapy.

    Glavin is located high atop a hill with magnificent
surrounding views.  The facility is bright, cheerful, well
decorated and located just off of Route 9 in Shrewsbury.

    E.   <u>Templeton Development Center</u>

The Templeton Development Center is located 70 miles west of
Boston on 2,600 acres in Baldwinville, Massachusetts.  Templeton
is a Title XIX certified, state operated intermediate care
facility that supports 143 adults with mental retardation with a
capacity to support 160 individuals.  Templeton, a Consent Decree
facility, was originally developed as an extension of the Walter
E. Fernald State School in May 1900.  In 1992 Templeton became an
independent facility known as Templeton Development Center.
Templeton provides services for individuals ranging in age from
26 to 91.  Templeton's residences are comprised of six lodges and
three small 8-person homes.  Templeton is an agricultural
community that has the capacity to provide medical and clinical
services to individuals with physical and emotional issues
associated with the aging process.  Templeton's medical services
are provided by Shriver Clinical Group, Henry Heywood Memorial
Hospital and The University of Massachusetts Medical Center.
Templeton utilizes twenty-four hour nursing coverage, two
physician's assistants and a community based medical practice

The Monitor's Report
March 6, 2007
Page 6

for on-site medical care.  Dental service is provide on-site
through a contract with Tufts Dental.

Templeton has developed highly specialized supports to assist and
treat individuals with challenging behavioral issues.  All
individual supports are provided through the ISP team process.
An ISP team composed of a QMRP, Nurse, Physician's Assistant,
Social Worker, Psychologist, Recreational Therapist, Adult
Educator, Vocational Rehabilitation Counselor, Occupational
Therapist, Physical Therapist and Speech Pathologist.   The
facility provides on-site educational and vocational supports
through four day programs and six vocational programs.   Two of
the on-site vocational programs provide training in the areas of
dairy operation and farming.   The facility also operates a
productive dairy/beef program and a gardening program.

    F.   <u>The Fernald Center</u>

The Fernald Developmental Center is distinguished as the Western
Hemisphere's oldest publicly-funded facility serving individuals
who have developmental disabilities.  Fernald is located on 186
acres in Waltham.  Fernald's services concentrate on encouraging
each resident to learn and grow by participating in a variety of
programs designed to develop social, work and daily living
skills.  Between 1924 and 1970, Fernald became a site for
expanded research into the causes of mental retardation,
resulting in the opening of Shriver Center on the Fernald grounds
in 1970.  In 1974, Fernald entered into the Medicaid (Title XIX)
program and into a consent decree  process.  Since that time,
dramatic improvements have taken place in the quality of the
residents' lives, and in the quality of services they receive.
In 1993, Fernald merged with the Metro Boston Region with a focus
on opportunities in the community for individuals.  In 1998 the
Walter E. Fernald State School campus became known as The Fernald
Center to reflect both the Fernald Developmental Center and the
Marquardt Skilled Nursing Facility.

The individuals who live at Fernald have a range of developmental
disabilities and most function at the profound level of
retardation.  As of September, 2006, there are 189 residents at
Fernald and 29 resident at Marquardt with the age range of 35 -
94.  The individuals who live at Fernald live in homes with
groupings of 5 to 16.  Thirteen buildings, including the
Marquardt Nursing Home are currently used for residential
housing.  Six sites are used for vocational training and
recreational pursuits.  Fernald's residents receive services on

The Monitor's Report
March 6, 2007
Page 7

and off grounds, ranging from leisure-based retirement programs
to supportive employment.  All Fernald residents receive some
form of social security assistance and are covered by Medicaid.
The Fernald Center employs more than 774 staff in administrative,
direct care, clinical and support services positions.  About 85
percent of the staff are engaged in direct care services.
Fernald provides supports and services 24 hours a day.  A team of
direct service staff and clinicians work together to meet the
individual needs of the individuals who live at Fernald.  The
teams may include speech, occupational, physical and recreation
therapists, direct care staff, adult education, psychology,
nursing, medical and nutrition staff.  By being in compliance
with Title XIX Acts of 1974, Fernald receives Federal
reimbursements.  Some of the resources at the Fernald Center
include an indoor handicapped accessible pool, gymnasiums,
Activity Center and a ballfield.

2.    **Residential Placement Options Within Community**

   A.    Residential placement options within the community are
         divided into essentially three options including
         supervised living, shared living and family
         partnership.

      (i)    Supervised Living - If a family chooses supervised
             living they have a preference between a provider
             operated program or a state operated program.
             Typically, individuals can live in a home with
             anywhere from 1 to 5 other individuals.  Each home
             has a house manager and direct support staff.
             Dependent upon the needs of the people living in
             the homes, there may be a nurse working in the
             home or available to the home.  Staffing varies
             depending on the support needs of the individuals,
             but typically there are 2 direct support staff for
             4 individuals.   These homes have their own
             vehicles for transportation.

      (ii)   Shared Living - Individuals have the option of
             living with a care provider in the care provider's
             home.  The care provider can be single or have a
             family, and the provider is paid to support the
             individual.  Oversight of such a living situation
             is provided by a residential support provider
             agency that provides placement, guidance and
             oversight.

The Monitor's Report
March 6, 2007
Page 8

      (iii) <u>Family Partnership</u> - A family partnership is an individual or family-directed cooperative arrangement in which a DMR consumer or his or her family provides or contributes toward the cost of a residence in which the Department provides or arranges for services to be provided.  The arrangement provides individuals and families with greater choice and control over where a family member lives and will receive services such as in their childhood home or a particular area where an individual grew up or has community connections.

B.    <u>Community Day Supports</u>

      (i)   <u>Community-Based Day Supports</u> - These supports are provided to individuals who qualify for DMR services during the workday hours in lieu of employment supports.  These services offer individuals an opportunity to develop, enhance and maintain their competence and confidence in personal, social and community activities. Individuals who are medically fragile or have other significant health, mental health or behavioral issues that limit their ability to be engaged in productive work activities.

      (ii)  <u>DMA Day Habilitation</u> - A structured, goal-oriented active treatment program of medically oriented, therapeutic, and habilitation services that are intended to raise individuals' level of functioning and facilitate independent living and self-management in their home communities.

      (iii) <u>Employment Supports</u> - Employment supports are for individuals of all abilities.  Supports assist individuals to prepare for and experience gainful employment, and may include sheltered employment, work crews, enclaves, provider-owned businesses, volunteer work, provider-paid employment, and supported employment, with the overarching goal of quality jobs for individuals.

      (iv) <u>Competitive Employment</u> - This is full or part time paid work, which is done either in the public or private sector.  Such work is not supported in any

The Monitor's Report
March 6, 2007
Page 9

way by DMR.  Individuals who work competitively are on company payroll and may be eligible for all employee benefits.

(v)  <u>DMA Adult Day Health</u> - A program to provide an alternative to 24-hour long term institutional settings through an organized program of health care, supervision, restorative services, and socialization.  The Division of Medial Assistance administers this program.

(vi) <u>DMH Day Program</u> - This Psychiatric Day Treatment Program is a planned combination of diagnostic, treatment, and rehabilitative services provided to mentally or emotionally disturbed individuals who need more active or inclusive treatment that is typically available through a weekly visit to a mental health center or hospital outpatient department, but who do not need full-time hospitalization or institutionalization.  Such a program utilizes multiple, intensive, and focused activities in a supportive environment to enable individuals to acquire more realistic and appropriate behavior patterns, attitudes, and skills for eventual independent functioning in the community.  Such programs may be operated by a freestanding clinic, a satellite facility of a clinic, a hospital licensed health center, or an identifiable unit of a clinic, hospital, or hospital licensed health center.

(vii)<u>MCB Day Programs</u> - This Day/Work program is funded and operated by the Massachusetts Commission for the Blind (MCB).

(viii)<u>MRC Employment and Training</u> - These are Massachusetts Rehabilitation Commission (MRC) funded employment supports that include extended employment (EEP) at a private rehabilitation facility.  This program offers supported employment in an integrated work setting, or transitional employment work experiences at a business or industry for the purpose of providing evaluation, training, and supervision.

The Monitor's Report
March 6, 2007
Page 10


3.   <u>**Review of Medical and Clinical Services at the ICF/MRs and within the Community**</u>

In an attempt to independently glean a full understanding of the medical and clinical requirements of individuals seeking to transfer from Fernald to other ICF/MRs or to community residences, our office hired independent medical doctors with a history of caring for individuals afflicted with mental retardation.  We asked counsel for the plaintiffs and the defendants to provide a list of qualified medical professionals that had experience in treating and servicing individuals with mental retardation.  Once the list was finalized, it was distributed to counsel for the plaintiffs and the defendants.  A period of time was allowed for our office to receive comments, suggestions and concerns regarding the list of medical professionals.  Three medical doctors with extensive experience servicing individuals with mental retardation were chosen by our office.  Our office had extensive discussions with these doctors, and specifically discussed the ISP process and DMR's use of the ISP process for both present and future needs of individuals who have transferred from Fernald, and for potential prospective transfers.

     A.   <u>Medical Professionals Hired to Assist the Monitor</u>

Lawrence W. Osborn, M.D., MPH, is the Associate Medical Director for Geriatric Psychiatry at Providence Hospital and Mercy Medical Center.  He was a Commissioned Medical Officer for the United States Public Health Service between 1968 - 1988.   He was the National Medical Director for Mental Health, U.S. Healthcare (then Aetna-U.S. Healthcare) between 1992-2001.

Dr. Robert Baldor is a Board-certified family Physician and has a practice at the University of Massachusetts Medical School in Worcester.  His current practice includes caring for individuals with intellectual disabilities, and he makes house calls to group homes where 4-8 individuals with mental retardation reside.  He also worked at Belchertown Development Center when it was operational.

Paul Millard Hardy, M.D. is a physician licensed to practice medicine in the Commonwealth of Massachusetts since 1977. Dr. Hardy is board certified in Neurology by the American Board of Psychiatry and Neurology and received sub-specialty training in

The Monitor's Report
March 6, 2007
Page 11

Neuropsychiatry at Boston University School of Medicine.  In 1976 he was the Joseph P. Kennedy Jr. Fellow in Medical Ethics at Harvard University. The following year he joined the Eunice Kennedy Shriver Center and worked as physician and neurological consultant at the Paul A. Dever State School in Taunton, Massachusetts. During that time he assisted in the evaluation of residents for transition into the community under the jurisdiction of this Court.  He was medical director at the Fernald State School from 1982 to 1985 and held academic appointments in the departments of neurology at Harvard Medical School and the Tufts University School of Medicine.  At Tufts he also held an appointment in the Department of Psychiatry. In 1980 he began an outpatient clinic at Tufts New England Medical Center in neurology for community-based developmentally disabled persons and in 1992 formed his own practice in neuropsychiatry in Hingham, Massachusetts where he has cared for many developmentally disabled individuals in the community.

B.  <u>Document Review Conducted by the Medical Professionals</u>

The medical doctors reviewed various documents and reports for each of the transferred individuals to assist our office in our investigation.  Some of the documents reviewed included, but were not limited to, the following:

1.  Results of Recertification Survey for Title XIX ICF/MR of Walter E. Fernald Developmental Center;

2.  Results of Recertification Survey for Title XIX ICF/MR of Wretham Developmental Center;

3.  Results of Recertification Survey for Title XIX ICF/MR of the Hogan Regional Center;

4.  Results of Recertification Survey for Title XIX ICF/MR of the Monson Development  Center;

5.  Results of Recertification Survey for Title XIX ICF/MR of the Glavin Regional Center;

6.  Results of Recertification Survey for Title XIX ICF/MR of the Templeton Development  Center;

7.  Medication and Routine Physician Orders;

8.  Fernald Center – Title XIX Annual Medical Review per

The Monitor's Report
March 6, 2007
Page 12

      individual;

9.   Annual Physical Examinations;

10.  Psychiatric Clinic Notes;

11.  Mental Health Care Team Reports;

12.  Orthopedic Clinic Notes, Cardiology Services Reports, Radiologic examination reports and audiologic evaluation reports;

13.  Tufts Dental Facility Reports;

14.  Health Transfer Plans for each individual -- Covering Primary Care, Audiology, Dental, Orthopedics, Ophthalmology and Psychiatry. These reports identify client-specific resources at the new location available to meet an individual's assessed needs, both current and future;

15.  Individual Transition Plan for each individual (the ITP covers Personal Characteristics, Special Information for Personal Routines, Social Life, Relationships and Communication, Physical Considerations and Equipment Needs, Safety Considerations, Health/Medical/Psychological Needs, ISP Reviews Transition and Fire Safety Forms, and OT/PT Team Reviews);

16.  Individual Support Plan Meeting Reports;

17.  Letters and Information Packets on each individual from The Fernald Center to Family Members/Guardians and/or Representatives;

18.  Internal letters and information packets regarding individuals moving from one ICF/MR to another ICF/MR, and from an ICF/MR into a community residence; and

19.  Characterization of Retardation Level and Psychological Assessment for each individual.

The Monitor's Report
March 6, 2007
Page 13

4.   **The Monitor's Findings**

Our office was asked by the Court to conduct an investigation into whether the "past and prospective transfer processes employed by the Department of Mental Retardation were in compliance with Federal law, State regulations, as well as Orders of the Court."

   A.   **DMR's Certification of Equal or Better Services**

The plaintiffs have alleged that DMR is in violation of the Final Order of the Court entered on May 25, 1993, because the Facility Director of Fernald is not certifying that individuals to be transferred will receive equal or better services at their new residences.  The plaintiffs are also alleging that the Facility Director is not certifying that ISP recommended services for the individual's current needs are available at the new location (see: Pleading #83, p. 4 of 21).

DMR has responded by stating that "the completed Individual Service Plan, in conjunction with the ISP Process represents the certification by the Facility Director (Linda Montminy) that the Individual's needs are being met in the new location" (Letter from Marianne Meacham to Beryl Cohen dated September 26, 2005; and Pleading #86, p. 13, Section C; Diane Enochs Aff. ¶ 10).

   The 1993 Final Order of the Court provides as follows:

      "Defendants shall not approve a transfer of any
      class member out of state school into the
      community, or from one community residence to
      another such residence, until and unless the
      Superintendent of the transferring school
      (or the Regional Director of the pertinent
      community region) certifies that the individual
      to be transferred will receive equal or better
      services to meet their needs in the new location,
      and that all ISP-recommended services for the
      individuals current needs as identified in
      the ISP are available at the new location."

Ricci v. Okin, M.D. et. al., 823 F.Supp. 984, 987 (D. Mass. 1993).

The Monitor's Report
March 6, 2007
Page 14

Our office noted that the Court did not specify how the certification must be made, but it is clear that certification must be made. The Final Order is also silent on whether certification is required when transferring from one ICF/MR to another ICF/MR. Given these parameters, our office conducted an investigation into how the Facility Director certified that services currently being received would be duplicated and perhaps better at the new residence.

Our office independently verified that DMR, through its Facility Director, has certified for the 49 individuals transferred previously, that services will be equal or better. This certification was made through the Facility Director's review of objectives of an individual's current ISP as compared to their new ISP at the new location. Following January, 2005 DMR implemented a return to an explicit certification of equal or better services in the Ricci Change of Address Form for any transfers of class members. Our office also had the medical doctors that we retained review the ISPs of the individuals that transferred from Fernald to determine if the services received after the transfer met their needs.

Of note is DMR's position that transfers from an ICF/MR to another ICF/MR do not require a certification of equal or better because such certification is not required by the Final Order. Although the Final Order is silent on this specific scenario, our office found that all of the ICF/MRs were Title XIX certified. Each facility currently has the minimum services, staffing and amenities to provide equal or better services. As expected, each ICF/MR has its own individual character and differing degrees of specialized services. The staff at all the ICF/MRs are extremely experienced and long tenured.

Through our tours of various community homes we witnessed services consistent with the Court's Final Order including the following: "residential programs; day programs; recreational and leisure time activities; medical, psychological, dental and health-related professional services; respite care and crisis intervention services; support and generic services, such as guardianship and adaptive equipment services; and transportation services." Ricci, 823 F.Supp. at 987. The medical doctors that we retained also confirmed that these services are available in the community, and reviewed the housing, health, employment and occupational needs of the clients. Individuals transferred to the community can receive these services equal or better than at the ICF/MRs.

The Monitor's Report
March 6, 2007
Page 15

While the services that are listed in the Final Order are
available in the community, the issue is evaluating how these
services are accessed and delivered, what the wait time is for
these services and where the services are located as compared
with where the individual resides and how that may impact on an
individual basis "equal or better." Our office received a
presentation from DMR regarding Medical Services to Ricci Class
Members in the Community. This presentation shed light on how an
individual in a community residence actually sees a physician and
receives dental care. In the community residences the direct
care staff makes the arrangements and appointments for a specific
resident. Ultimately, this process takes much longer than the
process at Fernald and is more difficult to coordinate (i.e. our
office noted that community residences have one wheelchair
adaptive vehicle assigned per house. If this vehicle has to be
used for pick-up and drop-off of other residents from day
programs, coordination must be made with other vehicles operated
by the provider). Based on the information provided one could
not conclude that quicker access to medical care in and of itself
equated to better care (the bedside manner of the community
doctor located 20 minutes away could be better than the facility
doctor that is on call, or just the opposite could be the case).
But, given the physical limitations, and fragile emotional state
of members of this population, coupled with a reduced mental
capacity to communicate and explain an increase or decrease in
the intensity of an ailment, we certainly understand the
potential risks and why some guardians would prefer to have their
ward in an ICF/MR and have a facility doctor on call.

An individual living in a community residence attends day
programs outside of the residence. Some day programs offer a
myriad of services during the day program including speech
therapy, physical therapy and occupational therapy. Our office
did note that some therapy, such as aquatic therapy in a heated
room with a heated pool, are more difficult to access in the
community. Aquatic therapy can be duplicated in the community
but with effort.

Lastly, DMR organized tours of community residences throughout
Massachusetts for our office. Counsel for the plaintiffs were
invited to attend these tours. Our office also toured specific
community homes at the request of counsel for the plaintiffs.
Our tours revealed well maintained homes in very nice
neighborhoods. The staffing patterns varied dependent upon the
needs of the residents. Our office did note that the tenure of
most House Managers within community residences was less than 3

The Monitor's Report
March 6, 2007
Page 16

years, with 5 years being a rarity.  Staff turnover was in some
instances 100% every year and a half.  Repeatedly, our office
heard, from guardians and providers, that an on-going struggle is
to maintain the continuity of staffing for better on-going care.
The direct cause for the high turnover rate was the challenging
work coupled with the low pay scale.

Guardians were present on some of the tours to discuss their
experience of having their ward/family member in a community
home.  Some of the comments we heard included the joy of having
their ward in his/her own home; having his/her own room to
decorate with personal belongings without having something
disappear; being closer to family and friends and taking
advantage of community events; being able to cook in the kitchen,
interact with the same roommates and being part of a community
around the home.  The recreational activities varied from home to
home but essentially involved community activities such as summer
concerts, picnics, shopping at the mall, going to restaurants,
arts and crafts, holiday and birthday parties at the home and
walking through the neighborhood.  While one goal of the
community residences is to integrate adults with disabilities
within the community, a bedroom in a neighborhood home does not
guarantee integration into the fabric of a neighborhood or a
community.  It takes an effort and commitment on the part of the
provider to maximize these opportunities.  From the perspective
of DMR, as well as the guardians and the residents, community
placement for many individuals has been a great success.

Given that medical and rehabilitative services, outlined by the
Court's Final Order, can be met within the community, albeit
through the more labor intensive methods used by direct care
staff, our office found that DMR was in compliance for the
transferred residents with certifying equal or better services in
the community.  It is important to note the vulnerability of many
of these residents.  Though those already in community homes
appear to have adapted well, many seem younger than the average
age of those still residing at ICF/MRs.

Unfortunately, after reviewing data from the Disabled Persons
Protection Commission, our office did note some very concerning
neglect and abuse trends in Contract Vendor operated community
residences, as compared to the ICF/MRs and State operated
community residences.  These neglect and abuse trends,
particularly sexual abuse, were of great concern to our office

The Monitor's Report
March 6, 2007
Page 17

and shows that residents in our community homes are at a greater
risk of being abused and/or neglected.[1]

**B.    The Green United States Postal Service Registered
       Mail Cards (Sent with the "Notice of Request
       for Proposed Facility Transfer" letter Returned to
       <u>DMR with the Guardian's Signature</u>).**

Our office independently reviewed each file of the individuals
transferred and found that DMR was in compliance with documenting
the properly signed returned receipt of each Registered Mail Card
from guardians.

**C.    Notice of and Request for Proposed
       <u>Facility Transfer ("45-Day Letter)</u>**

    (i)    <u>Documentation that 45-Day Letter was sent to Guardians</u>

Our office independently reviewed each file of the individuals
transferred and found evidence that the 45-Day Letter was sent to
"individual's family, guardian, and designated representative"
pursuant to 115 CMR 6.63.

    (ii)   <u>Receipt of the 45-Day Letter</u>

Our office independently reviewed each file of the individuals
transferred and found that DMR was in compliance with documenting
the receipt of Notice of and Request for Proposed Facility
Transfer Letter pursuant to 115 CMR 6.63(2) of the Department of
Mental Retardation Transfer Regulations.  The letters are

---

[1]    The Disabled Persons Protection Commission provided our
office with Vender Survey Reports for all ICF/MRs dating back to
January, 1996.  We also reviewed Vender Survey Reports for State
operated community residences and Contract Vendor operated
community residences dating back to 2002.  Our office noted that
over the years there was a steady increase in allegations of
sexual abuse and physical abuse in Vendor operated community
residences.  The highest levels of sexual abuse occurred with the
transportation providers for the Vendor operated community
residences.  Physical abuse was much higher in Vender operated
community residences than in the ICF/MRs. Our office also noted
that unreported incidents of abuse may even be higher in
community residences due to the non-verbal nature of the clients.
Lastly, there was very little to no sexual abuse noted for all of
the ICF/MRs.

The Monitor's Report
March 6, 2007
Page 18

complete with all the information required by the Regulation, and clearly provided guidelines for the appellate process (115 CMR 6.63(4)) before the Division of Administrative Law Appeals if the ward's ISP could not be fully implemented as a result of her guardian's objection to the proposed transfer.

Our office also noted that pursuant to 115 CMR 6.63(2)(c ) and 115 CMR 663(2)(d) 2 and 3, that each guardian, through their consent to the proposed facility transfer, waived the 45-day waiting period.

Our office did not find any evidence that the 45-Day Letter was delivered to other parties, as described in 115 CMR 6.63(2)(a). Our office could not determine who, other than the legal guardian, would be entitled to receive this Letter.  A copy of this Letter is maintained in the individual's permanent file at Fernald.

     (iii) <u>The Right to Visit and Examine the Proposed Homes</u>

Our office found that although the specific language providing a right to visit was not always present in the 45-Day Letter for proposed moves, most of the guardians indicated that they had visited the new proposed residences.  Our office would suggest that DMR insert the right to visit language in every 45-Day Letter whether or not a guardian has visited the proposed ICF/MR or proposed community residence.  The specific language in 115 CMR 6.63(2)(c)(3) is as follows: "include a statement that the parties may visit and examine the proposed home at a time and in a manner not disruptive to individuals who may be living in the home."

     (iv) Language within the 45-Day Letter Inviting
          Guardians to Consult with Service Coordinators
          and Other Staff Regarding the Advantages and
          <u>Disadvantages of the Transfer</u>

          Our office independently reviewed the files of all the individuals that transferred and found language in each 45-Day Letter identifying the telephone number for the DMR Service Coordinator/QMRP, and other individuals working for DMR available to discuss with the Guardian the new ICF/MR or community residence.  DMR is in compliance with 115 CMR 6.63(2)(c)(4).

     (v)  <u>Allegations of DMR Violating 42 CFR 483.12 (Code of</u>

The Monitor's Report
March 6, 2007
Page 19

Federal Regulations)

Our office did not find any violations by DMR of 42 CFR 483.12.
Specifically, these regulations pertain to the admission,
discharge and transfer standards for skilled nursing facilities
and nursing facilities in general, and do not address the
transfer of residents from ICF/MRs.

(vi) DMR's Consultation with the Guardians of the 49
Transferees

Our office has verified that DMR received the consent of all of
the guardians for the transfer of all 49 individuals from
Fernald.  Some of these Guardians, representatives and family
members were located out of state, and thus there was a varying
level of involvement of each individual.

(vii) The Right to Return Letter

Our office found that for individuals being transferred from
Fernald to another ICF/MR, DMR did not provide the Guardians with
a Right to Return Letter.  DMR's position was that these
individuals were not transferring from an ICF/MR to the community
and thus it was not necessary to provide the Guardian with a
Right to Return Letter.

Our office identified six individuals transferred from Fernald
following the Court's June 15, 2005 hearing making it clear that
anyone who leaves can return if they choose.  Following this
hearing, approximately six individuals were transferred from
Fernald to the community and each individual's file contained a
Right to Return Letter.  Prior to this hearing date, such a
letter was not routinely provided to Guardians of individuals
that transferred from Fernald to the community.

(ix) Informed Consent Regulations

The plaintiffs allege that DMR failed to comply with State
regulatory requirements to obtain knowing consent, voluntarily
given by an individual's guardian, of the advantages and
disadvantages of the proposed move.  Specifically, the plaintiffs
contend that DMR has failed to comply with 115 CMR5.08(1)-(3) by
utilizing a blanket consent form that states as follows:

        "I (guardian) have received timely notice of the

The Monitor's Report
March 6, 2007
Page 20

> proposed transfer pertaining to (individual) from
> (place) to (place) on or about (date) pursuant to 115
> CMR 6.63(2) of the regulations of the Department of
> Mental Retardation.  I have also received notice of my
> rights under these regulations.  I understand my right
> to deny consent to the proposed transfer and my right
> to a hearing.  After considering the information I have
> received about the proposed transfer, I am satisfied
> that this transfer is in (individual's) best interest.
> All my questions have been answered to my full
> satisfaction.  I, therefore, choose not to object and
> hereby consent to the proposed transfer."

(Pleading #83, p. 9).

DMR responded by stating that plaintiffs are relying on
regulatory provisions for "informed consent" that pertain to
admission to a [nursing] facility or prior to medical or other
treatment that requires the risks and benefits of admission or
medical treatment.  DMR's position was as follows:

> "The Fernald Plaintiffs erroneously contend that the
> voluntary transfer of an individual from a Department
> facility requires the "informed consent" of the
> individual or guardian.  "Informed consent" is a term
> of art defined in the Department's regulations, and is
> required only in limited instances and is generally
> reserved for medical procedures, research activities,
> facility admissions or related activities.  See 115 CMR
> § 5.08.  Transfer from one setting to another requires
> consent, not "informed consent" as defined in 115 CMR §
> 5.08; nevertheless, the 45-day letter and consent form
> the Department provides during the transfer process
> clearly meets this standard as well as the standard set
> forth in 115 CMR § 2.01's definition of "consent.""

(Pleading #86, p. 25 fn. 13).

Our office found that pursuant to 115 CMR 5.08, informed consent
of an individual, or a guardian, is required (a) prior to
admission to a facility; (b) prior to medical treatment; (c )
prior to involvement of an individual in research activities; (d)
prior to level II or III behavior modification interventions; and
(e) prior to the release of personal information.  In addition,
the person securing consent shall: (1) explain the intended
outcome and nature of procedure involved in the proposed

The Monitor's Report
March 6, 2007
Page 21

treatment; (2) explain the risks, side effects of treatment or activity; (3) explain the alternatives to the proposed treatment; (4) explain that consent may be withheld or withdrawn; (5) present the information in a foregoing manner understood by the individual; and (6) offer to answer additional questions.

Informed consent is a term associated with medical procedures, not requests to transfer.  The doctrine of informed consent imposes on a physician the duty to explain the procedure to the patient and to warn him of any inherent risks or dangers, it is specific to the medical procedure and is not intended to be used synonymous to the requirement of consent. See Kissinger v. Lofgren, 836 F.2d 678, 680 (1st Cir. 1988) (explaining doctrine of informed consent in Massachusetts requires a plaintiff to establish (1) the existence of a duty owed by the defendant to inform about significant risks, consequences, and options of a medical treatment, and (2) that breach of this duty caused harm to plaintiff).  Requiring "Informed Consent" is specific to medical procedures and treatments.  See Rosaria v. U.S., 824 F. Supp. 268, 286 (Mass. 1993) (explaining the doctrine of informed consent derives from the notion that a person has a strong interest in being free from non-consensual invasion of his bodily integrity; person needs to make an intelligent decision whether to proceed with a specific course of treatment); Goldstein v. Kelleher, 728 F.2d 32, 39 (1st Cir. 1984) (finding that informed consent rest on foresight, not hindsight, where patient would not have undergone medical procedure had she known the risks); Harrison v. U.S., 284 F.3d 293, (1st Cir. 2002) (finding that a physician must disclose any material information to enable patient to make an informed judgment whether to give or withhold consent to a medical or surgical procedure).

DMR's Notice of and Request for Consent to proposed Facility Transfer letter in fact complies with the consent requirement for transfers involving non-medical circumstances.  115 CMR § 5.08 requires informed consent for medical procedures and other potential invasion tactics or procedures such as Level II or III modification interventions (restraining an individual) or involving a person in research activities.  This is not similar to a guardian providing consent to have his/her ward transferred to another ICF/MR or a community residence.

Lastly, the plaintiffs rely on 42 CFR 483.12 as stating that DMR failed to comply with this Regulation prior to transferring 49 individuals.  42 CFR 483.12 governs specialized services for mental illness or mental retardation for persons found to require

The Monitor's Report
March 6, 2007
Page 22

care within a skilled nursing facility.  We did not find that
this Regulation applied to ICF/MRs.  see also <u>Rolland v. Romney</u>,
318 F.3d 42 (1st Cir. 2003)(holding the Commonwealth is
responsible for providing specialized services that result in
active treatment when combined with services provided by nursing
facilities); <u>Rolland v. Cellucci</u>, 138 F.Supp.2d 110 (D. Mass.
2001)(The State was required to provide specialized services to
the mentally retarded regardless of whether they resided in
private nursing homes or state-owned facilities).

Our office did not find that DMR initiated any transfers without
the full knowledge and consent of guardians.  There were no
allegations from any of the guardians, or from our medical
doctors, that there were any unmet active treatment needs for the
individuals transferred.

**D.  Post Placement Satisfaction Surveys from
     <u>Guardians of the Transferees</u>**

All of the individuals that responded to the Post Placement
Satisfaction Surveys affirmatively stated they participated in
planning for their ward's placement.  The surveys were measured
by numerical rankings with #1 being the most favorable and #5
being the least.  The ratings were as follows:

            (I)  78%  rating #1
            (ii) 14%  rating #2
            (iii)2% rating #3
            (iv) 1% rating #4
            (v)  1% rating #5
            (vi) 4% not rating at all but writing commentary.

The written commentary reflected extremely positive attitudes
regarding the moves.  A recurrent theme found was hesitancy to
move from Fernald due to familiarity.  Many of the guardians
stated that they decided to transfer their ward from Fernald
based on the announcement that Fernald will be closing.  The
comments were positive regarding the moves for a variety of
reasons.  There were recurrent themes of reduced care at Fernald
due to staffing issues and low morale.  The other ICF/MRs were
praised for their wonderful staff, an improvement in services and
environment.  There was praise for the Fernald staff,
particularly when it came to assisting in the transition, but the

The Monitor's Report
March 6, 2007
Page 23

general sense was the lack of certainty in the closing of Fernald
was causing problems. [2]

With regard to Guardians that preferred a transfer from Fernald
to the community, the responses were also positive.  Many
Guardians reported an opportunity to visit their children, wards
and siblings more frequently and at any time of the day.  The
responses to the surveys did not give the impression that there
was any concerns or tendencies to seek a return to Fernald.

**E.**    **The Home and Community Based Services Waiver Program**

The plaintiff's contend that DMR failed to fully explain the
"Home and Community Based Services" Waiver Program to the
guardians so that the guardians could make an informed consent to
proposed community placement.  Informed consent was discussed
above in section ix, and our office found no Federal Law, State
Regulations and any Orders of this Court requiring DMR to have a
specific discussions with guardians on the Home and Community
Based Services Waiver Program.

**5.**    **The Monitor's Final Assessment**

DMR's directive to close Fernald has come with an offer by DMR
for any resident seeking to remain at an ICF/MR, having the
option of transferring to another ICF/MR.  All of the ICF/MRs are
Title XIX certified and DMR claims that they all have the
capacity to potentially meet the need to provide equal or better
treatment, care, professional services and medical treatment to
all of the Fernald residents.  With the appropriate involvement
of family members and/or guardians, each resident at Fernald
could be transferred to another ICF/MR to achieve the objective
of closing Fernald, but clearly at a cost to individual
residents.  In this respect, DMR can duplicate the basic services
and medical treatment for any resident at any of its ICF/MRs.
Unfortunately, this solution does not solve the underlying
problem.

The true issue plaguing the plaintiffs as a whole runs much
deeper than simply transferring all of Fernald's residents to
another ICF/MR.  For many residents, Fernald is their home, the
average age is 57 years, the average length of stay is 47 years,

---

[2]        It should be noted that 6 individuals of the 49 individuals who transferred from
Fernald died within 2 years of the transfers.

The Monitor's Report
March 6, 2007
Page 24

the oldest resident is 95 and has been there for 81 years.  The
question is simply after all these years at this facility will
their lives be equal or better if transferred elsewhere?  As the
guardians are getting older, they express both a fear and a
mistrust.  The guardians have expressed a fear of who will care
for their loved ones, and a mistrust of whether promises made
today will be broken in the future.  The plaintiffs also claim
that given the high level of sexual and physical abuse in the
community, lack of accessibility to medical and dental services,
along with high staff turnover and potentially less qualified
staff, residential community homes are not the answer for many
residents.  Another concern is that although individuals in
community residences supposedly have access to community
activities, residing in the community does not guarantee that an
individual will be integrated into the community.    The
plaintiffs fear that following Fernald's closing, Wrentham,
Monson, Hogan, Glavin and Templeton will soon follow.  The
plaintiffs hold a genuine fear of years and years of shuffling
sons, daughters and wards in an attempt to stay ahead of the next
closure before being forced into community residences.

This very fragile segment of the Massachusetts' population
strives for simplicity and constants to thrive and conduct their
daily lives, and the threat of change does have an impact on the
physical and emotional health of some of the residents.  Similar
to our old shoes that fit just right, or that favorite reclining
chair that has molded perfectly to a body over the years, or the
room and building we have spent our life calling home and those
around us we consider family and friends, we all seek familiarity
to ground our lives.  We cherish these items for the
indescribable comfort that they provide.  For the severely
mentally retarded, such a loss of familiar surroundings and most
importantly people, could have devastating effects that unravel
years of positive, non-abusive behavior.  Moreover, the joy that
each of us experiences from seeing the same person who serves
morning coffee at the coffee shop, or that neighborhood person
who greets you every morning for the past umpteen years, is also
experienced ten fold by, in many cases, this segment of the
population that has been cared for by the same State workers for
ten, twenty and even thirty years in the ICF/MRs.  Change for
most of us comes at a cost, for the most vulnerable, the
slightest change can have dramatic and permanent consequences.

Our office has been touched by the families willing to share
their stories with us over the past year.  The story of one
mother and father who showed love and support for their

The Monitor's Report
March 6, 2007
Page 25

son/daughter, and concerned that the closure of Fernald would
mean a mad rush for the choice locations, decided to move their
child.  Their child had been cared for brilliantly at Fernald for
over 40 years.  Within one year, they received a call that their
child was found on the floor and had died.  Today, they ask
themselves, in an attempt to do the right thing, had they failed
their child by moving him/her after so many years of him/her
flourishing at Fernald?  The same fears grip others and for two
Sundays and over twelve hours our office listened to such
concerns by no less than 200 caring parents, sisters, brothers,
aunts, uncles, guardians, nieces, nephews and friends.  Our
office has been inundated with pleas to keep Fernald open since
now, through the Court's intervention, Fernald is a much
different place and has reached respectable levels of care.

On one particular Sunday our office spent six hours listening to
stories portraying Fernald during those dark years when the
conditions were atrocious.  Now, they proclaimed, Fernald is a
place where people can thrive and truly call home.  Faces are
familiar and people have brought laughter to the halls and the
programs.  On another Sunday we were invited to morning Service
by Father William Leonard.  We were moved by the outpouring of
young volunteers from the community that wheeled residents from
the Green building across the street to the Chapel for Sunday
Service.  Those same volunteers either stayed or returned in time
to escort the residents back to the Green building upon
completion of Services.  The community had embraced the residents
at Fernald and the residents enjoyed their Sunday morning
Service.  Overall, we all work hard every day to provide comfort,
stability and security for our families.  We cannot imagine after
residing in a home for thirty, forty or fifty years, and finally
getting it to the point where you feel comfortable, stable and
secure, that you are now told to pack up and move with
potentially more moves to endure.  Any of us would be outraged.

Today there are far fewer citizens in our ICF/MRS than a decade
ago.  For those that have moved into the community homes and are
thriving this has been a good and important outcome.  The
Commonwealth in its attempt to address excess capacity is moving
towards consolidation.  There are other options that can address
excess capacity and achieve some savings without resorting to
closure of this facility.

In an attempt to find a solution for the Fernald residents, our
office was surprised to find such vast acreage surrounding the
various ICF/MRs.  Glavin has 123 acres, Monson has 588 acres,

The Monitor's Report
March 6, 2007
Page 26

Templeton has 2,600 acres, Wrentham has 400 acres and Fernald has
186 acres.  At Fernald, it may be possible to group the homes and
work sites of Fernald residents by dividing the buildings north
of Pine Street and west of Cherry Lane and condense the campus.
The Commonwealth could then sell the remainder of the land for
residential development.  DMR could also build some new
residential homes on the land and have support services for these
residents at Fernald.

Servicing individuals with mental retardation in ICF/MRs and the
community each offers advantages and disadvantages to both
systems.  The model across the United States appears to be
shifting toward housing the mentally retarded in community
residences.  Despite this trend, the strength that Massachusetts
holds is allowing families to have a choice for their family
members and wards.  As this segment of the population ages, their
parents and relatives are also aging.  Many of the residents at
Fernald have family members that live within close proximity to
Fernald.  We have met numerous individuals through our visits to
Fernald that have expressed how difficult it would be for them to
drive the distance to another ICF/MR to make that daily or weekly
commute to visit their loved ones.  Our office was amazed at the
many residents at Fernald that have lived there for thirty, forty
and fifty plus years.  Many of the State workers can boast twenty
or thirty years tenure at Fernald.  These employees have become
more than individuals waiting to achieve the benefits of State
retirement, they are family to the residents who rely on them
every day for the most basic needs that we take for granted.
Breaking these decade long bonds is not the solution these
residents deserve, nor should they be forced to experience
countless moves given the conditions they had to endure before
the Court's intervention.

Since the Monitor's Appointment in February, 2006, our office has
witnessed outstanding medical and social care in all of the
ICF/MRs.  The quality of life for the ICF/MR residents is
excellent, and this Court's persistence and insistence, over the
past three decades, in raising the level of care for the mentally
retarded is certainly remarkable.  The Herculean effort
shouldered by this Court since the early 1970s has, without
doubt, enriched the lives of our mentally retarded citizens.
This Court's effort is reminiscent of another monumental
undertaking by the late Honorable Judge A. David Mazzone to
revitalize Boston's Harbor as a waterway capable of nurturing and
sustaining life.  In many ways, this Court has accomplished the
same task, as guardians of individuals residing within the

The Monitor's Report
March 6, 2007
Page 27

ICF/MRs have provided our office with a clear understanding that
the residents within these facilities receive the support that
nurtures and enhances their quality of life.

As a result of a year long investigation, our office has
concluded that some of the residents at Fernald could suffer an
adverse impact, either emotionally and/or physically, if they
were forced to transfer from Fernald to another ICF/MR or to a
community residence.  Our office would recommend the
implementation of a development plan that would enable Fernald to
remain open and provide services to some of the Commonwealth's
most vulnerable citizens.

In summary, based on our review of all the conditions that are
considered for "equal or better" services, it is the opinion of
the Monitor that residents should continue to have the
opportunity and option to move from Fernald to other ICF/MRs, or
to a community residence, provided that the Certification Process
is enforced.  Additionally, and most importantly, considering the
uniqueness of each of the ICF/MRs, and the vulnerability of the
residents, Fernald residents should be allowed to remain at the
Fernald facility, since for some, many or most, any other place
would not meet an "equal or better" service outcome.

We are available at your convenience to provide any further
information regarding this report.  Thank you for the opportunity
to assist the Court.

Sincerely,

/s/ Michael J. Sullivan
_____
MICHAEL J. SULLIVAN
United States Attorney


/s/ Rayford A. Farquhar
_____
RAYFORD A. FARQUHAR
Deputy Chief
Civil Division