JANET A. TOPALIS
20 STANDISH AVENUE
PLYMOUTH, MA 02360

<u>CERTIFIED MAIL</u>
7006 2760 0004 9583 1884

April 19, 2007

Jacqueline Winslow
Executive Director
DMR Southeastern Residential Services
74 Kilburn Street
New Bedford, Massachusetts 02740-7321

    SUBJECT:    <u>DMR's Proposed Transfer of Claudia A. Tetreault,
                               44 Prospect Street, East Bridgewater (Dever Class Member)</u>

Dear Jackie:

    On behalf of my Co-Guardian, Patricia A. Lewis, and myself, I am writing to you about our concerns regarding DMR's intention to shut down the group residence that DMR/Southeastern Residential Services operates at 34 and 44 Prospect Street, East Bridgewater for budget saving reasons. Our ward and sister, Claudia A. Tetreault, lives at 44 Prospect Street with three other mentally retarded people. An additional four mentally retarded people live downstairs at 34 Prospect Street.

    I appreciate your telephoning me on April 3, 2007 about DMR's plan to close the Prospect Street residence. After your call, I received a standardized letter, dated April 4, 2007, from DMR Regional Director Richard O'Meara about the planned closures of the East Bridgewater residences and another residence that DMR/SRS operates on Morton Street in Quincy. However, this proposal to shutdown the residence and force Claudia to move is very sudden.

    As you already know from my voice mail to you after our April 3rd telephone conversation and Pat Lewis' recent e-mail to you, we are troubled by DMR's plan to close the East Bridgewater residence. I along with my co-guardian, closely monitor Claudia's care, which requires that the staff respond to Claudia's complicated medical needs and severe behavioral needs (e.g., hitting, pinching, biting, throwing objects like furniture, self-injurious behavior like throwing herself against walls, etc.). Currently,

1

Claudia requires 1:1 staffing for ensuring her safety. Despite Claudia's challenging needs, we have been very satisfied with the delivery of Claudia's residential care at the East Bridgewater residence. Therefore, the idea of transferring Claudia's residential services has troubled us, along with the forced necessity of transferring Claudia's day program at VinFen in Rockland to another program near her new proposed residence.

You indicated during the April 3, 2007 telephone conversation that DMR intends to transfer Claudia to another SRS house in Lakeville. I recently visited the Lakeville house, which now has three wheelchair bound ladies living there. After sharing the information about the proposed new residence with Pat, we have doubts as to whether Claudia, with her severe behavioral needs, is an appropriate match for such physically vulnerable, mentally disabled women and whether this home is prepared to meet Claudia's psychiatric, medical and safety needs. For example, the Lakeville house has a pool in the backyard. It is difficult to imagine how Claudia would ever be safe with her home adjacent to a pool.

You have left a number of telephone messages for me about scheduling a transition meeting for Claudia's move to a SRS-operated group residence in Lakeville. In one of your messages, you indicated that if I did not participate in the transition meeting for Claudia, SRS would proceed with moving Claudia. The threat that DMR would transfer Claudia on short notice and without the consent of her guardian's is scary.

I want you to know that, *at this time*, we are not convinced that this proposed transfer is in Claudia's best interests. It is our understanding that, as a former resident of the Dever Developmental Center and current Dever Class Member in Ricci v. Okin, No. 72-460-JLT (D. Mass.), Claudia cannot be transferred without our consent. Also, Claudia's special eligibility for services is not subject to the availability of resources. With these concerns in mind, I have been in limited contact with my co-guardian and sister, Pat Lewis, who is traveling on business. At this time, Claudia's Co-Guardians, Patricia Lewis and I, do NOT consent to Claudia's transfer.

Our position to deny consent should not be viewed as an unwillingness to work with DMR and SRS. We are still committed to working cooperatively with DMR and SRS. We are willing to attend an Individual Support Plan (ISP) meeting and listen to DMR's proposal about transferring Claudia. Our attendance at any meeting(s), however, should not be misunderstood as consent. We do not want to be pressured by anyone about the proposed move. We want to know specifically what services are being provided at Claudia's current residence and day program, and what services will be offered at the new residence as well as day program. We want to be able to visit any proposed transfer location, including residences and day programs. After we receive from DMR all the facts and written responses to our questions (which we will put into writing as well), we are willing to revisit the issue of consent to the proposed transfer.

We also wish to reserve all of our guardian and familial rights as well as Claudia's rights to services and due process under the DMR regulations, the transfer

statute (M.G.L. c. 123B, sec. 3), <u>Ricci</u> Final Order, and any other federal or state law. In particular:

1. <u>DMR Individual Support Plan Procedures</u> – Presently, Claudia's October 16, 2006 ISP makes no mention of a need for Claudia to move from her East Bridgewater residence or Rockland day program. To the best of our knowledge, Claudia's current residential and day services are clinically appropriate for her individual needs. If the DMR administration wants to transfer Claudia, it is our understanding that an ISP team meeting must occur <u>prior</u> to any transfer of Claudia, and Claudia's team must support the proposed transfer. To date, no ISP meeting has been convened about Claudia's transfer.

2. <u>Transfer Statute, M.G.L. c. 123B, sec. 3</u> – I have read the DMR transfer statute and I understand it to require notice of the proposed transfer at least 45-days in advance of any proposed transfer of a mentally retarded person from one facility to another. By statute, Claudia's residence is a public facility for the care and treatment of mentally retarded persons. To date, we have not received from DMR any such 45-day notice. We expect DMR to comply with this statute concerning Claudia's transfer.

3. <u>Ricci Final Order</u> – The <u>Ricci</u> Final Order which protects Dever class members also contains provisions for protecting Claudia. One important provision is paragraph 4 which requires that the DMR Regional Director certify that Claudia would receive "equal or better" services in the new location and that all ISP-recommended services for her current needs are available in the new location <u>prior</u> to DMR approving the transfer. To date, we have not received any certification from the DMR Regional Director.

We wish to repeat that, by denying consent at this time, we are not being difficult or picky. As you are well aware, our sister, Claudia, has a high level of needs that are very challenging. The disruption that DMR is proposing to her current services is enormous and further jeopardizes her psychiatric well-being and physical safety. Claudia has already suffered one disastrous DMR transfer. Following Claudia's transfer out of the Dever Developmental Center around 1996 (DMR had ordered its shutdown), Claudia was transferred to a vendor-operated group residence in Walpole. The vendor was not able (or willing) to respond to Claudia's medical needs. The result was that Claudia deteriorated, lost a great deal of weight, and the family found Claudia lying in her bed with feces on her body. At that point, we advocated for Claudia's transfer back into direct state care.

By mentioning this prior experience, we are not suggesting that DMR or SRS intends to neglect Claudia at her next residence. But, with the speed at which this plan is occurring, we do sincerely believe that haste can lead to big problems. We do not want Claudia to suffer again.

Would you please confirm in writing that our sister, Claudia, will not be transferred, pending the completion of the above steps (e.g., ISP meeting, Regional Director's certification, the transfer statute's notification) and the guardians' consent? We are available to schedule an ISP meeting to listen to the DMR proposal in more detail.

Thank you.

Sincerely yours,

Janet A. Topalis          Patricia A. Lewis
Co-Guardian               Co-Guardian

cc:  Judge Joseph L. Tauro
     Rayford A. Farquhar, U.S. Attorney, Court Monitor
     Dennis A. Murphy, Esq., Nixon Peabody
     Barbara Mason, Esq., Rogers Monitor
     Betsy Vogel, DMR Service Coordinator