

**THE MASSACHUSETTS COALITION OF FAMILIES
AND ADVOCATES FOR THE RETARDED, Inc.**

ERKS OFFICE

3 Hodges Street, Mansfield, MA 02048
Telephone: (508) 339-3379 Fax: (508) 339-5034
**New website address: www.cofar.org** MAY 30 ⊃ 2: 56

U.S. DISTRICT COURT
DISTRICT OF MASS.

May 29, 2007

The Honorable Judge Joseph L. Tauro
United States District Court
John Joseph Moakley U.S. Courthouse
One Courthouse Way, Suite 2300
Boston, MA 02210

RE: Ricci v. Okin

Dear Judge Tauro:

The Massachusetts Coalition of Families and Advocates for the Retarded, Inc.
("COFAR"), representing some of the most profoundly mentally retarded and
medically fragile people served by the Commonwealth of Massachusetts, many of
whom are *Ricci* Class Members, would like to express our complete support for
the report written by United States Attorney Michael J. Sullivan in his role as
Court Monitor ("Sullivan Report").

We would also like to request the continuation of the U.S. Attorney's office as
Court Monitor, in order to continue the investigative work begun by that office
during the past fifteen months. The continuation of the Court Monitor's efforts in
the instant litigation would provide a complete and objective report to the Court
on the Department of Mental Retardation's system of care, particularly within the
provider operated system - where the Disabled Person's Protections Commission
("DPPC") has shown a disturbing increase in cases of abuse and neglect.

**The Final Order of this Court in the *Ricci v. Okin* matter promises that all
*Ricci* plaintiffs will receive "equal or better" services if they are requested by
the Department of Mental Retardation ("DMR") to move to a new residence.**
DMR Regulations, Massachusetts law and the law of the United States also
promise due process. The Sullivan Report has proven that "equal or better" may
not be possible if a move is forced upon Fernald residents or residents of the
Commonwealth's other Intermediate Care Facilities for the Mentally Retarded
("ICFs/MR"). *Ricci* Class Members have been denied due process of law by
DMR's incessantly representing to their families that Fernald's closure is
imminent. By inciting panic regarding Fernald's closure, DMR effectively
stampeded families into making "battlefield" decisions regarding placement.

As the U.S. Attorney summarized in his report, "[m]any of the guardians stated
that they decided to transfer their ward from Fernald based on the announcement
that Fernald will be closing …. The plaintiffs hold a genuine fear of years and
years of shuffling sons, daughters, and wards in an attempt to stay ahead of the

next closure before being forced into community residences.... There were recurrent themes of reduced care at Fernald due to staffing issues and low morale."

This fear is based on DMR's routinely breaking the "equal or better" promise of care it so long ago made. What followed was many families' rush to take what was available before the anticipated evaporation of available services as closures of Fernald and other ICFs/MR were formally announced and the inevitable decline and loss of staff morale in the facilities targeted for closure. Thus the Defendants created an atmosphere in which 49 transfers out of Fernald were "coerced" without overt coercion, and six of the transferred patients have since died.

When the court first became involved, conditions in the DMR state facilities were poor, and the case to shut them down had an air of reform. As the court's intervention led to many improvements, and higher functioning clients were able to choose community-based placements, the ICFs/MR have – perhaps ironically – become the placement of choice for many of our relatives and wards. Again, quoting the U.S. Attorney's report: "For many residents, Fernald is their home. The average age is 57 years, the average stay is 47 years."

One of the arguments from the Defendants in the case to shut down Fernald is purported to be about costs. But that case is not thought through and is rife with unfounded accusation, wink, nod and innuendo. There are many accounting practices in use, which make the ICFs/MR appear less efficient than they are. Throughout this process both COFAR and other advocacy groups have proposed options by which the ICFs/MR can be preserved as part of the DMR continuum of care while working with DMR to consolidate operations, realize some of the value of the real estate, and even develop new community based services on the grounds of existing ICFs/MR.

Since so much has been written about the historic evils of large facilities – ICFs/MR - we think it is in order to review some of the advantages we perceive, and why this choice should be preserved in the DMR continuum of care for people with mental retardation. The Class members who still reside in DMR ICFs/MR are there for a reason. Families who have chosen to have their loved ones remain in Fernald or other ICFs/MR have not made their choices based on whether a particular service model is "outdated" or "unenlightened" as characterized in the public policy debate over facility versus community-based care. Families who choose Fernald or other DMR ICFs/MR do so because they believe it is the best place to meet their loved one's needs as set forth in their ISPs. Current residents of ICFs/MR have more complex medical needs and are more functionally impaired.[1] Approximately 80% of ICFs/MR residents in

---

[1] Mental Retardation: Nature, Cause and Management, 3d Edition (1999), George S. Baroff, Ph.D. and J. Gregory Olley, Ph.D., at 350-51 (proportion of persons with profound retardation in large facilities has grown steadily while absolute number has declined).

2

general are severely or profoundly retarded.[2]  These individuals also tend to present more challenging behaviors than those in community settings – approximately 47% of facility residents have behavior disorders.[3]  As of 2000, DMR estimated that 44% of ICF/MR residents need assistance or supervision in walking; 60% need assistance or supervision in dressing; 63% need assistance or supervision in eating; and 55% need assistance or supervision in using the toilet. Of Class members who reside in ICFs/MR, 40% cannot understand simple verbal requests and 62% cannot communicate basic desires verbally.[4]  Residents in ICFs/MR are the most medically fragile of all the *Ricci* Class members,[5] so it is imperative that they have ready access to medical care that is available in the ICFs/MR.

## I.     FREEDOM FROM ABUSE AND NEGLECT

Individuals with profound mental retardation, who cannot speak to protest, are always at risk to be abused and neglected. The Sullivan Report cites "[v]ery concerning neglect and abuse trends in Contract Vendor operated community residences…. residents in our community homes are at a greater risk of being abused or neglected." Of particular concern is sexual abuse, apparently three times more frequent in provider-operated community settings. Substantiated complaints of sexual abuse have risen steadily for more than ten years, as the provider system has enlarged, and DMR oversight has been level-funded (while the independent agency, the Disabled Persons Protection Commission, has lost much of its capacity.) The Sullivan Report notes a strong association of sexual abuse with the use of private transportation contractors – another level removed from DMR direct supervision and another venue where lower pay, high turnover and ineffective employee screening appear to be the norm. For the most medically fragile clients, transportation with the best of intentions can be risky. Fernald, where medical care is available on-site, is vastly safer in many ways. Also, state-operated group homes, with more staff supervision and stability, are apparently also safer than the provider operated group homes.

The Fernald Center and the other ICFs/MR, reformed during the consent decree, are far-safer places for our loved ones than any alternative. There are a host of reasons: staff is stable, often with a decade or more of service. By contrast, the

---

[2] Cost Comparisons of Community and Institutional Residential Settings: Historical Review of Selected Research, Kevin K. Walsh, Theodore A. Kastner, Regina Gentlesk Green, Mental Retardation, Vol. 41 No. 2 (April, 2003) at 103.

[3] Id. at 104.

[4] Residential Services for Persons with Developmental Disabilities: Status and Trends Through 2000 (June 2001), Research and Training Center on Community Living Institute on Community Integration/UAP, College of Education & Human Development, University of Minnesota (Robert W. Prouty, Gary Smith, and K. Charlie Lakin, Editors) (hereinafter referred to as "Residential Services Status and Trends") at Table 1.19, page 43. Ex. 12 to *Memorandum in Support of Wrentham Association's Motion to Re-Open Case and Restore to Court's Active Docket.*

[5] Mental Retardation, 3d Ed. at 348.

staff turnover at provider operated group homes is so high that the average stay of staff is less than 18 months. The low wages and rapid turnover make it harder to screen potential employees. A Massachusetts CORI is a good check of someone who has been living and working in the state for a long time, but worthless to detect someone who may have a record of abusing or neglecting or assaulting patients in another state or another country. This does not require migration. Massachusetts is a narrow state which borders on five others. In ten recent years, DPPC handled 284 complaints against out-of-state residents commuting to work in Massachusetts programs. Moreover, the DMR's own QA report found about 200 employees of a handful of private vendors did not even have CORI checks. DMR cannot or will not enforce its own regulations on some private providers.

One form of neglect is medication error. Medication errors are more usually products of carelessness rather than bad intentions, but they can be very damaging. Many of our relatives take strong neuroleptics or anti-seizure medications with dangerous side effects and a high risk of fatal overdose. They may not notice a change in medication, or they may not be able to articulate a protest. Side effects that are visible to trained and experienced staff may not be picked up by someone new, someone temporary, someone who does not know how a patient usually responds. Medication errors have been more than three times as prevalent in provider operated group homes as in DMR facilities and state operated group homes. This problem has a history, as DMR was cited for having unauthorized people handing out medications, and responded by setting up a training program for them, the Medication Administration Program (MAP), rather than hiring more Registered Nurses. Massachusetts may be the only state that allows people with only 16 hours of training to hand out medications without supervision.

One might think that the rising number of complaints of abuse and neglect to DPPC is the product of better reporting. One might even postulate that the higher rates of substantiated complaints against provider operated group homes might be because state employees cover up better. Against both of these theories is the hard fact that DPPC substantiation rates, which were steady around 22 percent as late as 2002, have been rising rapidly toward 40 percent in recent years. Although DPPC endures chronic funding cuts, ever fewer staff and being routinely forced to "screen out" the majority of complaints, it has actually been able to substantiate – due to an increasing number of complaints - a higher percent of the abuse and neglect cases that it did before.

## II.   AVAILABILITY OF MEDICAL TREATMENT

The most obvious benefit of Fernald and other ICFs/MR is the availability of medical care. COFAR has advocated for 24-hour nursing care as a measure of safety. Having one nurse on call for as many as ten provider-operated group homes is not equal to 24-hour nursing care received at Fernald; neither is medication administered by a briefly-trained "med-tech" instead of a Registered Nurse. The advantage of these services to Fernald residents, as well as to other

4

ICF/MR residents detailed in US Attorney Sullivan's report is obvious. The DMR facilities also have dental care on site, vital as some of the genetic conditions and pharmaceutical side effects related to mental retardation cause severe and painful dental problems. Most of the DMR ICFs/MR have a pool and aquatic therapy on site – something largely unavailable to the residents of community-based group homes.

## III.    WHEN "EQUAL OR BETTER" CANNOT BE EITHER

Some services provided at Fernald and the other ICFs/MR, such as onsite aquatic therapy and medical care, simply cannot be duplicated elsewhere. Many of the important safety and security issues hinge upon DMR's own deteriorating capabilities. Thus any promise of "equal or better" is increasingly undone by DMR's staff cuts – fewer psychologists, fewer inspectors, and fewer service coordinators despite an ever-increasing population. With caseloads now greater than fifty (50) per service coordinator, and increasing paperwork and computer tracking making demands upon their time, DMR service coordinators have little time to visit the people they serve, and it is anecdotally becoming more difficult to write timely and accurate ISPs. Service coordinators are supposed to serve as the safety net for *Ricci* Class members. Given how far they are stretched by dangerously high caseloads, it is not surprising that Class members fall through the cracks. The most recent Massachusetts Senate budget has cut this DMR line item even further, with potential layoffs of 35-50 service coordinators in the FY 08 budget.

At lower levels, the inability to recruit and retain staff at poverty-level wages has led to measurable consequences in provider-operated group homes. The rising use of "emergency" restraints has been documented. Use of emergency restraints has traditionally been higher in ICFs/MR because residents there are less able to function in an appropriate way because of their disabilities – almost half of ICFs/MR residents have behavior disorders. In 2001, the rate of restraint in DMR ICFs/MR was 50% higher than in community-based homes.[6] By 2003, the rate of restraint in community-based homes had risen to 5.7% and decreased to 5.9% in facilities, effectively bringing parity to restraint rates in both venues.

Significantly, DMR has not certified "equal or better" treatment at any new location since 1997! Instead, it has relied upon "implicit certification" when a facility or regional director signs an ISP for the transfer of a *Ricci* Class member. **DMR could not more explicitly admit that they cannot provide services that are "equal or better" to the facilities on a systemic basis.** Although DMR has promised a "right to return," this promise is not memorialized in every ISP, and not always honored even when it is. COFAR recommends that the court require "right to return" letters to ensure that coercion plays no part in "voluntary"

---

[6] DMR QA Report, Table 18, page 32 (population restrained at facilities was 6.3%, compared to 4.2% in community), Ex. 2 to *Memorandum in Support of Wrentham Association's Motion to Re-Open Case and Restore to Court's Active Docket.*

transfers. It is fair to estimate that the readmission rate for *Ricci* Class members is likely to be consistent with the national average, which was approximately eight percent (8%) in 2000, measured against all ICF/MR discharges in 1989.[7] If anything, the readmission rate will increase over time, not decrease, since *Ricci* Class members are part of the aging "baby boom."

Lastly, DMR's own plan to close its ICFs/MR will ensure a sudden flood of transfers to an already over-stressed provider operated bureaucracy. And, as *Ricci* Class members are unable to maintain the functional and medical level of well-being required to live in a community-based home over the next 10-30 years, DMR will not have sufficient ICF/MR capacity for their readmission. Without sufficient ICF/MR capacity, DMR will not be able to provide the level of care that is likely to be referenced in Class members' ISPs in the future, and will violate the Disengagement Order.

## IV.    DMR NEEDS TRANSPARENCY

No bureaucracy can be improved without public interest and pressure, and this requires information. DMR, despite various court orders, continues to operate as clandestinely as possible. This is especially dangerous to residents at provider community-based group homes. As the system of care becomes more dispersed, it requires more DMR supervisory staff (not cut-backs) and much more advocacy by residents, families, and guardians. Effective advocacy requires information and an absence of intimidation. Yet survey after survey by DMR or parent groups shows parents and guardians are increasingly kept in the dark about the availability of services. Cutbacks have made even sympathetic bureaucrats into gatekeepers, and it is only human nature for gatekeepers to keep information about the gates secret, so that crowds do not gather.

In particular, DMR has ignored the court's orders of periodic reviews, keeps secret what reviews it does conduct, and delays release of what little information it releases. How is the community to support people with developmental delays if the community is kept in the dark? How are advocates to advocate for services if they are not informed of their existence?

DMR must comply with the Disengagement Order and yet given the currently imposed budgetary, organizational and policy constraints, lacks the tools and resources to fulfill its mission, as was the case when this action was first filed.

---

[7] Readmissions in 2000, nationwide, totaled 558. Ex. 12 to *Memorandum in Support of Wrentham Association's Motion to Re-Open Case and Restore to Court's Active Docket* at Table 1.21, page 45.

## V.    PRIVATIZED HUMAN SERVICES COMPLEX

Finally, COFAR seeks to make the court aware of its alarm at the growth, behavior and uncontrollability of the DMR provider operated system. In addition to the Sullivan Report, COFAR's own experience is that brutal and stressful struggles by families with DMR providers is commonplace and DMR offers no respite, oversight or accountability. Over and again we hear horror stories of wanton neglect and abuse, threats of eviction by provider employees, as well as ISPs manipulated to make residents appear far more independent than they are in reality. There is a pervasive problem with both (A) of family bewilderment of the workings of the DMR purchase of system; and (B) DMR unwillingness to assist families with aggressive and recalcitrant providers. Almost $900,000,000 of the planned Fiscal 2007 budget will be spent via contracts with so-called "non profit" corporations, the counter party with DMR in provider-operated group homes.[8] Based upon COFAR's nearly twenty five years of experience as a grass roots, family based and largely volunteer, advocacy group, there is overwhelming evidence that DMR routinely ignores family complaints as they relate to services delivered by providers. In certain cases COFAR has been witness to DMR Regional Directors simply ignoring gross evidence of provider intimidation, neglect, retaliation and abuse. In one particular instance COFAR has also reported on DMR employees directly trying to stifle family complaints.[9]

COFAR respectfully requests that the Court accept the report of US Attorney Michael J. Sullivan, and authorize his continuation as Court Monitor for the *Ricci* Plaintiffs for the purpose of compelling the Commonwealth of Massachusetts, through DMR, to comply with the Disengagement Order.

Respectfully submitted,

Colleen M. Lutkevich
Executive Director

David J. Hart
President

---

[8] See line items for the Department of Mental Retardation in the "Budget Tracking Tool" link on the Commonwealth of Massachusetts' website "Mass.Gov" an excellent source for budgetary information.

[9] *Accident at Group Home leaves Family Questioning DMR Care*, COFAR Voice, Vol. 8/No.5, September 2006