UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT SIMPSON RICCI, et al., <br><br> Plaintiffs, <br><br> v. <br><br> ROBERT K. OKIN, et al., <br><br> Defendants. | CA Nos. 72-0469-T (Belchertown) <br> 74-2768-T (Fernald) <br> 75-3910-T (Monson) <br> 75-5023-T (Wrentham) <br> 75-5210-T (Dever) |

**JOINT MEMORANDUM OF PLAINTIFF ARC/MASSACHUSETTS AND INTERVENOR DISABILITY LAW CENTER OBJECTING, IN PART, TO THE REPORT OF THE COURT MONITOR**

### Introduction

In 1993, more than twenty years after the first of these five consolidated cases was filed, this Court entered an Order, agreed to by the parties including the plaintiff Massachusetts Association for Retarded Citizens (now know as the Arc/Massachusetts), terminating its oversight of the cases and several consent judgments (the "Disengagement Order" or "1993 Order"). The part of the 1993 Order most relevant to the current proceedings, requires the following:

> Defendants shall not approve a transfer of any class member out of state school into the community, or from one community residence to another community residence, until and unless the Superintendent of the transferring school ... certifies that the individual to be transferred will receive equal or better services to meet their needs in the new location....

*Ricci v. Okin*, 823 F. Supp. 984, 987 (D. Mass. 1993).

Now, fourteen years after the Court disengaged, some of the plaintiffs have sought to reopen the case alleging that the defendant Department of Mental Retardation

1

("DMR") is in violation of the Disengagement Order. After Court-ordered discussions among the parties were unsuccessful, the Court appointed the United States Attorney for Massachusetts as a Court Monitor ("Monitor") to conduct an investigation into and to report to the Court on DMR's "past and prospective transfer processes." Document ("Doc.") 90.

The Monitor, after a year of conscientious investigation, has filed a report and recommendations. Doc. 158 . The Court has invited the parties to comment and to file objections, if any. Docs. 160 and 181.

The plaintiff Arc/Massachusetts and the plaintiff intervenor Disability Law Center jointly file this memorandum respectfully suggesting that despite his efforts, and notwithstanding that many of his findings and conclusions (particularly those related to "past" practices) are correct, the Monitor has made significant errors, particularly related to "prospective" transfers. The Monitor's conclusions and recommendations with respect to future transfers from Fernald Developmental Center ("Fernald"), although well-meaning, are at best misguided and at worst perilous to rights and liberty interest of class members and, in any case, are inconsistent with law and with previous orders of this Court.

In particular, the Monitor has recommended allowing all current residents of Fernald, and presumably current residents of all other Intermediate Care Facilities for Persons with Mental Retardation ("ICF/MRs") operated by the DMR, to remain in these facilities indefinitely and unconditionally, unless the guardian assents to a transfer to another facility or community program. This recommendation effectively shifts community placement decision-making authority from mental disability professionals to

2

guardians and to this Court. This significant error is based on his sweeping finding that, absent consent of their guardians, all remaining residents of Fernald cannot receive equal or better services at any other ICF/MR or community program, under any conditions. This finding is not based upon any individualized information concerning the strengths and needs of each of the residents and is directly contrary to clinical opinions of the medical professionals retained by the Monitor to evaluate prior transfers of Fernald residents. In effect, the finding seeks to create a new and unconditional legal right for class members to remain in their current facility. Because his findings and recommendations in this regard are erroneous, the plaintiff Arc/Massachusetts and the intervenor DLC respectfully object, in part, to the Monitor's Report.

## Summary of Argument

No one can dispute either the Monitor's effort or the seriousness with which he approached his task. Although most of the factual findings in his Report are accurate, there are two that are erroneous: (1) the finding that a transfer from an institution to another institution or to a community setting, absent consent from a guardian, is always harmful and can never result in equal or better services; and (2) the finding that the level of abuse in the community is greater than in the institutions. Therefore, these findings should be rejected.

Class members have a right under federal and state law to receive appropriate habilitation and support services, and to receive those services in an integrated community setting. But although they have a right to choose an ICF/MR, they do not have the right to remain in a particular ICF program or institution or to receive services in a specific building or facility, provided that the care they are provided is appropriate.

3

Therefore, the Monitor's recommendation that precludes the transfer of any resident from Fernald to another institution or community setting, absent consent from the person's guardian, is inconsistent with federal and state law.

The Monitor's Report concludes that DMR has complied with all provisions of the Disengagement Order, and rejects each of the allegations of systemic noncompliance presented by the Fernald and Wrentham plaintiffs in their respective Motions to Reopen. As a result, the Monitor finds that no systemic violation of the Disengagement Order has occurred. Therefore, there is no basis for the Court to reopen the case and no jurisdiction or authority for the Court to enter any further remedial orders.

Since the 1993 Order affords DMR the discretion to manage and transfer resources and close facilities, the recommendation that precludes the transfer of any resident from Fernald to another institution or community setting, absent consent from the person's guardian, would constitute an improper modification of the 1993 Order.

### Scope of the Monitor's Responsibilities and Standard of Review

The U.S. Attorney was appointed as a Court Monitor in response to motions of some of the plaintiffs alleging, among other things, that the defendant DMR was in violation of the 1993 Order because the Fernald Superintendent was not certifying, first, that individuals to be transferred will receive equal or better services in their new residences and, second, that the services recommended by the class member's Individual Support Plan ("ISP") are available at the new location. *See, e.g.,* Motion to Reopen and Restore Case to Active Docket and to Enforce the Final Order of May 12, 1993 (Doc. 1). On February 8, 2006, the Court appointed United States Attorney Michael J. Sullivan to serve as Court Monitor to "advise the court as to whether the past and prospective

4

transfer processes employed by the Department of Mental Retardation comply with federal law, state regulations, as well as the orders of this court." Order dated February 8, 2006 at 1 (Doc. 90). A year later, the Monitor filed his Report. Doc. 158 (hereafter "Report"). The Court ordered the parties to submit objections or comments by May 31, 2007. Docs. 160 and 181.

The Court's review of the Report is *de novo*. *See, Cobell v. Norton*, 175 F.Supp. 2d 24 (D.D.C. 2001) (describing review of objections to monitor's report as *de novo*). The Court did not appoint the U.S. Attorney as a Special Master. There is no appointment order as required by Rule 53 and consistent with its provisions. In fact, the Order does not even mention Rule 53, nor does it comply with its requirements. Nevertheless, if the Court treats the Monitor as a Special Master, the same *de novo* standard of review applies upon objection by any party. Fed. R. Civ. P. 53(g)(3)-(4). Therefore, the Court must independently review the Monitor's findings.

## Argument

I. **The Monitor's Finding That Transfer From an Institution to Another Institution or Community Setting, Absent Consent From a Guardian, Is Always Harmful and Can Never Result in Equal or Better Services Is Erroneous.**

Although most of the factual findings in the Monitor's Report, particularly those relating to the defendant's past practices, are accurate, his conclusion that transfer from Fernald to another institution or to a community setting, absent consent from a guardian, is always harmful and can never result in "equal or better" services is erroneous.

The Monitor's findings that the past transfers of Fernald class members since 1993 were appropriate and in compliance with the Disengagement Order were based upon direct observation, meetings with class members, staff, and parents, and review by

5

medical professionals selected by the Monitor for their expertise and experience in treating persons with mental retardation. However, his sweeping finding that any future transfers objected to by guardians would be harmful to every other class member is totally unsupported, is not based upon the individual needs and abilities of each class member, is contrary to his own observations of individuals placed from Fernald since 1993, is based completely on conjecture, and is without any underlying professional or clinical justification or support. The erroneous conclusion appears to be grounded primarily on a concern about "involuntary transfers." Although he does not define "involuntary transfer," it is clear that what the Monitor means is a transfer that is made over the objection or concerns of the class member's guardian. Moreover, given the sweeping, speculative findings that inform the Monitor's position on involuntary transfers, it appears that any move from a class member's current residential environment to another setting constitutes a transfer, even if the move is simply to another building, facility, or nearby program, at least if the moves creates a substantial change from the resident's known routines.

In the context of this case, where DMR is enjoined from discussing community alternatives with residents and their families and where the Court has prohibited transfers to the community for over a year, Doc. 90, it is nearly impossible to discern whether a guardian's concerns are justified or whether the objections could be addressed. The experience in other states and in Massachusetts has been that state agencies, including DMR, can and do work with family members to design programs and services that successfully address families' concerns. The Monitor ignores this evidence and experience.

It is important to note that by suggesting that a guardian's objection be the sole determinant of any transfer, the Monitor has recommended a substantial and substantive change in one of the core principles of this Court's 1993 Order. Heretofore, the determination and certification of whether an alternative placement is "equal or better" has been made by mental retardation professionals – the facility superintendent or the DMR regional director – based on recommendations of the class member's clinical team. *See Ricci v. Okin,* 823 F.Supp at 987.

The guardian plays an appropriate and important role in that process, as a full participant in the treatment planning meetings, 115 Code Mass. Regs. 6.21(1)(c), with the right to appeal. Mass. Gen. L. c. 123B § 3. However, despite their critical and influential role, the guardian does not now have an absolute right to veto transfer. The Monitor's recommendations would change that, and change it dramatically. Likewise, the Monitor's recommendation would change the nature of the "equal or better" determination from one that is an individualized assessment, based on a class member's particular strengths and needs, to a global determination, based exclusively on a guardian's veto, with no clinical assessment of where services would best meet the needs of the class member.

A federal court in Pennsylvania faced a similar issue in one of the many orders in the *Pennhurst* litigation. There, the parents of a voluntarily committed, profoundly retarded school-age minor child appealed from a special master's order directing the child's transfer from a state school to a community living arrangement. The District Court held that while the parents' views deserved serious consideration, they could not veto a placement, if there was a significant government interest to counter to the parents'

7

desires. *Halderman v. Pennhurst State School and Hospital*, 567 F. Supp. 1504 (E. D. Pa. 1983), *aff'd*, 723 F.2d 897 (3d Cir. 1983)(Table). Therefore, even in a case in which the court recognized the fundamental right of parents to raise their minor children – a right not recognized for guardians of adults – that right was not absolute. Likewise, in an unreported order in a California case, a judge enjoined the State defendants from allowing a guardian to veto of a community placement, ordering the State to exercise its own discretion in making placement. *Richard S. v. Department of Developmental Services*, No. SA CV 97-219-GLT (Anx)(Amn'd Permanent Injunction at 2)(C.D. Calif. January 18, 2001); *for a procedural history of the case, see* 317 F. 3d 1080, 1084 (9th Cir. 2003).

Therefore, although preference is an important factor in any transfer decision, neither the Americans with Disabilities Act, nor the Supreme Court's interpretation of it in *Olmstead v. L.C*, 527 U.S. 581 (1999), requires or supports a claim that Congress has required states to keep facilities open, either in the short term or indefinitely, to respect that preference. Without explanation or justification, the Monitor draws a bright line between those institutionalized class members whose families may desire future transfer and those who remain institutionalized and whose families object to transfer. Other than the families' objections, there is nothing in the Report to distinguish the two groups. For example, the Report cites no evidence that as a group, class members in the second category (those whose guardians object to transfer) have been institutionalized any longer, are any more disabled, any older, or any more behaviorally or physically challenged than class members in the first category. The only distinguishing characteristic is that the class members' families object to transfer. On this basis alone,

the Monitor reaches the sweeping conclusion that there can be no place anywhere other than the individuals' current housing at Fernald that can possibly be "equal or better."

> A. *The Experiences at Belchertown State School and Monson Developmental Center are Contrary to the Finding That Remaining Residents of Fernald Cannot Be Provided Equal or Better Services at Another ICF/MR or in a Community Program.*

1. <u>Belchertown State School</u>

The Monitor's findings about past practices, particularly the success of transfers to date, Report at 14-23, are consistent with independent studies of the closings and down-sizing of the other facilities that have been the subject of this case. Since Dr. Benjamin Ricci filed the first of these five consolidated cases in 1972, Massachusetts has successfully closed the Belchertown State School (1992)("Belchertown" or "BSS"), the John T. Berry Center (1995), and the Paul A. Dever Center (2001)("Dever"). Belchertown and Dever, of course, were subject to this litigation and the Court's oversight.

An affidavit executed by Dr. William E. Jones ("Jones Aff."), who served as Superintendent of Belchertown and in other high ranking state positions during much of the course of this litigation, attests to the processes and procedures that were employed to ensure the success of the facility closing and the transfer of class members to community living arrangements. It describes the significant safeguards put in place by Dr. Ricci, the parent organization, the State, and the Court. *See* Jones Aff. at ¶¶ 9-16. The affidavit is filed with this memorandum as Attachment A. In his affidavit, Dr. Jones describes that improvements at Belchertown after the initial consent decree led to observable increases in class members' abilities to live more independently at the facility. Jones Aff. at ¶ 10. This, in turn, shaped discussions with Dr. Ricci and the

Friends of Belchertown State School ("Friends"), the parent group, about the development of community living options. *Id.*

Dr. Jones and other state officials then began planning for a more comprehensive community system. *Id.* The plans were discussed openly and continuously with Dr. Ricci and the Friends. *Id.* at ¶¶ 10-11. As it is today, the Individual Support Plan ("ISP") was then the keystone for each resident's services and to ensure family, and guardian choice, participation, and satisfaction. *Id.* at ¶ 12. Dr. Jones describes that "[g]reat care and attention was given to use the ISP process as the means to identify each resident's needs and service options. When a recommendation was made for the placement/transfer of a resident to the community, visits were encouraged so that all questions/concerns would be discussed and resolved." *Id.* at ¶ 15. Although residents and parents were given the option of returning to BSS, it was rarely exercised. *Id.* at ¶ 16.

Dr. Jones reports that "services were planned and developed so that virtually *all* BSS residents accepted placement in a community living arrangement." *Id.* at ¶ 18 (emphasis in original). Importantly, "[m]any, if not most, of the residents who moved to the community had been living at BSS for many years, and often for many decades. The BBS [sic] made special efforts to ensure a careful, respectful, and gradual transfer process for all of these individuals, understanding that the change in living environments, services providers, and staff would take time. Residents and families were offered an opportunity to visit new homes and express preferences about their roommates and even their staff." *Id.* at ¶ 19.

Concluding, discussing the Monitor's Report, Dr. Jones remarks:

10

> I was struck by how far the community system has evolved since I left BSS more than twenty years ago. It appears to me that community options, services, and living arrangements have been dramatically expanded, and that the community service system now has capacity to serve even the most challenged and disabled resident of an ICF/MR. As a result, it would seem relatively straightforward to replicate the positive experience that we created in closing the BSS at the Fernald Developmental Center and at another ICF/MR.

*Id.* at ¶ 24.

Dr. Jones's recollections are consistent with the findings of two independent studies of the impacts of the Belchertown phase-down. While these studies are over a decade old, and even though conditions at Fernald may not be entirely comparable to those at Belchertown in the years before it closed and the community system has expanded and matured, there are clear lessons to be drawn for the literature.[1]

In 1988 by Eastwood and Fisher, compared class members who had been transferred from Belchertown to community placements with a matched group of persons still residing at the institution. The "community group" had significantly greater levels of cognitive and social skills after placement than the "match group" that stayed at Belchertown. The community group's progress over time surpassed the institutional group in seven of eight skills areas. Elizabeth A. Eastwood & G.A. Fisher, *Skills Acquisition Among Matched Samples of Institutionalized Community-based Persons with Mental Retardation,* 93 Am. J. on Mental Retardation 75 (1988), cited in Valerie J. Bradley, Celia S. Feinstein, James Lemanowicz, and Mary Ann Allard, *Results of the Survey of Current and Former Belchertown Residents and their Families: The Belchertown Follow-Project,* 20 (Dec. 1992)(Bradley et al. hereafter *"Belchertown Follow Study"*).

---

[1] Although the plaintiff Arc/Massachusetts and the intervenor Disability Law Center provided copies of several studies to the Monitor, they apparently played no part in the development of his conclusions.

11

The 1992 *Belchertown Follow Study* was a six-month survey conducted by the Human Services Research Institute for DMR after the Commonwealth announced that the facility would close but before the phase-down was completed. The study is filed with this memorandum as Attachment B. The study measured family satisfaction and family and class member's own perceptions of the quality of life for both those who had moved from Belchertown and for those who remained there at the time of the study.

The study is very instructive and in significant ways, contradicts the Monitor's findings. Relevant findings include:

- 78% of the people who left Belchertown were reported to have severe or profound retardation and the level of retardation of those who transferred was "not at all different" from that of those who remained at the time of the study.

- 89% of the families of people who moved were satisfied or very satisfied with where their family members were living and only 2% expressed dissatisfaction (the other 9% were "neutral").

- 85% of the community families perceived their relatives as being very happy or happy, compared to 73% of the Belchertown families.

- Most community families felt that relatives continued to learn and these families had strong feelings that funding for community services was secure.

- Overall, therefore, the researchers found that "[w]hen comparing Belchertown families to community families, the community families were happier overall, perceived their relatives to be happier, [and] believed that their relatives were continuing to learn new things."

*Belchertown Follow Study*, p. 17.

2. <u>Monson Developmental Center</u>

A decade later, a less intensive, but still instructive, satisfaction study was undertaken by Monson Developmental Center ("Monson"). Susan M. Boucher, *Community Placement Survey: 1993-1999 Monson Developmental Center* (1999) (*"Boucher study"*). A copy of the survey is filed with this memorandum as Attachment

C. The survey sought to measure satisfaction with community services of the 156 individuals (and their families) transferred from Monson from 1993 to 1998. The report reveals that 53% of those who responded to the survey reported they had been "quite cautious" or "very skeptical" about transfer and 7% reported they were "opposed" to placement. *Id.* at 10 – 11. Despite this, the study found a very high level of family satisfaction with community placements. In fact, although there were a few concerns raised (and the report includes each of them, verbatim), 100% of the responses indicated that the class member's quality of life was the "same or better," and "94% of families/guardians found their family members quality of life was better" than it had been at Monson.[2] *Id.* at 1.

3. The Monitor's Survey of Family Satisfaction

The Belchertown and Monson studies are consistent with the results of the Monitor's own Post Placement Satisfaction Survey of Fernald transfers. The survey found "extremely positive attitudes toward the moves" and the found no "concerns or tendencies to seek a return to Fernald." Report at 22-23. As has been the case everywhere in the nation, the positive experiences of Fernald families occurred despite an initial "hesitancy to move from Fernald due to familiarity" and despite the fact that some were the direct result of the announcement that Fernald would be closing. Report at 24.

---

[2] The results of the Monson and Belchertown studies are consistent with national studies of parent satisfaction. For example, Larson and Lakin summarized the "clearest message" of their review of several studies to be that "the overwhelming majority of parents become satisfied with community settings once their son or daughter has moved from the institution, despite general disposition to the contrary." Sheryl A. Larson & K. Charlie Lakin, *Parent Attitudes About Residential Placement Before and After Deinstitutionaization: A Research Synthesis*, 16 J. Ass'n for Persons with Severe Handicaps, 25, 27 (1991).

13

*B. The National Experience of Transfers From Institutions to the Community Is Contrary to the Finding That Remaining Residents of Fernald Cannot Be Provided Equal or Better Services at Another ICF/MR or in a Community Program.*

In 1991, a year before Belchertown closed, New Hampshire shuttered the Laconia State School to become the first state to completely terminate its public institutional system. *See, Garrity v. Gallen,* 522 F. Supp. 171 (D.N.H. 1981). By 2001, the District of Columbia, Vermont, Rhode Island, Alaska, New Mexico, West Virginia, Hawaii, and Maine had followed suit; Indiana joined them this year. Massachusetts and Connecticut are the only New England states with public institutions for people with mental retardation. Thirteen other states, including Arizona, Michigan, Minnesota, and Oregon, serve 200 or fewer individuals with mental retardation or developmental disabilities in state operated institutions. David Braddock, Richard Hemp, Mary Rizzolo, et al, *The State of the States in Developmental Disabilities 2005,* 48-51 (2005). Numerous other states are aggressively reducing their institutional censuses. Florida, for example, has closed one of its four institutions and a second is well on track for closure by 2010. From 2002 to 2004 Florida reduced its institutional population by 283 persons, California placed 392 residents in community programs, and New Jersey 219. *Id.* at 49. During that same period, 2002 to 2004, there have been significant reductions in census in Illinois, Alabama, Georgia, Pennsylvania, Ohio, Louisiana, Tennessee, and North Carolina. *Id.*

Massachusetts has made progress in increasing community options. Overall, spending on community services and individual and family supports has increased every year from 1977 to 2004, in part because of the influence of this litigation and the influx of federal funding through programs like the Medicaid Home and Community-Based Waiver. Nevertheless, at least as measured against progress in other states, Massachusetts

has lagged behind, making fewer community placements than the majority of states and still lingering in the top third of the states in terms of institutional utilization. *Id.* at 48.

The Arc/Massachusetts and DLC requested Robert M. Gettings to comment on the Report and its conclusions.[3] The comments and observations contained in his Affidavit ("Gettings Aff.") are based on the knowledge and experience he has gained over the past forty years in assisting state agencies to develop residential and daytime services for individuals with intellectual and other developmental disabilities.[4] The affidavit and Mr. Gettings's resume are filed together with this memorandum as Attachment D.

In his extensive affidavit, based on his rich experience and with copious citations to the literature, Mr. Gettings responds to the concerns that underlie the Monitor's recommendations. For example, he notes the argument that community service systems lack the capacity to effectively serve persons with especially severe and complex disabilities is belied by the fact that "over the past twenty years many states have amply demonstrated that such persons can be served successfully in appropriately designed community program settings." Gettings Aff. at § III, p. 4. He notes that "many individuals with extensive support needs -- needs that are similar to persons currently receiving services in public and private institutions – are living in the community today.

---

[3] Drawing on his experience as the head of the national organization of university affiliated developmental disability programs, Dr. Jones's affidavit also describes the national experience with community placement. Jones Aff. at ¶ 23.

[4] For the past thirty-six years, Mr. Gettings has served as the Executive Director of the National Association of State Directors of Developmental Disabilities Services (NASDDDS), a non-profit organization representing agencies in the fifty states and the District of Columbia that are responsible for providing, financing and overseeing the delivery of institutional and home and community-based long-term supports for persons with mental retardation and other developmental disabilities. Gettings Aff. at §§ I & II, pp. 1-3, and attached resume.

15

Many of these people have never lived in an institution, while others have moved successfully from an institution to a community-based living environment." *Id.*

To the argument that persons with challenging behaviors and/or psychiatric disorders cannot be properly supported outside of an institutional setting, Mr. Gettings reports that "there are many approaches to serving such persons in community-based setting that have proven successful." *Id.* Citing to follow-up studies of persons with such characteristics who moved from an institution to a community setting between 1980 and 1999, he notes that "all but two reported that the individuals involved had shown improvements (or no significant change) in adaptive skills and reduced incidents of disruptive behavior after being transfer to the community." Gettings Aff. at § III, p. 3-4 (footnote omitted). He further cites to a recent monograph published by the American Association of Intellectual and Developmental Disabilities (formerly the American Association on Mental Retardation) that describes "programs in Vermont, Minnesota, California, Massachusetts, Iowa and Colorado that furnish specialized behavioral supports and crisis prevention/response services for persons with lifelong disabilities who are dwelling in the community." *Id.* (footnote omitted). "Obviously," he concludes, "states which have closed their public institutions for individuals with ID/DD have learned how to support persons with psychiatric disabilities (often referred to persons with 'dually diagnoses') in the community." *Id.*

To the argument that individuals with mental retardation with chronic medical conditions require access to sophisticated medical technology and expertise, Mr. Gettings cites to literature that demonstrates that "for every person with chronic health needs who

lives in an institution, there are individuals with similar needs living in the community."

*Id.* at § III, p. 5 (footnote omitted).

To the argument that older residents cannot live in the community, Mr. Gettings observes that

> a steadily growing number of older adults with [mental retardation] are now living in the community. Many of these individuals resided in state institutions for decades and now live fulfilling, active lives in the community. Developing alternative community-based living arrangements for persons who have resided in institutions for many years poses special challenges since the institution is the only life some of these individuals have known. But, again, with careful advanced planning state officials have demonstrated, time after time, that it is possible to design community programs and living settings for such persons that simply could not be replicated in even the best run institution.

*Id.* (footnote omitted).

Mr. Gettings is a realist. He acknowledges that

> [s]uccessfully transitioning institutional residents – especially residents with complex support needs – to a community-based setting is a complex undertaking that requires carefully synchronized planning and execution over an extended period of time. ... State officials [ ] need to create a community infrastructure that is capable of assuring that such individuals are able to live safe, secure, fulfilling lives once they move to the community. A successful institutional downsizing/closure initiative also requires a resolute commitment to a person-centered approach to planning and resource development that places the best interests of each individual at the center of the decision-making process, plus the development and maintenance of a quality management system that continuously monitors and improves the quality, appropriateness and consistency of the services being furnished.

*Id.* at § III, p. 6. Nevertheless, he observes that "many states – including Massachusetts – have demonstrated over the past thirty years that it is possible to create improved living circumstances for former institutional residents with intellectual and other developmental disabilities within the community." *Id.*

Mr. Gettings also discusses the impact of the Monitor's recommendation if it is adopted by the Court. Although he believes the Monitor was "well-meaning and

17

compassionate," he suggests that he "has been swayed, as he clearly acknowledges, by his interactions with the long-suffering parents and guardians of Fernald residents who passionately oppose the state's plan." *Id.* at § IV, p. 7. However, based on his own experience, Mr. Gettings recommends the Court "to weigh not only the interests of a comparatively small number of affected families but also the broader effects the adoption of the Court Monitor's proposed course of action would have on the remaining residents of the facility, other needy individuals with intellectual and developmental disabilities within the state who are un-served or under-served, as well as the Commonwealth's ability to meet its obligation under applicable federal and state statutes." *Id.*

In great detail, Mr. Gettings describes the impact "a court order requiring the Commonwealth to allow present Fernald residents (and potentially the residents of other state and privately operated residential facilities as well) to remain in their existing living and program units indefinitely," *id.* at 9, would have on:

- the Commonwealth's capacity to comply with the *Olmstead* ruling as Massachusetts officials would lack the necessary latitude to develop and systematically implement a comprehensive plan to reduce unnecessary institutionalization, by "seriously erod[ing] the state's authority to design and carry out, in the words of the Olmstead ruling, 'an effectively, working plan' for reducing unnecessary institutionalization." *Id.* at § IV A, p. 8.

- achieving improved access to publicly-funded MR/DD services by "handcuff[ing] efforts by DMR and other Commonwealth officials to ensure that available funds are used in the most efficient, economical and equitable manner possible." *Id.* at § IV B, pp. 8-10.

- the Commonwealth's ability to keep pace with best practices in serving people with developmental disabilities by making it more difficult for the state to access "new options under Medicaid law that permits states to cover home and community-based services." *Id.* at § IV C, pp. 10-11.

- the very purpose of the Disengagement Order by allowing "veto authority" to not only "thwart the department's future

18

> deinstitutionalization efforts but also reverse the emphasis on individual person-centered planning and the primacy of the individual's interests that are central to the Court's 'equal or better' standard." *Id.* at § IV D, pp. 11-12.

Understanding the objections of some families, Mr. Gettings concludes, that

> Parents and family members of institutionalized persons – especially older facility residents – have been forced by society to bear a heavy burden. Many of them lived through the period when care and treatment practices in state-operated residential facilities often were horrendous and they were forced to look out for their loved ones as best they could. These parents and siblings have learned from hard experiences to be suspicious of official promises that new program initiatives will yield substantial improvements. And, now that conditions in state facilities have improved considerably, they are understandably reluctant to see their sons, daughters, bothers and sisters moved to alternative residential settings.

*Id.* at § V, pp. 12-13.

Nevertheless, he suggests that "it is not reasonable, appropriate, or consistent with professional judgment to confer on such parents and other family members the right to have their loved ones remain in outmoded institutional facilities when the same services can be provided as effectively or more effectively and at a lower overall cost to the taxpaying public in other appropriate institutional and community-based settings." *Id.* Therefore, he recommends that "as long as state officials adhere to the court-mandated certification process, the federal court should not preempt the authority to carry out their responsibilities under state law and existing court orders." *Id.*

    C.    *The Relevant Social Science Research Contradicts the Report's Recommendations About Future Placements and Establishes That Transfers Can Be Made Safely and Productively.*

Numerous studies have attempted to measure the impact of movement to the community on former institutional residents. Longitudinal and contrast group studies

have been conducted at scores of facilities in dozens of states and, for that matter, in other countries.[5] Mr. Gettings cites to several of these studies throughout his affidavit.

The professional literature overwhelmingly confirms that people with mental disabilities who reside in a variety of community settings experience improved adaptive behavior, improved social participation, improved independence, improved control over decision making, and improved perceived quality of life. Several of the most comprehensive studies have been undertaken as part of or attendant to litigation, including multi-year studies at Pennsylvania's Pennhurst State School, *Halderman v. Pennhurst*, 446 F.Supp. 1295 (E.D. Pa. 1977) and Oklahoma's Hissom Developmental Center, *Homeward Bound v. Hissom Memorial Center*, No. 85-C-437-E (N.D. Okl. 1987)(Findings and Order July 24, 1987). The findings of the studies in other states are consistent with those at Belchertown and Monson.[6]

---

[5] Information about this considerable body of research and copies of numerous studies also was provided to the Monitor by the plaintiff Arc/Massachusetts and the intervenor Disability Law Center.

[6] *See, e.g.,* James W. Conroy, *Results of Deinstitutionalization in Connecticut, in* DEINSTITUTIONALIZATION AND COMMUNITY LIVING (Jim Mansell & Kent Ericsson eds., 1996); James W. Conroy, *The Hissom Outcomes Study: A Report of Six Years of Movement to Supported Living* (Dec. 1995) (persons with mental retardation and developmental disabilities who had been deinstitutionalized and placed in small community settings showed significant increases in adaptive behavior, productivity, employment, family contact, and overall quality of life); James W. Conroy, et al., Connecticut Dep't of Mental Retardation Report No. 10, *1990 Results of the CARC v. Thorne Longitudinal Study* 40-43, 55, 66 (Jan. 1991) (persons moving from large congregate setting to small community setting showed increase in adaptive behavior, social interaction, valued employment, quality of life, and family satisfaction); John Lord & Alison Pedlar, *Life in the Community: Four Years After the Closure of an Institution*, 29 Mental Retardation 213, 219 (1991) (four years after eighteen people were moved from institutional setting to community integrated group home, virtually all had progressed in skills development, and family members reported that their relative was generally happier and responding positively to the stimulation of community living); James W. Conroy & Valerie J. Bradley, Temple University Developmental Disabilities Center, Philadelphia & Human Services Research Institute, Boston, *The Pennhurst Longitudinal Study: A Report of Five Years of Research and Analysis* (Mar. 1985) (persons with severe mental retardation placed from an institution into small community living arrangements showed significant increase in adaptive behavior, marked decrease in dependency, and significant increase in happiness in most aspects of their lives); James Conroy, Joelle Efthimiou, and James Lemanowicz, *A Matched Comparison of the Developmental Growth of Institutionalized and Deinstitutionalized Mentally Retarded Clients*, 86 Am. J. Mental Deficiency 81 (1982) (individuals who left state institution for community placement showed significantly improved functioning and adaptive behavior after two years in the community); B.K. Hill & R.H. Bruininks, University of Minnesota Center for Residential and Community Services, *Family Leisure and Social*