In 1999, Kim, Larson, and Lakin identified 250 such studies undertaken between 1980 and 1999 of the relative risks and benefits of institutional and community living. Using criteria designed to select the most relevant and rigorous research, they reviewed 33 studies that could be compared with regard to findings that measured adaptive behaviors and challenging behaviors. S. Kim, Sylvia A. Larson & K. Charlie Lakin, *Behavioral Outcomes of Deinstitutionalization for People with Intellectual Disabilities: A Review of Studies Conducted Between 1980 and 1999,* 10 Policy Research Brief 1 (Oct. 1999). A copy of the article is filed with this memorandum as Attachment E. The authors reviewed 14 contrast group studies that compared people who moved from institutions to small residential setting with a "contrast" group of people who continued to live in the institution. "All but one of the studies found either a significant improvement associated with community placement or found improvements that did not reach statistical significance." *Id.* at 3. The gains of "movers" as compared to "stayers" were more consistent among the studies and more marked in areas of overall adaptive behavior (e.g., communication, motor skills, self-care, social skills) and less consistent in difference between the two groups in measures of challenging behaviors. *Id.* at 4.

The authors examined 19 longitudinal studies that followed "movers" over a period of time, often for several years after discharge. Thirteen of the studies reported statistically significant improvements in overall adaptive behavior associated with movement to small community settings. Two reported statistically significant declines. The others noted either improvements that were not statistically significant or, in one

---

*Activities of Mentally Retarded People in Residential Facilities* (1981) (for persons with all levels of mental retardation, moving to a community setting results in improved adaptive behavior and increased social participation). *See also,* Timothy M. Cook, *The Americans With Disabilities Act: The Move to Integration,* 64 Temple L. Rev. 393 (1991).

case, non-significant declines. *Id. at* 5-6. Ten studies showed improvements in challenging behaviors after the move from the institution; in five of these studies the improvements were statistically significant. Five studies found increases in challenging behaviors, of which two were reported to be statistically significant. Notably, all of the studies published in 1990 or later consistently found improvements in challenging behaviors. *Id. at* 6. The authors agree with Mr. Gettings that it may be that improvements in available behavioral supports, refined crisis response systems, and the increased use of more personalized housing and person-centered services that reduce the stimuli for challenging behaviors account for the across-the-board improvements during the 1990s. *Id.*, Gettings Aff. at § III, pp. 4-5.

While noting the limits of some of the research, the authors conclude that there is a "robust array of research whose findings are remarkable for their consistency." *Id.* at 8. Those findings are:

- Strong and consistent evidence that people who move from institutions to community settings have experiences that help them to improve their adaptive behavior skills;

- Consistent evidence that suggest that community experience increasingly provide people with environments and interventions that reduce challenging behaviors; and,

- A growing body of research that suggests that people enjoy a better quality of life in the community.

There is no reason to believe that the national research is not applicable to Massachusetts. To the extent they overlap, the findings are consistent with the Monson and Belchertown studies.

Despite this evidence, the Monitor's Report reflects several stubborn misperceptions about people with mental retardation and developmental disabilities.

Essentially, the Monitor has concluded that there is a group of people at Fernald who cannot be supported "equally or better" in the community. The Report describes this group in primarily as those whose guardians do not want them to leave. The evidence in Massachusetts and elsewhere in the country is that most if not all such individuals can be served as least as well if not better in the community. The evidence is that even people who have lived for many years in an institution can be and are successfully transitioned to the community and can thrive there.

This was proven, quite powerfully, at Belchertown and at Monson. Of the 156 class members placed into the community from Monson between 1993 and 1998, 54% were over 50 years old and the oldest was 86 years old. Fewer than half (47%) could walk independently, the rest needed staff assistance and/or used a wheelchair. *Boucher Study* at 1.

Indeed, as Mr. Gettings notes, because the life expectancy of people with developmental disabilities is increasing, many older adults with mental retardation, including many *Ricci* class members including those placed before 1993, are living and aging successfully in the community. Fernald class members are being denied that opportunity.

### D. The Monitor's Findings Regarding Alleged Abuse of Individuals with Mental Retardation in the Community Should be Rejected.

In his report, the Monitor concludes that "residents of our community homes are at greater risk [than residents of ICFs] of being abused and/or neglected." Report at 16-17 (footnote omitted). The Monitor based this conclusion on information received from the Disabled Persons Protection Commission ("DPPC"), a state agency that investigates or oversees investigations of allegation of abuse of people with disabilities. Mass. Gen. L. c. 119D. The Report does not describe in any detail how the Monitor arrived at this

conclusion, except to state that it is based on information from the DPPC. Report at 17, n. 1.

The plaintiff Arc/Massachusetts has undertaken it own analysis of abuse statistics and has reached a different conclusion. As explained in the Affidavit of Leo V. Sarkissian, filed with this memorandum as Attachment F, the plaintiff's analysis shows that on a per thousand client basis, the rate of abuse in community residential programs is actually slightly less than the rate in the institutions, at least in the two most recent years for which data were available at the time of the analysis. For example, in 2004, the rate per thousand of substantiated reports of abuse or neglect was 12.7 in the institution and 11.0 in the community. In 2005, the rate of substantiated abuse or neglect per thousand was 11.3 in the institution and 7.1 in the community. Sarkissian Affidavit, ¶¶ 11, 12.

Accordingly, the Court should reject the Monitor's finding regarding the prevalence of abuse.

**II.    The Federal and State Law Right to Appropriate Habilitation and Support Services Does Not Include a Right to Receive that Care in an Institution or Specific Facility.**

> *A.    The Constitutional and Statutory Right to Appropriate Habilitation Does Not Encompass A Right to be Provided Habilitation in a Specific Facility.*

"Habilitation" is the term of art used to refer to the education, training, and care required by individuals with developmental disabilities to reach their maximum development. *Garrity v. Gallen*, 522 F.Supp. 171, 176 n.10 (D.C.N.H. 1981) (citing *Halderman v. Pennhurst State School and Hospital*, 612 F.2d 84, 95, n.14 (3d Cir. 1979), rev'd sub nom. *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981)). The term is "not intended to... convey a static image" of functioning abilities, as "the modern 'developmental view'" stresses that all individuals

with developmental disabilities have potential for learning and growth.[7] *Garrity,* 522 F. Supp. at 176, n.10. (citation omitted).  The foundation of habilitation is an individual support plan, which assesses the individual's present abilities, establishes goals, and identifies the needed services and supports to meet the individual's needs and achieve his goals. *Id.* at 184.

Adequate and appropriate habilitation is guaranteed to persons with mental retardation in Massachusetts through the Individual Service Planning (ISP) regulations of the Department of Mental Retardation (DMR).  115 Code Mass. Regs. 6.05(2)(d) (providing for services and supports to *Ricci* class members recommended in ISP "for so long as such services or supports are needed…").[8]  The supports provided by the ISP include services, resources and strategies to promote health and safety, and relationships and experiences in work and living environments that "lead to enhanced interdependence, productivity, community integration and satisfaction." 115 Code Mass. Regs. 6.20(2). ISPs are developed using a team approach, consisting of the individual with a disability, and his or her family members, guardian, DMR service coordinator, service providers and designated representatives. 115 Code Mass. Regs. 6.21(1).  If a class member or his guardian is dissatisfied with an ISP, they have a right to appeal the team's decision through an administrative fair hearing and eventually to a superior court judge pursuant to G.L. c. 30A. *See* 115 Code Mass. Regs.  6.32, 6.33(2), 6.34(5).

---

[7] As noted in *Youngberg v. Romeo,* a person with a developmental disability experiences a "learning disability and training impairment rather than an illness." *Youngberg v. Romeo,* 457 U.S. 307, 309 n.1 (1982) (quoting amicus brief of the American Psychiatric Association).

[8] The entitlement of *Ricci* class members to ISP services exists regardless of whether the individual currently resides in a community or an institutional setting.  *See* generally 115 C.M.R. 6.05 (referring to "[a]ny person…regardless of current place of residence…").

In addition to the state law right to habilitation, the United States Supreme Court has recognized a federal constitutional right to minimally-adequate habilitation, at least where the resident remains in the facility involuntarily.[9] In *Youngberg v. Romeo*, the Court held that a developmentally disabled individual in state custody "enjoys constitutionally protected interests in conditions of reasonable safety, reasonably nonrestrictive confinement conditions, and as such training as may be required by these interests." *Youngberg v. Romeo*, 457 U.S. 307, 324 (1982). Similarly, in *Thomas S. v. Flaherty*, 699 F. Supp. 1178, 1200-1201 (1988), the Fourth Circuit Court of Appeals concluded that developmentally disabled adults who were involuntarily institutionalized had a constitutional right to minimally adequate habilitation in order to maintain basic self-care skills in a setting designed to reduce self-abuse and aggression. *See also*, *Halderman v. Pennhurst State Sch. & Hosp.*, 446 F. Supp. 1295 (E.D. Pa. 1978) (holding constitutional rights of mentally retarded residents at a state operated institution were violated due to inadequate rehabilitation), *aff'd in part, rev'd in part en banc*, 612 F.2d 84 (3d Cir. 1979), *rev'd*, 451 U.S. 1 (1981); *Welsch v. Likins*, 373 F. Supp. 487, 502-03 (D.

---

[9] Some lack of clarity remains as to whether, after *DeShaney v. Winnebago County Social Services Dept.*, 489 U.S. 189 (1989), an institutionalized person's right to care and safety should be regarded differently if their placement is involuntary or voluntary. Under Massachusetts law, there is no involuntary admission, commitment or retention of persons with developmental disabilities in an ICF/MR. *See* Plaintiff-Intervenor DLC and Plaintiff Arc's Joint Memorandum of Law in Support of Their Joint Motion to Modify the Court's February 6, 2006 Order, at Section III, pp. 6-11 (Doc. 151). In 2006, the Third Circuit held that when the state takes affirmative steps to restrain one's liberty, even of a voluntarily admitted resident, such deprivations may given rise to constitutional violations under of *Youngberg*. *Torisky v. Schweiker*, 446 F. 3d 438, 446-447 (3rd Cir. 2006). *See also Monahan v. Dorchester Counseling Ctr*, 961 F. 2d 987, 992 (1st Cir. 1992) (looking beyond plaintiff's formal status to develop fact-based inquiry as to freedom to leave). Courts have recognized that persons who reside in an institution "voluntarily" may find themselves in a *de facto* involuntary status. *Torisky*, 446 F. 3d at 447 (citations omitted).

Absent at least an informal restriction on the resident's ability to leave, there is serious doubt about the applicability of any rights under *Youngberg*. Class members in DMR facilities can point to no such restriction. In fact, the Court's February 2006 order prohibiting the transfer of Fernald residents to the community is the first and only, formal or informal, limitation on a class member's freedom to leave an ICF/MR. Thus, other than these involuntarily confined residents at Fernald, there is serious doubt about the existence of a constitutional right to habilitation for other class members.

Minn. 1974) (holding involuntary committed patients have a right, grounded in due process or the Eighth Amendment, to a humane and safe living environment), *aff'd*, 525 F.2d 987 (8th Cir. 1975); *Wyatt v. Stickney*, 325 F. Supp. 781 (M.D. Ala. 1971) (holding involuntarily committed patients have a constitutional right to receive individual treatment that provides a realistic opportunity for improvement of their condition), *aff'd in part, reversed in part sub nom. Wyatt v. Aderholt*, 503 F.2d 1305 (5th Cir. 1974).

Whatever the parameters and applicability of a right to habilitation under federal or state law, it is clear that such a right does not encompass a right to remain in the facility of one's choice. No court has ever held that a State must maintain a particular institution, facility, or program in order to comply with a resident's right to habilitation. To the contrary, several courts have held just the opposite: the right of a person with mental retardation to an adequate level of care does not include the right to receive that care in a specific location or facility. Addressing this precise issue, the district court in *Lelsz v. Kavanaugh* concluded:

> The second fear is that, as a result of school closure, residents will be relocated to new schools that are further from the guardians' home, causing undue hardship on the family and creating additional stress for the school resident. It is certainly true that closing a school may cause some residents deemed inappropriate for community placement to be relocated to one of the remaining eleven state schools. The Court recognizes that in some cases hardship will result. *The reality is, however, that the State has always possessed the power-and frequently exercises the power-to relocate its residents for its own administrative needs. If it so desired, the State could unilaterally close any of the State schools, for economic reasons or otherwise.* The ability of individual residents and parents to fight closure of their own school would likely be limited to political means. Under the Settlement Agreement, those same political avenues of redress exist. The decision of whether to close any school, and which schools to close, will be determined by the Task Force appointed by the Governor. The Task Force is the appropriate forum for parents, guardians, and residents to air their opposition to the closure of any one school.

27

*Lelsz v. Kavanaugh*, 783 F. Supp. 296, 298 (N.D. Tex. 1991), *affirmed*, 983 F.2d 1061

(5th Cir.), *cert. denied*, 510 U.S. 906, 114 S.Ct. 287, 126 L.Ed.2d 236 (1993) (emphasis

supplied).[10]

   In *Bruggeman ex rel. Bruggeman v. Blagojevich*, the 7th Circuit Court of Appeals

reached an almost identical conclusion:

> The plaintiffs argue that the state is not providing identical service statewide
> because the vacancy rate is lower in the southern part of the state and this favors
> the people living there over those who live in the northern part. The plaintiffs
> insist on a right of access to facilities not merely in the county or the metropolitan
> area in which they live but within a 45-minute drive (or 30 miles) from their
> homes, as if every Medicaid recipient in Illinois were entitled to be equidistant
> with every other from every facility that rendered services for which such a
> recipient might be eligible. But the plaintiffs' argument carries even further,
> because the plaintiffs vary in the degree and precise character of their disability
> and as a result each has a unique set of needs and is demanding that an ICF/DD
> *that is tailored to his unique needs* be within the 45-minute driving radius of his
> parents' home. An unattainable goal that cannot rationally be attributed to the
> statute, *Harris v. James*, 127 F.3d 993, 1011 (11th Cir.1997); cf. *Boatman v.
> Hammons*, 164 F.3d 286, 290-92 (6th Cir.1998), it doesn't even have a purchase
> in the statutory language, which requires merely that the state not exclude any of
> its political subdivisions from the state's Medicaid plan. The plan "shall be in
> effect in all political subdivisions of the State," 42 U.S.C. § 1396a(a)(1), but this
> doesn't mean that, as implemented, the plan has to assure identical convenience of
> service everywhere in the state. Even less plausible is the suggestion that lack of
> uniform proximity to medical facilities constitutes discrimination among
> Medicaid recipients. 42 U.S.C. § 1396a(a)(10)(B). *See Alexander v. Choate*, 469
> U.S. 287, 302-03, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985).
>
> As for the right to obtain a needed medical service from a provider "who
> undertakes to provide him such services," 42 U.S.C. § 1396a(a)(23), the aim is to
> give the recipient a choice among available facilities, not to require the creation or
> authorization of new facilities. See *O'Bannon v. Town Court Nursing Center*, 447
> U.S. 773, 785-86, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980); *Kelly Kare, Ltd. v.
> O'Rourke*, 930 F.2d 170, 177 (2d Cir.1991); see also *Catanzano v. Wing*, 103
> F.3d 223, 231 (2d Cir.1996). The language we have quoted makes this clear.

---

[10] *Lelsz* was similar to these cases, involving all of the state-operated ICF/MR facilities in Texas. The
district court approved several settlements, required several remedial plans, and entered several
enforcement orders to vindicate the residents' constitutional right to habilitation and community services.
One of those plans, opposed by parents and parent groups from several institutions, involved the State's
decision to close several of its ICF/MRs and to transfer residents to other similar facilities or community
programs.

*Bruggeman ex rel. Bruggeman v. Blagojevich,* 324 F.3d 906, 910-911 (7th Cir. 2003) (emphasis in the original).

Courts also have consistently approved agreements that require the closure or phase-down of state institutions, over the objections of family members, where due process protections were provided for the objectors. *See, e.g., Jackson v. Las Lunas Center for Persons with Developmental Disabilities,* No. 87-0389FP/LCS (D.N.M. Dec. 19, 1997) (closure of two facilities); *Lelsz v. Kavanaugh,* 783 F. Supp. 296, 297-99 (N.D. Tex. 1991), *affirmed,* 983 F.2d 1061 (5th Cir.), *cert. denied,* 510 U.S. 906, 114 S.Ct. 287, 126 L.Ed.2d 236 (1993) (closure of two large institutions); *Halderman v. Pennhurst State School & Hosp.,* 620 F. Supp. 1221, 1232-33 (E.D. Pa 1985) (closure of Pennhurst institution); *Martin v. Taft,* C2-89-362 (U.S. District Court, S.D. Ohio)(Sargus, J., 11/28/2005) at 6 (noting that proposed objectors to settlement seeking to pre-empt potential elimination of ICF/MR services "fail to provide a legal basis for imposing these limitations."). *See also, Wyatt v. Hanan,* 170 F.R.D. 189, 194-195 (M.D. Ala. 1995)(Parent's motion to intervene as guardian of daughter to prevent closing of mental retardation facility denied).  For these reasons, the Court should conclude that so long as the Department continues to offer ICF/MR services to current Fernald residents, it is not prohibited from consolidating Fernald with other ICF/MR facilities.

B.    *The Federal Right to Integrated Community Services under the Americans with Disabilities Act Does Not Encompass A Right to be Provided Habilitation in a Specific Facility.*

1.    Persons with Mental Retardation Have a Right to Receive Care in an Integrated Community Setting.

Title II of the ADA, 42 U.S.C. § 12134(b), requires that public entities provide services to qualified individuals in the most integrated setting appropriate to each person's needs. The most integrated setting[11] is defined in the preamble to the Attorney General's Title II regulations as "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible . . ." 28 C.F.R. pt. 35, app. A, at 450. This is referred to as the "integration mandate" of the ADA.

States are "required to provide care in integrated environments for as many disabled persons as is reasonably feasible, so long as such an environment is appropriate to their mental-health needs.…This requirement serves as one of the principal purposes of Title II of the ADA; ending the isolation and segregation of disabled persons…." *Arc of Washington State Inc. v. Braddock*, 427 F. 3d 617, 618 (9th Cir. 2005) (citations omitted.). *See also* 28 C.F.R. § 35.130(d) (2006) (providing regulation that a "public entity shall administer services . . . in the most integrated setting appropriate to the needs of qualified individuals with disabilities").

The Supreme Court interpreted and applied that duty in the landmark case of *Olmstead v. L.C.*, 527 U.S. 581 (1999) (holding that unjustified institutional segregation and isolation is discrimination under the ADA's integration regulation). The Court enunciated two legal principles that animate the ADA. First, it stated that "institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life." *Id.* at 600. Second, "confinement in an institution

---

[11] An "integrated setting" means a community setting, as opposed to an institutional setting. *See* 28 C.F.R. Pt. 35, App. A sec. 35.130 (Integrated setting under ADA is one "that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible.") This may include residential services, such as a group home, treatment habilitation services, and support services such as home health aides.

severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Id.* at 601.

Therefore, to address the "[u]njustified isolation" prohibited by ADA's integration mandate, *Id.* at 597, *Olmstead* generally establishes community integration as the default, in all circumstances where there is professional support for community living. While federal law does not impose a requirement of community-based treatment on those who do not desire it, *id.* at 602, the State *is* required to provide community-based treatment for persons with mental disabilities when: (1) the State's treatment professionals determine that such placement is appropriate; (2) the person does not oppose such treatment; and (3) the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities. *Id.* at 607. Moreover, institutionalization is not required when all three of these criteria are not met. *Richard C. ex. Rel. Kathy B. v. Houstoun,* 196 F.R.D. 288, 292 (W.D. 1999) aff. *sub. nom, Richard C. v. Snider,* 229 F. 3d 1139 (Table) (3rd Cir. 2000).

2.    States Have and Need Considerable Flexibility to Implement Their Duty to Eliminate Segregation, Including Phasing Down Large Institutions.

In order to comply with their duty under the ADA to eliminate unnecessary segregation, States are afforded considerable flexibility to manage their resources, to develop, maintain, or modify their programs, and to transfer institutionalized residents to the community at a reasonable pace, pursuant to an effectively-working plan. *Olmstead,* 537 U.S. at 605-606. This flexibility must encompass the ability to transfer resources, as well as residents, and to close outdated or expensive facilities in order to serve the

greatest number of needy citizens in an equitable and efficient manner. Phasing down and closing large institutions is certainly an important option that States have, and historically have used effectively, to implement their federal statutory duty to eliminate the segregation of persons with disabilities.

The Supreme Court highlighted this flexibility in a number of ways. First, it noted that States may need to operate a range of facilities and programs, in their discretion. *Id.* at 605. The exact blend of institutions and community settings is properly left to the State, provided that some range exists and provided further, and most importantly, that persons with disabilities are not forced to endure unnecessary segregation or isolation as a result of a State's decision to maintain its institutions.[12] *Id.* at 601-602, 605.

Second, the Court afforded the States broad flexibility in managing and distributing those resources in order to achieve the goal of non-discrimination. *Id.* at 605. It recognized that converting from an institution to a community delivery system, even in part, takes time, and allowed the States to satisfy the ADA's integration mandate by having in place a workable plan that moves at a reasonable pace. *Id.* at 606.

Finally, the Court noted that States must consider the needs of all of its citizens with disabilities, and allocate its resources equitably amongst them. *Id.* at 604. For DMR, which serves over 10,000 non-class members and has a waiting list for thousands more, phasing down some of its extraordinarily expensive facilities that serve only a few hundred persons, is a necessary and appropriate action to comply with the ADA.

---

[12] There is no suggestion that Massachusetts will eliminate all of its ICF/MR facilities. To the contrary, DMR has offered Fernald residents, just as did Belchertown and Dever residents, a choice of moving to another state-operated ICF/MR. The Monitor's Report found that even this choice was insufficient, despite his corollary finding that all of DMR's ICF/MRs are federally certified, and provided "outstanding medical and social care." *See* Report at 23, 26.

3.    While ICF/MR Residents Cannot Be Involuntarily Transferred to the Community, They Also Cannot Insist Upon Staying in the Institution or Institutional Building of Their Choice.

The right to object to a more integrated setting appears to rest with the affected individual, and not with the guardian or family member. *See Olmstead*, 587 U.S. at 587 (transfer appropriate where it "is not opposed by the affected individual"; *id.* at 603, ("neither woman opposed such treatment"); *id.* at 607; ("the affected persons do not oppose such treatment"). *See generally, Ligas v. Maram*, 2007 W.L. 518800 (7th Cir. 2007), (referencing same *Olmstead* provisions as requiring "inquiry into the mental state of the proposed class members"). In some cases, the interests or preferences of guardians and residents may diverge. The most obvious example is a decision by a guardian to move or not move a person with a disability based solely on geographical convenience of the guardian.[13] In *In re Hop*, the Supreme Court of California noted the potential conflicts between the guardian and person with a disability and the need to protect the underlying constitutional interests of the person with a disability, recognizing that:

> [T]he great majority of parents are well motivated and act in what they reasonably perceive to be the best interests of their children. That fact cannot however,

---

[13]  This question is made all the more difficult by a lack of clarity in state guardianship law. It has been 180 years since the Supreme Judicial Court squarely considered the common law rights of a guardian to determine the domicile of his or her ward. *See Holyoke v. Haskins*, 5 Pick. 20, 22 Mass. 20 (1827). The Court's opinion therein reflects the understanding of the day that a person with a cognitive or intellectual disability had little stature beyond being chattel of the guardian. More recent case law and statutory authority reflect a stronger recognition of inherent rights retained by the person with a disability and the need for scrutiny of potential conflicts between his or her expressed or best interests and those of the guardian. *See e.g.*, G.L. c. 123B sec. 3 (providing that following objection to a transfer lodged by guardian, the hearing officer determines the "best interest of the ward giving due consideration to the objections to the placement made by the relative or permanent guardian." ); G.L. c. 201 sec. 6A(b) (providing that guardian shall not have the authority to admit a person with a developmental disability to a mental health or mental retardation facility without a hearing to determine the person's best interests and the appointment of counsel for him or her, if indigent); *Doe v. Doe*, 377 Mass. 272, 385 N.E.2d 995 (1979) (impliedly overruling *Russell v. Russell*, 336 Mass. 762, 147 N.E. 2d 154 (1958) and interpreting statute to require showing of likelihood of serious harm, beyond a reasonable doubt, in order for guardian to civilly commit ward over his or her objection). As a result, the scope of the guardian's common law authority to determine the domicile of a person with a disability, against the expressed will of this person, is unclear.

detract in any way from the child's right to procedures that will protect him from arbitrary curtailment of his liberty interest in such a drastic manner no matter how well motivated.

*In Re Hop*, 29 Cal.3d 82, 93, 93 623 P.2d 282, 288-89 (1981) (quotation omitted).

The Monitor's Report inappropriately assumes a complete identity of interests between the guardian and the ward. The Report concludes that in all cases where a move to the community is voluntary, the equal or better standard will be met; where the move is opposed by the guardians, the standard can never be met. This conclusion fails to consider even the possibility of divergent views between the guardian and the resident.[14]

Moreover, the right to object to a community placement under *Olmstead* is not same as an affirmative right to remain in the institution of one's choice, in the face of a State's reasonable decision to phase-down one of its institutions in order to comply with the integration mandate of the ADA. In determining that the State was not required to provide a community placement to an individual who preferred to live in an institutional setting, the *Olmstead* court was relying in large measure upon established ADA principles that people with disabilities may decline an offered reasonable accommodation. The Court noted that there was "no federal requirement that community based treatment be imposed on patients who do not desire it." *Olmstead*, 587 U.S. at 602. The presence of a right to decline an integrated setting is not the same as an affirmative right to reside in an institutional setting. It simply means that the state *is not required by*

---

[14] Even where the person with a disability may have difficulty formulating or expressing an opinion, it may be possible to assess their interests under a "best interests" or substituted judgment standard. *See, e.g.*, G.L. c. 123B sec. 3, providing for adjudicatory hearing in the event of a contested transfer, in which the hearing officer determines "the best interest of the ward giving due consideration to the objections to the placement made by the relative or permanent guardian." In other ICF/MR closures, this has occurred by inquiring as to how the person with a disability reacts when on field trips to the community, or how well s/he has handled other change in surroundings, such as turnover of institutional staff.

*the ADA* to impose community integration on those who would prefer to remain in an institution.

In sum, states are entitled to "more leeway"… "to maintain a range of facilities and to administer services with an even hand…" *Olmstead,* 527 U.S. at 605. DLC and Arc maintain that the Department's decision to close Fernald is within the bounds of such discretion. In interpreting the integration mandate, courts normally "will not tinker with" comprehensive, effective state programs for providing care to people with disabilities. *The Arc of Washington State Inc. v. Braddock,* 427 F. 3d 615 618-619 (9th Cir. 2005) (quoting *Sanchez v. Johnson,* 416 F. 3d 1051, 1067-68 (9th Cir. 2005)).

     C.    *The Medicaid Act, and Its Home and Community Based Waiver (HCBW) Program, Require States to Offer Persons with Mental Retardation the Choice of an ICF/MR Facility But the ICF/MR Facility of Their Choice.*

The same principles applicable to the ADA hold true under Title XIX, which "does not confer a right to continued residence in the home of one's choice." *O'Bannon v. Town Court Nursing Center,* 447 U.S. 773, 785 (1980) (federal Medical Assistance law does not confer upon nursing home residents the right to a hearing prior to their transfer to another nursing facility).

Since the early 1980's, the federal government has allowed States to apply for waivers to provide people with developmental disabilities services in home and community based settings. 42 U.S.C. § 1396n. States must ensure that recipients likely to require care in an ICF/MR must be informed about the feasible alternatives and given the choice of either institutional or home and community based services. 42 C.F.R. § 441.302(d)(1); 42 U.S.C. § 1396n(c)(2)(C). *See also* 42 U.S.C. § 1396a(a)(31) (requiring periodic independent professional review of need for ICF/MR services) and 42

C.F.R § 456.609 (requiring inspection teams to determine if it is "necessary and desirable" that ICF/MR residents remain, and whether "alternative institutional and non-institutional services are feasible.")

However, in the same manner that *Olmstead* does not the require an ICF/MR of choice under the ADA, the HCBS waiver application does not require an ICF/MR of choice under Medicaid. As the 10th Circuit noted last year, in denying one Medicaid-based challenge:

> Although the waiver application suggests that a developmentally disabled person will have a choice between an ICF/MR and HCBS, it does not assign to the State, or any other party, the responsibility to ensure that such facilities are in fact available. Indeed, the waiver application appears to mean only that the choice among "feasible alternatives" is to be made by the recipient-not that the State must make alternatives available.

*Mandy R. v. Owens*, 464 F. 3d 1130, 1145 (10th Cir. 2006). *See also, Fisher v. Oklahoma Health Care Authority*, 335 F. 3d 1175, 1182 (10th Cir. 2003) (failure to provide Medicaid services may violate ADA's integration mandate, when plaintiffs are directed towards receiving care in an institutional rather than community based setting).[15]

---

[15]    An individual also has no right to receive ICF/MR services in a setting which is not "medically necessary." ICF/MR facilities must "meet such standards as may be prescribed by the Secretary [of the United States Department of Health and Human Services (HHS)]." 42 U.S.C. §1396d(d)(1). *Accord 42 C.F.R.* §440.150(a)(3). HHS has prescribed standards that prohibit the admission of individuals to an ICF/MR unless "the facility can provide for the client's needs" and "the client is likely to benefit from placement in the facility." 42 C.F.R. §483.440(b)(3). Further, the ICF/MR standards require that the individual program plans must "support the resident toward independence ...." 42 C.F.R. §483.440(c)(6). These provisions recognize that the ICF/MR services provided to any particular individual must be appropriate to her needs and must maximize her ability to function independently. This is consistent with the purpose of Title XIX, which is to provide services to help eligible persons "attain or retain capability for independence or self-care." 42 U.S.C. §1396.

The federal ICF/MR regulations allow ICFs/MRs to transfer or discharge a client for "good cause." 42 C.F.R. § 483.440(b)(4)(i). Certainly, "good cause" would include a determination that the person can be better served in another, less restrictive setting.

**III.    Since There Is No Evidence of Systemic Noncompliance With Its Disengagement Order, There Is No Basis for Entry of Any Further Remedial Orders, And Particularly No Order Requiring That Fernald Remain Open or That Residents Be Informed That Fernald Will Remain.**

The Disengagement Order provides that the Court may reopen the case only upon a showing of a systemic violation of the provisions of the Order. Disengagment Order at ¶ 7. In their Motion to Reopen filed on July 13, 2004, the Fernald plaintiffs alleged systemic violations of conditions at the Fernald Developmental Center, of transfers from the Center to the community. Doc. 1. The Court denied this motion without prejudice. Order (January 20, 2005). On February 7, 2006, the Wrentham plaintiffs filed their Motion to Reopen, alleging massive violations of conditions in the community and of transfers from Wrentham. Doc. 84. Once again, the Court denied this motion without prejudice and without making any findings. Order (June 8, 2006).

In its February 6, 2006 Order, the Court referred some of these allegations to the Monitor. Doc. 90. In his March 6, 2007 Report, the Monitor carefully reviewed each of the allegations of systemic violations concerning the ICF/MR facilities, community programs, and transfers from Fernald to these programs. Doc.158. As to each allegation, the Monitor found that there was no violation of the Disengagement Order or other applicable state or federal law. Report at 13-23. Thus, based upon a careful assessment of all relevant facts, including a clinical review by medical professionals of forty-three transfers from Fernald, the Monitor concluded the defendants had complied with all of their legal obligations and, in particular, with all of the provisions of the Disengagement Order. Report at 10-12, 16, 23.

37

It is particularly significant that following a year-long review, the Monitor failed to substantiate any of the Fernald plaintiffs' allegations of breaches of the Disengagement Order as to certification of "equal of better" services, *see* Report at 14-16; documentation of receipt of notices by guardians, *id.* at 17; requirements related to the 45 day letter, *id.* at 17-18; the right to visit group homes, *id.* at 18; skilled nursing facilities regulations, *id.* at 18-19; consultation with the guardians of transferees, *id.* at 19; right to return letters, *id.* at 19; informed consent regulations, *id.* at 19-22; and explanations of the Home and Community-Based Waiver Program, *id.* at 23. Indeed, 92% of respondents to post-placement surveys rate their experience with the transfer process and community services in the two highest categories, with 78% of respondents rating their experience in the very highest category. *Id.* at 22.

Nevertheless, the Monitor speculated that the phase down of Fernald and the future transfer of Fernald residents – even those that consented to leave in the face of such phase down – would violate the Disengagement Order's provision that all transfers from an ICF/MR to a community program must include a certification by the superintendent that such transfer will provide the resident with an equal or better level of care. Report at 27. This single, unsubstantiated conclusion cannot constitute a finding of a systemic violation of the Order, since it is not based upon any evidence that a violation *has* occurred. Moreover, the speculation as to a future violation is unsupported by any clinical findings, or any findings at all. It assumes that all residents, regardless of their age, length of time at Fernald, abilities, strengths, needs, or clinical condition would suffer harm from a transfer to ever other state-operated facility and every community program. This assumption applies with equal force to all 189 residents remaining at

Fernald, without any evaluation whatsoever of their individual situations. Finally, the assumption, and resultant speculation, is directly contrary to the clinical findings of the Monitor's medical professionals, who reviewed forty-nine recent transfers and found them all to be consistent with professional judgment and the Disengagement Order's equal or better standard. Report at 14.

In the total absence of credible facts demonstrating a systemic violation of the Order, there is no basis or authority for the Court to reopen this case. And in the absence of a basis for reopening the case, there is no jurisdiction or legal authority for the Court to enter any further orders in this case, including an order to keep the Fernald Developmental Center open or to inform residents and guardians that they have a choice to remain at Fernald.

**IV.    There Is No Basis for Modifying The Disengagement Order to Require DMR to Maintain Fernald for All Current Residents.**

    *A.  Requiring DMR to Maintain Fernald for All Current Residents and Prohibiting DMR From Transferring Any Resident To Any Other ICF/MR or Community Program, Even Based Upon a Certification that Such Facility or Program Is Equal or Better to Fernald, Contravenes the Express Terms of the Disengagement Order.*

        1.    The Disengagement Orders Vests DMR with Substantial Discretion to Manage its Own Resources and to Determine Which of its Facilities Should be Maintained at What Size and Cost.

The terms of the Disengagement Order indicate that a decision as to the closure of a facility rests solely in the discretion of the Department of Mental Retardation.

Paragraph 5 of the Order provides that:

        Except as set forth in other paragraphs of this Order, nothing in this Order is intended to detract from or limit the discretion of the defendants [Department of Mental Retardation] in developing and improving and determining the personnel and budget of the Department of Mental Retardation and other state agencies, implementing innovative services,

> improving quality enhancement and dispute-resolution mechanisms, or allocating its resources to ensure equitable treatment of its citizens.

*Ricci v. Okin*, 823 F. Supp. 984, 987 (D. Mass. 1993). The Order preserves the Department's discretion to shape and reconstruct programs, and allocate and reapportion resources, under G.L. ch. 19B, sec. 1 and G.L. ch. 123B, sec. 2. Thus, the Department's discretion to consolidate one ICF/MRs with others, while still preserving ICF/MRs as a choice for residents, is specifically authorized by the Disengagement Order. The Monitor's recommendation that Fernald must remain open indefinitely, and that all current residents must have the option of remaining at Fernald indefinitely, impinges on the Department's discretion and, if adopted, would constitute a modification of the Disengagement Order.

The youngest resident at Fernald is 35 years old, Report at 6, and may presumably live forty or fifty more years. The Fernald facility itself is located on 186 acres, and consists of 13 buildings for residential housing, six sites for vocational training and recreational pursuits, a central power plant, indoor handicapped accessible pool, gymnasiums, an Activity Center and ball field. *Id.* at 7. Presently, 774 staff persons serve the 189 residents of Fernald and 29 residents of Marquardt. Eighty-five percent of these staff provide direct care. *Id.* at 7.

To maintain a fully-operating, fully-staffed facility indefinitely, or at least for the remaining lifetime of every current resident, would be a dramatically inefficient and ineffective means of providing high quality care to people with developmental disabilities.[16] The terms of the Disengagement Order, and the discretion afforded the

---

[16] To avoid these fiscal implications, the remaining alternative would be for the Department to begin admitting new residents to Fernald. This has not occurred, except under rare circumstances, for over twenty years. By the terms of the Disengagement Order, such persons would then become *Ricci* class

40

Department by its terms, does not permit, let alone require, such action. Only a

modification of that Order would allow for the adoption of the Monitor's

recommendation.

2.   The Disengagement Order Provides for a Certification of "Equal or Better" Only When Residents Move to Community Residences and Not in Transfers to Other ICF/MRs.

Paragraph 4 of the 1993 Disengagement Order, the only section addressing an

"equal or better" inquiry, reads as follows:

> Defendants shall not approve a transfer of any class member *out of a state school into the community, or from one community resident to another such residence*, until and unless the Superintendent of the transferring school (or the Regional Director of the pertinent community region) certifies that the individual to be transferred will receive equal or better services to meet their needs in the new location, and that all ISP-recommended services for the individual's current needs as identified in the ISP are available at the new location.

*Ricci v. Okin*, 823 F. Supp. 984, 987 (1993) (emphasis supplied). No provision of the

Order establishes any requirement or certification for a transfer between one ICF/MR and

another. To the extent that the Monitor's Report examines whether a transfer from one

ICF/MR to another can meet the "equal or better" standard, it seeks to evaluate a

requirement not imposed by the Order.[17] Moreover, the Monitor found noted that all

ICF/MRs provided services which complied with the Disengagement Order and all

---

plaintiffs. Disengagement Order at 2, n. 1. The consequences of such a decision would run afoul of the Department's obligations under *Olmstead.*

[17] The Court's Order of February 8, 2006 appointing the Monitor, directs the Monitor to review past and prospective transfers as to whether they comply with the "orders of this court" and "federal law [and] state regulations." (Doc. 90). Under state law, the Department must provide each resident and guardian for whom a transfer is being proposed a 45-day notice of why the Department believes a new facility "will result in improved services and quality of life." G.L. ch. 123B §3; 115 C.M.R. 6.63 (c ) (l). The Monitor did not identify any violations of the transfer statute or regulations. Report at 17. Moreover, state law requirements are not, by the terms of the stipulated Disengagement Order, enforceable in federal court, absent either a "failure to provide a state ISP process in compliance with the order or claims of a systemic failure to provide ISP services. Order at ¶ 7b, at 6. No such state law violation has been established.