applicable federal laws. Report at 14. Thus, even if the Court were to modify the Order to require an equal or better certification for inter-facility transfers, by the very terms of the federal certification process as well as the Monitor's own findings, this standard would be met. At the very least, it is not credible that it could never and will never be met for any current resident of Fernald. To so conclude, as the Monitor does, can only be sustained by a modification of both the certification standard as well as the certification process.

    3.    <u>The Disengagement Order Provides for a Certification of "Equal or Better" to be Conducted by DMR, and Not By the Court or Court Monitor.</u>

The Disengagement Order provides that the certification of "equal or better" shall be done by the Department, either through the Superintendent of the transferring school or the pertinent Regional Director. The terms of the Order represent a bargained-for agreement in which the Department is invested with the exclusive authority to make this determination. Although the Monitor found, after a careful clinical review by his own medical professionals, that the Department had made this certification for all prior transfers from Fernald and that this certification was clinically sound, he went on to speculate that for "some, many or most" such transfer may never be "equal or better" because of intangible considerations. Report at 27. In effect, the Monitor not only assumes the authority to make such a determination, but he does so with no clinical justification and contrary to the clinical findings of his own experts. To allow the Court or its Monitor to assume the role of the facility superintendent or regional director is contrary to the express terms of the Disengagement Order.

*B.    The Monitor's Recommendation that Precludes the Transfer of Any Resident from Fernald to Another Institution or Community Setting, Absent Consent from the Person's Guardian, Constitutes an Improper Modification of the Disengagement Order.*

    1.    <u>The Standard for Modification.</u>

The Disengagement Order of May 25, 1993 is a stipulated order, entered "[a]fter notice and hearing, and with consent of the parties." *Ricci v. Okin*, 823 F. Sup. 984, 986 (D. Mass. 1993). The Court vacated and dissolved all prior consent decrees and supplanted those decrees with the Disengagement Order. *Id.*

For the purpose of determining the appropriate standard for modification, the Disengagement Order should be regarded as a consent decree. First, it supplanted a previous consent decree. *Id.* Second, as an order reached by "consent of the parties," it contains both defining characteristics of a consent decree, a judicial decree and a contract. *Local 93 v. City of Cleveland*, 478 U.S. 501, 519 (1986). [18]

"A consent decree 'embodies an agreement of the parties' and is also 'an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees." *Frew v. Hawkins*, 540 US 431, 437 (2004), quoting *Rufo v. Inmates of Suffolk County Jail*, 502 US 367, 378 (1992).

Any modification of the Disengagement Order would be governed by F.R.C.P. 60(b). Rule 60(b) relief is "an extraordinary remedy and is granted only in exceptional circumstances." *McCormick v. City of Chicago*, 230 F.3d, 319, 327 (7th Cir. 2000) (quotation omitted). The rule is "not intended to enable litigants to avoid the

---

[18] The Disengagement Order was also regarded by the Supreme Judicial Court as a consent decree in *Newell v. Department of Mental Retardation*, 446 Mass. 286, 291, ft. 11, 843 N.E. 2d 1084, 1089, ft. 11 (2006).

43

consequences to settle or compromise which in retrospect appears unfortunate. *Smith v. Widman Trucking & Excavating, Inc.*, 627 F.2d. 792, 795 (7th Cir. 1980) (citations omitted). F.R.C.P. 60 (b) "provides that a party may obtain relief from a court order when *it is no longer equitable that the judgment should have prospective application*" not when it is no longer convenient to live with the terms of a consent decree." *Rufo*, 502 U.S. at 383 (emphasis supplied).

The *Rufo* court establishes a two-part test for modification of consent decrees deriving from institutional reform litigation that implicate constitutional rights. First, the party seeking revision of the consent decree must establish a significant change in circumstances, either in factual conditions or in law. Second, if the moving party meets this burden, the court must consider next whether the proposed modification is suitably tailored to the changed circumstance. *Rufo*, 502 U.S. at 383-384.

It is noteworthy that no party has filed a motion to modify the terms of the Disengagement Order. No has the Monitor suggested that a modification is appropriate. Finally, there is no evidence supporting, let alone demonstrating, the need for modification. However, even if the court were to consider modification of the Order *sua sponte*, for the reasons set forth below, the two-part *Rufo* test cannot be met.

    2.    <u>There is No Change in Fact Warranting Modification.</u>

There are no changed factual conditions before the Court which would meet the *Rufo* standard for new facts or events that would make compliance with the decree "substantively more onerous." *Rufo*, 502 U.S. at 384. Indeed, there are no material changes in fact of any type.

As noted above, the Monitor found that there were no systemic violations of the Disengagement Order, and that none of the material allegations of noncompliance advanced by the Fernald plaintiffs concerning conditions at the institutions, conditions in the community, or the transfer process were valid. The only empirical finding by the Monitor of any negative experience following transfers were some data on alleged increase in sexual abuse, relegated to a footnote. Report at 17, n 1. This single finding is neither accurate, as discussed in section I, *supra*, nor sufficiently clear to constitute a significant change in fact.[19]

Nor is the proposed closure of Fernald the type of changed factual condition which would justify modification, given that DMR has closed two of its large ICF/MRs (the Belchertown State School in 1992 and the Dever Developmental Center in 2005), as well as one of its smaller ICF/MRs (the John T. Barry Regional Center in 1994) during or subsequent to the Disengagement Order. *See* Defendants' Opposition to Plaintiffs' Motion to Re-Open and Restore Case to Active Docket and Enforce the Final Order at 20 (Doc. 8). The closure of Dever was accomplished over ten years. *Id.* at 20. The Fernald plaintiffs concede that the Belchertown closure was undertaken pursuant to procedures "agreeably followed by previous administrations with the support of parents and guardians of residents at Belchertown." Motion to Reopen and Restore Case to Active Docket at 19 (Doc. 1). Moreover, as noted above, the language of the Disengagement Order vests the Department with a broad range of discretion in allocation and consolidating resources.

---

[19] *See also* Affidavit of Leo V. Sarkissian, of The Arc of Massachusetts, filed with this memorandum, using DMR and DPPC data and showing percentage rate of abuse in community settings are lower than that in facilities, and not higher. In any event, the Monitor's understanding of rates of abuse in community settings bear no connection to his conclusion that Fernald residents cannot receive equal or better services at another ICF/MR.

Since the State has proceeded and completed the closure of three of its ICF/MRs under the Court's oversight and supervision, it can hardly be argued that a decision to close a fourth is a material change in fact not anticipated by any party.

### 3. There is No Change in Law Warranting Modification.

Under *Rufo*, new developments in the law may also establish changed circumstances to warrant a modification. *Rufo*, 502 U.S. at 384. The interpretation of a consent decree in institutional reform litigation requires a flexible approach, sensitive to both the public interest and evolving principles of federal law. *Id.* at 380-381, 388-389. The ADA's integration was enacted by Congress prior to the entry of the Disengagement Order, and thus cannot be considered a subsequent change in law.[20] There has been no suggestion, nor could there be, that there is a change in law that requires modification of the Disengagement Order.

Given the absence of changes in either fact or law, neither element of the *Rufo* test has not been established.

### 4. Compliance with the Original Terms of the Decree is Not Onerous, "Unworkable Because of Unforeseen Obstacles" or Detrimental to the Public Interest.

In considering if a change of circumstances exists to warrant modification of a consent decree under F.R.C.P. 60(b), courts may also look to whether a change in conditions has made compliance more onerous, is "unworkable because of unforeseen obstacles," or would be detrimental to the public interest. *Wyatt v. King*, 811 F. Supp.

---

[20] If anything, there has been a change that supports the Commonwealth's discretion and decision to phase-down its large ICF/MRs. The *Olmstead* decision and evolving principles of independence and community integration plainly establish, even more than the time of the Disengagement Order, that States must act to end the segregation of persons with disabilities and must have reasonable flexibility to accomplish the ADA's non-discrimination imperative.

46

1544, 1538-39 (M.D. Ala. 1993) (applying *Rufo* analysis to modification of institutional reform litigation on behalf of persons with mental illness and developmental disabilities.)

No party or the Monitor has suggested, let alone demonstrated, that the decree as written is onerous or that the consolidation of an ICR/MR is unforeseen. To the contrary, the consolidation of Fernald with other ICR/MRS is in the public interest, given that a "range of facilities" will remain, to be "administer[ed] with and even hand". *Olmstead*, 527 U.S. at 605. Moreover, an order based upon the recommendations of the Monitor to provide a lifetime right for all current residents to remain in Fernald indefinitely, and presumably for all current residents of every other ICF/MR to remain in their ICF/MR, would trigger a series of consequences that would be antithetical to the public interest.

The repercussions of such a decision would be three-fold. First, people who choose to live in ICF/MRs would receive a hugely disproportionate level of resources that directly and severely prejudices all other persons with mental retardation within the care of DMR who have elected not to remain in a large facility. Fernald is the oldest, publicly-funded facility in the Western Hemisphere serving people with developmental disabilities. As an aging facility, it requires significant expenditure just in maintenance and capital costs. By consolidating ICF/MRs, more resources will be available to individual ICF/MR resident that are otherwise spent inefficiently.

Second, more efficient use of the Department's resources would benefit *Ricci* class members that wish to move to community settings or who currently live in the community. In Massachusetts and across the country, there is a national trend in favor of transferring people with developmental disabilities from large institutions to more integrated settings. As noted in *Olmstead*, confinement in an institution "severely

47

diminishes the everyday life" and "perpetuates unwarranted assumptions" about people with developmental disabilities. *Olmstead*, 572 U.S. at 599. The decision of the Department to consolidate certain of its ICF/MRs provides for more efficient use of the Department's resources to benefit all *Ricci* class members, including those who are or will be living in the community.

Third, an order adopting the Monitor's recommendation would have a significant impact on the Department's resources available to non-*Ricci* class members. People with developmental disabilities who are not *Ricci* class members – the vast majority of persons served by the Department – are relegated to waiting lists and dependent upon benefits which are subject to appropriations. It is critical that DMR's resources be used efficiently, for the benefit of all consumers.

     5.    The Modification Proposed by the Monitor Is Not Suitably Tailored to Any Changed Circumstance.

Since neither the Fernald's plaintiffs nor the Monitor have established either a significant change in fact or law that would justify modifying the Disengagement Order, the Court need not proceed to the second part of the *Rufo* test, inquiring as to whether any proposed modification is suitably tailored to the changed circumstance." *Rufo*, 502 U.S. at 383. But even if the Court engages in this inquiry, it is apparent that a remedy of providing each current resident with a right to remain at Fernald and every other ICF/MR for his or her life is a modification far out of proportion to the underlying interests at stake.

The Monitor suggests a range of other housing and relocation options to more efficiently use existing resources, including redesigning 123 acres at Glavin, 588 acres at Monson, 2,600 acres at Templeton, 400 acres at Wrentham and 186 acres at Fernald.

Report at 25-26. He opines that homes could be clustered, land could be sold, and new residential homes could be built. *Id.* But is it unclear how any such steps could be taken if no resident could be relocated involuntarily, including being forced to move to a different section of a large institutional campus, to new building with different staff, and to entirely different residential compound. Moreover, it is difficult to understand how such moves, necessary to implement his proposals for efficient resource allocation, result in less challenges or trauma to an individual resident than a move to another ICF/MR.

The Monitor's proposed solution fails to adopt a narrowly-tailored, individualized approach to assessing and mitigating "transfer trauma." There is a substantial body of practical experience in Massachusetts and across the county, and a related body of academic literature, to demonstrate how people with developmental disabilities may successfully relocate either to community or other institutional settings with sensitivity, compassion and full participation of residents and family members. Although this information was provided to the Monitor, his report fails to adopt or discuss it.

Finally, the Monitor's recommendation as to Fernald's closure is not "suitably tailored" because it adopts a sweeping global approach regardless of individual circumstances. It concludes, universally and without regard to individual circumstances or even an individualized assessment of those circumstances, that relocation to another ICF/MR may not be "equal or better" for "some, many or most" Fernald resident. Report at 27.

State law already provides for an individualized determination of the appropriateness of any involuntary transfer, through the ISP process. G.L. ch. 123B §3; 115 C.M.R. 6.63. The rights of residents are fully protected by an appeal process

through the Division of Administrative Law Appeals (DALA), during which time a "stay put" provision prohibits any involuntary transfer. 115 C.M.R. 6.63 (4) (b). Thereafter, the resident may seek review under G. L. ch. 30A and seek a further stay pending an appeal. 115 C.M.R. 6.63 (4) (b)(1).

These existing state law procedures are a more "suitably tailored" process for addressing concerns with respect to the transfer of any resident and which hardly could apply to all residents. Reliance on this state law procedure would be consistent with the Court's admonition in *Rufo* that "once a court has determined that a modification is warranted . . . principles of federalism and simple common sense require the court to give significant weight to the views of the local government officials . . ." *Rufo*, 502 U.S. at 393.

## CONCLUSION

For the reasons set forth above, the Court should reject the Monitor's recommendation that Fernald should remain open indefinitely, that residents should be informed of the choice to remain at Fernald indefinitely, and that no resident should have to leave Fernald, even if the State determines to phase down the facility, and even if it provides each resident with options of transferring to another certified ICF/MR or a licensed community program.

>Respectfully Submitted,
>THE ARC OF MASSACHUSETTS
>By its Attorneys,
>
>/s/ Robert D. Fleischner
>Robert D. Fleischner BBO # 171320
>Steven J. Schwartz BBO # 448440
>Center for Public Representation
>22 Green Street

Northampton, MA 01060
(413) 587-6265
rfleischner@cpr-ma.org
sschwartz@cpr-ma.org

DISABILITY LAW CENTER
By its attorneys,

/s/ Richard M. Glassman
Richard M. Glassman BBO # 544381
Stanley J. Eichner  BBO # 543139
Disability Law Center, Inc.
11 Beacon Street, Suite 925
Boston, MA 02108
(617) 723 8455
rglassman@dlc-ma.org
seichner@dlc-ma.org

Dated: May 31, 2007

51