# ATTACHMENT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ROBERT SIMPSON RICCI, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) CA Nos. | 72-0469-T (Belchertown) |
| | ) | 74-2768-T (Fernald) |
| | ) | 75-3910-T (Monson) |
| v. | ) | 75-5023-T (Wrentham) |
| | ) | 75-5210-T (Dever) |
| ROBERT L. OKIN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## AFFIDAVIT OF WILLIAM E. JONES

I, William Edward Jones, PhD, hereby swear as follows:

1.      I reside at 608 Symphony Woods Drive, Silver Spring, MD 20901.

2.      In November, 1972, I was appointed Superintendent of Belchertown State School. ("BSS") and was a Defendant in the <u>Ricci v. Okin</u> class action lawsuit. I have appeared before this Court numerous times to discuss efforts to improve services and create community opportunities for residents of BSS.

3.      From June 1982 to September 1983, I served as the Acting Chief Operating Officer for the Massachusetts Department of Mental Health ("DMH"), which at that time included the Division of Mental Retardation. I then resumed my responsibilities as the Superintendent of BSS until my resignation in February of 1986.

4.      In 1986, I became the Executive Director of the American Association of University Programs for People with Developmental Disabilities. I held this responsibility until I retired in 1998.

1

5.    Early in my professional career, I served for five (5) years as a public school teacher and an additional five (5) years as a public school administrator of services for children and adolescents with learning and behavioral disabilities. It was through these capacities and responsibilities that I worked directly with persons with mental retardation and their families and with public schools and other community agencies to support the person and his/her family to sustain a child in their homes and community. My doctoral studies were focused upon persons with disabilities and how to plan/develop community/home based support for community living as the primary option. These earlier experiences impacted significantly upon each of my later responsibilities.

6.    My responsibilities as Superintendent of BSS included many tasks, foremost of which was compliance with the Court's orders in this case. In addition, I was responsible for:

(1)    the overall management of all aspects of the facility;

(2)    compliance with all federal ICF/MR regulations/requirements;

(3)    compliance with DMH regulations and policies, including ISP regulations;

(4)    the development and maintenance of good working relationships with families of residents;

(5)    maintenance of a good working relationship with the leadership of various state employee unions, especially as major changes were made in the expectations of each employee regarding new services and supports to each resident;

(6)    working with the Plaintiffs, especially. Dr. Benjamin Ricci;

(7)    the development and maintenance of relationships with the leaders of local community agencies, state legislators and the media.

7.    A significant part of my responsibilities included working closely with the DMH Regional Director and the five Area Directors. The collaboration of this group was focused on the development of a comprehensive system of community placement options and care. This system was designed to address the individual support needs of BSS residents and of persons living in the community who were at risk of being institutionalized.

8.    When I became Superintendent in 1972, significant deficits existed concerning the basic safety and health of each resident at BSS. These deficits were described in the plaintiff's class action complaint and were further documented by legislative hearings and reports and the local media. Therefore, my initial priorities and actions were focused upon addressing the immediate needs of each resident.

9.    Working closely with the lead plaintiff, Dr. Ricci, my staff and I developed clear responses that addressed the concerns in the lawsuit and each class member's needs. The Legislature and Governor's Office adopted many of our recommendations, which were subsequently incorporated in the Belchertown Consent Decree. This Decree prioritized the developments and actions of the BSS staff for all of the years of BSS's operation. Dr. Ricci and members of the BSS Friends' Association (Friends) maintained close scrutiny over every action and helped identify progress, deficits, resource needs, and other necessary remedial actions. Dr. Ricci maintained a tireless and tenacious advocacy with increasing expectations and

3

accountability.

10.    It was through Dr. Ricci and the Friends' involvement and collaboration that we were able to shape and share the successes and benefits of improved services, supports, and living environments at BSS. With each resident, we saw the revival of skills and new growth. More and more residents demonstrated self-care skills that rapidly reduced the need for "staff care". The residents' ability to live more independently led to discussions with Dr. Ricci and the Board of Directors of the Friends about the development of community living options for many residents.

11.    From these discussions, we identified the requisite services and supports that had to be developed to accomplish a successful community placement. The Regional Director of DMH, the five Area Directors and I established a collaborative process in which we planned a more systematic approach to the development of community placement opportunities and options for BSS residents. These plans were then discussed openly and continuously with Dr. Ricci and representatives of the Friends, in order to gain their direct involvement in developing a new community system and an infrastructure that would hold all DMH managers accountable for compliance with the standards and quality specified in our plans.

12.    The Plaintiffs maintained strict oversight of BSS and joined in the planning and development of community based placement options for BSS residents. The ISP was the keystone for each resident's services, support and placement regardless of the location for living.  The ISP process was the central vehicle for ensuring resident/family/guardian choice, participation, and satisfaction.

4

Any disputes by a resident or guardian with the ISP could be (and were) raised and resolved through the ISP appeal process.

13.    During this time, significant changes were occurring in the quantity and quality of the community service options, as well as state funding for community services.  Most important were: (1) the design and implementation of a comprehensive array of community services/support options, based upon the specified needs of each individual; and (2) the involvements of Dr. Ricci, the Friends, family members, the Area/Regional Directors, BSS leadership staff and others to create the new service network and options.

14.    The decision to close BSS was not a part of these earlier (1975 — 1986) remedial plans, decrees, and actions.  We focused our efforts upon opening the community by developing/providing the services needed by each BSS resident.  As more and more successful placements occurred, questions developed about the feasibility of operating a facility with fewer and fewer residents.  From these considerations the decision was made to close BSS.

15.    Throughout these years, each class member, family, guardian had choices regarding services, supports and placements.  Great care and attention was given to use the ISP process as the means to identify each resident's needs and service options. When a recommendation was made for the placement/transfer of a resident to the community, visits were encouraged so that all questions/concerns would be discussed and resolved.

16.    During the early phase of the development of these community services/options, given the relative immaturity of the system, residents/parents were

given the option of returning to BSS. However, this was rarely necessary. As the community system grew, so did supervision, oversight and quality assurance. After placements were made, if there were concerns, the concerns were quickly addressed/resolved. In those few cases where the initial placement was determined to be inappropriate, an alternative placement was promptly developed and provided in the community.

17.    There were several important outcomes from the actions to "open" the community while meeting the needs of each resident at BSS. First and foremost, in 1972, the relationship between the parents/families and the leadership at DMH and BSS was non-existent and adversarial. Through the establishment of a collaborative process, leaders from the parents/Friends and various state officials learned to work together in addressing/resolving services deficits and in planning and developing new services for each resident.

18.    Second, through the new partnership, community-based services were planned and developed so that virtually *all* BSS residents accepted placement in a community living arrangement. When it was determined to close BSS, and the remaining residents and their families were informed of this decision, most chose community placement, but the few who preferred to continue to live in an ICF/MR were offered a transfer to the Monson Developmental Center.

19.    Many, if not most, of the residents who moved to the community had been living at BSS for many years, and often for many decades. The BBS staff made special efforts to ensure a careful, respectful, and gradual transfer

process for all of these individuals, understanding that the change in living environments, services providers, and staff would take time. Residents and families were offered an opportunity to visit new homes and express preferences about their roommates and even their staff. When new residences were constructed, families even were asked to participate in their design. All of this occurred in the context of the ISP process, with the right of appeal, as well as a new regulatory appeal process through the Division of Administrative Appeals (DALA).

20.    As a result of these efforts and the multiple appeal processes, *all* residents of BSS moved to another setting, including many who had lived at BSS for many, many years. Their placements resulted in appropriate services and settings that clearly were equal to or better than BSS. As the Superintendent of BSS during most of these placements, I can clearly state that all of the placements that I reviewed were equal to or better than BSS.

21.    This conclusion was true for all residents, regardless of the length of time they had lived at BSS; regardless of the nature/extent of their disability; regardless of whether they chose to move to the community or Monson; and regardless of whether they chose to move before or after the announcement of the closure of BSS.

22.    Finally, through the collaborative partnership, real and potential problems were identified and resolved, thereby reducing/eliminating risks, neglect and service access problems.

23.    These developments have been successfully implemented by other

facilities in Massachusetts and across the United States. Over the past twenty years, other States, including our neighbors in Maine, New Hampshire, Rhode Island, and Vermont have closed *all* of their large ICF/MRs. As a result, *all* of the residents of these facilities have moved to community settings. Connecticut has closed several large facilities, although one remains open. In my role at the AAUAP, and from my perspective in Washington, D.C. working with States and the federal government, I am aware that all of these closures have been considered an enormous success by persons with mental retardation, their families and guardians, and public officials.

24.     In reviewing the United State's Attorney's report to the Court in this case, I was struck by how far the community system has evolved since I left BSS more than twenty years ago. It appears to me that community options, services, and living arrangements have been dramatically expanded, and that the community service system now has capacity to serve even the most challenged and disabled resident of an ICF/MR. As a result, it would seem relatively straightforward to replicate the positive experience that we created in closing the BSS at the Fernald Developmental Center and at any other ICF/MR.

25.     It also seems clear that since the Court oversaw the successful closure of both BSS and the Dever State School, with the gradual transfer of thousands of residents from these ICF/MRs to community programs as well as to other ICF/MRs, there is no clinical, programmatic, or legal barrier to this occurring at Fernald or other facilities.

Signed under the pains and penalties of perjury, this 26th day of May,

8

2007.

William E. Jones, PhD