# ATTACHMENT B

# RESULTS OF THE SURVEY OF CURRENT
# AND FORMER BELCHERTOWN
# RESIDENTS AND THEIR FAMILIES

### The Belchertown Follow-Project

### December 1992

---------------------------------

### Submitted by:

Valerie J. Bradley
Human Services Research Institute
and
Celia S. Feinstein and James A. Lemanowicz
Conroy & Feinstein Associates
and
Mary Ann Allard, Ph.D
Shriver Center

---------------------------------

### Submitted to:

Philip Campbell, Commissioner
Department of Mental Retardation
Commonwealth of Massachusetts
Boston, Massachusetts

---------------------------------

# Preface

In May 1992, the Massachusetts Department of Mental Retardation (DMR) asked the Human Services Research Institute (HSRI) in Cambridge, MA to conduct an independent evaluation of the quality of life for people who had moved from Belchertown State School and for those who were currently living at the state school. In order to accomplish this task, HSRI subcontracted with Conroy and Feinstein Associates (CFA) in Pennsylvania, to design the project surveys and analyze the results; and with The Shriver Center, to coordinate the collection of survey data from individuals, providers and families.

Project staff proposed to conduct interviews with individuals and to survey their families regarding satisfaction with where class members live, work, and spend their days and leisure time. On the individual survey, four themes were emphasized: consumer satisfaction, community integration, opportunities for making choices, and productivity. Some demographic and disability-related information was also requested. On the family survey, satisfaction was assessed in addition to perceptions of changes in the family member, concerns about permanence and stability in the community, and attitudes regarding the ultimate closure of Belchertown State School.

The project was conducted as part of DMR's quality assurance program and was specifically linked to the Department's Services Enhancement Plan, which requires some type of follow-up on the quality of services that DMR provides to persons who have moved from state facilities. Through this project, it was the Department's intent to add several important dimensions, namely individual and family satisfaction with services and indicators of quality of life, to their quality assurance program and to help identify the strengths of the Belchertown process while modifying that process, where necessary, for individuals making future moves to the community.

Both Central Office and Region 1 DMR officials and staff, including people at Belchertown State School, provided invaluable assistance in identifying lists of individuals, providers and families to participate in the project. Further, Belchertown State School staff enabled project interviewers to conduct surveys during a very difficult and hectic time at the school. Cooperation from community providers, staff and individuals with mental retardation and their families also greatly facilitated the completion of interviews of hundreds of individuals across several regions in the Commonwealth.

The results of the six month project are presented in three parts: Part 1 briefly summarizes some of the historical background that led to the closure of Belchertown State School, Part 2 summarizes the findings of the family survey and Part 3 highlights the results of the consumer survey. Discussion of major project findings is presented at the end of each respective part of the report.

## Part One: The Historical Backdrop for the Belchertown Follow-up Project

In 1915, the Commonwealth of Massachusetts obtained an 843 acre tract of land in Belchertown and two years later 10 male residents and two employees from Wrentham State School established the Wrentham State School Farm Colony in Belchertown. The farm colony at Belchertown gradually increased as additional residents from Wrentham State School were sent there for agricultural production. Finally, in 1922, Governor Cox of Massachusetts signed legislation establishing the "Belchertown State School, for the Care and Custody of Feeble-Minded Persons." (DMR, A Study of Feasibility of Consolidating Certain Mental Retardation Facilities in the Commonwealth, 1989, pp.3-4).

As in other states, institutions like Belchertown continued to increase in size while little attention was paid to deteriorating physical facilities, understaffing, and lack of adequate services for the residents. In the early 1970's, Dr. Benjamin Ricci, whose son had moved to Belchertown in 1953 after the town of Amherst refused to provide him with a public education, began to look more closely at the conditions at Belchertown (Scott, 1987). In 1972, after a special legislative commission investigated conditions at the school, Dr. Ricci decided to file a class action law suit against the Commonwealth on behalf of the residents of Belchertown State School (Ricci v. Greenblatt, C.A. No. 72-469 -T). Ricci v. Greenblatt became the first of five lawsuits brought by parents on behalf of institutionalized family members in the Commonwealth. The lawsuits were settled by consent decrees which obligated the Commonwealth to provide appropriate services to members of the plaintiff class throughout their lives. The consent decrees included not only institutional improvement but the development of community residences for persons covered by the decrees. Since the early 1970's, Judge Joseph Tauro has enforced the decrees with vigor and, as some observers have noted, he never forgot his initial visit to Belchertown and how conditions there improved as a result of the court's involvement (Scott, 1987).

During the next 10 years, various reforms took place at Belchertown and the other state institutions in large part because the state agreed to participate in the Medicaid (Title XIX) ICF/MR program. In order to meet the Medicaid standards, the Commonwealth upgraded the staffing, improved the programming, and carried out extensive physical renovations. Although the agreement brought in a significant amount of federal money, the linkage of Medicaid to the consent decrees, according to some observers, drove up the cost of improvements (Scott, 1987). At the same time, the adequacy and pace of community placements continued to be hotly debated among the plaintiffs and worried other advocates who saw the increasing attention to institutional improvement as siphoning off needed resources for those individuals

and their families not covered by the consent decrees (BRADLEY & ALLARD, 1983). In order to abate some of the controversy over "class versus non-class" membership and entitlement to services as a result of the consent decrees, the Commonwealth implemented a "80-20" policy which allocated 20% of the "slots" in community residences to non-class members. That policy continues informally to the present.

Implementation of the consent decrees in Massachusetts has spanned four administrations, including Governor Dukakis' two terms. The consent orders were originally signed by Governor Dukakis, but shortly thereafter he lost his bid for re-election to Ed King. Governor King and his staff were faced with implementing a series of mandates that they had no part in crafting. Implementation lagged and frequent clashes occurred between the court and the administration over staffing levels and proposed layoffs and between the Court and the legislature when it failed to enact certain appropriations for capital outlays at the state schools (HSRI, 1983).

In 1983, Governor Dukakis was back in office for his second term and got the legislature to pass a capital budget which represented the final push towards full compliance with the decrees. Funding was specified not only for varying degrees of renovations at each of the state schools but also for construction of new homes in the community. In this same budget, language was added requiring some state operation of community programs for persons leaving state institutions. In 1984, the Commonwealth submitted its plans to complete the consent decrees to the court. As part of these plans, a "Housing Agenda" was added which detailed institutional renovations and community placements in cities and towns throughout the Commonwealth for 1,024 class members (DMR, 1989, p. 6). In October 1986, Judge Tauro issued an order ending <u>active</u> court oversight of the state schools and included the steps the Commonwealth had to take in order to "disengage" from its involvement in the cases. The order established a three year disengagement period during which all outstanding requirements were to be completed. This was followed by Executive Order #268 on December 29, 1986, which created the Office of Quality Assurance for the Mental Retardation Consent Decrees to monitor the disengagement process.

During this time, the Commonwealth continued to implement institutional improvements and to create new community settings. In 1986, DMR gained approval from the Court to reassign staffing resources from the state schools and transfer them to community homes where state school residents would live. At the time, plans included the completion of 57 state staffed and operated homes, including a number of ICFs/MR serving eight people in some, while the remainder were duplex apartments with four people living in each apartment.

Interestingly, plaintiffs involved with Belchertown State School determined that a greater share of its resources should be focused on developing community living arrangements for individuals instead of upgrading the school. As a result, the fewest capital dollars have been expended on Belchertown (DMR, 1989). Given this fact, it was estimated that $10 to $15 million would have to be invested in the deteriorating Belchertown physical plant over the next five years if the facility was to continue operations. Further, Belchertown had the lowest census of all the five schools covered by the decrees (266 in 1989), which led to increasingly higher per diem costs as greater numbers of individuals were moved to community placements. All of these factors, together with some survey results indicating that most individuals residing at the School either expressed a preference for community services or no preference, led DMR to recommend that Belchertown be phased down over a three year period (DMR, 1989, p.ii).

Since 1989, the plans to close Belchertown have proceeded accordingly. Approximately $5 million from the phase down has been "re-invested" in community programs, including both state-operated and privately operated programs. In July 1992, at the time that this project began to interview Belchertown residents, 92 persons remained at the school and closing was imminent.

## Part Two: Results of the Survey of Families of Current and Former Belchertown Residents

### Introduction

As part of the contract between the Massachusetts Department of Mental Retardation and the Human Services Research Institute (HSRI), the study team surveyed the families of all individuals who still resided at Belchertown at the time of the study (May - October 1992). The opinions and experiences of families are important elements of this research project and should be included in any evaluation of the quality and efficacy of services and supports. Families are in the unique position of observing the effects of services and supports over a period of years, and they can offer concrete insights about what works and what does not work.

Families have received little systematic attention in the policy making process in the field of developmental disabilities. To be sure, certain vocal and articulate families have always been accorded access to decision makers. Without more systematic input, there are two important negative consequences: (1) it practically assures that the only news that state officials will ever get from families will be bad -- only the "problem cases" ever reach them, and (2) the families less gifted with assertiveness, verbal skill, and/or influence are never heard from at all.

One way to change this lack of systematic feedback, even if only in small steps, is to include families in the formal structure of the quality assurance system. In the past, the most widely known and used quality assurance practices have ignored families entirely. For example, neither the standards of The Accreditation Council, the Commission on the Accreditation of Rehabilitation Facilities, nor those of the federal Intermediate Care Facilities for the Mentally Retarded, define any role for families during the site review. The Belchertown Follow-Up Project was designed from the beginning to include the perceptions and concerns of the families.

### Prior Research

Families of people in public institutions have been found to be very satisfied with the facilities, and opposed to changes such as community placement. One of the earliest reports of this satisfaction was from Klaber (1969). Surveying parents of people in institutions in Connecticut, he found more than three fourths of them were convinced

of the excellence of the facilities. In his most radical statement of the findings, he wrote that "the praise lavished on the institutions was so extravagant as to suggest severe distortions of reality in this area."

Later, Brockmeier (1975) reported similarly high levels of satisfaction, coupled with skepticism about community-based care, among families of people in Nebraska institutions. In Texas, Payne (1976) discovered the same situation. Payne also identified a "deinstitutional backlash," a loosely knit counter-movement of various local and statewide associations of parents organized in support of institutions as opposed to community residential facilities (CRFs). Overwhelming satisfaction was also reported by Willer, Intagliata, & Atkinson (1979) in New York State. At an institution in Pennsylvania, Meyer (1980) found that over 70% of families were satisfied, and they opposed the idea of community placement. Our own initial findings from the Pennhurst study were released in 1980, and showed the same pattern. Atthowe & Vitello (1982) detected similar feelings among families in New Jersey; in their survey, 54% expected no more than custodial care, and 91% said the institutional care was adequate or better.

The only study to date in which family feelings were assessed **before and after** community placement was conducted as part of the Pennhurst study. From high opposition scores, the families changed dramatically to an average score reflecting overwhelming surprise and high levels of satisfaction with the new community based arrangements. They felt that their relatives had made great strides, which they had initially thought impossible; they were pleased with staff; and they perceived their relatives to be happier. They maintained, however, serious concerns about the **permanence** of community programs and funding.

In the early 1980's, a Family Impact Survey was also conducted in Massachusetts at Belchertown State School. Eastwood (1985) surveyed the families of two sets of matched persons: persons who had previously been institutionalized at Belchertown and were currently living in community settings and persons who were still institutionalized (N=49 in each group). Unlike the Pennhurst Family Survey, families of persons who were placed in community settings were not surveyed before their family member moved. Similar areas of concern were covered in the surveys including, but not limited to, family visitation patterns, family perceptions of medical needs, perceptions of an individual's personal growth, service system capabilities and stability, unmet service needs and satisfaction with services. Thirty two community families and

38 institutional families responded to a telephone interview. Overall, both sets of families were satisfied with the services their relative was receiving.

One finding, however, that does depart from earlier studies, is the perception by community families that funding is more permanent in the community than the institution. Even though community families were quite positive and enthusiastic about their family member's new life in the community, their major concerns focused on program continuity, stable staffing and adequate service provision.

In a study in New Hampshire (Bradley, et. al., 1986), families were interviewed after their family members had left Laconia State School and moved to the community. In addition to asking about satisfaction with current services in the community, families were asked, retrospectively, how they had felt about services at the institution.

The following section describes the results of a recent survey of families of Massachusetts residents who lived at Belchertown and have since moved to the community, as well as the families of people who still lived at Belchertown at the time of the study. For the families of people who moved to the community, questions were asked about satisfaction with community programs, as well as retrospective satisfaction with Belchertown.

## Methods

### Subjects

During June, 1992, the Department of Mental Retardation provided a list of family contacts to the Human Services Research Institute. A mail survey was sent to the family or guardian of persons who had left Belchertown between July, 1990 and April 1992 and were living in the community, as well as to the families of current Belchertown residents. An additional 68 families of individuals who had moved from Belchertown to the community before July 1990 also received surveys. The total number of families receiving surveys was 270.

### Instrument

The survey instrument was adapted from the family survey instrument used in the Pennhurst Longitudinal Study in Pennsylvania (Conroy & Bradley, 1985). The

Pennhurst survey was shortened and questions specific to Massachusetts were added. Similar family surveys have been conducted in Connecticut, Louisiana, Georgia and New Jersey. The family survey form is included as an appendix to this report.

### Procedures

Completion of the survey required between 10 and 25 minutes. Families who chose to participate in the study completed the survey and returned it in a stamped, addressed envelope to HSRI. The questions were multiple choice, with the exception of two questions at the end which were open-ended. The open-ended responses to the two questions are included as an appendix to the report. These family observations and comments are an important aspect of the family survey and provide information and insight that cannot otherwise be obtained.

In our analysis and presentation of the results of the family survey, we have refrained from using inferential statistics. That is, there are no "tests of statistical significance" in this analysis. The reason is that we do not wish to imply that the 270 families we surveyed are necessarily representative of all the families of people who have moved from Belchertown to the community or of families of people who still live at Belchertown. Tests of significance are designed to give estimates of the probability that what is true of a **sample** is true for the **population**. We do not intend to make any such claims. The 129 families who responded to the survey provide a rich and varied cross section of opinions and attitudes, but these surveys were not intended to be generalized to all families.

## Results

Of the 270 surveys mailed, 129 surveys were returned, for a 48% response rate. This rate is particularly impressive given the fact that a letter was sent by a local advocate to all families in the region encouraging them not to respond. Of the 129 surveys returned, 36 were from families of individuals who lived at Belchertown at the time of the survey, and the remaining 93 were from families of individuals who formerly lived at Belchertown but who now reside in the community.

The  distribution  of  respondents  to  the  survey  was  as  follows:

| | |
|---|---|
| Mother | 29% |
| Father | 8% |
| Mother and Father | 5% |
| Sibling | 32% |
| Guardian/Advocate | 22% |
| Other | 4% |

As the data show, the respondent was most often a parent (42%), or a brother or sister (32%). This is presented graphically in Figure 1. In Eastwood's study of Belchertown families (1985), the typical respondent was also the mother or the sister of the individual. The average age of family members who responded to the survey was 61 years, with the youngest respondent being 27 years of age, and the oldest respondent being 88 years of age.

The family surveys were completed for individuals who were living in a variety of settings, as indicated in the following table:

| | |
|---|---|
| Belchertown | 29% |
| Community Res (5-8) | 33% |
| Staffed Apt/Home (1-4) | 32% |
| Specialized Home Care | 2% |
| With Family | 1% |
| Other | 3% |

Overall, 29% of the responses were from the families of current Belchertown residents, and 71% were from the families of former Belchertown residents now living in community settings. These results are presented graphically in Figure 2.

The individuals in this study, both those living in the community as well as at Belchertown, have a wide range of disabilities as reflected in the question concerning level of retardation. The levels of retardation reported by family members is as follows:

FIGURE 1



BELCHERTOWN FAMILY SURVEY 1992
TYPES OF RESPONDENTS

N = 129



FIGURE 2

BELCHERTOWN FAMILY SURVEY 1992
WHERE RELATIVE LIVES

N = 129

|                              | Belchertown | Community |
|------------------------------|-------------|-----------|
| Not Retarded                 | 0           | 1%        |
| Mild Mental Retardation      | 0%          | 5%        |
| Moderate Mental Retardation  | 14%         | 16%       |
| Severe Mental Retardation    | 61%         | 58%       |
| Profound Mental Retardation  | 25%         | 20%       |

As the data indicate, people living at Belchertown are more likely to experience either severe or profound mental retardation. However, it must also be pointed out that of the people who left Belchertown, 78% are reported to have either severe or profound mental retardation. Figure 3 presents the data graphically. Although level of mental retardation is not the most comprehensive measure of level of functioning, it does give us some indication that these two populations of individuals are not all that different from one another.

The next question in the survey asked families how satisfied they are with where their relatives are living. The results are displayed in Figure 4. As the figure shows, 91% of the Belchertown families are satisfied or very satisfied with where their relatives are living, and 89% of the community families are satisfied or very satisfied with where their relatives are living. None of the families reported being very dissatisfied, and only 2% of the community families expressed dissatisfaction. In the earlier Belchertown study, Eastwood (1985) noted similar satisfaction levels for both sets of families.

The next questions asked about family visits to the relative and the relative's visits to the family during the past year. Figure 5 display the families' visits to the place where their relatives live. As the figure shows, 64% of the community families visit at least every 3 months, which is the same percentage as the Belchertown families. Eastwood (1985) also found that approximately 80% of the families have visited their relative during the previous year. However, in this study, 15% of the Belchertown families, compared to 20% of the community families, had not visited their relatives in the past year.

Figure 6 shows how often the relative has visited his/her family during the past year. The frequency of visits to the family home is significantly less than family visits to the relative's home for both groups. However, 58% of the community residents have not visited their relatives in the past year, while for the Belchertown residents the figure is 87%. Interestingly, Eastwood (1985) also noted that individuals living in the community visited their families more frequently than their institutional counterparts.

FIGURE 3



# BELCHERTOWN FAMILY SURVEY 1992
## LEVEL OF MENTAL RETARDATION

FIGURE 4



BELCHERTOWN FAMILY SURVEY 1992
FAMILY SATISFACTION

FIGURE 5



# BELCHERTOWN FAMILY SURVEY 1992
## FAMILY VISITS TO RELATIVE



FIGURE 6



BELCHERTOWN FAMILY SURVEY 1992
RELATIVE VISITS TO FAMILY

In the next question we asked family members how happy they think their relatives are now. As Figure 7 shows, none of the families perceives their relatives as being unhappy. Eighty-five percent of the community families perceive their relatives as being happy, while 73% of the Belchertown families believe their relatives are happy.

In the next section of the survey families were asked to indicate how much they agree or disagree with a series of statements. For each item families were asked to rate using a scale of 1 to 5, with 1 being strongly disagree and 5 being strongly agree. There were 13 items in the section. In 5 of the 13 items the responses of the two groups were significantly different. Those 5 items are displayed in Figure 8.

The first statement was, "my relative has learned just about all he/she is ever going to learn about taking care of his/her own needs." As the figure shows, the Belchertown families were more likely to agree with the statement than the community families.

The second statement in which there was a significant difference was, "staff turnover at the program where my relative lives is a major problem." Again, the Belchertown families were more likely to agree with this statement than the community families.

The next statement, which is closely related to the first was, "my relative is continually learning to do more for himself/herself." Families of Belchertown residents were less likely to agree with this statement than community families.

The fourth statement in which significant differences were found was, "my relative has little or no privacy where he/she lives." Belchertown families were more likely to agree with this statement than community families.

In the last statement, "I think that the closing of Belchertown is a good decision," Belchertown families reported higher levels of disagreement. This may be because many of those individuals who remain at Belchertown are labelled "medically fragile" and their relatives may be concerned about the level of physical and medical care they may receive in the community.

FIGURE 8



BELCHERTOWN FAMILY SURVEY 1992
DO YOU AGREE OR DISAGREE?

LEARNED ALL HE CAN — 3.8 / 2.9

STF TURNOVER PROBLEM — 3.2 / 2.5

REL STILL LEARNING — 2.6 / 3.6

REL HAS NO PRIVACY — 2.6 / 2

BELCHER CLOSING GOOD — 2.2 / 3.6

RATING

BELCHER    COMM

1=STRONGLY DISAGREE
3=NEUTRAL
5=STRONGLY AGREE

FIGURE 7



The average responses to the remaining statements are presented below.

|  | Belchertown | Community |
|---|---|---|
| I trust the ability of staff who work with my relative to handle almost anything that comes up. | 4.1 | 3.5 |
| The funding for places like the one my relative lives in is secure and permanent | 3.0 | 3.5 |
| The agency that runs my relative's home will still be in business 5 years from now | 3.2 | 3.7 |
| My relative often does *not* get the kind of medical care he/she needs. | 2.1 | 1.9 |
| The food at the place where my relative lives is good quality. | 3.9 | 3.9 |
| It is very important to me that I have the major say about what happens to my relative | 4.5 | 4.4 |
| I feel that my family member's health and safety are protected | 4.3 | 4.2 |
| The staff that work with my relative, on the average, like him/her. | 4.2 | 4.2 |

Overall, families were similarly in agreement with the above statements. The statement on medical care was worded such that agreement would indicate that their relatives were not receiving needed medical care. Community families in the Eastwood study (1985) believed their relative's life had changed for the better, while the institutional families though changes would be for the worst if their relative moved to the community. In 8 out of 12 items measuring change, community families saw significantly better changes than did the institutional families including the general happiness of their relative and his/her relationship to other people. Unlike the current survey, both groups of families though that their relative had attained their highest level of personal growth, yet community families had significantly more positive attitudes towards normalization.

Families were asked whether the services that their relatives are receiving are being delivered in accordance with their Individual Service Plans (ISP). The results were as follows:

| | BELCHERTOWN | COMM |
|---|---|---|
| Yes, all prescribed services are being delivered | 89% | 85% |
| Yes, but there are gaps in service | 12% | 13% |
| No | d 0% | 1% |

For those family members who indicated that there were gaps in service, we asked for a description of the problem. A listing of those situations is attached in the appendix to the report.

For those families whose relatives had not yet left Belchertown, the following question was asked: "Would you like your relative to move into a small, community-based setting such as a community residence or staffed home/apartment?" Forty-five percent of the respondents said definitely yes, 10% said probably, 25% were not sure, 5% said probably not, and 15% said definitely no. This is presented in a graph in Figure 9. In the 1985 study of Belchertown, Eastwood found that 32% of Belchertown families would agree to having their relative placed in the community. The percentage of families favorable to community placement has grown since the mid 1980s.

While it is clear is that all residents of Belchertown will move into community settings, there is still a certain amount of uncertainty among families. This is quite similar to results found in other states in which surveys were administered to families of individuals living in congregate care settings.

The next set of questions was directed to those families whose relatives had already left Belchertown and asked for a retrospective appraisal of the conditions at Belchertown and the way in which their relatives' transition was managed. The first question asked how satisfied families were with the residential program at Belchertown. Responses were as follows.

| | |
|---|---|
| Very Satisfied | 17% |
| Somewhat Satisfied | 24% |
| Neutral | 15% |
| Somewhat Dissatisfied | 26% |
| Very Dissatisfied | 18% |

Figure 10 compares the family's rating of their satisfaction when their relative lived at Belchertown with their current rating of satisfaction with their relatives' home in the community. The figure shows that 40% of the families were satisfied or very satisfied with Belchertown, compared to 87% of the families who are satisfied or very satisfied

FIGURE 10



BELCHERTOWN FAMILY SURVEY 1992
SATISFACTION OF COMMUNITY FAMILIES

COMMUNITY FAMILIES ONLY
N = 80