with their relatives' community residence. Conversely, 19% of the families reported being very dissatisfied with Belchertown, yet no one was very dissatisfied with the community residence.

The next question asked families how satisfied they were with what their relatives did during the day while they were living at Belchertown. Families seemed to be more satisfied with day programs and activities than the residential program, as indicated below.

| | |
|---|---|
| Very Satisfied | 28% |
| Somewhat Satisfied | 25% |
| Neutral | 18% |
| Somewhat Dissatisfied | 19% |
| Very Dissatisfied | 10% |

We asked how often their relative came home to visit while they were living at Belchertown. The results were as follows.

| | |
|---|---|
| About once a week or more | 6% |
| About once per month | 7% |
| About every three months | 10% |
| Once or twice a year | 17% |
| Less than once a year | 59% |

Regarding the transition from Belchertown to the community, families were asked the following questions:

How were you and your family member treated by DMR institutional staff during the transition from Belchertown to the community?

| | |
|---|---|
| Very Well | 71% |
| Fairly Well | 16% |
| Neutral | 7% |
| Fairly Poorly | 6% |
| Very Poorly | 0% |

How were you and your family member treated by DMR community staff during the transition from Belchertown to the community?

| | |
|---|---|
| Very Well | 78% |
| Fairly Well | 12% |
| Neutral | 9% |
| Fairly Poorly | 1% |
| Very Poorly | 0% |

As these data reflect, families felt that they were, for the most part, treated well by both the institutional staff and community staff as their relatives moved from Belchertown to the community.

Families were then asked if they would be willing to serve on a citizen/consumer advisory board to the Department of Mental Retardation or on the board of a provider agency. Eighty percent said no, and 20% said yes.

## Discussion

The family survey is one of the critical pieces of the Belchertown study. In addition to obtaining the thoughts, feelings and opinions of people with disabilities and the people who support them, it is equally important to collect information from family members, who are often seen as "secondary consumers" of service. In this study, families of former Belchertown residents (referred to as community families) and families of individuals who resided at Belchertown were surveyed (referred to as Belchertown families).

Readers must be cautioned that the results reported herein are from the 129 families who responded to the survey. Because there was no test for non-respondent bias (a process to test whether non-respondents are different from those individuals who did respond), it cannot be assumed that the families who responded are representative of all families of current and former Belchertown residents. However, the responses reported by these families members provide valuable information for other families, policy-makers, and the public regarding their experience with the deinstitutionalization process and the outcomes for their family members.

Overall, the data indicate that the respondents' family members living in the community, based on level of retardation, are not very different from those living at Belchertown, indicating that community placement for the remaining Belchertown residents should be successful.

As cited in previous studies, families of institutional residents are generally satisfied with the facility in which their relative lives. This was confirmed by those families whose relatives still lived at Belchertown. Likewise, families of community residents reported similar high levels of satisfaction. However, when those same families were asked retrospectively about their levels of satisfaction with Belchertown, the results were

fascinating, yet in remarkable concordance with results in other states. For the community families, 16% reported having been very satisfied with Belchertown, yet 76% of the families report being very satisfied with the community. Conversely, 19% of the families reported having been very dissatisfied with Belchertown, and no one reported being very dissatisfied with the community. Caution must be exercised, however, in interpreting these data in particular. We have asked families to remember back to when their relatives lived at Belchertown, which for some families was as long as 5 years ago. For some family members, the further away they are from a situation, the more difficult it is to remember the situation with clarity.

When comparing Belchertown families to community families, the community families were happier overall, perceived their relatives to be happier, believed that their relatives were continuing to learn new things, and that the closing of Belchertown was a good idea. Although families had some concerns about the permanence and security of community programs, in general they felt positive about the community system. This attitude was also found in Eastwood's study of Belchertown families several years earlier. At the same time, it may be that the positive orientation that families feel is due in large part to the administration of mental retardation services in Region I.

However, despite overall satisfaction with the quality and quantity of services, the open-ended comments suggest that there is still a lack of variety, diversity, and choice in people's lives, and for several families, a need to focus on communication issues -- an area which was also raised in the 1985 Eastwood study.

In summary, because of our experience in surveying these families in Massachusetts, we conclude that any monitoring or quality assurance system that is developed should include meaningful participation by families, both as respondents to annual surveys and as part of any citizen/consumer-based monitoring system.

**Part Three:  Results of the Survey of Current and Former Belchertown Residents**

Introduction

To determine the impact of deinstitutionalization on people who have left Belchertown, the study team at HSRI and Conroy & Feinstein Associates (CFA) also performed face-to-face surveys with people who are receiving community-based residential services.  For those individuals who were not able or willing to complete a verbal interview, interviews were conducted with surrogates (i.e., direct contact staff who know the individuals well).  In addition, individuals who still resided at Belchertown at the time of the study were interviewed.  Where necessary, surrogates were also interviewed for Belchertown residents.

This report summarizes the results of interviews with individuals and their caregivers regarding the dimensions of satisfaction, community inclusion and productivity.

The work that CFA has conducted in other states as well as nationally, has demonstrated that people with disabilities should always be interviewed about the quality of the places in which they live, and about their assessment of satisfaction with where they live, work and recreate.  However, it must also be recognized that not all individuals with developmental disabilities are capable of or willing to participate in a verbal interview.  Therefore, it is important to remember that in any study of satisfaction of people with disabilities, people who respond to the interview are not necessarily representative of all people with disabilities.

Unfortunately, the study team did not have access to baseline data for the former Belchertown residents, so a comparison between current satisfaction and satisfaction with Belchertown was not possible.  While people could be asked to make a retrospective assessment of satisfaction with the institution, the literature indicates that for people with mental retardation, this is not a wise strategy (Sigelman, 1981).  Instead, the study team measured current satisfaction based on a "slice of time."

Prior Research

It is an extremely important fact that deinstitutionalization of people with mental retardation has been stimulated, perhaps even fueled, by litigation.  In Alabama, frustrated advocates took their concerns to a federal court, and the Wyatt versus

Stickney case soon established a "right to treatment" for people at the Bryce State Hospital and other institutions, including Partlow State School and Hospital. The court decided that, if people were going to be segregated from society in locked facilities, the only constitutional justification for such an abridgement of rights would be that they were receiving "treatment" from which they would benefit. Moreover, the court set certain standards the facility would have to meet. Finally, the court even decided that if the state could not do the job, the facilities would be put under the direction of the court itself

The case of Halderman versus Pennhurst was tried in 1977 and decided in 1978. It was one of the most significant cases because all previous cases had been settled without the judge having to make a decision; the parties had come to agreements. In Pennhurst, Judge Raymond Broderick of the District Court for the Third District of Pennsylvania, was forced to issue a decision on December 23, 1977, and an order on March 17, 1978. He decided that the Pennhurst Center, **by its very nature**, could never provide even minimally adequate care. He decreed that every person at Pennhurst would be given a chance to live in community settings in regular neighborhoods.

Following Pennhurst, and before the middle of the 1980s, 26 other states were facing similar litigation. The social influence of these cases was enormous (Laski, 1985).

Other factors have also influenced change over the past two decades including a rejection of the "medical model" (Nowell, Baker, & Conroy, 1989; Conroy, Feinstein, Lemanowicz, & Kopatsis, 1985). Such a rejection is based on the fact that people with mental retardation do not necessarily have significantly more needs for health care personnel than the rest of the population. Until the 1970s, institutional opponents have based their arguments almost entirely on ideology and moral principles, rather than scientific evidence. Since then, there has been almost 20 years of empirical studies of community placement outcomes. These studies without exception showed superior outcomes associated with community living (Craig & McCarver, 1984; Larson & Lakin, 1989; Larson & Lakin, 1991).

In a Pennhurst type study conducted in Massachusetts, Eastwood (1985) matched 49 Belchertown State School residents who moved to a variety of community settings between 1980 and 1984 to a group of residents still residing at the school. The two

samples were matched on 14 independent variables, including age, level of mental retardation, self-preservation ability, and a number of secondary disabilities and two dependent variables, a daily living skills scale and a cognitive, social and community orientation skills scale. Measures of skills were taken in 1980, prior to movement, again, in 1984, after at least one year of community living.

In 1988, Eastwood and Fisher published the results of their study which indicated that persons who were placed in the community had a significantly greater level of cognitive and social skills after placement than the matched group of persons still residing at Belchertown. The community group surpassed the institutional group on seven of eight skills areas (e.g., reading/writing, quantitative, independent living, community orientation, recreation/leisure time, vocational, & social interaction). Only language skills were not significantly greater at Time 2. Both groups had significantly higher daily living skills at Time 2, and no differences were found between the groups on any of the individual skills scores. As Eastwood notes, however, the findings are noteworthy because the staff to client ratios for the community residents were only two thirds that of the staff to client ratios for the institutional residents during the same time period. These findings are similar to other deinstitutionalization studies that have shown increased adaptive behaviors or cognitive development after community placement.

Largely because of this accumulating evidence, more and more Medicaid dollars have recently been used to support community residential programs. Federal rules and regulations for "FFP" (Federal Financial Participation) have changed. The ICF/MR program was expanded in the late 1970s to include a subprogram called the "small ICFs/MR 4 to 15 beds" program. This was the first time states had the option of securing Medicaid funds for small community group homes. However, these facilities were required to meet medically-oriented standards similar to those required for the large state institutions.

Despite the Medicaid program, in the recent past the deinstitutionalization process has continued. The essence of the recent history of residential programs can be captured with three words: decentralization, privatization, and federalization. People have been moving from the centralized congregate care facilities to dispersed homes, and those homes are operated almost entirely by private entities. However, more and more of the costs of all kinds of care have been shouldered by the federal government.

In terms of the number of people receiving residential services, the total number of beds has remained remarkably constant for 20 years at about 250,000 (Lakin, White, Hill, Bruininks,

& Wright, 1990). Thus per capita placement rates have dropped significantly. This is largely because it has become very rare for a child to be placed in an institution. With the advent of the Right to Education law, PL 94-142, a free appropriate education is offered to every child regardless of severity of disabilities. Where parents previously had little option but to institutionalize, now there is a very real option.

Reflecting the privatization trend, privately operated beds have increased from 10% in 1967 to 37% in 1977 and then to 58% in 1986 (Lakin, White, Hill, Bruininks, & Wright, 1990). Small facilities (15 beds or fewer) have increased: 16% of the beds in 1977 were in small facilities, and that figure had grown to 41% by 1986. Similarly, the mean size of facilities dropped from 22 in 1977 to 9 in 1986.

This investigation is <u>not</u> intended to explore the continuing debate between those who believe that institutional settings are an important part of the continuum of care (Ellis, 1979; McCann, 1984) and those who feel that no one is better off in an institution (Center on Human Policy, 1979).

There have been several thorough reviews of the community versus institution literature in recent years (Craig & McCarver, 1984; Haney, 1988; Willer & Intagliata, 1984). The most recent and the best is the analysis performed by Larson and Lakin (1989). They examined all recent quantitative studies of the behavioral outcomes associated with deinstitutionalization. They selected the experimental/comparison group and longitudinal studies of people who moved from state institutions to small (15 or fewer people) community living arrangements. They found 15 research reports, containing 18 separate studies, with 1,358 subjects total, that met specific criteria for design and recency.

There were 8 experimental/contrast group studies, and all of them found significant improvement in overall adaptive behavior and/or basic self-help and domestic activity skills. (These skills include such things as dressing, toileting, eating, communication of needs, use of money, attention span, and so forth.) Of the 10 longitudinal studies without comparison groups, 5 of the 10 reported statistically significant improvements in adaptive behavior, and the other 5 found improvements that did not reach statistical significance.

Next, Larson and Lakin (1991) performed an analysis on studies of family responses to the deinstitutionalization of their relatives. Their report summarized 27 research studies which examined the attitudes and perspectives of parents of currently or formerly institutionalized people. Several trends were evident. Parents whose offspring were living in institutions at the

time of the survey were overwhelmingly (90%) satisfied. Parents whose offspring had moved from institutions to small community settings were very positive (over 80%) about the new community settings. Finally, the mean level of satisfaction with the institution for retrospective studies (after movement to the community) was only 52.3%.

Larson and Lakin summarized their analysis: "The clearest message in these studies is that the overwhelming majority of parents become satisfied with community settings once their son or daughter has moved from the institution, despite general predispositions to the contrary." (p. 37) In summary, large total care institutions have been convincingly shown to yield lower quality of care and lower quality of life than small integrated community homes. Whether it is the size, in itself, that "causes" the low quality of life in institutions, is still an open question. Some analysts say it is not the size, but structural factors. Others say that structural factors are inextricably intertwined with the fact that the organization itself is so large. In any case, as Larson and Lakin (1989) said, size may only be acting as a proxy for some cluster of factors that are very important. But it is possible for program operators to <u>control</u> size. Therefore it is important to try to understand what influences size has on the quality of the residential program.

When we use the outcome approach, we are asking whether the person's quality of life has been enhanced in any measurable way by the service, in this case the residential program. Outcomes can also be thought of as "indicators" of quality. Some examples of positive outcomes are developmental progress toward increased independence, earning more money, being more integrated, consumer satisfaction, and family satisfaction.

## Methods

### Subjects

The focus of this study is on two groups of individuals: those who formerly resided at Belchertown and currently live in the community, and those individuals who are still living at Belchertown and are awaiting community placement. Through the Department of Mental Retardation, we were given a list of the names and addresses of 212 individuals living in the community and 82 individuals living at Belchertown. The Department of Mental Retardation sent a letter to each individual requesting their participation in this study. A data collector contacted the residence of each individual, scheduled a face-to-face interview, and conducted the interview.

### Instruments

The survey instrument was adapted from the follow-up survey used to collect data about individuals involved in the Pennhurst Longitudinal Study (Conroy & Bradley, 1985). Because the focus of this study was on the satisfaction of the individuals affected by the Belchertown closure, questions were concentrated in the areas of making choices, integration and productivity. The individual survey form is included as an appendix to this report. Wherever possible, the individual was interviewed to measure their responses to the questions. However, if the individual was unwilling or unable to complete a verbal interview, the direct care staff person who knew the individual best was interviewed, with one exception. In the case of the consumer interview, if the individual was unwilling or unable to complete the interview, surrogate responses were not accepted. Instead, that section of the interview was left blank.

The instrument was reviewed by individuals from the Department of Mental Retardation as well as other interested parties to insure that it reflected the needs of individuals in Massachusetts and the service system that supports them.

### Procedures

In order to collect the aforementioned data, we contracted with approximately 10 individuals who live in Western Massachusetts and who have experience in the field of mental retardation. CFA provided training during a one-day session held in Springfield, and an in-state coordinator was available by phone to answer questions and provide technical assistance. Data collectors visited each of the individuals who had moved out of Belchertown and who agreed to participate in the study, and attempted a verbal interview with each person. Open-ended comments from those interviews are included in the appendix to this report. In addition, the data collectors interviewed staff, if necessary, to obtain responses to the questions about disability related information, integration and productivity. Surrogate respondents were not used for the satisfaction portion of the instrument.

Once all data were received, the data were entered onto a microcomputer and analyzed.

Completion of the survey required between 60 and 90 minutes. In the analysis and presentation of the results of the individual survey data, when differences between groups were found (institution and community or institution, state-operated community and vendor-operated community), appropriate post-hoc tests were performed to determine whether the differences were significant. In most cases, a one-way analysis of variance was used. These tests of

significance are designed to give estimates of the probability that what is true of a sample is true for the population.

## Results

The population identified for this study was 92 people currently living at Belchertown State School, and 212 former Belchertown residents now living in the community. In the time frame of this study, 265 surveys were completed. Data was collected for 86 out of 92 people at Belchertown (93%), and 179 out of 212 people identified in the community (84%). There is no reason to believe that the small number of people that were not surveyed were any different than the people we did survey.

The residential placement type of the 265 people in the data set are presented in Figure 1. The percentages were as follows: 33% lived at Belchertown, 18% were in a community residence (5-8 people), 46% were in a staffed apartment/home (1-4 people), 1% were in specialized home care, and 2% were in some other type of residential placement. Overall, 67% were former Belchertown residents living in the community, and 33% were Belchertown residents.

It was found that about half of the community programs were state operated, and half were vendor operated. Therefore, for the remainder of this report, the 265 people are split into three comparison groups: the 86 people at Belchertown (33%), 96 people in state operated community programs (36%), and 83 people in vendor operated community programs (31%).

The percentages at reported levels of mental retardation are shown in Figure 2. The Belchertown group had the highest percentage of people labeled with severe or profound mental retardation (95%). The people in state operated community programs had the next highest percentage (72%); people living in vendor operated community residences had the lowest percentage of people with severe or profound retardation (54%). All three groups were significantly different from each other on this dimension.

The three groups were tested for differences in age. No significant difference in age was found among the three groups. The people living in state operated community programs had an average age of 53, and the people at Belchertown and in vendor operated community programs had an average age of 48.

An analysis was also done of the number of people with disabilities living together for each of the three groups. The average for each group is shown in Figure 3. As the figure shows,

FIGURE 1



### BELCHERTOWN STUDY 1992
### WHERE PEOPLE LIVE

N = 265

FIGURE 2



BELCHERTOWN STUDY 1992
LEVEL OF MENTAL RETARDATION



FIGURE 3



living areas at Belchertown have the highest number of people with disabilities living together (an average of 13.1 people), followed by state operated community settings (5.6 people), and then vendor operated community programs (3.4 people). All three groups were significantly different from each other on this variable.

Figure 4 presents the level of medical needs for each of the three groups. The figure shows the percentage of people who had more serious medical needs (i.e. need 24 hour medical care, or has life-threatening condition) and less serious medical needs (i.e. needs only a visiting nurse, or has no serious needs). Belchertown residents had a higher percentage of people with more serious medical needs (34%) than people in state operated (8%) or vendor operated community programs (2%). The Belchertown group had significantly greater medical needs than the two community groups.

Each consumer in the study was given the opportunity to tell an interviewer how they felt about many aspects of their lives, in a brief but private interview. A check question was included in the interview to insure the consistency of responses. We asked the same question twice in a slightly different way, and interviews containing contradictory responses were removed from the analysis.

The primary focus of this study was consumer satisfaction. Unfortunately, only 4 interviews were completed with the people at Belchertown, compared to 82 in the community groups. This is not surprising, in light of the difference between the groups in the level of mental retardation, and the large number of non-verbal people at Belchertown. Due to the small numbers, we cannot compare the results at Belchertown with the results in the community. However, the Belchertown results are reported separately, and only raw numbers (rather than percentages) are presented.

## RESULTS OF CONSUMER INTERVIEW AT BELCHERTOWN

|  | YES | UNSURE | NO |
|---|---|---|---|
| Like Living Here | 3 | 1 | 0 |
| Like Staff | 4 | 0 | 0 |
| Like Food | 4 | 0 | 0 |
| Enough Clothes | 4 | 0 | 0 |
| Have Good Friends | 4 | 0 | 0 |
| Staff Nice | 3 | 0 | 0 |
| Like Day Program | 3 | 1 | 0 |
| Make Money | 1 | 0 | 1 |
| Choose What To Eat | 2 | 0 | 3 |
| Choose Clothes To Buy | 2 | 1 | 0 |
| Choose Clothes To Wear | 2 | 1 | 0 |

FIGURE 4



BELCHERTOWN STUDY 1992
MEDICAL NEEDS

| | | | |
|---|---|---|---|
| Choose Activity In Free Time | 2 | 1 | 0 |
| Choose Friend For Free Time | 2 | 1 | 0 |
| Choose How To Spend Money | 2 | 1 | 0 |
| Choose How Often Friends Visit | 0 | 3 | 0 |
| Are Guests Allowed Anywhere | 3 | 0 | 0 |

The results show a general pattern of satisfaction for the four people at Belchertown who responded to the consumer interview. This finding is similar to responses in Pennsylvania on the same questions.

It should be noted that the results of the consumer interview, while valuable, cannot be taken as being representative of the larger groups (Belchertown or community). By virtue of the interview method itself, only the opinions of the verbal people were included. The opinions of the more capable and verbal consumers do not necessarily represent those of people who could not speak for themselves.

In the community, we completed 82 consumer interviews (of the 179 community residents). The results are as follows:

### RESULTS OF CONSUMER INTERVIEW IN THE COMMUNITY

| | YES | UNSURE | NO |
|---|---|---|---|
| Like Living Here | 92% | 1% | 7% |
| Like Staff | 86% | 8% | 6% |
| Like Food | 89% | 4% | 7% |
| Enough Clothes | 90% | 6% | 4% |
| Have Good Friends | 85% | 2% | 13% |
| Staff Nice | 87% | 11% | 2% |
| Like Day Program | 92% | 0% | 8% |
| Make Money | 73% | 7% | 20% |
| Choose What To Eat | 79% | 17% | 4% |
| Choose Clothes To Buy | 82% | 13% | 5% |
| Choose Clothes To Wear | 91% | 9% | 0% |
| Choose Activity In Free Time | 80% | 20% | 0% |
| Choose Friend For Free Time | 54% | 36% | 10% |
| Choose How To Spend Money | 72% | 21% | 7% |
| Choose How Often Friends Visit | 27% | 58% | 15% |
| Are Guests Allowed Anywhere | 78% | 14% | 8% |

The table reveals a general pattern of satisfaction with various aspects of life. In fact, more than 90% of the respondents were satisfied with where they live, the amount of clothes they have, and their day program. Dissatisfaction was greatest on items dealing with friends and money. Many of the respondents said they have no real good friends (13%) and do not make any money (20%).

When the responses to the above questions are compared for the two community groups (state operated and vendor operated) there were no significant differences on any of the items.

Figure 5 presents graphically the results for community residents to the question, "Do you like living here?" The figure shows that 92% of the people in the community do like where they live, versus 7% who said "no." With a similar community population in Pennsylvania, we found that 81% of the people liked where they live, and 11% did not like where they live.

Two scales were created from the consumer interview data, one of which summarizes the consumer satisfaction items and another which summarizes the consumer choice items. Interviewers completed consumer interviews for 40 people in state operated community programs and 42 people in vendor operated programs. There was no statistically significant difference between the state operated and vendor operated programs, on either of the scales.

Another section of the survey measured social presence for each of the people in the study. This was done by counting the number of contacts with non-handicapped people in a week. The results are presented in Figure 6. People in Belchertown had far less frequent contact with non-handicapped people than people living in either of the community programs. This difference was statistically significant.

The study team also investigated the frequency of integrated activities by creating a scale which can be compared across groups. This scale measured the frequency of a variety of common community activities, including visiting friends, going to a supermarket, going to restaurants, going to places of worship, going to a shopping center, going to taverns, and going to the bank. It ranged from 0 to 100, with a higher score indicating more frequent participation in integrated activities. The results of this comparison are shown in Figure 7. The frequency of integrated activities was much higher for vendor operated and state operated community programs than for people at Belchertown. This difference was statistically significant.

The respondent to these questions on integrated activities was usually the staff or family member only (72%). Sometimes the resident responded in combination with the staff/family member (25%). The resident responded alone in only 4% of the cases.

Average weekly earnings for the three groups were compared, and are presented in Figure 8. Weekly earnings were higher for vendor operated ($12) and state operated ($9) community programs than for Belchertown residents ($2 per week). This difference was statistically significant.

FIGURE 5



BELCHERTOWN STUDY 1992
LIKE WHERE YOU LIVE

COMMUNITY ONLY
N = 82

FIGURE 6



# BELCHERTOWN STUDY 1992
## CONTACT WITH NON-HANDICAPPED PEOPLE

HIGHER SCORE = MORE FREQ CONTACT

FIGURE 7



# BELCHERTOWN STUDY 1992
## FREQUENCY OF INTEGRATED ACTIVITIES

HIGHER SCORE = MORE FREQ ACTIVITY

FIGURE 8



# BELCHERTOWN STUDY 1992
## WEEKLY EARNINGS

A scale on Opportunities for Choicemaking was computed for group comparison. This scale rated how frequently the resident either made choices or had the opportunity to make choices. The scale ranged from 0 to 100, with a higher score indicating more frequent opportunities to make choices. Figure 9 presents the scale scores for the three groups. The figure shows that people in vendor operated community programs had the greatest opportunity for choicemaking among the three groups, and the people at Belchertown had the least. All three groups were significantly different from each other. This scale is highly correlated with level of mental retardation (r = .55).

Responses to these questions on opportunity for choicemaking was usually made by the staff or family member (72%). Sometimes the resident responded in combination with the staff/family member (21%). However, the resident responded alone in only 7% of the cases.

The physical quality of the environment is presented in Figure 10. This scale ranged from 0 to 10; a higher score indicated a more pleasant and attractive environment. This rating was subjective, and was made by the data collector. There was a statistically significant difference between the community program ratings (state and vendor operated) and the Belchertown ratings of physical quality.

In another part of the survey dealing with services, we asked whether the person is receiving services in accordance with the Individual Service Plan (ISP). We found that the vast majority of people are receiving services in accordance with the ISP, with no gaps in services. The figures were 92% of the Belchertown group, 93% for the state operated community program group, and 85% for the vendor operated community group. There were no statistically significant differences among the three groups on this item.

The study team also measured the hours of service received at the day program per week. The averages were 27 hours for state operated community programs, 26 hours for vendor operated community programs, and 24 hours at Belchertown. There were no statistically significant differences among the three groups on this item.

In summary, the team found that the people living at Belchertown had more people with a label of severe/profound mental retardation, and lived in living areas with a larger number of people with disabilities, than the people in the community (state or vendor operated). Of the two community groups, people living in state operated programs had more people with a label of severe/profound mental retardation, and lived with a larger number of people with disabilities,

FIGURE 9



# BELCHERTOWN STUDY 1992
## OPPORTUNITY FOR CHOICEMAKING

HIGHER SCORE = MORE
OPPORTUNITY FOR CHOICEMAKING

FIGURE 10



# BELCHERTOWN STUDY 1992
## PHYSICAL QUALITY

HIGHER SCORE - MORE
PLEASANT ENVIRONMENT

than the people in vendor operated programs. The people in the Belchertown group have more serious medical needs than the people in the two community groups.

Statistically significant differences were found between the community groups (vendor and state operated) and the Belchertown group on four variables. The people in the community had more weekly contact with non-handicapped people, had more frequent integrated activities, had higher weekly earnings, and lived in more pleasant environments than the people at Belchertown.

All three groups were significantly different from each other in the opportunity for choicemaking. People living in vendor operated community programs had the greatest opportunity for choicemaking, followed by people living in state operated community programs. The people at Belchertown had the least opportunity for choicemaking of all.

Although the difference between "state operated" and vendor operated community programs were not statistically significant with respect to the social presence and integration in the community, vendor operated programs scored higher on those scales that the state operated, which suggests that there are some differences between the two.