# ATTACHMENT D

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT SIMPSON RICCI, et al.,<br><br>          Plaintiffs,<br><br>v.<br><br>ROBERT K. OKIN, et al.,<br><br>          Defendants. | CA Nos. 72-0469-T (Belchertown)<br>74-2768-T (Fernald)<br>75-3910-T (Monson)<br>75-5023-T (Wrentham)<br>75-5210-T (Dever) |

# EXPERT AFFIDAVIT OF ROBERT M. GETTINGS

## I.    Introduction.

My name is Robert M. Gettings. I live at 5466 Free State Road in Marshall, Virginia. I am submitting this affidavit in response to the report filed on March 6, 2007 by Michael J. Sullivan, the Court-appointed Monitor in Ricci v. Okin, et. al.. Specifically, this affidavit focuses on the Court Monitor's recommendation that current residents of Fernald Developmental Center "… be allowed to remain at the … facility, since for some, many or most, any other place would not meet an 'equal or better' service outcome."[1] The comments and observations contained in this affidavit are based on the knowledge and experience I have gained over the past forty years in assisting state mental retardation/developmental disabilities (MR/DD) agencies to develop residential and daytime services for individuals with intellectual and other developmental disabilities (ID/DD).

## II.    Professional Experience.

For the past thirty-six years, I have served as the Executive Director of the National Association of State Directors of Developmental Disabilities Services (NASDDDS), the leading organization in the nation for state MR/DD officials. NASDDDS members are the directors of state MR/DD agencies in all fifty states and the District of Columbia. These agencies are responsible for providing, financing and overseeing the delivery of institutional and home and community-based long-term supports for persons with mental retardation and other developmental disabilities. As NASDDDS' director for over three decades, I am extensively familiar with the experiences in almost all of the states in

---

[1] Letter from Michael J. Sullivan, U.S. Attorney for the District of Massachusetts, and Rayford A.. Farquhar, Deputy Chief of the Civil Division, Office of the U.S. Attorney for the District of Massachusetts, to The Honorable Judge Joseph L. Tauro, U.S. District Court for Eastern Massachusetts, dated March 6, 2007, p. 27.

transitioning residents of their large institutions into community programs and related settings.

Over the past four decades, revolutionary changes have occurred in the manner in which publicly-financed developmental disabilities services are organized, financed and delivered. State governments no longer rely exclusively on large, multi-purpose residential treatment centers, and in their place have developed comprehensive networks of community-based services and supports. The chief role of NASDDDS during the many years I have been at the helm has been to help member state agencies successfully navigate the pathway from an institutionally dominated to a community-centered service delivery system.

The mission of NASDDDS is to assist member state agencies to build person-centered systems of services and supports for children and adults with developmental disabilities as well as their families. In pursuit of this goal, the Association provides member state agencies with: (a) timely analyses of federal statutory and regulatory policies that affect persons with lifelong disabilities; (b) cutting edge information on state-of-the-art programs and service delivery practices; (c) technical assistance in organizing, financing and delivering services to eligible individuals and families; and (d) a forum for the joint development of multi-state and national policy initiatives.

Over the years, NASDDDS has furnished technical assistance to all fifty states and the District of Columbia. While the focus of this assistance has varied depending on the times and the circumstances, for the most part states have called upon the Association for help in designing deinstitutionalization strategies and in finding new and better approaches to financing and developing home and community-based services. I have been directly involved in many state-specific technical assistance projects over the years and supervised staff members responsible for furnishing such assistance in even more instances.

The Association also holds two membership meetings a year and sponsors an ongoing series of teleconferences on topical issues of the day in an attempt to expose member state agency officials to cutting edge developments in policy and practice. Over the past few years, NASDDDS has hosted a special teleconference group to help member state agencies that are engaged in closing or significantly downsizing large, multi-purpose residential facilities for persons with intellectual and developmental disabilities. These quarterly conference calls offer officials in participating states a chance to exchange information, learn new and improved planning and implementation strategies, and engage in mutual problem-solving.

In addition to my work at NASDDDS, I have served in an advisory capacity in several class action lawsuits, similar to this one, that were instrumental in reshaping public policy within the developmental disabilities arena. I was a member of the Professional Advisory Board to the Willowbrook Consent Decree in New York for over a decade and, consequently, became intimately involved in actions that led to the development of hundreds of community-based alternatives for persons with developmental disabilities

2

and the eventual closure of the facility in 1987. I also served on the National Advisory Committee to the Pennhurst Longitudinal Study of Deinstitutionalization, a landmark analysis of the impact of closing a large public MR facility on the former residents and their families. Furthermore, I served as part of two-member team that was asked by the Kansas Department of Social and Rehabilitative Services to complete a legislatively mandated study and made recommendations regarding the closure of one of the four public MR centers then operated by the state.

As a result of the experiences mentioned above, plus others that are too numerous to recount, I am qualified to offer a national perspective on the changes which have occurred in developmental disabilities policies and practices over the past forty years and the implications of those changes with regard to the Ricci v. Okin litigation. A copy of my resume is attached as Appendix A and provides a more comprehensive summary of my educational and employment background, as well as my professional experiences.

## III.    The States' Experiences with Institutional Downsizing and Closure.

Since the mid-1970s, all fifty states have significantly reduced their reliance on publicly-operated institutions. The number of individuals living in public institutions for persons with intellectual and developmental disabilities (ID/DD) peaked in 1967 at 194,650; by 2005, the number had declined to 40,532.[2] The census of large (16+ bed), privately-operated residential facilities also has declined, albeit not as dramatically. In 1990, 44,903 persons with ID/DD were living in nursing homes and an additional 32,926 were residing in large, privately-run intermediate care facilities for persons with mental retardation and related conditions (ICF/MRs). By 2002, the number of individuals living in such facilities had declined to 30,308 and 24,708 respectively.[3]

One manifestation of the deinstitutionalization trend has been the accelerating pace of state facility closures over the past two decades. Between 1960 and 1979, the states, collectively, closed twelve (12) large, public residential facilities for persons with ID/DD; in contrast, 155 state institutions or special units of 16 or more persons with these same disabilities were closed between 1980 and 2003.[4]

Another key benchmark is the growing number of states that operate without a large, state-run residential treatment facility for person with ID/DD. New Hampshire became to first state to operating without a state ID/DD institution in 1991 when it closed Laconia State School and Training Center. Since then nine additional states and the District of Columbia have become institution-free. While the first states to operate without a state

---

[2] Coucouvanis, Kathryn, et. al. "Current Population and Longitudinal Trends of State Residential Settings (1950-2005)" in R.W. Prouty, Gary Smith and K.C. Lakin (Eds), *Residential Services for Persons with Developmental Disabilities: Status and Trends Through 2005.* Minneapolis: University of Minnesota, Research and Training Center on Community Living, Institute on Community Integration, 2006.

[3] Ibid, 2005

[4] Ibid, 2006

institutions had relatively small population bases (NH, VT and RI), in recent years more populous states that once had thousands of institutional residents scattered among multiple state facilities also have shut down their last institution. For example, earlier this year, Indiana became the most populous state in the nation to operate without a state institution when it shuttered Fort Wayne Developmental Center.

An argument frequently advanced for keeping institutions open is that community service systems lack the capacity to effectively serve persons with especially severe and complex disabilities. Typically, proponents of this view point to persons with significant behavioral support needs and individuals with complex medical and psychiatric conditions, arguing that they can be served more effectively and/or at a lower cost in an institutional setting. The problem with this argument is that over the past twenty years many states have amply demonstrated that such persons can be served successfully in appropriately designed community program settings. Based on data drawn from the National Health Interview Survey and the Residential Information System Project, researchers at the University of Minnesota have reported that an estimated 92 percent of Americans with ID/DD live with family members, spouses or alone, while six (6) percent live in community living arrangements and only two (2) percent reside in either large institutions or nursing homes.[5]  Clearly many individuals with extensive support needs – needs that are similar to persons currently receiving services in public and private institutions – are living in the community today. Many of these people have never lived in an institution, while others have moved successfully from an institution to a community-based living environment.

It is sometimes asserted that persons with challenging behaviors and/or psychiatric disorders cannot be properly supported outside of an institutional setting. Yet, today there are many approaches to serving such persons in community-based setting that have proven successful. Of 33 follow-up studies of persons with such characteristics who moved from an institution to a community setting between 1980 and 1999, all but two reported that the individuals involved had shown improvements (or no significant change) in adaptive skills and reduced incidents of disruptive behavior after being transfer to the community.[6]  Moreover, a recent monograph published by the American Association of Intellectual and Developmental Disabilities (formerly the American Association on Mental Retardation) describes programs in Vermont, Minnesota, California, Massachusetts, Iowa and Colorado that furnish specialized behavioral supports and crisis prevention/response services for persons with lifelong disabilities who are dwelling in the community.[7]  In recent years, as the AAIDD monograph illustrates,

---

[5] Larson, S.A., Doljanac, R. & Lakin, K.C. "United States Living Arrangements of Persons with Intellectual/Developmental Disabilities in 1995," *Journal of Intellectual and Developmental Disabilities*.

[6] Kim, S., Larson, S.A., & Lakin, K.C., "Behavioral Outcomes of Deinstitutionalization for People with Intellectual Disability: A Review of U.S. Studies Conducted Between 1980 and 1999, *Journal of Intellectual and Developmental Disabilities*, 26(1), 35-50.

[7] Hanson, R.H., Wiesler, N.A., & Lakin, K.C. (Eds). *Crisis: Prevention and Response in the Community*. Washington D.C.: American Association on Mental Retardation, 2002.

many states have shifted the locus of services to behaviorally challenged individuals from group settings to individualized, person-centered supports, thus reducing the provocations that often trigger socially inappropriate and destructive behaviors. Obviously, states which have closed their public institutions for individuals with ID/DD have learned how to support persons with psychiatric disabilities (often referred to persons with "dually diagnoses") in the community.

Individuals with ID/DD who have chronic medical conditions frequently require access to sophisticated medical technology and expertise. But, for every person with chronic health needs who lives in an institution, there are individuals with similar needs living in the community.[8] Medical services are provided to persons in the latter category by community doctors, nurses, personal care attendants, community provider agency staff and trained family members. There are only a limited number of studies of health care utilization by persons with complex medical needs in combination with an intellectual/developmental disability. The data from some of these studies show that the health status of such persons tends to improve slightly when they move from an institution to a community setting, while other studies have found a slight deterioration in overall health status.[9] In general, persons living in out-of-home living settings tend have superior access to health services than individuals living with a family member, in a foster home or living on their alone. It is clear, however, that with careful advanced planning and execution, it is possible to develop a sound community-based network of health services for even persons with the most complex medical support needs. It is being done successfully in thousands of communities across the United States.

Finally, a steadily growing number of older adults with ID/DD are now living in the community. Many of these individuals resided in state institutions for decades and now live fulfilling, active lives in the community. Developing alternative community-based living arrangements for persons who have resided in institutions for many years poses special challenges, since the institution is the only life some of these individuals have known. But, again, with careful advanced planning state officials have demonstrated, time after time, that it is possible to design community programs and living settings for such persons that simply could not be replicated in even the best run institution. Indeed, deinstitutionalization studies reveal that the attitudes of family members toward community placement often are negative initially; but, once the individual moves to the community opinions shift in favor of community living.[10]

---

[8] Hewitt, A., Larson, S.A., & Lakin, K.C., *An Independent Evaluation of the Quality of Services and System Performance of Minnesota's Medicaid Home and Community Based Services for Persons with Mental Retardation and Related Conditions.* Minneapolis, MN: University of Minnesota, Institute on Community Inclusion, Research and Training Center on Community Living, 2002.

[9] Hayden, M.F., Kim, S. & DePaepe, P., "Health Status, Utilization Patterns, and Outcomes of Persons with Intellectual Disabilities: Review of the Literature." *Mental Retardation,* 43(3), 175-195.

[10] Larson, S.A. & Lakin, K.C. "Parent Attitudes About Residential Placement Before and After Deinstitutionalization: A Research Synthesis." *Journal of the Association for Persons with Severe Handicaps,* 16, 25-38.

Given the sweeping changes that have occurred in community MR/DD service systems over the past three decades, it is very difficult to argue that there are persons with ID/DD who cannot be successfully served in a community-based setting. Successfully transitioning institutional residents – especially residents with complex support needs – to a community-based setting is a complex undertaking that requires carefully synchronized planning and execution over an extended period of time. Locating alternative living accommodations for former facility residents is only part of the task. State officials also need to create a community infrastructure that is capable of assuring that such individuals are able to live safe, secure, fulfilling lives once they move to the community. A successful institutional downsizing/closure initiative also requires a resolute commitment to a person-centered approach to planning and resource development that places the best interests of each individual at the center of the decision-making process, plus the development and maintenance of a quality management system that continuously monitors and improves the quality, appropriateness and consistency of the services being furnished.

While the components of a well-designed deinstitutionalization plan are numerous and complex, many states – including Massachusetts -- have demonstrated over the past thirty years that it is possible to create improved living circumstances for former institutional residents with intellectual and other developmental disabilities within the community. The planning and resources development techniques involved in organizing a sound institutional downsizing or closure initiative are at this point well understood and have been shown to work in many states across the nation.

## IV.    Implications of the Court Monitor's Recommendation in *Ricci*.

Based on the results of a year-long review of the process and practices used by the Massachusetts Department of Mental Retardation (DMR) in placing Fernald residents in alternative institutional and community-based settings, an analysis conducted by an independent panel of three medical experts, visits to over 30 community homes, and the completion of a post-placement satisfaction survey involving the guardians of persons transferred out of Fernald since February 26, 2003, the Court Monitor in the Ricci lawsuit concluded that:

- DMR was in substantial compliance with the Final Court Order with respect to the method it used to certify that residents placed out of Fernald were receiving "equal or better services;"

- Services furnished to the residents of community homes were "consistent with the Court's Final Order…"

- The community homes visited during the course of the review were "well maintained" and located "in very nice neighborhoods."

6

- The medical experts retained by the Court Monitor "… confirmed that … [the required] services are available in the community" and … [i]ndividuals transferred to the community can receive these services equal or better than at the ICF/MRs."

- On a scale of one to five (with #1 being the most favorable), 78 percent of the respondents to the post-placement satisfaction survey of guardians rated the community placement a "1" and an additional 14 percent rated it a "2", suggesting a very high (92%) level of satisfaction with community placements.

Yet, despite the above findings, the Court Monitor, incongruously, concluded in his report that "… some of the residents at Fernald could suffer an adverse impact, either emotionally and/or physically, if they were to be forced to transfer from Fernald to another ICF/MR or to a community residence." Based on this conclusion, the Court Monitor recommended that "… a development plan [be designed and implemented] that would enable Fernald to remain open and provide services to some of the Commonwealth's most vulnerable citizens."[11]  Noting that his office has been "… inundated with pleas to keep Fernald open since now, through the Court's intervention, Fernald is a much different place and has reached respectable levels of care," he argues that:

> residents should continue to have the opportunity and option to move from Fernald to other ICF/MRs, or to a community residence, provided that the Certification Process [establishing that the alternative services are "equal or better" to the services the resident received at Fernald] is enforced. Additionally, and most importantly, considering the uniqueness of each of the ICF/MRs, and the vulnerability of the residents, Fernald residents should be allowed to remain at the Fernald facility, since for some, many or most, any other place would not meet an "equal or better" service outcome.[12]

The Court Monitor's recommendation, while no doubt well-meaning and compassionate, has been swayed, as he clearly acknowledges, by his interactions with the long-suffering parents and guardians of Fernald residents who passionately oppose the state's plan to significantly downsize and reconfigure the facility. But, the court needs to weigh not only the interests of a comparatively small number of affected families but also the broader effects the adoption of the Court Monitor's proposed course of action would have on the remaining residents of the facility, other needy individuals with intellectual and developmental disabilities within the state who are un-served or under-served, as well as the Commonwealth's ability to meet its obligation under applicable federal and state statutes. When these additional factors are taken into account, I believe that the Court should conclude that the actions recommended by the Court Monitor are ill-advised. My reasons for reaching this conclusion are detailed below.

---

[11] Ibid, letter from Sullivan and Farquhar to Judge Tauro, dated March 6, 2007, p. 27.
[12] Ibid.

### A. Impact on the State's Capacity to Comply with the Olmstead Ruling.

A federal court order requiring the Commonwealth to offer current facility residents the option of remaining at Fernald would seriously undermine the state's ability to comply with the U.S. Supreme Court's historic <u>Olmstead</u> ruling. In this 1999 decision, the Court found that unnecessary segregation of individuals with disabilities in institutions constitutes prohibited discrimination under Title II of the Americans with Disabilities Act (ADA). The court majority concluded, based on its review of applicable statutes, that Title II of the ADA requires a state to place institutionalized persons with disabilities in community settings when: (a) the state's own treating professionals have determined that a community placement is appropriate; (b) the transfer from an institution to a more integrated setting is not opposed by the affected individual; and (c) the placement can meet the needs of the individual and can be reasonably accommodated, taking into account the resources available to the state. The decision goes on to indicate that the judiciary should find a state in compliance with the above test as long as it has in place a comprehensive plan for eliminating unnecessary institutionalization that is being implemented at a reasonable pace.

Should the federal court order the Commonwealth to keep Fernald open and guarantee all current residents the right to remain on their existing units indefinitely should they so choose, Massachusetts officials would lack the necessary latitude to develop and systematically implement a comprehensive plan to reduce unnecessary institutionalization. Such an order almost certainly would trigger similar petitions from groups of parents and guardians of persons residing at the other four state-operated ICF/MRs in Massachusetts. It may also generate court petitions aimed at preventing DMR officials from altering community day and residential placements, even when the needs and circumstances of an individual change significantly and it can be shown that the effected individual would benefit from the transfer. The cumulative impact of such court intervention, in other words, would seriously erode the state's authority to design and carry out, in the words of the Olmstead ruling, "an effectively, working plan" for reducing unnecessary institutionalization. It also would constitute an unwarranted act of judicial incursion into the legitimate exercise of the responsibilities of the executive and legislative branches of state government.

### B. Impact on Achieving Improved Access to Publicly-Funded MR/DD Services.

Second, the course of action proposed by the <u>Ricci</u> Court Monitor would handcuff efforts by DMR and other Commonwealth officials to ensure that available funds are used in the most efficient, economical and equitable manner possible. As is the case with virtually all publicly-funded programs, the dollars available at any given point in time to support MR/DD services in Massachusetts are inadequate to address the needs of all persons with intellectual and developmental disabilities in the state. The lack of sufficient fund has resulting in waiting lists of services, especially for community residential services, in Massachusetts and in many other states. One of the critical roles of the executive and legislative branches of state government, therefore, is to develop strategies for deploying

8

available resources in a manner that ensure that as many eligible individuals as possible receive the essential services and supports they require. This objective would be seriously undermined by a court order requiring the Commonwealth to allow present Fernald residents (and potentially the residents of other state and privately-operated residential facilities as well) to remain in their existing living and program units indefinitely.

The average per capita cost of services in a state developmental center in Massachusetts is over $600 a day, or roughly ten times the median amount the Commonwealth spends on participants in home and community-based waiver services. Given the present age profile of Fernald residents, the per capita costs of operating the facility is sure to climb even higher in future years since: (a) the state will be forced to invest tens of millions dollars to renovate and/or replace antiquated buildings and facilities; and (b) the state will be unable to reduce operating costs proportionately as deaths and transfers occur due to a variety of fixed costs that are insensitive (or only partially sensitive) to changes in the facility's census. Thus, Fernald and other state-run facilities would become an even greater drain on the DMR budget than they are at present. In the real world of finite budgets, the net effect will be that waiting lists for community services are likely to grow longer and longer.

In his report, the Court Monitor suggests that there are "other options" for addressing the "excess capacity" that presently exists on the grounds of Fernald and other state-run developmental centers. More specifically, he proposes that residential units and work sites at Fernald (and presumably at other state developmental centers as well) be consolidated and the remainder of the land sold by the Commonwealth for general residential development. Or, alternatively, he suggests that the un-occupied areas of the Fernald campus be used to build new residential homes and support services for un-served or under-served persons with intellectual and other developmental disabilities.[13]

The problem with the first option is that, while the sale of excess land no doubt would yield additional revenues for the Commonwealth (especially in the case of property on the Fernald campus, given its location within a high growth corridor of the Greater Boston area), the resulting funds – and probably tens of millions of dollars more – would have to be invested in developing new and renovated residential and daytime facilities as well as support units on the campus. But, more importantly, a facility consolidation plan would do nothing to address the long-term costs associated with operating a large, two-tiered system of services in which the Commonwealth is committed to expending huge sums of money on behalf a comparatively small number of persons living in state developmental centers, thus limiting the resources it has available to provide services to eligible individuals who are un-served or under-served, now as well as in future years.

The Court Monitor's alternative proposal – building new residential homes and support service facilities on the grounds of existing state centers – is both expensive, cumbersome, and raises the specter of a return to the tragic days of institutionalization in the United States. The lesson to be learned from the experiences of states that have built

---

[13] Ibid, page 26.

"modern" care and treatment facilities on the grounds of existing state institutions is that, no matter how much attention and care is devoted to the design, construction and operation of such facilities, the net effect is to isolate people with disabilities from the mainstream of American society and deny them the right to engage in activities which are normative for their age group peers. This is a result that would be completely incompatible with the provisions of the Americans with Disabilities and everything we learned over the past forty years about maximizing developmental opportunities for people with lifelong disabilities.

### C. Impact on the Commonwealth's Ability to Keep Pace with Best Practices in Serving People with Developmental Disabilities.

Third, as the Court Monitor acknowledges in his March 6, 2007 report, a nationwide consensus has emerged in recent years that favors "... housing the mentally retarded in community residences."[14] What he does not acknowledge is that allowing guardians of Fernald residents to veto outplacements and transfers that comply with the Court's "equal or better" standard would make it more difficult for the Commonwealth to keep pace with these national trends in serving individuals with intellectual and other developmental disabilities.

During the post-Olmstead era, federal policy has tilted increasingly toward affording persons with disabilities expanded opportunities to live, work and recreate in integrated community settings. Through a series of policy changes first launched by President Clinton and later embraced and expanded by President Bush under the banner of the "New Freedom Initiative," the federal government has taken numerous steps to make it easier for states to offer home and community-based services to persons who in prior years would have been institutionalized. Through changes in rules governing Medicaid home and community-based waiver services, the federal Centers for Medicare and Medicaid Services (CMS) has made it easier for states to qualify for the waivers necessary to offer expanded access to Title XIX-financed HCB services. Meanwhile, Congress, with the President's backing, has added new options under Medicaid law that permits states to cover home and community-based services (including self-directed personal assistance services) under their regular Title XIX state plans, instead of exclusively through special Secretarial waivers.[15] In addition, Congress has authorized a Money Follows the Person demonstration grant program to offer states additional financial inducements to reduce their reliance on institutional services and improve community service capacity over a five year period.[16]

In recent years, Massachusetts has taken advantage of these new federal financing options to expand access to HCB services. As has been the case in many other states, the

---

[14] Ibid, page 26.

[15] Sections 1915(i) and Section 1915(j) of the Social Security Act, as added by Section 6086(a) and Section 6087 of the Deficit Reduction Act of 2005 (P.L. 108-171), respectively.

[16] As authorized under Section 6071(a) of the Deficit Reduction Act of 2005 (P.L. 109-171).

development of a stronger community service infrastructure has permitted the Commonwealth to reduce its reliance on large public MR institutions. The resident census of large, state-operated developmental centers dropped by almost two-thirds in Massachusetts between 1989 and 2005 (declining from 3,026 to 1,046 over the period),[17] Meanwhile, DMR officials have been able to divert to community day and residential services literally thousands of youth and adults who once would have had no other option than to be place in a large, state-run developmental center. Spurred by a federal class action lawsuit (Boulet, et. al. v. Cellucci, et. al.) that was settled in 2001, the Commonwealth also agreed to expend $355.8 million over a five-year period to extend home and community services to an additional 1,975 persons and, thus, trim the long waiting list for such services.[18]

It is difficult, however, to envision a continuation of this trend should the federal courts grant parent-guardians the right to reject outplacements and transfers developed and carried out in accordance with the court's previously articulated standards. While the Court Monitor's recommendation would apply only to current resident of Fernald Developmental Center, there is a strong likelihood that similar rights would be granted to parents-guardians of residents of other state-operated developmental centers and, possibly, to similarly situated relatives of persons residing in community group living facilities as well. Hampered by the restrictions such a court order would impose, it is hard to imagine how Commonwealth officials might be able to take full advantages of the new and expanded options available under federal policy to continue the process of affording persons with lifelong disabilities expanded community living opportunities.

### D. Impact of a Parental Veto of Outplacements and Transfers.

Finally, to allow the legal guardians of Fernald residents to effectively veto any alternative placement would undermine the original purpose of the "equal or better" standard enunciated by the Court. The fact that the interests of an incapacitated ward and the interests of his or her guardian sometimes differ is well understood. In its Final Order in the Ricci case, the Court recognized the possibility of such conflicts and, therefore, established the "equal or better" standard as a benchmark for determining when transfers to other institutions or community-based residences are justified. In articulating this standard, the Court, in effect, was saying that the interests of the resident should remain the paramount consideration.

At the same time, the Court mandated a process for applying the "equal or better" test designed to ensure that parents and guardians would be able to participate fully in the development of their family member's Individual Service Plan (ISP) and to appeal provisions of the plan (including any proposed transfers or reassignments) that they felt were not in the individual's best interests. This process includes extensive opportunities

---

[17] Ibid, *Residential Services for Persons with Developmental Disabilities: Status and Trends Through 2005*, page 121.

[18] For a concise summary of the Boulet litigation, see Smith, Gary A., "Status Report: Litigation Concerning Home and Community Services for People with Disabilities," May 23, 2007.

for family members to express their views and preferences during the plan development process. Trial visits also can be (and frequently are) arranged to allow the facility resident and his/her family to experience the new environment and form opinions about its appropriateness as an alternative residential and program setting. Family members are encouraged to voice their opposition to ISP components which they feel would not be in the best interests of the individual, including filing formal appeals when necessary.

It is important to note that, following an extensive, year-long review, the Court Monitor concluded that DMR had fulfilled its obligations under the Final Ricci Court Order and properly applied the "equal or better" standard to the 49 individuals transferred out of Fernald between February 2003 and January 2006. Thus, there is no factual basis in the Court Monitor's report for his global finding that all Fernald residents would be unable to obtain equal or better services at another ICF/MR or in a community-based living and programmatic environment. Based upon this unsupported conclusion that contradicts the experience of Massachusetts and virtually all other states, the Court Monitor has recommended that legal guardians of Fernald residents be granted an absolute right to veto any outplacement or transfer recommended by the affected individual's ISP team. This veto authority would thwart the underlying purpose of the "equal or better" standard, which was intended to reconcile any conflicts between the ISP as developed by DMR and the views of the individual's legal guardian. In effect, it would not only under cut the Department's future deinstitutionalization efforts, but also reverse the emphasis on individual person-centered planning and the primacy of the individual's interests that are central to the Court's "equal or better" standard.

## V.    Conclusion.

Parents and family members of institutionalized persons – especially older facility residents – have been forced by society to bear a heavy burden. Many of them lived through the period when care and treatment practices in state-operated residential facilities often were horrendous and they were forced to look out for their loved ones as best they could. These parents and siblings have learned from hard experiences to be suspicious of official promises that new program initiatives will yield substantial improvements. Now that conditions in state facilities have improved considerably, they are understandably reluctant to see their sons, daughters, bothers and sisters moved to alternative residential settings.

While it is understandable that the Monitor would empathize with their concerns and take all prudent steps to involve them in the decision-making process, it is not reasonable, appropriate, or consistent with professional judgment to confer on such parents and other family members the right to have their loved ones remain in outmoded institutional facilities when the same services can be provided as effectively or more effectively and at a lower overall cost to the taxpaying public in other appropriate institutional and community-based settings. The Ricci Court has established a rigorous test of the circumstances under which an inter-facility transfer or placement in a alternative community-based setting is warranted and laid out a detailed process for reaching such determinations. As long as state officials adhere to the court-mandated certification

process, the federal court should not preempt the authority to carry out their responsibilities under state law and existing court orders.

Signed under the pains and penalties of perjury, this 30th day of May, 2007.

Robert M. Gettings

# Curriculum Vitae
# ROBERT M. GETTINGS
### Executive Director
### NASDDDS
### 113 Oronoco Street
### Alexandria, VA 22314
### 703·683·4202

## EDUCATION

*Bucknell University*, Lewisburg, Pennsylvania, September 1957 - June 1961, Degree, A.B., Major - Political Science

*Pennsylvania State University*, University Park, Pennsylvania, September 1961 - September 1962, Degree, Master of Public Administration, Major - Public Administration

## EXPERIENCE

| Employer | Position | Inclusive Dates |
|---|---|---|
| Commonwealth of Pennsylvania-Office of Mental Health | Administrative Assistant | Sept. 1962 - May 1963 |
| U.S. Army Headquarters V. Corps | Corps Personnel Officer | Nov. 1963 - May 1965 |
| National Association for Retarded Children | Assistant for Governmental Affairs | Sept. 1965 - Jan. 1968 |
| President's Committee on Mental Retardation | Management Officer | Jan. 1968 - Oct. 1970 |
| National Association of State Directors of Developmental Disabilities Services | Executive Director | Oct. 1970 - Present |

## HONORS AND AWARDS

Listed in <u>Outstanding Young Men in America,</u> 1970

Listed in <u>Who's Who in the South and Southwest</u>, 1974

Annual Leadership Award, National Association of Private Residential Facilities for the Mentally Retarded, 1979

Leadership Award, National Association of Superintendents of Public Residential Facilities for the Mentally Retarded, 1987

Burton Blatt Distinguished Leadership Award, Young Adult Institute, 1992

Franklin Smith Award for National Distinguished Service, The Arc, 1992

Censoni Award for Distinguished Public Service, National Association of State Directors of Developmental Disabilities Services, 2000

National Leadership Award, American Association on Mental Retardation, 2001


## OTHER ACTIVITIES

Chairperson, Committee on Social and Legislative Issues, American Association on Mental Deficiency, 1972 - 1975.

Member, National Board of Advisors, Developmental Disabilities Technical Assistance System, University of North Carolina, 1973 - 1978.

Member, Fairfax/Falls Church Mental Health and Mental Retardation Services Board, 1974 - 1976.

Vice President (Administration), American Association on Mental Deficiency, 1975 - 1977.

Member, Blue Ribbon Task Force on University Affiliated Facilities, Administration on Developmental Disabilities, U.S. Department of Health, Education and Welfare, 1976.

Member, Professional Advisory Board, Minnesota Developmental Programming System, University of Minnesota, 1976 - 1978.

Director, Federal Technical Assistant Project on "The Utilization of Federal Generic Assistance Programs on Behalf of Developmentally Disabled Citizens" (Grant Project No. 54-P-71156, Office of Human Development Services, U.S. Department of Health and Human Services), 1976-79.

Director, technical assistance projects on the use of federal assistance programs (primarily on housing and medical assistance) under contracts with the following states: Alabama, Alaska, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Hawaii, Illinois, Indiana, Kansas, Louisiana, Maine, Maryland, Michigan, Minnesota, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York,

North Dakota, Pennsylvania, South Dakota, Tennessee, Utah, and Virginia, 1979 - present.

Member, National Advisory Committee, "State of the Art in Serving Developmentally Disabled Persons," Urban Institute, 1980.

Member, National Advisory Committee on Developmental Disabilities Day and Residential Standards, Council on Accreditation of Rehabilitation Facilities, 1981.

Member, National Advisory Committee, Pennhurst Longitudinal Study of Deinstitutionalization, 1981 - 1984.

Chairperson, Medicaid Task Force, Consortium of Citizens with Disabilities, 1981 - 1989.

Co-Chair, Long Range Planning Task Force, University Affiliated Facilities for Developmentally Disabled Persons, Administration on Developmental Disabilities, Department of Health and Human Services, 1982.

Member, Selection Panel, Joseph P. Kennedy, Jr. Foundation Public Policy Fellowship Program, 1988 - present.

Advisory Board on Revised Standards, Council on Accreditation of Rehabilitation Facilities, 1988.

Advisory Committee, National Supported Employment Project, National Association of Rehabilitation Facilities, 1988 - present.

Technical Advisory Group, National MR/DD Survey Design Project, Mathematica Policy Research, Inc., 1988 - 1989.

Joseph P. Kennedy, Jr. Foundation, International Awards Planning Committee, 1989 - 1990.

Joseph P. Kennedy, Jr. Foundation, International Awards Planning Committee, 1994 - 1995.

Member, National Advisory Committee, Self-Determination Project, The Robert Wood Johnson Foundation, 1996 - 2001.

Member, Legislative and Social Issues Committee, American Association on Mental Retardation, 1996 - 2000.

Member, Ad Hoc Committee on Managed Long Term Care, American Association on Mental Retardation, 1996 - 98.

Vice Chair and Member, Board of Directors, Quality Trust for Individuals with Developmental Disabilities, a District of Columbia non-profit corporation formed to "promote a city-wide system that affords individuals with mental retardation and other developmental disabilities universal access to high quality, person-centered services and supports, regardless of the extent or severity of their needs." 2001 – present.

Frequent speaker and lecturer on federal assistance programs affecting citizens with disabilities at statewide, regional, and national meetings of professional and citizen organizations.

## PUBLICATIONS

After Planning - What?, National Association for Retarded Children, Inc., 1966.

Department of Health, Education, and Welfare, A Summary of Selected Legislation Relating to the Handicapped, 1971, U.S. Government Printing Office, 1971.

92nd Congress: Federal Legislation Affecting the Mentally Retarded and Other Handicapped Persons, National Association of Coordinators of State Programs for Mentally Retarded, Inc. (NACSPMR), 1973.

Synergism for the Seventies: Proceedings of a National Conference of State Advisory Councils on Services and Facilities for the Developmentally Disabled, Council for Exceptional Children, 1973 (Content Editor).

Organization of State Services for the Mentally Retarded, (Co-authored with Wm. Allen Ziegler, Jr.) NACSPMR, 1973.

Department of Health, Education and Welfare, Office of Handicapped Individuals, Programs for the Handicapped, "A Summary of Selected Legislation Relating to the Handicapped: 1974", April 20, 1974.

93rd Congress: Federal Laws and Regulations Affecting the Handicapped, NACSPMR, 1975.

Department of Health, Education, and Welfare, A Summary of Selected Legislation Relating to the Handicapped, 1974, U.S. Government Printing Office, 1975.

Department of Health, Education and Welfare, Office of Handicapped Individuals, Programs for the Handicapped, "A Summary of Selected Legislation Relating to the Handicapped: 1975", April 20, 1975.

A Summary of Bills Enacted and Considered by Congress During First Session, 94th Congress, NACSPMR, 1976.

Mental Retardation: Trends in State Services, President's Committee on Mental Retardation, U.S. Government Printing Office, 1976.

"Hidden Impediments to Deinstitutionalization" in State Government, Autumn 1977.

Income Maintenance and the Developmentally Disabled: An Analysis of Policy Issues (with Harold Tapper and Myrl Weinberg), National Association of State Mental Retardation Program Directors, Inc. (NASMRPD, formerly NACSPMR), December 1977.

"Generic vs. Specialized Services: The Ying and Yang of Programming for Developmentally Disabled Clients" in State of the Art Report on Serving Developmentally Disabled Clients, Urban Institute, 1979.

Trends in Capital Expenditures for Mental Retardation Facilities, NASMRPD, June 1981.

Status of the Reagan Budget Proposals: An Interim Analysis of the Implications for Developmentally Disabled Citizens, NASMRPD, June 1981.

Congressional Action on the Reagan Budget Proposals, NASMRPD, September 1981.

The Medicaid Home and Community-Based Care Waiver Authority, NASMRPD, December 1981.

An Update on the Medicaid Home and Community Care Waiver Authority, NASMRPD, July 1982.

Federal Administrative Constraints on State Medicaid Outlays for MR/DD Recipients, NASMRPD, April 1985.

The Federal Look Behind Initiative: Impact on the States (with Ruth Katz), NASMRPD, February 1986.

"Trends in Quality Assurance Programs for Developmentally Disabled Persons", in The Quality Assurance Network, New York State Office of Mental Retardation and Developmental Disabilities, Vol. 1, No. 3, July, 1985.

Supported Employment, Federal Policies, and State Activities Related to Integrated Work Opportunities for Persons with Developmental Disabilities (with Ruth Katz), NASMRPD, April 1987.

Summary of Existing Legislation for Persons with Disabilities, U.S. Department of Education, Clearinghouse for the Handicapped, 1988.

The Medicaid Home and Community Quality Services Act: An Analysis and Detailed Explanation, NASMRPD, January 1988.

Nursing Home Reform: Implications for Services to Persons with Developmental Disabilities (with Gary Smith and Ruth Katz), NASMRPD, July 1988.

Federal Medicaid Policies and Services to Americans with Developmental Disabilities: Critical Issues - Difficult Choices (with Gary Smith), NASMRPD, January 1989.

Medicaid Home and Community-Based Services for Persons with Developmental Disabilities: The Home and Community-Based Waiver Experience (with Gary Smith and Ruth Katz), NASMRPD, September 1989.

Eliminating Inappropriate Nursing Home Placements: An Analysis of Federal-State Implementation of OBRA-87's PASARR Requirements, NASMRPD, January 1990.

The HCB Waiver Program and Services for People with Developmental Disabilities: An Update (with Gary Smith), NASMRPD, January 1991.

Supported Employment and Medicaid Financing (with Gary Smith), NASMRPD, September 1991.

Medicaid in the Community: The HCB Waiver and CSLA Programs (with Gary Smith), NASMRPD, March 1992.

"Improving State Rate-Setting and Reimbursement Policies for Developmental Disabilities Services: A Critical Task for the '90s" (with Rosemary Chapin) in Journal of Disability Policy Studies, Vol. 3, No. 2, 1992.

Medicaid-Funded Home and Community-Based Services for People with Developmental Disabilities (with Gary Smith), NASMRPD, March 1993.

Medicaid's ICF/MR Program: Present Status and Recent Trends (with Gary Smith), NASMRPD, May 1993.

The HCB Waiver and CSLA Programs: An Update on Medicaid's Role in Supporting People with Developmental Disabilities in the Community (with Gary Smith), National Association of State Directors of Developmental Disabilities Services, Inc. (NASDDDS, formerly NASMRPD), October 1994.

"The Link Between Public Financing and Systemic Change" in Creating Individual Supports for People with Developmental Disabilities: A Mandate for Change at Many Levels (Editors V.J. Bradley, J.W. Ashbaugh and B.C. Blaney) Paul H. Brookes Publishing, 1994.

"Financing Individual Supports" in State Collaboration for Community Membership, President's Committee on Mental Retardation, 1996.

The Medicaid Home and Community-Based Waiver Program: Recent and Emerging Trends in Serving People with Developmental Disabilities (with Gary Smith), NASDDDS, 1996.

Medicaid Home and Community-Based Waiver Services and Supports for People with Developmental Disabilities: Trends Through 1997 (with Gary Smith), NASDDDS, 1997.

Medicaid and Systems Change: Finding the Fit (with Gary Smith), NASDDDS, 1998.

Managing Medicaid Home and Community-Based Waiver Programs: An Analysis of State Policymaking and Operational Responsibilities for Waiver Programs Serving People with Developmental Disabilities (with Gary Smith), NASDDDS, 2000.

"Balancing Individual Choice and Control with Personal Health and Safety: A State Administrator's Perspective" (with Nancy Thaler) in Wingspread Conference Proceedings: October 19-21, 2000, Racine, Wisconsin, National Center on Outcomes Resources, 2001.

"Renegotiating the Social Contract: Rights, Responsibilities, and Risks for Individuals with Mild Cognitive Limitations" in The Forgotten Generation: The Status and Challenges of Adults with Mild Cognitive Limitations (Editors J. Tymchuk, K. Charlie Lakin, and Ruth Luckasson) Paul H. Brookes Publishing, June 2001.

"Public Policy Challenges in a New Millennium: The Drivers of the Present System Redesign Process" in Embarking on a New Century, American Association for Mental Retardation, Baltimore: Paul H. Brooke Publishing Co., 2002.

"Building a Comprehensive Quality Management Program: Organizing Principles and Primary Operating Components," in Quality Enhancement in Developmental Disabilities: Challenges and Opportunities in a Changing World, Valerie J. Bradley and Madelaine H. Kimmich (editors), Baltimore: Paul H. Brooke Publishing Co., 2003.

Note:  In addition to the publications listed above, Mr. Gettings has prepared over 40 technical assistance reports for 30 different states over the past twenty years. Most of these reports have focused on the particular state's utilization of federal funds on behalf of persons with mental retardation and related developmental disabilities.