UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

)
ROBERT SIMPSON RICCI, *et al.*  )    Civil Action Nos.  72-0469-T (Belchertown)
)                      74-2768-T (Fernald)
Plaintiffs,   )                      75-3910-T (Monson)
)                      75-5023-T (Wrentham)
ROBERT L. OKIN, *et al.*   )                      75-5210-T (Dever)
)
Defendants.   )
_____ )

**WRENTHAM ASSOCIATION'S RESPONSE TO THE REPORT OF THE**
**INDEPENDENT MONITOR, UNITED STATES ATTORNEY MICHAEL J. SULLIVAN**

WRENTHAM ASSOCIATION FOR RETARDED
CITIZENS, INC.,
By its attorneys,

_____/s/ Margaret M. Pinkham_____
Margaret M. Pinkham (BBO #561920)
Daniel J. Brown (BBO #654459)
BROWN RUDNICK BERLACK ISRAELS LLP
One Financial Center
Boston, MA  02111
Telephone:  (617) 856-8200
Fax:  (617) 856-8201
E-mail: mpinkham@brownrudnick.com
DATED:  May 31, 2007        E-mail: dbrown@brownrudnick.com

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

DISCUSSION......................................................................................................................2

I.       The ongoing need for ICFs/MR. ................................................................................2

     A.       Benefits of ICFs/MR ........................................................................................2

     B.       The "light in the window must remain on" for those individuals wishing
to return..................................................................................................................4

II.      Review of the community-based system is required to protect Class members in the
Community. ......................................................................................................................6

     A.       Cases of abuse substantiated by the Disabled Persons Protection Commission
("DPPC") show that abuse is worse and certain rates of abuse are higher in vendor
operated group homes.................................................................................................7

     B.       DMR fails to investigate over 1,500 complaints every year. .............................18

          1.       DMR's investigations go to great lengths to avoid findings of abuse.......20

          2.       Critical incident reports are on the rise..................................................22

          3.       Preventative measures are not being taken. ...........................................23

          4.       Proper background checks need to be conducted to protect Class
Members.........................................................................................................24

     C.       DMR's Licensure and Certification Surveys do not help protect DMR clients....26

     D.       DMR's explanations do nothing to alleviate Class Members' concerns. ............30

     E.       Superior Court cases filed against vendors. .......................................................32

III.     The Governor's Commission on Mental Retardation is not the appropriate body to
conduct an independent review...............................................................................................34

CONCLUSION..................................................................................................................36

## INTRODUCTION

Plaintiff, the Wrentham Association, commends the work of United States Attorney Michael Sullivan and all who assisted in reviewing the numerous issues faced by Ricci class members and in preparing the report to the Court, including Rayford Farquhar, Michael Loucks and Constance O'Brien. Each should be commended for their professionalism and courteousness in conducting the very thorough investigation. The Wrentham Association endorses the Monitor's conclusion that for a large number of class members still residing in ICFs/MR, any move away from the place they have called home for decades could be emotionally and/or physically detrimental, and therefore, would not be "equal or better." As such, the residents should be allowed to remain at an ICF/MR if that is their wish and a "light should always be left on" for those who leave and choose or need to return.

The Wrentham Association also agrees that there are "two areas of significant concern: delivery of medical services and the potential for greater abuse and neglect in the community." *Monitor's Report*, at 1-2. As the Monitor stated, "neglect and abuse trends, particularly of sexual abuse, were of great concern to our office and shows that residents in our community homes are at a greater risk of being abused and/or neglected." *Monitor's Report*, at 16-17. The community system must be reviewed to determine how DMR, providers, guardians and family members can do a better job of protecting Ricci class members and insuring that they receive competent and timely medical care. Given the dedication shown by the US Attorney's office and the extensive knowledge it developed, the Monitor's appointment should be extended to include a review of these very troubling and very real issues.

## DISCUSSION

### I.    The ongoing need for ICFs/MR.

The same reasoning that led the Monitor to conclude that a number of Fernald residents could be harmed by forced transfers also applies to the Wrentham Development Center ("Wrentham"). As with Fernald, Wrentham residents have known no other home. Most of the 284 residents have lived there for more than 40 years. The residents live together in "family groups" that have been together for long periods of time, and staff go to great lengths to maintain those groupings because of the importance of that sense of familiarity. In May, a 96-year-old Wrentham resident died. She lived at Wrentham for 87 years, which is a testament to the excellent care she received. For Wrentham residents, losing such "familiar surroundings and most importantly people, could have devastating effects that unravel years of positive, non-abusive behavior." *Monitor's Report*, at 24.

### A.    Benefits of ICFs/MR

In addition to the emotional benefits and comfort of home, ICFs/MR provide very real benefits in the provision of healthcare to this aging population.

> Class members who reside at state facilities remain there because the facilities are best able to meet the needs set forth in their ISPs. Current residents of [ICFs/MR] have more complex medical needs and are more functionally impaired.[1] Approximately 80% of facility residents in general are severely or profoundly retarded.[2] These individuals also tend to present more challenging behaviors than those in community settings – approximately 47% of facility residents have behavior disorders.[3] As of

---

[1] Mental Retardation: Nature, Cause and Management, 3d Edition (1999), George S. Baroff, Ph.D. and J. Gregory Olley, Ph.D., at 350-51 (proportion of persons with profound retardation in large facilities has grown steadily while absolute number has declined).

[2] Cost Comparisons of Community and Institutional Residential Settings:  Historical Review of Selected Research, Kevin K. Walsh, Theodore A. Kastner, Regina Gentlesk Green, Mental Retardation, Vol. 41 No. 2 (April, 2003) at 103.

[3] Id. at 104.

2000, DMR estimated that 44% of ICFMR residents need assistance or supervision in walking; 60% need assistance or supervision in dressing; 63% need assistance or supervision in eating; and 55% need assistance or supervision in using the toilet.  Of Class members who reside in [ICFs/MR], 40% cannot understand simple verbal requests and 62% cannot communicate basic desires verbally.[4]  Residents in [ICFs/MR] are the most medically fragile of all of the *Ricci* Class members,[5] so it is imperative that they have ready access to medical care that is available in the [ICFs/MR].

Individuals who reside in facilities after two decades of growth in community-based residential services tend to be older and have more problems with daily living skills.  As community services expanded over the past two decades, the average functioning of individuals residing in facilities has declined, while their average age has increased.[6]  "Adults with severe physical disabilities are disproportionately represented among persons with severe and profound retardation," and their medical problems include:  "seizures; multiple joint contractures, as in cerebral palsy; nutritional problems related to feeding difficulty, such as adults requiring tube feeding . . . and recurrent respiratory problems.  The last-mentioned is the most common cause of death in this group."[7]  Access to medical care in a community-based home is hardly comparable to that offered at a facility where medical staff are available 24 hours.

*Wrentham Memorandum in Support of its Motion to Reopen the Case*, at 48-49.

Wrentham has its own 12 bed acute care medical center, which is used for diagnostic evaluations, reassessment of chronic illness, and close medical and nursing observation.  Four physicians and four nurse practitioners provide the primary care for the residents, and they are assisted by a large staff of nurses (RNs and LPNs).  Additional care is provided by the two psychiatrists and one neurologist who go to Wrentham twice per week.  There is an organized

---

[4] Residential Services for Persons with Developmental Disabilities:  Status and Trends Through 2000 (June 2001), Research and Training Center on Community Living Institute on Community Integration/UAP, College of Education & Human Development, University of Minnesota (Robert W. Prouty, Gary Smith, and K. Charlie Lakin, Editors) (hereinafter referred to as "Residential Services Status and Trends") at Table 1.19, page 43.  Ex. 12.

[5] Mental Retardation, 3d Ed. at 348.

[6] Cost Comparisons of Community and Institutional Residential Settings:  Historical Review of Selected Research, Kevin K. Walsh, Theodore A. Kastner, Regina Gentlesk Green, Mental Retardation, Vol. 41 No. 2 (April, 2003) at 105.

[7] Mental Retardation, 3d Ed. at 347.

plan of chronic care that provides each resident with an annual physical exam.  In connection

with the annual physical, the doctors review the entire medical record and consult with the entire

team that works with each resident.  Six months after the annual physical, there is an additional

medical follow-up.  For serious and life threatening medical issues, Wrentham has various

formal and informal arrangements with a number of area hospitals.  It also has established long-

term referral relationships with various specialists, including a pulmonary physician and an

ophthalmologist.

      The availability of such services is unmatched in the community and is gravely important

for medically fragile, profoundly retarded class members and citizens of the Commonwealth.  In

fact, the medical director at Wrentham, who is also on staff at Children's Hospital, has

recognized the lack of experience in treating the mentally handicapped population among

physicians in the community, particularly internists.  As such, he is involved in a joint program

with Children's Hospital and Brigham & Women's to train doctors on how to treat adult patients

with mental retardation.  During the four-year program, physicians will rotate through Wrentham

to gain experience.  While that is a great start, the lack of experienced doctors to treat mentally

retarded adults remains a challenge for individuals in the community now.

      B.    <u>The "light in the window must remain on" for those individuals wishing to return</u>.

      This Court has repeatedly stated that DMR should leave a light on for anyone who wishes

to return to the ICFs/MR if a community placement no longer fits their needs.  It is difficult to

know what DMR's current readmission policy is because it has been "under review" for at least

two years.[8]  DMR has, however, issued a "Right to Return" letter to each person transferred from

Fernald in 2006.

Over the years, more than 500 Wrentham Class members have moved into the

community, and most have done well.  As Class members continue to age, they will become

increasingly infirm and need more care than required under current ISPs.  The life expectancy of

individuals with mental retardation is increasing – from 59 in the 1970's to 66 in 1993 – and is

approaching average life expectancy of seventy (70) years in the United States.[9]  In addition to

usual health and care needs of aging patients, additional medical challenges will arise for class

members with Down Syndrome.  Among older persons with Down Syndrome, the aging process

is accelerated and, unfortunately, the disorder has a chromosomal connection to Alzheimer 's

disease.  By age 60, approximately 40% of people with Down Syndrome will show symptoms of

the Alzheimer's form of dementia.[10]  Progressing more rapidly in Down Syndrome, initial

Alzheimer's changes include memory loss, both general and visual memory, and behavior

changes.[11]  Its middle stages are marked by a loss of social skills and decline in the ability to care

for one's personal needs.  At the Wrentham facility, approximately five percent (5%) of the

population has Down Syndrome.  Of those, fifty percent (50%) have already developed

Alzheimer's.  As is the case with the general population, individuals who suffer from

---

[8] *See* reference to DMR's Admission/Readmission Policy (Policy #89-4) being "under review" at
http://www.mass.gov/?pageID=eohhs2subtopic&L=5&L0=Home&L1=Government&L2=Laws%2C+Regulations+a
nd+Policies&L3=Department+of+Mental+Retardation+Statutes%2C+Regulations+and+Policies&L4=Policies&sid
=Eeohhs2.

[9] Promoting Healthy Aging, Family Support and Age-Friendly Communities for Persons Aging with Developmental
Disabilities, Report of the 2001 Invitational Research Symposium on Aging with Disabilities, Dept. of Disability
and Human Development, University of Illinois at Chicago, at 1, Ex. 13.

[10] Mental Retardation:  Nature, Cause and Management, 3d Edition (1999), George S. Baroff, d J. Gregory Olley,
Ph.D., at 350-51 (citing Schupf, Silverman, Sterling & Zigman, 1989).

[11] Mental Retardation, 3d Ed. At 351.

Alzheimer's typically require institutional care as the disease progresses. In short, as they age, *Ricci* Class members will require more care than they currently need.[12]

The greater medical and personal care that is provided in the on-site medical facilities of ICFs/MR is simply not readily available in the community, where DMR clients face challenges in finding internists and specialists who accept MassHealth. As such, the Commonwealth should maintain ICF/MR capacity so that Class members will have a place to go when they need more care in the future, especially where DMR is under a court order to provide appropriate medical care under the 1993 Disengagement Order.

## II.    Review of the community-based system is required to protect Class members in the Community.

The Wrentham class appreciates the review conducted by the Monitor and the conclusions regarding Fernald and its residents. However, the scope of the Monitor's role did not allow him to address significant issues faced by Class members who reside in the community. Among those issues are neglect and abuse, both physical and sexual, and problems of access to medical care cited in the Monitor's Report. As such, the Wrentham Association requests that the Court appoint the Monitor to conduct an investigation and report on these problems so that *Ricci* Class members can receive the protection and services to which they are entitled.

Unfortunately, there is disturbing resistance to any further review and/or report by the US Attorney. ARC of Massachusetts and the Disability Law Center, both of which advocate for community-based care, have openly opposed any further review stating:

---

[12] Introduction to Special Issue on Aging: Family and Service System Supports, American Journal on Mental Retardation, Vol. 109, No. 5:350 (Sept., 2004).

> [T]here is nothing in the Disengagement Order that authorizes such a review
> [by the United States Attorney], or establishes standards or criteria for a
> comparison of the quality of institutional and community services. The equal
> or better test is to be applied at the time of transfer, and **does not constitute the
> basis for ongoing evaluations** or comparisons of institutional facilities and
> community programs. **If it did**, anyone could seek to reopen the case or
> request further court orders whenever **a class member was hurt or died under
> suspicious circumstances.**

*ARC Opposition to Wrentham Class Plaintiffs' Motion to Supplement its Motion for
Clarification of Order Appointing Court Monitor* (Document No. 145), ¶ 4 (emphasis
added). As advocates for mentally retarded citizens, the ARC and the Disability Law Center
are presumably just as concerned as Class members and their guardians about the risks of
neglect, abuse and death, and should be similarly open to identifying and remedying sub-
standard care in the community. The blatant resistance to any real investigation from DMR
and certain advocacy groups demonstrates the need for an independent monitor to shed light
on the successes and failures of the community-based system. The US Attorney's Office's
dedication and knowledge make it an obvious choice for this challenging task.

    A.    <u>Cases of abuse substantiated by the Disabled Persons Protection Commission
("DPPC") show that abuse is worse and certain rates of abuse are higher in vendor
operated group homes.</u>

The DPPC investigates claims of abuse against individuals with mental disabilities who
are between the ages of 18-59 under Mass. Gen. L. c. 19C. In response to a public records
request, the DPPC provided factual summaries for fiscal years 2002-2005 for claims in
residential settings where the abuse allegations were substantiated under the c. 19C requirements
(i.e., abuse which results in serious physical or serious emotional injury to a person with a
disability). 118 CMR 2.02.

In FY 2002, there were 114 substantiated claims of abuse in residential, non-facility settings, 121 substantiated reports in FY 2003, and 83 (plus 19 substantiated cases from transportation providers) in FY 2004 and 79 (plus 55 pending cases) in FY 2005. This is not to say that DMR facilities are immune from the same reports. In fact, there were an average of 12 substantiated reports of abuse in DMR facilities each year from FY 2002-2005. However, the overwhelming majority of substantiated claims of abuse at DMR facilities are the result of omissions on the part of staff: falls, usually from wheelchairs, or out of bed, or because the Class member was not closely supervised or because protective equipment was not used (rail, gait belt, wheelchair lock or belt).

The abuse against DMR clients in community homes is more often the result of malfeasance – it is conduct that is intended to cause harm, or represents gross recklessness in the care of individuals who need to be constantly monitored in order to be safe from themselves, other clients, or abusive staff. Substantiated claims of abuse and neglect have resulted in dozens of deaths of DMR clients over the years. While the number of investigations remained relatively constant, with the exception of 2005, the number of substantiated deaths, and the number of cases still pending as of the time the DPPC published its annual report, has risen substantially since FY 2000. Clearly, something is wrong with DMR's system of care – there is no acceptable "background" death rate resulting from abuse or neglect.

| YEAR | INVESTIGATIONS | SUBSTANTIATED | PENDING |
|------|----------------|---------------|---------|
| 2000 | 23 | 2 | 0 |
| 2001 | 19 | 0 | 0 |
| 2002 | 20 | 3 | 0 |
| 2003 | 25 | 8 | 4 |
| 2004 | 23 | 5 | 4 |
| 2005 | 48 | 2 | 31 |
| 2006 | 24 | 4 | 11 |

Source:  DPPC Annual Reports

In FY 2002-2003, medication errors represented 7% of the substantiated complaints against vendors, but only 2% of the complaints against DMR as a care provider (including DMR-operated group homes).  The numbers for Fiscal Year 2004 tell a similar story of greater rates of abuse and medical errors.  The breakdown of substantiated claims of abuse provided by the DPPC is as follows:

Facilities:
    14 substantiated cases of abuse:

7% medication error
0% sexual abuse
14% physical abuse
64% neglect
7% unclear

DMR Operated Group Homes:
    14 substantiated cases of abuse

7% medication error
0% sexual abuse
21% physical abuse
50% neglect
23% unclear

Vendor Operated Group Homes
    69 Substantiated cases of abuse

14% medication error
1% sexual abuse
35% physical abuse
46% neglect
3% unclear

Transportation Providers
    19 Substantiated cases of abuse

26% sexual abuse
11% physical abuse
63% neglect

Criminally Deferred
    19 cases

68% sexual abuse
16% physical abuse
11% neglect

In FY 2005, DPPC substantiated 79 claims of abuse where DMR clients resided in the community.  There are another 55 abuse claims still pending.  Of the substantiated claims of abuse in the community, 30% of people were physically abused, typically at the hands of a

caregiver who slapped, punched or dragged the victim or injured the client in the course of restraining him/her; 9% of substantiated reports of abuse in the community in FY 2005 involved sexual abuse.[13]

Reports of abuse to DPPC's hotline have increased by more than 40% between 2000-2006.  There were almost 6,000 reports of abuse in Fiscal Year 2006.  The May 13, 2007 FOX 25 News Report on abuse and neglect in the community system told two such stories.[14]  Six months after her transfer from Fernald to a group home in Lynnfield, Joanna Bezubka, who has Down Syndrome, was found one morning with a black eye and scratches and bruises on her thighs, which the registered Sexual Assault Nurse Examiner identified as "text book for sexual assault," indicating that it looked like someone tried to pry Joanna's legs open.  Photos of Joanna's injuries are set forth in <u>Exhibit A</u>.  Unfortunately, criminal charges were never brought because Joanna could not describe what happened.  The other story reported by Fox 25 was about Carrie Beaufard, a woman who is autistic, mentally retarded and suffers from bi-polar disorder.  Carrie's caregivers are supposed to be within an arms-length of her at all times.  At one point, Carrie was unsupervised for long enough that she repeatedly punched herself in the face, to the point that her eyes were swollen shut.  Photos of Carrie's injuries are set forth in <u>Exhibit B</u>.  That was not the only abuse she suffered.  Carrie's mother was informed that her daughter's pubic area had been shaved, supposedly because she was getting ready for a "hot date."  Another time, Carrie was restrained so forcefully that she suffered permanent nerve damage to her right arm.

---

[13] 2 of the 12 substantiated complaints at institutional locations in FY 2005 were sexual in nature.  At Taunton State Hospital, the mentally ill victim reported a months-long sexual relationship with a caregiver, while there was a substantiated complaint of sexual fondling at Glavin Development Center.

[14] "Protecting the Developmentally Disabled?" by Mike Beaudet, available at http://www.myfoxboston.com/myfox/pages/News/Detail?contentId=3195773&version=1&locale=EN-US&layoutCode=VSTY&pageId=3.1.1

These are not isolated incidents.  As information from the DPPC indicates, DMR clients frequently suffer neglect and abuse.  All of the stories are tragic, and some of them are described below.[15]

### EXAMPLES OF SUBSTANTIATED CLAIMS OF SEXUAL ABUSE

| PROVIDER | DATE | SUMMARY |
|---|---|---|
| Center Of Hope-QRADH | 12/11/2002 | ALV reported that ALAB had taken her into a ladies room on a community outing last June and put his hands down her pants and put his fingers in "her hole".  ALV does not need assistance going to the bathroom.  There should have been another staff person as well as other CLTS during this outing.  When ALV reported this she was nervous, not crying but worried about being in trouble. |
| C-Marc Industries | 5/7/2003 | The ALV reported that another client "spanked me hard in my bum, and put his penis in my bum".  This other client has a history of sexualized behaviors toward peers. |
| Community Enterprises | 6/19/2003 | ALV was sexually assaulted vaginally and anally at the workshop.  The ALV was sent back to the workshop today where she met David again. |
| Community Strategies | 6/27/2003 | ALV alleges that between the summer and October of 2002 that she had performed oral sex on the [ALAB] several times, they had anal sex twice and vaginal sex once. |
| Community Strategies | 6/27/2003 | Last summer the ALAB raped the ALV sexually.  ALAB gave the ALV $200.00 to keep quiet. |
| Community Systems, Inc. | 10/6/2003 | ALV was thirsty and ALAB only offered him pee to drink.  ALV stated that he did not want to touch ALAB's "vagina" and didn't want ALAB to touch his penis. **This has happened before.**  ALV does not want ALAB working there anymore. |
| Delta Projects, Inc. | 11/16/2001 | Although the ALV has previous recent suicide attempt (with shoelaces) and the ALAB was told to check her room daily to ensure that there were no dangerous items within her reach, the ALV was able to attempt suicide again with shoelaces.  There is also concern for past rapes of the ALV during restraints and for the ALV's 100 pound weight loss since January of this year. |

---

[15] The Wrentham Association previously submitted much of this information for fiscal years 2002 and 2003.  *See Wrentham Association's Memorandum in Support of its Motion to Reopen*, at 3-17.  This information has been updated to include substantiated cases from FY 2004-2005 as well.  For a more complete summary of substantiated claims of abuse, please see the 39-page chart attached hereto as Exhibit C.

| PROVIDER | DATE | SUMMARY |
|---|---|---|
| Eliot Community Human Services, Inc. Kelliher Cent. | 10/21/2002 | ALV has been touched inappropriately by another client on several occasions.  The staff are aware of the other client's sexual behaviors toward the ALV, and are continuing to let him be in contact with the ALV.  The other client has a history of this type of behavior. |
| Greater Marlboro Programs, Inc. | 11/18/2002 | The ALAB raped the ALV over a 4-year period, holding her down using physical restraint to stop her from fighting him off, and threatening her that he would kill her if she told anyone.  Several things have occurred with other clients, and the parents of the other clients dropped the charges. |
| Kennedy Donovan Center | 3/25/2003 | The ALV was touched by another client on the penis.  The other client is supposed to be supervised at all times as he is a pedophile.  The ALAB had left the ALV and the other client alone. |
| Riverside Community Care | 1/24/2003 | ALV initially said there was inappropriate touching.  When staff sat down with ALV on 1/22 ALV wrote a statement that stated ALAB played with her vagina.  ALV was lying down on the couch, ALAB took his penis out and put it inside her vagina and had sex with ALV. |
| Seven Hills Foundation | 11/15/2001 | The ALAB should have been supervising the ALV at a community dance, where the ALV reports that another client had touched him while they were in the bathroom.  The other client admitted he touched the ALV inappropriately.  ALAB is aware of this ALV's HX of sexually acting out, even if they might not be aware of the other CLT's. |
| Seven Hills Foundation | 11/22/2002 | The ALV states that another client touched her two times today.  Once at the center waiting to go to the workplace, and again at the workplace.  Some staff both at the center and at the residence were aware of this behavior of the other client.  Nothing has been done to alleviate this situation. |
| Seven Hills Foundation | 12/8/2004 | ALV indicated in her journal that ALAB has her sit on his lap and he kisses and hugs her. |
| Seven Hills Foundation | 2/4/2005 | The ALAB asked the ALV to touch his penis while the ALAB had a condom on.  The ALAB masturbated in front of the ALV, and told him that this was the way to have safe sex.  The ALV was uncomfortable, upset, and thought it was very wrong and unnatural.  The reporter adds that the ALAB is direct care staff and should not be teaching safe sex to a client. |

## EXAMPLES OF SUBSTANTIATED CLAIMS OF MEDICAL ERRORS

| | | |
|---|---|---|
| Advocates, Inc. | 3/31/2003 | ALAB (alleged abuser) gave ALV (alleged victim) 13 sleeping pills over the course of the night.  In the morning ALAB could not get |

| PROVIDER | DATE | SUMMARY |
|---|---|---|
| | | ALV up.  ALV is not prescribed this medication-ALAB brings the medication to work to give to ALV because she wants the ALV to be quiet and sleep. |
| Behavioral Heath Network | 2/14/2005 | ALV was not taken for blood work to monitor med. Level.  ALV had to be taken to the emergency room and was found to have toxic Dilantin levels. |
| Central Residential Services/DMR | 12/31/2004 | It is alleged that the ongoing inadequate care and staffing at the residential program has put the ALV at medical risk as well as increased the ALV's anxiety level.  ALV's SIB's are reported to have increased.  Reporter states that ALV was not given his new medication from 6/2004 to 12/2004.  ALV was brought to doctor for bruises on all toes. |
| Communities For People/CFP | 8/20/2001 | ALV suffered severe seizure after being seizure free for 12 years.  When his blood level for anti seizure medication was checked at the hospital it was far below therapeutic range.  The only explanation is that ALAB was not giving ALV his medication properly. |
| Fidelity House | 10/28/2003 | The ALAB failed to get the proper doses of medication to the ALV, and as a result, the ALV sustained increased seizure activity, and tremors, and was unable to walk as a result, as well. |
| Justice Resource Institute | 1/21/2004 | ALV missed 3 to 4 days of meds.  ALV had a seizure. |
| May Institute, Inc. (The) | 8/26/2002 | ALV was not given her seizure meds for several days,  and had a seizure during transport from program to home. |
| May Institute, Inc. (The) | 1/7/2003 | On 1/5/03 ALV was brought into Lahey Clinic due to an overdose of Levoxyl.  She took approximately 35 pills.  At clinic ALV was observed to have a bruise on chest.  ALV reported that a house mate hits her and another kicks her.  ALV reported not wanting to return home.  Concerns as to how ALV gain access to all the pills. |
| May Institute, Inc. (The) | 3/3/2004 | Clients are self medicating but they need reminders from staff to take the medications.  Due to lack of staffing . . . ALV often misses his medication . . . ALV has ended up hospitalized as a result of missing meds/not taking his nebulizer as prescribed, most recently within the last month. |
| North Suffolk Mental Health Assoc. | 11/21/2003 | ALV did not receive his medication (Prozac) from Oct. 8 – Oct. 27.  ALV has been depressed which psychiatrist attributes to this situation. . . . |
| Reach Out Independence | 12/17/2001 | ALV takes Depakote for her seizure disorder.  ALV was without medication for four [4] days, causing her to have seizures.  Seizures |

| PROVIDER | DATE | SUMMARY |
|---|---|---|
|  |  | started at 8:30 am and fire dept. did not receive an emergency call until 3 pm when the 3rd shift came on duty and called. |
| South Shore Mental Health | 12/30/2002 | There has been on-going concern that the ALAB's agency was not giving the ALV his medications as prescribed.  Yesterday the ALV had 3 seizures.  He lost consciousness and his heart stopped.  He is presently in a coma in the cardiac care unit. |
| Vinfen | 4/20/2005 | ALABs have been neglectful of ALV's care.  ALV has had infections on his feet/toes.  ALV was taken to a Dr. and ALAB#2 told him that ALV was bipolar.  ALV was put on meds, to which he had bad side effects.  ALV's urinary output became excessive.  ALV is currently hospitalized, suffering from dehydration, malnutrition, and abnormal liver enzymes from the malnutrition, and an internal systemic infection with a 101 fever.  ALV's physical condition has deteriorated as a result of the malnutrition and he has sores. |

## EXAMPLES OF SUBSTANTIATED NEGLECT/PHYSICAL ABUSE COMPLAINTS

| Advocates, Inc. | 9/23/2003 | ALV reported that the ALAB hit him on the back with a belt.  When examined the ALV had two welts on his back, and the indentations of the belt are apparent. Reporter took two photos of the marks. |
|---|---|---|
| Bamsi Brockton Area Multi Services | 10/7/2002 | The ALV went to the day program crying and was flustered.  The ALV stated the ALAB hit her with a belt on her back because she was angry.  The ALV had two welts above the bra and one below the bra about 1-3 inches in length.  There were marks on her hip, but they could be from the depends that she wears.  The ALAB is not scheduled to work. |
| Behavioral Health Network | 2/20/2004 | The ALAB appears to not be providing a safe environment for the ALV.  There is an aggressive/assaultive client in the residence who terrorizes the ALV.  ALV's PTSD has worsened, ALV is withdrawn, and expresses fear of being at the residence.  There is also a 2nd client who is going in to ALV's room and frightening her and taking her things. |
| Charles River ARC | 9/3/2002 | ALV was left unsupervised, and sustained a black eye.  ALV was left alone with another client who has a history of assaultive behavior.  All clients in the residence are not receiving proper medical care. RPTR feels that the agency is covering up things, and that the clients are at risk. |
| Charles River ARC | 8/24/2004 | The ALV was restrained by the ALAB, by holding the ALV's hands behind her back like being handcuffed.  ALV sustained a sprained wrist as a result.  The hold is reported not to have been a proper or acceptable restraint. |

| PROVIDER | DATE | SUMMARY |
|---|---|---|
| Comprehensive Mental Health Systems | 3/8/2004 | The ALV slipped and fell and the ALAB fell on top of the ALV. ALAB had been assisting the ALV with walking and was yelling and screaming at the ALV to get him moving. With the yelling and the hurried movement, the ALV slipped and fell and the ALAB fell on top of the ALV. Instead of helping the ALV, the ALAB kept yelling at the ALV to get up. The ALV sustained a broken hip and is in ICU. |
| Delta Projects, Inc. | 12/17/2002 | Several clients and staff have witnessed the ALAB abuse the ALV. The abuse includes kicking the ALV while ALV was laying on the floor, throwing sneakers at the ALV and then putting the ALV in the basement, ALAB then put his foot in the ALV's face. The ALAB has been suspended. The ALV was seen with bruises on his back. |
| Delta Projects, Inc. | 1/17/2005 | ALV was suicidal and hearing voices. ALV called 911. ALV had attempted to hang himself earlier, and ALAB had apparently cut him down. Upon arrival rope was observed in ALV's room. ALV had bruises around his neck. ALAB had left his shift. Staff were uncooperative. There are concerns over safety issues and mistreatment and endangerment of the ALV and other clients at residence. |
| Fidelity House, Inc. –Jacalyn McIsaac c/o | 8/1/2004 | ALV has a laceration of unknown origin on his right forearm. It is a stage three wound with tendon and muscle exposure. The wound appears to be a couple days old. |
| Greater Lynn Mental Health and Retardation Assoc. | 3/10/2003 | The supervisor stated that the ALV's little toe on one foot was black, and smelled very bad. The house Mgr. said that he thought it was black fungus or gangrene. RPTR states that the Dr. disclosed to the guardian, that the ALV could lose part of the toe, as a result of the injury or infection, cut, crack in the skin, that the staff did not treat in time. |
| Horace Mann Educational Associates | 1/23/2002 | The ALAB put the ALV in his wheelchair in the bedroom and locked the wheelchair. The ALAB then propped the ALV's legs up on a chair so he would not be able to move himself. Staff are not supposed to do this. The reporter does not know how long the ALV was left like this. RPTR also stated she is unsure if this actually happened or not. The residential director told RPTR this happened. |
| Horace Mann Educational Associates | 11/10/2004 | ALV is supposed to be on 1:1 around food. ALV was left alone in the kitchen. ALV got hold of bread and started gorging the bread. ALV aspirated. ALV ended up in the hospital and is on a ventilator. Also ALV gained 30 lb. in a short time. ALV is supposed to be on a control diet. |
| IPP/Institute for Professional | 9/24/2001 | Police were called due to a man found lying on side of road. ALV was wet, hungry and thirsty. ALV had cuts on hand and scratches on legs. Police knocked on doors and located ALAB who stated that |

15

| PROVIDER | DATE | SUMMARY |
|---|---|---|
| Practice | | ALV belonged to them.  Ambulance had arrived they felt ALV should be taken to hospital.  ALAB disagreed and stated ALV was fine. |
| Latham Center, Inc./Gilbough Center | 7/19/2001 | The ALV duct taped shut the mouth of another client at the direction of the ALAB.  The ALV said she felt weird placing tape over another clients mouth.  She said she did what the ALAB # 1 told her to do because she was afraid of upsetting the ALAB # 1.  The ALV expressed being uncomfortable and confused during and after the incident. |
| May Institute, Inc. (The) | 5/7/2003 | The May Institute, Inc. is not providing adequate care and safety to the ALV.  ALV has been brought into the police station 4 times with various scratches.  Staff will not disclose additional information to ALV's father and police are looking into it.  Police are having a difficult time getting information from May Institute Staff, but believe that the injuries are being caused by another client. |
| May Institute, Inc. (The) | 8/14/2004 | ALV had been found under her bed by a staff member of the Peck Street Residence.  ALV had bruises on her arms and legs and was incontinent of urine and feces.  ALV had cuts on her face and a bruised eye.  It was discovered that the ALV was lethargic and was having a seizure and was probably in her room for hours.  ALV did not come down for dinner or her 8 PM medications. |
| North Shore ARC | 10/29/2003 | ALV was restrained by two staff members who tied his hands behind his back with rope.  ALV's wrists were red and swollen. |
| Rehabilitative Resources, Inc. | 10/15/2004 | The reporter states that the ALAB grabbed the ALV by the throat this morning and called him a "lazy bastard".  The ALAB also allegedly threatened the ALV with "beating the shit out of him, if he didn't go to work".  The ALV has seemed more agitated and behavioral all day. |
| Riverside Community MH/MR Center | 8/12/2004 | At 11:30 ALV ran out of the house.  A new system was recently installed so front doors and gates outside are locked.  Staff watched the ALV for two hours while ALV tried to get out.  ALAB then went upstairs to check on the clients.  ALAB got a call from police that the ALV was found down by the lake which is half a mile from the house. . . . Protocol requires that ALV be kept in sight. |
| Seven Hills Foundation | 6/25/2002 | ALV's behaviors have been increasing over the last two weeks.  ALV is adamant when ALAB is on that she doesn't want ALAB near her.  ALV stated that she was dragged across the floor by ALAB and she cut the bottom of her feet.  ALAB cleaned up the blood.  Staff found a large burn mark on ALV's back that was 3" x 1/2" and 3 smaller marks which all appear to be friction burns. |
| Seven Hills Foundation | 5/2/2003 | ALV has unexplained injuries.  He has a broken arm, which will require surgery and bruising on his face.   Staff are unable to explain |

16

| PROVIDER | DATE | SUMMARY |
|---|---|---|
| | | the injuries.  Reporter is very concerned for the ALV and reported that ALV never suffered any injuries or broken bones until placement at this residence. |
| Southeastern Residential Services/DMR | 2/13/2004 | . . . ALAB dumped ALV out on the ramp and told ALV to wheel himself to the van.  ALV is incapable of doing that and residential staff are supposed to bring ALV right to the ramp of the van.  ALV went down the ramp and slammed into the gate.  Driver reported that ALV was complaining that his leg and ankle hurt. |
| Southeastern Residential Services/DMR | 1/18/2005 | ALV went out with hat and coat on to take out the trash.  According to the incident report, ALV's fingertips were observed to be dark blue.  ALV was brought to the E.R. and was treated for frostbite of both hands, including 2 fingers on his left hand and all 5 fingers on his right hand.  ALAB is alleged to have stated that "ALV didn't have gloves on because she did not think it was that cold out". |
| Sullivan & Associates | 11/18/2003 | ALAB #2 held the ALV while ALAB #1 beat ALV with a belt.  ALV has three red marks on the right side of his hip, several red marks on his spine and a 3.5 inch red mark on his chest. |
| Vinfen | 10/30/2002 | The reporter states that the ALAB was on top of the ALV, pulling her hair, and saying to the ALV, "how do you like it when someone pulls your hair".  The ALAB and the reporter discussed this and the ALAB swore at the reporter, and asked where she was when the ALV was doing the same thing to the ALAB.  Screened out - based on the information received, there is no indication that the ALV sustained a serious injury.  A mistreatment/administrative review is recommended. DPPC should be contacted if it is found that the ALV did sustain any bruising or other injuries. |
| Vinfen | 6/4/2004 | In 1997 ALAB engaged in a pattern of physical and verbal intimidation and demeaning comments towards the ALV.  ALV was very emotionally upset by this.  ALAB also failed to intervene when ALV engaged in head rubbing causing ALV's head to bleed, or ALAB would dig her own fingernails in to ALV's heads as a deterrent.  ALAB would use ALV's seat belt to restrain her.  Other staff (ALABs 2, 3 and 4) also engaged in intimidation, inappropriate behaviors towards the ALV. |

Some of the most egregious situations are those deferred for criminal investigation.  A

few recent examples include:

17

| PROVIDER | DATE | SUMMARY |
|---|---|---|
| DMR | 3/17/2004 | ALV and a staff person were stabbed by another client. The client was placed at residence by DMR/DSS who failed to notified [sic] administrators and staff of the abuser client's behaviors. |
| DMR | 6/23/2004 | ALAB performed oral sex on the ALV on at least one occasion. ALAB also attempted to have anal sex with the ALV but he "didn't get in". ALAB has also been verbally inappropriate with the ALV asking questions like "do you want a blow job." . . . |
| Riverside Community Care | 3/21/2005 | ALV was observed this morning to have has [sic] extensive bruising on arms and back. ALV reported that a staff hit him. A witness indicated seeing a newer staff hit the ALV with a belt. |
| VHS Transportation Company, Inc. | 6/18/2004 | ALV came home covered in bug bites. ALAB reported that he had taken ALV for ice cream. ALV was asked if ALAB had touched her. She pointed on a doll to the genital area and the breast. ALV keeps apologizing and crying. ALV has been told that she has done nothing wrong. |
| Vinfen | 12/4/2003 | ALV was anally raped by another client. ALV was put into a headlock and forced to perform oral sex on the other client. ALV screamed out for help and no staff responded to help. Several staff were aware, and no reports were made to DPPC, law enforcement was not notified, and no medical attention was sought for the ALV. ALV has been unable to eat, and has had increased stuttering. |
| Waltham Committee, Inc. | 10/29/2003 | Staff found two clients in the kitchen, ALV was zipping up her pants. There is a question of possible sexual activity. The other client was supposed to be within sight of staff on 1:1 supervision. . . due to sexualized behaviors. |
| Work Community Independence | 11/12/2003 | The ALV was raped vaginally and anally by another client. The other client was supposed to be on 1:1 supervision. . . . |
| Work Community Independence | 1/4/2005 | The ALV told the Reporter that she was kissed, and fondled on at least two occasions, between 12/27/04 and 1/1/04 [sic]. The ALV said that he wanted to have sex with her but had no condom. The ALAB wanted to have a friend come over & have sex with the ALV. The ALAB was the ALV's 1:1. |

B.    DMR fails to investigate over 1,500 complaints every year.

The DPPC investigations tell only a part of the story because of the thousands of

complaints made every year, most of those involving mentally retarded victims are investigated

by DMR.  In fact, in 2005, the DPPC investigated 6% of all claims within its jurisdiction, while DMR investigated 54% of all Chapter 19C claims.[16]  According to DMR's own Quality Assurance ("QA") Reports, a number of complaints go uninvestigated year after year, or DMR chooses to exclude certain complaints from its reports.  There were 3,428 complaints of abuse of mentally retarded individuals reported to DPPC in FY 2004.[17]  DMR was referred 1,788 of these reports, which were not within DPPC's jurisdiction.[18]  DPPC's FY 2005 Annual Report shows 3,289 reports of abuse of individuals with developmental disabilities.[19]  Of those reports, 1,670 were referred to DMR.[20]  However, DMR's Quality Assurance Reports, which are supposed to include investigations from DPPC and DMR, show a significant gap in the number of investigations conducted.[21]  There is no explanation for the difference between the number of reports for the mentally retarded referred to DMR, as reported by DPPC, and the number of investigations listed in DMR's QA Reports.

| Fiscal Year | Reports Received by DPPC Regarding Mentally Retarded[22] | Non Chapter 19C Cases Referred to DMR[23] | Number of Investigations According to DMR[24] |
|---|---|---|---|
| 2001 | 2388 | 1467 | 1213 |
| 2002 | 2553 | 1765 | 1351 |

---

[16] 2005 DPPC Annual Report, at 7.

[17] FY 2004 DPPC Annual Report at 7.

[18] Id.

[19] FY 2005 DPPC Annual Report at 4, 14.

[20] Id. at 5.

[21] 2004 QA Report, at 4.

[22] Combined FY 2000-2002 DPPC Annual Report, at 6-8; FY 2003 DPPC Annual Report, at 4, 6; FY 2004 DPPC Annual Report, at 7; FY 2005 DPPC Annual Report, at 4, 14; FY 2006 DPPC Annual Report, at 5, 15.

[23] Id.

[24] 2004 QA Report, at 18; 2005 QA Report, at 23.

| 2003 | 2234 | 1765 | 1257 |
| 2004 | 3428 | 1788 | 1083 |
| 2005 | 3289 | 1670 | 1093 |
| 2006 | 3273 | 1638 | Unknown |

While there is no explanation for this glaring disparity, DMR noted that its statistics indicate the number of substantiated complaints has gone down every year, inferring that less abuse may be happening. However, DMR omits the fact that the number of open cases every year has increased almost four-fold: from 40 in 2002 to 159 in 2005, even though fewer investigations were actually conducted (1,351 in 2002 compared to 1,093 in 2005).[25] DMR also apparently does not include any cases deferred for criminal investigation, which increased from 622 in 2002 to 835 in 2005.[26] According to DPPC's annual reports, the substantiation rates have been stable with 31-33% of complaints within its jurisdiction being substantiated.

     1.     DMR's investigations go to great lengths to avoid findings of abuse.

It is difficult for any organization to effectively police itself, given the innate tendency to portray one's own conduct in the most positive light. The investigation of Joanna Bezubka's reported sexual assault provides an example of attempts by DMR and its investigators to put the most positive spin on facts, even to the point of being irrational. Joanna was seen first thing in the morning with a black eye and bruises and scratches on her thighs. DMR offered a number of explanations for her injuries, except for the most probable one, that she was physically abused and probably sexually abused. The investigative report ultimately concluded that there was enough evidence to substantiate an "omission" but not enough to substantiate physical or sexual

---

[25] 2005 QA Report at 23, 26.

[26] FY 2005 DPPC Annual Report, at 14.

abuse because the alleged abusers denied inflicting Joanna's injuries and the rape kit was inconclusive.[27]  It is not surprising that the rape kit was inconclusive given that Joanna was not taken to the hospital until hours after her injuries were discovered and after the staff bathed her and changed her clothes.

After examining Joanna, the Sexual Assault Nurse Examiner found a small amount of blood when she swabbed Joanna's vaginal area.  The scratches on Joanna's inner thigh could not have been self-inflicted because of the angle, and the investigators found that there was nothing in Joanna's room that could have caused the scratches.  The Nurse Examiner concluded:

> [I]t is my medical opinion that the ALV was physically assaulted and at least an attempt was made to sexually assault her.  The marks on her inner thighs are text book for a sexual assault, these marks required force.  It looks like someone attempted to pry her thighs open.[28]

Joanna's caregivers said that her black eye and the fist-sized bruises on her thighs were self-inflicted:  she must have fallen out of bed or crawled on the floor and bumped into the doorknob, or maybe she rolled the bed over herself.  State Trooper Mike O'Connor, who investigated the scene, tried but was unable to move the bed because it was bolted to a large headboard.  Additionally, there is a motion detector in the room that should have gone off had Joanna been trying to move the bed, but the detector can easily be turned off by staff.  Trooper O'Connor also could not find anything that would have caused Joanna's scratches.[29]  As for the black eye, he found that the explanation that she must have hit it on the door knob did not make sense because the door has a lever handle, not a round knob, and her bruising would have been in the shape of the handle.  The ophthalmologist who examined Joanna concurred that her black eye

---

[27] Chapter 19C Investigation Report, submitted with April 27, 2007 letter of George Mavridis (Document No. 182), at 1.

[28] Id. at 9.

[29] Id. at 10.

was not caused by falling onto something, rather it was the type of injury that occurs "when someone is hit 'dead on and hard enough.'"[30]  Trooper O'Connor's professional opinion was that Joanna was a victim of physical abuse, at a minimum.  The conclusion of the report, however, was only that there was evidence of omission, meaning that the worst thing the two alleged abusers did was not check on Joanna every 30 minutes and/or respond to the motion detector.

The investigation is a prime example of DMR ignoring the evidence and the rational findings of the initial investigators to put the most positive spin on the situation as possible. Incredibly, the alleged abusers, who notably did not cooperate with the investigation, were still employed by the agency and were working without any increased supervision.[31]  Perhaps even more incredible is the fact that Joanna's guardian had to wait six months for the investigative report to be released.

>    2.    Critical incident reports are on the rise.

DMR staff and providers are required to report unusual incidents that place individuals at risk including assaults, medical, physical abuse, inappropriate sexual conduct, etc.[32]  Critical incident reports have increased considerably since 2002:  from 623 in 2002 to 1,920 in 2005. DMR claims that the higher number should not be used because it includes reports in "additional categories" this year.  However, whether DMR's new computer system includes new categories does not change the number of incidents being reported, especially when the "new" categories are "sexual assault," "unplanned hospital" and "victim of crime" which all should have been reported under the old categories of "inapp sexual," "medical" and "criminal," respectively. Regardless of which box DMR or the provider checked, sexual assaults should have been

---

[30] Id. at 9.

[31] Id. at 11.

[32] 2005 QA Report, at 32, 34.

reported in prior years.  Even without the 761 reports for "unplanned hospital," which arguably

may not have been reported previously, there were still 1,159 critical incident reports in FY

2005, including 31 sexual assaults (plus 23 "inapp sexual"), 185 crimes and 58 assaults.  The

name of the category is immaterial - - the real point is that there were 1,920 (or 1,159, excluding

"unplanned hospital") critical incident reports in 2005 and no one knows what DMR has done

with them.[33]

        3.      <u>Preventative measures are not being taken</u>.

During the survey and certification process for vendors, DMR claims that:

> [S]urveyors identify situations where concerns exist re: possible
> mistreatment (e.g., abuse/neglect) of the individuals being reviewed.  This
> is done through a review of substantiated investigations and action plans
> that have occurred since the last review.  Surveyors also identify whether or
> not the provider has taken appropriate actions to correct the situation and to
> prevent it from occurring in the future.[34]

DMR reports that where there are concerns about "past or potential abuse/neglect," providers

take action more than 90% of the time, representing a slight increase from 2004.[35]  It is

outrageous that 10% of abuse/neglect situations DO NOT see corrective and/or preventive

action, especially where there has been a 45% increase in these situations from 2003 (269

instances) to 2005 (392 instances).[36]  The fact is that the need for corrective and/or preventive

measures is on the rise, and just as was the case with the critical incident reports, it is unclear

what DMR is doing about it.

---

[33] <u>Id.</u>

[34] 2005 QA Report, at 30.

[35] <u>Id.</u> at 32.

[36] <u>Id.</u> at 30-31.

4.    Proper background checks need to be conducted to protect Class Members.

Direct care providers have the most access to and control over DMR clients. It is for this reason that criminal background checks are required for all employees who will be providing services to this at-risk population. In 2003, there were 20 vendors with a total of 200 violations – that means vendors could not prove they had done CORI background checks on 200 direct care workers. DMR tried to paint a positive picture, noting that 98% of the violations were based on a lack of records to demonstrate that CORI checks were done, DMR claimed that it could just be poor record keeping, rather than the more obvious conclusion that the providers were not conducting the CORI checks. DMR's QA Reports are silent on whether DMR ever required those 20 vendors to conduct a CORI check on the 200 employees once the violations were discovered, to confirm that they were, in fact, cleared to work with such a sensitive population.[37]

In its 2005 QA Report, DMR attempted to put another positive spin on continuing violations because a lack of records is no longer the predominant violation. Although the percentage of providers audited with CORI violations decreased in 2005, 11% of audited providers still had violations, each with an average of more than two. Lack of documentation regarding CORI checks being performed was still a large reason for CORI violations, but DMR seems to claim a victory because "other causes" showed a significant increase. However, that means that providers are not conforming to CORI regulations including not adhering to the mandatory disqualification of employees convicted of certain crimes.[38] The most reasonable inference to draw from this data is that more providers are conducting the background checks,

---

[37] 2002-2003 QA Report, at 17-18.

[38] 2005 QA Report, at 29.

but ignoring the results.  These are all serious violations and DMR does not seem to be taking appropriate steps to ensure compliance.

Unfortunately, even if CORI checks are done, they may be of limited value.  In one case reported by FOX 25 News,[39] a house manager at a Needham group home stole money from residents for her own personal use.  After an investigation began, she applied for another position in Randolph and was hired by the May Institute, a large DMR provider.  The May Institute reportedly conducted a CORI check but found nothing.  Had the May Institute contacted DMR or checked with the DPPC, it would have learned of a "long history of embezzlement" and that the manager's case was referred for criminal prosecution.  As reported by FOX, many employers are not informed that they can, let alone should, check the DPPC database to see if prospective employees are alleged abusers.

In February 2005, the Massachusetts Inspector General faulted the process that social service agencies, including the DMR, use to check criminal backgrounds.  During the ten year period reviewed, there were 284 reported cases of abuse in which the abuser did not live in Massachusetts.[40]  State agencies only check on applicants' criminal records in Massachusetts, so anyone with a criminal record in a surrounding state would escape review.  Given these facts, not only are providers continually violating DMR regulations, but DMR's regulations are inadequate.  More needs to be done to protect DMR clients and Ricci Class Members, and an independent review of the community-based care system will assist in that process.

---

[39] "Employees With Troubled Pasts Working with Mentally Retarded," Mike Beaudet, Nov. 6, 2006 FOX 25 News Report, available at
http://www.myfoxboston.com/myfox/pages/News/Detail?contentId=1404988&version=2&locale=EN-US&layoutCode=VSTY&pageId=3.2.1.

[40] *Boston Globe*, Feb. 24, 2005, IG Faults Screening of Caregivers.

C.    DMR's Licensure and Certification Surveys do not help protect DMR clients..

The licensure and certification[41] process for DMR providers depends on surveys conducted by DMR Quality Enhancement Specialists.  While some of the reports are provided on DMR's website, the information is incomplete and in some cases, outdated.  More concerning is the fact that the surveys themselves are based on incredibly small samples, and still reveal disturbing levels of unsafe environments even among those providers that are certified "with distinction" by DMR.

TILL, a large DMR provider, obtained a two year license and certification with distinction in 2005 (DMR has not posted a newer report) based on a survey of only 18 people receiving residential supports and 2 receiving work/day supports.[42]  For some of DMR's largest providers, those sample sizes are too small for DMR to truly evaluate the services being provided to DMR clients.

Vinfen Corporation, one of DMR's largest providers, serves over 300 individuals residentially, 130 individuals with family supports and 500 with day supports.[43]  Despite the

---

[41] The difference between licensure and certification, according to DMR's website, is as follows:

"Licensure is the provider's legal authorization to provide service and supports and focuses on the presence of essential safeguards in the areas of health, safety and human rights.  These essential safeguards are non-negotiable, that is they must be present in order for a provider to serve individuals with mental retardation in Massachusetts. . . .

Certification is an assessment of outcomes in peoples' lives, in addition to health and safety.  These outcomes include relationships, community connections, individual control and growth and accomplishments.  These outcomes are equally important, but may be part of an evolving process with individuals a provider supports and occur over a longer period of time."

http://www.mass.gov/?pageID=eohhs2terminal&L=8&L0=Home&L1=Consumer&L2=Disability+Services&L3=Se rvices+by+Type+of+Disability&L4=Mental+Retardation&L5=Spectrum+of+Services&L6=For+Adults+with+Ment al+Retardation&L7=Find+info+about+licensed+or+certified+providers&sid=Eeohhs2&b=terminalcontent&f=dmr_ c_provider_reports_intro&csid=Eeohhs2.

[42] 3/31/2005 Licensure and Certification Report of TILL, at 1.

[43] See 9/18/06 Licensure and Certification Report of Vinfen, at 1.  Some Agency Reports, including all of those cited herein, are available on DMR's website at:
http://www.mass.gov/?pageID=eohhs2terminal&L=8&L0=Home&L1=Consumer&L2=Disability+Services&L3=Se rvices+by+Type+of+Disability&L4=Mental+Retardation&L5=Spectrum+of+Services&L6=For+Adults+with+Ment

large number of clients, Vinfen was rated in the September 2006 Report based on only 27

individuals receiving residential services and 17 receiving employment and community-based

day supports.[44]  Even with such a small sample, the findings were disturbing:  11 out of the 27

people receiving residential services, or 40%, had a home and work place that were not safe,

secure, or in good repair; 8 out of 27 people did not know what to do in an emergency, nor did

their supporters; and 3 people could not safely evacuate their home or work in an emergency.[45]

Yet, DMR determined that Vinfen achieved the goal of protecting clients' personal well-being.

DMR further determined that Vinfen clients "are free from harm" although in 4 out of 7

cases where people were mistreated, no action was taken to correct the situation, nor were any

steps taken to prevent the mistreatment from occurring again.[46]  In 7 out of 25 situations,

people's funds were not managed properly or with their consent, and in 5 out of 27 cases,

supporters were not knowledgeable about their clients' health care needs.[47]

Vinfen was also criticized in the Executive Summary for the following:

1.  Staff training and competence—staff worked "without required current
    certifications, a lack of knowledge regarding emergency evacuation plans and
    proper conduct of evacuation drills, and incomplete knowledge of clinical
    programs. . . . It was also unclear as to where responsibility for ensuring that
    monitoring and oversight of staff competence and training rested or whether those
    responsible knew what they should in fact be monitoring."

2.  Property management—although systems were put into place to identify
    maintenance and environmental concerns, "since the previous[] survey conditions
    appear to have significantly worsened in several homes."

---

al+Retardation&L7=Find+info+about+licensed+or+certified+providers&sid=Eeohhs2&b=terminalcontent&f=dmr_
c_provider_reports&csid=Eeohhs2.

[44] Id. at 2.

[45] See 9/18/06 Licensure and Certification Report of Vinfen, at 8.

[46] Id.

[47] Id. at 9.

3. Human Rights Committee and rights systems—the committees had difficulty obtaining quorums at quarterly meetings and did not carry out their mandated responsibilities; staff appointed to act as Human Rights Officers did not complete DMR approved training; protecting people's rights with respect to imposing restrictions, including physical restraints, was inconsistent.

4. "Establishing and enhancing community and social connections," was a constant challenge for staff and the available activities were limited.[48]

Additionally DMR considers Vinfen to have achieved the goal of supporting "growth and change to continually improve its supports to individuals" because it has processes to evaluate the quality of its supports, even though those processes do not result in improved services.[49] Identifying a problem without correcting it does not "improve [the provider's supports to individuals]," yet that apparently satisfies DMR. Despite the lackluster survey findings, DMR awarded Vinfen a two year License, the longest license available, and certified Vinfen with "5 out of 6 Quality of Life Areas Achieved,"[50] one of its highest ratings possible. If a 40% unsafe rate is good enough to obtain such a licensure and certification from DMR, it is scary to consider how bad the conditions are for those provider's with average ratings.

Similar issues appear in other providers' reports. TILL received a 2-year license and "Certification with Distinction" even though its employees do not consistently obtain or maintain consent of individuals or their guardians before using "health related/supportive protective devices and psychotropic/behavior modifying medications."[51] TILL had also been cited in the previous survey for not ensuring that clients' money was being managed properly and with consent, but in two years did not correct the problem.[52] These are common concerns:

---

[48] Id. at 3.

[49] Id. at 16.

[50] Id. at 1.

[51] 3/31/2005 Licensure and Certification Report of TILL, at 3.

[52] Id.

28

- Advocates, Inc.—received a two year license and was certified with all 6 Quality of Life Areas being achieved.[53]  However, 7 of the 19 individuals were not safe at home or work; 2 of the 19 do not know what to do in an emergency, nor do their providers.[54]  Almost half of the Advocates, Inc. residents surveyed are not supported in exploring interests and options for community involvement, and 26% of them are not involved in activities that would connect them to the community.[55]

- The Behavioral Health Network—received a two year license and very favorable review even though BHN's level of service worsened from previous years in various quality of life areas, "most noticeably in the documentation of staff trainings and in ensuring homes are safe."[56]  A number of managers were also unable to verify the training or certification status of staff at particular locations.[57]  More than a third of people surveyed indicated they were not in safe or secure homes or work places, and over 40% of residential cases lacked adequate supports to ensure safety in home or at work; 29% of the time, people's medications were given improperly.[58]

- Better Community Living—received a two year license and was certified with 5 out of 6 Quality of Life Areas achieved despite the following: 4 of 10 had no safeguards to ensure thorough review or approval of interventions; 2 of 10 residences or work places are not safe, secure or in good repair; 3 of 10 people and supporters do not know what to do in an emergency; 4 of 10 people were improperly given medications; 4 of 9 people did not receive the support or education they need in managing financial resources[59]; and 3 of 10 people's funds are not managed properly or with their consent.[60]  Additionally, only 50% of people engage in activities that connect them to others in the community.[61]

- The Center for Human Development—received a two-year license and was certified at the highest level but the survey found that in residential settings: 3 out of 13 times, people's home and work place were not deemed to be safe, secure or in good repair; 3 out of 14 reviews indicated that people could not safely evacuate in case of an emergency; 4 out of 11 times, interventions were not safely, accurately or consistently implemented;

---

[53] 11/28/06 Licensure and Certification Report for Advocates, Inc. at 1.

[54] Id. at 7.

[55] Id. at 12.

[56] 7/19/05 Licensure and Certification Report of Behavioral Health Network, at 1.

[57] Id. at 2.

[58] Id. at 6, 7.

[59] Inexplicably, the Report indicates that this is a 100% achievement rate.  2/12/07 Licensure and Certification Report of Better Community Living, Inc., at 9

[60] Id. at 7-9.

[61] Id. at 12.

and a majority of the reviews indicated that people's funds were not managed properly or with their consent.[62]

The survey results for these providers do not merit the longest term licenses and the highest available ratings. Clearly something is wrong with the Licensure and Certification process and it needs to be reviewed.

D.      DMR's explanations do nothing to alleviate Class Members' concerns.

DMR denies any culpability and claims that it conducts proper reviews. After DMR gave a presentation to the Monitor on medical care in the Summer of 2006, the Wrentham Association submitted questions about the presentation and referenced the sad case of Rachel Deline who died from Lithium poisoning. On April 13, 2002, a pharmacist who filled Rachel's prescription accidentally gave her double the dose of lithium that was prescribed to control her mood swings. She developed diarrhea, a symptom of lithium poisoning that went unnoticed. Her doctor told staff it was probably a virus, and the group home manager instructed staff to limit her fluids, which increased the risk of dehydration. The diarrhea continued and Rachel soon became weak and unsteady. On May 11, her parents came from New Hampshire for their monthly visit. When they arrived, the staff were all watching television. Rachel's father found her moaning and crying, with half her body on a couch and the other half on the floor. The DPPC investigator subsequently determined that she had been in that condition for 90 minutes. She died, on May 13, 2002 at age 51, of dehydration and kidney damage.[63]

In responding to the questions posed by the Wrentham Association, DMR sidestepped responsibility for Rachel's death by pointing out that she was brought to see her primary care

---

[62] 12/19/06 Licensure and Certification Report of Center for Human Development, at 6.

[63] Sue Reinert, *No One Punished for Woman's Death, and Her Family Asks, "Why Not?"* The Patriot Ledger, March 22, 2004.

physician three times and no one recognized the symptoms of lithium toxicity. DMR's explanation does not rationalize the outcome, instead it shows the inferior level of medical care that Class members receive in the community, as well as demonstrating that Rachel's caregivers did not communicate with the doctor sufficiently to obtain a proper diagnosis.

DMR has consistently dismissed cases of neglect and abuse as isolated incidents, frequently turning a blind eye to dangerous situations. Sadly, Rachel Deline's story is not an isolated incident. Another heartbreaking example of a DMR client being harmed by the failure of a community home to meet the basic requirements of handicap-accessibility is that of Thomas Frost, Jr.[64] As a result of a stroke as an infant, Thomas was partially paralyzed on his left side and used a foot brace for walking assistance. Despite these physical handicaps, he could walk, talk, dance, play softball and feed himself. He lived at a home operated by Human Service Options, Inc., and he was going back upstairs after staff told him to put a dirty towel in a hamper on the first floor. The stairs were too high and the single railing was on the left side, so it was useless to Thomas. He fell down the stairs and sustained serious injuries, including a fractured skull, fractured bones, a concussion, sinus injuries, internal bleeding and multiple bruising, a permanent brain injury, and marked worsening of his health and disability. He is confined to a wheelchair and no longer talks or feeds himself. He is now permanently and totally disabled and will need constant care for the rest of his life. DMR had improperly certified the home as compliant a few months before Thomas fell.[65]

---

[64] DMR's regulations require group homes to provide a "barrier free environment" to persons with "substantial mobility impairment." 115 CMR 7.07(4). In order to comply, premises must comply with the Architectural Access Board requirements. Specifically, 521 CMR 27.4.1 requires that "stairways shall have continuous handrails at both sides of all stairs." Additionally, stair risers are to be a maximum of 8.25 inches high.

[65] *Frost et al. v. Human Service Options, Inc.*, Norfolk Superior Court, CV2005-00063.

When the Wrentham Association brought that case to the Monitor's attention after the July 2006 DMR presentation, DMR took the position that it would not comment on the ongoing litigation, to which DMR was not even a party. Furthermore, DMR claimed that nothing was wrong because not every group home must be fully handicapped accessible. In doing so, DMR missed the point that the house that Mr. Frost was living in was not adequately equipped for <u>his</u> needs, nor did he receive adequate supervision, which led to his horrible injuries.

  E. <u>Superior Court cases filed against vendors.</u>

Over the past few years, a number of other personal injury actions have been filed in counties across the Commonwealth against various vendors. A review of some of them illustrates the risks faced by DMR clients:

A nine year-old severely handicapped child, a DMR client, died of pneumonia at privately-operated Sunshine Haven due to alleged inadequate training of caregivers, and the failure of that provider to have nursing supervision while the provider's regular nurse was on vacation. The caregivers did not recognize that the child had pneumonia and therefore failed to take him to receive medical care.[66] Sunshine Haven is a DMR provider.

Inadequate supervision by staff also resulted in severe injuries to the plaintiff in *Bobick v. United States Fid. & Guar. Co.*, when Mr. Bobick fell trying to cross the street by himself, despite the fact that the van driver who was transporting him was supposed to ensure that he was met by someone at the day program.[67]

Another DMR client, Paul Iafrate, died as a result of inadequate supervision when he choked to death on a bus operated by Kiessling Transit—which was also the abuser agency for at

---

[66] *Massachusetts Lawyers Weekly*, "Child Dies of Pneumonia At Facility for Handicapped," May 30, 2005.

[67] *Massachusetts Lawyers Weekly*, "Plaintiff Can't Sue over a 'Low' Offer to Settle Case," July 7, 2003.

least 5 substantiated cases of abuse in 2004, including 3 that were sexual in nature.  Exhibit C at 3, 23.  According to the summary judgment papers filed in the subsequent wrongful death action,[68] one of the supervisors of the residence in which Mr. Iafrate lived filed a report that he "should be monitored in the community at all times, including on bus rides" because of a known choking hazard. [69]  Even the van driver requested a monitor on the bus because he could not drive and monitor all 13 of the passengers at the same time.[70]  After a previous choking incident, an ISP meeting was held and everyone who attended agreed that there should be a monitor on the van.[71]  The known choking hazard, coupled with more than 25 assaults that occurred on the van in the years before Iafrate choked to death[72], showed the need for a bus monitor.  In 1999, the transportation contracts between DMR and the Montachusett Regional Transit Authority ("MART") and MART and Kiessling Transit even required that a monitor be on the van at all times.[73]  Inexplicably, and in spite of the known need for a monitor, the contract for 2000 did not require a monitor.[74]  No monitor was supplied and Mr. Iafrate choked to death.[75]

---

[68] *Iafrate v. Gittens, et al.*, Norfolk Superior Court, CV2001-05592.

[69] *Plaintiff's Opposition to Defendants, Kiessling Transit, Inc., Kevin Dixon and Lars Kiessling's Motion for Summary Judgment, or in the Alternative, for Partial Summary Judgment ("Plaintiff's Opposition")*, attached as Exhibit D, at 4, 7.

[70] *Id.* at 6.

[71] *Id.* at 6, 8.

[72] *Id.* at 7.

[73] *Id.* at 3.

[74] *Id.* at 3-4.

[75] Of additional concern is the fact that the driver did not even perform CPR, although he claimed that he tried. Nonetheless, the undisputed evidence presented by the plaintiff showed that the driver's CPR certification had lapsed years before Iafrate's death, and Kiessling Transit did not require CPR certification. *Id.* at 10-11.  The CFO and COO testified that he knew someone on the van should be trained in CPR and recommended it to DMR, however, he also knew that it would cost an extra 50 cents per hour and did not want to lose the contract to a lower bidder. *Id.* at 13.  Furthermore, even after he noticed that Iafrate was choking, the driver radioed Kiessling's dispatcher rather than call for help, and then radioed a second time saying he might need an ambulance.  No one at Kiessling called an ambulance. *Id.* at 11-12.

DMR's failure to critically evaluate the services provided in the community has contributed to its willful ignorance of the deficiencies in the system. The Iafrate case recently settled, however, Vinfen, a DMR provider, required that the terms of the settlement be kept confidential. Because the dangers that are faced by DMR clients are matters of public concern, DMR and its providers should not be allowed to hide behind confidentiality agreements or their own ignorance to prevent the disclosure of facts that are a matter of public concern. Absent an honest and independent investigation of the community care system, DMR is incapable of providing adequate services, sufficient, adequately trained personnel, or even protecting *Ricci* Class members from harm. Such an unsafe environment does not comply with the 1993 Disengagement Order, and must be reviewed.

## III.    The Governor's Commission on Mental Retardation is not the appropriate body to conduct an independent review.

The ARC and the Disability Law Center have suggested to this Court that an independent monitor should not be appointed to conduct any further review, because of the existence of the Governor's Commission on Mental Retardation. *ARC of Massachusetts and Disability Law Center, Inc.'s Motion to Supplement Their Opposition to the Motion for Clarification by the Dever, Fernald, and Wrentham Class Plaintiffs* (Document No. 163) ("*ARC and DLC Motion to Supplement*"), ¶ 11. Notably, the latest Executive Order reinstating the Governor's Commission has expired, leaving it without any authority, and the Commission's last meeting was already held.[76] Furthermore, the Governor's Commission can no longer be held up as the independent oversight entity that it once was.[77]

---

[76] See Executive Order No. 459, ¶ 5.4 (2004) (reestablishing the Commission until May 2007).

[77] Executive Order No. 459, ¶¶ 2.1, 2.4 (2004). The ARC and Disability Law Center state that "[a]ccording to the Executive Order, Commission members are selected by the Governor from nominations by a nominating committee consisting of representatives of the parent organizations at the four facilities and the ARC," implying that those

The Commission's mandate requires it "to act as an advocate for the Department."[78] Obviously, DMR's advocate cannot conduct an independent, non-biased review of the DMR system. The Commission was originally intended to act as an independent body, but that independence has been compromised as two long-term members of the Commission are former DMR employees and the Commissioner attends all meetings, while all complaints brought to the Commission's attention were referred back to DMR. Any independence that the Governor's Commission once had changed further in 2003, when Governor Romney transferred the Commission to the Executive Office of Health and Human Services ("EOHHS"), under whose auspices DMR also resides, rather than having it report directly to the Governor.[79]

In addition to its lack of independence, there are significant concerns about the ability of the Governor's Commission to conduct such a broad review given its lack of activity in recent years—until a recent flurry of activity coinciding with the Patrick Administration's arrival and the impending end of the Commission's three-year term. Far from the original mandate to conduct hearings at least twice per year,[80] the Commission is only expected to hold public hearings "from time to time" as it deems appropriate,[81] which it has been doing less and less frequently. In fact, for several years, no public hearings were held at all and then a few were held in a very short time frame at the end of 2006. The Commission was expected to issue reports and position papers, but between May 2001 and February 2007, it did not produce a

---

nominations add to the independence of the Commission. *ARC and DLC Motion to Supplement*, ¶ 10. However, in making that statement, they are relying upon the original 1993 Executive Order, and ignore the fact that the nominating committee only provided candidates to fill certain vacancies, not the entire Commission. Executive Order No. 356, ¶ 2.7 (1993). Additionally, the most recent Executive Order No. 459, contains no reference to such a nominating committee, and therefore is irrelevant.

[78] Executive Order No. 459, ¶ 1.1(e) (2004).

[79] Executive Order No. 448, ¶ 5.1 (2003); Executive Order No. 459, ¶ 5.1 (2004).

[80] Executive Order No. 356, ¶ 3.2 (1993).

[81] Executive Order No. 459, ¶ 3.2 (2004).

single publication.  To the contrary, the US Attorney's Office demonstrated its dedication and willingness to hear all sides of the issues.  Given the recent experience of the US Attorney, it makes the most sense to continue the review, and if the Governor's Commission is reinstated, the Wrentham Association has no doubt that the US Attorney would consider the Commission's views and seek its assistance as is deemed appropriate.

## CONCLUSION

While the Wrentham Association applauds the hard work of the Monitor in conducting the exhaustive investigation of the services provided at DMR facilities, it seeks further review of the services provided to class members who are living in the community.  As such, the Wrentham Association respectfully requests that the United States Attorney be appointed as an independent monitor to review DMR's community-based service system and that DMR be ordered to fund the cost of the investigation, ancillary to the 1993 Disengagement Order.

WRENTHAM ASSOCIATION FOR RETARDED CITIZENS, INC.,
By its attorneys,


_____/s/ Margaret M. Pinkham_____
Margaret M. Pinkham (BBO #561920)
Daniel J. Brown (BBO #654459)
BROWN RUDNICK BERLACK ISRAELS LLP
One Financial Center
Boston, MA  02111
Telephone:  (617) 856-8200
Fax:  (617) 856-8201
E-mail: mpinkham@brownrudnick.com
DATED:  May 31, 2007     E-mail: dbrown@brownrudnick.com

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties below by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

| | |
|---|---|
| **Fernald/Monson/Belchertown Classes** | **Dever Class** |
| Beryl Cohen, Esq. | Neil Moynihan, Esq. |
| 11 Beacon St. | Nixon Peabody |
| Boston, MA  02108 | 101 Federal Street |
| | Boston, MA  02110 |
| | |
| **ARC** | **Disability Law Center** |
| Cathy E. Costanzo | Christine M. Griffin, Esq. (564420) |
| Center for Public Representation (CPR) | Disability Law Center, Inc. |
| 22 Green Street | 11 Beacon Street, Suite 925 |
| Northampton, MA  01060 | Boston, MA  02108 |
| | |
| **Office of the Attorney General** | **Department of Mental Retardation** |
| Juliana deHaan Rice, Esq. | Marianne Meacham, General Counsel |
| Assistant Attorney General | Commonwealth of Massachusetts |
| Office of the Attorney General | Executive Office of Health & Human Services |
| Government Bureau | Department of Mental Retardation |
| One Ashburton Place | 500 Harrison Avenue |
| Boston, Massachusetts  02108 | Boston, Massachusetts  02118 |

_____/s/ Margaret M. Pinkham_____

DATED: May 31, 2007                    Margaret M. Pinkham

# 1494815 v4 - BROWNDJ - 000004/0784

37