**EXHIBIT D**

52

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

SUPERIOR COURT
CIVIL ACTION
NO. 01-5592-B

)
ENRICO IAFRATE, as ADMINISTRATOR )
OF THE ESTATE OF PAUL IAFRATE, )
    Plaintiff )
)
v. )
)
ROBERT P. GITTENS, as SECRETARY )
OF THE EXECUTIVE OFFICE OF )
HEALTH AND HUMAN SERVICES, )
KIESSLING TRANSIT, INC., VINFEN )
CORP., LOUIS DIVERS, KEVIN A. )
DIXON, JACK T. MACKAY, )
THE MONTACHUSETT REGIONAL )
TRANSIT AUTHORITY, BRUNO FISHER, )
JACQUELINE FLETCHER, SANDRA MULCAHY )
HAROLD JORDAN and LARS KIESSLING, )
    Defendants )
                                 )

*MICHAEL JOSEPH DONOVAN CLERK/MAGISTRATE*
*2005 AUG 31 P 12: 46*
*SUFFOLK SUPERIOR COURT CIVIL CLERK'S OFFICE*

## PLAINTIFF'S OPPOSITION TO DEFENDANTS, KIESSLING TRANSIT INC., KEVIN DIXON AND LARS KIESSLING'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

I.    INTRODUCTION

    This is a wrongful death action brought by the estate of the deceased, Paul Iafrate

("Iafrate"), a severely retarded individual with Down Syndrome, arising out of his death by

asphyxiation while being transported in a van (the "Van") owned and operated by the defendant,

Kiessling Transit Inc. ("Kiessling"), driven by the defendant, Kevin A. Dixon ("Dixon"), under

the supervision of the defendant, Lars Kiessling ("Lars Kiessling"), Chief Operations Officer.

Kiessling was itself supervised by the defendant, Montachusett Regional Transit Authority

("MART") through its Assistant Director of Operations, the defendant, Bruno Fisher ("Fisher")

and his supervisor, the defendant, Harold Jordan ("Jordan"), who were themselves supervised by the defendant, Sandra Mulcahy ("Mulcahy"), the Regional Transportation Director for the Department of Mental Retardation. At the time, Iafrate was being transported from a supervised work program administered by the defendant, Vinfen Corp. ("Vinfen") under the supervision of the defendant, Jack T. Mackay ("Mackay") . The deceased was in the care and custody of the defendant, Executive Office of Health and Human Services through its Department of Mental Retardation ("DMR") , at a residential facility under the supervision of the defendants, Louis Divers ("Divers") and Jacqueline Fletcher ("Fletcher").

The plaintiff brings negligence claims against all defendants, and breach of contract claims as third-party beneficiary against DMR, MART, Kiessling, and Vinfen.

II.    FACTS

Background

The deceased, Paul Iafrate ("Iafrate") had Down Syndrome and was severely retarded with behavioral problems according Divers, DMR's Residential Supervisor. Divers Tr. I at 31-32, 37.[1] In 1997, Iafrate was living in a DMR residence located in Dorchester under the supervision of Divers. Id. Tr. I at 31-36. Iafrate attended a supervised work program at Vinfen in Cambridge. He was transported there and back in the Van owned and operated by Kiessling. The ride took about half an hour. Id. Tr. I at 38-40; MacKay Tr. I at 16-17, 81, Tr. II at 95. Kiessling provided this transportation service under a contract with MART, Exhibit 1,[2] according to Paula Kiessling ("Mrs. Kiessling") the owner of Kiessling, Mrs. Kiessling Tr. at 11-12, 16, 21.

---

[1]    Deposition transcripts are identified by the last name of the deponent followed by the transcript ("Tr.") page number. All such excerpts are appended to the Affidavit of Robert D. Cohan, Volume II, filed herewith.

[2]    Exhibits referenced are appended to the Affidavit of Robert D. Cohan, Volume I, filed herewith.

MART provided transportation management services under a contract with DMR, according to Fisher, MART's Assistant Director of Operations. Fisher Tr. at 11-14.

Kiessling's Contract

Kiessling's contract incorporated by reference the contract between MART and DMR, Exhibit 2, which included, DMR – Specific Conditions:  Transportation Services ("Conditions"), Exhibit 3, and also, Attachment C, Exhibit 4, which requires compliance with DMR regulations found at 115 CMR 1.00-10.00. Kiessling was required to comply with these Conditions, Exhibit 3, and DMR regulations as part of their contract. Jordan Tr. at 14-15, 34-37; Mulcahy Tr. at 32-33. Kiessling, as a provider, was obligated to comply with 115 CMR 7.06 and, in particular, had to have someone on the Van trained in CPR. Jordan Tr. at 22-23, 41-50, 56, 63; Mulcahy Tr. at 37-41. Furthermore, under the Conditions, subsection T(3), Exhibit 3, the Kiessling driver was required to ensure the safety of the passengers and never leave passengers unattended. Jordan, Tr. at 103-104. In that regard, Jordan testified that the driver was to drive the Van, not attend to individual needs. Id. Tr. at 109. Finally, Kiessling was required to document any incidents that occurred on the Van. Id. Tr. at 131; Fletcher Tr. at 33-35.

Attachment A, to the contract required MART and Kiessling to drive Iafrate, identified by Social Security No. 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. Mrs. Kiessling Tr. at 18-19, 21. The Attachment A for the contract year 1999, Exhibit 5, expressly required that a group monitor be assigned to the Van. Jordan Tr. at 91-94; Lars Kiessling Tr. at 53. Without any reason or explanation, no monitor was assigned for the 2000 contract year under the Attachment A for 2000, Exhibit 6, the year in which Iafrate died.[3] Jordan Tr. 100; Fisher Tr. at 57-58, 110-114. Neither Mulcahy nor Fisher could say whether the designation of a monitor was an error in the 1999 contract. Mulcahy Tr. at

---

[3]     MART contracts went by fiscal year. July 1, 1999 began the 2000 fiscal year under Attachment A Exhibit 6, Jordan Tr. At 102-103.

137-139; Fisher Tr. at 44-47. Fisher could not explain why a monitor was designated for 1999 but not 2000. Fisher Tr. at 61. Mrs. Kiessling admits that there was never a monitor on that Van and Kiessling never requested one despite the fact that Kiessling was required to report problems to MART and request monitors when needed or appropriate. Mrs. Kiessling Tr. at 23, 32-33.

Iafrate's Limitations

Iafrate had a history of stealing and stuffing food. Sometimes he would take other people's food and stuff it into his mouth. In February, 1998, he suffered a choking incident while at Vinfen. Divers Tr. I at 79-80, 85, 87-89, Tr. II at 15, 16, 44, 55, 88, 102, 103, 157. MacKay, Vinfen's program Coordinator, performed the Heimlich Maneuver on Iafrate to save his life. MacKay Tr. I at 10-12, 56-59, 69-70, Tr. II at 75.

Iafrate had limited survival skills in the community and had to be closely monitored, in part because of his history of stealing and stuffing food. Divers Tr. I at 126-128, 158, 190-191, 205, Tr. II at 84. In 1998 Divers prepared a report stating that Iafrate should be monitored in the community at all times, including on bus rides. Id. Tr. II at 39-40. At Iafrate's residence, a 2:4 staff to client ratio was maintained at all times, except at night when they were sleeping. Id. Tr. I at 38. When Iafrate rode the DMR residence vans, a monitor was always present to maintain the 2:4 staff to client ratio. Id. Tr. I at 63-64, Tr. II at 12, 51, 127-128. Similarly at Vinfen, Iafrate was always monitored for safety purposes, not only when he engaged in activities but also when he ate, so someone would be present in case he choked. MacKay Tr. I. at 48, 59-60. Vinfen maintained a 1:3 staff to client ratio at the workshop and on its own vans. Id. Tr. 18-20, 81-83, Tr. II at 15-16.

Kiessling's Failure to Stay Informed

According to both Jordan and Fletcher, DMR's Service Coordinator Supervisor, Kiessling was a provider of services for DMR. Fletcher, Tr. at 36, 46; Jordan Tr. at 22-23. All providers are supposed to attend Individual Support Plan ("ISP") meetings. Fletcher Tr. at 36. At the meetings individual safety assessments are made in accordance with the requirements of 115 C.M.R. 7.08. Id. Tr. at 44-45. Kiessling had an obligation to transport clients on its vans safely, and that included enforcing a "no-eating" rule. Id. Tr. at 47. Iafrate had to be closely monitored when eating. Id. Tr. at 80.

Kiessling made no effort to stay informed of Iafrate's needs. No one from Kiessling ever participated in Iafrate's ISP meetings. Divers Tr. II at 141. Kiessling never conducted any "individual safety assessments" or developed strategies "for meeting specific and unique safety needs of individuals" under 115 C.M.R. 7.08(2)(a) and Kiessling never provided staff support and training "focused on the individual's needs" under subsection (b). According to Mrs. Kiessling, the driver of the van, Dixon, was provided with no background on the passengers he was transporting and Kiessling had no knowledge of Iafrate's propensity to steal and stuff food, or that the Heimlich Maneuver had been performed on him to save him from choking. Mrs. Kiessling Tr. at 28, 77-78.

Kiessling started transporting Iafrate at the end of 1998 and was not made aware of any incidents involving him prior thereto. Id. Tr. at 85.

Undisputed Need for a Monitor

There is no serious dispute that a monitor should have been placed on the Van. A monitor was needed to prevent fights, enforce the "no eating" rule and respond promptly to

5

medical emergencies. The Van driver, busy driving the Van, could not safely monitor his

passengers. According to plaintiff's expert, Dr. Edward J. Dougherty;

> [T]he ratio of one adult driver to 9 moderately to severely mentally retarded clients was
> not sufficient to meet the standard of care to insure the safety of the clients being
> transported by Kiessling Transit, Inc.

Report of Dr. Edward J. Dougherty, Ed.D. DACFE, DABPS ("Dougherty Report"), Exhibit 21.

Divers understood that the absence of a monitor exposed the passengers to serious harm.

Divers Tr. II at 129. Beginning in 1992, Iafrate's guardian, Rico Iafrate, requested a monitor and

continued to do so over time because of fights between Iafrate and two other residents who rode

the Van. Divers Tr. I at 131-132, 153-155, Tr. II at 147. Iafrate and other passengers had a

tendency to get into fights with each other. Id. Tr. I at 109, 122-124, Tr. II at 5. Two instances

involving fights on the Van were reported, Exhibits 7 and 8. These individuals were always

getting into altercations. Dixon Tr. II at 145. A 1995 incident report, involving several assaults

at once, described the Van as "chaotic". Exhibit 9

Even Dixon, the Van driver, requested a monitor according to Divers. Divers Tr. II at

116-117. Dixon, as a former monitor himself, knew that, for whatever reason a monitor was

assigned, the monitor's responsibilities included helping out if other passengers were fighting or

choking. Dixon Tr. 18-21. See also Facts, infra at 8-9.

Fletcher and Jim Sperry, the Director of DMR's program, were in agreement that a

monitor was needed and in June, 1999, Fletcher went so far as to offer to pay $8.00 per hour to

any staff member willing to accept the job, but there were no takers. Fletcher Tr. at 105, 110-

117; Divers Tr. I at 67-73; Tr. II at 129. Jim Sperry said that he would follow-up, but no monitor

was assigned Id. Tr. I at 73-74; Tr. II at 117-118. After the first choking incident, at the March,

1999 ISP meeting, Divers renewed his request for a monitor. Id. Tr. II at 82-83. Everyone Divers reported to agreed that there should be one. Id. Tr. II at 129-132, 153.

MacKay also attests to the pressing need for a monitor. MacKay knew that the Van should have had a monitor to insure individual safety. MacKay Tr. I at 33-34. Since 1995, MacKay knew of assaultive behavior problems with Iafrate and other passengers. From time to time they had to be physically restrained. This history gave rise to MacKay's concerns that there was no Van monitor. MacKay Tr. I at 91-93, 117-118; Tr. II at 113. During the four years MacKay was there, before Iafrate died, Vinfen received more than 20 incident reports regarding assaults on the Van, of which more than five involved Iafrate. Id. Tr. I at 25-29.

MacKay knew that, without a monitor, it would be very difficult for the driver alone, who had to be aware of traffic, to monitor the actions and conditions of his passengers. Id. Tr. I at 34. Monitors were responsible for preventing assaults and protecting passengers from themselves. Id. Tr. I at 35, 139-140. Although Vinfen maintains a staff to consumer ratio of 1:3 at the workshop and on its own vans, MacKay understood that Iafrate's Van, carrying between eight and twelve passengers, was staffed only with a driver. Id. Tr. I at 19-20, 32-33, 81-83; Tr. II at 15-16, 43-44.

Even before the 1998 choking incident, MacKay was concerned that Iafrate might choke on food on an unsupervised Van. Id. Tr. I at 70-71. MacKay knew that eating on the Van without a monitor was unsafe and believed there should be a monitor. Id. Tr. I at 47-48, Tr. II at 144. He knew that passengers were not prevented from taking food on the Van and several passengers did. Id. Tr. I at 35-37, 54; Tr. II at 122, 130-131, 149. From time to time, MacKay also saw food eaten on Iafrate's Van. Id. Tr. I at 40. At Vinfen, Iafrate was monitored for safety purposes not only when he engaged in activities but also when he ate, in part, so that someone

7

would be present in case he choked. Id. Tr. I at 48, 59-60. On Vinfen vans, monitors enforced a

no eating rule for safety reasons, including concerns that someone might choke. Id. Tr. I at 83-

84, 172; Tr. II at 18.

MacKay was present at Iafrate's ISP meetings with DMR staff and others, and the subject

of a monitor on the Van was brought up in each meeting. He could recall at least two meetings,

one in 1997 and one in 1998, at which Iafrate's brother, Rico, and his mother, requested a

monitor. MacKay voiced his support for a monitor with them. Id. Tr. I at 60-63, 66-67.

MacKay communicated to DMR the choking incident and generated an incident report. Id. Tr. I

at 71-72. At the ISP meetings he voiced concerns that Iafrate might choke again on an

unmonitored Van. Id. Tr. I at 72-74. A monitor could take food away from Iafrate or stop him

from eating, or perform the Heimlich maneuver if he choked. Id. Tr. I at 74-75.

In fact, the safety skills assessment prepared at ETC stated that Iafrate had limited self-

care skills, limited skills in emergency situations and that he should be monitored at all times in

the community. Id. Tr. I at 147-150; Exhibit 10. MacKay understood this to mean that Iafrate

should be monitored when he rode the Van. MacKay Tr. I at 150-151. Furthermore, a

behavioral report from March, 1999, within months of Iafrate's death, indicated that Iafrate had

problems with the Van driver. Divers. Tr. II at 75-76; Exhibit 11. MacKay told the driver,

Dixon, more than once that the Van should have a monitor. MacKay Tr. II at 87-88.

Kiessling's Knowledge of the Need for a Monitor

Even without the background on Iafrate which Kiessling was supposed to gather,

Kiessling was well aware that the absence of a monitor on the Van presented a clear risk of harm

to Iafrate. As previously stated, Dixon asked for a monitor. Divers Tr. II at 116-117. Dixon

testified that he knew that the Van passengers were not safe without a monitor because he

admitted candidly that he could not safely drive the Van and watch passengers behind him to make sure that they were not eating. Dixon Tr. at 145. Kiessling had a "no-eating" rule on its vans. Mrs. Kiessling Tr. at 44-47. It was Dixon's job to enforce that rule. Dixon Tr. at 37-38. There were thirteen passengers on that Van along with Iafrate, all with disabilities. Id. Tr. at 25-27, 35-36. If passengers brought food on the Van in their pockets, he did not know about it and, even if he saw passengers eating while he was driving, there was nothing he could do about it. Id. at 146-147. Dixon knew that a monitor was required on his Van as he had previously been a monitor on that Van for a passenger who had seizures. Id. at 18-19. Although he was specially assigned to monitor that passenger, his responsibilities included helping out if other passengers were fighting or choking. Id. at 20-21.

Kiessling's Ability to Insure Safe Transportation

Although Kiessling claims that it had no ability to require that monitors be placed on the Van, Mrs. Kiessling Tr. at 32-34, Kiessling had the ability to refuse to transport a passenger when they believed that it could not be done safely. Id. Tr. at 79-81.

Kiessling's Failure to Report and Advise

Kiessling failed to properly report incidents of assault in the Van, from which DMR might have learned of the seriousness of transporting Iafrate without a monitor, and Dixon was not given adequate background information on his passengers from which he might have learned of the seriousness of the risk of driving them without a monitor. After late 1998, when Dixon began driving the Van, he was aware of only two assaults involving Iafrate in the Van. Dixon Tr. at 39-42. In facts, during the four year period prior to Iafrate's death, there were more than 20 assaults in the Van, of which more than 5 involved Iafrate, according to MacKay. MacKay Tr. at 25-29. Kiessling is required to report such incidents to its supervisor, MART, who passes

them on to DMR, according to Fisher. Fisher Tr. at 11-12, 66-67. DMR received only one report, according to Mulcahy, DMR's Regional Transportation Director, who is supposed to receive such reports. Mulcahy Tr. at 6-7, 18-19, 73-74. Dixon was also not made aware of prior assaults in the Van, and, although there was a no eating rule, Dixon was never made aware that Iafrate had a propensity for stealing and stuffing food. Dixon Tr. at 34, 38, 58. Dixon was left in the dark not only about the prior assaults and Iafrate's eating problems, but also not informed about Iafrate's limitations on communicating and limitations on his ability to assess danger and seek emergency treatment. Id. Tr. at 70.

### Dixon's Failure to Give Aid

The evidence establishes that, when Iafrate choked to death, Dixon never came to his aid and, in particular, never even attempted to perform CPR to save his life. According to Officer Raoul Goncalves, the Boston Police Officer who stumbled on the scene, Dixon was looking for help after he discovered Iafrate in the rear of the Van discolored and not breathing. Goncalves Tr. 8, 18-20, 57, 66; Exhibit 12. Consistent with Officer Goncalves' testimony and report, Exhibit 12, Dixon told Divers that he, Dixon, did not see Iafrate until he had already turned blue. Divers Tr. II at 139-140. The report indicates that the Municipal Police were assaulted while trying to administer CPR. The police did not even arrive until 3:15 according to that report, Exhibit 12, and the ambulance did not arrive until sometime after that. Therefore, Dixon did nothing after calling the dispatcher at 2:45 and fully 30 minutes passed before anyone came to Iafrate's aid. Although Dixon disputes the accuracy of that report, he could not recall when the police arrived. Dixon Tr. at 117-118, 125-126. He does, however, confirm that the ambulance arrived after the police. Id. Tr. at 123-124.

10

Even if Dixon is to be believed in his self-serving and unsupported claim that he performed CPR on Iafrate, the evidence establishes that he had let his CPR training lapse and, by his own testimony, he did it all wrong. Vinfen's records establish that he was last certified in CPR as an employee at Vinfen in November, 1994, and not re-certified until six years later, in April, 2000, which was after Iafrate died. Exhibit 13. MacKay was recertificatied every year. MacKay Tr. II at 60. [4] Kiessling did not require CPR certification. Dixon Tr. at 16. Although Dixon claims that he was certified around 1995 when he worked at Vinfen and re-certified three or four times thereafter, id. Tr. at 14-15, there is no documentary evidence to support this claim. The Red Cross certification is valid only for one year. See, printout from Red Cross website, Exhibit 14.

On July 22, 1999, when Iafrate began to choke, Dixon's own unsupported self-serving testimony establishes that he wholly failed to respond in accordance with established CPR protocol. Dixon did not immediately call for an ambulance, or even radio Kiessling's dispatcher to call an ambulance, and did not properly perform the Heimlich maneuver.

On July 22, 1999, the day Iafrate died, there were, as usual, thirteen passengers in the Van with Iafrate. Dixon Tr. at 61-62. At 2:40 p.m., Dixon noticed Iafrate coughing and so stated in his incident report, Exhibit 15; Dixon Tr. at 63-64. Dixon never saw Iafrate put food in his mouth. Id. Tr. at 145. Dixon did nothing while Iafrate coughed for five minutes, until Iafrate stood up holding his throat. Id. Tr. at 70-71, 143. Although Dixon recognized, when Iafrate held his throat, that this was a sign that Iafrate was choking, he did not immediately call for an ambulance. Id. Tr. at 71, 148-149. Instead, Dixon called Kiessling's dispatcher to let her know that he was pulling over for an emergency. Id. Tr. at 129-131. This was plainly contrary to

---

[4]     When recertified, an additional record is issued and Vinfen maintains a copy. MacKay Tr. II at 58-63. No recertification records were produced except for the year 2000, Exhibit 13.

established CPR protocol, as testified by the EMTs. The first thing Dixon should have done was call for help. Sweeny Tr. at 6, 41; Pearsull Tr. at 6, 55.

Precious minutes later, after Dixon moved other passengers so he could reach Iafrate, and after Dixon had incorrectly performed the Heimlich maneuver on Iafrate until he threw up, Dixon called the dispatcher again and told her that he "might" need an ambulance. Dixon Tr. at 82-89, 102-106, 132-134. He never called an ambulance himself. Id. Tr. at 171. In fact, the dispatcher never called an ambulance either, according to Kiessling's own report, Exhibit 16. No one at Kiessling called for an ambulance. Lars Kiessling Tr. at 80-82. The Boston Police radioed for an ambulance.[5] Dixon Tr. at 135-137. Therefore, the ambulance was not called until at least thirty-five minutes after Iafrate began to cough and fully thirty minutes after Iafrate signaled Dixon that he was choking.

If Dixon performed CPR at all, his own testimony establishes that he did not properly perform the Heimlich maneuver or CPR. He states repeatedly that he applied a firm, slow pressure when he squeezed Iafrate's chest, not a hard, fast thrust. Dixon Tr. at 92-101, 113-115. This was incorrect, according to American Heart Association protocol. See their brochure explaining the proper procedure to administer the Heimlich maneuver and CPR, Exhibit 22. Dixon also admits that he did not do any of the following, also required under applicable CPR protocol:

1.  Reach into Iafrate's mouth to remove any obstructions in his throat. Dixon Tr. at 126-127. This should have been attempted when Iafrate had caught his breath after vomiting and again when Iafrate lost consciousness.

2.  Attempt to perform CPR on Iafrate. Id. Tr. at 127-128, 139.

---

[5]    Since the police did not arrive until 3:15, Exhibit 12, it must be assumed that the ambulance dispatch time of 1500 (3:00 P.M.) Exhibit 17, is inaccurate.

3.    Attempt to perform rescue breathing or chest compressions. Id. Tr. at 128-129.

According to plaintiff's medical expert, Dr. Gregory A. Volturo, the Heimlich Maneuver was not applied correctly, Dixon failed to timely call for help, never attempted to clear Iafrate's airway and did not perform rescue breathing or CPR when indicated. Report of Gregory A. Volturo, M.D., FACEP ("Volturo Report"), Exhibit 18.

Iafrate was alive when the ambulance arrived as Dixon saw eye movement and heard a gurgling sound. Dixon Tr. at 121-123. According to the emergency room records, Exhibit 19, Iafrate was pronounced dead at 15:48.

Lars Kiessling's Failures

Lars Kiessling was the CFO and COO of Kiessling, responsible for everything having to do with the day-to-day operations of the company. Lars Kiessling Tr. at 16. He was well aware that someone in the Van should be trained in CPR because he recommended it to DMR. Id. Tr. at 29. Despite this awareness, he did not include it in the bid for the contract because it would have added an extra 50 cents per hour and he did not want to lose the contract to a lower bidder. Id. Tr. at 31.

Lars Kiessling understood that Kiessling's contract with MART required them to comply with DMR's Conditions, Exhibit 3, and it was his job to make sure Kiessling complied. Id. Tr. at 37, 39. Notably, he was unfamiliar with the requirements of 115 C.M.R. 7.06 and 7.08, although it was his job to enforce those DMR regulations. Lars Kiessling Tr. at 60-63. Despite his ignorance, he was well aware that someone in the Van had to be trained in CPR as he was quick to point that out after Iafrate died. In the investigation immediately following Iafrate's death, Fisher inquired as to Kiessling's policies regarding CPR. In response, Lars Kiessling stated that Kiessling employed three staff persons certified to train CPR and Kiessling "fully complied"

with contract requirements.  Further, Dixon was fully trained in CPR.  <u>Exhibit 20; Lars Kiessling</u>

Tr. at 68-71.  It is undisputed that in fact Dixon had allowed his CPR training to lapse.  <u>Facts,</u>

above, at 11.

### Consequences of Defendants' Failures

Had a monitor been placed on the Van properly trained in CPR, in all probability Iafrate

would be alive today.  Dixon admitted that he could not always tell when one of his passengers

was having a problem and that a monitor would have been able to respond to the problem

quicker than he could.  <u>Dixon</u> Tr. at 168-171.  Mrs. Kiessling admitted that, had a monitor of any

kind been placed on the Van, either a general monitor or individual monitor, that person would

have enforced Kiessling's no eating rule and responded promptly to a choking incident.  <u>Mrs.</u>

<u>Kiessling</u> Tr. at 35-43.  Dixon, also testified that a monitor would have taken food away from

Iafrate before he could eat it.  <u>Dixon</u> Tr. at 18-19, 165-166.

Further, had the ambulance been called in accordance with proper CPR protocol at 2:45

when Dixon claims he observed that Iafrate was choking, the ambulance would have arrived five

minutes later, before or around the time that Iafrate vomited and began to breathe again.  Had it

arrived timely, Iafrate's life would probably have been saved.  Because Dixon and Kiessling

delayed in calling for an ambulance, twenty-five life saving minutes were wasted and this delay

was a contributing factor leading to Iafrate's death.  <u>Facts</u>, above, at 10.  The EMT's on the scene

agree that the probability of saving Iafrate's live would have been greater had they arrived on the

scene when he was still conscious.  <u>Sweeney</u>, Tr. at 6, 40-41; <u>McHugh</u>, Tr. at 6, 41-42, 50;

<u>Pearsull</u> Tr. at 6, 63-64.

It is noteworthy that Iafrate threw-up peanut butter crackers.  <u>Dixon</u> Tr. at 102.  This is

confirmed by the EMT's on the scene.  <u>McHugh</u> Tr. at 17-20; <u>Sweeney</u> Tr. at 17.  These crackers

are sold in Vinfen's vending machine. <u>Dixon</u> Tr. at 159-161; <u>MacKay</u> Tr. II at 74, 105.

MacKay had seen Iafrate eating those crackers. <u>Id.</u> Tr. II at 149.   This is precisely the tragedy

MacKay warned would happen without a monitor on the Van. <u>Facts</u>, above, at 7.  After Iafrate's

death, a monitor was placed on the Van. <u>MacKay</u>. Tr. I at 88.

According to Dr. Dougherty, the failure to maintain the proper staff to client ratio on the

Van was a contributing cause of Iafrate's death. Dougherty Report, <u>Exhibit 21</u>, at 12.  In the

opinion of Dr. Volturo, Iafrate would be alive today if appropriate actions were taken on the day

he died.  Volturo Report, <u>Exhibit 18</u>, at 6.

III.    ARGUMENT

    A.    <u>THE DEFENDANTS BEAR A HEAVY BURDEN TO SUPPORT THEIR
        MOTION WHICH THEY CANNOT POSSIBLY MEET.</u>

The defendants bear a heavy burden to obtain summary judgment which they cannot

possibly meet.  The defendants must establish by credible evidence that there is no genuine issue

of any material fact. <u>Community National Bank v. Dawes</u>, 369 Mass. 550, 554 (1974). They

must demonstrate that there is no genuine issue of fact "on every relevant issue raised by the

pleadings." <u>Attorney General v. Bailey</u>, 386 Mass. 367, 371 (1982), quoting <u>Mack v. Cape

Elizabeth School Board</u>, 553 F.2d 720, 722 (1st Cir. 1977).  A litigant has the right to a trial

where there is "the slightest doubt as to the facts." <u>Gottlieb v. Isenman</u>, 215 F.2d 184, 186 (1st

Cir. 1954); <u>Peckham v. Ronrico Corporation</u>, 171 F.2d 653, 657 (1st Cir. 1948); <u>Brady v. the

Hearst Corp.</u>, 281 F. Supp. 637, 642 (D. Mass. 1968).

Furthermore, any inferences favorable to the plaintiffs must be drawn. <u>Coveney v.

President & Trustees of the College of the Holy Cross</u>, 388 Mass. 16, 17 (1983).  the plaintiffs'

evidence must be read generously and "a party is not entitled to summary judgment just because

it appears that the adversary is unlikely to prevail at trial." <u>Commonwealth v. Colonial Motor

15

Sales, Inc., 11 Mass. App. 800 (1981), quoting Hub Associates, Inc. v. Goode, 357 Mass. 449, 451 (1970). Usually, "the question of negligence is one of fact for the jury. Only when no rational view of the evidence warrants a finding that the defendant was negligent may the issue be taken from the jury." Mullins v. Pine Manor College, 389 Mass. 47, 56 (1983) quoting Luz v. Stop & Shop Inc. of Peabody, 348 Mass. 198, 203-204 (1964)

Conclusory statements regarding an affiant's understandings, beliefs and assumptions are insufficient to avoid summary judgment. Graham v. Quincy Food Service Employees Ass'n. & Hosp., Library & Pub. Employees Union, 407 Mass. 601, 611 (1990); Key Capital Corp. v. M & L Liquidating Corp., 27 Mass. App. Ct. 721, 727-728 (1984). Rather Mass. R. Civ. P. 56(e) requires that affidavits "shall be made on personal knowledge," not belief, and set forth facts which would be admissible evidence.

For the reasons set forth below, the defendants are not entitled to summary judgment.

**B.** **THERE IS SUBSTANTIAL EVIDENCE ESTABLISHING THAT KIESSLING, DIXON AND LARS KIESSLING WERE NEGLIGENT AND THEREFORE SUMMARY JUDGMENT SHOULD BE DENIED.**

There is substantial evidence that Kiessling, Dixon and Lars Kiessling were negligent.

1.    Kiessling's Negligence

Kiessling's duty to Iafrate was well established by the terms of Kiessling's contract, DMR regulations, and common law. Its liability is both direct and vicarious.

Kiessling's direct liability arises from its status as a "provider". Kiessling was a provider of services to DMR because it is a legal entity with day to day responsibility for providing transportation services which are regulated by DMR pursuant to the terms of its contract. Facts, above at 3-4. A "provider" is defined under 115 C.M.R. 2.01 as follows:

The individual, agency or other legal entity with day-to-day responsibility for the operation of services or supports or facilities regulated by the Department [DMR] by law

or contract. In accordance with the foregoing definition, a provision which applies to "providers" applies with equal force to the Department's service, supports, or facilities unless otherwise specified.

(Emphasis added.) Pursuant to 115 C.M.R. 5.01,[6] as a provider, Kiessling was required to comply with the provisions of sec. 5.03 through 5.16. Kiessling was also required to comply with the terms of these regulations pursuant to its contract which expressly references 115 CMR 1.00-10.00. Further, it was required to comply with the Conditions, Exhibit 3. Facts, above, at 3. Kiessling violated its duty to Iafrate in the following way:

1.      The Conditions, sec. T(3), Exhibit 3, requires the "safe daily transportation" of passengers, as Kiessling well knew. Mrs. Kiessling Tr. at 22-23. Similarly, 115 C.M.R. 5.03(2) requires that passengers', "safety and well being shall not be unreasonably jeopardized." Kiessling violated the Conditions, Exhibit 3, and these DMR regulations because they knew, or should have known, that Dixon alone could not safely monitor thirteen passengers and drive the Van. Facts above, at 8-9.

2.      The Conditions, sec. T(5), Exhibit 3, required that passengers, "should never be left unattended". Kiessling misconstrued this to mean that the Van driver, busy driving the bus, satisfied this requirement simply because a passenger could get the driver's attention if he needed him. Mrs. Kiessling Tr. at 25. This is flat wrong. One goal of attending to these passengers was to prevent them from hurting themselves, as Kiessling well knew. The job of a monitor is to prevent fights, help with seizures, address medical emergencies and enforce the "no eating" rule for the safety of the passengers. Id. Tr. at 36-27, 42-43, 48-49, 53. This is not

---

[6]      115 CMR 5.01 states; "115 CMR 5.03 through 5.16: Standards to promote dignity, applies to all providers and to all services or supports which are operated, certified, licensed, or contracted for or otherwise funded by the Department."

something the driver, occupied with driving, can effectively do, as Kiessling also knew. Id. Tr. at 56-57. In fact everyone knew it. Facts, above, at 5-9.

      3.      The failure to properly train Dixon in CPR violated 115 C.M.R. 7.06(1)(a)[7] because he was not properly qualified to respond to a situation where someone might choke on food. In fact, Subsection (1)(e)(5)[8] of that regulation expressly required that Dixon be trained in CPR. It does not help the defendants to claim that the Conditions, sec. I(T)(16)(i), Exhibit 3, make CPR training optional. Mrs. Kiessling Tr. at 21, 32. The Conditions of DMR's contract are void insofar as they conflict with the explicit and well defined public policy requiring providers to be trained in CPR as set forth in the DMR regulations. Pursuant to 115 C.M.R. 5.01, these regulations apply to "all providers and to all services or supports which are operated, certified, licensed or contracted for or otherwise funded by the department," including Kiessling.

---

7.    115 CMR 7.06(1)(a) states, in pertinent part;

    (1) All providers of supports and services shall be subject to the following requirements:
    (a) All providers shall assure that the number, organization and qualifications of stall meet the training, care, support, health, safety, and evacuation needs of the individuals served by the provider. This shall be determined by all of the following:
    (1) The provider's ability to meet the objectives delineated in the ISP of each individual and to assure care and safety of each individual ...
    (3) The provider's ability to meet ... safety ... and service delivery requirements ...
    (5) The provider's ability to meet contract performance measures.

(Emphasis added.)

8.    115 CMR 7.06(1)(a) states, in pertinent part;

    (1) All providers of supports and services shall be subject to the following requirements:

          ...
    (e) All providers except those specifically exempted in 115 CMR 7.06(1)(e)4. and 5. shall also comply with those additional requirements: ... 5. Training in cardiopulmonary resuscitation (CPR), such that at least one trained staff person shall be present in homes providing 24-hour supports; work/day supports; and in site-based respite. 115 CMR 7.06(1)(e)5. shall not apply to homes providing less than 24-hour supports.

(Emphasis added.)

A contract "will not be enforced" where it is "outweighed by public policy" which is "grounded in legislation and precedent". Beacon Hill Civic Assoc. v. Ristorante Toscano, Inc., 422 Mass. 318, 321 (1996). A contract which conflicts with a public policy that is "'explicit,' 'well defined,' and 'dominant'" is "rendered unenforceable". Calvert v. Reinisch, 2004 WL 157206 *1, *6 (D. Mass. 2004) quoting E. Assoc. Coal Corp. v. Mine Workers, 531 U.S. 57, 62 (2000). DMR cannot invade by contract its own regulations. Carr v. Howard, 426 Mass. 514, 519 (1998) (Board of Registration could not "invade" privilege of statute through promulgation of conflicting regulations); Beth Israel Hospital v. Board of Regulation in Medicine, 401 Mass. 172, 176 (1987) (same).

4.      115 C.M.R. 7.05(1)(a) required Kiessling to assure that the "number, organization and qualification of staff meet the . . . care, support, health [and] safety needs" of the passengers. For the reasons set forth in paragraphs 1-3, above, the absence of a monitor violated this regulation.

5.      Kiessling violated 115 C.M.R. 7.08(2)(a) which required them to conduct "individual safety assessments" and develop strategies "for meeting specific and unique safety needs of the individual." This includes, under subsection (b), staff support and training "focused on the individual's needs." Kiessling made no attempt to do so. Dixon was provided with no background on the passengers he was transporting and Kiessling had no knowledge that Iafrate had a propensity to steal and stuff food or that the Heimlich maneuver had been performed on him to save him from choking. Kiessling started transporting Iafrate at the end of 1998 and was not made aware of any incidents involving Iafrate prior thereto. Facts, above at 5. Had Kiessling complied with this regulation, they would have been forced to the conclusion that, absent a monitor trained in CPR, the Van was not safe.

Fletcher is in error in suggesting that Kiessling was not invited to those meetings because Kiessling "did not provide direct services" to consumers. Fletcher Tr. at 45-46. Kiessling did provide direct services, transportation services, and had an obligation to attend under this regulation.

6.       MART and Kiessling violated the Conditions, sec. I(T)21, Exhibit 3, which requires "all acts of assault" to be reported to DMR. Although over 25 assaults occurred in the Van, none were report to DMR. Facts, above, at 9-10. Had they been reported, in all likelihood a monitor would have been properly provided who would have enforced the no eating rule, prevented Iafrate from eating, and, if Iafrate was able to avoid the monitor's eyes, the monitor could still have promptly responded with proper CPR to save his life. Such favorable inferences must be drawn. Coveney, 388 Mass. at 17.

The violation of these regulations constitute evidence of negligence, "as to all consequences that the ... regulation was intended to prevent." Follansbee v. OHSE, 293 Mass. 48, 52 (1936) quoting Guinan v. Famous Players-Lasky Corp., 267 Mass. 501, 516 (1929). It helps Kiessling not at all to argue that they had no authority to place a monitor on the Van. They had the ability to refuse to transport Iafrate in an unsafe Van, Facts, above, at 9, and, at a minimum, they should have done that. Leary v. Boston & A.R. Co. 139 Mass. 580, 587 (1885) ("When one has assumed an employment, if an additional and more dangerous duty is added ... he may accept or refuse it ... if for that reason he is discharged [he] may avail himself of his remedy on his contract"). See also Engel v. Boston Ice Co., 295 Mass. 428, 432 (1936) ("No agreement by the employee to expose himself to ... risks [not ordinarily incidental to his employment] is implied from his contract of employment. He does not contractually assume the risk of subsequent negligence" of his employer); Doyle v. Fitchburg R. Co., 166 Mass. 492, 496-

97 (1896) ("The great weight of authority in this country is against the right of a common carrier

to contract for exemption from the consequences of his own negligence").

This misconduct constitutes negligence. A defendant is deemed to have breached a duty

of care owed when he fails, either by omission or action, to exercise that degree of care,

vigilance and forethought which a reasonable and prudent person would have exercised under

the circumstances. Carroll v. Bouley, 338 Mass. 625, 627 (1959). The duty of care may arise

out of a contract. As stated by the SJC;

> [W]hen a party binds himself by contract to do a work or to perform a service, he agrees
> by implication to do a workmanlike job and to use reasonable and appropriate care and
> skill in doing it. Abrams v. Factory Mut. Liab. Ins. Co., 298 Mass. 141, 143 (1937).
> "Although the duty arises out of the contract and is measured by its terms, negligence in
> the manner of performing that duty as distinguished from mere failure to perform it,
> causing damage, is a tort." Id. at 144. See Hartford Cas. Ins. Co. v. New Hampshire Ins.
> Co., 417 Mass. 115, 118 (1994) (insurer may be liable in contract for negligent failure to
> satisfy promise to defend and liable in tort for negligent handling of defense).

Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co., 439 Mass. 387, 395-96 (2003).

The amount of care that a prudent person would exercise varies with the circumstances,

the care increasing with the likelihood and severity of harm threatened. Goldstein v. Gontarz,

364 Mass. 800, 805 (1974); Restatement (Second) of Torts sec. 328A (1925). A defendant is

negligent if he engages in an act which is done, "without the competence which a reasonable

[person] in the position of [the defendant] would recognize as necessary to prevent it from

creating an unreasonable risk of harm to another." Restatement (Second) Torts sec. 299.

Furthermore, Kiessling is vicariously liable for the negligence of its employees, Dixon

and Lars Kiessling. Douglas v. Holyoke Machine, Inc., 233 Mass. 573 (1919); DiLorenzo v.

Yellow Cab of Somerville, Inc., 359 Mass. 751, 752 (1971).

    2.    Dixon's Negligence

Dixon was negligent in numerous ways. Specifically:

1.    He failed to enforce the non-eating rule, permitting Iafrate to eat on the bus.

2.    He failed to properly monitor Iafrate and was not even aware that Iafrate was choking until Iafrate turned blue.

3.    He failed to promptly request an ambulance, causing a 25 minute delay in EMS care while Iafrate choked to death.

4.    He failed to perform CPR.

5.    Even if he is to be believed that he did perform CPR, he performed it wrong.

Facts, above at 10-13.

It cannot be argued that G.L. c. 112, sec. 12V protects Dixon.  That statute states, in

pertinent part:

> Any person who is <u>trained according to the standards and guidelines</u> of the American Heart Association or the American National Red Cross in cardiopulmonary resuscitation … or any person who has successfully met the training requirements of a course in basic cardiac life support, conducted according to the standards established by the American Heart Association, <u>who</u> in good faith and <u>without compensation</u> renders emergency cardiopulmonary resuscitation … in accordance with his training, <u>other than in the course of his regular professional or business activity</u>, to any person who apparently requires cardiopulmonary resuscitation … shall not be liable for acts or omissions, other than <u>gross negligence</u> or willful or wanton misconduct, resulting form the rendering of such emergency cardiopulmonary resuscitation.

(Emphasis added.)  Dixon does not fall within the protection of the statute because;

1.    He was acting "in the course of his regular profession" when he allegedly rendered CPR and therefore is expressly excluded by the plain statutory language.

2.    He was not "trained in accordance with the standards and guidelines" of the American Red Cross, as expressly required by the statute because he allowed his certification to lapse.  Facts, above, at 11.

3.    His failure to properly perform CPR amounts to "gross negligence", which is expressly excluded from protection.

Furthermore, the Massachusetts Good Samaritan Doctrine affords the defendants no

refuge because it does not abrogate G.L. c. 112, sec. 12V, and in any event, under the

Massachusetts rule, "a duty voluntarily assumed must be performed with due care." Mullins,

389 Mass. at 52-53. Therein, the SJC ruled that Pine Manor College could be held liable for negligence in failing to provide students with adequate protection from criminal acts because their actions, although "voluntarily" undertaken, were not "gratuitous" as students paid for this service through tuition or dorm fees. Id. at 53 fn. 10. Under the Massachusetts rule, "even a volunteer must use due care," it is only when the undertaking, is "gratuitous", i.e. "without consideration" that liability is limited to gross negligence. Pierre v. U.S., 741 F. Supp. 306, 309 (D. Mass. 1990) citing Mullins. Dixon's actions were not gratuitous as he was paid to protect the safety of his passengers.

The report of Dr. Volturo, Exhibit 18, establishes that Dixon was grossly negligent in the manner in which he performed CPR and, in fact, probably made the situation worse by his inept conduct. Facts, above, at 13. The delay in calling for an ambulance was particularly egregious because, as testified by the EMTs on the scene, Iafrate would have had a better chance of surviving had they been called promptly when he was conscious. Id. at 14.

### 3.    Lars Kiessling's Negligence

Lars Kiessling was negligent in failing to ensure that someone on the bus was properly trained in CPR. It was his job to make certain that Kiessling complied with its contract obligations and he understood that Kiessling was required to have someone on the bus trained in CPR. Facts, above, at 13-14. Dixon was not properly trained in CPR and, in fact, his CPR certification had lapsed. Id. at 11. Lars Kiessling is therefore liable for his own wrongdoing in failing to ensure that someone on the bus was properly trained in CPR. Furthermore, it was his job to make sure that Kiessling complied with its obligation and as stated above, at 17-20, Kiessling was negligent in numerous ways. This negligence was Lars Kiessling's negligence

because it was his job to see that Kiessling complied. He was liable for his own wrongdoing and cannot hide behind the corporation to protect himself.

It is well settled that an individual is liable for his own wrongdoing even though he may be acting on behalf of a corporation. Refrigeration Discount Corp. v. Catino, 330 Mass. 230 (1953) (where defendant, the president, director and general manager of corporation, knowingly violated terms of corporation's agreement, he could be held personally liable for conversion even though he was acting for the corporation's benefit); LaClaire v. Silberline Mfg. Co., Inc., 379 Mass. 21, 29 (1979) ("A corporate office is liable for torts in which he personally participated whether or not he was acting within the scope of his authority"); Nader v. Citron, 372 Mass. 96, 102 (1977) (the defendant was "not immunized as an officer and director of a corporation for the acts he is alleged to have committed personally."). Bond Leather Co. v. Q.T. Shoe Mfg., Co., 764 F.2d 928, 938 (1st Cir. 1985) ("[I]t is settled that a corporate officer who commits a tort is personally liable for his actions and cannot seek refuge in the fact that he was acting for the corporation").

C.  THERE IS CREDIBLE EVIDENCE ESTABLISHING THAT THE DEFENDANTS' NEGLIGENCE WAS A SUBSTANTIAL FACTOR IN BRINGING ABOUT IAFRATE'S DEATH.

There is credible evidence, viewed in the light most favorable to the plaintiff, establishing that the negligence of these defendants was a substantial factor in bringing about Iafrate's death. Had a monitor been placed on the Van properly trained in CPR, in all probability Iafrate would be alive today. Facts, above, at 14. The same would be true if the defendants simply refused to transport Iafrate in an unsafe Van, something which Kiessling was free to do. Id. at 9. To meet their burden, the plaintiff need only show that there was greater likelihood or probability that the harm complained of was due to causes for which a defendant was responsible than from any other cause. Mullins 389 Mass. at 58 citing McLaughlin v. Benstein, 356 Mass. 219, 226

(1969). A defendant may be held liable for his wrongdoing even if "subsidiary" causes for which he or she is not responsible "cooperated to produce the final result." Jones v. Hayden, 310 Mass. 90, 95 (1941).

The plaintiff does not have to prove that a defendant's wrongdoing was the only or predominant cause of the injury. If two or more factors, which operated concurrently, contributed to Iafrate's death so that, in effect, the damages suffered were inseparable, then it is enough for the plaintiff to prove that a defendant's wrongdoing was a substantial contributing factor in causing the injury. O'Conner v. Raymark Indus., Inc., 401 Mass. 586, 591-92 (1988). The plaintiff is, "not required to show the exact cause of … injuries or to exclude all possibility that they resulted without fault on the part of the defendant". Woronka v. Sewall, 320 Mass. 362, 365 (1946).

Furthermore, Iafrate's death was foreseeable. Facts, above, at 5-9. A defendant is liable for those injuries that are a reasonably foreseeable consequence of its negligence. Jorgensen v. Massachusetts Port Auth., 905 F.2d 515, 522 (1st Cir. 1990); Wiska v. St. Stanislaus Social Club, Inc., 7 Mass. App. Ct. 813, 818 (1979). The plaintiff does not have to establish that the defendants foresaw, or should have foreseen, the exact manner in which the harm occurred, only that this harm was a natural and probable consequence of the defendant's negligence. Hill v. Winsor, 118 Mass. 251, 259 (1875); Lane v. Atlantic Works, 111 Mass. 136, 139-40 (1872). In that regard the SJC has ruled that, "if a person, confronted with a state of facts, closes his eyes in order that he may not see that which would be visible and therefore known to him if he looked, he is chargeable with 'knowledge' of what he would have seen had he looked." Demoulas v. Demoulas, 428 Mass. 555, 577 (1998) quoting West's Case, 313 Mass. 146, 151 (1943) quoting Zdunek v. Thomas, 215 Wis. 11, 254 N.W. 382 (1934). See also Van Christo Advertising, Inc.

v. M/A-COM/LCS, 426 Mass. 410, 417 (1998). A defendant will not be excused for "'willful

ignorance' of information of which the [defendant] would have been aware had the [defendant]

not consciously disregarded that information." NyCal Corp. v. KPMG Peat Marwick, LLP, 426

Mass. 491, 498-99 (1998); Demoulas, 428 Mass. at 577, West's Case, 313 Mass. at 150-151;

Van Christo Advertising Inc., 426 Mass. at 417.

Furthermore, the "requisite prudence and care might differ, depending on the potential

severity and likelihood of the risks posed in different circumstances." Bergendahl v.

Massachusetts Elec. Co., 45 Mass. App. Ct. 715, 725 (1998) app. den. 707 N.E. 2d 1078, cert.

den. 120 S. Ct. 326 (1999).

In some instances, the causal relationship between a defendant's negligence and a

plaintiff's injury may be broken by the intervention of a superceding cause, such as some

unforeseeable negligence or fault of another. Griffiths v. Campbell, 425 Mass. 31, 34-36 (1997);

Whittaker v. Saraceno, 418 Mass. 196-197 (1994); Carter v. Yardley & Co. Ltd., 319 Mass. 92,

99 (1946). Only unusual, extraordinary negligence of a third party will excuse an original

tortfeasor's liability. Jones v. Cincinnati, Inc., 32 Mass. App. Ct. 365, 370 (1992) quoting A.L.

v. Commonwealth, 402 Mass. 234, 244 (1988).

D.    THE PLAINTIFFS MAY PURSUE A BREACH OF CONTRACT CLAIM
        AGAINST KIESSLING.

The plaintiff may pursue a breach of contract claim against Kiessling because Iafrate was

the intended beneficiary of the contract between Kiessling and MART. Iafrate was specifically

identified as a passenger on the Van in Addendum A. Facts, above, at 3-4. While no recovery

may be had for Iafrate's wrongful death, recovery for breach of contract is permissible for the

conscious pain and suffering Iafrate experienced prior to his death. Recovery is permissible,

"notwithstanding that [the breach of contract] finally resulted in [his] death." Sherlag v. Kelley,

200 Mass. 232, 235 (1908) cited with approval in <u>Necktas v. General Motors Corporation,</u>

<u>Pontiac Division,</u> 357 Mass. 546, 549-50 (1970).  See also, <u>Seiden v. Village Haven Rest Home</u>

1996 WL 1186910 (Mass. Super. 1996) *1, *3 (no liability for breach of contract resulting in

suicide where no contract was produced).  Iafrate, as the beneficiary, may recover for breach of

contract.  <u>Spinner v. Nutt</u>, 417 Mass. 549, 554 (1994); <u>Ray v. Air-Speed, Inc.</u>, 386 Mass. 187,

195 (1982).

<u>CONCLUSION</u>

For the reasons set forth above, this Court should deny <u>Defendants, Kiessling Transit</u>

<u>Inc., Kevin Dixon, and Lars Kiessling's Motion for Summary Judgment, or in the Alternative,</u>

<u>Motion for Partial Summary Judgment.</u>

<div style="margin-left:40%">

Respectfully submitted,
ENRICO IAFRATE, as ADMINISTRATOR
OF THE ESTATE OF PAUL IAFRATE,
Plaintiff
By his attorneys,
COHAN RASNICK MYERSON LLP

_____
Robert D. Cohan, Esq. (BBO #088300)
One State Street, Suite 1200
Boston, MA 02109
(617) 742-1820

</div>

C:\Myfiles\I\Iafrate\Opposition to SJM of Kiessling et al 8-8-05.doc

I hereby certify that a true copy of
the above document was served upon
the attorney of record for each other
party by hand/mail on 8/23/05

_____