UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROBERT SIMPSON RICCI, et al.,

                      Plaintiffs,

v.

ROBERT K. OKIN, et al.,

                    Defendants.

CA Nos. 72-0469-T (Belchertown)
74-2768-T (Fernald)
75-3910-T (Monson)
75-5023-T (Wrentham)
75-5210-T (Dever)

**AMICUS BRIEF IN RESPONSE
TO REPORT OF COURT-APPOINTED MONITOR
– LEAVE TO FILE GRANTED ON MAY 11, 2007**

**INTRODUCTION**

In the Monitor's Report on Whether the "Past and Prospective Transfer Processes Employed by the Department of Mental Retardation ["DMR"] were in Compliance with Federal Law, State Regulations, as Well as Orders of the Court" (the "Monitor's Report"), the court-appointed Monitor concludes that, contrary to the allegations of certain plaintiffs, "DMR was in compliance for the transferred residents with certifying equal or better services in the community."  *See* Monitor's Report, p. 16.  He also concludes that, where transfers of residents from the Fernald facility to a community setting had occurred, the families' and guardians' reactions and attitudes were "extremely positive," leaving no "impression that there were any concerns or tendencies to seek a return to Fernald."  *See id.*, pp. 22-23.  In his oral report to this Court, the Monitor noted that his office had observed "outstanding medical and social care" in all facilities, including "similar results in the community residences as well."  Transcript from March 7, 2007 hearing, p. 14.

The Monitor and his staff should be commended for the energy, compassion and commitment that is reflected in the Report. The amici associated with this brief do not doubt the Monitor's sincerity or desire to help the lives of people with intellectual disabilities. Regrettably, however, in his efforts to help, the Monitor ended his report with dangerous and unfounded conclusions that could, if followed, harm the rights of people with intellectual disabilities, rather than protect them.

Despite the above findings, the Monitor concludes, in sweeping but unsupported terms, that all 218 residents of the Fernald facility should have the legal right to remain at Fernald solely because of the potential impact that a transfer could have on those residents. *See id.*, p. 27. The amici constitute sixteen national and state advocacy groups dedicated to the protection and advancement of people with disabilities. Over the past 30 years, the intellectual disability community has seen a dramatic shift in housing, advanced in part by the Supreme Court decision in *Olmstead v. L.C. ex. rel. Zimrig*, from institutional settings to community-based settings. Based upon both the overwhelming experience of the amici and studies detailed in the professional literature, this paradigm change has had a profoundly positive impact on the lives of thousands of people with intellectual disabilities. The Monitor's conclusions are at sharp odds with these real life experiences and studies.

Specifically, implicit in many of these success stories is the successful transition of many individuals from institutional to community-based settings. Such a transition is never simple, nor is it necessarily pain-free. To be successful, any transfer must be handled professionally and under well-defined procedures and parameters employing clinical judgments that utilize professional standards to ensure best practices. Respectfully, however, the process, as conducted by trained professionals, is not about "striv[ing] for simplicity," the comfort of "old shoes," or

how we feel about our favorite "reclining chair."  *See* Monitor's Report p. 24.  It is about

professional assessment and judgment based upon years of study and empirical data.

The amici submit this brief because, as well-meaning as the Monitor's intentions may be,

they are misguided and dangerous.  As the Supreme Court has recognized, "professionals," not

the courts or the U.S. Attorney, must be allowed to assess individual needs and make individual

judgments.  *See Olmstead, infra*, at 601-602 (state may "rely on the reasonable assessments of its

professionals" in determining whether transfer to community settings is appropriate).  The

insecurity associated with a transfer itself can never, alone, be a reason to block the transition of

groups of people.  Such a result would hinder, not advance, the cause of people with intellectual

disabilities.

This Court has noted that there is always "an element of risk" in promoting opportunities

for people with intellectual disabilities to integrate into the community.  *See Ricci, infra*, at 988

and 988 n.3.  That risk cannot, by itself, block such an integration.  For that reason, the amici

object to the Report of the Monitor.

## I.    THE ORGANIZATIONS FILING THIS AMICUS BRIEF

### A.    AdLib, Inc.

Adlib, Inc. ("AdLib") is a private, non-profit, community-based, consumer-controlled,

Independent Living Center.  AdLib provides independent living and specialized services for

people with disabilities in Berkshire County, Massachusetts.  Adlib empowers people with

disabilities to live more independently and have control of their own lives.  AdLib's four core

services include: providing customers with requested information and referrals about issues and

services; advocating for consumers on a wide variety of issues that affect them and their

independent living; providing peer counseling; and assisting the consumer to develop those skills

necessary to achieve or enhance an independent life-style.

### B.      The Arc of the United States

The Arc of the United States ("The Arc") is the world's largest grassroots organization of and for people with intellectual and developmental disabilities. With over 140,000 members affiliated through more than 850 state and local chapters across the nation, The Arc is an advocacy group devoted to promoting and improving support and services for all people with intellectual and developmental disabilities.  The Arc is a collective of community organizations committed to providing supports and services, across the life span, to individuals with disabilities, with a focus on helping families ensure that any person with a disability is afforded the rights, duties, responsibilities, and full participation as citizens in their community.  The Arc's vision is that every individual and family affected by an intellectual disability in the United States has access to the information, advocacy, and skills they need to participate as active citizens of our democracy and active members of their community. The Arc works to ensure that people with intellectual and developmental disabilities and their families have the support they need to live an ordinary, decent life.

### C.      Association of Developmental Disabilities Providers of Massachusetts

The Association of Developmental Disabilities Providers of Massachusetts ("ADDP") is an organization that promotes the social, political and economic well-being of community organizations that support people with developmental disabilities and their families.  ADDP represents 103 community providers who deliver residential, day and/or employment services throughout the Commonwealth.  ADDP represents the providers before the Department of Mental Retardation and the Massachusetts legislature and also provides technical training and in-service training to its members concerning best practice.

### D.    Boston Center for Independent Living

Boston Center for Independent Living ("BCIL") is a consumer-controlled nonprofit organization, which has been providing services, community education, advocacy and employment for individuals with disabilities in the Greater Boston area since 1974. BCIL's goals include: empowering people with disabilities by supplying them with the opportunity to develop the practical skills and self-confidence to freely determine their life choices in the community; and promoting access and change within society, and making full and equal participation by individuals with disabilities a reality. Every year, BCIL works with thousands of consumers on skills training, peer mentoring, individual and systemic advocacy and other direct consumer services, which prepare individuals to live independently in the community. BCIL also works with numerous family members, educators, human service providers and other professionals.

### E.    Independent Living Center of the North Shore and Cape Ann, Inc.

The Independent Living Center of the North Shore and Cape Ann, Inc. ("ILCNSCA") is a Massachusetts service and advocacy center run by and for people with disabilities. ILCNSCA supports people who have all types of disabilities in their goal to live independently and participate fully in community life. The ILCNSCA pursues this mission through a combination of self-advocacy services and community action. Self-advocacy services are designed to enable participants to develop the skills and knowledge necessary to achieve personal independence. ILCNSCA organizes and supports collective action by people with disabilities aimed at positive social change, the elimination of discriminatory barriers, and the creation of a supportive and fully accessible community environment.

F.    **Massachusetts Advocates Standing Strong**

Massachusetts Advocates Standing Strong (MASS) is a statewide, non-profit, self-advocacy group founded and operated by individuals with cognitive and developmental disabilities. MASS's mission is to empower self-advocates through education so that they can make choices to improve and enrich their lives.

G.    **Massachusetts Council of Human Service Providers, Inc.**

The Massachusetts Council of Human Service Providers Council, Inc. (the "Providers' Council") was founded in 1975 to influence and direct public policy change to support community-based services in Massachusetts.  The Providers' Council represents hundreds of agencies in Massachusetts across the field of health and human services that work with people with developmental disabilities, physical disabilities, mental illness, children, elders/senior citizens, veterans, people who are homeless, people with certain health needs, and people who are abused.  The Providers' Council offers high quality public policy research, advocacy, communication and information, education and training, research and business partnership services to add value to its members and to help them reach their objectives.  As the state's largest human services trade association, it is widely recognized as the official voice of the private provider industry.

H.    **Massachusetts Families Organizing for Change**

Massachusetts Families Organizing for Change ("MFOFC") is a statewide, grassroots coalition of individuals with disabilities and/or chronic illnesses and their families.  The members of MFOFC are uniquely situated to understand deeply how effective services can assist in helping individuals with disabilities to achieve the best within themselves and also to understand how inclusive communities benefit all members of those communities.  Members of MFOFC have successfully worked to create statewide policy and practice for individual and

family support.  In addition, MFOFC has sponsored various conferences, workshops and forums to inform and educate individuals, families and community members about advocacy, services and local, state and federal resources.  MFOFC provides information, leadership training and support to families, and also has regular regional meetings for families and individuals.

    **I.**       <u>**MetroWest Center for Independent Living, Inc.**</u>

The MetroWest Center for Independent Living, Inc. ("MWCIL") is a community-based, consumer-controlled, cross disability center for independent living serving the MetroWest area of Massachusetts.  MWCIL is dedicated to working on behalf of the objectives of the disability rights and independent living movements, through the provision of comprehensive services to enhance the range of options available to, and improve the quality of life of, persons with disabilities.  MWCIL's mission is twofold: to help individuals with disabilities become productive and contributing members of the community and to eliminate barriers within the community that impede this process.  MWCIL assists consumers in achieving the goals that they have set for themselves by providing training, information, advocacy and support.

    **J.**       <u>**National Disability Rights Network**</u>

The National Disability Rights Network ("NDRN"), formerly the National Association of Protection & Advocacy Systems, is the membership association of protection and advocacy systems located in all fifty states, the District of Columbia, Puerto Rico and the territories (the Virgin Islands, Guam, American Samoa, and the Northern Marianas Islands).  Protection and Advocacy systems ("P&A's") are mandated under various federal statutes to provide legal representation and related advocacy services on behalf of people with disabilities in a variety of settings.  Collectively, the P&A network is the nation's largest provider of such services for persons with disabilities.  Through training and technical assistance, legal support, and legislative advocacy, the NDRN works to create a society in which people with disabilities are

7

afforded equality of opportunity. The member P&A's serve a wide range of individuals with disabilities – including, but not limited to, those with sensory, cognitive, mental and physical disabilities – by guarding against abuse; advocating for basic rights; and ensuring accountability in health care, education, employment, housing and transportation.

### K.    Northeast Independent Living Program

Northeast Independent Living Program ("NILP") is a consumer-controlled Independent Living Center providing advocacy and services to people with all disabilities in the greater Merrimack Valley who wish to live independently in the community. NILP provides people with disabilities with a variety of specialized programs that are designed to assist the consumer in the most effective way possible. In one of its programs, NILP works with adolescents with disabilities and their families to facilitate the transition from both institutional and public schools into the adult human services system. As a part of this program NILP provides advocacy and information during the development of Individualized Education Programs and social/recreational activities.

### L.    Self Advocates Becoming Empowered, Region 8

Self Advocates Becoming Empowered, Region 8 (SABE), is the New England chapter of the national self-advocacy movement and organization made up of people with both cognitive and physical disabilities. SABE not only provides resources to people with disabilities so that they can better advocate on their own behalves, but also seeks to educate people without disabilities about issues that are important in the lives of people with disabilities. One of SABE's fundamental goals is to mentor people with disabilities in order to assist them with making the choice of what support they need in the community.

**M.    Service Employees International Union**

The Service Employees International Union ("SEIU") is the fastest-growing union in North America, with 1.8 million members in the United States, Canada, and Puerto Rico. Focused on representing workers in four sectors – hospital systems, long term care, property services, and public services – SEIU is the largest health care union, the largest property services union, and the second-largest public employees union. SEIU represents over 70,000 public and private sector workers in Massachusetts.

**N.    Local 509 of the Service Employees International Union**

Local 509 of the SEIU represents 33 employees at the Fernald facility and hundreds of employees of the Massachusetts Department of Mental Retardation in community programs and development centers. Like the international SEIU, the Local 509 seeks to constantly improve the quality of service it provides and also to promote, whenever possible, the interests of the client community served by it.

**O.    Stavros Center for Independent Living**

Stavros Center for Independent Living ("Stavros") is one of the oldest independent living centers in the country. Stavros is a not-for-profit organization which provides services to and advocacy for individuals living in the western Massachusetts counties of Hampshire, Franklin and Hampden. Stavros's services include: providing counseling, skills training, general encouragement and support to people with disabilities so that they can live independently; providing funding to hire people who help individuals with long-term disabilities with daily living activities; providing housing assistance; and actively advocating for the civil rights of people with disabilities, regionally, statewide, and nationally.

P.    **United Cerebral Palsy**

For more than 55 years, United Cerebral Palsy ("UCP") has been committed to change and progress for persons with disabilities. As one of the largest health charities in America, the mission of UCP is to advance the independence, productivity and full citizenship of people with disabilities through an affiliate network.  UCP affiliates serve more than 170,000 children and adults with disabilities and their families every day. The affiliates provide services such as housing, therapy, assistive technology training, early intervention programs, individual and family support, social and recreation programs, community living, state and local referrals, employment assistance and advocacy. Each affiliate offers a range of services tailored to its community's needs.  The UCP provides direct support to the affiliates via fundraising, marketing and communications, best practices, and programmatic support and serves people with disabilities and their families through the development of forward-thinking programs, information and referral service, legislative advocacy, technology initiatives and research.

## II.    THE FINDINGS OF THE MONITOR

### A.    The Task of the Monitor As Defined By The Court

In 1993, this Court entered an Order terminating federal court oversight of five consolidated matters that dealt with the conditions of a number of mental health institutions in the Commonwealth of Massachusetts (the "Disengagement Order").  In connection with that Order, the Court required the following with regard to the transfer of members of the affected class:

> Defendants shall not approve a transfer of any class member out of state school into the community, or from one community residence to another community residence, until and unless the Superintendent of the transferring school … certifies that the individual to be transferred will receive *equal or better services* to meet their needs in the new location.…

*Ricci v. Okin*, 823 F. Supp. 984, 987 (D. Mass. 1993) (italics added).  Immediately after that

provision, the Court also declared in the Order the following:

> Except as set forth in other paragraphs of this Order, nothing in
> this Order is intended to detract from or limit the discretion of the
> defendants in developing and improving programs, managing and
> determining the personnel and budget of the Department of Mental
> Retardation and other state agencies, implementing innovative
> services, improving quality enhancement and dispute-resolution
> mechanisms, or allocating its resources to ensure equitable
> treatment of its citizens.

*Id.* at 987.

Certain plaintiffs have alleged a violation of the Disengagement Order.  Specifically, the

"plaintiffs have alleged that DMR [the Department of Mental Retardation] is in violation of the

Final Order of the Court entered on May 25, 1993, because the Facility Director of Fernald is not

certifying that individuals to be transferred will receive equal or better services at their new

residences.  The plaintiffs are also alleging that the Facility Director is not certifying that ISP

[Individual Service Program] recommended services for the individual's current needs are

available at the new location."  Monitor's Report, p. 13.  As a consequence, the Court asked the

Monitor "to conduct an investigation into whether the 'past and prospective transfer processes

employed by the Department of Mental Retardation were in compliance with Federal law, State

regulations, as well as Orders of the Court."  *Id.*  Accordingly, the Monitor's task was to

determine whether transfers from institutions to community-based housing conformed with the

law and the prior Orders of this Court.

**B.    The Findings of the Monitor With Regard to Past Transfers**

The Monitor spent in excess of one year meeting with over 250 guardians, parents and

siblings at Fernald and other institutions, visiting over thirty community residences and day care

centers, visiting other institutions and reviewing documentation.  *Id.,* p. 1.  Few can seriously

doubt the extent of the devotion or effort committed by the Monitor and his staff over that period of time.

With regard to the allegations of the plaintiffs, the Monitor determined that the state had in fact been in compliance with the Disengagement Order.  The Monitor specifically found that services in community settings were consistent with the court's order that they be "equal or better" than at the ICF/MRs.

> Through our tours of various community homes we witnessed services consistent with the Court's Final Order including the following:  "residential programs; day programs; recreational and leisure time activities; medical, psychological, dental and health-related professional services; respite care and crisis intervention services; support and generic services, such as guardianship and adaptive equipment services; and transportation services." Ricci, 823 F.Supp. at 987.  The medical doctors that we retained also confirmed that these services are available in the community, and reviewed the housing, health, employment and occupational needs of the clients.  Individuals transferred to the community can receive these services equal or better than at the ICF/MRs.

Monitor's Report, p. 14.

With respect to the transfers themselves, the Monitor conducted a Post Placement Satisfaction Survey.  *See id.*, p. 22.  As described in the Report, that survey reflected overwhelmingly positive attitudes regarding the transfer of Fernald residents to other housing. *See id.*  ("[t]he written commentary reflected extremely positive attitudes toward the moves").  In particular, the "responses to the surveys did not give the impression that there was [sic] any concerns or tendencies to seek a return to Fernald."  *See id.*, p. 23.

Notably, these positive experiences were, initially, met with significant hesitation.  *See id.*, p. 24 ("[a] recurrent theme found was hesitancy to move from Fernald due to familiarity").  Further, many were not voluntary in any traditional sense.  Rather, they were a direct result of "the announcement that Fernald will be closing."  *See id.*  Even so, as noted above, those transfers have been extremely positive.

III.    __THE MONITOR'S OBSERVATIONS ON THE TRANSFER OF FERNALD__
__RESIDENTS__

Notwithstanding all of the data reflecting the positive experiences regarding transfers,
both voluntary and involuntary, the Monitor engaged in a series of statements and observations
seriously at odds with his own prior observations, at odds with the experience of the amici, and
contrary to accepted professional literature.  Those observations and recommendations related to
the potential impact that Fernald residents would experience, were those residents to be
transferred from the Fernald facility.

Specifically, the Monitor began with the following observations:

- "This very fragile segment of the Massachusetts' population [referring to the
  Fernald residents] strives for simplicity and constants to thrive and conduct their
  daily lives, and the threat of change does have an impact on the physical and
  emotional health of some of the residents."  Monitor's Report, p. 24.

- "Similar to our old shoes that fit just right, or that favorite reclining chair that
  has molded perfectly to a body over the years, or the room or building we have
  spent our life calling home and those around us that we consider family and
  friends, we all seek familiarity to our lives. …  For the severely mentally
  retarded, such a loss of familiar surroundings and most importantly people,
  could have devastating effects that unravel years of positive, non-abusive
  behavior."  *Id.*

- "Change for most of us comes at a cost, for the most vulnerable, the slightest
  change can have dramatic and permanent consequences."  *Id.*

- "We cannot imagine after residing in a home for thirty, forty or fifty years, and
  finally getting it to the point where you feel comfortable, stable and secure, that

you are now told to pack up and move with potentially more moves to endure.

Any of us would be outraged."  *Id.* at 25.

From these well-meaning but inappropriate observations, and the "pleas" with which the Monitor had been inundated to keep Fernald open, *see id.*, the Monitor then ended with a far reaching and potentially dangerous conclusion:

> *As a result of a year long investigation, our office has concluded that some of the residents at Fernald could suffer an adverse impact, either emotionally and/or physically, if they were forced to transfer from Fernald to another ICF/MR or to a community residence.  Our office would recommend the implementation of a development plan that would enable Fernald to remain open and provide services to some of the Commonwealth's most vulnerable citizens. … Additionally, and most importantly, considering the uniqueness of each of the ICF/MRs, and the vulnerability of the residents, Fernald residents should be allowed to remain at the Fernald facility, since for some, many or most, any other place would not meet an 'equal or better' service outcome.*

*Id.* at 27.

The Monitor should be commended for his sensitivity, earnestness and caring.  Regrettably, those same qualities have caused the Monitor to lose sight of a critical issue.  The Monitor's recommendations are contrary to his own data and, more importantly, are contrary to the vast weight of authority and experience regarding the impact caused by the transfer of people with intellectual disabilities from an institution to the community, when those transfers are part of a thoughtful and carefully orchestrated process.

As discussed below, adoption of this aspect of the Monitor's Report would set a dangerous precedent.  Even for the demographics of the population at Fernald, transfers to different facilities -- when done properly and overseen by trained professionals– can and should be very positive steps in the lives of Fernald's residents.  Wholesale efforts to block institutional

closures based upon broad brush conclusions can severely impede efforts that otherwise would meaningfully improve the lives of those and other residents.

## IV.    ARGUMENT

### A.    Standard of Review Regarding Conclusions of Court-Appointed Monitor

The February 26, 2006 Order of this Court appointed United States Attorney Michael J. Sullivan as a "Court Monitor" vested with the authority to conduct an "inquiry" and submit a "report to the court."  *See* Docket for Civil Action No. 72-00469 at Entry No. 90.  For purposes of evaluating the "Final Assessment" contained in the Monitor's Report, this Court must apply a *de novo* standard of review.  *See Nat'l Org. for the Reform of Marijuana Laws v. Mullen*, 828 F.2d 536, 543, 545 (9th Cir. 1987) (equating duties of a court-appointed "monitor" to those of a special master).  *See also* Fed. R. Civ. P. 53(g)(3)-(4) (as amended December 1, 2003) (court must decide *de novo* all objections to findings of fact or conclusions of law made or recommended by court-appointed master).  Accordingly, this Court owes no special deference to the findings or conclusions stated in the Monitor's Report, and must independently review his findings to determine their validity.

### B.    The Requirements Contained in the Disengagement Order

As a result of the Disengagement Order closing federal court oversight of this case, *see Ricci v. Okin, M.D.*, 823 F. Supp. 984, 985 (D. Mass. 1993), the Defendants are subject to the following requirements:

1.    The Defendants must "substantially provide services to each [*Ricci*] class member on a lifetime basis.  The specific services to be provided to each class member to meet this obligation, and defining this obligation, shall be set forth in an Individual Service Plan ("ISP") that details each class member's capabilities and needs for services, pursuant to the regulations governing the preparation of ISP's, as currently set forth in 104 CMR 20, *et seq.* (the "ISP

Regulations").[1]  Such services shall include, as appropriate for the person, residential programs;

day programs;  recreational and leisure time activities;  medical, psychological, dental and

health-related professional services;  respite care and crisis intervention services;  support and

generic services, such as guardianship and adaptive equipment services;  and transportation

services." *Id.* at 986-987.

2.      The Defendants must ensure that "[s]ufficient adequately trained and experienced

personnel, as reasonably determined by the Department of Mental Retardation based on

professional judgment, shall be available to substantially meet the needs set forth in each class

member's ISP." *Id.* at 987.

3.      The Defendants "shall not approve a transfer of any class member out of a state

school into the community, or from one community residence to another such residence, until

and unless the Superintendent of the transferring school (or the Regional Director of the pertinent

community region) certifies that the individual to be transferred will receive *equal or better*

*services* to meet their needs in the new location, and that all ISP-recommended services for the

individual's current needs as identified in the ISP are available at the new location." *Id.* at 987

(emphasis supplied).

4.      The Defendants must "continue to seek to improve, and shall not undermine, the

progress achieved during [ the *Ricci* ] litigation by ... maintaining and implementing the basic

principles of the ISP," which include: "(1) human dignity, (2) humane and adequate care and

treatment, (3) self-determination and freedom of choice to the person's fullest capacity, (4) the

opportunity to live and receive services in the least restrictive and most normal setting possible,

---

[1] The Disengagement Order goes on to state that the ISP Regulations must "guarantee that each class member be provided with the least restrictive, most normal, appropriate residential environment, together with the most appropriate treatment, training, and support services suited to that person's individual needs." *Ricci,*  823 F. Supp. at 987 n.2.

(5) the opportunity to undergo normal developmental experiences, even though such experiences may entail an element of risk, provided however that the person's safety and well-being shall not be unreasonably jeopardized, and (6) the opportunity to engage in activities and styles of living which encourage and maintain the integration of the client in the community through individualized social and physical environments." *Id.* at 988 & 988 n.3.

The Disengagement Order made clear, however, that "nothing in this Order is intended to detract from or limit the discretion of the defendants in developing and improving programs, managing and determining the personnel and budget of the Department of Mental Retardation and other state agencies ...  implementing innovative services, improving quality enhancement and dispute-resolution mechanisms, *or allocating its resources to ensure equitable treatment of its citizens.  Id.* at 987 (emphasis supplied).

## C.    The Requirements Under *Olmstead v. L.C. ex. rel. Zimring*

In addition to the specific requirements set forth by the Disengagement Order, the Defendants are also bound by the U.S. Supreme Court's decision in *Olmstead v. L.C. ex. rel. Zimring*, which analyzed the circumstances under which a state can be required to place a person with intellectual disabilities in a community setting rather than an institution.

Pursuant to the Americans with Disabilities Act of 1990 ("ADA"), "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The corresponding regulations promulgated by the Attorney General further require public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities," which is defined as "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible."  28 C.F.R. pt. 35,

App. A, p. 450 & § 35.130(d).  Consistent with these statutory mandates, a public entity must make "reasonable modifications in policies, practices or procedures" in order to avoid discrimination on the basis of disability, unless the public entity can "demonstrate that making the modifications would fundamentally alter the nature of the service, program or activity."  28 C.F.R. § 35.130(b)(7).

Upon close review of these provisions, the U.S. Supreme Court concluded in *Olmstead* that the unjustified institutionalization and isolation of persons with mental disabilities violates the ADA.  *See* 527 U.S. 581, 597, 607 (1999) ("[U]nder Title II of the ADA, States are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.")

The Supreme Court reached this conclusion based upon two factors.  First, the Court observed that "institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life."  *Id.* at 600.  Second, the Court noted that "confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment."  *Id.* at 601.  *But see id.* at 601-602 (holding that nothing in the ADA requires termination of institutional settings for those persons who do not desire a transfer to a community-based setting or who will not benefit from a community-based setting) (state may "rely on the reasonable assessments of its own professionals in determining whether an

individual 'meets the essential eligibility requirements' for habilitation in a community based program.").

> **D.     The Vast Majority of Professional Literature Establishes That Transfers Can And Are Safely Conducted**

In his Report, the Monitor draws sweeping conclusions by virtue of the demographics and tenure of the 218 residents at Fernald, that the impact of a transfer itself, without more, would deprive those residents of "equal or better" treatment. *See* Monitor's Report, p. 27. This conclusion, based as it was on personal sympathy, is contrary to the Monitor's own survey results. *See infra*, pp. 22-23 (96% in survey of transferees had positive attitudes regarding the moves). More fundamentally, it is contrary to numerous empirical studies that have analyzed this issue in depth.

As a preliminary matter, a substantial body of professional literature, as well as the experience of amici, show that community living arrangements offer far greater benefits for people with intellectual disabilities than institutional living. These proven benefits have been shown in a variety of community settings, and for a varying degree of disability. Importantly, gains from community living are achieved whether the move is voluntary or involuntary. Developments for people with intellectual disabilities include improvements in adaptive behavior, independence, self-care skills, social skills and vocational skills.

Contrary to the Monitor's recommendations, while there may be an initial adjustment period, moves into the community are generally not traumatic for people with intellectual disabilities and present those individuals with opportunities unavailable in institutional settings. If moves to community living arrangements follow well laid-out standards, policies and clinical guidelines that make transitions following transfer as easy as possible, individuals placed in the community experience fuller lives from increased family contact and community integration.

This improvement not only includes regular interactions with individuals without disabilities, but also greater freedom to experience day-to-day community life:  shopping in the grocery store, participating in religious services, going to the movies and visiting friends.  These experiences cannot be duplicated in the isolation of an institutional setting; the importance of partaking in community life cannot be underestimated.  Community placement allows people with intellectual disabilities to develop fuller lives and to enjoy the benefits and experiences that those without intellectual disabilities share daily.  The Monitor's sweeping generalizations regarding the impact of a transfer -- as well meaning as they may be -- put at risk this important process.

> 1.      **The Trend Toward Community Placements and Away from Institutional Living**

Nationwide, community placement has become the favored living situation for people with intellectual disabilities.  Since the beginning of the deinstitutionalization movement, *all* states have reduced the numbers of individuals in institutions.  This move toward community living has been paired with a trend toward institutional closure.  Current statistics show that, from 1966 to 2006, the population of state institutions decreased from 191,584 residents to 38,137 residents.  Prouty, Coucouvanis & Lakin, "State Institution Populations in 2006 Less than 80% of 40 Years Earlier; 'Real Dollar' per Person Costs More Than 10 Times Greater," *Intellectual and Developmental Disabilities* 45, 2:  143-145, 143 (2007) (Declaration of Gillian N. Rattray, dated May 31, 2007 ("Rattray Decl."), Ex. 1).

This progression represents an 80.1% decrease in the population of people with intellectual disabilities in institutions.  *Id.*  Thirty-nine states have closed, or will close, 139 state-operated institutions, representing over one-half of the institutions that existed in 1970.  *See* Braddock, David, "Closing the North Dakota Developmental Center:  Issues, Implications, Guidelines," University of Colorado, 5-6 (2006) ( Rattray Decl., Ex. 2).

# 4561934_v4

New Hampshire was the first state to operate an "institution-free" system, which has been followed by seven other states. *Id*. at 6. Many other states have closed significant percentages of their institutions and the remaining institutions serve a diminishing number of people with intellectual disabilities. *See id.; see also*, Kim, Larson & Lakin, "Behavioral Outcomes of Deinstitutionalization for People with Intellectual Disabilities: a Review of Studies Conducted between 1980 and 1999," *Journal of Intellectual and Developmental Disability*, 26(1), 35-50, 36 (2001) (Rattray Decl., Ex. 3). Michigan's only remaining facility houses 162 people, while Minnesota's only institutional program houses 7 people. *Id*.

It is clear that the trend in decreasing state institution populations continues, with institutional populations only a mere fraction of the numbers seen in the past. According to data from the National Health Interview Survey on Disability and the Residential Information Systems Project, 92% of individuals with mental disabilities live with family or alone; 6% live in community-supported living; 1% live in nursing homes and only 1% live in institutions. *See* Shoultz, Bonnie, Walker, Pam & Taylor, Steve, "Policy Research Brief: Status of Institutional Closure Efforts in 2005," University of Minnesota, 2 (2005) (Rattray Decl., Ex. 4). In 2006, there were 13.1 average daily residents ("ADR") per 100,000 of the state population; in 1966, this number was 98.8. *See* Prouty, Coucouvanis & Lakin at 145.

This dynamic is coupled with increased costs of running institutions. The cost per person for ADRs in 1966 was $43.32; in 2006, it was $453.59. *Id*. While institutional living may have been the only option in the past, it is clearly no longer the way to meet the present needs of people with intellectual disabilities. Sky-rocketing costs, aging facilities, isolation of residents, and proven benefits available in the community have led to widespread disfavor for institutional

living.  The needs of people with intellectual disabilities are now best served in community

placement.

Further, these trends are not exclusive to the United States.  Many other countries,

including Australia, Canada, Ireland and the United Kingdom have seen large decreases in their

institutional populations.  These decreases are supported by consistent findings of improvements

in behavior for individuals moved into community placement.  In 1976, England's National

Health Service ("NHS") utilized over 51,000 long-stay beds for people with intellectual

disabilities.  By 2002, that number had decreased by 93% to 3,638.  *See* Emerson, Eric,

"Deinstitutionalisation in England," *Journal of Intellectual & Developmental Disability*, vol 29,

1:  79-84, 79 (March 2004) (Rattray Decl., Ex. 5).  By 2001, NHS was responsible for only 12%

of residential services, which was to be eliminated by 2004.  *See id.* at 81.  Foreign

deinstitutionalization has contributed greatly to the body of professional literature on the subject.

While systems may vary from country to country, the results are consistent:  it is clear that

deinstitutionalization and moving people with intellectual disabilities into community placement

is fundamentally beneficial.

### 2. Deinstitutionalization and its Benefits are Well Supported by Studies and Literature

The advantages of community living are powerfully and convincingly supported by a

large body of professional literature.  These results have been consistently reconfirmed in the

United States and around the world over the past 25 years.  It is well-documented that

individuals who leave institutions and move into the community have a better quality of life,

improve adaptive behaviors and acquire more skills that help them on a daily basis.  Community

placement makes "a significant impact on acquisition of the more complex cognitive and social

skills."  Eastwood, Elizabeth A. and Fisher, Gene A., "Skills Acquisition among Matched

Samples of Institutionalized and Community-Based Persons with Mental Retardation," *American Journal on Mental Retardation*, vol. 93, no. 1:  75-83, 75 (1988) (Rattray Decl., Ex. 6).

Further, transfer trauma is neither an absolute nor an unavoidable outcome of deinstitutionalization.  *See generally* Braddock at 23-24.  Community placement has been found to be viable, suitable and beneficial to institutional residents of all ages and disability levels, whether the move into the community is voluntary or involuntary.

The *Pennhurst Longitudinal Study* was a seminal study in the field of intellectual disabilities.  The study was launched in connection with class action litigation, which provided the researchers the opportunity to study a sizable population as they moved into community placement.  Research and analysis were conducted for five years and followed over 1,100 individuals involuntarily moved into the community following the court-ordered deinstitutionalization of the Pennhurst State School and Hospital.

As reflected even today, the study found that people who moved into community placement were more independent and showed improvements in adaptive behavior.  Conroy, J.W., & Bradley, V.J. *The Pennhurst Longitudinal Study:  a Report of Five Years of Research and Analysis*, Philadelphia:  Temple University Developmental Disabilities Center, 314-315 (1985) (Rattray Decl., Ex. 7).  "Movers" from Pennhurst increased their adaptive behavior scores significantly, improving their scores by over 11 points, while "stayers" improved their scores by less than 1 point.  *Id*. at 97-98.  These findings showed significant increases in adaptive behavior upon initial community placement from 1980 through 1982, improvement that continued after placement from 1982 to 1983.  *Id*. at 104-105.  While "movers" experienced those increases in adaptive behavior, there was no significant growth among those individuals while they resided at Pennhurst.  *Id*. at 105.  This study unequivocally shows that gains were largely due to

community placement, rather than aging or natural development, and all occurred

notwithstanding forced transfers.

>    **3.     Community Placement Improves Adaptive Behavior and Quality of**
>         **Life at Rates Not Seen in Institutional Living**

Changes in adaptive behavior, like those seen in the *Pennhurst* study, are perhaps the

main benefit to deinstitutionalization.  An overwhelming number of studies have corroborated

the *Pennhurst* results, finding a statistically significant increase in overall adaptive behavior

scores associated with deinstitutionalization.

In 1989, for example, Larson & Lakin published a survey of eighteen studies on changes

in adaptive behavior for deinstitutionalized individuals.  *See* "Deinstitutionalization of Persons

with Mental Retardation:  Behavioral Outcomes," *Journal of the Association for Persons with

Severe Handicaps*, 14, 324-332 (1989).  1,358 subjects were involved in 18 studies and came

from 13 different states from all regions of the country.  Studies included both voluntary and

involuntary deinstitutionalization.  This review found that institutions were "consistently less

effective than community-based settings in promoting growth, particularly among individuals

diagnosed as severely or profoundly retarded."  Braddock at 9 (citing Larson & Lakin at 330).

Based on these findings, Larson & Lakin noted that "it must be recognized that based on

a substantial and remarkably consistent body of research, placing people from institutions into

small, community-based facilities is a predictable way of increasing their capacity to adapt to the

community and culture."  *Id*. (citing Larson & Lakin at 331).  They were able to conclude that

"available research denies support for the assertion that people obtain greater or even equal

benefit in adaptive behavior from living in institutions.  In fact, this research suggests that those

benefits very consistently accrue more to the people who leave institutions to live in small

community homes."  Kim, Larson & Lakin at 44 (citing Larson & Lakin).

In a follow-up to their ground-breaking 1989 work, Kim, Larson & Lakin reviewed 33 more studies and found that the literature continued to support their earlier findings. This literature review again shows that improvements in adaptive behaviors are consistently found in deinstitutionalized individuals. *See* Kim, Larson & Lakin at 35. Contrasting "movers" and "stayers," all of the studies found significant improvements associated with community placement, or improvements that did not reach statistical significance. *See id*. at 39. Areas of improvement included: self-care or domestic skills; academic skills; communication; community living skills; social skills; and vocational skills. *See id*.

Additionally, a study of over 2,000 people with intellectual disabilities in California yielded similar results, further speaking to the unquestionable benefits of deinstitutionalization. Brown, Fullerton, Conroy and Hayden evaluated individuals moved into community placement from 1993 to 2001. *See Eight Years Later: the Lives of People who Moved from Institutions to Communities in California. Year 2001 Report of the Quality of Life Evaluation of People with Developmental Disabilities Moving from Developmental Centers into the Community* ('The Quality Tracking Project'), Final Report (Year 2), Narberth, PA: the Center for Outcome Analysis (2001) (Rattray Decl., Ex. 8). The California Legislature and the California Department of Developmental Disability Services defined the researchers' tasks, the origins of which are laid out in California Welfare and Institutions Code 4418.1. This study analyzed over 700 items of information for each individual that were combined into scales to assist in interpretation. *See Id*. at 25. These results were compared before and after moves into the community. The study used a *population*, not a sample, in its project and included every individual who moved into community placement in the time period. *See Id*. at 7. Because the study used a population, rather than a sample, these results do not require inferential statistics

required for samples.  *See Id*.  There is no need to infer any outcomes to a whole population; therefore, the results for the population simply "are what they are."  *Id*.

The researchers primarily asked one question:  "are the people who moved better off than they were when living in Developmental Centers?"  Brown, et al. at 2.  The results showed that "movers" "benefited considerably from community living."  *Id*.  Quality of life for deinstitutionalized individuals "improved in more than three times as many dimensions as they have declined."  *Id*. at 27.  The study found improvements in several quality of life dimensions, including progress in personal goals, individualized treatment, integration, challenging behavior and choice-making.  *Id*. at 26.  The researchers also found that families were "unexpectedly and overwhelmingly happy with community living, even those who formerly opposed the change."  *Id*. at 3.

While the study found that levels of adaptive behavior decreased over time, this finding was small.  *Id*.  Initial findings were not statistically significant and would not have been detected without the state mandate for monitoring progress.  *Id*. at 40.  Researchers explained that the findings may partly be due to under-funding and "zealous" moving.  California spent only 55% of its institutional cost per person on community supports, while New Hampshire and Pennsylvania expended 86% and 85%, respectively.  *Id*. at 4-5.  Researchers agreed that whether such a loss was truly significant would be answered in the long run, rather than in one year of data.  *Id*. at 47.  Despite this anomaly, the researchers stated that the findings continue to show that "the Movers are still much better off than they were at the Developmental Centers.  Almost no one wants to go back."  *Id*. at 5.  A study of this size adds further strength to the considerable body of professional literature showing the benefits of moving individuals with mental disabilities into the community.

As shown through the literature, community placements provide people with intellectual disabilities with opportunities to improve adaptive behavior and acquire useful skills. Improvements are consistently found in reading/writing skills; quantitative skills; independent living skills; vocational skills; and social interaction skills. *See* Eastwood & Fisher at 80; *see also* Conroy, James W., et al*., Initial Outcomes of Community Placement for the People who Moved from Stockley Center,* Narberth, PA: the Center for Outcome Analysis, 33 (2003) (Rattray Decl., Ex. 9); *see also* Kim, Larson & Lakin. The body of professional literature shows that these gains are significant and make movers "better off" than they were in institutional care. *See* Conroy, et al., at 47.

### 4. Deinstitutionalization Provides Individuals With an Opportunity to Become Integrated Into Their Communities

Integration is fundamental in supporting those with disabilities who have been moved into the community. Integration can be defined as the opportunities people with disabilities possess for contact with people without disabilities. *See* Conroy, et al., at 33. Studies have consistently found integration and community orientation to significantly improve upon deinstitutionalization. *See* Brown, et al. at 31; *see also* Eastwood & Fisher at 80; *see also* Kim, Larson & Lakin. Brown, et al. found that movers were involved in an additional 13.3 community events per month and that this almost doubling of integrative activities was statistically significant. *Id.* at 31. Conroy, et al., showed increases in 15 of 16 types of integrative activities, six of which were significant. *Id.* at 35. These results were found to be consistent with movers from other states. *Id.* at 36. While this phenomenon can be said to be expected upon deinstitutionalization, movers greatly increased their opportunities to go places and interact with citizens without disabilities. *Id.* Deinstitutionalization is a powerful policy

because it "seeks to maximize inclusion for people with intellectual disability." Kim, Larson & Lakin at 44. This step is an important one in the further improvement of adaptive behaviors.

### 5. Deinstitutionalization Leads to Improvements in Challenging Behavior

Deinstitutionalization also has been found to diminish challenging behavior. While studies in the 1980s suggested that deinstitutionalization may lead to significant deterioration in challenging behavior,[2] more recent studies have shown that challenging behavior either stays the same or significantly improves upon moving to community placement. *See* Kim, Larson & Lakin at 45; *see also* Brown, et al. at 40-41.

Brown, et al. found the largest improvements ever documented in research on challenging behavior, finding a 9.9 point increase. *See* Brown, et al. at 42. From this research, they concluded that "[t]he proper conclusion is that these 191 Movers are far better off now, in the community, in terms of being able to control their own potentially challenging behavior." *Id.* at 43. As such, this argument against deinstitutionalization loses its strength.

The positive outcomes may be the result of improved behavioral support systems available in the community, many of which came into existence as a result of depopulation of institutions. *See* Kim, Larson & Lakin at 45. These support systems often involve a shift from group settings to individualized, person-centered support services that reduce the aggravations that may trigger challenging behavior. Shoultz, Walker & Taylor at 3.

### E. Transfer Trauma Has Not Been Proven to be an Inevitable Outcome in Community Placement

Studies unequivocally show that families of individuals relocated from institutional into community placement are overwhelmingly satisfied with the results of that relocation. Notably,

---

[2] Some 1980s studies showed that while challenging behavior increased in the community, it increased more among those remaining in institutions.

even where families initially opposed the transfer, the great majority ultimately become supporters of community placement. *See* Braddock at 11; *see also Pennhurst* at 177; *see also* Braddock, David & Heller, Tamar, *The Closure of Mental Retardation Institutions:  Trends and Implications (a Working Paper)*, Chicago:  Evaluation and Public Policy Program, Institute for the Study of Developmental Disabilities, University of Illinois at Chicago, 21 (1984) (Rattray Decl., Ex. 10).  Many of these families have been studied since the late 1970s, with the studies consistently demonstrating that, after community placement, families report lower levels of satisfaction with earlier institutional placement and higher levels of satisfaction with community placement. *See id.*; *see also* Brown, et al.

These changes in family attitudes were highly statistically significant. *Pennhurst* at 178. Brown, et al. found that families saw improvements in their relative's quality of life following community placement and found a clear shift from opposition to support for community living. *Id.* at 125-126.  This trend grows stronger the longer their relatives are out of institutions.  *Id.* at 127.  In those instances, families felt that their relatives were "happy" or "very happy" with living in the community and strongly opposed the idea of relatives moving back to institutions. *Id.* at 127-128.

Interestingly, family members are often surprised by their own change in feelings and report unexpected changes for the better in their own lives, and in the lives of their relatives with disabilities. *Pennhurst* at 188.  While family worries over transfer trauma often lead to initial opposition to community placement, they ultimately do not play a role in long-term reactions. Brown, et al. at 127-128.

The transfers are not simple, of course.  To help with family concerns, families must be informed that adjustment problems are not uncommon during and following institutional

closures. *Brown, et al.* at 127-128. Transfer trauma also must be mitigated by a safe and orderly relocation process.[3] Clinical judgment, a critical aspect of the relocation process, utilizes professional standards to ensure best practices and enhanced accuracy, precision and integrity in decision-making. Clinical judgment can be defined as "a special type of judgment rooted in a high level of clinical expertise and experience; it emerges directly from extensive data. It is based on the clinician's explicit training, direct experience with those with whom the clinician is working, and specific knowledge of the person and the person's environment." Schalock, Robert L. & Luckasson, Ruth, *Clinical Judgment*, Washington, D.C.: American Association on Mental Retardation, pg. 5-6 (2005) (Rattray Decl., Ex. 12). Characteristically, clinical judgment is: "(a) systematic (i.e., organized, sequential, and logical), (b) formal (i.e., explicit and reasoned), and (c) transparent (i.e., apparent and communicated clearly)." *Id.* This judgment is fundamental to successful transitions into the community. Preferences to stay in institutions, however, are often "based on lack of experience with other alternatives and fear of something new and different." Shoultz, Walker & Taylor at 3. Transfer trauma may be feared for these individuals; however, studies do not show significant evidence of transfer trauma (for voluntary or involuntary transfers) in these individuals and proper protocols and relocation standards will minimize any potential effects on those moving into the community. *See generally* Braddock at 23-24. The same is true for older individuals who, after the transfer, should experience

---

[3] Mortality is one aspect of transfer trauma that has been studied in detail. Studies showing increased mortality in community settings have been criticized. Attempts to replicate Strauss' mortality findings have found that those moving into community placements "were at no increased risk of death." *See* Lerman, Paul, Apgar, Dawn Hall and Jordan, Tameeka, "Deinstitutionalization and Mortality: Findings of a Controlled Research Design in New Jersey," *Mental Retardation*, vol. 41, no. 4: 225-236, 225 August (2003) (Rattray Decl., Ex. 11). It was noted that Strauss misclassified over 50 deaths as community placements instead of correctly identifying them as institutional stayers. *Id.* Lerman, Apgar & Jordan performed a prospective study on mortality and deinstitutionalization and found that death rates for movers and stayers were comparable. *Id.* at 234. While risk variables best explained mortality, mover/stayer status or institutional/community residence as variables did not change the findings. *Id.* There is no conclusive evidence that transfer trauma is inevitable or that moves into the community lead to increases in mortality. As such, transfer trauma cannot be an argument against moving people with intellectual disabilities into the community and depriving them of the significant behavioral benefits found there.

community activities that help them learn about life in the community and their various support options.  Shoultz, Walker & Taylor at 3.

## **CONCLUSION**

Ultimately, while the Monitor's concern regarding transfer trauma is well-meaning, it is misplaced.  The fear and anxiety associated with transfers is real, but it cannot outweigh the benefits associated with moves from institutional settings.  Whether a transfer is appropriate must be made on an individualized, professional basis – as required by *Olmstead* – not on a global, emotional and legal one.  If the Monitor's recommendations on this point are adopted, such a precedent puts at risk meaningful and profound advances in the care and treatment of people with intellectual disabilities.  For that reason, the Monitor's conclusions must be rejected.

Respectfully submitted,

ADLIB, INC., THE ARC OF THE
UNITED STATES, ASSOCIATION OF
DEVELOPMENTAL DISABILITIES
PROVIDERS OF MASSACHUSETTS,
BOSTON CENTER FOR
INDEPENDENT LIVING,
INDEPENDENT LIVING CENTER OF
THE NORTH SHORE AND CAPE ANN,
INC., MASSACHUSETTS
ADVOCATES STANDING STRONG,
MASSACHUSETTS COUNCIL OF
HUMAN SERVICE PROVIDERS, INC.,
MASSACHUSETTS FAMILIES
ORGANIZING FOR CHANGE,
METROWEST CENTER FOR
INDEPENDENT LIVING, INC.,
NATIONAL DISABILITY RIGHTS
NETWORK, NORTHEAST
INDEPENDENT LIVING PROGRAM,
SELF ADVOCATES BECOMING
EMPOWERED, REGION 8, SERVICE
EMPLOYEES INTERNATIONAL
UNION, LOCAL 509 OF THE SERVICE
EMPLOYEES INTERNATIONAL
UNION, STAVROS CENTER FOR
INDEPENDENT LIVING, UNITED
CEREBRAL PALSY

By their attorneys,


*/s/ Joshua C. Krumholz*
Joshua C. Krumholz (BBO #552573)
Lawrence R. Kulig (BBO #544656)
Gillian Rattray (not yet admitted in MA)
Benjamin M. McGovern (BBO #661611)
Edwin L. Hall (BBO #667276)
HOLLAND & KNIGHT LLP
10 St. James Avenue
Boston, MA  02116
(617) 523-2700 - Telephone
(617) 523-6850 - Facsimile
joshua.krumholz@hklaw.com

Dated: May 31, 2007

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 31, 2007, I served a copy of the foregoing document by electronic mail to all parties through the Court's ECF system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

/s/ *Joshua C. Krumholz*
Joshua C. Krumholz (BBO #552573)