UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| _____ | ) | |
| ASSOCIATION FOR RETARDED | ) | |
| CITIZENS OF MASSACHUSETTS, | ) | |
| INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION |
| | ) | Nos.  72-0469-T |
| v. | ) | 74-2768-T |
| | ) | 75-3910-T |
| COMMONWEALTH OF | ) | 75-5023-T |
| MASSACHUSETTS DEPARTMENT | ) | 75-5210-T |
| OF MENTAL RETARDATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**THE DEPARTMENT OF MENTAL RETARDATION'S RESPONSE TO:**
**(1) THE REPORT OF UNITED STATES ATTORNEY MICHAEL J. SULLIVAN; AND**
**(2) THE COURT'S ORDER SHOW CAUSE WHY AN INJUNCTION SHOULD NOT ENTER**

<u>Introduction</u>

By Order dated February 8, 2006 (the "Feb. 2006 Order"), this Court appointed United

States Attorney Michael J. Sullivan as court monitor in these cases and directed him to determine

"whether the past and prospective transfer processes employed by the Department of Mental

Retardation comply with federal law, state regulations, as well as the orders of this Court[.]"[1]

While awaiting the Monitor's report, the Court enjoined all transfers by the Department of

individuals from the Fernald Developmental Center ("FDC").  *Id.*  The Monitor conducted an

intensive, 13-month investigation into the Department's past and prospective transfer processes

and determined that the Department was in full compliance with all applicable laws, regulations,

and orders of the Court.  *See* "The Monitor's Report" dated March 6, 2007, at pp. 13-23.  Most

_____

[1]  Allegations contained within the Fernald plaintiffs' February 2, 2006, submission to the Court
regarding the first 43 transfers from Fernald (following the announcement, on February 23, 2003, of
a planned closure of the facility) apparently prompted this Court-ordered review.

importantly, the Court Monitor found that the Department followed well established rules and practices in the transfer of some 49 individuals from the FDC, and that the Department had complied with all applicable transfer regulations.[2]  *Id.* at 17-22.  Specifically, the Department had carefully transitioned these individuals to new homes, with the FDC Facility Director in all instances certifying that services in the new location would be "equal to or better" than those available at the FDC, as required by the so-called "Final Order" entered in these cases in 1993.[3]  *Id*. at 14, 16.

On May 9, 2007, the Court proposed an order that would require the Department, whenever communicating with FDC residents or their guardians about future residential placements, to expressly include the FDC as a placement option.[4]  The Court asked the defendants to show cause, in their submission due on May 31, 2007, why this order should not enter.  The reasons for the Department's opposition to the Proposed Order are set forth below.

<u>Summary of the Argument</u>

In light of the Court Monitor's findings that the Department has been in full compliance with the Final Order, and in the absence of any ongoing violation of the Constitution or federal law, there is no legal basis for re-opening any of these closed cases or for the entry of further injunctions.  No change in either law or fact justifies re-writing the Final Order to impose further

---

[2]  The Department endorses the Findings documented in pages 13-23 of the Court Monitor's Report, and will voluntarily adopt the minor suggestions the Monitor offered to improve the placement process.

[3]  On May 25, 1993, in a published decision, this Court wrote:  "I am today signing a comprehensive Order closing the federal court's oversight of these cases."  *Ricci v. Okin*, 823 F. Supp. 984, 985 (D. Mass. 1993).  The Department refers to this Order herein as the "Final Order."  The "equal or better standard" is articulated at page 987 and also in footnote 5, *infra*.

[4]  The exact text of the proposed order is:  "Any further communication from Defendant Commonwealth of Massachusetts Department of Mental Retardation to Fernald residents and their guardians which solicits choices for further residential placement shall include Fernald among the options which residents and guardians may rank when expressing their preferences."  Hereinafter, this text within the Court's May 9, 2007, Order will be referred to as "the Proposed Order."

obligations on the Department 14 years after closure of these cases.  The Proposed Order would constitute an impermissible revision of a negotiated consent decree.  Point I, pp. 9 - 16.

The Proposed Order, which requires the Department to offer the FDC as a "choice[] for further residential placement," and thus obliges the Department to keep the FDC open indefinitely, would conflict with the Massachusetts Legislature's express statutory directive to close the FDC.  Point II.A., pp. 16-17.  By granting the family or guardian apparent authority to block a community placement, even if this type of placement is in an individual's best interests, the Proposed Order also would run contrary to federal law, the Department's regulations, and the Final Order's provisions requiring that services be provided in the least restrictive setting possible.  Moreover, the Proposed Order would conflict with state law, which vests exclusive authority in the Department to manage and operate all facilities and programs for persons with mental retardation, including the discretion to modify existing programs and to create new programs.    Point II.B., pp. 17-20.  No federal law imperative justifies the preemption of state law safeguards that govern the rights of the individuals at FDC and define the Department's role and authority pertaining to the transfer of individuals from intermediate care facilities for the mentally retarded ("ICFs/MR").   Point II.C., pp. 20-21.

The Proposed Order, by requiring the Department to offer the FDC as a choice for future residential placement, and thus requiring the Department to keep the FDC open indefinitely, also contravenes the Final Order's provisions, which expressly vest discretion with the Department to improve programs and allocate resources fairly for the benefit of all of the Commonwealth's developmentally disabled citizens.  The Final Order effectively grants the Commonwealth the authority and discretion to decide whether to close the FDC in order to strengthen programs elsewhere (and, if so, when and how to implement the closure).  Point III, pp. 22-24.  Fernald class members possess no constitutional or statutory entitlement to continue to receive services at

the FDC.  Hence no rule of law supports entry of the Proposed Order.  Point IV, pp. 24-26.

The Proposed Order would interfere with the Commonwealth's discretion regarding the delivery of treatment to individuals with mental retardation, upsetting basic principles of governance inherent in our federal system of government.  When the law charges a government agency with a particular legal obligation, black letter doctrine holds that agency officials, rather than courts, are empowered to select the means by which the legal obligation is discharged. Point V.A., pp. 26-27.

The decision of whether and how to close the FDC is a matter of significant public policy with far-reaching consequences for persons with mental retardation in the Commonwealth.  An order granting the families of Fernald residents "veto power" over the FDC closure is wholly unwarranted on this record and would create an unwise precedent possibly preventing the closure of any of the Commonwealth's six ICF/MR facilities.  The Commonwealth's policy decision whether and how to close the FDC is properly guided both by legislative directive and a widely-shared national consensus favoring the reduction of large congregate facilities.  A federal court should not interfere in the manner contemplated by the Proposed Order with the exercise of the State's policy-making authority.  Point V.B., pp. 27-30.

The Court Monitor's broad-brush suggestion that the transfer of a Fernald resident (or presumably a move of any kind) may not meet the Final Order's "equal or better" standard,[5] unless such transfer were requested by the individual or guardian, is not based upon an in-depth review of any individual at FDC and his or her particular needs; runs contrary to the law of the

---

[5]    Paragraph 4 of the Final Order states as follows:  "Defendants shall not approve a transfer of any class member out of a state school into the community, or from one community residence to another such residence, until and unless the Superintendent of the transferring school (or the Regional Director of the pertinent community region) certifies that the individual to be transferred will receive equal or better services to meet their needs in the new location, and that all ISP-recommended services for the individual's current needs as identified in the ISP are available at the new location." 823 F. Supp. at 987.

case, which vests authority to decide how and if this standard is met with the Facility Director; and is contradicted by over thirty years of experience in Massachusetts in transitioning individuals from institutional settings to community homes or other settings. Further, the Monitor's suggestions are inconsistent with copious research demonstrating that careful planning and thoughtful transitions can eliminate any adverse effects of disruption or change. Point VI, pp. 30-46.

Finally, the Court Monitor's assertions, unsupported by specific data or evidence, that DMR-supported individuals residing in community placements are exposed to a higher risk of abuse or mistreatment, and have greater difficulty accessing medical and dental services, are both erroneous and form an insufficient basis for a continuing injunction against transfers from the FDC. The same holds true regarding allegations of higher turnover and fewer qualified staff in community residences. These statements, which the Court Monitor attributes to input from certain plaintiffs (*see* Monitor's Report at p. 24), are clearly at odds with substantial official data bearing on these topics. Point VII, pp. 46-59.

## **PRIOR PROCEEDINGS**

1.      *Ricci v. Okin* (No. 72-469-T) was filed in 1972 on behalf of residents of the Belchertown State School ("BSS") challenging purportedly illegal and inhumane conditions at BSS. This action was later consolidated with similar class actions filed on behalf of the residents of the Monson Developmental Center, the Wrentham State School, the Dever State School, and the Fernald State School. These actions resulted in interim consent decrees and court orders entered in the late 1970s and 1980s, which required the Commonwealth to upgrade and rehabilitate the facilities in question and to provide services and community placements to class members.

2.      In 1993, the parties negotiated the terms of a disengagement order designed to end

federal court oversight of the Department with regard to all *Ricci* class members and issues. On May 25, 1993, "with the consent of the parties," this Court entered the Final Order, which "supplant[ed] and replace[d] each of the consent decrees and all orders of the court in these matters." *See* Final Order, ¶ 1 (823 F. Supp. at 986). In their place, the Final Order requires lifelong provision of individualized services to class members and contains requirements regarding adequate staffing, maintenance of effort (including efforts to obtain funding), and other matters. *Id.* at ¶¶ 2 - 6 (823 F. Supp. at 986-989).

3.      On February 23, 2003, Governor Romney announced plans to close the FDC. Shortly thereafter, Fernald Class Representatives began meeting with Commissioner Morrissey and Department staff regarding their concerns about the closure. In April of 2004, the Fernald plaintiffs filed a demand under Paragraph 7 (c) of the Final Order alleging certain violations of the Final Order and state law governing transfers. *See* Docket no. 1, Exhibit 1. After a preliminary written response and then meeting twice with the Fernald representatives, the Department responded to plaintiffs' letter in detail on July 1, 2004. *See* Docket no. 2, Exhibit B.

4.      On July 14, 2004, the Fernald plaintiffs filed a motion to reopen the case and enforce the Final Order, asserting various reasons why the Department allegedly had fallen out of compliance with the Final Order -- most relating to the Commonwealth's plan to close the FDC. The Department filed a responsive pleading on August 16, 2004, asserting that the Department had faithfully met all of the Final Order's requirements.

5.      On January 25, 2005, this Court denied, without prejudice, the Fernald plaintiffs' motion to re-open the case. However, the Court granted Fernald Class Counsel access to the records of some 43 individuals who had been transferred from the FDC between the date of the announcement regarding closure (February 23, 2003) and June of 2005 to assess whether the Department had complied with the requirements of the Final Order and state law regarding those

6

transfers.

6.    On February 2, 2006, Fernald Class Counsel filed a report reiterating the same alleged instances of noncompliance with the Final Order and/or relevant statutes and regulations governing transfers of individuals served by the Department.[6]

7.    On Feb. 7, 2006, the Wrentham plaintiffs filed a motion to re-open these cases. Docket no. 84.  The Department filed a motion to strike the Wrentham motion to re-open for failure to comply with Paragraph 7 (c) of the Final Order.  Docket no. 96.

8.    On February 8, 2006, without holding a prior hearing, the Court appointed United States Attorney Michael Sullivan as Court Monitor to investigate the allegations and enjoined all transfers from Fernald.

9.    The Court appointed the U.S. Attorney to "advise the court as to whether the past and prospective transfer processes employed by the Department of Mental Retardation comply with federal law, state regulations, as well as the orders of this court."  See Feb. 2006 Order at 1. Further, this order specifically decreed that "[p]ending the completion of Mr. Sullivan's inquiry, and his report to the court, all transfers from Fernald to other ICF/MRs and community residences shall be discontinued."  Id. at 2.[7]

10.    Between February 2006 and March of 2007, the Court Monitor conducted a comprehensive review of the Department's transfer processes.  This inquiry included a review of the records of all transferred individuals; meetings and interviews with most of these individuals, or their families or legal guardians; visits to the new settings (both community-based day

---

[6]  See Fernald Class Counsel's "Report to the Court in Accordance with Order of January 20, 2005 Relative to the Transfer Between February 26, 2003 and June 22, 2005 of 43 Residents from the Fernald Developmental Center to an Alternative Placement."  (Docket no. 83)

[7]  Four months after entering the Feb. 2006 Order, the Court dismissed the Wrentham class members' motion to re-open the case.  See Order dated June 7, 2006.  The Court then denied as moot Defendants' motion to strike the Wrentham class members' motion for failure to comply with the Final Order's ¶ 7(c) process.  See Order dated July 24, 2006.

programs and residential homes, or the ICFs/MR) in which these individuals were placed; and interviews with staff at both the transferring facility and in the new placement settings.

11.    In addition, the Court Monitor visited all of the Department's intermediate care facilities, and many state-operated residential programs, vendor-operated residential programs, supported employment programs, and day habilitation programs (whether or not these providers were providing services to Fernald class members).

12.    The Court Monitor also posed written questions to the Department regarding the Department's community-based system; in particular, how DMR assured that individuals who moved to community-based programs (either state-operated or vendor-operated) received appropriate clinical services, and how DMR assured that staffing levels and training for individuals in these programs were adequate.  Department staff met with the Court Monitor to explain the system and how these assurances are given, and also responded to questions posed by the plaintiffs' attorneys and class representatives.

13.    The Court Monitor also initiated a review by independent medical experts of the individuals who, at the time the Court entered its Order prohibiting transfer, were either in varying stages of preparation for transfer or who came forward over the past year to express a desire to transfer from Fernald to another intermediate care facility or to a community-based residence.  The Court Monitor expressed the view that a medical review would assist him in determining whether these individuals would receive "equal or better" services in the new location.

14.    The Department cooperated fully with this aspect of the Monitor's inquiry, even going so far as to facilitate the outside medical review, despite its position that under the plain language of the Final Order, it is the Facility Director or Regional Director, and not an outside medical expert, who is authorized to certify that the services will be equal or better for a

transferred *Ricci* Class Member.

15.    On March 7, 2007, the Court Monitor submitted a report to the Court in which he found that the Department had not violated the Final Order or any other laws with regard to the transfers or other matters asserted by the Fernald plaintiffs.  Yet he recommended that the Fernald Developmental Center remain open.    The Court then permitted all parties the opportunity to submit written responses to the Monitor's report on or before May 31, 2007.  At the March 7 hearing, the Commonwealth moved orally for an immediate dissolution of the February 2006 injunction.  The Court, however, issued a verbal order staying transfers until at least May 31, 2007.  Even individuals seeking to leave FDC, whose cases had been reviewed by the Court Monitor and who had his blessing for a transfer, were not permitted to leave Fernald in the absence of a motion seeking leave filed by the Court Monitor and granted by the Court.

16.    On May 9, 2007, the Court issued an Order requiring "[b]y May 31, 2007, Defendants shall show cause why the court should not issue the following order:  'Any further communications from the defendants Commonwealth of Massachusetts to Fernald residents and their guardians which solicits choices for further residential placement shall include Fernald among the options which residents and guardians may rank when expressing their preferences.'"

## ARGUMENT

I.  THERE IS NO LEGAL BASIS TO ENJOIN TRANSFERS FROM FDC OR TO MODIFY THE FINAL ORDER SO AS TO MAINTAIN, IN PERPETUITY, FDC AS AN OPTION FOR RESIDENTIAL PLACEMENT OF FERNALD CLASS MEMBERS.

### A.    The Court Monitor Found Full Compliance with the Requirements of Federal and State Law, and with the Final Order, Concerning Past and Prospective Transfers from FDC.

This is a closed case, governed by a Final Order entered in May of 1993.  The Final Order requires that in order for plaintiffs to re-open the case and seek relief, they must first comply with Paragraph 7 (c), and then establish a "systemic" violation of the Final Order.  Here,

the Fernald plaintiffs filed a Motion to Re-open the case in July of 2004.    After responsive pleadings were filed, the Court denied the Motion without prejudice on January 20, 2005. Although denying the Fernald plaintiffs' Motion to Re-open, the Court allowed the FDC Class Counsel to review the files of the first 43 individuals transferred from the FDC following the announcement of the closure on February 23, 2003.  Subsequently, FDC Class Counsel filed a February 2, 2006 "Report" which asserted multiple violations of the Final Order and purposeful violations of the Department's transfer processes during the transfer of individuals from the FDC.  As discussed below, all of these allegations were determined to be baseless.

Pursuant to his appointment order of February 8, 2006, the Court Monitor conducted a comprehensive review of the Department's transfer processes and procedures as they related to the transfer of 49 individuals from Fernald between February 26, 2003 and February 8, 2006. The Court Monitor additionally reviewed the files of Fernald residents who had requested transfer from the facility, but whose transfer planning was halted upon entry of the Feb. 2006 Order.[8]    Following a 13-month review, the Court Monitor conclusively determined the Department's compliance with applicable federal laws, state regulations,[9] and Court Orders and effectively confirmed the Department's earlier assertions that Class Counsel's "Report" allegations were baseless.  *See* Monitor's Report at 1-23.

The Court Monitor found the Department's past and prospective transfer processes to be

---

[8]  Nine individuals were actively engaged in placement planning with the Department when the Court entered the Feb. 2006 Order.  Since that time, the Court's injunction has prevented all but one individual from leaving the FDC.

[9]  Even if the Monitor (or some plaintiffs) were of the view that the Department had violated some provision of state law, that conclusion would form no basis for this Court to take remedial action. *See* Final Order, ¶ 7(b) (823 F. Supp. at 988) ("Nothing in this Order shall make state law (including but not limited to the ISP regulations) enforceable in federal court[.]").  "[A] claim that state officials violated state law in carrying out their official responsibilities is a claim against the State that is protected by the Eleventh Amendment."  *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984).

in full compliance with all legal safeguards designed to ensure that any placements from facilities to community-based programs are carefully planned, that there is adequate notice and transition time, input from families in the process, and certification of services by the transferring Facility Director that equal or better service are in place in the receiving location. *See id.* Each individual transferred from Fernald received appropriate notice, consented to the transfer, and had appropriate planning and transition activities to ensure a safe transition from one location to another. *Id.*

Despite a 13-month inquiry, and over 13 months of an injunction preventing any transfers, not a single allegation contained in Class Counsel's February 2006 Report to the Court, which provided the basis for the appointment of the Monitor, was substantiated during the Monitor's review. Although the Monitor's Report wholly refutes Class Counsel's earlier allegations concerning the transfer process, FDC Class Counsel has publicly supported the findings contained within the Report.[10] In concurrence with FDC Class Counsel, the Commonwealth hereby endorses the "Findings" of the Court Monitor that the Department's past and prospective transfer process is in full compliance with all applicable State and Federal statutes and regulations and the Orders of this Court. *See id.* at 13-23. Given the absence of any "systemic" or other violation of the Final Order, there is no legal basis for the Court to re-open this closed case and impose new "remedial" orders preventing the closure of the FDC.

**B. This Court's Limited Jurisdiction in These Cases Is Insufficient to Authorize Entry of the Proposed Order.**

1. The Live 'Case or Controversy' Requirement Has Not Been Met Here.

Federal courts generally are limited to enforcing the Constitution and federal law. Constitution, Art. III, § 2. *Sosna v. Iowa*, 419 U.S. 393, 402 (1975) ("The judicial power of Art.

---

[10] *See* transcript of March 7, 2007, at p. 18, line 13 [Mr. Cohen]: "We accept, the [Fernald] plaintiffs accept the report as written and commend Mr. Sullivan for his work."

III courts extends only to 'cases and controversies' specified in that Article."). This Court acquired jurisdiction over the Department of Mental Retardation upon the filing of the five above-captioned cases in the early-to-mid 1970s. "The complaints [in these five cases] variously alleged deprivation of the plaintiffs' due process rights to minimally adequate care and treatment, and their rights under certain federal and Massachusetts statutes, including Section 504 of the Rehabilitation Act of 1973, Title XIX of the Social Security Act, and G.L. c. 19 and c. 123." *Ricci v. Okin*, 537 F. Supp. 817, 819 n.4 (1982).

As the Court is well aware, a succession of interim consent decrees ensued. "[T]he basic objective of the consent decrees [was] the elimination of conditions at state facilities that were so poor as likely to be unconstitutional." *Mass. Ass'n for Retarded Citizens v. King,* 668 F.2d 602, 609 (1st Cir. 1981). By mid-1993, the Court's jurisdiction over the Department had abated with the entry of the Court's Final Order. *See County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979). By that point, this Court had recognized that the previous unconstitutional conditions within the subject facilities, including Fernald, had been eradicated.[11] In fact, this Court opined that "Massachusetts now has a system of care and habilitation that is probably second to none anywhere in the world." *Ricci v. Okin*, 823 F. Supp. 984, 985 (1993).[12] Any latent jurisdiction this Court possessed was (and is) strictly limited to enforcement of the literal terms of the Final Order. *See Firefighters v. Stotts*, 467 U.S. 561, 574 (1984) (a district court's authority to enforce the terms of a consent decree must flow from language found "within its four corners").

The controversy in which the Fernald plaintiffs and the Department find themselves

---

[11]    *Cf. City of Los Angeles v. Lyons*, 461 U.S. 95, 101-105 (1983) (no case or controversy when defendants have ceased practice alleged to be unconstitutional).

[12]    Seven years earlier, in 1986, this Court expressed a firm expectation that the unconstitutional conditions at the five subject facilities would never recur: "I take this step of disengagement with confidence that our retarded citizens will never again live under the conditions of a decade ago." *Ricci v. Callahan*, 646 F. Supp. 378, 380 (1986).

embroiled in 2007 (some 35 years after the cases *sub judice* were filed) entails a wholly separate set of issues stemming from the Commonwealth's previous announcement that it would be closing the Fernald Developmental Center. The Final Order does not speak directly to, and in no way curbs, the authority of the Department to close the FDC.[13] No party is alleging today that the Fernald plaintiffs are subject to unconstitutional conditions at the FDC. Independent federal regulators repeatedly have concluded in writing that the FDC is in compliance with Title XIX. Allegations that the Department has violated the terms of the Final Order have been wholly discredited by the United States Attorney. This Court has denied the Fernald plaintiffs' (and the Wrentham plaintiffs') motions to reopen the 1970s-era cases.

In order to maintain an action, a plaintiff must not only present a case or controversy at the time a lawsuit is filed, but there must also be a live, justiciable controversy at the time the case is reviewed by the Court. *Sosna v. Iowa*, 419 U.S. at 402. *See also Evans v. City of Chicago*, 10 F.3d 474, 479 (7th Cir. 1993) ("[T]he court must ensure that there is a substantial federal claim, not only when the decree is entered but also when it is enforced.") Here, the Final Order defines the scope of cognizable claims in these now-closed cases: the Court's jurisdiction may be reawakened only upon evidence of a "systemic violation" of the Final Order's terms. 823 F. Supp. at 988 (¶ 7). Certain procedural requirements must also be satisfied. *Id.* The requirements of paragraph 7 of the Final Order not having been satisfied, this Court lacks jurisdiction to issue injunctive orders.

---

[13] In fact, in this Court's words, "The Decrees [supplanted in 1993 by the Final Order] *permit* significant changes in the life circumstances of class members, including the anticipated movement of a majority of class members from institutional environments to community homes." *Ricci v. Okin*, 781 F. Supp. 826, 828 (1992) (emphasis added). "The Consent Decrees do not prohibit the possible closing of any facility. Indeed, if residents are properly placed into alternative settings, and a facility is no longer needed, this court will not interfere with its closure." *Id.* at 830. The Final Order does not deviate from the consent decrees on this point. *See* 823 F. Supp. at 986-989.

   2.   <u>The Court's Equitable Powers Are Constrained by Fundamental Federalism
        Principles.</u>

As will be discussed in greater detail in Point IV, *infra*, no party before the Court has any

substantial claim under federal law to the indefinite continued operation of the FDC when

equally serviceable alternative placements exist.  Unless there is a *substantial* claim under a

federal law, a district court in general lacks the authority to enter an injunction affecting the

operation of a governmental body.  *Evans*, 10 F.3d at 482.  Moreover, "courts are bound by

principles of federalism (and by the fundamental differences between judicial and political

branches of government) to preserve the maximum leeway for democratic governance."  *Id*. at

479.  "[T]he district court [has a] responsibility to identify the rule of federal law supporting a

consent decree binding the political arms of government, and [a] corresponding obligation to

permit new public officials to set their own policy within the limits established by federal law."

*Id*.  Logically, this responsibility also arises when, as here, a district court seeks to impose new

obligations on government officials not found within the four corners of a consent decree or final

judgment.  "Doubts [a]re to be resolved in favor of leeway for the political branches[.]"  *Id*.[14]

Given that the Department has not admitted, and the Court has never found, any violation

of law by the agency in the years since the Final Order, the Court may not revise the parties'

agreement to impose any additional directives or obligations.  *Lorain NAACP v. Lorain Bd. of

Educ.*, 979 F.2d 1141, 1153 (6th Cir. 1992), *cert. denied*, 509 U.S. 905 (1993).  As the Sixth

Circuit has explained:

> [A] district court may not, in the name of modification, circumvent the express
> terms of a defendant party's consent in the absence of an adjudicated or admitted
> violation of [federal] law.  In the absence of an adjudication or admission of

---

[14]   The Supreme Court repeatedly has cautioned federal courts to be mindful of their duty, grounded
on bedrock principles of federalism, to exercise their equitable powers to minimize interference with
the day-to-day workings of state and local governments. *See, e.g., Rizzo v. Goode*, 423 U.S. 362, 379
(1976); *O'Shea v. Littleton*, 414 U.S. 488, 501 (1974).

> constitutional violation [or other violation of federal law], the district court's authority to impose additional obligations on a defendant is constrained by the terms of agreement entered by the parties to the consent decree.

*Id*. In no circumstances may a federal district court, even with the assent of the government defendant, enter a modification of a consent decree (which is exactly what the Proposed Order would be) if the result would be inconsistent with governing substantive law. *McClendon v. City of Albuquerque*, 79 F.3d 1014, 1021 (10th Cir. 1996) (citing *Local No. 93 v. Cleveland*, 478 U.S. 501, 527-28 (1986), and *Stotts*, 467 U.S. at 580 n.12). As the Department argues in greater detail below (*see* Point II), the Proposed Order would run afoul of both state and federal law concerning the rights of developmentally disabled individuals.

In the absence of a fresh complaint, alleging credible constitutional or federal law violations, the authority of this Court over the Department is tightly circumscribed, as outlined above.[15] The limitations upon the equitable powers of the federal court found in the Constitution and relevant Supreme Court decisions take on special significance when the inquiry turns to the proper scope of federal court remedies against state and local officials. *See, e.g., Younger v. Harris*, 401 U.S. 37, 44 (1971).[16] "[T]he scope of prospective relief under federal law is 'constrained by principles of comity and federalism.'" *Ass'n for Retarded Citizens v. Sinner*, 942 F.2d 1235, 1240 (8th Cir. 1991) (quoting *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 104 n.13 (1984)). "Federal courts may not order States or local governments, over their objection, to undertake a course of conduct not tailored to curing a constitutional violation that has been adjudicated." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 389 (1992) (citing *Milliken v. Bradley* (Milliken II), 433 U.S. 267, 281 (1977)). Accordingly, as matter of law, and

---

[15]  Moreover, if the Fernald plaintiffs were to initiate a new complaint, in order to survive a motion to dismiss, they would have the burden of alleging "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, __ U.S. __, 127 S.Ct. 1955, 1974 (2007).

[16]  *See also* Note, Federalism and Federal Consent Decrees Against State Governmental Entities, 88 Col. L. Rev. 1796, 1802-1812 (1988).

for the additional reasons set forth below, this Court lacks authority to enter the Proposed Order.

II. **THE PROPOSED ORDER WOULD CONFLICT WITH STATE LAW AND CANNOT BE JUSTIFIED AS A REMEDIAL MEASURE CURING A NEW VIOLATION OF FEDERAL LAW.**

### A. The Proposed Order Would Conflict with the Legislature's Directive to Close or Consolidate DMR's Intermediate Care Facilities, Including the FDC.

The Legislature, in the Acts and Resolves of Fiscal Year 2004, and again for Fiscal Years 2005, 2006, and 2007,[17] has directed that the Department "take appropriate steps to consolidate or close" its ICFs/MR in general, and FDC in particular. Each year, in connection with the Department's budget appropriation, the Legislature has directed the Department to close the FDC and to discharge clients residing in its ICFs/MR "in order to promote compliance with the *Olmstead* decision."[18] In order to accomplish this objective within available resources, the Legislature has directed the Department to reduce its ICF capacity, provided that "equal or

---

[17] Chapter 139 of the Acts and Resolves of 2006 provides that "in order to comply with the provisions of the *Olmstead* decision and to enhance care within available resources to clients served by the department, the department shall take steps to consolidate or close intermittent [sic] care facilities for the mentally retarded, in this item called 'ICF/MRs', managed by the department and shall endeavor, within available resources, to discharge clients residing in the ICF/MRs to residential services in the community if the following criteria are met: 1) the client is deemed clinically suited for a more integrated setting; 2) community residential service capacity and resources available are sufficient to provide each client with an equal or improved level of service; and 3) the cost to the commonwealth of serving the client in the community is less than or equal to the cost of serving the client in ICF/MRs; provided further, that any client transferred to another ICF/MR as the result of a facility closure shall receive a level of care that is equal to or better than the care that had been received at the closed ICF/MR[;] . . . provided further, that the Fernald Development Center shall not be closed before October 31, 2006 to ensure adequate community, client, and family member input into the closure planning process . . . [.]"

[18] In *Olmstead v. Zimring*, 527 U.S. 581, 587 (1999), the Court held that there are circumstances in which "the proscription of discrimination [in Title II of the Americans with Disabilities Act] may require placement of persons with mental disabilities in community settings rather than in [state] institutions." The Court stated: "Such action is in order when the State's treatment professionals have determined that community placement is appropriate, the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." *Id. See also* 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(d).

16

better" services are furnished to individuals transferring to the community.[19]    In compliance with this directive, the Department has sought to transfer FDC residents to other settings where equal or better services are available.  All FDC residents have been offered the opportunity to choose placement at another Title XIX-certified ICF/MR, a state-operated community-based residence, or a vendor-operated residence.  In every case, there are multiple program options capable of meeting each FDC resident's needs, assuming careful planning and the crafting of person-centered services.

The Proposed Order, by contrast, directs the Commonwealth to notify families that the FDC will remain a future placement option, apparently indefinitely.  Because all official communications with families must be accurate and not misleading, the Proposed Order thus indirectly (but assuredly) requires the Commonwealth to maintain the FDC as an operating facility for the indefinite future, in contravention of clear legislative language to the contrary.  In the absence of a new, adjudicated violation of federal law, no lawful basis exists for such a directive.

### B.    The Proposed Order Would Conflict with State Law, Which Vests Exclusive Authority in the Department to Manage the Department's Facilities and Develop New Programs.

The exclusive authority to manage the resources of the Department, including the operation of all state-operated ICFs and all community programs for individuals with mental retardation, is vested in the Commissioner of the Department.  M.G.L. c. 19B, § 1.  The statute provides broadly that "[t]here shall be a department of mental retardation and  . . . a commissioner of mental retardation who shall have and shall exercise exclusive supervision and control of the department."  *Id.*  The authority of the DMR, through its Commissioner, is intentionally broad:  "The department shall take cognizance of all matters affecting the welfare

---

[19]  As noted above, the Court Monitor has confirmed the Department's ability to provide FDC clients with appropriate services in the community.  Monitor's Report at 14, 16.

of the mentally retarded citizens of the commonwealth [. . .] and *shall have supervision and control of all public facilities for mentally retarded persons and of all persons received into any of said facilities* and shall have general supervision of all private facilities for such persons[.]" *Id.* (emphasis supplied). Further, " . . . [t]he department shall have supervision and control of all mental retardation facilities established within the department . . . [and] may further develop additional mental retardation facilities under commonwealth operation or . . . may contract with any private agency furnishing complementary or community mental retardation services . . . to persons in need thereof." *Id.*

Pursuant to the explicit language of M.G.L. 123B, § 2, the Commissioner is charged with the supervision of the Department's intermediate care facilities and with adopting regulations which "establish procedures and the highest practicable professional standards for the reception, examination, treatment, restraint, transfer and discharge of mentally retarded persons in departmental facilities." Moreover, these regulations "shall be adaptable to changing conditions and to advances in methods of care and treatment and in programs and services for the mentally retarded." *Id.*

Pursuant to the grant of authority under M.G.L. c. 19B, § 14, and c. 123B, § 2, the Commissioner has promulgated rules and regulations governing all aspects of service provision for persons with mental retardation, including regulations that outline the human rights of individuals with mental retardation, 115 C.M.R. § 5.03,[20] and an individual's right to receive services in the "least restrictive setting." *See* 115 C.M.R. § 6.20(3).

---

[20]   Section 5.03(1)(2) of Title 115 of the Code of Mass. Regulations provides, in pertinent part: "Services and supports are to be provided in a manner that promotes:  (a) Human dignity; (b) Humane and adequate care and treatment; (c) Self-determination and freedom of choice to the individual's fullest capability; (d) The opportunity to live and receive services or supports in the least restrictive and most typical setting possible; (e) The opportunity to undergo typical developmental experiences, even though such experiences may entail an element of risk;  provided however, that the individual's safety and well-being shall not be unreasonably jeopardized; and (f) The opportunity to

The Proposed Order would interfere with this grant of authority to operate the Department's facilities, including the FDC, and may make it harder for the Department to meet the "highest practicable professional standards for the treatment and provision of services to individuals" within the Department's facilities. Further, the Proposed Order would contravene the Department's regulations concerning the provision of services to individuals in the least restrictive environment. As an indirect mandate to continue operating the FDC, the Proposed Order runs afoul of state law, which vests authority in the Commissioner to determine whether and how to operate ICFs, and how to populate other programs designed to serve the needs of these individuals based upon the highest and best clinical practices.[21]    Continued judicial involvement in the Department's affairs, as contemplated by the Proposed Order, would constitute an improper displacement of the authority of duly appointed and elected state officials. *See Milliken v. Bradley*, 418 U.S. 717, 743-744 (1974).[22]

Finally, to the extent that the Proposed Order would require the Department to solicit family preference information from FDC families in a particular manner, it is overly intrusive and unnecessary. The Department has solicited preference information from FDC families through the placement profile. The Department has and will continue to solicit individual and

---

engage in activities and styles of living which encourage and maintain the integration of the individual in the community[.]"

[21]  Assuming that the Proposed Order is not intended to require the FDC to remain open, but is simply a mechanism to elicit family/guardian preferences about their wards' remaining at FDC, it nonetheless contravenes state law, which vests the Department with determining, in its best professional judgment, how to provide services to the individuals it serves in the least restrictive environment. The law unambiguously requires the Department to communicate with families regarding how to meet individuals' needs in the least restrictive setting possible. Impeding communication with families by requiring the Department to offer the FDC as a placement option – whether or not such placement is in the individual's best interests as determined by the Department's professionals -- directly interferes with this primary legal responsibility of the Department.

[22]  Federal courts must avoid orders that unduly limit state administrators' discretion. *See Lelsz v. Kavanagh*, 807 F.2d 1243, 1252, *reh. denied*, 815 F.2d 1034 (5th Cir.), *cert. dismissed*, 483 U.S. 1057 (1987) (modifying consent decree to minimize interference with operations of state facilities for mentally retarded).

family preferences through this mechanism and in individual service planning meetings. Uncertainty, however, is not conducive to good planning. An order requiring the Commonwealth to indicate to families that FDC remains a placement option would be a significant impediment to the necessary and sensitive communications with family members and guardians that are the linchpin of a successful transition. *See* Point VI.B., *infra*.

C.   **The Proposed Order Would Undermine Additional Provisions of State Law Authorizing Transfers and Providing an Administrative Mechanism for Families to Appeal a Transfer Decision.**

Inherent in state law is a careful balancing of the rights of the Commonwealth's most vulnerable citizens and their families or guardians with the Department's need to manage its facilities and to exercise its professional judgment in serving individuals with mental retardation. *See* M.G.L. c. 123B, § 3 ("the Transfer Statute"). The Transfer Statute provides protections and safeguards for individuals and their families or guardians, as well as guidelines for the Department in circumstances in which the Department recommends a change in placement for an individual whom the Department serves. *Id.* at ¶ 2. Before the Department implements any transfer or change in placement from one facility to another, it must provide 45-day notice to the individuals or guardian and an opportunity to visit the new setting. *Id.* Individuals or guardians can object and appeal the individual service plan, or may seek relief directly from the Division of Administrative Law Appeals (DALA). No change may be implemented pending resolution of the appeal. *Id.* The standard to be met is that the proposed move must be in the "best interests" of the individual. *Id.* at ¶ 3 .

Although the guardian or family member's choice of placement for any individual is entitled to great weight, the choice of an institutional placement over a less restrictive setting should not always be accorded unconditional acceptance. *See* M.G.L. c. 123B, § 3. This section grants the Department standing to challenge an objection to placement decision that the

Department believes is not in the individual's best interest in the event that the guardian objects to the state's placement recommendation.  At that juncture, an adjudicatory hearing at DALA shall be convened to determine "which placement meets the best interest of the ward giving due consideration to the objections to the placement made by the relative or permanent guardian." *Id.*[23]  Thus, the decision of the guardian or family member to refuse community placement or other placement on the individual's behalf may be set aside in the best interests of that individual.[24]

An order requiring that FDC be maintained as a viable placement option for all current FDC residents would effectively supersede existing state law providing a specific remedy for individuals or families who do not agree with a proposed alternative placement for their family member.  In contrast to the *de facto* placement veto that the Proposed Order would accord family members and guardians, state law limits their right of appeal to a determination by DALA of whether the placement is in the individual's "best interests," and not whether it satisfies the family or guardian's desires.

---

[23] General Laws c. 123B, § 3, provides, in pertinent part:  "If the individual service plan developed for the mentally retarded person by the department pursuant to its regulations cannot be fully implemented as a result of the guardian's objection to a proposed transfer, the department shall, with twenty days of receipt of said objection, file a request for an adjudicatory proceeding with the division of administrative law appeals . . ., whereupon said division shall . . . conduct said proceeding to determine whether the transfer should proceed. The division shall conduct an adjudicatory hearing within ninety days in accordance with the provisions of chapter thirty A, and the burden of proof shall be on the department.  During the pendency of said hearing the proposed residential transfer shall not occur. . . . The hearing officer shall determine which placement meets the best interest of the ward giving due consideration to the objections to the placement made by the relative or permanent guardian.  . . . After the hearing officer renders a written decision [within 30 days] the parties shall have twenty days in which to appeal the decision to the superior court and the court shall hear such appeal as expeditiously as possible[.]"

[24]  Despite the existence of this remedy, throughout the closure of the Belchertown State School, no one ever pursued an appeal of a placement decision.  O'Hare Aff., ¶ 23.

III.   THE PROPOSED ORDER, WHICH MAY BE INTERPRETED AS GRANTING FAMILIES VETO POWER OVER COMMUNITY SERVICES, IS INCONSISTENT WITH THE LAW OF THIS CASE, AS REFLECTED IN THE COURT'S ORDER OF MAY 25, 1993.

There is nothing in the Final Order precluding the Commonwealth from transferring residents out of the FDC or requiring that the FDC continue to be an option for particular residents.  In fact, the Final Order expressly reserves to the Department the discretion to manage its facilities as it sees fit:

> Except as set forth in other paragraphs of this Order, nothing in this Order is intended to detract from or limit the discretion of the defendants in developing and improving programs, managing and determining the personnel and budget of the Department of Mental Retardation and other state agencies, implementing innovative services, improving quality enhancement and dispute-resolution mechanisms, or allocating its resources to ensure equitable treatment of its citizens.

Final Order, ¶ 5.[25]   Particularly given that the Department's plan to downsize its ICF/MR capacity was well known to the Court and all parties in advance of entry of the Final Order,[26] there is no justification for backtracking now on the language of the final consent decree entered in these cases and entering a new order that curbs the Department's lawful discretion.[27]

---

[25]  That the Final Order reserves this discretion to the Commonwealth was re-affirmed by this Court when, in January of 2005, this Court stated:  "Do I think that Fernald ought to be sold and some other use made of it?  Sure, that seems very reasonable to me.  And I have always said the same thing.  I mean, the happiest day that -- those of us who care about this whole project, the happiest day that we will achieve is when there is no more need for anyplace like Fernald, where we don't have retardation anymore.  We have always talked about that.  Or when it comes about that the people who are residents at Fernald can be placed in the same quality someplace else with the same positive effect that is consistent with the decree.  And I will enforce that part of it too."  Transcript of Court Hearing, January 20, 2005, at 13.

[26]  *See Ricci v. Okin*, 781 F. Supp. 826, 828 (1992) ("The court is not opposed to the eventual closing of Dever or any other Consent Decree facility.")

[27]  In fact, this Court has said in these cases:  "'Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead [a court] to change what was decreed after years of litigation with the consent of all concerned.'"  *Ricci v. Okin*, 537 F. Supp. 817, 825 (1982) (quoting *United States v. Swift & Co.*, 286 U.S. 106, 119 (1932)).  A decade later, the Supreme Court's *Rufo* decision relaxed considerably the Rule 60(b) standard for modification of consent

The Department's discretion to "implement innovative services" and to "allocate its resources to ensure equitable treatment of all its citizens" would undoubtedly be jeopardized by the Proposed Order. The Proposed Order would require the Department, in communicating with FDC residents and their guardians or families, to present the FDC as an available residential placement into the indefinite future. This effectively requires the Department to continue to operate the FDC indefinitely since the Department would not mislead families into offering future placement at the FDC as an option if the FDC were not, in fact, an available option.[28]

Since the signing of the Final Order in 1993, the Department has transferred hundreds of individuals from developmental centers to more home-like, community-based residences. These individuals have been transferred from their institutional homes of many years either during an ICF/MR's phase-down or closure process or in response to the carefully considered decisions of individuals (or the substituted decisions of their guardian/family members) who have chosen to receive services in a less restrictive community setting. For many years, the Department has had great success in the planning of, transition into, and eventual residency of former facility residents in more home-like community settings – including many instances in which individuals were initially opposed to the idea of leaving an ICF/MR. *See* Affidavits of Terry O'Hare and John Riley, attached hereto as Exhibits A and B, respectively.[29]

---

decrees, *upon request of a governmental defendant*, but the basic point that a court should not lightly tamper with a final judgment (whether sua sponte or at a plaintiff's request) still applies.

[28]    The Court's Proposed Order, which would apparently permit the families and guardians of Fernald residents to exercise a controlling preference for keeping their wards at the FDC, is also inconsistent with the Court's own statements throughout the history of this litigation. *See, e.g., Ricci v. Callahan*, 576 F. Supp. 415, 417 (1983) ("This court . . . [has] stated repeatedly that it had no preference as to where the retarded were cared for -- community or institution. The court's only concern was that the care be proper and adequate to meet the human rights of affected retarded citizens.")

[29]    Considering the size, staff, and infrastructure differences, distinctions will always exist in how services are coordinated for residents of a community home as compared to how services are delivered to individuals who reside in an ICF/MR operated on a medical model. The critical inquiry

Importantly here, the Court Monitor found that the 49 individuals transferred from Fernald since early 2003 *were* receiving equal or better services in the new location.  Given the Court Monitor's findings that all of the individuals transferred from Fernald are now receiving the same quality services in their new locations, in compliance with the Final Order, this Court should now enforce that portion of the Final Order that gives the Department the discretion to provide services to individuals in a location other than FDC so long as the equal or better standard is met.  And this discretion should be honored not to facilitate the sale of the land, which will in any event be a matter for the Legislature to decide, but rather to allow the Department to (1) serve individuals in the least restrictive environment as required by law, and (2) equitably distribute its resources to serve all citizens with mental retardation.

IV.    THE PROPOSED ORDER LACKS A PROPER LEGAL BASIS FOR THE ADDITIONAL REASON THAT FDC CLASS MEMBERS HAVE NO CONSTITUTIONAL OR STATUTORY RIGHT TO ICF/MR SERVICES IN A PARTICULAR LOCATION.

The Fernald plaintiffs have no constitutional or statutory entitlement to services in a particular location; for example, at the FDC.  Construing nursing home residents' right to receive Medicaid state plan services (in that instance nursing home services) in a particular location, the Supreme Court held that, "[w]hether viewed singly or in combination, the Medicaid provisions relied upon by the Court of Appeals do not confer a right to continued residence in the home of one's choice."  *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 785 (1980).  In this context, no provision of Title XIX confers on FDC residents the "right to continued residence in the [ICF/MR] of one's choice."  Stating the question as "whether the patients have an interest in receiving benefits for care in a particular facility that entitles them, as a matter of constitutional

---

is whether the ISP-identified needs of the individual are being met.  As discussed above, the Final Order certainly recognized and implicitly determined that services provided in the community can be equal to or better than the services provided in an ICF/MR.

law, to a hearing before the Government can decertify that facility," *id*. at 784, the *O'Bannon* Court concluded no such entitlement existed. *Id.* In so holding, the Supreme Court affirmed the State's authority to close a facility where necessary Medicaid services were available in another location.

The Fifth Circuit Court of Appeals has recognized that "the state reserves the right to unilaterally close a state school [for the mentally retarded] for administrative or financial reasons, even if it means that certain residents will have to relocate as a result." *Baccus v. Parrish*, 45 F.3d 958, 961 (5th Cir. 1995). Other federal district courts have applied the *O'Bannon* holding to the ICF/MR closure context. *See Alexander v. Rendell*, no. 3:05-cv-00419-KRG (W.D. Penn. 2006) (copy attached hereto as Exhibit C)("The Court concludes that the Defendants' closing of the Altoona Center and its plan for transfer of its residents serves both the public policy of the ADA, Rehabilitation Act and the applicable Medicaid statutes and proper judicial deference to the discretion of the state in determining the manner in which it allocates its resources[.]"); *Lelsz v. Kavanagh,* 783 F. Supp. 286, 298 (N.D. Tex. 1991)("[t]he State has always possessed the power – and frequently exercises the power – to relocate its residents for its own administrative needs. If it is so desired, the State could unilaterally close any of the state [ICF/MRs] for economic reasons or otherwise.")

Here, as in *O'Bannon*, the Commonwealth will continue to provide needed services to any FDC residents who are transferred, consistent with their individual service plans within another service setting. The Commonwealth currently operates, in addition to the FDC, the Monson Developmental Center in Palmer, Glavin Regional Center in Shrewsbury, the Templeton Developmental Center in Templeton, Wrentham Developmental Center in Wrentham, and the Hogan Regional Center in Danvers. The Court Monitor visited and reviewed these facilities, and found all to be in compliance with Title XIX; all are well maintained and employ

competent and caring staff.   Monitor's Report at 2-7.   The Monitor found "comprehensive medical care" at Hogan Regional Center and "sophisticated medical services and supports to address complex medical needs" at Monson Developmental Center.   *Id.* at 4.   Both Wrentham and Hogan have the same array of recreational facilities -- i.e., a fully accessible indoor pool and large gymnasium -- as well as day programming areas, "vocational, recreational and other learning and interactive programs."   *Id.* at 3.   Despite the variations in the staff or special programs at each ICF, all are fully certified, Title XIX facilities capable of providing services of equal or better quality to residents of FDC.   In fact, over 35 Fernald residents have chosen this option since 2003 and made successful transitions to these other ICF/MR facilities.   *Id.* at 14.

V.   IN THE ABSENCE OF A CONSTITUTIONAL VIOLATION OR VIOLATION OF FEDERAL LAW, THIS COURT HAS NO AUTHORITY TO INTERVENE IN A MATTER OF STATE POLICY.

A.   **This Court Must Respect the Commonwealth's Policy Choices in the Absence of a Violation of Federal Law.**

As explained above in Point I.B., when contemplating an order that affects the operations of local governmental units, federal courts must be "ever mindful that the 'legal justification for displacement of local authority . . . is a violation of the Constitution [or other federal law] by the local authorities.'"   *Mackin v. City of Boston,* 969 F.2d 1273, 1275-76 (1st Cir. 1992) (quoting *Board of Education of Oklahoma City Public Schools v. Dowell*, 498 U.S. 237, 248 (1991)). "Because of this inherent limitation upon federal judicial authority, federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation[.]"   *Id.*, quoting *Milliken II* at 282.

Here, the "condition" of apparent concern to the Court is the Commonwealth's dual-headed policy of (a) streamlining its service delivery system so as to ensure an equitable and rational allocation of its limited resources; and (b) encouraging placement of its clients in the least restrictive setting possible.   Neither aspect of the state's policy is unconstitutional or

violative of federal law.  In fact, the Department's policy is entirely consistent with the holding

in the *Olmstead* decision.  *Olmstead* speaks of "the states' obligation to administer services [to

persons with mental disabilities] with an even hand."  527 U.S. at 597.  *Olmstead* also affirmed

the right of state MR/DD agencies to decide whether individuals in their care should be steered

toward community placements.  *Id.* at 602 ("the State generally may rely on the reasonable

assessments of *its own* professionals in determining whether an individual 'meets the essential

eligibility requirements' for habilitation in a community-based program") (emphasis supplied).

    B.  **The Decision Whether to Close the FDC Is a Matter of Significant State Public Policy, with Far-Reaching Consequences, in Which the Court Should Not Intervene, Absent a Proven Violation of Federal Law.**

        1.  <u>Massachusetts Policy Favors Community-Based Services</u>.

The Department has a long-established policy preferring integrated community settings to

ICFs/MR, which policy is reflected in the Final Order in this case, as well as in the Department's

regulations.[30]  Pursuant to those regulations, the Department is required to provide services that

protect health and safety while giving individuals an opportunity to receive services in the "most

normal" setting possible.  In accordance with this standard, and consistent with the federal

mandate to provide community-based residential and non-residential services for individuals

with mental retardation, the Department has, in the 14 years since the Final Order, steadily

reduced its ICF/MR capacity while concurrently creating a community-based residential system

to serve adults with mental retardation.  The capacity of the community-based residential service

system has grown to accommodate the demands of *Ricci* class members and others.  At the same

---

[30]  In describing the ISP regulations that govern the delivery of services, the Final Order states that "[t]hose regulations shall guarantee that each class member be provided with the least restrictive, most normal, appropriate residential environment together with the most appropriate treatment, training and support services suited to the person's individual needs." *Id.*, n.2 (823 F. Supp. at 987 n.2).  The "least restrictive" standard is also the applicable regulatory standard for the Department's services.  *See* 115 C.M.R. § 6.20(3).

time, there has been substantial growth in community-based day services and supports to families caring for their family members with mental retardation at home.  *See* Affidavit of Larry Tummino, attached hereto as Exhibit D, ¶ 10.  This includes services and supports to individuals with severe to profound retardation, and individuals with complex medical and behavioral needs. *Id.*  DMR has adequate capacity to meet the needs of all FDC class members in the community or, if families choose and it is appropriate, in an ICF facility.

      2.    <u>Massachusetts Policy Is Consistent with the National Movement Towards Community-Based Services.</u>

The decision to phase out one of the Commonwealth's six intermediate care facilities for the mentally retarded was and is consistent with the national movement away from institutional services and towards more integrated, less restrictive community-based services for all individuals with mental retardation.[31]  Particularly as the demand for community-based services grows, while the demand for institutional services declines, states require the flexibility to allocate resources fairly, and to re-balance the system towards more community-based services.[32] In order to meet this demand, most states, including Massachusetts, have increased their spending on community-based services,[33] while concurrently reducing their spending on higher-cost institutional services.[34]  Many states have closed unneeded facility capacity to allow for the continued expansion of community-based services.[35]   Indeed, several of Massachusetts'

---

[31]   The national census of developmentally disabled residents of public institutions has gone from nearly 150,000 in 1977 to less than 42,000 in 2004 -- a 73% reduction.  David Braddock, *et al.*, "The State of the States in Developmental Disabilities" (8th edition 2005) at 1.   The University of Colorado's Coleman Institute for Cognitive Disabilities published this monograph with support from the Administration on Developmental Disabilities at the United States Department of Health and Human Services.

[32]   *See id.* at 2, 7, 8, 9, and 15.

[33]   *Id.* at 16.

[34]   *Id.* at 15-16.

[35]   *Id.* at 48, 49-51.

neighboring states -- New Hampshire, Vermont, Maine and Rhode Island -- have eliminated all large (more than 16 person) ICF/MR capacity.[36]    Nationally, and in Massachusetts, as the institutional census continues to drop, and average daily costs of institutional care continue to rise, further efforts to consolidate or close institutional capacity can be expected.[37]

The cost of institutional care, and the lack of demand for it, is one reason states have moved away from ICF/MR care. [38]   In Massachusetts, the average daily cost of services at the FDC is over $700 person per day, or $259,000 per person annually.   This is more than **2.5** times the average cost of residential community-based services, which currently stands at $102,103, inclusive of day and transportation services.   Tummino Aff., ¶¶ 17-18.   Although the FDC costs are high in part due to transfers in the past several years and the resulting reduced census, all of the Department's other ICFs have rates between $433 and $590 per day, and all have a declining census.   *Id.* at ¶ 17.   Thus, the costs of operating six ICFs in Massachusetts will continue to increase in actual terms, as wages and variable and fixed operating costs increase, and will also increase in per-person costs as the demand for ICF services remains flat or declines and ICF residents age and die.   *Id.*

The continued expenditure of such a large percentage of the Department's resources to fund the services provided to the comparatively small number of individuals in the Department's six facilities impedes the development and expansion of community resources that are necessary to serve the growing population of individuals who receive services from the Department in community-based settings.   The disparity between the costs of providing services in the facility

---

[36] *Id.* at 48-49.

[37] *Id.* at 52, Figure 21.

[38]    "Financial constraints," of course, "are a legitimate concern of government defendants in institutional reform litigation[.]"   *Rufo*, 502 U.S. at 392-93.   This Court has recognized that "[t]he Commonwealth has always had limited resources" to devote to the needs of the population afflicted with mental retardation.   *Ricci v. Okin*, 537 F. Supp. at 836.

system versus the community system will continue to intensify as the facility census continues to decline and facility costs escalate due to limitations on the Department's ability to consolidate. For all of the above-stated reasons, the Proposed Order threatens "the public's right to the sound and efficient operation of its institutions." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 381 (1992).

## VI. THE MONITOR'S SPECULATION REGARDING POTENTIAL HARM TO TRANSFEREES CANNOT FORM THE BASIS FOR AN ORDER THAT RESTRICTS TRANSFERS FROM THE FDC.

The Monitor's "Final Assessment" relating to the emotional impact of the transfer of residents from the FDC on families, and the potential psychological or physical impact of closure on the remaining FDC residents, fails to respect the law of the case, which vests (by means of the Final Order) authority in the Facility Director, not the Court Monitor, to determine satisfaction of the "equal or better" service delivery standard. The Monitor's "Final Assessment" is also inconsistent with the Department's thirty years of experience with closures.

### A. The Department Has Successfully Closed Three Facilities with Careful Planning and Without Harm to the Former ICF/MR Residents.

The Department's experience with closing facilities, and the movement of hundreds of people similar to the FDC residents from facilities to community-based residences, empirically demonstrates that carefully planned and well executed transitions to community programs – or to facility based programs – can be accomplished without harm to the individuals involved and, in most instances, can lead to an enhanced quality of life. In contrast, the Monitor's assessment,[39] based upon several meetings with family members, regarding the potential harm to FDC residents resulting from a transfer to another ICF/MR or to a community residence is, quite simply, misinformed. As described below, thirty years of experience with closing large

---

[39]    *See* Monitor's Report at 24 ("For the severely mentally retarded, such a loss of familiar surroundings and most importantly people, could have devastating effects that unravel years of positive, non-abusive behavior").

institutions across the country, and here in Massachusetts, has demonstrated that with careful planning and attention to each individual's physical and psychological needs, along with coordination with familiar staff in the transferring facility and receiving program, any potential negative effects from the transfer can be avoided. Further, past experience has clearly shown that the outcomes for transferred individuals can be and are demonstrably positive. Nor is the situation here – in terms of the widespread opposition to transfers by many families or guardians as well as the demographics of the residents of the FDC – unique or even markedly different from the circumstances at other facilities successfully closed by the Department. O'Hare Aff., ¶¶ 11-22; Riley Aff., ¶¶ 7-10.

The Court Monitor's views, resting upon interviews with family members and guardians, and his awareness of general opposition to further transfers, is far too slender a reed upon which to base something like the Proposed Order which, as described above, would restrict transfers from the FDC. In the *O'Bannon* case, Justice Blackmun, in a concurring opinion, observed that "[s]ubstantial evidence suggests that 'transfer trauma' does not exist, and many informed researchers have concluded at least this danger is unproved. Recognition of a constitutional right plainly cannot rest on this inconclusive body of research and opinion." 447 U.S. at 804.

The Department has consolidated and closed a number of facilities in the last decade.[40] Since fiscal year 1992, DMR's facility population has declined from 2,643 to 972 (805 of whom are *Ricci* class members) in FY07. Tummino Aff., ¶ 4. More than 1,200 people have moved out of the large facilities in this time period, with the vast majority opting for community placement. The history of movement of individuals from the Department's closed or consolidated facilities, and the lessons learned about how to effectively overcome family fear and anxiety about

---

[40] These include the Belchertown State School (1992), the Dever State School (2002), and the J.T. Berry Regional Center (1995).

community placement, and how to transition adults with mental retardation to new surroundings with or without familiar staff, have informed and continue to inform the planning process for individuals at FDC.

### 1. The Closures of the Belchertown and Dever ICF/MR Facilities

The closure of the Belchertown State School ("BSS") was announced in 1989.  O'Hare Aff., ¶ 10.  At that time, there were 285 people living at the facility.  *Id.* at ¶ 11.  The population at BSS was not unlike the current population at FDC.  According to one survey, 86% of BSS residents were severely or profoundly mentally retarded.  *See* HSRI Report, attached to the O'Hare affidavit as Exh. TO-1, at 11.

Immediately after the announced closing some families and advocates expressed grave concern for their family members' future, most often expressing concern for their health and well-being, the loss of close relationships with caregivers, the inability of the community system to support their family member, and the loss of the only real home that so many living there knew.  O'Hare Aff., ¶ 15.   Working with families and advocates, Department staff developed several basic principles to guide the community placement process.[41]  *Id.*  In addition, a key lesson drawn from the BSS closure experience was the importance of phasing down and closing the facility within a pre-announced and defined time period.  *Id.*, ¶ 16.

Despite the ample family advocacy and support services available, and the leadership of Dr. Benjamin Ricci, who supported the closure, many families were angry when the closing of the BSS facility was announced.  *Id.,* ¶ 18.  Several families expressed great concern about the

---

[41]   These principles included the following:  (1)  providing each individual with services developed to substantially meet all their needs, as stated in their ISP; (2) individuals and their family members would be closely involved in all aspects of the placement planning and would have choices about their future home; (3) choices would include community vs. facility, as well as state operated homes vs. vendor operated homes; (4) the location of the community-based home would be based on family, friends, work, or other important factors;  and (5)  services on campus would be maintained and the Department would continue to provide excellent care until the last person left the facility.  *Id.*, ¶ 16.

closing both in group meetings and in individual meetings and phone calls.[42]  DMR staff learned to listen to the apprehension, fear, and concern and sought to respond to that feedback in the individual plans being developed.  *Id.*   Through these efforts, and the encouragement and involvement of families in placement planning from the very beginning, ultimately a significant level of family satisfaction in the placements (*all* of which involved community settings rather than ICFs) ensued.  Id., ¶¶ 20-21, 28, 34.[43]

The Dever closure commenced in 1993.  At that time, there were 289 individuals living at the facility.  Riley Aff., ¶ 7.  Many had lived at the facility for nearly their whole lives. One resident had lived there virtually since its opening in 1946.  *Id.*   The characteristics of Dever residents were very similar to those in all of the other DMR facilities.[44]

By 1997, the number of residents at the facility had declined to 82.  *Id.*, ¶ 8.  Placements into the community had proceeded steadily, with a small number of people opting for transfer to another ICF/MR.  *Id.*  Of the 289 residents of the facility at the time of issuance of the closure plan, nearly all made a successful and productive transition to community living.  *Id.*, ¶ 9.  At the conclusion of the closure process, only 12 residents transferred to other large, congregate facilities.  *Id.*  For many individuals and their families, the decision to move from Dever was a difficult decision, which they approached with some degree of apprehension.  What most came

---

[42]   Concerns ranged from general apprehension, to anger, to fear.  Some expressed worries about their wards' health and safety, vulnerability, lack of friends, not knowing who was in charge, access to emergency services, and their concerns about not knowing where their son or daughter would be in a few years.  O'Hare Aff., ¶ 18.

[43]   Following the BSS closure, the Department contracted with Human Research Services Institute (HSRI) to conduct a follow-up survey to assess family and guardian satisfaction with both the transition process and community-based services.  The results of that survey indicate that of the 129 respondents (just shy of a 50% response rate), the overwhelming majority was very satisfied with services in the community.  *See* O'Hare Aff., ¶ 11; Exh. TO-1.

[44]   About 80% of the remaining 195 individuals still residing at Dever two years after the closure plan was announced were profoundly mentally retarded.  A significant number were blind, and/or deaf, had severe maladaptive behaviors, or were severely mobility-impaired.  Riley Aff., ¶ 7.

to realize, however, was that community living offered an exciting opportunity to experience a style and rhythm of living not possible in a large congregate facility. *Id.* Further, it became apparent that with proper support planning, the development of appropriate housing, and adequate resource allocation, community living could become a reality for *any* resident of the facility. With very few exceptions, the feedback received from the former facility residents themselves and/or their families was extremely positive, and this was true without regard to the level of mental retardation or the level of support needed by the individual. *Id.*

Many individuals were also able to move into their new homes with familiar staff from the facility that had transitioned with these individuals to community-based residences as a result of an unprecedented "Social Unit Agreement." *Id.*, ¶¶ 10, 16.[45] As the Dever closure proceeded, every effort was made to keep families involved and informed.[46] Although not all families and guardians were in full agreement with the process and/or outcome due to their insistence that Dever remain open, each family was fully engaged by facility staff and included to the extent that they would permit. *Id.*, ¶ 17. Despite the vocal opposition of a number of families to the

---

[45] During the Dever closure period, the Department reached a unique labor agreement with what was then known as the "Alliance," which was comprised of American Federation of State, County and Municipal Employees (AFSCME), Council 93, and the Service Employees International Union, Local 509. Riley Aff., ¶ 16. This agreement addressed a common concern on the part of guardians and family members that long-term relationships between residents of the facility and their caregivers would be ruptured by movement from the facility. *Id.* The agreement provided that at least 60% of new community residential programs would be staffed by state employees, and that a large number of professional staff would be transferred to the community system. *Id.* At the same time, the facility administration was able to offer transfers into community residential homes for staff who had close personal relationships with the residents who would be living in those particular homes. This resulted in the preservation of a large number of meaningful relationships. *Id.* It also facilitated the transfer to the community system of hundreds of direct care personnel and a large number of clinical positions, including Social Workers, Qualified Mental Retardation Professionals ("QMRPs"), Vocational Rehabilitation Coordinators, Vocational Instructors, Licensed Practical Nurses, and Habilitation Coordinators. *Id.*

[46] Regular letters and the Dever newsletter were sent to family members, and they were given access to the Facility Director nights and on weekends (as well as during normal working hours). Riley Aff., ¶ 17. Clinical staff often traveled to families' homes when travel to Dever proved difficult. *Id.*

closure of the facility, reportedly there was not a single ISP appeal during the course of Dever's closure. *Id.*, ¶ 19.

   2. The FDC Phasedown Process

   Very soon after the Department made the 2003 Fernald closure announcement, Commissioner Morrissey convened a Steering Committee comprised of senior staff[47] who became involved in all aspects of the phase-out process. The Department also convened meetings with external and internal stakeholders.

   The framework for Fernald transition activities was derived from work undertaken during the closures of Belchertown (BSS) in the late 1980's and early 1990's, the Berry Campus in 1995, and the Dever Center phase-out (from approximately 1992-2002). Third Affidavit of Diane Enochs ("Enochs Aff."), attached hereto as Exhibit E, at ¶ 8.[48] In each case, the Department succeeded in transferring individuals of all ages, disabilities, and medical needs from these ICFs/MR to community-based settings.[49] *Id.*, ¶ 42.

   DMR improved many of the tools and processes developed for these prior closures and incorporated them into the planning process for phasing out the FDC. The enhanced FDC transition tools and processes are designed to inform and involve families and residents at all stages; to develop the most seamless transition possible; and, most importantly, to develop a

---

[47]   The Steering Committee includes individuals with many years of experience in maintaining Title XIX compliance, quality assurance, active treatment, individual service planning, building and capital issues, and community programming, placement and systems. Enochs Aff., ¶ 5.

[48]   The Department has also utilized a person-centered approach when transferring individuals independently of a facility closure – *i.e.*, in response to the requests of residents/guardians who wish to proceed with placements to less-restrictive, community-based settings. *See* Community Placement Survey 1993 – 1998: Monson Developmental Center (April 1999), attached to the Enochs Affidavit as Exhibit DE-2.

[49]   *See also* "From the JT Berry Regional Center to Community Living – Final Progress Report (1993 – 1996)," Seaside Associates, Inc., attached as Exhibit 12 to Defendants' Opposition to Plaintiffs' July 14, 2004 Motion to Reopen and Restore Case to Court's Active Docket (filed August 16, 2004 as docket no. 8) ("DMR Opposition").

person-centered transition plan to ensure that all needed services are planned for and provided in the new location. *Id.*, ¶¶ 8, 42, 47.

As it did at Belchertown and Dever, the Department utilized the "Placement Profile" tool at Fernald to compile information from individuals (families or guardians), from their Individual Support Plan ("ISP") teams, and from other existing documents to compile necessary planning information. For example, DMR staff solicited information regarding the desires and the interests of an individual (and/or their family or guardian) regarding home and day services. This information guided staff in their search for homes and day programs by: focusing attention on certain preferred geographic locations; alerting staff to individual needs (e.g., knowing that an individual uses a very large electric wheelchair is critical when looking for an accessible home); and surfacing important considerations such as specific preferences regarding housemates. *Id.,* ¶¶ 9, 10.

In January of 2004, the Department began compiling Placement Profiles for FDC residents. The Department mailed the profile forms to all families and guardians to solicit preferences in terms of facility or community placement, geographic location, co-relocation with staff or familiar friends, etc. Thereafter, the FDC staff contacted all families and guardians by telephone to solicit similar input.[50] *Id.*, ¶11.

For those individuals transferred from the FDC prior to the injunction, once families were engaged and an actual placement was identified, the individual transition planning (ITP) team began its work.[51] Placement planning included extensive information sharing between the FDC

---

[50] Unfortunately, due to the ongoing litigation over DMR's plans and the frequently stated belief that no closure would occur, many families refused to participate in this process, or were advised not to speak to DMR staff regarding the Profile. The Department again attempted to solicit input by mailing all the completed Profiles to families and guardians in June of 2004. *Id.*, ¶ 11.

[51] The ITP team is a dedicated group of staff who complete the work of finding and planning appropriate placements for individuals. This involves frequent travel to other residential and

ISP team and new service providers. This included ISPs, assessments, medical reports, legal documents, and intervention strategies. *Id.,* ¶ 14.

As the plan for each individual to move to a specific home and day program progressed, the FDC ISP and ITP teams met with the new service providers for a thorough sharing of information about the individual, including discussion of concerns the FDC teams had, if any, about how the person would adjust to a move, and the development of strategies to address those concerns. The ITP teams created transition schedules – detailing the visits the individual would make to the new home and day program. Following an individual's placement, the FDC ITP team and key members of the FDC ISP team remained in contact with the new service providers, as necessary, to provide support and advice about how to help the individual adjust. In each case involving a former FDC resident, whenever any individual showed evidence of adjustment problems, FDC staff provided direct assistance to the new service providers until the adjustment problems were satisfactorily resolved. *Id.*, ¶¶ 15, 18, 20-23.

3. Individuals Placed from the FDC and the Court Monitor's Report

Of the 43 individuals who left the FDC for either a community placement or placement in another ICF, the process described above was followed meticulously, and the results and outcomes for the individuals and families were uniformly successful. *Id.*, ¶ 25. As noted by the

---

program locations; on-going communication with ISP team members and other facility staff, individuals, families/guardians, and potential service providers; and a variety of management tasks such as identifying possible home groupings and locations based upon information provided by the ISP team and/or the individual, family or guardian. For each individual, the ITP team developed an individual transition plan, with copious input from others, including information in the following areas: (1) the individual's preparations for moving, including special information about: personal routines, relationships, and communication abilities; physical considerations and equipment needs; safety considerations; and health, medical and psychological considerations; (2) the individual's current ISP and a discussion of how the needs identified in the ISP would be met in the new setting; and (3) transition information, including contact persons to whom the receiving team could turn for assistance during and after the transition, identification of all new service providers; medical providers with first appointments specified; detailed information about family involvement in the transfer; and strategies for developing relationships between the individual and new housemates. *Id.*, ¶¶ 13-23.

Court Monitor, the Department offered Fernald families and guardians the choice of several different service models:  another facility, a group home, or shared living.[52]  Within these options there was also a choice of service providers – either private providers or state providers.  *Id.*, ¶ 65.  DMR also gave residents the option of returning to a facility placement if a community placement proved unsuccessful.  *Id.*

Many of Fernald's amenities are found in the Department's other facilities.  For example, the Wrentham Developmental Center and Hogan Regional Center both have indoor pools similar to the pool at Fernald.   Wrentham, Hogan, and Monson Developmental Center have gymnasiums.   Glavin Regional Center, Hogan, and Templeton Developmental Center have outdoor pools.  All DMR facilities are certified under Title XIX of the Social Security Act, and all have the capacity to meet the needs of individuals currently living at Fernald.  *Id.*, ¶¶ 66, 67.

For those nine individuals whose families chose community placement, the transition processes were thoughtful and caring.  They adjusted well to their new settings and were provided with an array of opportunities and experiences not available to them at Fernald, which resulted in an improved quality of life for them.  For the 34 individuals whose families chose transfer to Wrentham, Monson, or Hogan, a full array of ICF/MR services supplied by knowledgeable and caring staff are equal to the services provided at the FDC, and in most cases have resulted in improved opportunities for community outings and more spacious living quarters for individuals.   Those transfers also precipitated a high level of satisfaction.  Without minimizing in any way the potential for transfers to be disrupting, many of the individuals transferred and their families have said that the moves, while requiring adjustments, have been extremely positive for all concerned.  *Id.*, ¶¶ 25, 26, 28.

---

[52]   *See* Letter of July 1, 2004, attached as Exhibit B to Marianne Meacham's affidavit filed in connection with DMR's Opposition to the reopening of these cases (docket no. 2).

One service coordinator for an individual ("A") who moved to a community-based vendor-operated program in May of 2003 summarized A's transition this way:

> [A]'s transition was extremely successful and without incident or issue. He immediately became oriented and comfortable in his new surroundings. Behavioral, psychiatric, nursing support was all available to [A,] as was ongoing support from staff at Fernald in case [A] didn't transition well into his new surroundings . . .
>
> The most important and obvious changes for [A] is the increase in community membership: [he] frequently goes for walks to the local store and makes purchases, he has enjoyed day trips to New Hampshire and Maine, he is a member of the local yacht club, he has participated in countless community activities which have included picnics, concerts, dances, hosting seasonal parties, as well as some involvement with the local church. [A] has also reached a point where he is able to communicate when he wants to spend time outside in the yard, which he does safely. . . .

*Id.*, ¶ 28.    Several individuals echoed the experience that community placement allows individuals to experience new activities such as enjoying the aroma of food cooking in their own home and having neighbors over for a cookout. *Id.*, ¶ 29. For many individuals the transition was uneventful. *Id.*, ¶ 30. In some cases, the availability of familiar staff to assist with the transition shortened the adjustment period. *Id.* For some individuals in the community or at an ICF/MR, the moves placed them in much closer proximity to families, allowing more time for visiting siblings and elderly parents. In particular, for some aging parents with transportation challenges, this has proven very beneficial. *Id.*, ¶ 31. Most families and guardians have expressed a high degree of satisfaction with the new services. For example, A's family member commented in A's ISP in 2003:

> I find this I.S.P. report to be excellent and comprehensive. I am very pleased with [A]'s new home and workshop environment. I am always available to help with [A]'s needs and [I] plan on a continuing communication with the people that are assisting him in his growth. It was a "long one" but I was privileged to walk with my son to find his present destination.

To date, no FDC family whose family member was placed in a community setting has requested a return to an ICF/MR. *Id.*, ¶ 32.

The FDC residents who have made successful moves into other settings are not different from those currently living at Fernald.[53] Current FDC residents also share similar characteristics with the individuals who moved from Belchertown and Dever (and they do not differ markedly from many of the people the Department serves successfully in community-based residential settings).[54] *Id.*, ¶ 52. The Department has substantial expertise in preparing individuals for their placement, and in knowing how to ensure these individuals are well cared for, comfortable, and happy in their new homes. Individuals transferred from the ICFs/MR to homes in the community have received excellent care and thrived in a more home-like environment. The transfer of individuals from the facilities to the community homes has not been limited to young, healthy individuals with mild mental retardation, but has included many medically fragile individuals with intense health needs. Id., ¶ 54. The experiences of families and guardians who have made the decision to move their family member or ward from Fernald to a new home have been equally positive. Feedback from guardians of individuals placed from Fernald has been obtained through "satisfaction surveys" and includes the following three representative

---

[53] As of May 2007, there are 186 Fernald residents. Of this number, 131 fall into the profound range of mental retardation, 40 in the severe range, and 12 in the moderate range and 3 in the mild range. Ages of individuals residing at the facility range from 36 to 95 years old with an average age of 57. Only 38 people at Fernald are age 63 years old and over. In the area of mobility, 72 are mobile while 114 are non-ambulatory. Enochs Aff., ¶¶ 50-52.

[54] Of the 156 individuals who transferred from Monson to community-based settings from 1993 to 1999, approximately 10% were between the ages of 26 and 35 years of age; 36% were between 36 and 49 years of age; and the remaining 54% were over 50 years old at the time of placement. The youngest person placed was 26, the oldest person to move into a community home was 86 years of age, and the overall average age at placement was 51 years old. In terms of ability to ambulate, 47% were independently ambulatory, 15% required one-to-one staff assistance and/or a walker, and 38% used a wheelchair and staff support. All of the individuals required 24-hour staffing/supports, and all were provided with jobs, day activity programs, or retirement options, depending on their skills, interests, and preferences. Out of all the placements made during this six year period, 78% moved to a community-based residence housing 2 to 4 people, 8% moved into homes with 5 to 8 housemates, and 14% moved into a shared living situation with a family or non-disabled housemate. *See* Monson Community Placement Survey, attached to the Enochs Affidavit as Exhibit DE-2, at p. 1.

responses:[55]

1  "In the beginning I was quite hesitant about moving [X] from the only home she's known for over fifty years.  As time went on it was obvious that the inevitable was going to happen, Fernald would be closing.  I had to do what was best for [X] in the long run.  She moved to [new home] and quite surprisingly the transition went extremely well.  I know that this was due largely to the wonderful staff at both Fernald and [new home].  [X] is healthy and happy and has settled in quite comfortably in her new home."

2  "I am very pleased overall with [Y]'s new home.  The moving process went very smoothly and quickly. . . .  We were worried about how she would adapt to her new environs but she did so with no problems whatsoever.  I am pleased with the staff and facilities at [new home] and although we all miss the great staff at Fernald, her new environment is so much better overall.  This move ended up being more beneficial to her in the end, and would have been better even if Fernald were not closing."

3  "The involvement of [two ITP team members and another Fernald staffer], was beyond anything I anticipated.  The move was thorough and smooth.  [Z] has been at [new home] for a year and content and happy and we are more than pleased with his situation [there].  It has also given us the opportunity to visit more with him.  In summary, I could not have asked more of all the people involved both at Fernald & [new home]."

Staff in direct support roles play a very important role in individual's lives, ensuring that the care and well being of individuals with mental retardation is carried out in a professional, individualized, and compassionate manner.  Although some staff and individuals develop close personal relationships, these relationships cannot be guaranteed by DMR in any setting since staff may choose to terminate employment or transfer to a new work site for personal reasons.  Nevertheless, the Department recognizes the value of long-term relationships between individuals and the staff who care for them and supports these relationships in whatever ways are possible.  *Id* ., ¶¶ 58, 59.

DMR has tried to support these relationships and to retain its valuable, experienced staff by attempting to engage the unions at Fernald in discussions about continued employment of

---

[55]  Nine separate family survey responses have been summarized in the affidavit of Diane Enochs but, for space reasons, only three are reprinted above.

union members in other settings.  One union, Local 509, has worked with the Department and, as a result, reached an agreement that will result in the retention and re-employment of talented DMR clinical staff in other DMR locations, many of whom will support individuals leaving Fernald.  *Id.*, ¶¶ 61, 62.

### 4.  Current Alternative Options for FDC Residents

As of today, there are 186 residents still at the FDC.  *Id.*, ¶ 70.  Of these, 24 reside in four smaller, recently updated, units on the part of the Fernald campus known as Malone Park.  If the FDC closes, Malone Park will remain open and be operated as four, six-person, state-operated community residences.  Familiar staff are expected to remain with the residents there.  Further, it is anticipated that as individuals at the FDC age and develop certain medical conditions, over the next two years an estimated ten persons likely will be recommended for skilled nursing care on the Fernald campus at the Marquardt Skilled Nursing Center, which has a capacity to serve 29 individuals.  *Id.*

There is currently adequate capacity at the Department's five other ICFs to accommodate the remaining 152 residents from FDC.  Alternatively, in addition to a robust capacity in its existing service system, the Department has completed construction of 40 new, fully accessible, state-operated, community residences in geographic locations that are near to FDC family members and guardians, and which are now ready to accept FDC residents.  *Id.*, ¶ 71.

### 5.  The Monitor's Recommendation for a Fernald "Postage Stamp" Presence

Although an individual may live in a facility for many years, most individuals move from time to time from one residence to another within a facility, living with different people, and supported by different staff.  As the needs of individuals who live at a facility change, and as the facility itself undergoes various changes, there are naturally-occurring shifts in the overall pattern of needs of individuals which DMR considers in order to determine the most effective

utilization of facility resources to support the entire population.  This often involves building and/or unit consolidations, as well as redeployment of staff to ensure appropriate staffing levels for all individuals.  Staff may have primary work locations within a facility; however, the collective needs of all the individuals in the facility are the primary consideration in the daily deployment of staff.  Staff who have direct support roles are expected to know and provide individualized support to people.  *Id.* ¶ 57.

Plaintiffs' advocates and the Court Monitor have implicitly recognized the Fernald residents' capacity to adjust to new living environments with their suggestions to "condense" the campus and build "new residential homes on the land and have support services for the[] residents at Fernald."  *See* Monitor's Report at 26 (discussing the so-called "postage stamp proposal").  The Court Monitor's recommendation for a continued, albeit smaller, operation at Fernald, aside from requiring a shuffling of FDC residences around the campus, fails to take into account the significant investment that would be needed to maintain ongoing service programs at Fernald.  In 2001, as part of DMR's strategic planning initiative, a Facility Planning Workgroup formed to review and consider the future need for and use of the Department's ICF/MR facilities. *Id.*, ¶ 72.  This workgroup examined the projected capital needs of each ICF/MR facility. Several types of projected capital needs were reviewed and compared for each facility.[56]  The estimated costs were based upon an on-site survey (commissioned by the state's Division of Capital Asset Management and conducted by the engineering firm of Parsons-Brinkerhoff) that assessed:  (1) expenditures necessary to keep each facility operational, and (2) the costs of bringing each facility into compliance with ADA accessibility requirements.  The projected capital costs for Fernald were estimated at $14.3 million to keep FDC operational, and $ 41.2

---

[56]  *See* "Report of the DMR Facility Planning Working Group," p. 26 (copy attached to the Enochs affidavit as Exhibit DE-5).

million to bring the facility into ADA compliance.  *Id*., ¶¶ 73, 76.

DMR staff also did a "self-assessment" of projected costs to keep Fernald operational, reaching an estimate of $13.7 million, which did not include an additional $6.2 million for the installation of individual boilers in the remaining buildings at Fernald (since the existing power plant is in poor condition and will require replacement soon).  *Id.*  These estimates, in 2001 dollars, are likely to be significantly understated today due to inflation and other changes.[57] Hence the proposal to maintain a "postage stamp"- sized ICF facility on the Fernald campus would require significant new appropriations in order to meet the capital needs of the facility.  In DMR's judgment, this is not the best use of scarce fiscal resources.

### B. Research Shows that Careful Transition Planning Mitigates Any Potential Trauma.

One of the nation's preeminent experts on individuals with developmental disabilities, Dr. Tamar Heller,[58] maintains that "it is now possible to place people with even the most severe intellectual disabilities, complex medical needs, and behavioral challenges into community programs."  Heller Aff., ¶ 5.  In the course of doing so, in a limited number of cases, a phenomenon some call "transfer trauma" (albeit the proper terminology is hotly debated in the field) has been observed.  This phenomenon "is a short term (under two months) response that can result in behavioral disruptions and stress reactions, but the situation usually improves if the new setting is suitable to meet the needs of the resident."  *Id.*, ¶ 8.  According to Dr. Heller, "[k]ey steps for avoiding transfer trauma include:  (1) providing sufficient information to

---

[57]  Fernald was ranked "Number 1" in needed capital improvements as compared to all the other DMR ICFs.  *Id.*

[58]  Professor Heller is the Head of the Department of Disability and Human Development at the University of Illinois at Chicago.  *See* Affidavit of Tamar Heller, Ph.D., attached hereto as Exhibit H, at ¶ 1.  She has conducted research and written extensively over the past 25 years on the subject of transitioning adults with developmental disabilities from institutional to community-based settings. *Id.*

residents, staff, and families; (2) ensuring seamless transfer of information with visits and contacts by sending and receiving residential staff; (3) providing opportunities for visits to receiving residences; (4) developing individualized plans that take each resident's needs and preferences into account; (5) making sure that all needed supports are in place prior to the move; and (6) providing follow-up services by the staff at the previous residence." *Id.*

Dr. Heller has opined that "the transition processes developed for the Fernald transition are comprehensive and abide by principles that minimize 'transfer trauma' and facilitate smooth transitions and successful outcomes of placements. . . . The [individual transition plan template in use at Fernald] shows sensitivity to the preferences of people with disabilities and their families/guardians, attention to good principles of transition, including documentation of physical and psychological preparation for the move, and details regarding how individual support needs will be met." *Id.*, ¶ 33.

The Department also asked Dr. Heller to perform a review of expert studies that have examined the outcomes of transitions like those experienced by the 14 individuals who left FDC for a community placement between 2003 and 2006. Most of the numerous studies Dr. Heller reviewed "have reported improvements in adaptive behavior after community placements." *Id.*, ¶ 14. In general, researchers have found: "Improved self-determination and autonomy[;] [i]mproved satisfaction of families, who often opposed community placement initially[;] . . . [and] [g]reater life satisfaction reported by residents (who can reliably be interviewed) after moving to a community setting from an institutional setting." *Id.*, ¶ 15 (citations omitted).

"Overall," writes Dr. Heller, "there is no clear evidence that deinstitutionalization of adults with developmental disabilities results in higher mortality [rates].[59] Furthermore, there is

---

[59] In a review of 11 studies between 1960 and 1997 examining the impact of community placement on mortality of residents with developmental disabilities, a nationally prominent expert found no evidence of increased mortality for residents moving into the community. *See* Heller Aff., ¶ 10.

a large body of literature indicating improvements in quality of life for these residents in community placements." *Id.*, ¶ 17.

Dr. Heller notes, however, that "careful attention needs to be paid to the relocation process, by minimizing disruption; keeping communication flowing in both directions with residents, guardians, and staff; paying careful attention to preferences of residents and guardians; and by developing a seamless system in which needed supports are provided." *Id.*, ¶ 25. But in reviewing the Department's transition plan for the FDC, Dr. Heller "conclude[d], based on [her] best professional judgment, that the plan adequately addresses each of the concerns raised by the Court Monitor, and concerns commonly raised by critics of deinstitutionalization, and it adheres closely to the relocation principles [she] outlined" in her affidavit. *Id.*, ¶ 34.

VII.    THE COURT MONITOR'S CONCLUSIONS REGARDING HIGHER LEVELS OF ABUSE AND NEGLECT IN THE COMMUNITY SYSTEM ARE NOT SUPPORTED BY THE EVIDENCE AND DO NOT FURNISH A SUFFICIENT BASIS FOR THE PROPOSED ORDER (OR EVEN CONTINUED ACTIVE OVERSIGHT OF THE DEPARTMENT BY THE COURT).

While the Monitor found full compliance with all applicable federal laws, regulations, and court orders concerning "past and prospective transfer processes employed by the Department," the Monitor echoed, as a partial basis for his recommendation that FDC remain open indefinitely, the Wrentham plaintiffs' allegations regarding abuse and neglect in the community system. The Monitor made particular note of what he termed "a steady increase in allegations of sexual abuse and physical abuse in Vendor operated community residences." *See* Monitor's Report at 17.[60] The Report, however, contained no analysis of the data he received

---

[60] The Monitor wrote that he based this statement on his review of data provided by the Disabled Persons Protection Commission ("DPPC"), but it additionally appears to be strongly influenced by the assertions contained within recent pleadings of the Wrentham plaintiffs. *See* Plaintiffs' motions for clarification (docket no. 137 at pp. 9-12) and to supplement that motion with exhibits (docket nos. 143 and 146).

from the Disabled Persons Protection Commission (DPPC) regarding abuse.[61]   Both the Court

Monitor and the Wrentham plaintiffs have drawn faulty conclusions from the DPPC data.   The

Department's published data, and the data generated by the DPPC, demonstrate that there is, in

fact, no appreciable difference between the overall risk of harm from either physical or sexual

abuse across the two relevant settings:   (a) institutional or facility-based programs and (b)

community-based programs.[62]

### A. The Rate of Abuse and Neglect Is Not Increasing and Is Not Higher in the Community.

The Department serves over 23,000 adults with a range of disabilities in residential

settings, including individuals living independently or with family.   For these individuals, which

include almost 4,000 Ricci class members, the quality and safety of the Department's services

was recently re-affirmed in a national study that ranked Massachusetts' services for individuals

---

[61]   Additionally, it must be noted that the Court Monitor never fully identified the specific data and/or documents he relied upon in making his statements concerning abuse/neglect in the community system.   At page 17 of his report, he identifies "Vendor Survey Reports for all ICF/MRs dating back to January, 1996" as part of his review.   Next, the Monitor notes that he also reviewed "Vendor Survey Reports for State operated community residences and Contract Vendor operated community residences dating back to 2002" – suggesting a review of data from 2002 up through early 2007.   The Department was able to confirm that the DPPC provided the Court Monitor with Vendor Survey Reports concerning the ICFs/MR from 1996 to 2006, but that no information was provided to the U.S. Attorney regarding state-operated or vendor-operated community residences.   The DPPC did, however, provide Vendor Survey Reports [for three years only:  FY 2002, FY 2003 and FY 2004] to Wrentham Class Counsel, who presumably then forwarded copies to the U.S. Attorney's Office.   The Monitor denied DMR's repeated requests that he identify the specific DPPC data that he reviewed. Hence the Department presumes that his statements concerning abuse in "community homes" are founded upon his review of three years' worth of DPPC reports and an uncritical adoption of the allegations of the Wrentham plaintiffs.

[62]   In an effort to inflame matters and elicit continued Court intervention, Wrentham Counsel has taken the further step of citing to tragic or newsworthy instances of injury or harm suffered by individuals with mental retardation living in the community.   These incidents have been cited to suggest "systemic" problems in the community and imply DMR complicity in the unfortunate circumstances.   *See* Plaintiffs' Motion for Clarification, Document No. 137, at pp. 10 – 11.   Plaintiffs have carelessly rehashed these tragedies regardless of whether the individual is a Ricci Class Member, or even receives DMR-funded services.   Almost none of the instances cited in the Plaintiffs' Memorandum involved Ricci Class Members; one incident was from over 14 years ago, and one involved a 9 year-old child who did not even receive DMR-funded services.

with intellectual disabilities and developmental disabilities fourth in the nation in "promoting independence and productivity in safe, quality community settings." *See* United Cerebral Palsy's "2007 Case for Inclusion Report, An Analysis of Medicaid for Americans With Intellectual and Developmental Disabilities."[63]  With regard to the sub-category "Safety," Massachusetts was ranked number **two** in the nation in protecting individuals from harm with approximately *one percent* of individuals served requiring protection and advocacy services.  *Id.* at p. 13.  As described below, the Department's initiatives with regard to the reporting of suspected abuse, and its close collaboration with the DPPC and the District Attorneys' offices, are part of a comprehensive, systemic effort to keep individuals safe from abuse.

1.  The Department's Methods of Reporting, Investigating, and Correcting Abuse and Neglect in its Facilities and Community System Are Comprehensive and Effective.

The Department has thorough and comprehensive oversight and investigative systems in place that seek to ensure that clients are protected from harm.   Department staff presented a multi-hour overview of these systems to the U.S. Attorney's Office and to plaintiffs' counsel, and they followed up by answering numerous inquiries posed after the presentation.[64]  The Department's quality assurance and monitoring systems have been designed to protect individuals who receive a wide spectrum of services from the Department:  from 24-hour residential services to individuals living independently or at home with their families.[65]  These thorough and robust systems seek to ensure, to the greatest extent possible, that individuals

---

[63]  Available at http://www.ucp.org/ucp_generaldoc.cfm/1/9/10020/10020-10020/7331.

[64]  *See* DMR Response to U.S. Attorney Concerning Comments of the Dever and Wrentham Plaintiffs (December 11, 2006), attached to the Affidavit of Gail Grossman (Exhibit G hereto) as Exhibit GG-1.

[65]  As noted in the Monitor's Report, state-operated and vendor-operated programs are both community-based programs; the Department draws no distinction between the survey and certification, quality assurance, oversight, and investigation systems in place for either model, and both are monitored by the same systems, in the same manner.

receiving services from the Department are free from harm, regardless of the particular supports they receive from the Department.

In 1997, following a multi-year review of an egregious case of abuse of two mentally retarded Raynham residents, who were *not* being served by DMR, and whose abuse went undetected for years, the House of Representatives' Post Audit Committee issued a report that was critical of certain aspects of the Department's service system and the way in which the Department responded to public scrutiny and requests for information. Affidavit of Bernie Murphy, attached hereto as Exhibit F, ¶ 6. In response to the House Post Audit Report, Commissioner Morrissey commissioned an Investigation Advisory Panel. Murphy Aff., ¶ 7. The Panel was chaired by District Attorney Elizabeth Scheibel and was charged with scrutinizing the DMR investigations system with an eye towards identifying system area failures and recommendations to improve those areas. *Id.* In 1998, the Panel issued a report that identified several areas of the system that required improvement, and contained recommendations that could lead to improvement of those parts. *Id.* at ¶ 8. Following issuance of these reports, the Department engaged with both internal and external stakeholders to change its systems.

In 1999, the Department launched the "Building Partnerships for the Protection of Persons with Disabilities" initiative in collaboration with the Department of Mental Health, Massachusetts Rehabilitation Commission, Disabled Persons Protection Commission, and the Commonwealth's 11 District Attorneys. *Id.*, ¶ 10. As a leader of the Building Partnerships initiative and a co-signatory of a "Memorandum of Understanding" with District Attorney offices across the Commonwealth, the Department has participated in a number of projects aimed at implementing the recommendations of the Advisory Panel Report and improving its ability to screen and investigate allegations of abuse and mistreatment. *Id.*, ¶ 13. As a result of these projects, many law enforcement officers and officials and provider personnel have been

educated on, among other issues, matters related to identifying abuse and mistreatment, reporting requirements, communicating with persons with disabilities, protecting potential evidence, and cooperating with law enforcement or human service agencies to ensure an optimal result. *Id.,* ¶ 14. As one result of this extensive educational effort and attendant increased awareness, reports of allegations of abuse and mistreatment increased for five consecutive years. *Id.,* ¶ 15.

Today, DMR staff and non-DMR community providers alike have a clear mandate to report any suspicion of abuse to the Disabled Persons Protection Commission ("DPPC") for screening by a state police unit imbedded within the DPPC. Reports of serious abuse or neglect are investigated within 24 hours by investigators who are well trained in the techniques of interviewing individuals with disabilities and any staff involved. Allegations that are less serious in nature are screened out to DMR for investigation. The DMR Investigations unit is headed by a former Assistant District Attorney, and DMR has signed memoranda of understandings with all of the Commonwealth's district attorney offices. The investigation of suspected abuse is an area in which the Department has significantly strengthened its systems, and currently the collaborative efforts of the Department's Investigations Unit, the DPPC, and the district attorney offices across the state have developed a comprehensive approach to the prevention, investigation, and prosecution of abuse that is serving as a national model emulated by other states around the country. *Id.*, ¶¶ 9-21.

In addition, there are multiple quality assurance systems that act as effective checks to ensure the safety of all DMR consumers in their homes. These measures ensure that the over 10,000 individuals that DMR serves residentially are safe in their homes, whether it be in a community group home or in one of the Department's six facilities. Data collected by the Department and by the DPPC regarding complaints of abuse, and substantiated reports of abuse, reflect increased reporting of allegations of abuse or mistreatment. This is a positive

development in light of the well recognized phenomenon of under-reporting of abuse of individuals with mental retardation, and a common failure to prosecute these crimes.  *Id.*, ¶¶ 12, 15.  Further, as is detailed below, official data support the conclusion that, over the past four years, both the number of reported allegations of abuse and, more importantly, the number of substantiated allegations have declined.   Published data demonstrate beyond doubt that individuals served by DMR are as safe in community-based programs as they are in DMR's ICF/MR facilities.

>    2.   Data Compiled by the DPPC and DMR Indicate that Individuals Who Receive Services in the Community Are as Safe There as They Are in DMR's ICF/MR Facilities.

Officially compiled investigations data[66] indicate that steady progress is being made to reduce the incidence of abuse or neglect, and fewer developmentally disabled individuals are experiencing abuse, neglect, or mistreatment than four years ago.  According to a review of all investigations conducted by the DPPC (or DMR, under DPPC's authority and supervision[67]) for years 2002 to 2005, the total number of substantiated allegations of abuse or mistreatment, as a percentage of investigations completed, declined steadily.  In 2003, there were 358 substantiated incidents of abuse in the total adult population of 22,802 individuals eligible for services from DMR.  In 2004, there were 299 substantiated cases as compared to a population of 23,157.  In 2005, there were 291 substantiated cases, as compared to a population of 22,916.  *See* Table 1,

---

[66]  Unless otherwise specified, the source of all data included in this section is DMR-IS, which is the Department's secure management information system.  There are two major components to DMRIS: Meditech, which serves as the system of record for case related information, and HCSIS, which holds DMR's quality management-related information.  An investigations module within HCSIS permits the tracking and reporting of all complaints alleging abuse or mistreatment of DD individuals.  This module captures information from the time a complaint is filed with the DPPC, through investigation and actions taken in response to the findings, and including the conclusions of the investigations.

[67]  Investigations into the abuse or neglect of mentally retarded Bay State citizens can be conducted either under the authority and supervision of the DPPC, pursuant to M.G.L. c. 19C, or under DMR regulations spelled out at 115 C.M.R. §§ 9.00, *et seq*.  The latter, termed a "Section 9 investigation," encompasses a broader category of conduct than is covered by M.G.L. c. 19C, and requires no actual physical or emotional harm.

*infra*; Affidavit of Gail Grossman (Exhibit G), ¶¶ 7 - 8.  The rate of substantiated cases of abuse per 1,000 also decreased consistently from 2002 to 2005.[68]  *Id.*, ¶ 9.

TABLE 1

| Number of Abuse/Neglect Investigations, Percent, and Rate Substantiated, 2002-2005 | | | | |
|---|---|---|---|---|
| **Abuse/Neglect Investigations** | **2002** | **2003** | **2004** | **2005** |
| Total Investigations | 1,351 | 1,257 | 1,083 | 1,093 |
| No. Substantiated | 431 | 358 | 299 | 291 |
| Percent Substantiated | 33% | 31% | 33% | 31% |
| Population (>18 yrs.) | 22,604 | 22,802 | 23,157 | 22,916 |
| No. of Substantiated Investigations per 1000 | 19.07 | 15.70 | 12.91 | 12.70 |

The same trend is demonstrated in both the sub-categories of "physical abuse" and "sexual abuse."  The total number of substantiated findings (one case can lead to multiple findings) of physical abuse has consistently declined from 2002 (105 substantiated cases) to a low three years later of 56 substantiated cases.  The numbers of substantiated sexual abuse incidents are too small to permit meaningful statistical analysis, but the data [15 substantiated cases in 2002; 11 in 2003, 10 in 2004, and 13 in 2005] do not reflect any worrisome trend.  *See* the "sexual misconduct" entry in Table 2:

---

[68]  The above rate calculations are based upon completed investigations; pending investigations are not included in the counts.  During the period 2002 to 2006, the annual number of allegations reported to DPPC has remained stable. Comparing the number of reported allegations to the total adult population served by DMR indicates that the rate of reporting has not decreased over time. Grossman Aff., ¶ 9 n.3.

TABLE 2

| Changes in the Number of Substantiated Findings for the 13 Leading Types of Substantiated Abuse/Neglect, 2002-2005 | | | | |
|---|---|---|---|---|
| **Types of Substantiated Abuse** | **2002** | **2003** | **2004** | **2005** |
| Omission | 179 | 166 | 159 | 129 |
| Physical | 105 | 76 | 61 | 56 |
| Emotional | 68 | 45 | 27 | 37 |
| Medical | 50 | 50 | 29 | 30 |
| Verbal | 83 | 31 | 20 | 27 |
| Failure:  Report | 39 | 32 | 22 | 23 |
| Medication | 34 | 24 | 17 | 19 |
| Failure:  Meet Needs | 24 | 26 | 12 | 17 |
| Unknown Injury | 15 | 21 | 14 | 13 |
| Sexual Misconduct | 15 | 11 | 10 | 13 |
| Inappropriate Restraint | 11 | 14 | 11 | 12 |
| Financial Misconduct | 25 | 6 | 2 | 6 |
| Other Legal/Human Rights Violations | 17 | 10 | 5 | 3 |

In order to analyze the Court Monitor's assertions regarding the level of abuse in community-based programs, DMR requested that the DPPC provide DMR with an aggregated count of cases investigated and findings substantiated for residential and institutional services for a period of five years (FY 2002 – FY 2006).[69]  The DPPC provided DMR with information regarding all substantiated abuse incidents, including physical and sexual abuse, that occurred in DMR residential programs only (*i.e.*, not including people living in the community, with or without family).  A review of these data yields a very different conclusion than that drawn by the U.S. Attorney.  *See* Table 3, *infra*.  The DPPC data show some fluctuations in the rate of abuse over the years (which is based on the number of findings resulting from investigations relative to the census and population figures) in facilities and in the community.  The overall rate for all

---

[69]  *See* Exhibit GG-2 (attached to the Grossman affidavit) (an April 30, 2007 Memorandum from the Disabled Persons Protection Commission re DMR Request for Information).

types of abuse, however, was higher in facilities than in the community in three out of five years.[70]  Grossman Aff., ¶ 11.

**Table 3**
**Rates per 1,000 DD Residents of all instances of**
**substantiated abuse complaints**

| Year | In Community Settings | In Facilities |
|---|---|---|
| 2002 | 35.9/1000 | 29.1/1000 |
| 2003 | 37/1000 | 37.8/1000 |
| 2004 | 29.5/1000 | 34.2/1000 |
| 2005 | 18.9/1000 | 25.3/1000 |
| 2006 | 20.1/1000 | 10.5/1000 |

The data also demonstrate that the incidence of sexual abuse is very low overall, and for the five year period for which data was provided, the community rate has either remained stable or decreased with the highest rate occurring in the facilities in Fiscal Year 2005 at a rate of 1.8 per 1,000 persons.[71]  The data also show that the incidence of physical abuse in the community has consistently decreased with the highest rate over the five years for which data was provided also occurring in the facilities in Fiscal Year 2004 at a rate of 13.5 per 1,000 persons.[72] Grossman Aff., ¶ 12.

The Department's published data, and the data generated by the DPPC, demonstrate that there is no appreciable difference in the overall risk of harm from either physical or sexual abuse between the two relevant settings – institutional or facility-based services and community-based

---

[70]    *See* Exhibit GG-3, Rates per 1,000 of All Instances of Substantiated Abuse (5/5/07).

[71]    *See* Exhibit GG-4, Rates per 1,000 of Substantiated Sexual Abuse (5/5/07).

[72]    *See* Exhibit GG-5, Rates per 1,000 of Substantiated Physical Abuse (5/5/07).

services.  Both the Court Monitor (and the Wrentham plaintiffs) have drawn improper conclusions from incomplete DPPC data.  *See* Monitor's Report at 16-17.

Contributing to the Monitor's erroneous interpretation of the DPPC "Vendor Survey Reports" is the assumption he made (following the Wrentham plaintiffs' lead) that allegations, not substantiated findings, can form the basis of a conclusion that abuse rates are increasing or relatively high.  The Monitor's implied assumption is that because many class members are nonverbal, prosecution or substantiation of claims is not possible.  As set forth in the affidavit of Bernie Murphy, much has been done in partnership with the district attorneys and local police to ensure that all instances of sexual or physical abuse are prosecuted.  It is no longer the case that a highly vulnerable, nonverbal individual is the victim of abuse without a thorough investigation, from both a criminal and civil law perspective, commencing thereafter.  Furthermore, substantiations and prosecutions regularly occur.   In addition, the current culture of "erring on the side of reporting" has produced large numbers of complaints that are not substantiated.  The Court Monitor's apparent assumption that an allegation should be counted the same as a substantiated incident of abuse or neglect is deeply flawed.

### B. Medical Services Provided to *Ricci* Class Members in the Community are Consistent with the Final Order's Equal or Better Requirement.

The U.S. Attorney's Office made over 30 site visits to community-based residential programs and ultimately determined that services were consistent with the Court's Final Order and that individuals transferred to the community can receive services that are equal to or better than services provided at the ICFs/MR.[73]   *See* Monitor's Report at 14.  This conclusion was

---

[73]  Even a cursory review of the plain language of the Final Order, which undeniably references transfers between ICFs and community residences, reveals that the Court contemplated (and implicitly determined) that ICF-to-community transfers can satisfy the equal-or-better requirement. The Fernald plaintiffs' oft-asserted flawed interpretation of the Final Order suggests that transfers from an ICF to a community residence could *never* satisfy the 'equal-or-better' standard as community homes do not have the size, staff, or physical characteristics of an ICF, which house and

confirmed by the medical doctors retained by the Monitor who reviewed the housing, health, employment, and occupational needs of the 49 transferees. Although the Monitor determined that clinical and medical services consistent with the equal or better requirement were available in the community, his report included the observation that the "process takes much longer than the process at [an ICF] and is more difficult to coordinate." *Id.* at 15.

The Department is well practiced in assuring that services provided to individuals, both in its facilities and in the community, are sufficient to meet each individual's unique needs. During the course of the Court Monitor's review, the Department consistently acknowledged that the provision of services to individuals in the community did not mirror exactly the delivery of services to residents in an ICF/MR, but that meeting the *needs* of the individual is the key point with respect to satisfying the Final Order's "equal or better" services requirement. *See* DMR's December 11, 2006, Submission to the Court Monitor (Exhibit GG-1), at 2-4. The Department gave the Monitor a thorough presentation regarding this topic during his investigation, and the Department further provided detailed responses to the queries the plaintiffs forwarded to the Monitor's Office after the presentation.

Substantial quality assurance data, as well as data compiled by independent surveyors, confirm that individuals in the community, and in the ICFs/MR, are receiving adequate medical and dental care to meet their needs. DMR's Quality Assurance Reports ("QA Reports") include multi-year comparisons of DMR outcomes related to health, as they are measured by the National Core Indicators Project (NCI). The findings and trends presented in the QA Reports suggest consistency and/or improvement over time in the quality and safety of health-related

---

serve many individuals. The intent of 'equal-or-better', as specified in the language of the Final Order, did not require that all characteristics of ICFs, including on-site access to medical care, be replicated in a community home. Instead, the Court (and parties) sought to ensure that an individual's *needs* as identified in the ISP would be met through provision of equal-or-better services at the new location.

services and care for persons served by the Department.  Comparing the Massachusetts DMR data with that collected by NCI for all of the New England states, plus a national sample, further suggests that persons receiving services in Massachusetts are able to access healthcare services more readily than their peers in other state MR/DD service systems.  The most recent QA Report shows that approximately 88% of the individuals receiving DMR services through surveyed programs received an annual physical exam.  This is significant in that the extent to which individuals receive at least an annual physical exam is a simple measure of access to appropriate medical care.  *See* Table 4 in the 2005 Quality Assurance ("QA") Report at p. 11.

Percentage of Persons Receiving Annual Physical Exams (2002-2005)

| Physical Exams | 2002 | 2003 | 2004 | 2005 | Change 2004 - 2005 | Type of Change |
|---|---|---|---|---|---|---|
| MA DMR - S&C | 87.0% | 94.0% | 92.0% | 88.0% | -4% | ⟷ |
| NCI - MA DMR | | | | 95.4% | | |
| NCI - New Eng | | | | 84.8% | | |
| NCI - National | 83.0% | 80.0% | 83.5% | 83.9% | | |

*MA DMR - Survey/Certification findings for 2005*
*NCI-MA DMR - NCI report issued 2006*
*NCI New England = CT, ME, RI, VT, special report issued 2006*
*NCI National = 15 states and 1 large county in CA, 2005*

Receiving an annual dental exam is also an important indicator of access to medical care. The percentage of persons served by DMR in residential programs reviewed by the Survey and Certification unit who have received a dental exam within the past 12 months is approximately 86%.  *See* Table 5 – 2005 QA Report at p. 12.   This rate compares favorably with both regional and national data and demonstrates that a higher percentage of individuals who receive DMR services in Massachusetts have had an annual dental exam than individuals served by other states' MR/DD agencies.

Percentage of Persons Receiving Routine Dental Care
2002 – 2005

| Dental Exams | 2002 | 2003 | 2004 | 2005 | Change 2004 - 2005 | Type of Change |
|---|---|---|---|---|---|---|
| MA DMR - S&C | 83.0% | 88.0% | 87.0% | 86.0% | -1% | ⇔ |
| NCI - MA DMR | | | | 69.7% | | |
| NCI - New Eng | | | | 58.1% | | |
| NCI - National | 50.0% | 51.0% | 53.5% | 52.0% | | |

NCI criteria is exam every 6 months.  DMR S&C criteria is exam every 12 months.
NCI New England = CT, ME, RI, VT, report issued 2006
NCI National = 15 states and 1 large county in CA, 2005

This percentage (86%) of individuals receiving residential services from the Department who have had an annual dental exam also compares favorably with the percentage of Massachusetts residents (in the general population) who have received a dental exam in the last year (79.5%); as well as the percentage of the U.S. general population who undergo an annual dental check-up (70.2%).  *See* Table 6 – 2005 QA Report at p. 13.

Comparison of DMR and General Population for
Dental Visits within Past Year

| Dental Visit | MA DMR S&C | MA Gen Pop | US Gen Pop |
|---|---|---|---|
| Percent:  Dental Visit in Past Year | 86.0% | 79.5% | 70.2% |

Data for general MA and US population from statehealthfacts.org, 2006
Data for MA DMR - 1-yr criteria - DMR Survey/Certification, 2005

Data gathered by the Department's Quality Assurance unit measuring access to medical services, both primary and specialty physician services, additionally show that a high percentage (95%) of developmentally disabled individuals in Massachusetts (surveyed in both the community system and in facilities) receive routine annual physicals.  *See* 2005 QA Report at 11-13.  A relatively high percentage (63%) of females in the DMR system had a gynecology exam within the past year and 70% reported having a dental examination within the past 6 months.  *Id.*

These data demonstrate that a relatively high percentage of persons served by DMR are receiving appropriately frequent health care services, as measured by a minimum of one annual physical and dental exam (*i.e.,* at least one health care encounter each year). Compared with other mental retardation/developmentally disabled systems in New England and nationally, more persons served by DMR have had both physical and dental exams annually. *See* Table 6 – 2005 QA Report at 13. Equal access to medical care does not require that each community residence maintain a medical staff of similar size and composition to an ICF/MR or that medical care be delivered in the same manner as within an ICF/MR. Assuring that there are adequate clinical supports, including accessing Medicaid state-plan medically necessary services, is critical, however, to the Department's implementation of ISPs for *Ricci* class members.

In order to improve access to medical services over the past several years, the Department, through its Office of Quality Management, has developed a health initiative to ensure that all individuals within the DMR service system receive appropriate access to health care of all kinds in accordance with their needs. The Department's consumers have regular access to health care through annual physicals and referrals to appropriate specialists and hospital care. To meet this need, the Department has committed to a clinical template in the community of at least one registered nurse and one psychologist in each DMR Area Office to provide support and consultation to state and vendor operated community providers. These individuals are also available for consultation or to assist residential or direct care staff in addressing any concerns for the health and welfare of DMR clients. To complement its Area Office-based staff, the Department has secured clinical team support through provider agencies and additional clinical services at day habilitation programs. These systems ensure that services provided to individuals, both in the facilities and in the community, are sufficient to meet each individual's unique needs without regard to the particular process for coordinating such care.

CONCLUSION

For all of the foregoing reasons, the concerns articulated by the Court Monitor and some of the plaintiffs in these cases do not constitute adequate grounds for further intrusion by this Court into the operations of the Department.   As permitted under the Final Order in this case, and consistent with state law vesting the Commissioner of the Department with the exclusive authority to manage DMR's programs and facilities, the Department has safely transitioned hundreds of individuals from its ICF/MRs to community-based programs.  Most recently, the Department successfully transitioned dozens of individuals from the FDC to new community-based homes and other ICFs.  After a 13-month, comprehensive investigation, the Court Monitor has independently confirmed that in doing so the Department fully complied with the law, and provided "equal or better" services to those individuals in both community-based and institutional settings.

The Department's efforts are fully consistent with the state and federal mandate to provide services to individuals in the least restrictive setting possible.  This Court should recognize the proven success of these endeavors and vacate any orders restricting the manner in which the State, in the exercise of its authority and obligations, plans for and provides services to individuals with mental retardation and their families.  Any order requiring a DMR facility to remain open indefinitely constitutes an infringement on that authority and obligation.   In sum, the Court should stay its hand, decline to enter the Proposed Order, and thereby eschew "an activist federal intrusion in the affairs and prerogatives of state officials."[74]

---

[74] *Ricci v. Callahan*, 97 F.R.D. 737, 738 (D.Mass. 1983).

Respectfully submitted,

DEPARTMENT OF MENTAL RETARDATION

By its attorneys:

MARTHA COAKLEY
ATTORNEY GENERAL

/s/ Marianne Meacham
_____
Marianne Meacham, BBO #550468
Special Assistant Attorney General
General Counsel
Department of Mental Retardation
500 Harrison Avenue
Boston, MA  02118
(617) 624-7701

and

/s/ Robert L. Quinan, Jr.
_____
Robert L. Quinan, Jr.  BBO No. 553010
Assistant Attorney General
Office of the Attorney General
One Ashburton Place, 20th floor
Boston, MA  02108
(617) 727-2200, ext. 2554

Dated:  May 31, 2007

## Certificate of Service

I hereby certify that this document was filed through the Electronic Case Filing (ECF) system and thus copies will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF); paper copies will be sent to those indicated on the NEF, on or before May 30, 2007, as non-registered participants. Additionally, paper copies of the exhibits appended to the affidavits accompanying this document will be mailed to all principal counsel of record.

/s/ Robert L. Quinan, Jr.
_____
Robert L. Quinan, Jr.
Assistant Attorney General