UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ASSOCIATION FOR RETARDED CITIZENS OF MASSACHUSETTS, INC., et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>COMMONWEALTH OF MASSACHUSETTS DEPARTMENT OF MENTAL RETARDATION, et al.<br><br>    Defendants | Civil Action Nos.    72-0469-T<br>74-2768-T<br>75-3010-T<br>75-5023-T<br>75-5210-T |

## AFFIDAVIT OF TERESA L. O'HARE

I, Teresa L. O'Hare, on oath hereby depose and state as follows:

1. I have been employed by the Department of Mental Retardation ("DMR") since August 1978.

2. My first association with DMR was at the Belchertown State School ("Belchertown or BSS") in 1976 as a student volunteer from the University of Massachusetts ("UMASS"). Shortly after graduation I was hired as a full-time employee by the Department, initially as a direct care worker and then as a Speech Therapist. Four years later I began an entry level management

position. Over the next 12 years I earned a number of promotions and ultimately, in February of 1990, I was appointed as the Interim Facility Director for the closing of the Belchertown State School.

3. Three months following the successful closing of Belchertown State School, I was appointed as Facility Director for the Monson Developmental Center. In 1996, I was appointed to the position of Regional Director for the Western Region of DMR and, in November of 2004, I became the Regional Director for the newly consolidated Central and West Regions, a position I hold today.

4. In preparing this affidavit I have read the March 6, 2007 Monitor's Report to the Court, reviewed numerous newspaper articles related to the closing of the Belchertown State School, and reviewed a number of relevant documents from that era.[1]

5. Unless otherwise indicated, the facts contained in this Affidavit are based on personal knowledge, document review, and information provided by families and DMR staff with whom I have worked with over the years; many with whom I still have regular contact.

## My Role in the Belchertown Closure Process

6. As Interim Facility Director of Belchertown during the phase-down period, I was responsible for the oversight and effective operation of the Belchertown State School within the appropriate statutory and regulatory standards, and for

---

[1] Projected Placements-District I (3/89), Residents Who Are Not On The Housing Agenda (3/89), Letter to Joan Pine from Terry O'Hare (3/31/89), Placement Profile Draft (9/19/89), Human Resources Plan for the Phase-down of the Belchertown State School, Placement Overview (3/20/91), High Risk List (1/8/92), Outline for Discussion on Planning & Service Delivery For the Five Health Care Homes in CSC-West (3/23/92), and the HRSI Survey of Current and Former Belchertown Residents and Their Families (December, 1992).

overseeing the multitude of placement and transitional planning activities necessary to meet each individual's unique needs.

7. In 1985, DMR began a planning and development initiative to create state-operated community homes for residents living at the intermediate care facilities for the mentally retarded ("ICFs/MR") operated by DMR which would be under the operational control of the facilities. Belchertown State School would develop 12 – eight person homes to serve 96 people. Six of these homes would be ICFs/MR under the federal Title XIX program, and 8 would be 4 person by 4 person duplex homes developed under the Chapter 689 Housing for Individuals with Special Needs program.[2]

8. Planning for the state-operated community initiative required collecting preliminary information from clients/families and teams regarding all residents living at the facility to determine individuals' needs and preferences for placements from the Belchertown facility.

9. Prior to the announced closing of Belchertown, the Department had conducted a preliminary review of all relevant information related to the facility, including client information and fiscal considerations related to the continued operation of the facility.

10. The Belchertown closing was announced in March of 1989 by the then Commissioner, Mary A. McCarthy.

---

[2] The Chapter 689 Housing for People with Special Needs program is a Massachusetts state-aided public housing program that provides housing opportunities for physically and mentally disabled individuals.

3

11. In March of 1989 when the closing was announced there were 285 people living at the facility. The population at Belchertown was not unlike the current population at the Fernald Developmental Center ("FDC").[3] Nineteen of the 285 residents were scheduled to move to the ICFs/MR or Chapter 689 homes developed as referenced above in ¶ 7, therefore new homes would need to be developed or transfers to other facilities would need to be planned for approximately 266 individuals in order to close the Belchertown State School. See HSRI Results of the Survey of Current and Former Belchertown Residents and their Families (1992) at Exhibit "T.O.-1".

12. As a result of the 1985 initiative to develop state-operated community homes managed by the facility, by the time the closing was announced the BSS managers and staff had significant experience in the planning and development of community services and homes for Belchertown residents.

13. It was projected it would take 3 years from the commencement of the phase-down in January 1990 to transition the residents of Belchertown to new homes.

14. Immediately after the announced closing, some parents, families and advocates expressed grave concerns for their family member's future, most often expressing concern for their health and well-being, the loss of close relationships with caregivers, the inability of the community system to support

---

[3] The 1992 survey of current and former Belchertown residents reported that approximately 86% of Belchertown residents were within the severe or profound range of mental retardation; while approximately 78% of individuals who had transitioned from Belchertown during the phase-down and closure were reported to have either severe of profound mental retardation. See Exhibit "T.O.-1" at p. 11.

4

their family member as well as the facility and the loss of the only real home that so many living there knew.

15. Dr. Benjamin Ricci, father of the lead plaintiff in <u>Ricci, et al. v. Okin, et al</u>. and the then President of Advocacy Network, Inc. supported the decision to close the facility. He committed to concerned parents and family members that he would work closely with them and the Department to ensure that each person would have a full array of excellent services developed and provided for their family members' transition to a community home; and, most importantly, that he would aggressively ensure that each Class Member's entitlement to appropriate Class Member services would be fully met and protected during the placement process and upon their transition to a home in the community.

16. From early on following the closure announcement through the 3 year phase-down, Dr. Ricci and DMR agreed on a number of principles. These principles were embedded implicitly and explicitly in all of our conversations.

- Each individual will have services developed to substantially meet all of their needs as stated in their ISPs, and which they are entitled to as Ricci Class Members.
- Individuals and their family members/loved ones will be closely involved in all aspects of the placement planning and they will have choices about their future home. Choices available to individuals included: community vs. facility; state operated home vs. vendor operated home; geographic locations taking into consideration special factors such as family, friends, work, housemates or other important aspects of their lives.
- Services on the Belchertown campus would be maintained and DMR would continue to provide excellent care until the last individual resident left the facility.
- Although a great deal of time, resources and commitment would be needed to develop both excellent community homes and to maintain excellent services on campus, we agreed it was important to close the facility as projected within the three year timeline. It became clear within

5

the first year after the closure was announced that the interests of clients, family members, and staff would be best served by closing the facility as soon as possible. An extended period of uncertainty about the future would be detrimental. In fact, Dr. Ricci argued that the facility closing date should be in June rather than December of 1992.

17. Dr. Ricci and the Department encouraged all families to participate fully in the transition planning process and to advocate for what each thought was important in a new home. Dr. Ricci attended planning meetings as an advocate of any family that requested his services.

18. Despite the family advocacy and support and the leadership from Dr. Ricci, many families were angry when the plan to close the Facility was announced.

19. Several families expressed their great concern about the closing in group meetings and at individual meetings, and during phone calls. Concerns ranged from general apprehension, to anger, to fear. Some expressed worries about health and safety concerns, vulnerability, lack of friends, uncertainty regarding who was in charge, access to emergency services and their concerns about not knowing where their son/daughter would be living in a few years. The Department was sensitive to the specific concerns expressed by family members and sought to respond to these concerns in the transition plans being developed for their family members.

20. I believe the tremendous encouragement and significant involvement of families in placement planning from the very beginning ultimately resulted in a great level of family satisfaction in the placements.

21. Some of the residents were capable of understanding the impact of the announcement to close the facility; most, however, were not able to

understand it. For those who did, the reaction ranged from fear and concern to excitement. Our work with this group of clients was similar to that which we engaged with their families; to listen, understand and address their concerns and fears in the plans being developed. People were worried about the loss of friends, staff relationships, and the freedom to move about the campus without risk, and of course, the unknown future. For all other residents, our work focused on informed planning and development of a carefully developed transition plan. Some clients needed a long transition to get comfortable in their new homes while others needed a very short transition. Overall, with few exceptions, the transition of the residents went extremely well and the satisfaction in their new homes was exceptional. People liked living with fewer people in their own homes, closer to family or friends and often with familiar staff supports.

22. The same parents, who had expressed great concerns to me initially, and throughout the closing process, expressed tremendous amazement with their total satisfaction and peace of mind, once their son/daughter was in their new home.

23. Another indication of success of the closing process was that not one of the transfers was appealed. Initially some ISP appeals may have been filed, but all were settled during the informal conference stage.

24. Belchertown State School was the first DMR facility to close in Massachusetts, and therefore, we did not have the benefit of previous closure procedures to follow. However, we had many years of experience with

community placements and a tremendously well-trained and experienced workforce both at the facility and in the DMR community system. In fact, a great many of the DMR community staff and managers had previously worked at the facility.

25. Immediately following the announcement that Belchertown would close, numerous meetings were held to provide information and obtain input from residents, families, and staff. However, shortly thereafter, the resident and family meetings were primarily individual client-centered meetings. Staff meetings were held throughout the closing to provide information about the future as it related to the transition to the community system and the closing of the Facility.

26. Additionally, all meetings of existing groups (Board of Trustees, Human Rights Committee, labor, etc.) continued; however, their agendas focused on the on-campus and community efforts related to the closing.

27. As previously stated there were 266 individuals living at the facility who needed plans developed to move to a community homes or another facility. Of that number, 71 had previously expressed opposition to the idea of community living.

28. In the fall after the closing was announced, the "Placement Profile" was developed to collect preliminary information needed to begin the individual planning process. The information collected included a survey which revealed that only 24 of the 266 clients wanted another facility placement (even though the Monson Developmental Center was only 12 miles away from

Belchertown). Many of those expressing interest in another ICF/MR were families of people who were medically fragile or had complicated medical care needs.

29. Intensely detailed work to specifically design and plan for services and to plan for the client and staff transitions necessary to meet each individual's needs occurred at Belchertown between March, 1989 and when the last individuals left the Facility on December 17, 1992. The foundation of all planning was the individual, their needs and preferences and the preferences, interests or concerns of their families and loved ones.

30. The transition planning process started with the collection of important service need and individual preferences information through the Placement Profiles. Teams of knowledgeable staff used the Profiles to develop proposals and plan new community group living opportunities. Individual transition teams were then responsible for assuring that families were involved in all aspects of the planning process and that each Individual Transition Plan fully and carefully addressed each person's needs and preferences.

31. Several new planning committees specific to the closure were created to develop detailed plans on placements, clinical services, human resources, housing, budget and furniture and equipment.

32. Several state-operated community homes were planned for and developed to serve clients/families who wanted to maintain the close relationships they had with state staff in hopes that these staff members could transition to the new

sites with the clients. Other families wanted to maintain the perceived greater security and familiarity of the "state system".

33. Several state operated homes, which were commonly referred to as "health care homes," were specifically developed to provide services to individuals who had significant health care needs, including the need for close direct nursing care monitoring/oversight. One of these homes, known as "River Road" in Hadley, was specifically developed for eight of Belchertown's most medically fragile clients. A key member of the planning team for these homes was the Belchertown Director of Nursing, who was a Nurse Practitioner who had worked at the Belchertown State School for many years and was familiar with most of the medically involved clients. Other clinicians, residential staff, managers and families of the individuals considering placement in these homes were also closely involved in the planning and development of the "health care homes." The design and physical layouts of these homes were carefully selected in order to ensure that they would be built to accommodate the needs of the individuals that would reside therein.

34. Ultimately, all 24 of the individuals who expressed an interest in a placement at another facility chose instead to transition to a community-based residence.

Planning for FDC's Closure

35. At the time of the announcement to close the Fernald Developmental Center (in early 2003), I was assigned to Chair the Facility Planning Committee that was charged by Commissioner Morrissey with overseeing the closure of the

FDC. This Committee was formed to ensure that planning and implementation activities were developed with full input from key field and Central Office managers who had related responsibilities and/or experience in facility closures. Of primary importance was ensuring that each individual residing at FDC continue to receive appropriate services during the closure process and upon their transition to a new home.

36. Six sub-committees were formed consisting of: the ISP/Placement Sub-Committee, the Family Sub-Committee, the Human Resources Sub-Committee, the Budget Sub-Committee, the Housing Sub-Committee, and the Property Sub-Committee.

37. The ISP/Placement Sub-committee was charged with developing standardized processes and procedures to ensure appropriate placement and transition planning. This included making sure that all regulatory and legal requirements would be met when individuals transfer from FDC. A manual was developed by building on the experience and achievements of the past in planning and implementing successful transitions of individuals from facilities. The Subcommittee researched and reviewed information from across the service system and synthesized the best of that work into this manual. See Placement Planning Process for Facilities Identified for Closure, September 2003 attached as Exhibit 1, to Gail Conley's Affidavit submitted with Defendants' Opposition to Plaintiffs' July 14, 2004 Motion to Reopen and Restore Case to Court's Active Docket and Enforce Order of May 12, 1993 (filed August 16, 2004) ("DMR Opposition").

38. The transitional and placement planning processes developed at Belchertown, and improved through the JT Berry and Dever facility closures, as well as through the work of the Facility Planning Sub-Committees demonstrates that when the proper transitional planning, and support services are in place, even individuals with the most medically intense needs can be appropriately served in community-based residences.

39. Based upon my over 30 years with the Department of Mental Retardation from student intern, to interim Facility Director at BSS during the phase-down and closure, to my position today as Regional Director for the Central and West Regions my experience has consistently been that with the proper placement planning activities and support services in place, individuals may successfully transition from one living environment to another and flourish and thrive in their new residential setting.  Many times, an individual's adaptation and growth in their new environment is well beyond the apprehensive thoughts or expectations of family members and loved ones prior to the transition.  The Department has improved its placement planning with each successive closure or consolidation.  The Department's proven record of successful transition planning and placement has continued with the transfer of 49 former FDC residents who have transferred from the FDC since February, 2003.  Today, the Department is offering the remaining FDC residents the same choices and opportunities that other individuals who transitioned to new living environments have previously accepted.

Signed under the pains and penalties of perjury this  31st  day of May 2007.

                                                  /s/ Teresa L. O'Hare  
                                                 Teresa L. O'Hare