UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ASSOCIATION FOR RETARDED CITIZENS OF MASSACHUSETTS, INC., et al., | | |
| Plaintiffs, | Civil Action Nos. | 72-0469-T |
| | | 74-2768-T |
| | | 75-3010-T |
| | | 75-5023-T |
| v. | | 75-5210-T |
| COMMONWEALTH OF MASSACHUSETTS DEPARTMENT OF MENTAL RETARDATION, et al. | | |
| Defendants | | |

**AFFIDAVIT OF JOHN E. RILEY**

I, John E. Riley, on oath hereby depose and state as follows:

1.  In preparing this Affidavit, I reviewed the Monitor's Report to the Court, dated March 6, 2007, and the document entitled Planning the Dever Future: Consolidation, Closure and Community Placement and all relevant attachments.  I authored the latter document which was issued on September 25, 1992, and was the blueprint for the closure of the Dever Developmental Center which occurred in February of 2002.

1

2.  I was employed by the Department of Mental Retardation (the "Department" or "DMR") from 1987 until 2002.    Unless otherwise indicated, the facts contained in this Affidavit are based on personal knowledge, document review, and information provided by DMR staff with whom I have been in regular contact and continue to consult with to date.

3.  For twelve years prior to my work with DMR, I worked in the mental retardation division of the Department of Mental Health ("DMH").  I served as a consultant to DMH for the first three years of this period prior to beginning my employment there.  After, I worked as a clinical social worker at DMH; I served as Director of the Dexter Unit, the Medical Unit, and the Community Preparation Unit of the Wrentham State School, in sequence.  I also served as the Facility Director of the Paul A. Dever Developmental Center (formerly the Paul A. Dever State School) ("Dever" or "the Facility") until its closure in February, 2002. I also served as an Assistant Regional Director for DMR's Southeast Region and was responsible for oversight of both of the large intermediate care facilities for the mentally retarded ("ICFs/MR") in the region: the Dever Developmental Center and the Wrentham Developmental Center.

4.  In addition, from about 1998 to 2002, I served as the Department's senior staff liaison to the Ricci, et al. v. Okin, et al. class representatives. I continue to consult on a limited basis in this capacity. Through these roles, I am familiar with the Department's operational and fiscal management, and have had the

opportunity to be involved in both the facility and community-based sides of the Department's organization.

5.  As the Director of the Dever Developmental Center throughout the entire period of its phasedown and ultimate closure, I was responsible for both the operation of the facility within Title XIX guidelines and the planning for the re-location of the individuals living at the facility. Much of the framework of our activities in relation to the latter responsibility was derived from the excellent work done in a similar closure at the Belchertown State School ("Belchertown" or "BSS") in the late 1980's and early 1990's.  In turn, many of the tools and structures we utilized during the Dever closure such as the Placement Profile and the Individual Transitional Plan Team, have been incorporated into the planning structure for placement of individuals from the Fernald Developmental Center. These measures were designed to gather information about class members' preferences and needs to facilitate residential planning, and also to insure that each class member's ISP was implemented both before and after placement. This planning at Dever resulted in a person-centered placement process as individuals left the facility.

6.  As placements were occurring from the Facility and both the census and the number of staff were declining, internal mechanisms (such as Quality Assurance committees) to insure compliance with Title XIX standards were developed which resulted in excellent annual surveys by the Department of Public Health, the state agency responsible for federal participation surveys. In fact, the last several years of the phasedown process, arguably the most intense

of the entire duration, not only saw a large number of individuals with significant physical and cognitive limitations placed very successfully in homes in the community, but also saw an extended period of total compliance with Title XIX regulations without a single deficiency and with a perfect Active Treatment rating.

7. At the time that the Dever phasedown commenced, there were 289 individuals living at the Facility. Many had lived at Dever for nearly their whole lives. One resident had lived at the Facility virtually since its opening in 1946. The characteristics of Dever residents were very similar to those in all of the other DMR facilities; their disabilities and support needs were widely varied. For instance, in May of 1995, just over two years after the issuance of the Phasedown plan, 195 men and women resided at Dever. Of that number, 155 fell into the profound range of mental retardation, 25 in the severe range of mental retardation, 7 in the moderate range of mental retardation, and 7 in the mild range of mental retardation. Ages of individuals residing at the facility ranged from 28 to 89. In the area of mobility, 69 people required wheelchairs, and 20 were confined to bed. In terms of visual impairments, 43 had impaired vision, 10 were legally blind, 22 were determined to be totally blind and 18 could not be tested because of their cognitive limitations. As for hearing, 22 had impaired hearing, 7 were determined to be totally deaf and 39 could not be determined because of their level of impairment. Nearly every resident of Dever had chronic medical issues. A number of residents also had severe maladaptive behaviors.

8. By 1997, the number of residents at the Dever facility had declined to 82. Placements into the community had proceeded steadily, with a small number of people opting for transfer to another ICF/MR. Of the remaining residents, 66 were in the profound range of mental retardation and 9 were in the severe range of mental retardation, 35 had significant vision problems, 26 had significant hearing problems, and 47 were not mobile without a wheelchair. Nearly all of the remaining residents had multiple diagnoses, including a wide range of serious medical and behavioral challenges. With the exception of a very small number (12) who moved to Wrentham Developmental Center, the great majority of these men and women made a successful transition into new homes in the community which met all of their support needs and offered them the opportunity to enjoy more normal daily lives.

9. Of the 289 residents of the facility at the time of issuance of the closure plan, nearly all made a successful and productive transition to community living. At the conclusion of the closure process, only 12 residents transferred to other large, congregate facilities. For many individuals and their families, the decision to move from Dever was a difficult one which they approached with some degree of apprehension. Many residents of the facility had lived at Dever for their entire lives. Many of their family members had always assumed that their relative could not be supported in a community setting; however, most came to realize that community living offered an exciting opportunity to experience a style and rhythm of living not possible in a large congregate facility. Further, it became apparent to them that with proper support planning,

the development of appropriate housing, and adequate resource allocation, community living could become a reality for any resident of the Facility. With very few exceptions, the feedback I received from the former Facility residents themselves and their families was extremely positive, without regard to the level of mental retardation or the level of support needed by the individual.

10. Through ongoing monitoring of individuals who moved from Dever to community settings conducted by members of my staff, I became aware of many positive outcomes in the daily lives of individuals who had transitioned from the Dever facility. These positive outcomes occurred for individuals regardless of their level of disability or medical complexity. I also personally witnessed a number of instances in which former residents of the facility not only made seamless transitions to community living, but also flourished in their new homes. Many individuals were also able to move into their new homes with familiar staff from the facility that transitioned with these individuals to community-based residences as a result of the Social Unit Agreement discussed below at ¶ 16.

11. Each step of the Dever closure was conducted in such a way that maximum input was elicited from the resident when possible, the guardian if applicable, members of the clinical team, and from family, friends, and anyone who was a key part of the individual's life who was interested in participating.

12. The plan to effect the closure of the Dever Developmental Center was based on nine key principles: [1]

- "The needs and preferences of each individual will be carefully analyzed and the Departmental of Mental Retardation staff will work diligently to plan and implement a highly specific and clinically appropriate plan to meet each person's needs.
- Each individual will be afforded choices regarding the nature and location of his or her new home. Further, each individual and his or her family will be encouraged to be active participants in designing the array of residential and support services needed and will be provided opportunities to do so.
- In collaboration with Community Service Center Staff and staff from other facilities, each resident and his or her family will be afforded the opportunity to gain whatever information is necessary to make an informed decision about the future including the opportunity to visit existing community homes as well as other facilities.
- When an individual does not have an involved family member or guardian, or when requested by the individual, family or guardian, an advocate will be appointed to represent the interests of the individual.
- Communication with residents, families, staff and other concerned individuals will be given a high priority.
- During its phasedown, the Dever State School will continue to provide a high quality of services and will remain a Title XIX facility.
- The participation of all members of the Dever Community will be elicited at all stages of the phasedown.
- Resident transfers within the facility will be limited as much as possible to maintain stability in the lives of the residents. Every attempt will be made to avoid more than a single move for each resident. However, in the event that an additional move becomes necessary, great care will be taken to ensure that the transition is sensitively designed and that the move is clinically sound.
- The Dever work force is highly regarded for the knowledge, expertise and experience that they possess in serving the residents of the facility. Throughout the entire phasedown, the skills of the Dever employees will be utilized maximally to plan and implement optimal services for Facility residents. In addition, through the implementation of the Social Unit concept and in the development of community based state-operated residences and work/day services in the community, the wealth of knowledge and skills will be preserved in the continuity of the lives of individuals served."

---

[1] *See* "Planning the Dever Future: Consolidation, Closure and Community Placement" (Sept. 25, 1992) at pp. 5-6 (copy available from DMR upon request).

13. Based on the above principles, a resident-oriented placement process unfolded which enhanced the participation of everyone with a committed interest in the life choices of each individual living at Dever.

14. The Placement Profile, which was a data-gathering instrument, adopted in large measure from the Belchertown closure, sought to obtain from the individual, their family, the ISP team, and others, information about the person's preference for residential setting(s) and the services which would be necessary to ensure that all needs would be met in the new setting. Each of the more than 280 families or guardians was approached in an effort to gather this information. Some families actively participated in the process. Only after repeated attempts to involve a family were unsuccessful, did the Individual Service Planning team undertake to complete the Placement Profile form, which was then sent to the family for review. While this process was difficult, and some families objected to its implementation, it nevertheless yielded accurate and valuable information which allowed us to develop the appropriate option for each individual.

15. The Placement Profile was designed to be a comprehensive tool for gathering key information in many areas including:

- Location of the new home;
- Types of residential services needed;
- Type of residential setting;
- Preference for state-operated or provider-operated home;
- Health needs;
- Special staff needs;
- Special peer relationships;
- Day program services needed;
- Leisure activities;
- Support services; and

- Other special individual needs/requests.

16. In 1992, a unique labor agreement was reached with what was then known as the "Alliance," which was comprised of American Federation of State, County and Municipal Employees ("AFSCME"), Council 93 and the Service Employees International Union ("SEIU"), Local 509. This agreement addressed a commonly described concern on the part of guardians and family members that long-term relationships between residents of the facility and their caregivers would be ruptured by movement from the facility. This agreement, commonly referred to as the "Social Unit Agreement," provided for at least 60% of new community residential program development to be staffed by state employees, and the transfer of a large number of professional staff positions to the community system. At the same time, the Facility administration was able to offer transfers into community residential homes for staff who had close personal relationships with the residents who would be living in those particular homes. This practice resulted in the preservation of many meaningful relationships and facilitated the transfer of hundreds of direct care personnel and a large number of clinical positions to the community system including Social Workers, Qualified Mental Retardation Professionals ("QMRPs"), Vocational Rehabilitation Coordinators, Vocational Instructors, Licensed Practical Nurses ("LPNs") and Habilitation Coordinators, to name a few.

17. As the Dever closure proceeded, every effort was made to keep families involved and informed; communication in a variety of forms was essential.

Regular letters and the Dever newsletter were sent to family members and access to the Facility Director was available to families at night and on weekends (as well as during normal working hours). Clinical staff often traveled to families' homes when travel to Dever was difficult for them. Although not all families and guardians were in full agreement with the process and/or outcome due to their insistence that Dever remain open, each family was fully engaged by facility staff and included in the planning to the extent that they would allow.

18. Families were provided educational opportunities to explore alternative residential living, including opportunities to visit community programs and other ICFs/MR. Family support activities also offered the opportunity for family members of people who were living at Dever to meet and talk to family members of individuals who had made successful transitions to integrated community living. Again, it must be stressed that the residents of the facility were largely in the severe and profound range of mental retardation and exhibited a wide variety of serious medical and physical problems which required intensive staff support. Family members were paired with families whose loved ones presented similar profiles. This was done to assist families to share their experiences of family members who possessed similar life experiences and to emphasize the point that people with significant physical limitations and complicated medical conditions can live successfully in a community setting if careful planning is undertaken, proper safeguards are in place and adequate resources are devoted to the new home.

19. Each residential transfer was carefully and individually planned, regardless of whether it involved the 12 individuals who moved to other developmental centers, or the over 250 individuals who moved to either state-operated or provider-operated community-based programs. Each Individual Transition Plan ("ITP") was meticulously specific in identifying the individual's need for supports and how those supports would be met in the new setting. It was the Department's clear and unwavering insistence that each class member moving from the Facility would have all of his/her needs met regardless of whether it be in the community or at another congregate facility. This message was consistently transmitted to Dever staff who were accountable for ensuring compliance. Since the ISP was the final repository of all of the elements of each individual's plan and constituted my certification that services in the new setting would equal or exceed those of the previous location, it is significant that despite the vocal opposition of a number of families to the closure of the facility, to my recollection there was not a single ISP appeal during the course of the facility's closure.

20. The ITP process was developed to gather very specific, concrete information about each person which would aid in the development of all necessary support services and aid in the smooth transition to a new residence. The ITP addressed the following areas:

     1.  The person's understanding of the new living arrangements;
     2.  Previous residential moves and reactions;
     3.  Important contacts during the transition;
     4.  Family support and involvement;
     5.  Specific information about personal routines;
     6.  Physical considerations and equipment needs;

7. Social Life;
8. Relationships and communication abilities/styles;
9. Emergency skills;
10. Recommendations for Day Services;
11. Recommendations for the transition schedule; and
12. Recommendations for follow-up.

21. The ITP was developed by the ITP Team in conjunction with the ISP Team, reviewed, modified and ultimately approved by the guardian, at which time it was incorporated into the ISP via an ISP modification.

22. At the same time that the ITP was being developed, a Registered Nurse who was familiar with the medical status of the individual for whom placement was being planned completed a Health Care Assessment which likewise became a part of the ITP and ultimately was incorporated into the ISP.

23. Beginning no later than October of 1995 and continuing until the closure of the facility in February 2002, a Support Services Readiness Checklist was required to be completed for each resident who was moving to a new home. It contained an exhaustive list of tasks that needed to be completed prior to placement, identified services that needed to be in place at the time of placement, the date that each item would be put into place and the specific staff person responsible for each item. This Checklist along with a Class Member Transfer Notice was submitted to the Phasedown Coordinator for review and ultimately to me for approval. Also, once the Checklist was completed, a Dever staff person, usually a Social Worker on the ITP Team, was formally assigned to conduct a follow-up review after the placement occurred. This process represented an additional level of quality assurance monitoring to make certain that services

and supports were in place both at the time of placement and after the individual had moved to his or her new home.

24. Over the course of my 32 years of professional experience serving individuals with mental retardation, I have filled a variety of roles. Several years as a Clinical Social Worker and later as a Unit Administrator at the Wrentham Developmental Center gave me a well-rounded perspective of facility operation. As Director of the Wrentham Community Living Unit, I was responsible for seven community residences in five different towns which provided homes to 56 individuals. As Director of State Operated Programs for the Department of Mental Retardation, I oversaw all state-staffed community residences across the state. Finally, I was the Director of the Dever Developmental Center during the entire course of its phasedown and ultimate closing. This array of experiences has led me to the firm conclusion that there are no limits to what the spirit of a person with a disability can achieve. In my professional opinion, an individual's level of mental retardation, medical or behavioral challenges, sensory deficits or mobility difficulties need not preclude a fulfilling life in an integrated community setting. Treating each person as an individual, developing proper housing, allocating adequate resources, insuring strong clinical support, and maintaining long-term personal relationships can lead to successful community living and a lifetime of new horizons.

Signed under the pains and penalties of perjury this __30th__ day of _May, 2007_ .


__/s/ John E. Riley_____

John E. Riley