UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ASSOCIATION FOR RETARDED CITIZENS OF MASSACHUSETTS, INC., et al., | | |
| Plaintiffs, | Civil Action Nos. | 72-0469-T |
| | | 74-2768-T |
| | | 75-3010-T |
| | | 75-5023-T |
| v. | | 75-5210-T |
| COMMONWEALTH OF MASSACHUSETTS DEPARTMENT OF MENTAL RETARDATION, et al. | | |
| Defendants | | |

## AFFIDAVIT OF LAWRENCE TUMMINO

I, Lawrence Tummino, do depose and say as follows:

1. I am the Assistant Commissioner for Field Operations of the Massachusetts Department of Mental Retardation (hereafter referred to as "DMR" or "the Department"). I have worked for the Commonwealth in the field of mental retardation for 33 years. In my current position, my responsibilities include the general supervision, coordination, and management of the provision of services by or through the DMR field offices to persons with mental retardation who are eligible for services from the Department. The Department field offices are located throughout the Commonwealth. There are four Regional Offices headed

by Regional Directors and 23 Area Offices headed by Area Directors. The Area Directors report to their respective Regional Directors who, in turn, report to me. In addition, staff working on special projects affecting DMR consumers report to me. I report directly to Commissioner Gerald J. Morrissey, Jr.

2. The facts in this affidavit are based upon my personal knowledge, reports and studies given to me by DMR staff, and DMR records, unless otherwise indicated.

3. In preparing this affidavit, I reviewed the Court Monitor's March 6, 2007 Report to the Court ("Court Monitor's Report"), the recent pleadings filed by the *Ricci* Plaintiffs including the Plaintiffs' Motion and Memorandum for Clarification of the Court's February 8, 2006 Order and Supplements (Document(s) Nos. 137 and 146), as well as the Wrentham Association's February 6, 2006 Motion to Re-open Case and Restore to Court's Active Docket ("Wrentham Association's Memo"). I am familiar with the May 25, 1993 Final Order issued in *Ricci, et al.,* v. *Okin, et al.* ("the Final Order").

<u>The Department's Service System</u>

4. In May 2007, the Department's Information System ("Meditech" or "DMRIS") reports approximately 32,338 individuals as clients of the Department of Mental Retardation. As reported by DMRIS, the Department provides residential services to approximately 10,729 individuals. Of that number approximately 9,757 receive services in community-based settings, and approximately 972 individuals reside in facility-based settings or intermediate care facilities for the mentally retarded ("facilities" or "ICFs/MR"). Of the number that reside in

2

community-based residential settings, 1,009 reside in 24-hour state-operated community programs, and 8,748 reside in provider operated residential programs including provider-operated 24-hour supports, shared living and home share supports, less than 24-hour residential supports, and adult foster care programs. Since FY92, the facility population has declined from 2,643 to 972 (of whom 805 are *Ricci* class members).[1]

5. The Department serves over 8,000 individuals in *24-hour supervised* residential programs including ICF/MR residential settings, 24-hour provider-operated community-based residences, and 24-hour state-operated community-based residences.

<u>The Community-Based System Successfully Serves Individuals with Intense Medical Needs</u>

6. Over the last 15 years, thousands of individuals with mental retardation who live in the Commonwealth have benefited from the national movement toward community living. The transitioning of individuals from the facilities to less-restrictive community-based settings has been accompanied by an increase in funding for community supports and the development of a robust community system, as a significant portion of the funds allocated to serve individuals in the facilities is now used to fund services provided to them in community-based settings.

---

[1] Unless otherwise stated the figures are as reported in the Department's information system DMRIS as of May, 2007. DMRIS is an integrated and interoperable system that supports both the programmatic and clinical needs of DMR in its client service responsibilities and the administrative and assurance functions as they relate to meeting federal and state standards applicable to mental retardation services. There are two major components to DMRIS: Meditech which serves as the system of record for case related information and HCSIS which is the system of record for quality management-related information.

3

7. Moreover, budget increases have allowed for substantial investments to the Purchase of Service (POS) residential system as a whole. With the influx of new funding the POS system has benefited by providing for service expansion throughout the community-based residential system and, through the addition of resources to core administrative services, has among other things strengthened clinical services and staff training programs and enhanced internal quality assurance systems.

8. The Department contracts with non-profit providers that collectively operate over 2,000 small (typically 5 person or less), community-based programs, as well as over 200 state-operated programs that serve over 1,000 individuals with all ranges of mental retardation and related health disabilities in the community.

9. Among the Department's array of state and vendor-operated community programs, many have nursing and other clinical supports embedded in the programs enabling them to successfully care for the most health intensive and medically needy individuals with mental retardation on a daily basis.

10. The capacity of the community-based residential service system has grown to accommodate the demands of *Ricci* class member and others. At the same time, there has been substantial growth in community-based day services and supports to families caring for their family members with mental retardation at home, and includes services and supports to individuals with severe to profound retardation, and individuals with complex medical and behavioral needs. Through close coordination the Department has been able to assemble the appropriate combination of clinical and direct care supports, as determined by the ISP, to

serve individuals with the most challenging behavioral needs and those needing intensive medical supports. This service capability is evidenced by the fact that the Department has been able to successfully serve individuals with complex needs who have transitioned from the large congregate facilities such as Dever and Belchertown to community living. Just as importantly, the Department has been able to serve individuals with these same kinds of clinical and medical needs, who have never lived in a facility, as they "age-out" of special education entitlement services.

11. The intensive level of care required for some individuals successfully residing in the community programs are in many instances greater than those required by individuals presently residing in an ICF/MR. The Department has a long and successful record of meeting the clinical needs of medically fragile individuals with mental retardation in the community and continues to expand its community programs as necessary to meet the needs of a growing community population.

12. To meet the health care needs of individuals served by DMR and to ensure that they have regular access to healthcare services including annual physicals and referrals to appropriate specialists and hospital care, the Department has committed to a clinical template in the community of having a registered nurse and a psychologist in each DMR Area Office to provide support and consultation to state-operated and vendor-operated community providers. To complement the Area Office-based clinical staff, the Department has secured clinical team

support through provider agencies and additional clinical services at day habilitation programs.

13. In addition to the DMR Area Office nurses, many providers have their own "in-house" nursing staff which may include a nursing coordinator who oversees and coordinates systems across the agency, registered nurses ("RN") who train and consult with direct support professionals, and registered nurses who provide direct services. For individuals whose health care needs require more direct supervision, the Department has several medically intensive homes where registered nurses or licensed practical nurses are available on-site for all shifts.

Fiscal Effort

14. The Commonwealth's fiscal efforts with regard to services for individuals with mental retardation, including *Ricci* class members, far exceeds the 1993 levels required by the Final Order. DMR's state-appropriated budget has nearly doubled from $601.4 million in FY1992 to approximately $1.192 billion in the FY2007 appropriation. This expansion has resulted in a concomitant doubling of federal reimbursement dollars coming to the state, rising from $219 million in FY1992 to $435.95 million in FY2006, and a projected $446.9 million for FY2007. Federal funding represents only 37.49% of the total funding devoted to individuals with mental retardation through the DMR state-appropriated budget. The funding dedicated to *Ricci* class members during this period has been substantial and, indeed, captures the greatest portion of this funding stream.

## A Disproportionate Amount of the Department's Resources are Allocated to the Commonwealth's Facilities

15. As the agency responsible for providing services for all persons with mental retardation in the Commonwealth, the Department is obligated to equitably allocate the funding appropriated by the Massachusetts Legislature to provide services to almost 23,000 adults with mental retardation eligible for services from the Department. Recognizing that funding is not unlimited, the Department is required to make decisions necessary to ensure individuals receive necessary services. Department services include facility supports, community residential supports, clinical supports, service coordination supports, community day supports, individual supports, respite care, transportation supports, family support services and other services.

16. Approximately $181.9 million (or about 15%) of the Department's annual budget is expended for the operation and maintenance of the Department's six facilities and the services provided to the individuals who reside there. In FY2007, the DMR state-appropriation for operating FDC is $42 million, for currently 186 residents. The average cost per person per year for each of the 972 individuals to receive services in an ICF/MR is approximately $187,140 from the DMR budgeted account.

17. The costs of operating six ICFs/MR in Massachusetts will continue to increase in actual terms, as wages and variable and fixed operating costs increase and the demand for ICF services remains flat and individuals in the facilities age and die. By necessity the cost per person for services in an ICF/MR rises as the overall census of residents residing at the facilities declines and the physical, capital and

staff costs necessary for the continued operation of each facility are attributed to fewer individuals. For example, the average cost per person at the Fernald Developmental Center is approximately $700/person per day or $259,000 per person annually. Although the FDC costs are high in part due to the closure and reduced census, all of the Department's other facilities have rates between $433 and $590 per day, and all have declining census.

18. The average cost of serving an individual in a Department operated or contracted 24-hour community-based residential program is significantly lower, currently costing about $280 per day or approximately $102,103 annually, inclusive of day and transportation services.

19. Despite the Commonwealth's great strides in the development of a thorough and robust community system, there are new demands for community-based residential opportunities for individuals with mental retardation. Each year a growing number of individuals with an assessed need for residential supports present to the Department, including but not limited to, adolescents transitioning from Department of Education services to adult DMR services through the "Turning 22" initiative (in FY2007 approximately 196 these individuals had an assessed need for residential supports),[2] individuals in emergency situations, such as those with high needs who lose a family caregiver to illness or death, and nursing facility patients who are ready to move back to the community. These are just a few examples of the continuing and growing need for community

---

[2] The "Turning 22" initiative alone has required significant residential assets be dedicated to meet the needs of this growing population – which renews on an annual basis. Since Fiscal Year 2002 over 900 individuals have been served residentially through the Turning 22 program.

8

residential services requiring the further development and expansion of the Commonwealth's community-residential system.

20. The continued expenditure of such a large percentage of the Department's resources to fund the services provided to the comparably small number of individuals in the Department's six facilities adversely impacts the development and expansion of community resources that are necessary to serve the growing population of individuals who receive services from the Department in community-based residential settings. The disparity between the costs to provide services in the facility system and community system will continue to intensify as the facility census continues to decline and facility costs escalate due to limitations on the Department's ability to consolidate.

21. I have read the "Final Assessment" of the Court Monitor's Report and disagree with his conclusion that alternatives to Fernald "would not meet an 'equal or better' service outcome." Monitor's Report at p. 27. The suggestions contained in the Monitor's Report such as "condensing" the campus simplistically ignore the overwhelming expenditures that would be required, such as: modifying the facility's existing infrastructure to the tune of millions of dollars; re-routing utilities on the Fernald Campus to decommission the power plant; purchasing and installing individual power sources for each remaining structure; constructing new structures and roadways throughout the campus; and the continued allocation of millions of dollars each year dedicated toward maintaining an expensive residential model that serves fewer individuals each year and is unnecessary in light of the excess capacity available at the

Commonwealth's remaining facilities and the extensive opportunities available in the community residential system. Any additional funding allocated to increase Massachusetts ICF/MR residential capacity will further contribute to the disproportionate funding of the facility system and will negatively impact the development and expansion of community-based services at a time when they continue to face increased demand.

22. Any Court Order that is consistent with the Court Monitor's suggestion to allow individuals to remain indefinitely at Fernald (and presumably at each of the Commonwealth's 5 other facilities), will preclude the Department from implementing needed cost-saving measures such as consolidation and will perpetuate and intensify the inequitable funding of the ICF/MR system to the detriment of individuals who reside in the community, potentially for decades to come.

### Massachusetts has been Increasing Provider Staff Compensation

23. The Department and its vendor agencies currently provide adequate salaries to direct care staff. Moreover, the salaries of direct care workers have increased during the period since 2001. Over the past 5 years, the Massachusetts Legislature has appropriated approximately $73 million dollars for the sole purpose of increasing the salaries of human service workers. This "Salary Reserve," which is expected to be replenished in the FY2008 budget, has resulted in steady salary increases for direct care workers and supervisors in the community system.

Turnover

24. Staffing levels in the community system are sufficient to meet the needs of DMR consumers. The Court Monitor's Report noted they were told during their community program tours that "continuity of staffing" represented an "on-going struggle" for providers; however, the Court Monitor also observed that the homes they visited were "well maintained" and they noted the positive input they received from guardians they spoke with during the visits. See Court Monitor's Report (Document No. 158) at pp. 15 – 16.

25. Turnover alone is an insufficient measure of workforce stability and does not account for the variety of ways that continuity of care to individuals in the community is accomplished. The use of overtime, the availability of relief staff, and the redeployment of career (perhaps supervisory level) staff, are just a few of the ways in which continuity of staffing is assured.

26. Moreover, there are many reasons that people leave jobs; one example is that new employees in direct care positions may discover that they are not suited to working with people with disabilities and, thus, create turnover at entry level positions. Workforce churning is not a phenomenon that is limited to direct care staff, it is an attribute of service positions of all types. Although the community system experiences some churning, generally the workforce is fairly stable; particularly if the direct support staff that is "churning" is primarily composed of new employees.

27. At any given time in the POS system, providers may experience staff turnover as the result of the ordinary workings of the marketplace. When this happens,

providers enter a very competitive job market to get the most qualified staff, which providers have generally been able to do. In some cases, they take steps to fill occasional gaps through the use of overtime or relief staff or by means of the redeployment of management staff to address temporary direct care vacancies.

Community Staff is Highly Trained and Competent

28. Department training initiatives ensure that its employees and providers' staff are well-trained. The Department's training department includes a Central Office Training Director, four Regional Training Directors, and support staff. DMR holds a number of direct support conferences on a variety of subjects and has a broad-based partnership group that identifies and assists in the development of curricula on needed topics. All Regional training units work with both the provider community and DMR staff to identify and develop training programs and curricula relevant to the needs of staff working with people with mental retardation. Some Regions also have established training councils consisting of DMR and provider staff that identify areas and topics for additional training. Additionally, each Regional Training Unit and the Central Office Training Division also maintain a large library of materials and resources available to assist employees in their jobs.

29. Training staff provide hundreds of opportunities across the state for direct care and supervisory staff to enhance their skills. Regional training catalogs are available and contain a wide variety of training opportunities on various subjects. Orientation training is available to all new staff and includes such core

topics as "Understanding People with Mental Retardation," "A Life Like Any Other," human rights training (both the basic training and Human Rights Officer training) and training in teamwork skills. Other critical trainings include CPR, Fire Safety, and Diversity training which are offered on an ongoing basis for employees at provider agencies and for any individual interested in updating their skills and knowledge.

30. Each Region also offers elective clinical trainings and workshops addressing a broad-range of subject areas related to individuals' specific needs. For example, a sample of special trainings offered in 2007 included topics on: swallowing/dysphagia; pica, seizures; diabetes; deaf awareness; multi modal communications/sign language; medication administration; vital signs training; using computers with adults with mental retardation, adaptive equipment and software for early learners.

31. Additional professional development is also available through DMR trainings, supervisory and leadership series, and projects with colleges and universities.

32. Over the last several years, the Department has collaborated with eight Community Colleges to develop a tremendously successful Direct Support Certificate program designed to support and enhance the careers of direct support staff in DMR-funded programs. The Direct Support Certificate program model in Massachusetts has been presented at numerous national conferences as an excellent example of the partnership between community colleges and public human service agencies. Program areas of study include: teaching and learning, person centered planning, teaching people with cognitive disabilities, and

behavior management. Many students who complete the Certificate program continue on to enter the Associate in Human Services programs that are available at various Community Colleges.

33. The Department also collaborates with the University of Massachusetts which offers three relevant Bachelor of Arts programs on two of the University of Massachusetts campuses, Amherst and Lowell. These programs offer a specialization in developmental disabilities and include a supervised internship component. Typically the graduates go on to become first-line house managers or supervisors.

34. In a number of important ways, DMR ensures that the Department and its providers have adequate numbers of competently trained staff in the community; and that contracted services meet the needs of the individuals involved in each particular program. Conformance with specialized staff and qualifications in the RFR and contract performance objectives, staffing requirements, ongoing program oversight via program visits and contact with families, Area Office contacts with provider organizations, comprehensive Annual Standard Contract Reviews, the health care initiative program, and certification and licensing requirements are examples of activities that assure that quality community services are being provided.

Signed under pains and penalties of perjury this 30th day of May 2007.

                                          /s/ Lawrence Tummino
                                          Lawrence Tummino