UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ASSOCIATION FOR RETARDED CITIZENS OF MASSACHUSETTS, INC., et al., <br><br>  Plaintiffs, <br><br><br><br> v. <br><br><br> COMMONWEALTH OF MASSACHUSETTS DEPARTMENT OF MENTAL RETARDATION, et al. <br><br>  Defendants | Civil Action Nos.  72-0469-T<br>75-2768-T<br>75-3010-T<br>75-5023-T<br>75-5210-T |

**AFFIDAVIT OF BERNARD J. MURPHY**

I, Bernard J. Murphy, do hereby depose and say as follows:

1.   That I am an attorney licensed in Massachusetts and New York.  I have been

licensed in Massachusetts since 1985.  I am currently employed by the

Department of Mental Retardation ('the Department or DMR") as the Director

of the Investigations Division.  Immediately prior to joining the Department in

June 2000, I was engaged in the practice of law as an Assistant District Attorney

for the Bristol District for nearly 11 years.

2.      That as the Director of Investigations my responsibilities include overseeing the implementation of 115 C.M.R § 9.00 <u>et</u> <u>seq</u>., and M.G.L. c. 19C as they relate to the investigation of allegations of Mistreatment and Abuse involving individuals served by the Department.

3.      That in addition to my duties and responsibilities as the Director of Investigations, I am also a member of the Steering Committee for the Building Partnerships Initiative, a cross-agency effort that focuses on protecting individuals with mental retardation from instances of abuse or neglect. The Committee is chaired by District Attorney Elizabeth Scheibel.

4.      That the Investigations Division is also responsible for oversight of Residential Service Providers' compliance with 115 C.M.R. § 11.00, which requires the review of Criminal Offender Record Information (CORI) regarding candidates for employment or regular volunteer positions that involve the potential for unsupervised contact with individuals served by the Department.

5.      That in my role as the Director of Investigations, I am also responsible for coordinating Investigation Division activities with the Disabled Persons Protection Commission ('DPPC'), an independent state agency with oversight authority for DMR and other human service agencies investigations, and with law enforcement agencies and professionals.

Changes in the DMR Investigative Processes Since 1997

6.      That in 1997, after a multi-year review, the Massachusetts House Post Audit and Oversight Committee issued a report critical of certain aspects of the Department service system and the way the Department responded to public scrutiny and requests for information.

7.      That in 1997, in response to an abuse/neglect incident in Raynham, Massachusetts, and the House Post Audit Report, Department Commissioner Gerald J. Morrissey, Jr. commissioned the Investigation Advisory Panel.  The Panel was chaired by District Attorney Elizabeth Scheibel and was charged with scrutinizing the DMR Investigations system with an eye toward identifying areas of system failures and recommendations to improve those areas.

8.      That in 1998, the Panel issued a report that identified several areas of the system that required improvement, and contained recommendations that could lead to improvement of those parts.

9.      That as a result of examining the findings and recommendations of the House Post Audit Report and Investigation Advisory Panel Report and the systems failures related to the investigation process, the Department engaged with internal and external stakeholders and others to change its systems.

10.     That in 1999  the "Building Partnerships for the Protection of Persons with Disabilities" Initiative  was launched with cooperation among the Department of Mental Retardation, The Department of Mental Health, The Massachusetts Rehabilitation Commission, The Disabled Persons Protection Commission and the Commonwealth's 11 District Attorneys.

3

11.     That the above-named agencies entered into a Memorandum of Understanding ("MOU") that was written with the purpose of providing protection to persons with disabilities by ensuring the prompt and effective reporting, investigation and prosecution of crimes against persons with disabilities through enhanced communication and cooperation between law enforcement and human service agencies, and increased awareness of the threat of abuse involving persons with disabilities.

12.     That the MOU established a multi-disciplinary approach towards addressing the most serious allegations of abuse involving persons with disabilities and provided a framework for more effective investigation and prosecution of crimes against persons with disabilities. A true and accurate copy of the MOU is attached as Exhibit "BJM-1."

13.     That as a participant in the Building Partnerships Initiative and a co-signatory of the MOU, the Department  has participated in a  number of projects designed to implement the recommendations of the Advisory Panel Report and improve our ability to report and investigate allegations of abuse and mistreatment. See Exhibit "BJM-2" attached hereto.

14.     That as a result of the aforementioned projects many law enforcement officers and officials and provider personnel have been educated on matters including but not limited to: issues related to identifying abuse and mistreatment; reporting requirements of abuse or mistreatment of a disabled person; communicating with persons with disabilities; protecting potential evidence of

4

incidents of abuse/mistreatment of a disabled person;  and cooperating with law enforcement or human service agencies to ensure an optimum result.

15.    That as a result of the extensive educational effort and an attendant increased awareness, reports of allegations of abuse and mistreatment went up for approximately five (5) consecutive years beginning in 1999.

16.    That all police recruits now receive 8 hours of basic training regarding M.G.L. c. 19C and other issues concerning persons with disabilities.

17.    That an aggressive and comprehensive training initiative within the DMR has ensured that all civil investigators have completed, at  a minimum, a 40 hour Basic Investigation course and a 40 hour Sexual Assault Investigation course.

18.    That additionally presenters from the DPPC, DMR, and MRC ("Massachusetts Rehabilitation Commission") conduct  semi-annual training for civil investigators.

19.    That Criminal Investigation Liaisons have been identified within the Investigations Division and trained to work with law enforcement authorities in cases of suspected criminal abuse so that complimenting resources can be brought to bear in all such cases, and to ensure that there are no duplicative investigations.

20.    That this collaborative and complementary system for investigating Abuse and Mistreatment is the direct result of the Department studying the system failures of the 1990s, and correcting those failures.

21.    That Complaint Resolution Teams have been established in every DMR Area Office and Facility Office to review each complaint and to design a remedial

services plan designed to redress the harm involved and to prevent similar harm from befalling other individuals in the future.

22. That each Complaint Resolution Team has volunteer citizen membership that allows for added transparency of the investigation process.

## Review of the Allegations of Abuse in the Plaintiffs' Memo

23. That in preparing this affidavit, I reviewed the Court Monitor's March 6, 2007 Report to the Court ("Court Monitor's Report"); and the Wrentham Association's February 8, 2006 Motion to Re-Open Case and Restore to Court's Active Docket ("Wrentham Association's Memo") and the documents provided to the Court Monitor and Wrentham Counsel by the DPPC.

24. That I reviewed the Vendor Survey Reports the DPPC provided to the United States Attorney's Office described at p. 17, footnote 1 of the Court Monitor's Report.

25. That I conducted a review of all of the investigation reports that were generated as a result of the cases identified in the Wrentham Association's Memo as substantiated claims of abuse.

26. That the so-called "summaries" of cases presented in the Wrentham Association's Memo do not contain investigation conclusions; rather they describe allegations as made to the Intake call screeners at the DPPC at the time of the initial report of the incident.  The intake call description does not necessarily correlate with the investigation's findings and conclusions – even in substantiated cases.  Additionally, approximately 15 cases cited in the tables of

the Wrentham Association's Memo that were described as substantiated were pending at the time the information was released to the Wrentham Association. Several of these cases reported as substantiated have since been found to be unsubstantiated following investigation.

27. That of the 87 G.L. c. 19C Intakes[1] identified in the Wrentham Association's Memo, only five (5) were related to Ricci Class Members of the Wrentham Class.

28. DPPC data regarding the number of "hotline" calls, as referenced in the Wrentham Association's Memo at pp. 17 - 18, encompass calls across all disability agencies and are not specific to individuals with mental retardation.

29. DPPC data counts each report/intake as a separate case, including duplicate calls about the same incident and individual.

<u>CORI Compliance and Audits by DMR</u>

30. That as a component of the Department's initiatives to keep individuals safe from harm, the Department's regulation require Criminal Offender Record Checks ("CORI checks") for all Department and Provider staff and volunteers whose positions involve the potential for unsupervised contact with individuals served by the Department. See 115 CMR § 11.00.

31. That in 2000 the DMR began conducting annual onsite audits of providers to insure compliance with DMR CORI check requirements.

---

[1] A total of 92 DPPC Intakes were included in the Wrentham Association's Memo – representing 87 incidents. DPPC will generate a separate Intake for each complaint received although each complaint may refer to the same incident. See ¶ 29.

32.     That with few exceptions when a CORI violation is discovered during the audit process, it is because the agency does not have proper documentation on site that the CORI check was completed.  This does not necessarily mean that a CORI review was never conducted.  In such cases, the Department directs the provider to prohibit the employee from having the potential for any unsupervised contact with individuals served by the Department even if a CORI check had been conducted, until the requirements of Department regulations have been met.

33.     That since the audit process began in 2000, the number of providers who comply with the CORI regulations has increased significantly, and likewise the number of overall violations has decreased significantly.

34.     That DMR's process for conducting CORI audits was commented upon favorably by the Inspector General in his audit of human services providers for the Department of Mental Health.  See Office of the Inspector General, Feb. 2005, "A Review of the Department of Mental Health's Employee Screening Practice." Attached as Exhibit "BJM-3."

35.     That the forgoing is based upon my personal knowledge, and/or information provided to me by DMR Investigations staff, DPPC staff and the House Post Audit and Investigation Panel Reports.

Signed under the pains and penalties of perjury this  30th  day of  May,  2007.


 /s/  Bernard J. Murphy
Bernard J. Murphy