UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ASSOCIATION FOR RETARDED
CITIZENS OF MASSACHUSETTS,
INC., et al.,

                Plaintiffs,

v.

COMMONWEALTH OF
MASSACHUSETTS DEPARTMENT
OF MENTAL RETARDATION, et al.,

                Defendants.

Civil Action Nos.        72-0469-T
                         74-2768-T
                         75-3010-T
                         75-5023-T
                         75-5210-T

## AFFIDAVIT OF GAIL GROSSMAN

I, Gail Grossman, do depose and say as follows:

1. I am employed by the Department of Mental Retardation ('the Department" or "DMR") as the Assistant Commissioner for the Office of Quality Management. My responsibilities include oversight of all activities relating to quality assurance and quality improvement including but not limited to the licensing/certification process for all public and private providers, the Medication Administration Program, the mortality review process, risk management and critical incident reporting systems, health and wellness initiatives, and the writing and

dissemination of statewide quality assurance reports. Unless otherwise indicated, the facts contained in this Affidavit are based on personal knowledge, information provided by DMR staff, and DMR records.

2. I received my B.A. in English from Brooklyn College, City University of New York in January 1970 and my Masters in Social Service Administration (M.S.S.A.) from Case Western Reserve University in June 1972.

3. Upon completing my Master's Degree I worked for one year at the Federation for Community Planning in Cleveland, Ohio on a grant to develop an alcoholism service system for the city of Cleveland.  I then served as the Associate Executive Director for the ARC/Massachusetts from 1973 to 1978.  From 1978-1986, I was the Associate Area Director for the Concord Office of the Department of Mental Health.  From 1986 to 1992, I worked for Children's Hospital as the Contract Manager for the Children's Hospital Health and Habilitiative Services Contract at Wrentham State School.  In 1992, I joined the Department of Mental Retardation as Deputy Assistant Commissioner for the Office of Quality Enhancement and was promoted to Assistant Commissioner for Quality Management in 2001.

4. In preparing this affidavit, I reviewed the Court Monitor's March 6, 2007 Report to the Court ("Court Monitor's Report"), the recent pleadings filed by the Ricci Plaintiffs, including the Plaintiffs' Motion and Memorandum for Clarification of Order Appointing Court Monitor and the Plaintiff's Motion to Supplement it Motion for Clarification of Order Appointing Court Monitor (Document(s) Nos. 136, 143 and 146), the Wrentham Association's February 6, 2006 Motion to Re-

open Case and Restore to Court's Active Docket ("Wrentham Association's Memo") and the Vendor Reports produced by DPPC for the years 2002-2004 and referenced in the Court Monitor's Report. I am also familiar with the May 25, 1993 Final Order issued in *Ricci, et al., v. Okin, et al.* ("the Final Order").

5. The Department of Mental Retardation's transparent reporting of data related to health, safety and quality of life of individuals, is indicative of system-wide efforts to achieve continuous quality improvement and improve consumer safety in the community. The Department's Quality Management and Improvement System (QMIS) is a very robust and rigorous one. The DMR QMIS system begins with a thoughtful design that fosters prevention, promotes the early discovery of issues that affect the health, safety, and quality of life of individuals, provides for the remediation and correction of issues, and the use of aggregate data and information to inform quality improvement efforts. <u>See generally Commonwealth of Massachusetts Department of Mental Retardation Quality Assurance Reports for Fiscal Years 2002, 2003, 2004, and 2005.</u>

6. An in-depth overview of the Department's Quality Management and Improvement system was provided to the United States Attorney's Office and the Plaintiffs' on July 20, 2006. This presentation also included a component regarding the provision of clinical and medical services to individuals receiving DMR services in the community. Following the presentation, the Department responded to the Court Monitor in-writing addressing the written comments or inquiries the Ricci Plaintiffs presented to the United States Attorney's Office.

3

*See* Response to the Ricci Comments of the July 20, 2006 Presentation attached at

Exhibit GG-1.

<u>Abuse and Mistreatment of Individuals with Mental Retardation</u>

7.  All complaints of abuse and neglect are initially screened by the DPPC.  The

    DPPC notifies the Department that a complaint has been filed, screened in or

    screened out.  In either case, the information is transmitted from the DPPC to

    DMR and recorded electronically through the Department's HCSIS information

    system.   As described in the Affidavit of Bernie Murphy, the Department

    investigates some complaints under the authority of the DPPC, and some

    complaints which are screened out of the DPPC are investigated under the

    Department's authority of 115 CMR 9.00 <u>et</u> <u>seq</u>.   Because of this dual

    investigation authority, DMR statistics contain more completed investigations

    than those recorded by the DPPC.

8.  The Department's compiled investigations Data[1] indicate that there is steady

    progress being made to reduce the incidence of abuse or neglect, and fewer

    individuals are experiencing abuse, neglect or mistreatment than four years ago.

---

[1] Data source: DMRIS.  DMRIS is the Department of Mental Retardation's management information system.  DMRIS is an integrated and interoperable system that supports both the programmatic and clinical needs of DMR in its client service responsibilities and the administrative and assurance functions as they relate to meeting federal and state standards applicable to mental retardation services.  There are two major components to DMRIS:  Meditech which serves as the system of record for case related information and HCSIS which is the system of record for quality management-related information.  Within HCSIS is the Investigations module.  The Investigations module provides for the tracking, data entry, reporting, and of all complaints alleging abuse or mistreatment that are reported to the Disabled Persons Protection Commission (DPPC).  The module captures information from the time a complaint is filed with DPPC, through investigation and actions taken in response to the findings and conclusions of the investigation.

According to a review of all investigations conducted by the DPPC (or DMR, under DPPC's authority and supervision) [2] for years 2002 to 2005 the total number of substantiated allegations of abuse or mistreatment, when compared to the total adult population served, has decreased. In 2003, there were 358 substantiated instances of abuse in the total adult population eligible for services from DMR, as compared to a population of 22,802. In 2004, there were 299 substantiated cases as compared to a population of 23,157. In 2005, there were 291 substantiated cases, as compared to a population of 22,916. *See* Table 1, infra.

9. The rate of substantiated cases of abuse per 1,000 also decreased consistently from 2002 to 2005. [3] (Based upon completed investigations; pending investigations are not included in the counts.)

TABLE 1

| No. of Abuse/Neglect Investigations, Percent and Rate Substantiated 2002-2005 | | | | |
|---|---|---|---|---|
| **Abuse/Neglect Investigations** | **2002** | **2003** | **2004** | **2005** |
| Total Investigations | 1,351 | 1,257 | 1,083 | 1,093 |
| No. Substantiated | 431 | 358 | 299 | 291 |
| Percent Substantiated | 33% | 31% | 33% | 31% |
| Population (>18 yrs.) | 22,604 | 22,802 | 23,157 | 22,916 |
| No. of Substantiated Investigations per 1000 | 19.07 | 15.70 | 12.91 | 12.70 |

---

[2] DMR investigations can be conducted either under the authority and supervision of the DPPC, pursuant to G.L. c. 19C, or under DMR regulations, pursuant to 115 C.M.R. §§ 9.00 et seq. The latter, termed a "Section 9 investigation," encompasses a broader category of conduct than is covered by G.L. c. 19C, and requires no actual physical or emotional harm.

[3] During the period 2002 to 2006 the number of allegations reported to DPPC has remained very stable. Using the number of reported allegations when compared to the total adult population served by DMR indicates that the rate of reporting has not decreased over time.

10.  The same trend is demonstrated in both sub-categories of "physical abuse" and "sexual abuse." The total number of substantiated findings (one case can lead to multiple findings) of physical abuse has consistently declined from 2002 (105 substantiated cases) to a low in 2005 of 56 substantiated cases. Similarly, although the numbers of substantiated sexual abuse are too small to be statistically significant, a downward trend is evident with 15 substantiated cases in 2002, 11 in 2003, 10 in 2004, and 13 in 2005. *See* Table 2, Changes in the Number of Substantiated Complaints for the 13 Leading Types of Substantiated Abuse/Neglect 2002-2005.

TABLE 2

| *Changes in the No. of Substantiated Findings for the 13 Leading Types of Substantiated Abuse/Neglect 2002-2005* | | | | |
|---|---|---|---|---|
| **Types of Substantiated Abuse** | **2002** | **2003** | **2004** | **2005** |
| Omission | 179 | 166 | 159 | 129 |
| Physical | 105 | 76 | 61 | 56 |
| Emotional | 68 | 45 | 27 | 37 |
| Medical | 50 | 50 | 29 | 30 |
| Verbal | 83 | 31 | 20 | 27 |
| Failure:  Report | 39 | 32 | 22 | 23 |
| Medication | 34 | 24 | 17 | 19 |
| Failure:  Meet Needs | 24 | 26 | 12 | 17 |
| Unknown Injury | 15 | 21 | 14 | 13 |
| Sexual Misconduct | 15 | 11 | 10 | 13 |
| Inappropriate. Restraint | 11 | 14 | 11 | 12 |
| Financial Misconduct | 25 | 6 | 2 | 6 |
| Other Legal/Human Rights Violations | 17 | 10 | 5 | 3 |

11. In order to analyze the conclusions of the Court Monitor in the Ricci case about the level of abuse in community-based programs, I requested that the DPPC provide DMR with an aggregated count of cases investigated and findings substantiated for residential and institutional services for a period of 5 years (FY

2002 – FY 2006). *See* Exhibit GG-2 April 30, 2007 Memorandum from Disabled Persons Protection Commission – DMR Request for Information (4/27/07). The DPPC provided me with information regarding all substantiated abuse cases, including physical and sexual abuse, that occurred in DMR community residential programs (not to people living in the community with family or other setting) and in DMR facilities. A review of these data yield a very different conclusion than that drawn by the Court Monitor. The DPPC data show fluctuations in the rate of abuse over the years (which is based on the number of findings resulting from investigations as compared with census and population figures) in facilities and in the community. The overall rate for all types of abuse, however, was higher in facilities than in the community in three out of five years. *See* Exhibit GG-3, Rates per 1,000 of All Instances of Substantiated Abuse (5/5/07).

12. The data also demonstrate that the incidence of sexual abuse is very low overall, and for the 5-year period for which data were provided, the community rate has either remained stable or decreased with the highest rate occurring in the facilities in Fiscal Year 2005 at a rate of 1.8 per 1,000 persons. *See* Exhibit GG-4, Rates per 1,000 of Substantiated Sexual Abuse (5/5/07). The data also show that incidence of physical abuse in the community has consistently decreased with the highest rate over the five years for which data were provided also occurring in the facilities in Fiscal Year 2004 at a rate of 13.5 per 1,000 persons. *See* Exhibit GG-5, Rates per 1,000 of Substantiated Physical Abuse (5/5/07).

13. The Department's published data, and the data generated by the DPPC, demonstrate that there is no appreciable difference in the overall risk of harm from either physical or sexual abuse across the two relevant settings – institutional or facility-based services and community-based services. Both the Court Monitor (and the Wrentham Plaintiffs) have drawn improper conclusions from DPPC data. See Court Monitor's Report at pp. 16-17.

14. For example, based upon data for FY 2003 only the Wrentham Plaintiffs purport to present conclusions about patterns and trends over time. It is not possible and is, in fact, invalid to draw such conclusions from data limited to only one year. Reliance on the data from one year fails to recognize the likelihood of fluctuations over time or to account for trends that inevitably emerge over a period of time. In fact, as identified above, their conclusions based upon one year of data do not accurately reflect the declining trend of abuse.  Using the same "Vendor Survey Reports" supplied by DPPC, a review of FY 2002 data reveals that the rate of abuse in the community and facilities were statistically the same.  For FY 2004, the rate of abuse in the facilities was actually higher in facilities than in the community.

15. Contributing to the erroneous interpretation of the DPPC "Vendor Survey Reports" reviewed by the Court Monitor is that the Reports contains only allegations, not substantiated findings, but the Monitor concluded that they were

the same and that an allegation was tantamount to a substantiated finding. This conclusion is patently inaccurate.

16. Further, there were several providers listed in the DPPC "Vendor Survey Reports" that do not support individuals with mental retardation and for which the Department has no licensure or certification involvement. These Reports cannot be used as a basis to draw conclusions regarding residential providers or community homes.

<u>Access to Clinical and Medical Services in the Community</u>

17. I have read the statements in the Court Monitor's Report in which the Monitor determined that clinical and medical services consistent with the Final Order's "equal or better" requirement are available in the community but that the "process takes much longer . . . and is more difficult to coordinate" than the process for providing such at an ICF/MR.  See Court Monitor's Report at p. 15.

18. Equal or better access to clinical and medical care in the community does not require the exact replication of the provision of services to residents of an ICF/MR in the same manner.  The equal or better requirement mandates that the *needs* of the individual be met and that the services necessary to meet those needs be available to the individual.  The Court Monitor determined that equal or better services, including equal or better medical services, were available to the individuals who transferred from Fernald; and the medical experts retained by the Monitor concurred with this determination.

19. The Department of Mental Retardation, through the Office of Quality Management, has developed a Health Promotion and Coordination Initiative to ensure that all individuals with mental retardation within the DMR service system receive appropriate access to health care of all kinds as necessary to meet their needs. This health initiative has contributed greatly to ensuring that individuals receiving DMR services have regular access to health care services.

20. In 2005, approximately 88% of individuals receiving DMR services from programs evaluated by the Department's Survey and Certification process received an annual physical exam. This is very probative in that the extent to which individuals receive at least an annual physical exam is a simple measure of access to appropriate medical care.

21. For 2005, approximately 86% of individuals served by DMR in programs reviewed by the Survey and Certification Unit had received a dental exam within the past 12 months. This percentage compares favorably with the percentage of Massachusetts residents (general population) who have received a dental exam in the last year (79.5%); as well as the percentage of the U.S. General Population (70.2%). It is also worthy to note that the majority of individuals receiving DMR services who reside in the community receive their dental care from the same provider as individuals in the facilities – the Tufts Dental Clinic.

22. The compiled data demonstrate that a relatively high percentage of persons served by DMR are receiving basic health care services – represented by a minimum of

one annual physical and dental exam, and resulting in at least one heath care encounter each year.  Compared with other mental retardation/developmental disability systems in New England and nationally, more persons served by DMR have had both physical and dental exams, and the percentage of persons served by DMR who receive dental care is higher than that of the general population of Massachusetts, and the United States.

23. In addition to annual physical exams, as part of a major health care coordination initiative, DMR has published a prescribed set of preventative health care screenings adjusted for age and specific disability related factors.  Providers are expected to have their health care practitioners implement these screenings in their interactions with individuals receiving DMR services.  In addition, DMR implemented a required health care record, which is now electronic, that includes all relevant health care history and current status.  The health care record is required as part of the annual ISP process and providers use it as a dynamic document for primary and specialty care visits.  Providers also maintain a health review checklist which they are required to use for all visits to primary care physicians.

24. To meet the health care needs of individuals served by DMR and to ensure that they have regular access to healthcare services including annual physicals and referrals to appropriate specialists and hospital care, the Department has committed to a clinical template in the community of at least one registered nurse and one psychologist in each DMR Area Office to provide support and

consultation to state and vendor-operated community providers. To complement the Area Office-based clinical staff, the Department has secured clinical team support through provider agencies and additional clinical services at day habilitation programs.

25. In addition to the DMR Area Office nurses, many providers have their own "in-house" nursing staff which may include a nursing coordinator who oversees and coordinates systems across the agency, registered nurses ("RN") who train and consult with direct support professionals, and registered nurses who provide direct services. For individuals whose health care needs require more direct supervision, the Department has several medically intensive homes where registered nurses or licensed practical nurses are available on-site for all shifts.

26. Since the signing of the Final Order in 1993, the Department has successfully transferred hundreds of individuals from facilities to more home-like, community-based residences and has ensured that individuals are provided with equal or better medical and clinical services. Consistent with its past practices, and as determined by the Court Monitor, the Department will continue to provide equal or better services to meet the *needs* of individuals residing in the community through the provision services identified in their ISPs – notwithstanding that the procedures for coordinating how such needs are met may differ from the procedures in place at an ICF/MR.

<u>Deaths of Individuals Transferred from Fernald</u>

27. I have read the Court Monitor's Report at p. 23, inferring that the deaths within 2 years of 6 of the 49 individuals that transferred from Fernald was somehow related to a "general sense [that] the lack of certainty in the closing of Fernald was causing problems." See Monitor's Report at p. 23, footnote 2. The deaths of individuals who transferred from the Fernald Developmental Center to other facilities or to the community were reported and reviewed and investigated, as appropriate. Clinical Mortality Review Forms, Autopsy Reports and other related materials documenting these procedures were provided to the Court Monitor. Considering the age of the individuals and their serious underlying medical conditions, the deaths of these individuals were not unanticipated nor was there any indication that their moves from Fernald were related to their deaths.[4]

---

[4] At page 25 of the Court Monitor's Report a reference is made regarding parents' statement that they "received a call that their child was found on the floor and had died" within one year of moving from Fernald to another ICF/MR. An autopsy was conducted on this individual which identified the cause of death as: sudden cardiac death from likely conduction block. Although the initial autopsy report indicated that the individual was found on the floor, an addended report correctly documented that the individual was found in bed – not on the floor. This information was included with the mortality review and autopsy report documents that the Department provided to the Court Monitor.

Signed under penalties of perjury this 29th day of May, 2007.

   /s/ Gail Grossman

Gail Grossman, Assistant. Commissioner
Office of Quality Management