UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ASSOCIATION FOR RETARDED CITIZENS OF MASSACHUSETTS, INC., et al., | | |
| Plaintiffs | Civil Action Nos. | 72-0469-T |
| | | 74-2768-T |
| v. | | 75-3010-T |
| | | 75-5023-T |
| | | 75-5210-T |
| COMMONWEALTH OF MASSACHUSETTS DEPARTMENT OF MENTAL RETARDATION, et al., | | |
| Defendants | | |

## AFFIDAVIT OF TAMAR HELLER, Ph.D.

I, Tamar Heller, do depose and say as follows:

1. I am the Head and Professor of the Department of Disability and Human Development at the University of Illinois at Chicago (UIC). I also direct the Institute on Disability and Human Development (the Illinois University Center of Excellence in Developmental Disabilities) and the national Rehabilitation Research and Training Center on Aging with Developmental Disabilities. I have conducted research on residential transitions, quality of life, and family caregiving of adults with developmental disabilities for over 25 years and have authored over 150 publications, including two books and three specially edited issues of journals, on these topics. I serve on the Council of the International Association for the Scientific Study of

Intellectual Disabilities and the board of the American Association of University Centers on Disability. I have served on the board of the American Association on Mental Retardation and I was a delegate to the 2005 White House Conference on Aging. I received my doctorate in psychology from UIC in 1974.

2. I have been asked to comment on the transition plan for the Fernald Developmental Center ("FDC") in Waltham, Massachusetts (operated by the Massachusetts Department of Mental Retardation, or "DMR") after (1) reviewing the scientific literature on deinstitutionalization and the relocation process for residents with developmental disabilities, and (2) reviewing the affidavits of Teresa L. O'Hare and John E. Riley; the "Placement Process for Facilities Identified for Closure, September 2003" manual; and the "Monitor's Report on Whether the 'Past and Prospective Transfer Processes Employed by the Department of Mental Retardation were in Compliance with Federal Law, State Regulations, as well as Orders of the Court'" (dated March 6, 2007). Other materials I have relied upon in forming my opinions in this matter are listed in the document entitled "References," attached to this affidavit.[1]

3. Below I discuss the results of my review and provide my opinions, which I express here with a reasonable degree of professional certainty. I will review the literature on: (1) national trends in deinstitutionalization, (2) transfer trauma and relocation, and (3) outcome studies of community placements. Next I will provide my assessment of best principles and guidelines for practice. Finally, I will discuss the results of my review of the Fernald relocation plan, process, and outcomes including: (1) DMR's experience in community placement; (2) experience with Fernald

---

[1] Citations to referenced materials herein will be by author and year of publication only. See Attachment A ("References") for further publication information.

transfers since the closure announcement; and (3) the Fernald closure transition process.

**Review of Literature on Closure and Relocation**

**National Trends**

4. Closure and phasedowns of public institutions caring for individuals with developmental disabilities have been occurring for over three decades. As of 2004, 38 states have closed down at least one institution and 9 have closed all of their public institutions for developmentally disabled ("DD") residents (Braddock, Hemp, Rizzolo, Coulter, Haffer, & Thompson (2005)). The national census of DD residents of public institutions has gone from nearly 150,000 in 1977 to less than 42,000 in 2004 -- a 73% reduction.

5. In the earlier period of closures and phasedowns there was a "creaming" process, whereby the highest functioning residents were moved into the community. Often these closures were done rapidly with little consideration of individualized planning. Gradually the community supports have begun to be established so that it is now possible to place people with even the most severe intellectual disabilities, complex medical needs, and behavioral challenges into community programs. The literature is replete with examples from various states (e.g., Oklahoma, New Jersey) of successful transitions of severely disabled individuals into the community (Conroy, Spreat, Yuskauskas, & Elks, 2003; Lerman, Apgar, & Jordan, 2003).

6. Most of the research shows positive outcomes of community placement, including two recent comprehensive review articles focusing on mortality (Hayden, 1998) and on adaptive behavior outcomes (Kim, Larson, & Lakin, 2001). The major exceptions

have been the Strauss and Kastner mortality studies regarding the California deinstitutionalization experience. It is generally regarded by the key professional and advocacy organizations that view their mission as furthering the best interests of people with developmental disabilities[2] that public institutions are restrictive settings and that community placements offer better quality of care and a better quality of life for people with developmental disabilities. These groups view community integration as a human and civil rights issue. The federal government through its New Freedom Initiative is encouraging the community participation and inclusion of individuals with disabilities. The *Olmstead* decision (1999) from the United States Supreme Court mandates the placement of individuals with disabilities in the least restrictive and most integrated environment possible, in keeping with their needs and their rights under the American with Disabilities Act (1990).

7. Therefore, DMR's plan to transition residents out of the Fernald Developmental Center into community programs is consistent with national trends, with federal mandates, and with the thinking of key professional and advocacy organizations in the area of developmental disabilities.

**Transfer Trauma and the Relocation Process**

8. There is concern that when persons are moved from one residential setting to another there can be what some call "transfer trauma." This can occur when the transfer is involuntary, results in considerable disruption, and is unpredictable. It is a short term (under two months) response that can result in behavioral disruptions and stress

---

[2] For example, the American Association on Intellectual and Developmental Disabilities, The Association for the Severely Handicapped (TASH), The Arc (formerly the Association of Retarded Citizens), Self-Advocates Becoming Empowered, and the Association of University Centers on Disabilities.

4

reactions, but the situation usually improves if the new setting is suitable to meet the needs of the resident. However, transfer trauma can be mitigated by good relocation planning. I outlined such procedures in my paper written after evaluating the Dixon Developmental Center closure in Illinois (Braddock & Heller, 1985). Key steps for avoiding transfer trauma include: (1) providing sufficient information to residents, staff, and families; (2) ensuring seamless transfer of information with visits and contacts by sending and receiving residential staff; (3) providing opportunities for visits to receiving residences; (4) developing individualized plans that take each resident's needs and preferences into account; (5) making sure that all needed supports are in place prior to the move; and (6) providing follow-up services by the staff at the previous residence (Heller, 1984).

## Outcome Studies

9. The literature on the impact of placements of individuals with developmental disabilities out of institutional settings into community programs has focused on two broad areas, mortality and quality of life.

## Mortality

10. Most recently, the findings on mortality have garnered considerable attention. In a review of 11 studies between 1960 and 1997 examining the impact of community placement on mortality of residents with developmental disabilities, Hayden (1998) found no evidence of increased mortality for residents moving into the community. Some studies, such as the Pennhurst studies 1978-1989, found that mortality rates were lower in the community (Conroy & Adler, 1998). Hayden noted that the only studies that found higher mortality in the community were the studies by Strauss and

5

his colleagues of the California data (e.g., Strauss, Kastner, & Shavelle, 1998). This study found that among 22,576 adults receiving services in California, 1985-1994 mortality rates (adjusted for age and level of functioning) were 72% higher in the community than in the institutional setting.

11. In an effort to replicate these findings, O'Brien & Zaharia (1998) also analyzed the California placement data. They found that from 1993-1995 community placements were not associated with increased risk of death. In fact, in 1993 and 1994, rates were lower in the community (adjusting for mobility, self-help skills, and level of MR) than in institutional developmental centers. They did find higher mortality in the community in 1991 and 1992 (before the Coffelt period$^3$). Stronger mortality risk factors than type of placement are self-help skills, low motor skills, and dependence on technology. O'Brien & Zaharia criticized the Strauss studies since they found different results in the number of deaths during the same period (1,952 placements in 1.2 years and 34 deaths April 1993 to Dec. 1995 versus 1,878 placements in 1.4 years and 45 deaths for the same period plus 45 days). They had concerns about accuracy of the data. The Strauss studies have been widely criticized regarding their conclusions. They had lumped together different types of community placements (including nursing homes which often have worse outcomes), failed to include quality of life outcomes, and failed to measure quality of health care. These studies generally did not explain the process by which higher mortality occurs. Also, it is difficult to impute causation from these studies as they did not measure the same people longitudinally.

---

$^3$ The so-called Coffelt Agreement (1994) required that 2,000 developmentally disabled adults living in institutional state developmental centers in California be transferred to community residences.

12. To test these criticisms, researchers conducted a longitudinal study of mortality following deinstitutionalization from the North Princeton Developmental Center in New Jersey (Lerman, Apgar, & Jordan, 2003). The researchers found no increased risk in community placements, when controlling for critical initial risk variables (e.g., age 60 years and older, having epilepsy, low self-care abilities, and one or more medical conditions). Only nursing home placement was associated with increased risk.

**Quality of life**

13. Many studies have reviewed the impact of community placement on various aspects of quality of life of the individual with developmental disabilities. The dimensions examined include: (1) behavioral outcomes, (2) community participation, (3) satisfaction of families, (4) satisfaction of residents, (5) resident self-determination, and (6) other dimensions of well-being.

14. Overall, most of the studies have reported improvements in adaptive behavior after community placements. This conclusion has been reached in several review articles including Larson & Lakin's (1989) review of 18 studies; Kim, Larson, & Lakin's (2001) review of more than 250 studies on this topic; and Lynch, Kellow & Wilson's (1997) meta-analysis of 11 studies of specific adaptive behavior skills. The Lynch study found that self-care, communication, academic, social skills, and community living skills improved as did physical development. A literature review in the United Kingdom and Ireland concluded that deinstitutionalization was associated in most but not all the studies with increases in adaptive behaviors and reductions in observed challenging behavior (Emerson & Hatton, 1996). A recent study in New Jersey

showed gains in self-care competencies, while institutional living was significantly related to losses in multi-cognitive functioning over a period of 27 months (Apgar, Lerman, & Jordan, 2003).

15. Other findings reported after deinstitutionalization have included the following:

    i. Improved community participation (Conroy, 1996; Emerson & Hatton, 1996; Raynes, Wright, Shiell, & Pettipher, 1994; Young, Sigafoos, Suttie, Ashman, & Grevell, 1996), family phone contacts, and productivity (Apgar et al., 2003);
    ii. Improved self-determination and autonomy (e.g., Emerson & Hatton; Stancliffe & Abery, 1997; Wehmeyer & Bolding, 2001);
    iii. Improved satisfaction of families, who often opposed community placement initially (reviewed by Larson & Lakin, 1991). Families of those who moved were more likely to say that consumer life quality (material well-being, productivity, personal safety and health) was better in community residences and that life was better for their relative than in the institution; and
    iv. Greater life satisfaction reported by residents (who can reliably be interviewed) after moving to a community setting from an institutional setting (Apgar et al., 2003).

16. The recent study of the Hissom closure (in Oklahoma) (Conroy et al., 2003) found that among 254 who moved from 1990 to 1995 there were improvements in adaptive and challenging behaviors, participation in employment, number of hours of developmentally-oriented services, opportunities for integration, frequency of contact with relatives, and lower use of anti-psychotic medications. While there was a greater difficulty in accessing health care, the urgency for health care needs declined. People had serious challenges with over 73% having severe to profound intellectual disabilities.

17. Overall, there is no clear evidence that deinstitutionalization of adults with developmental disabilities results in higher mortality for adults with developmental disabilities. Furthermore, there is a large body of literature indicating improvements

8

in quality of life for these residents in community placements. The research from the two recent closures in Oklahoma and in New Jersey has particular relevance to the FDC matter as they also entailed transfers of residents with severe levels of disability.

## General Guidelines and Principles for Practice

18. The relocation process should be designed as a seamless system wherein staff of the developmental center and families/guardians have input and provide information to staff at the receiving programs. The process should have follow-up services built in that allow for input from developmental center staff and other concerned people during the 30 days following the transfer, the period that is most likely to be disruptive to the residents. Ongoing communication between developmental centers and receiving residences should occur prior to the move and within the 30 days after the move. Developmental center staff should remain available even after the 30 day period. Strategies to improve planning, communication, and oversight include the following:

- Develop a seamless relocation plan with a timeline, strategies for involving community agencies and other stakeholders, resources needed, list of residents and their needs, notification process, plan for alternative living arrangements that can address each individual's ongoing needs.
- Parents, families and guardians need to be informed of the closure and placements and meaningfully involved throughout the process.
- The community placement must have a plan to provide supports needed, including the capacity to support individuals with complex medical or intensive behavioral needs.
- A person-centered community integration plan (e.g., Individual Transition Plan or "ITP") for each individual should be developed to outline the plan for providing appropriate supports in the community setting. It should be followed by a 30 day review and there after annually. It should be grounded in a person-centered details. It should focus on helping the person plan for a "meaningful life." It should emphasize choice-making, goal attainment, and development of skills facilitating community participation.

9

- This person-centered plan should involve administrators and staff from the developmental center and the receiving facilities, plus families, guardians, and the individual with disabilities.
- Minimize disruption by minimizing internal transfer of residents and staff in the developmental center and community placements.
- Give parents, guardians, and the individuals opportunities to visit the future placements and communities and address their concerns and preferences.
- Involve parents and people with disabilities who have been through the process of community placements to help inform others.
- Provide employee counseling and job placement services for employees at the developmental centers.
- Mechanisms should be developed and in place for sufficient preparation and oversight of community placements. In addition to state oversight systems, guardians and families should also provide oversight, so that their concerns and suggestions can be addressed.
- Staff in the community system need to be adequately trained to support individuals moving from the developmental centers. The staff from the developmental centers have insight into the unique needs of each individual and can convey these needs to the community staff.

### Fernald Transition Plan, Process, and Outcomes

19. This next section will review the Fernald transition plan, process, and outcomes including the following aspects: (1) Massachusetts experience in community placement, (2) the Fernald transition experience to date, and (3) the Fernald transition process.

### Massachusetts Experience in Community Placements

20. Massachusetts has had considerable experience in successfully phasing down and closing developmental centers similar to FDC: the Belchertown State School and the Dever Developmental Center. As indicated in the Affidavit of Teresa L. O'Hare, the Belchertown closure included 285 residents who were similar to the residents at the Fernald Developmental Center. In response to family concerns, DMR developed a transition process with significant involvement of affected families. Overall, the transition of the residents went well, with families who previously opposed the

10

closure expressing satisfaction with the outcome. None of the families appealed the transfers. Eight of the residents moved to "health care homes" specifically developed for residents with significant health care needs. All 24 individuals who had originally expressed an interest in placement at another developmental center chose instead to transition to a community- based residence. The subsequent closure at Dever incorporated principles learned in the Belchertown closure.

21. As indicated in John Riley's Affidavit, the Dever closure involved 289 individuals who had lived at Dever most of their lives. The characteristics of the residents were very similar to those in other DMR facilities, with the majority having profound intellectual disabilities and chronic medical conditions. Many of these residents also had serious behavioral challenges. Most of these residents made a successful transition into new homes in the community. Only 12 residents transferred to other large facilities. As in the other studies reviewed, nearly all the residents and families (including those who opposed it prior to the move) were very positive about the move into community placements afterwards. Many of the processes developed in the Dever closure were used in the Fernald transition plan. The Dever plan was based on principles of person-centered planning, informed choice making, involvement and communication with families and guardians, and efforts to minimize disruption and facilitate seamless transitions. Transition tools included "The Placement Profile" (developed for the Belchertown closure), which included information about the person's preference gathered from the person, family, ISP team and others and sent to families for review. Secondly, the "Social Unit Agreement" provided that at least 60% of new community residential program development would be staffed by state

employees, enabling many staff that had relationships with the residents to continue their relationships. Lines of communication were kept open with families through newsletters and access to the Facility Director. Families had opportunities to visit residences and were paired up with other families who had gone through similar transitions. Individual Transition Plans (ITP) were developed for each resident, which specified needs for supports and how these needs would be met. Despite the previous opposition of many families, no families or guardians appealed these plans or the Individual Service Plans (ISP) that were developed during the closure. In addition to the ITP, a Registered Nurse familiar with the resident completed a Health Care Assessment, which became a part of the ITP and subsequent ISP. To help ensure that the receiving program had appropriate services in place, a Support Services Readiness Checklist was completed before a resident moved. After the placement occurred, a follow-up was completed by a member of the ITP team.

22. I believe that the Massachusetts track record in relocating residents with developmental disabilities into community programs, including residents with behavioral and medical challenges, shows that DMR-supported community programs are capable of addressing the needs of most of the population currently residing at the FDC.

**Experience with Fernald Transfers since the Closure Announcement**

23. Since Governor Mitt Romney's announcement, in February 2003, that he intended to close Fernald, 49 persons have transferred to other residences, with 35 transferring to ICF/MRs and 14 transferring to community residences. According to the Court Monitor's Report (2007), the Fernald Facility Director certified that "services

currently being received would be duplicated and perhaps better at the new residence" (p. 14). The Court Monitor noted that the ICF/MRs to which residents transferred provided "equal or better services." He also noted that the "individuals transferred to the community can receive these services equal or better than at the ICF/MRs." Furthermore, he noted that from the perspective of DMR, guardians, and residents, the "community placement for many individuals has been a great success." (p. 16). He did note some concern about the fact that those who moved were younger on average than the residents remaining at Fernald.

24. Overall the Monitor found that DMR initiated transfers with the "full knowledge and consent of guardians." (p. 22). In a survey of post-placement satisfaction sent to guardians, the attitudes were "extremely positive" regarding the moves. There was praise for the Fernald staff in assisting in the transition. *Id.*

25. Finally, the Monitor acknowledged the fears of families and residents regarding moving to unfamiliar settings and warned about potential adverse affects for some residents if "forced to transfer." As noted above, in an earlier section, this is a valid and real concern. For this reason careful attention needs to be paid to the relocation process, by minimizing disruption; keeping communication flowing in both directions with residents, guardians, and staff; paying careful attention to preferences of residents and guardians; and by developing a seamless system in which needed supports are provided. The following section outlines the Transition Process developed for the Fernald Developmental Center.

**Fernald Transition Process**

26. In 2003 it was announced that the Fernald Developmental Center would close and Commissioner Morrissey convened a Facility Planning Committee, chaired by Teresa O'Hare, to oversee the closure. Six subcommittees were formed in order to developing procedures. A manual was developed that built on Massachusetts' previous experience with closure of the two similar developmental centers. The manual *"Placement Process for Facilities Identified for Closure, September, 2003"* was developed to guide the closure. This manual and the process it outlines build on the experiences in previous developmental center closures in Massachusetts.

27. The process as outlined is designed to (1) inform and involve families and residents throughout the process, (2) develop a seamless transition from one setting to another, and (3) implement a plan that meets the support needs of the residents transitioned.

28. Families and guardians were sent a letter from the Facility Director verifying that the facility would close and containing assurances of DMR's commitment to find good placements and support in the process. Secondly, families were contacted by phone regarding their placement preferences for their relative. The third contact was inviting them to be part of the Individual Transition Planning (ITP) Team along with the person with disability, and staff. The non-agency person deemed responsible for making placement decisions could be the individual, his or her guardian, or the person's family.

29. The ITP Team's goal is to support individuals and families in the placement planning development and transition process. The placement process is laid out in detail with appropriate assessments and documents, including the following:

- A Placement Profile that outlines general information on the individual's physical abilities, community options and preferences, any health or safety considerations, and support needs
- Assessments, including nursing referrals, Reference Form for Health Related Supports and Equipment, Emotional Support Needs Assessment, Fire Safety Assessment, and Mental Health and Behavioral Support Needs Checklist
- Documentation of Intent to Pursue Placement
- Documentation of facility visits by staff and families and recommendations
- Nursing Referral Assessment and Nursing Checklist for Community Placement
- Health Record
- Transition Plan (including preparations for moving, personal routines, social life, relationships, physical considerations and equipment, review of health assessments, safety concerns, plans for transition, supports and contacts, schedule of visits, in-service training, financial, and follow up supports)
- Various Consents
- Other required documents
- 45 day notice (or waiver of notices)
- Discharge documentation
- ISP within 60 days of move

30. These various forms and the processes that lead to them being filled out help ensure that the individuals' needs are documented and supports are developed that meet the needs of the residents.

31. The placement planning process is designed to gather maximum input from families and professionals through meetings, consideration of their preferences, continual communications, visits to facilities, and reviews by families. It is also designed to educate families and support them in making placement decisions that can meet the needs of the individuals.

32. Once the plan is developed, the ITP works with Regional/ Area Offices to develop a regional plan and conduct community assessments and plans for developing community housing and options. Transition meetings occur with the family, individual, ISP staff person, new providers, and service coordination staff to develop

a plan for supporting the individual in moving, including visits and timelines. As needed, modifications are made to take into account the feedback of those involved.

33. The processes developed for the Fernald transition are comprehensive and abide by principles that minimize "transfer trauma" and facilitate smooth transitions and successful outcomes of placements. The assessments attend to health and socio-emotional issues and the supports needed for a successful transition. The ITP shows sensitivity to the preferences of people with disabilities and their families/guardians, attention to good principles of transition, including documentation of physical and psychological preparation for the move, and details regarding how individual support needs will be met. Finally, the ITP requires information on follow-up measures and ensures a smooth linkage with the ISP process at the receiving residence.

34. In reviewing DMR's plan for Fernald residents, I conclude, based on my best professional judgment, that the plan adequately addresses each of the concerns raised by the Court Monitor, and concerns commonly raised by critics of deinstitutionalization, and it adheres closely to the relocation principles I have outlined above.

Subscribed under the pains and penalties of perjury this 31st day of May 2007.

/s/ Tamar Heller_____
Tamar Heller, Ph.D.

**Attachment A**

## References

Braddock, D. & Heller, T. (1985). The closure of mental retardation institutions II: Implications. <u>Mental Retardation</u>, Vol. 23, pp. 222-229.

Braddock, D., Hemp. R., Rizzolo, M. C., Coulter, D., Haffer, L., & Thompson, M. (2005). <u>The state of the states in developmental disabilities: 2005</u>. Boulder, CO: University of Colorado.

Conroy, J.W. (1996). Results of deinstitutionalization in Connecticut. In J. Mansell & K. Ericsson (Eds.) <u>Deinstitutionalization and community living: Intellectual disability services in Britain, Scandinavia and the USA</u>, pp.149-168. London: Chapman & Hall.

Conroy, J. W., & Adler, M. (1998). Mortality among Pennhurst class members, 1978 to 1989: A brief report. <u>Mental Retardation</u>, Vol. 36(5), 380-385.

Conroy, J.W., Spreat, S., Yuskauskas, A., & Elks, M. (2003). The Hissom closure outcomes study: A report on six years of movement to supported living. <u>Mental Retardation</u>, Vol. 41(4), pp. 263-275.

Emerson, E., & Hatton, C. (1996). Impact of deinstitutionalization on service users in Britain. In J. Mansell & K. Ericsson (Eds.) <u>Deinstitutionalization and community living: Intellectual disability services in Britain, Scandinavia and the USA</u>, pp. 169-184. London: Chapman & Hall.

Hayden, M.F. (1998). Mortality among people with mental retardation living in the Untied States: Research review and policy application. <u>Mental Retardation</u>, Vol. 36, pp. 345-359.

Heller, T. (1984). Issues in the adjustment of mentally retarded individuals to residential relocation. In N. Ellis and N. W. Bray (Eds.), <u>International review of research in mental retardation. Vol. 12</u>. New York: Academic Press.

Kim. S., Larson, S. A., & Lakin, K.C. (2001). Behavioral outcomes of deinstitutionalization for people with intellectual disability: A review of US studies conducted between 1980 and 1999. <u>Journal of Intellectual and Developmental Disability</u>, Vol. 26 (1), pp. 35-50.

Larson, S.A., & Lakin, K.C. (1989). Deinstitutionalization of persons with mental retardation: Behavioral outcomes. <u>Journal of the Association for Persons with Severe Handicaps</u>, Vol.14(4), pp. 324-332.

Larson, S. A., & Lakin, K. C. (1991). Parental attitudes about residential placement before and after deinstitutionalization: A research synthesis. <u>Journal of the Association for Persons with Severe Handicaps</u>, Vol. 16(1), pp. 25-38.

17

Lerman, P., Apgar, D.H., & Jordan, T. (2003). Deinstitutionalization and mortality: findings of a controlled research design in New Jersey. Mental Retardation, Vol. 41(4), pp. 225-236.

Lynch, P.S., Kellow, J. T., & Willson, V. L. (1997). The impact of deinstitutionalization on the adaptive behavior of adults with mental retardation: A research synthesis. Education and Training in Mental Retardation and Developmental Disabilities, Vol. 32, pp. 255-261.

Raynes, N.V., Wright, K., Shiell, A., & Pettipher, C. (1994). The cost and quality of community residential care. London: Fulton.

Stancliffe, R.J., & Lakin, K. C. (1998). Analysis of expenditures and outcomes of residential alternatives for persons with developmental disabilities. American Journal of Mental Retardation, Vol. 102 (6), pp. 552-568.

Stancliffe, R.J., Hayden, M.F., Larson, S. A. & Lakin, K.C. (2002). Longitudinal study on the adaptive and challenging behaviors of deinstitutionalized adults with mental retardation. American Journal on Mental Retardation, Vol. 107, pp. 302-320.

Strauss, D., Kastner, A., & Shavelle, R. (1998a). Mortality of adults with developmental disabilities living in California Institutions and community care, 1985-1994. Mental Retardation, Vol. 36(5), pp. 360-371.

Wehmeyer, M.L. & Bolding, N. (2001). Enhanced self-determination of adults with mental retardation as an outcome of moving to community-based work or living environments. Journal of Intellectual Disability Research, Vol. 45, pp. 1-13.

Young, L., Sigafoos, J., Suttie, J., Ashman, A., & Grevell, P. (1998). Deinstitutionalization of persons with intellectual disabilities: A review of Australian studies. Journal of Intellectual and Developmental Disability, Vol. 23(2), p. 155.