# CLOSING THE NORTH DAKOTA DEVELOPMENTAL CENTER: ISSUES, IMPLICATIONS, GUIDELINES

**David Braddock, Ph.D.**
**Professor in Psychiatry, University of Colorado**

**March 7, 2006**

# TABLE OF CONTENTS

**PURPOSE AND FOCUS OF THE PAPER** ................................................................................. 1

**Question 1**:  How did state-operated institutions for persons with mental retardation and developmental disabilities (MR/DD) evolve nationally?........................................... 2

**Question 2**:  What are residential and community services trends in North Dakota today and in two groups of "comparison states"? ................................................. 4

**Question 3**:  How many states have closed state MR/DD institutions and how many are planning to do so in the near future?........................................................... 5

**Question 4**:  What are today's institutional costs per resident in North Dakota and, based on previous trends, what can these costs be estimated to be in future years?............ 7

**Question 5**:  How well do persons with MR/DD typically adjust to relocation from institutions to community living environments?........................................... 8

**Question 6**:  How do parents of individuals relocated from state institutions to community settings respond to this process of change? ............................................. 10

**Question 7**:  How might cost savings be achieved in North Dakota if Grafton were to be closed in the near future? ................................................................... 12

**Question 8**:  Should the State of North Dakota anticipate a short-term need for increased appropriations associated with Grafton's closure to cover the temporary "dual costs"?........................................................................................ 13

**Question 9**:  What are some of the alternate uses to which a closed Grafton facility might be put?........................................................................................ 15

**Question 10**:  What can North Dakota learn from the extensive experience of other states in planning and implementing institutional closures?................................. 16

**CONCLUSION** ................................................................................................................. 17

**REFERENCES CITED** ..................................................................................................... 19

**APPENDIX I**:  Completed and In-Progress Closures of State-Operated Institutions in the United States....................................................................................... 21

**APPENDIX II**:  Suggested Preliminary Guidelines for Institutional Closures ................................. 23

# CLOSING THE NORTH DAKOTA DEVELOPMENTAL CENTER:
# ISSUES, IMPLICATIONS, GUIDELINES

## PURPOSE AND FOCUS
## OF THE PAPER

This paper has been prepared at the request of the Arc-Upper Valley Board of Directors. It is intended to stimulate discussion and further study by the Arc and other interested parties in North Dakota on the possible closure of the North Dakota Developmental Center at Grafton (hereafter "Grafton").

The primary focus of the paper is to identify and discuss 10 key issues, expressed as questions, associated with the potential closure of Grafton, North Dakota's remaining mental retardation and developmental disabilities (MR/DD) institution. The implications of closing Grafton are considered in light of other states' experiences in closing state-operated MR/DD institutions and in light of relevant research. The paper addresses the following ten questions:

1. How did state-operated institutions for persons with mental retardation and developmental disabilities evolve nationally?

2. What are residential and community services trends in North Dakota today and in two groups of "comparison states"?

3. How many states have closed state MR/DD institutions and how many are planning to do so in the near future?

4. What are today's institutional costs per resident in North Dakota and, based on previous trends, what can these costs be estimated to be in future years?

5. How well do persons with MR/DD typically adjust to relocation from institutions to community living environments?

6. How do parents of individuals relocated from state institutions to community settings respond to this process of change?

7. How might cost savings be achieved in North Dakota if Grafton were to be closed in the near future?

8. Should the State of North Dakota anticipate a need for increased appropriations associated with Grafton's closure, to cover the temporary "dual costs"?

9. What are some of the alternate uses to which a closed Grafton facility might be put?

10. What can North Dakota learn from the extensive experience of other states in planning and implementing institutional closures?

***Question #1:  How did state-operated institutions for persons with mental retardation and developmental disabilities (MR/DD) evolve nationally?***

The first state-operated MR/DD institutions were opened in the Northeastern U.S. in the 1850s. They were developed to provide a temporary residential placement for individuals who, after a relatively brief period of education and training in these facilities, returned to community life. Early success at several schools led to the opening of additional state-operated MR/DD institutions across the U.S. (Braddock & Parish, 2003). The first state MR/DD institution in North Dakota was opened as the State Institute for Feeble-Minded in Grafton in 1904. In addition, the San Haven facility, opened originally as a tuberculosis hospital in 1922, was converted to MR/DD use in 1973, and closed in 1987 (Braddock & Hemp, 2004).

As the country industrialized and urbanized, state institution populations expanded much faster than facilities' capacities to provide appropriate training and educational services. By 1930, more than 100,000 persons with mental retardation were institutionalized across the U.S., and most residents received minimal custodial care. This trend toward custodial care and "warehousing" of persons with mental retardation increased after the Second World War and throughout the 1950s. Media exposés about deficient conditions were commonplace (Blatt & Kaplan, 1974).

In 1967, the nation's institutional census peaked at 195,000 residents in 240 state mental retardation facilities. Since 1968, the number of individuals with mental retardation served in state institutions has declined every year and, on average, four percent annually for 37 consecutive years. In 2004, the residential census of the nation's state institutions was 41,214 persons. If present trends continue, there will be fewer than 20,000 residents in state institutions in 10 years (2016). Costs for residential care, however, are climbing rapidly. Based on previous trends, in 10 years they are projected to reach an average of approximately $193,000 for each resident per annum ($530/day), in constant 2004 dollars. The per diem cost in the Grafton facility in 2004 was $392/day and $143,000 annually (Braddock, Hemp, Rizzolo, Coulter, Haffer, & Thompson, 2005).

Current trends promoting community services in the mental retardation field evolved out of the parent movement in the 1950s and 1960s. At that time, parents began insisting upon both a higher quality of institutional care and greater opportunities for community living. Federal legislation was enacted in 1963 (Pub. L. 88-156 and Pub. L. 88-164) that authorized the establishment of an initial, but incomplete, network of community centers and services across the country (Braddock, 1987). Segregating individuals with MR/DD in large, often remote institutions and providing substandard care became prominent civil rights issues in the 1970s and 1980s. Class action lawsuits (e.g., *Wyatt v. Stickney* in Alabama, *Ricci v. Okin* in Massachusetts, *New York State Arc v. Carey, Association for Retarded Citizens of North Dakota v. Olson*) were filed and such litigation continues in Federal District Courts throughout the U.S. (Braddock, 1998). By 1980, however, many states had begun implementing community services initiatives involving the development and funding of

small group homes, supervised apartments, in-home family support programs, and supported employment.

**Question #2:  *What are residential and community services trends in North Dakota today and in two groups of "comparison states"?***

Today, institutional settings are being replaced by smaller, more individualized community placements and family support services. There are now more than 140,000 supervised living settings in the U.S. for six or fewer residents with MR/DD (Prouty, Smith, & Lakin, 2005). The total residential population of these small living environments was approximately 335,000 and this figure represented 68% of all out-of-home residential placements in 2004. In contrast, 86% of all persons with mental retardation in out-of-home residential placements nationally were living in large, 16 beds or more, publicly and privately-operated institutions in 1977 (Braddock et al., 2005).

North Dakota, however, significantly lags the dominant national trend in this regard. The State ranked 39th in 2004 in the percentage of persons with MR/DD living in smaller (six person or fewer), family-scale out-of-home environments, and



44th in the proportion of its total spending allocated to six-person or fewer settings. *Figure 1* compares North Dakota to four New England states with roughly the same state general population as North Dakota (Braddock et al., 2005).

Another analytically useful comparison group of states includes South Dakota (.8 million population), Wyoming (.5 million), Montana (.9 million), and Idaho (1.4 million). Each of these "mountain west/plains states," like North Dakota, has one remaining institution. The 2004 MR/DD institutional censuses were 90 (MT), 92 (WY), 94 (ID) and 176 (SD), compared to 146 in North Dakota. Although South Dakota's census in 2004 was larger than North Dakota's, all four of these states had lower institutional utilization per capita rates (per 100,000 of the state general population).

*Figure 2* illustrates how the MR/DD institutional utilization per capita (of the state general population) for the four mountain west/plains comparison states began diverging from North Dakota in 1996. In 2004, North Dakota's institutional utilization exceeded the aggregate of the four comparison states by 83% (23.0 vs. 12.6). Moreover, South Dakota, Wyoming, Montana, and Idaho each committed a considerably larger share of total MR/DD spending to six-person or fewer residential and community services (70-77%) compared to only 59% in North Dakota. North Dakota's utilization rate for state-operated institutional care has been stable for the past 12 years, through 2006.



**Figure 2**
**Institutional Census Per Capita in North Dakota and the Mountain West/Plains States: 1990-2004**

### Question #3:   *How many states have closed state MR/DD institutions and how many are planning to do so in the near future?*

Since 1970, on a national basis, 39 states have closed, or are planning to close, 139 state-operated MR/DD institutions (*Appendix I*). This is more than one-half the 240

institutions that existed in 1970. (The average institutional census in 1970 was about 800 persons, compared to an average of 206 residents for the 200 facilities open in 2004.)

Sixty of the 139 completed and in-progress closures have occurred in the past 10 years. In January 1991, New Hampshire closed the Laconia State School and became the first contemporary American state to operate an institution-free service delivery system. The District of Columbia, Vermont, Rhode Island, New Mexico, West Virginia, Hawaii, and Maine became institution-free from 1991 to 1999. Michigan has closed 12 state institutions and in 2004, its only remaining facility, Mt. Pleasant, had a census of 162 persons. Minnesota has only one "institutional" program for persons with MR/DD. This is an intensive behavioral treatment program for seven consumers, located in a state psychiatric hospital.

Providing community-based services for persons with MR/DD and their families has gained considerable public support in recent years. Between 1977 and 2004, the annual growth of total community spending in the United States averaged 10% per year, after adjusting for inflation. Total state institution spending, however, actually declined 1% annually during 1977-04, and the average annual census of residents in institutions dropped by five percent per year.

The census of Grafton and San Haven in North Dakota (*Figure 3*) declined by an average of two percent per year from 1966 to 1983, one-half of the U.S. institutional rate over that period. Following the implementation of the consent decree in *Association for Retarded Citizens of North Dakota v. Olson* (1982), the North Dakota institutional census dropped by 15% per year from 1983 to 1995, from 966 to 140 persons. San Haven closed in 1987. In the past 12 years, through early 2006, there has been essentially no further decline in Grafton's institutional population. In fact, it has increased slightly since 1995.



*Question #4:*   *What are today's institutional costs per resident in North Dakota and, based on previous trends, what can these costs be estimated to be in future years?*

If present trends continue, an average of $193,000 per year, or $530 per day in constant 2004 dollars, is expected to be spent in the year 2016 for each institutional resident in the United States. From 1977 to 2004, average per diems grew nearly nine-fold, from $45/day to $400/day, and in 2004 per diems exceeded $500/day in 15 states, $400/day in 21 states, and $300/day in 35 states (Braddock et al., 2005).

Since 1995, the cost for each Grafton resident has advanced from $315 to $392 per day (*Figure 3*). The average cost of care in North Dakota's institution is now over $143,000 per year for each resident. Absent a decision to close Grafton, and given the stability of the Grafton census, the Grafton per diem for fiscal year 2016 in constant 2004 dollars may well surpass $600/day for approximately 146 residents. This amounts to $219,000 per year per resident, or $32.0 million per annum for the Grafton facility in 10 years.

An equally significant fiscal consequence of continuing to commit increasingly larger sums of money to institutional operations lies in the fact that, given current spending trends for Grafton, fewer "new" funds would be available to initiate additional or higher quality community services for consumers and families in the State. However, the New England

states of Maine, New Hampshire, Rhode Island and Vermont have all closed their remaining state MR/DD institutions, reallocated institutional funding, and greatly expanded their community services for thousands more individuals with MR/DD and their families (*Figure 4*). In contrast, North Dakota has continued to dedicate funding to persons in Grafton and to larger group living arrangements for seven or more persons. The New England states' decisions to close their MR/DD institutions lead to the development of a range of community housing and supported work options that subsequently received widespread political support (e.g., Covert, Macintosh & Shumway, 1994).



**FIGURE 4**
**SPENDING FOR SIX PERSON OR FEWER RESIDENTIAL SERVICES: 1997-2004 (ADJUSTED)**

***Question #5: How well do persons with MR/DD typically adjust to relocation from institutions to community living environments?***

Larson and Lakin (1989) of the University of Minnesota published a comprehensive review of research on changes in adaptive behavior associated with residents moving from state mental retardation institutions to smaller community living arrangements. Over 50

studies published between 1976 and 1988 were initially identified. After screening them according to six quality standards, 18 studies were subsequently analyzed. Results of the analysis indicated that institutions were "consistently less effective than community-based settings in promoting growth, particularly among individuals diagnosed as severely or profoundly retarded" (p. 330). The 18 studies reviewed involved 1,358 participants. The studies were conducted in 13 different states from all regions of the country. The authors concluded:

> ...it must be recognized that based on a substantial and remarkably consistent body of research, placing people from institutions into small, community-based facilities is a predictable way of increasing their capacity to adapt to the community and culture (p. 331).

In California, Brown, Fullerton, Conroy, & Hayden (2001) evaluated the well-being of more than 2,000 individuals with developmental disabilities who left state-operated California developmental centers from 1993 to 2001. The researchers assessed each individual at the state institution prior to the move, and, during 1994-2001, visited all 2,170 relocated individuals in their new homes in the community.

Data collected included measures of independence, behavioral challenges, choice-making, friendships, integration, person-centered planning, health, service intensity, earnings, and both consumer and family satisfaction. Brown et al. (2001) found that those relocated, compared to their lives in an institution in 1994, experienced improvement in "integrative activities," individualized treatment," "progress toward individual goals," "opportunities for choice-making," "reduced challenging behavior," and "perceived quality of life." Families were reported to be "unexpectedly and overwhelmingly happy with community living, even those who formerly opposed the change" (p. 3).

Brown et al. (2001) acknowledged that individuals relocated lost some of those gains between 2000 and 2001, stating that a plausible explanation was that "low salaries and high turnover rates translate into poorly motivated and poorly trained staff" in the community, an issue confirmed by family members who stressed the "poor quality and the short tenure of direct care staff" (p. 50). The State of California spent only 55% of the previous institutional cost per person, compared to community spending levels in New Hampshire, Pennsylvania, and Connecticut ranging from 80% to 86% of their states' institutional costs (Brown et al., 2001; Conroy, 1996).

Many people with levels of impairment once believed to be manageable only in institutional settings now live satisfactorily in community settings. This includes individuals with health problems (Gaylord, Abery, Cady, Simunds, & Palsbo, 2005; Hayden, Kim, & DePaepe, 2005; Larson, Anderson, & Doljanac, in press) and with challenging behaviors (Hanson, Wiesler, & Lakin, 2002; Kim, Larson, & Lakin, 2001; Stancliffe, Hayden, Larson, & Lakin, 2002). Undeniably, anecdotal reports of instances in which community placements did not work out are occasionally cited by proponents of continuing institutionalization of persons with MR/DD. However, the institutionalization of persons who have committed no wrong against society can only be justified by demonstrating clear benefits accruing to these persons from living in an institution. *Research literature noted above clearly indicates that state institutions do not provide a superior level of care for people with mental retardation.*

### Question #6: *How do parents of individuals relocated from state institutions to community settings respond to this process of change?*

Families often initially oppose the transfer of their relatives from institutions to community settings, but after transfer occurs, the great majority of parents become strong

supporters of community placement (Heller, Bond, & Braddock, 1988). Since the late 1970s several studies have addressed the reactions of parents of institutionalized persons to the community placement of their relative with mental retardation. The studies demonstrated that, after community placement, parents consistently reported lower levels of satisfaction with the earlier institutional placement and higher levels of satisfaction with community placement (Brown et al., 2001; Larson & Lakin, 1991).

Initial family dissatisfaction with closure often bears little relationship to family attitudes toward closure a year later. The relative's medical status and the family's worry over "transfer trauma" have often both played significant roles initially upon the announcement of the closure, but not in determining longer-term parent reactions. The primary variables affecting both parent satisfaction with closure and parent stress levels is the family's current appraisal of the quality of the new community placement. Frequent staff consultation with the family members during the closure process was related to higher parent satisfaction with closure one year later (Heller et al., 1988).

Given that some families might resist institutional closure and the relocation of their relative, it is important to assure families that increased consumer health and adjustment problems are now uncommon during and following institutional closures. This is due to implementing the relocation process with sensitivity to the consumer's needs and preferences and involving families directly in the process. The literature on family reaction to institutional closure and relocation may be summed up as follows:

> ...the clearest message in these studies is that the overwhelming majority of parents become satisfied with community settings once their son or daughter has moved from the institution, despite general predisposition to the contrary (Larson & Lakin, 1991, p. 36).

### Question #7:  How might cost savings be achieved in North Dakota if Grafton were to be closed in the near future?

The closure of a state institution can generate savings for state government over time because it: 1) eliminates the high fixed cost of operating a state-owned facility, usually built for many more residents than live there at the time of closure; 2) shifts some fiscal responsibilities from state government tax revenues to federal Supplemental Security Income (SSI) and, in some cases, to local government sources; 3) increases the likelihood that individuals will engage in productive employment in a local community because they now live there; 4) utilizes less costly social, educational, religious, and recreational resources in the community rather than the relatively expensive, specialized services provided in the institution; and, 5) by renting/leasing residences it avoids the expensive institutional capital construction and remodeling costs necessary for most older institutions to remain open and certified for receipt of federal reimbursement (Braddock, 1991a, 1991b).

In a relevant study of closure costs and savings, the New York State Office of Mental Retardation and Developmental Disabilities (OMRDD) retained the services of an independent consulting firm to study the cost implications of its decision to close multiple mental retardation institutions. The study, authored by the Grant-Thornton accounting firm, concluded that the average post-closure per diem operating costs for each client "were approximately 9% lower than the pre-closure costs" (New York OMRDD, 1990). The study found that closure had little effect on state employee levels. Conversion of a state school campus to an alternate use such as a prison or juvenile facility provided substantial new employment opportunities and absorbed much of the economic impact of the state institution closure.

Another perspective on pre- and post-closure costs is afforded by the four New England states (Maine, New Hampshire, Rhode Island, and Vermont). These states, upon the closures of their last remaining institutions during 1991-99, became "institution-free"--like North Dakota would with the closure of Grafton. New Hampshire closed Laconia in 1991, Vermont closed Brandon in 1993, Rhode Island closed Ladd in 1994, and Maine closed Levinson in 1999 (Braddock et al., 2005).

An analysis of pre- and post-closure costs per residential recipient across 1991-2004 was completed. From the dates of the first closure (Laconia in 1991) through 2004, in inflation-adjusted terms, annual spending per statewide residential recipient in the four New England states declined from $91,000 to $85,000 (*Figure 5*). In addition, the



number of aggregate MR/DD recipients served in the four states increased by 44% from 1991 to 2004. The number of recipients post-closure increased by 76% in New Hampshire, 50% in Rhode Island, 41% in Vermont and 30% in Maine.

**Question #8:**   *Should the State of North Dakota anticipate a short-term need for increased appropriations associated with Grafton's closure, to cover the temporary "dual costs"?*

Without specific knowledge as to how a closure process might be implemented in North Dakota, including the nature of the phase-down of the physical plant and the duration

of the closure's implementation, it is difficult to provide an accurate estimate of "dual" costs associated with the closure. However, the state should anticipate some temporary dual costs. Assuming closure takes three years to implement (i.e., 2007-09), and that approximately 50 residents move to the community each of the three years, "dual" costs were estimated to be $3.1 million in the first year, $5.7 million in the second year, and $1.9 million in the third year. These estimates, totaling $10.7 million for the three year implementation period are based on the following two additional assumptions:

- The annual cost per relocated consumer in the new community settings in FY 2007 was assumed to be equivalent to the projected per diem cost at Grafton in FY 2007. This assumption permitted community direct support staff wages in 2007, the first year of closure implementation, to be comparable with Grafton's wages. Community direct support staff wage costs for FYs 2008 and 2009 were projected to increase at the average annual rate of increase in Grafton's per diem rates during FYs 1977-04 (2.6% per year on an inflation-adjusted basis).[1]

- Consumer per diems for those residents remaining at Grafton during the closure process will increase significantly in the second and third years, due to fixed costs being spread over fewer residents. We estimated the increased Grafton per diem rates based on the average increases in per diems in the New England comparison states to be 17% in year one, 51% in year two and 57% in year three.

However, as noted in the previous discussion for *Question 7*, average inflation-adjusted statewide costs per resident receiving services in the consolidated four New England comparison states actually declined from 1995 to 2004. This was due to the fact that additional community recipients with lower average support needs were able to be served as well. North Dakota may experience a similar trend in average overall community costs in the long-term as well.

---

[1] Some studies, however, have indicated that community costs for individuals with MRDD who had comparable needs were only 55-86% of those in institutions (Brown et al., 2002; Conroy, 1996). These lower community cost estimates were not used to generate the community per diem estimates in favor of emphasizing the conservative assumption of equalizing FY 2007 direct support staff wages in community settings with Grafton's projected FY 2007 staffing costs.

**Question #9:   *What are some of the alternate uses to which a closed Grafton facility might be put?***

Alternate uses possible for the Grafton physical plant depend upon the facility's proximity to projected population growth areas, the adaptability of the facility to alternate public or private use (e.g., prison, factory, state or industrial warehouse, etc.), and other factors. *Table 1* presents a summary of the various alternate uses for 130 developmental disabilities institutional closures in the U.S. See *Appendix I* for additional detail on each of the facilities that closed.

| TABLE 1: ALTERNATE USES FOR INSTITUTIONAL CLOSURES IN THE U.S. | | | |
|---|---|---|---|
| Alternate Use | Number[1] | Alternate Use | Number[1] |
| Corrections (including federal corrections) | 22 | New MR facilities | 2 |
| DD or other state/local administrative offices | 15 | Unoccupied (asbestos) | 2 |
| Alternate use not yet known | 9 | Private institutions | 2 |
| Universities/junior colleges | 9 | Historic preservation | 1 |
| Property vacant | 9 | Housing | 1 |
| Various community uses | 6 | Public health infirmary | 1 |
| Community DD programs | 5 | Retirement program | 1 |
| To be sold (including realty, public auction) | 5 | Reverting to U.S. Department of Defense | 1 |
| Commercial uses | 4 | Veterans' medical center | 1 |
| MI facilities | 4 | Water survey office | 1 |
| Demolished | 3 | Women's prison | 1 |
| Juvenile facilities | 3 | Undetermined | 29 |

[1]Total is 137--7 institutions had two alternate uses

The four New England closures demonstrate the range of possible alternate uses displayed in *Table 1*. The Laconia State School in New Hampshire was quickly reopened in 1991 as the Lakes Region Adult Correctional Facility. The town of Laconia (population 16,411) is 30 miles from Concord (population, 40,687). Brandon Center in Vermont, closed in 1993, is near Rutland (population 17,292) which is 85 miles from Colonie, New York (population 79,258). The closed facility is currently under development as a manufacturing site, with both private and state ownership.

The Ladd Center in Rhode Island, closed in 1994, was located in Exeter (population

6,045), 13 miles from Warwick (population 85,808) and was also proximal to Providence, a large city. A $6.4 million state fire academy and new state police headquarters is being developed on the Ladd Center site. The Elizabeth Levinson Center in Maine closed as a state institution in 1999 and now operates as a state-run short-term residential and health program for medically fragile children. Levinson, in Bangor (population 31,473) is 129 miles from Portland (population 64,249). Like North Dakota, the institutions in New Hampshire and Vermont were located in small towns, somewhat distant from a larger city. Grafton, a town of 4,516, is located 38 miles from Grand Forks.

### Question #10: What can North Dakota learn from the extensive experience of other states in planning and implementing institutional closures?

In 1983, Illinois successfully relocated the 820 residents of the Dixon State School within a single calendar year. More than 90% of the parents were satisfied with the closure process and outcomes. Resident friendship patterns were kept intact by moving small groups of individuals together and by closing down one residential unit at a time (Braddock, Heller, & Zashin, 1983; Heller, Factor, & Braddock, 1986).

Guidelines based on state experiences in MR/DD institutional closures are summarized in *Appendix II.* They are presented from five perspectives: 1) general guidelines; 2) the individuals with developmental disabilities who are being relocated; 3) their families; 4) the community programs receiving residents from the closing facility; and 5) the staff of the closing facility. The guidelines were revised from Braddock et al. (1983) and Heller, et al. (1986).

## CONCLUSION

In three previous analyses of the structure, financing and quality assurance of residential and community services in North Dakota, Braddock & Hemp (2004, 2000) and Braddock, Hemp, & Rizzolo (2002) suggested service and funding priorities for the State. For example, it was noted that North Dakota had fared better than most states fiscally in the recent national economic downturn during 2003-2005, and North Dakota was one of 10 states with the strongest financial outlook for fiscal year 2005. Priority needs for MR/DD services identified in the most recent North Dakota study included: 1) continuing the expansion of the Medicaid Home and Community-Based Services (HCBS) Waiver; 2) reducing reliance on Intermediate Care Facility/Mental Retardation (ICF/MR) programs for 16+ person public and private institutional facilities; 3) increasing family support, supported employment and supported living; and, 4) enhancing direct support staff wages and benefits (Braddock & Hemp, 2004, p. 50).

Nationwide, there are over nine times more individuals with mental retardation and developmental disabilities living in supervised out-of-home community settings than in state-operated institutions. The number of families and persons with disabilities benefiting from community services and supports nationally is growing as well. State-operated institutions are being closed in many states across the country and few families prefer such programs. Thus, given the trends outlined in this paper, the long-term future of services to persons with mental retardation and developmental disabilities in North Dakota is in community settings.

It therefore seems appropriate for North Dakotans to seriously consider expanding community residential services and support programs for people with MR/DD and their families, and subsequently closing the North Dakota Developmental Center at Grafton.

However, if Grafton is slated for closure, the implementation of that closure needs to be planned and executed in a manner sensitive to the needs of Grafton's consumers and their families and considerate of the employees of the facility as well. As previously noted, suggested guidelines specifically addressing closure implementation issues are presented in *Appendix II.*

# References Cited

*Association for Retarded Citizens (Arc) of North Dakota v. Olson*, 561 F. Supp. 473 (D.N.D. 1982), 6
    MDLR 374, *aff'd.,* 713 F.2d 1384 (8th Cir. 1983), 7 MDLR 465; *Arc of North Dakota v. Sinner,*
    No. 90-5397; *rev'd and remanded,* 942 F., 2d 1235 (8 Cir. 1991), 16 MPDLR 43; *Arc of North
    Dakota v. Schafer,* 87 F. Supp. 689 (D.N.D. 1995), 19 MPDLR 171).)

Blatt, B., & Kaplan, F. (1974). *Christmas in Purgatory: A photographic essay in mental retardation.*
    Syracuse, NY: Syracuse University, Center on Human Policy.

Braddock, D. (1998). Mental retardation and developmental disabilities: Historical and contemporary
    perspectives. In D. Braddock, R. Hemp, S. Parish, & J. Westrich, *The state of the states in
    developmental disabilities, fifth edition,* pp. 3-21. Washington, DC: American Association on
    Mental Retardation.

Braddock, D. (1991a). *Issues in the closure of state schools in Texas: A briefing paper.* Austin, TX:
    Texas Planning Council on Developmental Disabilities.

Braddock, D. (1991b). Issues in the closure of state schools in Texas: A briefing paper. *Rivista
    Italiana Del Disturbo Intellecttivo, 4,* 183-193.

Braddock, D. (1987) *Federal policy toward mental retardation and developmental disabilities.*
    Preface by Senator Robert Dole. Baltimore: Brookes Publishing Company.

Braddock, D. & Heller T. (Eds.) (1984). *Proceedings of the biannual conference of the National
    Association of State Mental Retardation Program Directors: The closure of state institutions.*
    Alexandria, VA and Chicago: IL: The Association and the Institute for the Study of DD,
    University of Illinois at Chicago.

Braddock, D., Heller, T. and Zashin, E. (1983). *The closure of the Dixon Developmental Center: A
    study of the implementation and consequences of a public policy.* Chicago: Evaluation and Public
    Policy Program, Institute for the Study of Developmental Disabilities, University of Illinois at
    Chicago.

Braddock, D., & Hemp, R. (2004, October 11). *Developmental disabilities in North Dakota: The year
    2004 report.* Boulder: University of Colorado, Department of Psychiatry.

Braddock, D., & Hemp, R. (2000). *Developmental disabilities in North Dakota: The year 2000
    report.* Boulder: University of Colorado, Department of Psychiatry.

Braddock, D., Hemp, R., & Rizzolo, M.C. (2002). *Developmental disabilities in North Dakota: The
    year 2002 report, a study of the structure, financing, and quality assurance of residential and
    community services.* Boulder: University of Colorado, Department of Psychiatry.

Braddock, D., Hemp, R., Rizzolo, M.C., Coulter, D., Haffer, L., & Thompson, M. (2005). *The state of
    the states in developmental disabilities: 2005.* Boulder and Washington, DC: University of
    Colorado, Department of Psychiatry and Coleman Institute for Cognitive Disabilities and
    American Association on Mental Retardation.

Braddock, D., & Parish, S. (2003). Social policy toward intellectual disabilities in the 19th and 20th
    Centuries. In S.S. Herr, L.O. Gostin and H.H Koh (Eds.), *The human rights of persons with
    intellectual disabilities: Different but equal,* pp. 83-111. Oxford, UK: Oxford University Press.

Brown, M., Fullerton, A., Conroy, J.W., & Hayden, M.F. (2001, July 1). *Eight years later: The lives
    of people who moved from institutions to communities in California. Year 2001 report of the
    quality of life evaluation of people with developmental disabilities moving from developmental*

centers into the community (The "Quality Tracking Project"), final report (year 2). Narberth, PA: The Center for Outcome Analysis.

Conroy, J.W. (1996). The small ICF/MR program: Dimensions of quality and cost. *Mental Retardation, 34,* 13-26.

Covert, S.B., MacIntosh, J.D., & Shumway, D.L. (1994). Closing the Laconia State School and Training Center: A case study in systems change. In V.J. Bradley, J.W. Ashbaugh and B.C. Blaney (Eds.), *Creating individual supports for people with developmental disabilities: A mandate for change at many levels,* pp. 197-211. Baltimore: Paul H. Brookes.

Gaylord, V., Abery, B., Cady, R., Simunds, E., & Palsbo, S., (Eds.). (2005, Winter*). Impact: Feature issue on enhancing quality and coordination of health care for persons with chronic illness and/or disabilities, 18*(1). [Minneapolis, MN: University of Minnesota, Institute on Community Integration.]

Hanson, R.H., Wiesler, N.A, & Lakin, K.C. (Eds.). (2002). *Crisis: Prevention and response in the community.* Washington, DC: American Association on Mental Retardation.

Hayden, M.F., Kim, S., & DePaepe, P. (2005). Health status, utilization patterns, and outcomes of persons with intellectual disabilities: Review of the literature. Mental Retardation, 43(3), 175-195.

Heller, T., Bond, M., & Braddock, D. (1988). Family reactions to institutional closure. *American Journal on Mental Retardation, 92,* 336-343.

Heller, T., Factor, A., & Braddock, D. (1986). *Illinois closure project: Galesburg Mental Health Center closure's impact on facilities receiving developmentally disabled residents.* Chicago: Institute for the Study of Developmental Disabilities, University of Illinois at Chicago.

Kim, S., Larson, S.A., & Lakin, K.C. (2001). Behavioral outcomes of deinstitutionalization for people with intellectual disability: A review of U.S. studies conducted between 1980 and 1999. *Journal of Intellectual and Developmental Disability, 26*(1), 35-50.

Larson, S.A., Anderson, L.L., & Doljanac, R.F. (in press). Access to health care. In W. Nehring (Ed*.), Health promotion for persons with intellectual/developmental disabilities: The state of scientific evidence.* Washington, DC: American Association on Mental Retardation.

Larson, S.A., & Lakin, K.C. (1991). Parent attitudes about residential placement before and after deinstitutionalization: A research synthesis. *Journal of the Association for Persons with Severe Handicaps, 16,* 25-38.

Larson, S.A., & Lakin, K.C. (1989). Deinstitutionalization of persons with mental retardation: Behavioral outcomes. *Journal of the Association for Persons with Severe Handicaps, 14,* 324-332.

New York OMRDD. (1990). *Grant-Thornton study.* Albany: Office of Mental Retardation and Developmental Disabilities.

Prouty, R.W., Smith, G., & Lakin, K.C. (Eds.). (2005, July). Residential services for persons with developmental disabilities: Status and trends through 2004. Minneapolis: University of Minnesota, Research and Training Center on Community Living, Institute on Community Integration.

Stancliffe, R.J., Hayden, M.F., Larson, S., & Lakin, K.C., (2002). Longitudinal study on the adaptive and challenging behaviors of deinstitutionalized adults with intellectual disability. American Journal on Mental Retardation, 107, 302-320.

### APPENDIX I
### COMPLETED AND IN-PROGRESS CLOSURES OF
### STATE-OPERATED 16+ INSTITUTIONS IN THE U.S. (139 CLOSURES IN 39 STATES)

| State | Institution | Year Built/ Became MR | Original Use | # Residents, Closure Announcement | Year of Closure | Alternate Use |
|---|---|---|---|---|---|---|
| Alabama | Brewer-Bayside | 1984 | MR Facility | 67 | 2003 | Corrections |
| | Glenn Ireland | 1986 | MR Facility | 20 | 1996 | To be sold |
| | Tarwater | 1976 | MR Facility | 74 | 2003 | Corrections |
| | Wallace | 1970 | MR Facility | 80 | 2003 | Corrections |
| Alaska | Harborview | 1964 | MR Facility | 45 | 1997 | Community Programs |
| Arizona | Phoenix | 1974 | MR Facility | 46 | 1988 | Commercial |
| | Tucson | 1972 | MR Facility | 13 | 1997 | Outreach Offices |
| California | Agnews | 1855/1966 | MI Facility | 411 | 2007 | Undetermined |
| | Camarillo | 1935 | MR Facility | 497 | 1998 | University |
| | DeWitt | 1942/1947 | Army Hospital | 819 | 1972 | Placer County Recreation |
| | Modesto Unit | 1943/1948 | Army Hospital | 1,394 | 1969 | Modesto Co. Comm. College |
| | Napa | 1875/1967 | Asylum for MR/MI | 30 | 2001 | MI Use Only |
| | Stockton | 1852 | Asylum for MI | 414 | 1996 | University |
| Colorado | Pueblo | 1935 | MI/MR Facility | 163 | 1989 | Pueblo Regional Center |
| Connecticut | John Dempsey Center | 1964 | MR Facility | | 1998 | Administrative Offices |
| | Mansfield | 1906/1917 | Epileptic Colony | 146 | 1993 | Corrections/U. of Connecticut |
| | New Haven | 1964 | MR Facility | 56 | 1994 | Job Corps |
| | Seaside | 1961 | MR Facility | | 1996 | Administrative/Storage |
| | Waterbury | 1963/1972 | Convent | 40 | 1989 | Administrative Offices |
| DC | Forest Haven | 1925 | MR Facility | 1,000 | 1991 | Private Rehab/PH Infirmary |
| Florida | Community of Landmark | 1965 | MR Facility | 256 | 2005 | Revert to Dade County social programs |
| | Gulf Coast Center | 1960 | MR Facility | 306 | 2010 | Undetermined |
| | Orlando | 1929/1959 | TB Hospital | 1,000 | 1984 | Demolished, land to school, county |
| | Tallahassee | 1928/1967 | TB Hospital | 350 | 1983 | Unoccupied; asbestos |
| Georgia | Bainbridge | 1967 | WW II Air Force School | 129 | 2001 | Corrections |
| | Brook Run | 1969 | MR Facility | 364 | 1997 | Undetermined |
| | Georgia Regional-Augusta | | | 438 | 2004 | Undetermined |
| | Gracewood School/Hospital | | | 93 | 2004 | Undetermined |
| | Rivers' Crossing | 1969 | MR Facility | 37 | 1994 | Undetermined |
| Hawaii | Kula Hospital (privatized) | 1984 | | | 1999 | |
| | Waimano | 1921 | MR Facility | 96 | 1999 | Art Center for PWD |
| Illinois | Adler | 1967 | MI/MR Facility | 16 | 1982 | Water Survey Offices |
| | Bowen | 1985 | MR Facility | 105 | 1982 | Corrections |
| | Dixon | 1918 | MR Facility | 820 | 1987 | Corrections/New MR Facility |
| | Galesburg | 1950/1989 | Army Hospital | 350 | 1985 | Head Start/Community Programs |
| | Lincoln | 1877 | MR Facility | 153 | 2004 | Vacant* |
| | Meyer | 1966/1970 | MI Facility | 53 | 1993 | Women's Prison |
| | Singer | 1966 | MI Facility | 45 | 2004 | Undetermined |
| Indiana | Central State | 1848 | MI/MR Facility | 83 | 1994 | Undetermined |
| | Ft. Wayne | 1879 | MR Facility | 120 | 2007 | To be demolished |
| | Muscatatuck | 1920 | MR Facility | 287 | 2005 | Undetermined |
| | New Castle | 1907 | Epileptic Village | 200 | 1998 | Corrections |
| | Northern Indiana | 1943 | MR Facility | 53 | 1998 | Undetermined |
| Kansas | Norton | 1926/1963 | TB Hospital | 60 | 1988 | Corrections |
| | Winfield | 1888 | MR Facility | 250 | 1998 | Undetermined |
| Kentucky | Frankfort | 1860 | MR Facility | 650 | 1972 | Demolition |
| | Outwood | 1922/1962 | TB Hospital | 80 | 1983 | Demolition/New Campus |
| Maine | Aroostook | 1972 | | | 1995 | |
| | Levinson | 1971 | | | 1999 | |
| | Pineland | 1908 | MR Facility | 265 | 1996 | Undetermined |
| Maryland | Victor Cullen | 1908/1974 | TB Hospital | 79 | 1991 | Private Juvenile Facility |
| | Great Oaks | 1970 | MR Regional Center | 273 | 1997 | Private Senior Retire. Community |
| | Henryton | 1928/1962 | TB Hospital | 312 | 1985 | Undetermined |
| | Highland Health | 1870/1972 | General Hospital | 88 | 1989 | Sold to Johns Hopkins University |
| Massachusetts | Belchertown | 1922 | MR Facility | 297 | 1992 | Vacant |
| | John T. Berry | 1900/1963 | TB Sanitarium | 101 | 1995 | Undetermined |
| | Paul A. Dever | 1940/1946 | P.O.W. Camp | 294 | 2001 | Undetermined |
| | Fernald | 1848 | MR Facility | 274 | 2007 | Undetermined |
| Michigan | Alpine | 1937/1959 | TB Hospital | 200 | 1981 | Notsego County Offices |
| | Caro | 1914 | | | 1998 | |
| | Coldwater | 1874/1939 | Orphanage | 113 | 1987 | Corrections |
| | Fort Custer | 1942/1956 | Army Hospital | 1,000 | 1972 | Back to U.S. Dept. of Defense |
| | Hillcrest | 1905/1961 | TB Hospital | 350 | 1982 | Demolition |
| | Macomb-Oakland | 1967/1970 | CDA | 100 | 1989 | Reverted to Community Dev. |
| | Muskegon | 1969 | MR Facility | 157 | 1992 | Vacant |
| | Newberry | 1896/1941 | MI Facility | 39 | 1992 | Vacant |
| | Northville | 1952/1972 | MI/MR Facility | 180 | 1983 | Revert to MI Use |
| | Oakdale | 1895 | MR Facility | 100 | 1991 | Vacant/County Negotiating |
| | Plymouth | 1960 | MR Facility | 837 | 1984 | County/State Offices |
| | Southgate | 1977 | MR Facility | 55 | 2002 | Undetermined |

*Closing Grafton Developmental Center: Issues, Implications, Guidelines -- APPENDICES*    *Page 22*

## APPENDIX I (CONTINUED)

| State | Institution | Year Built/ Became MR | Original Use | # Residents, Closure Announcement | Year of Closure | Alternate Use |
|---|---|---|---|---|---|---|
| Minnesota | Brainerd | 1958 | | | 1999 | |
| | Faribault | 1879 | MR Facility | 501 | 1998 | Portion used by Corrections |
| | Fergus Falls | 1888/1969 | Asylum for MI | 38 | 2000 | Regional MH Center |
| | Moose Lake | 1938/1970 | Psychiatric Hosp | 34 | 1993 | Corrections |
| | Owatonna | 1895/1947 | Orphanage | 250 | 1970 | Abuse |
| | Rochester | 1879/1972 | MI Facility | 150 | 1982 | Federal Corrections |
| | St. Peter | 1988 | | | 1996 | |
| | Willmar | 1973 | | | 1996 | |
| Missouri | Bellefontaine | 1924 | MR Facility | 341 | 2005 | Undetermined |
| Montana | Eastmont | 1969/1979 | Residential School | 29 | 2003 | Nursing Facility |
| New Hampshire | Laconia | 1903 | MR Facility | 4 | 1991 | Corrections |
| New Jersey | Edison | 1975/1981 | Corrections | 70 | 1988 | Sold at public auction |
| | Johnstone | 1955 | MR Facility | 239 | 1992 | Corrections |
| | North Princeton | 1898/1975 | Epileptic Colony | 512 | 1998 | Undetermined |
| New Mexico | Fort Stanton | 1964 | Army Apache Outpost/TB H | 145 | 1995 | Skilled Nursing/Respite |
| | Los Lunas | 1929 | MR Facility | 252 | 1997 | Community Based Program MR/DD |
| | Villa Solano | 1964/1967 | Missile Base | 82 | 1982 | Housing |
| New York | J.N. Adam | 1912/1967 | TB Hospital | 180 | 1993 | Undetermined |
| | Bronx | 1977 | MR Facility | 217 | 1992 | Plans Not Final |
| | Craig | 1896/1935 | Epilepsy Hospital | 120 | 1988 | Corrections |
| | Gouverneur | 1982 | MR Facility | N/A | 1978 | Leased site |
| | O.D. Heck | 1972 | MR Facility | 274 | 1999 | Administrative Offices; non-profit use |
| | Letchworth | 1911 | MR Facility | 704 | 1996 | Undetermined |
| | Long Island | 1965 | MR Facility | 692 | 1993 | Undetermined |
| | Manhattan | 1919/1972 | Warehouse | 197 | 1991 | OMRDD Office |
| | Newark | 1878 | Custodial Asylum | 325 | 1991 | Community College |
| | Rome | 1825/1894 | County Poorhouse | 638 | 1989 | Corrections |
| | Sampson | 1860/1961 | Naval Base | 695 | 1971 | Office of Mental Health |
| | Staten Island | 1942/1952 | Army Hospital | 692 | 1987 | OMRDD & Community College |
| | Sunmount | 1922/1965 | TB Hospital | 503 | 2004 | OMRDD Specialty Units |
| | Syracuse | 1851/1972 | MR Facility | 409 | 1997 | Undetermined |
| | Valatie | 1971 | MR Facility | N/A | 1974 | Private Holdings and ICFs/MR |
| | Westchester | 1932/1979 | MI Facility | 195 | 1988 | Office of MH |
| | Wilton | 1960 | MR Facility | 370 | 1995 | Sold to private industry |
| North Dakota | San Haven | 1922/1973 | TB Hospital | 66 | 1987 | Vacant |
| Ohio | Apple Creek | 1931 | MR Facility | 178 | 2006 | Undetermined |
| | Broadview | 1930/1967 | TB Hospital | 178 | 1992 | City Administration Building/Retirement |
| | Cleveland | 1855/1963 | MI Facility | 149 | 1988 | Vacant/Negot. with City of Cleveland |
| | Orient | 1898 | MR Facility | 800 | 1984 | Corrections |
| | Springview | 1910/1975 | TB Hospital | 86 | 2005 | Undetermined |
| Oklahoma | Hissom | 1967 | MR Facility | 451 | 1994 | Corrections/Educational |
| Oregon | Columbia Park | 1929/1963 | TB Hospital | 304 | 1977 | College |
| | Eastern Oregon | 1929/1963 | TB Hospital | 240 | 1984 | Corrections/Opened New MR Facility |
| | Fairview | 1907 | MR Facility | 327 | 2000 | Light commercial/housing |
| Pennsylvania | Altoona | 1975 | MR Facility | 90 | 2005 | Undetermined |
| | Cresson | 1912/1964 | TB Hospital | 155 | 1982 | Corrections |
| | Embreeville | 1880/1972 | County Poorhouse | 152 | 1998 | Undetermined |
| | Hollidaysburg | 1974 | MR Facility | 60 | 1976 | Revert to MI Use |
| | Laurelton | 1920 | MR Facility | 192 | 1988 | Undetermined |
| | Marcy Center | 1915/1974 | TB Hospital | 152 | 1982 | Vacant |
| | Pennhurst Center | 1908 | MR Facility | 179 | 1988 | Veterans' Medical Center |
| | Philadelphia | 1983 | MI/MR Facility | 60 | 1989 | Vacant |
| | Western | 1962 | | 133 | 1999 | |
| | Woodhaven | 1974 | MR Facility | N/A | 1985 | Became private institution |
| Rhode Island | Dix Building | 1945/1982 | WPA | 80 | 1989 | Corrections |
| | Ladd Center | 1907 | MR Facility | 292 | 1994 | Undetermined |
| South Carolina | Clyde Street | 1973 | Home for unwed mothers | 20 | 1995 | Administrative Offices |
| | Live Oak | 1987 | Nursing home | 50 | 1999 | To be sold |
| South Dakota | Custer | 1964 | TB Hospital | 76 | 1996 | Boot camp for delinquent boys |
| Tennessee | Winston | 1979 | | | 1998 | |
| Texas | Forth Worth | 1976 | MR Facility | 339 | 1995 | Undetermined |
| | Travis | 1934 | MR Facility | 585 | 1997 | Undetermined |
| Vermont | Brandon | 1915 | MR Facility | 26 | 1993 | For Sale, Local Realty |
| Washington | Interlake School | 1946/1967 | Geriatric MI | 123 | 1995 | Other State Agency |
| West Virginia | Colin Anderson | 1920s | MR Facility | 85 | 1998 | Possible Juvenile Corrections |
| | Greenbrier | 1801/1974 | Women's College | 56 | 1994 | Community College |
| | Spencer | 1893 | MI/MR Facility | 150 | 1989 | Vacant/Possible Corrections |
| | Weston | 1864/1985 | MI/MR Facility | 99 | 1988 | Revert to MI Use |
| Wisconsin | Northern Wisconsin Ctr. | 1897 | MR Facility | 173 | 2005 | Intensive Treatment/Dental |

*"Four 10-bed "grouphomes" to be built on the Lincoln, Illinois site, to be named "Lincoln Estates."*
*Source: Braddock, Hemp, & Rizzolo, Coleman Institute and Department of Psychiatry, University of Colorado, 2005.*

# APPENDIX II
## SUGGESTED PRELIMINARY GUIDELINES FOR INSTITUTIONAL CLOSURES

Institutional closure affects "sending" facility staff (staff at the institution that is closing), the "receiving" community staff and their agencies, and, of course, the individuals with disabilities and their families who are most affected. These guidelines were primarily adapted from closures at the Dixon and Galesburg Centers in Illinois (Braddock, Heller, & Zashin, 1983; Heller, Factor, & Braddock, 1986)

There are five sections in the Guidelines:

- I.   General Guidelines
- II.  Individuals Moving from the Institution
- III. Families and Guardians
- IV.  Community Programs
- V.   Personnel of the Closing Facility

## I. GENERAL GUIDELINES

### 1. Evaluate the Closure Systematically and Longitudinally

Develop a plan to evaluate (study) the closure of Grafton, first from the standpoints of the residents and their families but also from the standpoint of the impacted staff and the local community in which Grafton is situated. Use this evaluative information to help increase the likelihood of positive long-term impacts on consumers, employees, and communities. Announce the study at the same time the closure is announced. It should continue for at least two years after the last resident is moved to the community.

### 2. Seek Out Knowledge From Other States' Experiences with Institutional Closure

Many states have a great deal of experience with closing institutions for people with MR/DD. Seek out that experience if you choose to close Grafton.

## II. GUIDELINES FOR INDIVIDUALS MOVING FROM THE INSTITUTION

### 1. Minimize Resident Transfer Trauma by Implementing an "Anticipatory Coping Strategy"

- Close Down Institutional Cottages or Units One at a Time;

- Keep Resident Groups and Friends Intact;

- Minimize Internal Transfer of Residents and Staff in the Closing Facility;

- Conduct Preparatory Programs for Consumers. This should include site visits to the new residential settings, as desired by the individuals, and in respect to any support needed based on their level of functioning; and,

- Involve Consumers Personally in Choosing Their Roommate(s) and Their New Community Home and Support Network.

### 2. Transfer Staff with Those Moving From the Institution

Determine whether institutional staff can be employed at community programs with individuals with developmental disabilities who know them and who are relocating to those programs.

### 3. Adopt a Relocation Assessment Process with an Appeal Mechanism

- Level One: Identification of an Alternative Plan

    The sending facility and state agency staff recommend a receiving program in the community for each resident based on service and support needs, preferences of the individual and/or the legally responsible persons, and availability of community resources.

- Level Two: Development of an Individual Services Plan

    A service plan is developed by the receiving program staff in collaboration with the sending facility staff. Minimizing internal transfers at the sending facility will improve the quality of information transmitted, as staff most familiar with the individuals moving would be available to provide the necessary input into the plans. The community agency staff has the final discretion in writing the plan.

- Level Three: Conference with Legally Responsible Person

    Prior to relocation, a meeting is offered at the community program with the legally responsible family member or guardian, if desired, to review with the community program staff the individual service plan. Closing facility staff may also participate in the meeting.

- Level Four: Appeal Process Available to Legally Responsible Person

    The legally responsible parent or guardian can object to the transfer plan if he or she believes it does not meet the individual's habilitation, support or medical needs. An appeal process is a necessary "relief mechanism."

### III. FAMILY AND GUARDIAN GUIDELINES

#### 1. Consultation with Closing Facility's Parents' Association

If a closure is decided upon, the state agency should promptly request permission to address the facility's parents' association. Meetings should be held, as necessary, to explain the closure process and to deal with problems that might arise during the relocation process. It is wise to acknowledge upfront to parents at both the sending facility, and to the community programs, that the relocations may temporarily disrupt routines at the institution and the community programs and in the lives of the individuals being relocated and their families. Every attempt to minimize this disruption should be made.

The state agency representative should convey to parents her or his willingness to work out solutions. It is also important for community program parents to be engaged to help provide a receptive environment for the relocated individuals and their families.

#### 2. Involve Parents Who Have Been Through the Process

Parents involved in a successful institutional closure from a nearby state with such experience may be invited to the initial closure discussions with state agency representatives and with the closing facility parents' association. This can help reduce family anxiety and build support for the positive opportunities that a well-planned relocation can bring to their relatives.

#### 3. Family/Guardian Notification

Individualized notification of families and guardians can serve to reduce anxiety and build support for individuals' planned relocations. Immediately upon the announcement of closure or phase-down, notification letters are sent to family members or guardians providing the following information.

- A rationale for the closure;
- The approximate time-frame;
- Anticipated positive aspects of the change;
- Types of community programs that will be available;
- Family and guardian options for alternative community programs;
- Reaffirmation of the state's commitment to serve the individual throughout relocation;
- Description of the four-level relocation assessment process--what will happen next; and,

- Name and phone number of a contact person designated by the state agency.

  Follow-up is continued through telephone contact reiterating essential information that was in the letter of notification and soliciting family or guardian participation in the individual's relocation to the community program.

### 4. Encourage Family Involvement

The following six steps can be employed to involve the families meaningfully in the process:

- Hold Informational Sessions at the Sending Facility

  Invite families to informational sessions at the sending (closing) facility. Representatives of the receiving community programs should also make presentations about their programs for the families.

- Open House at Community Programs

  Most community agencies operate a range of residential, day, work, and other support services. Invite families to an open-house at each receiving agency so that they have access to the appropriate information about the programs their family member is likely to be involved in.

- Parents at the Receiving Community Agencies. Contact families at the sending institution to offer assistance, inviting them for individualized or small group visits.

- Set Up a Family Buddy System at the Community Agency

  This system connects community agency families with the new families before, during and after the relocation.

- Family and Guardians Should be Present During the Actual Relocation if Desired

- The Community Agency Should Contact Families and Guardians to Inform Them When the Relocation is Scheduled and Invite Them to be Present. (The community agency parent buddy should also be present if possible.)

## IV. COMMUNITY PROGRAMS RECEIVING RESIDENTS FROM THE CLOSING FACILITY

### 1. Develop Consistent Entry Criteria

Develop systematic criteria for accepting residents at each receiving program and communicate these clearly with sending facilities and family/guardians. Encourage pre-placement visits to the receiving programs by staff, consumers with disabilities, and families to enable them to evaluate the program's appropriateness.

### 2. Provide Staff Training

Prepare incumbent staff and personally orient new staff to the consumers who will be moving in. Often the persons coming from closing facilities are lower functioning, medically fragile, or have challenging behaviors. Without sufficient training, staff may lack the specific knowledge and skills to properly support some of the individuals moving.

### 3. Involve Receiving Programs in Planning

Once closure has been scheduled, involve receiving program representatives early in the planning process and keep them involved and well-informed.

### 4. Establish Mental Health Back-Up Supports

Mental health back-up supports to community residences should take the form of a troubleshooting group of trained and experienced professionals drawn from the state facility and community agencies. A "behavioral unit" at one of the community programs or at a state mental health center could function as a temporary placement until appropriate, permanent back-up programs are established in the community and/or state mental health center.

### 5. Develop Public Relations and Education Programs for Communities

Community providers and state agency personnel can enlist community support by attending meetings with persons and groups in the receiving communities. These meetings could be held at churches, schools, or informally with immediate neighbors, to educate and reassure.

### 6. Establish Relationships with Local Resources

Some new community residences may need to establish relationships with such local resources as the fire department, health providers, and public safety offices. Specific recommendations for local resources include the following topics:

- Testing, counseling and behavioral support for community mental health providers;
- Updated treatment and medication training for physicians and hospitals on topics such as challenging behavior, seizures, and motor problems;

- Dental monitoring and treatment techniques for neighborhood dentists; and,
- General orientation to developmental disabilities for firemen, police, recreation facilities.

### 7. Provide Financial Incentives for Community Residential Development

Community placements will be greatly facilitated by financial incentives for community programs. The Medicaid Home and Community-Based Services (HCBS) Waiver has been used successfully in most states.

### 8. Facilitate Development of Needed Support Services in the Community

Closure affords the opportunity for the development of necessary community services "infrastructure." For example, expanded supported living and supported employment programs for individuals moving from the institution will be needed.

## V. PERSONNEL GUIDELINES

### 1. Plan Ahead Beginning Early in the Process

Develop a plan for future staffing patterns as individuals are relocated, conduct surveys of employee desires for transfer, and determine clear personnel policies early in the closure process. Do not promise employees what cannot be delivered.

### 2. Terminate One Unit at a Time and Minimize Internal Transfers

Close down one unit, wing, ward, or cottage at a time when possible and determine the schedule ahead of time, not during implementation. Closing down one component at a time keeps groups of individuals with developmental disabilities and familiar staff together, and can also result in increased administrative efficiency and cost savings.

### 3. Minimize Employee "Bumping"

"Bumping" (whereby staff working elsewhere in a state agency have more seniority and can replace less senior employees) should be avoided or at least minimized during the closure process. Bumping destroys program continuity in the closing facility at precisely the moment individuals being relocated need it most, with a deleterious effect on individuals who have developed interdependent relationships with staff over a long period of time.

### 4. Establish Employee Counseling Service

Establish an employee counseling and job placement service at the closing facility as soon as the closure is announced and becomes evident to staff. This service

would include individual counseling, workshop training, job relocation and transfer planning, job fairs, resume writing, and retirement planning.

### 5. Conduct Early and Continuing Briefings for Staff

Have a representative of the state agency or the state's personnel department present comprehensive briefings to facility staff when closure is announced. The briefings should announce the initiation of the employee counseling service, and fully discuss employee rights, benefits, and realistic expectations concerning layoffs, employee transfers, and retirement.

### 6. Develop an Open Door Policy

Develop clear lines of communication between management and all levels of staff at the closing facility.

### 7. Establish Liaison with Other Departments and Facilities

Establish positive working relationships with the other major employers in the closing facility's community, and in neighboring municipalities.

### 8. Adopt as Many Staff Incentives as Possible

Consider using one or more of the following incentives for staff in the closing facility:

- Early Retirement Inducements

- Staff Retraining

    In particular, develop staff retraining programs for community-based services employment.

- Extended Health Coverage

    Temporarily extend health insurance benefits for laid-off workers and their families throughout the first year if the workers remain unemployed.

- Adopt a Priority Interviewing Policy at Community Agencies

    Implement a priority for community agencies to interview staff from the closing facility, but give the community agency complete latitude to judge an employee's potential for working at the agency.

- Payment of Moving Expenses

Consider paying a pre-designated sum of money for moving expenses for employees transferring to MR/DD community agencies or to other MR/DD-related employment in North Dakota that is beyond 30 miles from Grafton.

## 9. Develop/Distribute Newsletter

Develop a periodic newsletter, perhaps monthly, and distribute it to staff at the closing facility and at the community agencies receiving individuals from the closing institution. A newsletter is useful in dispelling rumors and improving communication between the supervisory staff at the closing facility and employees affected by the closure. Rumors breed anxiety in staff and this can be transmitted to individuals who are undergoing the relocation to community agencies. The newsletters should include time tables, administrative policies including changes in policy, information about employees receiving new positions, job search information, and where to obtain counseling or other services.

## 10. Use a Participatory Management Approach

Involve top management and employee unions (if applicable) in the initial and ongoing planning for the closure. Make it clear to them that they cannot change the fact that closure is going to happen, but that they can and should influence and help make the decisions about the best way to carry out the closure and implement the relocation process.