# CHAPTER 1
# INTRODUCTION

# Introduction

## Background of the Study

When United States District Court Judge Raymond Broderick issued his opinion in the Halderman v. Pennhurst State School and Hospital case in 1977, it was considered the most far-reaching legal event in the field of mental disabilities to date. Unlike other federal judges who had primarily focused their attention on the improvement of institutional settings, Broderick ruled that Pennhurst State School and Hospital was incapable of providing constitutionally appropriate care and habilitation. This finding led him to conclude that the residents of Pennhurst, those on the waiting list to the institution, and any other mentally retarded person in the community "at risk" of institutionalization at Pennhurst should be provided services in less restrictive settings in the community.

Following Broderick's ruling and the issuance of his decree in March, 1978, plaintiffs in 20 other states began the process of seeking similar relief. Recognizing the potential national significance of the Pennhurst case, leadership in the Department of Health and Human Services (DHHS) -- specifically in the Office of the Assistant Secretary for Planning and Evaluation (ASPE), and the Region III (Philadelphia) Office of Human Development Services (OHDS) -- decided to support a five year longitudinal study which would:

- measure the relative growth of residents in the institution and in the community in order to determine the impact of relocation on mentally retarded persons;

- assess the impact of deinstitutionalization on the families of retarded persons and on the communities in which they live;

- compare the costs of providing services in the institution to those in community settings;

- assess the legal history of the Pennhurst case;

- address significant issues growing out of the implementation of the district court decree.

3

The main value of the study has been its utility in providing DHHS, state, and court officials with information on which vital short and long term policy decisions can be made. From the initial conception of the project, the Pennhurst Longitudinal Study has been a partnership involving the Commonwealth of Pennsylvania, the court, ASPE, and OHDS Region III. Further, because of the information needs of the Office of the Special Master and the Pennsylvania Office of Mental Retardation, their representatives also participated in the original design and in the ongoing oversight of the project. In addition to direction provided by the DHHS project officers, the Pennhurst Study Work Group was also established to ensure the study's continued relevance. Member of this group include representatives of the Special Master, the Hearing Master, the Office of Mental Retardation, the Pennsylvania Developmental Disabilities Council, and the Region III Developmental Disabilities Office.

Further, in order to ensure the national relevance of materials emerging from the Pennhurst Longitudinal Study, an Advisory Committee was appointed. The Committee is comprised of national experts in the field of mental retardation, a representative of the national organization of state mental retardation commissioners, and others interested in the general area of litigation and deinstitutionalization..

The Longitudinal Study, which is being conducted as a collaborative effort by the Temple University Developmental Disabilities Center in Philadelphia and Human Services Research Institute in Boston, is divided into three major parts:

- Impact on Clients and Communities (Temple University)

    This portion of the study involved monitoring the developmental progress of the study population, the services they received, the quality of their living environments, and the level of their satisfaction -- both at Pennhurst and after relocation to the community. This segment also included an assessment of the impact of deinstitutionalization on families of clients, both in anticipation of the action to be taken under the decree and

following the actual relocation, and the attitudes of others in
clients' local communities both before and after deinstitution-
alization.  Included in this study component were case studies of
several Pennhurst residents which provide a more in-depth exploration
of the impact of the case on particular individuals.

Briefly, the study population had the following characteristics:

Average age:  39 years
Average years institutionalized:  24
Level of disability:  86% severely or profoundly disabled
Other disabilities:  40% displayed physical violence toward
  others; slightly more than 50% non-verbal
Sex:  64% male

- Impact on Costs (Human Services Research Institute)

  The results of this portion of the study include an assessment of the
  costs and cost configurations of services provided both at Pennhurst
  and in community settings.  For as many service categories as
  possible, average cost per unit of service at Pennhurst and in the
  community were calculated.  These service unit costs were applied to
  the reported units of service received by individual clients.  From
  this, the staff derived estimates of total costs for each relocated
  client, as a function of how much service the client actually
  received.

- History and Implementation Analyses (Human Services Research
  Institute)

  This study area included a continually updated historical account of
  the implementation of the Pennhurst decree and the events surrounding
  the litigation for the first three years of the study.  In the course
  of these assessments, the actions and intentions of policy makers
  were highlighted.  Further, the interrelationships among events and
  key system actors are chronicled and the implications for state and
  federal policy were explored.  In addition, four aspects of
  implementation were singled out during the course of the study for
  extensive investigation and analysis.

## Organization of the Report

   This final report of the results of the Longitudinal Study

integrates qualitative, quantitative, and cost findings into one

comprehensive report in order to facilitate a review of the varied strands

of evidence generated by both Temple University and Human Services

Research Institute.  The material is organized as follows:

## Chapter II -- History of the Case

This chapter provides a summary of the six Historical Overviews prepared
during the first three years of the Longitudinal Study. It is organized
chronologically, with special sections on legal developments,
Pennhurst-related developments, and general system developments at each
historical stage. The chapter concludes with a brief summary of events
for the last two years.

## Chapter III -- Implementation Issues

This chapter summarizes three of the implementation issues that have been
addressed in depth during the course of the project. The first topic is
the Special Master mechanism employed by the federal court to monitor and
enforce the Pennhurst decree. The second area focuses on the actions and
reactions of the state defendants in the case as contracted with those of
state defendants in other suits around the country. The third analysis
is a multi-state assessment of limitations and constraints to the
implementation of court decrees.

## Chapter IV -- Growth and Development

This chapter describes the results of the systematic assessment of client
growth and development among the study population both at Pennhurst State
Center and in the community. Chapter IV through Chapter VIII represent
the findings from the quantitative studies. Four of the five chapters
are introduced by a digest from one of the project's case studies.

## Chapter V -- Consumer Satisfaction

This chapter presents the results of surveys of clients in the study
population to determine their level of satisfaction with their
surroundings both in the institution and in the community.

## Chapter VI -- Quality of Environments

This chapter reports the findings of surveys of client environments both
at Pennhurst and in the community.

## Chapter VII -- Family Attitudes

This chapter concentrates on the responses of families to the process of
deinstitutionalization and focuses on changes in their attitudes over
time.

## Chapter VIII -- Neighbor Attitudes

This chapter discusses the results of surveys of neighbors of the clients
in the study population both before and after community living
arrangement  were developed.

## Chapter I  -- Comparative Cost Analysis

This chap.  describes the comparative costs of the provision of services
at Pennhurst Center and in the community.

Chapter X -- Impact of Court-Ordered Change

This chapter, which is also the fourth and final implementation analysis, explores ten questions regarding the impact of the Pennhurst case on the mental retardation system in Pennsylvania. It draws together quantitative, qualitative, and cost findings in order to shed light on the issues.

Chapter XI -- Policy Implications

This final chapter summarizes the larger policy questions that have been uncovered by the study and offers suggestions for future planning and policy development.

Where appropriate, instruments used to collect information are included in the Appendix to the report.

# CHAPTER 2
# HISTORY

# History

## Introduction

As part of the longitudinal evaluation of the <u>Halderman v. Pennhurst</u> case, a series of <u>Historical Overview</u> reports was prepared in order to chronicle key events surrounding the implementation of the court decree and to analyze the roles of various actors in the implementation process. Since 1980, a total of six <u>Overview</u> reports were prepared -- one every six to eight months (in the last two years of the study, the Overviews were replaced by brief updates). The historical analyses describe the major activities surrounding the implementation of the decree, and assess the constraints and limitations on such actions. The reports also characterize the influence that the litigation had on the general service system and, conversely, how general system factors affected the requirements of the decree.

In preparing for each <u>Overview</u> report a number of data gathering activities were conduted. In addition to reviewing relevant legal documents, state reports and regulations, and other materials, staff interviewed a cross section of key actors in the state including county, provider, state, legal and consumer representatives.

Each <u>Overview</u> report corresponded to a specific time period during which certain key events concerning the decree transpired. The first <u>Overview</u> was somewhat different from subsequent reports because it set the stage for ensuing analyses. As such, it served two major functions: (1) to describe the context in which the litigation was brought; and (2) to highlight those activities that took place immediately after Judge Broderick arrived at his decision in December 1977. All other phases in the historical analysis of the <u>Pennhurst</u> case are presented in three parts: legal activities, Pennhurst-specific activities, and general system developments.

# An Introduction to the Litigation and Court Ordered Reform

Some of the key background elements reviewed in the first historical account included the following:

- Overview of the study area -- The history and characteristics of the Southeast Region of Pennsylvania (Philadelphia, Bucks, Delaware, Montgomery and Chester Counties) were described and the history of Pennhurst Center was presented. As map of the Department of Public Welfare regions is included in Exhibit 2-1, and the population trends at Pennhurst State Center are described in Exhibit 2-2. A detailed discussion of the social and economic characteristics of the state, the region, and the five counties is included in the appendix.

- Legal history of the litigation -- Similar litigation in the field of mental disabilities was reviewed and compared and contrasted with the Pennhurst case; the use of public law litigation as a tool of social reform was also analyzed.

- Events leading up to the suit -- A brief account of the rationale for the Pennhurst suit was summarized including the early expose of conditions at the state center, the pivotal role of the Pennsylvania Association of Retarded Citizens, attempts by the state to upgrade Pennhurst and create alternatives in the community, and finally the filing of the suit by David Ferleger on May 30, 1974 on behalf of Terri Lee Halderman for both injunctive relief and money damages. The complaint was later amended when PARC intervened in the suit; money damages were dropped from the remedy and the five Southeast Pennsylvania counties as well as the state were named as defendants in the suit.

- Legal arguments made and the remedies sought -- The plaintiffs argued that both constitutional and statutory law guarantees mentally retarded persons a right to habilitation and a right to receive services in the least restrictive setting. Moreover, the plaintiffs maintained that Pennhurst was incapable of ensuring the rights of mentally retarded persons because of deplorable conditions. The remedy sought was the ultimate closure of the facility and the movement of residents to less restrictive community-based services. The state did not significantly contest the facts presented by the plaintiffs but asserted that the proposed remedy went beyond the powers of the courts. The Judge's attempt to get all parties to agree to a form of relief failed and he proceeded to fashion one of the most complex decrees in the field of mental disabilities litigation.

- State mental retardation system -- Certain general characteristics of Pennsylvania's mental retardation system were described including such factors as the state/county partnership arrangement, the influence of 1966 MH/MR Act, and the growth of community living arrangements. The influence of these factors on the implementation of the court ordered reforms was assessed.

12

# Exhibit 2-1



# Exhibit 2-2

# Population Trends at Pennhurst Center (1966-1984)

| Date | Clients On Books | Clients In Residence | Admissions | To"Normalized" Environments* | Transfers | Deaths |
|------|------|------|------|------|------|------|
| 1966 | 3071 | 2864 | 51 | 57 | 22 | 53 |
| 1967 | 2979 | 2778 | 45 | 43 | 22 | 56 |
| 1968 | 2761 | 2300 | 48 | 77 | 338 | 54 |
| 1969 | 2653 | 2029 | 94 | 184 | 158 | 61 |
| 1970 | 2534 | 1893 | 75 | 237 | 12 | 39 |
| 1971 | 2414 | 1780** | 92 | 169 | 49 | 40 |
| 1972 | 2217 | 1704 | 90 | 63 | 79 | 21*** |
| 1973 | 2047 | 1584 | 89 | 116 | 142 | 28 |
| 1974 | 1718 | 1488 | 75 | 97 | 84 | 23 |
| 1975 | 1619 | 1424 | 81 | 49 | 85 | 20 |
| 1976 | 1545 | 1399 | 46 | 35 | 22 | 17 |
| 1977 | 1448 | 1322 | 20 | 61 | 17 | 16 |
| 1978 | 1257 | 1211 | 1 | 76 | 1 | 26 |
| 1979 | 1170 | 1145 | -- | 43 | 1 | 18 |
| 1980 | 964 | 927 | -- | 38 | 155**** | 17 |
| 1981 | 912 | 857 | -- | 85 | 1 | 12 |
| 1982 | 817 | 669 | -- | 177 | -- | 11 |
| 1983 | 676 | 592 | -- | 69 | -- | 8 |
| 1984 | 576 | 399 | 1 | 180 | 5 | 9 |

*Normalized environments include group homes/apartments, family care program, return to family, indepedent living, etc.

**This figure, from 1971 to 1980, represents clients counted in residence, but who were actually living at Pinehill Rehabilitation Center.

***This figure, from 1972 to 1980, includes deaths occurring at Pinehill.

****This figure represents the 155 clients discharged to Pinehill when that facility became a free standing ICF/MR.

Source:  J. Gregory, Pirmann, Pennhurst Center, 1985.

- **Specific litigation activities within the mental retardation framework** -- In addition to the organizational aspects of Pennsylvania's mental retardation system, the court's requirements were reviewed. The responsibilities of the Office of the Special Master (OSM) -- the court's primary enforcement mechanism -- were described, including the way in which the court orders would be monitored, and planning and resource development would be conducted. (A summary of the major orders that make up the decree is included in Exhibit 2-3).

# Exhibit 2-3

# Major Court Orders

## "Original Order" (March 17, 1978)

Judge Broderick's initial order included the following requirements:

- that suitable community services be provided for all Pennhurst residents and other class members;

- that individualized program plans be developed for each class member;

- that plans for the placement of Pennhurst residents into appropriate community services be submitted to the court;

- that a Special Master be appointed to supervise planning and implementation;

- that no further commitments be made to Pennhurst State Center;

- that a "friend advocate" program be established to represent class members and to monitor community services along with other entities set up by the court;

- that the Commonwealth take steps to eliminate abuses at Pennhurst;

- that the Special Master prepare a plan to provide alternative employment for all Pennhurst employees.

## Order for the Interim Operation of Pennhurst (March 5, 1979)

This order includes the following requirements:

- that the Special Master appoint a liaison to Pennhurst State Center;

- that OSM monitor compliance with institutional requirements regarding the administration of medication, use of restraints, appropriate feeding procedures, maintenance of sanitary conditions, prevention of abuse, use of seclusion, and modification of wheelchairs and other equipment.

- that OSM review and approve all Individual Habilitation Plans based on OSM guidelines developed pursuant to the original order;

- that counties appoint case managers to serve the needs of Pennhurst class members;

- that OSM review and approve the employment of all county case managers and case management supervisors;

- That OSM provide training to case managers, coordinate their duties, and establish procedures for the activities of certified advocates.

## "Employee Order" (April 1979)

This portion of the decree established an Office of Employee Services as part of the Office of the Special Master.  The Office was created in order to provide counseling and guidance to those employees of Pennhurst State Center who lost jobs because of court-mandated deinstitutionalization. The order also included a schedule for the ultimate closure of the institution.  This order was nullified by the circuit court on December 13, 1980.

## "Children's Order" (June 8, 1979)

This order requires the following:

- that all children under the age of 21 years be moved out of Pennhurst into appropriate community living arrangements by September 1979;

- that counties prepare a plan for the provision of services to school-age children and that OSM approve such plans;

- that the Commonwealth prepare a plan for program and fiscal monitoring of the provision of services to school age children and that OSM approve such plans;

- that OSM monitor the placement of such children and make periodic reports to the court.

## "Hearing Master Order" (April 24, 1980)

This order, which was necesitated by the ruling by the Third Circuit, mandated the following:

- that a Hearing Master be appointed to conduct individual determinations in cases of contested placement out of Pennhurst, and in cases where institutional commitment is recommended;

- that the Hearing Master establish procedures for hearings, ensure that notice is given to all parties, set hearings at specified times, review evidence on both sides, and make a decision regarding the legitimacy or placement objections or admission request.

This order was subsequently modified to give the Hearing Master responsibility for determining the "voluntariness" of all placements out of Pennhurst pursuant to the Supreme Court stay.

## "Implementation Order" (March 2, 1982)

This order included the following directives:

- that the Commonwealth and county defendants place 61 Pennhurst residents (not covered by the Children's Order) and 29 community class members in community residential and support services by June 30, 1981;

- that Commonwealth and county defendants place 150 Pennhurst residents and 100 community class members in community residential and support services by June 30, 1982;

- that Commonwealth defendants place 100 Pennhurst clients who resided out of the Southeaster Region, in community residential and support services by June 30, 1982;

- that the Commonwealth develop a plan for complying with the placement schedules and submit such plans to the court.

## "Consolidated Order" (August 26, 1983)

This order consolidated and updated the previous orders and added the following provisions:

- that the Special Management Unit be substituted for the Office of the Special Master to monitor the interim operations of Pennhurst Center;

- that the Commonwealth's placement procedures, which allow for IHP review by the Special Management Unit, be substituted for those developed by the Office of the Special Master;

- that the Commonwealth be given 90 days to submit plans for the placement of class members to any facility operated by the Commonwealth defendants.

## "Final Settlement in Halderman v. Pennhurst" (July 12, 1984)

The following are the major points included in the agreement reached between the plaintiffs and the defendants:

- that Pennhurst Center will close by July 1, 1986 (possible extension to September 30, 1986);

- that the definition of plaintiff class will be "any retarded person who has resided at Pennhurst at any time on or after May 30, 1974";

- that resources currently committed to Pennhurst will be reallocated to community programs and services;

- that the Hearing Master will continue his functions until the settlement is approved by the District Court. At that time unresolved matters will be transferred to an independent neutral retardation professional who will also hear any cases in which a person (class member, state, county, parent, advocate or legal counsel) disagrees with a decision to move an individual to a CLA or an institution;

- that client advocates will be continued;

- that court jurisdiction will end for the counties two years after the last of each county's residents leave Pennhurst; and for the state defendants on July 1, 1989.

What emerged in this analysis is a picture of an already complex system beset with the usual array of structural and political problems, and faced with meeting the very specific and immediate mandates of a complicated and far-reaching court decree. The weight of the discussion provided a view of both the limitations of judicial intervention in the area of mental retardation and the ways in which litigation can shape the course of reform in this field. It further highlighted the unique position of the Office of the Special Master in an ongoing state statutory, regulatory, and political environment.

In assessing the progress of implementation of the decree during this phase (which concluded in early December 1979), it is safe to say that the major constraint to compliance was the defendants' unwillingness to accept the results of the district court decree. Such resistance was manifest in continued appeals and a hope that Judge Broderick's decision would ultimately be overturned. This posture made it extremely difficult to secure the planning and funding commitments necessary to begin the movement of resident out of Pennhurst in the numbers envisioned in the original order. This singular fact, unlike aspects of litigation in other states where consent decrees have been signed, made the case and its implementation during this period, unique.

Other factors that influenced implementation were primarily derivative of larger system problems that would have constrained any major deinstitution-alization activity. They include the following:

- Restrictions in the state's mental health and mental retardation statute that limited the development of community residences to three person homes;

- A lack of cooperation and participation in resource development from other state funding agencies such as the Bureau of Vocational Rehabilitation and the housing finance agency;

- The absence of any regional planning or funding mechanism in the state mental retardation system capable of consolidating and funding highly specialized and expensive services for more disabled individuals;

- No comprehensive plan for the use of ICF/MR (Title XIX) funds in the community which would free up state funds for the expansion of community-based living arrangements;

- Limited development of back-up resources for the support of severely mentally retarded persons living in the community;

- Turn-over in staff in the community living arrangement (CLA) program at an average rate of once every six-months -- a phenomenon that adds costs and creates instability in the minds of some observers;

- No mechanism in the state to ensure an orderly transfer of state employees from institutional to community-based settings;

- No comprehensive standards for CLAs.

Additionally, there were constraints that were peculiar to the litigation:

- Given legal doctrine in the field, it is difficult if not impossible to force a state legislature to appropriate funds to implement the decree.

- Current structural, organizational and political problems surrounding the relationships between the Office of the Special Master and the defendants constrained an easy and mutually trusting relationship.

- There were no officially recognized county plans to guide the implementation of the decree in the Southeast Region.

- The nature of the individual planning process on behalf of Pennhurst residents was long and tedious and resulted in numerous delays that purportedly discouraged the participation of some local providers.

- The addition of Pennhurst case managers at the county level, while accepted in some counties, caused consternation and resistance in other counties.

- The implementation of the Employee Order was constrained by the inability ot OSM to secure job placements and training resources.

- The role of OSM with respect to planning caused duplication and confusion and removed accountability from the state and the counties.

## Another Ruling and An Opportunity for Agreement
## (December 1979-July 1980)

Legal Developments. On December 13, 1979, the United States Court of
Appeals for the Third Circuit issued its en banc opinion in the Pennhurst
case. In a six to three decision, the court affirmed certain aspects of
Broderick's decree and negated others. The three areas that were eliminated
included: 1) the requirement that alternative employment be found for all
Pennhurst employees; 2) the presumption that Pennhurst would eventually close;
and 3) the portion of the decree banning all admissions to Pennhurst. The core
of the decision was affirmed, however, since the court supported the community
presumption.

With the appeals court decision in hand, there was an opportunity for the
parties to negotiate a settlement. The appointment of Dr. Jennifer Howse,
former director of the Willowbrook Review Panel in New York, generated optimism
among the plaintiffs that agreement could be reached. Given her past position,
Dr. Howse was seen as an aggressive and articulate spokesperson for the
interests of mentally retarded persons.

Negotiations began early in 1980 and continued for several months. The
major area of disagreement among the parties was the ultimate role of
Pennhurst. Specifically, discussions focussed on how many persons should be
considered part of the class and, therefore, eligible for community placement.
After several proposals from both sides, there was still no consensus on the
magnitude of placement.

OMR staff maintained that the sticking point was a disagreement regarding
the speed of CLA development and client movement, while the plaintiffs asserted
that discussions broke down both over the placement schedule and system
improvement. Given the high hopes of each side, the inability to reach

agreement left the parties with a great deal of bitterness and ill feeling. Each side felt that its position had not been respected and blamed the other for the ultimate failure of the discussions.

During the negotiations, Judge Broderick revised his original order to conform with the changes made by the court of appeals. The changes narrowed the scope of his original order and placed additional emphasis on the individual rather than the collective aspects of the remedy. Included among the changes in his order was the termination of the Office of Employee Services (OES) -- a unit that had been established at Pennhurst to ensure the protection of institutional employees. Upon termination of the OES, the Office of the Special Master (OSM) issued a special report outlining the multiple problems involved in finding alternative employment for Pennhurst employees.

Broderick also created the Hearing Master. The Hearing Master was directed to conduct individual reviews involving contested institutional discharges and where institutional admissions were being sought on behalf of a class member. In filling this critical position Judge Broderick selected Michael Lottman, an attorney with broad background in the field of mental disabilities.

Finally, Judge Broderick allowed the Parent-Staff Association -- a group of anti-deinstitutionalization parents and Pennhurst employees -- to intervene in the litigation. This move further fragmented the case by introducing a group that was neither supportive of the plaintiffs nor entirely supportive of the defendants. Moreover, the Parent-Staff Association was receiving (and continues to receive) financial support from the American Federation of State, County and Municipal Employees (AFSCME), a powerful union with similar interests in maintaining institutions.

Following the court of appeals decision and the collapse of the negotiations, the defendants, and the Parent-Staff Association had to decide whether or not to pursue the case in the U.S Supreme Court. Each group had different motives for seeking certiorari, and some were reluctant about taking such an important test case to the Supreme Court. In the end, however, all parties sought review.

On June 9, 1980, the Supreme Court agreed to take the Pennhurst case. In granting certiorari, the Court agreed to hear arguments in four areas: the ability to enforce a private right of action either under the Developmental Disabilities (DD) Act or under general or federal civil rights provisions; the ability of the DD Act to support the breadth of the remedy in the Pennhurst case; the ability of the state Mental Health and Mental Retardation Act of 1966 to support the Pennhurst case; and the extent to which federal courts can intervene in state affairs. In addition to granting certiorari, the Court granted a partial stay prohibiting "involuntary" discharges from Pennhurst. Although there were several different interpretations of the Court's partial stay, in the end, Judge Broderick issued an order directing the Hearing Master to schedule a hearing for each Pennhurst resident for whom a community living arrangement had been prepared. The purpose of the hearing was to detemine whether or not the transfer of Pennhurst clients to the community was in fact "voluntary."

Pennhurst-Related Developments. Shortly after her arrival in Pennsylvania, Dr. Howse created the Pennhurst Implementation Team (PIT). The major responsibilities of the PIT included: serving as a liaison to OSM and other key actors; providing continuity between the policies developed for Pennhurst and the Southeast Region, and statewide policies; and ensuring that any positive benefits growing out of the litigation were expanded statewide.

One of the first tasks taken on by the PIT team was the preparation of a staffing study at Pennhurst Center that recommended the addition of 107 direct care staff at a cost of $11 million. The relationship of the PIT to the Master's Office was complicated by the negative feelings surrounding the failed negotiations, and a growing polarization between the state and OSM staff regarding implementation of the court decrees.

One of the key concerns of the PIT and other OMR staff during this time was resource development for the Southeast Region. Though the Commonwealth's proposed implementation order showed 150 community placements for Pennhurst residents and another 100 slots for class members in the community by 1981, only 65 CLA slots were actually projected by OMR for "Phase I" of annual placement activity for Pennhurst residents. "Phase 2" included an unspecified number of placements as a result of the initiation of a community-based ICF/MR program.

Judge Broderick was not satisfied with the projected placements and circulated an implementation plan of his own in the form of a proposed order. The proposed order included movement of 150 Pennhurst residents to the community, the creation of 150 CLA beds for community class members and the movement of 150 out-of-region Pennhurst residents. State defendants criticized the order because it was unrealistic given the existing system capacity.

During this period the attorney for the original plaintiffs, David Ferleger, raised serious questions regarding suspicious deaths at Pennhurst State Center. The Commonwealth responded by commissioning a study by outside consultants regarding medical practices at the institution. The issues of adequacy of medical practices and resident abuse and neglect at Pennhurst were among the key areas to be monitored by OSM staff. Despite a rocky start, OSM monitoring activities and subsequent reports were accepted by Pennhurst staff and ultimately led to certain reforms and policy changes at the institution.

General System Developments.  In addition to bringing on new staff to OMR, Dr. Howse also developed a reorganization plan for the Office immediately after her arrival.  One of the major organizational changes was the creation of a unit to oversee the development of community-based intermediate care facilities for mentally retarded persons (ICF/MRs).  The new unit prepared a proposal for the developement of small ICF/MRs as part of Pennsylvania's Title XIX plan of compliance.  Regional Health Care Financing Administration (HCFA) staff had numerous reservations about the small ICF/MR proposal.  Despite the reservations of the Federal Regional Office, OMR staff began to develop a plan to operationalize the ICF/MR program.  In the initial planning stages, there was no special focus on the Southeast Region and the community placement requirements of the Pennhurst case.

## Relationships Deteriorate and the Court Asserts its Authority (August 1980-March 1981)

Legal Developments.  Up to the Summer of 1980, the Halderman v. Pennhurst case had been characterized by numerous appeals, stalemates and continuing confrontation mmong the parties.  The ensuing period was much the same.  The U.S. Supreme Court heard oral argument on the circuit court decision in Pennhurst, Judge Broderick signed an implementation order covering movement of class members into community living arrangements for the ensuing two fiscal years, and two related cases -- Romeo v. Youngberg and In Re Joseph Schmidt -- were decided.

As noted in the previous section, Judge Broderick interpreted the Supreme Court's stay to mean that no one could be moved from Pennhurst unless the transfer was "voluntary."  The Parent/Staff Association, the group that originally requested the stay, disagreed with the Judge's interpretation and on November 4, 1980 went again to the Supreme Court to renew its request for stay

and to ask that Judge Broderick suspend implementation of the decree.  The
state but not the counties also joined in the request.  The Supreme Court
denied the request immediately prior to the oral argument on the <u>Pennhurst</u>
case.

On December 8, 1980, the Supreme Court heard arguments on the <u>Pennhurst</u>
case.  The primary focus of the oral argument on both sides focussed on whether
the Developmental Disabilities Act supported the comprehensive remedy ordered
by Judge Broderick.  The defendants (petitioners) maintained that the
Developmental Disabilities Act rested solely on the general spending power
granted in Article I, Section 8, of the Constitution.  Though the petitioners
differed among themselves regarding the extent of federal enforcement authority
under the Act, they all maintained that no substantive rights had been
conferred by Congress.  The plaintiffs (respondents) argued that Congress
specified substantive due process and equal protection rights under the
Fourteenth Amendment.

A week before the Supreme Court argument, the U.S. Court of Appeals for
the Third Circuit rendered an <u>en banc</u> decision in the <u>Romeo v. Youngberg</u> case.
The suit, which was originally filed in the federal district court in 1976,
involved a profoundly retarded resident of Pennhurst State Center.  While
confined at Pennhurst, Romeo was injured on over 70 occasions either by
injuries that were self-inflicted or the result of attacks by other residents.
The action was brought on behalf of Romeo by his mother who sought compensatory
and punitive damages from the defendants because of violations of the
resident's Constitutional rights under the Fourteenth and Eighth Amendments.

The plaintiffs lost in the federal district court but appealed the
decision citing irregularities in the trial and in the Judge's instructions to
the jury.  In its ruling, the circuit court remanded the case back for a new

trial noting that the district court, in an effort to distinguish the suit from a malpractice case, adopted a standard that was too rigorous in the context of a civil action. The circuit court proposed alternative jury instructions and requested the lower court to reconsider its earlier exclusion of expert medical testimony. Although Romeo won a favorable judgment in the circuit court, other legal hurdles remained before money damages could be awarded. In the meantime, the state defendants petitioned the U.S. Supreme Court for a writ of certiorari.

Another significant case, In Re Joseph Schmidt, was decided by the Pennsylvania Supreme Court. The case arose when the Allegheny County mental health and mental retardation administrator requested that Joseph Schmidt be committed to Western State Center. The Commonwealth intervened asserting that the Center was not an appropriate residential arrangement as required by the Mental Health and Mental Retardation Act of 1966. The lower court ruled that the responsiblity for finding an appropriate placement for Schmidt was at the county level. The county appealed to the state supreme court asking for a clarification of which unit of government, the county or the Commonwealth has the responsiblity to develop long term residential care. The state supreme court found that the 1966 Act created a right to care in the least restrictive environment and that the responsiblity for such care rested with the Commonwealth.

On March 2, 1981. Judge Broderick signed an implementation order setting a placement schedule for Pennhurst class members. Many of those interviewed for the project were perplexed that Broderick cmose this period to issue the order given the imminence of the Supreme Court decision. Several observers speculated that the Judge had become increasingly frustrated by the pace of movement of individuals out of Pennhurst and was concerned that resources that had been allocated for placement would revert to the state general fund.

The Judge ordered that, from March 2, 1981 to June 30, 1981, the Commonwealth develop 61 community living arrangements for Pennhurst residents (not covered by the children's order) and 9 similar arrangements for retarded class members in the Southeast Region. These figures coincided with the state's allocation letters to the counties for 1980-81. For the second year, the Judge ordered 150 Pennhurst and 100 community class members placed -- the identical targets presented by the Commonwealth to the court in May 1980. Broderick justified an additional 100 out-of-region placements by noting that since OMR had placed several hundred persons out of state centers in other regions, the state could therefore find community living arrangements for outof-region Pennhurst residents.

Pennhurst-Specific Developments. Fiscal concerns preoccupied state and community staff during this time period. Several counties in the Southeast Region used part of their allocation for FY 1980-81 to cover reported short-falls in existing courtordered placements and other unanticipated fiscal constraints. Certain counties attributed some of the deficit to the court requirements. On the other hand, OSM staff contended that some counties were interpreting certain IHP requirements too literally and providing certain services (nursing, etc.) at greatly increased costs. In order to rectify the budgeting problems, OMR staff prepared both short term and long term solutions: first, they covered the existing deficits through a modification of the 1980-81 allocation; and second, they developed special procedures for monitoring and controlling the use of expansion funds for Pennhurst class members.

At Pennhurst, an $800,000 contract was awarded to the Northeast Emergency Medical Association (NEEMA) to provide medical care for residents. The use of a contract, which included nine physicians and a medical director, was a

response to concerns regarding deaths and other medical care issues at the institution.

Other significant developments during this period included the removal of OSM's appropriation from the overall Pennhurst budget and its inclusion as a separate line item in the Governor's 1981-82 proposed budget. As could have been predicted, this action drew the legislature's attention to OSM"s almost $1 million budget.

The activities of the Hearing Master were praised by most observers -even those who did not necessarily agree with his decisions. His approach was viewed as fair and his opinions literate and comprehensive. Up to this point, five of the Hearing Master's rulings had been appealed to Judge Broderick -four regarding community placement from Pennhurst and one regarding an admission to Woodhaven Center. In three of the five cases, the Judge upheld the Hearing Master; the other two required pre-placement visits before a "voluntariness" hearing could be held. The "pre-placement" decisions did not address any of the complex issues raised by the appealing parties -- they merely deferred a decision for a later time.

General System Developments. One of the major events during this period was the release of the Governor's proposed budget which provided $10.2 million in new program funds for OMR -- $2.3 million of which was targeted for new CLAs and $6.05 million for community ICF/MRs. Though the overall budget for the Department of Public Welfare was lean, mental retardation services continued to receive favorable funding increases.

The ICF/MR program -- with a proposed development strategy of 500 beds for FY 81-82 -- continued to encounter resistance by Regional Health Care Financing Administration staff. In order to achieve a resolution, a meeting was held in

Washington D.C. with Central HCFA staff. At the meeting, it was suggested that the state prepare a waiver under Section 1115 of the Social Security Act to accomplish its objectives. Although a waiver was developed, OMR staff never submitted the request given the change in administration in January 1981. OMR staff continued to develop plans for the small ICF/MR program including clarifying agency roles and responsiblities, issuing program memoranda that listed the criteria for DPW approval of ICF/MR proposals, and preparing an implementation plan.

OMR staff were determined to use the ICF/MR program to promote small, community-based living arrangements. In a December 1980 memorandum, the size of new ICF/MRs was limited to a maximum of eight beds on non-contiguous sites. The proposed implementation plan called for converting large CLAs to ICF/MRs and developing new facilities to serve only "self-preserving" clients.

## Community Placements Pick up Steam Amidst Legal Confrontations (March 3, 1981-August 31, 1981)

Legal Developments. During this period, the legal theories and theoretical legitimacy of the Pennhurst case, were challenged, the enforcement prerogatives of the Judge were tested, and the resp   bilites of the defendants to comply with various aspects of the decr  were reinforced.

The major legal event during this period was the decision by the U.S Supreme Court to reverse the Third Circuit Court of Appeals decision in Pennhurst and to remand the case to the lower court for consideration or reconsideration of the remaining Constitutional and state and federal statutory issues (i.e., Section 504. the Eighth and Fourteenth Amendments to the Constitution, the Pennsylvania Mental Retardation Act of 1966, and other sections of the Developmental Disabilities Act). On April 20, 1981, the Supreme Court ruled, in a six to three decision, that Section 6010 of the

Developmental Disabilities Assistance and Bill or Rights Act (DD Act) does not create any substantive rights to "appropriate treatment" in the "least restrictive" environment.

Because the Court did not address itself to any of the legal issues considered by Judge Broderick, it provided only partial guidance to the lower courts regarding the future course of the litigation. However, though the Court's decision did not automatically vacate Judge Broderick's decree, it did alter the tone and momentum of the litigation. The defendants, in order to test the implications of the ruling, sought a stay of the decree from Judge Broderick pending the Third Circuit review. As he had on three other occasions, Judge Broderick denied the request.

In spite of the Supreme Court's decision, the Judge responded strongly to the state's withdrawal of funding from the Office of the Special Master. As mentioned in the previous section, the 1981-82 appropriation for the Master was placed in a separate line item of $900,000. Some observers saw this move as an attempt to prod the legislature to cut OSM's funds while Commonwealth representatives maintained that the shift to a line item was intended to clarify the issues for the legislature and to avoid misrepresenting the level of resources for Pennhurst Center.

In its final action on the budget in June, the Legislature cut the Master's Office appropriation to $35.000. Following this action. the Commonwealth indicated to the court that it could not pay the court's monthly payment orders. In August 1981. Judge Broderick found the the Department of Public Welfare and Secretary Helen O'Bannon in contempt and assessed a $10,00 per day fine to run each day after September 2, 1981 that the payment orders were not obeyed. Several requests for stays by the Commonwealth were denied and the Commonwealth elected to pay the fines instead of OSM. In the meantime

31

OSM staff "volunteered" their services without pay for a period of three months.

In another assertive action, the Judge issued an order to show cause why the Commonwealth and four counties (Chester County was in compliance) should not be held in civil contempt for failing to obey his March 2nd, 1981 "implementation order." The contempt hearings raised a number of key issues. For example. defendants and plaintiffs were using different definitions of who was placed and who was not. By July 31, 1981, OSM showed that of 90 persons slated for community residences, only 15 had been officially placed, while the Commonwealth's figures showed a total of 81 placed. During the course of the proceedings, the Judge also became concerned about the lack of county attention to the IHP process spelled out in the OSM guidelines.

The final legal event during this phase was the consummation of the first consent agreement since the Pennhurst case was decided in 1977. The plaintiffs and the City and County of Philadelphia agreed to settle placement issues raised in the civil contempt proceedings described above. By signing the agreement, Philadelphia did not admit contempt of the March 2nd Order, but agreed to make its required placements by September 30, 1981. Moreover, the Philadelphia defendants agreed to pay $15,000 in attorney's fees to plaintiffs' counsel for costs incurred during the contempt proceedings and to provide a performance fund as an expression of "good faith."

Pennhurst Specific Developments. For the most part, placements of Pennhurst class members in 1980-81 went more smoothly than in the previous year. By July 31, 1981, almost all residential and day programs had been developed. A number of constraints, however, were cited by the counties including delays in site identification, zoning obstacles, community resistance and client crisis situations.

Escalating costs of programs for class members became an issue during this period. Many of the per diems, according to county staff, fell in the $70.00 to $100.00 range. Some county staff maintained that the per diems were sometimes high because of the complexity of the clients' residential and day program needs. Such costs were not necessarily questioned by county commissioners since most of the programs are 100% state funded. State resources, however, were becoming more limited, especially in light of the 1981-82 budget for the Southeast Region. Since $8 million in new program funds were cut by the legislature, OMR staff had to adjust its funding commitments to the Southeast Region. Although the Commonwealth indicated to county staff that funding would be available to cover its court-ordered requirements, some counties were concerned about future funding for the court orders.

Two other important developments affected the on-going implementation of the Pennhurst Decree. As part of their response to Judge Broderick's March 2, 1981 order, OMR staff proposed to establish a "special management unit" in the Southeast Region with responsibilities for reviewing all TIHPs and IHPs for Pennhurst class members. The unit, to be based at Pennhurst, would include two staff persons -- one of whom was the former case management supervisor for Chester County. OMR staff anticipated that initially the unit would prepare revised IHP guidelines to "streamline" the procedures set out by OSM and would eventually take over responsibility for IHP monitoring from OSM. In addition, OMR staff proposed to use the data collection strategies developed by Temple University as part of the Longitudinal Study, to aid in monitoring individual clients. OSM staff were somewhat skeptical about the proposal since Temple's data was analyzed only on an aggregate basis.

Developements at Pennhurst State Center continued to focus on medical services including the medication reviews conducted by an outside medical

consultant. According to Pennhurst staff, the presence of Dr. Ziring increased the level of interest and knowledge among direct care staff regarding medication issues. Meanwhile, a new medical director was hired as part of the NEEMA contract and plans for improved medical services for Pennhurst residents and for those residents making the transition to the community were initiated.

General System Developments. In July 1981, the Pennsylvania Legislature completed work on the state budget and approved a $22 million increase for the Office of Mental Retardation. This increase was $8 million lower than the Office had requested and as such, cut into plans for new programs. To make up the loss, OMR planned to use carry-over funds and dollars freed-up from conversions of existing CLAs to ICF/MRs.

OMR's proposal to develop small ICF/MRs was also completed during this period. Although OMR staff had never intended that the program become a major component in the implementation of the Pennhurst remedy, 112 community ICF/MR beds were included in the FY 1981-82 projections to meet the court-ordered requirements for the Southeast Region. Because of the budget cuts in new progams, OMR staff had to revise their original estimates of the number of ICF/MRs beds that would be developed throughout the state. A total of 225 beds as opposed to 317 beds would be converted to ICF/MRs and 200 new ICF/MR beds instead of 504 beds would be developed statwide. Further because of a ban on new construction, ICF/MRs would be limited to existing housing. Aa a result, only "self-preserving" clients would be served.

Other general system developments included a statement by OMR Deputy Secretary that Marcy State Center in Western Pennsylvania would be closed by 1982. Based on a feasibility study conducted the year before, OMR staff determined that Marcy residents were among the most appropriate candidates for

34

commmunity placement in the entire state system and that a significant savings

would occur if all residents were placed in alternative living arrangments.

## Cooperation Prevails but Fiscal Uncertainties Lie Ahead (September 1, 1981-March 31, 1982)

Legal Developments. In the second court of appeals decision in Pennhurst, Broderick was upheld on the basis of provisions of the state's Mental Health and Mental Retardation Act of 1966. The majority opinion distinctly avoided the more thorny Constitutional issues of and federal statutory questions remanded by the Supreme Court. Instead, the opinion stated that the entire superatructure of Broderick's decree could be supported by state law. The court of appeals ruling, though a victory for plaintiffs, left the remedy somewhat at the mercy of the state legislature and opened up the possibility of significant changes in the 1966 Act.

In the meantime, Judge Broderick congratulated OMR staff for their diligence in carrying out those tasks necessary to ensure rapid compliance with his implementation order. He did not find, however, that the county defendants had pursued implementation with the same zeal. As a result, the Judge found some of the counties in contempt but did not assess fines since compliance had been virtually achieved. The Commonwealth's performance may have influenced the Judge's receptivity to a reduction in the Master's Office and to the transfer of some compliance responsibilities to the Commonwealth.

Though the Commonwealth won kudos from the district court, compliance for fiscal year 1981-82 was somewhat clouded by the lack of state action on outof-region placements. This issue, coupled with the possibility that in-region placements would not be completed by June 30, 1982, raised the possibility of additional proceedings during the summer.

On the O'Bannon contempt issue, Judge Broderick relieved the Secretary and the Commonwealth of the responsibility to pay the $10,000 daily fines. By early January 1982, the fund had swelled to approximately $1,200,000. The Judge agreed with the state that any further collection of fees would be inequitable since the funds paid by the Commonwealth were already in excess of the amount needed to operate the Master's offices. The Judge used the funds to reimburse OSM personnel for back pay and left the remainder in interest bearing accounts.

The Friend Advocacy program, the future role of the OSM and the transfer of monitoring responsibilities to the Commonwealth were the major issues that surfaced in another round of negotiations among lawyers for the defendants and the plaintiffs. Aside from discussions surrounding the Philadelphia County consent, this was only the second time that some or all of the parties had entered into serious negotiations. There were two major sticking points according to those interviewed:  (1) the frequency of Commonwealth monitoring of class members living in the community; and (2) the timing of any transfer of monies from the contempt fines back to the Commonwealth. Although the parties were close to agreement on the first point, there was substantial difference of opinion on the return of fines to the Commonwealth. In the end, the negotiations collapsed. Ironically, shortly after the negotiations broke down, OMR program staff and OSM were able to reach an agreement of the transfer of monitoring.

The final legal event during this time period was the Judge's decision to vacate his order of July 14, 1980 which directed the Hearing Master to hold hearings on every individual being placed out of Pennhurst and to determine whether the placements were "voluntary." With the elimination of voluntariness hearings, the Hearing Master would be limited to cases where "beneficiality" of

a placement was challenged by the client or his parents or guardians.

By the close of this period, there were several legal issues left hanging fire. First, the outcome of the Romeo v. Youngberg litigation was not known. Though Romeo differed in character from the Pennhurst suit, it offered the Supreme Court its first opportunity to define the Constitutional rights of institutionalized mentally retarded persons. The decision by the Court would certainly affect any future rulings on the Pennhurst litigation. Second, and somewhat related, it was not clear whether the Supreme Court would grant certiorari in Pennhurst for a second time thereby opening the issue of federal court jurisidiction in the enforcement of state laws.

Also, it was not clear what Judge Broderick would do to structure compliance beyond the end of fiscal year 1981-82. It was thought that the Supreme Court's action in both Romeo and Pennhurst would influence whether he would keep the pressure on the Commonwealth through an implementation order covering future placement.

Pennhurst-Specific Events. As discussed above, OSM and OMR staff were successful in forging agreements regarding the transfer of some compliance responsibilities including the aproval of IHPs, monitoring of community facilities housing Pennhurst class members, and case manager training. The agreement included time lines for activities and a stipulation that OSM would remain involed for some period of time and would conduct joint reviewa of several TIHPs and IHPs, as well as joint monitoring visits. County staff reaction to the shift was generally positive.

Funding for the remaining placements to be made under the March 2nd Order and possible future orders became increasingly more difficult to obtain during this period. As a result, funding for FY 81-82 placements was to some extent

"boot-legged" from other sources. Because of an underestimate in the amount of
federal funding accruing to the mental retardation program, a one time only
surplus was generated. These funds, which were not part of the community
services appropriation, were channeled to the counties through so-called
"blue-black" contracts with the state. These agreements included augmented
funding for the expansion of community programs under the order. County staff
interviewed during this phase were concerned about developing new progra
ms because of potential shortfalls in annualization funds for FY 82-83.
Philadelphia and Bucks counties were told by OMR staff that adjustments would
have to be made in their Pennhurst placement schedule because of the Governor's
new "no growth" budget. Other counties saw that the only way to expand
programs for the upcoming fiscal year was to increase the size of facilities.

The size of ICF/MR programs continued to be a point of contestion among
certain counties. Delaware County decided against developing ICF/MRs since the
state would not accept its proposals for two, 15 bed facilities. Other county
staff were concerned about the costs of ICF/MRs given the additional federal
requirements. In its December 1981 ICF/MR status report, the state reported a
total of 20 sites, with 91 beds in the Southeast Region that would serve
Pennhurst class members.

The implementation of out-of-region placements was stalled because the
state continued to maintain that placing Pennhurst residents in other parts of
the Commonwealth would jeopardize Title XIX "run-down" requirments in state
centers and, therefore, federal reimbursements.

General System Developments. Events in the state legislature events
occurred during this period signalled a potential change in the Commonwealth's
orientation to programs for mentally retarded persons. House Bill 1824,
introduced in the General Assembly in September 1981, called for significant

changes in the Mental Health and Mental Retardation Act of 1966. The bill grew out of concerns about the spate of individual litigation in county courts of common pleas around the state, the decision in the Schmidt case, and the Third Circuit's action in Pennhurst. Specifically, the legislation was intended to make it clear that the 1966 Act was not an entitlement statute and that there was no presumption in favor of least restrictive settings. As a result of pressure from the Pennsylvania Association for Retarded Citizens and other interested groups, the bill was returned to committee by a vote of 23 to 25.

In other legislative actions, pressure from a variety of disaffected groups including parents of institutionalized persons, providers and some county staff resulted in the passage of Senate Resolution 63 -- a measure calling for an investigation of the Office of Mental Retardation and, in particular, the community programs it funds and supervises. The sponsor of the resolution had publicly criticized the Deputy Secretary of Mental Retardation for her lack of sensitivity to parents of mentally retarded persons.

In the Fall of 1981, an investigator was hired to staff the effort. The investigator, a former county district attorney with no background in mental retardation, spent several months conducting site visits and obtaining information about the mental retardation system. Prior to hearings on the results of the investigation, a preliminary report was prepared. Some of the concerns cited in the report included high turnover among CLA staff, failure to consult parents regarding placement of fmily members, and limitations on the size of ICF/MRs.

The role of parents of mentally retarded persons in decisions affecting the placement of their adult or minor child was a primary issue in the investigation. In partial anticipation of legislative action on the problem,

the Department of Public Welfare issued a policy memorandum regarding parent
participation in late 1981. Although the policy provided parents with access
to the court of common pleas as a last resort, some parents felt that this
option was not sufficient. As a result, a "Parents Rights Bill" was introduced
in order to place the burden on the State to prove that the recommended
placement was the correct one for the adult client and to force the
Commonwealth to pay parents' legal expenses no matter what the outcome of the
appeal.

During this time period, state licensing standards for CLA programs were
finally published. The standards applied to all community residences 24 hour
care was provided to one or more mentally retarded persons. OMR staff
anticipated that all CLAs and PLFs would be licensed within one year. In those
cases where facilities were found to be deficient, it was the state's intent to
provide six month provisional licenses. Some county provider staff were
concerned that the new standards might result in significant increases in per
diems for those facilities not in compliance.

## Enforcement Mechanism Ordered to be Phased Out Despite Failed Negotiations (April 1982–September 1982)

Legal Developments. During the last phase, developments in the litigation
revolved primarily around two actions of the Supreme Court -- one that directly
affected the case and one that could indirectly affect the course of the
lawsuit. Specifically, the Supreme Court granted certiorari in the Pennhurst
case for the second time and also issued an opinion in the Romeo v. Youngberg
case. Further, Judge Broderick issued a far-reaching order that will probably
result in the disappearance of the Special Master. The remaining legal events
mirror those of pa    periods and include ongoing appeals of almost every facet
of the Judge's decr    and another intense but failed set of discussions
regarding the possible agreement in the case.

The Supreme Court decision in the Romeo case was relevant to the Pennhurst litigation because it was the first time that the Supreme Court considered the substantive constitutional rights of involuntarily committed mentally retarded persons. As such, the opinion suggested some of the reasoning that might be applied by the Court in its second hearing of Pennhurst case. In reviewing the Third Circuit's opinion in Romeo, a majority of the Supreme Court found that involuntarily detained mentally retarded persons have the following constitutionally protected rights: reasonably safe conditions of confinement, freedom from unreasonable bodily restraints, and minimally adequate training as reasonably may be required by these interests.

With respect to a "right to treatment" the Court defined the term narrowly to mean habilitation that would diminish Romeo's dangerous behavior and therefore avoid unconstitutional infringement of his safety and freedom of movement rights. This interpretation was far different from the court of appeals finding that such persons have a right to treatment in the least restrictive fashion and according to accepted medical practice. The Supreme Court also noted that in determining whether an individual's constitutional rights had been violated, his liberty interests must be balanced against relevant state interests. Finally, the Court stated that in ascertaining liability, the Constitution only requires that courts make certain that professional judgment is exercised and that judges should not take sides regarding which of several professionally acceptable choices should have been made.

In June 1982, the Supreme Court once again granted certiorari in Pennhurst. The major foundation of the defendants' request for review was the Eleventh Amendment and the multiple ways in which it shields states from

inappropriate instrusion by the federal courts. The nub of the defendants'
position was summed up in the following quote from their brief: "Unless it
[the Third Circuit] is reversed, the decision will give federal courts a free
hand in the management of state programs despite the absence of any federal
interest at all."

There was much speculation regarding the reasons why the Court granted
certiorari including the possibility that the Court may want to address a much
larger issue -- whether federal courts should avoid ruling on Constitutional
questions if a state law claim is available. If the Court is interested in
clarifying issues regarding OSM, it will have to be in retrospect since, on
August 12, 1982, Judge Broderick issued an order requesting that the Special
Master develop a plan for phase-down of her operations by the end of the
calendar year.

The timing of the Commonwealth's petition for certiorari caught a number
of key observers by surprise, including the Secretary of Public Welfare. In
mid-May, a series of intense discussions had begun between the Secretary and
the President of the Pennsylvania Association of Retarded Citizens (PARC) in an
effort to find some common ground that might eventually lead to agreement
between the two parties. Several days after the discussions were initiated by
the Secretary of DPW, PARC's President presented a proposal specifying seven
major steps inlcuding foregoing a request for Supreme Court review of the Third
Circuit ruling. Soon after the working document was submitted, it was learned
that the Commonwealth had already filed the petition. As a result, discussions
were terminated and once again the parties were left feeling frustrated and
disillusioned with the process.

Despite the continuing inability of the parties in the Pennhurst case to
reach a consent agreement, Judge Broderick moved in the Fall of 1982 to

phaseout the Special Master -- an action that caused some consternation among
the plaintiffs. The Judge's order stated that the dissolution of OSM did not
signal a diminution of vigilance on his part. Moreover, the order made no
mention of the Hearing Master -- an entity that will almost certainly continue,
perhaps even in an expanded capacity.

Certain individual cases were also noteworthy during this period including
the April Saures case in Allegheny County. The Saures case was similar to the
Schmidt case, ruled on earlier by the Pennsylvania Supreme Court. As in the
Schmidt case, the Pennsylvania Commonwealth Court found that the state must pay
100% of the cost of community living arrangements for April Sauers. This
ruling further reinforced the interpretations of the State Supreme Court and
the Third Circuit regarding the requirements of the Mental Health and Mental
Retardation Act of 1966.

Within the Pennhurst class, one group of individuals -- persons who are
non-ambulatory -- have been particularly difficult to place. The problem is
locating accessible housing that meets fire and life safety standards. One
non-ambulatory community-based class member, M.H., has been on the waiting list
for sometime for an accessible and appropriate placement. Planning began for
M.H. and a site was selected last fall. The site was eventually rejected by
the Commonwealth because of life safety problems. When the family was finally
notified that M.H. would not be placed, a motion was filed in district court
seeking emergency relief for M.H. In the meantime, the county shifted its
energies to the placement of ambulatory class members -- a choice that some
observers felt was necessitated by the court's placement deadlines.

Pennhurst-Specific Developments. It was evident during this most recent
phase that the five county defendants had a sense of urgency in meeting the
June 30 1982 deadline for community placements. Although only one county met

all of its required placements by June 30, the remaining counties were very
close to full compliance. There was concern, however, that in order to meet
the deadline certain counties "cut corners." Specifically, it was suggested
that trial visits for certain class members were not long enough. This issue
was

eventually brought to the attention of the Hearing Master and OMR. Counties
were notified that all procedural safeguards for class members had to be
observed, but certain county staff maintained that short cuts had not been
taken; on the contrary, they asserted that a great deal of thme had gone into
developing appropriate placements. Other compli meeting the deadline were not
new. Zoning disputes, community resistance and ICF/MR delays all presented
obstacles to meeting full compliance with the March 2nd Order.

With respect to the remaining part of the implementation order, the Judge
denied the Commonwealth's request to eliminate the 100 "out-of-region"
placements. Although the Commonwealth contended that there was inadequate
funding to implement the out-of-region placements, Judge Broderick strongly
disagreed and pointed to the Marcy and Harrisburg Mental Retardation unit
deinstitutionalization efforts as evidence of the state's ability to fund
institutional reductions in other regions. He gave the Commonwealth until
September 30, 1982 to comply with placement requirements.

Following the Judge's ruling, planning for the out-of-region placements
was accelerated. By June 1982, 90 persons had been identified as candidates
for movement to a total of 14 counties. There was some concern that the three
month time limit would be insufficient to guarantee adequate planning and that
the needs of these clients could strain the resources of some of the smaller
rural counties. Once the out-of-region placements are made, the question of
who and how those placements will be monitored must be addressed.

During this phase, the Special Management Unit (SMU) in the Southeast Region became operational and took over monitoring and IHP reviews from the Office of the Special Master. SMU staff agreed to monitor each <u>Pennhurst</u> placement once a year and to monitor the conditions of each class member within 120 days of placement out of Pennhurst. Although there were some concerns with certain aspects of the monitoring process, most of those interviewed were pleased with the SMU's and Temple's efforts.

<u>General System Developments</u>. Funding issues dominated general system developments during this time period. The new 1982-83 budget passed by the legislature contained few surprises for mental retardation except that funding for interim care and CLAs was separated into two line items. Several county staff expressed reservations about this move while provider representatives and others were pleased to see that interim care -- the primary funding source for private licensed facilities (PLFs) -- was clearly visible in the state budget.

Two proposed per diem ceilings for ICF/MRs were issued in June 1982. The ceilings were $87.70 for urban areas and $77.27 for non-urban areas. The proposed ceilings created an uproar in the provider community and dismay and frustration in some counties. A number of key areas were at the center of the controversy. They included: the lack of differentiation in the regulations among types of ICF/MRs and the clientele they served; the data used to develop the proposed caps; and the distinction between private and public ICF/MRs in the application of the ceilings. The Commonwealth ultimately postponed the final regulations through the end of the fiscal year or until an acceptable rate methodology had been developed. If applied as proposed, the ceilings could have eliminated many providers already on line to develop ICF/MRs for <u>Pennhurst</u> class members.

Finally, the implementation of the recently enacted licensing regulation for community-based residential facilities created some fiscal problems for certain residential programs.  A few of the large PLFs requested increases in their rates because of the upgrading required to meet the standards.  However, state and regional OMR staff noted that only a few providers increased per diems and that so far, there was no statewide trend.

## Key Events During the Final Two Years of the Study and Beyond

Briefly, some of the major events that shaped the implementation of the federal district court decree during the final study period (1982-1983, 1983-1984, and 1984 to date) include the following:

Termination of the Office of the Special Master. As of the end of December 1982, the Office of the Special Master was officially terminated by the court. Many of the functions previously carried out by OSM were transferred to an entity set up by the Commonwealth defendants. The new monitoring mechanism, the Special Management Unit, has responsibility for review of transitional habilitation plans (TIHPs) and individual habilitation plans (IHPs), on-site monitoring, and supervision of the certified advocates. Monitoring of individual client progress is being carried out by the Temple University Developmental Disabilities Center. The Hearing Master continues to conduct hearings in those cases where there are exceptions to community placement or when reinstitutionalization is proposed.

Order of January 14, 1983. The January 14 order sets out an implementation schedule for the 18 month period ending on June 30, 1984. The order requires the counties and the Commonwealth to provide community living arrangements to 143 residents of Pennhurst, 81 other members of the plaintiffs class living in the Southeast Region, and 50 Pennhurst residents from outside the Southeast Region.

Community Services Waiver Application. As part of their plan of compliance to the court following the January 14, 1982, order, the Commonwealth noted that an application for a Medicaid waiver under the provision of the Omnibus Budget Reconciliation Act of 1981 had been submitted to the Health Care Financing Administration (HCFA) on behalf of Philadelphia and Delaware Counties. Following submission of the plan, applications were also submitted

on behalf of Montgomery, Bucks, and Chester Counties. The combined impact of
the implementation of the waiver and the judge's order would reduce the
population of Pennhurst to 200 by fiscal year 1985-1986. As of early 1985, the
waiver applications for the suburban counties had not been approved and the
federal audit of the Philadelphia waiver resulted in numerous exceptions.

Supreme Court Arguments. During this period, the Pennhurst case was
argued twice in the Supreme Court -- once in February and once in October. The
February argument centered primarily around the ability of the district court
to order a major reordering of the state mental retardation system ostensibly
on the basis of a state law claim. The theoretical assertions revolved around
the interpretation of the Eleventh Amendment and the principle of "comity" as
they related to the facts in Pennhurst. The argument also addressed the powers
of the Office of the Special Master. In June, the Supreme Court announced that
they had been unable to reach a decision and that they would rehear the case.
The second argument, in October, focused on the same issues, with the exception
of the Special Master.

Legislative Task Force. Following a legislative investigation and a
special report on the mental retardation system in the state, three legislative
task groups were convened to develop revised state legislation. The three
groups looked at placement procedures, definitions, and state and county
responsibilities, respectively. The task groups included providers, consumers,
and county officials in addition to legislators. The reports of the task force
groups have been presented to the legislature, but to date no action has been
taken.

Consolidated Order. In August 1983, Judge Broderick issued a
"consolidated" order which encompasses -- where relevant -- the provisions of
all previous orders, and adjusts provisions to reflect changes made over the

past year (e.g., the dissolution of the Office of the Special Master). For instance, the responsibilities vested with OSM to develop county plans for class members have not been shifted to the state.  OSM's previous monitoring responsibilities at Pennhurst were given to the Special Management Unit. The Hearing Master's responsibilities have been expanded to include jurisdiction over class members who are subject to involuntary commitment in mental health facilities. The Commonwealth and counties have filed exceptions to the order. The state's primary concern is that the Judge has essentially mandated the Special Management Unit as party of the decree and also expanded its powers beyond those to which the state agreed. The new order also requires the Commonwealth to develop and submit plans for class members and non-class members through the end of June 1985.

Commonwealth Plan. In November 1983, the Commonwealth defendants submitted a plan to Judge Broderick in response to the consolidated order.  The plan described how placements would be carried out for the ensuing two and a half years. It was in this plan that state officials indicated that Pennhurst Center would be closed and that closure would be accomplished by 1986. The plan called for a small residual population that would be transferred to other institutions.

Supreme Court Decision. In its second opinion in the Pennhurst case, issued on January 23, 1984, the Supreme Court -- in a five-to-four decision -- held that the sovereign immunity principle of the Eleventh Amendment to the Constitution prohibits a federal district court from ordering Pennsylvania state officials to comply with state law. The ruling reversed the Third Circuit's earlier ruling (which followed the Court's 1981 decision noted above) that affirmed the district court's decree in Pennhurst based on state law grounds alone. The Supreme Court decision significantly altered the

49

traditional jurisdiction of federal courts in state law matters and may force litigators with state as well as federal claims to file in state and federal court respectively. This second Supreme Court ruling in Pennhurst is in keeping with the decision in Romeo v. Youngberg insofar as its emphasis on judicial restraint and its deference to state law and state mental retardation professionals is concerned.

Consent Agreement. On July 12, 1984, ten years after the original lawsuit was filed, the Commonwealth and county defendants and the plaintiffs announced that they had reached consensus on the terms of a consent agreement. The only party not included in the agreement was the Parent Staff Association. The consent agreement included the schedule of placement included in the Commonwealth's November 1983 plan and spelled out ongoing responsibilities for the preparation of Individual Habilitation Plans, the conduct of monitoring and quality assurance, and the maintenance of a placement review forum for those protesting the provisions of an IHP. The agreement also narrowed the definition of the class by eliminating ongoing monitoring for those on the Pennhurst waiting list and those at risk of being institutionalized at Pennhurst.

Hearings on the Consent Agreement. In September 1984, Judge Broderick held a public hearing on the provisions of the consent agreement in order to determine whether there were any objections. The only group that lodged a protest was the Parent Staff Association which continued to maintain that Pennhurst State Center should not be closed. Because of the delay in the approval of the waiver (on which much of the financing for class member placements depended) the Judge postponed his decision on the agreement. After one postponement, the Judge scheduled another hearing in November which was held in his chambers. At that time, the Commonwealth voiced its concern about

its ability to carry out the agreement because of the lack of approval of the state's waiver applications. Finally, on December 5, 1984, the Judge held another hearing at which time the Commonwealth announced its intention to comply with the agreement regardless of the disposition of the federal waiver. It is expected that the Judge will soon announce his approval of the consent agreement.

New Role for Pennhurst. In January, 1985, Governor Richard Thornburgh announced that the Pennhurst State Center facility would be converted into a state medical facility for veterans by 1986.