# CHAPTER 3
# IMPLEMENTATION ISSUES

# Implementation Issues

As part of the qualitative assessment of the conduct of the Pennhurst litigation, four special analyses were conducted. These focussed assessments, termed "implementation analyses," were directed at particular aspects of the environment in which the decree was being carried out. The subject of each analysis was selected jointly by project staff and the Pennhurst Advisory Council. Candidate issues were drawn from the findings of the Historical Overviews described in Chapter III. The implementation analyses have made it possible to go beyond the broader historical analysis of the litigation to a fuller exploration of one or more key element in the use of litigation to bring about social change. The analyses have also allowed staff to examine factors in the implementation of the Pennhurst decree against the backdrop of political, sociological, organizational, and legal theories surrounding social change as discussed in a wide body of literature. Finally, in the last three years of the study, the implementation analyses have expanded to include comparative analyses in other states thereby increasing the relevance of the study and its utility to state and federal policy makers.

The following section describes three of the analyses including the methods used to secure information and the major findings reported. The fourth analyses, which summarizes the impact of the decree, comprises Chapter 10 of the report.

## Year 1 — Office of the Special Master

Nature of the Issue. The use of special masters appointed by the courts to supervise the implementation of broad-based structural reform is a relatively new phenomenon -- particularly in the area of public health and human services. Masters are judicial deputies appointed by the court to assist in the conduct of complex lawsuits. These officers traditionally have been

utilized to superintend such things as the complex calculation of damages -, or to aid in corporate reorganization and dissolution. Further, masters have conventionally been used to oversee remedies directed at the private sector. More recently, masters have been used to carry out injunctions against public sector agencies such as school districts in desegration cases and state governments in prison reform cases. The appropriate role and function of masters in litigation directed at reform of large bureaucratic programs is a subject of much debate and controversy. The purpose of the Implementation Analysis for Year 1 was to shed some light on the issue by focussing on the case history of the master appointed to supervise the district court's decree in the Halderman v. Pennhurst State School and Hospital case.

Method and Objectives. In order to provide a comprehensive picture of the Office of the Special Master (OSM) in Pennhurst, the analysis encompassed both the legal context within which the master functions and the larger bureaucratic milieu which is the object of the court's intervention. Because the appointment of the master in Pennhurst is part of a larger legal tradtion, OSM was also assesssed in light of the experience of other masters in related litigation.

The analysis drew both from the legal literature on complex litigation and compliance mechansisms, and from the political science and public administration literature on implementation and program change. Further, the analysis encompassed interviews and document reviews conducted as part of the preparation of the Historical Overviews for Year 1. Thus, the analysis provided two perspectives — one that concentrated on the legal expectations and parameters that characterize compliance mechanisms like the Office of the Special Master, and the other directed at system reform and bureaucractic change.

## Findings

(1)  <u>Lack of Consent</u>

Almost all of the cases in the mental disabilities field have ultimately been settled by consent decrees.  A consent disposition has important implications for the efficacy of the compliance mechanism selected, the strategies that it employs and the resources it requires to bring about chnage.  The significance of consent is highlighted in a report by the external Court Monitor appointed by the federal district court in Massachusetts to ensure compliance in five institutional class action suits (Horowitz, 1979):

> It may be useful to clarify here the significance of the fact that the decrees were entered by consent of the parties.  The spirit of seeking agreement has been fundamental to the success of the litigation to this point.  Despite the far-reaching powers of the federal court, there can be no doubt that better and quicker results are achieved when all parties make an effort to cooperate and reach a common groud. (p. 4)

Achievement of a consent decree in institutional litigation does not necessarily guarantee the success of reform or even the spirit of cooperation connoted by a consent disposition.  David D. Gregory (1980), Special Master in the <u>Wuori v. Zitnay</u> case in Maine, illustrates this point in a report to the district court:

> The State's failure to comply with the Court's [consent] decree remains substantial . . . The State could have made much greater achievements if all State agencies bound by the decree had given their active, informed cooperation.  The administrative complexity of carrying out the decree in the absence of just such cooperation has prolonged the time needed for compliance without bring any countervailing benefit to the state. (p. 1)

The fact that Judge Broderick could not persuade the parties in the <u>Pennhurst</u> case to negotiate a consent decree also had an impact on the remedy adopted by the court.  In the absence of consent or of any proposed orders from the defendants that the court could adopt, the character of the initial and subsequent orders has been significantly influenced by the plaintiffs.  A a result, the defendants view the orders as instrusive and unrealistic and have little stake in the remedy since they have not participated in its development.

(2) Limited Enforcement Powers

    Given documented problems of other court appointed implementation
mechanisms in institutional and deinstitutional litigation, the plaintiffs in
the Pennhurst case attempted to structure a remedy that embodied comprehensiv
planning and compliance duties.  The master mechanism ordered by Judge
Broderick encompasses both broad and individual planning responsibilities,
needs assessment activities, monitoring tasks to ensure compliance with basic
standards at the institution, and a variety of other responsibilities ranging
from the recruitment and training of case managers to the certification of
advocates for individual clients.

    Notwithstanding the broad powers vested in the Office of the Special
Master in Pennhurst, the ability of the Master to enforce compliance with the
decree has been hampered because of the limited sanctions available to the
court.  The only real sanction is the contempt power which, in cases like
Pennhurst, is generally regarded as a last resort -- in part because it must be
directed at an individual or individuals within the broader bureaucracy
implicated in the litigation.  By focussing the punishment for non-compliance
on one actor, the larger, more complicated wrongdoing is ignored.  The ability
of the court to enforce a complex decree is further complicated by the court's
lack of power to reach through the bureaucracy to the legislature which is
ultimately responsible for providing funds for the reform.  Though some judges,
such as Johnson in Wyatt v. Stickney (1972) have threatened to circumvent the
legislature by attaching public lands or taking some other action that would
inhibit the legislature's ability to control specific public funds, by and
large courts have been unwilling to take the legislature on directly.

    The court is thus limited to negative and to some extent blunt powers in
enforcing its decrees.  It has no bonuses or rewards to hand out to compliant

defendants except the ultimate disappearance of the court and the master from the scene once the aims of the decree have been fulfilled. What the court, and therefore the master, are left with is some form of psychological reinforcement or judicial back-patting when the defendants have done well.

(3) Involvement in Individual Cases

The Special Master's compliance functions reflect a broad and deep involvement in the day-to-day implementation of the decree. The Master's responsiblities begin with the condition of the class in the institution, carry through the initiation of individualized habilitation plans, and continue to placement in the community and beyond. Compliance activities entail review and approval of both individual and collective plans for class members. They span such substantive areas as quality assurance, program development, client advocacy, institutional operations, program design, client and family grievances, fiscal auditing. and staff training. In short, OSM"s compliance functions touch on almost every aspect of the traditional delivery system for mentally retarded individuals.    Because of the deinstitutionalization thrust of the decree, however, the institutional compliance functions of the Special Master in Pennhurst are relatively limited and focused primarily on life safety, sanitation and other mechanistic aspects of the program at the institution.

The individuated nature of the remedy in Pennhurst is a significant factor in diverting the attention of the Special Master from the broader structural aspects of the decree. Involvement in individual cases siphons off energy and places the master squarely in the middle of debates reflecting conflicts in professional judgment. It creates a sort of schizophrenia in the operation making it difficult to be both detached planner and general system monitor, and also analyst and arbiter of particular cases.

(4)  Separate and Countervailing Agency

The establishment of OSM as an agency separate and removed from the bureaucracy to manage the implementation of the Pennhurst decree was directly motivated by the plaintiffs' frustration with past bureaucratic performance. The creation of new agencies to solve old problems is a tactic frequently used in government as evidenced by the establishment of special White House commissions, Congressional task forces, and elite semi-autonomous bureaus reporting directly to agency administrators.  The isolation of such enterprises from the ongoing bureaucratic machine, however, has drawbacks.  As Pressman and Wildavsky (1979) report in their book Implementation:

> The cost of independence from ordinary bureaucratic constraints turns out to be loss of contact with the very political forces necessary to preserve the thrust of the organization. (p. 129)

In the case of the Office of the Special Master, the isolation and separateness of the agency created conflicts and tensions both because of its perceived favored position, and also because it ultimately relied on the bureaucracy to carry out the specifics of implementation.  It must guide thecourse of implementation, but it cannot become the bureaucracy without jeopardizing its autonomous and unique character -- and ultimately its moral and legal authority.

Establishing a working relationship with the bureaucracy in order to accomplish the ends of the litigation has been difficult for OSM.  Part of the problem is that OSM staff are perceived as being highly ideological and unbending.  The reaction of a bureaucracy to this sort of "cause oriented" group is described by Eugene Bardach (1977) in The Implementation Game:

> A not insignificant number of policies and programs originate in the desire to extirpate real or imagined evil.  Such policies create implementation opportunities for activists whom many political interests will perceive as "hotheads," "extemists," or "zealots."  A couterreformation then sets in.  A political coalition emerges to scrutinize, criticize, and in some cases to terrorize the agency charged with assaulting the stipulated evils. (p.93)

In the case of OSM. however, the problem is not so much the actual values of OSM staff -- many of whom previously worked in the system -- but the seemingly rigid values and time tables included in the decree.  Nonetheless, the perception of OSM staff by those forced to comply with the decree is not that different from the picture presented by Bardach.

The various structural and political factors have conspired to create a "we-they" mindset in OSM and conversely in the bureacracy.  Polarization of OSM is the result of its continually frustrated attempts to influence, let alone move, the bureaucracy to make those changes necessary to facilitate the deinstitutionalization process.  On the other hand, the bureaucracy is increasingly alienated from what it sees as a "foreign" agency with power to direct its actions but totally outside of its control.

(5) Lack of Control Over Policy-Making

Though the Master has a quasi-policy making function in that she suggests proposed orders and devises related "policies," she is not a policy maker in the broadest sense.  The sources of broader policies that affect the system are the Governor, the Department of Public Welfare and the legislature.  The implementation literature argues strongly that the separation of policy making from the operationalization of a program is fatal to the success of reform. This principle is not directly relevant to OSM's situation, since OSM does not monopolize policy making in the system and is not directly responsible for implementation, but the principle does have some resonance.  The need for connectedness and coherence between policy and implementation is as relevant in court ordered change as it is in legislative or bureaucratic change.

(6) Conflicts with the Bureaucracy

OSM seems inextricably drawn into areas traditionally reserved for the bureaucracy because of a perceived failure on the part of mental retardation

administrators and the very implementation instrumentalities established by the decree. Though OSM can never become the bureaucracy, the court placed it squarely in the center of the system. As a result, it is difficult to tell where even the most prudent Master would draw the line between his or her authority and bureaucratic turf.

(7) Lack of an Overall Plan

Though the court order does not specify that the Master is responsible for developing an overall plan or task description to guide implementation, several of the parties have expressed the need for such a document. In particular, county personnel -- who are responsible for the bulk of implementation detail -- see a distinct need for such a document. They argue that an overall plan would be particularly useful in spelling out the expectations of the Master including the schedule of implementation and the specific actors designated to carry out particular tasks.

In Judge Broderick's original order, OSM was given the responsibility to develop county plans for the Southeast Region. OSM and others argued that the development of detailed county plans should not be the responsibility of the Master. It is the county adminstrators who are most familiar with the specific problems at the local level and it should therefore be their responsibility to prepare the plans. Further, if the goal of the litigation is to institute new practices, the counties should adopt plan preparation as an ongoing responsibility. It would appear that almost everyone, including the court, has accepted the inappropriateness of the Master's role in this area. However, no substitute plan requirement was adopted. As a result, there are also no plans to guide the implementation of county responsibilities under the decree.

(8)  Compliance v. Planning Duties

The bulk of the activity conducted by the Office of the Special Master falls into the area of compliance.  The extent of compliance responsiblities is far broader than the range of general planning duties.  It is in part thi imbalance between general system functions and compliance detail that explai the drain of OSM resources into individualized crises and particularistic controversies.

(9)  Constraints to Compliance

The Master's ability to secure an acceptable level of compliance from the counties is complicated by the nature of state law and the counties' position in the overall mental retardation delivery system.  Though counties have the responsibility for carrrying out the law at the local level, the bulk of the funding comes from the state as do the policies that govern program content. OSM's ability, therefore, to influence and goad the counties into compliance has distinct limitations.

Further, though OSM can apply pressure to the counties to generate residential and support services for the class, counties are reliant on the private sector to provide needed services.  The county system in Pennsylvania is based on purchase of service arrangements with the county administrator and his staff performing only administrative, monitoring and fiduciary functions. Thus the success of deinstitutionalization goals is to a large extent dependent on the service marketplace.

(10)  Conflicts with Case Management Functions

OSM's involvement in individual cases may undermine the role of the county case manager.  According to some case managers interviewed, continued involvement of OSM in the details of implementation has been aggravating.  From their point of view, the Master is seeking "perfection" from a complex and

already strained system. Further, the tenacity with which OSM staff have carried out their functions in this area leaves them vulnerable to accusations that they are merely substituting their own judgments for those of county bureaucrats rather than ensuring overall compliance with systemic norms.

## Year 2 — Reaction of the Pennsylvania Department of Public Welfare

Nature of the Issue. In a departure from conventional right-to-treatment cases, the Pennhurst suit and others like it question the legitimacy of the institution itself. These second generation cases assert the rights of institutionalized mentally retarded persons to equal treatment and freedom from alleged discrimination enfored on them in large custodial facilities. Remedies in these lawsuits became even more complex as they reached into the less walled off and more complicated realms of community-based systems of care. As the second and third offspring of Wyatt have evolved, the interests of more and more groups have been implicated in court actions including institutional employees, parents of institutionalized children, parents of children in the community, community caretakers, and other human service providers and administrators.

The drama and controversy surrounding cases in this field have drawn considerable attention to the legal theories and strategies that characterize the litigation. However, very little attention has been paid to the complicated interaction between the nature of court mandates for refonm and the constellation of resource, leadership, organizational, political, and systemic variables that exist within a particular state. Even the impact of seemingly unidimensional right to treatment suits -- one wrong, one remedy —will vary depending on the complexity and internal dymanics of a particular state. As more and more divergent interests become drawn into a decree, the character of the state system becomes key to an understanding of the role of litigation in

creating the changes desired by plaintiffs.

<u>Method and Objectives</u>.  The response of states to litigation in the area of mental disabilities has been varied and wide-ranging.  Even within a particular state, the official position vis-a-vis the court can shift in response to changes in the level of resources, the force of public opinion, a turn-over in political leadership, and pressures of competing constituencies. Some states have readily entered into consent agreements with plaintiffs.  Some states, even after consent agreements have been signed, have resisted the court's jurisidiction.  Other states have begun to reach the limits of cooperation under consent agreements and are attempting to terminate the court's oversight.  Still other states, like Pennsylvania, continue to contest the court's right to intervene in the state system.

The purpose of the Implementation Analysis for Year 2 was to explore the factors that dictate a state's reaction to more complex forms of mental disabilities litigation.  By using Pennsylvania as a case example and contraating it with selected comparison states, it was possible to gain insight into state policy-making, the influence of particular constituencies, the internal constraints that exist within a system, the cohesiveness of state leadership, and the relative openness of a system to external changes.  A close examination of externally imposed deinstitutionalization mandates in Pennsylvania and other states also sheds light on the tensions surrounding community placement and the limits of the state's ability to hasten its activites in a politically charged atmosphere.

Specifically, the analysis accomplished the following:

- Provided an assessment of state activities directed at deinstitutionalization generally and in response to the decree in <u>Halderman v. Pennhurst</u> specifically;

- Highlighted major decisions made and strategies adopted by the state in responding to the plaintiffs and the court;

- Compared and contrasted Pennsylvania's response to the Pennhurst case with the response of other states confronted with roughly similar or related litigation;

- Summarized the major constraints to state implementation of the Pennhurst decree (e.g., resource limitations, employee opposition, system discontinuities, etc.);

- Assessed the behavior of the Commonwealth of Pennaylvania and other states facing litigation based on the theories and case examples presented in the public administration literature;

- Commented on the influence that the decree has had on general state policy in the area of mental retardation.

In order to provide a framework for the analysis, a set of initial hypothses which seemed likely to explain at least some of a state's reaction to broad-based litigation was developed.  The hypotheses can be stated as follows:  "A state's reaction to litigation will vary according to --"

- the level of sophistication and development of the existing state mental retardation system;

- the extent of public pressure for reform;

- the explicit or implicit agenda of state officials;

- the nature of the relationship between state program officials and the state's attorney general;

- the orientation of the state's political leadership;

- the extent of previous litigation in the state;

- the judicial strategies employed by the federal judge in contested and uncontested cases;

- the nature of the decree and the monitoring mechanism established;

- the strategies employed by the plaintiffs;

- the level and distribution of state resources.

In order to gather material for the analysis, several steps were taken. First, information was sought from the Commonwealth's Deputy Attorney General assigned to Pennhurst, the current Deputy Secretary of Mental Retardation, past Deputy Secretaries of Mental Retardation who held their positions during

66

relevant stages of the litigation, plaintiffs' lawyers, county officials, Pennhurst State Center staff, and representatives of consumer organizations.

In addition, two states were selected for in-depth comparisons -- Maine and Michigan. These states were selected for several reasons. First, they both are currently the targets of suits that are roughly similar to Pennhurst. Second, unlike Pennsylvania, they both have entered into consent agreements. Third, Maine and Michigan represent two distinct types of states; Maine is a fairly rural state with characteristics very different from Pennsylvania, and Michigan is an industrial state with characteristics similar to those of Pennsylvania. In each state, key actors were identified including state program officials, institutional administrators, consumer representatives state legal representatives, plaintiffs' lawyers, and local program staff.

Because the issues to be considered in the analysis centered around organizational behavior, project staff also reviewed the public administration literature regarding the response of organizations to externally generated change. Though there is very little written on the response of state organizations to changes embodied in mental disabilities litigation, the general principles and theories advanced in the literature were helpful in describing the phenomena under analysis. Finally, staff reviewed materials from the two comparison states and other states facing similar court mandates including Minnesota, Nebraska, New York, Massachusetts, and the District of Columbia.

Findings. Before proceeding to a summary of the usefulness of the various hypotheses, it should be noted that there were sensible explanations for the state's posture that do not necessarily bear on internal political or systemic factors. Organizational theorists assert that it is perfectly rational for a complex organization to resist competing control over its traditional domains.

Though human service organizations tend to have less control over their environments than do organizations in the private sector, their reactions to intrusions in those areas they do control are similar. Further, though it can also be expected that organizations will conform with the law, the law in these cases is by no means settled. In many ways, it was inevitable that one or more states would ultimately test the Constitutional and statutory underpinnings of institutional litigation in this field.

The analysis can be divided into two parts -- factors affecting consent and non-consent, and factors influencing progress in the implementation of court decrees. No one factor can be isolated as necessarily the most prominent and not all of the variables proved useful in explaining the reasons why Pennsylvania's reaction differed from that of Maine and Michigan. A summary of the relevance of the initial variables that formed the hypotheses follows:

- <u>Level of sophistication and development of the existing state mental retardation system</u> -- This factor did not prove very helpful in explaining the distinction between Pennsylvania on the one hand and Maine and Michigan on the other. Though Maine's system at the time of the suit was not fully developed, certainly the Michigan system could be seen as relatively complex and sophisticated. The more interesting factor that emerged, which is somewhat related, is the extent of shared ideology among key staff in the mental retardation agency in Pennsylvania and their sense of efficacy in creating system change.

- <u>Extent of public pressure for reform</u> -- Certainly in Michigan the pressure in the press and from the public weighed in favor of expedited negotiations. In Maine, the pressure was more diffuse and in Pennsylvania the pressure was more sporadic. This factor may be a partial explanation for consent but does not necessarily explain progress once the agreement is reached.

- <u>Explicit or implicit agenda of state officials</u> -- This factor appears to be important both with regard to consent and progress in implementation--a fact that is born out in the comparison states and in the literature. To the extent that state officials see litigation as a means of furthering their programmatic agendas, the chances of consent and progress are heightened.

- <u>Nature of the relationship between state program officials</u> -- This factor appears to be important in the forging of a consent decree. In the two comparison states, state lawyers were more governed by the program agenda of state agency officials than was the case in Pennsylvania.

- Orientation of the state's political leadership -- This factor has a somewhat hazy relationship to the events under analysis. If orientation means political party, there appears to be no relationship between party identification, and the inclination to settle. In Pennsylvania, the case now spans two political administrations, and neither showed any inclination to consent. What is clear is that the aims of the Governor play a key role in the decision to consent.

- Extent of previous litigation in the state -- Though it cannot be directly shown that the cumulative effect of multiple suits in a state will eventually turn state officials against consent decrees, anecdotal information clearly suggests that enthusiasm wanes and wariness increases after prolonged experience with complex consent decrees.

- Judicial strategies employed by the federal judge in contested and uncontested cases -- This factor requires substantially more exploration in more cases before any real conclusions can be drawn. At least tentatively, it does appear that the judges in Maine and Michigan were more successful at cajoling the parties into consent--and into fairly regular progress--but it is not clear whether the other factors suggested outweigh the judicial influence in all three cases.

- Nature of the decree and the monitoring mechanisms established -- This factor leads to a circular argument which is not terribly useful in explaining the differences among states. Since the nature of the decree and the compliance mechanism are directly related to whether or not there is consent, the analysis becomes a tautology.

- Strategies employed by the plaintiffs -- This factor has potential utility for explaining the behavior of state defendants, but the limited amount of information in this analysis is not conclusive. If the defendants' perception of the lawyers themselves are taken into account, then this factor plus the strategies employed did tend to establish expectations among the defendants in Pennsylvania regarding the "implacability" of the plaintiffs' attorneys.

- Level and distribution of state resources -- This factor is not particularly satisfactory in explaining the decision to consent among the three states -- at least at the time such decisions are made. Michigan's level of funding, if anything, was lower than what was available in Pennsylvania and certainly the economic future of that state was much more precarious. Level of funding may, however, bear on the degree of progress a state is able to make in implementing the decree. Further, the extent to which funding for the decree is obtained at the expense of other parts of the system may ultimately constrain compliance.

Though Pennsylvania is treated in this analysis as an exception to the

trend of settlement in mental disabilities cases, the posture of the

Commonwealth may increasingly become the rule. The question is whether those settled cases, if they were brought now, would result in consent agreements. Of the cases brought recently, more are going to trial, and consent agreements are more agressively negotiated by the defendants.

Even without a shift in the case law, many state officials are increasingly reluctant to submit control over aspects of the service system to federal court oversight. In part, this reluctance stems from direct experience with other consent decrees and in part it is the result of a growing consensus among such individuals that the price paid for consent is not worth the benefits that may be conferred on the system. One state official among the several states contacted for this analysis was asked whether he would support consent if he had to do it all over again and his answer was a reluctant "no."

Finally, the increasing resistance to federal court interveution is also strongly influenced by the gloomy financial picture emerging at the federal level and in several states. As long as resources were relatively flexible, there was enough "play" in the system to accommodate comprehensive consent agreements. As resources become short, meeting court requirements may be accomplished at the expense of expansion or improvement in other parts of the system. The uncertainty surrounding future cut-backs in federal funds also may mean that many state officials will be loathe to contemplate significant ystem reform projects.

Another related fiscal issue has to do with the Medicaid program. Those states that have certified a significant number of institutional beds for Title XIX reimbursement may resist court-mandated, deinstitutionalization unless they can be assured that the Title XIX funds will follow the clients into the community. In states where there is an aggressive ICF/MR program in the community, this shift may be accomplished with no substantial loss to the state

treasury.  However, in states where community programs are funded primarily with state dollars, deinstitutionalization will result in a direct loss of federal funding and a concommitant drain on scarce state funds.  The rumored cap on Medicaid may even diminish the ability of those states with communi ty ICF/MR facilities to expand the program given the reluctance of providers to invest funds in the face of an uncertain potential for reimbursement.

Growing fiscal concerns have also resulted in increased attention by state legislatures to the fiscal impact of litigation.  Whereas in the past state legislatures were only somewhat involved in the development of litigating strategies, today more and more legislatures are demanding a role in implementation.  Their potential resistance to funding complex decrees poses serious problems for implementation and forces the issue of federal court jurisdiction over legislative bodies.

## Issues Affecting Complex Decrees

Nature of the Issue.  The first two Implementation Analyses concentrated on key actors in the litigation -- the Office of the Special Master in the first year, and the Department of Public Welfare in second year.  The topic for Year 3 covered a range of issues -- both as they emerged within the context of the Pennhurst litigation in Pennsylvania and in other comparison states.

The Pennhurst litigation has focussed a spotlight both on the implementation of public law litigation in the field of metal retardation, and also on the stresses and strains afflicting the mental retardation system in general -- particularly in the face of funding cut-backs and increasing concerns regarding the allocation of scarce resources.  The Historical Overviews highlighted several issues that bear further assessment and exploration.  They included:

- the seeming state legislative "backlash" against both the litigation and the general orientation of the mental retardation system;

- the strong and vigorous opposition to continued deinstitutionalization on the part of unions representing institutional employees;

- the appropriate role of the court, through its Special Master, in the enforcement of complex judicial decrees;

- the schism among parents of retarded citizens regarding the future of institutional care.

Method and Objectives.  The Implementation Analysis for Year 3 had several major objectives:

- To highlight the political and legal forces that influence the administration of the mental retardation system in Pennsylvania;

- To analyze each of the four major issues and the relative impact that each has had on the system in the state to date, and in the foreseeable future;

- To compare and contrast the influence of the four major issues across other states where significant litigation is in progress;

- To assess the relative weight of each of the political and legal phenomena as catalysts in the system, and the extent to which they stem from similar or dissimilar motivations and/or circumstances;

- To suggest possible policy directions for addressing concerns raised by each of the factors under analysis.

To gather the information necessary for this analysis, HSRI first identified four comparison states -- Maine, Michigan, Minnesota and Massachusetts.  The major characteristic of each state was the presence of litigation directed at some aspect of the mental retardation system.  The first two states were included in order to provide continuity with the Implementation Analysis for Year 3.  The second two states were selected in order to broaden the base of analysis and because the litigation in those states is longstanding.

Prior to site visits, each state was contacted and pertinent court related and program materials were requested.  The names of key system actor

were secured and interviews were scheduled.  A specialized interview guide was prepared to ensure that all relevant topics were covered.  Each site visit lasted approximately two days.  Material on the Pennsylvania portion of the analysis was gathered during the five day site visit conducted prior to the preparation of Historical Overview VI.

## Findings
(1) Legislative Backlash.

In Pennsylvania, one of the major changes in the political landscape in which the mental retardation system functions is intensified legislative scrutiny.  Whereas in the past the legislature had, within reason, relied on the Department of Public Welfare to set the tone and direction for the mental retardation program, insistent complaints from parents and others stimulated the legislature to conduct its own investigation of the management of the system.  Late in 1982, the Pennsylvania Senate passsed a resolution establishing a five member investigatory committee to review the operations of the Office of Mental Retardation.  The committee looked into allegations of mismanagement within the Office of Mental Retardation, and in the community system generally.

The final report of the committee is primarily focussed on community living arrangements in the state.  Though the committee finds them to be the most "home like" of all facilities visited, the report concludes that there is a need for "additional planning, preparation, and safeguards," and that it is time to "take stock."

The major recommendation by the Senate Committee was the formation of a Senate Task Force to design needed changes in the Mental Health and Mental Retardation Act of 1966.  In making its recommendation, the Committee notes that "the legal base upon which the State's MR system is built may no longer be

adequate." In addition to problems in the delivery of services, the Committee also appears to have been stongly influenced by the Pennhurst litigation. In reviewing the actions of both the Third Circuit and the Pennsylvania Supreme Court, the Committee states:

> . . . these decisions now interpret the Act to entitle all of the MR population to the above-stated treatment without regard for the availability of funds and services exists. Intervention of the courts has created additional legal and manpower costs; has limited the available choices of professionals, parents and MR clients; has made regional and statewide planning more difficult; and has encouraged a division among Pennsylvania's advocacy groups.

Though attempts to amend the 1966 Act have consistently been unsuccessful, it is possible that the combination of the litigation and the growing dissatisfaction among some parents provide sufficient momentum to those seeking to put the brakes on deinstitutionalization through revisions of the state statute.

In each of the four comparison states, legislative attitudes toward the mental retardation system generally and to related litigation were explored. In all four states, legislators were supportive of services for mentally retarded persons and did not appear to question continued development of community-based services. In Michigan, for example, legislators had appropriated $3 million in new funding to provide services to "underserved" persons in the community. This investment in the face of Michigan's dire financial condition underscores the legislature's continued commitment. In Maine, though there has been no significant increase in state funding for community services this year, legislators remain pleased with the progress being made toward expansion of community services.

In Minnesota, a state which has also been hard hit by the recession, legislators are concerned about how to make the most of shrinking resources, but these hard fiscal realities do not appear to have dampened their enthusiasm

for community-based services.  In Massachusetts, the legislature is clearly
concerned about the conduct of the system, but its criticisms are directed at
the state's managment of the system rather than at the viability of community
programs.

Though legislators in the four states do not seem to share the concerns
about the community system expressed by their opposite numbers in Pennsylvania,
they all share a certain restiveness about the continued presence of the
federal court in the management of state mental retardation programs.  In
Minnesota, legislators complained that even after the recent stipulation in the
Welsh suit that expands reforms to all of the state's institutions, the
plaintiffs continue to bring the defendants before the court over various
enforcement details.  In Massachusetts, the Chairman of the House Ways and
Means Committee has formed a special subcommitte on "Federal and Court Consent
Decrees."  The purpose of the committee is to assess the impact of the court's
intervention and to explore the state department's management of the funds
provided by the legislature to meet the requirements of the decree.

In Maine and Michigan, the level of hostility is not as prominent but
individual legislators are still concerned with the court's continued
presence.  In Maine, legislators are perhaps more sanguine because the state
has already been released from half of the provisions of the decree in the
Wuori suit.  In Michigan, there is no significant disagreement among
legislators regarding the aims of the decree, though individual legislator are
unhappy that they were not involved in the negotiations.

(2)  Union Influence

In Pennsylvania, the American Federation of State, County and Municipal
Employees (AFSCME) is a significant actor in the political environment of the
mental retardation system.  Actions of the union have taken many forms

including the use of litigation to attempt to block institutional closures and institutional phase-downs; financial support for the Parent/Staff Association, a defendant intervenor in the Pennhurst suit; and legislative lobbying, including successful opposition to zoning legislation that would have opened up residential neighborhoods to small group living arrangements for mentally retarded persons.

The intensity of AFSCME's activities definitely increased once the deinstitutionalization character of Judge Broderick's decree became clear. The nature of the litigation in the four comparison states, however, is somewhat diffcrent than the Pennhurst case in Pennsylvania. In Massachusetts, for instance, the five class action suits are all directed at institutional improvement and have resulted in at least a doubling of staff to client ratios. In Maine, though the consent agreement required the movement of some residents of the state mental retardation center to the community, the increased staffing standards in the decree offset the need for any lay-offs of state personnel.

In Minnesota, the state AFSCME chapter considered joining the plaintiffs in the Welsh suit in order to press for institutional improvement. Even though the defendants have now signed a stipulation agreement that includes a reduction in institutional census. AFSCME spokespersons do not see any abnormal reductions in force at the institutions. The situation in Michigan comes the closest to the situation in Pennsylvania since the litigation has resulted in the planned closure of a state institution. AFSCME in that state did attempt to intervene in the suit, but the Judge rejected their petition. Since that time, union officials have brought in staff from their national headquarters to try and persuade legislators and others to stem the tide of deinstitutiona-lization. To date Michigan AFSCME has not been as effective as their

76

counterparts in Pennsylvania though they have been successful at negotiating a 12.5% ceiling on institutional staff lay-offs.

(3)  Role of Enforcement Mechanisms

The creation of the Office of the Special Master in Pennsylvania caused a great deal of consternation both because of the extent of its responsibilities and the amount of resources devoted to its operations. Since its inception, OSM has been viewed by the state defendants in particular as an intruder into traditional state prerogatives. In part, OSM's problematic relationships with the defendants had to do with its multiple mandates and the individuated nature of much of its compliance mission. It was also a very large target given its $900,000 budget at the height of its powers.

Again, the situation in the comparison states is very different. For one thing, the litigation in all of the states visited has been settled by consent agreement. As mentioned earlier, the presence of consent has a direct bearing on the nature of the compliance mechanism established by the court. As a result, the court-appointed officers in the four states have responsibilities that are much more removed from the day-to-day operations of the system and the resources at their disposal are much more limited than those allocated to the Office of the Special Master in Pennhurst.

This is not to say that there were no tensions between court officials and state defendants. In Maine, state defendants became upset with the attitude of the court monitor in the Wuori case because of what they asserted was his failure to acknowledge the positive accomplishments of the state in meeting the requirements of the decree. The monitor finally resigned in favor of another individual whose personal style is less confrontational. It should be noted, however, that many of those in the state feel that the initial court-appointed official had the right approach for that phase of the litigation, and that the

approach of the recent monitor is consistent with the requirements of the later stages of the litigation.

In Minnesota, though the Welsh case has been active since 1972, it is only recently that the court appointed a monitor. By and large, relationships with the state defendants have been smooth though, as mentioned earlier, the patience of the legislature with the court is beginning to wear thin.

In the other two states, relationships between court compliance officers and state defendants appear to be fairly positive. In Michigan, the monitor has eschewed obvious demonstrations of authority in favor of an "illusion of power." In Massachusetts, most seem to accept the monitor's role and appear to direct most of their attention to the actions of the Judge. Some legislators in particular have been concerned with the Judge's involvement in the system — particularly his decision to subpoena the Chairman of the Senate Ways and Means Committee.

(4)   Schism in Parents Groups

The Pennhurst litigation appears to have exacerbated if not created enions among the parents of mentally retarded persons in Pennsylvania. Because of the frank deinstitutionalization character of the remedy, proinstitution parents were forced to take sides and they ultimately formed a separate organization and became opposing parties in the case. Given the community orientation of the Office of Mental Retardation in Pennsylvania, this polarization may have occurred in any event, but perhaps not as quickly nor as intensely. In order to determine whether the apparent schism in Pennsylvania was repeated in other states — as the result of litigation and/or state deinstitutionalization policies — parents group representatives in the four comparison states were interviewed.

In assessing the experience in the other four states, it should be kept in mind that, with the exception of Michigan, litigation had resulted in substantial institutional improvement. In Massachusetts, the five remedies are almost entirely comprised of standards for institutional reform. Parents in that state are somewhat unified, although the father of one of the named plaintiffs remains an independent agent somewhat critical of the state parents group. Unlike the situation in Pennsylvania, it is the community parents in Massachusetts who feel some resentment toward the institutional parents because of the diversion of resources to support state center programs.

In Michigan, the Plymouth suit was originally brought by parents of Plymouth residents who were concerned about institutional conditions. The state ARC eventually joined the suit and more recently the defendants have signed a stipulation to close the facility. Though Plymouth parents felt somewhat left out of the negotiation process and were initially hesitant about the impact of closure, they admit that the viability of the facility is inserious doubt. When asked whether they had ever thought of aligning themselves with the institution's employees to stop closure. a parent spokesperson gave an unequivocal "no" -- especially in light of the abuses attributed to some personnel at Plymouth. Though there is no npen schism between the state association and this local group, there is very little communication or sense of solidarity of purpose.

In Maine, where the litigation has resulted in both institutional improvement and deinstitutionalization, parents interviewed seemed pleased with the results. When the consent was first signed, however, there was concern among some institutional parents regarding the movement of their relatives to the commmunity. According to those interviewed, this resistance to placement was diminished in large part because of the intervention of the state

commssioner who personally worked with parents to orient them to the nature of community programs. Though there is no vocal division among parents in Maine, there is also no state parent organization. Recent attempts to resuscitate the dying state ARC failed. The collapse of the ARC, however, appears to have less to do with philosophical differences and more to do with previous mismanagement.

In Minnesota, parents appear to have made a conscious effort to accomdate the sometimes divergent views of insititutional and community parents in order to hold the organization together. The litigation in that state does not appear to have exacerbated relationships among parents in part because it has evolved slowly and now includes mandates regarding both institutional improvement and community services.

Interestingly, relationships among parents appeared somewhat more strained in those states -- Massachusetts and Michigan -- where the parents organization(s) had become plaintiffs in the litigation. Further, all parent group representatives reported a decline in vitality in their organizations ironically because of their past successes. Now that public education has been extended to all handicapped children, for instance, recruitment of the  parents of young children has fallen off.

# References

Bardach, E. The Implementation Game. Cambridge, MA: The MIT Press, 1977.

Gregory, D.D. Report of the Special Master to the United States District Court for the District of Maine: Community Standards, Appendix of the Court's Decree, April 1980, p. 1.

Horowitz, S.G. Report to the Court: March 12, 1979 - June 1, 1979. Report submitted by the District Court Monitor to the United States District Court, District of Massachusetts, p.4.

Pressman, J. & Wildavsky, A. Implementation (2nd edition). Berkeley, CA: University of California Press, 1979.

Wyatt v. Stickney, 344 F. Supp. 373 and 387 (M.D. Ala. 1972), aff'd sub. nom., Wyatt v. Aderholt, 503 F. 2d. 1305 (5th Cir. 1974).

# CHAPTER 4
# GROWTH AND DEVELOPMENT

# Individual Progress Case Study:
# Growth in the Community

Robert was delivered prematurely, at 6 1/2 months, in 1961; he weighed just over 3 pounds, and spent two months in an incubator. Due to retrolental fibroplasia at 6 months, Robert became blind. From that point on, Robert was developmentally delayed. He developed a seizure disorder and was not toilet trained until he was 5 years old. His parents enrolled him in a school for the blind, but he was asked to leave within a year, as he had begun to lose bowel control. For the next 3 years, Robert went to another school, where he learned to dress and undress, toilet himself, and speak in simple sentences.

Robert's parents were going through a divorce, and his school was too far away, so his parents institutionalized him at Pennhurst. The early records indicate that Robert began to regress soon after admission. He lost his ability to speak, began having toileting accidents, and began to bite and slap himself and others when he was upset.

Since Robert was under 21 in June 1979 (when Judge Broderick signed the "school-age children's order"), he was slated to be one of the early movers. Because of parental objections, Robert did not move until the summer of 1982, and even then his parents were less than thrilled.

The changes in Robert in the 2 years since his placement have been remarkable. When the Case Studies Coordinator visited Robert in his group home most recently, he seemed very different. His clothes fit properly and were, in fact, quite stylish. His hair was well trimmed and neat, and he was smiling, something that had not been the case in the 12 visits with Robert while he was at Pennhurst. In addition, as staff pointed out, Robert had no open wounds on his hands, which had been the prime target of self abuse in the past. In place of the open wounds were scars, a reminder of Robert's past behavior.

There had been quite a change in Robert's home, as well. All over the house one could find soft sculpture on the walls to both stimulate and orient Robert in the house. He was also using a cane and, with it, was able to move about the house independent of staff. During the visit, Robert signed "bathroom" to the staff person and proceeded to the bathroom without help. When he returned, staff praised him and Robert, smiling, looked quite pleased with himself. Knowing he had achieved a major accomplishment, Robert approached the staff person and signed the words "please" and "cookie."

# Introduction

For more than a century, states have maintained large, segregated, congregate care institutions for people with mental retardation. More recently, residential alternatives closer to home have been developed for such individuals. The Pennhurst Longitudinal Study investigated whether people were better off, in terms of their own individual behavioral development, after making the transition from an institution to a community residence.

The places where people went in the Pennhurst case are called Community Living Arrangements (CLAs). These are very small programs, usually housing only three but almost never more than six residents. CLAs are almost always in regular residential housing stock, and are staffed continuously when the people who live there are present. All residents leave every weekday to go to some variety of day program or work or school. Staff coverage is provided either according to the live-in plus part-time-help model or the shift model, with the preponderance of programs using the shift model. Service providers are private entities, about 90% are non-profit, and they range from very small (one CLA site) to quite large (40 CLA sites).

Beyond this basic CLA model, which has been in place in Pennsylvania since the early 1970s, certain additional programmatic and procedural elements were required by the Federal court for Pennhurst class members. The court mandated case managers with caseloads not to exceed 30, ordered that Individual Habilitation Plans (IHPs) be written in a collaborative way involving all concerned professionals and nonprofessionals, and also that those plans be reviewed and approved by a special unit before implementation, and finally that a special unit be designated to monitor the well being of the people and the services rendered to them.

Similar community service settings have been proliferating rapidly across the country (Janicki, Mayeda, & Epple, 1983). But to the extent that a given state's community service configuration differs from the model described above, the power to generalize from our Pennhurst Study findings to that state is decreased. As an extreme example, our research would probably have little to say about a state in which the community service system that is composed of 15-bed, specially constructed or renovated facilities located in mixed zoning areas.

The deinstitutionalization of Pennhurst Center should be seen in the national context of declining institutional populations and increasing community residential facility populations. Figure 4-1 on the next page shows the changes in public institution populations from 1960 to the present. Clearly, there has been a strong trend away from institutional care, but the figure also reveals that as of this writing about 100,000 people still live in public institutions. Whether it would be possible to serve those people in a "better" way, at the same or lower public cost, is an essential question addressed by the Pennhurst Study.

In the sense of Campbell (1967) in his classic article "Reforms as Experiments," the Pennhurst Study was an evaluation of a social experiment. The reform (experiment) in this case was conducted by a Federal court. On March 17, 1978, Judge Raymond J. Broderick of the Federal court for the Eastern District of Pennsylvania ordered that all the people living at Pennhurst (among others) move to alternative CLAs. Evidence and expert testimony had convinced the judge that people would be better off out of Pennhurst Center but no one was really certain. The issue of deinstitutionalization was controversial and provoked broad public concern.

# Figure 4-1

## POPULATION OF PUBLIC INSTITUTIONS



Prior research had established firmly that deinstitutionalization of people with mental illness had in many states been a failure (Bassuk & Gerson, 1978). In the field of mental illness, the decline in institutional populations began in 1955 (long before it began in mental retardation). People in many instances were "released" from mental institutions with no place to go, no backups, no supports, and nothing to do during the day. The bulk of public opinion about deinstitutionalization was formed by that flawed policy. The politicians who voice concern about the homeless, the street people, the vent people are, in the vast majority of cases, talking about people who were released from mental health, not mental retardation, institutions.

Institutions for people with mental health problems were generally not very pleasant places to live during the 1950s (Goffman, 1961). Public and professional outrage over institutional conditions surely lent momentum to the trend toward institutional discharges. Perhaps an even more powerful catalyst was the development of powerful new medications that could ameliorate the effects of many forms of mental illness. The first of these medications was approved for general use by the Food & Drug Administration in, not coincidentally, 1955. It appears that many people were released from facilities with a supply of medications and little else.

In the field of mental retardation, in contrast, the situation is by no means parallel. When a person with serious intellectual impairment is considered for release, it is clear to everyone that the individual will still need round the clock supervision. There are no chemical or other substitutes for creation of a place to live with staff and therapeutic activities. Thus the Pennhurst Study was not revisiting an old question. The question was, in Pennsylvania, under this court order, at this time, with these Pennhurst residents who had mental retardation, would community placement (deinstitutionalization) be beneficial?

88

In the first section of our quantitative research on this question, we were concerned with behavioral growth and development. This area merited primary attention because several ideological trends and practical program models were converging toward the "reduction of dependency" as the central goal of services. This concept was based, in part, on a growing realization among professionals in the field that all people could grow and learn (Gold, 1973). New behavioral technologies were being used to impart skills such as independent toileting to people who professionals had thought were incapable of learning such skills.

In the Federal standards for reimbursement under Title XIX, Intermediate Care Facilities for the Mentally Retarded, the phrase is was "active treatment." Active treatment implies interventions that are designed to be far more than custodial. The requirement is meant to facilitate gradual but continual increases in independent functioning. The Accreditation Council on Mental Retardation and Developmental Disabilities, formerly a part of the Joint Commission on Accreditation of Hospitals, has supported that notion in conjunction with an emphasis on the developmental model.

The single most influential principle in the field of mental retardation in the past decade has been the principle of normalization. In his original formulation, Wolfensberger (1972) defined normalization as:

> "Utilization of means which are as culturally normative as possible in order to establish and/or maintain behaviors and characteristics which are as culturally normative as possible" (page 28).

The definition of normalization has evolved since 1972 but the original formulation held sway through most of the 1970s. The principle strongly implied, through the phrase "in order to," that one of the two central purposes of services was to increase peoples' behavioral repertoires to encompass skills and patterns displayed by average citizens. (the other purpose was to

do this in ways that did not degrade people or emphasize their differences from average citizens.)  Subsequent treatments of normalization (Wolfensberger & Glenn, 1975) also stressed a "developmental growth orientation" and the "intensity of relevant programming" to foster behavioral development.

The first part of the 1972 definition clearly meant that the principle of normalization was incompatible with segregated, large-scale institutional care because such settings could never be considered "as culturally normative as possible." If people moved from an extremely deviant and non-normative segregated setting to a more normative and valued living arrangement, then normalization predicted that favorable changes in behavior would follow.  In specific terms, then, the principle predicted that people moving from Pennhurst to CLAs would display more normative (higher adaptive and lower maladaptive) behaviors.

Thus several standards and philosophies of service highlighted the importance of behavioral outcomes.  Because the technology to measure the adaptive behavior of individuals was already well developed in 1978, the question of behavioral benefits of deinstitutionalization became the central focus in the Pennhurst Study.

In 1978 there was an extreme paucity of reported research concerning the behavioral benefits of deinstitutionalization.  We knew of only a handful: Aanes & Moen (1976), Brown (1978), Fiorelli & Thurman (published in 1979, but conducted in 1977-1978 at Temple University), Isett & Spreat (1978), and Schroeder & Henes (1978).  Each one reported behavioral improvements after community placement, but each study was small, short term, and limited in generalizability.  In this area, then, the results of the Pennhurst Study became the most extensive body of knowledge in the country.

More recently, comprehensive reviews of the policy of deinstitutionalization (Willer & Intagliata, 1984) and of research about outcomes (Craig & McCarver, 1984) have been published. The Pennhurst studies figured prominently in both. Because of the availability of these recent reviews, we will not present an extensive literature review here.

In this chapter, there are two studies. The first is a replication of our earlier study (Conroy, Efthimiou, & Lemanowicz, 1982) using the matched comparison design, which tests whether <u>similar</u> people, some who leave Pennhurst and some who stay, display different amounts of behavioral growth over time. But that study concerned 70 of the first people to leave Pennhurst; here, we will report on 191. The second is the longitudinal design. This design, the best scientific approach available to us, measures a person's growth while living at Pennhurst, then measures that same person's growth upon community placement and while living in the community. This enables us to test whether the same person displays more rapid behavioral growth in one setting than the other.

Both of these designs are quasi-experimental; neither is as powerful scientifically as a true experiment. In a true experiment, as noted by Campbell (1967), the reformer (in this case the judge) would have ordered that some number of people, say 100, be chosen by lottery to be deinstitutionalized first. This "random assignment" would enable scientists to generalize what was learned about these first 100, and predict confidently that the remaining 1054 people would have similar outcomes. Although this was not done (and may never be), the combination of the two strong quasi-experimental designs from the Pennhurst Study comes very close to the level of confidence a true experiment would provide.

Because there are two major studies to describe, but both used the same instruments and drew from the same population of subjects, we will begin with a description of general Methods that were applicable to both studies. Then the specific methods and results of each study will be presented, followed by a general discussion of both sets of results.

# Methods: General

## Subjects: General

The people of primary interest in all aspects of the Pennhurst Study were the 1154 people who lived at Pennhurst Center on the date of Judge Broderick's original Order, which was March 17, 1978. Their ages ranged from nine to 82 years with an average of 39, and they had lived at Pennhurst for an average of 24 years. Sixty-four per cent of the people were male. Thirty-three per cent had some history of seizures, 13% had visual impairments, 4% had hearing impairments, and 18% were unable to walk. Medical problems of a severe, life-threatening nature were reported for only eight individuals, or under 1%.

In terms of level of functioning, 54% were labeled profoundly retarded, 31% severely, 11% moderately, and 4% mildly retarded. For 9%, I.Q. was reported as unmeasurable; for the others, the range was from 3 to 87, with an average of 23. Just over 50% were completely or nearly nonverbal, 47% were less than fully toilet trained, and 40% were reported to threaten or do physical violence toward others. On the Behavior Development Survey, the adaptive behavior scores ranged from 0 to 120, with an average of 51 points; maladaptive behavior scores ranged from 3 to 22, with an average of 17 points.

## Instruments: General

The Behavior Development Survey (BDS) contained our measures of individual functioning. Changes over time provided a measure of developmental growth. The behavioral items on the survey were taken from the American Association on

Mental Deficiency's Adaptive Behavior Scale (ABS), by the UCLA Neuropsychiatric Research Group at Lanterman State Hospital, on the basis of mathematical criteria and reliability. The resulting shortened research version of the scale contained 32 items on adaptive behavior and 11 items on maladaptive behavior. According to Arndt (1981), the best way to treat these data is as two simple sum scores, one reflecting adaptive behavior and the other maladaptive behavior.

The adaptive behavior sum score has been found to be highly reliable (Conroy, 1980), with test-retest reliability of .96, and interrater reliability of .94. For the maladaptive behavior section, although test-retest reliability is good at about .90, interrater reliability is barely adequate at about .65 to .70 (Isett & Spreat, 1979; Conroy, Efthimiou, & Lemanowicz, 1981). The relatively "noisy" measure of maladaptive behavior implies that it is more difficult to detect changes; they must be quite large to be detected.

For the present study, we extended the instrument by adding items covering individual characteristics, family relationships, friendships, medical status, the individual habilitation plan, program goals, and type and amount of services delivered. The full modified BDS was designed to be a comprehensive tool for monitoring the status, needs, services, and outcomes of individuals in the mental retardation service system. The BDS was designed to be collected by interviewing the direct care and other personnel who knew the individual best, combined with examination of records where necessary. Each BDS required about 40 minutes with the respondent(s).

Although the behavioral items on the BDS were not changed, the other sections were revised continually during the five years of the study. The 1984 version of the BDS is presented in Appendix 4-1.

## Procedures: General

In September 1978 a BDS was completed for every person at Pennhurst by teams of institutional staff members most familiar with the individuals. Each team usually included a direct-care worker, a psychologist, and a nurse. Written instructions were provided, and the Temple University Developmental Disabilities Center's Evaluation & Research team was available on site to answer questions about the form. A total of 1113 forms were completed (41 people had already left Pennhurst). This supplied the baseline data for the entire five year study.

In subsequent years, BDSs were collected by project field staff by direct interviews with interdisciplinary groups of direct care and other staff who knew the individuals best. Records were used to verify the data in the sections on written plan, demographics, health, and services. Table 4-1 below displays the record of BDS data collection for the whole study.

--------------------------------------------------------------------------

TABLE 4-1
BDS DATA COLLECTION

| Year | At Pennhurst | In CLAs |
|------|--------------|---------|
| 1978 | 1113 | 0 |
| 1980 | 713 | 70 |
| 1982 | 0 | 223 |
| 1983 | 618 | 408 |
| 1984 | 0 | 474 |

--------------------------------------------------------------------------

Data were not collected at Pennhurst in every year because the focus of interest was the effects of community placement. Originally, the study design did not call for any Pennhurst data after 1978. The Temple team added this facet after the study began because it made possible the matched comparison designs.

94

# Methods: Matched Comparison Study

## Design

The matched comparison design was implemented by identifying all the people in CLAs for whom baseline BDS data were available; for each one we then tried to find a person who was still at Pennhurst, and who was the same sex and was also very similar in initial adaptive behavior, maladaptive behavior, and age. For both groups ("movers" and "stayers") we compared 1983 BDS data to the 1978 baseline data, investigating whether one group had changed more than the other.

The matched comparison design is quasi-experimental. Specifically, it is a prepost nonequivalent control group design with subjects matched on pretest scores and several other variables. The weaknesses of the design are that no matching can be perfect, and that no adequate matches may be available for some people, so that we can wind up with biased samples.

Our objectives were to compare the behavioral changes of matched samples of institutionalized and deinstitutionalized people and to identify, in a preliminary way, specific variables that might be associated with individual growth.

## Subjects

Prerelocation (1978) and postrelocation (1983) data were available for 340 people who were placed in CLAs under federal court order. Each "mover" was matched as closely as possible with a person who was still at the institution in 1983, and there were 618 such "stayers." Individuals were matched on the bases of (1) gender, (2) chronological age $\pm 5$ years, (c) prerelocation (1978) Adaptive Behavior total score $\pm 5$ points, and (d) prerelocation Maladaptive Behavior Total Score $\pm 3$ points. The matching process located excellent matches for 191 of the 340 movers. Perfect gender matches were found in all cases (134

males, 57 females); means for the two groups on the other matching variables
are shown in Table 4-2.  No significant differences were found between the
movers and stayers on the matching variables (using simple t-tests).

---

TABLE 4-2
ADEQUACY OF MATCHING

| Variables | Movers | Stayers |
| --- | --- | --- |
| Matching variables | | |
| 1978 Adaptive Behavior | 54.8 | 55.0 |
| 1983 Maladaptive Behavior | 18.3 | 18.1 |
| Age (in 1978) | 38.1 | 37.7 |
| Other variables* | | |
| Vision | 3.6 | 3.5 |
| Hearing | 3.9 | 3.8 |
| Ambulation | 3.4 | 3.4 |
| Years at Pennhurst (in 1978) | 24.3 | 23.8 |

*Vision, hearing, and ambulation are on scales from 1 (extreme impairment)
to 4 (no impairment).

---

Both the movers and the stayers displayed an average 1978 adaptive behavior
score of 55 points (the scale ranges from 0 to 128), which was very close to
the overall population's average of 51.  In maladaptive behavior, both groups
scored about 18 points, again close to the population average of 17 points.
The average age for both groups (in 1978) was 38 years, similar to the
population average of 39 years.

Group differences were examined on some other variables as well. Secondary
conditions, including vision, hearing, and ambulation were compared using
simple t-tests; none were significantly different. These results seemed to
indicate a lack of "creaming" (i.e., selecting people to leave the institution
specifically because of less serious secondary disabilities) in selection of
the movers.  No difference was found between movers and stayers in the number
of years they had lived at the institution.  Both groups averaged 24 years, the

96

same as the population.

Thus, although not chosen by lottery, the people in this matched comparison study reflected the characteristics of the population quite well.

# Results: Matched Comparison Study

## Group Comparisons of Behavioral Change

Several methods of statistical analysis were used in the prior matched comparison of developmental growth (Conroy, et al., 1982); all led to the same conclusion as the simple t-test. Here, we present only the simple t-test because it is the most straightforward. As Table 4-3 shows, the 191 people who were placed in community settings were functioning at a higher level of adaptive behavior in 1983 than were their matched peers who had remained at Pennhurst.

---

TABLE 4-3
BEHAVIOR CHANGES AMONG MOVERS AND STAYERS

|                     | 1978 | 1983 | Change |
|---------------------|------|------|--------|
| Adaptive Behavior   |      |      |        |
| Movers              | 54.8 | 66.3 | +11.5  |
| Stayers             | 55.0 | 55.7 | + 0.7  |
| Maladaptive Behavior |     |      |        |
| Movers              | 18.3 | 18.0 | - 0.3  |
| Stayers             | 18.1 | 18.2 | + 0.1  |

*Higher scores are favorable for both.

---

A t-test on the 1983 adaptive behavior total scores of the two groups was significant ($t$ = 3.94, (380), $p$ = .001). The results in maladaptive behavior showed only very slight changes in both groups, and the t-test revealed no

significant difference between the movers and stayers in 1983.

This analysis indicated that the deinstitutionalized group had improved in adaptive behavior by more than 11 points over a five year period, while the group which remained at Pennhurst gained less than one point. Neither group changed significantly in maladaptive behavior.

## Group Comparison of Service Provided

Service data were collected in 1983 on the BDS for both the movers and the stayers. The amount of developmentally oriented service rendered in the prior month at the living area was obtained. These services included training (e.g., academic, mobility, social, interaction, community living, etc.), skills development (dressing,eating, hygiene), therapy (physical, occupational, speech, etc.), behavior modification (to reduce maladaptive behavior), and supervised recreation. We also measured time spent at the day program(vocational, educational, etc.). Table 4-4 presents average hours of service per person per month for the two groups.

--------------------------------------------------------------------------------

TABLE 4-4
HOURS OF SERVICE PER MONTH REPORTED IN 1983

|                          | Movers | Stayers |
|--------------------------|--------|---------|
| Services at Living Area   | 104.5  | 156.0   |
| Day program               | 120.7  | 33.1    |
| TOTAL                     | 225.2  | 189.1   |

--------------------------------------------------------------------------------

As the table shows, people living at Pennhurst received more service on their living areas each month than their counterparts in the community. However, the movers spent more time at the day program and received more total

98

service.  On the average, the movers received 8.0 hours of service per day and the stayers received 6.8 hours of service per day.

## Correlates of Adaptive Behavior Gains Among Movers

Because a substantial change in adaptive behavior was found only for the movers, we examined factors correlated with growth among the movers.  Change in adaptive behavior was compared by Pearson correlations with 23 variables, including personal characteristics (sex, age, etc.), functioning level, secondary conditions (vision, hearing, ambulation, seizures), medical information, family contact, and service data.  The results appear in Table 4-5.

TABLE 4-5

CORRELATES OF ADAPTIVE BEHAVIOR GAINS AMONG MOVERS

|  | r | p |
|---|---|---|
| Year of admission to community living arrangement | -.25 | .001 |
| Ambulation (1978)* | -.23 | .001 |
| Adaptive behavior total score (1978)** | -.21 | .001 |
| Number of goals in written plan | -.11 | .057 |
| Weeks since case manager last visited | .11 | .058 |
| Level of retardation (1 = not retarded, 5 = profound) | -.11 | .072 |
| IQ | .11 | .190 |
| Change of address in past year*** | .10 | .083 |
| Medical needs* | .09 | .098 |
| Sex (0 = female, 1 = male) | .08 | .137 |
| Family contact (1 = weekly, 5 = never) | -.08 | .143 |
| Vision (1978)* | -.07 | .169 |
| Maladaptive behavior total score (1978)** | .06 | .187 |
| Number of residents at the site | -.06 | .225 |
| Year of admission to Pennhurst | .05 | .228 |
| Amount of behavior modification used | -.05 | .231 |
| Months since last medical exam | .05 | .247 |
| Seizure frequency | -.05 | .247 |
| Amt. of developmental service received | -.04 | .280 |
| Hearing (1978)* | .03 | .358 |
| Year of birth | .02 | .366 |

*Scale of 1 (extreme impairment) to 4 (no impairment).
**Higher scores are favorable
*** 0 = no, 1 = yes.

Three variables displayed significant correlations with adaptive behavior gains upon deinstitutionalization. They were year of admission to community living arrangement, ambulation, and beginning adaptive behavior total score.

These results suggested that (1) people who had been in CLAs the longest showed the most overall growth, (2) people who could not walk displayed more growth than those who could, and (3) people who started out with lower levels of adaptive behavior showed larger gains than did people who initially had more skills.

100

# Methods: Longitudinal Study

## Subjects

In 1984, we visited 474 people who left Pennhurst Center under court order at their new homes in CLAs. The information we had collected about these people since 1978 formed the data set for the longitudinal analyses of growth and development. Again, for convenience we will adopt the "movers" and "stayers" terminology.

In mid 1984 there were about 450 Stayers still living at Pennhurst. Ninety-two of the remaining 138 people (the original 1154 minus 474 minus 450) had died, 77 of them while still at Pennhurst and 15 in CLAs; 32 had gone to other congregate care facilities, and the other 14 had returned to the natural family at family choice.

The movers were living in small CLAs. Most, 63%, lived in three person CLAs. Another 1% were living in a CLA by themselves, 19% had just one housemate, 11% were in CLAs with a total of four to six people, and 6% were in settings with a total of seven to 11 people.

Because many past deinstitutionalization activities have resulted in "creaming," or selection of only the highest functioning people for placement, an immediate question was how the movers compared to the original population of 1154 people. In prior years of the Pennhurst Study, we had found only trivial differences between Movers and Stayers; people being placed were just about the same as those still awaiting placement in the areas of adaptive and maladaptive behavior, age, level of retardation, and secondary handicaps. As our data set grew in numbers, some of the differences reached statistical significance, but they were still not large in magnitude, as shown in Table 4-6.

---

TABLE 4-6
COMPARISON OF MOVERS' CHARACTERISTICS TO
THOSE OF THE ORIGINAL POPULATION OF 1154 PEOPLE

|  | Movers | Population |
|---|---|---|
| 1978 Adaptive Behavior | 59 | 51 * |
| 1978 Maladaptive Behavior | 18 | 17 * |
| Age in 1978 | 37 | 39 * |
| Years at Pennhurst | 21 | 24 * |
| Vision (1 to 4 scale) | 3.7 | 3.5 * |
| Hearing (1 to 4 scale) | 3.8 | 3.8 |
| Ambulation (1 to 4 scale) | 3.4 | 3.3 |

* $t$-test significance, $p < .01$.

---

The statistically significant differences meant that the people placed in CLAs by 1984 were slightly higher in adaptive behavior, had slightly fewer maladaptive behaviors, were about two years younger and had spent three fewer years at Pennhurst, and were slightly less likely to have a visual impairment, than the average person who lived at Pennhurst in 1978. These differences suggest that, strictly speaking, our findings for the people placed so far will not necessarily hold true for those to be placed in the future. However, the differences are small, and we think it is very likely that future placements will have outcomes very similar to those we have observed.

## Design

The longitudinal approach is, in this case, really a family of analyses of the form called "interrupted time series" by Campbell (1967). We observed the behavior of people repeatedly, both before and after they moved to CLAs. The move to the CLA is the "interruption" in the time series. If significant

102

changes are observed right at the time of the "interruption," then those changes are unlikely to be coincidental.

The strength of the design is enhanced by using all possible time series configurations available in the data set. We have done so. We collected BDS data (as previously displayed in Figure 4-1) in 1978, 1980, 1982, 1983, and 1984. For some individuals, we collected a BDS in all five years; these were people who were still at Pennhurst in September 1980, and went to CLAs in late 1980 or by the middle of 1981, so that we saw them in CLAs in 1982 (we only collected data for people after they had been out for six months or more). For other people, who moved in 1983, the 1982 CLA data point did not exist; for them, there were just four observations. When all of the permutations are examined simultaneously, we can see whether the results are consistent across all the ways of analyzing behavior change.

# Results: Longitudinal Study

## Adaptive Behavior

The overall results of the family of longitudinal analyses for adaptive behavior are presented in Table 4-7 in numeric form. We will summarize the findings and then provide more detail on two of the clearest and most meaningful analyses. The overall questions are, again, did people change behaviorally upon deinstitutionalization, and did that pattern of change continue after placement?

```
------------------------------------------------------------------------------
```

TABLE 4-7
LONGITUDINAL RESULTS

ADAPTIVE BEHAVIOR

| Year: | 1978 (PC) | 1980 (PC) | 1982 (CLA) | 1983 (CLA) | 1984 (CLA) | (N) |
|---|---|---|---|---|---|---|
| Design | | | | | | |
| 1. | 51.4 | 51.6 *** | 59.9 *** | 65.2 | 65.1 | (92) |
| 2. | 53.0 | 53.6 ************ | 63.8 | 65.1 | | (176) |
| 3. | 60.8 ************ | 69.1 *** | 73.8 | 74.4 | | (163) |
| 4. | 52.4 | 53.0 ********************* | 64.8 | | | (200) |
| 5. | 60.5 ********************* | 71.3 | 72.2 | | | (326) |
| 6. | 59.3 ***************************** | 70.7 | | | | (383) |

* Entries connected by asterisks were significantly
different by paired t-tests at p<.001.

```
------------------------------------------------------------------------------
```

Table 4-7 indicates the five years of data collection across the top. The
subheading "PC" means that the data in those columns were collected at
Pennhurst Center, and the "CLA" subheading means the data were from CLAs.
Overall, the table shows that significant gains never occurred within
Pennhurst, always occurred upon CLA placement, and sometimes gains continued
even after placement.  Notably, none of the designs revealed significant growth
among people in CLAs between 1983 and 1984.

In design 1, which included all five data points, the right hand column
shows that N = 92, which means that there were 92 people who were at Pennhurst
in 1978 and 1980, and then moved to a CLA in time for us to visit them in 1982
and 1983 and 1984.  The asterisks show where significant increases in adaptive
behavior occurred:  for this design, significant increases were observed from
1980 to 1982 (initial CLA placement) and from 1982 to 1983 (advances continued

104

after placement). The gains appeared to level off after 1983. Figure 4-2 presents these findings visually. Figure 4-2 also shows what is evident from all the designs in Table 4-7: there was no statistically significant growth in this measure of adaptive behavior among these individuals while they were living at Pennhurst. The second longitudinal design included everyone for whom we had baseline 1978 data, who were still at Pennhurst in 1980, and who went to a CLA between 1980 and late 1982. There were 176 people in this category, and, as can be seen in Figure 4-3, they also made large gains in adaptive behavior upon community placement. The gain from 1983 to 1984, within the CLAs, was not statistically significant in this analysis.

Design 3 revealed the large initial gains, and also showed a continuation of growth within the community settings. Designs 4,5, and 6 further confirmed the lack of growth within Pennhurst and the sudden gains upon placement.

In sum, the adaptive behavior data showed clear and large gains among people who went to CLAs. After placement they were doing more things independently or with less help. Because this could have been the result of the change in environmental demands between the institution and the CLAs, it was important to test for continued growth after placement. In two of the longitudinal analyses (designs 1 and 3 in Table 4-7), such continued growth was observed. In the first of those analyses, the post-placement growth rate was just as rapid as the large gains upon placement. These adaptive behavior findings, especially among people who had been institutionalized an average of 24 years, seemed to us to tell a very positive story about human potential that had laid dormant among these people with mental retardation.

**Figure 4-2**



ADAPTIVE BEHAVIOR GROWTH
5 OBSERVATIONS, 92 PEOPLE

## Figure 4–3



## Maladaptive Behavior

The results of the longitudinal analyses of changes in our measure of maladaptive behavior were that there was no significant change when people went to CLAs. The data are presented in Table 4-8.

------------------------------------------------------------------------

TABLE 4-8
LONGITUDINAL RESULTS

MALADAPTIVE BEHAVIOR

| Year: | 1978 (PC) | 1980 (PC) | 1982 (CLA) | 1983 (CLA) | 1984 (CLA) | N |
|---|---|---|---|---|---|---|
| Design | | | | | | |
| 1. | 17.2 | 17.0 | 17.2 | 17.7 | 17.8 | 93 |
| 2. | 17.2 | 17.3 | | 17.6 | 17.7 | 179 |
| 3. | 17.9 | | 18.1 *** | 18.6 | 18.6 | 165 |
| 4. | 17.3 | 17.3 | | | 17.6 | 203 |
| 5. | 18.1 | | | 18.3 | 18.5 | 326 |
| 6. | 18.0 | | | | 18.2 | 386 |

\* Entries connected by asterisks were significantly different by paired t-tests at p<.05.

------------------------------------------------------------------------

Table 4-8 represents over 5 years of trying to detect any change on this scale, and the only one noted was statistically weak and was within-CLA rather than a change upon placement. It is possible that there was no improvement in the maladaptive behavior area among these people over the years. But it is equally possible that our scale was not sensitive or reliable enough to detect genuine changes.

As noted previously, the maladaptive behavior scale suffers from a lack of interrater reliability. Different respondents do not agree very well on what constitutes, for example, "Rebelliousness." This makes it difficult to attain statistical significance; the "signal" (behavioral change) must be very "loud" (large in magnitude) to be heard over the "noise" (random error of measurement). Indeed, it is at least suggestive that all of the rows in Table 4-8 show increased scores after CLA placement, and thereafter maintainance or further increases; even though the trends do not reach statistical significance, we suspect that changes may be taking place.

In summary, however, we are not statistically scientifically able to report any significant benefits of deinstitutionalization in the area of reduction of maladaptive behaviors.

## Longitudinal Changes in Service Delivery Patterns

The services section of the BDS was developed only after 1978, so there were no baseline data on services rendered to the population. In 1980, at Pennhurst, we did collect services information, and also in the community in subsequent years. This enabled longitudinal analysis of changes in the amount and pattern of services rendered to people. This time, we were asking the question "Is this person receiving more or less or different services in the community than s/he formerly received at Pennhurst?"

This is different from the matched comparison analysis, which asked whether two groups of similar people were receiving different services in 1983. In the longitudinal approach, we ask whether a person in the community in 1984 is receiving more or less or different services than that same person previously received at Pennhurst in 1980.

The results were much like those of the matched comparison. The summary figures are given in Table 4-9.

--------------------------------------------------------------------------

TABLE 4-9
HOURS OF SERVICE PER MONTH REPORTED
AT PENNHURST IN 1980 AND IN CLAs IN 1984
(N=207)

|                          | 1980 (PC) | 1984 (CLA) |
|--------------------------|-----------|------------|
| Services at Living Area   | 139       | 95         |
| Day program              | 48        | 119        |
|                          | ---       | ---        |
| TOTAL                    | 187       | 214        |

--------------------------------------------------------------------------

The decrease in hours of service per month delivered via the residential program was significant ($t$=5.17, (206), $p$<.001), meaning that the community service system delivered fewer hours of developmentally oriented programming, at the place where the person slept, than did the institution.

The community system delivered more than twice the amount of day programming, away from the place where the person slept, than the institution ($t$=19.6, (205), $p$<.001). When the two forms of service were combined into a total index, the 1984 community service system was delivering a larger quantity of service to these people than they had previously received at Pennhurst in 1980 ($t$=4.15, (205), $p$<.001).

As an exploration of an urgent contemporary issue in service delivery, we tested whether the 207 people in our data set who had been at Pennhurst in 1980 and were in CLAs in 1984 had shown any change in the number of medications administered to them on a daily basis, other than topical ointments and vitamins. At Pennhurst in 1980, these people had received an average of 2.1 medications each day; in 1984 in CLAs, they received an average of 1.7. The decrease was significant ($t$=3.22, (206), $p$<.001).

# Discussion

The overall results of five years of investigation into the behavioral consequences of deinstitutionalization are clear: in terms of adaptive behavior, the average person who left Pennhurst is better off. The average person is now about 11 points higher on our 128 point scale of adaptive behavior than s/he was while at Pennhurst. Matched people still living at Pennhurst did not show significant improvements. Moreover, the dramatic and sudden increases in adaptive behavior after CLA placement did not stop and level off; for at least a year after placement, the average person continued to display significant developmental growth.

The evidence suggests, however, that gains begin to level off at some point, usually a year or more after placement. It seems to us that the lack of significant growth from 1983 to 1984 demands attention and continued study. We will continue this investigation with support from the Commonwealth of Pennsylvania.

We should reiterate here, however, that during the course of the study we did detect favorable behavior changes among the people living at Pennhurst. When all the people at Pennhurst are included in the analysis, we do attain statistical significance, as reported by Lemanowicz, Conroy, & Feinstein (1984). These gains amounted to just over 1 point in adaptive behavior and under 1 point in maladaptive behavior. This finding is mentioned here because it suggests that, unlike the situation at Pennhurst at the time of the trial in 1977, people have not been regressing while residing at the institution. At the trial, evidence indicated that the average person at Pennhurst had lost skills during his/her time there. In more recent years, then, that situation has changed. Any visitor can tell in a brief tour that Pennhurst has improved over the years, and it may be that our findings of growth are quantitative reflections of that fact.

Nevertheless, the results of the two designs presented here do establish the quantitative superiority of CLA settings in fostering adaptive behavior expression and growth. People who have gone to CLAs have gained literally 10 times as much as the people who still await placement.

The limitations of the two designs should be kept in mind, and, even more important, our caution about generalization of these results to other areas or states is very important. To the extent that a community service system is similar to the Pennsylvania model, such generalization is warranted with moderate caution. But for systems unlike the one implemented for the Pennhurst class members, it would be extremely hazardous to assume that our findings will apply.

In addition to the elementary finding that people are better off in terms of behavior, we also noted that the pattern and amount of developmentally oriented services rendered had changed. The patterns were that the institution delivered more service at the living area, while the community system delivered more service at the day program, and more service overall (6.8 versus 8.0 hours per day for Pennhurst and CLAs respectively). Thus we conclude that the people who have left Pennhurst are also better off in terms of the amount of developmentally-oriented service rendered to them. We hope that further evaluative studies will address the quality and consequences of various kinds of day program.

We also examined medication use, and found that the average person who had been placed was receiving fewer daily medications than previously at Pennhurst. This would usually be regarded as a favorable outcome, because there has been a great deal of concern in the field of mental retardation about overuse and misuse of many kinds of medications, particularly those used for behavior control, and particularly when they may have serious and permanent side effects such as tardive dyskinesia. (We should also note that, from 1980

112

to 1983, since the reorganization of medical services at Pennhurst under the auspices of a private corporation, the average person at Pennhurst is also receiving fewer medications.)

Other than the essential findings that people are better off in terms of behavior and services, we believe the most important outcome of our years of work in this area is that we have developed a technology for quantitative monitoring of the well being of people in dispersed, decentralized community service systems. Many observers have suggested, over the years, that the difficulties in monitoring community services would be enormous compared to the ease of monitoring all the people in one place at an institution. This has been offered as a major argument against deinstitutionalization.

In fact, quantitative monitoring is not a difficult process at all, nor does it need to be terribly costly. The Temple part of the team has embarked on a long term partnership with the Pennsylvania Office of Mental Retardation to continue monitoring the Pennhurst class members when the Federal funds for this study expire, and to expand that monitoring as rapidly as possible to other people in community settings. Although our once a year monitoring visits are no substitute for frequent case manager visits, active family participation, fiscal controls, and alert neighbors, the quantitative information about individual growth (or regression), individual services, family opinions, and environments yields a rich basis for individual corrective actions and for systematic analysis and planning.

113

# References

Aanes, D., & Moen, M. (1976). Adaptive behavior changes of group home residents. Mental Retardation, 14, 36-40.

Arndt, S. (1981). A general measure of adaptive behavior. American Journal of Mental Deficiency, 85, 554-556.

Bassuk, E.L., & Gerson, S. (1978). Deinstitutionalization and mental health services. Scientific American, 238, 46-53.

Brown, M. (1978). Evaluation report: Post-institutional placement project. New York: New York University Institute of Rehabilitation Medicine.

Campbell, D.T. (1967). Reforms as experiments. American Psychologist, 24, 409-429.

Conroy, J. (1980). Reliability of the Behavior Development Survey (Technical Report 80-1-1). Philadelphia: Temple University Developmental Disabilities Center.

Conroy, J., Efthimiou, J., & Lemanowicz, J. (1981). Reliability of the Behavior Development Survey: Maladaptive behavior section (Pennhurst Study Brief Report No. 11). Philadelphia: Temple University Developmental Disabilities Center.

Conroy, J., Efthimiou, J., & Lemanowicz, J. (1982). A matched comparison of the developmental growth of institutionalized and deinstitutionalized mentally retarded clients. American Journal of Mental Deficiency, 86, 581-587.

Conroy, J., Feinstein, C., & Lemanowicz, J. (1981). Medical needs of clients: Perceptions of relatives and of staff (Pennhurst Study Brief Report No. 6). Philadelphia: Temple University Developmental Disabilities Center.

Craig, E.M., & McCarver, R.B. (1984). Community placement and adjustment of deinstitutionalized clients: Issues and findings. In: N. Ellis & N. Bray (Eds.), International review of research in mental retardation, Volume 12. Orlando: Academic Press.

Fiorelli, J., & Thurman, S.K. (1979). Client behavior in more and less normalized residential settings. Education and Training of the Mentally Retarded, 14, 85-94.

Goffman, E. (1961). Asylums. New York: Doubleday-Anchor.

Gold, M.W. (1973). Research on the vocational habilitation of the retarded: The present, the future. In N.R. Ellis (Ed.), International review of research in mental retardation, Volume 6. New York: Academic Press.

Isett, R., & Spreat, S. (1979). Test-retest and interrater reliability of the AAMD Adaptive Behavior Scale. American Journal of Mental Deficiency, 84, 93-95.

Isett, R., & Spreat, S. (1978). Progress accountability and deinstitution-
    alization. Technical report 78-3-3. Philadelphia: Temple
    University/Woodhaven Center.

Lemanowicz, J.A., Conroy, J.W., & Feinstein, C.S. (1984). A quantitative
    overview of Pennhurst Center: 1978 to 1983 (Pennhurst Study Brief Report #
    16). Philadelphia: Temple University Developmental Disabilities Center.

Schroeder, S.R., & Henes, C. (1978). Assessment of progress of
    institutionalized and deinstitutionalized retarded adults: A
    matched-control comparison. Mental Retardation, 16, 147-148.

Willer, B., & Intagliata, J. (1984). An overview of the social policy of
    deinstitutionalization. In: N. Ellis & N. Bray (Eds.), International
    review of research in mental retardation, Volume 12. Orlando: Academic
    Press.

Wolfensberger, W. (1972). The principle of normalization in human services.
    Toronto: National Institute on Mental Retardation.

Wolfensberger, W., & Glenn, L. (1975). Program analysis of services 3: A
    method for the quantitative evaluation of human services. Toronto:
    National Institute on Mental Retardation.