# CHAPTER 5
# CONSUMER SATISFACTION

# Consumer Interview Case Study:

# If I Were a Rich Man

Steve moved to the community after having lived at Pennhurst for 27 years. While Steve reported having been very happy at Pennhurst, he is even happier in his new group home. When he was asked what he liked about the group home, he talked about how good the staff were to him and how they had put a bell in his bedroom so that if he needed help during the night he could just ring and the staff person would come (Steve is non-ambulatory). Steve also talked about how good he felt having been able to visit his Aunt Sue when she was in the hospital.

When asked if he missed Pennhurst or any of the people, Stave said no. After thinking for a moment he said that he does miss a few of his friends, but not very much. When he was at a Speaking for Ourselves meeting he saw a few of his friends from Pennhurst who were now also living in group homes. Steve explained that Speaking for Ourselves is a place where you talk about a lot of things, like Pennhurst closing, and if you have a problem or something is bothering you they try to help you figure it out.

When asked what he would wish for if he had one wish, Steve responded, "I wish for people to live with me who are nice and kind to me like these people."

Bruce would like to stay in his group home. He moved there about 6 months ago, after having lived at Pennhurst for 28 years. He likes living in the community, because he gets to see his sister and her family and he works and earns money. (Bruce works on a pressing machine that steams and presses cardboard.)

When asked how his group home differs from Pennhurst, Bruce said, "Pennhurst was alright, I grew up in that place. We have different hours of getting up and going to sleep here. We have Saturdays and Sundays to ourselves. This is more home; there is no big crowd, just a few people." When asked what he would wish for if he had one wish, Bruce replied, "I wish I was a millionaire."

# Introduction

Among the many ways that the well-being of people with mental retardation may be assessed, one that stands out in importance and in difficulty is to ask the people themselves. In the Pennhurst Study, we were determined to address the feelings of the people themselves to the maximum extent possible.

It seemed particularly important to avoid the common error of assuming that only parents and professionals can make valid judgments about whether a person with mental retardation is better off. As Seltzer (1980) pointed out, "A critical, yet often ignored, aspect of retarded persons' community adjustment is their perceptions about their environments and the psychological sense of well being or discomfort derived from their living environments." However, Sigelman, et al. (1979) stated that, despite a trend toward allowing and encouraging people with mental retardation to speak for themselves, "...virtually nothing is known about the reliability and validity of information gained through survey research" (p. 1) with them.

It was clear at the outset that the methodological difficulties were considerable. For example, because we knew that nearly half of the people living at Pennhurst Center were nearly or completely nonverbal, we knew that the views of the people who were able to speak would not necessarily represent the views of those who were unable to speak.

In addition to this problem of representativeness, prior studies had suggested that some people with mental retardation had difficulty in expressing themselves in a consistent fashion. Despite these problems, it was decided that the effort to measure changes in individual satisfaction after movement from the institution to small community based living arrangements was demanded by the nature of the study.

The consumer interviews part of the study, then, addressed two objectives. First, it was designed to ascertain whether people who moved from Pennhurst into community living arrangements (CLAs) were pleased with the change, and whether there was any change in their self-expressed satisfaction and happiness. Second, because of questions about the reliability and validity of such interviews, the study was also intended to shed new light on the methodological problems inherent in soliciting direct consumer input.

Moreover, the study was, unexpectedly, able to investigate changes over time in the self-expressed satisfaction and happiness of people who remained at Pennhurst during the years in which the population of the facility dropped from 1154 to 450.

# Methods

## Consent Procedures

At the outset, it was determined that this phase of the study required extremely careful attention to the rights and privacy of the individuals themselves, because this was practically the only part of the effort that demanded direct contact. Certainly, if an individual said that s/he was not willing to be interviewed, then no interview would be done. But there were others who might have an important viewpoint regarding the advisability of the person's participation as well: program staff and families. We considered all of these parties. The only people we interviewed were those (a) who appeared, from prior data, to be capable of responding to verbal interview, (b) for whom staff judged there would be no significant risk to the person, (c) for whom written informed consent was obtained (either from families, or, in the case of people who had no family but were capable of giving their own informed consent, from the people themselves), and (d) who agreed on their own behalf when approached by our interviewers.

Our extreme caution in safeguarding rights and privacy in this part of the study grew at least partly from the knowledge that, in past years, people living in institutional settings have been part of studies that would never have been approved if the subjects had not been labeled mentally retarded.

## Design

Interviews were designed to be administered to a sample of people still at Pennhurst in 1980, and then again after as each person was placed into a community living arrangement (CLA). The "pre" interviews at Pennhurst and the "post" interviews in community settings asked the same standardized questions about resident satisfaction with the living situation, activities and services received, and general self-reported aspects of "happiness."

This simple pre-post consumer interviews design had not been implemented previously in any study of deinstitutionalization known to us. Even the pioneering work of Edgerton (1967), and Edgerton & Bercovici (1976) was based on interviews that began only after people had moved into community living. In related work, Birenbaum & Seiffer (1976) and Birenbaum & Re (1979) followed and interviewed adults for four years, and utilized a standardized questionnaire, but again the study began only after placement into community settings.

In our design, we waited about six months after each person's placement, and then conducted the post-placement interview. The first post-placement interview occurred in early 1981, the last in mid-1984.

We expected, on the basis of prior literature, that the people with the most functional skills (especially verbal) would probably be among the first to move to CLAs. Because the people in this part of the Pennhurst Study had verbal skills, we thought that, by the end of the study, most would be in CLAs. In fact, when the study was finished, only about half of the people in our Consumer Interview sample had left Pennhurst. (For convenience, this group

121

will be referred to as "movers.")

This presented an opportunity to reinterview the people who were still at Pennhurst in 1984 ("stayers") and to check for changes in their self-reported satisfaction and happiness. This was not viewed as a control group, because there was no matching or random assignment, but rather as a convenient but non-equivalent group for whom the results would also be of interest. As institutional populations decrease during moves toward closure, it is important to know how such a situation affects the people who still live in those facilities. The results of interviews with the two groups, movers and stayers, were not intended to be compared to one another; they were two separate studies, each with its own set of policy implications.

## Subjects

The sample of people interviewed in this part of the Pennhurst Study was not representative of the 1154 people who lived at Pennhurst in 1978, nor was it representative of all the people who moved to CLAs. Again, this was because the interview method itself biased the sample by excluding all people who were not able to communicate verbally (or by signing). Nevertheless, every effort was made to select a sample of people that would reflect the diverse elements of the verbal portion of the Pennhurst population.

Subject selection took place in Spring of 1980, after all design and instrument development was completed. The first stage of selection was to decide which people would be eligible for inclusion. Naturally, the people who had already left Pennhurst could not be included. It was also decided for economic reasons that, of the people still at Pennhurst, only the people who were originally from the greater Philadelphia area (the five southeastern counties of Pennsylvania) would be candidates.

Using this decision rule, there were 713 candidates for inclusion in the

consumer interviews. These were all the people who lived at Pennhurst in May 1980, and who came from the Southeast Region of Pennsylvania. We then examined Behavior Development Survey data (collected at Pennhurst in 1978) to identify all the people who were reported to possess moderate or good verbal skills. There were 287 such individuals.

From these 287, we wished to select a representative sample. In the view of the Temple team, the best such sample would have been simple random. However, a consultant retained as an outside methodological reviewer by the government required a stratified sample of 60 people, with approximately 15 from each labeling category for level of retardation: mild, moderate, severe, and profound.

In our first stage of probabilistic selection, we oversampled from each of the four categories. By simple random selection, about 25 were taken from the moderate, severe, and profound categories; all 19 people labeled mild were taken. In all, 92 people were selected at this stage. The oversampling was in anticipation of losses due to our strict consent procedures.

Because we were only able to secure complete consent and valid interviews with 35 of these 92 people, a second stage of sample selection was initiated, by similar rules, in which 51 additional people were drawn. In all, then, we drew 143 candidates for interviews in this part of the study. By the completion of the baseline surveys, we had interviewed 56 people who lived at Pennhurst in the summer of 1980. The disposition of the sample is displayed in Table 5-1.

123

TABLE 5-1

DISPOSITION OF THE CONSUMER INTERVIEWS SAMPLE

| | Reported Level of Retardation | | | |
|---|---|---|---|---|
| | Mild | Moderate | Severe | Profound |
| The universe of 713 | 21 (3%) | 55 (8%) | 197 (28%) | 440 (62%) |
| The 287 verbal people | 19 (7%) | 52 (18%) | 136 (47%) | 80 (28%) |
| The 143 drawn in sample | 19 (13%) | 45 (30%) | 43 (30%) | 36 (25%) |
| The 56 completed baseline interviews | 12 (21%) | 15 (27%) | 22 (39%) | 7 (13%) |
| The 30 Movers | 7 (23%) | 8 (27%) | 13 (43%) | 2 (7%) |
| The 26 Stayers | 5 (19%) | 7 (27%) | 9 (35%) | 5 (19%) |

Table 5-1 shows that the people we interviewed were not representative of all the people at Pennhurst, nor even of all verbal people. People with fewer functional abilities were underrepresented from either point of view.

The table also shows that, between stayers and movers, the differences in level of retardation were small but noticeable; again, these two groups were not treated as controls or comparisons.

Because of the way subjects were selected in this part of the Pennhurst Study, the consumer interviews should be viewed as (a) a case study of changes in the self-reported well-being of a specific group of deinstitutionalized people, (b) a case study of changes in the self-reported well-being of a specific group of people living in an institution as it phases down, and (c) an exploration of reliability and validity issues in direct consumer surveys.

## Instruments

An extensive search for prior work in this area was initiated in 1979. The study team obtained copies of instruments used before, analyzed all available literature, and telephoned many of the researchers who had conducted such work. A draft instrument was developed from this groundwork in 1979. It was pilot tested and revised. In Spring of 1980 it was tested again, this time comparing telephone interviews to face-to-face interviews (Conroy & Beyer, 1979). The third revision was piloted during Summer 1980, and an entire new section was added to assess respondents' ability to label their own feelings accurately.

In the process of instrument development, the weight of prior research demanded primary attention to reliability. Sigelman, Winer, Schoenrock & Hromas (1978) focused on the problems of responsiveness, reliability or consistency, and response bias. The difficulties they noted were considerable; the suggestion they offered was that any such interview effort should include alternative format questions and checks for consistency. Winer, Sigelman, Schoenrock, Spanhel, & Hromas (1978) compared responsiveness to Yes-No, Either-Or, Multiple-Choice, and Open-Ended questions. The Yes-No format appeared to yield the highest proportion of responses and also the highest consistency. Yet Sigelman, Budd, Spanhel, & Schoenrock (1981) suggested that Yes-No questions were problematic because of a common tendency to say "Yes" to all questions, regardless of content; this was called the acquiescence phenomenon.

Our interview was designed with these studies in mind. It contained, in its final form, 12 Yes-No, 3 Either-Or, 4 Open-Ended, and an entire separate section of 7 Multiple-Choice (Likert scale) items with five facial drawings (big smile, small smile, neutral, small frown, big frown) to assist in labeling

the way people felt about various issues. The questionnaire is included as Appendix 5-1.

An important facet of the interview instrument was the fact that there were six pairs of redundant questions. They were designed specifically as checks for consistency on the most important questions. For example, we asked, "Do you like living here?" (a Yes-No question), and later in the interview we asked "Would you like to leave here and live somewhere else?" (another Yes-No), and also "Which [face] is most like how you feel about living here?" (a Multiple-choice item with visual aids). These check items were intended to give the most weight to consistent responses.

## Procedures

Interviews were generally scheduled by contacting the residential staff and then the individuals themselves. Appointments were made by telephone. The interview data were collected directly on the form in Appendix 5-1. Researchers at Temple edited the forms and entered the data directly onto mainframe disk storage, and conducted analyses using the Statistical Package for the Social Sciences (SPSS).

# Results

## Internal Consistency: Acquiescence and Nay-Saying

The problem of acquiescence was first noted by Rosen, Floor, & Zistein (1974) in connection with interviews of people with mental retardation. More recently, it was investigated by Sigelman, Budd, Spanhel, & Schoenrock (1981). Their article, titled "When in doubt, say Yes," concluded that many people with retardation were likely to say "Yes" to any question that was not clear, concrete, and immediate. They speculated that this was part of a general tendency to avoid responses that "normal" people might interpret as negative, resistive, or rebellious. In related work, Sigelman, et al., (1979)

found a smaller number of people who acted in the opposite way, saying "No" to all questions - a phenomenon called nay-saying.

In their samples, Sigelman and colleagues found an acquiescence rate of 44% on Yes-No items, and a nay-saying rate of 4%. Because of their work, we included check questions for five of the Yes-No questions. They are shown in Table 5-2, along with the results as to consistency.

---

### TABLE 5-2
### ACQUIESCENCE AND NAY-SAYING, PRE AND POST

| Question | # of responses | | # Acq | # Nay |
|---|---|---|---|---|
| **YES-NO VERSUS YES-NO** | | | | |
| Q3: Do you want to keep on living here? | Pre: | 55 | 16 | 0 |
| Q16: If you could, would you like to leave here and live somewhere else? | Post: | 53 | 8 | 0 |
| | | | | |
| **YES-NO VERSUS SCALE** | | | | |
| Q1: Do you like living here? | Pre: | 48 | 6 | 6 |
| Q7B: Which face is most like how you feel about living here? | Post: | 46 | 1 | 0 |
| | | | | |
| Q13: Do you like your day program? | Pre: | 46 | 4 | 2 |
| Q10B: Which face is most like how you feel about your day program? | Post: | 42 | 1 | 0 |
| | | | | |
| Q2: Do you like the people who work here? | Pre: | 48 | 6 | 1 |
| Q11B: Which face is most like how you feel about the staff? | Post: | 45 | 2 | 1 |
| | | | | |
| **YES-NO VERSUS EITHER-OR** | | | | |
| Q2: Do you like the people who work here? | Pre: | 54 | 3 | 5 |
| Q7: Are people here mean or nice? | Post: | 53 | 1 | 1 |
| | | | | |
| OVERALL | Pre: | 251 | 35 | 14 |
| | Post: | 239 | 13 | 2 |

---

Table 5-2 shows, in the column headed "Acq," the number of people who displayed

acquiescence on each item pair. This means that they said "Yes" to the Yes-No question, but then contradicted that answer on the check question. The column headed "Nay" works the same way for people who said "No" and later contradicted that answer.

There is a lot of information in Table 5-2, but there are really just three main points. First, our overall rate of acquiescence in the baseline interviews at Pennhurst was 35 occurrences out of 251 possible occurrences, or 14%. This was much less than the rate of 44% reported by Sigelman et al. (1981). Second, our baseline rate of nay-saying was 6%, about the same as the Sigelman et al. rate of 4%. Third, our rates of inconsistent responses declined sharply in the post interviews; the rate of acquiescence in the post-test was 5% and the nay-saying rate was 1%. This decline was statistically significant (even by the relatively conservative nonparametric Wilcoxon $T$ test, $p < .001$). Further investigations revealed that significant declines in inconsistencies occurred among the movers and among the stayers.

## Internal Consistency: Recency

Spanhel, Sigelman, Schoenrock, Winer, & Hromas (1978) reported that 28% of the responses of institutionalized children to Either-Or items were inconsistent because of "recency." For example, when asked "Are you big or small?" and later "Are you small or big?," 19% of the children chose the most recently heard option both times (small the first time and big the second time), and another 9% chose the first option offered both times. Our questionnaire contained one pair of questions to check recency:

Q8: Are you usually happy or sad?

Q15: Are you usually sad or happy?

In the baseline interviews, 53 people responded to both items. Among them, 3 people chose the first option on both questions, and 8 people chose the second

option on both questions, for a combined "recency" inconsistency rate of 21%. This was somewhat less than in the prior work of Spanhel et al., probably partly because of our screening procedures and partly because Spanhel et al. were dealing exclusively with children. In our second round of interviews, there were 54 people who responded to both questions. None of them chose the first option on both questions, and nine chose the second item on both questions (17%). This was not significantly different from the baseline recency rate.

## Changes in Satisfaction: The Movers

Of the 56 people interviewed at Pennhurst in the 1980 baseline, 30 had moved to community living arrangements (CLAs) and had been reinterviewed there by 1984 (movers). This section presents our findings for these movers.

In the baseline, 18 of the 30 movers had said "Yes" in answer to the question "Do you like living here?" However, as shown in the upper part of Table 5-3, four of those 18 later contradicted themselves on the check question by indicating that they felt "Sad" or "Very Sad" about living there. In the table, these four can be seen in the "Yes" column (one sad and three very sad). The people who were consistent in their responses are marked with an asterisk; those who contradicted themselves are marked with parentheses.

TABLE 5-3

MOVERS' SATISFACTION WITH WHERE THEY LIVE

PRE:  AT PENNHURST

Q1:  Do you like living here?

|  |  | Yes | In Between | No |
|---|---|---|---|---|
|  | Very Happy | 9* | 0 | (1) |
| Q7B: Which face | Happy | 3* | 0 | (2) |
| is most like | | | | |
| how you feel | Neutral | 2 | 3* | 1 |
| about living | | | | |
| here? | Sad | (1) | 0 | 0* |
|  | Very Sad | (3) | 1 | 1* |

(3 people did not respond)

POST:  IN COMMUNITY LIVING ARRANGEMENTS

Q1:  Do you like living here?

|  |  | Yes | In Between | No |
|---|---|---|---|---|
|  | Very Happy | 21* | 1 | (0) |
| Q7B: Which face | Happy | 1* | 0 | (0) |
| is most like | | | | |
| how you feel | Neutral | 1 | 1* | 1 |
| about living | | | | |
| here? | Sad | (0) | 0 | 0* |
|  | Very Sad | (0) | 0 | 0* |

(4 people did not respond)

The table revealed that these verbal individuals had increased in their self-reported level of satisfaction with their living arrangements, but the data in the table must be interpreted carefully. In the baseline, at Pennhurst, 12 people, or 40% of the sample, reliably expressed satisfaction with living there; conversely, one person (3%) was reliably dissatisfied. Later, in CLAs, 22 people, or 73% of the sample, reliably expressed satisfaction, and no one was consistently dissatisfied. By this measure, satisfaction had almost doubled. On the facial picture scale item, the increase in expressed

130

was tested both with the parametric $t$-test ($t$=4.30, (24), $p$<.001) and with the nonparametric Wilcoxon T ($p$<.001).

A condensed presentation of the responses of the movers to the check question described above, and to the five other sets of check questions, is given in Table 5-4.

---

TABLE 5-4
SUMMARY OF MOVERS' RELIABLY EXPRESSED SATISFACTION
BEFORE AND AFTER CLA PLACEMENT

|  |  | Before | After | Change |
|---|---|---|---|---|
| Satisfaction with Living Arrangement (Q1 and Q7B) | Satisfied | 40% | 73% | +33% |
|  | Dissatisfied | 3% | 0% | -3% |
| Desire to Move (Q3 and Q 16) | Satisfied | 43 | 63 | +20 |
|  | Dissatisfied | 17 | 7 | -10 |
| General Happiness (QB and Q15) | Satisfied | 67 | 67 | 0 |
|  | Dissatisfied | 3 | 0 | -3 |
| Satisfaction with Staff (Q2 and Q7) | Satisfied | 60 | 80 | +20 |
|  | Dissatisfied | 0 | 0 | 0 |
| Satisfaction with Staff (Q2 and Q11B) | Satisfied | 53 | 63 | +10 |
|  | Dissatisfied | 7 | 0 | -7 |
| Satisfaction with Day Program (Q13 and Q10B) | Satisfied | 53 | 53 | 0 |
|  | Dissatisfied | 0 | 7 | +7 |

---

The figures in Table 5-4 reflect only the consistent responses, and all the percentages are taken as fractions of the entire 30 people in the movers group.  We have already discussed the first change in the table, Living Arrangement.  The second change was in Desire to Move, which decreased; at baseline 17% wanted to move and after relocation it was 7% (Wilcoxon $T$,

$p < .01$). On the General Happiness questions (Are you usually happy or sad), the table shows that there was no change. About two thirds reiliably said they were usually happy, both while they were at Pennhurst, and later in the CLAs. On both sets of check questions about staff, the proportion of people who reliably reported positive feelings increased after CLA placement (Wilcoxon $T$, $p < .05$). Finally, there were no significant changes in satisfaction with the day programs; although not statistically significant, it is worth noting that this was the only area in which there was increased dissatisfaction; two people reliably expressed dissatisfaction with their community based day programs.

Thus, in four of the six areas of satisfaction in which the consistency and reliability of responses could be checked, satisfaction increased; in the other two areas, satisfaction was unchanged.

There were also a number of questions for which there were no check questions. There were no significant changes from pre to post relocation for "Do you have any real good friends?" or "Do you ever see anyone in your family?" or "Do you make any money?" A significant increase was noted for "Do you have a girlfriend/boyfriend?" from 10 people saying "Yes" in the baseline to 17 saying "Yes" after relocation to CLAs.

The smile face Likert scale items were of special interest, and further analyses of change were undertaken. The special interest arose from prior reports of failure of this question format (Winer, et al., 1978) because too few people could respond to it at all; yet, if it could work, the data from a five point scale might be more useful than simple Yes-No answers. As has already been noted, in our sample, the smile face format worked fairly well; response rates did not drop much below those of the Yes-No and Either-Or formats. It was therefore possible to treat the seven smile face items as ordinal scales, calculating average scores on each one before and after relocation, and to use routine statistical tests of significance of change.

For each item, a score of 1 meant the "big frown" face, and a "5" meant the "big smile." Thus higher scores were more positive. The results are presented in Table 5-5.

---

TABLE 5-5
CHANGES ON SMILE SCALE ITEMS AFTER RELOCATION

| "Which face is most like how......" | Mean Score Before | Mean Score After | Signif- icance of $t$ (T) |
|---|---|---|---|
| Q7B ....you feel about living here? | 3.4 | 4.7 | .001(.001) |
| Q8B ....the staff feel about you? | 3.5 | 4.3 | .021(.028) |
| Q9B ....the other residents feel about you? | 3.4 | 4.0 | .076(.096) |
| Q10B....you feel about your day program? | 3.9 | 3.9 | 1.00(1.00) |
| Q11B....you feel about the staff? | 3.8 | 4.3 | .109(.140) |
| Q12B....you feel about the other residents? | 3.3 | 4.3 | .021(.026) |
| Q13B....you feel about yourself? | 4.1 | 4.3 | .484(.469) |
| OVERALL SCALE | 25.5 | 30.0 | .001(.003) |

---

The test of significance of change from before relocation to after was the simple paired $t$-test. The sample size was often less than 30 because not everyone answered every question; therefore we also ran the nonparametric Wilcoxon T tests. Significances of the Wilcoxons are shown in the parentheses. The $t$ and the Wilcoxon were nearly identical in each case.

The largest and most significant change was in how people felt about where they lived, which became more positive in the CLAs. Significant changes were also noted in people's beliefs about how staff felt about them, and how people felt about the other residents. When all seven Likert items were added up to form a single satisfaction scale, the change on this "overall scale" was also

significant. Results on the overall scale showed that the movers were more satisfied in three of these seven areas, and also overall, after they moved into the CLAs.

## Changes in Satisfaction: The Stayers

For the 26 people we interviewed in 1980 at Pennhurst who were still living at Pennhurst in 1984, it was of interest to find out whether they had changed in any areas of satisfaction/happiness. Certainly, the four years had been eventful ones in the history of Pennhurst. The population declined from about 1000 to about 450 in those years, some buildings had closed, some staff had been furloughed, and it had been announced by the Department of Public Welfare that Pennhurst definitely would close. For these reasons, we conducted reinterviews with the 26 people in the Summer of 1984.

Table 5-6 shows a summary of the changes in satisfaction among Stayers on the items for which we had check questions.

--------------------------------------------------------------------------------

TABLE 5-6
SUMMARY OF STAYERS' RELIABLY EXPRESSED SATISFACTION
IN 1980 AND IN 1984

| | | 1980 | 1984 | Change |
|---|---|---|---|---|
| Satisfaction with Living Arrangement (Q1 and Q7B) | Satisfied | 42% | 35% | -7% |
| | Dissatisfied | 12% | 27% | +15% |
| Desire to Move (Q3 and Q16) | Satisfied | 35 | 27 | -8 |
| | Dissatisfied | 27 | 35 | +8 |
| General Happiness (Q8 and Q15) | Satisfied | 50 | 58 | +8 |
| | Dissatisfied | 8 | 15 | +7 |
| Satisfaction with Staff (Q2 and Q7) | Satisfied | 65 | 69 | +4 |
| | Dissatisfied | 4 | 0 | -4 |
| Satisfaction with Staff (Q2 and Q11B) | Satisfied | 38 | 50 | +12 |
| | Dissatisfied | 12 | 0 | -12 |
| Satisfaction with Day Program (Q13 and Q10B) | Satisfied | 38 | 58 | +20 |
| | Dissatisfied | 4 | 4 | 0 |

--------------------------------------------------------------------------------

The data in Table 5-6 indicate, if anything, a slight decrease in satisfaction with the living situation, as evidenced by the consistent responses to the first two pairs of check questions, on which satisfaction decreased slightly and dissatisfaction increased slightly. General happiness appeared to increase for some, and decrease just as much for others. Changes regarding satisfaction with staff were all in a positive direction. The largest change was an increase in satisfaction with the day program. Statistical tests, however, showed that none of these changes were significant.

The unchecked items regarding good friends, girlfriends and boyfriends, family contact, and making money were also examined for change from 1980 to 1984. There were no significant changes in these areas.

As we did for the Movers, we treated the face scale items as ordinal data and computed averages and tests of change over time. The results of this analysis for the stayers are presented in Table 5-7.

---

TABLE 5-7
CHANGES ON SMILE FACE SCALE ITEMS AMONG STAYERS, 1980-1984

| "Which face is most like how....." | Mean Score Before | Mean Score After | Signif- icance of $t$ ($T$) |
|---|---|---|---|
| Q7B ...you feel about living here? | 3.7 | 2.9 | .074(.075) |
| Q8B ...the staff feel about you? | 3.4 | 3.6 | .709(.638) |
| Q9B ...the other residents feel about you? | 3.9 | 4.0 | .774(.790) |
| Q10B...you feel about your day program? | 3.7 | 4.5 | .111(.139) |
| Q11B...you feel about the staff? | 3.6 | 4.2 | .276(.272) |
| Q12B...you feel about the other residents? | 3.7 | 3.6 | .822(.875) |
| Q13B...you feel about yourself? | 3.5 | 4.0 | .394(.394) |
| OVERALL SCALE | 26.8 | 26.9 | .940(.638) |

---

Remarkably, none of the changes reached even the .05 level of statistical significance. The decreased satisfaction with the living situation came close, as did the rise in satisfaction with the day program. But strictly speaking, we cannot infer that there were any real changes in these measures of satisfaction.

# Discussion

The central question of the Pennhurst Longitudinal Study for the Temple University part of the effort was "Are people better off?" In the consumer interviews section of the study, the answer seems to be that the people (in our sample of verbal people) who have moved to CLAs are, in fact, better off. They are better off in terms of their own verbally expressed satisfaction with various areas of their lives, particularly with the place where they live.

In our explorations of reliability, we found generally higher consistency than in prior work, but we certainly agree with the body of work by Sigelman and colleagues that it is essential to include check questions in this kind of work. Hence asking questions in several ways, and in several formats, is important. Answers given to varied formats must be compared, and then the presentation of the results should give weight to the consistent, reliable responses. We believe that the extra effort required to perform quality interview work with people with mental retardation is amply justified.

This study revealed no strong preference as to the best question formats to use with people with mental retardation. Probably because of our preselection of people with verbal skills, nearly everyone was able to respond to all the formats (Yes-No, Either-Or, Multiple choice, Open-ended) most of the time.

Our surprising finding of sharply reduced inconsistency rates on the second interview was of considerable, although subsidiary, interest. Many explanations for the phenomenon are possible, including the idea that the first interview may have been the first time the people were asked for their opinions in a formal way by a stranger, and that, with even a little practice, they became more able to respond in such a situation. Another concerns the possibility of increased trust of, and rapport with, our interviewer. Similarly, it is possible that our interviewer gained in skill in probing answers by the time of the second interviews. If any of these explanations were the case, they could pose a threat to the validity of the increased satisfaction findings since improved ability to respond to interviews, or improved openness, or improved interviewer technique could all be potential explanations for the changes in satisfaction. However, both the movers and the stayers displayed sharp reductions in contradictions, but only one group showed the increases in satisfaction, so there does not seem to be a direct threat to validity in this area.

Finally, the stayers in this sample did not change significantly in their self-expressed satisfaction. There was a suggestion of increased satisfaction with the day program; one would hope that the decreased population of the Pennhurst Center has enabled more people to attend day programs, and to receive more individual attention when they do.

Originally, we did not expect to be able to investigate changes among the stayers, which could help to illuminate the effects of institutional phase-downs, but the opportunity to do so was welcome. We hope that similar work will continue here and elsewhere, so that the feelings of people who have lived in facilities for decades are taken into account as those facilities are phased down.

137

# References

Birenbaum, A. & Re, M.A. (1979).  Resettling mentally retarded adults in the
    community - almost 4 years later <u>American Journal of Mental Deficiency</u>,
    83, 323-329.

Birenbaum, A. & Seiffer, S. (1976).  <u>Resettling retarded adults in a managed
    community</u>.  New York:  Praeger Special Studies.

Conroy, J. & Beyer, F. (1979). <u>A comparison of two interview methods with
    mentally retarded persons:  Personal and telephone</u>. Philadelphia:
    Temple University Developmental Disabilities Center.

Edgerton, R.B. (1969).  <u>Cloak of competence</u>.  Berkeley: University of
    California Press.

Edgerton, R.B. & Bercovici, S.M. (1976).  The cloak of competence: Years
    later.  <u>American Journal of Mental Deficiency</u>, 80, 485-497.

Rosen, M., Floor, L., & Zistein, L. (1974).  Investigating the phenomenon of
    acquiescence in the mentally handicapped:  I - Theoretical model, test
    development, and normative data.  <u>British Journal of Mental
    Subnormality</u>, 20, 58-68.

Seltzer, G. (1980).  Residential satisfaction and community adjustment.  Paper
    presented at the American Association on Mental Deficiency, San
    Francisco, May 1980.

Sigelman, C.K., Budd, E.C., Spanhel, C.L., Shoenrock, C.J. (1981). When in
    doubt, say yes:  Acquiescence in interviews with mentally retarded
    persons.  <u>Mental Retardation</u>,19, 53-58.

Sigelman, C.K., Schoenrock, C.J., Spanhel, C.L., Hromas, S.G., Winer, J.L.,
    Budd, E.C., & Martin, P.W. (1980). Surveying mentally retarded persons:
    responsiveness and response validity in three samples.  <u>American Journal
    of Mental Deficiency</u>, 84, 479-486.

Sigelman, C.K., Schoenrock, C.J., Winer, J.L., Spanhel, C.L., Hromas, S.G.,
    Martin, P.W., Budd, E.C. & Bensberg, G.J. (1979). <u>Issues in interviewing
    mentally retarded persons: An empirical study</u>. Lubbock, Texas:  Research
    & Training Center in Mental Retardation, Texas Tech University.

Sigelman, C.K., Winer, J.L., Schoenrock, C.J., Hromas, C.L. (1978). <u>Performance
    of the mentally retarded in interviews: Responsiveness to questions</u>.
    Lubbock, Texas:  Research & Training Center in Mental Retardation, Texas
    Tech University.

Spanhel, C.L, Sigelman, C.K., Schoenrock, C.J., Winer, J.L., Hromas,

S.G.(1978).  The feasibility of interviewing the mentally retarded: responsiveness, reliability, and response bias. Lubbock, Texas: Research & Training Center in Mental Retardation, Texas Tech University.

Winer, J.L., Sigelman, C.K., Schoenrock, C.J., Spanhel, C.L, Hromas, S.G. (1978).  The performance of mentally retarded children on repeated and alternative format interview questions.  Lubbock, Texas:  Research & Training Center in Mental Retardation, Texas Tech University.

# CHAPTER 6
# QUALITIES OF ENVIRONMENTS

# Assessment of Environments Case Study:

## Access to Generic Resources

Joan left Pennhurst in June 1980, after having lived there since May 1969. Joan has Down's Syndrome and is legally blind. At 4 years of age, Joan had eye surgery which revealed a congenital cataract in her "good eye." As she got older, her eyes began to atrophy, as did the muscles around them. Joan had significant instances of self-abusive behavior while at Pennhurst. Her self-abusive behaviors consisted of face-slapping, mainly around her eyes. In addition, Joan has been known to spit at and pinch others.

Joan's move to the community in the summer of 1980 was fairly uneventful. She moved into her new home in the suburbs with 2 other women, one of whom had lived at Pennhurst and the other of whom had lived at another state-operated mental retardation facility. Joan seemed to adjust to her new home fairly well. She learned new skills at a steady pace, yet her inappropriate behaviors remained the same.

Over the next two years, Joan's self-abusive behaviors increased steadily, especially face-slapping to the area around her eyes. The community doctor believed there was no medical problem and did not deem it necessary to bring Joan into his office for a visit.

In December of 1982 a new project director took over Joan's program. When she assessed Joan's behavior problems, she made several changes, including bringing in a new house team leader and getting a new behaviorist and general practitioner. Joan's parents were quite upset with the regression their daughter was experiencing, and contacted staff on a daily basis. The project director met with the Harris's and suggested that Joan's problems with self-abuse may have been due to irritation in or around her eyes. When the project director suggested an evaluation at Wills Eye Hospital, Mr. and Mrs. Harris were hesitant, as they believed that Pennhurst had exhausted all options with regard to Joan's vision or lack thereof. After some coaxing, the Harris's consented to an evaluation at Wills. The evaluation concluded that, due to the atrophy of Joan's eyes and the muscles surrounding them, her upper and lower eyelids had grown inward, causing her irritation and pain. The opthamologist suggested that Joan should be considered for prostheses to alleviate the irritation.

In February 1983, after numerous fittings and close communication with one of the only ocularists in the city, Joan received her prostheses. Over the past year Joan's behavior has improved considerably. The incidence of self-abuse has decreased appreciably, and when Joan does slap herself it is never around her eye area. Joan seems very happy with her new eyes, and, most important, she is no longer in pain.

# Introduction

In this part of the Pennhurst Study, we address the question of whether people are "better off" in terms of the qualities of the places in which they live. We have consistently used the phrase "qualities" of environments to emphasize the fact that there is no generally accepted measure of quality; instead, there are many measures of environmental quality in use, and we have used several.

In the first part of this chapter, we describe the methods and results of our investigation of differences between Pennhurst and the CLAs in terms of normalization and individualization. In the second part, we present a summary of our efforts to identify and measure aspects of community residential settings that are correlated with developmental progress among the people living in them.

# Methods: Institution to Community

## Instruments

Four dimensions of the environmental program quality of the service setting were measured at the institution: (1) PASS-3 (Program Analysis of Service Systems; Wolfensberger & Glenn, 1975), a widely used measure of normalization; (2) selected portions of the Accreditation Council Standards for Mental Retardation & Developmental Disabilities (ACMRDD), chosen by ACMRDD field experts to measure physical and (3) programmatic aspects of the environment; and (4) the Resident Management Survey (King, Raynes, & Tizard, 1971; Balla, 1976), which measured the extent to which treatment was institution-oriented versus individual-oriented, or, in other terms, the degree of individualization versus regimentation.

PASS-3 may be thought of as a quantification of the normalization ideology. It is the oldest and most widely used instrument for that purpose.

As it is usually applied, about six to 15 person days are needed for a complete 50-item rating. Because our resources would not permit that level of effort for each of hundreds of CLAs, it seemed that PASS could not be included among our environmental measures. After considerable literature review and nationwide contact with experts, a solution was found. Flynn & Heal (1981) had developed a shortened version of PASS-3. They identified an 18-item subset that was correlated at r=.965 with the full 50-item PASS-3 scale. We concluded that the 18-item short form, administered by highly experienced raters, would be ideal for this study.

The ACMRDD standards consisted of 807 Yes-No items. In August 1979 the project engaged Mr. Terry Perl, former head of the Survey Procedures Committee of ACMRDD, and Mr. William Snauffer, director of a corporation that employed experienced ACMRDD field surveyors, as consultants. The purpose of the consultation was to reduce the ACMRDD standards to two subsets, focused on physical standards and program standards. From the full 807 standards, 323 were selected as core items representing physical and programmatic aspects of environments. The core item checklist was pilot-tested at a residential school in Maryland. Two survey teams of four members each performed independent evaluations in order to assess inter-team reliability. The consultants then selected 41 items concerning the physical environment and 106 for programming that were most readily applicable to both institutional and community programs.

After the institutional assessments were conducted, and the data analyzed, it was decided that use of the modified physical and program standards of ACMRDD be terminated. Our attempts to identify any relationship between individual growth within the institution and either ACMRDD environmental score had met with no success. After trying simple correlations, partial correlations controlling for individual characteristics, and multiple

regression of various forms, we had not been able to detect a relationship.
Moreover, ACMRDD central office staff and at least one board member took strong
exception to this experimental study of the standards. Among the public
objections were the contention that the standards should not be considered as a
scale, that the institutional cottage sampling was inadequate, that the
specific items selected and the way they were selected were questionable, and
that one of our methods of statistical analysis was misleading. Our repeated
offer to provide the data tape for ACMRDD to conduct its own search for a
relationship between growth and the ACMRDD characteristics of the living area
received no response. In this atmosphere, and because the ACMRDD standards
were extremely labor-intensive and expensive to collect, we decided to abandon
all efforts to validate the utility of those standards.

The Resident Management Survey (RMS) was designed to differentiate
institution-oriented from individual-oriented care practices. King, et al.
(1971) used this scale to compare care practices in institutions (size
121-1650), voluntary homes (50-93), and hostels or group homes (12-41). They
found that the instrument was a sensitive measure of individualized versus
regimented treatment, with the group homes being the most individualized and
the institutions the least. McCormick, Balla, and Zigler (1975) later
replicated these findings and extended them cross-culturally. More recently,
the instrument was adapted for wide use in conjunction with the Individualized
Data Base at UCLA. Because of its wide use, prior findings, and the
theoretical importance of the RMS in comparing institutions to community
settings, it was included.

## Sample

At the institution. In October 1978 there were 45 living areas at Pennhurst. The first principle of our approach was that we should not do one environmental rating for the whole institution since there was likely to be considerable variation among living areas. We could not, however, rate every living area. Therefore, it was necessary to crosstabulate the characteristics of the people in the living areas (using our 1978 Pennhurst behavioral and demographic data) and look for natural clusters of similar living areas. When this analysis was performed, Pennhurst fell into 10 clusters of living areas. We then randomly selected one living area to represent each cluster. We wanted to be able to assign a normalization score, two ACMRDD scores, and an RMS score to each individual's living area as accurately as possible.

In the community. With respect to environmental ratings in the community, sampling was not possible. We had no data at the beginning of the study to even test the clustering idea. Therefore, each CLA was rated along all environmental dimensions.

We decided to add three other environmental quality instruments before we began the community phase of data collection: the Life Safety Codes Instrument, Characteristics of the Treatment Environment (CTE), and Characterisitics of the Physical Environment (CPE).

The Life Safety Codes Instrument was developed by the Evaluation & Research Group at Temple University's Developmental Disabilities Center. It recorded adherence to life safety codes, emergency procedures, staff preparation for emergencies, and so forth. This instrument also contained selected items from the standards for intermediate care facilities.

Characteristics of the Treatment Environment (Jackson, 1969) was developed to measure the degree to which autonomy and activity are encouraged in the residential setting. It was revised in 1977 (Silverstein, McClain, Hubbell and Brownlee, 1977). Silverstein et. al. identified 10 items from Jackson's original scale that produced the highest item-factor correlations with the scale's two factors: autonomy and activity. This instrument was designed to be collected by interview with appropriate CLA staff.

Characteristics of the Physical Environment was developed by the Developmental Disabilities Project on Residential Services and Community Adjustment at the University of Minnesota (1981). This instrument measured the degree to which the environment was home-like. Each of five rooms was assessed on a five-point scale with "1" indicating a very home-like environment and "5" indicating a very non-home-like environment. This instrument was designed to be completed by the site reviewer after direct observation of the residence.

## Procedures

At the Institution. For Normalization and RMS ratings, it was desirable to locate a number of people highly familiar with PASS-3, because normalization assessment in the field presupposed intensive training. We were supplied with a list of 18 persons who were not only familiar with PASS-3, but were qualified as PASS-3 Team Leaders or Assistant Team Leaders. A training workshop was held in September 1979. The 18-item short form of PASS-3 (which we will henceforth call the Normalization Instrument, because it is not actually PASS-3) and the RMS were presented and explained. The normalization and RMS assessments in the institution were performed by two-person teams in September 1979. The interrater agreement appeared to be sufficiently high (Flynn & Heal, 1981) to justify later reduction of field team size in the community to one rater per site. This was seen to be cost effective, as well as less intrusive.

147

The condensed ACMRDD surveys were performed by a team of three qualified and experienced surveyors. For the Physical Standards section, the surveyors performed an on-site inspection to complete their checklist of 41 items. For the Program Standards section, the Principal Investigator was asked to draw a small simple random sample of three to six individuals in each selected living area. The surveyors assessed the individual records of each individual thus drawn, visited each unit, interviewed staff, and completed their 106-item Program Standards checklist for each individual.

The institutional environmental data were coded and keypunched and entered into the computer record of each person at Pennhurst. Each individual was given a normalization score, an RMS score, an ACMRDD physical standards score, and an ACMRDD program standards score.

In the Community. At the second training session, held in early 1982, site reviewers were retrained in Normalization and the RMS, and were trained in the use of the three new environmental instruments (CTE, CPE, Life Safety Codes). The three new instruments added approximately 1/2 hour to the review.

In March 1982, data collection began in the community. As of that time, approximately 200 people had been relocated from Pennhurst to the community. One site reviewer went to each site where a former Pennhurst resident lived; each reviewer collected the Normalization Scale, the RMS, the CTE, the CPE, and the Life Safety Codes instruments (in addition to a Behavior Development Survey for each individual). Once the data were collected, they were entered onto the record of each individual, thus enabling comparison between institutional and community scores on the environmental instruments.

148

# Results: Institution to Community

## Within Pennhurst

In 1980, the Behavior Development Survey was collected for all 713 individuals who remained at Pennhurst, and whose county of origin was one of the five counties in the Southeast Region of Pennsylvania (Bucks, Chester, Delaware, Montgomery, and Philadelphia). Comparison of those BDS scores to the ones collected in 1978, revealed that people had gained an average of 1.24 points in adaptive behavior.

The environmental variables were tested for relationship to the amount of behavioral growth displayed by the people in the Pennhurst living areas. In one approach, we examined simple correlations, in a second approach we used partial correlations controlling for 1978 adaptive behavior, and in a third we used several forms of multiple regression. In the regression analyses, we forced individual characteristics to enter the equation first, because the nature of the question we were asking was whether environmental variables could account for individual growth above and beyond the growth that was accounted for by unchangeable individual characteristics (e.g., sex, age, or level of retardation).

Above and beyond the growth that could be explained by unchangeable individual characteristics, we identified a few programmatic variables that showed suggestions of statistical significance, depending on the choice of statistical technique. The analyses suggested that, individual characteristics being equal, greater time in day program could make a difference in growth, as could individualized treatment (as measured by the RMS) and fewer medications daily. In addition, other forms of analysis implied some effects of compliance with the ICF standards, smaller living areas, more staff, and residential continuity. However, regardless of the statistical procedures used, these

149

programmatic variables could not account for very much of the variation in growth among the people living at Pennhurst. Compared to unchangeable individual characteristics, these program and environmental variables appeared to be relatively weak in predicting, or explaining, variations in individual growth.

## 1982 Community Data

The results of the first round of data collection in the community are summarized in Table 6-1, which gives the average Normalization scores and RMS scores for individuals from the five counties while they were residing at Pennhurst and once they had moved to the community.

---

TABLE 6-1
AVERAGE NORMALIZATION AND RMS SCORES FOR INSTITUTION

AND COMMUNITY BY COUNTY

| County | N | NORMALIZATION | | RMS | |
|--------|---|-----------|-----|-----------|-----|
| | | Pennhurst | CLA | Pennhurst | CLA |
| 1 | 14 | −239 | 152 | 54 | 66 |
| 2 | 22 | −237 | 163 | 55 | 66 |
| 3 | 29 | −247 | 110 | 60 | 64 |
| 4 | 34 | −226 | 177 | 58 | 64 |
| 5 | 58 | −226 | 207 | 58 | 65 |
| Average scores | | −232 | 172 | 58 | 65 |
| Average change | | 404 | | 7 | |

---

The people who had moved into CLAs had clearly experienced a large increase in the degree of normalization (from −232 to +172), and a significant increase in the degree of individualization (from 58 to 65), as measured by our short version of PASS-3 and by the RMS. The conclusion from these measures was that

150

people who had moved to CLAs were better off in terms of these two environmental qualities.

The county tabulation shows, in addition, that there were significant variations among Normalization scores received by CLA programs in different counties; however there was practically no variation among RMS scores in CLAs in different counties. This illustrates why the RMS was eliminated from the CLA data collection process; all CLAs were at or very near the top of the scale.

# Methods: Within the CLAs

## Instruments

For the second round of community data collection, the environmental assessment package was revised. We decided to keep the normalization measure derived from PASS-3, because the questions it addressed were basic and essential, and were not addressed by the other environmental measures. The Resident Management Survey was dropped in 1983, after the institution to community changes had been assessed. The RMS was replaced with the Group Home Management Schedule (Pratt, 1969), another measure of individualization versus regimentation, but designed to be more sensitive to the less obvious variations among community programs.

The Characteristics of the Treatment Environment was also dropped in 1983 for the same reason the RMS was eliminated: almost all CLAs received the highest possible score. The study team decided that replacement of this instrument was unnecessary because our normalization scale covered the same or similar areas.

The Characteristics of the Physical Environment was replaced by the Physical Quality Instrument (PQI) (taken from a modification of the MEAP Rating Scale created by Seltzer, 1982, and further modified by our group). The

151

Physical Quality Instrument was found to be a more thorough measure of the pleasantness of the residential site. This instrument also assessed the physical quality of the neighborhood in which the homes were located. As with the CPE, the PQI was completed by the site reviewer after the site review, including a tour of every room.

## Procedures

Since approximately 100 additional individuals had been relocated from Pennhurst to the community, it was necessary to recruit additional site reviewers to complete the environmental assessments. We recruited 10 more individuals who had been PASS trained through the Commonwealth of Pennsylvania's PASS training program. At a four day training session held late in 1983, site reviewers were retrained in the Normalization Scale, and were trained in the use of the three other environmental instruments (GHMS, PQI, Life Safety Codes). The three instruments took approximately 1/2 hour to administer, the same as in the previous year.

Data collection occurred late in 1983 and early in 1984. One site reviewer went to each site where a former Pennhurst resident lived; each reviewer collected the BDS, the normalization scale, the GHMS, the Life Safety Codes Instrument, and the PQI.

# Results: Within the CLAs

One of the original aims of the Pennhurst Study was to explore the differences in enviromental qualities between institution and community, and we did so.  Equally important was the question of what environmental qualities in community programs would "make a difference."  That is, it was important for policy makers and program operators alike to know how programs could best be designed to foster individual growth and development.  We therefore used the Pennhurst Study data set to investigate whether any of our environmental quality measures were associated with individual growth and development among people living in CLAs.

The analysis presented here was based on the data collected for all people in CLAs in 1983 and 1984.  This was the most recent information available, and it also included the largest number of people.  We further selected people who were living at exactly the same CLA, with the same street address, in 1983 and 1984, in order to eliminate people who had changed environments, even if they only moved to an apartment across the hall.  This assured us that the physical environment, at least, was relatively constant.  There were 320 people in the study's data base who met these criteria.

The index of individual growth and development was the change in adaptive behavior from 1983 to 1984 as measured by the Behavior Development Survey.  The 320 individuals in the analyses had gained an average of 2.0 points between 1983 and 1984; actual changes ranged from a 45 point loss to a 34 point gain.

Literally hundreds of variables were available to test for association with growth, but our interest in this analysis was in the environmental variables.  The first analysis was a simple Pearson correlation.  The variables selected were the following environmental measures:  number of other residents living at the site, hours of developmental service, hours of day programming,

153

Group Home Management Schedule score, Physical Quality score, Normalization Score, Characteristics of the Treatment Environment score and total staff hours.

Of all the variables entered into the Pearson correlation, shown in Table 6-2, the only significant correlation was between adaptive behavior growth and the Group Home Management Schedule score (r=-.20, 314 df, p=.001). This suggested that individuals living in more regimented settings gained more in the area of adaptive behavior. This was a paradoxical finding, because the prevailing wisdom indicated that more regimentation would inhibit growth.

---

TABLE 6-2
ASSOCIATIONS BETWEEN
ENVIRONMENTAL MEASURES AND INDIVIDUAL GROWTH
WITHIN CLAs

|  | Simple Correlation with 1983 - 1984 gains in Adaptive Behavior score |
| --- | --- |
| Number of residents | -.09 |
| Hours of developmentally-oriented service per day | .05 |
| Hours of day program per day | .00 |
| Group Home Management Schedule | -.20 * |
| Physical Quality Instrument | -.06 |
| Normalization Instrument | .04 |
| Total staff hours per week | -.06 |
| Characteristics of the Treatment Environment | -.10 |

---

It is a well established fact that much of the variance in gain scores, no matter what the context, can be accounted for by initial scores (Cronbach & Furby, 1970). In our case, the 1983 adaptive behavior scores were significantly correlated with the gain scores ($\underline{r}$=-.24, (318), $\underline{p}$<.001). The negative correlation meant that people who started out with lower scores were likely to gain the most, and people who started out with higher scores were likely to gain the least.

We also know that many environmental measures are correlated with the level of functioning of the people living in the environments; for example, the Group Home Management Schedule measures the degree to which the environment fosters expression of individual choices, as opposed to having blanket rules and regimentation for all. But obviously there would tend to be less evidence of individual freedom of choice among people with profound mental retardation than among people with mild mental retardation. Hence such a measure might yield higher scores for settings with higher functioning people.

If the environmental measures are correlated with initial adaptive behavior, and initial adaptive behavior is negatively correlated with gain scores, then possible relationships between the environmental variables and gain may be masked if we rely solely on simple Pearson correlations. It is useful to try to remove this confounding influence from the analysis. One mathematical way of doing so is to use partial correlations. A partial correlation gives a measure of the relationship between two variables while adjusting for the effects of one or more additional variable. (As an example, suppose it is found that there is no correlation between the number of firefighters and the speed of putting a fire out. Should the mayor cut the number of firefighters? No, because partial correlation shows a strong relationship between the number of firefighters and the speed of extinguishing,

when we adjust for the size of the fire.)

To see how strongly our environmental measures were influenced by the level of functioning of the people in the settings, we computed the correlations of each of the environmental measures with initial (1983) adaptive behavior. Positive correlations were found with the amount of day programming, the Group Home Management Schedule, the normalization scale, and the Characteristics of the Treatment Environment. Negative correlations were found with the number of other residents and the total number of staff hours per week. The simple correlations are shown at the left of Table 6-3.

----------------------------------------------------------------------------

TABLE 6-3
PARTIAL CORRELATIONS BETWEEN ENVIRONMENTAL
MEASURES AND INDIVIDUAL GROWTH WITHIN CLAs,
CONTROLLING FOR 1983 ADAPTIVE BEHAVIOR

|  | Simple Correlation with 1983 Adaptive Behavior | Partial Correlation with Gain in Adaptive Behavior |
|---|---|---|
| Number of residents | -.14 * | -.13 * |
| Hours of developmentally-oriented service per day | -.04 | .04 |
| Hours of day program per day | .20 ** | .05 |
| Group Home Management Schedule | .43 ** | -.12 * |
| Physical Quality Instrument | .02 | -.05 |
| Normalization Instrument | .31 ** | .12 * |
| Total staff hours per week | -.47 ** | -.20 ** |
| Characteristics of the Treatment Environment | .47 ** | .00 |

* p<.05
** p<.001

----------------------------------------------------------------------------

The simple correlations in Table 6-3 indicated that some of what the environmental variables were measuring was the functional level of the people living in the environments.  This is not a desirable property for a measure of environmental quality.  The data specifically showed that higher functioning individuals: (a) were in smaller settings, (b) were in settings that required fewer total staff hours, (c) received more day programming, and (d) lived in less regimented settings where normalization, autonomy and activity were encouraged.

Table 6-3 also presents the results of the partial correlation analysis. When the confounding effect of the relationship between the environmental measures anhd the adaptive behavior of the people in the setting was removed, four partial correlations between environmental measures and adaptive behavior gain were significant:  number of residents ($\underline{r}$=−.13, (308), $\underline{p}$=.019), Group Home Management Schedule score ($\underline{r}$=.12, (308), $\underline{p}$=.030), Normalization score $\underline{r}$=.12, (308), $\underline{p}$=.032), and staff hours per week ($\underline{r}$=.20, (308), $\underline{p}$=.001).

These partial correlations suggested that, when controlling for differences in initial adaptive behavior scores, the people who tended to make larger gains within the CLAs were those who lived:  (a) in smaller CLAs;  (b) in more regimented CLAs;  (c) in CLAs with higher normalization scores; and (d) in CLAs in which fewer total staff hours per week were expended.

Findings (b) and (d) were puzzling, so both were explored further.  Both the Group Home Management Schedule and the total number of staff hours were correlated with the size of the CLA, and possibly both were acting through size to product misleading partial correlations.  However, partial correlations of the Group Home Management Schedule and staff hours with growth, controlling for initial adaptive behavior $\underline{and}$ size, were still significant, and about the same magnitude.

We stress, however, that none of these partial correlations were overwhelmingly large; instead, they indicated significant, but weak, relationships. It should also be noted that these results do not represent a model of growth, since a series of partial correlations was used. These relationships may not lead to the same conclusions as multivariate techniques, and moreover the methods used here assume that the variables are all related in simple linear fashion. The validity of that assumption merits further investigation before drawing final conclusions about the nature of quality in services for people with mental retardation.

## Discussion

These five years of work on measurement of envinronmental qualities has been intriguing and rewarding, but has not produced any final list of things that "really matter" nor has it resolved all of the problems of measurement in this arena. At the time of this writing, however, the support of our entire behavioral and environmental assessment process has been taken over by the Commonwealth of Pennsylvania as a monitoring system. Hence, although the five years of Federal funding are over, work in this crucial area will continue into the foreseeable future.

A few things did emerge that were very clear. One is that when people moved from Pennhurst into CLAs in Pennsylvania under this Federal court order, they went into settings that were much "better" in terms of our measures of normalization and individualization.

In fact, the change was so extreme that our measure of individualization (the RMS) ceased to be of value after people moved to CLAs. Practically all of the CLAs attained the highest possible score on that scale. This implies that institutional environments and small community environments are so different that it may be an error to try to use the same set of of standards for both.

That could result in unrealistic demands for large institutional settings and unnecessarily low expectations from community programs. It is possible that we would be wiser to start from scratch in developing standards for community programs, rather than trying to tinker with and adapt the existing institution-oriented standards.

Another is that many so-called "environmental" measures are highly sensitive to the characteristics of the people living in the setting being rated. We hope that this will further impel the effort to develop standards and measures that are indpendent of the functional level of the people being served. Even our normalization measure, which definitely should be independent of individual functional level, was not. This need for "functional-level-free" measures of environmental quality is similar to the need for measures of individual intelligence that are free of "culture-bias."

We were not able to discern relationships between aspects of one of the most widely used set of program standards in the nation (ACMRDD) and individual growth and development within the institution in this study. That does not mean that a relationship does not exist, and we hope that others will investigate this issue in a rigorous scientific manner. It seems to us extremely important that programmatic standards should be shown to be associated with continual increases in the independent functioning of the people served. These comments apply also to the multitude of other standards and licensing instruments that are used at national, state, and local levels; we urge a great deal more scrutiny of validity (particularly predictive validity vis-a-vis growth).

During the research process, we were constantly reminded that growth is not the only criterion of a good environment. Our measures of Physical Quality and Life Safety, for example, were completely unrelated to people's functional

level or their growth. Yet not one of our site reviewers would suggest dropping those measures. There is clearly a place for standards of comfort, safety, and other areas that may have nothing to do with individual development. Of course, they too must be demonstrably reliable.

We constantly tested the reliability of our environmental instruments. One concern involved our Normalization Scale, because preliminary analyses showed that the Normalization Score of a given CLA could change a large amount from one year to the next. Although such phenomena may be genuine, they may also arise from a lack of one or more kinds of reliability. (We must emphasize that this concern about reliability was only about our normalization measure as we applied it with single site reviewers -- our work did not use the full PASS-3 scale.) Our work will continue in this area.

Over the years, our impressions from service providers have led us to the conclusion that skepticism about the reliability of environmental measures and standards is a major problem. It seems understandable that the agencies object to any review in which the result depends on the orientation of the reviewer who is sent out that year. To the extent that they believe that luck is involved, providers will gradually become cynical and resentful. That is certainly not a desirable product of the quality assurance process. We therefore call for far greater attention to the interrater reliability of the existing standards, licensing, and environmental quality measures. Data collection instruments may need to be revised or replaced, and reviewer training may need to be intensified. We see considerable promise in the use of videotaped site reviews to train surveyors and to test their scoring accuracy.

We have continually perceived the quiet presence of a significant question about the entire issue of environmental measures and program standards. In simple terms, that question is to what extent is it feasible to measure

qualities of the environment in a brief visit to a residential program? Some researchers have suggested that literally nothing useful can be learned about the quality of a program in less than several weeks of direct presence and observation. Because that is not likely to be practical for large systems of very small community residences, we must continue to face the question of how well we can measure things in brief visits, and whether we can establish that the things measured make a real difference in the lives of the people served.

Our investigation of environmental corrlelates of growth in community settings led to some provocative, if not conclusive, analyses. The data suggested that, adjusting for initial adaptive behavior, people in smaller settings tended to display more growth. People in more normalized settings tended to display more growth. The analysis suggested, however, that people in settings that were more regimented (as measured by the Group Home Management Schedule) did slightly better. Such a finding, although it could be accurate, is certainly not in line with the general trend of current professional theories in the field. We hope that others will investigate the possibility that a certain amount of structure is necessary and beneficial (although that amount varies according to the level of functioning of the people served), and that below this amount, less growth will occur. The question for scientific study is: how much "restrictiveness" is proper for which kinds of people?

# References

Balla, D. (1976).  Relationship of institution to quality of care:  A review of the literature.  <u>American Journal of Mental Deficiency</u>, <u>81</u>, 117-124.

Cronbach, L., & Furby, L. (1970).  How should we measure change -- Or should we?  <u>Psychological Bulleting</u>, <u>74</u>, 68-80.

Flynn, R.J., & Heal, L.W. (1981).  A short form of PASS 3:  A study of its structure, interrater reliability, and validity for assessing normalization.  <u>Evaluation Review</u>, <u>5</u>, 357-376.

Jackson, J. (1969).  Factors of the treatment environment.  <u>Archives of General Psychiatry</u>, <u>21</u>, 39-45.

McCormick, M., Balla, D., & Zigler, E. (1975).  Resident care practices in institutions for retarded persons.  <u>American Journal of Mental Deficiency</u>, <u>80</u>, 1-17.

King, R., Raynes, N., & Tizard, J. (1971).  <u>Patterns of residential care: Sociological studies in institutions for handicapped children</u>.  London: Routledge and Kegan Paul.

Rotegard, L., Bruininks, R., & Hill, B. (1981).  <u>Environmental characteristics of residential facilities for mentally retarded people</u>.  Minneapolis: University of Minnesota, Developmental Disabilities Project on Residential Services and Community Adjustment, Project Report # 15.

Silverstein, A.B., McClain, R.E., Hubbell, M. & Browniee, L.  (1977). Characteristics of the treatment environment:  A factor-analytic study. <u>Educational and Psychological Measurement</u>, <u>37</u>, 367-371.

Wolfensberger, W., & Glenn, L.  (1975).  <u>Program Analysis of service systems 3:  A method for the quantative evaluation of human services</u>.  Toronto: National Institute on Mental Retardation.