# CHAPTER 7
# FAMILY IMPACTS

# Family Impacts Case Study:
# A Case of Guilt

Susan left Pennhurst in 1974, before the Pennhurst litgation began; therefore, by current definition she is not a class member. She was included in the case studies as part of a comparison group of individuals who had been living in the community when the litigation started.

Since Susan moved to the community she has lived in 2 different homes. As a result of Susan's ambulation problems, the provider felt it would be better for Susan to live in a ranch-style home. Susan's ambulation problems were caused by chronic phlebitis, which has required hospital care on several occasions.

While Susan was at Pennhurst, she had little or no contact with her family. When she moved to the community, however, family visits increased dramatically. She has been visiting with her family in South Carolina at least 3-4 times a year over the past 10 years. Upon examination of records at Pennhurst and at the group home, it was quite clear that Susan's family (aunts and cousins) felt a great deal of guilt around her living at Pennhurst, yet they were unable to care for her themselves. It seems that, to alleviate their own guilt, they have become a doting family. In fact, they are perpetuating the myth of the sick, helpless, eternal child in Susan. Over the past few years gifts to Susan have been gifts that encourage dependence rather than foster independence. One year they gave her a single bed with bed rails. More recently, they gave her an ejection chair so that she wouldn't have to struggle to get up; she pushes a button and is lifted to an upright position. Staff and the provider agency have been unsuccessful in discouraging such gifts.

While increased family contact is certainly a desired outcome, it should never occur at the expense of the individuals who are struggling so hard, in many cases, to achieve their independence. Certainly, in this case, Susan is getting mixed messages from her family and from staff and others around her.

# Introduction

When Judge Broderick ordered Pennhurst closed, it was obvious that the decision would have an impact on the lives and attitudes of families, as well as on the people themselves. Therefore, part of the Pennhurst Longitudinal Study has been an assessment of the impact of the court orders on families.

Strangely, no prior study of family reactions to and feelings about alternatives to institutional care included family contact before and after deinstitutionalization. The opportunity to do both was presented by the court decree plus the federal support of the Longitudinal Study. This study therefore became the first to examine changes in family feelings after relocation of a relative. Literature (described below) had already established firmly that most families of people living in institutions were opposed to community placement. The question we were able to address was, if people were placed anyway, how would family behaviors and opinions change?

Families of people in public institutions have been found to be very satisfied with the facilities, and opposed to changes such as community placement. One of the earliest reports of such satisfaction was from Klaber (1969). Surveying parents of people in institutions in Connecticut, he found more than three fourths of them were convinced that the facilities delivered excellent care. Later, Brockmeier (1975) reported similar levels of satisfaction, coupled with skepticism about community-based care, among families of people in Nebraska institutions. In Texas, Payne (1976) discovered the same situation. Overwhelming satisfaction was also reported by Willer, Intagliata, & Atkinson (1979) in New York state. Meyer (1980) found that over 70% of families were satisfied with an institution in Pennsylvania, and were against the idea of community placement. Our own initial findings in the Pennhurst Study were released in 1980, and showed the same pattern. Atthowe &

Vitello (1982) detected similar feelings among families in New Jersey. In their survey, 54% expected no more than custodial care, and 91% said the institutional care was adequate or better.

Payne (1976) also identified a "deinstitutional backlash," a loosely knit countermovement of various local and state-wide associations of parents organized in support of institutions as opposed to community living arrangements (CLAs). While many families of people in institutions see group homes or community living arrangements (CLAs) as a viable way to care for some people, most prefer the institution for their own relatives (Atthowe & Vitello, 1982; Frohboese & Sales, 1980; Payne, 1976). Similarly, Ferrara (1979) documented that parents of children with mental retardation were much more supportive of normalization activities for children with mental retardation in the abstract than they were for their own children.

Many families believe that there are individuals with mental retardation who will never be able to achieve the level of independence they think is necessary for community living. Further, many families think it is damaging for professionals to create expectations that their children will achieve such independence (National Association for Retarded Citizens [NARC], 1977).

Families generally believe the decision to institutionalize their relatives was permanent and final. Atthowe and Vitello (1982) found that 84% of families believed that their child would stay institutionalized for life. Stedman (1977) suggested that deinstitutionalization of a relative with mental retardation forces the family to question whether institutionalization had been appropriate in the first place. To those families who institutionalized their children, deinstitutionalization represents a "painful revisitation" of the original decision (Willer et al., 1979).

Families also fear the implications of the concept of least restrictive alternative; they fear that their children will not be protected properly in small community settings (NARC, 1977). As Willer, et al. (1979) said:

> In this instance, the individual is moved from a very secure situation where someone else, the state, is responsible for his safety and future. Alternative settings are, by definition, less restrictive, and the family is faced with the belief that increased risk of harm or abuse may occur. (p. 13)

Frohboese and Sales (1980) documented that families believed the state institution to be the least restrictive alternative feasible for their relatives. They perceived greater freedom of movement, independence, and safety within the institution.

Perhaps the greatest concern families have about deinstitutionalization is the permanence of the community settings (Frohboese & Sales, 1980). The question of permanence, in turn, is linked to funding and the duration, amount, source, and intent of that funding. An analysis of funding history and current practices reveals that funding for institutions has continued for nearly 100 years, and federal assistance has grown significantly in the past decade. In contrast, funding for CLAs has come primarily from states and/or short-term federal demonstrations. Recent federal funding initiatives for community programs have not yet been tested fully (Braddock, Howes, & Hemp, 1984). For a family whose concern is that their relative be housed, fed, and clothed in the year 2020, institutional funding may appear to be a safer bet than CLA support.

Thus, a reasonably large array of research in many states shows that most families oppose community placement of their institutionalized relatives. The focus of the Pennhurst Longitudinal Study was to test whether attitudes of Pennhurst families fit this pattern, and then to take the unprecedented next step: test for changes among the same families _after_ community placement of their relatives.

# Methods

## Respondents

There were 713 people residing at Pennhurst in May 1980 who originally came from the five southeastern counties of Pennsylvania. Of these residents, 630 had known relatives. Questionnaires were mailed to each of these 630 families for the Baseline Survey. After two mailings and extensive telephone follow-up, responses were received from 472 families (75%). One-fourth of the non-respondents were telephoned and asked a subset of the survey questions; it was determined that the 472 respondents were representative of the population of 630. (That is, the non-respondents did not differ from respondents in their answers to 19 key survey items, as measured by $t$-tests. Hence the sample was judged to be free of non-respondent bias.)

After the Baseline Survey, we telephoned the families of each of the next 134 people who moved to CLAs; only the families of people who had already been in a CLA for six months were telephoned for the Post-Relocation Survey. The telephone interviews were conducted between January 1981 and February 1984 in four waves.

In the first wave, conducted in early 1981, the 22 families of people who had been in CLAs for six months or more were interviewed. The second wave added 43 more families in mid-1982. In the third wave, in early 1983, there were 54 families of recently placed people, and in the final wave, in late 1983, we spoke with another 15 families. At the end of the Longitudinal Study, then, we had spoken with 134 families of people who had moved to CLAs. In all cases, we had spoken with families who had completed the baseline mail survey form andwhose relatives had experienced the CLA setting for at least six, but less than 12, months.

## Instruments

Two questionnaires -- one for the baseline survey and one for the post-relocation survey -- were developed for the family impacts study. The aims of these instruments were to assess initial attitudes toward deinstitutiona- lization, to measure changes in those attitudes after relocation of the relatives, and to identify demographic variables, such as education, sex, and race, which might possibly relate to attitudes.

Barnes, Krochalk, and Hutchinson (1976) conducted a comprehensive community residential care system study that included a mail survey of families/guardians of individuals with mental retardation. Their survey questionnaire assessed characteristics of the person with retardation, services needed to keep the person living at home, positions on philosophical issues, and the types of facilities preferred for out-of-home placement. Although no item from their questionnaire was used in ours, the Barnes, et al. instrument served as a model for development of the first draft of our questionnaire.

The first draft of the baseline survey was prepared in September, 1979. Two national experts in this field were consulted, and their reviews and recommendations for modification were received in December, 1979. At about the same time, the survey was pretested on nine family contacts whose relatives had moved recently from Pennhurst into the community. This group was selected because they had recently been in the same situation as the population of the study but would not be eligible for the before-and-after study. The pilot test provided feedback which led to improvements in the questionnaire.

Additional criticism and feedback was obtained from several psychologists, and a certified advocate from the Office of the Special Master for Pennhurst, and necessary modifications were made. The revised instrument was submitted to the Office of Management and Budget in February, 1980. In March, that agency

requested additional changes. The final form of the instrument was approved in April, 1980. This baseline questionnaire is included as Appendix 7-1.

The Post-Relocation questionnaire was designed to measure changes in families' attitudes six months after relocation of their relatives with mental retardation. This post-questionnaire was simply a subset of the items on the baseline questionnaire. We also asked an open-ended question, intended to gather any perceptions, attitudes, or feelings not covered in the survey. This post-relocation questionnaire is included in Appendix 7-2.

The instruments contained many questions that addressed the attitudes of the respondent toward deinstitutionalization. The validity of single items can be questioned, because errors and misinterpretations can bias any particular response. This problem is reduced when many similar items are combined into a scale. Therefore the Attitudes Toward Deinstutionalization Scale (ATDS), a simple additive scale composed of 25 items, was constructed. It was well-structured and internally consistent (Cronbach's Alpha = .94). This scale ranged from 1 to 5; the higher the numerical value of the score, the greater the resistance toward deinstitutionalization. The items contained in this simple additive scale are marked with asterisks in Appendix 7-1.

## Procedures

The overall design of the family impacts portion of the Longitudinal Study was pre-post. Families of Pennhurst residents were surveyed by mail in June 1980, before their relatives left the institution. As each resident left Pennhurst, his/her family was interviewed by telephone, approximately six months after the relocation; the six-month delay was intended to permit enough time for each family to develop familiarity with the CLA, and for transitional or temporary relocation phenomena to fade.

170

The decision to use telephone contact for the post-relocation questionnaire was reached only after careful consideration with government officials, consultants, and the project Advisory Committee. It was possible that the change in methods (pre = mail, post = phone) could influence the results. On the other hand, too small an "N" could call the entire family study into question. Not knowing how many people would actually move, and judging the minimum acceptable prepost sample size to be 100, we chose telephone follow-up because it assured collection of data from virtually 100% of the families of people who moved. By mail, we could only be confident of reaching about 70%. As it turned out, there were 136 families of people who moved and met our criteria for this part of the study. If we had done the post-relocation survey by mail, we might have obtained only 95 completed prepost interviews, rather than the 134 we actually received.

## Results

### Baseline Study

The central and most striking finding of the baseline family study was the overwhelming opposition of the families to the idea of community placement. When asked the question, "If your relative were to be selected for movement from Pennhurst to the community, how likely would you be to agree with this decision?", the responses were as follows:

> Very likely to agree . . . . . . . . .9%
> Somewhat likely to agree . . . . . . .5%
> Unsure . . . . . . . . . . . . . 14%
> Somewhat unlikely to agree . . . . . .9%
> Very unlikely to agree . . . . . . . 63%

Thus, 72% of the families of the people still living at Pennhurst in 1980 would have disagreed with any proposal for community placement of their relatives.

In addition, the families were very satisfied with services their relatives were receiving at Pennhurst. In answer to the question, "Overall, how satisfied are you with the services your relative has received from Pennhurst?" the following responses were given:

Very satisifed . . . . . . . . . . 54%
Somewhat satisfied . . . . . . . . 29%
Neutral . . . . . . . . . . . .11%
Somewhat dissatisfied . . . . . . . 5%
Very dissatisified . . . . . . . . .2%

Together, these two questions revealed a clear pattern of satisfaction with the institution, coupled with strong opposition to community placement. This was the primary finding of the baseline study.

Attitudes Related to Opposition. We were also interested in some of the reasons for these initial feelings of the families, and in some related opinions. Analysis revealed that families who were older, and whose relatives at Pennhurst were older, were more opposed to community placement. More educated families were more opposed, and white as opposed to non-white families were more opposed.

An attitude that appeared to be related to feelings about community placement was that 75% of families believed, strongly or somewhat strongly, that their relatives had no potential for further educational or psychological development. Moreover, a family's opinion in this area was not related to the relative's adaptive behavior, IQ, or level of retardation. The fact that it was not related suggested that this pessimistic attitude among the families was not necessarily grounded in empirical observation or rational thinking.

Three of the best known philosophical trends in service delivery in the 1970s and 1980s have been "normalization," the "least restrictive alternative," and "deinstitutionalization." Families were asked for their degree of agreement/disagreement with these ideas and the results showed that they were

172

not in accord with these concepts.  In fact, 32% agreed (strongly or somewhat)
with "normalization," 36% agreed with "least restrictive alternative," and only
19% agreed with "deinstitutionalization."  This lack of agreement suggested
that there was a general pattern of suspicion and distrust of "new" ideas that
might lead to change in the situation of the institutionalized relatives.

There were other opinions that were relevant to opposition to
deinstitutionalization.  For example, only 15% of families agreed (strongly or
somewhat) that funding for community living arrangements was secure and
permanent, and 61% disagreed.  Permanence seemed to be a central issue for
families, and they were clearly not confident of the permanence and security
offered by the new CLA concept.  Similarly, only 18% of families agreed that
all needed services would be available in the community, and only 20% agreed
that CLA staff would be sufficiently knowledgeable and skillful to handle all
situations that might arise with their relatives.

One of the strongest predictors of a family's opposition to community
placement was the family's perception of the intensity of the relative's need
for medical care.  If the family believed that the relative had great need for
attention from doctors or nurses, then that family was likely to oppose
community placement.  A questionnaire item on medical needs was put into both
the family survey and the Behavior Development Survey (BDS), which was our
primary instrument for collection of information about individuals:


    1 =  would not survive without 24-hour medical care
    2 =  has life-threatening condition that requires very
         rapid access to medical care
    3 =  needs visiting nurse and/or regular visits to
         the doctor
    4 =  generally has no serious medical needs


173

In 1978 we collected the BDS for each person living at Pennhurst, from staff, including nurses, and from facility records. We were therefore able to compare the responses from the families to the responses from the facility. The comparison revealed that the facility responses and the family responses did not agree very much at all. Table 7-1 presents the results from both sources.

--------------------------------------------------------------------------------

Table 7-1
Medical Needs as Perceived by Families
and by Facility Staff

FACILITY RESPONSES

|  |  |  | High Need 1 | 2 | 3 | Low Need 4 | Total |
|---|---|---|---|---|---|---|---|
| F A M I L I E S | High Need | 1 | 5 | 7 | 43 | **57** | 112 |
|  |  | 2 | 2 | 3 | 20 | 21 | 46 |
|  |  | 3 | 0 | 5 | 50 | 62 | 117 |
|  | Low Need | 4 | 1 | 2 | 41 | 96 | 140 |
|  | Total |  | 8 | 17 | 154 | 236 | 415 |

--------------------------------------------------------------------------------

The meaning of this table is simply that the families perceived much more intense medical needs among their relatives at Pennhurst than did the staff who were providing direct care. The entry in the table marked by asterisks is the most extreme case of this disparity in perceptions; it represents the fact that there were 57 people about whom the family reported that the person would not survive without 24-hour medical care, but about whom staff reported that there were no serious medical needs.

174

## Post-Relocation Study

<u>Representativeness of the sample</u>.  The 134 people in the Post-Relocation study were generally very similar to the average Pennhurst person, except in age.  The 134 were five years younger on the average, and were admitted to Pennhurst about five years later than the average.  In both adaptive and maladaptive behavior, the 134 people were not significantly different from the average of the Pennhurst population.  The distribution of level of retardation labels was about the same for our sample and the population, as well.  In both groups, 86% of the people were labeled severely or profoundly retarded.

<u>Characteristics of the 134 family respondents</u>.  The 134 family respondents interviewed in the post-relocation study were not very different from the population of 472 families with regard to education, race, sex, and relationship, as Table 7-2 shows.

---

Table 7-2
Demographic Characteristics of Families

|  | Population of 472 Families | Sample of 134 |
|---|---|---|
| Education:  High school or more | 55% | 51% |
| Race:  Non-white | 18% | 16% |
| Sex:  Male | 63% | 51% |
| Relationship:  Parent | 68% | 72% |

---

Furthermore, in analyzing the responses of the 134 family sample to the 25-item scale assessing attitudes toward deinstitutionalization, we found that this group did not differ in initial attitudes from the average Pennhurst family (472), as Figure 7-1 shows.

175

## Figure 7–1



This bar graph showed what the statistics also revealed:  the 134 families were, to begin with, just as opposed to community placement as was the average Pennhurst family.

Because the 134 families initially were not different from the average Pennhurst family, we believe that the findings about attitude changes contained here are generalizable to the entire set of Pennhurst families.  That is, what we have observed for 134 families will probably hold for the remaining hundreds of families.

## General Pre-Post Changes

Satisfaction.  The 134 families in this study were very satisfied with Pennhurst, but are now just as satisfied with the CLAs.  The question we asked was, "Overall, how satisfied are you with the services your relative is receiving from (Pennhurst/the CLA)?"  The responses were on a 5-point scale from "very satisfied" (1) to "very dissatisfied" (5).

The average baseline survey response of the 134 (in 1980, while their relatives were still at Pennhurst) was 1.7, which was identical to the average for all 472 families.  After movement of the 134 relatives to CLAs, their families gave an average response of 1.5, which indicated that they were just as satisfied with the CLAs as they had been with Pennhurst.  This was remarkable because the families had been so opposed to placement, and generally had not expected to be pleased by community services.

Family visits to relative.  Families' visits to their relatives hardly changed.  Initially, 42% of the 134 reported visiting their relatives at least once a month (similar to the 472, at 44%).  After relocation, the figure was 52%, and, though this change was statistically significant, the substantive change was very small. Similarly, 13% of the 134 families reported that their

relative came home for a visit at least once a month (much like the 472 at 11%), but this figure changed only to 15% after relocation of the relative to a CLA. Thus we found no confirmation of the notion that visits to or from the family would become more frequent upon deinstitutionalization.

Perception of medical needs. We obtained the families' perceptions of their relatives' medical needs from 126 of the 134 families in the pre-post study. In general, families perceived serious medical needs among their relatives in 1980, before relocation, and also after relocation. Families continued, for the most part, to view their relatives as being in need of frequent attention from doctors and nurses. On a scale of 1 to 4, families averaged 2.8 both before and after relocation.

## Changes in Attitudes Toward Deinstitutionalization

Overall change. Our general measure of attitudes was the 25-item ATDS, described previously. This overall scale ranged from 1 (in favor of deinstitutionalization) to 5 (opposed). The average score of the 134 families before relocation was 3.5; the average score after relocation was 2.4. This change was highly significant ($t = 12.94$, $= (114)$, $p < .001$). The families were much more positively disposed toward the complex of concepts related to deinstitutionalization after the relocation of their relatives had taken place.

Changes in particular attitudes. The most direct questions about the idea of community placement were measured on 5-point agreement scales. The questions were:

Baseline: If your relative were to be selected for movement from Pennhurst to the community, how likely would you be to agree with this decision?

Post Relocation: Overall since your relative was selected for movement from Pennhurst to the Community, how do you feel about that move?

From pre to post, the changes were dramatic, as shown in Figure 7-2.

## Figure 7-2



The figure shows visually what the data revealed statistically:  these 134 families had drastically changed their positions.  Before relocation, 55% of the families were strongly opposed to community placement, and afterward, only 4% were still strongly opposed (the bars at the extreme right of the figure). Conversely, the bars at the left of the figure show that, before placement, only 19% agreed strongly with placement, and afterward, fully 66% strongly agreed.

Treating the same data statistically, as a pair of 5 point scales, the average score of the families before relocation was 3.8, indicating strong opposition.  Afterward the average was a very positive 1.7, and the change was highly significant ($\underline{t}$ = 13.7, (130), $\underline{p}$ < .001).

## Other Changes

There were a number of other areas in which potential changes from before to after relocation were of interest.  In Question 13, we asked whether families believed changes would occur in 14 areas of their lives; after relocation, we asked whether changes had occurred in the same 14 areas.

Of the 14 items within Question 13, the 12 that showed significant pre-post changes are shown in Table 7-3.  Each item was on a scale ranging from 1 (large change for the better) to 5 (large change for the worse).  For the 134 pre, the means indicate expectations; for the 134 post, the means reflect actual changes.

Table 7-3
Expected and Perceived Changes* in Family Life

|  | 134 Pre (Expected) | 134 Post (Actual) |
|---|---|---|
| a. Your own social life | 3.5 | 2.8 |
| b. Your job | 3.5 | 2.9 |
| d. Family recreation activities | 3.4 | 2.8 |
| e. Your time alone | 3.5 | 3.0 |
| f. Your time with your spouse | 3.4 | 2.9 |
| h. Family vacation | 3.5 | 2.9 |
| i. Your general happiness | 3.7 | 2.1 |
| j. Your relative's relationships with other people | 3.6 | 1.9 |
| k. Your relative's general happiness | 3.6 | 1.7 |
| l. Your relative's relationship with you | 3.1 | 2.5 |
| m. Your relative's relationship with your spouse | 3.3 | 2.7 |
| n. Your relative's relationship with brothers and sisters | 3.1 | 2.6 |

*All changes were significant at the .001 level.

The initial (expected) responses of the 134 families clustered about 3.5 at baseline, which meant they were basically pessimistic about expected changes. Their expectations were exceeded on each of the items shown in Table 7-3. (The two areas in which changes were not significant were "Your spouse's job" and "Your time with your children living at home.") In many areas, the change from pre to post was from negative expectations to an actual observation of no change (e.g., "Your job" went from 3.5 to 2.9, and 2.9 is essentially no change).

In some areas, however, the differences were from negative expectations to post-relocation reports of distinctly positive observations. For example, the largest change reported by the families was in their relatives' general happiness, followed by changes in their relatives' relationships with other people and in the family respondents' own general happiness.

As a concrete example of the magnitude of these differences between expectations and actual experiences, we present the pre and post data for the Relative's General Happiness in greater detail in Table 7-4. (We select this item because of its special interest for families who want to know whether people are perceived to be happier in community settings.)

---

Table 7-4
Change in Relative's General Happiness

Post (Actual)

|  |  | Much Better |  |  |  | Much Worse |
|---|---|---|---|---|---|---|
|  |  | 1. | 2. | 3. | 4. | 5. |
| Much Better | 1. | 19 | 0 | 2 | 0 | 0 |
|  | 2. | 4 | 1 | 0 | 0 | 0 |
| Pre (Expected) | 3. | 7 | 3 | 5 | 0 | 0 |
|  | 4. | 10 | 3 | 2 | 0 | 0 |
| Much Worse | 5. | 20 | 10 | 11 | 4 | 0 |

---

Examining the diagonal from upper left to lower right on Table 7-4, we see that there were 25 families (19 + 1 + 5) whose expectations matched their actual experience. For example, the 19 expected a large change for the better in their relatives' general happiness, and then reported seeing exactly that. Above the diagonal are the families whose expectations were disappointed.

182

There were only two who expected a large change for the better, but saw no change. All the other families, (i.e., those below the diagonal), perceived that the happiness of their relatives had improved beyond their expectations. In fact, at the extreme lower left of the table, 20 families expected a large change for the worse, but actually saw a large change for the better.

In another part of the survey (Questions 14 to 23), we posed a series of 10 specific statements concerning deinstitutionalization, and asked for responses from 1 (strongly agree) to 5 (strongly disagree). All items changed in a positive direction, and 8 were statistically significant. These 8 are presented in Table 7-5.

---

#### Table 7-5
#### Agreement with Specific Ideas

|  | 134 Pre (Expected) | 134 Post* (Actual) |
|---|---|---|
| 14. Relative will not progress beyond present level | 2.0 | 2.9 |
| 17. CLA personnel are knowledge-able and skillful | 3.5 | 1.9 |
| 18. CLA funding is secure | 3.8 | 2.7 |
| 19. All needed services are available in community | 3.8 | 1.8 |
| 20. Community placement does not add to family financial burden | 2.8 | 1.7 |
| 21. Normalization | 3.1 | 1.9 |
| 22. Least restrictive alternative | 2.9 | 1.6 |
| 23. Deinstitutionalization | 3.6 | 1.9 |

*The significance of the prepost change for the 134 was $p < .001$ by paired $t$-test for all items.

---

These results followed one general pattern: the 134 families became significantly more positive about each area after their relatives moved to CLAs (note that on Question 14, agreement implied a negative attitude).

Two items in Table 7-5 were of particular interest. Item 14 was important because it concerned the developmental model, (i.e., the belief that all people can grow and learn). This concept is one of the cornerstones of the new ideology in mental retardation services. The families initially tended toward rejection of the developmental model, and at post-test changed only to neutrality. Both in the institution and the community, then, it appeared that families were not responsive to this relatively new philosophy.

The second item of special interest from Table 7-5, Item 18, concerned the security of CLA funding, a very important issue for families. The families initially tended to disagree somewhat that funding for CLAs was secure and permanent. After relocation, the 134 families changed their opinion, but only to approximate neutrality. Their anxieties on this issue were reduced, but by no means eliminated.

## Qualitative Results

At the conclusion of the structured interview, we asked an open-ended question: "Is there anything else you would like us to know about your relative's recent move from Pennhurst?" Interviewers were instructed to take comments verbatim, and not to ask additional questions.

Upon analysis of these responses, the predominant tone indicated that the majority of the respondents expressed very positive feelings about the CLAs and the quality of service therein. A significant majority had not expected such services and were quite overwhelmed by the superior quality of the facilities. The general feeling was that the relatives had shown progress toward development of skills for independent living. Many respondents attributed this

growth to the personalized attention and interest of the staff, which was greatly facilitated by the small size of the facility and a high staff-to-client ratio.

The respondents also reported that they enjoyed their visits to the CLAs. They had found visits to Pennhurst "scary" and were intimidated by converging crowds of other people who lived there. Other respondents felt the CLA setting was conducive to bringing younger siblings for visits. Previously, parents had not wanted to expose other children to the large, hospital-like, impersonal environment of Pennhurst. In addition, most respondents indicated that their relatives appeared happier at the CLAs. They enjoyed the small family and home-like environment and individual attention.

Though the general tone indicated a positive attitude toward community living, there were some objections to the move from Pennhurst. Some respondents felt it was "not safe" and "rather dangerous" for "these people" to "walk around alone." The implication was that persons with mental retardation need to be protected from the "normal" world; that they should not be free to walk around, since they are vulnerable. Given the level of functioning of these former Pennhurst residents (86% were labeled severely or profoundly retarded, and nearly half were non-verbal), this belief was understandable. One respondent opposed the move because CLAs did not have the advantage of having all the necessary facilities (medical, recreational, educational) on the premises, and another respondent objected on the grounds that the court decision to move the relative to a CLA was a violation of parental rights.

In addition, there were many expressions of concern about the security of funding for the CLAs from both the respondents who approved the move and those who did not. A number of respondents feared they might have to assume financial responsibilities for which they had no resources. Also, there was

185

some apprehension about the effect of staff turnover. One respondent felt that the staff could not possibly be permanent since they would want to "live their own lives," and feared that this would be emotionally damaging to his/her relative.

The retrospective evaluation of Pennhurst from these 134 families was that it was too large and crowded a place to offer adequate care and growth opportunities for the people who lived there. It was felt to be a place where repetitive, institutional behaviors prevailed due not only to the large numbers of persons housed, but also to the chronic shortage of direct care and professional staff.

Although the CLAs were seen as addressing the needs of the clients more favorably than Pennhurst, there was strong concern that they would not have the permanence of a large institution like Pennhurst. This appeared to us to be the central counterpoint to the general extreme satisfaction expressed in the open-ended comments, and this paralleled the quantitative results of the survey.

## Discussion

The most striking result of the family survey was the overwhelmingly positive change in attitudes among the families of the people who left Pennhurst and went to live in community based settings. Also of significant interest were the attitudes which did <u>not</u> change. In this discussion, we will comment on both.

Before proceeding, it is important to stress the caveat that the Pennhurst results did not arise from families of individuals deinstitutionalized at random. We cannot be <u>certain</u> that the "sample" of 134 families were representative of the "population" of 630 families in every way, although we found that they were so in nearly every way we could measure. Although

186

cautions against perfectly confident generalization to the population, or to facilities in other states, must be applied to the Pennhurst results, we believe that some general policy implications can be drawn.

The attitudes expressed by the families in the baseline study were consistent with the results obtained by Atthowe and Vitello (1982), Brockmeier (1975), Klaber (1969), Meyer (1980), Payne (1976), and Willer, et al. (1979). A large number of the families in our study disagreed strongly with deinstitutionalization, and a substantial number disagreed strongly with the principles of normalization and least restrictive alternative. The families in our study seemed to agree with families in other studies that the institution was the most appropriate environment for their relatives, and were generally very satisfied with Pennhurst. Our findings brought to mind Klaber's (1969) comments:

> The parents...were convinced of the excellence of the facilities in which their children were placed...The praise lavished on the institutions was so extravagant as to suggest severe distortions of reality in this area.

Most of the families in the baseline study (75%) also believed that their relatives had reached the highest level of development possible. Evidently, families did not accept the idea that everyone, even persons with severe or profound mental retardation, can grow and develop (e.g., Gold, 1973). The families in the Baseline Study also believed their relatives had serious medical needs (although this belief was not confirmed by comparison to reports from Pennhurst staff).

These two attitudes, pessimism about future development and perception of serious medical needs, may be related. They could both have arisen from the advice given to the families, decades ago, by professionals. When the families in this study admitted their relatives to Pennhurst, an average of more than 20 years ago, there were no alternatives, and the professional with the most

authority in these matters was usually a physician.  The message most often given, we speculate, was on the order of "S/He will never be able to learn, and will always need medical care."  These attitudes are not eradicated even today.  Among both families and professionals, we would suggest vigorous efforts to provide the most up to date information; particularly for families of people who may move out of institutions.  Any educational interventions should stress the idea that people can grow and learn, and should address medical concerns directly.

Families in the baseline study also were greatly concerned about the security of funding for community placements.  They did not believe the funding for community alternatives was secure and permanent -- unlike the funding for institutions -- and felt they could not depend on the community service system to provide services for their relatives.

Six months after the relocation of their relatives, the 134 families in the Post-Relocation Study were more than satisfied with the community placement of their relatives.  Many expressed astonishment over their own changes since the baseline survey.  The families reported unexpected changes for the better in their lives, and in the lives of their relatives, especially with regard to the happiness of their relatives, their relatives' relationships with other people, and their own happiness.  In addition, families' fears about the quality of CLA staff and about the availability of services in the community seem to have been allayed somewhat, although by no means completely.  An examination of the beliefs and attitudes which did not change is also revealing.  For example, even after the relocation, families still believed their relatives had serious medical needs.  Families also did not completely accept the developmental model (i.e., the idea that their relative would continue to grow and learn).  Attitudes became more positive, but only to the

point of neutrality, not to outright acceptance. In light of the increase the families had seen in their relatives' developmental abilities -- especially as reported in the open-ended comments -- this finding was difficult to interpret. In essence, most families were saying that they had recently witnessed large improvements, but they doubted that _more_ was possible.

Families also expressed continued concern about the security of funding for community services. Their belief that funding was secure improved significantly, but only to the point of approximate neutrality. Their anxieties were reduced, but not eliminated. This appeared to us to be the central remaining issue among these families, who otherwise were generally surprised and pleased by the change from care in a large segregated public institution to small, more integrated settings in regular neighborhoods.

No matter how much families may prefer the services in the community, if they believe those services can be cut off for lack of funding next year -- or, more important, in ten or fifteen years -- families will not support community living. We believe this issue must be addressed on a federal level since the federal government has provided more fiscal support to institutions than to community service systems (Braddock, Howes, & Hemp, 1984). This has engendered a disincentive for states to develop community services.

Two final implications of our five years of research with families do not arise directly from data, but rather from years of impressions. The first is that any deinstitutionalization plan or effort should provide a formal forum through which families can express their feelings, especially their fears and their reasons for opposition. Although this need not guarantee that families have the power to veto community placement, impressions from formal family hearings in the Pennhurst arena strongly imply that many, perhaps most, families will become willing to "give it a try" after a formal and structured

hearing designed to treat their concerns with dignity.

The second is that, in our experience with surveying these families, we have come to the conclusion that any monitoring or quality assurance system should include annual surveys of families. Particularly when conducted by a third party, such surveys can reveal information that families would not express otherwise. Many dissatisfactions go untold because families fear that state, county, or private providers will resent such statements and that the consequences might fall on the relatives. Our surveys in this area have been welcomed by families, they are very inexpensive to conduct, and they can help to raise red flags that would not reach official attention in any other way. In years to come, our surveys of families will continue as part of our permanent monitoring of Pennhurst class members (and others in the Commonwealth).

# References

Atthowe, J. M., Jr., & Vitello, S. J. (1982). Deinstitutionalization: Family reaction and involvement. Unpublished manuscript, College of Medicine and Dentistry of New Jersey, Rutgers Medical School.

Barnes, D., Krochalk, P., & Hutchison, J. (1976). Comprehensive Community Residential Care System Study. Los Angeles: Exceptional Children's Foundation.

Braddock, D., Howes, R., & Hemp, R. (1984). A summary of mental retardation and developmental disabilities expenditures in the United States: FY 1977-1984 (Preliminary working data). Chicago: University of Illinois at Chicago, Institute for the Study of Developmental Disabilities.

Brockmeier, W.E. (1975). Attitudes and opinions of relatives of institutionalized mentally retarded individuals toward institutional and non-institutional care and training. Lincoln: University of Nebraska, doctoral dissertation. Dissertation Abstracts International, 35, 5163A.

Conroy, J.W., Feinstein, C.S., Lemanowicz, J.A., & Kopatsis, M. In press.

Ferrara, D. M. (1979). Attitudes of parents of mentally retarded children toward normalization activities. American Journal of Mental Deficiency, 84, 145-51.

Frohboese, R., & Sales, B. D. (1980). Parental opposition to deinstitutionalization. Law and Human Behavior, 4, 1-87.

Gold, M.W. (1973). Research on the vocational habilitation of the retarded: The present, the future. In N.R. Ellis (Ed.), International review of research in mental retardation, Volume VI. New York: Academic Press.

Klaber, M.M. (1969). The retarded and institutions for the retarded – A preliminary research report. In S.B. Sarason and J. Doris (Eds.), Psychological problems in mental deficiency. New York: Harper & Row.

Meyer, R. J. (1980). Attitudes of parents of institutionalized mentally retarded individuals toward deinstitutionalization. American Journal of Mental Deficiency, 85(2), 184-187.

National Association for Retarded Citizens (1977). The parent/professional partnership: The partnership -- How to make it work. New York: NARC.

Payne, J. E. (1976). The deinstitutional backlash. Mental Retardation, 3, 43-45.

Stedman, D. J. (1977). Introduction. In J. L. Paul, D. J. Stedman, & G. Neugeld (Eds.), Deinstitutionalization: Program policy developments. Syracuse, NY: Syracuse University Press.

Willer, B. W., Intagliata, J. C., & Atkinson, A. C. (1979). Crisis for families of mentally retarded persons including the crisis of deinstitutionalization. British Journal of Mental Subnormality, Vol. 2, p. 2.

# CHAPTER 8
# NEIGHBOR ATTITUDES

# Introduction

When a group home or community living arrangement (CLA) for people with mental retardation opens in a neighborhood, how do neighbors react? How many even know about it, and do their attitudes toward people with mental retardation change in any way? How do these attitudes compare to feelings about people with other kinds of differences? We have been exploring these questions in southeastern Pennsylvania for five years, as part of the Pennhurst Longitudinal Study, and some of the most interesting findings are reported in this chapter.

Attitudes about unfamiliar groups of people are generally characterized as stereotypes. As noted by Triandis (1971) and others, the strength of the stereotype is inversely related to knowledge about the group. The more one knows about a person or group, the less likely one is to develop stereotypes about them.

In most of this century, the practice of segregated institutional care has meant that people with severe or profound mental retardation rarely have been seen in public places. Despite the fact that institutional populations have been declining since 1967 (Lakin, 1979), and despite the literature and experience that demonstrate that people with severe degrees of retardation can live and grow in less segregated community settings (e.g., Bradley & Conroy, 1983), the public's knowledge about mental retardation is limited (Budoff, Siperstein, & Conant, 1979; Gottwald, 1970; Hollinger & Jones, 1970; Latimer, 1970). Therefore it is likely that public attitudes toward people with mental retardation are based on stereotypes. The question of whether these public attitudes can change, then, should be viewed from the perspective of theories on stereotypical attitudes.

Budoff et al. also implied an important function of attitudes, called the knowledge function. The knowledge function is related to the needs of persons to maintain an organized, stable, and meaningful structure of the world. These attitudes change when the existing attitude is insufficient for dealing with situations, whether because of new information or because of a new environment of some kind. This viewpoint is related to the situation of a group home opening in a neighborhood, in that stereotypes may prove to be of little value when a citizen directly encounters a new neighbor with mental retardation.

Researchers have assumed that knowledge about and contact with people with mental retardation affects attitudes toward such people, and that change of either knowledge or contact would change those attitudes. Much of the research on attitude change has been done in school settings rather than in the community (i.e., structured rather than unstructured contact), and previous studies of attitudes vary in their conclusions. Most of the studies indicating a relationship between contact and attitudes were concerned with contact that was structured in some way. Begab (1969), for example, found that increasing knowledge about retardation only effected a positive change in attitudes when education was coupled with direct contact with people with mental retardation.

There have been few studies which examined attitude change in communities where community living arrangements opened. Baker, Seltzer, and Seltzer (1974), and Sandler and Robinson (1981) examined the effects of preparing communities for the opening of a residence and suggested that preparation is likely to raise opposition, perhaps to the point of preventing the opening of the home. Mamula and Newman (1973) and O'Connor (1976) reported that, after initial opposition, communities tended to accept the residence. If opposition prevents homes from opening, however, there can be no opportunity for attitudes to become more positive. Sigelman (1976) suggested that a Machiavellian

approach (i.e., establishment of homes without informing neighbors and without measuring attitudes) "has the advantage of preventing moves to block the home's opening" and that such an approach "may be no less effective in the long run than more elaborate strategies involving advance attitude sampling" (p. 26).

Because community acceptance has been portrayed in the media as a crucial issue in the opening and success of group homes and other community programs, the Pennhurst Longitudinal Study included an examination of the attitudes of members of the communities into which the people from Pennhurst moved. The situation offered the opportunity to conduct the first "before-and-after" interview study of neighbors. There was no preparation of neighborhoods; the only "intervention" was the actual opening of the community living arrangement (CLA).

The plan called for the assessment of neighbor attitudes toward people with mental retardation before and after CLAs opened in nearby houses or apartments. In addition, an exploration of the factors related to attitudes, and of factors related to changes in attitudes over time, was planned. The general research questions were: (1) What were the patterns of attitudes among the general public toward people with mental retardation living in their neighborhoods? (2) What factors and characteristics were associated with those attitudes, that is, were some kinds of neighbors more accepting than others? (3) Were there changes in attitudes after the CLAs entered the neighborhoods? and (4) Would there be any consistent pattern to, or predictors of, changes in attitudes?

# Methods

## Subjects

The locations of eight prospective CLA sites were obtained, and a one quarter to one half mile radius (depending on population density) was drawn around each. In each circle, 45 households were selected by a simple random

selection procedure from crisscross telephone directories. A probabilistic, representative sample of the adults in those households was accomplished using a procedure developed by Kish (1965). A table determined which household member was to be the interview subject, based on the number and kind of potentially eligible respondents in the household. In this table, the one selected would be varied from one interview to the next. No substitution was allowed. In this way, we achieved samples in each neighborhood that were close approximations to simple random samples (i.e., every person within the neighborhood had about the same chance of being interviewed).

There were 362 neighbors who were interviewed in the initial round. Their average age was 48 years. They were 87% white and 54% female, and 80% had a high school education or more. They had lived at their current addresses for an average of 16 years.

## Design

This study of neighbor attitudes was designed to be the first to assess attitudes before and after opening of a CLA nearby. Initially, we intended to interview neighbors six months before the CLA entered the neighborhood, and then again six months after the opening. After completing that design, however, the research team determined to interview the neighbors again about a year later. The reason was that we had detected significant changes in attitudes at six months after CLA opening, and others (Mamula and Newman, 1973; O'Connor, 1976) had suggested, but had not quantitatively demonstrated, that such short term changes would vanish by about a year to a year and a half.

The national advisory committee for the study agreed that this was a worthwhile design modification, as did the government project officers. We therefore conducted a total of three waves of interviews with the original sample of neighbors.

## Instruments

Because we did not want to inform respondents that a CLA was about to open in their neighborhoods, we could not ask the most direct questions -- such as "How do you feel about the group home that's going to open on your block next month?" Such questions would have destroyed the integrity of the study by giving information to many neighbors who otherwise might not have had it. More importantly, it could have engendered active opposition as suggested by Sigelman (1976). It was necessary to aim instead for general attitudes about people with mental retardation. No completely suitable instrument was found in the literature so a new instrument was developed.

We began by assembling 350 items from a dozen previously used scales. About two thirds of the items were immediately revised or rewritten to remove archaic language or to suit the conditions in Pennsylvania. We also wrote about 50 new items for our specific pre-post needs, then sorted all 400 into categories: (1) tolerance toward people with mental retardation in everyday settings; (2) knowledge about mental retardation; (3) general attitudes toward people with mental retardation; (4) frequency and locations of contact; and (5) fears and stereotypes. The research group then began to eliminate items within each category, keeping only the ones that appeared to be the most clear and concise ways to ask about each content area. After several cycles of review, we settled on a draft set of 50 items.

The draft interview contained many questions about attitudes toward people with mental retardation. We added items about people with physical disabilities, people of a different race, and people with mental illness. Again, these other questions were added to prevent respondents from coming away with the impression that they had been interviewed solely about mental retardation, or about new CLAs. We wished to avoid alerting the neighbors

because of the possibility of resistance and because of experimenter effects. By alerting neighbors in a way that normally would not occur, we possibly could have altered their natural pattern of response to the eventual opening of the CLA. The extra questions also enabled comparisons of attitudes among the various groups, to give some idea of the magnitude and direction of the attitudes.

Following selection and refinement of items, the instrument was pretested. One of the most significant results of the pretest was the labeling of all questions about mental retardation with "mild" or "severe." This was done because nearly three-fourths of pretest respondents said, on at least one question, "It depends on how severe . . . ." or a similar qualifier.

Following final review, the questionnaire contained 46 substantive items about various groups, and 34 concerned people with mental retardation. The instrument was submitted to the federal Office of Management and Budget, and was approved by May 1980. At this final stage, it was designed to take approximately 15 minutes to administer. No mention of Pennhurst or the prospective CLA was contained in the interview.

After the baseline interviews, the form was shortened somewhat, and a few new items were added. After CLA opening, it was of interest to ask people whether they knew of any such programs in their neighborhoods, and if so, how long they had been in existence. The questionnaire is in Appendix 8-1.

In order to provide a sensitive and reliable measure of general attitudes toward people with mental retardation, a scale was constructed from questionnaire items (ATTSCALE). All items were weighted equally, and a simple additive scale was constructed. Item selection was based on Cronbach's Alpha, a measure of one kind of reliability called internal consistency. By removing five questionnaire items (of the 18 chosen initially as candidates for a

general attitudes scale on face validity grounds), Cronbach's Alpha attained a value of .78. This was a very acceptable value because Alpha provides a conservative estimate of reliability.

In addition, the interview included nine True-False items that were designed to be combined into a single scale of knowledge about mental retardation. It was intended to permit analysis of variations in attitudes, and in attitude change, according to how much people understood about mental retardation.

## Procedures

Data collection was initiated with an introductory letter, followed by telephone screening and interviewing. The first interviews were conducted six months prior to the opening of the CLAs, in May-June 1980, and yielded 364 interviews. The second wave (an average of six months post opening) was conducted in the Spring of 1981, and yielded 287 interviews, 79% of the original sample. The third wave was conducted in the Spring of 1982, an average of about 20 months after CLA opening, and produced 252 interviews, 69% of the original sample.

Respondents who moved out of the boundaries of the CLA sample circle were not reinterviewed, and in one sample site the CLA did not open. The 34 sets of interviews from that neighborhood have been included only in the baseline results. The final data set, on which most of the results presented here are based, consisted of the remaining 218 respondents from whom all three interviews were obtained.

201

# Results: Baseline Survey

## Specific Attitude Items

Respondents were asked how much they would be bothered if two to five people with mental retardation moved into the neighborhood. As a comparison, and to avoid sensitizing respondents, respondents were also asked how much they would be bothered if members of other groups moved into the neighborhood. The results are presented in Table 8-1.

---

### TABLE 8-1
#### WOULD NEIGHBORS BE "BOTHERED?"

Question: How much would it bother you if 2 to 5 people who are [...GROUP...] moved into your neighborhood? Would it bother you a lot, some, very little, or not at all?

| Group | A Lot | Some | Little | Not at All |
|---|---|---|---|---|
| Physically disabled | 2.5% | 27.5% | 11.9% | 80.6% |
| Mildly mentally retarded | 6.1 | 9.7 | 15.5 | 68.7 |
| Severely mentally retarded | 14.0 | 16.8 | 18.5 | 50.7 |
| Mentally ill | 16.4 | 25.6 | 15.8 | 42.1 |
| Of a different race from your own | 4.7 | 12.2 | 16.3 | 66.9 |

---

On this question, responses concerning people with mild mental retardation were most like those about people of a different race. Responses about people with severe mental retardation were most like those about people with mental illness. Also, responses showed sharply different levels of "bother" for mild versus severe mental retardation.

Respondents also were asked how much they thought the value of their property would be affected if two to five members of the same groups moved into the neighborhood. These results are presented in Table 8-2.

TABLE 8-2

NEIGHBORS' BELIEFS ABOUT EFFECTS ON PROPERTY VALUES

Question:  How much do you think the value of your house would change if 2 to 5 people who are [...GROUP...] moved into your neighborhood?

| Group | A Lot | Some | Little | Not at All |
|---|---|---|---|---|
| Physically disabled | 7.2% | 12.6% | 15.9% | 64.3% |
| Mildly mentally retarded | 7.3 | 13.6 | 18.2 | 60.9 |
| Severely mentally retarded | 13.3 | 17.5 | 19.0 | 50.2 |
| Mentally ill | 15.5 | 21.0 | 18.6 | 44.8 |
| Of a different race from your own | 12.4 | 25.6 | 14.4 | 47.6 |

On the property values question, again, feelings about people with mild mental retardation were less intense than feelings about neighbors with severe mental retardation.  This time, however, responses about people with mild retardation were most like those about people with a physical disability; responses about people with severe mental retardation were similar to those for people with mental illness and people of a different race.

Comparison of the "bother" question to the property values question revealed an intriguing pattern.  Figure 8-1 on the next page is structured to show the comparison as a bar graph, in which each bar represents the average value of the baseline responses to both questions.

The labels for the 5 groups in the figure have these meanings:

PHYS = People with Physical Disabilities
MMR = People with Mild Mental Retardation
RACE = People of a different Race than the respondent
SMR = People with Severe Mental Retardation
MI = People with Mental Illness

# Figure 8–1



In answer to either question (would you be bothered or would property values be affected), respondents could say:

[1 = Not at all]    [2 = A little]    [3 = Some]    [4 = A lot]

These responses were treated as 4 point scales. The bar graph shows that, on the "bother" dimension, respondents said they would be bothered very little by new neighbors with physical disabilities, with mild mental retardation, or of a different race. They would be bothered much more by neighbors with severe mental retardation or mental illness.

The pattern for property value effects was different. Relatively 'mild' effects were projected for people with physical disabilities and for people with mild mental retardation. "Major" effects were projected for people of a different race, people with severe mental retardation, and people with mental illness. (Dividing the responses into minor and major effects is based on t-tests of differences among the mean scores for the five categories. The bars for property values in Figure 8-1 for PHYS and MMR were statistically indistinguishable from one another; the bars for RACE, SMR, and MI were also indistinguishable from one another. However the first two were statistically smaller than the latter three.)

An interesting facet of the bar graph data was that respondents were quite consistent for SMR and MI (they would be bothered considerably and property values would be affected considerably), they were fairly consistent for PHYS and MMR (they would not be bothered much, and property values would only be affected slightly), but they were not consistent for RACE. Here the respondents claimed that they would be bothered very little by new neighbors of a different race, yet they projected major property value impacts.

## Factors Related to General Attitudes

The next step in analysis of the baseline data was an investigation of the factors that were related to the general attitudes of the neighbors toward people with mental retardation. As previously noted, we had composed such a scale by combining 13 items (ATTSCALE). The factors that might be related to this scale of general attitudes fell into two categories: unchangeable factors, such as the age and sex of the respondent, and changeable factors, or things that could conceivably be changed by social policy or experiences, such as knowledge about mental retardation or contact with people who have mental retardation.

Unchangeable factors. The baseline survey produced an array of demographic and descriptive data on the characteristics of each respondent. These characteristics were tested for relationship to general attitudes toward people with mental retardation via simple Pearson correlations and analyses of variance. The characteristics examined were age, sex, ethnicity (white/other), education, income, type of dwelling, length of time at this address, length of time in neighborhood, marital status, and number of children in the household. The three characteristics which were related significantly to attitudes (ATTSCALE) were age ($r=.18$, $p=.002$), ethnicity (binary variable, $r=.13$, $p=.023$), and sex (binary variable, $r=.10$, $p=.038$). Using these three variables together in multiple regression, age explained 7.8% of the variation in ATTSCALE, followed by ethnicity (3.4%) and sex (1.0%). Younger respondents, non-white respondents, and females had more positive attitudes. Altogether, these three variables explained 12.2% of the variation in our measure of attitudes toward people with mental retardation.

Changeable factors. The survey included nine true/false items about people with mental retardation. A scale of 0 to 9, based simply on the number

of correct answers, was calculated for each respondent and was used as a general index of knowledge about retardation, people with retardation, and programs/services.  Knowledge was found to be a strong predictor of attitudes ($r$=.46, $p$<.001).  We ran a multiple regression in which the three unchangeable factors above were forced to enter the equation first, and together they accounted for 12.2% of the variation in the general attitudes measured by ATTSCALE; after them, knowledge accounted for an additional 18.2% of the variation.

There were two measures of contact with persons with mental retardation — one measured overall frequency of contact, and the other item measured contact in given settings (e.g., school, work, neighborhood, shopping).  Among the contact variables, only "contact in neighborhood" (a simple Yes or No item) predicted attitudes ($r$=.30, $p$<.001).  Again using multiple regression, and entering the unchangeable characteristics of the respondents first, contact accounted for an additional 2.9% of the variance in ATTSCALE.

Both of these findings about the changeable variables suggested that general attitudes of citizens toward people with mental retardation were subject to change, either by increasing knowledge or by increasing contact.

# Results: After CLA Openings

## Changes in Attitudes

We divided the sample into two groups:  (1) those who knew, at the time of the second interview six months after CLA opening (Time 2), that the CLA had opened, and (2) those who did not know, at Time 2, that the CLA had opened.  The analyses of interest concerned only those who were aware of the existence of the CLA.

Only 28% of the respondents in our sample were aware that a CLA had moved into their neighborhoods by Time 2.

Among these neighbors who were aware of the CLA, attitudes became significantly less positive from six months before to six months after, and then became significantly more positive again by 20 months after CLA opening. Attitudes were not significantly different between Time 1 and Time 3, which indicated simply that general attitudes had returned to their original levels after a temporary negative swing. This pattern is illustrated in Figure 8-2 on the next page. Statistically, the average ATTSCALE score six months before was higher than the average score six months after (paired $t=1.80$, (56), $p<.001$). The ATTSCALE scores six months after were significantly lower than at 20 months after ($t=2.06$, (56), $p=.044$). Scores at six months before and 20 months after were statistically indistinguishable.

Even by the time of the second interview, at six months after CLA opening, there was evidence that neighbors' attitudes were moving in a positive direction. Six months after opening, we asked the people who were aware of the CLA how they had felt when they had <u>first</u> heard about it, as well as how they felt about it at the time of the interview. The results are presented graphically in Figure 8-3 on the next page. Looking at the two bars on the right of the figure, the open bar represents the 7% of respondents who recalled being strongly in favor of the CLA when they first learned of its existence. The shaded bar represents the 20% who were strongly in favor "now." The entire figure shows the pattern of change -- there is a shift from the left to the right. Treating the responses as 5 point scales produces the same result from the statistical perspective. The average response "when first learned about CLA" was 3.09, and the average "now" was 3.64 ($t=5.28$, (132), $p<.001$).

## Figure 8-2



## Figure 8–3



In sum, the respondents clearly recalled having been more opposed to having a CLA in their neighborhoods when they first heard about it than they were at the time of our second interview. This suggested that neighbor attitudes were already becoming more positive by the time of our six month post-opening interviews (and this was part of the rationale for the decision to conduct a third wave of interviews). This also suggested that, at one or two or three months after CLA opening, neighbor attitudes may have been considerably more negative than indicated by our six month results.

## Contact in the Neighborhood

We explored whether contact with people with mental retardation in the neighborhood increased after the CLAs opened, and whether increased contact was associated with positive changes in attitudes. None of the contact variables showed a statistically significant increase, overall, for the sample of neighbors in this study. For the respondents who had said "No" in the first interview to "In the past six months, have you had any personal contact...in the neighborhood," and who said "Yes" at 20 months after opening, we could discern no significant changes in general attitudes. This group of respondents followed the general pattern of temporary negative reactions followed by a return to the original level.

## Real versus Hypothetical CLAs

We examined whether attitudes toward real CLAs were different from attitudes toward hypothetical CLAs. At the time of the third interview, about 20 months after the CLAs had opened, 68 of our respondents said they were aware of the CLAs' existence and 144 said they knew of no CLA in their neighborhoods (a few others did not answer this question). For the 68 who were aware, we then asked "How do you feel about that group home now?" and for the unaware 144, we asked "Imagine that a group home were located in your

neighborhood...How would you feel?" These questions enabled us to compare the attitudes of people toward real CLAs to attitudes toward imaginary CLAs. The results are presented as the bar graph of Figure 8-4 on the next page. The striking aspect of this figure is the large difference on the right side; relatively few people (about 10%) were willing to express strong support for imaginary CLAs, perhaps partly because they were not sure what a CLA was or how it might affect the neighborhood. In contrast, the respondents who were aware of real CLAs that had been in their neighborhoods for an average of 20 months were more definite; 26% expressed strong support.

## Discussion

This study of neighbor attitudes was the first to interview neighbors before and after group homes/CLAs opened in their neighborhoods. We were most interested in the question of changes over time, that is, whether neighbors would become more accepting or rejecting toward people with mental retardation after a CLA moved into the community. We also wanted to find out whether any such changes were short term or long term. In addition, some important subsidiary issues included the relation between contact and attitudes and the differences between some peoples' feelings about imaginary CLAs in their communities and other peoples' feelings about real CLAs. Our findings on these issues may prove useful to policy makers and planners, as well as to those who are involved more directly with implementing and operating small community based residences.

In general, members of communities do seem to accept their neighbors with mental retardation. Six months after the opening of the CLAs in our study, only about 28% of neighbors were aware of it. The attitudes of these neighbors became less positive from pre-opening to six months post-opening, but, by 20

212

## Figure 8-4



FEELINGS ABOUT REAL AND IMAGINARY CLA

months post-opening, attitudes had returned to baseline levels.  In other words, for the neighbors who were aware, negative reactions were only temporary.

From our baseline data, we could conclude that the neighborhoods which would be more accepting are those where the population is younger and includes more non-white people and more females.  However, these three variables combined only predicted 12.2% of the variance in our attitudes scale, and, therefore, we would not recommend that they be given much weight in choosing sites for CLAs.

The responses to the questions about how much citizens would be "bothered" by various groups of new neighbors, and about how such neighbors might affect property values, are interesting.  For people with mild mental retardation, respondents reported that they would be "bothered" very little, and they expected no major impacts on property values.  For people with severe mental retardation, however, the responses were quite different.  Possibly this was because of a public perception that severely retarded people are immediately recognizable in a neighborhood, and might therefore have a far greater impact on property values than people with mild retardation.  Citizens on the average believed that small groups of people with severe mental retardation, of a different race, or with mental illness, all posed about the same level of threat to property values, and the threat was considerable.  About the first and third groups, citizens were even willing to admit that they themselves would be bothered by such people; for people of a different race, however, respondents appeared to be saying "I don't mind, but most people do, so property values would be affected."  The possibility of public hypocrisy in this regard should not be overlooked.

The questions about real and imaginary CLAs reveal that, for the average citizen, the idea of a CLA in the neighborhood is more threatening than the reality. In our study, people who were aware of CLAs were significantly more positive than were people who did not know of any CLAs in their neighborhoods.

The data on imaginary and real CLAs also suggests to us that, if there are no CLAs already in a neighborhood, then only about 10% to 20% of neighbors will be opposed to allowing one to open. If one is already in the neighborhood, then opposition will be even less, and strong support may be available. This finding might be related to a common tendency for community residences to accumulate in a given neighborhood -- the "CLA ghetto" phenomenon. The more there are, the easier it is to open a new one -- up to a certain point, at least.

The 10% to 20% figure implies that only a small proportion of citizens would be opposed to a CLA -- unless something is done to raise opposition to the CLA, especially before the CLA opens. One possible scenario -- one that Sigelman (1976) has found -- is that even a small number of community members who are strongly opposed can influence general community sentiment, to the extent that the CLA does not open. Sigelman reported that "Although only two neighbors initially opposed the [proposed hostel] program, community sentiment reversed due to the efforts of one intense critic, to the point that almost all of the people who had originally accepted the proposal signed a petition against it" (p. 28). Similarly, one of the eight sites we chose for our study of community attitudes did not open because of community opposition. It is worth repeating that our respondents who knew of the CLA reported feeling more favorable toward the CLA over time; but neighbors can not grow to accept or welcome CLAs if the CLAs are prevented from opening.

It also seems that unstructured contact with people with mental retardation has little measurable effect on attitudes. "Contact in the neighborhood," the only significant contact variable at baseline, predicted only 2.9% of the variance in attitudes beyond that predicted by the characteristics of the respondents themselves. Post-opening, an increase in contact in the neighborhood had no effect on attitudes, regardless of whether the respondent was aware of the CLA. Given the possible problems with giving community members "advance notice" (i.e., time to raise opposition and prevent the opening of the CLA), and given the possible positive effects of structured contact reported by other researchers (e.g., Aloia, Beaver, & Pettus, 1978; Ballard, Corman, Gottlieb, & Kaufman, 1977; Leyser & Gottlieb, 1980; Marlowe, 1979; Voeltz, 1980), structured contact, or structured contact plus education, after the CLA has opened, may influence attitudes favorably without allowing prevention of the opening of the CLA. We suggest this as an area for future research, and such research need not be exclusively quantitative -- for example, the case studies and anecdotal reports of Robert and Martha Perske (Perske & Perske, 1980) are also of tremendous value.

Our results suggest, to us, that future research should include further examination of the effects of structured contact with the CLA residents after the CLA has opened. We also interpret our results as supporting Sigelman's notion of a Machiavellian approach to the opening of CLAs. Neighbors do seem to become more favorable over time, and, as previously noted, attitudes cannot improve if the CLA never opens.

# References

Aloia, G. F., Beaver, R. J., & Pettus, W. F. (1978). Increasing initial interactions among integrated EMR students and their nonretarded peers in a game-playing situation. Americcan Journal of Mental Deficiency, 82, 573-579.

Baker, B. L., Seltzer, G. B., & Seltzer, M. M. (1974). As close as possible. Boston: Little, Brown, & Co.

Ballard, M., Corman, L., Gottlieb, J., & Kaufman, M. J. (1977). Improving the social status of mainstreamed retarded children. Journal of Educational Psychology, 69, 605-611.

Begab, M. J. (1969). The effect of differences in curricula and experiences on social work student attitudes and knowledge about mental retardation. Dissertation Abstracts, 29, 4111-4112.

Bradley, V. J., & Conroy, J. W. (1983). Third year comprehensive report of the Pennhurst Longitudinal Study. Philadelphia: Temple University Developmental Disabilities Center.

Budoff, M., Siperstein, G., & Conant, S. (1979). Children's knowledge of mental retardation. Education and Training of the Mentally Retarded, 14, 277-281.

Gottwald, H. (1970). Public awareness about mental retardation. Arlington, VA: The Council for Exceptional Children.

Hollinger, C. S., & Jones, R. L. (1970). Community attitudes toward slow learners and mental retardates: What's in a name? Mental Retardation, 8, 19-23.

Kish, L. (1965). Survey sampling. New York: John Wiley & Sons.

Lakin, C. (1978). Demographic studies of residential facilities for the mentally retarded: An historical overview of methodologies and findings, Project Report #3. Minneapolis: Developmental Disabilities Project on Residential Services and Community Adjustment, University of Minnesota.

Latimer, R. (1970). Current attitudes toward the mentally retarded. Mental Retardation, 8, 30-32.

Leyser, V., & Gottlieb, J. (1980). Improving the social status of rejected pupils. Exceptional Children, 46, 459-461.

Mamula, R. A., & Newman, N. (1973). Community placement of the mentally retarded: A handbook for community agencies and social work practitioners. Springfield, IL: Charles C. Thomas.

Marlowe, M. (1979). The games analysis intervention: A procedure to increase the peer acceptance and social adjustment of a retarded child. Education and Training of the Mentally Retarded, 14, 262-268.

O'Connor, G. (1976). Home is a good place: A national perspective of
    community residential facilities for developmentally disabled persons.
    Washington, DC:  American Association on Mental Deficiency.

Perske, R., & Perske, M. (1980). New life in the neighborhood: How persons
    with retardation or other disabilities can help make a good community
    better.  Nashville:  Parthenon Press.

Sandler, A., & Robinson, R. (1981). Public attitudes and community acceptance
    of mentally retarded persons:  A review. Education and Training of the
    Mentally Retarded, April, 97-103.

Sigelman, C. K. (1976).  A Machiavelli for planners:  Community attitudes and
    selection of a group home site. Mental Retardation, 14, 26-29.

Triandis, H.C. (1971). Attitude formation and change.  New York: Wiley.

Voeltz, L. M.  (1980).  Children's attitudes toward handicapped peers. American
    Journal of Mental Deficiency, 84, 455-464.