# Eight Years Later:
# The Lives of People Who Moved From Institutions to Communities in California

### Year 2001 Report of the Quality of Life Evaluation
### Of People with Developmental Disabilities
### Moving from Developmental Centers into the Community
### (The "Quality Tracking Project")

### Final Report
(Year 2) [1]

### Submitted to:
The Honorable Gray Davis
The Honorable Steve Peace, Senate Budget and Fiscal Review Committee
The Honorable Dede Alpert, Senate Appropriations Committee
The Honorable Carole Midgden, Assembly Appropriations Committee
The Honorable Wesley Chesbro, Senate Select Committee on DD & MH
The Honorable Dion Aroner, Assembly Human Services Committee
Mr. Dale Sorbello, Department of Developmental Services

### Submitted by
*Marguerite Brown, MS, Amanda Fullerton, MS, James W. Conroy, Ph.D.,*
*and Mary F. Hayden, Ph.D.*
*The Center for Outcome Analysis*
*201 Sabine Avenue*
*Narberth, PA 19072*
*610-668-9001, fax 610-668-9002, e-mail* outcomeanalysis@aol.com

July 1, 2001

---

[1] **Prepared Pursuant to Contract Number HD989038 from 1999 to 2002 in the Amount of $1,410,515**

# Acknowledgment

The authors wish to acknowledge and thank the more than 2,000 people who allowed us into their homes and workplaces to find out how they were doing. We also thank the 21 Regional Centers for their cooperation, the staff of the provider agencies who made time for our visits, and all the relatives who took time to complete our mail survey. In gratitude, we dedicate our work and this report to people with disabilities and their families.



# TABLE OF CONTENTS

**EXECUTIVE SUMMARY** ........................................................................................................ 11

**METHODS** ............................................................................................................................. 66

PARTICIPANTS: THE PEOPLE IN THIS STUDY ............................................................ 66
RESULTS OF THE FIELD WORK: A POPULATION, NOT A SAMPLE ............................ 77
INSTRUMENTS ................................................................................................................ 1414
PROCEDURES FOR FIELD WORK AND DATA COLLECTION .......................................... 1717

**PRE-POST RESULTS FOR 191 MOVERS** ............................................................ 1919

PRE-POST RESULTS 1: "BEFORE AND AFTER" QUALITIES OF LIFE................................ 1919
THE "PRE-POST" DESIGN............................................................................................... 1919
LIMITATIONS OF THE PRE-POST DESIGN ....................................................................... 2121
WHAT KIND OF COMMUNITY HOMES ARE THE 191 MOVERS NOW LIVING IN? ........... 2424
OUTCOMES SUMMARY ................................................................................................... 2525
PROGRESS REPORTED TOWARD INDIVIDUAL PLAN GOALS ........................................ 2828
NUMBER OF SERVICES IN INDIVIDUAL PLAN ............................................................... 2828
HOURS OF DAY PROGRAM SERVICES............................................................................. 2929
EARNINGS...................................................................................................................... 2929
NUMBER OF CLOSE FRIENDS REPORTED ...................................................................... 3030
INTEGRATION ................................................................................................................. 3131
QUALITIES OF LIFE RATINGS (1994 AND 2001) .......................................................... 3131
STAFF JOB SATISFACTION .............................................................................................. 3333
STAFF LIKE WORKING WITH THIS PERSON ................................................................... 3333
DO STAFF GET SUFFICIENT SUPPORT?.......................................................................... 3434
NUMBER OF DAILY MEDICATIONS ............................................................................... 3434
NUMBER OF PSYCHOTROPIC MEDICATIONS ................................................................ 3434
HEALTH BY DAYS ILL IN PAST 30 DAYS ...................................................................... 3535
QUALITY OF HEALTH CARE ......................................................................................... 3535
DOCTOR VISITS PER YEAR............................................................................................ 3535
DENTAL VISITS PER YEAR............................................................................................. 3636
RELATIVE VISITS PERSON HERE AT THIS HOME ......................................................... 3636
INDIVIDUALIZED PRACTICES SCALE ........................................................................... 3636
ADAPTIVE BEHAVIOR ................................................................................................... 3737
CHALLENGING BEHAVIOR.............................................................................................. 4040
CHOICEMAKING.............................................................................................................. 4343
PRE-POST RESULTS 2: LAST YEAR AND THIS YEAR..................................................... 4545

**DESCRIPTIVE RESULTS FOR THE 2,170 MOVERS**..................................................................5556

**DESCRIPTIVE RESULTS 1:** CHARACTERISTICS OF THE MOVERS .................................................5556
**DESCRIPTIVE RESULTS 2:** FAMILY CONTACTS .............................................................................5758
**DESCRIPTIVE RESULTS 3:** FRIENDSHIPS ......................................................................................5960
**DESCRIPTIVE RESULTS 4:** INDIVIDUAL PLANNING ....................................................................6162
**DESCRIPTIVE RESULTS 5:** DAY ACTIVITIES, EMPLOYMENT, AND EARNINGS ...........................6970
**DESCRIPTIVE RESULTS 6:** CHOICEMAKING AND SELF-DETERMINATION....................................7576
**DESCRIPTIVE RESULTS 7:** INTEGRATIVE ACTIVITIES ..................................................................7879
**DESCRIPTIVE RESULTS 8:** HEALTH, HEALTH CARE, AND MEDICATIONS ..................................8283
**DESCRIPTIVE RESULTS 9:** PERSONAL INTERVIEWS......................................................................8990
**DESCRIPTIVE RESULTS 10:** PERCEIVED QUALITY OF LIFE CHANGES ......................................111112
**DESCRIPTIVE RESULTS 11:** QUALITIES OF THE HOMES .............................................................113114

**RETURNEES** .................................................................................................................................116117

**FAMILY SURVEY** .........................................................................................................................124125

**PARTICIPANTS**...............................................................................................................................124125
**PERCEPTIONS OF QUALITY** ..........................................................................................................125126
**SATISFACTION WITH SUPPORTS** ..................................................................................................128129
**VERBATIM COMMENTS** ................................................................................................................131132

**APPENDICES**
A:    PRIOR REPORTS OF THE CENTER FOR OUTCOME ANALYSIS ON THE WELL BEING OF PEOPLE
      WHO MOVED FROM DEVELOPMENTAL CENTERS TO COMMUNITY HOMES IN CALIFORNIA
B:    THE YEAR 2001 PERSONAL LIFE QUALITY PROTOCOL
C:    THE YEAR 2001 FAMILY SURVEY
D:    RESPONSES TO OPEN-ENDED QUESTIONS IN THE YEAR 2001 FAMILY SURVEY

# Executive Summary

The Quality Tracking Project of the California Department of Developmental Services is intended to track and monitor the well-being of more than 2,000 Californians with developmental disabilities who left institutions (Developmental Centers) since 1993. The origin of the project can be found in Welfare and Institutions Code 4418.1, which is reproduced below.

## Welfare & Institutions Code 4418.1

(a) The Legislature recognizes that it has a special obligation to ensure the well-being of persons with developmental disabilities who are moved from state hospitals to the community.

(b) To ensure that persons with developmental disabilities who are moved from state hospitals to the community are receiving necessary services and supports, the department shall contract with an independent agency or organization for the tracking and monitoring of those persons, including all persons moved as a result of the Coffelt v. State Department of Developmental Services settlement agreement and any persons moved after the terms of that agreement have been met.

(c) The contractor shall be experienced in all of the following:
   (1) Designing valid tracking instruments.
   (2) Tracking the quality of community programs, including outcome-based measures such as health and safety, quality of life, integration, choice, and consumer satisfaction.
   (3) Tracking the quality and appropriateness of community placements for persons moving from large institutions into community settings.
   (4) Developing data systems.
   (5) Data analysis and report preparation.

(d) The contractor shall measure consumer and family satisfaction with services provided, including case management and quality of life, including, but not limited to, health and safety, independence, productivity, integration, opportunities for choice, and delivery of needed services.

(e) The information maintained for each person shall include the person's name, address, nature of disability, medical condition, scope of community-based services and supports, and the annual data collected by the contractor.

(f) The contractor shall meet with each person, and the person's family, legal guardian, or conservator, when appropriate, no less than once a year to discuss quality of life and observe the person's services and supports. In cases where the consumer is not capable of communicating his or her responses and where there is no family member, guardian, or conservator involved, the contractor shall meet with no less than two persons familiar with the consumer. Additionally, the contractor shall interview staff and friends who know the consumer best and review records, as appropriate.

(g) If the contractor identifies any suspected violation of the legal, civil, or service rights of an individual, or if the contractor determines that the health and welfare of the individual is at risk, that information shall be provided immediately to the regional center providing case management services, the client rights advocate, and to the department.

(h) The department shall monitor the corrective actions taken by the regional center and maintain a report in the person's file. The consumer and, when appropriate, his or her parents, legal guardian, or conservator, shall be provided with access to the person's file and be provided with copies of all reports filed with the regional center or department relative to them.

(i) The department shall establish a task force, including representatives from stakeholder organizations, to annually review the findings of the contractor and make recommendations regarding additional or differing criteria for information to be gathered by the contractor in future interviews.

(j) As of July 1, 1998, and annually thereafter, the contractor shall provide a report to the Governor, the Legislature, and the department outlining the activities and findings of this process. The reports shall be public and shall contain no personally identifying information about the persons being monitored.

The present Annual Report is the third one delivered in response to the law above. It is the second report prepared for the Governor, the Legislature, and the Department of Developmental Services, by the Center for Outcome Analysis.

Our primary goal in this Report is to answer the question "Are the people who moved better off than they were when living in Developmental Centers?" And, for the first time, we have explored a related question, "Are the people who moved into community homes better off than they were last year?" In other words, do they continue to grow, learn, and flourish year after year in the community? Our third purpose is to describe in quantitative, scientific terms what are the characteristics of the people and what are the qualities of life they experience in their new community homes? When appropriate, we also include comparisons to similar studies we have conducted in other states.

As for the first question, we find that the "Movers" (the people who moved from institution to community) have benefited considerably from community living. We attempted to conduct a visit with every single Mover, and we were successful with 2,170 of them (94% of all known Movers). The average visit lasted 79 minutes. We collected data and scales that have been very widely used, extensively tested, and are known to be reliable and valid. The data collected included measures of independence, behavioral challenges, choicemaking, friendships, integration, person-centered planning, health, service intensity, earnings, and both consumer and family satisfaction.

In this Report, we delineate exactly what has changed in the lives of 191 of the Movers compared to what their lives were like when they were living in Developmental Centers. We can do this because, back in 1994, we collected the same data for a random sample of 839 people living in Developmental Centers. Now, 7 years later, 191 of those 839 happen to be out in the community, and we now know how they are doing in dozens of ways.

The data show, with considerable clarity, that the Movers are better off than they were when living in a DC in 1994 in 11 of 21 major dimensions that we measured. Some of these

are "integrative activities," "individualized treatment," "progress toward individual goals," "opportunities for choicemaking," "reduced challenging behavior," and "perceived quality of life in 10 areas." Families too are unexpectedly and overwhelmingly happy with community living, even those who formerly opposed the change. However, they are somewhat worse off in the "number of close friends," the "staff perceptions of the quality of health care," and the "frequency of dental care." Moreover, very few people have become involved in competitive or supported employment. We suggest that the community system still needs attention in the areas of health and dental care, and employment and income generation, and also that systematic thought needs to be devoted to the issue of natural relationships with other than paid employees.

Our analyses over the years revealed that the earlier Movers experienced major behavioral gains – adaptive behavior increased, and challenging behavior decreased. The later Movers tended to show smaller gains. This led to a new analysis, for all the Movers, in which we examined changes in life from the year 2000 to the year 2001 for 1,912 Movers. We found that the average Mover actually lost ground in adaptive behavior in the past year in the community. We also found that the average Mover lost ground in the challenging behavior area too; that is, their challenging behavior increased. These findings, although small, were both highly significant, and both scales are sufficiently reliable to be virtually certain that something genuine is being measured.

This is the first time in 22 years of constant research by this team that such an outcome has been observed. We have never before seen people in community service systems lose skills and increase challenging behavior. However, the monitoring process put into place through Welfare & Institutions Code 4418.1 has resulted in early detection of these problems. A concerted effort to identify the reasons for these outcomes can surely result in quick and decisive action to arrest further decline. Without the kind of quantitative monitoring mandated

by the Legislature for the present project, no one would even know that the average Mover has now begun to lose ground behaviorally.

At the same time that the Movers were experiencing the first behavioral decline, they were rapidly increasing their choicemaking opportunities. This apparently paradoxical finding is fully discussed in the second section of Pre-Post Results. We must proceed with considerable caution in trying to interpret the new findings. The new findings are mixed. Before we make a judgment about how "bad" or "good" these findings are, we must carefully study how people's lives have changed. If they are expressing fewer adaptive skills, and more challenging behaviors, while they have gained rapidly in controlling their own daily lives and decisions, then what exactly is the nature of the balance that seems to have shifted? How did this balance shift over the past year or two, and why? These are the questions that must be explored before any parties, on either side of the ever-present community versus institution debate, claim to know what these findings imply. We do not yet know what they imply.

Since 1995, the staff of the California Quality Tracking Project have been reporting to DDS that the community system is "underfunded." We repeat this refrain. The evidence has always been very clear. Other states have undergone very successful deinstitutionalization movements, and they too did it in ways that saved some money, and that money then went to support people and families who were in need. But, California was different from the other states.

California "saved" much more money than the other states as reported to DDS and the court in the Coffelt case in 1996 in Report 8 of the prior series.[2] For example, New Hampshire expended 86% of its institutional cost per person on community supports, Pennsylvania 85%, and Connecticut 80%. In contrast, California spent 55%. Other national studies have noted

---

[2] Conroy, J. (1996, February). *Patterns of Community Placement II: The First 27 Months of the Coffelt Settlement*, Report Number 8 Of the 5-Year Coffelt Quality Tracking Project, California Department of Developmental Services

that California's fiscal effort with regard to funding community programs is low in comparison to other states.[3] It is difficult to draw precise fiscal comparisons with other states as each state develops and allocates resources from multiple funding streams. However, California's rating on several standard measures of fiscal commitment appears low. We will note again that there is danger in trying to save too much money on institutional to community transition initiatives.

Although we have evidence of a service system that may be troubled, in that two behavioral outcomes have slipped in the past year, it needs to be reiterated that the Movers are still much better off than they were at the Developmental Centers. Almost no one wants to go back. Only a few families would like their relatives to go back. The people themselves, and those closest to them, believe their lives are significantly better in 9 out of 10 ways we asked them about. The people who moved are far more integrated, and have much more of a role in making choices about their daily lives. There has been no major decrement in health and/or safety. The people and their families believe they are as healthy as ever, and as safe as ever.

The movement of more than 2,000 Californians from institutions to community homes was excellent social policy. However, the data deliver a clear warning that should not be ignored. The recent downturn in two behavioral outcomes needs to be understood, and analyzed in the context of other behavioral outcomes that were enhanced. The meaning and causes of the new findings must be explored in depth.

---

[3] Braddock, D., Hemp, R., Bachelder, L., & Fujiura, G. (1995). The state of the states in developmental disabilities: Fourth edition. Washington, DC: American Association on Mental Retardation.

# Methods

The purpose of a Methods section in a scientific report is to enable other researchers to replicate our findings. We describe exactly how we collected our data, the measurement tools we used, and the people we visited. Our own findings are enhanced by independent validation and so we are careful to furnish detailed information. This section therefore describes the technical aspect of our project from start to finish; the instruments we use to measure qualities of life; the procedures for Visitor assignments; data collection and analysis procedures; the family survey instrument.

## Participants: The People in this Study

Our task, as set by the California Legislature and as detailed in our contract with Developmental Disability Services is to:

> ...conduct statewide evaluations annually of the quality of life of all persons with developmental disabilities who have moved from state developmental centers into community settings throughout the state commencing in April, 1993. The instrument to be used for the evaluation will be provided to Contractor by DDS, or approved by DDS. This instrument will measure consumer and family satisfaction with services provided, including case management and quality of life, including, but not limited to, community placement, health and safety, independence, productivity, integration, opportunities for choice, and delivery of needed services.

The population we visit is defined by the list furnished to us by DDS. In 2000 we began with a list of 2,458 people. These people were reported to be Community Target Group Members and all those who had moved from a developmental center between April 1, 1993 and June 30, 2000. In collaboration with our DDS Project Officers, we used the legislative mandate for our research to narrow the list to only those "persons with developmental disabilities who are moved from state hospitals to the community" (4418.1-(a)). We were unable to meet with 184 of those people for reasons ranging from death or incarceration to moved out of state, reducing the list to 2,274 people. We completed visits with 2,271 people. For the purposes of the analyses in this report, we removed 57 people who are listed as members of the Community

Target group and 47 people who have returned to developmental Centers. Our report therefore refers to 2,170 Movers.

### Results of the Field Work: A Population, Not A Sample

In the executive summary, we explained that for the purposes of this project we did not use sampling. We included every individual in the Mover population, that is, all 2,170 Developmental Center residents who were known to DDS, who moved to the community from April 1, 1993 through June 30, 2000, and who continued to reside in the community at the time of our data collection.

The distinction between a sample and a population is scientifically important. A population is everyone in a certain group. A sample is a selected subgroup from that population. When we use a sample, we measure things and then attempt to "infer" that what we observe in the sample is also true for the population. The term "inferential" in the phrase "inferential statistics" means exactly that: inferential statistics help us infer something we measure in a sample to the whole population of which the sample is a part.

In the present study, we have included the entire population. *Therefore inferential statistics are not strictly necessary*. The measurement results we obtain for this population simply "are what they are." We still have the ever-present problems of measurement imprecision, plus the fact that we could not complete visits with a few people, but all in all, the work reported here must be considered and treated as the population, not as a sample. (Nevertheless, some analysts and readers may find statistics useful as indicators of the magnitude of effects, so we will include them in this Report wherever helpful.)

This fact is also important in a very practical sense. It enables us, and the state of California, to say that we attempted to visit every single person who was affected by the Coffelt settlement and its aftermath. *No one "fell through the cracks."* For the second year in a row, we located every individual and documented their current living arrangement. We completed

visits with 2,271 people. These visits took between 20 and 340 minutes. They averaged 79 minutes.

During these visits, we measured many aspects of the people's well-being and quality of life. We can now compare our findings to the results from last year and from now on we can detect any changes that might affect this population. This is the highest form of system accountability: to be accountable for the qualities of the individual lives of the people who are receiving services from the system.

We completed visits with 2,271 people. This was a "response rate" of **93.8%**. The most common reason for not completing a Visit was that multiple appointments were made and then broken. Our Visitors were instructed to stop after three appointments were broken by the person and/or the person's support personnel.

This response rate compared very favorably with the prior work of Berkeley Planning Associates or BPA [4], who reported two separate completion rates (80% on page i and 80.7% on page 1.10). Whichever figure was correct for the BPA study, our completion rate exceeded theirs by more than 12%. Our own Visitors exceeded their own previous completion rate of 92%

The major variable that we are studying in the lives of these 2,170 people is their place of residence. Therefore, we present the following Table 1 to illustrate the type and frequency of residential alternatives for the "Active Movers" visited this year.

---

[4] Berkeley Planning Associates (1998). *Quality Of Life For Persons With Developmental Disabilities Moving From Developmental Centers Into The Community.* Sacramento: Department of Developmental Services.

**Table 1**
**Detailed Living Situations of the 2,170 "Active Movers"**

| Type of Setting | Number | Percent |
|---|---|---|
| State Mental Hospital | 1 | 0.0 |
| ICF/DD > 15 Beds | 15 | 0.7 |
| Skilled Nursing Facility | 21 | 1.0 |
| Private Facility | 5 | 0.2 |
| Board and Care | 8 | 0.4 |
| Hospital, Acute Care | 3 | 0.1 |
| Nursing Home | 5 | 0.2 |
| Jail or Detention Center | 2 | 0.1 |
| ICF/DD 4 to 15 Beds | 9 | 0.4 |
| ICF/DD-N 4 to 6 Beds | 361 | 16.9 |
| ICF/DD-N 7 to 15 Beds, Nursing | 16 | 0.7 |
| ICF/DD-H 4 to 6 Beds Habilitative | 509 | 23.8 |
| ICF/DD-H 7-15 Beds Habilitative | 10 | 0.5 |
| CCF Level 2 Owner | 6 | 0.3 |
| CCF Level 2 Staff | 7 | 0.3 |
| CCF Level 3 Owner | 43 | 2.0 |
| CCF Level 3 Staff | 85 | 4.0 |
| CCF Level 4 A/Staff | 23 | 1.1 |
| CCF Level 4B/Staff | 8 | 0.4 |
| CCF Level 4C/Staff | 45 | 2.1 |
| CCF Level 4D/Staff | 13 | 0.6 |
| CCF Level 4E/Staff | 16 | 0.7 |
| CCF Level 4F/Staff | 79 | 3.7 |
| CCF Level 4G/Staff | 159 | 7.4 |
| CCF Level 4H/Staff | 79 | 3.7 |
| CCF Level 4I/Staff | 341 | 15.9 |
| Adult Foster Care | 2 | 0.1 |
| Foster Care Dept. of Social Services | 2 | 0.1 |
| Adult Family Home SB1730 | 10 | 0.5 |
| Supported Living > 21 hours/week | 115 | 5.4 |
| Supported Living 11-20 hours/week | 6 | 0.3 |
| Supported Living 0-10 hours/week | 4 | 0.2 |
| Independent Living | 30 | 1.4 |
| In Parent's Home | 43 | 2.0 |
| Other Relative's Home | 14 | 0.7 |
| In Friend's Home | 7 | 0.3 |
| Other Community Setting | 38 | 1.8 |
| No description given | 30 | 1.4 |
| Total | 2170 | 100.0 |

The names for types of settings in the table are taken from various California and Medicaid codes and titles that are used to describe residential living arrangements for people with disabilities. Some differ in the number of residents they accommodate e.g., ICF/DD-h 4-6 beds versus ICF/DD-h 7-15 beds. Others vary according to people's levels of disability and the related kinds of support and staff ratios that they require. For example, CCF Level 4-A/staff versus CCF Level 4-E/staff, and supported living services are classified according to the hours of support that people receive per week, e.g., Supported Living >21 hours versus Supported Living 0-10 hours.

It is important to note that the first eight lines of Table 1 record 60 people living in nursing homes, or other large, congregate care type facilities. These people were included because they were originally members of the group who moved from Developmental Centers to the community, "Movers", and so we feel it is necessary to track their subsequent moves. In addition, there is a detailed section on "Returnees", beginning on page 117, that describes the characteristics of 47 people who returned to developmental centers after community placement.

The distinctions noted in Table 1 are important for some analyses and are therefore included in this report. However, for most discussions of the characteristics and outcomes of the Movers, we have collapsed the 37 categories into the eight categories listed in Table 2.

**Table 2**
**Broad Categories of Living Situations**

| Living Situation Category | Number | Percent |
|---|---|---|
| Congregate | 60 | 2.8% |
| ICF (Small) | 905 | 41.7% |
| CCF | 904 | 41.7% |
| Foster Care | 4 | 0.2% |
| Supported Living | 125 | 5.8% |
| Independent Living | 30 | 1.4% |
| Relatives' Homes | 57 | 2.6% |
| Other | 85 | 3.9% |
| Total | 2,170 | 100.0% |

The 60 people listed in the congregate living situation category were not technically living "in the community" at the time of our Visit. It is a generally accepted practice that any facility housing 16 or more individuals is not referred to as a "community" facility. This custom is legitimatized by several respected sources:

- Definitions established by regulations of the Health Care Financing Administration's ICF/MR (Small) Program, which was defined as "4 to 15 beds." Anything larger than that must obey the standards set for institutions.
- The National Residential Information Systems Project of the University of Minnesota (R.W. Prouty & K.C. Lakin (Eds.), *Residential Services for Persons with Developmental Disabilities: Status and Trends Through 1998.* Minneapolis: University of Minnesota, Research & Training Center on Community Living, Institute on Community Integration. Their reports break all living situations into 15 and smaller versus 16 and larger.
- The fiscal tracking Project of National Significance of the University of Illinois at Chicago (Braddock, D., Hemp, R., Parish, S., & Westrich, J. (1998). *The state of the states in developmental disabilities: Fifth Edition.* Washington, DC: American Association on Mental Retardation.

Despite a national consensus that larger settings are not "community," we included all 2,170 Movers in our analyses. The basis for keeping the 60 congregate care people in these

analyses was that they were, in fact, part of the <u>Coffelt</u> and subsequent deinstitutionalization initiatives. Wherever they wound up, they had to be tracked and included. Moreover, many such large settings could, in theory, be "appropriate" for some people. For example, the three people we visited in acute care hospitals were surely in them for good reason. And some or all of the 26 people in skilled or other nursing homes may have required that level of care. Hence we determined to include people in the congregate care settings. We think this produces the fairest picture of what happened to all the people who moved out of, and stayed out of, California's Developmental Centers.

Table 3 shows a breakdown of current living types and the average number of people with disabilities living at each type.

**Table 3**
**Average Sizes of Community Homes**

| Type of Home | Average Number of People with Disabilities |
|---|---|
| ICF/DD 4-15 Beds | 6.9 |
| ICF/DD-N 4-6 Beds, Nursing | 5.9 |
| ICF/DD-N 7-15 Beds, Nursing | 9.6 |
| ICF/DD-H 4-6 Beds, Habilitative | 5.7 |
| ICF/DD-H 7-15 Beds, Habilitative | 10.3 |
| CCF L2 Owner | 4.0* |
| CCF L2 Staff | 5.4 |
| CCF L3 Owner | 7.0* |
| CCF L3 Staff | 7.8 |
| CCF L4-A/Staff | 7.3 |
| CCF L4-B/Staff | 5.0* |
| CCF L4-C/Staff | 5.1 |
| CCF L4-D/Staff | 4.1 |
| CCF L4-E/Staff | 4.9 |
| CCF L4-F/Staff | 5.3 |
| CCF L4-G/Staff | 5.3 |
| CCF L4-H/Staff | 4.7 |
| CCF L4-I/Staff | 4.7 |
| Adult Foster Care | 3.5 |
| Foster Care, Dept. Of Social Services | 2.0 |
| Adult Family Home SB1730 | 2.7 |
| Supported Living >21 hours/week | 2.2 |
| Supported Living 11-20 hours/week | 1.2 |
| Supported Living 0-10 hours/week | 1.3 |
| Independent Living | 2.5 |
| Parent's Home | 1.0 |
| Other Relative's Home | 0.9 |
| Friend's Home | 2.6 |
| Other Community Setting | 14.2 |

*The median rather than the mean was used for these types of homes because one or two people
in these categories reported living with large numbers of people.

Table 3 shows that aside from the ICF homes, Other Community Settings has the largest
average number of people with disabilities with an average of 14.2 residents. The next highest
in average number of residents is CCF L-3 Staff at 7.8, followed by CCF L-4-A Staff at 7.3.

## Instruments

COA's package of measures of qualities of life is generally called the **Personal Life Quality** protocol (PLQ). Many of the elements of this package evolved from the Pennhurst Longitudinal Study (Conroy & Bradley, 1985). Pennhurst Class members have been visited annually since 1978. An extensive battery of quality-related data has been collected on each visit. Over the years, other groups have been added to the database, such as all people living in Community Living Arrangements in Philadelphia who were not members of the Pennhurst Class.

Prior to the present work in California, the PLQ package had also been applied in deinstitutionalization studies and quality assurance systems in Arkansas, Colorado, Connecticut, Florida, Georgia, Louisiana, Maryland, Minnesota, New Hampshire, New Jersey, North Carolina, and Texas, as well as in Canada, France, and Australia. COA's PLQ approach has been selected as the primary method for evaluating the impacts of self-determination in the 29 participating states funded by the Robert Wood Johnson Foundation and was most recently selected as the instrument to track court mandated deinstitutionalization in Tennessee.

This comprehensive battery of instruments was based on the notion that "quality of life" is inherently multidimensional (Conroy, 1986). It is essential to measure many kinds of individual outcomes to gain an understanding of what aspects of quality of life have changed over time (Conroy & Feinstein, 1990a).

Modifications made to the battery of instruments over the years have been based on the concept of "valued outcomes" (Conroy & Feinstein, 1990b; Shea, 1992). Professionals may value some outcomes most highly, such as behavioral development; parents and other relatives may value permanence, safety, and comfort more highly; and people with mental retardation may value having freedom, money, and friends most highly. The goal in our research on

deinstitutionalization, and later in self-determination, has been to learn how to measure aspects of all of these "valued outcomes" reliably.

The primary instrument package for this project is called the Personal Life Quality protocol or PLQ. It is included herein as **Appendix B**. It includes measures of independence, productivity, choice making, integration, friendships, behavioral progress, health, health care utilization, health care quality ratings, case management, activities and supports, individual planning, environmental qualities, and satisfaction. The PLQ used in this year's work was reviewed by a Task Force in 1999.

The reliability of the PLQ was explored in detail in Report Number 7 in the previous series, with very positive results (Conroy, 1995). The components have been subjected to other reliability tests over the years, (Devlin, 1989; Fullerton, Douglass, & Dodder, 1996; Isett & Spreat, 1979). The components of the PLQ have been shown to be highly objective, scientific, and reliable. The dimensions measured in the PLQ were derived from many years of interviews with services users, parents, other family members, service providers, and other stakeholders, about what is really important in peoples' lives.

The instrument package contains dozens of measures of quality of life and outcomes. Some of them are:

- power to make one's own life choices (with support if needed)
- self-care skills and skill development (adaptive behavior)
- vocational skills and skill development
- challenging behaviors and reduction of such behaviors
- stability of living and working environments
- attitudes and experience of primary caregivers
- health
- health care utilization patterns
- health care satisfaction
- use (versus overuse) of medications
- earnings
- hours per week of productive activity

- individual planning process timeliness
- individual planning process usefulness
- individual planning process degree of "person-centeredness"
- case manager involvement and quality of support
- integration
- relationships with neighbors
- friendships
- family contacts and family relationships
- opportunities for intimate relationships
- having a financial interest in the home
- satisfaction with home
- satisfaction with work
- satisfaction with leisure time
- satisfaction with services rendered (including case management)
- individual wishes and aspirations
- size of the home environment
- characteristics of the home environment (e.g. staffing)
- physical quality of the home environment
- individualized treatment in the home environment
- normalization in the home environment
- costs of the service/support elements
- family/next friend opinions and satisfaction

The Task Force that was convened for this project recommended that the tool utilize symbols, pictures, and/or simple language in our interviews with the focus people. Our Personal Interview was, in fact, constructed in simple language and tested more than 30,000 times across the country. We decided to use that simple-language instrument for the current project.

The Task Force also recommended that we ask questions concerning the staff of the homes, such as turnover, wages, and benefits. We did include questions about staff longevity, and also questions about how long staff have supported the specific person being visited. We also included optional wage questions.

The second instrument for this project is the Family Survey (**Appendix C**). This form was derived from 20 years of work surveying the families of people living in institutions and in communities. The first such survey was conducted with families of people living at Temple University's Woodhaven Center in 1975. The Pennhurst Longitudinal Study produced the next generation of family surveys, followed by versions adapted for Arizona, Arkansas, Connecticut, Colorado, Georgia, Massachusetts, New Hampshire, New Jersey, North Carolina, Oklahoma, and Texas. The 1996-97 California <u>Coffelt</u> Family Survey form, developed in 1993, was included in Report 12 as an Appendix. It was first sent to families of <u>Coffelt</u> Class Members in 1994, and every year thereafter. The results of the Family Surveys were summarized in Reports 6, 8, and 11, 12, and 14. For the current 3 year project, we will present the results of family surveys annually.

## Procedures for Field Work and Data Collection

The time and coordination necessary to schedule and complete individual visits with 2,170 people living in the community is enormous. The three Regional Coordinators for this project have perfected a system that is efficient and responsive to the needs of all stakeholders as well as to the time constraints of the project.

In the first year of the project, COA recruited and trained local professionals, paraprofessionals, and graduate students to Visit each person in the Quality Tracking Project and to collect the PLQ data. These data collectors, referred to as "Visitors", function as Independent Contractors. The majority of the Visitors returned for this year's round of visits. This continuity facilitates timely data collection as the Visitors utilize personal connections with the person to be visited, and often with family members or residential staff, to schedule visits.

Visitors are paid a fixed rate for each completed interview plus expenses for overnight trips or significant distances. The Visitor instructions from the PLQ are reproduced below:

This package is composed of many measures, scales, instruments, and interview items. Practically all of the information collected in this package is related to quality of life. In order to complete the package, you must have access to:

1. The person (to attempt a 5 to 15 minute direct interview)
2. The person's home (for a 5 to 10 minute tour and observation)
3. Whoever knows the individual best on a day to day basis (average 45 minutes)
4. The person's records, including medical records
5. In some cases, a health care professional (about 5-10 minutes)

With access to these five sources of information, you should in most cases be able to complete this package within the range of 60 to 90 minutes.

Visitor training was conducted in the first year by Dr. Conroy, the Principal Investigator. The training consisted of an introduction to the project, a role-playing exercise, and a review of the instrument sections and purposes. On site field supervision was provided by Regional Coordinators. New Visitors hired in year two were trained and directly supervised by their Regional Coordinators. Dr. Conroy hosted a two-day project meeting with all Regional Coordinators and Visitors in February, 2001 in Oxnard, California. The agenda for the meeting was a presentation of the results from Year One, a review of all instruments, and a question and answer session regarding instruments and methods. This meeting provided a forum for Visitors to learn from each other and to make suggestions to improve the instruments used by COA.

The data collection process begins with an updated list of Active Movers from DDS. The list is divided according to COA's three regions, North, Central and South, and distributed to the Regional Coordinators. The Regional Coordinators assign names to Visitors who are them responsible for scheduling and completing appointments. Visitors are trained to be sensitive to the schedules of the people to be visited and to the programmatic needs of staff. All visits are scheduled for the person's convenience, not our Visitor's convenience. Visitors can make appointments for evenings and weekends if that is what is preferable. The average length of a visit for this year was 79 minutes, down from an average of 83 minutes from last year. We collected reliable quantitative data on dozens of qualities of life in a very short time, with very little intrusion into peoples' lives.

# Pre-Post Results for 191 Movers

## Pre-Post Results 1:  "Before and After" Qualities of Life

The central question of any evaluation of a social intervention is "Are the people who received the intervention better off?"  In the case of California's recent deinstitutionalization initiative under the terms of the Coffelt settlement, this question is very appropriate. California's stakeholders deserve to know whether the people who moved from Developmental Centers (DCs) to community homes from 1993 to the present are better off, worse off, or about the same --- and, it is important to know in what ways and how much.

## The "Pre-Post" Design

In prior reports, we approached these questions in several ways, with several designs.[5] First, we used matched comparison, to test whether "similar" Movers and Stayers experienced different qualities of life (Reports 2 and 3 of the first series of 20 Reports).  Second, we used analysis of covariance to mathematically control for differences between Movers and Stayers, and then to test for differences in quality between the groups (Report 10).  Third, we used "before and after" or "pre-post" measures of qualities of life for a group of people when they were still in DCs back in 1994, and again when they were out in their new community homes (Reports 7, 12, and 17 of the first series).[6]

What made this "pre-post" design possible was a decision we made back in 1994. Although not originally mandated by the Court or by DDS, we contended that we needed to collect "baseline data" for as many people as possible before they left DCs.  We requested permission from Court representatives and DDS officials to rework our study designs so that

---

[5] The ideal research design, as noted by Campbell (1969), would have been random assignment to "treatment" and "control" groups. Naturally, this was not feasible, because program implementers felt they should select people for placement according to their characteristics and perceived potential for community living, their wishes, and the wishes of their families.

we could immediately visit as many DC residents as possible, and it was granted.  Hence, back in 1994, we conducted data collection visits with as many DC residents as resources would permit.  We visited 839 individuals in DCs, selected purely at random from the more than 5,000 DC residents.[7]

This decision provided DDS and COA with a crucial advantage.  For any of those 839 people who later moved out of DCs, we would then be able <u>in any future year</u> to measure any changes in the qualities of their lives, compared to when they lived at a DC.

If we had not collected this "baseline data" on quality of life for people in the DCs at the beginning of this social change, we would never have been able to answer the most fundamental and important questions:  ***"Have the qualities of these peoples' lives changed, and if so, in what ways, in what direction, and how much?"***

This year, we completed visits with 2,170 Movers (people who once lived in a DC, but now are living in the community).  Included in that number, by pure random sampling, are 191 of the people who had  been visited at their previous DC homes back in 1994.  These 191 people are the topic of this chapter.  We can now examine what, if any, qualities of their lives have changed since community placement.

---

[6] In a "fourth design," we surveyed the closest relatives, guardians, and conservators each year to obtain their opinions about comparative quality back at the DC and in the community.

[7]  Sample drawn by DDS statistical program as simple random 15%.

**Limitations of the Pre-Post Design**

The number of people in the analysis, 191, is definitely large enough for studies of this kind. For example, a peer-reviewed article on Movers from Pennhurst (Conroy, Efthimiou, & Lemanowicz, 1982), was based on a smaller number of people who moved from institution to community (70). Many other published articles have relied on considerably smaller sample sizes. [8] For reference, the "sampling margin of error" for 191 out of 2170 people is, in the very simplest case, calculated as plus or minus 7%. This meets most professional standards for sample size and precision.

However, the 191 Movers who were in our original baseline of 839 people may have had different characteristics than those 648 people who remained in DCs. If so, this would limit our ability to generalize from the 191 to all the remaining people in DCs. In plain language, what has been observed to be true for the Movers so far may or may not be what is true for any future Movers. This will depend in part on whether the current Movers are "similar to" the future Movers. In Table 4 below, we can see that there is at least one significant difference between the 191 Movers in our sample and the 648 "potential future Movers" (in other words, the 648 Stayers).

---

[8] For example, see Aanes, D., & Moen, M. (1976). Adaptive behavior changes of group home residents. *Mental Retardation, 14,* 36-40.

## Table 4
## Tests of Initial 1994 Differences Between Movers and Stayers

|  | The 648 Stayers | The 191 Movers | Mean Difference | t | df | Significance (1-tailed) |
|---|---|---|---|---|---|---|
| Average Adaptive Behavior in 1994 | 36.5 | 45.9 | -9.41 | -5.07 | 301.9 | 0.0000 |
| Average Challenging Behavior in 1994 | 70.4 | 68.0 | 2.48 | 1.46 | 353.8 | 0.1454 |
| Average Age in 1994 | 38.0 | 36.6 | 1.46 | 1.32 | 400.4 | 0.1887 |

The table shows that the average Stayer started out in 1994 with a lower adaptive behavior total score than the average Mover, by 9.41 points. And on the extreme right of the adaptive behavior row, the figure "0.0000" means that this difference is large and almost certainly not something that happened by chance.[9] Thus the Movers in our sample were initially somewhat higher in self-care abilities and independent functioning than the Stayers, by about 9 points on a 100 point scale. Although highly significant, this difference was not overwhelmingly large. Yet even small differences in adaptive behavior, which is a very global and reliable measure, can influence many other aspects of life.

The second row of the table shows only a small difference in challenging behavior between the Movers and the Stayers, about 2 ½ points (this time with the Movers having more challenging behavior than the Stayers -- lower scores on this scale mean more challenging behaviors). That difference did not reach significance -- the figure at the extreme right of the row is not below the usual criteria of .0500 or .0100. The finding for age is similar. The difference of about 1½ years was not statistically significant.

Thus the tendency was for these 191 randomly identified Movers to be slightly higher functioning in adaptive behavior, to display somewhat more challenging behaviors, and to be slightly younger, than the average Stayer. But only the adaptive behavior finding was

---

[9] Statisticians generally require that significance numbers fall below some arbitrary standard, usually 0.0500 or 0.0100.

significant. We think the proper conclusion is that our findings about these Movers should be interpreted as generalizable with caution. That is, what we find about the experiences of these 191 Movers over the past 7 years would likely have been similar for the other 648, if they had moved. However, this is not certain, and in some areas of quality, outcomes might have been different. In the text above, we have simply emphasized that we must be very careful about generalizing findings from one group to all kinds of other groups.

In addition to the above caution about generalization, the pre-post design suffers from another threat to validity. The pre-post design by itself does not answer the question "How do we know the Stayers haven't experienced the same kinds of changes in qualities of life as the Movers?" With the pre-post design by itself, the answer is that we don't. There is no "control group." A valuable addition to this study would be to conduct visits with the people who continue to live in Developmental Centers, the "Stayers", particularly the 648 people that we visited in 1994. This additional data would allow us to track their progress since 1994 and to compare it to the "Movers".

It is true that our past matched comparison and covariance designs did shed light on that issue, with the inference that the Stayers did not show similar changes.[10] Nonetheless, it needs to be said that the analyses in this Chapter by themselves are vulnerable to several threats to validity, even though these threats have already been diminished by other designs in the present body of work.

---

10 Incidentally, the best available design to settle this question would be a matched comparison study of change over time, which would require current visits with 191 Stayers who are "twins" (people still in DCs who have characteristics very similar to the 191 Movers). The cost of such a study would be under $40,000.

## What Kind of Community Homes Are the 191 Movers Now Living In?

The 191 people moved into the types of community settings shown in Table 5.

### Table 5
### Current Homes of 191 Pre-Post Movers

| Type of Community Setting | Number of People | Percent |
|---|---|---|
| 9  ICF/DD >15 Beds | 1 | 0.5% |
| 10  Skilled Nursing Facility | 2 | 1.0% |
| 14  Nursing Home | 1 | 0.5% |
| 22  ICF/DD-N 4-6 Beds, Nursing | 39 | 20.4% |
| 23  ICF/DD-N 7-15 Beds, Nursing | 1 | 0.5% |
| 24  ICF/DD-H 4-6 Beds, Habilitative | 47 | 24.6% |
| 25  ICF/DD-H 7-15 Beds, Habilitative | 4 | 2.1% |
| 29  CCF L3 Owner | 2 | 1.0% |
| 30  CCF L3 Staff | 10 | 5.2% |
| 31  CCF L4-A/Staff | 4 | 2.1% |
| 32  CCF L4-B/Staff | 1 | 0.5% |
| 33  CCF L4-C/Staff | 4 | 2.1% |
| 36  CCF L4-F/Staff | 6 | 3.1% |
| 37  CCF L4-G/Staff | 19 | 9.9% |
| 38  CCF L4-H/Staff | 4 | 2.1% |
| 39  CCF L4-I/Staff | 24 | 12.6% |
| 43  Adult Family Homes SB1730 | 2 | 1.0% |
| 44  Supported Living >21 Hrs Per Week | 7 | 3.7% |
| 47  Independent Living | 2 | 1.0% |
| 48  In Parent's Home | 3 | 1.6% |
| 50  In Friend's Home | 1 | 0.5% |
| 52  Other Community Setting | 7 | 3.7% |
| Total | 191 | 100.0% |

The table shows that four of these Movers are currently living in a congregate care setting, i.e., the first three rows. Nearly 100 are in some variety of federally assisted Medicaid ICF/MR setting. The rest are in a diverse set of community settings, with the preponderance in group homes that receive federal financial assistance through the Medicaid Waiver. This general pattern reflects the fact that nearly all of the Coffelt Movers went to settings that were assisted by the federal Medicaid program --- about half via ICF/MR and about half via Waiver.

## Outcomes Summary

For the quantitative part of our work, we visited hundreds of people with disabilities, interviewed hundreds of staff members, reviewed records, and toured homes and day programs. The data permitted us to analyze more than 700 items of information for each person. Most of these items were combined into scales for ease of interpretation.

For example, there were 16 items on "getting out" and going on outings. The 16 items were combined into a single scale of how many times each person went out into integrated settings each month. This produced a simple measure of "how often people got out each month." If this measure increased between 1994 and 2001, then we would conclude that the level of "integrative activities" increased. That would be a positive outcome, insofar as reduced segregation is viewed as a good thing. For the Quality Tracking Project, we collected a series of measures related to quality of life and therefore to outcomes.

Table 6 presents a summary of results for a variety of important quality and outcome indicators for the 191 Movers.

**Table 6**
**Summary of Outcomes**
**For 191 Movers**

| Quality Dimension | Pre | Post | Change | Outcome |
|---|---|---|---|---|
| Progress Reported Toward IP Goals | 45.2 | 78.9 | 33.7 | Positive |
| Number of Services in Individual Plan | 6.1 | 8.9 | 2.8 | Positive |
| Hours of Day Program Services | 23.4 | 27.1 | 3.6 | Positive |
| Earnings | 5.2 | 4.1 | -1.1 | Not Signif. * |
| Number of Close Friends Reported | 3.3 | 2.2 | -1.1 | Negative |
| Integration | 14.0 | 27.6 | 13.7 | Positive |
| Qualities of Life Ratings (Now 1994-Now 2001) | 71.3 | 83.8 | 12.5 | Positive |
| Staff Job Satisfaction | 8.9 | 9.4 | 0.6 | Positive |
| Staff Like Working With This Person | 8.2 | 9.3 | 1.1 | Positive |
| Staff Get Sufficient Support | 4.1 | 4.6 | 0.5 | Positive |
| Number of Daily Medications | 4.9 | 5.0 | 0.1 | Not Signif.* |
| Number of Psychotropic Medications | 0.4 | 0.4 | 0.0 | Not Signif.* |
| Health by Days Ill Past 28 | 0.5 | 0.9 | 0.4 | Not Signif.* |
| Perceived Quality of Health Care (Staff responses) | 4.7 | 4.4 | -0.3 | Negative |
| Doctor Visits Per Year | 34.4 | 13.5 | -21.0 | Unclear |
| Dental Visits Per Year | 2.2 | 1.5 | -0.7 | Negative |
| Relative Visits Person Here At This Home | 8.4 | 7.3 | -1.1 | Not Signif.* |
| Individualized Practices Scale | 61.7 | 67.4 | 5.8 | Positive |
| Adaptive Behavior | 45.7 | 45.0 | -0.7 | Not Signif. * |
| Challenging Behavior | 68.0 | 78.0 | 9.9 | Positive |
| Choicemaking | 32.7 | 47.3 | 14.7 | Positive |

\* "Not Signif." means the change did not attain statistical significance at the .05 level by Paired t-test and is therefore not labeled as either positive or negative.

For each quality dimension in Table 6, we have presented the average score for Movers on that dimension prior to the move (in the column headed "Pre"). The column headed "Post" shows the average score in 2001, after moving into the community. Next, the column headed "Change" shows the average number of points of change that occurred in each dimension.

Since many of these dimensions are measured on different scales, the amounts of change cannot always be compared directly. Therefore each dimension will be discussed individually below.

The final column headed "Outcome" shows whether the change in each dimension was positive or negative; that is, whether each represented an improvement or a decline in quality of life. Any findings that did not reach statistical significance are labeled "Not Signif.," meaning that we are unable to conclude that any real change occurred. The label "Unclear" means that the direction of the change cannot be obviously identified as positive or negative, e.g., are 13.5 doctor visits per year "worse" than 34.4, or are 34.4 visits excessive? A coherent argument can be constructed that 13.5 visits, on the average, shows sufficient access to health care and is not "worse" than 34.4. The opposite argument can also be made. Hence our conclusion is "Unclear", and the reader may draw his or her own inference on such an outcome.

Table 6 lists outcomes for 21 quality dimensions that were compared from the pre (DC 1994) to post (community 2001) visits. There are 11 significantly positive outcomes, 3 significantly negative outcomes, 6 outcomes that are neither significantly positive nor negative and 1 outcome for which the comparison is unclear. In other words, for these 191 Movers, quality of life improved in half the ways measured, got worse for one seventh of the ways measured, and did not change for about a third.

In summary, the Table data support the inference that people's lives have improved in more than three times as many dimensions as they have declined. This leads to the conclusion that, at least for these 21 indicators of quality, moving out of institutions allowed these 191 people, on the average, to experience improvements in many qualities of their lives.

Following are individual explanations and implications for each of the 21 indicators of quality.

### Progress Reported Toward Individual Plan Goals

For each of the top five goals in each person's Individual Plan, we ask "Has there been any progress toward this item in the past year?" Responses are given on a five point scale: Major Loss, Some Loss, No Change, Some Gain, Major Gain. These five point scales are combined across the five goals, and we construct an overall scale of progress toward goals. This overall scale is computed so that it can potentially range from 0 to 100.

As the table shows, the respondents at the DCs produced an overall scale score of 45.2 back in 1994, which can be interpreted as an average perception of a little below "No Change". In the community in 2001, the average rating was 78.9, which can be interpreted as an average perception of a little above "Some Progress". The difference is large. Since staff of the residences almost always answered these items, it can safely be concluded that community staff believe they are seeing a lot more progress than did institutional staff back in the DCs.

The proper conclusion is that these 191 Movers are "better off" than they were back in the DCs in terms of making progress toward the goals in their Individual Plans.

### Number of Services in Individual Plan

The Personal Life Quality protocol (PLQ) contains a checklist of 15 traditional therapies, training programs, services, and supports that might be delivered via the residential program. The number of services for these Movers increased from 6.1 at the DCs in 1994 to 8.9 in the community in 2001. The increase of 2.8 services was statistically significant.

The proper conclusion is that these 191 Movers are receiving a wider range of services and support than they were back in 1994 at the DCs. Since we did not measure amount of services, however, we cannot comment on how much of each such service is being provided.

**Hours of Day Program Services**

We collected the number of hours per week of each of 17 types of day activities, from self-employment to community experience to school. The average number of hours of day program services of all types increased from an average of 23.4 hours per week back at the DCs to 27.1 hours per week in 2001 in the community. This increase of 3.5 hours is significant.

We conclude that community placement appeared to be related to a greater number of hours per week that people spend in some kind of "productive activity". Further research into changes in the distribution of <u>types</u> of day activities could be performed within the present data set, but is beyond the scope of this chapter.

**Earnings**

Comparison of average weekly earnings back at the DC to earnings in the community reveal a slight decrease, which is not statistically significant. The average amount in the DCs was $5.20 per week, and the average amount in the community is $4.10. Both of these figures are so low that they should engender a statewide discussion of the potential role of work and income generation for all Californians with developmental disabilities, whether in DCs or the community.

Last year, in Report 2 of this series, we found a different result. For the 178 Movers who were included in that analysis, average weekly earnings dropped from $4.80 in the DCs to only $1.60 in the community. That drop was statistically significant. Now, a year later, the significant drop is gone. This means that a fair number of people among the 191 Movers either began earning some small amount of income, or increased what they were earning.

This could be interpreted as a positive finding, in the sense that a previously negative outcome has been reduced to no change.

As we have consistently stated in Reports 2, 3, 8, 12, and 18 of the previous series, and Report 2 of this series, the data support the strong conclusion that California's community

services system is sorely in need of attention to supported and competitive employment options, and to more innovative options for generation of income such as microenterprises.

### Number of Close Friends Reported

In 1994 in the DCs, and in 2001 in the community, we asked people how many "close friends" they had. The answers were usually given by whomever knew the person best. We did not define "close friends" for the respondents, we asked them to use their own definitions. Hence this item must be considered to be largely subjective as an indicator of quality of life.

From 1994 to 2001, the average number of close friends reported fell from 3.3 to 2.2. The decrease of 1.1 was statistically significant.

Friendships are rapidly becoming recognized as a very important dimension of quality, and one that has often been under-emphasized or even ignored by traditional human service systems. Hence this negative finding should be interpreted to be an important one. We suggest that friendships, relationships, and community connections might be considered as a dimension for close monitoring by families, service providers, regional centers, advocates, and also for policy makers in DDS, the legislature, and the judiciary.

In our last annual report, Report 2, we also detected a drop in the average number of close friends from DC to community. However, that drop was not statistically significant (from 3.3 to 2.6). Now, measuring from 1994 to 2001, the decrease from 3.3 to 2.2 has become statistically significant. This suggests that some of the loss of friends may have taken place over the past year or two within the community. If so, that would be a very important finding, pointing to a rather urgent need to help people maintain and/or extend what relationships they have.

We suggest that the nature and depth of human relationships is an area in need of urgent concern and further investigation. Further investigations should study the proportion of friends in 1994 and in 2001 who were paid and unpaid, and friends with and without disabilities. A

study of those variables and others such as levels of retardation, age, gender, and living arrangement may help to explain the drop in close friends that we have detected.

### Integration

Our measure of Integrative Activities is simply a count of "how many times the person went out" and went to places where any citizen might go. The Movers increased their levels of integration from 14.0 to 27.6, indicating an additional 13.3 community events per month. This near doubling of integrative activities was statistically significant.

Although integration is an expected result of movement to the community, this outcome is strong evidence that the Movers have sharply increased their opportunities to go to places in which they are in the presence of citizens without disabilities. Insofar as integration is a fundamental value in supporting people with disabilities, and a prominent issue in the Coffelt Settlement, this is a major outcome.

For future investigation, we would recommend a full analysis of the integrative activities in relation to the close friends scale and the individual goals. Such a simultaneous investigation might yield more insight about complex relationships among Individual Planning, relationships, and community activities. The present database is sufficiently rich to permit such a thorough analysis.

### Qualities of Life Ratings (1994 and 2001)

The measures in this study include a scale of perceived qualities of life. Fourteen dimensions of quality of life are addressed including health, friendships, safety, comfort, etc. The person, or whoever knew the person best, gave numeric ratings of the person's qualities of life at the developmental center. (Back in 1994, there were only 10 dimensions of quality in the scale, so only 10 of the 14 can be compared pre and post.) In subsequent interviews, the person, or whoever knew the person best, gave ratings of the same qualities of life.

We compared the ratings given by people and/or DC staff back in 1994 to those given by people and/or community staff in 2001. (The overall 100-point scale for this analysis was composed of only the 10 items used in 1994, to keep the scales comparable in 1994 and 2001). The average score increased from 71.3 to 83.8, for an increase of 12.5 points. This indicates that the Movers, or the people closest to them, perceived lower quality of life back in the DC, and considerably higher qualities of life in the community.

To reveal the largest perceived changes, we broke down the scale into its component items. Table 7 shows the results, sorted by the size of the change.

**Table 7**
**Perceived Qualities of Life Reported by Person or Closest Others, Pre-Post**

| Dimension of Quality | 1994 at DC | 2001 in Community | Change | Statistical Significance |
|---|---|---|---|---|
| Food | 3.6 | 4.4 | 0.8 | 0.0000 |
| Comfort | 3.9 | 4.5 | 0.6 | 0.0000 |
| Getting out | 3.5 | 4.1 | 0.6 | 0.0000 |
| Happiness | 3.8 | 4.4 | 0.6 | 0.0000 |
| Running my own life | 3.2 | 3.8 | 0.6 | 0.0000 |
| Seeing friends | 3.2 | 3.7 | 0.6 | 0.0000 |
| Safety | 4.2 | 4.7 | 0.5 | 0.0000 |
| What I do all day | 3.7 | 4.2 | 0.5 | 0.0000 |
| Health | 3.9 | 4.2 | 0.3 | 0.0000 |
| Family relationships | 2.8 | 2.9 | 0.1 | 0.1708 |

The table shows that 9 out of 10 dimensions of quality of life were rated higher in the current community homes than they were back at the DCs. The largest difference was in quality of food. The next largest differences were in comfort, getting out, happiness, and running my own life.

It is worth noting that the perceptions of health and safety went up as well. This may be a surprise to those who believe that living in the community carries with it a price to be paid in

terms of diminished health and safety.  These 191 Movers, and those closest to them, clearly do not agree with that contention.

The one element that did not change significantly was relationships with family.  We speculate that those who had involved family members while at the DC continued to have them in the community, and those who did not have involved family members did not acquire them.

The proper conclusion from this is that the people and/or the staff closest to them reported their perceptions of quality back at the DC, and again 7 years later in the community – and the community ratings were considerably higher.  These data strongly support the inference that the Movers are "better off" in their own eyes and the eyes of those close to them.

### Staff Job Satisfaction

A critical factor in rating the quality of life in residential programs is staff.  Do they like their jobs?  Do they like working with this person specifically?  Do they feel they receive sufficient support from administration to do their jobs effectively?

For "How much do you like your job?" on a scale of 1 to 10, the average response from developmental center staff was 8.9 and in the community it rose to 9.4.  Community staff like their jobs more than did developmental center staff.  This difference was significant.

### Staff Like Working With This Person

The question "How do you feel about working with this person?" is believed to be very important for people with disabilities.  Staff who like their jobs, and who like working with the individual, would seem likely to render better support.

On a scale of 1 to 10, the developmental center staff score averaged 8.2, and the community staff was significantly higher at 9.3.  Community staff report enjoying working with each specific person significantly more than did the developmental center staff.  We think

the proper conclusion is that relationships with close staff members are better in the community than they were back at the DCs for these 191 Movers.

### Do Staff Get Sufficient Support?

When asked "Do you feel you receive sufficient support from administration to do your job?" the staff responses were fairly high in both settings. On a 5-point scale, the response was 4.1 from developmental center staff and 4.6 from community staff. Although both groups reported feeling supported, the ratings were higher in the community than they were in the developmental centers. The proper conclusion is that current community staff feel more supported than did DC staff back in 1994.

### Number of Daily Medications

The average number of medications (including vitamins, minerals, and special supplements) administered daily stayed essentially the same, going from 4.9 to 5.0. This was not a statistically significant change (0.1). Incidentally, detailed analysis shows that the average number of "digestive, stomach, and bowel" medications has decreased significantly. This may be an indication of a change in dietary habits and medical management practices.

### Number of Psychotropic Medications

The number of psychotropic medications remained the same. However, we must point out that in a sense this is a positive finding, because in our early studies, we found that the people who moved out of DCs in the mid-1990s actually experienced increases in psychotropic medications. This suggested that the community medical system was overmedicating people, perhaps out of lack of experience. Now we conclude that the 191 Movers are experiencing about the same probability of being given psychotropics in the community as they were in the DC.

**Health by Days Ill in Past 30 Days**

Another method used to measure general health is taken from national health surveys: "Number of days of restricted activity because of illness within the past 30 days." This health quality indicator did not change significantly, indicating that people's general health had neither improved nor diminished.

**Quality of Health Care**

The responses to the question "Overall, how good is the health care this person is getting?" revealed a negative and significant difference. Because this dimension was rated on a 1 to 5 scale, both the answers from 1994 in the DCs (4.7), and the answers from 2001 in the community (4.4), lie in the "Good" to "Excellent" range. However, the average rating in the community is significantly lower than the average rating back at the DCs.

One potential explanation for the decrease in the perceived rating of health care is problems with locating specialists and doctors in the community who have experience in working with people with disabilities. This is an area that has begun to be monitored closely via various DDS policies and actions, such as the Wellness Initiative. We interpret our finding as evidence that this attention to health care in the community needs to continue.

**Doctor Visits Per Year**

The Movers' number of doctor visits per year decreased sharply from 34.4 to 13.5 times per year. This pattern has been documented as fairly standard in moves from institutions to the community.[11] However, the fact that they saw the doctor 21 less times in the community does not necessarily mean that either their health care or general health was negatively affected.

---

[11] Hayden, M. F., & DePaepe, P .A. (1991). *Medical conditions, level of care needs, and health related outcomes of persons with mental retardation: A Review*. Journal of the Association of Persons with Severe Handicaps, 16(4), 188-206.

There is no evidence from any of the data that people in the community need to see doctors more often than 13 times a year. We therefore interpreted this finding as neither positive nor negative, but rather "Unclear."

### Dental Visits Per Year

The Movers' number of dental visits per year decreased, from 2.2 to 1.5. Because the dental profession recommends 2 visits per year, we interpret the significant decrease as a negative finding. (Although the 1.5 times per year rate is believed to exceed the frequency of general public visits to dentists.)

### Relative Visits Person Here At This Home

The frequency of family contacts increased from 8.4 to 11.2 per year. This was not a statistically significant change. Again, this might be interpreted as "those that had family contacts in the DC continued to have them; those that had no family contacts did not acquire the.". Proximity may also play a part in this increase as a number of people may have been placed in community residences that were close to their family home.

### Individualized Practices Scale

This scale lists 15 items that are related to staff management practices, and it is designed to reveal the extent to which people are treated as individuals versus a management style in which "the same rules apply to everyone". The scale tends to reflect people's opportunities to engage in non-group activities and their options for making independent scheduling decisions within a group living arrangement.

The Movers increased their score on this quality dimension from 61.7 to 67.4, and this increase of 5.8 points on a 100 point scale was statistically significant, but not very large.

The topic of individualized supports may benefit from further investigation, because similar deinstitutionalizations in several other states have been associated with larger enhancements of individualized practices. A much larger increase on the Individualized Practices Scale occurred recently among 183 Indiana citizens who moved out of Developmental Centers. The Indiana Movers showed a statistically significant gain of 25 points on the Individualized Practices Scale after one year of life in the community.

### Adaptive Behavior

For the first time in this body of work, the change in adaptive behavior between institution and community has become negative. Although the change is not statistically significant, this does represent a first. In more than 20 years of this kind of work in 10 states, this is the first time this research team has detected a skill loss, significant or not, for people who moved from institutional to community settings. We decided that this new finding was important enough to warrant a preliminary review of the entire California body of work since 1994. To follow up on this preliminary review, we will definitely need to investigate more deeply to try to understand the causes and the implications of these data.

Last year, in 2000, we conducted the same kind of pre and post analysis for 178 Movers whom we visited in the DC in 1994 and again in the community in 2000. In that analysis, there was an average gain of 0.6 points from the DC 1994 score in adaptive behavior. That was not significant. However, the fact that it was the first non-significant gain led us to wonder whether we might be seeing the leading edge of a trend. Hence we looked at the findings of all of our past pre-post comparisons for adaptive behavior change i.e., the results for each year of the study regarding the people that we interviewed in the DCs in 1994. The data are shown in Table 8. Although this table is complex, we believe it is necessary to present complete information because of the potential importance of the issues raised.

## Table 8
## Trends in Pre-Post Adaptive Behavior Findings Over the Years

| Adaptive Behavior Measure | Baseline DC 1994 | Community 2001 | Change | Significant? |
|---|---|---|---|---|
| Report 8, 1996 34 Movers | 48.9 | 51.4 | 2.5 | Significant |
| Report 12, 1997 64 Movers | 45.1 | 48.3 | 3.2 | Significant |
| Report 17, 1998 91 Movers | 44.7 | 46.7 | 2.0 | Significant |
| Report 2, 2000 178 Movers | 45.0 | 45.6 | 0.6 | Not significant (1st time) |
| Report 4, 2001 191 Movers | 45.7 | 45.0 | -0.7 | Not significant (2nd time, first loss) |

In our earliest studies at the top of the table, in 1996, 1997 and 1998, we found significantly increased adaptive behavior among the Movers after they left the institutions. This is consistent with a large number of studies by many research groups, as documented in the meta-analysis performed by Larson & Lakin (1989).[12]

Moving down the table to the larger and more recent analyses, we see a fairly consistent trend toward less and less benefit, until at the bottom, the average outcome for the 191 Movers in 2001 is that they appear to have actually lost slightly in adaptive behavior skills. Since the change is not statistically significant, we cannot be certain that the apparent loss is valid. Nonetheless, the trend seems worthy of note. A graphic presentation may make this issue more clear. Chart 1 shows only the amount of change in adaptive behavior detected in the five California studies.

[12] Larson, S., & Lakin, C. (1989). *Deinstitutionalization of persons with mental retardation: Behavioral outcomes.* Journal of the Association for Persons with Severe Handicaps, 14, 324-332.

**Chart 1**



**Changes in Adaptive Behavior Among Movers,
Compared to 1994 Baseline at DCs:
Five California Studies**

It is the trend that is of greatest interest. The chart suggests rather strongly that the early Movers enjoyed considerable benefits in terms of learning new self-care skills and becoming more independent, but that the later Movers did not. In fact, the data suggest, but do not prove, that there might have actually been a loss in adaptive behavior in the past year, not between DC and community, but within the community. This hypothesis is tested in the next section, in which we analyze changes in quality indicators from the year 2000 community visits and the year 2001 community visits.

Another way to attempt to interpret the adaptive behavior data is to compare it with parallel data from other states.[13] Table 9 shows the adaptive behavior results from several studies conducted by this research group.

---

[13] As far as we are aware, only COA possesses a national database that permits such cross-state comparisons.

**Table 9**
**Adaptive Behavior Results From Several Deinstitutionalization Studies**

| State | # of Years | Time-1 Average Adaptive Behavior Score | Time-2 Average Adaptive Behavior Score | Gain on 100 Point Scales |
|---|---|---|---|---|
| Pennsylvania | 14 years | 39.8 | 50.2 | 10.4 |
| New Hampshire | 8 years | 53.0 | 62.3 | 9.3 |
| Louisiana | 7 years | 56.2 | 64.2 | 8.0 |
| **California** | **7 years** | **45.7** | **45.0** | **-0.7** |
| Oklahoma | 6 years | 41.3 | 47.4 | 6.1 |
| Connecticut | 5 years | 49.5 | 54.0 | 4.5 |
| North Carolina | 2 years | 52.7 | 54.8 | 2.1 |
| Kansas | 1 year | 33.1 | 34.8 | 1.7 |
| Indiana | 1 year | 48.1 | 50.2 | 2.1 |

At this point, the California experience is unusual.  In prior years, the California data fit rather neatly into the general national pattern.  Now, in 2001, something has changed.  We think it is urgent to find out what has changed, and why, and also what can be done about it.  It is important to again state that this change is not statistically significant and that it would certainly not have been detected without the mandate from the California legislature to monitor the progress of the Movers.  This data, although alarming in its implications, presents an opportunity for all stakeholders to review current policies and practices and to assure that community services are being implemented according to the spirit and the letter of the law.

## **Challenging Behavior**

This dimension was measured according to the person's ability to control challenging behavior and so a higher score is a positive outcome.  The 9.9 point increase in our current pre-post analysis is very high.

It is possible that the decrease in adaptive behaviors (although not statistically significant) and the major improvement with regard to challenging behavior are related. Programs that focus on adaptive behaviors are often more formal and regimented. In contrast, state-of-the-art programming for people with challenging behaviors relies more on prevention and positive reinforcement to produce safe and nurturing environments. The data on these two dimensions appear to support the hypothesis that the community programs for these 191 Movers have been designed to meet their specific needs in these areas. This is an area that should be investigated further.

Because of the surprising findings in adaptive behavior, we decided to look at challenging behavior findings over the years in the same way. Table 10 shows the data.

**Table 10**
**Trends in Pre-Post Challenging Behavior Findings Over the Years**

| Challenging Behavior Measure | Baseline DC 1994 | Community 2001 | Change | Significant? |
|---|---|---|---|---|
| **Report 8, 1996** **34 Movers** | 67.3 | 75.0 | 7.7 | Significant |
| **Report 12, 1997** **64 Movers** | 69.7 | 77.3 | 7.6 | Significant |
| **Report 17, 1998** **91 Movers** | 68.1 | 76.4 | 8.3 | Significant |
| **Report 2, 2000** **178 Movers** | 67.6 | 78.4 | 10.9 | Significant |
| **Report 4, 2001** **191 Movers** | 68.0 | 78.0 | 9.9 | Significant Less than Year 2000 |

The table suggests that outcomes were progressively becoming more and more positive over the years, until this year. The 2001 average gain from deinstitutionalization has become less than the average gain we measured last year (10.9 to 9.9). Again, a chart may make this trend easier to see.

**Chart 2**



It is the downturn on the right that makes us suspect that there may have been very recent decrements in quality within the California community support system, at least for these 191 Movers.

To this research group, this finding is of major importance. As in the case of adaptive behavior, this gradual decline in the challenging behavior benefits associated with community placement may suggest that in the past year or two these 191 Movers have actually lost ground in this area. We decided to add a new chapter to this report, the chapter following this one, to explore this issue further. In the next chapter we present tests for changes in qualities of life between the Year 2000 visits and the Year 2001 visits, not just for the 191 Movers, but for all 2170 people in this study population.

Before leaving the challenging behavior dimension, it is important to underscore the fact that California's Movers appear to have experienced the largest improvements ever documented in such research. The following state comparison table shows this fact.

**Table 11**
**Challenging Behavior Results From Several Deinstitutionalization Studies**

| State | # of Years | Time-1 Average Challenging Behavior Score | Time-2 Average Challenging Behavior Score | Gain on 100 Point Scale |
|-------|-----------|-------------------------------------------|-------------------------------------------|--------------------------|
| Pennsylvania | 14 years | 77.7 | 87.3 | 9.6 |
| New Hampshire | 8 years | 79.6 | 78.6 | -1.0 |
| Louisiana | 7 years | 80.9 | 84.1 | 3.2 |
| **California** | **7 years** | **68.0** | **78.0** | **9.9** |
| Oklahoma | 6 years | 89.7 | 93.5 | 3.8 |
| Connecticut | 5 years | 79.0 | 80.2 | 1.2 |
| North Carolina | 2 years | 87.7 | 89.4 | 1.7 |
| Kansas | 1 year | 78.6 | 81.3 | 2.7 |
| Indiana | 1 year | 70.5 | 67.9 | -2.6 |

The proper conclusion is that these 191 Movers are far better off now, in the community, in terms of being able to control their own potentially challenging behavior. Yet the data still lead to intense concern about possible recent declines in this important quality dimension.

**<u>Choicemaking</u>**

The scale for measuring opportunities for choicemaking is called the Decision Control Inventory. It is composed of 35 ratings of the extent to which minor and major life decisions are made by paid staff versus the focus person and/or unpaid friends and relatives. Each rating is given on a 10 point scale, where 0 means the choice is made entirely by paid staff/professionals, 10 means the choice is made entirely by the focus person (and/or unpaid trusted others), and 5 means the choice is shared equally. This is the same scale being used by the Robert Wood Johnson Foundation in its National Evaluation of Self-Determination in 29

states. In fact, the scale was originally created by COA in order to measure the impacts of self-determination in people's lives.

Choicemaking opportunities as measured by the Decision Control Inventory increased from 32.7 points back at the DCs in 1994, to 47.3 points in the community in 2001. This increase of 14.7 points was highly statistically significant.

This positive outcome may reflect major differences between institutional and community life. The Movers, despite their levels of disability, have shown a consistent pattern of growth in their ability to make choices. This outcome may also be an indication of provider and staff commitment to independence as a valued goal.

We are intrigued, however, that the large increases in choicemaking did not appear until recently in our studies. In the same format as in the two previous sections, Table 12 shows the choicemaking results of five pre-post analyses.

### Table 12
### Trends in Pre-Post Choicemaking Findings Over the Years

| Choice Making Measure | Baseline DC 1994 | Community 2001 | Change | Significant? |
|---|---|---|---|---|
| **Report 8, 1996** **34 Movers** | 35.9 | 40.6 | 4.7 | Not Significant |
| **Report 12, 1997** **64 Movers** | 33.6 | 34.6 | 1.0 | Not Significant |
| **Report 17, 1998** **91 Movers** | 31.5 | 36.3 | 4.8 | Significant (1st time) |
| **Report 2, 2000** **178 Movers** | 31.7 | 38.9 | 7.2 | Significant (2nd time, larger) |
| **Report 4, 2001** **191 Movers** | 32.7 | 47.3 | 14.7 | Significant (3rd time, still larger gain) |

For the early Movers, the gains in opportunities to make choices were small and not statistically significant. In the third of the five studies, the gain was still small, but at least it

reached significance. By the time of the fourth study in 2000, the gain was larger. Then the average gain more than doubled in 2001. The pattern may again be made more clear by a chart.

### Chart 3



**Changes in Choicemaking Opportunities Among Movers, Compared to 1994 Baseline at DCs**

What could explain such a dramatic recent increase in the choicemaking scale? Several competing possibilities are available. They will be discussed after new analyses in the next chapter: changes in qualities of life <u>within</u> the community, from Year 2000 to Year 2001, for <u>all</u> the movers.

### Chart 3

## Pre-Post Results 2: Last Year and This Year

For the first time, we now have the ability to explore changes in the lives of the Movers from one year to the next, while they are living in the community. In the previous section, we studied changes in the Movers' lives from institution to community. In this section, we investigate changes from last year to this year. Has anything changed? Are people growing and learning? Is individual planning becoming more person-centered? Are people making more choices now than they were last year? There are many questions that can be posed, all aimed at the question "Is the entire service system any different now than it was a year ago?"

And, the ideal way to test this question is to determine whether the qualities of life of the people served in the system have changed.

Using this approach, we have attempted to further investigate some of the major issues raised in the previous section. These major issues involve adaptive behavior, challenging behavior, and choicemaking. These areas will be the focus of this section.

Before proceeding into those three areas, we note that we did test the entire battery of quality indicators to see what had changed since last year. In brief, we detected statistically significant changes in:

- Perceived Progress Toward Individual Goals (up 1.3 points on the 100 point scale)
- Number of Services in the Plan (up .4 services per person)
- Time Spent in Day Program (up .4 hours per week)
- Individualized Practices Scale (up 4.3 points on the 100 point scale)
- Elements of the Planning Process (up 4 points on the 100 point scale)
- Number of Friends (down 1.3 friends, to 8.8)
- Number of Doctor Visits Per Year (down .8 visits per year, to 11.7)

Five of these changes are favorable, one is unfavorable (Number of Friends), and one is unclear (Number of Doctor Visits). We will offer to prepare a full report on changes from year 2000 to year 2001 as part of the existing contract with DDS, within existing resources. For the present report, we wish to focus on what we see as the largest and most pressing issues.

In the previous section, we examined five separate pre-post analyses over the years of our work. We found reason to suspect that people's adaptive behavior abilities (also called self-care skills or independent functioning) might have begun to decline. It is extremely important to find out if this is true.

Our statistical test includes 1,912 Movers who were visited both in 2000 and 2001, and for whom complete data on the selected issues was available. We use the Student's t-test to ask whether the average adaptive behavior score this year is any different from the average score from last year. The answer is "Yes".

**Table 13**
**Average Adaptive Behavior Changes Among 1,912 Movers**
**Year 2000 to Year 2001**

| Average for Year 2000 | Average for Year 2001 | Change | Significance |
|---|---|---|---|
| 49.064 | 47.350 | -1.7 | 0.000 |

The average Mover experienced a <u>loss</u> of 1.7 points on the adaptive behavior scale. This was very highly statistically significant, as symbolized by the "0.000" at the right of the table. Any number below 0.050 would be considered significant. The lower the number, the higher the significance. The probability that this decrease of 1.7 points is just a chance variation in the numbers is very close to zero.

Because adaptive behavior is such a highly reliable,[14] valid, global, and strongly predictive measure of individual functioning, we think this finding should be taken very seriously.

One might wonder whether a mere 1.7 point loss on a 100 point scale is really that serious. The answer is found in the long run. What would happen to people if such losses continued each year for 10 years? If our service system consistently produces small losses, people would lose 17 points in the next decade. In old and generally outmoded terminology, that loss would be more than enough to push a person from the mental retardation label "moderate" to the label "severe." In our data set, the average person with the label "moderate" has an adaptive behavior score of 64; the average person with the label "severe" has a score of 51. A loss of 17 points over 10 years would be devastating to a person's functional status.

---

[14] In Report 7 of our earlier <u>Coffelt</u> series, we reported interrater reliability for the adaptive behavior scale as .97 or .98 depending on the calculation method. This is extremely high. It means that this is a very accurate measure. We also know that this measure correlates strongly with many other aspects of life, such as choicemaking, earnings, and integration. This means that it is an important measure that influences many aspects of people's lives.

That is why we feel a strong sense of urgency about this finding. Further investigation of causes and necessary actions are <u>urgently</u> needed.

Next, we performed the same kind of analysis for challenging behavior. Obviously, challenging behavior and its reduction is a very important aspect of people's lives. Challenging behaviors are also of great concern to service providers and families.

### Table 14
### Average Challenging Behavior Changes Among 1,912 Movers
### Year 2000 to Year 2001

| Average for 2000 | Average for 2001 | Change | Significance |
|---|---|---|---|
| 78.614 | 77.106 | -1.5 | 0.000 |

As seen in the table above, the average scores for the 1,912 Mover decreased by 1.5 points on the 100 point scale. On this scale, the higher the score the better the person is able to control challenging behavior. The 1.5 decrease means that people are displaying <u>more</u> challenging behaviors in 2001 than they were in 2000. The decrease was highly statistically significant.

This finding is also unusual in our experience. We have seen challenging behavior increase temporarily when people change homes, as happened in our 6-month post deinstitutionalization data in Indiana. However, those increases later vanished as people settled into their new homes. The increase we have measured in California, however, appears to be quite different. This is associated with people living in their homes, engaging in daily activities, and not obviously experiencing any major disruptions in their lives. It strongly suggests a systemic problem. In combination with the adaptive behavior finding, the evidence seems to us to be compelling. We do not know for certain, however, exactly what is (are) the nature of the problem(s).

At the same time that people were losing skills and increasing challenging behavior, a counterintuitive and paradoxical process was occurring. Average scores on the Decision Control Inventory, our measure of opportunities for choicemaking, were increasing rapidly. This scale is an important indicator of power shifting and progress toward self-determination.

### Table 15
### Average Decision Control Inventory Change Among 1,912 Movers
### 2000 to 2001

| Average for 2000 | Average for 2001 | Change | Significance |
|---|---|---|---|
| 43.077 | 47.345 | 4.3 | 0.000 |

The average score on the Decision Control Inventory <u>increased</u> significantly from 2000 to 2001, from 43.077 points in 2000 to 47.345 in 2001. The increase of 4.3 points is highly statistically significant, and it is also large. The entire self-determination movement has been at least partly fueled by the positive scientific findings from the original project in New Hampshire – and in that project, the observed gain on this same scale was only 4.1 points over an 18 month period. The observed increase among California's Movers is larger, and happened faster, than the power shift in New Hampshire. This too should be taken seriously, and on the surface, it appears to be a positive outcome.

Taken together, what do these three major changes over the course of 12 months mean? At this time, we can only brainstorm and speculate. It is urgent that we obtain explanations so that California can take action to halt any negative trends.

The first explanation that occurred to our team was a broad based acceptance of the principles of self determination which espouse personal choice and freedom. It is possible that in their zeal to convert the system, some people have moved too quickly and have decreased

their focus on skill development activities. This kind of scenario could explain behavioral losses and increased choice.

A second possible explanation is the widely acknowledged crisis in the direct care labor pool. Low salaries and high turnover rates translate into poorly motivated and poorly trained staff. Recognizing the antecedents of challenging behavior and providing positive supports to prevent such behavior requires caring and well-trained staff. A direct care worker who does not have the benefit of such skills, or complete knowledge of the principles of self determination and person centered planning, may find it convenient to adopt the rhetoric of consumer choice and "let the people do what they want."[15] This could explain the increase in the choicemaking scale.

Either explanation fits at least some of the facts. A reading of Appendix D, which contains the notes and comments written by relatives in the 2001 Family Survey, tends to support the second explanation. There are many comments about the poor quality and the short tenure of direct care staff.

The details of the power shift reflected in our choicemaking scale also seem to support the second explanation. The top 10 changes in power from 2000 to 2001 were:

- *When to go to bed on weekdays*
- *What to have for dinner*
- *When to get up on weekends*
- *What to have for breakfast*
- *Choosing to decline activities*
- *What to do with relaxation time*
- *When to go to bed on weekends*
- *Taking naps in evenings/weekends*
- *What foods to buy*
- *Express affection*

---

[15] Self-determination advocates would not favor the description given above. True self-determination is a very careful and responsible process of sharing power and control with a person and the person's allies. Genuine self-determination requires Freedom, Authority, Responsibility, and Support.

It is our opinion that these activities are mainly related to direct care staff attitudes and actions. We should also note that in general, the above kinds of choices do not entail significant cost increases. At the other end of the Decision Control Inventory are the things that did <u>not</u> change.

- *Who goes with you on outings*
- *Time spent working or at day program*
- *Choice of house or apartment*
- *Choice of case manager*
- *Type of work or day program*
- *How to spend residential funds*
- *Whether to have pets in the home*
- *How to spend day activity funds*
- *Choice of people to live with*
- *Choice of furnishings*

These items seem to us to be "big" aspects of life – where you live, with whom you live, what you do during the day. In most traditional service systems, these items are controlled by administrative policies and personnel. These items also have significant financial implications depending on the choices people make. This pattern of change in the scale tends to support the idea that what is going on among the Movers in California in the past year is not actually self-determination, but rather simply a relaxing of authority over several "small" aspects of daily life.

Because the behavioral results were both unusual and unexpected, we wanted to begin preliminary investigations at slightly deeper levels. Based on past research by this team,[16] we wondered whether outcomes differed for people who lived in ICF/MR versus Waiver settings. We collapsed the long list of residential categories into Community ICF/MR and Waiver

---

[16] Conroy, J. (1996). The Small ICF/MR Program: Dimensions of Quality and Cost. *Mental Retardation, 34 (1)*, 13-26. Conroy, J. (1998). Quality in Small ICFs/MR Versus Waiver Homes. *TASH Newsletter, Valume 2, Issue Number 3, March 1998.*