**Integrative Activities Item Analysis**

|  | Then | Now | Change | Significance |
|---|---|---|---|---|
| Go to a park or playground* | 0.7 | 4.8 | 4.0 | 0.000 |
| Go to a restaurant* | 0.5 | 3.8 | 3.3 | 0.000 |
| Go to a shopping center* | 0.7 | 3.2 | 2.5 | 0.000 |
| Use public transportation | 0.0 | 2.3 | 2.3 | 0.076 |
| Go to a bank* | 0.0 | 2.0 | 2.0 | 0.000 |
| Visit with close friends | 2.1 | 4.0 | 1.9 | 0.127 |
| Visit a grocery store* | 0.4 | 2.1 | 1.7 | 0.000 |
| Other kind of getting out | 0.7 | 1.7 | 1.0 | 0.075 |
| Go to a sports event | 0.2 | 0.7 | 0.5 | 0.059 |
| Go to church | 0.8 | 1.1 | 0.4 | 0.134 |
| Go to a movie | 0.2 | 0.5 | 0.3 | 0.061 |
| Go to a health or exercise club | 0.0 | 0.3 | 0.3 | 0.115 |
| Go to a post office* | 0.0 | 0.2 | 0.2 | 0.045 |
| Go to a theater | 0.1 | 0.2 | 0.1 | 0.267 |
| Go to bars | 0.0 | 0.0 | 0.0 | -- |
| Go to a library | 0.1 | 0.1 | -0.1 | 0.211 |

The results shown above are sorted by the degree of change from "Then" to "Now." Of the 16 types of integrative activities measured, all but one showed positive changes, while six of the areas showed statistically significant increases. These six areas were "Going to a park or playground," "Going to a restaurant," "Going to a shopping center," "Going to a bank," "Visiting a grocery store" and "Going to a post office."

For context, the following chart shows data from the same scale from other states and service types. Please note that this graph shows integrative events <u>per week</u> rather than per month as in the text and charts above.

## Comparison of Integrative Activities per Week



We can see that the experiences of the Movers are not dissimilar to those of Movers in other states. The Delaware Movers averaged over six activities per week. When compared to the four other states, this is just what we would expect to see. What is interesting to note is the large gain in activities the Movers have shown, nearly five activities a week gained. Only the Indiana Movers showed a larger gain of 6.4 activities per week.

The survey also asked the respondents how many times out of ten the person would be able to have access to transportation on the spur of the moment. Freedom and flexibility are important values for people learning to live outside of the institution. We therefore wanted to know if people could go somewhere on the

spur of the moment whenever he/she wanted.  If they could make that choice, ten out of ten times, they would score a ten on the scale.  If they could never go anywhere on the spur of the moment, they would score a zero.  The results on this scale of transportation access were as shown below.

### Access to Transportation

| Then | Now | Change | Significance |
|------|-----|--------|--------------|
| 0.4  | 5.1 | 4.7    | 0.000        |

Access to transportation showed a highly statistically significant increase from "Then" to "Now" for the people who moved from the Stockley Center.  The averages on this question went from 0.4 times out of 10.0 at Stockley to 5.1 times out of 10.0 in the community.  This demonstrated a large increase in freedom of movement – a central and universal value for any citizen.

The Perceived Qualities of Life Scale is made up of 14 items.  These items ask the respondent to rate their quality of life from one (Very Bad) to five (Very Good) in areas such as health care, privacy, comfort, safety, food, care by staff or attendants and relationships.  Respondents are asked to rate these items both for what they remember from "Then" and what they perceive "Now."  This allows the Center for Outcome Analysis to compare ratings at two points in time ("Now" from the pre-test and "Now" from the post-test) and from one point in time (comparing perceptions from "Now" to what is remembered from "Then").  The results of the first type of analysis are shown in the graph below.

**Perceived Qualities of Life, Now to Now**



The average score from "Now" at the pre-test (while people were at the Stockley Center) to "Now" at the post-test (after they've moved out of the Stockley Center) show an increase of over 11 points in people's overall perception of their qualities of life. This increase was highly statistically significant. The same data are contained in the table below, along with the amount of change and its statistical significance.

**Perceived Qualities of Life, Then to Now**

| Then | Now | Change | Significance |
|------|-----|--------|--------------|
| 66.5 | 82.3 | 15.8 | 0.000 |

People's perceptions of their qualities of life increased an average of almost 16 points on the 100-point scale. This difference was large and it was also highly statistically significant. Both of these analyses showed that people (and their

allies) believed that the qualities of their lives had significantly improved since moving from the Stockley Center.

We believe that the quality of a person's life can be greatly affected by the simple difference between either having or not having a friend. We therefore asked each person how many friends they had during both the first and second interview rounds. We can then directly compare the two numbers to see whether community living was conducive to making friends.

### Number of Friends

| Then | Now | Change | Significance |
|------|-----|--------|--------------|
| 4.5  | 6.8 | 2.3    | 0.091        |

The people who moved out of the Stockley Center gained about 2 friends on average since moving, although this change was not statistically significant.

The next graph shows what is a relatively simple question with tremendous implications. We asked the Movers, both before and after the move, how they would rate their General Health. Not just how they were feeling today, but on a scale of one to five, how have they been feeling. An increase in this score means that the person feels they are generally in better health, while a decrease shows that they think the quality of their health declined since the move.

## Ratings of General Health



These ratings showed a statistically significant increase, from a rating of 3.9 at "Then" to a rating of 4.4 "Now."

The Need for Medical Attention scale includes 49 items, with questions ranging from issues of Ear Infections to Congestive Heart Failure. Each participant was asked if they had a minor or major need for medical attention in the areas listed. The scale ranges from one to three (with three meaning major medical attention needed for this area). We then averaged the scores and compared the Then and Now scores as shown below.

### Need for Medical Attention

| Then | Now | Change | Significance |
|------|-----|--------|--------------|
| 1.2 | 1.1 | 0.0 | 0.435 |

The people who moved from the Stockley Center showed no change in their need for medical attention after moving.

The next table measures the number of reported days of illness in the last month.  The question looks for days of restricted activities.

### Illness in the Past 28 Days

| Then | Now | Change | Significance |
|------|-----|--------|--------------|
| 1.5  | 0.5 | -1.1   | 0.230        |

The people who moved from the Stockley Center showed no significant change in the reported number of days ill in the past 28 days from "Then" to "Now."

We measured the number of hospital admissions in the last year to see if people experienced more serious health conditions in the community, or the institution.

### Number of Hospital Admissions

| Then | Now | Change | Significance |
|------|-----|--------|--------------|
| 0.3  | 0.1 | -0.1   | 0.128        |

There was also no significant change in the number of hospital admissions from "Then" to "Now" for the people who moved from the Stockley Center.

It is common knowledge that finding quality medical care is not easy. For those with Developmental Disabilities, it can often be harder. Therefore, we asked the participants how they would rate their search for quality medical care on a five point scale, with five being Very Easy.

### Process of Finding Medical Care

| Then | Now | Change | Significance |
|------|-----|--------|--------------|
| 4.3  | 4.2 | -0.2   | 0.206        |

The 45 people who moved from the Stockley Center reported no changes in the difficulty of finding medical care from "Then" to "Now."

A good, working relationship with one's primary care doctor can make all the difference in the success or failure of one's treatment. We measured this relationship on a simple one to five point scale, with five meaning a positive relationship.

### Relationship with Primary Care Doctor

| Then | Now | Change | Significance |
|------|-----|--------|--------------|
| 3.7  | 3.9 | 0.2    | 0.110        |

These 45 movers also did not report any significant difference in their relationship with their primary care doctor from "Then" to "Now."

We also tracked perceptions about the quality of the health care for the Movers to find out if there had been any changes since their moves into the community.  The results follow.

### How Good is this Person's Health Care?

| Then | Now | Change | Significance |
|------|-----|--------|--------------|
| 4.1 | 4.2 | 0.1 | 0.578 |

When asked to rate their health care from "Then" at the Stockley Center to "Now" after moving, the 45 Movers reported no significant difference, rating their health care essentially the same for both times.

Maintenance of health and safety is a major consideration in any transition and so in every interview we asked about the number of allegations of abuse in the last year.  The chart below details the difference between numbers of allegations while at Stockley and the number documented in the community.

### Allegations of Abuse



As shown in the chart, there was less than one (0.3) allegation of abuse per person per year while at Stockley. That number decreased after community placement to less than 0.1 per year. This is a very positive finding.

One of the most important parts of everyone's life is freedom. While this usually means freedom to make choices, it can occasionally mean freedom to move about at will. Below we compare the number of times restrictive procedures were used in the course of a year at Stockley with that number in the community.

### Restrictive Procedures Used in the Last Year

| Then | Now | Change | Significance |
|------|-----|--------|--------------|
| 0.6  | 0.2 | -0.4   | 0.104        |

Similar to the numbers on abuse, there were very few restrictive procedures used on these 45 people while at Stockley (0.6) and even less in the community (0.2). This very slight decrease did not reach statistical significance.

The following two tables were collected from the Personal Interview section. The questions in this section are asked only of the actual Movers. If the COA Visitor and the person could not figure out a way to communicate directly, this section was left blank. If appropriate, this part of the interview was completed in private.

# Wishes

We asked each person, "If you had one wish, what would you wish for?" The following are the responses we received.

| |
|---|
| A Cheeseburger, My Mom |
| A Radio- A Silver Band Watch |
| A Steak, Chicken, To Have A Girlfriend |
| Braid My Hair |
| Cake, Anything He Wants |
| Fried Chicken, Pepsi -Will I Ever Get To Earn It? |
| Go For A Car Ride Or A Bus Ride |
| Go To McDonald's Milkshake, French Fries, Hamburger |
| Have A Nice Day To See A Friend |
| I Don't Know |
| I Forget |
| I Would Like A Model Plane To Put Together And Fly |
| Like To Have $2.00 |
| May I Go On The Boardwalk? |
| Merry Christmas, Be A Nice Woman |
| More Candy- Peppermint Patties |
| More Magazines- |
| More Music |
| Orange Soda & Potato Chips |
| Out Of Here |
| Take A Ride |
| Take A Trip |
| To Be In Community Near My Dad |
| To Go Home With My Sister |
| To Have More Cars |
| To Live With Family, Sister |

## Comments

We also asked if there was anything else the people wanted to say, and those responses are given below.

| |
|---|
| I'm In A Bad Mood |
| I Got To Find My Way |
| I Want To Go On A Boat Ride |
| KFC- For Chicken" |
| Like To Have A Key |
| Like To Work With People Who Don't Complain |
| May I Go To The Canteen |
| Saw A Movie |
| Something About Santa Claus |
| T.T. Tapes, Markers, Crayons, Scissors. Paper |
| To Go To A Group Home, I'll Work. |
| To Go To Church |

# Concluding Comment

The Stockley Follow-Up Project was designed to find out whether the decision to move from an institutional model of supports to a community-integrated model was a good decision. In order to judge the merit of this decision, we need to answer this question: **"Are the people better off?"** This is the ideal way to judge the success of any social intervention. The quality of human life is the ultimate unit of accountability for human services.

We have visited the people affected by the decision twice - once while they lived at the Stockley Center, and again after they moved to community homes. We measured dozens of indicators of qualities of life and of services. We can now state with confidence that the Stockley Movers are indeed "better off." Some of the ways in which they are "better off" include behavior, progress toward individual goals, decision-making, integrative activities, perceived qualities of life in 14 areas, person-centered planning, and indicators of general health. These are major and significant findings. We believe they validate the public policy of moving away from institutional care.

In addition to the primary question of whether people are "better off," there are several subsidiary but important questions. One concerns the costs associated with the movement to community living. Does it cost more, less, or about the same to support a person in a community home? What accounts for the cost differences? In practically all prior studies, including more than 200 "independent assessments" of Medicaid Waivers, community costs have been found to be lower than public institutional costs, even for the same or comparable people. We hope in the near future to be permitted to conduct a cost study to supplement the outcome findings reported here. Only through proper tracking of costs will the State be aware of the money that could possibly be saved, and spent more wisely,

in the community. This kind of evidence will become crucial for development of public policy, as the pressures for full implementation of Olmstead mandates increase.

Another important subsidiary question concerns the feelings of the families of the people who moved from Stockley to community homes. After years and sometimes decades of having a relative live in a public institution, the decision to change is inevitably frightening and stressful. A family survey is another instrument that we suggest to fully document stakeholder perceptions.

One of the most important aspects of the Stockley Project is the fact that it is being done at all. It is a rare but welcome innovation when public officials voluntarily hold themselves accountable for individual well-being. When that well-being is being measured by an independent third party with proven methods and measurement techniques, the results would seem to be worthy of serious policy consideration.

All the evidence at our disposal leads toward the conclusion that many other Delaware citizens could benefit from the same kinds of changes that have been tracked in this project, namely, moving from segregated, isolated, institutional models of care toward community based and integrated supports. Community living is far from "perfect," and is by no means free of frailties and problems. However, the simple fact is that these people, in spite of challenges encountered by some, are on the average much better off in their current community situations than they were while living at the Stockley Center.

# References

Alexander, R. Jr. (1996). The quality of life of persons with severe emotional disability: a review of empirical studies. Journal of Health & Social Policy, 7:4 9-22, 1996.

Arndt, S. (1981). A general measure of adaptive behavior. American Journal of Mental Deficiency, 85, 554-556.

Balla, D. (1976). Relationship of institution size to quality of care: A review of the literature. American Journal of Mental Deficiency, 81, 117-124.

Baroff, G. S. (1980). On "size" and the quality of residential care: A second look. Mental Retardation, 3, 113-118

Bassuk, E.L., & Gerson, S. (1978). Deinstitutionalization and mental health services. Scientific American, 238, 46-53.

Bradley, V., Conroy, J., & Covert, S. (1986). Community Options: The New Hampshire Choice. Concord, NH: New Hampshire Developmental Disabilities Council.

Byberry Miracle: The Inside Story was published in June 1991 by the Public Policy Office of the Mental Health Association of Southeastern Pennsylvania, 311 S. Juniper St., 19107.

Conroy, J., Feinstein, C., & Lemanowicz, J. (1986). Principles of quality assurance: recommendations for action in Pennsylvania. Position paper submitted to the Pennsylvania Office of Mental Retardation. Philadelphia: Temple University Developmental Disabilities Center/UAP.

Conroy, J. (1996). The Hissom Outcomes Study: A Report on 6 Years of Movement into Supported Living. The People Who Once Lived at Hissom Memorial Center: Are They Better Off? Brief Report Number 1 of a Series on the Well-Being of People with Developmental Disabilities in Oklahoma. Submitted jointly to Oklahoma Department of Human Services and United States District Court, Northern District of Oklahoma. Ardmore, PA: The Center for Outcome Analysis.

Conroy, J. (1995). Reliability of the personal life quality protocol. Report Number 7 of the 5 year Coffelt Quality Tracking Project. Submitted to the California Department of Developmental Services and California Protection and Advocacy, Inc. Ardmore, PA: The Center for Outcome Analysis.

Conroy, J. (1992).  Size and Quality in Residential Programs for People with Developmental Disabilities.  Unpublished doctoral dissertation,  Temple University, Philadelphia, PA.

Conroy, J., Seiders, J. (1998, June, revised October). The Coffelt Quality Tracking Project: The Results of Five Years of Movement From Institution to Community.  Final Report (Number 19) Of the Coffelt Quality Tracking Project California Department of Developmental Services.  Submitted to: the California Department of Developmental Services and Protection & Advocacy Inc. of California.  Rosemont, PA:  The Center for Outcome Analysis.

Conroy, J., & Bradley, V. (1985).  The Pennhurst Longitudinal Study:  A report of five years of research and analysis. Philadelphia:  Temple University Developmental Disabilities Center. Boston:  Human Services Research Institute.

Conroy, J. & Feinstein, C.(1990b).  Measuring quality of life: Where have we been, where are we going? In R. Schalock and M. Begab (Eds.) Quality of Life: Perspectives and Issues. Monograph Number 12. Washington: American Association on Mental Retardation.

Conroy, J., & Feinstein, C. (1990a).  A new way of thinking about quality.  In:  V. Bradley and H. Bersani (Eds.)  Quality assurance for individuals with developmental disabilities: It's everybody's business.  Baltimore:  Paul H. Brookes.

Conroy, J., Lemanowicz, J., Feinstein, C., & Bernotsky, J. (1991).  1990 Results of the CARC v. Thorne Longitudinal Study.  The Connecticut Applied Research Project, Report Number 10, to the Connecticut Department of Mental Retardation.  Narberth, PA:  Conroy & Feinstein Associates.

. Conroy, J. (1986).  Principles of quality assurance: Recommendations for action in Pennsylvania.  Position paper submitted to the Pennsylvania Office of Mental Retardation. Philadelphia: Temple University Developmental Disabilities Center/UAP.

Devlin, S. (1989). Reliability assessment of the instruments used to monitor the Pennhurst class members. Philadelphia: Temple University Developmental Disabilities Center.

Dudley, J.R., Ahlgrim-Delzell, L., & Conroy, J. (1995).  Changes in the Well-Being of Thomas S. Class Members With and Without Implemented Plans.  Intermediate Findings of Two Subgroups of Class Members Year 1 to Year 2 (1993-95).  Monograph 3 of the Thomas S. Longitudinal Research Project.  Charlotte, NC: University of North Carolina at Charlotte.

Fullerton, A. Douglass, M. & Dodder, R. (1999).  A reliability study of measures assessing the impact of deinstitutionalization.  Research in Developmental Disabilities, Vol. 20, No. 6, pp. 387-400.

Harris, C. (1982).  An interrater reliability study of the Client Development Evaluation Report.  Final report to the California Department of Developmental Services.

King, R., Raynes, N., & Tizard, J. (1971).  Patterns of residential care:  Sociological studies in institutions for handicapped children. London:  Routledge and Kegan Paul.

Larson, S., & Lakin, C. (1989).  Deinstitutionalization of persons with mental retardation: Behavioral outcomes.  Journal of the Association for Persons with Severe Handicaps, 14, 324-332.

Larson, S., & Lakin, C. (1991).  Parent attitudes about residential placement before and after deinstitutionalization:  A research synthesis.  Journal of the Association for Persons with Severe Handicaps, 16, 25-38.

Lakin, K.C., White, C.C., Hill, B.K., Bruininks, R.H., & Wright, E.A. (1990).  Longitudinal change and interstate variability in the size of residential facilities for persons with mental retardation (Brief Report No. 28).  Mental Retardation, 28, 343-352.

Lemanowicz, J., Conroy, J., & Gant, S. (1985).  Gary W. classmembers:  Characteristics of 268 people and changes in adaptive behavior, 1981 to 1984, among people monitored in community settings.  Report to U.S. District Court, New Orleans, Louisiana, by Conroy & Feinstein Associates, Philadelphia.

Lemanowicz, J., Levine, R., Feinstein, C., & Conroy, J. (1990b).  Evaluation of the well-being of Pennhurst class members living in the community in 1990:  The results of Temple monitoring in Philadelphia.  Project Report 90-1 to the Pennsylvania Office of Mental Retardation.  Philadelphia:  Temple University Developmental Disabilities Center/UAP.

McLain, R., Silverstein, A., Hubbell, M., & Brownlee, L. (1975).  The characterization of residential environments within a hospital for the mentally retarded.  Mental Retardation, 13, 24-27.

Moos, Lemke, & Mehren (1979).  Multiphasic Environmental Assessment Procedure.  Palo Alto, CA:  Social Ecology Laboratory.

Nihira, K., Foster, R., Shellhaas, M., & Leland, H. (1974).  AAMD Adaptive Behavior Scale, 1974 Revision.  Washington DC:  American Association on Mental Deficiency.

Pratt, M., Luszcz, M., & Brown, M. (1981).  Measuring dimensions of the quality of care in small community residences.  American Journal of Mental Deficiency, 85, 188-194.

Seltzer, G. (1980).  Residential satisfaction and community adjustment.  Paper presented at the 104th Annual Conference of the American Association on Mental Deficiency, San Francisco, May 1980.

Shea, J. R. (1992).  From standards to compliance, to good services, to quality lives:  Is this how it works?  Mental Retardation, 30, 143-149.

Taylor, H., Kagay, M., & Leichenko, S. (1986).  The ICD Survey of Disabled Americans. Conducted by Louis Harris and Associates.  New York:  The International Center for the Disabled, and Washington, DC: National Council for the Handicapped.



```
Job : 17
Date: 5/14/2007
Time: 12:02:01 PM
```

# Louisiana Developmental Disabilities Council
## Position on Consolidation and Closure of Developmental Centers

Position Statement

Louisiana's reliance on nine segregated Developmental Centers for residential services to people with disabilities is excessive, costly, unnecessary and fundamentally unfair. Louisiana should immediately reduce the number of Developmental Centers, consolidate them into a few smaller residential facilities, close the majority and reallocate the state's resources from a reliance on institutional services to support of adequate, high quality community-based options for individualized supports and services.

Discussion

*"The goals of the Nation properly include a goal of providing individuals with developmental disabilities with the information, skills, opportunities, and support make informed choices and decisions about their lives; live in homes and communities in which such individuals can exercise their full rights and responsibilities as citizens; and achieve full integration and inclusion in society, in an individualized manner, consistent with the unique strengths, resources, priorities, concerns, abilities, and capabilities of each individual."* The Developmental Disabilities Assistance and Bill of Rights Act of 2000 (P.L.106-402)

All people, regardless of the severity of their disability, have a right to live in their own homes in the community. The Council supports the full inclusion of individuals with disabilities in all facets of community life - where they live, learn, work, and play - so they are free to experience life and pursue happiness and meaningful relationships. Segregation in Developmental Centers deprives individuals of the benefits and freedoms afforded by participating in community life. It prevents countless reciprocal and loving relationships and robs Louisiana communities of the gifts and talents of thousands of our citizens.

Society's values change as civil rights, contemporary technology, and new medical and health approaches are incorporated into mainstream society. Outdated technologies and treatment approaches are then replaced by more advanced practice. Developmental Centers, by their very nature, do not allow people with disabilities the freedom of choice to live where they wish. These institutions are no longer the contemporary approach for the way individuals with disabilities seek to live and receive treatment and supports. Public funding, removed from Developmental Centers and spent on services and supports people with disabilities want, and most importantly, deserve, will turn the restricted exercise of rights into the realization of freedom. Louisiana's over reliance on institutional services is a barrier to freedom of choice for people with disabilities; and by supporting nine Developmental Centers, the state does not allow the full exercise of freedom, not only to the residents of the developmental centers but also to the 7932 individuals waiting for supports from the Home and Community Based Waiver.

Deinstitutionalization has been taking place in the United States for over three decades. In the 1990s alone there was a 44 percent decline in the number of people in state-operated institutions. Potential cost savings did not drive these reductions. These institutions closed and others continue to close because it is the right thing to do. Unfortunately, Louisiana has not witnessed these types of closures.

Costs benefits would be realized with institution closures in this state. According to the LA Department of Health and Hospitals' Medicaid Budget report, in 2003 Louisiana spent almost $185 million to serve 1608 people in developmental centers; $184 million to serve the 4,090 residents of the 447 private ICFs/MR; and only $162 million to serve approximately 4300 people through the MR/DD Waiver (the former designation for the NOW waiver). Recent cost comparisons of community and institutional services refute claims that institutions offer "economies of scale" or that the centralization of services at institutions is more cost-effective[i].

People with the most challenging needs can and do live successfully in their own homes in Louisiana and all over the country with appropriate, individualized supports. Research has proven over the past three decades that individuals grow and thrive as members of their community and have a better quality of life than in congregate settings[*]. Currently, eight states and the District of Columbia have found public institutions unnecessary in providing services and supports to people with disabilities, and eight others do not provide residential services through small private ICFs/MR[**]. Alaska and New Hampshire do not utilize either institutions or small private ICFs/MR in supporting their citizens with disabilities. The continued practice of segregation in the face of this compelling evidence is inexcusable. Louisiana must return its citizens with disabilities to their home communities where their lives can be enriched and they can enrich the lives of others.

In the consultants' report, "Program and Policy Review of Long Term Care in Louisiana," it states that "downsizing inevitably pushes per person costs upward" and cites North Carolina as an example of a state whose costs have risen while they have downsized, but not closed, their Developmental Centers. It further states, "the amount of resources that could be redeployed to the community has been minimal. As a consequence, we recommend that Louisiana confront facility closure sooner rather than later in order to maximize the amount of funds that can be shifted to community services."

The state's efforts to expand community services to meet the needs of the 7932 individuals waiting for waiver services have been thwarted by maintaining costly institutions. It is time for the state of Louisiana to exercise leadership and chart a new course for services and supports for people with developmental disabilities and their families. It is time for Louisiana to close, not downsize Developmental Centers.

Recommendations
That Louisiana:

    A)  immediately adopts a policy to halt admissions into its state Developmental Centers and develop alternative safety nets such as emergency waiver slots and a crisis response system for individuals in crisis in the community;

    B)  continue transitioning individuals out of the state's Developmental Centers and reallocate resources from the Developmental Centers to support those re-entering the community and those on the waiver waiting list;

    C)  immediately develop and implement a short term plan to reduce the number of Developmental Centers by consolidating them into a few smaller residential facilities, giving the residents of the facilities selected for closure a choice of waiver services, community home placement, or placement in a Developmental Center remaining open; and

    D)  increase its capacity to provide high quality individualized supports and services in the community to those re-entering the community and those on the waiting list.

Notes:
* Larson, S.A., & Lakin, K.C. (1989). Deinstitutionalization of persons with mental retardation: Behavioral Outcomes. *Journal of the Association for Persons with Severe Handicaps,* 14, 324-332.
** *Residential Services for Persons with Developmental Disabilities: Status and Trends Through 2001,* Research and Training Center on Community Living Institute on Community Integration/ UCDD, University of Minnesota, June 2002

[i] Taylor, S.J. (2003, June) *The Editor's Perspective on Institutional and Community Costs.* Mental Retardation, 41,125-126

**LOUISIANA DEVELOPMENTAL DISABILITIES COUNCIL**
**April 2005**

```
   ### ## ## ##    ## ###     ####      #        #       ## ###    ####
  #    ##   ## #    ##      #    #      #####    #####    ##   #    #
  #      #    #  #   #      #####   #      #        #          #    #####
  #      #    #  #   #      #    #   #      #        #          #    #
  #    ##    #   #   #      #   ##   #  #   #   #    #   #   #    #   ##
   ### #   ### ### #####     ### ##   ###     ###       #####    ### ##
      #
  ####
```

Job : 49
Date: 5/14/2007
Time: 12:05:19 PM

# Parental Attitudes Toward Deinstitutionalization

*by Lynda Anderson and Sheryl A. Larson*

With the growing number of state institution closures, many parents are concerned about finding and maintaining a safe, caring, respectful, and permanent home in the community for their sons and daughters who have mental retardation. The possibilities and uncertainty of the move away from institutions have stimulated parental responses ranging from ardent support for deinstitutionalization to adamant opposition. Many studies have examined parental attitudes and expectations related to deinstitutionalization. Twenty-one such studies reviewed by Larson and Lakin (1991) reported on observations by parents regarding the move from institutions to the community, and offered suggestions for families and individuals in making the transition. From these studies, the following conclusions emerged about parent attitudes toward their son's and daughter's lives in institutions and in the community:

- **The vast majority of parents were satisfied (secure, content, and comfortable) with their family member's public institution placement.** Eleven of the studies surveyed parents while their family members lived at the institution on their opinion about moving to a community setting. Ninety-one per cent of the parents were somewhat or very satisfied with the institution. Only 21% of the parents supported the idea of having their son or daughter move to a community setting.

- **The vast majority of parents changed their attitudes about community placement after their family member had moved to the community.** Four studies surveyed parents before and after their family member moved to a community setting from the institution. Only 15% of these parents had a positive reaction to their family member moving before the move occurred; after the move, 62% of the parents expressed a positive opinion about the move to the community. Before the move, 83% of the parents re-ported satisfaction with the institution; after the move 87% were satisfied with the community setting.

- **After experiencing community services, parents viewed the institution less positively than they did when their family member lived there.** Seven studies interviewed parents whose sons or daughters had moved from an institution to a community home about their satisfaction with the institution, the community setting, and their opinion of the move. Only 52% of these parents expressed satisfaction with the institution, and 56% of the parents reported they had a positive reaction about their family member moving to a community home before it happened. This compares with an 83% predischarge rate of satisfaction with the institution and a 15% rate of support for the

move. The same parents reported an 88% rate of satisfaction with their children's community living experiences.

- **Parents observed improved quality of life and relationships for their family member after the move.** In five studies, more than 65% of the parents reported after the move that their family member was happier, that relationships between their son or daughter and other people improved, that needed services were available, and that staff members in the homes were competent. Fewer than 12% reported negative changes in these areas. The only area in which parents reported considerable uncertainty was the 31% who felt that community funding was less secure than institutional funding.

Those parents initially opposed to their child's move to the community offered a number of reasons for their attitude. In open-ended responses in 16 studies, parents said they were initially opposed to the move because they felt that the institutions were better than community homes at responding to the specific characteristics or needs of their children; available homes were inadequate in terms of safety, service quality or staffing; the process involved in the decision to move people was unfair, improper or disrespectful; or they felt movement to the community would increase the care-giving responsibilities of the family members. While most parents were ultimately satisfied with the community placement, many offered recommendations for lessening the fear about the move. They suggested those planning for people's moving must acknowledge as legitimate the fears and wishes of the family and respond to them as well as they can. They must include the person who is going to move and the family members in decisions related to the move. Visits should be arranged for family members to potential community sites, and parents who have been involved in previous moves should act as guides in these visits and/or be available in other ways to parents. Government agencies should assist in establishing communication between families and community providers. Finally, they emphasized the importance of public articulation of government commitments to funding and other policies to ensure the viability, continuity, and quality of community settings.

*Lynda Anderson is Research Assistant and Sheryl A. Larson is Research Fellow with the Center on Residential Services and Community Living, University of Minnesota, Minneapolis. They may be reached at 612 / 624-6024.*

**Reference:** Larson, S.A. & Lakin, K.C. (1991). Parents attitudes about residential placement before and after deinstitutionalization: A research synthesis. *Journal of the Association for Persons with Severe Handicaps, 16*(1), 25-38.

Job : 51
Date: 5/14/2007
Time: 12:06:04 PM

JASH
1991, Vol. 16, No. 1, June 25–38

copyright 1991 by
The Association for Persons with Severe Handicaps

# Parent Attitudes About Residential Placement Before and After Deinstitutionalization: A Research Synthesis[1]

Sheryl A. Larson and K. Charlie Lakin
University of Minnesota

*This paper reviews 27 studies of parental attitudes on the deinstitutionalization of a family member. In 12 of the studies, the family member was institutionalized. Those studies showed overwhelming satisfaction with the institutional placement and general opposition to deinstitutionalization. In seven studies, the family member had already moved from an institution to the community. Those parents retrospectively reported lower levels of satisfaction with the earlier institutional placement, lower levels of opposition to deinstitutionalization, and high levels of satisfaction with community settings. The three studies in which parental attitudes were sampled both before and after deinstitutionalization mirrored the other studies, showing high levels of general satisfaction with institutional placements before deinstitutionalization and high levels of satisfaction with community placements after deinstitutionalization. Also summarized are parental concerns about deinstitutionalization, their continuing concerns about their children's community placement, their perceptions of the positive outcomes of community living, and ways to facilitate parental satisfaction with deinstitutionalization.*

Descriptors: community integration, community services, deinstitutionalization, developmental disabilities, families, group home, institutionalization, mental retardation, parents, residential

Deinstitutionalization as a public policy led to a reduction of over 60,000 residents of state mental retardation institutions between 1977 and 1988 (White, Lakin, & Bruininks, 1989). About 15% of these individuals returned to live with a parent or relative and about 12% were transferred to another state facility (Scheerenberger, 1988), whereas more than 44,000 individuals and their families faced the changes and uncertainties of moving from large, state-operated facilities to a wide range of alternative, predominantly small, community-based residential settings. The trends in the last 10 years show continued depopulation of state institutions at an average rate of about 4% per year (White, Lakin, Hill, Wright, & Bruininks, 1988). At that rate, tens of thousands of families in coming years will be affected by continuing deinstitutionalization.

Parents have been intensely involved in the deinstitutionalization process, both individually and collectively, in many different ways. Parents, often with the assistance and support of professionals, provided a large part of the early momentum for deinstitutionalization, and had a primary influence on federal and state legislative and administrative initiatives fueling this major social change (Frohboese & Sales, 1980). However, parents have also played other roles, including passive observer and adamant foe.

Finding and maintaining a safe, caring, respectful, and permanent place to live for family members who have mental retardation and who are living away from home is one of the major concerns and challenges that parents face. Not surprisingly, then, parental responses to the prospect of deinstitutionalization vary considerably, depending on the extent to which parents perceive these qualities in long-term housing for their family members in institutional versus alternative community-based settings. Many parents publicly and privately resist deinstitutionalization on the basis of negative perceptions, causing considerable polarization of sentiment among groups of parents and other concerned people (Frohboese & Sales, 1980; Landesman-Dwyer et al., 1980; Payne, 1976). On one side of the broad issue of deinstitutionalization are the largest national professional and parent organizations, such as the Association for Retarded Citizens, the Association for Persons with Severe Handicaps, and the United Cerebral Palsy As-

This review was supported in part by a grant (90DD0145) from the Administration on Developmental Disabilities, US Department of Health and Human Services.

Requests for reprints should be sent to Ms. Sheryl A. Larson, Research and Training Center on Community Living, 207 Pattee Hall, 150 Pillsbury Drive SE, University of Minnesota, Minneapolis, MN 55455.

[1] An earlier version of this article was presented as a policy research brief by the Research and Training Center on Community Living at the University of Minnesota.

26                                    Larson and Lakin

sociations, which support continued deinstitutionaliza-
tion of all people with mental retardation and related
conditions. On the other side, are much smaller, but
often extremely active, groups of parents and profes-
sionals committed to keeping institutions open, includ-
ing the Congress of Advocates for the Retarded and the
Voice of the Retarded.

Whatever an individual's or group's position with
respect to the general issue of depopulating large public
institutions, it is clear that many families whose mem-
bers face movement from institutions to community-
based settings can experience strong feelings of uncer-
tainty, fear, betrayal, and/or guilt (Conroy, 1985;
Mitchell, 1988). Attention to parental attitudes and
perspectives should be an important feature in planning
and providing services and supports for deinstitution-
alization programs.

During the last 10 years, two comprehensive reviews
have been published on parental responses to deinsti-
tutionalization. The first, by Frohboese and Sales
(1980), reviewed the historical context of parental op-
position to deinstitutionalization. This study examined
archival, public testimony, and interview data to delin-
eate in great detail concerns expressed by Nebraska
parents regarding the impeding deinstitutionalization
of their sons or daughters. In addition, the authors
analyzed possible reasons for those concerns, and po-
tential strategies to address them. The second, by Con-
roy (1985), reviewed theoretical and applied research
published between 1957 and 1983 on parent responses
to deinstitutionalization, and possible psychological
reasons for those responses. Conroy identified four ma-
jor gaps in the literature on parental responses to dein-
stitutionalization, including (a) the lack of a represent-
ative national sample of families of persons who are
institutionalized, (b) limited understanding of the rea-
sons for parental opposition, (c) the lack of pre-test/
post-test studies of changes in parental attitudes, and
(d) potential unexamined differences between parents
of adults versus parents of children who are to be
deinstitutionalized.

This review extends these earlier summaries of re-
search on parental attitudes by summarizing all identi-
fiable studies on the attitudes and perspectives of par-
ents of currently or formerly institutionalized family
members regarding movement from institutional to
community placements. Particular attention is paid to
changes in attitudes associated with the experience of
deinstitutionalization and to addressing the gaps noted
by Conroy (1985). It also examines the specific concerns
underlying parental opposition to deinstitutionaliza-
tion, examines parental evaluations of the positive out-
comes of deinstitutionalization and continuing con-
cerns about community settings, and identifies strate-
gies to address parental concerns and to facilitate
parental satisfaction with deinstitutionalization.

## Method

Three general types of research were examined for
this review. One type surveyed parents of persons who
were currently living in public institutions. In those
studies, parents were simply asked about their satisfac-
tion with the current institutional living arrangement,
and in most instances how they would feel about having
their son or daughter moved to a community-based
residential setting. A second type of study surveyed
parents whose formerly institutionalized sons or daugh-
ters were currently living in community settings. Those
parents were asked about their satisfaction with the
current community-based residence, how satisfied they
had been with the institution when their son or daughter
was living in it, and how they had felt about their child
moving into the community. A third type surveyed
parents twice: first, while their son or daughter was still
institutionalized, and later after he/she had moved to a
home in the community. Those parents were ques-
tioned about their satisfaction with each type of place-
ment while their children were actually there and about
their opinion on the deinstitutionalization of their child.

The three types of research described above were
identified by five basic means. First, a computer search
was conducted of the *Psychological Abstracts* and *ERIC*
databases from 1974 to 1988 using appropriate descrip-
tors. Second, requests for studies on these topics were
made of all State Planning Councils on Developmental
Disabilities which, at the time, were preparing their
Congressionally mandated studies of "consumer satis-
faction" (as required in the Developmental Disabilities
Assistance and Bill of Rights Act Amendments of 1987).
Third, additional studies were located in the reference
lists of previously identified studies. Fourth, a manual
review was conducted of articles published between
1978 and 1989 in 27 journals, including the *American
Journal of Mental Retardation, Education and Training
of the Mentally Retarded, Journal of the Association for
Persons with Severe Handicaps,* and *Mental Retarda-
tion.* Finally, persons known to be involved in or knowl-
edgeable about investigations of this type were con-
tacted to obtain unpublished or informally published
research, including dissertations, theses, and unpub-
lished manuscripts. More than 35 studies were identi-
fied and reviewed for this report. Of the 23 studies
reporting quantitative information, four were published
in professional journals, one was indexed in *Disserta-
tions Abstract International* and was obtained from
University Microfilms, and 18 were unpublished or had
limited publication by a state mental retardation/de-
velopmental disabilities unit or other governmental or-
ganization.

Twenty-three of the studies were summarized by
creating a simple scale that grouped parental attitudes
into three categories: positive, neutral, or negative. For
each study, the percentage of all parents reporting pos-

itive, neutral, or negative satisfaction was recorded. If a particular study included nonresponse or missing data, percentages were recalculated using only positive, neutral, or negative answers. Simple mean percentages were computed and weighted by the total number of parents surveyed in each study.

Several rules were developed for summarizing the findings. First, when a question about deinstitutionalization was asked directly (e.g., "How do you feel about deinstitutionalizing your son or daughter?") the response was coded directly. However, when parents were asked about deinstitutionalization indirectly (e.g., "Where would your son/daughter best be served?"), a negative opinion about deinstitutionalization was inferred if parents considered their family member better served in an institution. Conversely, if the parents responded that a community setting would be the best, their attitude about deinstitutionalization was coded as positive. In the few instances in which parents were asked their opinion about the best residential option for their son/daughter both now and in the future, responses reflecting attitudes at the present time (i.e., "now") were coded. Second, when parental attitudes after movement to a community setting were measured on more than one occasion, the responses with the longest interval after deinstitutionalization were recorded. Third, when it was possible to separate the attitudes of parents whose son or daughter had moved to a nursing home or large private institution from those whose son or daughter had moved to a community-based facility, only the parents whose sons or daughters moved to community-based facilities were included. Finally, the vast majority of persons whose responses were studied were parents. However, small numbers of other relatives (e.g., siblings, grandparents) were sometimes included and could not be separated in the data summaries.

Review of the identified studies also revealed many observations by parents regarding factors affecting their attitudes, both before and after deinstitutionalization. There were three basic types of observations: direct open-ended comments of parents, open-ended comments that were categorized and/or summarized by researchers, and parent opinions solicited through closed-ended questions. Qualitative observations from all 27 studies are listed without quantitative ordering. No effort was made to quantify the number or proportion of parents expressing each view, or to suggest that these are universally or even widely held views. Rather, all views expressed by two or more parents were included in the summaries to reflect, in a broad qualitative way, parental experiences and perceptions. The number of parents holding these views, therefore, may vary considerably from item to item.

The process for identifying and categorizing parental comments involved several steps. First, each study was

reviewed and parental observations were listed. Lengthy and complex comments were edited into one or more one-sentence comments. Each successive comment was compared with those already listed. Comments that were identical or essentially the same were not added to the list but existing comments were sometimes modified to include the subtle expansion of an idea. For example, Feinstein, Lemanowicz, Spreat, & Conroy (1986) quoted one parent as saying "I am happy for him. He is doing great at Fernwood. He is more alert and happy." They quoted another parent as saying "I think it was the best move ever made for our son. He is happier and more content." In this case, one of the resulting combined statements was "The person became happier, more communicative, more aware, more content, and more relaxed." After the complete list of comments had been generated, each study was reviewed again to confirm that all comments were included.

The second step involved classification. Broad categories were defined by separating comments made before the move from those made afterward. The latter were further divided into positive and negative comments. Comments made by parents and researchers about how the deinstitutionalization process could or should be improved were also isolated. Next, individual parent statements were categorized based on the headings developed by Frohboese and Sales (1980), summary statements made by other researchers or parents, and subcategories developed by the authors. One author then classified all the comments by heading and the other author reviewed the classification decisions. Joint decisions were made about comments that were in question. Each study was then reviewed a third time to ensure that all specific comments had been included and that those made by only one parent in one study were specifically identified.

The final step in creating the qualitative tables involved making minor editorial changes to express all comments in each table in a consistent format, such as making noun usage uniform (e.g., son/daughter, him/her, he/she became "the person"), and generalizing references to specific sites, such as to "the institution" or "the setting", etc., depending on the context. Once all of these editorial changes were completed, the studies were reviewed a final time to check whether the core content of all comments were included on the tables. Comments made by only one parent were eliminated.

In addition to this qualitative listing, 10 studies provided quantifiable parental observations on specific positive or negative aspects of the move. A summary table was constructed of the quantifiable observations reported in two or more independent studies. A mean of the study means was computed for studies reporting the percentage of parents who noted positive, neutral, or negative responses to each item. Another mean of

the study was computed for studies that reported mean scores for all parents on a 5-point Likert-type scale.

## Findings

Table 1 summarizes the responses of parents of currently institutionalized individuals. These studies asked parents about their satisfaction with the public institution in which their son or daughter resided, and about their feelings regarding moving their son or daughter from the institution to a community setting. Table 1 shows high levels of satisfaction with institutional settings/services, with a weighted average of 91.1% of the parents indicating that they were satisfied (from somewhat to very satisfied) with the institutional setting, whereas a mean of 4.9% of the parents were dissatisfied. When asked their opinion about deinstitutionalization of their son or daughter, 74.2% of these parents had negative reactions (from somewhat to very opposed). Only 20.6% of the parents were positive about such a move.

Table 2 summarizes the findings of studies in which parents were surveyed after their son or daughter moved to the community. These studies asked parents about their satisfaction with the community living setting/services where their son or daughter currently resided and retrospectively about their initial opinion of the move. The length of time between deinstitutionalization and the measurement of parental satisfaction with the community setting ranged from 2 months to 2 years (three studies) to 5 to 7 years (three studies). An average of 88.0% of parents were satisfied (from somewhat to

very satisfied) with the community setting/services. Interestingly, the only study that found a satisfaction rate lower than 84% (68% satisfied) was the earliest of the post-release studies in which the "community placements" averaged 22 residents, a typical pattern of the mid-to-late 1970s. When the parents in these studies were questioned retrospectively about their satisfaction with the institution in which their son or daughter had once lived, an average of 52.3% of the parents said they had been satisfied with the institution, whereas 31.5% said they had not been satisfied during the time their family member was living there. When these parents were asked retrospectively about their initial opinion regarding the proposed move, an average of 56.5% of the parents reported initial positive opinions, whereas only 26.6% reported initial negative feelings.

Table 3 shows the results of studies that surveyed parents both before and after the move. In each of these studies, most of the parents were surveyed both before and after the move, but none of these studies reported pre- and post-move responses for exactly the same group. These studies measured parent satisfaction with the community a median of 1 year after the move, with a range of 6 months to 4 years. Each of these studies found high levels of parent satisfaction with both institutional (83.3%) and community (86.9%) settings. Two of the three studies reported higher proportions of parents satisfied with the community living arrangements than with the institutional setting. Among the three pre/post-move studies, an average of 15.1% of the parents reported positive opinions about a proposed

Table 1
Parent Attitudes About Residential Placement: Parents Surveyed During Institutional Placement

| Authors (Date) | State | No. | Residence[a] | | Satisfied w/Institution | | | Opinion re: Move | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Institution | Community | Positive | Neutral | Negative | Positive | Neutral | Negative |
| Brockmeier (1974) | NE | 754 | X | | 94 | 3 | 3 | 9 | 6 | 85[b] |
| Conroy & Feinstein (1985)[c] | CT | 223 | X[d] | | 77 | 10 | 14 | 32 | 22 | 46 |
| Conroy & Feinstein (1987a) | GA | 308 | X[d] | | 72[e] | | 1[e] | | | |
| David et al. (1983) | MN | 322 | X | | 88 | 6 | 6 | 22 | 0 | 78[f] |
| Heller et al. (1986)[g] | IL | 184 | X | | 93 | — | 7 | 25 | — | 75 |
| Kjos (1981) | MN | 223 | X | | 92 | 7 | 1 | 18 | 2 | 80[f] |
| Marsh (1984) | NC | 464 | X | | 95 | 0 | 5 | 28 | 0 | 72[f] |
| Meyer (1980) | PA | 273 | X | | 79 | 15 | 5 | 14 | 0 | 86[f] |
| Spartz (1986) | MN | 349 | X | | 98 | 0 | 2 | 30 | 0 | 70 |
| Spreat et al. (1987) | USA | 284 | X | | 93 | 0 | 7 | 23 | 17 | 60 |
| Vitello et al. (1985) | NJ | 152 | X | | 91 | — | | — | | 67 |
| Weighted mean%[h] | | | X | | 91.1 | 4.2 | 4.9 | 20.6 | 5.1 | 74.2 |

[a] This column indicates whether the person with mental retardation was living in a public institution or a community-based setting at the time the parents were surveyed.
[b] This survey asked if the respondent prefers that the relative remain in the institution.
[c] Parents of those in or moving to nursing homes were excluded.
[d] These studies asked how satisfied the respondent was with the place his or her relative was living, while all of the other studies asked about satisfaction with the level of care/programming/services.
[e] These numbers represent only those who were very satisfied or very dissatisfied and were not included in calculations.
[f] These percentages were in response to a question that asked where should your son or daughter live.
[g] The people in this study moved from a larger state institution to a smaller regional institution.
[h] The Conroy et al. (1987a) and the Vitello et al. (1985) studies were not included in the calculation of the weighted means because the information was incomplete.

**Table 2**
**Parent Attitudes About Residential Placement: Parents Surveyed During Community Placement**

| Authors (Date) | State | No. | Residence[a] | | Satisfied w/Institution | | | Opinion re Move | | | Satisfied w/Community | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Institution | Community | Positive | Neutral | Negative | Positive | Neutral | Negative | Positive | Neutral | Negative |
| Bradley et al. (1986) | NH | 102[b] | | X[c] | 38 | 8 | 55 | | | | 84 | 5 | 11 |
| Bureau of Evaluation (1986) | WI | 63 | | X[c,d] | | | | 79 | 7 | 10 | 93 | 5 | 2 |
| Feinstein et al. (1988) | MN | 29 | | X[e] | | | | | | | 96 | 0 | 4 |
| Horner et al. (1988) | OR | 110 | | X[e] | 61 | 16 | 22 | 68 | 10 | 15 | 90 | 6 | 5 |
| | | 31 | | X[e] | 74 | 20 | 6 | 23 | 58 | 22 | 90 | 10 | 0 |
| Landesman-Dwyer et al. (1980) | WA | 50[f] | | X[e] | | | | 26 | 12 | 16 | 68 | 23 | 10[g] |
| Rudie & Reid (1984) | MN | 74 | | X | 53 | 21 | 26 | 55 | 21 | 24 | 91 | 8 | 1 |
| State of Wisconsin (1989) | WI | 197 | | X[c] | | | | | | 62 | 89 | 2 | 9 |
| Weighted mean % | | | | X | 52.3 | 14.8 | 31.5 | 56.5 | 16.7 | 26.6[a] | 88.0 | 5.8 | 6.5 |

[a] This column indicates whether the person with mental retardation was living in a public institution or a community-based setting at the time the parents were surveyed.
[b] Sixty-four of the subjects had been institutionalized; the others had not.
[c] These studies asked how satisfied the respondent was with the place his or her relative was living, while all of the other studies asked about satisfaction with the level of care/programming/services.
[d] This was the response after 2 months in the community and was used in the calculation of mean satisfaction with the community.
[e] This was the response after 12 months in the community and was not used in the calculation of mean satisfaction with the community.
[f] The community facilities in this study ranged in size from 1 to 88 residents with an average of 22.
[g] Only the 31 families who had actually visited the community homes were asked this question.
[h] The Bradley et al. (1986) "Opinion re: move" response was not included in the calculations of the weighted mean.

move to the community when asked prior to the move. However, when asked *after* the move about their initial opinion, 61.8% of the parents reported they had had positive opinions (similar to the 56.5% reporting retrospective positive opinions regarding the move in the post-move-only studies).

Qualitative comments of parents on their concerns, observations, and suggestions about deinstitutionalization, and specifically about parental involvement, were included in the 23 studies reviewed, and in four additional studies that examined parent attitudes and experiences with deinstitutionalization but that did not contain measures of satisfaction that could be expressed quantitatively. Tables 4 through 7 categorize these comments and provide examples of the observations and experiences of parents that underlie the parent attitudes reported in Tables 1, 2, and 3. The suggestions made by parents and/or researchers regarding efforts that were, or might have been, made to make the deinstitutionalization process less stressful and more positive for parents were also summarized.

Table 4 records 51 reasons expressed by two or more parents for their opposition or concern about deinstitutionalization. In general, the parents were concerned because of (a) their perception of the superiority of the institutional environment, (b) the potential or existing problems in community settings, (c) the perceived problems with the deinstitutionalization process, and (d) the potential negative implications for the family of deinstitutionalization. Table 5 notes 40 concerns, often continuing concerns, that parents had about community settings after their son or daughter moved to a community-based residence. Major categories of concern included (a) negative changes in the person who moved, (b) unsatisfactory conditions in some community settings, (c) inadequacies in the programs or services available in some communities, (d) staffing problems, such as high turnover in the community settings, (e) perceived problems with the administration of the community services, and (f) negative impacts of the deinstitutionalization process on some families. Table 6 records 45 positive outcomes noted by parents after a move from institutional to community settings. Categories of positive outcomes included (a) positive changes in the person, such as increased happiness, (b) positive environmental features, such as a more homelike setting, (c) improved services, including higher quality of services, (d) positive staff characteristics, such as being respectful and encouraging, and (e) positive family impacts, such as increased enjoyment in visiting. Finally, Table 7 records 41 recommendations made primarily by the researchers who conducted these studies, but also by some parents, concerning ways to facilitate parental satisfaction with the process and outcomes of deinstitutionalization, ways to make deinstitutionalization less stressful for individual families, and

Larson and Lakin

Table 3
Parent Attitudes About Residential Placement: Parents Sampled During Institutional and Community Placement

| Authors (Date) | State | No. | Residence[a] | | Satisfied w/Institution | | | Opinion re: Move | | | Satisfied w/Community | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Institution | Community | Positive | Neutral | Negative | Positive | Neutral | Negative | Positive | Neutral | Negative |
| Conroy & Bradley (1985) | PA | 472 | X | | 83 | 11 | 7 | 14 | 14 | 72 | | | |
| Conroy et al. (1987) | PA | 369 | | X | | | | | | | 88 | 6 | 6 |
| Eastwood (1985) | MA | 32[b] | X | | 92 | 3 | 5 | 32 | 18 | 50 | | | |
| | | 38 | | X | | | | 88 | 6 | 6 | 84 | 6 | 9 |
| Feinstein et al. (1986) | LA | 11 | X[c] | | 70 | 30 | 0 | | | | | | |
| | | 53 | | X[c] | | | | 43 | 28 | 29 | 81 | 19 | 0 |
| Weighted mean %[d] | | | X | | 83.3 | 10.9 | 6.7 | 15.1 | 14.3 | 70.6 | | | |
| Weighted mean %[e] | | | | X | | | | 61.8 | 18.8 | 19.4 | 86.9 | 7.5 | 5.6 |

[a] This column indicates whether the person with mental retardation was living in a public institution or a community-based setting at the time the parents were surveyed.
[b] This study used an institutional contrast group that was not the same as the community group.
[c] These studies asked how satisfied the respondent was the place where his or her relative was living, while all of the other studies asked about satisfaction with the level of care/programming/services.
[d] These means reflect opinions of parents surveyed during institutionalization.
[e] These means reflect opinions of parents surveyed during community placement.

ways that the service delivery system could be more responsive to family needs. Four of the five categories of suggestions related to ways of encouraging and involving parents in the deinstitutionalization process. The fifth category included changes in the service delivery system that would address parental concerns.

In addition to noting the broad range of comments summarized in Tables 4 through 7, several studies asked parents specific questions. A review of those reports revealed six items that appeared in at least two independent studies. These items noted parental responses to questions regarding changes resulting from deinstitutionalization. Some studies reported the mean response of parents on a scale of 1 to 5 (1 = very satisfied, or substantial positive change in their family member; 5 = very negative, or substantial negative changes). Other studies reported the percent of parents reporting positive, neutral (no change), or negative change in the area listed. As shown in Table 8, most parents in these studies reported positive changes in their son's or daughter's happiness and relationships with others after the move to the community. Most also reported satisfaction with the availability/adequacy of needed services, and the competence of staff in community settings. Parents reported that no change in their own relationships with their sons or daughters was associated with the move. However, only 43.7% of the parents reported positive feelings about the security of funding for community residences.

## Discussion

As previously noted, Conroy (1985) identified four major gaps in the literature on parental responses to deinstitutionalization: (a) the lack of an adequately representative national sample of families of persons who are institutionalized, (b) limited understanding of the reasons for parental opposition, (c) the lack of pretest/ post-test studies of changes in parental attitudes, and (d) potential unexamined differences between parents of adults versus parents of children who are to be deinstitutionalized. The studies reviewed here respond to at least three of these four gaps.

The first gap was partially addressed in the study by Spreat, Telles, Conroy, Feinstein, & Colombatto (1987), which included a representative national sample of 284 parents of institutionalized persons. More impressively, the state and local studies reviewed here surveyed over 4,000 parents from fourteen different states, including five from the Northeast Census region, four from the Midwest, three from the South, and two from the West. All reported similar findings.

The gap in understanding parents' reasons for opposing deinstitutionalization was addressed to some extent in the summaries of parent perceptions in Table 4. Although the comments noted were not ranked in terms of frequency or the strength of the perceptions, all came from more than one parent and most were mentioned in more than one study. Table 4 represents the diversity of reasons for parental opposition to deinstitutionalization. Further study is needed to determine which reasons are most frequent among parents of people in institutions.

The third gap, an absence of pre-release/post-release investigations, was not adequately addressed by any of these studies. Although three studies attempted to measure parent attitudes at two or more points in time, one used completely different groups, and the other two used overlapping but not identical groups. This area remains a major limitation of the data base on changes in parent attitudes related to deinstitutionalization. On

Table 4
Reasons for Parental Opposition to Deinstitutionalization

**I. Some parents believe that institutions are better environments for some people.** (4, 7, 10, 11, 14, 16, 19, 21, 22, 24, 25, 27)
- Parents feel that mental retardation experts, special resources and services are more readily accessible in a centralized institution.
- Parents believe that staff in the institution are caring and loving.
- Parents think that institutional residents have more freedom to walk on grounds.
- Parents feel that the family member would be happier and more satisfied with "their own kind" in the institution.
- Parents believe the family member needs an institutional level of care, protection, security, and 24-hr supervision because of their level of mental retardation, medical needs, or behavioral needs.
- Parents view the institution as a permanent home for their family member.
- Parents felt the person would die if he/she had to leave the institution.
- Parents consider the person too vulnerable or otherwise "not qualified" to move to the community.
- Parents believe that the family member will never achieve the level of independence needed for community living.
- Parents feel that the family member has no potential for further educational or psychological development.
- Parents believe that the family member has mental retardation and is not and can never be made normal. Therefore, they should not be treated as such.
- Parents are concerned because the family member previously failed in a community setting.
- Parents felt that normalization, the developmental model, least restrictive environments, and dignity of risk were inappropriate concepts for persons with mental retardation.

**II. Some parents prefer the institution because they perceive currently available community-based settings as undesirable or inappropriate.** (1, 4, 7, 11, 12, 14, 18, 20, 21, 22, 24, 25, 27)

*Environmental safety*
- Parents are concerned about coed settings. They fear that sexual activity would be permitted indiscriminately.
- Parents are concerned about the compatibility of people within the house and the appropriateness of groupings.
- Parents fear exploitation or inadequate supervision to protect the safety and health of their family member in community settings.
- Parents are concerned about the safety of the physical structure, cleanliness, physical layout, maintenance, fire safety, and age.

*Quality of services*
- Parents are concerned that needed experts or services (especially medical and behavioral services) are not as available or are insufficient in community settings (particularly in rural areas).
- Parents fear there is an absence of supportive services in the community, particularly for those with severe medical or behavioral problems.
- Parents fear that smaller may mean less: facilities, equipment, activities, and care.
- Parents are concerned that program quality, and comprehensiveness will be less than in the institution.
- Parents perceive that community residences don't provide proper care.

*Effect on the person*
- Parents fear that moving would cause physical and mental stress, or that the person could not adjust to community living.
- Parents fear that the relative would be harmed by changes in relationships with staff, and other residents.
- Parents fear the move will have a negative effect on the person's relationship with family members.

*Community reactions*
- Parents are concerned about negative neighbor and public reactions or rejection by the community.
- Parents sense that society would not tolerate integration of persons with mental retardation.

*Administrative structure*
- Parents perceive administrative and systemic shortcomings in community systems and policy implementation practices.
- Parents have more faith in state supervision than in local supervision and monitoring of services.

*Staffing problems*
- Parents believe that the quality, number, comprehensiveness, expertise, and type of staff are not as good in the community.
- Parents feel that community staff provide inadequate supervision.
- Parents believe that community facilities cannot attract and keep a sufficient number of qualified personnel.
- Parents are concerned about turnover in community settings.

*Stability/permanence/financing*
- Parents are concerned that funding for specialized services and staff will not be available in community settings.
- Parents are concerned about the financial instability of community programs in general.
- Parents are concerned about the stability of specific community providers (i.e., opening and closing facilities) because their future viability and reliability is unknown.
- Parents fear the unknown (i.e., they worry about moving their family member from a stable to an unknown environment).
- Parents worry about the stability of the placement especially over the very long term. Older parents especially want a permanent place for their son/daughter to live.
- Parents worry that the client will be pushed into yet another more independent setting.

**III. Some parents are opposed to deinstitutionalization because the process itself is seen as injudicious.** (11, 14)
- Parents fear that decisions about who and how many people should move are not made based on individual needs.
- Parents fear that the person will be "dumped" into an inappropriate placement.
- Parents fear the loss of parental control and decision making authority over residency and service decisions.

**IV. Some parents are opposed to deinstitutionalization because they feel that it will have an adverse impact on the parents or family members other than the person with mental retardation.** (4, 7, 11, 14, 16, 21)
- Parents thought that the original decision to institutionalize was final and permanent but it is now being renounced.
- Parents fear they may have an increased burden of care.
- Parents are concerned about their ability to meet the physical and emotional demands of those who are deinstitutionalized.
- Parents fear the potential financial impact on the family.
- Parents fear an increased burden in terms of their social life, job, recreation/vacation opportunities, or time spent alone or with their spouse.
- Parents fear possible strains on family harmony and functioning.
- Parents feel that deinstitutionalizing some will have negative funding ramifications for the institution.
- Parents feel that emotional stresses including guilt related to institutionalization, anger, confusion, fear of the unknown, and embarrassment resurfaced during the consideration of deinstitutionalization.
- Parents were concerned that the person would move farther away.

*Note.* The sources for the comments in each major section are indicated by the numbers in parentheses. The numbers refer to entries in the reference list.

Table 5
Continuing Concerns about Community Settings

I. The person who moved was considered to have changed for the worse. (8, 12, 15, 20)
- The person gained a significant amount of weight.
- The person appeared more belligerent, rude, or hostile.
- The person's appearance, hygiene, or attire was perceived as worse.

II. The environment of the community setting was not satisfactory. (8, 18, 20)
- The physical conditions or upkeep of the home was poor.
- The parents were concerned that we are developing a lot of mini-institutions.
- The person's clothing disappeared.
- Other resident's behavior problems negatively affected the family member's life in the community home.
- The home was crowded/too small.

III. The programs or services available in the community were considered inappropriate or inadequate. (1, 3, 8, 11, 12, 15, 20, 26)
- Needed services in areas such as recreation, transportation, dental, communication, day program, job training, education, psychology, health services, medicine, and behavior were not available on the premises, were inadequate, or were inappropriate.
- There was a need for additional training and better supervision for residents.
- The parents were concerned about the safety of, and the level of supervision for the person in the residence and in the community.
- The day program was not integrated into the community.
- The person moved before the facilities were ready.
- The person had to move again because of another person's behavior problems.
- The person doesn't like his/her job.
- Parents were uncertain about the permanence of community programs.
- The family member needed more to do, a greater chance to get out, and more integrated experiences.
- There was perceived to be an absence of meaningful training activities in the day programs.
- Parents were concerned about services for persons who were aging.

IV. There were staff-related problems in the community setting. (1, 3, 4, 8, 11, 15, 20, 26)
- The setting had high staff turnover rates.
- There was inconsistency related to turnover.
- The staff members were poorly paid, too young, or inadequately trained.
- The resident was not getting enough attention.
- Staff members had to do too much paperwork.
- No funds were available for increased staff for a person who had behavioral or medical emergencies.
- Communication between staff and parents was not good.
- More staff members were needed for community activities.

V. There were perceived problems with the administration or structure of the community service system. (1, 4, 5, 8, 11, 12, 15, 18, 20)
- The funding for community programs was considered inadequate.
- The parents had a lack of faith in the continuation of funding for community services.
- Parents were concerned about burial funds and handling of individual finances.
- There was considered to be inadequate monitoring and outside supervision.
- The parents noticed problems with case management.
- Parents were apprehensive about future relocation and transfers and prefer the status quo.
- The person was moved or reinstitutionalized due to behavioral or other problems.
- Parents worried that the person will be reinstitutionalized if the community setting fails.
- There was a lack of acceptance of the family member by the community.

VI. The deinstitutionalization process was seen as having a negative impact on the family. (1, 4, 5, 8, 12, 15, 20, 26)
- There was inadequate communication between care providers and guardians.
- Parents were not able to have a say in what happened to their family member.
- There was a limit on the number of days the person could be away from the residence to be with family.
- The resident now lived farther away from the family.

*Note.* The sources for the comments in each major section are indicated by the numbers in parentheses. The numbers refer to entries in the reference list.

a more positive note, the findings of the three studies that did sample groups of parents at more than one point in time had results that were very similar to those of both the pre- and post-release studies.

The final gap perceived by Conroy (1985), understanding the differences that may exist between parents of children and youth and parents of adults, was addressed only indirectly in three studies. Marsh (1984) reported a small, but statistically significant, difference in the mean age of residents whose parents opposed and those whose parents supported community placement ($M = 33.38$ and $M = 29.41$, respectively, $t = 3.61$, $df = 332.7$, $p < .001$). Spartz (1986) also reported that

the age of the son or daughter was related to parental opposition to community placement ($\chi^2 = 6.562$, $df = 2$, $p = .038$, $N = 319$), but again the magnitude of differences was small. Finally, Meyer (1980) reported that younger respondents were more likely to prefer community placement both in the present and in the future. Although differences in attitudes as related to the age (and other characteristics) of the parents of institution residents remains an important issue, practically speaking, the number of children and youth in institutions is decreasing rapidly. Children and youth (0 to 21 years) comprised only 10.6% of all residents of public facilities in 1989, with children aged 0 to 14

Table 6
Positive Outcomes Related to Community Placements

**I. The person who moved to the community was considered to have changed for the better.** (1, 4, 8, 9, 11, 12, 13, 15, 18, 20)
- The person became happier, more communicative, more aware, more content, and more relaxed.
- The person showed increased warmth, affection, and self-esteem.
- The person showed improved emotional development.
- The person developed more social relationships with other people.
- The family member had a positive attitude about returning to the community residence after a home visit.
- The person became more confident, independent, and responsible.
- The person's quality of life improved.
- The family member was clean and well cared for and showed better hygiene and appearance.
- The family member was acquiring skills through daily activities.
- The family member was considered to be showing positive behavioral changes and skill development in areas such as daily living, communication, and behavior problems.
- The family member is living well now whereas at the institution he merely existed.

**II. The qualities of the environment in the community setting were judged to be better than those of the institution.** (1, 4, 8, 11, 12, 15, 20)
- The location was considered better (closer to family members, resources, etc.).
- The environment was considered more stable and relaxed than the institution.
- There was an every day appearance of family life.
- The setting allowed a more normal lifestyle.
- The setting was warmer, smaller, and more homelike.
- The setting was seen as more comfortable.
- The smaller size allowed for increased individual attention.
- The community setting was considered the best place this family member has ever lived.
- The home is clean and well cared for.

**III. The services available in the community setting were seen as better than what was available in the institution.** (1, 3, 4, 5, 8, 11, 12, 18)
- The services were considered higher quality in the community.
- All needed services were currently available, including behavioral, medical, vision, OT/PT, speech, self-care, independent living, etc.
- More one-to-one personal attention was available.
- The house was judged to be well managed, efficient, and intelligently run.
- Enjoyable activities, and recreation opportunities were available.
- The day program was felt to be enjoyable and doing a good job.
- There were more opportunities to learn, experience new environments and activities, and make friends in the community.

**IV. The staff were considered as having a positive impact on the person.** (1, 3, 4, 5, 8, 11, 18, 20)
- Staff provided personalized attention and interest.
- The residence had good quality staff who were sincere, knowledgeable, capable, and skillful.
- The staff of the community facility showed respect for residents.
- The staff do a good job.
- The staff encouraged residents to learn new things, to talk more, and to be more social.
- The residence was perceived to have good staff/client ratios.

**V. The move was reported to have a positive impact on the parents and family.** (1, 3, 4, 8, 11, 12, 15)
- The move was reported to have improved the relationship between the person, the staff, and the parents.
- The relative now lived closer to parents and family.
- The parent enjoyed visits to the community setting.
- Siblings now felt more comfortable visiting their brother or sister.
- The lives of the individual and of the family had changed for the better.
- The parent was more aware of daily life events of the family member.
- The move allowed an increase in the frequency of visits.
- Parents were more able to give suggestions about care.
- Parents want the person to continue living in the home.
- The move resulted in positive attitudes about the benefits of deinstitutionalization.
- The parent and the family members now felt better, happier, and were more at peace about the living situation.
- Parents now have increased expectations for the development potential of their family member.

*Note.* The sources for the comments in each major section are indicated by the numbers in parentheses. The numbers refer to entries in the reference list.

years old constituting 2.7% of all residents and 4.7% of all releases, and youth 15 to 21 years old constituting 11% of all discharges (Scheerenberger, 1990).

Although these studies produced a wealth of information, certain methodological limitations were evident. First, there are questions about the reliability and validity of the survey instruments. The majority of these studies used unpublished instruments with untested reliability, although the use of satisfaction scales is commonplace. The results may also have been influenced by a response bias. Heal & Fujiura (1984) noted that attitudinal variables, such as parental satisfaction, are susceptible to differences in the way the survey was administered, to the characteristics of the investigator administering the surveys, and to the characteristics and roles of the respondents. The David, Morris, and Suom-

34                                    Larson and Lakin

Table 7
Ways to Facilitate Parental Satisfaction with the Deinstitutionalization Process

**I. Attend and respond to the perceptions, needs, and concerns of family members. (1, 4, 10, 14, 15, 20, 21, 22, 24, 25, 27)**
- Professionals should recognize that families have information and experiences that create legitimate concerns about community settings.
- Professionals should acknowledge the extent to which unresolved concerns and philosophical disagreements between parents and professionals can be detrimental to successful community reintegration and habilitation.
- Professionals and policy makers should create support services for families going through the process to respond to the needs and concerns of parents.
- Professionals should make referrals to support groups of parents who have gone or who are now going through the process of deinstitutionalization.
- Professionals should minimize conflict with parents.
- Professionals and planners should provide a formal forum through which parents can express their feelings and fears.
- Professionals should provide specific counseling, training, and education to help families develop realistic expectations, fears, and motivations.
- Service providers and other professionals should establish ongoing means to listen actively, address, and resolve additional parent concerns.
- Service providers and other professionals should provide accurate written and visual information about alternatives to institutional care, and about the ability of persons with disabilities to learn and grow.
- Professionals should counsel, train, and inform families about the capacity of community group homes to provide services.

**II. Facilitate participation of the person and his or her family in the decision making process related to deinstitutionalization. (2, 4, 14, 15, 18, 20, 22, 24, 25, 27)**
- Professionals should individually inform the family about impending moves in ways intended to reduce anxiety and build support necessary for a smooth transition.
- Professionals should encourage increased involvement by the family in the transition process to help them arrive at realistic expectations, fears, and motivation, as well as to provide a sense of control over their child's well being.
- Professionals should provide formal and structured hearings designed to treat family concerns with dignity.
- Service providers and other professionals should consider and utilize families as a valuable resource in planning for the successful placement of their relatives into the community.
- Professionals should consult with parents throughout the decision-making and placement process.
- Service providers and other professionals should invite parents to team-meetings where possible moves will be discussed and follow-up with families after the meetings.
- Professionals should provide an opportunity to chose knowledgeably between community and institutional settings if both are available.
- Professionals should inform parents about the details of community facilities in which their relative may be placed as soon as they are available.
- Professionals and policy makers should provide for parental control and consent in the placement decision.
- Professionals should take enough time to make sure the transition process is done right in the minds of the families.

**III. Arrange opportunities for family members to learn about and visit potential community sites. (1, 4, 5, 15, 20, 27)**
- Professionals should arrange for parents who have been through deinstitutionalization to provide input to professionals during preliminary planning and implementation phases.
- Professionals should arrange that parents who have been through deinstitutionalization can meet with the institution parent association, small groups, or individual parents.
- Professionals should share the positive feelings of parents who have been through the process in written or audiovisual forms.
- Professionals should provide parents opportunities to contact parents of previously deinstitutionalized persons, including matching families whose members have similar experiences or needs.
- Professionals should provide opportunities for parents to visit good community settings.
- Before the move, service providers and other professionals should arrange informational sessions and schedule open houses at the new residence.

**IV. Establish and maintain effective communication links between community providers and family members. (1, 4, 5, 15, 20, 27)**
- Professionals should provide information about the type of community residence to which a particular person will be moving.
- Service providers and other professionals should maintain contact with, and involvement of, parents by sharing information regularly about their resident's adjustment to the placement, the habilitation plan, and the availability of community services.
- Service providers and other professionals should inform parents when there are placement problems.
- Planners should use placements as close as possible to the family.
- Service providers and other professionals should involve parents when there is a breakdown that jeopardizes a placement or that necessitates movement to a new setting.
- Professionals and policy makers should conduct ongoing periodic family surveys to evaluate satisfaction and obtain other feedback.
- Professionals and policy makers should continually address ongoing problems in community services and communicate to families about those efforts.

**V. Provide federal, state, and local support to ensure that quality community-based options are available and have long-term viability. (1, 5, 6, 8, 14, 15, 21, 22, 24, 25, 27)**
- Policy makers and professionals should develop needed service structures to ensure an adequate level of services in community settings and communicate to families about those efforts.
- Policy makers and professionals should develop community resources that demonstrate the ability to provide quality programming consistently over time.

Table 7—*Continued*

- Policy makers and professionals should continue to work to increase state and federal commitment to the development of support for additional and more specialized community alternatives.
- Policy makers and professionals should establish permanent systems to monitor and evaluate quality of community services effectively and educate parents about these efforts.
- Policy makers and professionals should promote and publicize efforts that enhance the image of permanence for community settings.
- Policy makers and professionals should include the family in the formal structure of the quality assurance system for each individual.
- Policy makers and professionals should involve families in local and state policy planning related to deinstitutionalization and the development of community service.
- Researchers, policy makers, and professionals should research, demonstrate, and communicate about deinstitutionalization from the perspective of the consumer, the citizen moving to the community.

*Note.* The sources for the comments in each major section are indicated by the numbers in parentheses. The numbers refer to entries in the reference list.

Table 8
Quantitative Summary of Parental Comments Regarding Changes Resulting from Deinstitutionalization

| Parental Opinions After Deinstitutionalization | No. of Studies | No. of Parents | Mean Score[a] | Mean Percent Reporting[b] | | |
|---|---|---|---|---|---|---|
| | | | | Positive | Neutral | Negative |
| Change in son's or daughter's happiness after the move | 3 | 161 | | 74.7 | 18.6 | 6.7 |
| Parental feeling that needed services are available/adequate in the community setting | 2 1 | 166 27 | 1.74 | 74 | 15 | 11 |
| Change in relationships between son or daughter and other people after the move | 2 1 | 166 25 | 1.86 | 68 | 24 | 8 |
| Parental satisfaction with the competence of the community staff | 3 5 | 198 713 | 1.86 | 77.1 | (12.9)[c] | (10.5)[c] |
| Change in relationship between parents and son or daughter after the move | 3 1 | 198 102 | 2.39 | 25 | 75 | 0 |
| Parental feeling that the funding for community residences is secure | 3 3 | 198 499 | 2.48 | 43.7 | (27.5)[c] | (31)[c] |
| | 3 | 198 | 2.57 | | | |

[a] These studies reported results as a mean score on a scale of 1 to 5. All of the means have been coverted so that a score of 1 means very satisfied or much change for the better, whereas a score of 5 means very dissatisfied or much change for the worse.
[b] These studies reported the simple mean percentage of parents who reported each level of satisfaction.
[c] The percentages listed in parentheses were based on a smaller number of studies than the positive rating. This happened when one or more study reported only the percentage of parents who reported positive answers.

ala study (1983) addressed the possibility that different investigating agencies may induce differential responding by sending half of the surveys on the letterhead of an institution, and the other half on the letterhead of the Governor's Planning Council on Developmental Disabilities. However, they found no statistically significant differences in the responses of the two groups.

Second, questions can be raised about the representativeness of the findings. The state and regional studies reviewed here had response rates ranging from 50% to 84.4%, with a median of 63%. The lone national study (Spreat et al., 1987) reported a considerably lower response rate of 35.5%. The question of whether the responders varied systematically from nonresponders was addressed by Conroy & Bradley (1985), who noted no significant differences between these groups on a subset of the most critical items. The issue of representativeness also applies to whether the characteristics of persons moving to community settings whose families reported satisfaction were comparable to the characteristics of those who remained in the institutions, whose families' eventual satisfaction after deinstitutionalization we may wish to infer. As deinstitutionalization

has progressed, the people remaining in institutions typically have more severe impairments than those moving to community settings (White, Lakin & Bruininks, 1989). However, in the five studies (c.f. Tables 2 and 3) reporting the level of retardation, a mean of 56% of those who were deinstitutionalized had severe or profound mental retardation.

Finally, the majority of the studies of post-deinstitutionalization attitudes used retrospective data rather than pre/post data. While this practice afforded the opportunity to examine the differences between retrospective and prospective attitudes, it also demonstrated that this approach is not adequate for determining what would have actually been said in a pre/post survey. Clearly, future research that seeks to examine accurately changes in attitudes must measure these attitudes both before and after the intervention.

This review revealed several patterns in the results of parent attitude studies. Across the different types of studies, parents whose offspring were living in institutions at the time of the survey were overwhelmingly satisfied with the institutions (90.0%). Despite the considerable criticism of institutional settings in contem-

porary scholarly writing and court opinions (Haney, 1988; Heal, 1988; Scheerenberger, 1983), parents of institutionalized adults and children still feel that institutions serve their son or daughter well. In most studies (10 of 12), 60% or more of the parents of currently institutionalized people were opposed to moving their offspring from an institution to a community setting. This pattern has remained quite constant across time and is still evident in the studies conducted in the late 1980s.

The studies that asked parents to look retrospectively at their satisfaction with institutions were particularly interesting. There was a substantial discrepancy between parents' reported satisfaction with institutional settings when they were asked prospectively (i.e., before movement from the institution) versus parents' reported satisfaction about institutional settings when asked retrospectively (i.e., after movement to the community). The mean level of satisfaction with the institution for retrospective studies was 52.3%. However, when questions were asked during institutional placement, the mean level of satisfaction across all types of studies was 90.0%. In addition, across all types of studies an average of 19.9% of parents surveyed during their child's institutionalization reported positive opinions about a move to the community, but retrospectively, an average of 57.7% of parents reported initial positive opinions.

These findings raise an important question about why parental responses change so dramatically. It may be that parents who have had the opportunity to see their family member in a small community living arrangement have a different frame of reference and a new perspective on institutional living. Once having seen the nature of the community residences, the institution may not look as good as it once did. This in turn may have affected their recollection of past satisfaction. An alternate possibility was suggested by Conroy (1985). He explored the possibility that changes observed in parental responses after deinstitutionalization can be explained by dissonance theory. Basically, his explanation was that the decision to place a child in an institution, despite the negative consequences of such a decision for the child, could create a state of high post-decisional dissonance. This dissonance is reduced over time as parents come to adopt a position that the institution is what the relative needs. Placement into a community setting provides strong evidence that the institution was less appropriate than the parents once believed. This then results in a change in attitudes about both the institution, and about the appropriateness of the community setting.

The summary of quantitative data on parental attitudes about residential placement shows[3] clearly that prior satisfaction with institutional care and reservations about community care in time turns into satisfac-

tion with community settings for the majority of families. Nine of the 10 studies that surveyed parents about community settings found that over 80% of the parents were satisfied. The summary of family comments about the process of deinstitutionalization, however, clearly shows there are many ways this process can be improved to respond better to the concerns and needs of families. Parents are concerned about deinstitutionalization and community placement for a variety of reasons. Some of the reasons for resistance to deinstitutionalization turn out to be contradicted by the realities of community living. For example, there is strong evidence that moving from an institution to a small community setting is associated with positive outcomes for persons with all levels of mental retardation. Some of these positive outcomes are improved adaptive behavior (Larson & Lakin, 1989) and increased social participation (Conroy & Bradley, 1985; Hill & Bruininks, 1981; Horner, Stoner & Ferguson, 1988; Molony & Taplin, 1988). Furthermore, more parents in the studies summarized in Table 8 reported increased happiness and improved social relationships among persons who moved, and a wide variety of other positive outcomes were noted by parents in the studies summarized in Table 6. Finally, concerns expressed before the move about the availability and adequacy of services, and the competency of staff turned out not to be concerns for most parents after the move. When such evidence is available to counter concerns noted by parents, professionals have an obligation to provide in a respectful manner information to facilitate the reduction of parental anxiety. This will require establishing and maintaining effective communication links between providers and family members. Responding to parental uncertainty about their son or daughter's future lifestyle by arranging opportunities to learn about and visit community sites and talk with parents of persons who previously moved to the community also appear to be helpful.

On the other hand, some of the concerns raised by parents before deinstitutionalization turn out to be continuing concerns after deinstitutionalization. These continuing concerns underline the importance of attending and responding to the perceptions and concerns of family members before, during, and after their child moves from an institution to a community setting. The importance of responding to parental concerns and encouraging their participation in the deinstitutionalization process was also confirmed by Stoneman and Crapps (1990), who found that the amount of parental involvement in the deinstitutionalization process appears to be a strong predictor of future involvement by parents. Acknowledging parental concerns before the move, facilitating parental participation in the deinstitutionalization process, and involving parents in ongoing quality assurance efforts to address concerns such

as those noted in Table 5 requires only the commitment to do so. Responding to parents' concern about the stability of funding for community settings and other systemic matters requires broader attention to federal, state, and local policies as they affect and assure long range support for community services.

However, the clearest message in these studies is that the overwhelming majority of parents become satisfied with community settings once their son or daughter has moved from the institution, despite general predispositions to the contrary. The primary implication that may be drawn is that professionals, policy makers, and advocacy groups still have much to do in implementing programs that will assist parents in developing as early as possible the positive, less stressful attitudes about deinstitutionalization and community living that eventually almost all parents come to feel.

## References

Studies Reviewed[1]

1. Bradley, V. J., Conroy, J. W., Covert, S. B., & Feinstein, C. S. (1986). *Community options: The New Hampshire choice.* Cambridge, MA: Human Services Research Institute.
2. Brockmeier, W. E. (1974). *Attitudes and opinions of relatives of institutionalized mentally retarded individuals toward institutional and non-institutional care and training.* Unpublished doctoral dissertation, University of Nebraska. *Dissertation Abstracts International, 35,* 5163A.
3. Bureau of Evaluation, Division of Policy and Budget. (1986). *Evaluation of the Community Integration Program.* Madison, WI: Author.
4. Conroy, J. W., & Bradley, V. J. (1985). *The Pennhurst longitudinal study: A report of five years of research and analysis.* Philadelphia, PA: Temple University Developmental Disabilities Center. Boston: Human Services Research Institute.
5. Conroy, J. W., & Feinstein, C. S. (1985). *Attitudes of the families of CARC v. Thorne classmembers.* The Connecticut Applied Research Project (Interim Report No. 2). Philadelphia, PA: Conroy & Feinstein Associates.
6. Conroy, J. W., & Feinstein, C. S. (1987a). *1987 Survey of the families of the people who live at Georgia Retardation Center and Bainbridge State Hospital: An interim report of the GRC alternatives feasibility study* (Draft). Philadelphia, PA: Conroy and Feinstein Associates.
7. Conroy, J. W., & Feinstein, C. S. (1987b). *1987 Survey of the families of the people who live at Georgia Retardation Center and Bainbridge State Hospital: An interim report of the GRC alternatives feasibility study. Verbatim comments.* Philadelphia, PA: Authors.
8. Conroy, J. W., Lemanowicz, J. A., & Feinstein, C. S. (1987). *Pennhurst class members in CLA's: The views of the families in 1986, and changes from 1985 to 1986* (Technical Report No. 87-12-1). Philadelphia, PA: Temple University, Research & Quality Assurance Group.
9. Conroy, J. W., & Wang, I. (1987). *Attitudes of the families of CARC v. Thorne members in 1986, and changes since 1985* (Draft). The Connecticut Applied Research Project (Interim Report No. 6). Philadelphia, PA: Conroy & Feinstein Associates.
10. David, J., Morris, J., & Suomala, J. (1983). *Attitudes towards deinstitutionalization held by families of institutionalized mentally retarded persons* (Unpublished manuscript). Available from James V. David, Director, Program Evaluation, Cambridge Regional Human Service Center, Cambridge, MN 55008.
11. Eastwood, E. A. (1985). *Community living study: Three reports of client development, family impact, and the cost of services among community-based and institutionalized persons with mental retardation.* Belchertown, MA: Belchertown State School.
12. Feinstein, C. S., Lemanowicz, J. A., & Conroy, J. W. (1988). *A survey of family satisfaction with regional treatment centers and community services to persons with mental retardation in Minnesota, Welsch v. Gardebring Class members.* Philadelphia, PA: Conroy & Feinstein Associates.
13. Feinstein, C. S., Lemanowicz, J. A., Spreat, S., & Conroy, J. W. (1986). *Report to the special master in the case of Gary W. v. The State of Louisiana.* Philadelphia, PA: Temple University, Developmental Disabilities Center.
14. Frohboese, R., & Sales, B. D. (1980). Parental opposition to deinstitutionalization: A challenge in need of attention and resolution. *Law and Human Behavior, 4,* 1–87.
15. Grimes, S. K., & Vitello, S. J. (1990). A follow-up study of family attitudes toward deinstitutionalization 5 to 7 years later. *Mental Retardation, 28,* 219–225.
16. Heller, T., Bond, M. A., & Braddock, D. (1986). *Family reactions to institutional closure.* Chicago, IL: University of Illinois at Chicago, Institute for the Study of Developmental Disabilities.
17. Heller, T., Bond, M. A., & Braddock, D. (1988). Family reactions to institutional closure. *American Journal of Mental Retardation, 92,* 336–343.
18. Horner, R. H., Stoner, S. K., & Ferguson, D. L. (1988). *An activity-based analysis of deinstitutionalization: The effects of community re-entry on the lives of residents leaving Oregon's Fairview Training Center.* Salem, OR: University of Oregon, Specialized Training Program of the Center on Human Development.
19. Kjos, K. (1981). *Attitudes toward identified elements of a health care continuum by families of mentally handicapped individuals being served at the Fergus Falls State Hospital's regional residential setting* (Unpublished manuscript). Fergus Falls, MN: Author.
20. Landesman-Dwyer, S., Sulzbacher, S., Edgar, E., Keller, S., Wise, B., & Baatz, B. (1980). *Rainier School placement study* (Report No. 05-11). Olympia, WA: Department of Social and Human Services, Office of Research.
21. Marsh, H. W., III. (1984). *Family attitudes toward deinstitutionalization of the mentally retarded.* Unpublished master's thesis, University of Minnesota, Hospital and Health Care Administration.
22. Meyer, R. J. (1980). Attitudes of parents of institutionalized mentally retarded individuals toward deinstitutionalization. *American Journal of Mental Deficiency, 85,* 184–187.
23. Rudie, F., & Reidl, G. (1984). Attitudes of parents/guardians of mentally retarded former state hospital residents toward current community placement. *American Journal of Mental Deficiency, 89,* 295–297.
24. Spartz, G. G. (1986). *Family attitudes toward deinstitutionalization.* Unpublished Third Year Project, University of Minnesota at Minneapolis, Program in Health and Health Care Administration.
25. Spreat, S., Telles, J. L., Conroy, J. W., Feinstein, C., & Colombatto, J. J. (1987). Attitudes toward deinstitutionalization: National survey of families of institutionalized

---

[1] These numbers identify the references for comments on Tables 4 through 7.

persons with mental retardation. *Mental Retardation, 25,* 267–274.

26. State of Wisconsin, Legislative Audit Bureau. (1989). *An evaluation of community integration program 14: Department of Health and Social Sciences.* Madison, WI: Author.

27. Vitello, S. J., & Atthowe, J. M. (1985). Deinstitutionalization: Family reaction and involvement. *Mental Retardation Systems, 2,* 23–28.

**Other References**

Conroy, J. W. (1985). Reactions to deinstitutionalization among parents of mentally retarded person. In R. H. Bruininks & K. C. Lakin (Eds.), *Living and learning in the least restrictive environment.* (pp. 141–152). Baltimore: Paul H. Brookes.

Haney, J. I. (1988). Empirical support for deinstitutionalization. In L. W. Heal, J. I. Haney, & A. R. Novak Amado (Eds.), *Integration of developmentally disabled individuals into the community* (2nd ed.) (pp. 37–58). Baltimore: Paul H. Brookes.

Heal, L. W. (1988). Evaluating residential alternatives. In L. W. Heal, J. I. Haney, & A. R. Novak Amado (Eds.), *Integration of developmentally disabled individuals into the community* (2nd ed.) (pp. 211–225). Baltimore: Paul H. Brookes.

Heal, L. W., & Fujiura, G. T. (1984). Methodological considerations in research on residential alternatives for developmentally disabled persons. In N. R. Ellis & N. W. Bray (Eds.), *International review of research in mental retardation* (Vol. 12) (pp. 205–244). Orlando, FL: Academic Press.

Hill, B. K., & Bruininks, R. H. (1981). *Family leisure and social activities of mentally retarded people in residential facilities.* Minneapolis: University of Minnesota, Center for Residential and Community Services.

Larson, S. A., & Lakin, K. C. (1989). Deinstitutionalization of persons with mental retardation: Behavioral outcomes. *Journal of the Association for Persons with Severe Handicaps, 14,* 324–332.

Mitchell, G. J. (Chrmn.). (1988). *Medicaid Home and Com-*

*munity Quality Services Act of 1987. Hearing before the Subcommittee on Health of the Committee on Finance on S. 1673.* Washington, DC: U.S. Government Printing Office.

Molony, H., & Taplin, J. (1988). Deinstitutionalization of people with developmental disability. *Australian and New Zealand Journal of Developmental Disabilities, 14,* 109–122.

Payne, J. E. (1976). The deinstitutionalization backlash. *Mental Retardation, 14,* 43–45.

Scheerenberger, R. C. (1983). *A history of mental retardation.* Baltimore: Paul H. Brookes.

Scheerenberger, R. C. (1988). *Public residential services for the mentally retarded, FY 1986–1987.* Madison, WI: National Association of Superintendents of Public Residential Facilities for the Mentally Retarded.

Scheerenberger, R. C. (1990). *Public residential services for the mentally retarded, FY 1988–1989.* Madison, WI: National Association of Superintendents of Public Residential Facilities for the Mentally Retarded.

Stoneman, Z., & Crapps, J. M. (1990). Mentally retarded individuals in family care homes: Relationships with the family of origin. *American Journal of Mental Retardation, 94,* 420–430.

White, C. C., Lakin, K. C., & Bruininks, R. H. (1989). *Persons with mental retardation in state operated residential facilities: Year ending June 30, 1988 with longitudinal trends from 1950 to 1988.* Minneapolis: University of Minnesota, Center for Residential and Community Integration.

White, C. C., Lakin, K. C., Hill, B. K., Wright, E. A., & Bruininks, R. H. (1988). *Persons with mental retardation in state operated residential facilities: Year ending June 30, 1987 with longitudinal trends from 1950 to 1987.* Minneapolis: University of Minnesota, Center for Residential and Community Integration.

Received: July 18, 1990
Final Acceptance: November 2, 1990
Editor in Charge: John Nietupski