# PUBLIC POLICY MONOGRAPH SERIES

## Monograph 4

# THE CLOSURE OF MENTAL RETARDATION INSTITUTIONS: TRENDS AND IMPLICATIONS (A Working Paper]

David Braddock Ph.D                    Tamar Heller Ph.D



THE UNIVERSITY OF ILLINOIS AT CHICAGO

## Evaluation & Public Policy Program

# INSTITUTE FOR THE STUDY OF DEVELOPMENTAL DISABILITIES

THE CLOSURE OF MENTAL RETARDATION INSTITUTIONS:
TRENDS AND IMPLICATIONS


by

David Braddock, Ph.D. & Tamar Heller, Ph.D.
Evaluation and Public Policy Program
Institute for the Study of Developmental Disabilities
University of Illinois at Chicago
1640 West Roosevelt Road
Chicago, Illinois 60608

Suggested Citation:    Braddock, D. & Heller, T. 1984. The closure of
mental retardation institutions:      trends and
implications (A working paper). Chicago: Evalu-
ation and Public Policy Program, Institute for
the Study of Developmental Disabilities, Univer-
sity of Illinois at Chicago.

THE CLOSURE OF MENTAL RETARDATION INSTITUTIONS:
TRENDS AND IMPLICATIONS

## CONTENTS

PART I:  TRENDS ................................................. i

* Introduction ......................................... I

Establishment of  State .Institutions in America ................ 3

The Closure of State Institutions ...........................5

* Characteristics of Terminated Facilities .................5
* Factors Conducive to Institutional Closure.............. .10
* Precedents in Mental Health: State Hospital Closures . . .12
* Policy Termination Literature ...........................35

PART II:  IMPLICATIONS .......................................17

Closures  and Involuntary Relocation.  ,............................... 17

Client Impacts,  ........,*..,  ,  , .......♦ . . ,17
Family Impacts .............................. * . , , .20
Employee Impacts ........................... ♦ . . , .21
The Dixon Closure Study...............................23

Closure Guidelines...........................  . . , . , . . . ,25

Concluding Observations* ...................................28

References Cited ..............  ...........  . . , . , , . .3!

THE CLOSURE OF MENTAL RETARDATION INSTITUTIONS:
TRENDS AND IMPLICATIONS

By David Braddock, Ph.D. & Tamar Heller, Ph.D.


The facts are clear. The population in our mental health
institutions has dropped during the past decade from more
than 17,700 to less than 9,200, while the number of
facilities has dropped only slightly. The Dixon population
will fall from more than 2,500 to just 646 by the end of the
fiscal year. In the near future, the Dixon Center will
become one of the most costly to operate because of
compliance with federal rules. . .As painful as it is to
close an institution, the residents will be moved to
facilities that are certified or accredited, thereby
guaranteeing comparable or superior care. . . This has been
one of the most difficult decisions I have faced during my
five years in office..

- James R. Thompson,
Governor of Illinois
February 17, 1982

PART I:  TRENDS

INTRODUCTION


The announcement of the closure of a state-operated mental

retardation institution is no longer an uncommon event. One-eighth of

the state-operated institutions that existed in this country in 1965

have in fact been closed. The purpose of this two-part report is to

identify and describe these closures; to review pertinent literature

on the impact of institutional closure on clients, families, and

employees; and to spur public officials and the academic community to

Preparation of this report was supported in part by funds from the
Administration on Developmental Disabilities and the Administration on
Aging within the Office of Human Development Services (Grant # 90 DJ
0014). The Illinois Department of Mental Health and Developmental
Disabilities is providing financial support for the Dixon Closure
Study herein described.

anticipate future closures, plan for them, and evaluate their impacts.

In Part I, following a brief history of mental retardation institutions in America, 24 closures are identified and described. Factors thought to be conducive to such closures are enumerated. The closure of state hospitals for mentally ill persons, a trend which largely preceded closures of mental retardation facilities, is also briefly described in Part I. In Part II, studies of the impact of closure and involuntary relocation on clients, their families, and closing facility employees are reviewed. This is followed by a description of the interim results of the Dixon (Illinois) Closure Study, one of the first comprehensive longitudinal evaluations of an institutional closure in the United States. Guidelines are then presented encouraging positive outcomes for clients, families, and employees involved in closures. The two-part report concludes with proposed topics for future study; and some comments on the likelihood of future institutional closures in the United States.

The term "institution" must first be clarified. "Institution" can be defined in terms of its psychosocial or deindividualizing impact on the individual residing therein (Goffman, 1961; Wolfensberger, 1971); its philosophical origins, architecture, and geographic location (Wolfensberger, 1976); and its legal eligibility to receive or be denied state and federal funding. This article will not, however, debate the merits of each definition—all have validity for certain analytical purposes. We will refer to "traditional institutions" as 24-hour state-operated long-term care residential facilities, usually constructed prior to the end of the Second World War, with large numbers (100+) of mentally retarded residents. In state government,

institutions may also be referred to and funded as such, or as state schools, hospital-schools, training centers, training programs, developmental centers, and the like. "Institution," as used in this article, does not refer to mental retardation units in state psychiatric hospitals unless so specified.

ESTABLISHMENT OF STATE
INSTITUTIONS IN AMERICA

One hundred and thirty-nine years ago a committee headed by Samuel Gridley Howe was appointed by the Massachusetts legislature to "inquire into the condition of the idiots of the Commonwealth " (Howe, 1848, p. 3). The Massachusetts legislature accepted the committee's report and on May 8, 1848 it appropriated $2,500 per year for three years for an experimental school in South Boston (Fernald, 1917). Howe's school, which received its first pupil on October 1, 1848, was the first public mental retardation institution in America. It was later moved to Waverly and renamed the Fernald State School. In 1850, Howe and his pupils testified before the New York legislature in support of a parallel effort there to open and fund an institution. Another experimental school was thus established in October, 1851, at Albany. The school was soon moved to Syracuse, where, in 1855 "the first building in America for the specific purpose of caring for the feebleminded" was erected (Barr, 1904).

Pennsylvania, also influenced by events in Massachusetts, appropriated $10,000 in 1854 to a Philadelphia private facility for the public care of retarded people. The cornerstone of the the facility—the Elwyn Institute—was laid in 1857 at a site Dorothea Dix helped select.  That same year Ohio established an institution in

Closure of MR Institutions                                    Page 4

Columbus. Connecticut followed in 1858 by authorizing state aid for a private school at Lakeville. In 1913, this facility was transferred to state auspices. Kentucky opened the Frankfort State School in 1860. Illinois founded what was to become the Lincoln State School in 1865, at the Jacksonville School for the Deaf. Twenty-two years later the first working farm attached to an institution in the United States was begun at Lincoln (Murray, 1939). Through 1865, public or semi-public institutions for retarded people had been established in seven states and served 1,041 residents.

By 1900, Barr (1904) reported that 21 states had established 29 institutions. Their operation was among the most important responsibilities of state governments, which gradually centralized statewide supervision of them in "Boards of Charity," and then instituted departments of public welfare (Breckinridge, 1928). In 1930, the number of institutions had nearly tripled to 77; by 1965, it doubled again to 143 (Lakin, 1979), and most states had created distinct, cabinet-level Departments of Mental Health. In 1970, states operated 190 institutions. The most recent survey puts the figure for 1982 at 245. This is an unprecedented decline of twelve in the number of facilities reported in 1978 (Rotegard, Bruininks, and Krantz, 1984). An even more rapid decline was reported by Rotegard, et. al. (1984) in the number of mental retardation units in state mental hospitals, which dropped from 142 in 1978 to 119 in 1982.

Inspection of Lakin's (1979) historical data on the number of public institutions in the United States reveals that, prior to 1978,

only three times in the previous century did the number of institu-
tions diminish from one year to the next. In 1936-37, 1950-51, and
1956-57 the census of institutions diminished by one facility.
However, our analysis found no documented closure of a public mental
retardation institution in the United States prior to 1970.

## THE CLOSURE OF STATE INSTITUTIONS

### Characteristics of Terminated Facilities

To understand the possible significance of institututional closure
data, it is necessary to go beyond national totals and determine which
state facilities actually closed (Table 1). This was accomplished by
a review of contemporary state closure documents (Braddock & Heller,
1984); of related closure literature (Ahmed & Plog, 1976; Clumper,
Krantz, & Bruininks, 1979; National Association of State Mental
Retardation Program Directors, 1982; Weiner, Bird, & Bolton, 1973);
and from a telephone survey of state mental retardation program
officials completed in July, 1984 by the Evaluation and Public Policy
Program at the Institute for the Study of Developmental Disabilities,
University of Illinois at Chicago. State government executive budgets
for each of the 50 states over the 1977-84 period were inspected for
references to discontinuance of funding to guide the telephone survey
(Braddock, Howes, and Hemp, 1984).


INSERT TABLE ONE ABOUT HERE

TABLE 1

Completed and In-Progress Closures of State Operated
Mental Retardation Institutions in the United States

| STATE | INSTITUTION | YEAR BUILT/ BECAME MR | ORIGINAL PURPOSE | * MR RESIDENTS | YEAR OF CLOSURE |
|---|---|---|---|---|---|
| 1. California | DeWitt | 1942/1947 | Army Hospital | 819 | 1972 |
| 2. Florida | Tallahassee | 1928/1967 | TB Hosp, | 350 | 1983 |
|  | Orlando | 1929/1959 | TB Hosp. | 1,000 | 1984 |
| 3. Illinois | Bowen    Dixon | 1918 | MR MR | 105 | 1983 |
|  | Galesburg | 195? | Army | 820 | 1983 |
|  |  | 1860 | Hasp. | 350 | (1985) |
|  | Frankfort |  |  |  |  |
| 4. Kentucky |  | 1928/1962 | MR | 650 | 1973 |
|  | Henryton Fort |  |  |  |  |
| 5. Maryland |  | 1942/1956 | TB Hosp. | 312 | (1985) |
|  | Custer |  |  |  |  |
| 6. Michigan |  | 1937/1959 | Army Hospital | 1.000 | 1972 |
|  | Alpine Hillcrest | 1905/1961 |  | 200 | 1981 |
|  | Northville | 1952/1972 | TB Hosp. | 350 | 1932 |
|  | Plymouth | 1960 | TS Hosp. | 180 | 1983 |
|  |  |  | MI MR | 837 | 1984 |
|  | Owatonna |  |  |  |  |
|  | Rochester | 1879/1972 | Orphanage | 250 | 1970 |
| 7. Minnesota 8. | Villa Solano | 1964 | MI | 150 | 1982 |
| New Mexico 9- | Sampson |  | Missile Base | 82 | 1982 |
| New York | 1860/1961 Staten Island |  | Naval Base | 695 | 1971 |
|  | 1934/1948 |  | Army Hosp. | 776 | (1987) |
| 10. Ohio | Orient | 1898 | MR | 800 | 1984 |
| 11. Pennsylvania | Cresson | 1912/1964 | TB Hosp. | 155 | 1982 |
|  | Marcy | 1915/1974 | TB Hosp, | 152 | 1981 |
|  | Pennhurst | 1903 | MR | 567 | (1986) |
| 12. Oregon | Columbia Park | 1929/1963 | TB Hosp. | 304 | 1977 |
|  | Eastern Oregon |  | TB Hosp. |  | 1984 |

Source: Braddock, D. National Technical Assistance Project on
   Facility Closure, Evaluation and Public Policy Program,
   Institute for the Study of Developmental Disabilities,
   University of Illinois at Chicago, July, 1984.

Closure of MR  Institutions

Table 1 displays 19 completed and five in-progress closures of state mental retardation institutions in the United States. Two in-progress closures—Henryton and Orlando—are scheduled for completion within the year. The geographic dispersion of the closures—North, South, East, and West—suggests the national character of the phenomenon. However, 11 of the 24 closures (46%) are concentrated in Region V, in Illinois (3), Michigan (5), Minnesota (2), and Ohio (1). The Canadian Province of Ontario has also announced the impending closure of five regional institutions (Rice, 1984), thus intensifying the concentration of facility closures in the center of North America.

Three-fourths of the closures, counting the five in-progress, have occurred since 1982. The distribution of institutional closures over time is somewhat bimodal with clusters of closures in the early 1970's and the early 1980's (Chart 1). In 1970-73, five closures were implemented: in Minnesota (Owatonna); New York (Sampson); California (DeWitt); Michigan (Fort Custer); and Kentucky (Frankfort). Each of the 1970-73 closures involved extensive resident transfers to other institutions in the state systems. The Frankfort closure was the first termination of a facility originally constructed as a mental retardation institution in the United States. It opened in 1860 and closed in 1973. DeWitt was an Army hospital built in 1942 with an expected life of 12 years. It closed in March, 1972, 30 years later. The Sampson and Fort Custer institutions were also converted military facilities; Owatonna was originally an orphanage.

Only two states terminated institutions between 1974 and 1981.
Oregon closed Columbia Park in 1977.   Michigan shut down Alpine in
1981.    Both facilities relocated residents primarily to community
settings; and both institutions were converted tuberculosis hospitals.

Since 1982 there have been 17 completed or scheduled closures.    In
1982,  six institutions closed.  Illinois converted the Bowen Center in
July to a prison after transferring most of the 105 residents to
another institution,  the Anna Center.  Pennsylvania closed Marcy and
Cresson in June and December respectively,  transferring the majority
of residents to community settings.  Cresson is being converted to a
prison.  Michigan closed Hillcrest and relocated most of the 350
residents living at Hillcrest when closure was announced to the
community.   New Mexico terminated Villa Solano,  transferring all
residents to the community;  and Minnesota closed the Rochester State
Hospital,  moving 150 retarded residents to community settings as
well. Rochester is being considered for conversion to a prison by its
present owner,  the Federal Government.  A Federal court,  however,
recently issued a Temporary Restraining Order,  stemming from community
opposition, blocking the conversion.

In 1983, three more institutions closed: Dixon (Illinois), a
prison conversion, discussed later; Sunland-Tallahassee (Florida); and
Northville (Michigan). The Tallahassee closure involves the movement
of 350 individuals to small residential "clusters" in various parts of
Florida.  This is being accomplished in synchrony with the termination

of Sunland-Orlando. Orlando, which had 1,000 residents when closure was initiated in 1977, is scheduled for a December, 1984 closure. Michigan's Northville facility had 180 residents, nearly all of whom were relocated to community settings.

In 1984, the Orient Center (Ohio) was converted to a prison. There were 800 residents in 1982 when closure was announced, down from 1,300 in 1980. Residents were relocated to community settings and to other institutions in approximately equal numbers. The Eastern Oregon Center ceased to operate in June, 1984. The residential population was 240 when closure was announced; 150 clients were moved to community settings and a new ICF/MR facility was constructed for the other 90 residents adjacent to the old facility, which, like Orient, was converted to a prison. The Plymouth Center in Michigan terminated in June, 1984, after an extended phasedown involving 837 community placements from the point of closure's announcement. Plymouth was the fifth mental retardation institution closed in Michigan. In the last 17 years, Michigan's institutional census has plunged from about 13,000 to 2,200.

Four closures are publically scheduled in the 1985~~87 period. Maryland is phasing-out the Henryton Center and returning its 312 residents to community settings by June, 1985. Illinois is closing the Galesburg Center, entailing the movement of 350 retarded persons and 350 mentally ill individuals to a combination of institutional and community placements. New York is closing the Staten Island Center (Willowbrook) in 1987, after protracted litigation and extensive community placements. Staten Island had 776 residents when closure was announced. At one time the census was 8,000. Pennhurst, also the

site of unrelenting litigation for a decade, will be terminated by the Pennsylvania Department of Public Welfare on June 30, 1986. The 457 remaining residents are being relocated to community residences. The Pennhurst census is down from a high of about 3,500 residents.


INSERT CHART 1 HERE


Eighteen (75%) of the 24 terminated institutions were constructed prior to the end of World War II. None was built after 1965. The median original construction date was 1929. The range was 1860 to 1965. Three of the institutions were built prior to 1900 (Frankfort, Owatonna, and Orient). Eighteen of the 24 terminated institutions (75%) were originally constructed for non-retarded populations. Nine were converted tuberculosis sanitariums; two were psychiatric hospitals; four were military hospitals; one was a Naval training center; one was an abandoned missile base; and one was a children's orphanage. Only six (25*) of the terminated institutions were originally constructed as mental retardation institutions: Frankfort (KY), Orient (OH), Pennhurst (PA), Dixon (IL), Plymouth (MI), and Bowen (IL). Median facility size was 350 when closure was announced, down considerably from previous levels.

Although the median facility was orginally constructed in 1929, the median date for conversion to mental retardation use for the 18 converted facilities was 1963. The range was 1946 - 1974. Six of the



CHART[1] 1

The Distribution of Institutional Closures Over Time

Year Of Closure

Source: Braddock, D. Nat'l Tech. Assistance Project, Evaluation & Public Policy Program, ISDD, U of IL at Chgo. 1984

18 conversions during this period can be attributed to Federal
Government transfers under the Surplus Property Act of 1944, As
Amended: DeWitt, Galesburg, Fort Custer, Villa Solano, Sampson, and
Staten Island. The Surplus Property Act brought about the transfer of
$68.1 million in Federal real property to states and localities for
use in mental retardation programs throughout the United States
between 1945 and 1980 (Braddock, et. al, 1984). In sum, most states
have been reluctant to close institutions built originally by the
state for mental retardation use. Most terminated institutions have
either been surplus property transfers from the Federal Government or
converted tuberculosis hospitals.

Factors Conducive to
Institutional Closure

The confluence of many social, political, and economic factors,
has created a climate in many states conducive to closures. Several
factors are at work. First, diminished growth in federal funding for
social programs spawned in part by the Omnibus Budget Reconciliation
Act of 1981 led to a substantial shift of domestic fiscal burden from
the federal level to state governments. The recession of 1981 was
accompanied by low corporate profits and high unemployment. This led
to a general constriction of state tax revenues from the consequent
plunge in business, personal income, and sales taxes. Increased
welfare expenditure brought on by the recession further constrained
state budgets and priorities. Stiffer criminal sentencing, baby boom
demographics which saw a burst in the number of persons prone to crime,

prison overcrowding, and related litigation pushed state corrections budgets rapidly upward. The Governor's budget agency officials and corrections department planners thus began to covet space in underutilized mental health and mental retardation facilities. Mental institutions can be converted to prisons for possibly one half the cost of new prison construction, which is now $100,000 per cell.

There were longer-term factors at work too. State and federal laws and court decisions directing that disabled people be served in less restrictive environments played an important role. Three of the six closures of institutions originally built for mental retardation use—Pennhurst (PA), Orient (OH), and Plymouth (MI)—were the site of intense and protracted litigation. Dixon was being investigated by the U.S. Justice Department when closure was announced. The implementation of P.L. 94-142, The Education for all Handicapped Children's Act of 1975, was also a major positive influence in reducing the reliance on institutions. Underlying these factors was long-term growth of the maturity and effectiveness of articulate professional and consumer interests promoting community services. The institutional census was reduced to 117,160 in 1982, a drop of 40 percent from a 1967 peak of 194,650 (Rotegard, et. al., 1984). Meanwhile, institutional per diem costs escalated to $106 per day in 1984, the product of extensive institutional reform and diminished economies of scale (Braddock, et. al., 1984).

A substantial building program was completed in many states between 1966 and 1979. Inspection of the Clumper et. al. (1979) Directory of State Operated Residential Facilities revealed that an estimated 50-60 new institutions opened during this period.  These

facilities were on average smaller than their predecessors, but many had a capacity of several hundred residents each. They included facilities such as Howe, Ludeman, and Waukegan Centers in Illinois; the Bronx, Monroe, Broom, and Heck Centers in New York; and the Fort Worth, Lubbock, and Richmond State Schools in Texas, to name a few. The conversion of so many military facilities and tuberculosis hospitals to mental retardation institutions in the 1950's and 1960's had apparently swelled the states' institutional inventories beyond what was needed when facility populations dropped, and the newly constructed institutions came "on-line." The 1981 recession arrived. Many converted facilities and a few originally dedicated to mental retardation use became expendable.

### Precedents in Mental Health:
### State Hospital Closures

The closure of mental retardation institutions has important precedents in mental health. Greenblatt (in Ahmed & Plog, 1976) identified 13 state psychiatric hospital closures in eight states between 1970-73. Four of the closures—Modesto, Dewitt, Agnew, and Mendocino—were in California. A majority of the residents at DeWitt when closure was announced were actually mentally retarded people. The Agnews State Hospital closure was, in fact, a "partial termination" involving severence of services to mentally ill, but not mentally retarded, persons. Other closures identified by Greenblatt were in Illinois, Massachusetts, Minnesota, Oklahoma, Washington, and Wisconsin.

The closures in California exemplify the struggle between the executive and legislative branch for final authority over institutional closure decisions. The first closure—Modesto—was announced in 1969. In 1972, after the March and July closings of DeWitt and Mendocino State Hospitals respectively, then-Governor Reagan announced that all state mental illness hospitals would be closed by 1977. All mental retardation institutions were to be terminated by 1982. When a tentative closure schedule was released in early 1973, advocates for the retarded reacted with a storm of protest. The Mendocino closure also drew stiff opposition from employee 'unions, the press, impacted communities, and institutional advocates (Weiner, et. al., 1973).

In 1974, the California Legislature voted itself authority to review and veto all closure decisions. Governor Reagan vetoed the bill. The legislature met in Special Session and, for the first time in 28 years, voted to override a California governor's veto. Governor Reagan later announced that no additional closures would take place. It was 1982 before another California closure occurred and that termination was restricted to the mental retardation unit at the Patton State Hospital (Legislative Report, 1982).

Only one California termination was accompanied by an outcome analysis of closure's impact on clients and their families. Marlowe (in Ahmed & Plog, 1976) found an alarming increase in mortality rates for the most fragile groups of patients relocated from Modesto State Hospital. Weiner et. al., 1973, studied DeWitt's closure and noted that most staff were not seriously affected by closure and obtained new jobs at the Stockton State Hospital. The researchers stressed the need for better outcome studies of closures, noting that their study lacked the resources

to    focus on client/family outcomes.    The Agnews and Mendocino terminations apparently were not formally evaluated.

Additional literature on state mental hospital closures in the United States is thin. One explanation for this is that, unlike the closures of state mental retardation institutions since 1974, relatively few state psychiatric hospitals have been closed. Some exceptions include state hospital closures in "Indiana (Beatty); Illinois (East Moline, Adler; the Galesburg and Manteno closures are in-progress); Ohio (Cleveland State); Pennsylvania (Retreat); Michigan (Riverside); and Minnesota (Rochester). The Pennsylvania, Ohio, and Minnesota closures were described by Ashbaugh and Bradley (1979), Schultz, Lyons, & Nothnagel (1975) and the Minnesota Department of Public Welfare (1982) respectively. The Cleveland State Study, reviewed in Part II, included client, family, and employee outcome analyses. The Beatty, East Moline and Riverside closures were also prison conversions.

Greenblatt (in Ahmed & Plog, 1976) described the 1973 closure of the Grafton, Massachusetts State Hospital, but no formal evaluation was reported (Stanford Research Institute, 1974). The closure of the Southern Saskatchewan State Hospital in Canada was accompanied by several outcome studies (La Fave, et. al., 1966; Fakhruddin, et. al.,1972; Herjanic, 1968). The Saskatchewan studies credited the relative success of the total phase-down of the facility to the eaphasis placed in the Province on "phasing-up" community services over a number of years.

Closure of MR Institutions                              Page 15

## Policy Termination Literature

Three major themes run through the public administration litera-
ture on termination. First, it is extremely difficult to terminate
governmental organizations. The political incentives for doing so are
usually very small. Second, terminations are usually accompanied by a
budgetary crisis and by ideological struggle (Bradley, 1976; Cameron,
1978). The third major theme in the termination literature is an
acknowledged lack of systematic evaluation studies of the nature and
consequences of program terminations of any kind.

Analysts have offered persuasive arguments delineating why
termination is hard to implement (Ellis, 1983; Kaufman, 1976). The
arguments stress the ardent and effective activities of anti-
termination coalitions, and the general American distaste for the
social and economic disruption which usually characterizes large-scale
terminations (Bardach, 1976; Behn, 1980; Biller, 1976; Bradley, 1976;
Brewer, 1978; Cameron, 1978; De Leon, 1978).

Termination is rarely attempted by governments, and not only
because it guarantees instant, galvanized opposition. In most cases
the only benefit to the general public is quite generalized, such as
fractionally lower per capita taxes. The very structure of the public
appropriations process also favors the continuity of governmental
institutions. A fundamental tenet of public budgeting is incremen-
talism: Next year's appropriations level is based on this year's base
(Wildavsky, 1975). Any agency which busies itself terminating
programs will watch its budget diminish, since any funds "saved" from
such an economy would revert to the general treasury.

Closure of MR Institutions

The policy termination literature consistently identifies the need for additional evaluation studies of termination—especially outcome oriented studies (Bardach, 1979; Cameron, 1978; De Leon, 1978; 1982). In part, because governments have historically closed few major programs, the impact of termination policies has not often been subject to empirical investigation. In the current era of cutback management, however, the opportunity for research is greatly expanded.

Part II of this report, the conclusion, will review outcome studies of client, family, and employee impacts associated with institutional closures and involuntary relocation. Suggested closure guidelines will be presented; and we will speculate about future closures. Clearly, institutional closure is an emergent national trend of considerable significance.

PART II:  IMPLICATIONS

In Part I of this two-part report, 24 closures of state-operated mental retardation institutions in the United States were identified and described. Part II reviews outcome studies of the impact of closure and involuntary relocation on clients, families, and employees. Interim results of the Dixon Developmental Center Longitudinal Closure Study are also presented, along with suggested closure guidelines emanating from that study. In conclusion, the implications of institutional closure as an emergent national trend in the field is discussed, and suggestions for future study are delineated.

CLOSURES AND INVOLUNTARY RELOCATION: IMPACTS
ON CLIENTS, FAMILIES, AND EMPLOYEES

### Client Impacts

Closures of residential facilities for mentally ill, retarded, and elderly people can result in significant trauma not only to the relocated residents, but also to the residents' families, facility employees, and to the communities in which the facilities are located. Many researchers have sought to determine the degree of stress faced by residents transferred from one residential facility to another. The most dramatic effects reported have been increases in mortality rates (reviewed in Heller, 1984; Marlowe, 1973; Kasl, 1972; Miller & Lieberman, 1965); and in health problems (Heller, 1982a; Rago, 1976) for elderly and mentally retarded residents. However,

several recent studies found no increase in mortality among elderly (reviewed in Borup, Gallego & Heffernan, 1979), mentally ill (Markson & Cumming, 1974), or mentally retarded residents (Cohen, Conroy, Frazer, Snelbecker & Spreat, 1977; Braddock, Heller, & Zashin, 1984).

Stressful reactions to relocation are most commonly manifested in emotional, behavioral, and mental health changes. In facilities for geriatric patients, these effects have included pessimism and decreased social activity (Bourestom & Tars, 1974), mental health, self-care, and social capacities (Marlowe, 1973), and increased confusion, memory deficits, and bizarre behavior (Miller & Lieberman, 1965). Other effects reported include a decrement in behavioral functioning of mentally ill residents (Lentz & Paul, 1971) and in constructive, social behaviors of severely and profoundly retarded residents (Carsrud, Carsrud, Henderson, Alisch, & Fowler, 1979; Heller, 1982a).

While the literature indicates that institutional transfer frequently results in stress reactions, these effects seem to be stronger for some groups and occur primarily under certain circumstances. Several relocation studies examined the effects of residents' initial physical health, level of intelligence, and age on subsequent adjustment. Among elderly and mentally retarded residents, relocation has had the worst impact on those who are already in the poorest physical health (Goldfarb, Shahinian & Burr, 1972; Heller, 1982a; Killian, 1970; Marlowe, 1973).

Closure of MR  Institutions                                    Page 19

The effect of intelligence on post-transfer adjustment of retarded residents is not clear since there have been contradictory findings. The Cohen et al. (1977) study indicated that severely retarded residents became withdrawn and had decreased language functioning after the move, while profoundly retarded persons showed gains in domestic activity, self-direction, and responsibility, as well as increases in maladaptive behaviors. On the other hand, Hemming, Lavender, and Pill (1981) found that higher functioning residents showed increases in language development and lower functioning ones exhibited more withdrawal and maladaptive behavior.

There has also been no clear evidence that elderly mentally retarded people are at a higher risk of short-term traumatic transfer effects than younger residents (Heller,  in press; Landesman-Dwyer, 1982). Rather, differences between older and younger residents appear over the longer term, as older residents experience more health problems (Heller, in press).

In sum, facility closures and client relocations frequently result in physical-behavioral stress reactions. However, these effects seem to be stronger for some groups and occur only under certain circumstances. Specific policies which result in proper clinical management of the relocation and in establishment of superior new environments and programs can minimize these reactions (Braddock, et. al., 1984).

### Family Impacts

Families faced with the relocation of their relatives out of large state institutions have reported a high degree of stress and have strongly resisted these transfers (Conroy & Latib, 1982). In surveys conducted in several states (Washington. Pennsylvania, New Jersey), approximately two-thirds of the families at institutionalized mentally retarded people opposed community placements for their relatives (Conroy & Latib, 1982; Landesman-Dwyer, Sulzbacher, Keller, Wise, & BaatZ, 1980; Vitello & Atthowa, 1982). In some cases, such as in Illinois, families have sued the state to prevent the closure of institutions (Dixon Parent's Association v, Thompson},

Family opposition is largely based on perceptions that the large institutions provide better care, more experienced staff, and security for their relatives than would other smaller or comminity-based facilities (Payne, 1976). Families also have reservations about the normalization and developmental ideology underlying provisions of alternative community-based services (Boggs, in Turnbull a Turnbull, 1980), the process utilized to effectuate closures, and their own ability to cape with their relative in the community (Frohboese & Sales. 1980) The families most opposed to transfer of their relative out of institutions tend to be those who experienced higher stress when initially making the decision, to institutionalize their relative (Conroy & Latib, 1982). For these families, impending transfers of their relatives can rekindle feelings of guilt, anger, and confusion. Interestingly, most studies have noted that families' views dramatically change after the transfers, with very few expressing

negative feelings about their relative's placement outcome.   Rather, after the transfer, the majority of  families reaport satisfaction with the quality of services, more enthusiasm towards deinatitutionalization, and increased general happiness of their transferred relatives (Conroy & Latib, 1982; Heller, Bond, * Braddock, 1983),

These findings indicate that family attitudes can be changed and that proper attention to the perceptions and needs of families could alleviate the stresses they experience and reduce the strong negative reactions of those opposing client transfers. As noted with respect to clients at closing facilities, this provides a strong basts for developing and implementing appropriate administrative procedures and guidelines during institutional closures and phase downs.

## Impacts

Employees   of   the institutions slated for closure face the prospects of unemployment,  job  transfer,  or residential relocation to a new community. Despite the burdens fared by staff only *a,* few studies have examined the impact of closure on this (Weiner in Ahmed and Plog, 1976; Cameron, 1978; Braddock et, al., 1984).  The literature is somewhat more extensive on plant closings (Buss a Redburn, 1983)..

Institutional closures and reductions in staff affect the Morale and performance of staff, particularly those facing unemployment or transfer to other facilities. One sight expect some staff also to withdraw from their previous attachments to the residents, and to other staff at the facility as they anticipate transfer. Staff members[1] behaviors can be a powerful influence on residents ie.g.,

Schinke & Landesman-Dwyer, 1981). A survey conducted with former employees of a terminating large state psychiatric hospital (Cleveland State) indicated that 79 percent felt that the staff exhibited loss of interest and initiative and 29 percent felt that the quality of patient care decreased after the closure announcement (Schultz, Nothnagel, & Lyons. 1975).

Closures of institutions can also take a personal toll on the employees. This is particularly true for employees facing long-tent unemployment. underemployment, or downward mobility. Those likely to experience longer-term adverse outcomes are the older, poorer, less educated employees and minorities (Gordus, Jarley & Fervan, 1981). Studies of the effects of unemployment generally (not necessarily in connection with closure) have found that unemployment is associated with increases not only in economic difficulties, but also in suicides, homicides, and physical and mental .health problems {Lieu & Raymau, 1982; Buss * Redburn, 1983),

Several researchers have noted the following emotional stages that employees facing termination experience during the closure process: a) shock, b) denial/disbelief, c) relief, d) anger, e) bargaining, f) depression, and g) acceptance (Arvey & Jones, 1982; Greerblatt and Glazier, in Ahmed and Plog, 1976). In many cases, employees are transferred to other facilities during closure. While these people likely fare better than unemployed staff, they often experience the stress associated with movement to a new community, a new job setting, and disruption Of Old family and friendship ties. Studies of job and residential transfers have emphasized the loss of social contacts and increased maladjustment after relocation (reviewed in Heller, 1982b).

Closure of MR Institutions                                    Page 23

The available studies of physical and mental health outcomes of closure, unemployment, and relocation provide strong incentives and arguments for developing and applying suitable administrative policies and clinical guidelines to cope with these negative effects.

### The Dixon Closure Study

Dixon Developmental Center (DDC) was a state-operated residential facility located 100 miles west of Chicago. In 1954, it had more than 5,000 residents. When DDC's closure was announced, it served 820 persons, over 80 percent of whom were severely or profoundly retarded. Nearly all of the residents were moved to four accredited Chicago-area institutions, the area from which most of the residents originally came. About sixty residents were moved to the Jacksonville Center downstate, also an accredited institution. The primary purpose of the Dixon Study was to ascertain how well the residents are faring in their new homes and to assess the impact of the closure on the residents' families and on former DDC employees. To a limited extent, the Project also examined the impact of the closure on the several institutional facilities that received former DDC clients.

A second major purpose was to carefully document the process of implementing the Governor's closure order from an administrative standpoint. The DDC closure was a complicated process involving an Illinois Supreme Court test which affirmed the Governor's power to close the facility; the development and implementation of special client assessment, transfer, and appeal procedures; and the formation of and activity by organized interests opposing closure. Because so little had been written describing the course of events in the closure

of a large mental retardation institution, the importance of documenting in a "case study" how the DDC closure took place had special significance in the research design.

The Project's methodology employed analytic techniques common in longitudinal outcome studies of physical and mental health, including direct observation of clients at DDC and in the receiving facilities; comparative client adaptive behavior ratings; and repeated surveys of families and of employees using questionnaires developed by Project staff. In addition, the administrative process analysis involved formal surveys and field interviews of receiving facility unit directors and of key personnel involved in planning and implementing the closure. Neither the administrative process analysis nor the outcome design was an exceptional methodology when applied exclusively, but together they yielded a more comprehensive picture of the closure. A similar two-pronged research design was used in the Pennhurst Longitudinal Study (Conroy & Bradley, 1983).

Year Two Interim Results

Definitive results are    premature, but the following outcomes were noted within one year after    closure.    For an extended discussion, see Braddock, Heller, and Zashin                                              (1984).

1. Behavior.  There was little evidence of transfer trauma and increased maladaptive behavior within two to six months after relocation; however, residents exhibited at least short-term
   • decreases in interaction with their new social and physical environments.

2. Mortality.  There was no evidence of increased mortality within one year after closure.

3. Activity Level.  Residents spent more time in programmed activities at the new facilities than at Dixon.

4. **Family Attitudes**,      Although    families   opposed   closure
   initially,  primarily due to fear of transfer trauma,  a large
   number (70 percent) were satisfied <u>with the clos</u>ure process
   as it was completed.

5. <u>Employee Outcomes</u>.  Dixon employees were highly critical  of
   the closure and  reported high stress during it.    Most
   employees  transferring  to a receiving facility were  less
   likely to be married,  to have children, or to own a home
   They reported""poorer staff training at their new localion.

6- <u>Impact on Receiving Facilities</u>,  The influx of Dixon
   residents diminished the <u>quality of care :to residents</u> at the
   receiving facilities. Many unit administrators reported
   signifcantly worse staff-resident <u>ratios</u>, some of which are
   attributable to the DDC closure. Unit leaders reported more
   family-client contact with the DDC tranferees.

<u>CLOSURE GUIDELINES</u>

In recognition of the importance of having timely administrative
and clinical guidelines available to states implementing closures,
especially those closures involving extensive inter-institutional
transfers, a set of "model" or "suggested" closure/relocation
procedures was devel-oped (Braddock, Heller, & Zashin, 1984). These
Guidelines are based on interim results of the Dixon Closure Study,
the preceding literature review, and on ideas from Illinois
institutional directors involved in the Dixon Study. Guidelines are
summarized below in the following sequence: Client Guidelines;
Parents/Families/Guardians Guidelines; Personnel Guidelines; and
General Management Guidelines.

Client transfer trauma can be mitigated by implementing an antici-
patory coping strategy. This involves minimizing internal client and
staff transfers during closures, maintaining resident groupings and
friendships as intactly as possible, and transferring at least some
staff with residents. In addition, it is important to conduct
preparatory programs involving others

provide client counseling, and to adhere to client preferences in living arrangements. If the clients are capable, they will benefit from exercising choice and from participation in the movement process and in habilitation planning.

Once closure is announced, parents, families, and guardians need to be individually informed of closure plans and client placements to reduce anxieties and build support necessary for facility termination and client transfer to proceed smoothly. Parents who have been through a closure can provide an extremely useful service in the preliminary planning and implementation phases of closures. They should be enlisted to meet early-'on with the parents' association at the terminating facility when closure is announced. Receiving facility staff need to hold informational sessions, schedule open houses, and set up contacts, such as a support group with the families of clients being relocated and the families of the present clients in the receiving institutional facilities and/or community settings.

Facility employees face some of the most difficult burdens during closures. Several strategies to reduce negative impacts have been adopted. Examples include 1) establishing counseling programs at the terminating facility (Office of Employee Services, 1978); 2) adopting priority hiring policies at receiving facilities and elsewhere in state government operations; 3) providing extended health care coverage; 4) paying severance if possible; and 5) facilitating early retirement for older workers (Kawola, in Braddock & Heller, 1984). Extensive staff training and retraining programs for employees of the terminating facility are also recommended.

A deputy or ombudsman should be assigned to the terminating facility to oversee visiting receiving facility representatives and to coordinate transfer schedules. The purpose of this role is to insulate the superintendent of the terminating institution from controversy surrounding the phasedown; and to relieve him or her from many of the day-to-day details. The superintendent still has an institution to manage while closure is going on.

During the closure process it is important to minimize disruptions faced by clients at the terminating facility. Hence, "bumping" staff from one unit to another—as is often called for in employee union contracts concerned with seniority prerequisites—is discouraged. Moving clients into other units within the facility can also destroy program continuity and staff-client relationships even prior to the turmoil of the transfer out of the facility. A preferred approach is to close down one unit/cottage at a time. This minimizes internal transfers.

In dealing with closure decisions, the populous states must ponder whether to weaken several institutions a little, or to shut one down altogether. From the standpoint of clients in the system and their families, it may sometimes be more appropriate to terminate a facility and strengthen the remaining institutions. A state system with four well-funded, well staffed, relatively safe and sanitary institutions is superior to a system with five substandard institutions. Although this logic is compelling, the inherent political dynamic (one rural legislator equals one rural institution) drives the political system

toward protecting existing institutions at almost any cost; even if it means weakening habilitative programs in each and every facility in the system to prevent one from closing.

An institutional closure can also undermine program integrity at the state's remaining institutions and/or receiving facilities. When extensive inter-institutional transfers are involved, receiving institutions require a considerably enhanced resource base to continue to operate at previous levels of care. During institutional closures involving extensive community placements, legislators should consider granting the state mental retardation executive agency temporary authority to routinely re-budget funds from the budget of the phasing-down institution to the agency's budget lines supporting community placements. "Budgetary interchange" techniques can stream-line the deinstitutionalization process and reduce the fiscal incentives for the agency to protect the institution's budget at the expense of the developing community system. Medicaid Waivers can also greatly facilitate the phasedown process.

## CONCLUDING OBSERVATIONS

Thirteen years ago Wolfensberger (1971, 1971a) predicted institutions would gradually "fade away," casualties of

        epidemialogical trends, fiscal pressures, and of

        new

community services models, A century before, only 18 years after he spearheaded the drive to establish institutions In the United States the great pioneer Howe (1866) urged the field to "gradually dispense

with as many of them as possible." Economic factors acting in concert with the growing national commitment to develop continuity-based alternatives to institutions do indeed seen to be the primary driving forces behind most closures.

The process of institutional closure, however, does not resemble a gradual fading-out as Wolfenberger predicted, but rather a tenacious political struggle. Manifestations of this political struggle commonly take several forms. These include 1) the formation of coalitions of parental union, and employee interests opposed to closure; 2) parental concern over "transfer trama" and mortality; 3) a test of wills ___ between the Executive branch, of state government, which usually proposes closure and the which usually opposes it; 4) the marshalling of the force of ideology by proponents of closure under normalization and: deinstitutionalization tenets; and 5) linkage with the actions of federal courts implementing rights-driven court orders and consent agreements,

It is particularly noteworthy that only six of the 24 closures identified involve institutions originally constructed for mental retardation use. Eighteen were converted facilities. This suggests that the next series of closures may also primarily involve tuberculosis hospitals and Military facilities. Many state institutional systems continue to be extremely underutilized. They will continue to provide attractive targets for the governors' cost-budget managers for consolidation and conversion. When

the bulge in the country's population of persons age 16 to 29 slackens in the 1990's, however, there may be a concomitant slackening in the need for more prison space.

A number of novel studies of institutional closure were suggested or implied in this article. These include factor analyses and correlation studies of factors conducive to facility closure; longitudinal evaluations of client, family, and employee impacts; and studies of the impact of closure on the receiving institutions. Investigation of a closure's impact on the remaining institutions in the state system, and studies of closure decision-making and implementation are appropriate topics. There will also be a continuing need for technical assistance in the 38 states inexperienced with closure.

The termination of mental retardation institutions will be an important national trend in the United States for many years. It is strongly recommended that every future termination of a mental retardation institution be accompanied by a longitudinal evaluation study of that closure. Such studies are essential for proper system planning and for client monitoring during and after institutional closures.

The rate of future closures in the United States is impossible to predict accurately. Certainly, the adoption of a major federal financial disincentive to long-term institutional care; or adoption of an * important community services funding stimulus, would be an inducement to the closure of more state institutions. We speculate that closures will primarily be a function of the depths of the valleys

encountered by states during economic downturns; of the continuing use of converted tuberculosis hospitals and military facilities in the state systems; and of the pace of community out-placements in a given state, which is in turn a function of state-federal fiscal commitments to community services.

This closure calculus is probably a more accurate predictor of termination trends in heavily populated states with many institutions, such as New York, Illinois, Michigan, Pennsylvania, and Ohio. Less populated states such as Rhode Island, Montana, Alaska, and Nebraska often rely on only one institution. Closure of a state's only institution is a bold but not implausible step for a state to take in the next five to seven years. Such a step would cross a precedent-setting threshold: the first contemporary empirical demonstration of the total deinstitutionalization of services in an American state. It will be particularly important to evaluate that closure.

Ahmed, P I . & Plog, S.C, (1976).  State mental hospitals:  What
    when they close? New York:  Plenum Publishing Corporation-

Ashbaugh. J. & Bradley. V. (1979) . Linking deinstitutionalization of
    patients with hospital phasedown:  The difference between success
    and failure. Hospital and Community Ps^chiatry. 30 (2), 105-110.

Arvey. R.D. & Jones. S. P. (1982).  Reduction in force:  Organizational and
    individual issues- Houston:  University of Houston.

Bardach, E. (1977).  The implementation game.  Cambridge, MA:  MIT
    Prass,

Barr, M (1904).  Mental Defectives .  Philadelphia;  P. Blakiston's Son and Co.

Behn, R.D. (1980). How to terminate a public policy: A dozen hints
    for the would-be terminator    In C.H.  Levine (Ed,),
    Managing
    fiscal stress      the., .crisis in the public sector.   New York:
    Chafham House Publishers.

Biller, R. P. (1976), On tolerating policy and organization
    nation; Some considerations.  Policy Sciences, 7(2), 132-149.

Boggs. e. (1980). Chapter in R, Turnbull * Turnbull (Eds.) Parent!
            out- New York:  Charles Merrill.

Borup, J.H. Gallego, D. T, & Heffernan, P.G. (1979).  Relocation and its
    effects on mortality Gerontologist, 19. 136-140.

Bourestom, N,C. & Tars, S. (1974),  Alterations In life patterns fol-
    lowing nursing home relocation. Gerontologist, 14, 506-510.

Braddock. D. (1984).  The community and family living amendments of
    1983: A turning point? Mental Retardation Systems. in press.

        D. & Heller, T. (1984).  The closure of state mental  retarda-
    tion institutions:  Proceedings of a ..conference, of  the National
    Association of   State Mental  Retardation Program Directors.
    Alexandria, VA and Chicago, II: National Association of State
    Mental Retardation Program Directors and the Institute for the
    of Developmental Disabilities.

Braddock, D. Howes. R... & Hemp, R. (1984) Mental Retardation Expen
    diture Data Base.  (1984), Chicago: Evaluation and Public Policy
    Program, Institute for the Study of Developmental Disabilities.
    University of Illinois at Chicago.

D. , Heller, T, & Zashin, E. (1984). The Closure of the
Dixon Developmental Center:   A study of the implementation and
consequences of a public policy.   Chicago:  Institute for the
Study of Developmental Disabilities.

Bradley, V. (1976). Policy termination in mental health: The hidden
    agenda. Policy .Sciences, 7, 215-224.

Breckinridge, S-P. (1927).  Public welfare administration in the United
    States . Chicago:  University of Chicago Press.

Brewer,  G.D.  (1978),  Termination: Hard choices,  harder
questions. Pubic Administration,Review, 38(3), 338-344.

**Brewer**, G.D.  (1974) The policy sciences emerge:  To nurture and
structure a discipline- Policy Sciences, 5(2), 239-244.

Buss. T, 4 Redburn , P. S. (1983). Mass unemployment  Plant closings and
    community mental healthy Beverly Hills:  Sage Publications,

California Legislature (1974),  Final .report. .Sacramento; . Senate
    Select Committee on. Proposed Phaseout of State Hospital Services.

Cameron. J.M. (1978).  Ideology and policy termination: Restructuring
    California's mental health system.  Public .Policy, 26, 533-570.

Carsrud, A.L., Carsrud, K.B., Henderson. C.J., Alisch. C.J,. Fowler,
    (1979) Institutionalized  mentally  retarded  persons:  The
    relocation of mentally retarded residents. American Journal of
    Mental Deficiency, 84,

Clumper. J.L., Krantz, G.C. & Bruininks. R.H. (1979).  Directory
    of state-operated residential facilities serving mentally
    retarded people in 1979  Minneapolis:  Department of
    Psychoeducational
    Studies, University of Minnesota.

Cohen. H., Conroy. J.Q., Frazer  D.W.  Snelbecker, G.E., & Spreat. S.
    **(1977)**.  Behavioral effects of interinstitutional relocation of
    mentally retarded residents- American Journal of Mental
    82 , 12-18.

    J. & Bradley, V. (1983) Pennhurst Longitudinal four report.
    Philadelphia & Boston:  Temple University mental Disabilities Center
    and Hunan Services Research Institute,

    J.W., & Latib, A. (1982). Family impacts-  Pre-post attitudes
    of 65 families of clients deinstitutionalized.        Pennhurst
    Longitudinal Study,      Philadelphia:    Temple University
                disabilities Center.

De Leon, P. (1978), Policy evaluation and program termination:
    Restructuring California's mental health system. Public Policy,
    1978. 26,

34

De Leon, P. (1982),  Policy evaluation and program termination. Policy
     Studies Review, 2, 633-647.

Dixon Parents' Association (198-)

Ellis. C,A. {1983).  Program termination; A **word** to the wise. Public
     Administration Review,  p. 352.

Fakhruddin, A.K.M., Manjooran. A., Nair. N.P.V.. & Neufeldt, A., (1972)
     A Five year outcome of discharged chronic psychiatric patients-
     Canadian Psychiatric Association Journal., 17, 433-435.

Fernald, W. **(1917)**.  The Growth of provision for the feebleminded in
     the U, S. Mental Hygiene, 1, 34-59.

Prohboese. R. ft Sales, B. D. (1980),  Parental opposition to
                    A challenge  in need of attention and resolution.
                Behavior. 4, 1-87,

Goffman, E, {1961}. Asylums Garden City, NY:

Goldfarb, A.I. , Shahinian, S.P., & Burr, H.I.  (1972). Death rate of
     relocated residents. In D.P Kent. ft. Kastenbaum, & S, Sherwood
     (Eds.), Research planning and action for the elderly. New York:
     Publications.

Gordus. J.P., Jarley. P, . & Ferman, L. A. (1981)  Plant closings and economic
     dislocation. Kalamazoo: Upjohn Institute for Employment Research,

Greenblatt, M- (1976).  Historical factors affecting the closing of
     state hospitals.   In P.  Ahmed & S.  Plog  (Eds.) State mental
                    happens when they close.   New York:  Plenum
     Publishing Corporation.

Greenblatt, H. a Glazier, E, {1976}. Some issues in the closing of the
     hospitals.   In P, Ahmed & S. Plog (Eds.) State mental  hospitals:
     What happens..when they close.   New York:   Plenum Publishing
     Corporation.

Heller, T. (1982a). Social disruption and residential relocation of
     mentally retarded   children,        American Journal of Mental
     Deficiency. 87, 48-55.

Heller, T. (1982b). The effects of involuntary residential relocation: A
     review. American Journal of Community Psychology, 10, 471-492.

Heller. T. (1984)  issues in adjustment of mentally retarded indi-
     viduals to residential relocation. In N. Ellis & N. W. Bray
     (Eds.) International review of research in mental retardation,
     Volume 12, New York:  Academic Press,

Heller, T. -(in press).  Residential Relocation and reactions of elderly
    retarded persons-  In M. p.  Janicki & H. M. Wisniewski (EdB.)
    Aging .and developmental  disabilities:    Issues and approaches -
    Baltimore: Brookes.

Heller, I,, Bond, H  & Braddock D. [1983],  Family reactions to
    institutional closures.  Paper presented at the American Psycho-
    logical Association, Anaheim, CA.

      , H-, Lavender, T, , & Pill. R, (1981).  "Quality  of Life" of
    mentally  retarded adults transferred from large  institutions  to
    new,  small units. American Journal of Mental  Deficiency. 86,
    157-169.

Herjanic, J. , Stewart. A., & Hales, R.C. '(1988) .  the chronic patient in
    the community  A two year follow up of 339 chronic patients,
    Canadian Psychiatric Association Journal, 13. 231-235,

Howe, S. G. (1866}  In ceremonies on laying the corner-stone of the
    New York State Institution for the Blind,  at Batavia.  Genessee
    Co, New York.  Batavia, NY:  Henry Todd.

Howe. S. G. (1848).  Report made to the legislature of Massachusetts
        Boston; Coolidge a Wiley.

Kaal. S. (1972).  Physical and mental health effects of Involuntary
    relocation and institutional on the elderly: A review. American
    Journal of Public Wealth. 62, 377-383.

Kaufman, H. {1976}   Are government organizations immortal? Washing-
    ton, DC:  The Brookings Institution.

Kawola. S. (1984), Case study of a facility closure.  In D, Braddock
    and T, Heller (Eds.) The closure of state mental
    retardation
    institutions.;    Proceedings of. a. conference   of the National
    Association   of   State Mental Retardation Program Directors.
    Alexandria,  VA and Chicago, IL: National Association of State
    Mental Retardation Program Directors and the institute for the
    Study of Developmental Disabilities, 3-13.

Killian, E.C. (1970). Effect of geriatric transfers on mortality
    rates.  Social Work, 15, 19-26-

La Fave, H. G.  Herjanic, M. & Grunberg. F, (1966*),  one year follow-up
    of 67 chronic psychiatric patients,   Canadian Psychiatric
    Association Journal, 17, 433-435.

Lakin. K. (1979) , Demographic studies. of residential .facilities for the
mentally retarded: A historical review of methodologies and findings.
Minneapolis:  Developmental Disabilities Project. Depart    ment of
Psychoeducational Studies.

Landesman-Dwyer. S, (1982). The changing structure and function of institutions: . A search for optimal, group. .care environments. Paper presented at the Lake Wilderness Conference on the Impact of Residential Environments *on* Retarded Persons and Their Care Providers, Seattle,

Landesman-Dwyer, S.  Sulzbacher, S. Edgar, E., Keller, S,, Wise, B. St Baatz, B, (1980).   Rainier School placement study.  Olympia, WA: Office of Research. Department of Social and Health Services-

Lentz, R.J. & Paul, G.L. (1971) .  "Routine" *vs.* "therapeutic" transfer of chronic mental patients. General Psychiatry. 25, 187-191-

Liem, B, & Rayman, P. (1982).  Health and social costs of unemployment: Research and policy considerations.  American Psychologist. 37. 1116-1123.

Markson. E. & Cumming, J. (1974), A strategy of necessary mass transfer and its impact on patient mortality.   Journal *of* Gerontology, 29, 315-321.

Marlowe, R.A. (1973).  Effects of environment on elderly state hospital reiocatees.   Paper presented at the meeting  of  the Pacific Association, Scottsdale,

. R.A. (1978). When they closed the doors at Modesto.  In P. Ahmed & S. Plog (Eds.) State mental hospitals: What happens they close.  New York:  Plenum Publishing Corporation,

Minnesota Department of Public Welfare. (1982),  Rochester  5tate Hospital Closure  Impact.  Study.   Saint Paul:  Mental Health Bureau, June, {Draft).

Miller. D. & Lieberman, M.A. (1965).  The relationship of affect state and adaptive capacity to reactions to stress.   journal of Gerontology, 20. 492-497

Murray, W,G. {1939). Illinois care of the Mentally deficient. Welfare Bulletin, Springfield, IL; The Illinois State Department of Public Welfare, 3, 1,7-9.

National Association of State Mental Retardation Program Directors (1982) New. .Directions.

Office of Employee Services (1980).  Final report. King of Prussia, PA; Office of the Special Master,

Payne, J.E, (1976). The deinstitutionalization backlash. Menta] Retardation, 3, 43-45.

Research. Inc. ft Stanford Research Institute (1974). where is my home? Proceedings of a conference on the closing of state mental hospitals Springfield. VA: National Technical Assistance Inforination Service. U.S. Department of Commerce.

37

H. V-. (1976). On the transfer of the profoundly mentally
retarded Retardation, 14. 27.

Rice. J. (1984) Personal Communication, Minneapolis: Director, Thunder
Bay Ontario Regional Center.

Rotegard. L., Bruininks, R., & Krantz. G, (1984). State operated resi-
dential facilities for people with mental retardation: July 1.
19T& - June 30, 1982,  Mental Retardation, 22. 69-74

Schinke. S. P. & Landesman-Dwyer, S. (1981), Training staff in group
homes serving mentally retarded persons:  Frontiers of knowledge.
In  P,  Mittler  (Ed.).  Mental  Retardation.  Vol.  1:
educational,  and behavioral aspects- Baltimore: University Park
Press.

Schultz, D.ᵣ Lyons. T. & Nothnagel, G. (1975).  The effects of the
State Hospital on Its patients and staff.
Cleveland;  Case Western Reserve University and Ohio Department of
Mental Health.

Vitello, S. J. ft Atthowa, J- M. {1982}.  Deinstitutionalization: family
reaction and  involvement   Paper presented at the Gatlinburg
Conference on Research in Mental Retardation.. Gatlinburg.

S. , Bird, B. . & Bolton, A. (1973).  Process and  impacts of the
Closing Of DeWitt State Hospital:  Final report.  (NIHM Grant No. MH
19222-01 SRI  Project  URU  1147.)   Menlo  Park.  CA:  Stanford
Institute.

Weiner, S.  The impact of the closing of DeWitt State Hospital.  In P.
Ahmed & S. Plog (Eds,)  State mental hospitals:  what happens when
they close.  New York: Plenum publishing

Wildavsky. A. (1975), the politics of the budgetary process. 2nd
edition.  Boston:  Little, Brown, and Company.

Wolfensberger, W, (1971). Will there always be an institution? J-
The impact of expenditure trends. 915), 14-20.  _____