THOMAS J. FRAIN
ATTORNEY AT LAW
563 MAIN STREET
BOLTON, MASSACHUSETTS 01740
TELEPHONE (978) 779-0749
FACSIMILE (978) 779-0761

FILED
CLERKS OFFICE
2007 JUN 13 P 12: 32
U.S. DISTRICT COURT
DISTRICT OF MASS.

June 6, 2007

VIA FACSIMILE (617) 727-9725
AND FEDERAL EXPRESS (Tracking No. 8582 5142 2547)

The Honorable Deval Patrick
Governor of Massachusetts
The State House
Room 360
Boston, MA 02133

    Re:    **DMR's Proposed Transfer of Claudia A. Tetreault**
              **44 Prospect Street, East Bridgewater, Massachusetts**

Dear Governor Patrick,

    Please be advised this office has been retained by Ms. Janet A. Topalis, sister and legal guardian of the above referenced Claudia A. Tetreault ("Claudia" or "Ms. Tetreault"), to represent her relative to the Department of Mental Retardation's ("Department") proposed transfer of Claudia from her state operated group home in East Bridgewater to a state operated group home in Lakeville. The Department is in violation of numerous provisions contained in M.G.L. c. 123B, §3, Claudia's Individual Support Plan ("ISP"), and the Order of the United States District Court Order (Tauro, J.) *Ricci v. Okin* (C.A. No. 75-5210-T) relative to said transfer. As such, this letter is a formal objection to said transfer, and a demand that: (A) said transfer not occur without a formal adjudicatory proceeding; and (B) that the Department cease and desist from any further actions resulting in the closure of Claudia's residence unless expressly consented to by Ms. Topalis. As the Department has informed my client that Claudia will be moved as early as next week, please contact me immediately to discuss this matter further. If the Department has no intention of following the administrative construct of the laws of the Commonwealth please have it state so expressly so my client can seek appropriate relief.

    Claudia is legally blind, non-verbal, 53 years old and very medically complicated. She is mentally retarded as a result of Tuberous Sclerosis (brain and kidney) which she has had from birth. She also suffers from, among others, anemia, rheumatoid arthritis

The Honorable Deval Patrick
Governor of Massachusetts
June 6, 2007
Page 2 of 6

and a seizure disorder. According to her 2006 ISP, her room was only recently redecorated and adapted to better suit her lifestyle and medical needs. She was a resident of the Dever Developmental Center (an ICF/MR) until nine (9) years ago when the Department closed Dever and Claudia moved to an eight (8) person group home, seven (7) of whom are *Ricci* Class Members.

### The Department Of Mental Retardation Failed To Follow M.G.L. Chapter 123B, § 3's Specific Procedural Prerequisite And Due Process Requirements Prior To Claudia's Proposed Transfer

As you are aware M.G.L. c. 123B, § 3, clearly memorializes the due process requirements the Department *must* follow prior to the transfer of a mentally retarded individual from one state operated group home to another state operated group home. It states in pertinent part that:

> The department shall notify and consult with the permanent guardian ... prior to the transfer of said [mentally retarded] person from one residential facility for the mentally retarded to another. Such notice shall be given at least forty-five days prior to the proposed transfer.
>
> If a permanent guardian has been appointed for a mentally retarded person who is receiving residential services through the department, *said department shall request said guardian's consent prior to the transfer by the department of said mentally retarded person from one residential facility for the mentally retarded to another. Said consent shall be requested in writing by registered mail, at least forty-five days prior to the proposed transfer. The request for consent shall include (1) a statement of how the proposed residential transfer from the current facility to the proposed residential facility will result in improved services and quality of life for the retarded ward, (2) the location of the proposed facility and a statement that said guardian may examine the facility, and (3) a statement of the rights of said guardian established by this section. Any objection by the guardian to the proposed transfer shall be in writing and shall contain a statement of the reasons upon which the objection is based.* Failure to object in writing within forty-five days shall be deemed to be a consent to said transfer. *If the guardian files an objection, the transfer shall not occur unless the department prevails at an adjudicatory proceeding pursuant to this section.*
>
> If the individual service plan developed for the mentally retarded person by the department pursuant to its regulations cannot be fully implemented as a result of the guardian's objection to a proposed transfer, the department shall, within twenty days of receipt of said objection, file a request for an adjudicatory proceeding with the division of administrative law appeals established by section four H of chapter seven, whereupon said division shall be authorized to conduct

The Honorable Deval Patrick
Governor of Massachusetts
June 6, 2007
Page 3 of 6

said proceeding to determine whether the transfer should proceed. The division shall conduct an adjudicatory hearing within ninety days in accordance with the provisions of chapter thirty A, and the burden of proof shall be on the department. ***During the pendency of said hearing the proposed residential transfer shall not occur.*** ...

[Emphasis supplied] G.L. c. 123B, §3.

Notwithstanding the fact that the proposed new group home in Lakeville is unsuitable for Ms. Tetreault's specific needs, the Department failed to follow the foregoing strict procedural due process guidelines established by the Massachusetts legislature. In fact, in *Ricci v. Okin, 537 F.Supp 817 (D.Mass. 1982)*, the court, quoting Speaker McGee, held that the legislature of the Commonwealth, like the executive branch, was committed to providing care and treatment of the mentally retarded in keeping with the mandate of the *Ricci* consent decrees and the laws and Constitution of the United States. *Id.*, at 820. Ms. Tetreault, as a former resident of the Dever Developmental Center and as a *Ricci* Class Member, is protected by the *Ricci* decision and the resulting decree committed to her care.

### The Department's Rules And Regulations Require Notice To The Permanent Guardian Prior To The Proposed Transfer

In addition, via 115 CMR 6.63, DMR has codified the basic notice requirements contained in G.L. c. 123B, § 3. 115 CMR 6.63(1) states:

> Any proposed modification to an ISP involving an individual moving from one home, operated or licensed by the Department to another home, shall be subject to the requirements of 115 CMR 6.63, in addition to the regulatory requirements applicable to the modification of an ISP.

115 CMR 6.63(1).

### The Department's Actions Violated M.G.L. C. 123B, § 3, And 115 CMR 6.63

On April 3, 2007, the Department, through Jacqueline Winslow, Executive Director of the Department's Southeastern Residential Services, telephoned Ms. Topalis and explained that the Department was transferring Ms. Tetreault from her group home in East Bridgewater to another state operated group home in Lakeville. The Probate Court has appointed Ms. Topalis and Patricia A. Lewis – another sister - as Ms. Tetreault's co-guardians. There was no formal writing from the Department via registered mail detailing this transfer, as required by M.G.L. 123B, section 3, no ISP Modification

The Honorable Deval Patrick
Governor of Massachusetts
June 6, 2007
Page 4 of 6

Meeting to determine if said transfer is in Claudia's best interests, and no request for the guardians' consent. Rather, the tone of said telephone conversation left the guardians intimidated and threatened, and fearful for their sister's well-being. In a vaguely worded letter dated April 4, 2007 (attached as Exhibit "A"), Department Regional Director Richard J. O'Meara stated that,

> [c]urrently, our staff are stretched thin as we work to accommodate ... [the] needs [of the Department's population]. In certain instances we have had to impose mandatory overtime to sustain necessary coverage. This is not a desirable outcome for the people we support, or our dedicated employees. ... This means we will be closing two of our homes, Prospect Street in East Bridgewater, and Morton Street in Quincy.

[Emphasis supplied].

Mandatory overtime is a common problem in Department residences, be they operated by the Commonwealth or by a Department-provider. In fact the Court Monitor in the *Ricci* litigation stated expressly his concern regarding staff turn-over in provider operated group homes.[1] My understanding is that should the Department be successful in its efforts to close Claudia's home, it intends to contract with a Brockton-area provider to occupy the East Bridgewater residence.

On April 19, 2007 my client sent Ms. Winslow a letter via Certified Mail registering her objection to, and denying her consent for, any transfer (see letter dated April 19, 2007 from Janet A. Topalis and Patricia A. Lewis to Jacqueline Winslow attached hereto as Exhibit "B").

### Individual Support Plan Modification Meeting Required To Determine If Proposed Transfer Will Serve Ms. Tetreault Or Cause Her To Suffer

Ms. Topalis has been requesting an ISP Modification Meeting ever since she received Ms. Winslow's telephone call. Her requests have been ignored by the Department since no such ISP Modification Meeting has occurred and the Department is

---

[1] Re: The Monitor's Report on Whether the "Past and Prospective transfer processes employed by the Department of Mental Retardation were in compliance with Federal Law, State Regulations, as well as Orders of the Court." *Ricci v. Okin*, Case 1:72-cv-00469-JLT Document 158 Filed 03/06/2007. The United States Attorney concluded for a myriad of reasons, including the extreme emotional harm that occurs when moving mentally retarded persons, that the Fernald residents should not be transferred and that Fernald should not be closed. "Our office did note that the tenure of most House Managers within community residences was less than 3 years, with 5 years being a rarity. Staff turnover was in some instances 100% every year and a half. Repeatedly, our office heard, from guardians and providers, that an on-going struggle is to maintain the continuity of staffing for better on-going care. The direct cause for the high turnover rate was the challenging work coupled with the low pay scale." Id. at 16.

The Honorable Deval Patrick
Governor of Massachusetts
June 6, 2007
Page 5 of 6

summarily dismissing her legitimate concerns over Claudia's well being. In fact, Ms. Topalis has felt threatened by Department representatives who have warned her that said transfer would occur despite any objection and even if it is not in Claudia's best interests. This position is illegal and unconscionable, especially for an agency in charge of some of the Commonwealth's most vulnerable citizens.

### Lakeville Group Home Is Unsuitable For Ms. Tetreault's Needs

With respect to the Lakeville-based group home, said facility is unsuitable for Ms. Tetreault's complicated medical, and severe behavioral, needs. Ms. Tetreault is known to engage in hitting, biting, throwing objects, self-injurious behavior and other behavioral problems. Ms. Tetreault requires 1:1 staffing for monitoring and to ensure her safety. Ms. Topalis believes the East Bridgewater home to be far more appropriate for Claudia and, more importantly, Claudia's home of more than eight (8) years.

In addition, the Lakeville home currently has three (3) wheel-chair bound female residents. Claudia, with her severe behavioral needs, is not an appropriate housemate for ladies with such severe physical limitations. The Lakeville home is also not suitable to meet Claudia's psychiatric, medical and safety needs. It has also come to our attention that the Lakeville group home has a swimming pool in the yard. Unless the staff is able to watch Ms. Tetreault twenty-four hours a day, a swimming pool puts her at enormous risk.

Ms. Tetreault's guardians have advised the Department that they are willing to attend an ISP Modification Meeting and discuss the proposed transfer. Such an ISP meeting is not only necessary but is critical for a determination as to whether the Lakeville group home is adequate for Ms. Tetreault's specific needs and, as aforesaid, is required by the laws of the Commonwealth of Massachusetts and the United States.

### Ms. Tetreault Is A Member Of A Protected Class Pursuant To The Decision In *Ricci v. Okin*

As previously discussed, Ms. Tetreault is a former resident of the Dever Development Center. It was announced in 1991 that said center was slated for closure. The facility closed in 2002. As a *Ricci* Class Member, the Department's Regional Director must certify, prior to the transfer taking affect, that Ms. Tetreault will receive at the group home in Lakeville, "equal or better" services and that all ISP recommended services for her current needs are available in the new group home. To date the Department has failed to provide said certification. Ms. Tetreault is a fifty-three year old

The Honorable Deval Patrick
Governor of Massachusetts
June 6, 2007
Page 6 of 6

lady and, as Judge Tauro further stated, Ms. Tetreault "ought to be treated with great dignity."

### Conclusion

As the statute governing said transfer clearly states, "if the guardian files an objection, the transfer shall not occur unless the DMR prevails at an adjudicatory proceeding pursuant to section 3 of M.G.L. c. 123B." Accordingly, I am demanding that the proposed transfer not occur and that an adjudicatory proceeding be scheduled. In addition, I am requesting that an ISP Modification Meeting be convened forthwith to determine the best interests of Ms. Tetreault.

Finally, given the highly illegal and aggressive stance taken by the Department, my client needs immediate assurances that the Department's actions against Ms. Tetreault will immediately cease and the Department will desist from taking any further steps infringing upon Ms. Tetreault's rights under the laws of the Commonwealth and the United States. If my office does not receive confirmation by Friday, June 8, 2007, that the transfer of Ms. Tetreault from her group home in East Bridgewater to the group home in Lakeville will not occur, my client shall have no choice but to seek appropriate relief including but not limited to holding the DMR and its representatives personally responsible for Ms. Tetreault's injuries.

I look forward to your prompt response.

Very truly yours,

Thomas J. Frain, Esq.

TJF/st

Enclosure

cc:   U.S. District Court, *Ricci v. Okin*, Docket, C.A. No. 75-5210-T– Via First Class Mail
      U.S. Attorney Michael J. Sullivan– Via First Class Mail
      U.S. Assistant Attorney Rayford A. Farquhar – Via First Class Mail
      Department of Mental Retardation – Via First Class Mail

**EXHIBIT "A"**



# The Commonwealth of Massachusetts
Executive Office of Health & Human Services
Department of Mental Retardation
Southeast Region
68 North Main St. Carver, MA 02330

Deval L. Patrick
Governor

Timothy P. Murray
Lieutenant Governor

JudyAnn Bigby, M.D.
Secretary

Gerald J. Morrissey, Jr.
Commissioner

Richard J. O'Meara
Regional Director

Tel: 508-866-5000
Fax: 617-727-7822
TTY: 508-866-7602

April 4, 2007

Dear Families, Friends, and Guardians:

I am writing to inform you of some important changes that will soon be occurring within Southeastern Residential Services (SRS). Currently we operate sixty homes throughout Southeastern Massachusetts, serving over two hundred seventy five individuals. Jackie Winslow and her staff have done an exemplary job for the people we support. SRS is one of the finest residential networks in the Commonwealth. They have achieved the highest possible Survey and Certification of Two Years with Distinction four times in a row, covering a span going back nine years. I know of no other agency with such a record. Our direct support workforce deserves much of the credit, as they work tirelessly around the clock providing the best possible services.

It is imperative that we sustain this high quality of services to people served by SRS. We must also support our workforce in continuing to provide excellent care. As our population ages, many require additional support and staffing due to their changing medical needs. Currently, our staff are stretched thin as we work to accommodate those needs. In certain instances, we have had to impose mandatory overtime to sustain necessary coverage. This is not a desirable outcome for the people we support, or our dedicated employees.

We have many staff and consumer vacancies scattered throughout our residential network. In order to strengthen services to the people we currently support, I have made a decision to consolidate these vacancies and not accept new referrals. This means that we will be closing two of our homes, Prospect Street in East Bridgewater, and Morton Street in Quincy. The individuals living here will move to other homes within SRS. No one will lose services. All staff will maintain employment within our network. This action will permit us to reassign staff to where they are most needed, given the changing needs of our folks. I believe this will strengthen SRS's ability to maintain the high level of service quality that we are all accustomed to.

We chose these two homes after a careful consideration of which moves would cause the least disruption possible in people's lives, considering compatibility of housemates, maintaining current day programs, and other factors such as physical quality of the homes.

I recognize that a change such as this can be disruptive. Transitions must be handled sensitively. I am confident that Jackie and her staff will work with you, our staff, and the individuals served to achieve the best possible outcome for everyone. I'm sure you will have questions. Also, please know that there are no other consolidations being planned. I do believe that in the long run this is what we need to do to provide the coverage that is necessary, and maintain our excellent track record in service quality. Jackie Winslow and I are available to discuss this with you if you like. Jackie can be reached at 508-910-3023. My number is 508-866-5000 ext. 315.

Thank you for your understanding as we work to implement these changes by July 1, 2007.

Sincerely,

Richard J. O'Meara
Regional Director

**EXHIBIT "B"**

JANET A. TOPALIS
20 STANDISH AVENUE
PLYMOUTH, MA 02360


**CERTIFIED MAIL**
7006 2760 0004 9583 1884

April 19, 2007

Jacqueline Winslow
Executive Director
DMR Southeastern Residential Services
74 Kilburn Street
New Bedford, Massachusetts 02740-7321

     SUBJECT:    DMR's Proposed Transfer of Claudia A. Tetreault,
                           44 Prospect Street, East Bridgewater (Dever Class Member)

Dear Jackie:

     On behalf of my Co-Guardian, Patricia A. Lewis, and myself, I am writing to you about our concerns regarding DMR's intention to shut down the group residence that DMR/Southeastern Residential Services operates at 34 and 44 Prospect Street, East Bridgewater for budget saving reasons. Our ward and sister, Claudia A. Tetreault, lives at 44 Prospect Street with three other mentally retarded people. An additional four mentally retarded people live downstairs at 34 Prospect Street.

     I appreciate your telephoning me on April 3, 2007 about DMR's plan to close the Prospect Street residence. After your call, I received a standardized letter, dated April 4, 2007, from DMR Regional Director Richard O'Meara about the planned closures of the East Bridgewater residences and another residence that DMR/SRS operates on Morton Street in Quincy. However, this proposal to shutdown the residence and force Claudia to move is very sudden.

     As you already know from my voice mail to you after our April 3rd telephone conversation and Pat Lewis' recent e-mail to you, we are troubled by DMR's plan to close the East Bridgewater residence. I along with my co-guardian, closely monitor Claudia's care, which requires that the staff respond to Claudia's complicated medical needs and severe behavioral needs (e.g., hitting, pinching, biting, throwing objects like furniture, self-injurious behavior like throwing herself against walls, etc.). Currently,

1

Claudia requires 1:1 staffing for ensuring her safety. Despite Claudia's challenging needs, we have been very satisfied with the delivery of Claudia's residential care at the East Bridgewater residence. Therefore, the idea of transferring Claudia's residential services has troubled us, along with the forced necessity of transferring Claudia's day program at VinFen in Rockland to another program near her new proposed residence.

You indicated during the April 3, 2007 telephone conversation that DMR intends to transfer Claudia to another SRS house in Lakeville. I recently visited the Lakeville house, which now has three wheelchair bound ladies living there. After sharing the information about the proposed new residence with Pat, we have doubts as to whether Claudia, with her severe behavioral needs, is an appropriate match for such physically vulnerable, mentally disabled women and whether this home is prepared to meet Claudia's psychiatric, medical and safety needs. For example, the Lakeville house has a pool in the backyard. It is difficult to imagine how Claudia would ever be safe with her home adjacent to a pool.

You have left a number of telephone messages for me about scheduling a transition meeting for Claudia's move to a SRS-operated group residence in Lakeville. In one of your messages, you indicated that if I did not participate in the transition meeting for Claudia, SRS would proceed with moving Claudia. The threat that DMR would transfer Claudia on short notice and without the consent of her guardian's is scary.

I want you to know that, *at this time*, we are not convinced that this proposed transfer is in Claudia's best interests. It is our understanding that, as a former resident of the Dever Developmental Center and current Dever Class Member in Ricci v. Okin, No. 72-460-JLT (D. Mass.), Claudia cannot be transferred without our consent. Also, Claudia's special eligibility for services is not subject to the availability of resources. With these concerns in mind, I have been in limited contact with my co-guardian and sister, Pat Lewis, who is traveling on business. At this time, Claudia's Co-Guardians, Patricia Lewis and I, do NOT consent to Claudia's transfer.

Our position to deny consent should not be viewed as an unwillingness to work with DMR and SRS. We are still committed to working cooperatively with DMR and SRS. We are willing to attend an Individual Support Plan (ISP) meeting and listen to DMR's proposal about transferring Claudia. Our attendance at any meeting(s), however, should not be misunderstood as consent. We do not want to be pressured by anyone about the proposed move. We want to know specifically what services are being provided at Claudia's current residence and day program, and what services will be offered at the new residence as well as day program. We want to be able to visit any proposed transfer location, including residences and day programs. After we receive from DMR all the facts and written responses to our questions (which we will put into writing as well), we are willing to revisit the issue of consent to the proposed transfer.

We also wish to reserve all of our guardian and familial rights as well as Claudia's rights to services and due process under the DMR regulations, the transfer

statute (M.G.L. c. 123B, sec. 3), <u>Ricci</u> Final Order, and any other federal or state law. In particular:

1. <u>DMR Individual Support Plan Procedures</u> – Presently, Claudia's October 16, 2006 ISP makes no mention of a need for Claudia to move from her East Bridgewater residence or Rockland day program. To the best of our knowledge, Claudia's current residential and day services are clinically appropriate for her individual needs. If the DMR administration wants to transfer Claudia, it is our understanding that an ISP team meeting must occur <u>prior</u> to any transfer of Claudia, and Claudia's team must support the proposed transfer. To date, no ISP meeting has been convened about Claudia's transfer.

2. <u>Transfer Statute. M.G.L. c. 123B, sec. 3</u> – I have read the DMR transfer statute and I understand it to require notice of the proposed transfer at least 45-days in advance of any proposed transfer of a mentally retarded person from one facility to another. By statute, Claudia's residence is a public facility for the care and treatment of mentally retarded persons. To date, we have not received from DMR any such 45-day notice. We expect DMR to comply with this statute concerning Claudia's transfer.

3. <u>Ricci Final Order</u> – The <u>Ricci</u> Final Order which protects Dever class members also contains provisions for protecting Claudia. One important provision is paragraph 4 which requires that the DMR Regional Director certify that Claudia would receive "equal or better" services in the new location and that all ISP-recommended services for her current needs are available in the new location <u>prior</u> to DMR approving the transfer. To date, we have not received any certification from the DMR Regional Director.

We wish to repeat that, by denying consent at this time, we are not being difficult or picky. As you are well aware, our sister, Claudia, has a high level of needs that are very challenging. The disruption that DMR is proposing to her current services is enormous and further jeopardizes her psychiatric well-being and physical safety. Claudia has already suffered one disastrous DMR transfer. Following Claudia's transfer out of the Dever Developmental Center around 1996 (DMR had ordered its shutdown), Claudia was transferred to a vendor-operated group residence in Walpole. The vendor was not able (or willing) to respond to Claudia's medical needs. The result was that Claudia deteriorated, lost a great deal of weight, and the family found Claudia lying in her bed with feces on her body. At that point, we advocated for Claudia's transfer back into direct state care.

By mentioning this prior experience, we are not suggesting that DMR or SRS intends to neglect Claudia at her next residence. But, with the speed at which this plan is occurring, we do sincerely believe that haste can lead to big problems. We do not want Claudia to suffer again.

Would you please confirm in writing that our sister, Claudia, will not be transferred, pending the completion of the above steps (e.g., ISP meeting, Regional Director's certification, the transfer statute's notification) and the guardians' consent? We are available to schedule an ISP meeting to listen to the DMR proposal in more detail.

Thank you.

Sincerely yours,

Janet A. Topalis        Patricia A. Lewis
Co-Guardian             Co-Guardian

cc:   Judge Joseph L. Tauro
      Rayford A. Farquhar, U.S. Attorney, Court Monitor
      Dennis A. Murphy, Esq., Nixon Peabody
      Barbara Mason, Esq., Rogers Monitor
      Betsy Vogel, DMR Service Coordinator