UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ASSOCIATION FOR RETARDED CITIZENS OF MASSACHUSETTS, INC., et al., | | |
| Plaintiffs, | Civil Action Nos. | 72-0469-T |
| | | 74-2768-T |
| v. | | 75-3010-T |
| | | 75-5023-T |
| COMMONWEALTH OF MASSACHUSETTS DEPARTMENT OF MENTAL RETARDATION, et al., | | 75-5210-T |
| Defendants. | | |

## SECOND AFFIDAVIT OF GAIL GROSSMAN

I, Gail Grossman, do depose and say as follows:

1. This second affidavit supplements the first affidavit I submitted on May 31, 2007, to the Court as part of *The Department of Mental Retardation's Response to: (1) The Report of United States Attorney Michael J. Sullivan; and (2) the Court's Order to Show Cause Why an Injunction Should Not Enter* (Docket no. 198).

2. I am employed by the Department of Mental Retardation ("the Department" or "DMR") as the Assistant Commissioner for the Office of Quality Management. My responsibilities include oversight of all activities relating to quality assurance and quality improvement including, but not limited to, the licensing/certification process for all public and private providers, the Medication Administration Program, the mortality review process, risk management and critical incident reporting systems, health and wellness initiatives, and the writing and

dissemination of statewide quality assurance reports. Unless otherwise indicated, the facts contained in this Affidavit are based on personal knowledge, information provided by DMR staff, and/or DMR records.

3. In preparing this affidavit, I reviewed the United States Attorney's March 6, 2007 Report to the Court ("Court Monitor's Report"), the recent pleadings filed with the Court including the Wrentham Association's Response to the Report of the Independent Monitor, United States Attorney Michael J. Sullivan ("Wrentham Response") and the Vendor Reports produced by DPPC for the years 2002-2005. The same Vendor Reports for 2002-2004 were referenced in the Court Monitor's Report (*e.g.,* at page 17 n.1). I am also familiar with the May 25, 1993 final disengagement order issued in *Ricci, et al. v. Okin, et al.* ("the Final Order").

Abuse and Mistreatment of Individuals with Mental Retardation

4. In 2004, the Department provided residential services to approximately 9,656 individuals[1] in state-funded, community-based settings, which included 24-hour state-operated community programs, provider-operated residential programs with 24-hour supports, placement services (shared living and home-share supports), and less than 24-hour residential supports. Of the 9,656 individuals who received community residential supports, 2,819 (29.2%) were *Ricci* class members.

---

[1] Unless otherwise stated, all figures appearing in this affidavit are derived from DMRIS, the Department's management information and data compilation system. DMRIS is an integrated and interoperable system that supports both the programmatic and clinical needs of DMR in its client service responsibilities and the administrative and assurance functions of the agency as they relate to meeting federal and state standards applicable to mental retardation services. There are two major components to DMRIS: Meditech, which serves as the system of record for case related information, and HCSIS, which is the system of record for quality-management-related information. The above figure (9,656 individuals) also appears in Braddock, et al., *The State of the States in Developmental Disabilities: 2005* (University of Chicago 2005).

5. In 2005, the Department provided residential services to approximately 10,013 individuals in similar DMR-funded, community-based settings. Of the 10,013 who received community residential supports, 2,765 (or 27.6%) were *Ricci* class members.

6. In its May 31, 2007, filing, the Wrentham Association refers extensively to "factual summaries" of abuse allegations that were received by the Disabled Persons Protection Commission ("DPPC") during the fiscal years 2002-2005. These so-called "vendor reports" are in fact compilations of those intake reports that are later substantiated; these reports do not contain the substantiated findings of fact determined later, following an investigation. Additionally, the DPPC grouping labels -- "DMR Residential" or "DMR Institutional" – used in these reports are not accurate in all cases. For example, in some cases the reported "abuser agency" is not even a DMR provider. There is also at least one instance in which the DPPC included an intake in a report for one fiscal year, but the intake actually occurred in a different fiscal year.

7. Consistently over the years, the failure of staff to provide some component of proper care according to DMR policies or regulations (otherwise referred to as "omission") has been the leading type of abuse/neglect substantiated across all residential settings. In fact, the largest percentage of substantiated abuse incidents in community placements involves omission of care and not "malfeasance," as asserted by the Wrentham plaintiffs.

8. Despite the fact that *Ricci* class members represent a significant portion of the total population DMR serves in its community-based residential system (almost

30%), the percentage of substantiated findings involving *Ricci* class members (10%) is significantly less than their representation as a percent of the total population served in community residential supports.[2] For example, in 2004 *Ricci* class members constituted 29.2% of the total DMR-funded community residential population, yet they were the subjects of only 10.1% of all substantiated abuse/neglect findings. In 2005, *Ricci* class members constituted 27.6% of the total population served in DMR-funded community residential programs; yet they were the subjects of only 10% of all substantiated abuse/neglect findings.

## Licensure and Certification

9. The Wrentham plaintiffs' May 31, 2007, filing contains a distorted depiction of both the steps taken and the ultimate findings of the DMR licensure and certification process. The DMR survey and certification process is an extremely rigorous and detail-oriented evaluation of the impact of a given provider's services on the health, safety, and quality of life of individuals served by DMR. Contrary to the plaintiffs' allegations at page 26 of the Wrentham Response, the DMR survey and certification process utilizes a sample size that far exceeds that of other independent accreditation processes. The process itself utilizes lengthy on-site observation, interviews with individuals, families and staff, as well as review of documentation. This is quite unusual in that many other accreditation processes rely almost exclusively on documentation. This multi-faceted approach

---

[2] The overall rate of abuse experienced by DMR clients (12.7 incidents per 1,000 clients served in 2005) is quite low by national standards. Recent studies have concluded that Massachusetts is the second best state in the nation in terms of the "safety" of citizens served by the state's mental retardation/developmental disability agency. *See* United Cerebral Palsy's "2007 Case for Inclusion Report, An Analysis of Medicaid for Americans with Intellectual and Developmental Disabilities," at pg. 13 (available at: http://www.ucp.org/ucp_generaldoc.cfm/1/9/10020/10020-10020/7331).

enables survey and certification staff to discover important patterns and trends across all of a provider's service sites.

10. Issues relating to health, safety, or human rights identified during the survey process that pose an immediate risk to the health and safety of any individual are subject to follow-up by survey staff within 24-48 hours and must be corrected. Federal reimbursement is withheld until corrections are made and verified. Other health and safety issues that do not pose an immediate threat are also followed up on by surveyors as well as program monitors in area offices.

11. Plaintiffs quote findings from several provider reports as evidence that the survey and certification system is flawed. In fact, just the opposite is the case. It is due to the depth and rigorous nature of the survey process that issues are discovered, follow up conducted, corrections made and monitored, and on-going service improvements operationalized.

<u>Corrective Action</u>

12. The Wrentham plaintiffs distort information presented on pages 30-31 of DMR's 2005 Annual Quality Assurance Report ("QA Report") by stating that "10% of abuse/neglect situations DO NOT see corrective and/or preventive action." Wrentham Response at p. 23. This reflects both an inaccurate interpretation of the percentages noted in the 2005 QA Report (the Report specifically states that corrective action is appropriately taken in 94% of situations) as well as a lack of understanding of surveyor practices and the roles of other DMR staff in monitoring and oversight of issues of concern. Specifically, surveyors will check to see whether **all** necessary actions were taken in situations where an allegation

5

has been substantiated and they are instructed to answer "no" if there is any action, however minimal, that has not been taken. Therefore, a "no" response is not an indication that nothing has been done to remedy a situation, but rather that not all recommended actions have necessarily been taken. Surveyors will not hesitate to issue an "immediate action" order or, as mandated reporters, file a complaint with DPPC immediately if they find that actions outlined in an action plan have not been taken and continue to pose a risk to the individual.

13. Further, if a negative pattern or trend for a particular provider is identified during the course of a survey, it will result in the designation of an "area needing improvement" and will be followed up on by program monitors in area offices. In addition, complaint resolution teams, composed of area office staff and citizen volunteers, follow up on action plans crafted as a result of a substantiated allegation to check on compliance with recommended actions.

14. In the case of the Vinfen provider report, the Wrentham plaintiffs again distort the content and conclusions of the report. While Vinfen may have received a two-year license, that does not negate the findings of the surveyors with respect to those matters identified as needing improvement. The fact that surveyors identified the issues noted in the Wrentham filing is a reflection of the efficacy of DMR's survey and certification process, contrary to the plaintiffs' allegations. While the two-year license allows Vinfen to conduct business with the state, the issues identified by the survey team required prompt action and correction on the part of Vinfen, and survey staff plus DMR program monitors followed up to ensure corrections. In fact, follow-up action occurred on multiple occasions.

"Immediate action" notices were given to Vinfen at the time that issues were discovered, and all were subsequently corrected. Patterns and trends noted in the report with respect to environmental safeguards were the subject of follow up by survey staff for the entire agency after the conclusion of the survey. Additionally, program monitors paid close attention to identified problem areas. Clearly, this identification, correction, and follow-up on areas needing improvement serve as testimony to a system that is accomplishing its intended purpose.

### Critical Incidents

15. It is in their use of the Department's critical incident data that the Wrentham plaintiffs engage in the most egregious misinterpretations of information. Despite multiple caveats emphasized in the 2005 QA Report with respect to changes and additions to the incident categories, and the inherent limitations in being able to compare data that these changes pose, the Wrentham plaintiffs insist on twisting the findings to comport with their own philosophical bias. As mentioned repeatedly in the report, a number of new categories were added and some definitions clarified and changed, in anticipation of moving to a new web-based incident management system. Contrary to the plaintiffs' assertion, with the exception of unplanned hospital visits, sexual assault and victim of crime categories **were** in fact, previously reported, but under different classifications. Without the new categories, plaintiffs claim that there were 1,159 incidents, when in fact there were only 1,058.

16. As to the Wrentham plaintiffs' representation that there has been a 45% increase in situations that surveyors identify as requiring corrective action, this is yet

7

another example of how data can be misinterpreted or taken out of context. While the Wrentham plaintiffs technically are correct in asserting a 45% increase between 2003 and 2005, they conveniently omitted the statistics for 2002. When 2002 statistics are included in the analysis, the data show that the number of corrective action designations went from 510 to 392, a decrease of 23 percent.

17. The most erroneous assertion that the plaintiffs make is that "no one knows what DMR has done with [critical incident reports]." Wrentham Response at p. 23. While the former critical incident reporting system was not as sophisticated as the current system, CIR's were in fact routinely reported internally -- starting with the service coordinator and reaching up to the level of the Commissioner. Incidents were followed up on by DMR Area Office staff. The current web-based electronic incident management system, HCSIS, is a state-of-the-art system that guarantees identification, correction, and follow-up on both minor and major incidents. Providers must report incidents and action steps and no incident can be "closed" unless the area or regional office agrees with all of the provider's action steps.

Rachel DeLine

18. I am familiar with the circumstances surrounding the death of Rachel DeLine. The DPPC found that she had been administered two times the prescribed dosage of lithium by Medication Administration Program ("MAP") certified staff. MAP is a highly developed and standardized program that allows non-licensed, MAP-certified staff to administer medications in DMR and Department of Mental Health (DMH) licensed, funded, or supported programs, which are overseen by

the Department of Public Health. *See* Commonwealth of Massachusetts *MAP Policy Manual* (joint DMR, DMH, and DPH document; May 1, 2007) (available at http://www.mass.gov/Eeohhs2/docs/dph/quality/drugcontrol/map_policy_manual.doc).

19. The DPPC investigator found that direct care staff had administered the drug as directed, but the potency of the medication in the so-called "blisterpack" from the pharmacy was twice that prescribed by her psychiatrist. The investigator also found that direct care staff reasonably relied upon the labeling of the medication, which in this case was in error. Under the MAP program, pharmacy errors, such as the wrong strength of a prescription being packaged, are required to be reported in a so-called "medication occurrence report," even when staff, including nurses, could not be expected to know that the pharmacy-packaged medication was the wrong strength, as in the case of Rachel DeLine.

20. The DPPC investigator cited provider staff members for their failure, despite training on the subject, to identify symptoms of lithium toxicity and to communicate them to her physician; and their failure to seek further medical advice after taking Rachel to her physician who did not identify the problem.[3] The investigator also found that while the direct care staff had noted Rachel's changed appearance, contacted managers, and taken Rachel to her primary physician's office, they should have taken additional steps to seek medical help that would have detected the symptoms of lithium toxicity. DMR developed a corrective action plan, which included staff re-training. DMR also increased its

---

[3] A complaint was filed with the Board of Registration in Medicine concerning the physician.

overall efforts to make all provider staff aware of the symptoms of toxicity for certain medications.

21. A multiplicity of errors led to a most tragic outcome in the DeLine case. However, the Department addressed with the provider the shortcomings identified as a result of the DPPC investigation through a corrective action plan and the provider made significant changes in its practices to address these deficiencies.

22. The MAP program is in effect in both provider- and state-operated community residential programs. Sites that participate in the MAP program also must obtain a Massachusetts Controlled Substance Registration from DPH to allow for the storage of medications on site.

23. Hundreds of MAP-certified staff currently provide excellent care and essential services to DMR consumers in community programs. Exceptions to this are truly rare. In 2005, for example, the rate of medication errors per 1,000 individuals in DMR-operated or –funded community residential programs was a miniscule 0.100. *See* 2005 Quality Assurance Report at p. 14.[4]

24. The MAP program reporting criteria may be much stricter than exists in programs where nurses administer medications. Reporting in the community is likely more comprehensive and includes many events that are not usually reportable events in facilities or hospitals. For example, the administration of a medication one hour earlier or later than ordered by the health care provider is required to be reported under MAP. That generally will not constitute a reportable event in an ICF/MR, nursing facility, or a hospital.

---

[4] DMR's entire Fiscal Year 2005 Quality Assurance Report may be accessed on the Internet by pointing one's browser to http://mass.gov/Eeohhs2/docs/dmr/quality_assurance_report_2005.pdf.

Signed under the pains and penalties of perjury this 3rd day of July 2007.

*Gail Grossman*

Gail Grossman, Assistant Commissioner
Office of Quality Management