UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ASSOCIATION FOR RETARDED CITIZENS OF MASSACHUSETTS, INC., et al.,<br><br>      Plaintiffs<br><br>      v.<br><br>COMMONWEALTH OF MASSACHUSETTS DEPARTMENT OF MENTAL RETARDATION, et al.,<br><br>      Defendants. | Civil Action Nos. 72-0469-T<br>74-2768-T<br>75-3010-T<br>75-5023-T<br>75-5210-T |

### SECOND AFFIDAVIT OF BERNARD J. MURPHY

I, Bernard J. Murphy, do hereby depose and say as follows:

1. That I am an attorney licensed in Massachusetts and New York. I have been licensed in Massachusetts since 1985. I am currently employed by the Department of Mental Retardation ("the Department or DMR") as the Director of the Investigations Division. Immediately prior to joining the Department in June 2000, I was engaged in the practice of law as an Assistant District Attorney for the Bristol District for nearly 11 years.

2. That I have previously submitted an affidavit in this case, which was attached as Exhibit F to the Department's Response to the Court Monitor's Report (Doc. no. 198). In that affidavit, I detailed changes in the DMR investigation process since 1997; reviewed allegations of abuse in the Wrentham Association's Memo of

February 7, 2006 (Doc. no. 85); and presented information concerning the Department's efforts to audit and monitor provider agencies' compliance with Department regulations requiring Criminal Offender Record Checks ("CORI checks") for the Department's provider staff whose positions involve the potential for unsupervised contact with individuals served by the Department. *See* 115 CMR § 11.00.

3. That as the Director of Investigations my responsibilities include overseeing the implementation of 115 C.M.R §§ 9.00, et seq., and M.G.L. c. 19C as they relate to the investigation of allegations of mistreatment and abuse involving individuals served by the Department.

4. That in addition to my duties and responsibilities as the Director of Investigations, I am also a member of the Steering Committee for the Building Partnerships Initiative, a cross-agency effort that focuses on protecting individuals with mental retardation from instances of abuse or neglect. That committee is chaired by District Attorney Elizabeth Scheibel.

5. That in my role as the Director of Investigations, I am also responsible for coordinating Investigation Division activities with the Disabled Persons Protection Commission ("DPPC"), an independent state agency with oversight authority for DMR and other human service agencies investigations, and with law enforcement agencies and professionals.

6. That in preparing this affidavit I have reviewed the Wrentham Association's Response to the Court Monitor's March 2007 Report (Docket no. 193 or "Wrentham Response"), and the documents ("Vendor Survey Reports") the

       DPPC provided to Wrentham Counsel for fiscal years 2002 – 2005.

7. That unless otherwise indicated, the facts contained in this affidavit are based upon my personal knowledge, document review, data provided by DMRIS,[1] and information provided to me by DMR staff with whom I work regularly.

<u>Wrentham Counsel's Allegations of Abuse (Wrentham Response pp. 11-18)</u>

8. I have reviewed the 62 allegation summaries contained (at pp. 11-18) in the Wrentham Response and presented under the headings: Examples of Substantiated Claims of Sexual Abuse (pp. 11-12); Examples of Substantiated Claims of Medical Error (pp. 12-14); Examples of Substantiated Neglect/Physical Abuse Complaints (pp. 14-17); and those allegation summaries identified as deferred for criminal investigation (p. 18). Of the 62 intake summaries cited in the Wrentham Response, only seven later resulted in substantiated complaint determinations involving *Ricci* class members. Moreover, only *three* of the substantiated intakes pertained to members of the Wrentham class.

9. Of the 62 allegation summaries of sexual abuse, physical abuse, and medication errors presented at pp. 11-18 of Wrentham's Response, approximately 17 of the allegations cited in Wrentham's tables and described as substantiated were actually "pending" or "deferred for law enforcement [action]" when the DPPC

---

[1] DMRIS is an integrated and interoperable system that supports both the programmatic and clinical needs of DMR in its client service responsibilities and the administrative and assurance functions of the agency as they relate to meeting federal and state standards applicable to mental retardation services. There are two major components to DMRIS: Meditech, which serves as the system of record for case related information, and HCSIS, which is the system of record for quality management-related information.

provided this information to Wrentham class counsel. Of these 17 cases, eight have since been found to be *un*substantiated and 3 remain pending.

10. Additionally, of the 15 allegations of sexual abuse cited at pp. 11-12 of the Wrentham Response and described as examples of substantiated claims of sexual abuse, eight were "pending" or "deferred" when the DPPC provided this information to Wrentham class counsel. Of this number, six allegations have since been found to be *un*substantiated.

<u>Wrentham Counsel's Statements Regarding Substantiated DPPC Complaints</u>

11. I have read the Wrentham Association's statements regarding the number of "substantiated claims of abuse where DMR clients resided in the community" during fiscal years 2002 to 2005 and I have reviewed the DPPC Vendor Survey Reports for those years as provided by DPPC to Wrentham class counsel. *See* Wrentham Response at pp. 7-9.

12. In coordination with other DMR staff members, and using the DMRIS system as verification, I have determined the number of *Ricci* class members involved in these complaints.

13. In FY 2005, of the 79 cases cited by Wrentham as "substantiated claims" of abuse in community-based settings (including instances of sexual or physical abuse, or omission of care), *see* Wrentham Response at p. 9, only 14 incidents involved *Ricci* class members.

14. Of the 90 intake summaries furnished to Wrentham class counsel by DPPC for fiscal year 2004, and which appear under the category of "DMR/Residential

FY04,"[2] only 23 intakes involved *Ricci* class members.

15. In FY 2003, of the 121 substantiated intakes cited by Wrentham counsel as "substantiated claims" of abuse in the community (*see* Wrentham Response at p. 9), only 41 involved *Ricci* class members.

<u>Wrentham's Allegation that DMR Fails to Investigate 1,500 Complaints Every Year</u>
(Wrentham Response at p. 18)

16. I have read Wrentham counsel's statement that "DMR fails to investigate over 1,500 complaints every year." *See* Wrentham Response at p. 18.

17. As stated in my previous affidavit, two outcomes of the extensive educational effort undertaken by the Department are: (1) the resultant increased awareness of abuse/neglect of individuals with mental retardation among law enforcement officers, officials, and provider personnel; and (2) the fact that reports of allegations of abuse and mistreatment went up for approximately five consecutive years. *See* First Affidavit of Bernard J. Murphy at ¶¶ 14-15. Additionally, DPPC generates a separate intake for each complaint that is received, although multiple complaints may refer to the same incident or occurrence. *See id*. at ¶ 27 (footnote 1).

18. Each year a number of complaints are reviewed administratively, handled appropriately, and corrective or remedial actions are implemented without the necessity of a full investigation. These procedures effectively address complaints that are less serious in nature, and are consistent with the suggestions of the Investigations Advisory Panel's 1998 Report for the Department of Mental

---

[2] In their FY 2004 calculation Wrentham counsel include transportation providers with the numbers presented for substantiated claims of abuse in residential settings. *See* Wrentham Response at p. 8.

5

Retardation ("the Scheibel Report"). *See* First Affidavit of Bernard J. Murphy at ¶¶ 3, 6-11.

19. One recommendation of the Scheibel Report was to encourage the more careful screening of cases by DPPC, which would translate into better management of the agency's limited investigation resources. The Panel commented on the Department's over-involvement in matters which would be better dealt with through means other than a full investigation and it suggested a tiered system with different levels of priority and approaches to such cases -- from the utilization of dispute resolution and conflict management to fact-finding investigations that investigate wrong-doing and determine the need for remedial actions. *See* Scheibel Report at p. 17.

20. While each complaint received by DPPC is not resolved pursuant to a full investigation, improved effectiveness and coordination between DPPC and DMR ensures that the proper procedures are in place to sensibly resolve complaints and meet the agencies' goals of protecting persons with mental retardation/disabilities from abuse and neglect.

**Wrentham's Allegation that the Number of Open Cases Has Increased Four-Fold and Complaints Go Uninvestigated Year After Year (Wrentham Response at p. 19)**

21. I have read the Wrentham plaintiffs' references to open cases and their allegation that "a number of complaints go uninvestigated year after year." *See* Wrentham Response at p. 19.

22. Firstly, when a complaint is received an inquiry is made to determine whether immediate protective services are necessary to protect the safety, dignity, or welfare of the individual involved in the complaint. If such condition exists,

protective services are implemented to ensure that individuals receiving services from the Department are protected from harm. If a condition exists that warrants protective services and the investigation of the complaint is pending, such protective services will be implemented until the proper resolution of the complaint.

23. As referenced in ¶ 17, *supra*, following an extensive educational effort and an increased awareness of abuse/neglect allegations, reports of allegations of abuse went up for approximately five years.

24. Of investigations that are reported as open in any year, a large percentage of those are complaints that were deferred to law enforcement agencies for investigation of criminal matters. Additionally, a complaint that is listed as open in one year does not typically "go uninvestigated year after year." *See* Wrentham Response at p. 19. Upon a law enforcement agency's completion of an investigation or the conclusion of any other condition causing the complaint to remain open, appropriate steps are taken to complete the resolution of the complaint so that it does not remain open year after year.

Wrentham Plaintiffs' Criticisms of DMR's Difficulty to Effectively Police Itself

25. I have read the Wrentham plaintiffs' criticisms of the DMR Investigations Unit's ability to effectively investigate abuse allegations "given the innate tendency to portray one's own conduct in the most positive light." *See* Wrentham Response at p. 20.

26. The external Investigations Advisory Panel thoroughly assessed the notion that "DMR cannot investigate itself." After careful consideration, "the panel

concluded that a strong internal investigative capacity [was] not only appropriate, but [was] essential for an agency with responsibilities as profound and far-reaching as the DMR to meet its service and protective missions." *See* Scheibel Report at pp. 11-13.

Wrentham Allegations Concerning Joanna Bezubka and "Carrie Beaufard"

27. I have read the Wrentham plaintiffs' description of the incident involving Joanna Bezubka (See Wrentham Response at p. 10) and am familiar with the Investigation Report regarding this matter.

28. This incident was referred to the Essex County District Attorney's Office for criminal investigation. A State Police unit embedded within the Essex DA's Office investigated. The Essex County District Attorney's Office determined that there was insufficient evidence to prove that the alleged victim had been physically and/or sexually assaulted and no criminal charges were filed.

29. Following the conclusion of the criminal process, the Department commenced a civil investigation of the DPPC complaint. The Department's civil investigator determined there was sufficient evidence to conclude that Ms. Bezubka was injured as a result of an omission on the part of two of her caretakers and substantiated allegations of abuse and mistreatment against them. Disciplinary action was recommended for the two caretakers, as was the development and implementation of appropriate protocol to address matters discovered during the investigation.

30. I have read and am familiar with the Investigation Report concerning the incident involving an individual receiving DMR services whom the Wrentham plaintiffs

incorrectly identify as "Carrie Beaufard." The Department does not serve any individual with the last name of "Beaufard." The individual involved in this complaint (Kerry B.) had just returned to her community-based residence following a home visit with family members. Within a short time, staff at the home became aware that Kerry B. had suffered an injury, although the exact time or cause of the injury was never conclusively established. Staff ensured that medical assistance was promptly rendered to this individual, and the matter was referred for investigation.

31. Following an investigation and an addendum to the Investigation Report, the allegation of abuse was substantiated; however, due to the circumstances of the incident and the uncertainty regarding the time and cause of injury, no particular individual responsible for the injuries was ever identified and the allegations of abuse were substantiated against "an unidentified caretaker."

32. I certify to the best of my knowledge and belief that the foregoing are accurate and true statements and are based upon my personal knowledge, document review, data provided by the Department's information system and information provided to me by DMR staff with whom I work regularly.

Signed under the pains and penalties of perjury this 2nd day of July 2007.

Bernard Y. Murphy