UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ASSOCIATION FOR RETARDED CITIZENS OF MASSACHUSETTS, INC., et al., <br><br> Plaintiffs <br><br> v. <br><br> COMMONWEALTH OF MASSACHUSETTS DEPARTMENT OF MENTAL RETARDATION, et al., <br><br> Defendants. | Civil Action Nos.   72-0469-T <br> 74-2768-T <br> 75-3010-T <br> 75-5023-T <br> 75-5210-T <br><br><br> **Leave to file this document granted on July 12, 2007** |

## The Department of Mental Retardation's Reply to the "Wrentham Association's Response to the Report of the Independent Monitor"

### INTRODUCTION

In the Wrentham Association's Response to the Court Monitor's March 2007 report (Docket no. 193 or "Wrentham Response"), the Wrentham Class argues for the continuing involvement of the Monitor in these cases, including a DMR-funded review of the entire DMR community system, in light of two "areas of concern" alleged by the Monitor in his report: the delivery of medical services and the potential for greater abuse and neglect in the community. Wrentham Response at p. 1. The Department has already addressed each of these concerns at some length in its May 31, 2007, Response to the Court Monitor's Report, *see* Docket no. 198 at 46-59, and it will eschew repetition herein. Nonetheless, as the Wrentham Class, in its latest filing, has made a number of new and unsupported charges regarding abuse allegedly sustained by DMR clients that were not raised in the *Court Monitor's Report*, the Department submits this Reply to guard against the Court being led astray by Wrentham's inaccurate allegations.

ARGUMENT

**A.    The Wrentham Class Has Failed to Demonstrate a Higher Rate of Abuse in Vendor-Operated Homes**.

The Department does not tolerate abuse in any setting and, indeed, it has a comprehensive system for investigating and taking appropriate steps to protect individuals from harm no matter where they reside.  This system includes:  mandatory reporting to the Disabled Persons Protection Commission ("DPPC") of all suspected abuse or mistreatment; investigations by the DPPC, or the DMR under DPPC supervision; protective services to ensure that while an investigation is ongoing, individuals remain safe, including removing employees who are accused of abuse from contact with individuals and providing supports to individuals who are suspected of having been victimized; and, finally, after an investigation is complete, taking appropriate disciplinary action when warranted, as well as collaborating with police and district attorneys to prosecute criminal cases of abuse.  *See* Department's Response to U.S. Attorney's Report ("Doc. no. 198") at pp. 48-50, and Affidavit of Bernie Murphy, attached thereto as Exhibit F ("1st Murphy Aff.").  Investigation and protective services are only one piece, albeit an important one, of a comprehensive quality assurance system designed to keep individuals safe.

In an effort to paint a frightening picture of abuse in community-based residential settings, the Wrentham Association for Retarded Citizens ("Wrentham") has presented a grossly distorted analysis of data gathered by the DPPC, the agency charged under G.L. c. 19C with the investigation of abuse and neglect of all persons with disabilities.  Wrentham asserts that there is a greater rate of abuse and neglect – physical and sexual abuse and medication errors – in "community-based" DMR residences.  In fact, as set forth in the Department's Response to the Court Monitor's Report, the data show that there is virtually no difference between the two residential models.  Doc. no. 198 at pp. 51-55, and Affidavit of Gail Grossman, attached thereto as Exhibit G ("1st Grossman Aff.").  More importantly, as is set forth below, the rate of

substantiated abuse and neglect has been steadily *decreasing* over the most recent four years for which data have been compiled (2002-2005), indicating that fewer and fewer disabled individuals are subject to abuse, mistreatment, or violation of regulations.



Figure 1[1]
Four Year Trend in the Rate (n/1000) of
Substantiated Abuse/Neglect Investigations
2002 – 2005

### B.    Wrentham's Conclusions Regarding Client Deaths from Abuse Are Inaccurate and Misleading.

Wrentham asserts that "[s]ubstantiated claims of abuse and neglect have resulted in dozens of deaths of DMR clients over the years."  Wrentham Response at 8.  This statement is patently false, if limited to the time-frame Wrentham itself selected (2000-2006), or grossly misleading otherwise.  Wrentham purports to support this statement with data derived from the annual reports of the DPPC.  *Id*. at 8-9.  Wrentham wholly ignores the fact that the DPPC annual

---

[1]  Source:  DMR's Fiscal Year 2005 Annual Quality Assurance Report, at p. 24.  The full "FY '05 QA Report" is available on-line at:   http://mass.gov/Eeohhs2/docs/dmr/quality_assurance_report_2005.pdf. Additional documentation regarding the decreasing rate of substantiated abuse and neglect may be found in ¶¶ 8-9 of the First Grossman Affidavit.

report data on substantiated abuse cases involving a death[2] are <u>not</u> limited to persons served by the Department, much less limited to *Ricci* class members, but rather include *all* persons subject to the DPPC's investigative authority. This includes individuals served by other agencies, such as people with mental illness but not mental retardation, and individuals living in the home of family members. *See, e.g.*, DPPC FY '06 Annual Report at 4 (Exhibit A hereto).

Presenting these data as constituting the number of "substantiated deaths" resulting from "abuse against DMR clients," *see* Wrentham Response at 8, is therefore wholly misleading and inaccurate. Wrentham's assertion that "dozens" of DMR clients have died from abuse over the years is based upon figures for *all agencies* and the combined deaths of *all individuals with disabilities* during the years 2000-2006, a total of 24 deaths. These substantiated complaints involve persons with a physical disability, a mental illness, or any number of other disabled persons besides DMR clients.

Looking at the DPPC investigations data for DMR clients only, the figure is dramatically different. Rather than "dozens" of substantiated cases involving deaths, as Wrentham claims, for the seven-year period from 1999 through 2005 there were only ten substantiated cases involving the death of a DMR client, in all settings.[3] *See* 2005 Mortality Report, excerpt attached hereto as

---

[2] In this context, the DPPC investigation is aimed at "mak[ing] a determination of whether the cause of death may be related to abuse[.]" Annual Report of the DPPC for Fiscal Year 2006, at p. 5 (relevant excerpts from this document are attached hereto as Exhibit A).

[3] Although abuse or neglect may be detected in a mortality case, as happened in the tragic case of Rachel DeLine, discussed *infra*, that factor is not necessarily the cause of death. In the case of Rachel DeLine, for example, Rachel's death was the result of a pharmacy error in packaging her medications. While DPPC also substantiated a complaint for omission of care by staff because they failed to respond more aggressively to her symptoms after bringing Rachel to a complacent doctor, the provider staff's error in judgment cannot fairly be viewed as an example of "malfeasance." There is simply no factual basis for Wrentham's claim that, unlike in ICF/MRs where substantiated incidents of abuse typically involve a failure to act ("omission") on the part of staff, incidents of substantiated abuse in community placements are "more often the result of malfeasance." Wrentham Response at 8. To the contrary, the most common type of substantiated abuse in community placements involves mere omission of proper care on the part of residential staff. *See* Second Affidavit of Gail Grossman, attached hereto as Exhibit B, at ¶ 7.

Exhibit C, at 32.[4]   Wrentham's claim that "the number of substantiated deaths . . . has risen substantially since FY 2000," Wrentham Response at 8, is simply not true.  *See id*.  Currently available data indicate that there were <u>no</u> deaths of DMR clients related to a substantiated case of abuse or neglect in 2006, although two cases remain under investigation.

Wrentham's overstatements and manipulation of data continue in its assertion that reports of abuse to DPPC's "hotline" have increased by more than 40% between 2000 and 2006, and that there were almost 6,000 reports of abuse.  Wrentham Response at 10.  Again, Wrentham is relying upon DPPC data from *general* annual reports.  And, again, the numbers include disabled individuals served by other agencies and taken care of by caregivers at home.  However, the inference Wrentham draws is that abuse among DMR clients is on the rise, when in fact, *the opposite is true*.  *See* DMR Response to Court Monitor's Report (Docket no. 198) at pp. 51-53. As described above, individuals with mental retardation constitute only a subset of the population of individuals with disabilities who may be reflected in the "hotline" complaints reported by the DPPC.  Substantiated complaints of abuse involving individuals receiving DMR residential supports have *decreased* in recent years.  *Id*. at pp. 53-54.  *See also* 1st Grossman Aff. at ¶ 12 and exhibits GG-3, GG-4, and GG-5 attached to Doc. no. 198, Exhibit G.

    C.    **Newer DPPC Intake Summaries Involve An Increasingly Smaller Number of *Ricci* Class Members.**

Wrentham has consistently presented an inaccurate picture of abuse in community or vendor-operated settings[5] to support continued oversight of the Department by this Court, as if a

---

[4] The entire DMR 2005 Mortality Report can be accessed via the Internet by pointing one's browser to http://mass.gov/Eeohhs2/docs/dmr/mortalityreport2005.doc.

[5] Any appropriate comparison between community-based programs and ICF/MRs must include <u>all</u> community-based residential programs.  Indeed, the standard data-reporting conventions of both DMR and the DPPC require that "community-based" residences include both state-operated residences and provider-operated residences. These two categories are grouped together because both are, in fact, community-based programs subject to the same regulatory requirements, *i.e.* licensure and certification, in contrast to the regulatory requirements of the Department's facilities or ICFs/MR.

particular rate of abuse is an appropriate metric for judging the ability to provide "equal or better" services to *Ricci* class members.  Defendants assert that the rate of abuse among the entire DMR population, or even among the *Ricci* class, is not an appropriate metric to determine "equal or better" under the terms of the 1993 final disengagement order.[6]  But even assuming, *arguendo*, that it were, the actual number of substantiated abuse cases and the rate of abuse among *Ricci* class members are, respectively, small and decreasing.

Preliminarily, it should be noted that the so-called "factual summaries" reproduced by Wrentham (*see* Wrentham Response at pp. 11-18 and Exhibit 3), do not contain investigation findings; rather, they describe allegations as made to the intake call screeners at the DPPC at the time of the initial report.  *See* 1st Murphy Aff., at ¶ 26.  The intake call description does not necessarily correlate with investigation conclusions, even in substantiated cases.  *Id*.

More to the point, in FY 2005, of the 79 cases cited by Wrentham as "substantiated intakes" in community-based settings (including instances of omission of care, as well as sexual or physical abuse), *see* Wrentham Response at 9, only 14 involved *Ricci* class members.  *See* Second Affidavit of Bernard J. Murphy, attached hereto as Exhibit D, at ¶ 13.   In FY 2004, of 90 substantiated intakes across the community-based system, only 23 involved *Ricci* class members.  *See id.* at ¶ 14.   Based upon the DPPC intake numbers from vendor surveys and hotline reports (as reported by DPPC to Wrentham counsel),[7] the following table shows that the percentage of

---

[6]  Wrentham never states what an expected, or normative, rate of abuse would be, and ignores the fact that a recent study has concluded that Massachusetts is the second best state in the nation in terms of the "safety" of its MR/DD agency consumers.  *See* United Cerebral Palsy's "2007 Case for Inclusion Report, An Analysis of Medicaid for Americans with Intellectual and Developmental Disabilities," at p. 13 (full report available at:  http://www.ucp.org/uploads/Case_For_Inclusion_Report_2007.pdf).

[7]   The groupings DPPC uses to label intakes ("DMR Residential" or "DMR Institutional") are not accurate in all cases.  In some cases the reported "abuser agency" is not a DMR provider at all.  *See* 2nd Grossman Aff. at ¶ 6.  There is also at least one instance in which the DPPC included an intake in a report for one fiscal year, but the intake actually occurred in a different fiscal year.  *Id*.

intake summaries involving *Ricci* class members has consistently decreased over the most recent three years for which data have been compiled (2003 – 2005).

**Comparison Between *Ricci* Class Members and Other DMR Clients
Receiving Community Residential Services:  Subjects of Intake Summaries (Table 1)**

| Fiscal Year | Intake Summaries | No. of *Ricci* Class Members | Percentage of Intake Summaries Involving *Ricci* Class Members |
|---|---|---|---|
| 2003 | 121 | 41 | 33.88 |
| 2004 | 90 | 23 | 25.55 |
| 2005 | 79 | 14 | 17.72 |

Despite the fact that *Ricci* class members constitute a significant part (almost 30%) of the total population DMR serves in its community-based residential system, *see* 2nd Grossman Aff. at ¶ 8, the percentage of *substantiated* findings involving *Ricci* class members (about 10%) is much lower than their numbers in the community system would suggest.[8]  *Id.*  Perhaps even more important, as was set forth in the Department's Response to the Court Monitor's Report, these numbers, both the overall number of substantiated abuse cases and cases involving *Ricci* class members, have been trending downward for the past five years.  *See* 1st Grossman Aff., ¶¶ 10-12.  *See also* Figure 1, *supra*.

Wrentham ignores this obviously positive trend in reported data, choosing instead to focus on the admittedly disturbing descriptions of selected abuse allegations, typically involving individuals who are *not* part of the *Ricci* class.  Wrentham has identified 62 particularly egregious incidents of sexual abuse, physical abuse, or medication errors spanning seven years.[9]

---

[8]  For example, in 2004 *Ricci* class members constituted 29.2% of the total DMR-funded community residential population, yet they were the subjects of only 10.1% of all substantiated abuse/neglect findings.  2nd Grossman Aff., ¶ 8.  In 2005, *Ricci* class members constituted 27.6% of the total population served in DMR-funded community residential programs; yet they were the subjects of only 10% of all substantiated abuse/neglect findings.  *Id.*

[9]  Wrentham Response at 11-18.  Wrentham included a similar table of intake summaries of allegations of abuse in its February 7, 2006 *Motion to Re-Open Case and Restore to Court's Active Docket* (Docket no.

Approximately 17 of the cases cited in Wrentham's tables and described as substantiated were actually "pending" or "deferred" at the time this information was released to class counsel, and eight incidents have since been *un*substantiated.  *See* 2nd Murphy Aff., ¶ 9.  Of the 15 allegation summaries included in the Wrentham Response at pp. 11-12 under the heading "Examples of Substantiated Claims of Sexual Abuse," more than half were provided to class counsel with a clear identification that DPPC abuse findings were pending or deferred; they were *not* substantiated when the materials were provided to Wrentham's counsel.  *Id*. at ¶ 10.   Of these eight allegation summaries, *six* have subsequently been found to be *un*substantiated.   *Id*.   In short, Wrentham has misstated key facts in its Response.

Significantly, of the 62 DPPC intakes cited by Wrentham, only seven later resulted in substantiated complaint determinations involving *Ricci* class members (and, of that number, only *three* involved Wrentham class members).   *Id.* at ¶ 8.   While these isolated incidents of maltreatment are disturbing, they do not establish "a systemic failure to provide services" in violation of the 1993 final disengagement order.  Unfortunately, physical and sexual abuse can occur in almost every venue or setting, including in families having no connection to DMR; the Department's obligation is to do everything humanly possible to prevent abuse, to have systems for early detection of any abuse or mistreatment, and to act quickly when it does occur.  The systems that the Department has put in place do achieve those goals, although continuous quality monitoring is always necessary.  Wrentham's claims that the Department is placing Wrentham class members at greater risk of physical abuse or a medication error by placing them in the community, or that staff in the community are untrained or inadequate, are simply not borne out by the facts.

---

85).  This filing suffered from the same sort of errors:  not all summaries purporting to be of substantiated incidents in fact involved substantiated cases and, of the latter, very few involved Wrentham class members.  *See* 1st Murphy Aff., ¶¶ 26-27.

At the end of the day, the undisputed facts – not data extrapolated or manipulated in a flawed manner – regarding abuse of Wrentham class members is all that matters. The actual facts do not furnish proof of a "systemic" failure to provide services (or to provide an adequate number of trained personnel to provide services) to *Ricci* class or Wrentham class members. Nor do the few unfortunate occurrences negate the significant and sustained effort of the Department to serve these individuals well.

Even if the number of cases of "substantiated abuse" were the appropriate metric to determine whether "equal or better" care in the community is possible -- which it is not since abuse occurs in all settings, including in ICF/MRs -- Wrentham has failed to furnish a factual basis to support its claims. Although data can be very useful to understand trends and plan system improvement, *see infra*, when they are distorted, as Wrentham has done, one is reminded of the statement, variously attributed to Mark Twain or Benjamin Disraeli, that "there are three kinds of lies: lies, damn lies, and statistics."

**D.    Wrentham's Claim that "Preventative Measures Are Not Being Taken" Is Wholly Without Merit.**

In its Response to the Court Monitor's Report, Wrentham distorts both the processes used by, and the findings of, the DMR licensure and certification unit. *Compare* Doc. no. 193 at 26-30 *with* 2nd Grossman Aff. at ¶¶ 9-11. The DMR survey and certification process is an extremely rigorous and detail-oriented evaluation of the impact of a given private provider's services on the health, safety, and quality of life of individuals served by DMR. 2nd Grossman Aff. at ¶ 9. Contrary to Wrentham's allegations, DMR's survey and certification process utilizes a sample size that far exceeds that of other independent accreditation processes. *Id*. Trained surveyors engage in lengthy on-site observations and interviews with individuals, families, and staff. They spend a great deal of time reviewing individual-specific documentation. This is quite unusual in that many other accreditation processes rely almost exclusively on documentation. *Id*. This

multi-faceted approach enables survey and certification staff to discover important patterns and trends across all of a provider's service sites. *Id.*

Any issue relating to the health, safety, or human rights of DMR clients identified during the survey process is subject to follow up action by survey staff -- within 24 to 48 hours if the deficiency poses an imminent risk to the health and safety of individuals -- and must be corrected promptly. *Id.* at ¶ 10. Federal reimbursement is withheld until corrections are made and verified. *Id.* Surveyors and program monitors in the DMR area offices also follow up on other health and safety issues that do not pose any immediate threat to individual clients. *Id.*

Wrentham quotes findings from several provider reports as evidence that the survey and certification system is flawed. Wrentham Response at 27-30. In fact, just the opposite is the case. It is due to the depth and rigorous nature of the survey process that issues are discovered, follow-up actions are undertaken, corrections are made and monitored, and on-going service improvements are implemented. 2nd Grossman Aff. at ¶ 11. However, it is in their use of the Department's critical incident data that the Wrentham plaintiffs engage in the most egregious misinterpretations of information. Despite multiple caveats emphasized in DMR's 2005 Quality Assurance Report ("QA Report") with respect to changes and additions to the incident categories, and the inherent limitations in being able to compare data across years that these changes pose, the Wrentham plaintiffs insist on drawing comparisons that comport only with their own philosophical bias. As set forth in Gail Grossman's second affidavit, Wrentham's figures and statements in this regard are quite simply wrong. *See id.* at ¶ 15.

As to the Wrentham plaintiffs' representation that there has been a 45% increase in situations that surveyors identify as requiring corrective action, this is yet another example of how data can be misinterpreted or taken out of context. While the Wrentham plaintiffs technically are correct in asserting a 45% increase between 2003 and 2005, they conveniently

omitted the statistics for 2002.  When 2002 statistics are included in the analysis, the data show that the rate of corrective actions went from 510 to 392, a *decrease* of 23 percent.  *Id.* at ¶ 16.

The most erroneous assertion that Wrentham makes is that "no one knows what DMR has done with [critical incident reports ('CIR's')]."  Wrentham Response at 23.  While the former critical incident reporting system was not as sophisticated as the current system, CIR's were in fact routinely reported internally -- starting with the service coordinator and reaching up to the level of the Commissioner.  2nd Grossman Aff. at ¶ 17.  Incidents were followed up on by DMR Area Office staff.  *Id.*  The current web-based electronic incident management system, HCSIS, is a state-of-the-art system that guarantees identification, correction, and follow-up on both minor and major incidents.  *Id.*  Providers must report incidents and action steps and no incident can be "closed" unless the area or regional office agrees with all of the provider's action steps.  *Id.*

The Wrentham plaintiffs also distort information presented on pages 30-31 of DMR's 2005 QA Report by stating that "10% of abuse/neglect situations DO NOT see corrective and/or preventive action."  Wrentham Response at 23.  This reflects both an inaccurate interpretation of the percentages noted in the 2005 QA Report (the Report specifically states that corrective action is appropriately taken in 94% of situations) as well as a lack of understanding of surveyor practices and the roles of other DMR staff in monitoring or oversight of issues of concern.  2nd Grossman Aff. at ¶ 12.  Specifically, surveyors will check to see whether **all** recommended actions were taken in situations where an allegation has been substantiated and they are instructed to answer "no" if there is any action, however minimal, that has not been taken.  *Id*. Therefore, a "no" response is not an indication that nothing has been done to remedy a situation, but rather that not all recommended actions have been taken.  *Id.*

Surveyors do not hesitate to issue an "immediate action" order or, as mandated reporters, file a complaint with DPPC immediately if they find that actions outlined in an action plan have

not been taken and lack of action continues to pose a risk to the individual. *Id.* Furthermore, if a negative pattern or trend for a particular provider is identified during the course of a survey, it will result in the designation of an "area needing improvement" and will be followed up on by program monitors in area offices. *Id.* at ¶ 13. In addition, complaint resolution teams, comprised of area office staff and citizen volunteers, follow up on action plans crafted in the wake of a substantiated allegation to check on compliance with recommended actions. *Id.*

In the case of the Vinfen provider report, Wrentham again misrepresents the content and conclusions of the report. While Vinfen may have received a two-year license, that does not negate the findings of the surveyors with respect to those matters identified as needing improvement. *Id.* at ¶ 14. The fact that surveyors identified the issues noted in the Wrentham filing is a reflection of the efficacy of DMR's survey and certification process, contrary to the plaintiffs' allegations. While the two-year license allows Vinfen to conduct business with the state, the issues identified by the survey team required prompt action and correction on the part of Vinfen, and survey staff plus DMR program monitors action followed up to ensure corrections. *Id.* In fact, follow-up action occurred on multiple occasions. "Immediate action" notices were given to Vinfen at the time that issues were discovered, and **all** were subsequently corrected. *Id.* After the conclusion of the survey, surveyors scrutinized patterns and trends throughout the entire provider agency regarding environmental safeguards and program monitors worked to ameliorate identified problem areas. *Id.* Clearly, this identification, correction, and follow-up on areas needing improvement serve as testimony to a system that is accomplishing its intended purpose.

### E. Wrentham's Assertion that "DMR's Investigations Go to Great Lengths to Avoid Findings of Abuse" Is Unsupported Hyperbole.

Wrentham concludes that "DMR investigations go to great lengths to avoid findings of abuse" by relying upon a single case in which the findings of the police, the DPPC, and the DMR

investigations unit all were consistent:  that there was not enough evidence to find that sexual abuse had occurred.  Wrentham Response at 20-22.  In Joanna Bezubka's case, consistent with the complaint investigation protocol, the allegation of sexual abuse was reported to the DPPC, screened for criminal conduct, and investigated by the State Police, who determined that there was insufficient evidence to pursue a criminal prosecution.  *See* 2nd Murphy Aff. at ¶ 28.  The case was then referred by the DPPC to DMR for a civil investigation, which led to a substantiation, but not for sexual abuse.  *Id.* at ¶ 29.  Both the State Police and the civil investigators concluded that there was insufficient evidence to make such a finding.  *Id.* at ¶¶ 28-29.  Wrentham's substitution of its opinion regarding the forensic evidence for that of the police, the DPPC, and the DMR investigations unit, as well as its reliance upon this case as a basis for finding that DMR investigations "go to great lengths" to not find abuse, is not worthy of credence.

Wrentham's allegations that "DMR fails to investigate over 1,500 complaints every year" and "complaints go uninvestigated year after year," Wrentham Response at 18-19, are equally meritless.  Two unsurprising outcomes of the extensive educational effort undertaken by the Department in the past decade regarding the vulnerability of developmentally disabled citizens were:  (1) an increased awareness among law enforcement officers, officials, and provider personnel of the potential for abuse or neglect of individuals with mental retardation; and (2) a sharp increase in reports of allegations of abuse and mistreatment over the course of five consecutive years.  *See* 1st Murphy Aff. at ¶¶ 14-15.

Each year a number of complaints are reviewed administratively, handled appropriately, and corrective or remedial actions are implemented without the necessity of a full investigation.  2nd Murphy Aff. at ¶ 18.  These procedures effectively address complaints that are less serious in nature, and are consistent with the suggestions of the external Investigations Advisory Panel's

1998 Report for the Department of Mental Retardation ("the Scheibel Report").  *See* 1st Murphy Aff. at ¶¶ 3, 6-11, and relevant excerpts of the Scheibel Report attached hereto as Exhibit E.  One recommendation of the Scheibel Report was to encourage the more careful screening of cases by DPPC, which would translate into better management of the agency's limited investigative resources.  The Panel commented on the Department's over-involvement in matters that would be better dealt with through means other than a full investigation and it suggested a tiered system with different levels of priority and approaches to such cases -- from the utilization of dispute resolution and conflict management to fact-finding investigations that investigate wrong-doing and determine the need for remedial actions.  *See* Scheibel Report at p. 17.   Although each complaint received by DPPC is not necessarily resolved pursuant to a full investigation, improved effectiveness and coordination between DPPC and DMR ensures that proper procedures are in place to sensibly resolve complaints and meet the agencies' goals of protecting persons with mental retardation from abuse and neglect.[10]

Furthermore, of the investigations reported as "open" in any given year, a large percentage of those involve complaints that have been deferred pending investigation of criminal matters by law enforcement agencies.  2nd Murphy Aff. at ¶ 24.  Additionally, a complaint that is listed as open in one year does not typically "go uninvestigated year after year."  *Compare* Wrentham Response at 19 *with* 2nd Murphy Aff. at ¶ 24.  Upon a law enforcement agency's completion of an investigation or the conclusion of any other condition causing the complaint to remain open, appropriate steps are taken to complete the resolution of the complaint so that it does not remain open year after year.  2nd Murphy Aff. at ¶ 24.

---

[10]   If immediate protective services are necessary to protect the safety, dignity, or welfare of an individual involved in a complaint, such services are routinely implemented until a proper resolution of the complaint is reached.  2nd Murphy Aff. at ¶ 22.

**F.    DMR Audits 100% of its Providers and Ensures Compliance with CORI Regulations.**

Contrary to Wrentham's suggestion that "DMR does not do enough to protect" its consumers from putative criminals, Response at 24-25, the Department's criminal offender record check ("CORI") process -- as one protective tool -- is reputedly more comprehensive than that of any other Commonwealth agency.   DMR's regulations require CORI checks for <u>all</u> Department and provider staff and volunteers whose positions involve the potential for unsupervised contact with individuals served by the Department.   115 C.M.R. §§ 11.00, et seq. In 2000, DMR began conducting annual on-site audits of providers to insure compliance with DMR CORI check requirements.   1st Murphy Aff. at ¶ 31.

Since this audit process began in 2000, the number of providers in faithful compliance with the CORI regulations has increased significantly, and likewise the number of overall violations has decreased significantly.   *See* 2005 QA Report at Table 16, p. 28.[11]   The number of providers audited has increased over time, while the percentage of providers with *no* violations has risen from 31% in 2001 to 89% in 2005.   *Id.*   Further, the average number of violations per provider has dramatically decreased from 2.25 in 2003 to .025 in 2005.   *Id.* (Figure 17).   The Department now audits *all* of its providers, not a sample, to ensure compliance.   *See* 1st Murphy Aff. at ¶ 31.   And, with few exceptions, a discovered "violation" does not mean that a provider has hired an individual without conducting a CORI check; a violation is noted because proper documentation is not readily available at the site.   *Id.* at ¶ 32.   In such cases, the Department directs the provider to prohibit the employee from having the potential for any unsupervised contact with individuals served by the Department, even if a CORI check had been conducted,

---

[11] DMR's entire Fiscal Year 2005 Quality Assurance Report may be accessed on the Internet by pointing one's browser to http://mass.gov/Eeohhs2/docs/dmr/quality_assurance_report_2005.pdf.

until the requirements of Department regulations have been met.  *Id.*

> **G.     The Principal Instance of Medication Error Cited by the Wrentham Plaintiffs Was Not the Result of "Poorly Trained" Direct Caregivers.**

In an effort to further convince this Court that individual Wrentham class members are at risk, Wrentham points to one case of a "medication error" which it alleges was the result of underpaid and poorly trained direct care staff.  Wrentham Response at 30-32.  Wrentham class member Rachel DeLine resided in a DMR community-based group home for several years prior to her death.  Rachel regularly took lithium medication to address her bipolar disorder.  She died in 2002 as a result of a lithium overdose.  Rachel's death was immediately reported to DPPC, which completed an investigation.[12]  The DPPC investigation into the circumstances surrounding Rachel's death found that she had been administered two times the prescribed dosage of lithium by trained staff.  *See* 2nd Grossman Aff. at ¶ 18.  The DPPC investigator found that direct care staff had administered the drug as directed, but the potency of the medication in the so-called "blisterpack" from the pharmacy was twice that prescribed by her psychiatrist.  *Id.* at ¶ 19.  The investigator also found that direct care staff reasonably relied upon the labeling of the medication, which in this case was in error.   *Id.*

The DPPC investigator cited provider staff members for their failure, despite training on the subject, to identify symptoms of lithium toxicity and to communicate them to her physician; and their failure to seek further medical advice after taking Rachel to her physician who did not identify the problem.[13]  *Id.* at ¶ 20.  The investigator also found that while the direct care staff had noted Rachel's changed appearance, contacted managers, and taken Rachel to her primary physician's office, they should have taken additional steps to seek medical help that would have

---

[12]   Since Rachel was hospitalized prior to her death, the death was also reported to the Department of Public Health.

[13]   Investigators filed a complaint with the Board of Registration in Medicine concerning the physician.

detected the symptoms of lithium toxicity.  *Id.*  DMR developed a corrective action plan, which included staff re-training.  DMR also increased its overall efforts to make all provider staff aware of the symptoms of toxicity for certain medications.  *Id.*

The DPPC investigator also referred this matter to the Division of Professional Licensure in connection with the mislabeling of the dosage of lithium by the pharmacist, and recommended a referral to the Board of Registration in Medicine relating to Rachel's physician's conduct.[14] Ultimately, Ms. DeLine's estate recovered one million dollars in damages from the pharmacy-defendant in a civil action.  A multiplicity of errors led to a most tragic outcome in the DeLine case.  However, the Department addressed with the provider the shortcomings identified as a result of the DPPC investigation through a corrective action plan and the provider made significant changes in its practices to address those deficiencies.  2nd Grossman Aff. at ¶ 21.

Citing the tragic death of Rachel DeLine to illustrate a supposed "systemic failure" to meet the needs of *Ricci* class members amounts to sheer sophistry.  In the unusually complex factual circumstances surrounding the injury and untimely death of Rachel Deline, staff were trained, spotted a problem, sought to deal with the problem, and yet did not pursue corrective action aggressively enough.  This case, however tragic, does not constitute a "systemic failure" to provide services within the meaning of the Final Order.  Systemic data, in fact, show that the rate of medication errors per 1,000 doses in DMR-operated or -funded community residential programs is miniscule (in FY 2005, for example, the figure was 0.1).  2005 QA Report at 14 (Table 7).  In other words, the chance of a dose of medicine being administered improperly is a mere 0.01%.  *Id.*

---

[14]  The DPPC is only authorized to investigate complaints of abuse against "caretakers," as defined in G.L. c. 19C, and thus it referred its concerns about the pharmacy and the physician to the appropriate regulatory agencies.

**H.    The Superior Court Cases Filed Against Vendors that Wrentham Highlights to Support its Allegations Do Not Involve *Ricci* Class Members and, in Some Instances, Do Not Even Involve Individuals Served by DMR.**

The Wrentham Response details the injuries suffered by a number of individuals who are not *Ricci* class members in order to present a misleading depiction of a community system in which DMR consumers allegedly are regularly exposed to unsafe conditions. *See id.* at 32. Wrentham cites four cases filed in the Superior Court to illustrate risks faced by disabled individuals residing in the community, but three of those cases did not involve *Ricci* class members and one did not even involve a DMR client.

The first case cited by Wrentham involved the tragic death of a 9-year-old girl, who was neither a *Ricci* class member nor in services provided or contracted for by the Department. The fact that the program servicing this girl, Sunshine Haven, also works separately with adult DMR clients in certain community day programs is far too attenuated a relationship to warrant drawing any connection between this tragedy and the issues presently before this Court.

Another tragedy seized upon by Wrentham to justify its assertions concerns an individual who choked while being transported in a van and later died. *See* Wrentham Response at 33 (discussing the *Iafrate* case[15]). Wrentham relies upon the allegations set forth in a Superior Court memorandum in support of summary judgment as gospel; yet it cannot know the complete facts because the plaintiff and the vendor transportation agency entered into a confidential settlement. The Court did *not* grant summary judgment on the issue of the transportation vendor's liability and the parties subsequently settled the case.[16] Anyone would agree that the death of Mr. Iafrate was a grievous occurrence and that all efforts should be made to ensure that

---

[15]  *Iafrate v. Gittens, et al.*, Suffolk Superior Court, No. CV2001-05592. Paul Iafrate was never a Wrentham class member.

[16]  The Superior Court did grant summary judgment on several other claims, including dismissing DMR as a defendant in the case. *See* docket no. 67 in *Iafrate v. Gittens, et al.*, No. SUCV2001-05592.

such accidents do not occur in the future; however, the case does not support Wrentham's wild extrapolation that safe supports are not available in the DMR community system.

Wrentham then goes back in time to exploit an incident involving a non-*Ricci* class member that occurred over 14 years ago. Wrentham Response at 32. At the time, Jeremiah Bobick was a 60 year-old "mildly retarded" gentleman who slipped on an icy embankment while walking to a convenience store located near his day program. *Bobick v. U.S. Fidelity & Guar. Co.*, 439 Mass. 652, 653-54, 790 N.E.2d 653 (2003). In no way does this discrete incident, involving an individual with no connection to Wrentham,[17] and which transpired *before issuance of the 1993 Final Order*, bolster Wrentham's flawed claim that *today* community programs in general pose undue risks to Wrentham class members.

The Department has previously addressed, in its December 11, 2006, submission to the Court Monitor,[18] Wrentham's allegations regarding Thomas Frost, Jr., another individual who is not a *Ricci* class member.[19] As the Department was not a party to this now-settled case, it will refrain from commenting further upon the circumstances of Mr. Frost's injury. However, it must

---

[17]  Jeremiah Bobick lived at home with a family member for approximately three weeks of every month; the remaining week he spent at the Walnut Street Center, "a facility for rehabilitation and training of learning disabled individuals in Somerville." *Bobick*, 439 Mass. at 653-654. On January 15, 1993, while apparently unattended upon arrival at the day program, plaintiff crossed the street to go to a convenience store. *Id.* at 654. As he approached the store, he slipped and fell on an icy embankment, fracturing his right femur. *Id.*

[18]  *See* Exhibit GG-1, attached to the Department's May 31, 2007, filing (Docket no. 198).

[19]  Wrentham's allegation is that Frost suffered serious injuries in a group home that lacked certain handicap features (Response at 31). As discussed in the Department's submission to the Court Monitor, not all community-based residences are, or are required to be, fully compliant with all state or federal regulations regarding handicap accessibility. Wrentham's claim (Response at 31 n.64) that all such "premises must comply with the Architectural Access Board requirements" in order to satisfy DMR regulations is incorrect. As the Court Monitor observed during his site visits to community homes, many group homes have been made fully handicap accessible in order to meet the particular needs of the individuals residing therein. These fully accessible homes comply with applicable regulations and generally possess common features such as single-level living, wide hallways, ramps, and wheelchair-accessible showers, bathrooms, and kitchens. Other homes in the community have multiple levels and do not require the extensive physical characteristics of a fully-accessible home to meet the needs of the residents living therein.

be noted that the exact cause of Mr. Frost's injury has not been conclusively established, as the Wrentham Response suggests. The Wrentham plaintiffs' depiction of this incident as established fact is inappropriate; their portrayal represents a view of the incident that is disputed by the residential provider.[20]

With no apparent foundation for another set of allegations apart from a viewing of a May 13, 2007, FOX 25 television news report, Wrentham then relates incidents of omission and/or abuse involving an individual identified as "Carrie Beaufard." *See* Wrentham Response at 10. Wrentham's flawed recounting of unfortunate injuries sustained by yet another non-*Ricci*-class individual reflects an indiscriminate use of hearsay and a lack of any authoritative analysis of the incident. In the absence even of accurate information regarding the individual's name,[21] Wrentham nonetheless attempts to offer an opinion regarding the particular circumstances of the incident in question.[22] Inflammatory references to disturbing injuries suffered by individuals

---

[20] Wrentham's misunderstanding of the licensure and certification process is apparent in their comments to the Court Monitor regarding the Frost case. In their comments, the Wrentham plaintiffs inquire: "How frequently are inspections of premises conducted? At the July 20[th] conference DMR stated every 24 hour facility is inspected every 30 days, but [Mr. Frost's provider] is relying upon a certification by DMR, from months before." DMR regulations require licensure and certification for specified time periods. Generally these are: two-year licensure; one-year conditional licensure; or recommendation for non-licensure. See 115 CMR §§ 8.05, *et seq*. Wholly separate from the licensure and certification process, area office staff conduct monthly visits to all homes providing 24-hour support and quarterly visits to homes providing less than 24-hour support.

[21] The individual in the FOX news report is not named "Carrie Beaufard" and the Department does not serve any individual with that last name. 2nd Murphy Aff. at ¶ 30. The individual depicted in the FOX report is named Kerry B[.]; she is not a member of the *Ricci* class. *Id.*

[22] In Kerry B's case, she had just returned to her community-based residence following a home visit with family members. Within a short time, staff at the home became aware that Kerry had suffered an injury, although the exact time or cause of the injury was never conclusively established. Second Murphy Aff. at ¶ 30. Staff ensured that medical assistance was promptly rendered to this individual, and the matter was referred for investigation. *Id.* Following an investigation (and an addendum to the Investigation Report), the allegation of abuse was substantiated; however, due to the circumstances of the incident and the uncertainty regarding the time and cause of injury, no particular individual responsible for the injuries was ever identified and the allegations of abuse were substantiated against "an unidentified caretaker." *Id.* at ¶ 31.

who do not fall under the protective wing of this Court do nothing to advance the Wrentham plaintiffs' cause in this forum.

<u>CONCLUSION</u>

Wrentham has fallen woefully short of its burden, under the 1993 final disengagement order, of showing a "systemic" violation on the Department's part of obligations it assumed under that consent decree.  Without such a credible finding of systemic violations, and in light of the Court Monitor's findings running to the contrary, this Court lacks the jurisdiction or authority to take the kind of steps (*see, e.g.,* Wrentham Response at 36) that the Wrentham class is urging upon it.

Respectfully submitted,

DEPARTMENT OF MENTAL RETARDATION

By its attorneys:

MARTHA COAKLEY
ATTORNEY GENERAL

/s/ Marianne Meacham
_____
Marianne Meacham, BBO #550468
Special Assistant Attorney General
General Counsel
Department of Mental Retardation
500 Harrison Avenue
Boston, MA  02118
(617) 624-7701

and

/s/ Robert L. Quinan, Jr.
_____
Robert L. Quinan, Jr.  BBO No. 553010
Assistant Attorney General
Office of the Attorney General
One Ashburton Place, 20th floor
Boston, MA  02108
(617) 727-2200, ext. 2554

Dated:  July 11, 2007

## CERTIFICATE OF SERVICE

I, Assistant Attorney General Robert L. Quinan, Jr., do hereby certify that a copy of the above *Reply to the Wrentham Association's Response to the Court Monitor's Report* is being mailed via first class mail to all counsel of record who are not registered with the Court's Electronic Case Filing system.

Date:  July 11, 2007                     _/s/ Robert L. Quinan, Jr._____

## Certification of Compliance with Local Rule 7.1 (A)(2)

By my signature below, I hereby certify that counsel for the Department and counsel for the Wrentham Association have communicated regarding the matters raised in the accompanying memorandum and, notwithstanding these discussions, the Department has deemed it necessary to file this reply memorandum.

Date:  July 11, 2007                     _/s/ Robert L. Quinan, Jr._____
                                          Assistant Attorney General