# Investigations Advisory Panel Report for the Department of Mental Retardation

## April 1998

Elizabeth D. Scheibel, Chairperson
Donald N. Freedman
Susan C. Harrington
Elizabeth A. Keegan
Richard W. Krant
Marty Wyngaarden Krauss
Deborah A. McDonagh
Mary Beatty Muse
Richard M. Shaw

REPORT FROM THE
INVESTIGATIONS ADVISORY PANEL
FOR THE DEPARTMENT OF MENTAL RETARDATION

TABLE OF CONTENTS

|  | Page # |
|---|---|
| Executive Summary | i - iv |
| I. Introduction | 1 |
| II. Problems Faced by the DMR Investigations Unit | 3 |
|     A. Systemic Problems | 3 |
|     B. Management Problems | 7 |
|     C. Operational Problems | 9 |
|     D. The Crisis in Public Confidence | 11 |
|     E. Special Issues for Investigations Involving DMR Clients | 13 |
| III. Recommendations | 15 |
|     A. Recommendations for the Role of the DPPC | 16 |
|     B. Recommendations for the Role of DMR Investigations | 17 |
|     C. Training Requirements for DMR Investigators | 21 |
|     D. Management Information Systems | 24 |
| IV. Proposed Structure and Functions of DMR Investigations Unit | 26 |
|     A. Screening Protocols and Procedures for M.G.L. c. 19C Investigations | 28 |
|         Procedures for External Cases |  |
|         Procedures for Internal Cases |  |
|     B. Monitoring Role of the DPPC | 31 |
|     C. DMR Criminal Investigations Team | 31 |
|     D. DMR Conflict Resolution Team | 33 |
|     E. Communication | 34 |
| V. Conclusions | 35 |
| VI. Appendices |  |
|     A. Original Appointment Letter to Panel Members from Commissioner Morrissey and Letter from Panel Requesting Time Extension for Review and Report (9/23/97) |  |
|     B. List of Panel Members |  |
|     C. List of Panel Meetings and Public Hearings |  |
|     D. Governing Statute on Disability Abuse Protection (M.G.L. c. 19C) |  |
|     E. DMR Regulations (115 CMR 9.00) |  |
|     F. Recommended Mandated Referrals to DA's Offices at Point of Intake |  |

---

Investigations Advisory Panel Report              April 24, 1998

11

more illustrative of poor management and supervision of state or contracted employees than they were of abuse or neglect. Some of these cases represented interpersonal disputes (either between staff and clients or management and staff) which were characterized inappropriately as worthy of investigation. Indeed, some investigators described instances in which they felt they were called in to "do the dirty work" that should have been done by program managers. Aside from being a wasteful deployment of resources, this practice enables managers to shirk their responsibility to train, monitor, and oversee their staff. In addition, it highlights a need to develop new protocols for addressing instances of interpersonal conflict within the human services system. The existing investigatory interventions, which are based in an adversarial/prosecutorial methodology, seem inappropriate for most cases involving interpersonal disputes.

Finally, we discovered that the Investigations Unit is vulnerable to pressures -- subtle or otherwise -- that could compromise the integrity of investigation findings. For example, when additional agency funds are needed to rectify a situation which prompted an investigation (e.g., providing expanded services for an existing client or establishing coverage for a new one), there may be reluctance to press for the funding to meet those needs effectively. Related to this concern, there were instances cited in which information contained in reports was altered.

D. *The Crisis in Public Confidence*

It is obvious that complaints of abuse or neglect against employees of an agency can be a potential source of embarrassment or prompt defensiveness by any agency. Such complaints may call into question the agency's policies, procedures, and priorities. Indeed, many of those who spoke at the public hearings and those who submitted written statements to the panel took

---

Investigations Advisory Panel Report                                    April 24, 1998

12

the position that the Department simply could not investigate itself, and that an independent agency for investigations was needed. The panel considered these charges carefully and concluded differently.

First, there already *is* an independent state agency charged with investigating allegations of abuse and neglect of persons with mental retardation and for monitoring DMR's investigative activities. Ironically, however, DPPC is largely ignored by the public as an existing remedy. This may be a result of DPPC's practice of referring most cases involving persons with mental retardation to DMR. It may also be a result of the inconsistency with which DPPC decides which cases to retain for its own investigators and which to refer. To the general public, there is little understanding of the specific role that DPPC occupies within the system of protection for citizens with disabilities.

Second, some of the complaints that "DMR cannot investigate itself" come from individuals who were disappointed or disagreed with the findings of an investigation or the action or inaction taken following an investigation. For individuals who disagree with the findings of an investigation, a formal appeals process is available. For those who are disappointed with the action or inaction following an investigation, it is often more appropriate to direct their concerns to the operations units of DMR than to the Investigations Unit. Indeed, we heard of numerous instances in which the "action plans" were inexplicably delayed, inadequate to the problem, or poorly implemented. Curiously, investigators typically do not even see the "action plans" written as a result of their investigations. Although the "fire wall" limiting communication between the Investigations Unit and the operations units of DMR was designed to ensure the independence of investigations from undue influence of operations, it serves instead to exacerbate current problems, and ultimately exposes the need for *greater*

---

Investigations Advisory Panel Report                                   April 24, 1998

13

communication between investigators and DMR program administrators. Further, as noted earlier, communications between the Investigations Unit and those involved or affected by the conduct of an inquiry, particularly family members, have been a source of deep dissatisfaction, and may well have contributed to a public perception of poor performance within the Investigations Unit.

After careful consideration, the panel concluded that a strong internal investigative capacity is not only appropriate, but is also essential for an agency with responsibilities as profound and far-reaching as the DMR to meet its service and protective missions. This is not to ignore the danger of conflict of interest. But we prefer to treat that potential problem by deferring to law enforcement in cases involving potentially prosecutable criminal conduct, and in all other cases, by opening the investigative process up to new participants and more open procedures, rather than by involving external agents without knowledge of the system or client needs.

*E. Special Issues for Investigations Involving DMR Clients*

An ongoing problem faced by DMR investigators in conducting investigations of complaints of abuse involving a person with mental retardation concerns the difficulties of determining an individual client's competency. The issue of competency arises frequently, and the individual whose competency is questioned could be the victim, the complainant, a witness or an alleged perpetrator in an event under investigation. Unless adjudicated otherwise, persons with mental retardation age 18 and older are presumed to be competent to manage their affairs. However, extra care is obviously needed to make an accurate determination about legal competency as well as functional capacity to make prudent decisions on a case-by-case basis.

---

Investigations Advisory Panel Report                           April 24, 1998

its foundation. *Therefore, we recommend that the DPPC develop a new screening protocol to identify the specific information required for a complaint or referral.* A more specific protocol will serve to reduce the number of "frivolous" cases and cases in which most reasonable persons would agree that not enough evidence is available to proceed. In addition, a new protocol would encourage more careful screening of cases by DPPC, which should translate into better management of the limited investigation resources and improved effectiveness and coordination between DMR and DPPC. The screening protocols developed by the Department of Social Services provide a model for this recommendation.

*We further recommend that the DPPC retain all "external" cases for investigation by its own staff. We further recommend that investigators of the DPPC meet the same training requirements that we recommend for DMR investigators (explained below).*

B. *Recommendations for the Role of DMR Investigations*

In the panel's view, the role of the DMR Investigations Unit has been misshapen by over involvement both in criminal cases beyond its competency and authority and also in non-criminal matters which would be better dealt with through other means (e.g., dispute resolution, mediation, resource allocation, licensing and contracting sanctions, or personnel training and sanctions). In many cases, the quasi-criminal techniques and the secretive, isolated operating style of the Investigations Unit have shifted inappropriately its focus away from the Department's goal of protecting persons with mental retardation and toward the identification and punishment of "wrong-doers."

Because DMR must respond to such a wide range of problems facing persons with mental retardation, it should develop different types of responses and interventions within the

---

Investigations Advisory Panel Report                                    April 24, 1998

18

Investigations Unit to address these different needs. There are multiple types of allegations of abuse and neglect that DMR investigators confront, including allegations that should be referred to the law enforcement and criminal justice system (either immediately by the DPPC or subsequently by the DMR based on findings resulting from investigation) which may or may not result in prosecution. Other allegations, while potentially serious, may not pass the legal threshold required for criminal investigation and prosecution. Finally, there are many allegations of abuse or omission of care which are non-criminal but nonetheless represent unacceptable behavior. The capacity to investigate non-criminal allegations, and allegations that do not pass the legal threshold for prosecution is a vital one for DMR (if involving clients of the DMR) and the DPPC (if involving a person with mental retardation who is not currently a client of DMR).

Allegations of abuse or neglect that should be investigated by law enforcement authorities should be referred to the criminal justice system. If the screening conducted by the DPPC reveals a basis for referral to the criminal justice system, it should do so immediately. If a case is referred to the DMR and subsequent investigation reveals a potentially criminal issue, the DMR should refer the case to law enforcement immediately. The ultimate objective of law enforcement is to protect citizens from becoming victims of crime and to prosecute offenders who commit crimes. Law enforcement and criminal justice agencies have been vastly underutilized in the current system of protection, and the panel sees no proper justification for limiting this role in any respect when a crime has been committed against or by a person with mental retardation. During this review, the panel determined the willingness of law enforcement authorities and prosecutors to become involved in finding solutions to the disability abuse problem (in a capacity similar to the way that they have become involved in the problems of

Investigations Advisory Panel Report                April 24, 1998

19

domestic violence or child abuse). There is no reason to supplant, duplicate or forego the benefits of the training, skills, authority and responsibility invested in local and state police departments, the District Attorneys, or the Attorney General.

We recognize, however, that the special circumstances of persons with mental retardation who are involved in the criminal justice system warrant special treatment. The DMR Investigations Unit can provide valued, appropriate, and timely assistance to law enforcement agencies to ensure that persons with mental retardation are safeguarded and that coordination of efforts across the multiple agencies involved occurs. *Therefore, we recommend that a Criminal Investigation Team be created within the DMR Investigations Unit to work collaboratively with law enforcement and criminal justice authorities in a manner comparable to those now operating to investigate allegations of child sexual abuse.*

Although the need for greater coordination with law enforcement and criminal justice agencies is important, the number of allegations of abuse and neglect of a person with mental retardation that meet the legal threshold for referral to law enforcement agencies is much lower than the number of allegations of abuse and neglect that require a different level and type of intervention. The range of situations, events and circumstances which could trigger complaints for non-mandated referrals of abuse and neglect varies considerably, but it is still critical that clients, families and advocates be assured that there is a formal process to guarantee proper, timely consideration of and response to their concerns. A tiered system with different levels of priority and approaches to such cases -- from the utilization of dispute resolution and conflict management strategies to fact-finding investigations that presume wrong-doing and a need for disciplinary sanctions -- seems necessary within the agency. *Therefore, we recommend the creation of a Conflict Resolution Team to deal with the majority of allegations of abuse and*

---

Investigations Advisory Panel Report                      April 24, 1998

20

neglect received by DMR either directly or through referral from DPPC which are noncriminal or which for any reason cannot be criminally prosecuted.

Although DMR has a legitimate duty to investigate allegations of sub-standard care, and current investigators seem truly dedicated to their mission and sense of independence, it is clear that the divided structure of the current system is particularly problematic for cases in which there is dissatisfaction about an investigation. Given the high stakes involved in any investigation, it is critical that a layered system of review be visible, independent and accessible to those affected by the investigatory system. *Therefore, we recommend the establishment of an Ombudsperson in each DMR region to resolve disputes arising from completed non-criminal investigations and to monitor the implementation of action plans. We further recommend that, in appropriate cases, unresolved complaints about investigations be referred to the Governor's Commission on Mental Retardation, which is authorized to intervene in systemic problems in the system of services.*

In addition, the role of EOHHS in the overall system of disability abuse protection has been ill-defined. As an umbrella agency, the panel views the role of EOHHS to be one of oversight, support and coordination of the state offices responsible for the protection of persons with mental retardation. *Therefore, we recommend that EOHHS and DPPC periodically conduct a joint review of investigations and make recommendations to the Governor and legislature.* EOHHS could also serve as a liaison on disability abuse issues with the Attorney General's Office, District Attorneys, the State Police and Police Academy, and the Massachusetts Chiefs of Police Association.

---

Investigations Advisory Panel Report                                    April 24, 1998