UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ROBERT SIMPSON RICCI, et al., | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action Nos. 72-0469-T |
| | * | 74-2768-T |
| | * | 75-3910-T |
| ROBERT L. OKIN, et al., | * | 75-5023-T |
| | * | 75-5210-T |
| Defendants. | * | |

MEMORANDUM

August 14, 2007

TAURO, J.

  Plaintiff Ricci class members raised allegations that Defendant Department of Mental Retardation ("DMR"), by and through its Commissioner, was failing to comply with this court's Final Order when it transferred Plaintiff class members out of the Walter E. Fernald Developmental Center ("Fernald"). In response, this court appointed U.S. Attorney Michael Sullivan as Court Monitor to investigate whether the DMR's past and prospective transfer of residents out of Fernald was in compliance with this court's 1993 Final Order, and applicable law.

  When the court appointed the Court Monitor on February 8, 2006, it ordered all transfers out of Fernald stayed. More than a year later, on March 6, 2007, the Court Monitor filed his report, a copy of which is attached as an Appendix. This court entered a March 7, 2007 order

staying transfers from Fernald, pending consideration of the report and any objections.[1]

The DMR has recently filed a <u>Motion to Dissolve Court's Injunction of February 8, 2006, Barring Transfers from the Fernald Developmental Center</u>. For the reasons expressed below, the court ALLOWS that motion, and vacates its earlier orders of February 8, 2006, and March 7, 2007. DMR may transfer class member residents from Fernald, subject to the following.

In addition to a complex web of federal and state statutes and regulations that protect the residents of Fernald, those who are <u>Ricci</u> class members have the right to demand that the DMR "not approve a transfer of any class member out of a state school into the community, or from one community residence to another such residence, until and unless the Superintendent of the transferring school (or the Regional Director of the pertinent community region) certifies that the individual to be transferred will receive equal or better services to meet their needs in the new location, and that all ISP-recommended services for the individual's current needs, as identified in the ISP, are available at the new location."[2] That right, among others, is contained in the court's so-called Final Order, entered on May 25, 1993.

The Final Order returned to the DMR the authority to manage and oversee the Commonwealth's facilities. But, it reserved this court's right to intervene if "the defendants substantially fail to provide a state ISP process in compliance with this Order" or "if there is a

---

[1] That order was appropriate to prevent irreparable harm to the Plaintiff class while the court considered the matter. <u>See, e.g.</u>, <u>Ricci v. Okin</u>, 978 F.2d 764, 768 (1st Cir. 1992) (Breyer, J.) ("[W]e add that it would not likely benefit the appellants to obtain jurisdiction, for the practical, common sense considerations we have mentioned would balance heavily in favor of permitting a six-month procedurally-necessitated extension of the October 1986 Order's life.").

[2] <u>Ricci v. Okin</u>, 823 F. Supp. 984, 987 (D. Mass. 1993). "ISP" stands for Individual Service Plan. <u>Id</u>.

2

systemic failure to provide services to class members as described in this Order."[3]

After more than a year of exhaustive and meticulous study,[4] the Court Monitor concluded that the DMR had complied with the Final Order's requirement that transferred residents obtain "equal or better services."[5]  The Court Monitor also concluded that "Fernald residents should be allowed to remain at the Fernald facility, since for some, many or most, any other place would not meet an 'equal or better' service outcome."[6]  This court shares in these conclusions.

The DMR objects to the Monitor's second conclusion arguing that, as a matter of federalism, subject matter jurisdiction, and state and federal law, this court should not and cannot decide for the DMR whether Fernald residents can receive equal or better services elsewhere.  This court agrees that, in the first instance, it is the responsibility of the DMR to use the ISP process to assess the individual needs of each resident.  But, considering the entire record of this case, the Court Monitor's thorough investigation, as well as more than three decades of personal oversight of the case and the dozens of "views" by this court of the subject facilities,[7] this court

---

[3] Id. at 988.

[4] The Court Monitor visited DMR intermediate care facilities and community residences throughout the Commonwealth, surveyed day programs, hired independent medical experts, scoured the medical and departmental records of the transferred individuals, and met with officials, guardians, and residents.  See generally, The Monitor's Report, Paper #158 (March 6, 2007).

[5] Id. at 14.

[6] Id. at 27.

[7] These views of the facilities in question are admissible evidence in this circuit. United States v. Gray, 199 F.3d 547, 550 (1st Cir. 1999).

concludes that the Commonwealth's stated global policy judgment that Fernald should be closed[8] has damaged the Commonwealth's ability to adequately assess the needs of the Fernald residents on an individual, as opposed to a wholesale basis.

Although the transfers that have taken place so far may have been in the best interests of residents who were able to obtain "equal or better services" elsewhere, the Court Monitor's report reaches a conclusion that should be apparent to anyone who has visited Fernald. For some Fernald residents, a transfer "could have devastating effects that unravel years of positive, non-abusive behavior."[9] Of note, the Court Monitor emphasized the importance of simplicity, continuity, and consistency in the surroundings, activities, and caretakers that help residents live each day.[10]

An essential function of the ISP process is to give residents and guardians a voice in important decisions.[11] It is intended to provide an individual and personalized analysis of each resident. Administering this process under the global declaration that Fernald will be closed, however, eviscerates this opportunity for fully informed individualized oversight.[12] To dismiss the

---

[8] That the Commonwealth has such a plan is a fact established in the record and acknowledged by the DMR. See The Department of Mental Retardation's Response To: (1) the Report of United States Attorney Michael J. Sullivan; and (2) the Court's Order Show Cause Why an Injunction Should Not Enter, Paper #198, p. 6 (May 31, 2007) ("On February 23, 2003, Governor Romney announced plans to close the FDC.").

[9] The Monitor's Report, Paper #158, p. 24.

[10] Id.

[11] See e.g., 115 Mass. Code Regs. 6.20(3)(a)(3) (2007).

[12] See Ricci v. Okin, 781 F. Supp. 826, 827, n.4 (D. Mass. 1992) (describing the ISP process and explaining that "[r]ecommendation[s] as to residential and program placement are based on evaluation of the actual needs of the resident or client rather than on what facilities and programs are currently available").

benefit of hearing the voices and wishes of those most directly impacted invites the devastating effects about which the Monitor has warned. The DMR declaration not only disenfranchises the participants in the ISP process, it also deprives the DMR itself of valuable information, thereby undermining the efficacy of the ISP process. As a consequence, such administration of the ISP process amounts to a "systemic failure" to provide a compliant ISP process, within the meaning of the Final Order.[13]

To remedy this systemic failure, the court reasserts jurisdiction over this case,[14] restores it to active status on this court's docket, and enters the following order:

> Any further communication from Defendant Commonwealth of Massachusetts Department of Mental Retardation to Fernald residents and their guardians which solicits choices for further residential placement shall include Fernald among the options which residents and guardians may rank when expressing their preferences.[15]

This order is consistent with controlling precedent.[16] It does not mean that the

---

[13] The Final Order does not define "systemic." As this court oversaw entry of the Final Order, it is uniquely competent to declare that "systemic" simply was intended to have its plain dictionary meaning – "of or relating to a system." Webster's II New College Dictionary 1120 (2001). Accordingly, a systemic failure need not be catastrophic in and of itself. Rather, it may simply be a problem of any magnitude, which manifests itself on a system-wide basis, across a number of ISP processes.

[14] A district court has jurisdiction to enforce an order where the court retained such jurisdiction when it closed the case. See Baella-Silva v. Hulsey, 454 F.3d 5, 10 (1st Cir. 2006). This court did explicitly retain such jurisdiction in the Final Order. Ricci, 823 F. Supp. at 988.

[15] See Show Cause Order, Paper # 181 (May 9, 2007).

[16] The DMR asserts that entering such an order would run afoul of the Supreme Court's decision in Olmstead v. Zimring, 527 U.S. 581 (1999). There, the Court held that transfer out of a state institution and to a community setting "is in order when the State's treatment professionals have determined that community placement is appropriate, the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." Id. at 587 (emphasis added). But this court is not precluding

5

Commonwealth may never close Fernald.[17] It does mean, however, that the DMR must carefully assess the needs and wishes of each resident, and provide a genuine and meaningful opportunity for their guardians to participate in their placement decisions. The court is not dictating what the results of future ISP decision processes must be. It simply declares that starting an ISP discussion with the assumption that Fernald is not an available alternative for its residents is not acceptable.

The court believes that the Commonwealth's compliance with this order will remedy the systemic failure identified. Accordingly, the case may again be closed. All terms of the court's Final Order, in addition to the order referred to above, remain in effect. The DMR shall continue to have discretion to administer its programs and facilities, subject to the provisions of these orders.[18]

Consistent with the Final Order, this court will not review the results of individual ISP processes.[19] But, should the Plaintiff class believe that a systemic failure once again exists,

---

such a transfer. To the contrary, this court is simply ensuring that the DMR use the ISP process to adequately assess whether the setting is appropriate <u>and</u> whether it "is not opposed by the affected individual."

[17] As the DMR notes, the Consent Decrees entered by this court prior to the Final Order contemplate facility closure. See <u>Ricci</u>, 781 F. Supp. at 830 ("The Consent Decrees do not prohibit the possible closing of any facility. Indeed, if residents are properly placed into alternative settings, and a facility is no longer needed, this court will not interfere with its closure."). The court maintains this position. The purpose of today's order is not to interfere with closure, but to make sure alternative placement decisions properly start with the needs and wishes of the individual resident, rather than an inflexible global closure policy.

[18] The court would however, encourage the DMR and the Commonwealth to consider alternative proposals for Fernald, such as the one put forward by the Court Monitor at p. 25-26 of his report, which could use the existing capacity and resources available at Fernald to efficiently meet the needs of individuals, as well as the policy priorities of the Commonwealth, without causing the trauma and "devastating effects" that could result from transfers.

[19] <u>Ricci</u>, 823 F. Supp. at 988 ("Individual ISP disputes shall be enforced solely through the state ISP process.").

Plaintiffs may follow the procedures set forth in paragraph 7(c) of the Final Order to bring the matter to the attention of the DMR, and eventually, back before this court.[20]

AN ORDER WILL ISSUE.

/s/ Joseph L. Tauro
United States District Judge

---

[20] Id.