

# FERNALD LEAGUE for the RETARDED, Inc.

P. O. BOX 85 — BELMONT, MA 02478-0002
Telephone: 781-891-7345
24-hour Facsimile: 781-642-9517

Affiliate of: Coalition of Families and Advocates for the Retarded, Inc.

November 1, 2007

Commissioner Elin M. Howe
Department of Mental Retardation
500 Harrison Avenue
Boston, Massachusetts 02118

Dear Commissioner Howe,

The Fernald League for the Retarded, Inc. submitted a Public Records request, dated September 13, 2007, to the Executive Office of Health and Human Services (EOHHS), seeking documents supporting claims made by EOHHS about the cost of operating and upgrading the Fernald Developmental Center versus the cost of comparable care in the community system. In its documents request, which was subsequently modified, the Fernald League specifically asked for all analyses supporting claims that it costs $239,000 per resident per year to operate Fernald, compared with $102,000 in the community, and that Fernald would need $14 million to $20 million in capital improvements.

These cost claims were made by EOHHS in a written statement issued on September 12, 2007. In that statement, Secretary of Health and Human Services JudyAnn Bigby announced that the state would file an appeal to U.S. District Court Judge Joseph L. Tauro's decision in *Ricci v. Okin*, which required the Department of Mental Retardation (DMR) to offer Fernald as an on-going option for current residents.

In response to the Fernald League's records request, DMR provided the Fernald League with close to 100 pages of documents that included:

1) a spreadsheet containing a limited set of Fernald budget costs for Fiscal Year 2008 and projected budget costs for Fiscal Years 2009 and 2010. The spreadsheet also contained a calculated cost-per-person for each fiscal year, which was derived by dividing the total of the budgeted costs by the total census of the Intermediate Care Facility (ICF) portion of Fernald each year. That census was listed at 181 residents in FY 2008, 167 residents in FY 2009, and 157 residents in FY 2010.

   The total budgeted costs each year were adjusted by a reduction of projected amounts in "attrition" each year, and by the addition of projected "consolidation" costs for FY 2009 and FY 2010. For FY 2008, the total budgeted amount listed of

$43,625,873 was reduced by $365,537 due to attrition. The resulting total of $43,260,336 was then divided by the census of 181 to arrive at the previously stated annual per-person cost of $239,007.38. The spreadsheet contains similar calculations that show an annual per-person cost of $265,415.28 in FY 2009 and $296,564.80 in FY2010. The spreadsheet was listed as Attachment A;

2) the Report of the DMR Facility Planning Working Group, Objective 1.6 of the DMR Strategic Plan 2001-2004, and appendices, dated May 2002. The report was listed as Attachment B;

3) additional spreadsheet data, listed as Attachments C, D, E, and F.

The documents were accompanied by a letter, dated October 11, 2007, and signed by Marianne Meacham, DMR general counsel.

We have reviewed the documents provided and have the following comments:

### 1. Per-resident cost of Fernald

DMR's analysis in deriving its cost-per-resident figures for Fernald was overly simplistic and therefore incorrect. In arriving at its stated cost-per-resident of $239,000.38 in FY 2008, DMR, as noted above, simply divided the entire Fernald budget, adjusted only for attrition, by the total ICF census of 181.

This methodology was incorrect for several reasons. First, it did not take into account the 29 residents of the Marquardt Skilled Nursing Facility on the Fernald campus. All costs (salaries, drugs, administration, offices, motor vehicles, facility supplies, etc.) of the Marquardt facility are included in the total Fernald budget, according to the Fernald facility director. The director stated that the commonwealth does not maintain a separate budget for the Marquardt facility.

Secondly, the DMR per-resident calculation failed to take into account 265 homeless persons who live in three buildings on the campus, which are occupied under a contract with the Middlesex Human Services Agency. The cost of providing heat, hot water and electricity, and maintaining the grounds near the buildings leased to MHSA is included in the Fernald budget.

We therefore used budget figures from the spreadsheet in Attachment A to arrive at an amount per resident for fuel and maintenance costs common to all of these 475 residents at Fernald (181 ICF residents plus 29 Marquardt Skilled Nursing Facility residents plus 265 MHSA residents). We then added that per-resident cost to a separate per-resident cost calculated by dividing the salary and other costs common to the ICF and Marquardt residents (see attached spreadsheet). We calculated a total per-resident cost at Fernald of $195,421—an amount more than 18 percent lower than DMR's calculated amount.

We would note that even this total per-resident cost of $195,421 does not exclude those costs attributable to community residents who share numerous facilities and functions

with the Fernald residents. The total cost of these shared functions should not be attributed solely to the 181 ICF residents or even to the total 475 residents on the Fernald campus.

DMR did not provide information that would enable us to allocate salary costs, in particular, between Fernald and community-based residents. DMR also did not provide information that would enable the calculation of a cost of fuel, landscaping, snow removal or maintenance for each building, and thus there was no way for us to allocate those costs as well between Fernald and community-based residents. In fact, Fernald does not have a utility metering system capable of determining electricity or fuel costs for each building on the campus. As a result, we were unable as well to calculate costs that could be attributed to the Metro Boston regional office in the North Nurses building, the respite facility in the Wallace building, the psychologists and evaluation unit in the North building, the State Police storage facility in the South Nurses building, the Howe Library and the Tufts Dental clinic in the Withington building. DMR similarly did not provide documents that would enable us to calculate costs of the therapeutic Duhamel swimming pool or the gymnasium in the Greene building, which are used by both community-based and Fernald residents. Moreover, many of the gymnasium users are not mentally retarded individuals.[1]

The Fernald League has always supported leasing unused buildings to other state agencies and to and our Waltham neighbors. The cost per each Fernald resident would be significantly less if each of these groups were paying its fair share.

## 2. Per-resident cost in the community

DMR appears to have done no analysis whatsoever to back up the claimed cost of $102,000 per resident for care in the community system. Although we specifically requested all analyses supporting that claimed cost, we were unable to find any information in the documents provided that indicated how the $102,000 figure was derived. We therefore sent DMR a follow-up letter, dated October 16, 2007, which

---

[1] The DMR general counsel stated in her October 11, 2007 letter that in calculating the per-person cost of operating Fernald, DMR did not adjust for certain expenditures such as the costs of providing heat through the Fernald power plant to certain buildings on campus but not operated by DMR. The letter stated that because the total cost of the operation of the power plant is less than $2 million, that portion of this cost attributable to the heating of other buildings would not affect the total average costs significantly. We would note, however, that the Fernald power plant has been an albatross for decades. Every engineer and architect who worked on building renovations during the Ricci class action lawsuit recommended closing the power plant and building separate boilers. DMR, however, has never done so. The steam piping from the power plant to all the buildings on the campus is a closed loop and is the reason that some buildings were wrapped in chain link fencing rather than being demolished in the late 1970's. Former DMR Commissioner Gerald Morrissey told George Mavridis at a meeting in 2004 that he planned to add a boiler to the Green building as part of a plan to relocate the Marquardt nursing facility patients there. The power plant is the major reason that the unoccupied buildings on the campus were not renovated or demolished during the last three decades.

requested that DMR direct us to any provided documents that referred specifically to the claimed $102,000 cost. In a written response, dated October 23, 2007, James Bergeron, DMR assistant general counsel, stated that DMR had no documents responsive to our request.

The DMR Facility Planning Working Group report (Appendix 6 of Attachment B) stated that a Working Group subcommittee had estimated community costs for a sample group of former facility residents to be $134,247 per resident in FY 1998 and 1999. This amount is 24 percent higher than DMR's FY 2008 figure of $102,000, and yet it dates from ten years previously.

Appendix 6 states that the community cost figure of $134,247 was based on a sample of 71 individuals who had been moved from state facilities into either provider or state-operated community homes in FY 1998 and 1999. These individuals, who were relocated nearly 10 years ago, were higher level, younger and in most cases had less medical or behavioral complications than does the present ICF/MR population. If the average cost per resident transferred to the community was $134,247 in FY 1999, we question how that cost could have dropped to $102,000 in FY 2008. That community cost would have to be higher than $134,000 today, and will be higher in the future for any person relocated from an intermediate care facility.

We would point out, in addition, that in serving individuals in the community, providers receive funding from other state and federal agencies, in addition to DMR, for services such as low-income housing development (from the federal Department of Housing and Urban Development and the state Department of Housing and Community Development), transportation (from the federal Department of Transportation), and food stamps (from the federal Department of Agriculture). For example, one DMR provider wrote in its winter 2007 newsletter about having received three Section 811 grants from HUD that enabled it to develop three new residences for persons with developmental disabilities. The total award included subsidy funds, renewable every five years for the next 40 years, which will help defray the cost of food and utilities for the residents. The provider stated that "[t]hese [HUD] programs help us to move our mission forward **without relying solely upon the Department of Mental Retardation for funding** [emphasis added].

The point here is that the $102,000 per-person cost cited by DMR for care in the community includes only those costs paid by DMR, and not additional community costs paid by other agencies and ultimately taxpayers. The total cost of community care, therefore, is certainly higher than $102,000 per person when all relevant costs are included.

We would also note that Appendix 7 of the Working Group report lists a series of factors that have historically resulted in referrals to facilities in Massachusetts. Among those factors was that the needs of certain individual being referred required "a constellation of services, **the cost of which would be as much as, if not more than, the average cost of institutional care in a DMR facility** (est. $150,000 per year)" (emphasis added). Note, by the way, that the estimated facility cost per person listed here is nearly 40 percent lower than the DMR figure of $239,000.

4

Finally, we would note that DMR apparently never did an analysis of the economic impact on the local economy of closing Fernald, even though a subcommittee of the Working Group had recommended that one be done in making a decision to close a facility (Appendix 12 of Attachment B). The subcommittee recommended that the analysis include such things as the multiplier effect of facility and consumer spending in the local community, the community use of facility space and grounds, the use of the facility by other governmental agencies, projected mothballing and surplusing costs, and projected ramp-up costs for new community programs.

### 3. Projected cost of capital improvements to Fernald

The EOHHS estimate of $14 million to $20 million in needed capital expenditures at Fernald was apparently based, at least in part, on preliminary data from the Capital Asset Management Information System (CAMIS), which the Working Group report said had not been reviewed, verified or accepted (Appendix 3 of Attachment B). No documents were provided to back up either the CAMIS data or DMR's own capital needs projections for Fernald, so we have no way of assessing them.[2]

We would note that there was no comparative analysis apparently done by DMR of the capital costs in building housing in the community. DMR has already reportedly begun paying leasing costs that may be as high as $2 million per group home over a 20-year period for residences being constructed for former Fernald residents. We would add that, in contrast to the difficulty of siting and building housing and facilities in community settings, any construction at Fernald would be supported by the City of Waltham and by Fernald's neighbors.

Moreover, there was apparently no cost analysis done by DMR of a long-standing "postage-stamp" proposal by the Fernald League and other Fernald advocates to "right size" Fernald by scaling it back to properly accommodate its current population in the western corner of the campus and allowing the remainder of the property to be developed. Certainly, both capital costs and the Fernald residents' share of the facility budget would be lowered if they occupied a smaller portion of the campus.

In closing, we would be happy to meet with you to discuss the differences between our evaluation of the Fernald cost estimates for FY 2008 and DMR's evaluation. We believe our evaluation supports our position that the most cost-effective option for the future of Fernald involves closing the power plant, right-sizing the facility, and developing the remainder of the property to meet the needs of the commonwealth and the City of Waltham.

---

[2] It was unclear whether DMR's projected capital costs include projected renovations to buildings that are currently abandoned or projected upgrades to any buildings that currently do not comply with the Americans with Disabilities Act. The Fernald residents do not use any building including the Administration Building that does not comply with the ADA today. However, there are unused buildings that were renovated during the *Ricci* class action lawsuit, and abandoned buildings that do not comply with the ADA. It is our understanding that these buildings would be demolished if and when the Fernald power plant was closed.

In addition to the spreadsheet listing our cost calculations, we are enclosing a copy of "Cost Comparisons of Community and Institutional Residential Settings: Historical Review of selected Research," by Kevin K. Walsh, Theodore A Kastner and Regina Gentlesk Green, published in the journal *Mental Retardation* in April 2003. The article notes that the findings of hundreds of reviewed studies "do not support the unqualified position that community settings are less expensive than are institutions and suggest that staffing issues play a major role in any cost difference that are identified."

Sincerely,

Marilyn Meagher
President

George Mavridis,
Former President
Fernald's *Ricci* Plaintiffs' Representative

cc:  Judge Joseph L. Tauro with enclosures
     Governor Deval Patrick with enclosures
     Secretary JudyAnn Bigby with enclosures
     General Counsel Marianne Meachem with enclosures
     Mayor Jeanette McCarthy with enclosures
     David Kassel with enclosures
     Beryl Cohen with enclosures

Public Record Request - Fernald Developmental Center Budget FY08

George Mavridis Calculations                          15-Oct-07

DMR calculation using 181 Residents

| | |
|---|---:|
| Adjusted base cost of operations | $43,260,336.00 |
| Fernald Residents | 181 |
| Cost per Resident | $239,007.38 |

Actual No. Residents FDC + Marquardt is 181 + 29 = 210

Cost per FDC + Marq. Residents            $206,001.60

**Calculations with Middlesex Human Services**

FY 2008 Anticipated Expenditures Fernald + Marquardt

| | | |
|---|---:|---:|
| Salaries | $32,446,448.00 | |
| Administration & Offices | $431,908.00 | |
| Motor Vehicles | $72,480.00 | |
| Drugs | $824,370.00 | |
| Contract Services | $4,398,390.00 | |
| Pharmacy Services | $431,090.00 | |
| Facility Supplies | $434,500.00 | |
| 70% of Maintenance & Repair | $575,741.60 | 822488 |
| Subtotal | $39,614,927.60 | |
| Proportional Attrition | $334,734.38 | 365537 |
| Total FDC + MSNF | $39,280,193.22 | |
| Cost per Resident | $187,048.54 | |

Fy 2008 Anticipated Expenditures FDC, MSNF & MHSA

| | |
|---|---:|
| Fuel | $3,764,200.00 |
| 30% of Maintenance /Rerpair | $246,746.40 |
| Power Plant Operation | |
| Subtotal | $4,010,946.40 |
| Proportional Attrition | $33,891.31 |
| Total FDC, MSNF & MHS | $3,977,055.09 |
| Total residents 181 +29+265 | 475 |
| Cost per Resident | $8,372.75 |

Cost per Resident with MHS                $195,421.29

$195K  lets the regional office and its respite facility, Tufts Dental
90% of whose patients live in the community, the state police,
the Howe Library, the athletic facilities -and some community work
programs receive free rent at the expenseof the Fernald Residents.
 These may be legitimate DMR expenses but should not be part
of the cost per Fernald resident

These charges cannot be calculated and deducted from the DMR
 cost per resident calculations