

# FERNALD LEAGUE *for the* RETARDED, *Inc.*
### P.O. BOX 85 – BELMONT, MA 02478-0002
Telephone: 781-891-7345

Affiliate of: Coalition of Families and Advocates for the Retarded, Inc.

December 12, 2007

Commissioner Elin M. Howe
Department of Mental Retardation
500 Harrison Avenue
Boston, Massachusetts 02118

Dear Commissioner Howe,

We are responding to your letter, dated November 27, 2007, in which you offered your explanation of the Department of Mental Retardation's analysis regarding the cost of operating and upgrading the Fernald Developmental Center and the cost of caring for persons with mental retardation in the community.

First, we would note that you stated that "the decision regarding the closure of the (Fernald Center) was based upon both **programmatic** and **fiscal** reasons, and not simply **comparative costs**" [Our emphasis]. You note that the decision "was further based upon the Department's experience in providing appropriate services in the community to individuals with significant disabilities, as well as in its developmental centers."

Aside from the fact that we don't understand how "comparative costs" are separate from "fiscal reasons," we would note that most of the Fernald residents who have left the facility since February 2003 have been moved to other state facilities, such as the Wrentham Developmental Center and the Glavin, Hogan, and Monson Centers, and not to community-based care. Thus, it is not clear to us that the closure of Fernald necessarily involves a programmatic change. Our impression is that the quality of service and the ability of the staffs are equal among the six developmental centers.

Secondly, in discussing your claim that it costs $239,000 per resident to operate the Fernald Center, you stated that additional costs, such as fringe benefits for state employees, which are external to the DMR budget, were not included in the Fernald Center analysis. Had they been included, you contended, they would have caused the Fernald Center cost average "to rise significantly as compared with the community average due to the fact that nearly all facility workers are state employees as compared with staff in the community, the majority of whom work for nonprofit providers." The implication of this statement is that the Fernald employee fringe benefits are higher than the fringe benefits of community-based employees, including both the small number who are also state employees and the majority who work for non-profit providers. We know as well that the direct-care salaries of state employees are greater than those of people working for nonprofit community providers, and that this disparity is apparently part of the alleged cost differential between your claimed cost of $239,000 per resident at Fernald versus $102,000 in the community.

Your argument appears to suggest, therefore, that increasing direct care staff salaries and providing fringe benefits in the community system to achieve parity with facility-based salary levels is not a goal of DMR because it would increase the cost of community-based care. We hope that isn't your position.

We would also note that your letter implicitly acknowledges that DMR's claimed Fernald and community-based costs are not a true apples-to-applies comparison. You state on page 3 that the $102,000 figure for community care is largely based on the *average* cost for 24-hour residential care in the community. Fernald obviously does not serve an average population in the DMR system. DMR's working group report, which you provided among the documents sent to us on October 11, 2007, showed that 86 percent of Fernald's population had severe or profound mental retardation in 2001. That proportion was 11 percent higher even than the average among the six state facilities.

In contrast, most community clients are only slightly or mildly retarded individuals. Thus, it seems to us that your Fernald-versus-community cost comparison is fundamentally flawed on that basis alone because the populations involved in each setting are significantly different. DMR clients who have more severe clinical and medical needs require greater levels of staffing for their care, which adds to the cost of that care. If, in fact, equal or better care is to be provided in the community, then logic dictates that the staffing levels in the community must be the same as, or higher than, those in the facilities for clients with the same level of care needs. Yet, your letter goes on to discount that requirement for equal or better care.

You state that "the costs for serving particular Fernald residents in community settings would be based upon a careful assessment of what supports would be needed in order to provide them with equal or better care in the community. Such costs vary according to an individual's particular needs, but in the Department's experience, transitions to community-based programs **have historically cost less than providing services in an ICF/MR**" (our emphasis).

The only implication we draw from this statement is that you believe it will cost less to serve Fernald residents in the community because there will be less staffing in the community and the staff will have lower salaries and fewer benefits. Yet, your statement implies that despite those lower staffing levels and lower salaries, former Fernald residents would nevertheless receive equal or better care in the community system. That's the fundamental disconnect that we sense in your letter.

In "Cost Comparisons of Community and Institutional Residential Settings: Historical Review of Selected Research" by Walsh, Kastner and Green, which was published in the journal *Mental Retardation* in April 2003 (Volume 41, Number 2), the authors could not find any published studies that concluded that the cost of community care was always cheaper than institutional care. A key to a valid comparison of costs among the two systems is ensuring that the comparison is one of apples to apples.

We would also take issue with your statement on page 2 of your letter that the Department previously "directed" us to component parts of its analysis supporting its claim that the cost of care in the community is $102,000 per resident. That is not correct. Only now, in your November 1 letter, did you include an attachment showing how the $102,000 was calculated. Some of the numbers on the attachment do not correspond to the spreadsheets provided to us on Oct. 11. For instance, on the November 1 attachment, the total community residential cost used to calculate the per-resident figure was listed as $481,186,470. We could not find that total residential cost figure anywhere in the Oct. 11 documents. What we did find was a spreadsheet of DMR line items for Fiscal Year 2007, which listed the total community residential cost as $523,866,210, an amount almost 10% higher than the amount in the

2

November 1 attachment. Thus, we could see no way, based on the Oct. 11 documents and follow-up letter on October 23, that the $102,000-per-resident cost could be derived.

Regarding our own calculated cost per resident at Fernald of $195,421.29, we noted specifically to you that it did not exclude a number of costs of providing services to community-based residents who use Fernald's facilities. We do not believe it is possible to calculate the amount of those Fernald budget costs that do not exclusively benefit the 181 residents of the ICF portion of the Center. Those expenditures include the cost of heating, electricity, and maintenance for the Metro Boston regional office and its respite building, the Tufts Dental facility, the Marquardt Skilled Nursing Facility and much more. Thus, it is incorrect to assert that our cost figure shows that Fernald is "still considerably more costly" than community-based care.

Also, in explaining your analysis supporting your calculated per-resident cost at Fernald of $239,000, you stated that you excluded the 29 residents of the Marquardt facility from the calculation because the salaries of the Marquardt staff are not included in the Fernald budget. Yet, you acknowledged that the Fernald budget does contain $383,439 for dietary, drugs, pharmacy and motor vehicles that could be attributed to Marquardt. You stated that those Marquardt costs were not removed from your Fernald cost calculation because they were not substantial. You also stated in October that you did not remove the cost of providing heat and hot water, electricity, building maintenance and janitorial service to Marquardt and the other buildings that don't directly benefit the Fernald residents because those costs, too, were not substantial. We would note, however, that all of these costs, added together, can be substantial.

Regarding our "postage stamp" proposal to downsize Fernald, you stated that Department staff members have reviewed the proposal at various times, but that by "rough reckoning'" of the maps provided by George Mavridis, the plan would comprise 60 percent of the existing 187-acre Fernald campus. Your "rough reckoning" was just that, rough reckoning. The drawings in your possession are reduced prints made from files created by scanning old drawings that were not to scale. Had you consulted George Mavridis about the proposal and the maps, he would have informed you that those maps were not intended to depict the postage-stamp plan.

We would note that the only DMR official who discussed the postage stamp plan with Mavridis was Diane Enochs, assistant commissioner for facilities, who spoke to him on one occasion about the proposal on November 14, 2007. Mavridis explained to her that the drawings showed the Fernald campus as it existed as of December 2004, not as it was envisioned to exist under the postage-stamp proposal. The postage-stamp plan would require the construction of one or two new buildings near the Malone Park townhouses and the Greene Building. The maps that Mavridis provided did not depict those additional buildings.

Moreover, while former Commissioner Gerald Morrissey did propose a plan in 2004 to keep the Malone Park cottages open and to move the Marquardt patients to the Greene Building (not maintain Marquardt, as you stated), Morrissey never intended that Fernald would remain as an Intermediate Care Facility. Morrissey was proposing converting Malone Park into state-operated community homes and expanding the skilled nursing facility, which is not exclusively used by Fernald residents, but is open to all residents in the DMR system who qualify for its services. Thus, Morrissey's plan would have allowed only a small number of current Fernald residents to remain on the campus and was therefore unacceptable to us. We are proposing a reduction in the physical footprint of the Fernald Center, not a reduction in the level of services provided there. We are, moreover, not interested in negotiating with DMR over which Fernald residents we are willing to throw overboard. Any negotiated compromise would have to allow all of the current residents who want to stay, to do so.

3

We would note that a *Boston Globe* editorial on June 26 suggested a plan for DMR to solicit bids for land at each state facility from private housing developers, provided they agreed to build group homes for mentally retarded individuals on the periphery of each of the campuses or set aside units in their developments for those people. These homes could serve the roughly 200 new DMR clients who arrive each year in need of residential services. In addition, respite care could be offered on the grounds for use by the thousands of families who now receive only limited home-based services for their retarded relatives, or none at all. Campuses in key locations could still provide the intensive medical care needed for the most medically complicated cases.

We believe an approach such as this is necessary to deal effectively with the waiting list of thousands of persons in Massachusetts who need residential care in the DMR system. DMR's current approach of closing Fernald and possibly other facilities is simply not a workable solution to this problem. Creative solutions would first require the Arc of Massachusetts and its supporters to stop their provocative campaign to close all of the institutions. In turn, DMR, the Fernald League, COFAR and others need to come to an agreement on a long-range consolidation plan that leaves the campuses in place, albeit with reduced footprints, but with a full array of intensive medical and residential services. As long as DMR is not willing to negotiate, there is no real incentive for state redevelopment experts to come to the table.

Most town officials know better than to discriminate against people with disabilities. Legislators do the bidding of local officials on such homegrown issues. The Patrick administration could pitch in by appointing members, who favor compromise, to the lapsed Governor's Commission on Mental Retardation.

All disabilities are not created equal. The state needs both group homes that offer maximum independence and medically-intensive facilities that offer round-the-clock nursing care. The physical space is there if the Patrick administration and the advocates for the retarded can summon the will.

Waltham officials are on record as endorsing a smaller Fernald in the west corner of the campus. George Mavridis has spoken with a contractor who has similarly proposed the idea of building a smaller Fernald for the present residents and then developing the remainder of the property. We believe that any developer or developers who were to purchase the remaining campus property would demolish most of the unused and unneeded Fernald buildings—an outcome which would result in a cost of upgrading the campus that would be significantly lower than the $14 million to $20 million amount you have projected.

These alternative approaches to Fernald and the other campuses are workable and deserve consideration. We are always available to discuss these alternatives.

Thank you for your consideration.

Sincerely,

*Marilyn Meagher*
Marilyn Meagher
President

*George Mavridis* MM
George Mavridis,
Former President
Fernald's *Ricci* Plaintiffs' Representative

cc: Governor Deval Patrick
Secretary JudyAnn Bigby, M.D.
Diane Enochs, Assistant Commissioner for Facilities
Marianne Meachem, General Counsel, DMR
Mayor Jeanette McCarthy
Judge Joseph J. Tauro
David Kassel
Beryl Cohen