UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Robert Simpson Ricci, *et al.*, | CIVIL ACTION Nos.<br>72-0469-T<br>74-2768-T<br>75-3910-T<br>75-5023-T<br>75-5210-T |
| v.   Plaintiff | |
| Robert L. Okin, *et al.*,<br>Defendants | |

### AFFIDAVIT OF CARRIE JOHNSON

I, Carrie Johnson, on oath hereby depose and state as follows:

1. I have been employed by the Arc (formally Association of Retarded Citizens) of Greater Boston (hereinafter the "ArcGB") since November 2003. My position is Guardianship Case Manager. Unless otherwise indicated, the facts contained in this Affidavit are based on personal knowledge and experience.

2. I am submitting this affidavit in response to allegations that have been made regarding my decision-making process in approving the moves of four wards of the ArcGB who formerly resided at the Fernald Developmental Center ("FDC").

3. I have read the plaintiff's motion and attached affidavit.

4. Every one of my decisions to move the individuals listed below was based on independent, clinical judgment of clinicians and professionals as well as the individuals themselves where possible. My decisions on behalf ArcGB were not made under pressure by DMR or any other outside entity.

{Client Files\BMP\245085\0999\AAG\B0146930.DOC;1} 1

Exhibit B
Affidavit of Carrie Johnson

5. During this process of moving these four individuals from FDC to a least restrictive setting in the community, I had every opportunity to change my decision on behalf of the ArcGB, after providing information to the Corporate Guardianship staff, and Director of Guardianship Services throughout the process. I am aware of the Court mandate for these individuals to have been provided with the choice to remain at FDC. However, it is very clear to me that this community home does provide a more home-like environment. This community home will enrich each individual's life.

6. Each decision for each individual was made one person at a time.

7. The ArcGB provides guardianship services for over 230 individuals. These services consist of Guardianship Case Management (Guardian of the Person, Medical, Financial), Rogers Monitor, Conservator and/or Estate. For each of these individuals, a case manager is assigned. Each case manager maintains a caseload. However, there are times that a caseload is shifted, changed or otherwise reviewed to meet the needs of the office. At no time is an individual for whom we are guardian left without a manager overseeing their case and ensuring their needs are being met.

8. The ArcGB recently approved transfers of four individuals who are now living in a group home located in Bedford, Massachusetts. The individualized analysis that went into each of these transfers was lengthy and involved discussions with not only DMR personnel but with the Director of Guardianship Services at the ArcGB. The ArcGB independently made the decision to transfer after many visits to the proposed home and visits with each of the individuals. These are outlined below in more detail.

{Client Files\EMP\245085\0999\AAG\B0146930.DOC;1}2

## AT

9. The ArcGB has been guardian for this individual since 2001 when AT was adjudicated incompetent to make informed decisions with respect to the conduct of her personal affairs. A copy of this guardianship decree is attached as Exhibit 1. At that time, AT's sister no longer wished to serve as conservator and resigned this position. I first met AT as a new guardianship case manger in 2003 and have been active and inactive in case management due to case load rearrangement.. Most recently I became directly involved with AT October, 2007.

10. I visited with AT many times. At FDC, at her proposed day program, and at the proposed new home.

11. I had many meetings internal to ArcGB, with the Department of Mental Retardation, with staff at FDC and with AT.

12. I met with clinicians to seek their opinions as to whether it was in AT's best interest to move into the community despite her long tenure residing at FDC.

13. I visited the new home on several occasions since I have been assigned this matter. Attached as Exhibit 2 is a timeline that I prepared which sets forth the activity concerning the transfer of AT, as well as others.

14. I have read the affidavit of Marilyn Meagher and respond as follows:

   a) AT was not transferred over her objection. AT indicated her desire to be placed at the Bedford home after visiting it on several occasions during a transition period.

   b) I have not at any time threatened any professional or direct care staff who opposed the transfer of AT or transfer of any individual.

{Client Files\EMP\245085\0999\AAG\B0146930.DOC;1} 3

c) I did not assume responsibility for this matter after a previous guardian or other representative did not approve the transfer of AT.

d) It is inaccurate that residents who transferred are automatically subject to a DNR Order. It is the policy of the ArcGB to obtain substituted judgment whenever possible from the Court when such decisions are necessary or required.

**GG**

15. The ArcGB has been guardian for GG since 1992. At that time, the court found that GG was incompetent to make informed decisions with respect to the conduct of his personal affairs. A copy of this guardianship decree is attached as Exhibit 3. I first met GG as a new guardianship case manger in 2003 and have been active and inactive in case management due to case load rearrangement. Most recently I became involved with GG's in October, 2007. GG moved to Bedford on February 7, 2008.

16. I utilized similar procedures discussed above concerning AT before making the decision to transfer GG.

**BB and AB**

17. The ArcGB has been guardian for BB since 1992. At that time, the Middlesex Probate and Family Court found BB incompetent to make informed decisions with regard to the conduct of her personal affairs. A copy of this guardianship decree is attached as Exhibit 4. BB moved to Bedford on February 7, 2008. I first met BB as a new guardianship case manger in 2003 and have been active and inactive in case management due to case load rearrangement. Most recently I became involved with BB October, 2007.

{Client Files\EMP\245085\0999\AAG\B0146930.DOC;1} 4

18. The ArcGB has been guardian for AB since 1999. At that time, the Middlesex Probate and Family Court found AB incompetent to make informed decisions with regard to the conduct of his personal affairs. A copy of this guardianship decree is attached as Exhibit 5. AB moved to Bedford on February 7, 2008. I first met AB as a new guardianship case manger in 2003 and have been active and inactive in case management due to case load rearrangement. Most recently I became involved with AB October, 2007.

19. Similar procedures as outlined above were implemented prior to the transfers of BB and AB.

20. Each of the individuals who have moved has an Individual Support Plan. This Plan provides very detailed information on the person's preparation for moving, special information for personal routines, social life, relationships and communication, physical considerations and equipment needs, safety considerations and health/medical/psychological issues. The ISP is also reviewed carefully which is also documented in this Plan. There is another section just on Transition. This includes the new support provider, the important contact persons, the type of day supports, the community medical providers, schedule of visits, an in-service training schedule, financial issues and finally, follow-up supports.

21. There has also been an ISP modification meeting for each of the individuals who transferred. The meeting for AT was held on February 5, 2008. During this meeting, not one clinical, professional or other staff indicated that they felt this move was against AT's best interests. Each of the individuals at the meeting knew that I was

{Client Files\EMP\245085\0999\AAG\B0146930.DOC;1} 5

the guardian representative for AT and if there were concerns they could have been expressed at this meeting.

22. After this meeting, two distressing events occurred with Fernald staff. I have attached as Exhibits 6 and 7 letters I wrote to Christine Oliveira regarding my concern pertaining to the behavior of Fernald staff.

23. The first event occurred during the meeting where the social worker, Karen Liazos indicated that she wanted to call the last remaining family member of AT's, her sister. I indicated that I believed this was my role as the guardian of AT. After much discussion and resistance by the social worker, it finally was made clear to her that I would do this as the court appointed guardian. Please see Exhibit 6.

24. The second event occurred at AT's Fernald home. During her toileting, three staff people were in the bathroom with her who began berating her with statements such as "You're leaving soon", "you're going to leave" "you know you're leaving" and other variations. I heard these comments from outside a privacy curtain in the bathroom. I asked the staff to please stop this conversation as it was not appropriate to harass AT with these questions. I was asked "why" were the comments inappropriate. I expressed to Connie, the staff person, that the way the three staff people were asking her questions was not appropriate or fair. Not only was she trying to go to the bathroom but then trying to get transitioned back into her chair with hearing those same comments over and over again. AT appeared to be very upset after this incident with staff. I then sent a letter to Christine Oliveira indicating my request that no staff member was to discuss transition with AT.

25. There will be an array of opportunities and experiences which would not have been available to them at Fernald and resulted in an improved quality of life.

26. In regards to AT, there will be better medical care at her new home in Bedford. There is on-site nursing available whereas at Fernald the nursing was available but not at her cottage.

27. It is my understanding that there have been three complaints filed with the Disabled Persons Protection Commission regarding this case. I have spoken with investigator Paulie Kranak who is investigating these cases. In addition, I was, for reasons unknown, required to meet with a representative of the Inspector General's Office to discuss this matter.

28. I have visited AT as recently as Sunday, February 24, 2008. She continues to thrive in her new environment. She now lives in a beautiful home surrounded by caring staff and housemates. There is no question in my mind, as guardian, that she will continue to flourish.

I have read the above and attest that it is true and accurate to the best of my abilities and recollection.

Signed under the Pains and Penalties of Perjury on this 25th day of February, 2008.

_____
Carrie Johnson
Guardianship Case Manager
The Arc of Greater Boston

{Client Files\EMP\245085\0999\AAG\B0146930.DOC;1} 7