UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| ROBERT SIMPSON RICCI, et al., | * | |
|---|---|---|
| | * | |
| Plaintiffs, | * | |
| | * | |
| | * | Civil Action Nos. 72-0469-JLT |
| v. | * | 74-2768-JLT |
| | * | 75-3910-JLT |
| | * | 75-5023-JLT |
| ROBERT L. OKIN, et al., | * | 75-5210-JLT |
| | * | |
| Defendants. | * | |

MEMORANDUM

March 17, 2011

TAURO, J.

I.   Introduction

Local 509, Service Employees International Union ("Union") seeks to intervene in this case so as to restore the underlying litigation to this court's active docket. The Union argues that Defendants, in particular the Commonwealth of Massachusetts, are not in compliance with this court's 1993 Disengagement Order. Presently at issue is the Union's Motion for Permissive Intervention Pursuant to Fed. R. Civ. P. 24(b) [#283]. For the reasons detailed below, the Union's Motion is DENIED.

II.  Background

From 1972 to 1993, this court actively presided over a set of consolidated cases ("Ricci cases").[1] Due to the efforts of various dedicated individuals, this court oversaw improvements in

---

[1] For a detailed exposition of the history of these cases, see Ricci v. Okin, 978 F.2d 764 (1st Cir. 1992); Mass. Ass'n for Retarded Citizens v. King, 668 F.2d 602 (1st Cir. 1981); Mass. Ass'n for Retarded Citizens v. King, 643 F.2d 899 (1st Cir. 1981); Ricci v. Okin, 781 F. Supp.

1

the Commonwealth's previously woeful treatment of a class of individuals who were intellectually disabled.[2] In 1993, partly based upon the Governor Weld's creation of the Commission on Mental Retardation, this court closed the consolidated Ricci cases by issuing a Disengagement Order.[3] The Disengagement Order terminated this court's jurisdiction over the Ricci cases.[4] This court may re-open the Ricci cases and reassert jurisdiction only if the Ricci Plaintiffs show that one of three explicit conditions has been met: "1) 'defendants substantially fail[ed] to provide a state ISP process in compliance with [the] Order'; 2) defendants engaged in 'a systemic failure to provide services to class members as described in [the] Order'; or 3) defendants engaged in 'a systemic failure to provide ISP services required by [the] Order.'"[5] The Disengagement Order

---

826 (D. Mass. 1992); Ricci v. Callahan, 646 F. Supp. 378 (D. Mass. 1986); Ricci v. Callahan, 576 F. Supp. 415 (D. Mass. 1983); Ricci v. Callahan, 97 F.R.D. 737 (D. Mass. 1983); Ricci v. Okin, 537 F. Supp. 817 (D. Mass. 1982); Esther Scott, Judge Tauro and Care of the Retarded in Massachusetts (1987) (unpublished case program, Kennedy School of Government, Harvard University).

[2] The phrase "intellectual disability" or variations thereof is synonymous with "mental retardation." The former term—intellectual disability—is preferred by the American Association on Intellectual and Developmental Disabilities, formerly known as the American Association on Mental Retardation. See FAQ on Intellectual Disability, American Association on Intellectual and Developmental Disabilities, http://www.aamr.org/content_104.cfm (last visited Mar. 17, 2011).

[3] See Ricci v. Okin, 823 F. Supp. 984, 985–87 (D. Mass. 1993). The Disengagement Order, as a stipulated order entered with the "consent of the parties," contained the defining characteristics of a consent decree: a judicial decree and a contract. Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland, 478 U.S. 501, 519, 522 (1986) (explaining that the obligations embodied in a consent decree are created by the agreement of the parties); see Ricci v. Patrick, 544 F.3d 8, 11 (1st Cir. 2008) (explaining that the case was closed in 1993 "pursuant to a consent decree whose terms" were "adopted into a court order known as the Disengagement Order").

[4] Patrick, 544 F.3d at 13.

[5] Id. at 13–14 ("The Order allowed 'action[s] to enforce the rights of the plaintiff classes' only when they were brought 'pursuant to the terms of paragraph 7' of the Order." (quoting Ricci, 823 F. Supp. at 986)). Paragraph 7, which provides the grounds upon which Plaintiffs may

also detailed the Commonwealth's obligations with regard to the Individual Service Plan ("ISP") process.[6]

The Union filed its Motion in the summer of 2010. The Union is the collective bargaining representative of approximately 7500 human service professionals of the Commonwealth, including five-hundred and seven Human Service Coordinators ("HSCs") employed by the Massachusetts Department of Development Services ("DDS").[7] Four-hundred and ten of these

---

re-open the case, provides in relevant part:

> 7. a. If the defendants substantially fail to provide a state ISP process in compliance with this Order, or if there is a systemic failure to provide services to class members as described in this Order, the plaintiffs may seek enforcement of the Order pursuant to this paragraph. Individual ISP disputes shall be enforced solely through the state ISP process.
>
> . . .
>
> c. Should the plaintiff class believe that the defendants are not in substantial compliance with this Order with regard to systemic issues, plaintiffs may seek to reopen this case and to restore this case to the active docket and to move for enforcement of this Order only after the following steps have occurred: (1) plaintiffs have given written notice to defendants of the alleged non-compliance, including the facts alleged and the provision of the Order involved; (2) defendants have been provided with 30 days to review and respond to plaintiffs' notice, and to inform plaintiffs of any proposed plan of correction; (3) plaintiffs and defendants (or their respective counsel) have met personally at least twice to discuss and seek to resolve any remaining dispute under the notice. The court shall have jurisdiction to enforce the provisions of this Order pursuant to this paragraph, which shall be the exclusive means of enforcing this Order.

Ricci, 823 F. Supp. at 988.

[6] Patrick, 544 F.3d at 14–15 (explaining the Disengagement Order's requirements of compliance with state regulations and restrictions for amendments to the Commonwealth's ISP regulations).

[7] Mem. Supp. Mot. SEIU Local 509 Intervene, 3 [#284]; id. at Ex. A, 1 (attaching Complaint). The DDS was formerly known as the Department of Mental Retardation.

HSCs serve the adult clients of the DDS.[8] The HSCs generally develop, coordinate, and monitor Plaintiff class members' ISPs and manage the implementation of necessary services.[9] The case load of HSCs serving adult clients has grown from forty in 1990 to approximately fifty-five as of last year.[10]

The Union, in its Motion, alleges that Defendant Commonwealth has engaged in a systematic violation of the 1993 Disengagement Order by proposing budget cuts that will result in layoffs of sixty-three to one-hundred and twenty-four DDS HSCs.[11] The general caseload of a DDS HSC would increase.[12] This reduction in the number of HSCs to a level that the DDS finds inadequate, the Union alleges, would compromise the entire ISP process such that there will be a "systemic failure" to provide services to class members within the meaning of paragraphs 7(a) and (c) of the Disengagement Order.[13] Specifically, the Union claims, without explanation, that the

---

[8] Mem. Supp. Mot. SEIU Local 509 Intervene, 3 [#284].

[9] Mem. Supp. Mot. SEIU Local 509 Intervene, 3 [#284].

[10] Mem. Supp. Mot. SEIU Local 509 Intervene, 4 [#284]. According to the DDS, the size of the HSCs' caseload has a direct impact on their ability to efficiently perform "core functions." Mem. Supp. Mot. SEIU Local 509 Intervene, 4 [#284].

[11] Mem. Supp. Mot. SEIU Local 509 Intervene, 2 [#284].

[12] Mem. Supp. Mot. SEIU Local 509 Intervene, 2 [#284].

[13] Mem. Supp. Mot. SEIU Local 509 Intervene, Ex. A, 4 [#284]. The evidence for this claim is based on current staffing levels and the prior year's budget request. This assertion seems incorrect. The DDS has proffered that even under the reduced level of HSCs, the Ricci class members would receive the same level of "Service Coordination." State Defs.' Opp'n Service Emps. Int'l Union's Mot. Intervene, Ex. A, 4 [#289] (attaching Affidavit of Lawrence Tummino, Deputy Commissioner for the DDS).

4

ISP process is not in compliance with paragraphs 2(b)–(c) of the Disengagement Order.[14]

The Union asks for the Ricci cases to be re-opened so as to compel compliance with the staffing requirements of the ISP process in paragraphs 2(a)–(c) of the Disengagement Order and to enjoin Defendant Commonwealth from terminating HSCs.[15]

III. Discussion

To support its request for permissive intervention, the Union argues, pursuant to Federal Rule of Civil Procedure 24(b), (1) that its Motion is timely, (2) that its claim shares common issues of law and fact with the original Plaintiffs, and (3) that allowing its intervention would not unduly delay or prejudice any of the adjudicatory rights of the original Parties.[16] This court, however, will not reach the merits of the Union's request for permissive intervention because the Union lacks standing and this court lacks jurisdiction.

    A.    Third-Party Standing[17]

---

[14] Mem. Supp. Mot. SEIU Local 509 Intervene, 3 [#284]. Paragraph 2(c), the only relevant provision here, provides that "[s]ufficient adequately trained and experienced personnel, as reasonably determined by the Department of Mental Retardation based on professional judgment, shall be available to substantially meet the needs set forth in each class member's ISP." Ricci, 823 F. Supp. at 987.

[15] Two Plaintiff-Intervenors and the State Defendants oppose the Union's Motion. See Opp'n Pl.–Intervenor Disability Law Center, Inc. Local 509, Service Emps. Int'l Union's Mot. Permissive Intervention [#285]; Pl. Arc Massachusetts' Opp'n Mot. SEIU Local 509 Intervene [#287]; State Defs.' Opp'n Service Emps. Int'l Union's Mot. Intervene [#289]. One Party supports the Motion. See Wrentham Ass'n's Resp. Mot. SEIU Local 509 Intervene [#288].

[16] Mem. Supp. Mot. SEIU Local 509 Intervene, 6–7 [#284].

[17] Unlike the following discussion of standing, the issue of third-party standing does not implicate subject-matter jurisdiction. See, e.g., Craig v. Boren, 429 U.S. 190, 193 (1976) ("[L]imitations on a litigant's assertion of jus tertii are not constitutionally mandated . . . ."); Latin Am. Music Co. v. Archdiocese, 499 F.3d 32, 46 (1st Cir. 2007) ("A question of who may assert an otherwise justiciable claim is a question of prudential standing that does not implicate the

5

The Union is quite possibly asserting rights on behalf of itself as well as the Ricci class members.[18] The Parties, however, do not address the Union's third-party, or jus tertii, standing.[19] This court, raising the issue sua sponte,[20] finds that the Union is barred from asserting claims on behalf of the Ricci Plaintiffs or class members.

A litigant who asserts the rights of another must satisfy the Article III requirements of

---

court's jurisdiction." (citation omitted)). Nevertheless, third-party standing is the sort of "threshold question" that this court may resolve before addressing jurisdiction. Tenet v. Doe, 544 U.S. 1, 6 n.4 (2005) (citations omitted); see also Kowalski v. Tesmer, 543 U.S. 125, 129 (2004) (assuming Article III standing in order to "address the alternative threshold question" of third-party standing). But see General Inv. Co. v. N.Y. C.R. Co., 271 U.S. 228, 230–31 (1926) ("There may be jurisdiction and yet an absence of merits as where the plaintiff seeks preventive relief against a threatened violation of law of which he has no right to complain, either because it will not injure him or because the right to invoke such relief is lodged exclusively in an agency charged with the duty of representing the public in the matter. Whether a plaintiff seeking such relief has the requisite standing is a question going to the merits, and its determination is an exercise of jurisdiction." (citations omitted)).

[18] See Mem. Supp. Mot. SEIU Local 509 Intervene, Ex. A, 4–5 [#284] (requesting compliance with the Disengagement Order and preventing Defendant from terminating HSCs).

[19] This court does not decide whether the Union has associational standing. See United States v. AVX Corp., 962 F.2d 108, 116 (1st Cir. 1992) (explaining the three requirements for an association to sue on behalf of its members).

[20] Sua sponte consideration of third-party standing is in accord with Supreme Court decisions and the practices of other courts. See, e.g., Craig, 429 U.S. at 193–94 (1976) (holding that a party's failure to invoke the third-party standing doctrine provides a ground for but does not require a federal court to refuse consideration of the doctrine); Bellehumeur v. Bonnett, 127 Fed. Appx. 480, 483 (Fed. Cir. 2005) ("It is well-established that any party, and even the court sua sponte, can raise the issue of standing for the first time at any stage of the litigation . . . ." (quoting Pandrol USA, LP v. Airboss Ry. Prods., Inc., 320 F.3d 1354, 1368 (Fed. Cir. 2003); citing Warth v. Seldin, 422 U.S. 490, 517–18 (1975)); Am. Immigration Lawyers Ass'n v. Reno, 199 F.3d 1352, 1358 (D.C. Cir. 2000) (considering third-party standing sua sponte); Thompson v. Cnty. of Franklin, 15 F.3d 245, 249 (2d Cir. 1994) (examining a standing claim sua sponte); cf. Asociacion de Subscipcion Conjunta del Seguro de Responsabilidad Obligatorio v. Flores Galarza, 484 F.3d 1, 13 (1st Cir. 2007) (raising the issue of the prudential ripeness requirement sua sponte).

injury in fact, causation, and redressability.[21]  Additionally, the First Circuit instructs that a litigant asserting third-party standing must show the following:

> [1] "that the litigant personally has suffered an injury in fact that gives rise to a sufficiently concrete interest in the adjudication of the third party's rights"; [2] "that the litigant has a close relationship to the third party"; and [3], "that some hindrance exists that prevents the third party from protecting its own interests."[22]

The Union has not satisfied the requirements of third-party standing.  Assuming without deciding that there exist both an injury and sufficient relationship, the Union falters on the third requirement.  The Union does not identify any hindrance that prevents the Ricci Plaintiffs or class members from protecting their own interests.[23]  In fact, the interests of the Ricci class members are protected by various Plaintiffs involved in the Ricci case, including The Arc of Massachusetts ("The Arc").[24]  For years The Arc has been actively involved in opposing budget and service reductions that would restrict needed services for the Ricci class members.[25]  Most importantly, The Arc is prepared to seek judicial intervention if the rights of the Ricci class members are

---

[21] Eulitt v. Me. Dep't of Educ., 386 F.3d 344, 351 (1st Cir. 2004) (citing Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 472 (1982)).

[22] Council of Ins. Agents & Brokers v. Jaurbe-Jiminez, 443 F.3d 103, 108 (1st Cir. 2006) (quoting Eulitt, 386 F.3d at 351).

[23] Cf. Eulitt, 386 F.3d at 351–52 ("The [Union has] advanced no credible suggestion either that [Plaintiffs are] generically unable to assert [their] rights or that the circumstances of this case create some idiosyncratic barrier to such a suit.").

[24] The Arc was formerly known as the Massachusetts Association for Retarded Citizens and is a class representative in the Ricci cases.  Pl. Arc Mass. Opp'n Mot. SEIU Local 509 Intervene, Ex. A, 1 [#287] (attaching Affidavit of Leo Sarkissian, Executive Director of The Arc).

[25] Pl. Arc Mass. Opp'n Mot. SEIU Local 509 Intervene, 2 n.2, 10 [#287].  The Arc, through its various discussions with officials and general legislative advocacy, has spent "hundreds if not thousands of hours arguing against reductions to class members" this year alone.  Id. at 10.  The Arc's efforts resulted in proposed cuts to DDS's budget being rescinded.  Id. at Ex. A, 3.

violated or if The Arc can demonstrate a violation of the Disengagement Order.[26] The Union accordingly cannot assert any claims on behalf of the Ricci Plaintiffs or class members.

### B. Standing Under the Disengagement Order

The First Circuit has instructed that "an intervenor, whether permissive or as of right, must have Article III standing in order to continue litigating if the original parties do not do so."[27] In the context of a consent decree, however, a litigant must provide another sort of standing. A "well-settled line of authority from [the Supreme] Court establishes that a consent decree is not enforceable directly or in collateral proceedings by those who are not parties to it even though they were intended to be benefited by it."[28]

The Union lacks standing to bring its claim.[29] The claim that the Union wishes to assert is enforcement of the Disengagement Order, which is a consent decree.[30] The plain language[31] of

---

[26] Pl. Arc Mass. Opp'n Mot. SEIU Local 509 Intervene, Ex. A, 3–4 [#287] ("Such a violation would likely involve service reductions in residential, day, and other support services, not simply the layoff of service coordinators.").

[27] Mangual v. Rotger-Sabat, 317 F.3d 45, 61 (1st Cir. 2003) (quoting Arizonans for Official English v. Arizona, 520 U.S. 43, 65 (1997); Diamond v. Charles, 476 U.S. 54, 68 (1986)).

[28] Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 750 (1975) (citations omitted).

[29] The Parties do not address how to categorize the Union's lack of standing under the Disengagement Order. The lack of standing here is neither exactly statutory standing (like Blue Chip) nor Article III standing.

[30] See supra note 3 and accompanying text.

[31] United States v. Atl. Ref. Co., 360 U.S. 19, 22–24 (1959) (rejecting a strained construction and interpreting a consent decree pursuant to its "normal meaning" that had been adhered to over many years by the parties). Additionally, this court's interpretation of the Disengagement Order is in accord with First Circuit instructions regarding the interpretation of consent decrees. See infra note 46 and accompanying text. This court construes the unambiguous language according to its plain meaning, Servicios Comerciales Andinos, S.A. v. GE

8

the Disengagement Order reveals that the Union is not an intended beneficiary of the Disengagement Order.[32] Specifically, the purpose of the Disengagement Order is to provide services to class members[33] and to secure the "rights of the plaintiff classes."[34] Only Plaintiffs may seek enforcement of the Order.[35] None of the language of the Disengagement Order indicates that the Union is an intended beneficiary. The Parties did not intend that the Union (or another third party) would receive a benefit that might be enforced in court.[36] Pursuant to the rule from Blue Chip, the Union, as a non-party to the Ricci cases, lacks standing to enforce the Disengagement Order.

---

Del Caribe, 145 F.3d 463, 469 (1st Cir. 1998) (quoting United States Liab. Ins. Co. v. Selman, 70 F.3d 684, 687 (1st Cir. 1995)), and the provisions of the Order are interpreted consistently with the entire Order, Int'l Union v. Yard-Man, 716 F.2d 1476, 1479–80 (1st Cir. 1983) (citations omitted).

[32] Even if the Union were an intended beneficiary of the Disengagement Order, which it is not, the plain language of Blue Chip indicates that intended third-party beneficiaries of a consent decree lack standing to enforce its terms. See Aiken v. City of Memphis, 37 F.3d 1155, 1168 (6th Cir. 1994) (intended beneficiaries lack standing to enforce consent decrees). But see Hook v. Ariz. Dep't of Corr., 972 F.2d 1012, 1015 (9th Cir. 1992) (concluding that Blue Chip's holding "does not apply to intended third party beneficiaries").

[33] Ricci, 823 F. Supp. at 987 (containing paragraph 2 of the Disengagement Order).

[34] Id. (containing paragraph 1 of the Disengagement Order).

[35] Id. (containing paragraph 7 of the Disengagement Order).

[36] See SEC v. Prudential Sec., 136 F.3d 153, 159 (D.C. Cir. 1998) (quoting Corrugated Paper Prods. v. Longview Fibre Co., 868 F.32d 908, 911 (7th Cir. 1989)). There is, moreover, an indication of neither an agreement among the Parties about the Union's benefit nor any circumstances that Defendants intended to give the Union the benefit of Defendants' promised performance. See Amerifirst Bank v. TJX Cos. Inc. (In re TJX Cos. Retail Sec. Breach Litig.), 564 F.3d 489, 499 (1st Cir. 2009) ("Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and . . . the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." (quoting Restatement (Second) of Contracts § 302 (1981))).

C.     Jurisdiction

A federal court should consider whether it has subject-matter jurisdiction before discussing the merits of a motion or case.[37] A party seeking permissive intervention must set forth a claim or defense that falls within the federal court's subject matter jurisdiction.[38] The party invoking the jurisdiction of a federal court has the burden of proving that jurisdiction exists.[39]

The Union does not provide the grounds upon which this court may assert jurisdiction

---

[37] See, e.g., United Seniors Ass'n v. Philip Morris USA, 500 F.3d 19, 23 (1st Cir. 2007) ("A federal court is required to determine whether Article III jurisdiction exists prior to proceeding to the merits of the case." (citations omitted)); Parella v. Ret. Bd. of the R.I. Emps.' Ret. Sys., 173 F.3d 46, 54 (1st Cir. 1999) (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83 (1998)) (explaining how questions of Article III jurisdiction, but not necessarily those of statutory jurisdiction, should be decided before the merits). The First Circuit has referred to this court's "jurisdiction" and "authority" in the Ricci cases without specifying what type of jurisdiction was at issue. Patrick, 544 F.3d at 12, 17. As a starting point, this court assumes that the First Circuit used the terms "jurisdiction" and "authority" to refer to this court's subject-matter jurisdiction (or the lack thereof). See Reed Elsevier, Inc. v. Muchnick, 130 S. Ct. 1237, 1244 (2010) (explaining that "jurisdiction" refers to a court's "adjudicatory authority"); Steel Co., 523 U.S. at 89 (explaining that "subject-matter jurisdiction" refers to "the courts' statutory or constitutional power to adjudicate the case"); Omnipoint Holdings v. City of Cranston, 586 F.3d 38, 45 n.4 (1st Cir. 2009) ("'Clarity would be facilitated if courts and litigants used the label 'jurisdictional' not for claim-processing rules, but only for prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory authority.'" (quoting Kontrick v. Ryan, 540 U.S. 443, 454–55 (2004))). That being said, exactly what sort of subject-matter jurisdiction is at issue is neither summarily discernible nor dispositive here. The subject-matter jurisdiction could be Article III jurisdiction, statutory jurisdiction, or perhaps another type of jurisdiction, such as the "kind of jurisdictional issue that Steel Co. directs must be resolved before addressing the merits of a claim." Tenet v. Doe, 544 U.S. 1, 6 n.4 (2005) (explaining that a court may also dispose of a case on a different threshold ground). That is, whatever the answer, this court should (or at least may) consider this jurisdictional issue before considering the Union's Motion on its merits.

[38] Int'l Paper v. Town of Jay, Me., 887 F.2d 338, 346 (1st Cir. 1989) ("[P]ermissive intervention ordinarily must be supported by independent jurisdictional grounds" (quotations and citations omitted)).

[39] Johansen v. United States, 506 F.3d 65, 68 (1st Cir. 2007) (citations and quotations omitted) (reviewing a district court's conclusion on a motion to dismiss for lack of jurisdiction).

10

over its Motion. This court, therefore, will look to the jurisdictional bases claimed in the Union's proposed complaint.[40] The Union's proposed complaint asserts that this court retains jurisdiction pursuant to the 1993 Disengagement Order and the First Circuit's Ricci v. Patrick[41] decision.[42]

If this court does not have jurisdiction pursuant to the 1993 Disengagement Order, then it lacks the authority to adjudicate the case.[43] The Ricci cases can be re-opened, and this court can reassert jurisdiction, only if explicit conditions of the Disengagement Order are met.[44] Under paragraph 7 of the Disengagement Order, only "the [Ricci] plaintiffs may seek enforcement of the [Disengagement] Order."[45] As is clear from the Order's express terms,[46] Plaintiffs in the Ricci

---

[40] See Mem. Supp. Mot. SEIU Local 509 Intervene, Ex. A, [#284] (attaching proposed complaint); Int'l Paper v. Town of Jay, Me., 124 F.R.D. 506, 510 (D. Me. 1989) (looking to jurisdictional bases claimed in the amended complaint where a motion for permissive intervention did not proffer any jurisdictional bases); cf. Johansen, 506 F.3d at 68 ("[I]t is black-letter law that jurisdiction must be apparent from the face of the plaintiff's pleading." (quoting PCS 2000 LP v. Romulus Telecomms., 148 F.3d 32, 35 (1st Cir. 1998))).

[41] 544 F.3d at 8.

[42] See Mem. Supp. Mot. SEIU Local 509 Intervene, Ex. A, 2 [#284]. The Union (correctly) does not argue that there is diversity jurisdiction. See 28 U.S.C. § 1332. Moreover, there is no federal question jurisdiction because the Union's proposed complaint makes no mention of any federal law or constitutional provision that Defendants allegedly violated. See 28 U.S.C. § 1331; cf. R. I. Fed'n of Teachers v. Norberg, 630 F.2d 850, 854–55 (1st Cir. 1980) ("[I]ntervention under Rule 24 is conditioned by the Rule 24(c) requirement that the intervenor state a well-pleaded claim or defense to the action.").

[43] See Patrick, 544 F.3d at 12, 17.

[44] Id. at 13. There may be, in some instances, other grounds upon which this court may assert jurisdiction. Id. at 20–22. The Union does not address any of those grounds and this court similarly does not discuss those apparently inapplicable arguments.

[45] Ricci, 823 F. Supp at 988.

[46] This court's reading of the Disengagement Order, as a consent decree, is guided by principles of contract interpretation. See Patrick, 544 F.3d at 17 ("The terms of the consent decree embodied in the Disengagement Order [are] like any contract construction issue . . . ."); cf.

11

cases (as they stood in 1993) may seek to re-open the case, but third parties may not do so.[47] The Union is a third party. It is not and has never been (1) a Plaintiff or (2) a member or representative of the Ricci class. Because the express terms of the Disengagement Order preclude the Union, as a non-party, from seeking to enforce the Order's terms, this court cannot consider the Union's claim. Given this court's lack of subject-matter jurisdiction, it is obliged to abstain from any consideration of the merits.[48]

---

Navarro-Ayala v. Hernandez-Colon, 951 F.2d 1325, 1338–40 (1st Cir. 1991) (using ordinary principles of contract interpretation for a consent decree where the issue involved determining the scope of the parties' original bargain).

[47] Because the Disengagement Order mentions only that Plaintiffs may bring such an action, it is reasonable to read the Disengagement Order as not allowing anyone else to bring such an action. See, e.g., Cicirello v. N.Y. Tel. Co., 123 F.R.D. 523, 526 (E.D.P.A. 1989) (finding that because a consent decree vested the right to enforce the decree in one party, other, non-enumerated parties lacked standing to bring enforcement actions); cf. Institut Pasteur v. Cambridge Biotech Corp., 104 F.3d 489, 495 (1st Cir. 1997) ("The doctrine of expressio unius est exclusio alterius instructs that when certain matters are mentioned in a contract, other similar matters not mentioned were intended to be excluded." (citation omitted)). The Union, moreover, does not argue for a contrary interpretation of paragraph 7.

[48] See, e.g., Godin v. Schencks, 629 F.3d 79, 83 (1st Cir. 2010) ("'[A] court has an obligation to inquire sua sponte into its subject matter jurisdiction, and to proceed no further if such jurisdiction is wanting.'" (quoting In re Recticel Foam Corp., 859 F.2d 1000, 1002 (1st Cir. 1988))); see also supra note 37. But see Iglesias v. Mutual Life Ins. Co., 156 F.3d 237, 243 (1st Cir. 1998) (providing a non-binding discussion on the merits despite finding an apparent lack of subject-matter jurisdiction), abrogated on other grounds by Global Naps, Inc. v. Verizon New Eng. Inc., 603 F.3d 71, 86 n.18 (1st Cir. 2010). Two concluding notes are in order. First, this court's two other holdings regarding standing, see supra Sections III.A and III.B, are not considerations of the merits of the Union's Motion but are threshold questions. See supra note 17 and accompanying text. This court's decision, therefore, is faithful to Steel Co.'s ban on the practice of hypothetical jurisdiction. See supra note 37 and accompanying text. Second, the two other holdings are independent of this court's conclusion that it lacks jurisdiction. Admittedly,

IV.     Conclusion

For the foregoing reasons, the Union's Motion for Permissive Intervention Pursuant to Fed. R. Civ. P. 24(b) [#283] is DENIED.

AN ORDER HAS ISSUED.

                                              /s/ Joseph L. Tauro
                                              United States District Judge

---

two of the holdings—this court's lack of jurisdiction and the Union's absence of standing under the Disengagement Order—are rooted in the same operative document: the Disengagement Order. But the two holdings are independent from one another because they are animated by separate legal principles. The Union's absence of standing under the Disengagement Order is a direct result of the rule in Blue Chip, 421 U.S. at 750, whereas this court's lack of jurisdiction is based upon the First Circuit's Ricci v. Patrick decision, 544 F.3d at 8, 11.